UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

KENNETH M. KRYS and CHRISTOPHER
STRIDE, as JOINT OFFICIAL LIQUIDATORS
of SPHINX LTD., SPHINX STRATEGY FUND
LTD.;
SPHINX PLUS SPC LTD., SPHINX
DISTRESSED LTD., SPHINX MERGER
ARBITRAGE LTD.; SPHINX SPECIAL
SITUATIONS LTD., SPHINX MACRO LTD.;
SPHINX LONG/SHORT EQUITY LTD.;
SPHINX MANAGED FUTURES LTD.; SPHINX
EQUITY MARKET NEUTRAL LTD.; SPHINX
CONVERTIBLE ARBITRAGE LTD.; SPHINX
FIXED INCOME ARBITRAGE LTD.; SPHINX
DISTRESSED FUND SPC; SPHINX MERGER
ARBITRAGE FUND SPC; SPHINX SPECIAL
SITUATIONS FUND SPC; SPHINX MACRO
FUND SPC; SPHINX LONG/SHORT EQUITY
FUND SPC; SPHINX MANAGED FUTURES
FUND SPC; SPHINX EQUITY MARKET
NEUTRAL FUND SPC; SPHINX
CONVERTIBLE ARBITRAGE FUND SPC;
SPHINX FIXED INCOME ARBITRAGE FUND
SPC; PLUSFUNDS MANAGED ACCESS FUND
SPC LTD.; KENNETH M. KRYS and
CHRISTOPHER STRIDE as assignees of claims
assigned by MIAMI CHILDREN'S HOSPITAL
FOUNDATION, OFI, GREEN & SMITH
INVESTMENT MANAGEMENT LLC, THALES
FUND MANAGEMENT LLC, KELLNER
DILEO & CO., LLC, MARTINGALE ASSET
MANAGEMENT LP, LONGACRE FUND
MANAGEMENT LLC, ARNHOLD & S.
BLEICHROEDER ADVISERS LLC, PICTET &
CIE, RGA AMERICA REINSURANCE
COMPANY, DEUTSCHE BANK (SUISSE) SA,
ARAB MONETARY FUND, HANSARD
INTERNATIONAL LTD., CONCORDIA
ADVISORS LLC, GABELLI SECURITIES, INC.,
CITCO GLOBAL CUSTODY; and JAMES
P. SINCLAIR as Trustee of the SPHINX TRUST,

       Plaintiffs,



08 CV 3086

08 Civ. _____

NOTICE OF REMOVAL OF
ACTION PURSUANT TO 28
U.S.C. § 1452



NEW YORK
COUNTY CLERK'S OFFICE

MAR 26 2008

NOT COMPARED
WITH COPY FILE

-against-                                           :

CHRISTOPHER SUGRUE; MARK                            :
KAVANAGH; BRIAN OWENS;                              :
PRICEWATERHOUSECOOPERS L.L.P.; MARI                 :
FERRIS; PRICEWATERHOUSECOOPERS                      :
CAYMAN ISLANDS; GIBSON, DUNN &                      :
CRUTCHER LLP; REFCO ALTERNATIVE                     :
INVESTMENTS LLC; GRANT THORNTON                     :
LLP; MARK RAMLER; ERNST & YOUNG U.S.                :
LLP; MAYER BROWN LLP f/k/a MAYER                    :
BROWN ROWE & MAW LLP; JOSEPH                        :
COLLINS; EDWARD S. BEST; PAUL KOURY;                :
PHILLIP R. BENNETT; ROBERT C. TROSTEN;              :
TONE GRANT; SANTO MAGGIO; THOMAS                    :
HACKL; DENNIS KLEJNA; BAWAG P.S.K.                  :
BANK FUR ARBEIT UND WIRTSCHAFT UND                  :
OSTERREICHISCHE POSTPARKASSE                        :
AKTIENGESELLSEHAFT; JP MORGAN                       :
CHASE & CO.;                                        :
CREDIT SUISSE SECURITIES                            :
(USA) LLC f/k/a CREDIT SUISSE FIRST                 :
BOSTON LLC; BANC OF AMERICA                         :
SECURITIES LLC; THOMAS H. LEE                       :
PARTNERS, L.P.; THOMAS H. LEE                       :
ADVISORS, LLC; THL MANAGERS V, LLC;                 :
THL EQUITY ADVISORS V, L.P.; THOMAS H.              :
LEE EQUITY FUND V, L.P.; THOMAS H. LEE              :
PARALLEL FUND V, L.P.; THOMAS H. LEE                :
EQUITY (CAYMAN) FUND V, L.P.; THOMAS                :
H. LEE INVESTORS LIMITED PARTNERSHIP;               :
1997 THOMAS H. LEE NOMINEE TRUST;                   :
THOMAS H. LEE; DAVID V. HARKINS;                    :
SCOTT L. JAECKEL; SCOTT A. SCHOEN;                  :
WILLIAM T. PIGOTT; LIBERTY CORNER                   :
CAPITAL STRATEGIES, LLC; EMF                        :
FINANCIAL PRODUCTS LLC; EMF CORE                    :
FUND LTD.; DELTA FLYER FUND LLC; ERIC               :
M. FLANAGAN; INGRAM MICRO, INC.; CIM                :
VENTURES, INC.; BECKENHAM TRADING                   :
CO., INC.; ANDREW KRIEGER; COAST                    :
ASSET MANAGEMENT, LLC, f/k/a COAST                  :
ASSET MANAGEMENT LP; CS LAND                        :
MANAGEMENT LLC; CHRISTOPHER                         :
PETTIT; and REFCO GROUP HOLDINGS,                   :
INC.; and REFCO ASSOCIATES, INC.,                   :

|                                              |   |
|----------------------------------------------|---|
|                              Defendants      | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**TO THE CLERK OF THE ABOVE-ENTITLED COURT:**

**PLEASE TAKE NOTICE** that, on this date, JP Morgan Chase & Co.; Credit Suisse

Securities (USA) LLC (formerly Credit Suisse First Boston LLC); Banc of America Securities

LLC; Grant Thornton LLP ("Grant Thornton"); Mark Ramler; Mayer Brown LLP; Mayer Brown

International LLP; Thomas H. Lee Partners, L.P.; Thomas H. Lee Advisors, LLC; THL

Managers V, LLC; THL Equity Advisors V, L.P.; Thomas H. Lee Equity Fund V, L.P.; Thomas

H. Lee Parallel Fund V, L.P.; Thomas H. Lee (Cayman) Fund V, L.P.; Thomas H. Lee Investors

Limited Partnership; 1997 Thomas H. Lee Nominee Trust; Thomas H. Lee; David V. Harkins;

Scott L. Jaeckel; Scott A. Schoen; PricewaterhouseCoopers LLP; and Mari Ferris; (collectively,

the "Removing Defendants"), by their undersigned counsel, file this Notice of Removal pursuant

to 28 U.S.C. § 1452 removing this entire action from the Supreme Court of the State of New

York, County of New York ("New York State Court"), to the United States District Court for the

Southern District of New York ("Court" or "New York District Court"). This Court has original

jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b).

In support of this Notice of Removal, the Removing Defendants state as follows:

**THE COMPLAINT**

1.      On or about March 5, 2008, Plaintiffs commenced a civil action by filing a

summons and complaint in the New York State Court, captioned *Krys, et al. v. Sugrue, et al.*,

Index No. 08600653 (the "Complaint"). Plaintiffs seek more than $263 million in alleged

compensatory and punitive damages, pre- and post-judgment interest, attorneys' fees, and costs.

The Complaint, consisting of 276 pages, asserts 27 causes of action against one or more of the

3

Removing Defendants, including multiple claims for (a) breach of fiduciary duty; (b) aiding and

abetting breach of fiduciary duty; (c) fraud; (d) aiding and abetting conversion; (e)

officer/director liability; (f) accountant malpractice; (g) negligent misrepresentation; (h)

conspiracy; (i) conversion; (j) aiding and abetting fraud; and (k) interference with

contract/prospective contract.  A copy of the Summons and Complaint is attached to the

Declaration of Ross E. Firsenbaum, dated March 26, 2008, filed herewith, as Exhibit A.

Pursuant to 28 U.S.C. § 1446(a), the Removing Defendants represent that apart from the

Summons and Complaint attached hereto as Exhibit A, the Removing Defendants have received

no other process, pleadings, motions, or orders in this action.

      2.      According to the Complaint, the Plaintiffs have brought the claims asserted

therein in three different capacities: (a) as the Joint Official Liquidators of each of the SPhinX

Funds appointed by the Grand Court of the Cayman Islands ("the JOLs") and recognized in a

pending Chapter 15 case under the U.S. Bankruptcy Code, Case No. 06-11760 (S.D.N.Y.)

(RDD) ("SPhinX Chapter 15 Case"); (b) as purported assignees of claims assigned by various

parties; and (c) as trustee of the SPhinX Funds Trust that was created pursuant to the confirmed

Chapter 11 Plan in the bankruptcy case of PlusFunds Group, Inc. ("PlusFunds"), Case No. 06-

10402 (S.D.N.Y.) (JMP) ("PlusFunds Chapter 11 Case").  The Complaint mirrors, in substantial

part, complaints filed by the Refco Litigation Trust, created under the chapter 11 plan for Refco,

Inc. and its affiliates ("Refco Debtors"), and by other parties, whose actions are also pending in

this Court as part of the Refco Multi-District Litigation captioned as *In re: Refco Securities

Litigation*, No. 07 MDL 1902 (Dec. 28, 2007) ("Refco MDL").

      3.      On July 31, 2006, the Plaintiffs, in their capacity as JOLs of the SPhinX Funds,

filed a Petition for Recognition of a Foreign Proceeding under chapter 15 of the Bankruptcy

Code in the United States Bankruptcy Court for the Southern District of New York (the "New York Bankruptcy Court"), commencing the SPhinX Chapter 15 Case. That bankruptcy proceeding remains active and pending before Judge Robert Drain.

4.      On March 6, 2006, PlusFunds filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, also in the New York Bankruptcy Court, commencing the PlusFunds Chapter 11 Case. On August 7, 2007, Judge James Peck, who is presiding over the PlusFunds Chapter 11 Case, entered an order confirming PlusFunds' Fifth Amended Plan of Liquidation ("PlusFunds Plan"). Pursuant to the PlusFunds Plan and confirmation order, third-party litigation claims belonging to the PlusFunds estate were purportedly assigned to the SPhinX Trust,[1] whose beneficiaries were (and are), by far, the largest creditors of PlusFunds—the SPhinX Funds. The PlusFunds Plan expressly denominated the trustee for the SPhinX Trust, James P. Sinclair ("Trustee"), the "representative of the [PlusFunds bankruptcy estate] pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code." PlusFunds Plan, Art. VI, § F-1. Mr. Sinclair now purports to assert such estate causes of action, which purportedly were transferred to the SPhinX Trust under the PlusFunds Plan, for the benefit of PlusFunds' principal creditors, the SPhinX Funds. Compl. at ¶ 92. The PlusFunds Chapter 11 Case remains active and pending.

5.      Following confirmation of the PlusFunds Plan, but before filing this Complaint, the Trustee invoked federal bankruptcy jurisdiction to seek (and, in part, obtain) orders of the New York Bankruptcy Court authorizing extensive pre-litigation discovery, under Bankruptcy Rule 2004, so that it could investigate the claims it has now brought. *See, e.g.,* Mot. of Trustee for the SPhinX Funds Trust For Rule 2004 Examination, *In re PlusFunds Group, Inc., et al.,*

---

[1]       The Removing Defendants preserve any and all of their arguments and defenses, including but not limited to those defenses concerning the validity and effectiveness of the purported assignment of third-party causes of action from PlusFunds to the SPhinX Trust.

Case No. 06-10402 (S.D.N.Y. Oct. 3, 2007) (JMP), at ¶ 4.  The JOLs sought similar pre-litigation discovery in the SPhinX Case, again invoking federal bankruptcy jurisdiction.  *See* Mot. of the Foreign Representatives for an Order Compelling the Production of Documents and the Examination of Witnesses Pursuant to § 1521 of the Bankruptcy Code, *In re SPhinX, Ltd., et al.*, Case No. 06-11760 (S.D.N.Y.) (RDD), filed on Jan. 11, 2008, at ¶ 1.

6.      On October 17, 2005, the Refco Debtors filed Chapter 11 bankruptcy petitions in the New York Bankruptcy Court, Case No. 05-60006 (S.D.N.Y.) (RDD) ("Refco Chapter 11 Cases").  The Refco Debtors obtained confirmation of a Chapter 11 plan of liquidation ("Refco Plan") that created a series of trusts to litigate claims raised and associated with the Refco Chapter 11 Cases, provided for the appointment of various trustees, and specified that the debtors' estates would continue after plan confirmation.  The Refco Plan created a Private Actions Trust to pursue causes of action held by certain creditors and equity holders of the Refco Debtors.  It also created a Litigation Trust to pursue causes of action belonging to the Refco Debtors and their bankruptcy estates, with the Refco Litigation Trustee expressly deemed the representative of the Refco Debtors' bankruptcy estates.  Both of these trusts have brought causes of action—which are currently pending in this Court—against many of the same defendants in the instant action, and based on many of the same alleged acts or omissions as alleged here.  The Refco Chapter 11 Cases remain pending and active, before Judge Drain.

## GROUNDS FOR REMOVAL PURSUANT TO 28 U.S.C. 1452(A)

7.      Under 28 U.S.C. § 1452(a), "[a] party may remove any claim or cause of action in a civil action . . . to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under § 1334 of this title."  Under

28 U.S.C. § 1334(b), this Court has jurisdiction to hear all civil proceedings that are "related to cases under title 11," which is the Bankruptcy Code.

8.      This action is independently "related to" each of the PlusFunds, SPhinX, and Refco bankruptcy cases because (i) it is at least conceivable that the action will impact the bankruptcy estate and/or otherwise affect the debtor(s) and the bankruptcy proceedings, and/or (ii) the action is part of the implementation of a confirmed plan and has a close nexus thereto. *See, e.g., In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 144 (2d Cir. 1992) ("[t]he test for determining whether litigation has a significant connection with a pending bankruptcy proceeding is whether its outcome might have any 'conceivable effect' on the bankruptcy estate"); *In re WorldCom, Inc. Sec. Litig.*, 293 B.R. 308, 318 (S.D.N.Y. 2003) (finding "related to" bankruptcy jurisdiction over litigation to which the debtor was not a party where defendant's contingent, unliquidated claims against the debtor for either indemnification or contribution had a reasonable legal basis), *aff'd, California Pub. Empl. Ret. Sys. v. Worldcom, Inc.*, 368 F.3d 86 (2d Cir. 2004); *Bondi v. Grant Thornton Int'l*, 322 B.R. 44, 48 (S.D.N.Y. 2005) (finding "related to" jurisdiction over state law action that could have been brought in proceeding under former Section 304, the predecessor to Chapter 15, of the Bankruptcy Code); *Rahl v. Bande*, 316 B.R. 127, 133 (S.D.N.Y. 2004) ("A proceeding may have a 'significant connection' with a Chapter 11 bankruptcy case subsequent to confirmation of a plan when resolution of the dispute requires the interpretation of the plan of reorganization and the implementation of that plan.").

A.      **Related to the PlusFunds Bankruptcy**

9.      The Plaintiffs' claims have a conceivable effect on—and a substantial nexus to—the Plusfunds Chapter 11 Case in multiple ways.  These include the following:

(a).      As noted, the PlusFunds Plan created the SPhinX Trust and provided for the PlusFunds bankruptcy estate to continue post-confirmation.  The PlusFunds Plan designated

the Trustee as a "representative of the [PlusFunds bankruptcy] [e]state" and established the

SPhinX Trust for the primary purpose of liquidating causes of action "for or on behalf of the

JOLs in their capacity as JOLs for the SPhinX Funds." *See* PlusFunds Plan, Art. VI, § F-1 ("The

SPhinX Trustee shall be retained pursuant to the SPhinX Trust Agreement. The Trustee shall be

deemed to have been appointed by the Bankruptcy Court as a representative of the Estate

pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code. The SPhinX Trustee shall perform

the duties specified in the SPhinX Trust Agreement."). The PlusFunds Plan also provides for the

New York Bankruptcy Court (and, thus, this Court as well, since federal bankruptcy jurisdiction

resides in the first instance in the district courts under 28 U.S.C. § 1334) to retain jurisdiction

over all matters arising out of or related to the PlusFunds Chapter 11 Case unless such retention

would somehow be inconsistent with the Bankruptcy Code. *See* PlusFunds Plan, Art. XI

("[T]he Bankruptcy Court shall have jurisdiction of matters arising out of, and related to, the

Chapter 11 Case and the Plan . . . for, among other things, to . . . (V) hear and act on any other

matter not inconsistent with the Bankruptcy Code."). Indeed, as noted, the Trustee invoked that

jurisdiction in seeking pre-litigation discovery, and acknowledged that federal bankruptcy

jurisdiction would continue to exist, notwithstanding confirmation of the SPhinX Plan, over

claims, such as those asserted here, brought by the Trustee. *See* Mot. of Trustee for the SPhinX

Funds Trust For Rule 2004 Examination, *In re PlusFunds Group, Inc., et al.*, Case No. 06-10402

(JMP) (Oct. 3, 2007), at ¶ 4 ("[T]his Court retained jurisdiction over matters arising out of or

relating to the Debtor's Chapter 11 Case and the Plan, including avoidance actions, preference

claims and other cases or suits arising out of the SPhinX Trust.").

    (b).  The outcome of this lawsuit may impact distributions to, and relative

compensation for, creditors of the PlusFunds bankruptcy estate—notably, the Sphinx Funds.

Indeed, a threshold issue that this Court will have to decide is which plaintiff or set of plaintiffs has standing to assert the claims in this action. As noted, the Complaint asserts claims and seeks relief for damages that appear substantially to overlap with the claims and damages asserted in the Refco Litigation Trust case pending in this Court. The PlusFunds Plan specifically retains federal subject matter jurisdiction over disputes about whether the PlusFunds estate "owns" or has standing to assert a particular claim. *See* PlusFunds Plan, Art. XI, § P. (retaining jurisdiction "to determine the Debtor's exclusive ownership of claims and Causes of Action retained or otherwise dealt with under the Plan").

(c).    Certain of the Defendants in this action who are former directors of PlusFunds are scheduled in the PlusFunds Chapter 11 Case as the holders of undisputed, non-contingent and liquidated claims against the PlusFunds bankruptcy estate. The resolution of the claims asserted in this action against those Defendants could affect the allowance, or disallowance, of those Defendants' offsetting claims against the bankruptcy estate. Moreover, the claims asserted in this action against them may cause these individuals to seek to obtain access to directors and officers liability insurance policies or other insurance that may be property of the PlusFunds bankruptcy estate, in order to defend against the SPhinX Trustee's claims in this and potentially other actions. *See Beightol v. UBS Painewebber (In re Global Crossing Ltd. Sec. Litig.)*, 311 B.R. 345, 349 (S.D.N.Y. 2003) ("related to" jurisdiction exists in action for which corporate insiders may seek contribution); *New York City Employees' Retirement Sys. v. Ebbers (In re WorldCom, Inc. Sec. Litig.)*, 293 B.R. 308, 331 (S.D.N.Y. 2003) (same).

10.    Accordingly, this action is "related to" the PlusFunds Case, and removal is proper under 28 U.S.C. § 1452(a).

**B.**    **Related to the SPhinX Bankruptcy**

11.    The Plaintiffs' claims also have a conceivable effect on—and a substantial nexus to—the SPhinX Chapter 15 Case.

12.    Where, as here, a foreign representative brings causes of action in the United States on behalf of a foreign debtor that has been afforded recognition in a Chapter 15 case (or formerly, in a Section 304 proceeding—the predecessor to Chapter 15), "related to" bankruptcy jurisdiction exists over such causes of action. *See Bondi v. Grant Thornton Int'l*, 322 B.R. at 48 ("A state law action designed to recover . .. assets [located in the United States or otherwise subject to the jurisdiction of United States courts]—an action that could have been brought in the Section 304 Proceeding and thus increase the size of the estate involved in the Section 304 case—is [] "related to" the Section 304 Proceeding within the meaning of Section 1334."); *see also Osanitsch v. Marconi PLC (In re Marconi PLC)*, 363 B.R. 361, 365 (S.D.N.Y. 2007) (Lynch, J.) (recognizing that Section 304 confers federal subject matter jurisdiction over actions brought by "authorized representatives of the foreign bankrupt to marshal and protect the estate's assets in the United States for distribution in the bankruptcy proceeding abroad").

13.    Here, the JOLs bring the instant state law action as representatives of the SPhinX Funds—entities that are concurrently involved in ongoing insolvency proceedings in the Cayman Islands and in Chapter 15 proceedings in the New York Bankruptcy Court. Compl., at ¶¶ 29–31. Plaintiffs seek to recover assets located in the United States or otherwise subject to the jurisdiction of United States courts, such that any recovery would increase the size of the SPhinX Funds' estate involved in the foreign bankruptcy proceedings.

14.    Accordingly, this action is "related to" the SPhinX Chapter 15 Case, and removal is proper under 28 U.S.C. § 1452(a).

C.    **Related to the Refco Bankruptcy**

15.    Finally, the Plaintiffs' claims have a conceivable effect on—and a substantial nexus to—the Refco Chapter 11 Cases in several ways.  These include the following:

(a).    The outcome of this lawsuit may impact distributions to, and relative compensation for, creditors of the Refco Debtors' bankruptcy estates.  As noted above, a threshold determination that this Court will have to make is to whom do each of the claims asserted in this action rightfully belong—the Plaintiffs, the Refco Litigation Trust, or some other party.  Whatever the outcome is, the decision itself will either have a positive or negative impact on the Refco Debtors' bankruptcy estates. *See J.P. Morgan Chase Bank v. Altos Hornos de Mex., S.A. de C.V.*, 412 F.3d 418, 426 (2d Cir. 2005) ("Bona fide questions of property ownership . . . are antecedent to the distributive rules of bankruptcy administration because they seek to determine whether an asset is actually part of the debtor's estate."); *see also Bondi v. Grant Thornton Int'l*, 322 B.R. at 47 (citations omitted in original) ("[T]he proceeding need not necessarily be against the debtor or against the debtor's property.  An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, freedom or action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.").  Multiple parties cannot bring claims seeking redress for the same alleged injuries; a determination that the claims asserted in this action do or do not belong to these Plaintiffs will necessarily affect the pending litigation brought by the Refco Litigation Trust.

(b).    Defendant Grant Thornton has outstanding claims against certain of the Refco Debtors, including claims for contribution, which remain pending in the Refco Chapter 11 Cases before Judge Robert Drain.  The question whether these claims will be allowed has been adjourned without date so that the claims can be liquidated in the first instance in various

litigation matters pending against Grant Thornton.  If the Plaintiffs in this case were to succeed on their claims, Grant Thornton would seek contribution for any resulting liability through its pending proofs of claim.  On the other hand, if Grant Thornton were to defeat the Plaintiffs' claims, that too would impact distributions from the Refco Debtors' estates by leaving a greater portion for other creditors.  Thus the outcome in this case will almost certainly affect distributions from the Refco Debtors' estates.  These claims for contribution form an independent basis for "related to" jurisdiction.  *See Hesselman v. Arthur Anderson, LLP (In re Global Crossing Sec. Litig.)*, No. 02 Civ. 910, 2003 WL 21659360, at *1 n.2 (S.D.N.Y. July 15, 2003) (Lynch, J.); *In re WorldCom*, 293 B.R. at 318–20.

(c).    Certain individual Defendants may also pursue claims for contribution from the Refco Debtors' bankruptcy estates or their insurers for any judgment against them.  These claims, too, would potentially diminish the estates and the amount available for other creditors.  *See In re Global Crossing*, 311 B.R. at 349 ("related to" jurisdiction exists in action for which corporate insiders may seek contribution); *In re WorldCom, Inc. Sec. Litig.*, 293 B.R. at 331 (same).

16.    Accordingly, this action is "related to" the Refco Chapter 11 Cases, and removal is proper under 28 U.S.C. § 1452(a).

<u>**TIMELINESS**</u>

17.    The Removing Defendants have timely filed this notice of removal within 30 days

of receipt, through service or otherwise, of a copy of the initial pleading in accordance with 28

U.S.C. § 1446(b) and Fed. R. Bankr. P. 9027(a)(3).  The Removing Defendants received,

through service or otherwise, a copy of the initial pleading no earlier than March 5, 2008.

18.    The Removing Defendants will promptly serve a copy of this Notice on counsel

for Plaintiffs and file a copy of this Notice with the Clerk of the New York State Court in

accordance with the terms of 28 U.S.C. § 1446(d) and Fed. R. Bankr. 9027(b) and (c).  A true

and correct copy of the Certificate of Service for this Notice of Removal is attached to the

Declaration of Ross E. Firsenbaum as Exhibit B.

<u>**NON-CORE**</u>

19.    As required under Fed. R. Bankr. P. 9027(a)(1), the Removing Defendants state

that the claims asserted against them are non-core, within the meaning of 28 U.S.C. § 157(b),

and that they do not consent to entry of final orders or judgment by a bankruptcy judge.

<u>**RELATED CASES**</u>

20.    In addition to the PlusFunds Chapter 11 Case, the SPhinX Chapter 15 Case, and

the Refco Chapter 11 Cases, the instant action is related to numerous civil litigations coordinated

or consolidated for pre-trial purposes by the Judicial Panel on Multidistrict Litigation as a multi-

district litigation in this Court under the caption *In re: Refco Securities Litigation*, No. 07 MDL

1902 (Dec. 28, 2007).  Many of the factual allegations in the Refco MDL, which concern an

alleged fraudulent scheme by certain Refco insiders, serve as the basis for a majority of the

claims in this action.  Indeed, most of the causes of action brought in this action have seemingly

been brought by other plaintiffs in the Refco MDL against the very same defendants as those

here. The Refco MDL includes the following 11 civil actions, coordinated or consolidated for pre-trial purposes before the Honorable Gerard E. Lynch:

(a).    the consolidated securities class action, *In re Refco, Inc. Sec. Litig.*, 05 Civ. 8626 (S.D.N.Y. 2005) (consolidating 19 separate and independently filed actions);

(b).    the consolidated customer class action, *In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig.*, 06 Civ. 643 (S.D.N.Y. 2006) (consolidating two separate and independently filed actions);

(c).    *Kirschner v. Grant Thornton LLP et al.*, No. 07 Civ. 11604 (S.D.N.Y. 2007);

(d).    *Am. Fin. Int'l Group-Asia, LLC v. Refco, Inc. et al.*, 05 Civ. 8988 (S.D.N.Y. 2005);

(e).    *Carmona v. Paulson et. al.*, 05 Civ. 9327 (S.D.N.Y. 2005);

(f).    *Thomas H. Lee Equity Fund V, L.P. et al. v. Bennett et. al.*, 05 Civ. 9608 (S.D.N.Y. 2005);

(g).    *Kirschner v. Thomas H. Lee Partners, L.P. et al.*, 07 Civ. 7074 (S.D.N.Y. 2007);

(h).    *Thomas H. Lee Equity Fund V, L.P. et al. v. Mayer, Brown, Rowe & Maw L.L.P.*, 07 Civ. 6767 (S.D.N.Y. 2007).

(i).    *Kirschner v. Phillip R. Bennett, et al.*, 07 Civ. 8165 (S.D.N.Y. 2007);

(j).    *Axis Reinsurance Co. v. Bennett et al.*, 07 Civ. 7924 (S.D.N.Y. 2007);

(k).    *In re Refco Inc.*, 07 Civ. 9420 (S.D.N.Y. 2007); and,

(l).    *Kirschner v. Hackl*, 07 Civ. 9238 (S.D.N.Y. 2007).

21.    In light of the substantial body of related litigation involving many of the same parties, and common questions of law and fact, pending in the New York District Court, the Removing Defendants will promptly file a notice of tag-along action with the Judicial Panel on Multidistrict Litigation pursuant to J.P.M.L. Rule 7.4 to have this case coordinated or consolidated for pre-trial proceedings with the related civil cases in Paragraph 20 above. According to J.P.M.L. Rule 7.5(a), the Panel need not take any action in order to coordinate or consolidate this action with the Refco MDL because this action has been filed in the transferee district in which the Refco MDL is pending. Accordingly, the Removing Defendants, pursuant to Local Rule 1.6(a), have noted on the Civil Cover Sheet filed with this Notice that this action is related to the Refco MDL.

**WHEREFORE**, the Removing Defendants respectfully request that this Court accept this Notice of Removal of Action and grant them such other and further relief as the Court deems just and proper.

Dated:    March 26, 2008

Respectfully Submitted,

WILMER CUTLER PICKERING
HALE AND DORR LLP

By: _____

Robert B. McCaw (RM-7427)
Philip D. Anker (PA-7833)
John V.H. Pierce (JP-2870)
James Millar (JM-6091)
Jeremy S. Winer (JW-8823)
Ross E. Firsenbaum (RF-6306)

399 Park Avenue
New York, New York 10022
Tel.: (212)-230-8800
Fax: (212)-230-8888
*Attorneys for Defendants JP Morgan Chase
& Co., Credit Suisse Securities (USA) LLC
(formerly Credit Suisse First Boston LLC),
and Banc of America Securities LLC*

Dated: March 26, 2008
     New York, New York

WINSTON & STRAWN LLP

By: _____

David E. Mollón (dmollon@winston.com)
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
Ph: (212) 294-6700
Fax: (212) 294-4700

Of Counsel:
    Bradley E. Lerman (blerman@winston.com)
    Catherine W. Joyce (cjoyce@winston.com)
    Linda T. Coberly (lcoberly@winston.com)
    WINSTON & STRAWN LLP
    35 W. Wacker Drive
    Chicago, Illinois 60601
    Ph: (312) 558-5600
    Fax: (312) 558-5700

*Attorneys for Grant Thornton LLP
and Mark Ramler*

By: _____

Thomas G. Ward (TW-6255)
Williams & Connolly LLP
725 12th Street, N.W.
Washington, D.C. 20005

Of counsel:
    John K. Villa
    Michael S. Sundermeyer
    Craig D. Singer
    William T. Burke
    Williams & Connolly LLP
    725 12th Street, N.W.
    Washington, D.C. 20005

*Attorneys for Mayer Brown LLP*

New York, New York
March 26, 2008

Joel M. Cohen (JC-9162)
Anthony M. Candido (AC-9458)
CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, New York 10019
Tel: (212) 878-8000
Fax: (212) 878-8375
*Attorneys for the*
*UK Limited Liability Partnership*
*Mayer Brown International LLP*

Dated:     March 26, 2008                              Respectfully Submitted,

WEIL, GOTSHAL & MANGES LLP

By: _____
Greg A. Danilow, Esq. (GD 1621)
Michael F. Walsh, Esq. (MW 8000)

767 Fifth Avenue
New York, NY  10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Defendants Leo R. Breitman,*
*Nathan Gantcher, David V. Harkins, Scott*
*L. Jaeckel, Thomas H. Lee, Ronald L.*
*O'Kelley, and Scott A. Schoen*

Dated:  March 26, 2008

By:    _____
        James J. Capra, Jr.
        ORRICK, HERRINGTON & SUTCLIFFE LLP
        666 Fifth Avenue
        New York, New York 10103-0001
        Tel: (212) 506-5000

        Attorneys for Defendants
        PricewaterhouseCoopers LLP and Mari Ferris

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------------------X

KENNETH M. KRYS and CHRISTOPHER
STRIDE, as JOINT OFFICIAL LIQUIDATORS
of SPHINX LTD., SPHINX STRATEGY FUND
LTD.;
SPHINX PLUS SPC LTD., SPHINX
DISTRESSED LTD., SPHINX MERGER
ARBITRAGE LTD.; SPHINX SPECIAL
SITUATIONS LTD., SPHINX MACRO LTD.;
SPHINX LONG/SHORT EQUITY LTD.;
SPHINX MANAGED FUTURES LTD.; SPHINX
EQUITY MARKET NEUTRAL LTD.; SPHINX
CONVERTIBLE ARBITRAGE LTD.; SPHINX
FIXED INCOME ARBITRAGE LTD.; SPHINX
DISTRESSED FUND SPC; SPHINX MERGER
ARBITRAGE FUND SPC; SPHINX SPECIAL
SITUATIONS FUND SPC; SPHINX MACRO
FUND SPC; SPHINX LONG/SHORT EQUITY
FUND SPC; SPHINX MANAGED FUTURES
FUND SPC; SPHINX EQUITY MARKET
NEUTRAL FUND SPC; SPHINX
CONVERTIBLE ARBITRAGE FUND SPC;
SPHINX FIXED INCOME ARBITRAGE FUND
SPC; PLUSFUNDS MANAGED ACCESS FUND
SPC LTD.; KENNETH M. KRYS and
CHRISTOPHER STRIDE as assignees of claims
assigned by MIAMI CHILDREN'S HOSPITAL
FOUNDATION, OFI, GREEN & SMITH
INVESTMENT MANAGEMENT LLC, THALES
FUND MANAGEMENT LLC, KELLNER
DILEO & CO., LLC, MARTINGALE ASSET
MANAGEMENT LP, LONGACRE FUND
MANAGEMENT LLC, ARNOLD & S.
BLEICHROEDER ADVISERS LLC, PICTET &
CIE, RGA AMERICA REINSURANCE
COMPANY, DEUTSCHE BANK (SUISSE) SA,
ARAB MONETARY FUND, HANSARD
INTERNATIONAL LTD., CONCORDIA
ADVISORS LLC, GABELLI SECURITIES, INC.,
CITCO GLOBAL CUSTODY; and JAMES
P. SINCLAIR as Trustee of the SPHINX TRUST,

     Plaintiffs,

  -against-

Index No. 08600653

Date purchased

Plaintiff's designates New York
County as the place of trial.

The basis of venue is CPLR
503(a), (c) and (d)

**SUMMONS**



CHRISTOPHER SUGRUE; MARK                          :
KAVANAGH; BRIAN OWENS;                            :
PRICEWATERHOUSECOOPERS L.L.P.; MARI               :
FERRIS; PRICEWATERHOUSECOOPERS                    :
CAYMAN ISLANDS; GIBSON, DUNN &                    :
CRUTCHER LLP; REFCO ALTERNATIVE                   :
INVESTMENTS LLC; GRANT THORNTON                   :
LLP; MARK RAMLER; ERNST & YOUNG U.S.              :
LLP; MAYER BROWN LLP f/k/a MAYER                  :
BROWN ROWE & MAW LLP; JOSEPH                      :
COLLINS; EDWARD S. BEST; PAUL KOURY;              :
PHILLIP R. BENNETT; ROBERT C. TROSTEN;            :
TONE GRANT; SANTO MAGGIO; THOMAS                  :
HACKL; DENNIS KLEJNA; BAWAG P.S.K.                :
BANK FUR ARBEIT UND WIRTSCHAFT UND                :
OSTERREICHISCHE POSTPARKASSE                      :
AKTIENGESELLSEHAFT; JP MORGAN                     :
CHASE & CO.;                                      :
CREDIT SUISSE SECURITIES                          :
(USA) LLC f/k/a CREDIT SUISSE FIRST               :
BOSTON LLC; BANC OF AMERICA                       :
SECURITIES LLC; THOMAS H. LEE                     :
PARTNERS, L.P.; THOMAS H. LEE                     :
ADVISORS, LLC; THL MANAGERS V, LLC;               :
THL EQUITY ADVISORS V, L.P.; THOMAS H.            :
LEE EQUITY FUND V, L.P.; THOMAS H. LEE            :
PARALLEL FUND V, L.P.; THOMAS H. LEE              :
EQUITY (CAYMAN) FUND V, L.P.; THOMAS              :
H. LEE INVESTORS LIMITED PARTNERSHIP;             :
1997 THOMAS H. LEE NOMINEE TRUST;                 :
THOMAS H. LEE; DAVID V. HARKINS;                  :
SCOTT L. JAECKEL; SCOTT A. SCHOEN;                :
WILLIAM T. PIGOTT; LIBERTY CORNER                 :
CAPITAL STRATEGIES, LLC; EMF                      :
FINANCIAL PRODUCTS LLC; EMF CORE                  :
FUND LTD.; DELTA FLYER FUND LLC; ERIC             :
M. FLANAGAN; INGRAM MICRO, INC.; CIM              :
VENTURES, INC.; BECKENHAM TRADING                 :
CO., INC.; ANDREW KRIEGER; COAST                  :
ASSET MANAGEMENT, LLC, f/k/a COAST                :
ASSET MANAGEMENT LP; CS LAND                      :
MANAGEMENT LLC; CHRISTOPHER                       :
PETTIT; and REFCO GROUP HOLDINGS,                 :
INC.; and REFCO ASSOCIATES, INC.,                 :
                                                  :
                              Defendants          :
----------------------------------------------------------------X

**TO THE ABOVE-NAMED DEFENDANTS:**

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiffs undersigned attorneys within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated:    New York, New York
          March 5, 2008

                              BROWN RUDNICK BERLACK ISRAELS LLP

                              By:_____
                                    David Molton, Esq.
                                    Andrew Dash, Esq.
                              Seven Times Square
                              Times Square Tower
                              New York, New York 10036
                              Telephone: (212) 209-4800
                              Facsimile: (212) 209-4801

                                            and

                              BEUS GILBERT PLLC

                              Leo R. Beus, Esq.
                              4800 North Scottsdale Road, Suite 6000
                              Scottsdale, Arizona 85251
                              Telephone: (480) 429-3000
                              Facsimile: (480) 429-3100

                              Attorneys for Plaintiffs
                              Kenneth M. Krys and Christopher Stride as
                              Joint Official Liquidators of the SPhinX
                              Funds and James P. Sinclair, as Trustee of
                              the SPhinX Trust

Defendants' addresses:

See attached Rider

**Rider to Summons**

Defendants:

Christopher Sugrue
Address Unknown

Mark Kavanagh
Address Unknown

Brian Owens
Address Unknown

PricewaterhouseCoopers L.L.P.
300 Madison Avenue
24th Floor
New York, New York 10017

Mari Ferris
Address Unknown

PricewaterhouseCoopers Cayman Islands
Address Unknown

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166-0193

Refco Alternative Investments LLC
c/o CT Corporation System
111 Eighth Avenue
New York, New York 10011

Grant Thornton LLP
666 Third Avenue
New York, New York 10017

Mark Ramler
Address Unknown

Ernst & Young U.S. LLP
5 Times Square
New York, New York 10036-6430

8178873

Mayer Brown LLP f/k/a Mayer Brown Rowe & Maw LLP
1675 Broadway
New York, New York 10019

Joseph Collins
1190 Oakley Ave
Winnetka, Illinois 60093-1438

Edward S. Best
Address Unknown

Paul Koury
Address Unknown

Phillip R. Bennett
Address Unknown

Robert C. Trosten
Address Unknown

Tone Grant
Address Unknown

Santo Maggio
Address Unknown

Thomas Hackl
Address Unknown

Dennis Klejna
Address Unknown

BAWAG P.S.K. Bank für Arbeit und Wirtschaft und Österreichische Postparkasse
Aktiengesellschaft
Seitzergasse 2-4
A-1010 Vienna Austria

JP Morgan Chase & Co.
270 Park Avenue
New York, New York 10017

Credit Suisse Securities (USA) LLC f/k/a Credit Suisse First Boston LLC
11 Madison Avenue
New York, New York 10010

8178873

Bank of America Securities LLC
9 West 57th Street
New York, New York 10019

Thomas H. Lee Partners, L.P.
100 Federal St., 35th Floor
Boston, Massachusetts 02110

Thomas H. Lee Advisors, LLC
Address Unknown

THL Managers V, LLC
Address Unknown

THL Equity Advisors V, L.P.
Address Unknown

Thomas H. Lee Equity Fund V, L.P.
Address Unknown

Thomas H. Lee Parallel Fund V, L.P.
Address Unknown

Thomas H. Lee Equity (Cayman) Fund, L.P.
Address Unknown

Thomas H. Lee Investors Limited Partnership
Address Unknown

1997 Thomas J. Lee Nominee Trust
Address Unknown

Thomas H. Lee
Address Unknown

David V. Harkins
Address Unknown

Scott L. Jaeckel
Address Unknown

Scott A. Schoen
Address Unknown

William T. Pigott
Address Unknown

8178873

Liberty Corner Capital Strategies, LLC
47 Maple Street, Suite 101
Summit, New Jersey 07901

EMF Financial Products LLC
675 Third Avenue, Suite 2800
New York, New York 10017

EMF Core Fund Ltd.
Address Unknown

Delta Flyer Fund LLC
Address Unknown

Eric M. Flanagan
Address Unknown

Ingram Micro, Inc.
Address Unknown

CIM Ventures, Inc.
Address Unknown

Beckenham Trading Co., Inc.
Address Unknown

Andrew Krieger
Address Unknown

Coast Asset Management, LLC, f/k/a Coast Asset Management LLP
Address Unknown

CS Land Management LLC
Address Unknown

Christopher Pettit
Address Unknown

Refco Group Holdings, Inc.
Address Unknown

Refco Associates, Inc.
Address Unknown

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
-------------------------------------------------------------------X
KENNETH M. KRYS and CHRISTOPHER STRIDE,  :
as JOINT OFFICIAL LIQUIDATORS of SPHINX  :
LTD., SPHINX STRATEGY FUND LTD.;  :
SPHINX PLUS SPC LTD., SPHINX DISTRESSED  :
LTD., SPHINX MERGER ARBITRAGE LTD.;  :
SPHINX SPECIAL SITUATIONS LTD., SPHINX  :
MACRO LTD.; SPHINX LONG/SHORT  :
EQUITY LTD.; SPHINX MANAGED  :
FUTURES LTD.; SPHINX EQUITY MARKET  :
NEUTRAL LTD.; SPHINX CONVERTIBLE  :
ARBITRAGE LTD.; SPHINX FIXED INCOME  :
ARBITRAGE LTD.; SPHINX DISTRESSED  :
FUND SPC; SPHINX MERGER ARBITRAGE FUND  :
SPC; SPHINX SPECIAL SITUATIONS FUND SPC;  :
SPHINX MACRO FUND SPC; SPHINX  :
LONG/SHORT EQUITY FUND SPC; SPHINX  :
MANAGED FUTURES FUND SPC; SPHINX  :
EQUITY MARKET NEUTRAL FUND SPC; SPHINX  :
CONVERTIBLE ARBITRAGE FUND SPC; SPHINX  :
FIXED INCOME ARBITRAGE FUND SPC;  :
PLUSFUNDS MANAGED ACCESS FUND SPC  :
LTD.; KENNETH M. KRYS and CHRISTOPHER  :
STRIDE as assignees of claims assigned by MIAMI  :
CHILDREN'S HOSPITAL FOUNDATION, OFI,  :
GREEN & SMITH INVESTMENT MANAGEMENT  :
LLC, THALES FUND MANAGEMENT LLC,  :
KELLNER DILEO & CO., LLC, MARTINGALE  :
ASSET MANAGEMENT LP, LONGACRE FUND  :
MANAGEMENT LLC, ARNHOLD & S.  :
BLEICHROEDER ADVISERS LLC, PICTET & CIE,  :
RGA AMERICA REINSURANCE COMPANY,  :
DEUTSCHE BANK (SUISSE) SA, ARAB  :
MONETARY FUND, HANSARD INTERNATIONAL  :
LTD., CONCORDIA ADVISORS LLC, GABELLI  :
SECURITIES, INC., CITCO GLOBAL CUSTODY;  :
and JAMES P. SINCLAIR as Trustee of the SPHINX  :
TRUST,  :
                                        :
                              Plaintiffs,  :
                                        :
                                        :
                   -against-             :
                                        :

Index No.

**COMPLAINT**

**Jury Trial Demanded**

08600653


FILED
MAR 05 2008
COUNTY CLERK'S OFFICE
NEW YORK

CHRISTOPHER SUGRUE; MARK KAVANAGH;          :
BRIAN OWENS; PRICEWATERHOUSECOOPERS         :
L.L.P.; MARI FERRIS;                         :
PRICEWATERHOUSECOOPERS CAYMAN               :
ISLANDS; GIBSON, DUNN & CRUTCHER LLP;       :
REFCO ALTERNATIVE INVESTMENTS LLC;          :
GRANT THORNTON LLP; MARK RAMLER;            :
ERNST & YOUNG U.S. LLP; MAYER BROWN LLP     :
f/k/a MAYER BROWN ROWE & MAW LLP;           :
JOSEPH COLLINS; EDWARD S. BEST; PAUL        :
KOURY; PHILLIP R. BENNETT; ROBERT C.        :
TROSTEN; TONE GRANT; SANTO MAGGIO;          :
THOMAS HACKL; DENNIS KLEJNA; BAWAG          :
P.S.K. BANK FUR ARBEIT UND WIRTSCHAFT       :
UND OSTERREICHISCHE POSTPARKASSE            :
AKTIENGESELLSEHAFT; JP MORGAN CHASE &       :
CO.; CREDIT SUISSE SECURITIES (USA) LLC f/k/a :
CREDIT SUISSE FIRST BOSTON LLC; BANC OF     :
AMERICA SECURITIES LLC; THOMAS H. LEE       :
PARTNERS, L.P.; THOMAS H. LEE ADVISORS,     :
LLC; THL MANAGERS V, LLC; THL EQUITY        :
ADVISORS V, L.P.; THOMAS H. LEE EQUITY      :
FUND V, L.P.; THOMAS H. LEE PARALLEL FUND   :
V, L.P.; THOMAS H. LEE EQUITY (CAYMAN)      :
FUND V, L.P.; THOMAS H. LEE INVESTORS       :
LIMITED PARTNERSHIP; 1997 THOMAS H. LEE     :
NOMINEE TRUST; THOMAS H. LEE; DAVID V.      :
HARKINS; SCOTT L. JAECKEL; SCOTT A.         :
SCHOEN; WILLIAM T. PIGOTT; LIBERTY          :
CORNER CAPITAL STRATEGIES, LLC; EMF         :
FINANCIAL PRODUCTS LLC; EMF CORE FUND       :
LTD.; DELTA FLYER FUND LLC; ERIC M.         :
FLANAGAN; INGRAM MICRO, INC.; CIM           :
VENTURES, INC.; BECKENHAM TRADING CO.,      :
INC.; ANDREW KRIEGER; COAST ASSET           :
MANAGEMENT, LLC, f/k/a COAST ASSET          :
MANAGEMENT LP; CS LAND MANAGEMENT           :
LLC; CHRISTOPHER PETTIT; REFCO GROUP        :
HOLDINGS, INC.; and REFCO ASSOCIATES, INC., :
                                             :
                            Defendants.      :
                                             :
                                             :
-----------------------------------------------------------------X

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION. ................................................................................................ 1

    A.    Overview. ........................................................................................... 2

    B.    Fiduciary Duties. ................................................................................ 7

II.   PARTIES. ........................................................................................................ 11

    A.    Plaintiffs. .......................................................................................... 11

    B.    Defendants. ....................................................................................... 13

    C.    Non-Parties. ...................................................................................... 27

III.  JURISDICTION. .............................................................................................. 28

IV.   VENUE ........................................................................................................... 31

V.    THE SPHINX FUNDS AND PLUSFUNDS. ..................................................... 31

    A.    History. ............................................................................................. 31

    B.    The SPhinX Funds. .......................................................................... 32

    C.    Segregated Portfolio Companies. ..................................................... 33

    D.    Customer Segregation. ..................................................................... 35

    E.    Connections and Providers. .............................................................. 40

        1.    PlusFunds' Role as Investment Manager. ................................ 40

        2.    Refco's Role. ........................................................................... 41

        3.    DPM's Role. ............................................................................ 45

VI.   DIVERSION OF SMFF'S EXCESS CASH. ..................................................... 46

    A.    Robert Aaron Signs the July 31, 2002 Document. ............................ 47

    B.    SPhinX and PlusFunds Monitored Their Exposure at Refco. ............ 49

    C.    Diversion of SMFF Cash to RCM. .................................................... 51

    D.    Interest at Refco on SMFF Cash. ..................................................... 52

VII.  THE REFCO FRAUD. ...................................................................................... 52

    A.    The Refco Entities. ........................................................................... 56

    B.    Overview of Refco's Business. ......................................................... 57

    C.    The Refco Fraudulent Scheme. ........................................................ 58

Part One – Fraudulently Misrepresenting Refco's Financial Statements. ..................... 58

Refco's Trading Losses.................................................................................. 59

Concealing Refco Operating Expenses........................................................... 60

Inflating RGL's Revenues with Phantom Income. .......................................... 60

Part Two - Keeping the Illusion Going Long Enough to Cash-out. .................. 61

    D.    RTL Transactions. ................................................................... 61

    E.    Looting RCM's Assets. ........................................................... 63

VIII.    THE 2004 LBO AND 2005 IPO. ........................................................ 65

    A.    The LBO. ................................................................................ 67

    B.    The IPO. ................................................................................ 71

IX.    SUFFOLK LOANS. ............................................................................ 74

    A.    Bousbib Investigates Relationship with Refco. ...................... 74

    B.    Refco Extends Loans to Suffolk Entities to Buy Out Bousbib, Morriss, and Wehrle. ............................................................ 76

    C.    Discovery of Refco's Role in Suffolk Transactions. ................ 79

X.    REFCO'S BANKRUPTCY FILING. ................................................... 80

XI.    INDIVIDUAL ROLES. ....................................................................... 83

    A.    SPhinX/PlusFunds Agents. .................................................... 83

        1.    Aaron. ........................................................................... 83

        2.    Sugrue. .......................................................................... 85

        3.    Kavanagh. ..................................................................... 88

        4.    Owens. .......................................................................... 90

    B.    Refco Agents. ........................................................................ 92

        1.    Bennett. ........................................................................ 92

        2.    Tone Grant. .................................................................. 96

        3.    Trosten. ........................................................................ 97

        4.    Maggio. ........................................................................ 99

        5.    Hackl. ........................................................................... 102

        6.    Klejna. .......................................................................... 103

XII.    PROFESSIONAL DEFENDANTS' ROLES. ...................................... 106

    A.    Lawyers. ................................................................................ 106

        1.    Gibson Dunn & Crutcher. ............................................ 106

|     | 2.  | Mayer Brown, Collins, Best, and Koury..................................... 109 |
|     |     | (a) | Awareness of Refco's Trading Losses and Balance Sheet Problems................................................ 111 |
|     |     | (b) | The RTL Transactions. ........................................... 112 |
|     |     | (c) | Maintaining the Fraudulent Business Model. ............... 114 |
|     |     | (d) | Conduct in the LBO. ............................................. 116 |
|     |     | (e) | Conduct Before and After the IPO............................ 118 |

B.   Accountants............................................................................ 119

    1.  PwC and Mari Ferris............................................................. 119

        (a)  PwC's Role as Refco Accountant and Consultant...................... 120

        (b)  PwC Identified Numerous Material Weaknesses in Internal Controls, Which Should Have Prompted PwC to Audit with Heightened Skepticism and Enhanced Audit Procedures. ....................................... 137

        (c)  PwC Failed to Conduct its Audits of SPhinX and PlusFunds in Accordance with GAAS......................................... 143

        (d)  By Issuing Unqualified Audit Opinions, PwC Made Affirmative Misrepresentations to Innocent Decision-Makers Within SPhinX and PlusFunds. ...................... 147

        (e)  Innocent Decision-Makers of SPhinX and PlusFunds Reasonably Relied On PwC's Misrepresentations. ................................................... 150

    2.  Grant Thornton and Mark Ramler. ....................................... 151

        (a)  The RTL Transactions. ............................................. 159

        (b)  Maintaining the Fraudulent Business Model. ............... 162

    3.  Ernst & Young. .................................................................... 170

        (a)  Ernst & Young's Role in the Fraudulent Scheme...................... 170

        (b)  Knowledge of Refco's Trading Losses and Balance Sheet Problems.................................................. 173

        (c)  The RTL Transactions. ............................................. 174

        (d)  Maintaining the Fraudulent Business Model. ............... 175

C.   Underwriters: Credit Suisse and Banc of America Securities. ......... 179

    1.  Knowledge of the Looting of RCM Assets.............................. 182

    2.  The Investment Banker Defendants' Motivations. ................... 185

    3.  Investment Bankers' Use of Patently Unreasonable Projections........................................................................ 186

|       | 4.  | Impact on RCM Was Actively Concealed by Investment Banker Defendants. | 187 |
|       | 5.  | The Harm of the IPO to Refco Inc. | 189 |
| D.    |     | JP Morgan Chase & Co. | 189 |
| E.    |     | RTL Participants. | 196 |
|       | 1.  | BAWAG P.S.K. | 196 |
|       | 2.  | Other RTL Participants. | 206 |
| F.    |     | Administrator. | 210 |
|       | 1.  | DPM. | 210 |
| G.    |     | Others. | 212 |
|       | 1.  | RAI. | 212 |
|       | 2.  | Refco Associates Inc. | 214 |
|       | 3.  | THL Defendants. | 215 |

XIII.  CAUSES OF ACTION. ......................................................................... 221

COUNT I BREACH OF FIDUCIARY DUTY (Against Sugrue, Kavanagh and Owens) ................................................................................................ 221

COUNT II AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (Against Sugrue, Kavanagh and Owens) ................................................ 224

COUNT III FRAUD (Against Sugrue, Kavanagh and Owens) .............................. 226

COUNT IV AIDING AND ABETTING CONVERSION (Against Sugrue, Kavanagh and Owens) ......................................................................... 228

COUNT V OFFICER/DIRECTOR LIABILITY (Against Sugrue, Kavanagh and Owens) ............................................................................................ 229

COUNT VI ACCOUNTANT MALPRACTICE (Against PwC and Ferris) ............................ 230

COUNT VII AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (Against PwC and Ferris) ................................................................... 232

COUNT VIII NEGLIGENT MISREPRESENTATION (Against PwC and Ferris) ................. 234

COUNT IX FRAUD (Against PwC and Ferris) ..................................................... 239

COUNT X BREACH OF FIDUCIARY DUTY (Against Gibson Dunn) ................................. 244

COUNT XI CONSPIRACY (Against Sugrue, Kavanagh, Owens, Bennett, and Hackl) ............................................................................................ 245

COUNT XII AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
(Against Gibson Dunn) ................................................................................ 247

COUNT XIII FRAUD/NEGLIGENT MISREPRESENTATION (Against Gibson
Dunn) ......................................................................................................... 247

COUNT XIV FRAUD (Against Bennett, Trosten, Maggio, Grant, and Hackl) ....................... 248

COUNT XV BREACH OF FIDUCIARY DUTY (Against Bennett, Trosten,
Maggio, Grant, Hackl, and Klejna) .............................................................. 250

COUNT XVI CONVERSION (Against Bennett, Trosten, Maggio, Grant, and
Hackl) ........................................................................................................ 252

COUNT XVII AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
(Against Bennett, Trosten, Maggio, Grant, Hackl, Klejna, and Chase) ....................... 252

COUNT XVIII AIDING AND ABETTING FRAUD (Against Grant Thornton,
Ramler, Ernst & Young, PwC, Ferris, Collins, Best, Koury, Mayer Brown,
and Chase) .................................................................................................. 253

COUNT XIX AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
(Against Grant Thornton, Ramler, Ernst & Young, PwC, Ferris, Collins,
and Mayer Brown) ....................................................................................... 255

COUNT XX AIDING AND ABETTING CONVERSION (Against Grant
Thornton, Ramler, Ernst & Young, PwC, Ferris, Collins, Best, Koury,
Mayer Brown, and Chase) ............................................................................ 258

COUNT XXI AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
(Against RAI and Refco Associates Inc.) ...................................................... 260

COUNT XXII AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
(Against Credit Suisse and Banc of America Securities) .................................. 261

COUNT XXIII AIDING AND ABETTING FRAUD (Against Credit Suisse and
Banc of America Securities) ......................................................................... 263

COUNT XXIV CONSPIRACY (Against BAWAG, Bennett, Trosten, Hackl,
Grant, Maggio, Chase, and the RTL Participants) .......................................... 264

COUNT XXV AIDING AND ABETTING FRAUD (Against BAWAG and RTL
Participants) ............................................................................................... 265

COUNT XXVI BREACH OF FIDUCIARY DUTY/AIDING AND ABETTING
(Against THL Defendants) ............................................................................ 266

COUNT XXVII INTERFERENCE WITH CONTRACT/PROSPECTIVE
CONTRACT (Against All Defendants) ............................................................ 268

v

Plaintiffs Kenneth M. Krys and Christopher Stride as Joint Official Liquidators (the "JOLs") of SPhinX, Ltd., SPhinX Macro Fund SPC, SPhinX Macro, Ltd., SPhinX Managed Futures Fund SPC, SPhinX Long/Short Equity Fund SPC, SPhinX Convertible Arbitrage Fund SPC, SPhinX Fixed Income Arbitrage Fund SPC, SPhinX Distressed Fund SPC, SPhinX Merger Arbitrage Fund SPC, SPhinX Special Situations Fund SPC, SPhinX Equity Market Neutral Fund SPC, SPhinX Strategy Fund, Ltd., SPhinX Plus SPC, Ltd., SPhinX Managed Futures, Ltd., SPhinX Long/Short Equity, Ltd., SPhinX Convertible Arbitrage, Ltd., SPhinX Fixed Income Arbitrage, Ltd., SPhinX Distressed, Ltd., SPhinX Merger Arbitrage, Ltd., SPhinX Special Situations, Ltd., SPhinX Equity Market Neutral, Ltd., and PlusFunds Managed Access Fund SPC, Ltd. (collectively, "SPhinX" or the "SPhinX Funds"), Kenneth M. Krys and Christopher Stride as assignees of claims assigned by Miami Children's Hospital Foundation, OFI, Green & Smith Investment Management LLC, Thales Fund Management LLC, Kellner Dileo & Co., LLC, Martingale Asset Management LP, Longacre Fund Management LLC, Arnhold & S. Bleichroeder Advisers LLC, PicTet & Cie, RGA America Reinsurance Company, Deutsche Bank (Suisse) SA, Arab Monetary Fund, Hansard International Ltd., Concordia Advisors LLC, Gabelli Securities, Inc., Citco Global Custody (the "SPhinX investors") and James P. Sinclair, as Trustee of the SPhinX Trust (the "Trustee") created by the Fifth Amended Plan of Liquidation of PlusFunds Group, Inc., by and through their undersigned counsel, for their claims against Defendants, allege as follows:

## I.    INTRODUCTION.

1.    This is an action to recover (i) damages suffered by the SPhinX family of hedge funds, and (ii) the lost business enterprise value and deepening insolvency damages suffered by SPhinX's investment manager, PlusFunds Group, Inc., arising from the diversion of hundreds of millions of dollars of SPhinX's cash from protected, customer-segregated accounts to

unprotected offshore accounts, where those assets were ultimately lost in the Refco scandal. Unbeknownst to innocent decision-makers at SPhinX and PlusFunds, culpable Defendants allowed SPhinX's cash to be used to support a massive fraud orchestrated by Phillip Bennett, the President and CEO of Refco Group Ltd. LLC ("Refco Group" and, collectively with affiliated entities, "Refco"). The discovery of the Refco fraud and crash of Refco in October 2005 resulted in the loss of approximately $263 million in SPhinX cash wrongfully deposited at an offshore affiliate of Refco. These losses caused the collapse of both the SPhinX Funds and PlusFunds.

**A.   Overview.**

2.     On December 20, 2001, PlusFunds entered into an exclusive license contract with Standard & Poor's to create and market investment products designed to achieve returns consistent with the Standard & Poor's Hedge Fund Index, a composite index measuring major hedge fund strategies. Several months later, PlusFunds created the SPhinX Funds, a family of Cayman Islands hedge funds specifically designed to offer full "transparency" to investors – *i.e.*, SPhinX offered investors daily net asset value ("NAV") reports reflecting the value of investments on a real-time basis.

3.     A central and crucial component of SPhinX's business plan was the use of segregated portfolio companies ("SPCs") under Cayman Islands law. The Cayman SPC structure mandated segregation of assets and liabilities into separate portfolios. According to SPhinX's organizational documents and offering and marketing materials, SPhinX's customer assets were required to be protected in customer-segregated accounts, "ring-fenced" from claims against the other segregated portfolios and immune from claims of creditors of the prime broker or custodian of SPhinX's customer assets. Thus, the SPhinX Funds were structured to preserve and protect assets for the benefit of SPhinX and its investors in the event of the insolvency of other segregated portfolios or of the custodian or prime broker.

4.    The SPhinX Funds were almost immediately successful.    Assets under management ("AUM") increased steadily, rising to over $3 billion in 2004 and 2005. PlusFunds' business plan was to increase AUM to over $15 billion, and in October 2005, PlusFunds had negotiated a relationship with Lehman Brothers that would have brought in an additional $500 million-plus in AUM.

5.    However, unknown to innocent members of the SPhinX and PlusFunds Boards of Directors and management teams, certain SPhinX and PlusFunds agents/fiduciaries allowed cash belonging to SPhinX Managed Futures Fund SPC ("SMFF"), a SPhinX portfolio fund SPC, to be diverted from protected, customer-segregated accounts to non-regulated accounts where those assets were commingled and exposed to the risk of the custodian's insolvency.    These agents/fiduciaries acted contrary to the interests of SPhinX and PlusFunds in violation of the explicit requirement that SPhinX's assets must be protected in customer-segregated accounts.    In fact, these agent/fiduciary wrongdoers acted for their own exclusive interests.

6.    As a result, hundreds of millions of dollars of SMFF's excess cash was swept on a regular basis from Refco LLC, a regulated entity where SPhinX's assets were maintained in customer-segregated accounts, to non-segregated, commingled accounts at Refco Capital Markets, Ltd. ("RCM"), Refco LLC's unregulated Bermuda affiliate.

7.    Once SMFF's cash was moved to RCM, Refco-related parties and conspirators used RCM's customer assets for their own personal benefit and contrary to the interest of SPhinX or PlusFunds in fraudulent activities designed to conceal Refco losses, bolster Refco's financial statements, and enrich individuals.    In late 1997, a group of Refco customers to whom Refco had extended credit sustained large losses, some in connection with the Asian debt crisis. By the end of 1998, those losses amounted to hundreds of millions dollars.    Refco's CEO and

3

President, Phillip Bennett, caused the hundreds of millions of dollars in uncollectible customer accounts to be transferred to Refco Group Holdings, Inc. ("RGHI"), an entity owned and controlled by Bennett, to remove those losses from Refco's financial statements. A corresponding receivable of several hundred million dollars from RGHI (the "RGHI Receivable") was recorded on Refco's books.

8.      To conceal the RGHI Receivable and bolster Refco's financials, Bennett diverted customer assets held at RCM, including SMFF's cash, to fund a series of "round-trip loan" transactions ("RTLs") at the end of each of Refco's financial reporting periods. In each of these round-trip loan transactions, RCM assets were transferred by a Refco entity to an unaffiliated third party, who in turn extended a loan to RGHI. RGHI used the amount to pay down the RGHI Receivable just before the end of the reporting period so that Refco's financials appeared to show the satisfaction of the RGHI Receivable. Days after the end of each reporting period, the round-trip loans were unwound, and the RGHI Receivable reappeared on Refco's books.

9.      In exchange for their participation in the Refco fraud, certain culpable PlusFunds insiders were enriched by Refco, using SMFF's customer assets that had been wrongfully diverted to RCM. On or about March 29, 2005, Refco used RCM assets (including SPhinX's commingled cash) to fund in excess of $204 million in loans to several "Suffolk" entities controlled by Defendants Christopher Sugrue, Brian Owens and Mark Kavanagh (three members of PlusFunds' Board of Directors), purportedly to purchase outstanding minority shares of PlusFunds stock. The Suffolk loans were non-recourse and secured by all shares of PlusFunds stock owned or controlled by Sugrue, Kavanagh, and Owens. The Suffolk loans were a disguised acquisition by Refco of the PlusFunds shares owned by Sugrue, Kavanagh and Owens, and the *quid pro quo* to those individuals for participating in the Refco scheme.

4

10.    The true nature and source of funds for the Suffolk loans was concealed from innocent members of the SPhinX Board and PlusFunds' Board and management, who would have opposed such a transaction if its terms were not concealed. The Suffolk loans evidence the relationship and agreement among Sugrue, Kavanagh, Owens, Refco, and Bennett, who negotiated and executed the Suffolk loans documentation on behalf of Refco.

11.    During 2004 and 2005, as much as $560 million of SMFF's cash was held at RCM in non-segregated accounts. As of October 10, 2005, approximately $312 million of SMFF's cash was held at RCM. On that date, Refco announced that it had "discovered" a $430 million receivable owed to it by an entity controlled by Bennett (i.e., the RGHI Receivable) and that Refco's financial statements could no longer be relied upon. Although Bennett repaid the RGHI Receivable with an emergency $400 million loan from his co-conspirator BAWAG P.S.K. Bank Fur Arbeit Und Wirtschaft Und Osterreichische Postparkasse Aktiengesellschaft ("BAWAG"), Refco was irreparably damaged. A week later on October 17, 2005, RCM and 23 Refco subsidiaries and affiliates filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the Southern District of New York.

12.    On October 11, 2005, just days before Refco's bankruptcy petition, Sugrue demanded the return of the $312 million of SMFF's cash held at RCM to SMFF's segregated accounts at Refco LLC. Because it had diverted SMFF's cash elsewhere, RCM lacked the liquidity to return SMFF's cash. On or about October 12, 2005 (after the disclosure of the Refco fraud), JP Morgan Chase & Co. ("Chase") loaned $201 million to RCM on a day's notice to fund part of RCM's return of the $312 million to SMFF's Refco LLC accounts. On or about October 14, 2005, $312 million was transferred from SMFF's accounts at RCM to Refco LLC. Two months later, RCM's Official Committee of Unsecured Creditors commenced an adversary

proceeding against SMFF to recover the $312 million as a preferential transfer from RCM's estate. On December 15, 2005, the court in the preference action entered a temporary restraining order freezing SMFF's $312 million. A flood of redemptions by SPhinX investors followed.

13.    The redemptions from the SPhinX Funds and the resulting drop in AUM caused a sharp decline in PlusFunds' revenues, leading to PlusFunds' Chapter 11 bankruptcy petition in the Southern District of New York on March 6, 2006.

14.    On April 26, 2006, SPhinX settled the preference litigation with RCM's Bankruptcy Trustee Marc Kirschner. As part of that agreement, SMFF agreed to relinquish approximately $263 million of the $312 million and agreed to release certain claims against the Refco estate with respect to those funds.

15.    Two months later, on June 30, 2006, SPhinX was placed into voluntary liquidation in the Cayman Islands by resolution of its management shareholder. The JOLs sought and obtained court supervision of the SPhinX Funds in the Grand Court of the Cayman Islands on July 28, 2006, and August 8, 2006.

16.    By reason of Defendants' wrongdoing, SPhinX was damaged in an amount to be proven at trial, including but not limited to: (i) the $263 million of SMFF's cash that was paid to the RCM bankruptcy estate; (ii) other SPhinX funds, including the Suffolk loans, that were misappropriated by Defendants in conducting their fraudulent schemes; (iii) all fees SPhinX paid to its agents, including SPhinX's auditors and other Defendants for their services; (iv) lost income, profits and other actual damages; (v) punitive damages; (vi) attorneys' fees; (vii) costs of administration and liquidation of the SPhinX estates; and (viii) pre-judgment interest.

6

17.    PlusFunds, by reason of Defendants' wrongdoing, was injured in an amount to be proven at trial, including lost enterprise value, deepening insolvency damages, lost profits and other damages and punitive damages, attorneys' fees, and pre-judgment interest.

**B.    Fiduciary Duties.**

18.    The losses suffered by SPhinX and PlusFunds were caused by the Defendants' breaches of duty. At all relevant times, the agents, and fiduciaries of SPhinX and PlusFunds all understood that SPhinX's assets were to be protected in customer-segregated accounts as described in SPhinX's offering materials and Cayman Islands law. By allowing or participating in the movement of SPhinX's assets to non-segregated accounts at RCM, Defendants breached their own fiduciary and contractual duties to SPhinX and PlusFunds, and/or knowingly aided and abetted the breaches of others. Other Defendants knowingly participated in Refco's fraud and breaches of fiduciary duty and/or aided and abetted those breaches.

19.    As PlusFunds Directors at all relevant times, Sugrue, Kavanagh, and Owens owed direct fiduciary duties to SPhinX and PlusFunds that required each of them to safeguard customer assets and place the interests of SPhinX and PlusFunds ahead of his own. Owens also owed direct fiduciary duties to SPhinX because he sat on SPhinX's Board beginning in September 2004. Sugrue, Kavanagh, and Owens breached these duties by allowing SMFF's cash to be exposed in non-segregated accounts at RCM in exchange for a payoff from Bennett and Refco in the form of the Suffolk loans. At all material times, Sugrue, Kavanagh, and Owens knew SMFF's cash was held at RCM but allowed it to occur contrary to the interests of SPhinX and PlusFunds. Defendant Gibson Dunn & Crutcher aided and abetted the breaches of fiduciary duty by Sugrue, Kavanagh, and Owens by concealing the terms of the Suffolk loans and Refco's involvement from innocent members of the Boards and management of SPhinX and PlusFunds.

20.    Beginning in 2002, the Derivatives Portfolio Management ("DPM") entities and Robert Aaron owed SPhinX and PlusFunds fiduciary duties. As discussed in greater detail below, DPM agreed to provide accounting and financial services to SPhinX and PlusFunds, specifically including treasury functions and the investment of excess cash. DPM was responsible to protect SPhinX's assets and ensure segregation. DPM also owed SPhinX fiduciary duties because DPM had the contractual right to fill one seat on SPhinX's board of directors, and DPM's Chief Executive Officer, Robert Aaron, filled that seat as DPM's representative.

21.    As DPM's CEO, Robert Aaron not only shared DPM's fiduciary duties to SPhinX and PlusFunds, but owed his own duties as well. He served on SPhinX's Board from inception in 2002 until 2006. As a director, he owed direct fiduciary duties to the Funds. Aaron actually executed the Refco account opening documentation for the SPhinX Funds, and he had a fiduciary duty to ensure SPhinX's assets were invested properly and were protected as described in SPhinX's organizational documents and offering materials.

22.    SPhinX and PlusFunds relied upon PricewaterhouseCoopers ("PwC"), SPhinX's auditor, to identify irregularities relating to SMFF's business and assets. PwC breached its professional duties by failing to conduct GAAS audits and to disclose that SMFF's cash was exposed in non-segregated accounts at RCM. From its engagements as auditor of the SPhinX Funds and other funds that invested in the SPhinX Funds, PwC knew there were significant problems with SPhinX's internal controls and cash (mostly problems with DPM's accounting), but failed to report SMFF's cash in unregulated accounts at RCM. PwC represented that it had conducted a GAAS audit and that SPhinX financial statements "fairly presented" the Funds' financial position, statements that were both false. In fact, beginning in May 2004, PwC served

as Refco's *de facto* Chief Accounting Officer and knew that customer assets, including SMFF's cash, were diverted to fund Refco's operations and fraudulent activities. PwC breached its duties to SPhinX and PlusFunds by failing to disclose SMFF's assets exposed at RCM and by aiding and abetting Refco's fraud and breach of fiduciary duties.

23.    Once SPhinX's assets were placed with Refco, additional fiduciary relationships were created, which should have protected SPhinX's assets. Refco LLC owed fiduciary duties to its customers, including SPhinX. SPhinX and PlusFunds entrusted customer assets to Refco LLC to be maintained in customer-segregated accounts. Refco LLC was bound by statute and contract to maintain customer segregation. Refco LLC owed fiduciary duties not to misuse customer assets or use them to perpetrate fraud. Refco LLC owed a fiduciary duty of disclosure to its customers to disclose facts relating to Refco LLC's true financial condition.

24.    Similarly, RCM owed fiduciary duties to its customers, including SPhinX. SPhinX and PlusFunds entrusted customer assets to RCM. Because RCM was entrusted with SPhinX assets, RCM owed fiduciary duties not to misuse customer assets and to disclose to its customers information relevant to their assets, including accurate facts about RCM's financial condition. The officers, directors, and agents of Refco LLC and RCM, including Bennett, Santo Maggio, Robert Trosten, Thomas Hackl, and Tone Grant, shared in these fiduciary obligations to customers who entrusted assets to Refco LLC and RCM, including SPhinX.

25.    In addition to fiduciary duties arising out of Refco's role as custodian, Refco's officers and directors owed direct fiduciary duties to Refco's customers and creditors because Refco was insolvent as of August 2004, the date of the Refco leveraged buyout transaction ("LBO"), in which Refco borrowed hundreds of millions of dollars to cash out the interests of Defendants Tone Grant and BAWAG. In fact, Refco had been insolvent at least since December

2002. Refco, by its Trustee, Marc Kirschner, has filed suit on behalf of certain RCM customers, alleging and admitting that Refco was insolvent as of August 2004, and that it and its officers and directors owed fiduciary duties to Refco's customers arising from Refco's insolvency and its role holding customer assets. Refco and its officers breached these duties by stealing RCM customer assets, including SPhinX cash.

26.     The existence of so many parties with fiduciary duties to SPhinX should have prevented the diversion and misuse of SPhinX's assets. Not only did the fiduciaries of SPhinX and PlusFunds fail to safeguard SPhinX's assets, other culpable parties actively and knowingly aided and abetted those breaches of fiduciary duty. Refco's officers, directors, agents, lawyers, financial advisors, banks, auditors, and underwriters actively and knowingly helped Refco misuse RCM customer assets to fund Refco's fraudulent business operations and concealed Refco losses and true financial condition. Other parties, including BAWAG and the Thomas H. Lee Defendants, owned and exercised controlling interests in Refco and helped conceal Refco's insolvency and ongoing fraud in an effort to cash out their interests while Refco misused customer assets to stay afloat.

27.     Other Defendants aided and abetted Refco's breaches of fiduciary duty and fraud by knowingly helping Refco conceal its losses and distort its financial reporting through the round-trip loan transactions. These Defendants understood that the RTLs were designed fraudulently to improve Refco's financial position, but readily participated in exchange for quick profits earned in the RTLs.

28.     Each of the Defendants is liable for breaching fiduciary and contractual duties, intentionally aiding and abetting the breach of fiduciary duties owed to SPhinX and other tortious wrongdoing.

## II.    PARTIES.

### A.    Plaintiffs.

29.    Plaintiffs Kenneth Krys and Christopher Stride are the Joint Official Liquidators of each of the SPhinX Funds appointed by the Grand Court of the Cayman Islands.

30.    SPhinX Macro Fund SPC, SPhinX Managed Futures Fund SPC, SPhinX Long/Short Equity Fund SPC, SPhinX Convertible Arbitrage Fund SPC, SPhinX Fixed Income Arbitrage Fund SPC, SPhinX Distressed Fund SPC, SPhinX Merger Arbitrage Fund SPC, SPhinX Special Situations Fund SPC, and SPhinX Equity Market Neutral Fund SPC are each segregated portfolio companies organized and incorporated under Cayman Islands law.  Each of the SPhinX companies has its registered address at c/o Krys & Associates, Governor's Square, Building 6, 2nd Floor, 23 Lime Tree Bay Avenue, Grand Cayman, Cayman Islands.

31.    SPhinX Managed Futures, Ltd., SPhinX Long/Short Equity Ltd., SPhinX Convertible Arbitrage Ltd., SPhinX Fixed Income Arbitrage Ltd., SPhinX Distressed Ltd., SPhinX Merger Arbitrage Ltd., SPhinX Special Situations Ltd., SPhinX Equity Market Neutral Ltd., PlusFunds Manager Access Fund SPC Ltd., SPhinX Ltd., SPhinX Macro Ltd., SPhinX Strategy Fund Ltd. and SPhinX Plus SPC Ltd. are each limited liability companies organized and incorporated under Cayman Islands law.  Each of the SPhinX companies has its registered address at c/o Krys & Associates, Governor's Square, Building 6, 2nd Floor, 23 Lime Tree Bay Avenue, Grand Cayman, Cayman Islands.

32.    Kenneth M. Krys and Christopher Stride are assignees of claims assigned by Miami Children's Hospital Foundation, OFI, Green & Smith Investment Management LLC, Thales Fund Management LLC, Kellner Dileo & Co., LLC, Martingale Asset Management LP, Longacre Fund Management LLC, Arnhold & S. Bleichroeder Advisers LLC, Pictet & CIE, RGA America Reinsurance Company, Deutsche Bank (Suisse) SA, Arab Monetary Fund,

Hansard International Ltd., Concordia Advisors LLC, Gabelli Securities, Inc., and Citco Global Custody.

33.    On June 30, 2006, each of the SPhinX companies entered into voluntary liquidation by resolution of its management shareholder, and Messrs. Krys and Stride were appointed Joint Voluntary Liquidators for each of the SPhinX companies. On July 4, 2006, the Joint Voluntary Liquidators filed, on behalf of each of the SPhinX companies, except SMFF, petitions for court supervision in the Grand Court of the Cayman Islands (the "Cayman Court"). On July 28, 2006, the Cayman Court entered orders (the "Winding Up Orders") providing for the winding up of the SPhinX companies (other than SMFF), subject to the supervision of the Cayman Court. Pursuant to the Winding Up Orders, Messrs. Krys and Stride were appointed as the Joint Official Liquidators of each of the SPhinX companies other than SMFF. With respect to SMFF, a petition seeking court supervision was filed with the Cayman Court on June 5, 2006. On July 28, 2006, the Cayman Court entered an order appointing Messrs. Krys and Stride to serve as Joint Provisional Liquidators of SMFF, and subsequently on August 8, 2006, the Cayman Court entered an order appointing Messrs. Krys and Stride to serve as SMFF's Joint Official Liquidators. Messrs. Krys and Stride are authorized to bring each of the SPhinX Funds' claims in this litigation and will be referred to as the "JOLs."

34.    PlusFunds Group, Inc. ("PlusFunds") was organized and incorporated as a Delaware corporation on or about March 25, 2002. PlusFunds was a New York based, United States registered investment advisor that offered investment vehicles to qualified investors.

35.    On March 6, 2006, PlusFunds initiated Chapter 11 bankruptcy proceedings by filing a voluntary petition for relief in the Southern District of New York. On August 7, 2007, Bankruptcy Judge James M. Peck entered an order confirming PlusFunds' Fifth Amended Plan

of Liquidation. As contemplated and authorized under the Plan and the Confirmation Order, third-party litigation claims formerly belonging to the PlusFunds estate were assigned to the SPhinX Trust pursuant to a September 20, 2007 Assignment and Assumption Agreement and SPhinX Funds Trust Agreement, with James P. Sinclair acting as Trustee. Mr. Sinclair is authorized to bring claims assigned to the SPhinX Trust in this litigation. The JOLs are the beneficiaries of recoveries obtained by the SPhinX Trust.

**B.    Defendants.**

36.    Defendant Christopher Sugrue ("Sugrue") co-founded PlusFunds and owned PlusFunds stock. At all times relevant, Sugrue served as Chairman of the Board and director of PlusFunds. Sugrue owed SPhinX and PlusFunds contractual and fiduciary duties as an officer and director of PlusFunds and as the founder of the SPhinX Funds. Sugrue solicited investors using SPhinX's Offering Memoranda and marketing materials and represented to investors that assets would be maintained in customer-segregated accounts. SPhinX and PlusFunds both reposed confidence and trust in Sugrue. Sugrue also served as an officer and/or director of Suffolk LLC, MKK LLC, Suffolk KAV LLC, and/or Suffolk SUG LLC. At all times relevant, Sugrue acted entirely for his own personal benefit, contrary to the interests of SPhinX and PlusFunds and with intent to conceal the truth from SPhinX's and PlusFunds' innocent officers and directors. Sugrue is a United States citizen and at all times relevant resided in New York. Sugrue caused certain events, which are the subject of this litigation, to occur in New York. Upon information and belief, Sugrue has fled the United States and currently resides in Angola.

37.    Defendant Mark Kavanagh ("Kavanagh") is an individual who served as a director of PlusFunds and owned PlusFunds stock. As a PlusFunds director, Kavanagh owed fiduciary and contractual duties to SPhinX and PlusFunds. Kavanagh served as an officer and/or director of Suffolk LLC, MKK LLC, Suffolk KAV LLC, and/or Suffolk SUG LLC. At all times

13

relevant, Kavanagh was acting entirely for his own personal benefit, contrary to the interests of SPhinX and PlusFunds and with intent to conceal the truth from SPhinX's and PlusFunds' innocent officers and directors. Kavanagh is Sugrue's brother-in-law. He is an Irish citizen and is believed to reside in Dublin, Ireland. Kavanagh caused certain events, which are the subject of this litigation, to occur in New York.

38.    Defendant Brian Owens ("Owens") is an individual who served as a director of PlusFunds and director of SPhinX. As a director of SPhinX and PlusFunds, Owens owed fiduciary and contractual duties to PlusFunds and SPhinX. Owens served as an officer and/or director of Suffolk LLC, MKK LLC, Suffolk KAV LLC, and/or Suffolk SUG LLC. At all times relevant, Owens was acting entirely for his own personal benefit, contrary to the interests of SPhinX and PlusFunds and with intent to conceal the truth from SPhinX's and PlusFunds' innocent officers and directors. Owens is an Irish citizen and is believed to reside in Ireland. Owens caused certain events, which are the subject of this litigation, to occur in New York.

39.    Defendant Phillip Bennett ("Bennett") is an individual residing in the State of New York. Bennett was the Chairman of the Board, CEO, and President of Refco Group Limited ("RGL"), which was formerly the parent holding company for the various Refco entities prior to Refco's IPO in August 2005. Thereafter, Bennett held the same positions with Refco, Inc. Bennett was also a director and shareholder of Refco and an investor in the SPhinX Funds and served as an officer and director of other Refco entities, including RGHI and RCM. Bennett has been indicted in the Southern District of New York and recently pleaded guilty to criminal conspiracy and fraud charges in connection with his role in the Refco fraud. Bennett caused certain events, which are the subject of this litigation, to occur in New York.

14

40.    Defendant PricewaterhouseCoopers L.L.P. ("PwC") is a Delaware limited liability partnership headquartered in New Jersey. PwC has offices located in New York and regularly provides auditing, accounting, and financial services in the State of New York. PwC was retained as the auditor for the SPhinX entities' and for PlusFunds' year 2003-2005 financial statements. PwC performed its audits of SPhinX primarily at the offices of DPM and DPM-Mellon in Somerset, New Jersey. PwC owed professional and contractual duties to SPhinX and PlusFunds arising out of its engagement as auditor to SPhinX and PlusFunds. PwC also performed tax and consulting work for PlusFunds and SPhinX and therefore owed fiduciary duties to PlusFunds and SPhinX. PwC also served as a financial consultant to the Refco entities and functioned as Refco's *de facto* Chief Accounting Officer.

41.    Defendant Mari Ferris ("Ferris") is an individual residing in the State of New York. Ferris was the engagement partner for PwC's 2003, 2004, and 2005 audits of the financial statements of the SPhinX Funds, and signed PwC's unqualified audit opinions on the financial statements of SPhinX for the fiscal years 2003 and 2004. Ferris was also the engagement partner for PwC's 2004 audit of the financial statements of PlusFunds, on which financial statements PwC issued an unqualified audit opinion. Ferris was also the engagement partner on PwC's audits of the financial statements of certain Refco funds, including SPhinX Managed Futures Index Fund LP, S&P Managed Futures Index Fund LP, Refco SPhinX Managed Futures Fund Ltd., and Refco Advantage Multi Manager Fund, among others, for the years 2003, 2004, and 2005. Ferris was intimately familiar with the business affairs and organizations of SPhinX, PlusFunds, and Refco.

42.    Defendant PricewaterhouseCoopers (Cayman Islands) ("PwC Cayman Islands") is a Cayman Islands resident company organized under the laws of the Cayman Islands. PwC

15

Cayman Islands entered into audit engagements with, and provided audit services to, the SPhinX Funds for at least the years 2003, 2004, and 2005.

43.    PwC LLP and PwC Cayman Islands provided audit and other professional services jointly, under the control of a common engagement partner of PwC LLP, to the SPhinX Funds for at least the years 2003, 2004, and 2005. In connection with these joint engagements, PwC LLP and PwC Cayman Islands are hereafter referred to collectively as "PwC."

44.    Defendant Grant Thornton LLP ("Grant Thornton") is an Illinois limited liability partnership. Grant Thornton has offices located in New York and regularly provides auditing, accounting, and financial services in the State of New York. Grant Thornton was retained as Refco's auditor for Refco's financial statements since approximately 2002. Grant Thornton issued clean and unqualified audit opinion letters on Refco's financial statements for fiscal years 2003, 2004 and 2005. Grant Thornton also served as the purportedly independent auditor for RCM.

45.    Defendant Mark Ramler ("Ramler") is an individual residing in New York. Ramler was the engagement partner for Grant Thornton on its engagement as Refco's auditor. Prior to working for Grant Thornton, Ramler was the engagement partner on the Refco account at Arthur Andersen. Ramler was intimately acquainted with Refco's business affairs and oversaw all of Grant Thornton's services as Refco's auditor. Ramler caused certain events, which are the subject of this litigation, to occur in New York.

46.    Defendant Ernst & Young U.S. LLP ("Ernst & Young") is a Delaware limited liability partnership. Ernst & Young has offices located in New York and regularly provides auditing, accounting, and financial services in the State of New York. Ernst & Young served as Refco's tax accountant and provided accounting and advisory services from approximately 1991

16

through the 2002 tax year, and continued to provide tax advice and assistance to Refco Group Ltd., LLC thereafter until 2005 on a worldwide basis.

47.    Defendant Gibson, Dunn & Crutcher LLP ("Gibson Dunn") is a Delaware limited liability partnership providing legal services and advice in the United States and internationally. Gibson Dunn has offices located in a number of states, including the State of New York. Gibson Dunn served as legal counsel to PlusFunds and SPhinX at relevant times. Gibson Dunn owed professional, fiduciary, and contractual duties to PlusFunds and SPhinX. Gibson Dunn also served as legal counsel to Mark Kavanagh, Chris Sugrue, Brian Owens, Suffolk LLC, Suffolk SUG LLC, MKK LLC, Suffolk KAV LLC, and Hardwicke, Ltd.

48.    Defendant Mayer Brown LLP, f/k/a Mayer Brown Rowe & Maw LLP ("Mayer Brown") is an Illinois limited liability partnership providing legal services and advice in the United States and internationally. Mayer Brown has offices located in a number of states, including the State of New York. Mayer Brown served as legal counsel to Refco at all relevant times. Mayer Brown is a global legal services organization comprising legal practices that are a combination of three limited liability partnerships: Mayer Brown LLP, a limited liability partnership established in the United States; Mayer Brown International LLP, a limited liability partnership incorporated in England and Wales; and JSM, a Hong Kong partnership, and its associated entities in Asia.

49.    Defendant Joseph P. Collins ("Collins") is an individual residing in Illinois. Collins is or, at least from 1994 through October 2005, was a partner at Mayer Brown and was the supervising partner on all services provided by Mayer Brown on behalf of Refco. Collins had done work for Refco for nearly ten years prior to 1994 while with another law firm and brought Refco as a client when he joined Mayer Brown in 1994. Collins is reputed to have

expertise in law related to securities and commodity trading. Collins has been indicted in the Southern District of New York and awaits criminal trial in connection with his actions regarding Refco.

50.    Defendant Edward S. Best ("Best") is an individual who, upon information and belief, resides in Illinois. At all times relevant, Best was a partner at Mayer Brown and, together with Collins, was a supervising attorney on Mayer Brown's Refco engagement. Best is the co-leader of Mayer Brown's Capital Markets and Financial Institutions groups and holds himself out as having expertise in securities and corporate law.

51.    Defendant Paul Koury ("Koury") is an individual who, upon information and belief, resides in Illinois. At all times relevant, Koury was an attorney at Mayer Brown who worked personally on the Refco engagement.

52.    Defendant Refco Alternative Investments LLC ("RAI") is a Delaware limited liability company. RAI is or was a commodity pool operator located in the State of New York. RAI was retained to execute trades and provide clearing services on behalf of the SPhinX Funds. RAI owed contractual and fiduciary duties to SPhinX and PlusFunds.

53.    Defendant Tone Grant ("Grant") is an individual residing in the State of Illinois. Up through 1998, Grant was President and CEO of RGL. Prior to August 2004, through his ownership interest in RGHI, Grant held a significant ownership stake in Refco. From 1999 through August 2004, Bennett and Grant each held a 50% interest in RGHI. In or around August 2004, concurrently with the Refco leveraged buy-out (the "August 2004 LBO" or the "LBO"), Grant sold his interest in RGHI to Bennett, leaving Bennett the sole owner of RGHI. Grant has been indicted in the Southern District of New York and awaits trial on criminal conspiracy and

fraud charges in connection with his actions at Refco. Grant caused certain events, which are the subject of this litigation, to occur in New York.

54.    Defendant Robert Trosten ("Trosten") is an individual residing in the State of Florida. Trosten was a member of Refco's corporate finance team from 1997 to 2001, and Refco Group's Chief Financial Officer from 2001 to October 2004. Trosten was intimately familiar with all details of the fraud he, Bennett, Maggio, and Grant perpetrated at Refco. Trosten has been indicted in the Southern District of New York and recently pleaded guilty to criminal fraud and conspiracy charges in connection with his actions at Refco. Trosten caused certain events, which are the subject of this litigation, to occur in New York.

55.    Defendant Santo Maggio ("Maggio") is an individual residing in the State of Florida. Maggio joined Refco in 1985, and held executive positions with various Refco entities until he was forced to resign in October 2005, following the disclosure of the massive fraud, he, Bennett, Trosten and Grant perpetrated at Refco. Among his other positions within Refco, he served as Executive Vice President of RGL and President and a director of RCM. Maggio also ran the brokerage operations of RSL and RCM and directed, orchestrated and supervised the diversion of RCM assets alleged herein. On December 19, 2007, Maggio pleaded guilty to securities fraud, wire fraud, bank fraud, money laundering, securities fraud and wire fraud charges in connection with the Refco fraud. Maggio caused certain events, which are the subject of this litigation, to occur in New York.

56.    Defendant Thomas Hackl ("Hackl") is an individual, who, on information and belief, resides in New York. From 1991 to 2002, Hackl served as the head of treasury and investment banking for BAWAG. From 2002 to 2004, Hackl served as executive vice-president of Refco Group and as a member of Refco's management committee. Hackl is Sugrue's close

friend and the godfather to one of Sugrue's children. Hackl negotiated interest rates and certain transactions between Refco and SPhinX and made false representations to PlusFunds' President that SMFF's assets were maintained in customer-segregated accounts at Refco. Hackl has been identified as an unindicted co-conspirator in the federal prosecution of Bennett, Trosten, and Grant in the Southern District of New York. Hackl caused certain events, which are the subject of this litigation, to occur in New York.

57.    Defendant Dennis Klejna ("Klejna") was an Executive Vice President and General Counsel of Refco Group from 1999 until Refco's collapse. Upon information and belief, Klejna was also an Executive Vice President and General Counsel of Refco LLC and RCM. Prior to joining Refco, Klejna was in private law practice where his practice focused on derivatives trading regulations and prior to that he was Director of the Division of Enforcement of the Commodity Futures Trading Commission. As General Counsel of Refco Group, his duties included supervising the Company's outside legal counsel on all significant legal matters, and reviewing and approving bills received from outside counsel that described the legal work performed. Klejna was directly involved in Refco's day-to-day operations, including its financial reporting and accounting functions. Klejna prepared and approved the Offering Memorandum for the Bonds, and Refco's fiscal year 2005 Form 10-K and Form 10-K/A. Klejna also prepared, approved and signed the Refco's October 12, 2004 Bond Registration Statement (including subsequent amendments), and Refco's August 2005 IPO Registration Statement.

58.    Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") f/k/a Credit Suisse First Boston LLC is a Delaware limited liability company with its headquarters in the State of New York. Credit Suisse is an investment banking firm that provides securities underwriting, financial advisory, sales and trading, and financial products and services. Credit

Suisse was a lead financial advisor, joint book-running manager, underwriter, and/or initial purchaser for the bond offering made as part of the LBO and the lead joint book-running manager and lead underwriter of Refco's August 2005 initial public offering (the "August 2005 IPO" or the "IPO"). Credit Suisse was also the exclusive financial advisor to Bennett and/or RGHI and/or RGL.

59.    Defendant Banc of America Securities LLC ("Banc of America Securities"), a subsidiary of Bank of America Corporation, is a Delaware limited liability company with its headquarters in the State of New York. Banc of America Securities is an investment banking firm that provides securities underwriting, financial advisory, sales and trading, and financial products and services. Banc of America Securities was a financial advisor, joint book-running manager, underwriter and/or initial purchaser for the bond offering made as part of the LBO and was a joint book-running manager of the August 2005 IPO.

60.    Defendant BAWAG P.S.K. Bank Fur Arbeit Und Wirtschaft Und Osterreichische Postparkasse Aktiengesellsehaft ("BAWAG") is a banking and financial services corporation organized and existing under the laws of Austria with its principal place of business in Wien, Austria.

61.    Defendant JP Morgan Chase & Co. ("Chase") is a Delaware corporation providing banking and financial services throughout the United States. Chase has offices and regularly transacts business in the State of New York and caused certain events, which are the subject of this litigation, to occur in New York.

62.    Defendant Thomas H. Lee Partners, L.P. ("THLP"), a Delaware limited partnership, is a private equity investment firm headquartered in Boston, Massachusetts, with

approximately $12 billion of capital under management.   THLP's business focuses on the

acquisition of substantial equity stakes in mid-to-large capitalization companies.

63.     In June 2004, THLP and its affiliates purchased a controlling 57% equity state in

Refco for approximately $507 million.  As a result, THLP held a majority stake in Refco and had

de facto control over its operations.  As detailed below, in addition to having voting control over

Refco, THLP and related THL entities had a variety of contractual rights that provided them with

additional cover over, and access to information about, Refco's affairs.  The THL entities

involved with Refco include:

- Thomas H. Lee Equity Advisors V, L.P. ("Equity Advisors V"), a Delaware limited partnership owned and controlled by THLP with its principal office in Boston, Massachusetts;

- THL Managers V, LLC ("Managers V"), a Delaware limited liability company with its principal office in Boston, Massachusetts of which all time THLP was the managing and controlling member;

- Thomas H. Lee Equity Fund V, L.P. and Thomas H. Lee Parallel Fund V, L.P., each a Delaware limited partnership with its principal office in Boston, Massachusetts owned and controlled by Equity Advisors V and Managers V;

- Thomas H. Lee Equity (Cayman) Fund V, L.P., an exempted limited partnership formed under the laws of the Cayman Islands, owned and controlled by Managers V and Equity Advisors V (registered in the Cayman islands as a foreign company) (together with Thomas H. Lee Equity Fund V, L.P. and Thomas H. Lee Parallel Fund V, L.P., the "Fund V Entities");

- Thomas H. Lee Advisors, LLC ("THL Advisors"), a Delaware limited liability company with its principal office in Boston, Massachusetts, and general partner of THLP;

- Thomas H. Lee Investors Limited Partnership, a Massachusetts limited partnership controlled by Thomas H. Lee; and

- The 1997 Thomas H. Lee Nominee Trust, a trust over which Thomas H. Lee has voting and investment control.

64.     THLP, THL Advisors, Managers V, Equity advisors V, Fund V Entities, Thomas

H. Lee Investors Limited Partnership, and the 1997 Thomas H. Lee Nominee Trust are

collectively referred to herein as the THL Entities.  As discussed in more detail below, the THL

Entitles always acted in concert.  They owned a majority stake in Refco from the date of THL's

leveraged buyout of Refco (the "LBO") until Refco's IPO.  Additionally, from the date of the

LBO until Refco's bankruptcy filing, the THL Entities controlled and directed Refco and

exercised discretion over its affairs.

      65.     THL held their interests in Refco through the Fund V Entities.

      66.     Defendant Thomas H. Lee ("Lee") was at all relevant times subsequent to the

LBO a director of Refco.  Lee founded the Thomas H. Lee Company, the predecessor of THLP,

in 1974 and served as its Chairman and CEO from its inception until reportedly leaving that

entity after October 2005.  As a director of Refco and as Chairman and CEO of THLP, Lee was

actively involved in the decision to invest in Refco and in THLP's subsequent monitoring of its

investment.  Lee is a resident of the state of New York, caused certain events, which are the

subject of this litigation, to occur in the state of New York.

      67.     Defendant David V. Harkins ("Harkins") was at all relevant times subsequent to

the LBO a director of Refco.  Harkins also served on Refco's nominating and governance

committee.  Harkins is Vice Chairman and Managing Director of Private Equity Funds of THLP,

and has also served as President of THLP.  As a director of Refco and as Chairman and a top

executive at THLP, Harkins was actively involved in the decision to invest in Refco and THLP's

subsequent monitoring of its investment.

      68.     Defendant Scott L. Jaeckel ("Jaeckel") was at all relevant times subsequent to the

LBO a director of Refco.  Jaeckel also served as treasurer of New Refco, treasurer of Refco

Finance Holdings, LLC, and treasurer of Refco Finance Inc., a co-offeror in Refco's Bond

Offering of May 2004.  Jaeckel is a Managing Director of THLP.  Jaeckel previously served as

Vice President of THLP from 2001 until December 2004, and as an Associate from 1994 to 1996 and from 1998 to 2001. Jaeckel holds an M.B.A. from Harvard University and his extensive experience in corporate finance includes previous employment in the Corporate Finance Department of Morgan Stanley & Co. As a director and officer of Refco and a top executive at THLP, Jaeckel was actively involved in the decision to invest in Refco and in THLP's subsequent monitoring of its investment. Jaeckel also attended meetings of the audit committee of Refco's Board of Managers.

69.     Defendant Scott A. Schoen ("Schoen") was at all relevant times after the LBO a director of Refco. Schoen served as President of New Refco; President of Refco Finance, Inc., a co-offeror in Refco's Bond Offering of May 2004; and sole director of Refco Finance, Inc. Schoen also served on Refco's nominating and governance committee as well as its compensation committee. Schoen joined THLP in 1986 and currently serves as its Co-President. He previously served as a Managing Director of THLP from 1992 to 2004 and as Vice President from 1988 to 1992. Schoen received an M.B.A. and law degree from Harvard University and, prior to joining THL, was in the private finance department of Goldman, Sachs & Co. As a director and officer of Refco and a top executive at THLP, Schoen was actively involved in the decision to invest in Refco and in THLP's subsequent monitoring of its investment. Defendant Thomas H. Lee Partners, L.P.

70.     Lee, Harkins, Jaeckel, and Shoen are collectively referred to herein as the "THL Individuals."

71.     The THL Entities and THL Individuals are collectively referred to herein as the "THL Defendants."

24

72.     Defendant Liberty Corner Capital Strategies, LLC ("Liberty Corner") was a hedge fund management company located in the state of New Jersey and organized under the laws of Delaware. At all relevant times, Liberty Corner was wholly owned and controlled by Defendant William T. Pigott. As described below, Pigott, through the instrumentality of Liberty Corner, agreed to serve as a conduit for over \$5 billion of fictitious loan transactions through which substantial Refco trading losses and operational expenses were concealed. Liberty Corner and Pigott caused certain events, which are the subject of this litigation, to occur in New York.

73.     Defendant EMF Financial Products LLC ("EMF Financial") is a Delaware corporation headquartered in New York that was at all relevant times controlled by Defendant Eric M. Flanagan. Flanagan directed two entities affiliated with EMF Financial, Defendants EMF Core Fund, Ltd. ("EMF Core Fund") and Delta Flyer Fund, LLC ("Delta Flyer"), to serve as the conduit for \$575 million in fictitious loan transactions through which the RGHI Receivable was concealed from February 2000 to February 2003. EMF Financial, EMF Core, Delta Flyer and Flanagan caused certain events, which are the subject of this litigation, to occur in New York.

74.     Defendant Ingram Micro, Inc. ("Ingram Micro") is a Delaware corporation with offices in New York. Ingram Micro is the world's largest technology distributor and a leading technology sales, marketing and logistics company. Ingram Micro agreed to use its subsidiary, defendant CIM Ventures, Inc. ("CIM Ventures"), to participate in two fictitious loan transactions with Refco in 2000 and 2001 through which \$400 million of the RGHI Receivable was concealed. Ingram Micro and CIM caused certain events, which are the subject of this litigation, to occur in New York.

75.     Defendant Beckenham Trading Co., Inc. ("Beckenham") is a New Jersey corporation wholly owned and operated by defendant Andrew Krieger. Beckenham engaged in a $125 million fictitious loan transaction with Refco in February 2002, designed to conceal the RGHI Receivable. Beckenham and Krieger caused certain events, which are the subject of this litigation, to occur in New York.

76.     Defendant Coast Asset Management, LLC (f/k/a Coast Asset Management LP) ("Coast"), a Delaware limited liability company, is a hedge fund manager based in the State of California. At the time of the RTLs, Defendant Christopher Petitt was the CEO of Coast. In February 2000, Coast's subsidiary, defendant CS Land Management, LLC ("CS Land"), entered into a $110 million fictitious loan transaction with Refco designed to conceal the RGHI Receivable. Coast, CS Land and Petitt caused certain events, which are the subject of this litigation, to occur in New York.

77.     Defendants Liberty Corner, Pigott, EMF Financial, EMF Core Fund, Delta Flyer, Flanagan, Ingram Micro, CIM Ventures, Beckenham, Krieger, Coast, CS Land, and Petitt are collectively referred to as the "RTL Participants."

78.     Defendant Refco Group Holdings, Inc. ("RGHI") is a Delaware, subchapter S corporation that, before the LBO, was owned 50% by Bennett and 50% by Grant. In connection with the LBO, Bennett acquired Grant's interest in RGHI and became the sole owner of RGHI. From 1999 until the LBO, RGHI held a 90% interest in Refco Group. The remaining 10% in RGL was controlled by BAWAG. RGHI caused certain events, which are the subject of this litigation, to occur in New York.

79.     Refco Associates, Inc. was at all relevant times an entity used by Refco to hold and move cash. Refco Associates, Inc. had an account at Chase that held large amounts of

money for short periods of time for use in the round-trip loan transactions and cash sweeps described herein.    The address for Refco Associates Inc. listed on the Chase account is nonexistent.    Plaintiffs have been unable to locate a valid address or service agent for Refco Associates Inc.    It is unknown whether Refco Associates, Inc. is a citizen of any state of the United States or a foreign jurisdiction, or whether Refco Associates Inc. is a properly organized entity.    The ownership of Refco Associates Inc. is also unknown.

### C.    Non-Parties.

80.    Robert Aaron ("Aaron") was a director of SPhinX from 2002 until 2006.    In this capacity, Aaron owed fiduciary and contractual duties to SPhinX and PlusFunds.    Aaron was the founder and owner of Derivatives Portfolio Management LLC and Derivatives Portfolio Management Ltd. (collectively, "DPM"), the administrator of the SPhinX Funds.    Aaron resides in New Jersey.

81.    Derivative Portfolio Management LLC ("DPM LLC") is a Delaware limited liability company with its principal place of business located in New Jersey.    DPM LLC served as SPhinX's administrator and owed fiduciary and contractual duties to SPhinX and PlusFunds. The assets and liabilities of DPM LLC were acquired by Mellon Financial Corporation in February 2005, after which DPM LLC operated as DPM-Mellon.

82.    Derivative Portfolio Management Ltd. ("DPM Ltd.") is a Cayman Islands entity with its principal place of business located in the Cayman Islands.    With DPM LLC, DPM Ltd. served as SPhinX's administrator and owed fiduciary and contractual duties to SPhinX and PlusFunds.    The assets of DPM Ltd. were acquired by Mellon Financial Corporation in February 2005, after which DPM Ltd. operated as DPM-Mellon.

83.    Bank of New York Mellon Corporation f/k/a Mellon Financial Corporation ("Mellon") is a Delaware company with its principal place of business in Pennsylvania.    In

27

February 2005, Mellon acquired the assets and liabilities of DPM LLC and DPM Ltd. After that date, the DPM entities operated as DPM-Mellon within Mellon's financial services division. Mellon is liable for the acts and omissions of DPM. Mellon owed contractual and fiduciary duties to SPhinX and PlusFunds.

84.    DPM-Mellon LLC and DPM-Mellon Ltd. (collectively, "DPM-Mellon") are, respectively, a Delaware limited liability company and a Cayman Islands entity. After Mellon acquired the assets and liabilities of DPM in early 2005, DPM continued to provide administration services to SPhinX and PlusFunds as DPM-Mellon, the successor entity to DPM. Mellon was the sole owner of DPM-Mellon and exercised control over DPM-Mellon through the right to appoint four of six board members. Mellon held complete control over DPM-Mellon and used DPM-Mellon to serve Mellon's own purposes. DPM-Mellon owed fiduciary and contractual duties to SPhinX and PlusFunds.

### III.    JURISDICTION.

85.    Plaintiff, the SPhinX Trust, was created in New York and its Trustee, James Sinclair, is a New York resident. The SPhinX entities, which will be beneficiaries of any recovery by Plaintiff the SPhinX Trust, are Cayman Islands companies and, more specifically, Cayman Islands segregated portfolio companies. The JOLs of the SPhinX entities, as so designated by the Grand Court of the Cayman Islands in the pending SPhinX insolvency proceedings, are Kenneth Krys and Christopher Stride, who are, respectively, resident in the Cayman Islands and the British Virgin Islands.

86.    PlusFunds Group, Inc., the transferor of all interests designated in the PlusFunds Plan of Liquidation to the SPhinX Trust, is a Delaware corporation, with its principal place of business in New York. By reason of the Fifth Amended Plan of Liquidation of PlusFunds, approved by the United States Bankruptcy Court for the Southern District of New York on

August 7, 2007, PlusFunds retains no interest in the assets, or proceeds of those assets, transferred by PlusFunds to the SPhinX Trust, as reflected in the Court's confirmation order of August 7.

87. This action does not arise under or arise in a Title 11 proceeding.

88. The Bankruptcy Court of the United States District Court for the Southern District of New York, as noted, confirmed the plan of liquidation of PlusFunds by order of August 7, 2007. PlusFunds, the debtor in that proceeding, is not a plaintiff in this action. The Bankruptcy Court for the Southern District of New York did not retain jurisdiction over any of the claims or causes of action transferred by PlusFunds to the SPhinX Trust, the Plaintiff herein.

89. Any recoveries herein by the SPhinX Trust will redound only to the benefit of the SPhinX Trust and its beneficiaries.

90. In the PlusFunds Fifth Amended Plan of Liquidation, filed on June 28, 2007, and subsequently confirmed by the Bankruptcy Court, that court retained jurisdiction to hear avoidance actions and preference claims on behalf of PlusFunds.

91. There is no retention of jurisdiction, either general or specific, by the Bankruptcy Court with respect to causes of action brought by the SPhinX Trust against third parties, as is present here.

92. By the PlusFunds Plan of Liquidation, the causes of action transferred to the SPhinX Trust are prosecuted for the sole and exclusive benefit of the JOLs on behalf of the SPhinX Funds (and, ultimately, the creditors and interest holders of the SPhinX Funds). Neither PlusFunds nor the PlusFunds General Trust created by the Liquidation Plan retained any interest in any assets transferred to the SPhinX Trust.

93.     The PlusFunds Plan of Liquidation also provided that the SPhinX Trustee has the absolute discretion to pursue or not to pursue the causes of action which were vested in the Trust in the exclusive best interests of the SPhinX Funds.  The PlusFunds Bankruptcy Court did not retain any approval power with respect to any action brought by the SPhinX Trustee to compromise, prosecute, or settle any objections to the causes of action which were transferred by PlusFunds to the SPhinX Trust.  As stated by the Bankruptcy Court, the SPhinX Trust "shall have the absolute discretion to investigate, pursue or not to pursue, or to settle, consistent with the SPhinX Trust Agreement, any and all causes of action vested in the SPhinX Trust as the SPhinX Trustee determines is in the best interests of the SPhinX Funds."

94.     The PlusFunds Liquidation Plan also provided that "neither the General Trust [nor] the SPhinX Trust shall be deemed a successor-in-interest of the debtor for any purpose other than as specifically set forth in the plan." (Article VI(C)).

95.     By the PlusFunds Liquidation Plan, the only assets which PlusFunds retains are its own proofs of claim filed in an unrelated bankruptcy, as well as certain PlusFunds claims against its agents.  These claims, which are not part of the present case, include certain avoidance actions or preference actions against XRoads Solutions Group, LLC or Curtis, Mallet-Prevost, Colt & Mosle, LLP, or any claim arising after PlusFunds' petition date that PlusFunds may have against any of its officers, directors, employees, agents, representatives, attorneys, accountants, experts, professionals or agents for any action taken or omitted to be taken arising out of or relating to the following: (i) PlusFunds' operations and/or administration of its bankruptcy case after the petition date; (ii) PlusFunds' Chapter 11 case; or (iii) the formulation, preparation, pursuit, etc. or consummation of the Plan and Disclosure Statement.

96.     The Refco Plan was approved by the Bankruptcy Court on December 15, 2006.

97.     Neither the SPhinX Trustee, James Sinclair, nor the Joint Official Liquidators appointed by the Cayman Islands Court, Kenneth Krys, and Christopher Stride, have any relation to the Refco bankruptcy or to the Refco estates.  Nor will any recovery in the present action by Plaintiffs in any way benefit, augment, or enhance the Refco estate.  Recoveries in this action will redound only to the benefit of the Plaintiffs and their beneficiaries, the SPhinX Funds.

98.     Equally, no recovery by Plaintiffs herein will deplete, diminish, or adversely impact the Refco bankruptcy estates.

## IV.     VENUE

99.     Venue is proper in this county pursuant to CPLR 503(a), (c) and (d) in that, *inter alia*, certain of the defendants, including Ernst & Young LLP maintain their principal offices in New York County.

## V.     THE SPHINX FUNDS AND PLUSFUNDS.

### A.     History.

100.     Diego Winegardner and Defendant Chris Sugrue founded PlusFunds Ltd. as a Cayman Islands corporation in or about 1998.  From inception, the PlusFunds business model included business technology and infrastructure to provide a hedge fund platform with transparency and real-time valuation capability.  PlusFunds Ltd. sought to provide investors with accurate valuations of their investments on a daily basis, a feature that was then unavailable.

101.     By late 2001, PlusFunds Ltd. had developed intellectual property and technology including a comprehensive valuation and risk management platform for the hedge fund industry.

102.     In 2001, PlusFunds Ltd. established a relationship with Standard & Poor's, a division of the McGraw Hill Companies ("S&P").  S&P and PlusFunds Ltd. envisioned a new composite hedge fund index that would represent the primary strategies of the hedge fund industry.  S&P agreed to publish the hedge fund index and identify and monitor individual

portfolio managers for inclusion in the index. The portfolio managers were to be identified and selected based upon a track record of investments in particular strategies represented in the S&P Hedge Fund Index.

103.    On December 20, 2001, PlusFunds Ltd. entered into an exclusive license agreement with S&P that entitled PlusFunds Ltd. to develop and market hedge fund investment products designed to track the S&P Hedge Fund Index. The licensing agreement provided PlusFunds Ltd. with the right to use the S&P and S&P Hedge Fund Index marks to market the new PlusFunds Ltd. platform.

104.    In March 2002, after an infusion of new capital from investors, PlusFunds Group, Inc. ("PlusFunds") was organized as a Delaware corporation, and the S&P License was assigned to this new entity.

### B.    The SPhinX Funds.

105.    Beginning in the spring of 2002, PlusFunds created the SPhinX Funds, deriving the name from the **S&P H**edge Fund **I**ndex. The SPhinX Funds were designed to achieve returns consistent with the performance of the S&P Hedge Fund Index.

106.    The initial Board of Directors for the SPhinX Funds included Robert Aaron, Stuart Drake, and Martin Grennell. Subsequent directors included Brian Owens, Patrina Khoo Farquharson, and Andrew Feighery.

107.    The SPhinX Funds were a group of investment vehicles designed to address a broad range of investor needs. The Funds were comprised of separate investment portfolios corresponding to the investment strategies represented in the S&P Hedge Fund Index.

108.    The various SPhinX Funds entities, which were collective investment vehicles, were divided into three categories: (1) Feeder Funds, designed to support investments and issue subscriptions; (2) Master Funds, designed to capture operational efficiencies; and (3) Portfolio

Funds, segregated portfolio companies organized under Cayman Islands law in which portfolio managers trade in securities and commodities.

**C.    Segregated Portfolio Companies.**

109.    Cayman Islands law provides for a segregated portfolio company ("SPC") to segregate assets and liabilities within an SPC.  Within each SPhinX Portfolio Fund were a number of segregated portfolios.  Under Cayman law, customer assets within each segregated portfolio, or "cell," within an SPC are protected from cross-liability; *i.e.*, the assets maintained in one portfolio are protected from creditors of another cell or the general creditors of the SPC in the event of insolvency.

110.    Cayman Islands Companies Law, referenced in SMFF's Articles of Association and SPhinX's offering materials, provides:

> A segregated portfolio company may create one or more segregated portfolios in order to segregate the assets and liabilities of the company held within or on behalf of the portfolio from the assets and liabilities of the company held within or on behalf of any other segregated portfolio of the company or the assets and liabilities of the company which are not held within or on behalf of any segregated portfolio of the company.

111.    Cayman Islands Companies Law further provides:

> Segregated portfolio assets-
>
> (a)    shall only be available and used to meet liabilities to the creditors of the segregated portfolio company who are creditors in respect of that segregated portfolio and who shall thereby be entitled to have recourse to the segregated portfolio assets attributable to that segregated portfolio for such purposes; and
>
> (b)    shall not be available or used to meet liabilities to, and shall be absolutely protected from, the creditors of the segregated portfolio company who are not creditors in respect of that segregated portfolio, and who accordingly shall not be entitled to have recourse to the segregated portfolio assets attributable to that segregated portfolio.

112.   The actual trading and investment activities of the SPhinX SPCs were performed by independent portfolio managers, with each portfolio manager directing investment activity within a single segregated portfolio. Each of the individual portfolio managers was identified by S&P as representative of strategies represented on the S&P Hedge Fund Index.

113.   Among the various Portfolio Funds was SMFF, which at various times was comprised of 14 or 15 segregated portfolios, each managed by a separate portfolio manager.

114.   The relationship among the portfolio manager, the relevant SPhinX Funds and PlusFunds was governed by a Discretionary Investment Management Agreement ("DIMA").

115.   Under the DIMAs, PlusFunds delegated certain of its investment management authority over the cell to the portfolio manager, who invested capital in accordance with one of nine hedge fund strategies.   SMFF portfolio managers, for example, pursued strategies represented in S&P's Managed Futures Index, a subset of the S&P Hedge Fund Index.

116.   This unique structure, coupled with the exclusive S&P license, proprietary computer software and business practices, allowed PlusFunds and SPhinX to offer an array of investment products on a cost-optimized basis.

117.   An investor in SPhinX was issued shares in one of the Feeder Funds, and the proceeds of the investment flowed through one or more Master Funds to one or more SPC, where the proceeds were then allocated among different segregated portfolios or cells within the SPC, according to the investment strategy selected by the investor.

118.   Thus, an investor who elected to invest in SPhinX Ltd. or SPhinX Strategy Fund Ltd., two feeder funds, could elect to have a portion of the invested proceeds flow into SMFF, where those proceeds would be allocated among the 14 or 15 segregated portfolios within SMFF, each managed by a separate portfolio manager.

34

**D.    Customer Segregation.**

119.    The SPC structure and customer-segregation requirements were key components of the SPhinX Funds and were prominent in SPhinX's marketing materials, organizational documents, and Offering Memoranda.

120.    SMFF's Articles of Association provide:

> The Company may create one or more Segregated Portfolios in order to segregate the assets and liabilities of the Company held within or on behalf of a Segregated Portfolio from the assets and liabilities of the Company held within or on behalf of any other Segregated Portfolio or the General Assets.

> Each Segregated Portfolio shall be separately designated or identified in accordance with Part XIV of the Law and shall include in its name the words 'Segregated Portfolio'.

121.    The Cayman Islands Companies Law provides:

> It shall be the duty of the directors of a segregated portfolio company to establish and maintain (or cause to be established and maintained) procedures –

> (a)    to segregate, and keep segregated, portfolio assets separate and separately identifiable from general assets;

> (b)    to segregate, and keep segregated, portfolio assets of each segregated portfolio separate and separately identifiable from segregated portfolio assets of any other segregated portfolio;

> (c)    to ensure that assets and liabilities are not transferred between segregated portfolios otherwise than at full value.

122.    In addition to protection from cross liability, the SPC business structure and SPhinX business plan required customer assets to be maintained in customer-segregated accounts so that the segregated portfolios were protected from the potential insolvency of the custodian or prime broker holding the assets. SMFF's Articles of Association provide:

> The assets held in each Segregated Portfolio shall be held, subject to the provision of the Law and these Articles, for the benefit of the holders of the relevant Common Shares attributed to such

Segregated Portfolio and applied solely in respect of the liabilities of such Segregated Portfolio in accordance with the provision of the Law.

123.    The Offering Memoranda of SPhinX Ltd. and SPhinX Strategy Fund Ltd. represented:

> That portion of a Portfolio Fund Series' assets which are fully paid and not Margin Securities may be physically commingled with other customer assets but will be properly identified in the name of the Portfolio Fund Series in a separate customer account on the prime broker's official books and records ("Customer Assets"). Customer Assets are held by the prime broker with the assets of other customers on a segregated basis from the prime broker's assets and are not subject to the claims of the prime broker's creditors. Additionally, in order to ensure that assets of a prime broker's customers are not used by the prime broker to fund the prime broker's proprietary business operations, the prime broker is required to maintain a special segregated bank account for free cash balances (i.e., cash not subject to the claims of the prime broker) and must periodically post its own cash (or other qualified securities) in such account equal to the Margin Securities used to generate cash in excess of any loan to a Portfolio Fund Series. In the event of insolvency of the prime broker, all customer assets will be for the exclusive benefit of the Portfolio Fund Series and other customers of the prime broker for whose benefit the accounts have been established, and will be unavailable to the creditors of the prime broker. [Emphasis added.]

124.    SPhinX marketing materials emphasized that SPC assets would be "ring-fenced" and maintained in customer-segregated accounts to protect those assets. "Ring fencing" specifically referred to the protection of segregated portfolios from cross-liability. Assets of segregated Portfolio A could not be used to satisfy claims against Portfolio B. In general terms, ring fencing also refers to the fact that SPC assets are protected by Cayman Islands law and by contract as provided in the Offering Memorandum and organizational documents.

125.    Marketing and promotion materials PlusFunds provided to potential investors, and available for review by Defendants herein, touted the protection from credit risk afforded SPhinX Funds assets. For example, a PlusFunds document entitled "Frequently Asked

Questions By Investors About SPhinX Products", dated May 24, 2004, stated among other things:

**2.    What is a SPC?**

*Segregated Portfolio company ("SPC") is an exempted company which is registered under section 233(1) of the Companies Law (2002 Revision) and which, as a result, is able to separate its assets into general and portfolio assets, rather than having said assets commingled as was traditionally done in the past.*

General assets, as the name suggests, are the general assets of the SPC (which is usually a nominal amount) that are subject to cross liability by all creditors of the SPC. However, the *portfolio assets are protected from claims of creditors in other portfolios. Therefore, only creditors of a particular portfolio can bring a claim against the assets of that specific portfolio, and if the assets therein are insufficient to extinguish the claim that creditor can proceed against the general assets of the company.*

\* \* \*

**4.    Are the assets of each Portfolio Fund Series (PFS) commingled?**

*No. The Portfolio Fund Series are separate and distinct entities with all assets segregated at various Prime Brokers or Futures Commission Merchant for each Portfolio Manager.* The Portfolio Manager has full discretion to invest and trade those assets generally in accordance with the strategies they employ on behalf of their other accounts.

**5.    If a manager is unable to meet the liabilities to its creditors, do the creditors have recourse to other assets within that SPC?**

No. By Cayman Law definition, the general assets and the assets of that Portfolio Fund Series of a Segregated Portfolio Company shall only be used to satisfy liabilities to the Creditors of that Portfolio Fund Series. *PlusFunds also goes one step further. To assure nor recourse, we also include specific naming conventions and ring fencing language in our counterparty and Prime Brokerage Documentation.*

\* \* \*

37

PlusFunds Group, Inc. plans to report credit risk exposure to provide investors with more information.

\* \* \*

**1.      Are any of the SPhinX Products listed on an Exchange?**

Yes, SPhinX, Ltd. and SPhinX Strategy Fund Ltd. are listed on the Irish Stock Exchange.

(Emphasis added.)

A PlusFunds' marketing brochure entitled "The SPhinX Investment Program: A Prudent Path to Hedge Fund Investing" further stated:

PlusFunds, a SEC-registered investment advisor, serves as investment manager of the SPhinX Investment Program and provides investors:

Effective Legal Structure on Operational Control — Participating managers trade within separate accounts established by PlusFunds and provide investors the benefits of their investment expertise. PlusFunds, however, protects investors by establishing custody arrangements, counterparty agreements and cash movement controls that manage operational risk. In addition, each separate account is legally and contractually ring-fenced to prevent cross-liability.

\* \* \*

Central to PlusFunds' intelligent approach to hedge fund investing is the requirement that PlusFunds' assets are held in a separate account and not commingled with the assets of other fund investors.

126.    The DIMAs executed by SMFF, PlusFunds and the individual portfolio managers bolstered the customer segregation requirements. The relevant DIMAs represent that SMFF assets "including any uninvested cash" would be maintained at Refco's regulated affiliate, Refco LLC, acting as the "Settlement and Custody Agent."

127. On or about November 19, 2002, SMFF opened customer-segregated accounts for each of its cells at Refco LLC, Refco's regulated affiliate. The account opening documentation provided:

> All property carried for Customer [SMFF] by Refco shall be segregated as required by the Commodity Exchange Act and the rules of the Commodity Futures Trading Commission (CFTC).

128. The Refco LLC account opening documents for SMFF further stated:

> If your security futures positions are carried in a futures account, they must be segregated from the brokerage firm's own funds and cannot be borrowed or otherwise used for the firm's own purposes. If the funds are deposited with another entity (e.g., a bank, clearing broker, or clearing organization), that entity must acknowledge that the funds belong to customers and cannot be used to satisfy the firm's debts. Moreover, although a brokerage firm may carry funds belonging to different customers in the same bank or clearing account, it may not use the funds of one customer to margin or guarantee the transactions of another customer. As a result, the brokerage firm must add its own funds to its customers' segregated funds to cover customer debits and deficits. Brokerage firms must calculate their segregation requirements daily.

129. Thus, Refco LLC assumed a duty to maintain SPhinX's assets in segregated accounts. Refco LLC also, in accepting custody of SPhinX assets, assumed fiduciary duties to safeguard such assets and not to use them for Refco's own purposes or business operations.

130. The customer-segregation requirement was essential to the SPhinX Funds, as mandated under Cayman law and relied upon by SPhinX investors. Safeguarding the segregated nature of the assets provided a crucial level of protection to SPhinX's assets against the bankruptcy or insolvency of other investors, brokers, custodians, and service providers.

131. Investors relied on the representations contained in the marketing materials and Offering Memoranda, and financial statements and based their decision to invest on those representations. The materials relied on by the investors reflected current materials available at the time of the investors respective investment in the funds. Those who invested in 2003 for

example, would have reviewed the financials from 2003 as well as the marketing materials and Offering Memoranda provided to them at that time. Investors in 2004 would have, for example, received the 2004 financials. Investors were unaware that those representations regarding segregated funds were false and misleading.

132.    The SPhinX investors reasonably relied on those representations.

133.    In just a short time after their inception, the SPhinX Funds succeeded in attracting an impressive level of AUM. AUM approached $1 billion by the end of 2003 and peaked at over $3 billion in 2004 and 2005.

134.    Investors, including the assignors of claims referenced herein, were provided with and reviewed SPhinX marketing materials and Offering Memoranda. These materials discussed, in detail, the nature of the funds and, in particular, the special requirements relating to the segregation of investor funds that is discussed in greater detail herein.

**E.    Connections and Providers.**

**1.    PlusFunds' Role as Investment Manager.**

135.    On or about July 12, 2002, SPhinX Ltd. entered into an Investment Management Agreement ("IMA") with PlusFunds. Various SPhinX Funds thereafter entered into identical IMAs with PlusFunds.

136.    Under the IMAs, PlusFunds was the exclusive investment manager for SPhinX. PlusFunds was given broad authority and discretion to run SPhinX's daily operations, as well as the responsibility to allocate assets, transfer and hold cash balances, open and maintain bank accounts, make distributions of assets, borrow and pledge funds, hire service providers and professionals and execute documents for and on behalf of SPhinX.

137.    PlusFunds and its management and Board of Directors owed the SPhinX Funds contractual and fiduciary duties, including duties to exercise due care and to manage SPhinX's funds for the sole benefit of SPhinX.

138.    At relevant times, PlusFunds' directors included Christopher Sugrue, Mark Kavanagh, Brian Owens, Diego Winegardner, Randall Yanker, Doug Morriss, and John Wehrle.

139.    Under the IMAs, PlusFunds received a management fee equal to a percentage of AUM as of the beginning of each month.  PlusFunds typically collected approximately 1.7% of AUM in the aggregate for management fees.  Approximately 97% of PlusFunds' 2005 revenues derived from SPhinX management fees.

140.    SPhinX had no employees or physical facilities.  Meetings of SPhinX's Board of Directors took place in New York at the offices of PlusFunds, with some SPhinX directors attending in person and others participating by telephone.  PlusFunds' representatives were present at meetings of SPhinX's board, and a PlusFunds' employee acted as the secretary for the SPhinX board meetings and prepared the board minutes.

141.    Although PlusFunds and the various SPhinX entities maintained their separate legal existence, the business and operations of SPhinX and PlusFunds were closely intertwined. Service providers, contract parties, and investors dealing with the SPhinX Funds generally communicated with PlusFunds agents and understood that PlusFunds acted as the investment manager for the SPhinX Funds.

### 2.    Refco's Role.

142.    Beginning in the 1990s, Refco Group Ltd. LLC, its successor entity, Refco Inc., and affiliated subsidiaries (collectively, "Refco Group") provided execution and clearing services for exchange-traded derivatives and prime brokerage services in the fixed income and

foreign exchange markets. At all relevant times, Refco LLC and Refco Capital Markets, Ltd. ("RCM") were two of Refco Group's three operating subsidiaries.

143.   As of the July 12, 2002 execution of the IMA, PlusFunds had agreed to retain Refco LLC to act for SPhinX's benefit and on its behalf, Refco LLC provided execution, clearing, and margin services in connection with futures and commodities trading activities.

144.   Refco LLC held customer assets belonging to SMFF. Refco LLC owed SMFF contractual and fiduciary duties in connection with SMFF's cash and assets, including duties to hold SMFF's assets and execute trades for SMFF's benefit, and not to use those assets for the benefit of Refco LLC or its principals and affiliates. Refco LLC also owed a duty to disclose facts relevant to the assets entrusted to Refco.

145.   As a regulated entity, Refco LLC maintained its customer assets in customer-segregated accounts at Harris Bank, such that these assets were protected in the event of Refco LLC's insolvency.

146.   PlusFunds also arranged for Refco Alternative Investments ("RAI"), a regulated commodity pool operator located in New York, to execute trades for SPhinX at the direction of PlusFunds. RAI also managed several external funds, including the S&P Managed Futures Index Fund LP that invested in the SPhinX program. RAI likewise owed contractual and fiduciary duties with respect to SPhinX's assets, including duties to use and hold those assets for SPhinX's benefit and not to use those assets for the benefit of RAI or its principals and affiliates.

147.   SMFF's segregated portfolios also held foreign currency exchange accounts with RCM, a non-regulated Bermuda entity. RCM was an offshore securities and foreign exchange broker. RCM also assumed fiduciary and contractual duties in connection with SMFF's assets,

including duties not to use those assets for the benefit of RCM or Refco and to disclose facts and information relevant to SMFF's assets entrusted to RCM.

148.    Refco made substantial investments in SPhinX. As a SPhinX investor, Refco received SPhinX's Offering Memoranda and other materials.  Accordingly, Refco fully understood the SPhinX SPC business structure and the customer segregation requirements.

149.    Refco's President and CEO, Bennett, also invested in SPhinX, as did BAWAG, a controlling shareholder in Refco. PlusFunds' chairman, Sugrue, had close relationships with Refco and Bennett, who were well acquainted with the SPhinX Funds. Another PlusFunds director, Kavanagh, was also well connected with Refco, which employed Kavanagh's son, Michael.

150.    Refco also acted as a distributor for the SPhinX Funds, creating and marketing its own funds that invested in SPhinX. In this role, Refco used SPhinX and PlusFunds' marketing materials and made representations to investors regarding SPhinX's structure and customer segregation requirements.

151.    As a result of the totality of the facts and circumstances surrounding the relationship between SPhinX and Refco, Refco and its directors and officers owed fiduciary duties to SPhinX with respect to investment funds entrusted to Refco.  These facts and circumstances included, among others and without limitation:

    (a)    Refco's acceptance of responsibility to act at all times on SPhinX's behalf and in its best interest;

    (b)    the custodial and entrustment nature of the relationship between Refco and SPhinX with respect to SPhinX customers' funds;

    (c)    the fact that SPhinX entrusted its funds to Refco with the reasonable expectation that the funds would be returned to SPhinX and SPhinX customers on their instruction;

(d)    Refco's decision to make use of SPhinX customer funds for purposes unrelated to Refco's ability to service its customers, including SPhinX, and without any benefit to the SPhinX funds;

(e)    the undisclosed facts and risks to which SPhinX customer funds were exposed by virtue of the undisclosed, unsecured, uncollateralized transactions alleged herein;

(f)    the concealed fact that Refco and RCM were insolvent beginning no later than December 2002;

(g)    the lack of deposit or similar insurance protecting the SPhinX customer funds transferred to RCM;

(h)    Refco's public statements concerning, among other things, its "focus on acting as an agent," its "customer-oriented philosophy," its appeal to "customers concerned about potential conflicts of interest," and its efforts to "avoid potential conflicts with [its] customers";

(i)    Refco's public statements, designed to foster greater trust and confidence with customers, that the business of Refco did not involve proprietary trading for Refco's account but rather involved acting as an agent and executing customer instructions;

(j)    Refco's statements to the effect that the relationships between Refco and other Refco entities were structured in such a way as to ensure that Refco would be able to satisfy its obligations to its customers before funds from Refco could be made available to other Refco entities for other corporate purposes, such as discharging obligations under notes issued by other Refco entities on which Refco was not obligated and which Refco did not guarantee;

(k)    the lack of indicia that the relationship between Refco and SPhinX was a debtor/creditor relationship, in which the SPhinX funds were lenders to or investors in Refco or any other Refco entity;

(l)    Refco's failure to disclose to SPhinX or PlusFunds the existence, nature, and extent of the massive intercompany transfers alleged herein;

(m)    the lack of any communications from Refco to SPhinX or PlusFunds that would have suggested to SPhinX or PlusFunds that SPhinX customer funds were being deposited in unregulated, non-segregated accounts where they were subject to the risk of loss to Refco's creditors, and that neither Refco nor RCM could be relied upon to return their funds when instructed to do so; and

(n)    Refco's superior knowledge of all of the underlying facts and the fraud alleged herein.

44

152.    The nature of the relationship between Refco on the one hand, and SPhinX and PlusFunds on the other, was such that innocent decision-makers at SPhinX and PlusFunds had every reason to expect that SPhinX funds in accounts at Refco would be held in regulated, customer-segregated accounts and would be returned to them on their instructions.

### 3.    DPM's Role.

153.    Under the Investment Management Agreement, PlusFunds was authorized and required to engage professionals and service providers necessary to operate the SPhinX Funds. Pursuant to this authority, PlusFunds engaged Derivatives Portfolio Management LLC ("DPM LLC") and its subsidiary, Derivatives Portfolio Management Ltd. ("DPM Ltd."), (collectively "DPM") to serve as the SPhinX Funds' administrator.    The relationship among the SPhinX Funds, PlusFunds, and DPM was governed by a Service Agreement dated July 9, 2002, and amended on May 1, 2003, and June 30, 2004.

154.    In February 2005, Mellon acquired the assets and assumed the liabilities of DPM, which continued to provide administration services as DPM-Mellon.  DPM-Mellon succeeded to the interests and obligations of DPM under the Service Agreement.

155.    Under the Service Agreement, DPM, as administrator to the SPhinX Funds, was obligated to perform financial and accounting services on behalf of SPhinX and PlusFunds. SPhinX and PlusFunds relied upon DPM to perform the services necessary for the administration of the SPhinX companies, including recordkeeping, accounting, financial reporting and cash management functions.

156.    SPhinX and PlusFunds reposed confidence and trust in DPM by delegating important duties to DPM.  DPM owed fiduciary duties to SPhinX and PlusFunds.

157.    The Service Agreement required DPM to perform all services necessary for administration and reconciliation of the SPhinX Funds, including, but not limited to, providing:

45

daily activity and portfolio reports; daily reconciliations; daily and monthly valuations and NAV reports; reconciliations of marketable instruments, cash and security positions; monthly reports, including gains and losses, accrued dividend and interest analysis; market and credit risk reports; corporate secretarial functions; and quarterly unaudited financial statements.

158.    Among other things, the Service Agreement required DPM to:

> Fulfill one board of director position of the SPhinX Ltd., SPhinX Strategy Fund Ltd., Portfolio Funds, SPhinX Plus SPC, Ltd. and Strategy Master Funds.

159.    DPM's CEO and owner, Robert Aaron, sat on the Board of Directors of the various SPhinX Funds, including SMFF, as the representative of DPM and DPM-Mellon. At all times relevant, DPM and, thereafter, DPM-Mellon and Mellon, had a duty to supervise and manage the activities of Robert Aaron, and are responsible for his actions.

160.    In exchange for providing its services under the Service Agreement, DPM was paid an administration fee calculated as a percentage of assets under management.

161.    DPM and Aaron owed fiduciary duties to both SPhinX and PlusFunds arising out of DPM's role as administrator of the funds.

## VI.    DIVERSION OF SMFF'S EXCESS CASH.

162.    Beginning in the late 1990s and continuing through the end of 2005, Refco was involved in a massive scheme to conceal hundreds of millions of dollars in unrecoverable customer and proprietary losses and falsify Refco's financial statements. Essential to this scheme was ready access to cash, which was necessary to fund Refco's operations and conceal Refco's losses.

163.    As discussed in greater detail below, Refco had three primary operating subsidiaries, Refco Securities, LLC ("RSL"), Refco LLC and RCM. The first two units were

46

regulated entities bound by restrictions on treatment of customer assets, including segregation requirements and the obligation not to use customer assets to fund operations.

164.    The third branch of Refco's operations, RCM, was an unregulated Bermuda entity without the strict regulatory obligations. In order to free up cash to fuel the Refco fraud, Refco funneled as many assets to RCM as possible, where those assets could be used to fund Refco's operations and conceal Refco's losses.

**A.    Robert Aaron Signs the July 31, 2002 Document.**

165.    On or about July 31, 2002, Aaron signed a document (the "July 31, 2002 Document") on Refco stationery and at Refco's request that provided Refco with the authority to transfer SMFF's cash and other assets interchangeably among Refco entities without regard to segregation or protection of assets.

166.    Specifically, the July 31, 2002 Document stated:

> You are hereby authorized at any time and from time to time, in your sole discretion and without prior authorization from or notice to the undersigned entities, to transfer monies, securities, commodities or other property, for purposes of satisfying margin obligations, the production or satisfaction of any debit balance, or the satisfaction of any other commitments of the undersigned parties, interchangeability [sic] among and between the accounts of the undersigned maintained at one or more of the above entities (together or separately, 'Refco'). Such transfers may include transfers from a regulated commodity interest or securities account to any other account (including an unregulated account) of the undersigned entities.

167.    The document also included a prominent acknowledgement that segregation and protection of funds might be lost:

> CERTAIN REFCO ENTITIES ARE SUBJECT TO LAWS AND REGULATIONS WHICH MAY REQUIRE SEGREGATION OF THE UNDERSIGNED'S FUNDS AND PROPERTY AND ENTITLE THE UNDERSIGNED'S PROPERTY TO PREFERENTIAL TREATMENT IN THE UNLIKELY EVENT OF THE INSOLVENCY OF A PARTICULAR REFCO ENTITY.

47

BY PERMITTING THE TRANSFER OF FUNDS AND PROPERTY AMONG THE UNDERSIGNED'S ACCOUNTS, THE UNDERSIGNED ACKNOWLEDGES THAT SUCH SEGREGATION AND PREFERENTIAL TREATMENT MAY NOT BE RECEIVED.

168.    There was no legitimate business justification for Aaron to execute the July 31, 2002 Document. As Aaron knew and understood, SMFF's assets were required to be maintained in customer-segregated accounts, protected from the insolvency of the prime broker or custodian of the assets. His decision to sign the July 31, 2002 Document destroyed the protections in place to preserve SMFF's assets for its investors.

169.    Aaron signed the July 31, 2002 Document to further his own interests. From his role at DPM and his role on SPhinX's Board, Aaron understood that PlusFunds director Chris Sugrue had a close relationship with Refco. He understood that challenging Refco or refusing to accommodate Refco could jeopardize DPM's relationship with PlusFunds and the SPhinX Funds, the major client of DPM.

170.    Aaron signed the July 31, 2002 Document at Refco's request with full knowledge of the document's effect.

171.    Aaron's actions were in breach of duties imposed on SPhinX's directors to establish and maintain procedures to identify and segregate assets. Aaron's actions were adverse to the interests of PlusFunds and SPhinX, and PlusFunds and SPhinX in no way benefited from them.

172.    Aaron has testified and admitted that he understood that the July 31, 2002 Document permitted the transfer of funds among Refco LLC and RCM accounts. Aaron understood that the transfer of SMFF funds among Refco accounts might result in the loss of segregation and preferential treatment relating to those funds. Aaron understood when he signed the July 31, 2002 Document that he was placing SPhinX assets at risk and that protection and

segregation might be lost. He understood that keeping cash at RCM exposed SMFF's cash to an insolvency risk.

173.    Aaron did not consult or notify innocent SPhinX Board Members or PlusFunds before or after signing the July 31, 2002 Document. In fact, the existence and terms of the July 31, 2002 Document were concealed from innocent decision-makers at SPhinX and PlusFunds, including the SPhinX Board and the PlusFunds Board and management.

174.    Innocent members of SPhinX's Board and PlusFunds' management and/or board were unaware of the July 31, 2002 Document and that SPhinX's assets might be removed from regulated, protected, customer-segregated accounts. They were further unaware that SPhinX's funds at Refco might be subject to the claims of Refco's creditors in the event of insolvency.

175.    Although certain members of PlusFunds' management team were aware that SMFF's cash was swept from Refco LLC accounts to RCM, PlusFunds' management was unaware that RCM was an unregulated entity that commingled customer assets and could not provide customer segregation or protection from claims of RCM's creditors. Innocent members of PlusFunds' Board and management and the SPhinX Board were unaware that hundreds of millions of dollars of SMFF's cash were not maintained in customer-segregated accounts at a regulated entity or were exposed to the risk of RCM's insolvency.

176.    Had the innocent decision-makers at SPhinX and/or PlusFunds understood that SMFF's cash was exposed in unregulated, non-segregated, commingled accounts, they would have caused SMFF's assets to be moved to regulated, customer-segregated, protected accounts.

**B.    SPhinX and PlusFunds Monitored Their Exposure at Refco.**

177.    Although the SPhinX Funds had contracted to use Refco LLC, RAI and RCM for various services, innocent members of PlusFunds' management team were cautious about the Funds' relationship with Refco and monitored the Funds' exposure at Refco.

49

178.   Throughout the existence of the SPhinX Funds, PlusFunds' management and S&P convened a risk committee that analyzed the SPhinX Funds' risk exposure to trading counterparties and providers, including Refco-related entities.

179.   Because Refco did not have a credit rating from a recognized credit agency, PlusFunds' risk committee conducted an analysis of Refco's financial position and calculated a "shadow rating" designed to estimate Refco's approximate credit rating. PlusFunds relied upon publicly available information, including Refco's financial statements and public filings to generate the shadow rating.

180.   Based upon PlusFunds' shadow rating of Refco, PlusFunds calculated guidelines to limit SPhinX's exposure on transactions with or assets entrusted to Refco.

181.   Innocent members of PlusFunds' Board and management were also aware of significant Refco transactions, including the August 2004 LBO transaction and August 2005 IPO for Refco stock, and the fact that those transactions were negotiated and underwritten by prominent and reputable law firms and banks, including Mayer Brown, Banc of America and Credit Suisse. SPhinX and PlusFunds relied upon publicly available information, including Refco's financial statements and public filings that suggested that Refco's financial position was strong.

182.   Had the PlusFunds risk committee been aware that Refco's financial position was far worse than what Refco represented to the public, or that Refco was actively concealing in excess of $400 million in uncollectible losses, PlusFunds and SPhinX would have refused to do any business with Refco or allow any of SPhinX's assets, cash or securities to be maintained in Refco accounts.

## C.    Diversion of SMFF Cash to RCM.

183.    SMFF's portfolio managers traded in futures and commodities on behalf of SMFF's Portfolio Funds.  SMFF's portfolio managers often utilized margin trading in these accounts, such that SMFF was only required to post a percentage of the value of the positions in cash.  The remaining free cash balance, or excess cash, could be used to generate additional returns for the SPhinX Funds.

184.    Beginning in December 2002, SMFF's excess cash was moved on a regular basis from segregated accounts at Refco LLC to accounts at RCM, where SMFF's cash was commingled with assets belonging to other RCM customers and RCM's own assets.

185.    Each week, RAI agents monitored the amount of cash necessary to satisfy margin requirements on SMFF's investments at Refco LLC, and, in conjunction with DPM and PlusFunds agents, caused excess cash to be moved to RCM.

186.    Aaron and DPM knew that the majority of SMFF's cash was maintained at RCM. Aaron and DPM understood that SMFF's excess cash was moved from Refco LLC accounts to RCM accounts on a regular basis, and DPM was aware from its Service Agreement that it was responsible for the proper and secure investment of excess cash.

187.    Neither PlusFunds nor any of the SPhinX entities entered into an account agreement with Refco to provide for the maintenance of SMFF's excess cash at RCM.  The only account opening documents executed by SMFF for accounts at RCM were designated as foreign currency exchange accounts.

188.    Although certain PlusFunds agents were aware of the arrangement by which SMFF's cash was moved between the Refco LLC and RCM accounts, the true nature of the RCM accounts as unregulated, commingled accounts was not known to innocent PlusFunds

agents. Innocent members of SPhinX's Board were unaware that SMFF cash was moved to RCM or that SMFF's cash was not protected in customer-segregated accounts.

189. Similarly, although the individual portfolio managers were informed that cash would be moved to RCM, none of the portfolio managers was informed or understood that RCM was not a regulated entity and that funds maintained at RCM were commingled and therefore at risk.

### D.    Interest at Refco on SMFF Cash.

190. More than 70 percent of SMFF's cash was held at RCM at most times relevant, but there was no *bona fide* business reason for allowing SPhinX's assets to be maintained or exposed at RCM.

191. From the time customer money first came into SMFF in December 2002, until late 2003, SMFF cash held at RCM did not yield interest income for the benefit of SPhinX. SMFF did not benefit at all from moving cash to RCM.

192. Beginning in or about December 2003, cash held with RCM yielded income at the rate of one month LIBOR minus 35 basis points. Beginning in or about October 2004, cash held with RCM yielded interest at the rate of 90% of the 90-day Treasury Bill rate.

## VII.    THE REFCO FRAUD.

193. The motivation to move SMFF's cash to unregulated accounts was to provide easy access to cash for Refco. At all relevant times, Refco and its agents were involved in a scheme to conceal massive losses from Refco's books and records and enrich Refco insiders – a scheme that required ready access to cash to succeed. The diversion of SMFF assets to RCM, where cash could be channeled to fund Refco's operations and fraud, was part of that scheme.

194. The Refco entities, as the custodians of SMFF's cash, owed fiduciary duties not to convert or misuse those assets. Refco itself invested in the SPhinX Funds and created and

52

advised several funds that invested in the SPhinX Funds. As a result, Refco possessed and read the SPhinX offering materials. Refco's agents were familiar with the SPhinX Funds' structure and the Cayman SPC regime and understood that the SMFF funds were to be maintained in customer-segregated accounts. The purposeful movement of SMFF cash to RCM for use in the Refco fraud constituted a breach of Refco's fiduciary duties.

195.    Refco and its co-conspirators, including Bennett, BAWAG, and others, devised and implemented an elaborate scheme through which Refco maintained the illusion that it was a highly successful, financially secure broker-dealer. The illusion of a thriving company enabled Refco to steal billions of dollars by positioning Refco for, and ultimately carrying out, what appeared on the surface to be a legitimate "buy-out" of insiders' interests in RGL.

196.    To maintain the illusion of financial and operational strength and stability, Refco and its agents, professionals and advisors conspired to conceal Refco's trading losses, operating expenses and true financial condition by fraudulently inflating Refco's revenues and funding virtually every aspect of Refco's operations and expenses with assets belonging to customers of RCM, including SMFF.

197.    Refco created the illusion that it was financially solid by concealing trading losses and operating expenses from Refco's financial statements, recording them as receivables owed by RGHI (a related-party company owned and controlled by Bennett and, prior to the LBO, by Bennett and Grant), and inflating Refco's revenues by recording hundreds of millions of dollars in accrued interest income on these phantom receivables.

198.    Once these losses and operating expenses were concealed, Refco and its lawyers, Mayer Brown, carefully designed and implemented a series of fraudulent RTLs to conceal the RGHI Receivable. The RTLs purported to be loan transactions involving third parties, but only

53

served to pay down the RGHI Receivable at the end of Refco's reporting periods in an effort to conceal the Receivable from Refco's books. Defendants Liberty Corner, Pigott, EMF Financial, EMF Core Fund, Delta Flyer, Flanagan, Ingram Micro, CIM Ventures, Beckenham, Krieger, Coast, CS Land, and Pettit each helped conceal Refco's true financial condition by participating in RTLs in exchange for a fee. SMFF's assets were diverted to RCM to be used in the RTLs and other Refco operations.

199.    At the same time that the RGHI Receivable was concealed through fraudulent RTLs, Refco funded its operations by diverting RCM customer assets (including SMFF cash) and using them to finance Refco Group and affiliates that had no ability and no intention of returning the RCM customer funds.

200.    Refco's auditors, lawyers, and financial advisors actively assisted in manufacturing and maintaining this illusion by lending their reputations and an aura of respectability to Refco's finances and operations and by actively participating in the fraud. Indeed, the Refco scheme only could have worked with the active assistance of Refco's professionals and advisors.

201.    Having successfully maintained the illusion of Refco's financial health, Refco borrowed $1.4 billion of bank and bond debt to fund the August 2004 LBO that enriched Refco's insiders at the expense of its customers and creditors. RCM was left insolvent and unable to repay the customers, including SMFF, from whose accounts assets had been stolen to fund Refco's business.

202.    As of the date of the LBO, Refco and RCM were insolvent. As a result, Refco's officers and directors owed fiduciary duties to Refco's creditors and customers, including SMFF.

203.    A year later, as was always the plan, the LBO was followed up with an initial public offering (the "IPO") that further impaired Refco's assets. The IPO (i) impaired Refco Inc.'s financial condition through the fraudulent sale of more than $583 million of shares of common stock, (ii) caused Refco Inc. to pay down over $230 million of RGL's LBO debt (despite the fact that RGL was insolvent), approximately $40 million in underwriting fees and expenses, and more than $80 million in the form of a "greenshoe" dividend, for which it received no value, and (iii) thereby allowed Refco insiders to strip out all of Refco's remaining assets.

204.    Given Refco's true financial state, as the Company's auditors, legal advisors, and financial advisors knew and/or consciously avoided knowing, neither the LBO nor the IPO served any legitimate purpose. Refco was insolvent and its attention should have turned to its customers. The LBO and IPO were only entered into to allow Refco's insiders, including BAWAG and Grant, to cash-out their interests at inflated values that bore no relationship to Refco's true financial condition.

205.    Refco's auditors, Grant Thornton, issued unqualified, clean audit opinions on Refco's fraudulent financial statements with knowledge of the nature and massive extent of the Refco fraud. The illusion of Refco's financial stability and health could not have been maintained without the complicity of Mayer Brown, Refco's attorneys. Over the course of more than five years, Mayer Brown attorneys documented and facilitated fraudulent RTLs at the end of each relevant reporting and audit period and misallocated operating expenses and fictitious accrued interest on the RGHI Receivable. Nor could the RTLs have occurred without the complicity of the other RTL Participants. Similarly, the fraudulent hoax could not have been maintained if Ernst & Young had not willingly generated false Refco tax returns or if PwC had not validated Refco's deficient internal controls throughout the LBO and IPO process. Further,

55

Credit Suisse and Banc of America Securities structured and facilitated the lucrative cashing-out of Refco's insiders' interests through the LBO transactions. Each of these Defendants received significant fees and other payments in return for their support and participation in the Refco fraud.

### A.    The Refco Entities.

206.    With the exception of RAI and RGHI, the Refco entities have not been named as Defendants because they have received a discharge of claims in their bankruptcy case. The specific Refco entities include the following:

(a)    Refco Group Ltd., LLC – Before the LBO, RGL was the corporate parent of Refco.

(b)    Refco Capital Markets, Ltd.    Before the LBO, RCM was an indirect subsidiary of RGL. RCM was organized and existed under the laws of Bermuda. At all relevant times, RCM was an unregulated securities broker and foreign exchange broker, and one of three principal operating subsidiaries of Refco.

(c)    Refco Inc. – Refco Inc., a Delaware corporation, was the corporate parent of both RGL and RCM. Refco Inc. was a publicly traded holding company that, through its subsidiaries, provided securities brokerage, execution, and clearing services for exchange-trade derivatives and prime brokerage services in the fixed income and foreign exchange markets. Refco Inc. was formed in connection with Refco's August 2005 IPO, and was the issuer of the stock sold in the August 2005 IPO.

207.    Further, the relevant affiliates and subsidiaries of Refco Inc. include:

(a)    At all relevant times, Refco Securities, LLC ("RSL") was a non-debtor, indirect Refco Inc. subsidiary. At all relevant times, RSL was a Delaware limited liability company and registered broker-dealer.

(b)    At all relevant times, Refco Global Finance Ltd. ("RGF") was an indirect subsidiary of Refco Inc. organized and existing under the laws of Delaware. RGF filed for bankruptcy protection under Chapter 11 on October 17, 2005.

(c)    At all relevant times, Refco Capital LLC ("RCC") was an indirect subsidiary of Refco Inc. organized and existing under the laws of Delaware. As detailed below, Bennett and others used RCC as the

56

"treasury" and "disbursing agent" through which RCM's assets were diverted and distributed to fund the operations of the other Refco entities. RCC filed for bankruptcy protection under Chapter 11 on October 17, 2005.

(d) At all relevant times, Refco LLC was an indirect subsidiary of Refco Inc. organized and existing under the laws of Delaware. Refco LLC was along with RSL and RCM, was one of three primary Refco operating subsidiaries. Refco LLC filed for bankruptcy protection under Chapter 7 on November 25, 2005.

208.    At all relevant times, Defendant RGHI was a Delaware, subchapter S corporation that, before the LBO, was owned 50% by Bennett and 50% by Grant. In connection with the LBO, Bennett acquired Grant's interest in RGHI and became the sole owner of RGHI. From 1999 until the LBO, RGHI had a 90% interest in RGL. The remaining 10% in RGL was controlled by BAWAG, a foreign financial institution closely tied to Bennett.

209.    Although it was not a Refco entity, Defendant BAWAG was closely intertwined with Refco going back at least until the early 1990s, but particularly during the period leading up to the LBO in August 2004. In a 1999 transaction brokered by Sugrue and Thomas Hackl, acting respectively for Refco and BAWAG, BAWAG acquired a ten percent equity interest in Refco as well as an additional undisclosed 27% interest. BAWAG also loaned undisclosed amounts to Refco such that BAWAG exercised actual influence and control over Bennett and Refco's business. As discussed in greater detail below, BAWAG and Refco conspired to help each other conceal losses from the respective books and records of Refco and BAWAG.

**B.    Overview of Refco's Business.**

210.    Before its implosion, Refco was one of the world's largest providers of brokerage and clearing services in the international derivatives, currency, and futures markets.

211.    Refco had three major operating subsidiaries through which its services were provided:

57

(a)    RSL was a registered broker-dealer through which Refco offered prime brokerage services. RSL was a registered broker-dealer regulated by the SEC and the NASD.

(b)    Refco LLC, a regulated futures commission merchant through which Refco executed and cleared customers' orders for exchange-traded derivatives. Refco LLC was regulated by, among other entities, the Commodity Futures Trading Commission ("CFTC") and the National Futures Association ("NFA"), and was subject to the net capital and other regulatory requirements of those entities.

(c)    RCM, a Bermuda entity was at all relevant times "unregulated." In December 2001, Refco shut down RCM's Bermuda operations and "repatriated" all of RCM's operations to the United States.

## C.    The Refco Fraudulent Scheme.

212.    Beginning in late 1997, Refco initiated a three-part fraudulent scheme through which it concealed trading losses and operating expenses, inflated revenues, and hid the manipulation of Refco's financial statements through the fraudulent RTLs, all the while funding Refco's operations with customer assets – including SMFF cash -- looted from RCM.

## Part One – Fraudulently Misrepresenting Refco's Financial Statements.

213.    Refco avoided writing off hundreds of millions of dollars in trading losses and misallocated operating expenses and inflated Refco's revenue with phantom interest income, by booking these amounts as receivables owed by RGHI (a related-party company owned and controlled by Bennett and Grant) resulting in a massive related-party receivable owed to various Refco entities. This, in turn, concealed Refco's true financial results, and allowed Refco (i) to overstate assets, understate liabilities, and overstate profit and loss statements, and (ii) fraudulently to project an illusion of financial health and strength—falsely securing customer confidence and ensuring the continued deposits of cash and securities from customers, including SPhinX, needed to facilitate and fund the Refco scheme.

**Refco's Trading Losses**.

214.    As part of its trading business, Refco regularly extended credit to customers who engaged in securities, commodities, and futures trades. As a result, when markets fluctuated, as they did during the 1997 Asian market collapse, Refco customers trading on credit could not cover their losses, and Refco was forced to assume those losses.

215.    Refco's customer and proprietary trading losses in 1997-1999 alone amounted to hundreds of millions of dollars. If disclosed, trading losses of this magnitude would have caused Refco to shut down, and customers such as SPhinX and PlusFunds would never have done business with Refco at all. Refco knew that it would lose customers and considerable goodwill if the public did not believe that Refco had sound internal risk management controls, was appropriately capitalized, and was financially healthy.

216.    Facing debilitating losses, Refco set out to prop up its reputation and perceived strong financial condition through fraud. Instead of disclosing and writing off its losses as bad debts, Refco caused its losses and uncollectible obligations to be transferred to RGHI and acknowledged a receivable owed to Refco by RGHI. This was done without appropriate reserves and thus overstated the overall enterprise's financial results.

217.    These trading losses were converted to a receivable owed to Refco through one of three mechanisms: (i) the obligation to repay Refco for covering a customer's bad trade was transferred from the customer to RGHI; (ii) the obligation to repay money loaned to a Refco customer (where the customers' devalued collateral did not cover its obligation to Refco) was transferred from the customer to RGHI; or (iii) in Refco's own proprietary trading, Refco booked its trading losses at RGHI, creating a receivable owed by RGHI (the "RGHI Receivable").

218.    Instead of being written off as bad debt, hundreds of millions of dollars in customer and proprietary trading losses were "converted" into what appeared to be a legitimate

and collectible receivable from RGHI—a related party whose principal asset was Refco stock. If the truth had been disclosed, Refco would have violated its debt covenants with its lenders, would have had to report its insolvency and would have had insufficient regulatory capital to continue to do business.

**Concealing Refco Operating Expenses.**

219.    Further perpetuating the illusion that Refco was in healthy financial condition, Refco also hid tens of millions of dollars of Refco expenses (and thereby fraudulently increased Refco's apparent profits) by transferring them to RGHI, even though these expenses were incurred and paid by Refco.

220.    Through this scheme, tens of millions of dollars in expenses unrelated to RGHI, including tens of millions in computer systems expenses and millions more in payroll and outside professional expenses, were moved off Refco's books and concealed as a receivable owed to Refco by RGHI. As the Examiner appointed in the Refco Chapter 11 case determined, Refco's operating expenses were "transferred to RGHI and added to the [RGHI R]eceivable balance," thereby overstating the earnings capability of RGL.

**Inflating RGL's Revenues with Phantom Income.**

221.    Refco also fraudulently inflated its income as a result of "transactions" with RGHI. On January 28, 2004, for example, the RGHI Receivable was increased by two entries totaling approximately $13 million, both of which resulted in the recording of income at Refco.

222.    Refco further fraudulently inflated its revenues and financial results by charging RGHI usurious interest of as much as 35% on the RGHI Receivable. This was fictitious income recorded (but not paid) on the hundreds of millions of dollars in trading losses, operating expenses and other transactions that comprised the RGHI Receivable. For example, on or about January 28, 2004, Refco increased its receivable from RGHI by $62.75 million through a

60

transaction described as "Compound Interest To Principal." The $62.75 million of interest had been recorded as income by Refco.

223.    Between 2001 and 2005 alone, fictitious recorded interest on the RGHI Receivable amounted to at least $250 million.

224.    Between the trading losses, operating expenses and other transactions that made up the RGHI Receivable, and the accrued interest on the RGHI Receivable, just prior to the LBO, the RGHI Receivable ballooned to nearly $1 billion.

**Part Two - Keeping the Illusion Going Long Enough to Cash-out.**

225.    After losses and operating expenses were moved from Refco's books, Refco had to conceal the fictitious nature of the RGHI Receivable and Refco's true financial condition. Refco accomplished this through fraudulent "round trip loan" transactions and by funding Refco's operations with RCM customer assets, which included SMFF's cash.

226.    A large receivable owed to Refco by a related-party, which was owned by its current and former chief executive officer, would have to be disclosed on Refco's financial statements, and would have invited scrutiny and skepticism. To conceal the magnitude and related-party nature of this receivable, Refco devised and implemented a series of sham "loans" timed to straddle Refco's financial reporting and audit periods.

**D.    RTL Transactions.**

227.    The round trip loan transactions—*i.e.*, the RTLs—enabled Refco temporarily to remove related-party receivables off of Refco's books by shifting them between wholly-owned Refco subsidiaries, RGHI, and several third-party Refco customers (or their affiliates) who agreed to serve, for a fee, as conduits in the deceptive RTLs.

228.    The RTLs were implemented at the end of each fiscal year starting in 1998 (and also, beginning in 2004, at the end of each fiscal quarter) to "pay-down" temporarily the RGHI

Receivable and replace it on Refco's books with a receivable purportedly owed by an unrelated third-party customer of Refco. In order to conceal the size of the RGHI Receivable, a number of RTLs were often employed, temporarily replacing the nearly $1 billion RGHI Receivable with a number of smaller third-party receivables.

229. Thus, at the end of every relevant reporting and audit period, a Refco entity (sometimes RCM) would "loan" up to $720 million to a third-party with no apparent relation to Refco, Bennett, or RGHI. That third-party entity would then "loan" the same amount to RGHI (typically via a transfer to one of RGHI's accounts at Refco). The RTL was completed when RGHI used the "loan" to pay down the debt it owed Refco (typically via a credit to one of RGHI's accounts at Refco). Thus, on Refco's financial statements, the RGHI Receivable was transformed into a payable on a loan owed to Refco from an unrelated third-party.

230. Right after the start of each new reporting or audit period, the RTL was "unwound" by reversing the entire process. As the temporary pay-down of the RGHI Receivable was reversed, RGHI returned the funds it had "borrowed" from the RTL Participants, and the RTL Participants in turn paid back the money they had borrowed from Refco. Once the transaction was unwound, the RGHI Receivable was restored to its full value.

231. For agreeing to participate in the RTLs and conceal the related-party nature of the RGHI Receivable, the RTL Participants received payment of the "spread" between the interest rates of the two "loans." In this manner, for example, Pigott received, either through direct personal payments or through payments to Liberty Corner, at least $1.1 million in interest charges as a reward for his participation in the RTL scheme. The other RTL Participants also received fees for their participation in the RTL scheme.

232.  In addition, for many of the transactions, Bennett caused RGL to guarantee repayment of the obligation to the supposed "third-party lenders" on RGHI's behalf, again despite the fact that the RTLs provided no benefit to RGL.  Thus, the RTL Participants knew and/or consciously avoided knowing that the transactions involved risk-free transfers of large round-dollar amounts days before the end of Refco's reporting periods, and that these transfers would be unwound days after the start of the new reporting or audit periods.

233.  Refco, with the active assistance of Mayer Brown and the RTL Participants, engaged in these RTLs at least 18 times from 2000 through 2005.

234.  In addition, from 2000 through 2005, Refco engaged in approximately 12 additional wire transfer RTLs with, among others, Refco's conspirator and 10% equity owner, BAWAG.  These loans involved transfers of amounts from BAWAG to RGHI in late February, with those transactions reversed in early March.  BAWAG has admitted its role in these transactions, as well as its knowledge that Refco was engaged in RTLs to fraudulently improve its financial statements.

235.  In this manner, at the end of each relevant reporting or audit period, Refco, with the active assistance of Mayer Brown, BAWAG and the RTL Participants, falsified Refco's financial statements to suggest that the RGHI Receivable had been repaid or never existed. Refco concealed the magnitude and related-party nature of the RGHI Receivable at the end of each relevant reporting and audit period and thereby concealed Refco's trading losses, its true operating expenses, and the fictitious nature of hundreds of millions of dollars in revenue.

### E.  Looting RCM's Assets.

236.  In order to keep Refco appearing to be a fast-growing group of companies, and to maintain the illusion that Refco was highly profitable, healthy, and able to satisfy its substantial working capital needs from what it called its "internally generated cash flow and available

funds," Refco needed cash.  As Refco itself stated, "[r]eady access to cash is essential to our business."

237.    Because its other operating units were regulated entities, RCM became Refco's source of cash to fund its operations.  The movement of customer assets to RCM became crucial to Refco's ongoing operations.

238.    Instead of owning up to its true financial condition and borrowing the money it needed as part of an overall restructuring of operations, Refco stole it from RCM and its customers, including SMFF.  In violation of its fiduciary duties, Refco simply took the money and property entrusted to RCM by its customers, including SPhinX and PlusFunds, and sent the funds to other Refco entities.

239.    On a daily basis, RCM customers' assets, commingled in one account at Chase Bank, were transferred out of RCM to other Refco entities.  Refco caused RCM to keep as little cash as possible on hand.  In fact, even though RCM purported to hold billions of dollars of customer cash and securities entrusted to it, RCM in fact maintained only about $50 million in cash and those securities it did not need to fund the current operations of RGL and its affiliates.

240.    The diverted RCM customer assets were used for a wide variety of general and specific funding purposes by various Refco affiliates that would not have been able to sustain their operations without RCM customer funds.  Another use for the RCM customer assets was to fund the RTLs described above.

241.    These transfers, which purportedly took the form of unsecured "intercompany loans" from RCM to other Refco entities, often occurred without any "loan" documentation between RCM and the Refco entities that received the funds.

242.   Because Refco's overall financial health and strength depended on a constant influx of RCM assets, Refco kept careful track of the intercompany transactions and of the customer funds that were available for diversion at RCM at any given time. Refco created daily "cash flow" statements identifying customer assets available at RCM for diversion, which were circulated at least to Bennett, Maggio, and Trosten.

243.   The fraudulent scheme perpetrated on RCM's customers, including SPhinX and PlusFunds, was so fundamental to the operation and financing of Refco that it was or should have been apparent to Grant Thornton, PwC, Ernst & Young, and Mayer Brown. The volume and size of the transfers involved, on many occasions hundreds of millions of dollars each, ensured that the amounts stolen in RCM customer assets outsized Refco's total capital. By the time Refco filed for bankruptcy, the net uncollectible RCM transfers totaled over $2 billion, while RGL claimed only $515 million in capital in 2002, $566 million in 2003, $616 million in 2004 and only $150 million in 2005.

## VIII.   THE 2004 LBO AND 2005 IPO.

244.   The purpose of the entire scheme was to allow Refco's insiders, including Bennett, Grant, BAWAG and others, to sell their interests in Refco at a fraudulently inflated price. Indeed, in the years before the LBO, Refco made a number of attempts to sell:

- At the end of 1998, with Mayer Brown's assistance, Bennett, Maggio, and Grant sold a 10% ownership interest in RGL to BAWAG for $95 million and received an additional $85 million for granting BAWAG an option to purchase an additional 10% interest in the company.

- In 2001 and 2002, Refco, with Ernst & Young's assistance, explored the possibility of selling substantial portions, and perhaps all, of Refco to BAWAG or to third parties in ways that maximized the tax benefits of any such sale.

- In 2001 and 2002, Refco hired Credit Suisse to try to find a major investment bank or commercial bank to purchase Refco outright. Credit Suisse was unable to identify a suitable purchaser.

245.    Through these and other attempted transactions, each of Refco's professional advisers became aware that Refco's insiders intended to sell their interests in Refco.

246.    As the court-appointed Examiner observed, Grant Thornton "was aware as early as 1998 of Bennett's plan to sell," when Bennett informed Grant Thornton that he "intended to restructure Refco over the next 3-10 years" and "to increase earnings and maintain RGL's book value," because he and others working with him wanted "to liquidate their positions."

247.    The Examiner concluded that "E&Y understood since before . . . January 1, 1997 that the goal of Refco's owners was to sell the entire [company]." In mid-2001, Refco Insiders specifically asked Ernst & Young to develop a "tax free" way of selling all or part of Refco. Although Refco considered an outright sale of a portion of Refco to BAWAG in 2001-2002, a satisfactory structure that addressed the various tax considerations raised by Ernst & Young could not be developed and an outright sale to BAWAG was abandoned in 2002. While no outright sale to BAWAG was realized in 2002, BAWAG entered into or contemplated entering into a "Proceeds Participation" agreement prepared by Mayer Brown, pursuant to which a BAWAG affiliate ("DF1") made three payments to RGL in exchange for the right to participate in the proceeds of a future sale of RGL.

248.    The Examiner also observed that "no later than February 6, 2002," and possibly long before that, "[Mayer Brown] knew that the ultimate goal of . . . Bennett and other [Refco employees] . . . was to sell RGL."

249.    Similarly, Credit Suisse knew no later than 2001 that Bennett and the other Refco Insiders wished to cash-out their interests in Refco. In June 2003, Bennett hired Credit Suisse as Refco's exclusive financial advisor to assist in, among other things, selling Refco. After efforts

66

to sell Refco outright failed, Credit Suisse devised other ways through which the Refco Insiders could sell all or a portion of Refco.

### A. **The LBO.**

250.    In November 2003, Refco began negotiations with THL, a private equity firm headquartered in Boston, regarding a possible purchase of a controlling stake in Refco as part of a leveraged buyout transaction.

251.    The LBO was ultimately carried out on August 5, 2004. THLP, through affiliates, purchased 57% ownership interest in Refco for approximately $507 million; Refco sold $600 million in notes and obtained $800 million in financing from a syndicate of banks. As a result of the LBO, Bennett and others acting in concert received $106 million, with at least $25 million going to Bennett personally. In addition, hundreds of millions of dollars were transferred to RGHI.

252.    In or about July 2002, BAWAG and Refco entered into a Proceeds Participation Agreement, pursuant to which BAWAG acquired rights to participate in the proceeds of any sale of Refco in exchange for certain payments. Going into the LBO, Refco had significant obligations to BAWAG, and a substantial part of the proceeds of the LBO was used to redeem BAWAG's interest in Refco and to repay BAWAG's loans to Refco. At the closing of the LBO, BAWAG received in excess of $950 million directly or through its subsidiaries.

253.    By the time of the LBO, the trading losses and operational expenses that had been pushed onto RGHI's books and hidden through the RTLs had grown to over $700 million and the diversion of RCM property had grown to approximately $2 billion.

254.    Even though this was well known to Refco and its legal and financial advisors and auditors involved in the LBO, Refco Group borrowed $1.4 billion of bank and bond debt to fund THLP's buyout of RGHI's control of Refco. The LBO proceeds were not used to retire the full

amount of the RGHI Receivable, pay the operating expenses that had been concealed on RGHI's books or repay any of the loans owed to RCM. Instead, Refco used the proceeds to cash-out its insiders, including Bennett, BAWAG, Tone Grant, and others.

255.    Refco's auditors and legal advisors each played key roles in addressing and allaying THLP's concerns in connection with entering into the LBO. Nowhere in the LBO Offering Circular was Refco's use of RCM's assets or the RGHI Receivable disclosed. Thus, Refco's auditors and legal advisors concealed from the world both: (1) the misuse of RCM customer assets (including SPhinX cash), and (2) the jeopardy that Refco's precarious financial condition caused to customers of Refco and RCM.

256.    Nowhere did the Offering Circular explain: (i) that RCM customer assets (including SPhinX's cash) were routinely diverted from RCM and distributed to other Refco entities without security or collateral and without regard for RCM's obligations to its customers; (ii) that RCM's most significant assets were approximately $2 billion of undocumented, uncollateralized receivables from RGL and other Refco affiliates who were obligated to repay the LBO borrowings; (iii) that Refco's business plan did not provide for repayment of these receivables; and (iv) that the LBO transactions resulted in "priming" these receivables with $1.4 billion of new bank and bond debt without regard for the interests of RCM.

257.    Instead, the Offering Circular falsely stated that the LBO bond debt was "effectively junior to all existing and future liabilities of our subsidiaries [including RCM] that have not guaranteed the notes." Similarly, the Offering Circular stated elsewhere that "[t]he effect of this subordination is that, in the event of a bankruptcy ... , the assets of [RCM] could not be used to pay you [bondholders] until after all other claims against [RCM], including trade payables, have been fully paid." These and similar statements describe how the LBO should

have been structured so as to be consistent with the duties the directors of RGL had to RGL and RCM—*i.e.*, ensuring that any obligations incurred by any Refco affiliate in connection with the new LBO debt would not be satisfied until after all of RCM's intercompany obligations were satisfied.

258.    Refco's professionals working on the LBO, Mayer Brown, PwC, Grant Thornton, and Ernst & Young, each knew and/or consciously avoided knowing the magnitude and significance of Refco's financial problems. Each of these Defendants reviewed, helped prepare and, or was aware of the following information set forth in the "payable to customers" line of the condensed consolidating balance sheet to Note 0 of the financial statements attached to the LBO Offering Circular, which is labeled Condensed Consolidating Financial Information:

| Condensed consolidating balance sheet | | | | | |
|---|---|---|---|---|---|
| **February 29, 2004** | | | | | |
| | Parcel (RGL) | Guarantor Subsidiaries [Includes RCC] | Non-Guarantor Subsidiaries [Includes RCM and RGF] | Consolidation Adjustments | Consolidation Totals |
| Liabilities (in thousands) Payable to customers | $465,681 | $1,556,629 | $6,647,453 | ($3,573,946) | $5,095,717 |

259.    By performing professional services for the Company and/or performing detailed due diligence of the Company in connection with the LBO, each of Refco's professionals was familiar with Refco's corporate structure and its operations. They knew that Refco and RCM held funds belonging to customers, including SPhinX, and therefore owed fiduciary and contractual duties with respect to those funds. While an outsider would have been unable to discern from the condensed consolidating information the full extent to which RCM funds had

been siphoned off to RGL and its other affiliates, these professionals understood, at least, the following:

    (a)    that in order to obfuscate Refco's financial statements and conceal the fraudulent scheme, Refco's financial statements misleadingly referred to intercompany and related-party obligations as receivables and payables owed to and from "customers";

    (b)    as a result, when the condensed consolidating financial statement referred to RGL's liabilities of approximately $465,681,000 as a "Payable to customers," these Professional Defendants knew and/or consciously avoided knowing that this $465,681,000 liability represented RGL's payable on intercompany obligations to its subsidiaries because RGL was a parent holding company with no trading operations and no "customers";

    (c)    RCC, the principal guarantor of the LBO debt, and the other guarantor subsidiaries could not have had $1.556 billion of payables to "customers" because RCC did not have any significant customer obligations and the other guarantors did not engage in business that had the potential to generate that magnitude of customer payables; and

    (d)    that only RCM had the volume of non-segregated customer assets necessary to fund billions of dollars in intercompany loans.

260.    Furthermore, as Defendants Mayer Brown, PwC, Grant Thornton, and Ernst & Young knew, each intercompany transfer by RCM to RCC was booked in a back-to-back fashion through a non-Guarantor Subsidiary, Refco Global Finance, Ltd. ("RGF"). Thus, these Defendants knew and/or consciously avoided knowing that the $3.573 billion in consolidation adjustments were the result of eliminating the approximately $465,681,000 of RGL's intercompany debt owed to RCM, the approximately $1.556 billion of RGF's intercompany debt owed to RCM, and the approximately $1.556 billion of RCC's intercompany debt owed to RGF, and that RCM was thus owed $2 billion ($465 million owed from RGL and $1.556 billion owed from RCC, which when booked in a back-to-back fashion through RGF, added another $1.556 billion to the consolidation adjustment).

261.    Given their due diligence, detailed in-depth understanding of Refco's financial structure and operations, and access to and preparation of the type of condensed consolidating financial information set forth in Note 0, each of the above Defendants who assisted and advised the company in connection with the LBO was fully aware of the massive $2 billion payable owed by RGL and its affiliates to RCM. Refco's professionals knew that RCM's customers, including SPhinX, could not be returned.

262.    The ultimate effect of the LBO was to pledge RGL's and RCM's asset base in favor of bank and bond lenders, leaving RCM without assets to satisfy its outstanding obligations to its customers and creditors, including SPhinX.

263.    Furthermore, as these Defendants knew and/or consciously avoided knowing, this LBO was atypical because RGL went into the LBO with hundreds of millions of dollars of concealed trading losses, misallocated operating expenses, phantom revenues, and unpaid billions owing to RCM, whose assets had been used to fund Refco's entire operations.

264.    Given Refco's true financial condition, the LBO irreparably undermined Refco's already precarious financial condition. Refco and RCM had been insolvent at least as of the consummation of the LBO.

**B.    The IPO.**

265.    Less than one year after the LBO, Refco, and THL led Refco through an initial public offering of its stock. In the IPO, Bennett sold approximately 7 million shares for a total price of approximately $146 million. THLP and its affiliates sold approximately 10 million shares of Refco common stock for approximately $223 million.

266.    A "greenshoe" option was also exercised whereby Credit Suisse, Banc of America Securities and other investment bankers agreed to purchase approximately 4 million shares of

Refco common stock for over $80 million. The proceeds from the over allotment sale were used to pay an aggregate dividend to Refco's pre-IPO shareholders.

267.    As evidenced by this dividend, the IPO was structured with the principal goal of allowing Refco's insiders to cash-out, as opposed to raising funds for Refco to reduce Refco's enormous debt. Furthermore, because Refco and RCM were insolvent at the time of the LBO, the $231 million in proceeds from the IPO that Refco Inc. used to retire part of RGL's LBO debt was wasted; Refco spent over $200 million dollars on RGL – an insolvent subsidiary that filed for bankruptcy merely weeks later.

268.    As a result of the IPO, Refco faced hundreds of millions of dollars in liabilities to the purchasers of Refco stock in the IPO who had claims against Refco based on its false and misleading registration statement and prospectus. The IPO forced Refco deeper into insolvency.

269.    The professionals who advised the company in connection with the IPO knew and/or consciously avoided knowing that Refco was in no state to undertake an IPO and that the IPO as structured would cause irreversible harm to Refco's customers, including SPhinX.

270.    Indeed, the most blatant indication that Grant Thornton, Mayer Brown and PwC understood that Refco was hiding hundreds of millions of dollars in undisclosed related-party receivables was the conscious editing of SEC disclosure documents to conceal the RGHI Receivable.

271.    Given the planned IPO, Refco had to file an S-4 with the SEC to register the $600 million of senior subordinated notes issued in the LBO. In early drafts of the S-4 registration statement, which were reviewed and commented on by Grant Thornton, Mayer Brown, and PwC and subsequently submitted to the SEC for comment, the S-4 disclosed a $105 million receivable owed from RGHI to Refco, which was characterized as a "customer receivable." As this was a

related-party receivable owed to Refco from RGHI, the SEC questioned the characterizing of "amounts due from equity members (RGHI) as receivable from customers." Given the SEC's comment, Grant Thornton, Mayer Brown, and PwC were forced to amend subsequent drafts and the final October 12, 2004 version of the S-4 registration statement to falsely reflect that the receivables were due from "equity members," not customers.

272. The professionals involved in the LBO thus substantially assisted Refco in trying to deceive the SEC and the investing public about the RGHI Receivable. Furthermore, those that were aware of the full massive size of the RGHI Receivable and/or that RTLs were used to reduce the RCM Receivable at the end of reporting periods, such as Mayer Brown, Grant Thornton and PwC, also knew and/or consciously avoided knowing that the actual amount due from "equity members" was well above the $105 million amount reported in the S-4 and that the S-4 was, therefore, still materially false.

273. Despite being aware of these related-party receivables, none of Refco's professionals disclosed the RGHI Receivable in Refco's IPO S-1 registration statement.

274. The S-1 was reviewed by and prepared in consultation with Grant Thornton, Mayer Brown, PwC, and Refco's investment bankers. While early drafts of the S-1 included the $105 million intercompany receivable reflected in the S-4 and the reference to the receivable being owed by "equity members," the final version of the S-1 filed with the SEC omitted any reference to any portion of the RGHI Receivable, despite the fact that none of Refco's professionals received, or sought, any confirmation that even the limited $105 million portion receivable from RGHI disclosed in the S-4 had, in fact, been paid down, or that there were no other related-party receivables owed by RGHI to Refco.

275.    The final S-1, reviewed by Grant Thornton, Mayer Brown, PwC and Refco's investment bankers, was signed by Bennett and publicly filed with the SEC on August 8, 2005, and failed to disclose: (a) the existence of the multi-million dollar RGHI Receivable reflecting debt owed by RGHI to Refco; and (b) that the RTLs used to hide the RGHI Receivable and temporarily pay down RGHI's debt to Refco at year-end and quarter-end financial reporting periods. Nevertheless, the IPO went forward on August 10, 2005.

276.    In hopes of concealing the fraud and maintaining the illusion of Refco's financial health for as long as possible, in late August 2005, after the IPO was completed, Refco, with the active participation and assistance of Mayer Brown, carried out yet another $420 million RTL with Liberty Corner to, once again, conceal the RGHI Receivable.

## IX.    SUFFOLK LOANS.

277.    Sugrue, Kavanagh, and Owens were complicit in the placement of SMFF's cash and other SPhinX assets with Refco, and they protected their relationship with Refco by forcing out PlusFunds agents who questioned the use of Refco as a provider of services to SPhinX and custodian of its assets.

278.    As the *quid pro quo* for the support of Sugrue, Kavanagh, and Owens, Refco extended approximately $200 million in "loans" to entities controlled by Sugrue, Owens, and Kavanagh, transactions that in fact were payments to Sugrue, Owens, and Kavanagh for their assistance. These payments were, perversely, funded from SPhinX moneys held at RCM.

### A.    Bousbib Investigates Relationship with Refco.

279.    In 2004, PlusFunds' then CEO and President, Gabriel Bousbib, became concerned that SPhinX assets held by Refco entities were not earning sufficient interest and that Refco's transaction fees were excessive. SMFF, in particular, had an unusually high proportion of excess cash that was not earning adequate interest.

74

280.    Bousbib instructed PlusFunds' agents to conduct an analysis to determine what fees were appropriate in the market for the types of transactions provided by Refco. Bousbib also approached Refco to re-negotiate the interest on SMFF cash held at Refco.

281.    In the fall of 2004, Bousbib negotiated an increase in interest earned on SMFF cash at Refco. Thomas Hackl, on behalf of Refco, agreed that effective December 1, 2004, "Refco" would pay SMFF 90 percent of the three-month T-Bill rate, adjusted on a daily basis.

282.    Hackl, who represented Refco in the negotiations with Bousbib, was at all relevant times a close friend of Sugrue, and is the godfather to Sugrue's children. Hackl had met Sugrue while Sugrue was at Refco and Hackl at BAWAG. Hackl and Sugrue brokered BAWAG's purchase of an ownership interest in Refco.

283.    In the course of the negotiation of interest rates, Hackl told Bousbib that he could not pay a higher rate because the funds at Refco were held in customer-segregated accounts. Bousbib did not question this representation. He believed at all times that SMFF's assets were in customer-segregated accounts and that Refco was financially responsible.

284.    Still not satisfied that SPhinX assets were receiving adequate interest, Bousbib proposed to Sugrue that PlusFunds institute a new cash management program to maximize returns on SPhinX cash and suggested that SPhinX's assets should be removed from Refco.

285.    Sugrue became incensed by this suggestion and indicated that he believed such a program was a consideration for the PlusFunds Board, not for management. Accordingly, Bousbib prepared a proposal for submission to the PlusFunds Board. As part of his proposal, Bousbib suggested that cash be removed from Refco.

286.    Sugrue, Kavanagh, and Owens opposed Bousbib's proposal and explicitly instructed him not to take any further action regarding SPhinX cash held at Refco.

287.    Bousbib continued to pursue the issue, causing dissension among the PlusFunds Board and management team. Sugrue and Kavanagh concluded that Bousbib could no longer serve as PlusFunds' CEO and President, and began to consider their alternatives.

288.    Two members of the PlusFunds Board of Directors, Morriss and Wehrle, were responsible for Bousbib's appointment as PlusFunds' CEO and President and were therefore aligned with Bousbib. Had Morriss, Wehrle or Bousbib known that SMFF's assets were not maintained in regulated, protected, customer-segregated accounts, they would have taken steps to protect SMFF's assets. Similarly, if they had known Refco was insolvent, they would have ended SPhinX's relationship with Refco.

289.    The two factions on the PlusFunds Board, one comprised of Sugrue, Kavanagh, and Owens, and the other comprised of Morriss and Wehrle, began discussions regarding the buyout of the others' interests. Morriss and Wehrle initially offered to purchase the interests of Kavanagh, Sugrue, and Owens in or about December 2004.

290.    In or about January 2005, Kavanagh, Sugrue, and Owens switched course and offered to purchase the ownership interests of Morriss and Wehrle. Bousbib had been forced to resign in late 2004, and Sugrue, Kavanagh, and Owens agreed to purchase the PlusFunds ownership interests of Morriss, Wehrle, and Bousbib with financing provided by Refco through the "Suffolk loans," described below.

**B.      Refco Extends Loans to Suffolk Entities to Buy Out Bousbib, Morriss, and Wehrle.**

291.    In March 2005, RCC, extended a series of loans to Suffolk LLC, Suffolk SUG LLC, Suffolk KAV LLC and MKK LLC (collectively, the "Suffolk Entities"), entities owned and controlled by Sugrue, Kavanagh and Owens.

76

292.    Refco Capital funded the Suffolk loans with cash provided by RCM.  Thus, Sugrue, Kavanagh, and Owens used SMFF's cash, diverted to RCM, to finance their purchase of minority PlusFunds shares and eliminate PlusFunds agents who questioned the relationship with Refco.

293.    In Phase I of the Suffolk loans, on March 29, 2005, RCC provided $158 million to Suffolk LLC pursuant to a credit agreement for the purchase of outstanding equity of PlusFunds held by minority shareholders.  Bennett signed the credit agreement as president of Refco Capital.

294.    Suffolk LLC secured the $158 million loan by pledging to Refco Capital all of the equity that Suffolk LLC intended to acquire with the proceeds of the loan.  Suffolk LLC also granted Refco Capital call rights to purchase all of the equity of PlusFunds held by Suffolk LLC or to be acquired with the proceeds of the loan.  The call exercise price was based, in substantial part, on a fixed percentage of AUM by PlusFunds.  Suffolk LLC used a portion of the proceeds of the $158 million loan to purchase the minority interests in PlusFunds, including those controlled by Bousbib, Morriss, and Wehrle.

295.    Also on March 29, 2005, in Phase II, Refco loaned $19.4 million to an entity controlled by Sugrue known as Suffolk-SUG LLC.  Sugrue was the sole member of Suffolk-SUG LLC.

296.    Suffolk-SUG LLC secured the $19.4 million loan by pledging all of Sugrue's shareholder interests in the equity of PlusFunds.  As with the loan to Suffolk LLC, Sugrue also granted RCC call rights to his PlusFunds shares at a price based on a fixed percentage of AUM.

297.    RCC made additional "loans" of approximately $11.35 million and $19.25 million to Suffolk-KAV LLC and Suffolk-MKK LLC, two entities owned and controlled by Kavanagh.

As with the loans to Suffolk LLC and Suffolk-SUG LLC, Suffolk-KAV LLC pledged all of Kavanagh's shareholding interests in the equity of PlusFunds, and Kavanagh granted RCC call rights to his PlusFunds shares at a priced based upon a fixed percentage of AUM.

298.    The non-recourse Suffolk loans were sham transactions intended to disguise the transfer of control of PlusFunds to Refco.

299.    At or about the same time that Sugrue and Kavanagh purchased the minority shareholders' shares in PlusFunds and pledged those shares to RCC, RCC extended a $25 million standby credit facility dated April 13, 2005, to PlusFunds, purportedly to be used to provide SPhinX investors with interim secondary market liquidity on securities held pursuant to their investment in the SPhinX Funds. In reality, it tied PlusFunds to Refco. As part of the *quid pro quo* for the loans from RCC, Sugrue, Owens, and Kavanagh pledged to RCC that PlusFunds would continue to use Refco's services, ensuring that SPhinX assets would remain at RCM for Refco's use.

300.    While negotiating the Suffolk loans with Refco, Sugrue, Kavanagh, and Owens took steps to prevent PlusFunds and SPhinX from discovering Refco's role in the transactions. Indeed, Sugrue, Kavanagh and Owens did not disclose that Refco was involved at all, and innocent decision-makers at SPhinX and PlusFunds did not discover this fact until after the transactions had been consummated.

301.    Specifically, Sugrue, Kavanagh, and Owens had identified Bousbib's replacement as CEO and President as early as December 2004 or January 2005. Paul Aaronson, one of PlusFunds' primary contacts at S&P, was familiar with PlusFunds and SPhinX, and agreed to replace Bousbib in December or January. However, Sugrue, Kavanagh, and Owens conspired to delay the start of Aaronson's employment until April 2005 – after the consummation of the

78

Suffolk loans. Until Aaronson's hire, Owens acted as the interim CEO of PlusFunds. As a result, the Suffolk loans were negotiated and consummated during a time when PlusFunds had no independent CEO or president in place.

302. On May 4, 2005, Suffolk LLC used the amounts provided by RCC to issue a tender offer to purchase outstanding shares of PlusFunds. PlusFunds used all or a portion of the proceeds of the $158 million loan to purchase the outstanding shares of PlusFunds held by a number of shareholders, including entities controlled by Morriss and Wehrle. Morriss and Wehrle resigned from their roles as PlusFunds directors on or about March 29, 2005.

303. The additional loans to the other Suffolk entities controlled by Kavanagh, Owens, and Sugrue constituted disguised payments for cooperation. As a result, Sugrue and Kavanagh each received in excess of $20 million.

304. Kavanagh and Sugrue stood to earn an additional $100 million if RCC exercised its call rights. The *quid pro quo* for those potential gains was participating in the scheme to divert SPhinX's money to RCM.

**C.    Discovery of Refco's Role in Suffolk Transactions.**

305. The true nature of the Suffolk loans, as a disguised acquisition of PlusFunds by Refco, and the payoff of Sugrue, Kavanagh, and Owens, was concealed from PlusFunds and SPhinX management. The Suffolk loan documentation was not maintained in PlusFunds' offices, and none of the members of PlusFunds' management was aware that Refco loaned the amounts used by the Suffolk entities to purchase outstanding PlusFunds stock.

306. Sugrue, Kavanagh, and Owens, in violation of their fiduciary duties to PlusFunds and SPhinX, concealed the true nature of the Suffolk transactions from PlusFunds' management and the SPhinX Funds. Sugrue, Kavanagh, and Owens conspired with their legal counsel, Gibson Dunn, to conceal Refco's role in the Suffolk loans. At the request of Sugrue, Kavanagh,

Owens, and Bennett, Gibson Dunn advised that the loans did not have to be disclosed as related

party transactions and concealed Refco's role from innocent PlusFunds directors and

management. In violation of its ethical and professional duties, Gibson Dunn also purported to

represent PlusFunds at the time.

307. Sugrue, Kavanagh, Owens, and Gibson Dunn concealed the true nature of the

Suffolk loans until after the Refco fraud became public on October 2005. Innocent members of

PlusFunds' management team, including Aaronson, became aware of Refco's role in the Suffolk

transactions only after the SEC requested Suffolk loan documentation in connection with an

investigation of PlusFunds.

308. When the facts regarding the Suffolk transactions were disclosed to PlusFunds'

management, Aaronson and other members of management were deeply concerned, and they

took action. The extension of hundreds of millions of dollars in loans from a service provider,

Refco, to members of PlusFunds' board of directors, without full disclosure, was a violation of

trust. The fact that the transaction was intended to transfer effective control of PlusFunds to

Refco made it worse.

309. After discovering the facts of the Suffolk loans, Aaronson, and several other

members of PlusFunds' senior management announced in writing their intention to resign. After

attempting to negotiate the removal of Sugrue, Kavanagh, and Owens from the board of

directors, Aaronson, CFO Chris Aliprandi, general counsel Patrick McMahon, and other

PlusFunds agents resigned in December 2005.

## X.    REFCO'S BANKRUPTCY FILING.

310. During 2004 and 2005, RCM held as much as $560 million of SPhinX's cash in

non-segregated accounts. As of October 10, 2005, approximately $312 million of SPhinX's cash

was deposited at RCM.

311.    Approximately two months after consummation of the IPO, Refco's entire fraudulent scheme fell apart when a non-conspiring Refco employee discovered a $430 million receivable owed to Refco from RGHI. Refco demanded repayment of the debt by Bennett, who tried unsuccessfully to cover up the fraud by turning to his co-conspirator, BAWAG. In early October 2005, BAWAG extended an emergency loan in excess of $400 million, which Bennett used to repay the RGHI Receivable.

312.    In a press release issued October 10, 2005, Refco announced that it had discovered, through an internal review, a $430 million receivable from an entity controlled by Bennett and that the receivable, "which may have been uncollectible," was not shown on the company's balance sheet as a related-party transaction. As a result, Refco announced that "its financial statements, as of and for the periods ended, February 28, 2002, February 28, 2003, February 28, 2004, February 28, 2005, and May 31, 2005, taken as a whole, for each of Refco Inc., Refco Group Ltd., LLC and Refco Finance, Inc. should no longer be relied upon."

313.    On Tuesday, October 11, 2005, after news of Refco's "discovered" receivable became public but before the Refco bankruptcy, Sugrue visited Refco's headquarters to demand that SMFF's cash held at RCM be immediately transferred to Refco LLC. Approximately $312 million of SMFF's assets held at RCM were transferred to Refco LLC pursuant to Sugrue's demand within days. PlusFunds then moved those assets to accounts at Lehman Brothers and elsewhere.

314.    On October 11, 2005, Bennett was arrested. He was indicted on or about November 10, 2005, and pleaded guilty to criminal conspiracy and fraud charges on February 15, 2008.

315.    On October 12, 2005, Refco issued a second press release announcing that the $430 million RGHI obligation (the "RGHI Receivable") had remained concealed as a result of the actions of Bennett and others, who had caused Refco to engage in a series of transactions designed to hide and otherwise disguise the nature and extent of the RGHI Receivable.

316.    Once the fraud was revealed, the market for Refco stock plummeted, leading to well over $1 billion in lost market capitalization. Refco's stock was delisted by the New York Stock Exchange, and the Company – along with its subsidiaries, including RCM – was forced into bankruptcy.

317.    On October 17, 2005, RCM and 23 of its subsidiaries and affiliates filed Chapter 11 bankruptcy petitions in the Southern District of New York.

318.    Between October 25, 2005 and the filing of the preference action in December 2005, Refco-related funds advised by RAI redeemed approximately $110 million of investments made in SPhinX Funds. On or about October 26, 2005, Bennett redeemed all or part of his personal investment in one of the SPhinX Funds. Furthermore, after disclosure of the Refco fraud on October 10, 2005, BAWAG redeemed approximately $50 million of its investment in the SPhinX Funds, including approximately $3.3 million from SMFF.

319.    On December 16, 2005, the Official Committee of Unsecured Creditors of Refco commenced an adversary proceeding against SMFF and other SPhinX entities seeking avoidance of the $312 million transfer from RCM to SMFF's accounts at Refco LLC, in order to recover that property for the benefit of RCM's bankruptcy estate. Also on that date, the bankruptcy court issued an order of attachment and temporary restraining order freezing assets of SPhinX valued at $282 million, pending resolution of the adversary proceeding.

320.    On or about April 21, 2006, SPhinX entered into a settlement agreement resolving the adversary proceeding. As part of that agreement, SPhinX agreed to relinquish approximately $263 million of the $312 million that had been transferred from RCM to Refco LLC and further agreed to release certain claims against the Refco bankruptcy estate with respect to those funds.

## XI.    INDIVIDUAL ROLES.

### A.    SPhinX/PlusFunds Agents.

#### 1.    Aaron.

321.    Robert Aaron was the CEO and owner of DPM.

322.    Aaron served on the board of directors of the various SPhinX entities as DPM's representative, and as a result owed fiduciary and contractual duties to each of the SPhinX Funds. Each of the SPhinX Funds and PlusFunds reposed confidence and trust in Aaron, delegating financial and accounting responsibilities and relying upon Aaron's superior knowledge and expertise in connection with DPM's role as administrator. As a result, Aaron owed fiduciary and contractual duties to the SPhinX Funds and PlusFunds.

323.    At all times relevant, Aaron was acting for his personal benefit and adversely to the interests of PlusFunds and SPhinX.

324.    Aaron understood the SPhinX business model, including the Cayman SPC regime, customer segregation requirement, and NAV reporting obligations of the Funds.

325.    Aaron was personally involved in setting up the customer-segregated accounts for the SMFF segregated portfolios. Aaron signed the Refco LLC account opening documentation on behalf of the SMFF entities. He was familiar with SPhinX's Offering Memoranda, organizational documents, DIMAs and marketing materials, which provided for customer segregation.

326.    Before money ever came into SMFF, Aaron authorized the movement of SMFF's assets from customer-segregated accounts at Refco LLC to non-segregated accounts at RCM. He accomplished this by signing, at Refco's request, the July 31, 2002 Document authorizing the interchangeable movement of SMFF assets between Refco LLC and RCM.

327.    Aaron testified and admitted that he understood the import of the July 31, 2002 Document when he signed it.  He understood when he signed the document that SMFF assets might be placed in non-regulated accounts where "segregation and preferential treatment [might] not be received."  Aaron understood that he was authorizing the movement of SMFF assets to accounts where they would be placed at risk in the event of the bankruptcy of the custodian.

328.    Aaron did not discuss the terms of the July 31, 2002 Document with innocent decision-makers at PlusFunds or SPhinX or the fact that SMFF's assets might be exposed in non-segregated accounts.

329.    Although Aaron signed documents to set up accounts at RCM to hold SMFF's excess cash, Aaron took no action to assure segregation of those assets.  Aaron testified and admitted that he never discussed with anyone at Refco or RCM the requirement that SMFF's assets be maintained in customer-segregated accounts.

330.    Aaron's actions were motivated by a desire to profit from his relationship with the SPhinX Funds, PlusFunds, and Refco.  SPhinX was the largest client of DPM and the value of DPM was based, to a large extent, on its relationship with SPhinX.  Aaron desired to sell DPM and knew that in order to achieve the highest sales price for DPM, it was critical to maintain his relationship with PlusFunds and SPhinX.

331.    In February 2005, Aaron orchestrated the sale of DPM to Mellon Financial Corporation for an amount in excess of $50 million.

332.    Aaron helped conceal the fact that SMFF's cash was not maintained in regulated, protected, customer-segregated accounts at Refco LLC. SMFF's June 30, 2005 Financial Statements, issued in or about October 2005, included the representation that SPhinX "historically carried its futures and related cash positions in segregated accounts held at Refco LLC, a regulated Futures Commission Merchant." This statement failed to disclose to SPhinX's and PlusFunds' innocent decision-makers or to their investors that DPM and Aaron had established and maintained an agreement and an arrangement with Refco whereby most of SPhinX's cash position was in fact held at RCM in unregulated, non-segregated accounts, and was therefore false and misleading. Aaron knew at the time that most of SMFF's cash was maintained at RCM, yet he approved and signed off on the June 30, 2005 Financial Statements.

### 2.    Sugrue.

333.    Christopher Sugrue was a co-founder of PlusFunds and served as a PlusFunds director at all relevant times. In addition, he is considered the founder of the SPhinX Funds and was at all times involved in the management of the SPhinX Funds as a director of PlusFunds. As a result, Sugrue owed both PlusFunds and SPhinX fiduciary and contractual duties.

334.    At all times relevant, Sugrue was acting for his own benefit and adversely to the interests of PlusFunds and SPhinX.

335.    Sugrue, as the founder of the SPhinX Funds and PlusFunds, was intimately familiar with the business and operations of the SPhinX Funds. He understood the Cayman SPC regime, the customer-segregation requirement, and the representations made to the public regarding customer segregation and ring fencing. Sugrue was actively involved in sales of SPhinX Funds and personally explained the SPC concept to potential investors when he solicited investments in the SPhinX program. He was familiar with the Offering Memoranda, SPhinX's

85

financial statements, organizational documents, DIMAs, marketing materials, and contractual relationships with Refco, DPM and other providers.

336.    Sugrue worked at Refco from 1992 until approximately 1998 and maintained close personal relationships with certain Refco agents, including Bennett, Hackl, and others.

337.    While employed at Refco, Sugrue brokered the relationship between Refco and BAWAG, whereby BAWAG acquired a significant interest in Refco.    After moving to PlusFunds, Sugrue negotiated the relationship between SPhinX and the Refco entities, agreeing that Refco entities would act as, among other things, an agent for purposes of SPhinX's trading activities and custodian of its assets.

338.    Sugrue was complicit in the movement of SMFF cash to RCM.    Sugrue understood that SMFF's cash was maintained in non-protected accounts at RCM.    On October 11, 2005, the day after the Refco fraud was disclosed, Sugrue demanded that RCM move all cash to Refco LLC.    Sugrue knew at relevant times that SMFF's cash was at risk at RCM.    Upon information and belief, Sugrue was personally compensated by Refco for creating and maintaining the relationship between Refco and SPhinX.

339.    Sugrue breached his duties to SPhinX and PlusFunds by participating in the fraud at Refco and protecting Refco's interests at the expense of SPhinX and PlusFunds.

340.    Sugrue clashed with Bousbib over a number of issues and forced Bousbib's resignation from the company in response to Bousbib's investigation of SPhinX's relationship with Refco and Bousbib's desire to remove SMFF and other SPhinX assets from Refco.

341.    After Bousbib's resignation, Sugrue intentionally delayed the hiring of Paul Aaronson as PlusFunds' President and CEO until after completion of the Suffolk loans.    By

doing so, Sugrue and other conspirators ensured that no CEO was in place to question or investigate the Suffolk loans.

342.   Through, among other things, the Suffolk loans, Sugrue was compensated by Refco for participating in the diversion of SPhinX assets and protecting Refco's role in connection with the SPhinX Funds.

343.   Sugrue profited directly from the Suffolk transactions. On information and belief, Sugrue received in excess of $20 million in non-recourse loans from Refco Capital to Suffolk-SUG LLC, an entity wholly owned and controlled by Sugrue.

344.   Sugrue conspired with Kavanagh, Owens, and their lawyers at Gibson Dunn to conceal details and the true nature of the Suffolk transactions from other members of the PlusFunds Board and management and from the Board of the SPhinX Funds in order to assure the consummation of those transactions.

345.   Sugrue is believed to have fled the United States and to currently be residing in Angola. Before leaving the U.S., he caused his e-mail files to be erased from PlusFunds' servers and removed the laptop he used at PlusFunds. He concealed evidence of his wrongdoing and is liable for spoliation.

346.   Sugrue's breaches of duty proximately caused and were a substantial factor in causing the losses suffered by SPhinX and PlusFunds. But for Sugrue's actions, SMFF's cash would not have been held at RCM and would not have been lost. Both SMFF and PlusFunds would have avoided the losses they suffered and would have continued in business.

347.   Had Sugrue not conspired to oppose and force out Bousbib, SMFF's cash would have been removed from Refco. Had Sugrue not conspired to conceal the Suffolk loans and the true nature of Refco's role in the Suffolk loans from PlusFunds' management and SPhinX,

SMFF's cash held at RCM would not have been diverted to fund the Suffolk loans and management would have ended the relationship between SPhinX and Refco.

348.    The losses suffered by SPhinX and PlusFunds were reasonably foreseeable to Sugrue. Sugrue should have reasonably foreseen that the placement of assets in non-segregated accounts at RCM exposed the SPhinX Funds in the event of RCM's insolvency. Sugrue also understood that PlusFunds' primary business was the management of the SPhinX Funds, and that the collapse of the SPhinX Funds would destroy PlusFunds' business.

### 3.    **Kavanagh.**

349.    Kavanagh is Sugrue's brother-in-law and resides in Ireland.

350.    Kavanagh served as a member of the PlusFunds Board at all relevant times and, as a result, owed fiduciary and contractual duties to SPhinX and PlusFunds.

351.    At all times relevant, Kavanagh was acting for his personal benefit and adversely to the interests of PlusFunds and SPhinX.

352.    Kavanagh understood Sugrue's relationship with Refco and took steps to protect Refco's role in connection with the SPhinX Funds. Kavanagh was complicit in the placement of SMFF's cash at RCM.

353.    Kavanagh assisted Sugrue in efforts to force Bousbib from PlusFunds in response to Bousbib's investigation of SPhinX's relationship with Refco and Bousbib's desire to remove SMFF and other SPhinX assets from Refco. By doing so, Kavanagh protected Refco's role as custodian of SPhinX's customer assets to the detriment of SPhinX and PlusFunds.

354.    After Bousbib's resignation, Kavanagh intentionally delayed the hiring of Aaronson as PlusFunds' President and CEO until after completion of the Suffolk loans. Until Aaronson's hire, Owens acted as interim CEO of PlusFunds. Through this arrangement,

Kavanagh and other conspirators ensured that no independent CEO was in place that would question or investigate the Suffolk loans.

355.    Kavanagh concealed the terms of the Suffolk loans and Refco's true role in the Suffolk loans. Kavanagh understood that Refco's role in the Suffolk loans should have been disclosed but concealed that role because he knew SPhinX and PlusFunds management would oppose the transaction.

356.    Through, among other things, the Suffolk transactions, Kavanagh was compensated by Refco for participating in the diversion of SPhinX assets and protecting Refco's role in connection with the SPhinX Funds.

357.    Kavanagh profited directly from the Suffolk transactions. He is believed to have received in excess of $20 million in non-recourse loans from Refco Capital to Suffolk-KAV LLC, an entity owned and controlled by Kavanagh.

358.    Kavanagh's breaches of duty proximately caused and were a substantial factor in causing the losses suffered by SPhinX and PlusFunds. But for Kavanagh's actions, SMFF's cash would not have been held at RCM and would not have been lost. Both SMFF and PlusFunds would have avoided the losses they suffered and would have continued in business.

359.    Had Kavanagh not conspired to oppose and force out Bousbib, SMFF's cash would have been removed from Refco. Had Kavanagh not conspired to conceal the Suffolk loans and the true nature of Refco's role in the Suffolk loans from PlusFunds' management and SPhinX, SMFF's cash held at RCM would not have been diverted to fund the Suffolk loans and management would have ended the relationship between SPhinX and Refco.

360.    The losses suffered by SPhinX and PlusFunds were reasonably foreseeable to Kavanagh. Kavanagh should have reasonably foreseen that the placement of assets in non-

segregated accounts at RCM exposed the SPhinX Funds in the event of RCM's insolvency. Kavanagh also understood that PlusFunds' primary business was the management of the SPhinX Funds, and that the collapse of the SPhinX Funds would destroy PlusFunds' business.

### 4. Owens.

361. Owens is an accountant and works with Kavanagh in Ireland.

362. Owens served as a member of the PlusFunds Board at all relevant times and served as a member of the SPhinX Board from October 2004, until his resignation in 2006. Owens owed fiduciary and contractual duties to both SPhinX and PlusFunds.

363. At all times relevant, Owens was acting for his personal benefit and adversely to the interests of PlusFunds and SPhinX.

364. Owens understood Sugrue's relationship with Refco and took steps to protect Refco's role in connection with the SPhinX Funds. Owens was complicit in the placement of SMFF's cash at RCM.

365. Owens assisted Sugrue in efforts to force Bousbib from PlusFunds in response to Bousbib's investigation of SPhinX's relationship with Refco and Bousbib's desire to remove SMFF and other SPhinX assets from Refco. By doing so, Owens protected Refco's role as custodian of SPhinX's customer assets to the detriment of SPhinX and PlusFunds.

366. After Bousbib's resignation, Owens intentionally delayed the hiring of Aaronson as PlusFunds' President and CEO until after completion of the Suffolk loans. Until Aaronson's hire, Owens acted as interim CEO of PlusFunds. By doing so, Owens and other conspirators ensured that no independent CEO was in place that would question or investigate the Suffolk loans.

367. Owens personally presented the Suffolk loan transactions to the SPhinX Board. In his presentation, Owens omitted the fact that the loans were funded from customer accounts at

90

RCM, which included large amounts of SPhinX cash. Owens knew this fact but omitted it from his presentation in order to conceal the true nature of the transactions.

368.    Owens also omitted from his presentation the fact that Gibson Dunn, which at the time purported to represent SPhinX, also represented Sugrue, Kavanagh, Owens, the Suffolk Entities, and Hardwicke Ltd., an entity owned and controlled by Kavanagh, and that Gibson Dunn had documented the Suffolk loans.

369.    At the same time, Owens was involved in the negotiation of the terms of the Suffolk loans in the spring of 2005, Owens met with PlusFunds' counsel to discuss ethics, corporate responsibility, and disclosure obligations. Owens understood that Refco's role in the Suffolk loans should have been disclosed but concealed that role because he knew SPhinX and PlusFunds management would oppose the transaction.

370.    Owens helped conceal the diversion of SPhinX cash to RCM. In the wake of Bousbib's inquiry into cash management procedures, Owens stated opaquely to the innocent members of SPhinX's board that "some changes" had been made to cash management procedures but that there was no significant effect on the financial statements.

371.    In fact, when pointedly asked by one of SPhinX's innocent board members whether any event that might have led to Bousbib's departure from PlusFunds would affect SPhinX, Owens responded, "No."

372.    Through, among other things, the Suffolk transactions, Owens was compensated by Refco for participating in the diversion of SPhinX assets and protecting Refco's role in connection with the SPhinX Funds.

373.    Owens breached his contractual and fiduciary duties to SPhinX and PlusFunds.

374.    Owens' breaches of duty proximately caused and were a substantial factor in causing the losses suffered by SPhinX and PlusFunds. But for Owens' actions, SMFF's cash would not have been held at RCM and would not have been lost. Both SMFF and PlusFunds would have avoided the losses they suffered and would have continued in business.

375.    Had Owens not conspired to oppose and force out Bousbib, SMFF's cash would have been removed from Refco. Had Owens not conspired to conceal the Suffolk loans and the true nature of Refco's role in the Suffolk loans from PlusFunds' management and SPhinX, SMFF's cash held at RCM would not have been diverted to fund the Suffolk loans and management would have ended the relationship between SPhinX and Refco.

376.    The losses suffered by SPhinX and PlusFunds were reasonably foreseeable to Owens. Owens should have reasonably foreseen that the placement of assets in non-segregated accounts at RCM exposed the SPhinX Funds in the event of RCM's insolvency. Owens also understood that PlusFunds' primary business was the management of the SPhinX Funds, and that the collapse of the SPhinX Funds would destroy PlusFunds' business.

**B.      Refco Agents.**

**1.      Bennett.**

377.    Defendant Phillip Bennett was the highest ranking corporate officer of various Refco entities until he was forced to resign in October 2005, following the disclosure of the massive fraud that he, Maggio, Trosten, and Grant perpetrated. At relevant times, he served as a director and officer of RGL, RCM, and Refco Inc. Before serving as President, Chief Executive Officer, and Chairman of RGL from September 1998, Bennett had been the Chief Financial Officer of RGL.

92

378.    The Refco entities owed the SPhinX Funds and PlusFunds contractual and fiduciary duties, by virtue of Refco's role as, among other things, holder of SMFF's assets, not to convert or misuse those assets. Bennett shared in those duties as Refco's officer and director.

379.    In addition, because Refco was insolvent at the time of the LBO and IPO transactions, Bennett owed direct fiduciary duties to Refco's creditors and customers, including SPhinX and SMFF.

380.    Refco LLC owed fiduciary duties to its customers, including SPhinX. SPhinX and PlusFunds entrusted customer assets to Refco LLC to be maintained in regulated, protected, customer-segregated accounts. Refco LLC was bound by statute and contract to maintain these protections.

381.    Refco LLC owed fiduciary duties not to misuse customer assets or use them to perpetrate fraud. Refco LLC owed a fiduciary duty of disclosure to its customers to disclose facts relating to Refco LLC's financial condition.

382.    Similarly, RCM owed fiduciary duties to its customers, including SPhinX. Because RCM was entrusted with SPhinX assets, RCM owed fiduciary duties not to misuse customer assets or use them to perpetrate fraud. RCM owed a fiduciary duty to disclose to its customers facts relating to RCM's financial condition.

383.    The officers and directors of Refco LLC and RCM, including Bennett, shared in these fiduciary obligations to customers who entrusted assets to Refco LLC and RCM, including SPhinX.

384.    Refco's agents, including Bennett, were familiar with the SPhinX Funds' structure and the Cayman Islands SPC regime. Refco and its agents, including Bennett, understood that the SMFF funds were to be maintained in protected, regulated, customer-

93

segregated accounts to preserve those assets. Refco and Bennett both invested directly in the SPhinX Funds; therefore, Bennett received and was familiar with the SPhinX Offering Memorandum and other materials and understood the customer-segregation and other requirements designed to protect SPhinX assets. Bennett was a friend of Sugrue and understood PlusFunds' business. The purposeful movement of SMFF cash to RCM for use in the Refco fraud constituted a breach of the Refco entities' fiduciary duties, as well as Bennett's.

385.    Bennett recently pleaded guilty to criminal conspiracy and fraud charges in connection with the acts alleged herein. He is currently awaiting sentencing.

386.    Bennett orchestrated and choreographed the transfer of Refco losses to RGHI to remove them from Refco's consolidated financial statements.

387.    Bennett also planned and implemented the diversion of RCM customer assets, including the SPhinX Funds' assets, to fund Refco's business operations and for use in the RTLs and the Suffolk loans.

388.    Bennett directly oversaw the diversion of RCM assets to fund Refco's operations. Daily "cash flow" statements setting forth the amount of customer assets available were circulated to Bennett, Maggio, and Trosten. These statements were used to determine what assets were available at RCM for use elsewhere in Refco's operations.

389.    Bennett signed the final S-1 in connection with the IPO on August 8, 2005. The S-1 failed to disclose hundreds of millions of dollars in uncollectible customer losses, the movement of losses to RGHI in the form of the RGHI Receivable, and the concealment of the RGHI Receivable from Refco's consolidated financial statements, all of which Bennett knew and participated in. Bennett also helped prepare and signed off on Refco's financial statements and public filings.

390.    Bennett directed and oversaw annual RTLs throughout his tenure at Refco, both before and after the LBO and IPO transactions.

391.    Refco has admitted and alleged in pleadings and other court filings that Bennett conspired and directed a massive fraud to conceal losses from Refco's consolidated financials.

392.    Bennett's breaches of duty proximately caused the damages suffered by SPhinX and PlusFunds. Bennett conspired to funnel customer assets, including SMFF assets, held at regulated Refco entities to RCM, where Bennett caused those assets to be used to conceal hundreds of millions of dollars in Refco losses. But for Bennett's conspiracy, SMFF's cash would never have been diverted to RCM, and the SPhinX Funds and PlusFunds would have avoided their losses entirely. Had Bennett properly disclosed Refco's customer losses and the details of the RGHI Receivable, SPhinX and PlusFunds would never have allowed any customer assets to be held at Refco and their losses would have been avoided entirely. Had Bennett observed his fiduciary duties to Refco's investors and customers, he would have fully disclosed Refco's losses, the details of the RGHI Receivable and Refco's true financial condition and SMFF's assets would never have been entrusted to any Refco entity.

393.    Bennett's breaches of duty were a substantial factor in causing the losses suffered by SPhinX and PlusFunds. But for Bennett's actions, SMFF's cash would not have been held at RCM and would not have been lost. Both SMFF and PlusFunds would have avoided the losses they suffered and would have continued in business.

394.    Had Bennett not conspired to conceal the Suffolk loans and the true nature of Refco's role in the Suffolk loans from PlusFunds' management and SPhinX, SMFF's cash held at RCM would not have been diverted to fund the Suffolk loans and management would have ended the relationship between SPhinX and Refco.

95

395.   The losses suffered by SPhinX and PlusFunds were reasonably foreseeable to Bennett.  Bennett understood that Refco and RCM were insolvent and that the placement of customer assets at RCM exposed customers to loss of those assets.  Bennett should have reasonably foreseen that movement of SMFF cash to RCM could put both SPhinX and PlusFunds at risk.

### 2.   Tone Grant.

396.   Defendant Tone Grant joined RGL in 1981.  Up through 1998, Tone Grant was President and CEO of RGL.  Prior to August 2004, through his ownership interest in RGHI, Tone Grant held a significant ownership stake in Refco.  From 1999 through August 2004, Bennett and Tone Grant each held a 50% interest in RGHI.  In or around August 2004, concurrently with the LBO, Tone Grant sold his interest in RGHI to Bennett, leaving Bennett the sole owner of RGHI.  Tone Grant has been indicted for, among other things, conspiracy to commit securities fraud, bank fraud, and money laundering.

397.   The Refco entities owed the SPhinX Funds and PlusFunds contractual and fiduciary duties by virtue of Refco's role as custodian of SMFF assets.  Tone Grant shared in those duties as a Refco officer and director.

398.   . Refco's agents, including Tone Grant, were familiar with the SPhinX Funds' structure and the Cayman Islands SPC regime.  The purposeful movement of SMFF cash to RCM for use in the Refco fraud constituted a breach of the Refco entities' fiduciary duties.

399.   Tone Grant's breaches of duty proximately caused the damages suffered by SPhinX and PlusFunds.  Tone Grant conspired to funnel customer assets held at regulated Refco entities to RCM, where Tone Grant caused those assets to be used to conceal hundreds of millions of dollars in Refco losses.  Tone Grant conspired with Bennett, BAWAG and Refco

agents to conceal Refco's losses and distort Refco's financials by moving losses and expenses to the RGHI Receivable and engaging in RTLs.

400.    But for Tone Grant's conspiracy, SMFF's cash would never have been diverted to RCM, and the SPhinX Funds and PlusFunds would have avoided their losses entirely. Had Tone Grant properly disclosed Refco's customer losses and the details of the RGHI Receivable, SPhinX and PlusFunds would never have allowed any customer assets to be held at Refco and their losses would have been avoided entirely.

401.    Tone Grant's breaches of duty were a substantial factor in causing the losses suffered by SPhinX and PlusFunds. But for Tone Grant's actions, SMFF's cash would not have been held at RCM and would not have been lost. Both SMFF and PlusFunds would have avoided the losses they suffered and would have continued in business.

402.    The losses suffered by SPhinX and PlusFunds were reasonably foreseeable to Tone Grant. Tone Grant understood that Refco and RCM were insolvent and that the placement of customer assets at RCM exposed customers to loss of those assets.

### 3.    **Trosten**.

403.    Defendant Robert C. Trosten was a member of Refco's corporate finance team from 1997 to 2001, Executive Vice President and Chief Financial Officer from 2001 to October 2004. Trosten was intimately familiar with all details of the Refco fraud. Trosten recently pleaded guilty to criminal fraud and conspiracy charges in the Southern District of New York and awaits sentencing.

404.    The Refco entities owed the SPhinX Funds and PlusFunds contractual and fiduciary duties by virtue of Refco's role as custodian of SMFF assets. Trosten shared in those duties as Refco's CFO.

405.    Trosten owed fiduciary duties to SPhinX and SMFF in connection with the roles of Refco LLC as, among other things, custodian of SMFF assets.

406.    Also, because Refco and RCM were insolvent, Trosten owed fiduciary duties to Refco and RCM creditors, including SMFF and the other SPhinX Funds.

407.    Refco's agents, including Trosten, were familiar with the SPhinX Funds' structure and the Cayman Islands SPC regime. Refco and its agents, including Trosten, understood that the SMFF funds were to be maintained regulated, protected, in customer-segregated accounts to preserve those assets. The purposeful movement of SMFF cash to RCM for use in the Refco fraud constituted a breach of the Refco entities' fiduciary duties.

408.    Trosten's breaches of duty proximately caused the damages suffered by SPhinX and PlusFunds. Trosten conspired to funnel customer assets held at regulated Refco entities to RCM, where Trosten caused those assets to be used to conceal hundreds of millions of dollars in Refco losses. But for this conspiracy, SMFF's cash would never have been diverted to RCM, and the SPhinX Funds and PlusFunds would have avoided their losses entirely. Had Trosten properly disclosed Refco's customer losses and the details of the RGHI Receivable, SPhinX and PlusFunds would never have allowed any customer assets to be held at Refco and their losses would have been avoided entirely.

409.    Trosten's breaches of duty were a substantial factor in causing the losses suffered by SPhinX and PlusFunds. But for Trosten's actions, SMFF's cash would not have been held at RCM and would not have been lost. Both SMFF and PlusFunds would have avoided the losses they suffered and would have continued in business.

410.    The losses suffered by SPhinX and PlusFunds were reasonably foreseeable to Trosten. Trosten understood that Refco and RCM were insolvent and that the placement of customer assets at RCM exposed customers to loss of those assets.

411.    Trosten knowingly participated in the transfer of Refco losses to RGHI to remove them from Refco's consolidated financial statements. As the CFO, Trosten authorized and signed off on the accounting records and financial statements for Refco, including the accounting for the RGHI Receivable, knowing that they misrepresented the nature of the RGHI Receivable.

412.    Trosten also participated in the diversion of RCM customer assets to fund Refco's business operations and for use in the RTLs and the Suffolk loans.

413.    Trosten directly oversaw the diversion of RCM assets to fund Refco's operations. Daily "cash flow" statements setting forth the amount of customer assets available were circulated to Bennett, Maggio, and Trosten.

414.    Trosten approved the final S-1 in connection with the IPO on August 8, 2005. The S-1 failed to disclose hundreds of millions of dollars in uncollectible customer losses, the movement of losses to RGHI in the form of the RGHI Receivable, and the concealment of the RGHI Receivable from Refco's consolidated financial statements.

415.    Refco has admitted and alleged in pleadings and other court filings that Trosten conspired and directed a massive fraud to conceal losses from Refco's consolidated financials.

### 4.    Maggio.

416.    Defendant Santo C. Maggio, also known as "Sandy" Maggio, joined Refco in 1985 and held executive positions with various Refco entities until he was forced to resign in October 2005, following the disclosure of the Refco fraud. Among his other positions within Refco, he served as Executive Vice President of RGL and President and a director of RCM. At all relevant times, Maggio ran the brokerage operations of RSL and RCM and directed,

orchestrated, and supervised the diversion of RCM assets alleged herein. According to press reports, Maggio is cooperating with the United States Justice Department and the SEC in relation, inter alia, to his role in various frauds perpetrated during his tenure at Refco. He recently pleaded guilty to criminal fraud and conspiracy charges in connection with his role at Refco.

417. The Refco entities owed the SPhinX Funds and PlusFunds contractual and fiduciary duties by virtue of Refco's role as custodian of SMFF assets. Maggio shared in those duties as an officer and director of Refco entities.

418. Maggio owed fiduciary duties to SPhinX and SMFF in connection with the roles of Refco LLC and RCM as, among other things, custodian of SMFF assets.

419. Also, because Refco Group and RCM were insolvent, Maggio owed fiduciary duties to Refco and RCM creditors, including SMFF and the other SPhinX Funds.

420. Refco LLC owed fiduciary duties to its customers, including SPhinX. SPhinX and PlusFunds entrusted customer assets to Refco LLC to be maintained in regulated, protected, customer-segregated accounts. Refco LLC was bound by statute and contract to maintain customer segregation and not to divert customer funds to unregulated accounts to use the funds for its own business purposes and to fraudulently prop up its financial statements.

421. Refco LLC owed fiduciary duties not to misuse customer assets or use them to perpetrate fraud. Refco LLC owed a fiduciary duty of disclosure to its customers to disclose facts relating to Refco LLC's financial condition.

422. Similarly, RCM owed fiduciary duties to its customers, including SPhinX. Because RCM was entrusted with SPhinX assets, RCM owed fiduciary duties not to misuse

customer assets or use them to perpetrate fraud. RCM owed a fiduciary duty to disclose to its customers facts relating to RCM's financial condition.

423. The officers and directors of Refco LLC and RCM, including Maggio, shared in these fiduciary obligations to customers who entrusted assets to Refco LLC and RCM, including SPhinX.

424. Refco's agents, including Maggio, were familiar with the SPhinX Funds' structure and the Cayman Islands SPC regime. The purposeful movement of SMFF cash to RCM for use in the Refco fraud constituted a breach of the Refco entities' fiduciary duties.

425. Maggio's breaches of duty proximately caused the damages suffered by SPhinX and PlusFunds. Maggio conspired to funnel customer assets held at regulated Refco entities to RCM, where Maggio caused those assets to be used to conceal hundreds of millions of dollars in Refco losses. But for this conspiracy, SMFF's cash would never have been diverted to RCM, and the SPhinX Funds and PlusFunds would have avoided their losses entirely. Had Maggio properly disclosed Refco's customer losses and the details of the RGHI Receivable, SPhinX and PlusFunds would never have allowed any customer assets to be held at Refco and their losses would have been avoided entirely.

426. Maggio's breaches of duty were a substantial factor in causing the losses suffered by SPhinX and PlusFunds. But for Maggio's actions, SMFF's cash would not have been held at RCM and would not have been lost. Both SMFF and PlusFunds would have avoided the losses they suffered and would have continued in business.

427. The losses suffered by SPhinX and PlusFunds were reasonably foreseeable to Maggio. Maggio understood that Refco and RCM were insolvent and that the placement of customer assets at RCM exposed customers to loss of those assets.

428.    Maggio was aware of and participated in the transfer of Refco losses to RGHI to remove them from Refco's consolidated financial statements.

429.    Maggio planned and implemented the diversion of RCM customer assets to fund Refco's business operations and for use in the fraudulent RTLs and Suffolk loans. Maggio personally arranged, negotiated, and participated in the documentation of numerous RTLs from 2000 to 2005 with RTL Participants and BAWAG.

430.    Maggio was aware of and directly participated in the diversion of RCM assets to fund Refco's operations. Daily "cash flow" statements setting forth the amount of customer assets available were circulated to Bennett, Maggio, and Trosten.

431.    Maggio was aware of the public filings in connection with the August 2004 LBO and the August 2005 IPO. Maggio understood that the S-1 failed to disclose hundreds of millions of dollars in uncollectible customer losses, the movement of losses to RGHI in the form of the RGHI Receivable, and the concealment of the RGHI Receivable from Refco's consolidated financial statements.

432.    Refco has admitted and alleged in pleadings and other court filings that Maggio conspired and directed a massive fraud to conceal losses from Refco's consolidated financials.

### 5.    Hackl.

433.    Thomas Hackl was employed with BAWAG from July 1991 through May 2002. While at BAWAG, his various responsibilities included senior management in the bank's global treasury and investment banking operations, trading on sales, asset management, and private banking. In 2002 Hackl moved to Refco as part of BAWAG's increasingly active participation in and control of Refco operations. Hackl was directly involved in assisting both Refco and BAWAG hide their respective losses through the operation of the RTLs. For example, BAWAG hid losses by shifting them to Liquid Opportunities, an entity created for the sole purpose of

concealing BAWAG's losses. Hackl was the conduit for the shifting of those losses, by buying worthless investor positions from BAWAG thereby allowing BAWAG to record the loss as an asset. Hackl also had close ties to Sugrue. Each is the godfather to the other's children.

434. Hackl understood that SMFF's cash was exposed in non-segregated accounts at RCM.

435. Hackl made direct misrepresentations to PlusFunds that were intended and actually did serve to conceal the exposure of SMFF's assets in non-segregated accounts at RCM. In the fall of 2004, Hackl negotiated interest rates on SMFF's cash held at Refco with Bousbib. In the course of those negotiations, Hackl falsely stated to Bousbib that the interest rate Refco could pay on SMFF cash was limited because SMFF's cash was maintained in customer-segregated accounts. This statement was false when made and was intended to deceive and mislead Bousbib and PlusFunds.

436. Had Hackl disclosed the truth about SMFF's cash at RCM, Bousbib would have taken steps to move SMFF's cash and SPhinX's losses would have been avoided.

### 6. Klejna.

437. Defendant Dennis Klejna was an Executive Vice President and General Counsel of Refco Group from 1999 until Refco's collapse. Upon information and belief, Klejna was also an Executive Vice President and General Counsel of Refco LLC and RCM.

438. The Refco entities owed the SPhinX Funds and PlusFunds contractual and fiduciary duties by virtue of Refco's role as custodian of SMFF assets. Klejna shared in those duties as Refco's officer.

439. Klejna owed fiduciary duties to SPhinX and SMFF in connection with the roles of Refco LLC and RCM as, among other things, custodian of SMFF assets.

440.    In addition, because Refco Group and RCM were insolvent, Klejna owed fiduciary duties to Refco and RCM's creditors, including SMFF and the other SPhinX Funds.

441.    Refco LLC owed fiduciary duties to its customers, including SPhinX. SPhinX and PlusFunds entrusted customer assets to Refco LLC to be maintained in regulated, protected, customer-segregated accounts. Refco LLC was bound by statute and contract to maintain customer segregation and not to divert customer funds to unregulated accounts to use the funds for its own business purposes and to fraudulently prop up its financial statements.

442.    Refco LLC owed fiduciary duties not to misuse customer assets or use them to perpetrate fraud. Refco LLC owed a fiduciary duty of disclosure to its customers to disclose facts relating to Refco LLC's financial condition.

443.    Similarly, RCM owed fiduciary duties to its customers, including SPhinX. Because RCM was entrusted with SPhinX assets, RCM owed fiduciary duties not to misuse customer assets or use them to perpetrate fraud. RCM owed a fiduciary duty to disclose to its customers facts relating to RCM's financial condition.

444.    The officers and directors of Refco LLC and RCM, including Klejna, shared in these fiduciary obligations to customers who entrusted assets to Refco LLC and RCM, including SPhinX. The purposeful movement of SMFF cash to RCM for use in the Refco fraud constituted a breach of the Refco entities' fiduciary duties.

445.    Klejna's breaches of duty proximately caused the damages suffered by SPhinX and PlusFunds. The losses suffered by SPhinX and PlusFunds were reasonably foreseeable to Klejna. Klejna understood that Refco and RCM were insolvent and that the placement of customer assets at RCM exposed customers to loss of those assets.

446.    But for Klejna's breaches of duty, SMFF's cash would never have been diverted to RCM, and the SPhinX Funds and PlusFunds would have avoided their losses entirely. Had Klejna properly disclosed Refco's customer losses and Refco's insolvency, SPhinX and PlusFunds would never have allowed any customer assets to be held at Refco and their losses would have been avoided entirely.

447.    Klejna's breaches of duty were a substantial factor in causing the losses suffered by SPhinX and PlusFunds. But for Klejna's actions, SMFF's cash would not have been held at RCM and would not have been lost. Both SMFF and PlusFunds would have avoided the losses they suffered and would have continued in business.

448.    Klejna was aware of, prepared, and approved the public filings in connection with the August 2004 LBO and the August 2005 IPO. Klejna prepared and approved the Offering Memorandum for the Bonds, and Refco's fiscal year 2005 Form 10-K and Form 10-K/A. Klejna also prepared, approved and signed the Refco's October 12, 2004 Bond Registration Statement (including subsequent amendments), and Refco's August 2005 IPO Registration Statement.

449.    The Offering Memorandum and IPO Registration Statement each contained substantially similar discussions of the Officer Defendants', including Klejna's, importance to Refco's affairs. The Executive Employment and Non-Competition Agreements, pursuant to which Klejna was employed, gave him substantial authority over the day-to-day management and operation of Refco. The Agreements explicitly state that he is employed "in a key capacity with the Company," and that he has access to "confidential information regarding the organization, business, and finances of the Company."

450.    As an Executive Vice President and General Counsel, Klejna had power to influence and control, and did influence and control, directly or indirectly, the decision-making

of Refco as evidenced by his direct involvement in the day-to-day operations of Refco including its financial and accounting functions, and his signatures on and participation in the preparation and dissemination of Refco's false financial statements and other public statements.

451.    On January 1, 2004, Klejna and Aaron executed an agreement between SMFF, Refco LLC, and RCM in connection with opening accounts for the Segregated Portfolios of SPhinX SPC. Klejna signed the agreement as Executive Vice President and General Counsel on behalf of Refco LLC and RCM. This agreement was an attempt to remedy a deficiency in the safeguard procedures regarding SMFF Funds with Refco LLC and RCM.

452.    Klejna personally benefited from his breaches of duty receiving $6.5 million in a profit-sharing agreement buyout at the time of Refco's August 2005 IPO.

## XII.    PROFESSIONAL DEFENDANTS' ROLES.

### A.    Lawyers.

#### 1.    Gibson Dunn & Crutcher.

453.    Gibson Dunn & Crutcher ("Gibson Dunn") served as legal counsel to PlusFunds and SPhinX, but also represented Sugrue, Kavanagh and Owens and the Suffolk Entities controlled by Sugrue, Kavanagh, and Owens in connection with the Suffolk transactions.

454.    Additionally, Gibson Dunn represented Hardwicke Ltd., a company owned and controlled by Kavanagh.

455.    Gibson Dunn's simultaneous representation of all these parties was a conflict of interest. Gibson Dunn did not disclose the conflict to either PlusFunds or SPhinX's boards or to PlusFunds' innocent officers. Nor did Gibson Dunn attempt to obtain a conflict waiver. Even if it had attempted to obtain a waiver, the conflict was unwaivable.

456.    As a result of Gibson Dunn's attorney-client relationship, Gibson Dunn owed PlusFunds fiduciary, professional and contract duties. Gibson Dunn's fiduciary duties to

PlusFunds included duties of loyalty, duties of care, duties of disclosure, and duties to place the interests of PlusFunds ahead of the duties of Gibson Dunn. Gibson Dunn also owed PlusFunds and SPhinX a duty not to aid and abet the fraud or breaches of fiduciary duties of others, including Refco, Sugrue, Kavanagh, and Owens.

457. The Suffolk transactions were designed to compensate Sugrue, Kavanagh and Owens for their participation in the Refco fraudulent scheme – specifically, for Sugrue, Kavanagh and Owens' participation in the movement of SMFF cash from Refco LLC to RCM, where the cash could be used to fund the fraudulent RTLs and conceal Refco's insolvency. The Suffolk loans were also designed to transfer control and indirect ownership of PlusFunds to Refco without revealing the nature of the transaction to innocent members of PlusFunds or SPhinX management and other interested parties, including S&P.

458. The Suffolk loans were a sham and were fraudulent on their face. Gibson Dunn understood that Refco, Kavanagh, Owens, and Sugrue owed fiduciary duties to SPhinX and PlusFunds and that by participating in the Suffolk loans they were violating those fiduciary duties. Gibson Dunn knew that the source of the funds was Refco. Gibson Dunn also knew that SPhinX cash was required to be segregated in regulated accounts because Gibson Dunn possessed SPhinX's Offering Memoranda and marketing materials. Gibson Dunn proceeded to document the Suffolk loans and tender offer anyway.

459. Gibson Dunn assisted Sugrue, Kavanagh, and Owens in documenting the Suffolk loans with knowledge that PlusFunds and SPhinX's innocent decision-makers would object if it were disclosed that Refco had extended $200 million in non-recourse loans to PlusFunds directors with the majority of PlusFunds' outstanding stock pledged to secure those obligations.

460.    Gibson Dunn intentionally concealed Refco's role in the Suffolk transactions from innocent decision-makers at PlusFunds and SPhinX. Had Gibson Dunn told the innocent decision-makers that the source of the funds for the Suffolk loans was Refco and that Refco sought to exercise control over PlusFunds through the transactions, they would have precluded the transactions, thus preventing the buyout of Doug Morriss, Gabriel Bousbib, and John Wehrle, preventing further involvement with Refco, and preventing the payout of SPhinX cash to the disloyal Sugrue, Kavanagh, and Owens.

461.    Gibson Dunn understood that Sugrue, Kavanagh, and Owens owed fiduciary duties to PlusFunds and SPhinX. Gibson Dunn knew and understood that Sugrue, Kavanagh, and Owens wanted to conceal the nature of the Suffolk transactions from PlusFunds, in violation of their fiduciary duties to PlusFunds.

462.    Gibson Dunn wrongly and intentionally advised Sugrue, Kavanagh, and Owens that the Refco-Suffolk relationship did not have to be disclosed as a related-party transaction. Gibson Dunn became a coconspirator and substantially assisted the breach of fiduciary duties.

463.    Gibson Dunn's legal advice and services in connection with the Suffolk transactions were compromised by the aforementioned conflict of interest – Gibson Dunn represented SPhinX, PlusFunds, several of its board members, and the Suffolk Entities at the same time, in a transaction in which these parties had competing interests. At no time did Gibson Dunn ever consult any member of PlusFunds management or board other than Sugrue, Kavanagh, or Owens relating to the terms of the Suffolk transactions or this conflict of interest.

464.    Had innocent members of SPhinX or PlusFunds management understood the true nature of the Suffolk transactions or Refco's role and interest in the Suffolk transactions, they would have opposed and prevented the Suffolk loan transactions. If the true relationship

between Refco and Sugrue, Kavanagh and Owens had been known, innocent members of SPhinX and PlusFunds management would have removed SPhinX assets from Refco and SMFF's losses would have been avoided.

### 2.    Mayer Brown, Collins, Best, and Koury.

465.    Mayer Brown and its attorneys, Collins, Koury, and Best, served as Refco's legal counsel. As a result, they each owed fiduciary and professional duties to Refco. They each owed SPhinX and PlusFunds duties not to aid and abet the breaches of fiduciary duty and fraud of Refco.

466.    Mayer Brown, Collins, Koury, and Best owed to SPhinX and PlusFunds the duty to refrain from aiding and abetting any breach of duty, including fiduciary duties, owed by any other person or entity to SPhinX and/or PlusFunds.

467.    In the course of their representation of Refco, Mayer Brown, Collins, Koury, and Best knew and understood that Refco owed fiduciary duties to Refco's customers, including SMFF, arising out of Refco entities' roles as custodians of customer assets. By virtue of their role as counsel to Refco, Mayer Brown, Collins, Koury, and Best understood Refco's relationship with the SPhinX Funds and knew that Refco held customer assets, including assets belonging to SPhinX, and knew and understood all the facts alleged herein giving rise to the fiduciary duties Refco owed to SPhinX and PlusFunds.

468.    In the course of their representation of Refco, Mayer Brown, Collins, Koury, and Best understood that Refco was insolvent. Accordingly, they knew that Refco's officers and directors owed fiduciary duties to creditors and customers, including SPhinX and SMFF.

469.    As described herein, in the course of their representation of Refco, Mayer Brown, Collins, Koury, and Best became aware of the Refco fraud and were direct and knowing participants in it. Through their active participation, Mayer Brown, Collins, Koury, and Best

substantially assisted Refco's fraud, breach of fiduciary duties and other wrongdoing alleged herein.

470.    Until October 2005, Mayer Brown was Refco's primary law firm, and Collins was Refco's primary outside legal counsel, with legal bills, on average, of approximately $4 million a year.  Mayer Brown provided a broad range of legal services to Refco—representing Refco in responding to SEC investigations, drafting profit sharing plans for key executives, advising Refco on corporate governance issues and United States and foreign regulations regarding its operations and activities, drafting Refco's customer agreements, providing Refco with tax advice, leading financings for senior note and loan agreements, and drafting and negotiating the RTLs.  Mayer Brown was thoroughly familiar with Refco's business, including Refco's relationship with SPhinX and PlusFunds.

471.    The vast majority of important transactions and deals at Refco, including the LBO and IPO, were cleared through Collins and Best or attorneys working under their direct supervision, including Koury, and Collins was aware of all work done for Refco by virtue of his review of Refco's legal bills.

472.    As the Court-appointed Examiner found, Mayer Brown was aware of the Refco fraud and aided and abetted it:

- Mayer Brown was aware of Refco customer losses and helped the Refco Insiders hide these losses by transferring them to RGHI.  By June 2002, Mayer Brown knew that RGHI owed a related party debt to RGL of at least $350 million.

- Mayer Brown drafted the RTL documents on 18 separate transactions, negotiated the terms of the RTLs with the RTL Participants, and fully understood the nature of the RTLs.  Mayer Brown knew that the loans were risk-free to the RTL Participants and served no legitimate business purpose.

- Because Mayer Brown documented the RTLs, Mayer Brown knew they were tied to Refco's financial reporting periods.  Mayer Brown knew that the RTLs straddled Refco's financial reporting and audit periods and occurred only at those times (with one exception).

- Mayer Brown drafted guarantees and indemnities on behalf of RGL in favor of the RTL Participants to guarantee RGHI's repayment obligation. Mayer Brown knew that Bennett signed the guarantees and indemnities on behalf of RGL or RCM and the loan documents on behalf of RGHI. Mayer Brown knew and/or consciously avoided knowing that the guarantees and indemnities violated the terms of other loan agreements that Mayer Brown had prepared for Refco.

473.    Joseph Collins was recently indicted for his actions in connection with his representation of Refco.

### (a)    Awareness of Refco's Trading Losses and Balance Sheet Problems.

474.    Starting in 1997, Mayer Brown, Collins, and Best provided legal services to Refco in connection with various transactions involving "bad debts" incurred by Refco. In those cases, the "bad debts" were assigned to RGHI or related entities. For example, in late 1997, a group of Refco customers to whom Refco had extended credit sustained large losses, some in connection with the Asian debt crisis. By the end of 1998, those losses amounted to hundreds of millions dollars. Mayer Brown attorneys were involved in the resolution of Refco's claims against those customers, which debts later became part of the RGHI Receivable.

475.    For example, in October 1997, a Refco customer named Victor Neiderhoffer lost more than $90 million (the "Neiderhoffer Loss"). Instead of disclosing the losses in its financial statements – losses which Neiderhoffer could not cover – Refco, with Mayer Brown's assistance, transferred this receivable to an RGHI subsidiary and subsequently to the RGHI Receivable. Because Mayer Brown, Collins, and Best were advising both RGHI and Refco throughout the relevant time, Mayer Brown was aware that Refco used RGHI as a repository for bad debts.

476.    In a letter dated October 15, 1999, Bennett wrote to Collins estimating the apparent net worth of RGHI as the value of its investment in RGL. Collins, aware of the RGHI Receivable, jotted in his handwritten notes: "Minus loans to RGH[I]." These handwritten notes show that Collins knew RGHI owed money to RGL.

111

477.   By June 2002, Mayer Brown, Collins, and Best were aware that the RGHI Receivable totaled at least $350 million.   On June 11, 2002, Mayer Brown revised legal documents that included a "Letter Agreement" to be signed by, among others, RGL and RGHI, in which RGL agreed that "$350 million" would be used "for the retirement of related party debt of [RGHI]."

### (b)    The RTL Transactions.

478.   Mayer Brown drafted and negotiated the RTLs to hide the RGHI Receivable.  For five years, Mayer Brown drafted virtually all documents for at least 18 RTLs collectively totaling billions of dollars in fraudulent loans.  The drafting and negotiating for each of those transactions were personally supervised by Collins and Best.

479.   Koury personally drafted the documentation for at least the RTLs involving Liberty Corner which, as described in further detail below, were fraudulent on their face.  Koury did his work under the direct supervision of Collins and Best.

480.   Mayer Brown employed the same loan structure for each of the RTLs and drafted (at times even negotiated) RTLs with Flanagan's EMF Financial and Delta Flyer entities, with Coast (through its subsidiary CS Land), with Krieger (through his Beckenham entity), and with Ingram Micro (through its subsidiary CIM Ventures),

481.   Although the loan structure—whereby a loan at the close of a financial reporting period was unwound shortly after Refco's financial reporting and audit periods—was suspicious on its face, Mayer Brown, Collins, Best, and Koury drafted and negotiated nearly identical loan documents at least an additional 14 times.

482.   No later than June 2002, Mayer Brown, Collins, Best, and Koury knew that RGHI owed a receivable of at least $350 million to RGL but continued to facilitate additional RTLs.

483.   Mayer Brown, Collins, Best, and Koury not only continued their work on the RTLs, but escalated it, as RTLs began to occur on a quarterly basis right before the LBO. The RTLs straddled the end of Refco's financial reporting periods (with one exception). Despite this obvious sign that the RTLs were intended to manipulate Refco's financial statements Mayer Brown, Collins, Best, and Koury continued to participate.

484.   Additionally, Mayer Brown, Collins, Best, and Koury knew and/or consciously avoided knowing that the RTLs had no legitimate purpose. The RTLs were uncollateralized, short-term loans of hundreds of millions of dollars by one Refco entity through a third party to a Refco related-party (RGHI), with guarantees and indemnities by RGL to eliminate any risk to the RTL Participants. The transactions, which Mayer Brown knew to be risk-free lacked economic substance and were inherently suspicious.

485.   Moreover, Mayer Brown, Collins, Best, and Koury's awareness of the impropriety of the RTLs is obvious from the fact that certain RTL Participants backed out of the deals based on their concerns over the propriety of the transactions. In early 2002, Ingram Micro was prepared to go forward with a third RTL, sending a mark-up of its 2001 loan documents to Collins. However, on January 30, 2002, Ingram Micro withdrew due to then-recent news about the Enron scandal. Later that same day, Ingram Micro sent Refco an email backing out of the proposed RTL, referencing the Enron debacle and heightened scrutiny from the SEC.

486.   As the Examiner concluded, "there is significant evidence that Mayer Brown ... assisted Refco by drafting and negotiating documents in connection with the Round Trip Loan transactions, which Mayer Brown knew or should have known were fraudulent and undertaken for the purpose of manipulating Refco's financial statements," and "there is evidence showing that Mayer Brown knew that the Round Trip Loans were a scheme to avoid disclosure of the

RGHI Receivable on Refco's audited financial statements in order to fraudulently bolster Refco's financial appearance to lenders and investors."

### (c)  Maintaining the Fraudulent Business Model.

487.  Refco facilitated its fraudulent scheme to attract and siphon RCM assets by continuing to maintain RCM as an unregulated, offshore broker-dealer despite the fact that it conducted substantial activity in the United States and did not even maintain any Bermuda operations after 2001.  Mayer Brown, Collins, and Best advised Refco and RCM on their efforts to misappropriate customer funds beginning no later than October 1996, and continuing through October 2005.

488.  In 2001, in furtherance of the scheme described herein, Refco decided to close down RCM's Bermuda operations and to "repatriate" RCM to the United States.  Bennett enlisted the assistance of Mayer Brown, Collins, and Best which advised RCM on the implications of repatriating to the United States.  As reflected in, among other things, a June 24, 2002 Mayer Brown memorandum, Mayer Brown became intimately familiar with the business and operations of RCM through discussions with Maggio and others.  As reflected in an August 3, 1998 Mayer Brown memorandum, Mayer Brown was aware when it did this work that RCM was engaging in repurchase agreements, or "repos," and buying and selling customer securities "for its own account."  In connection with the repatriation of RCM to the United States, Mayer Brown advised RCM on, among other things, ways to structure its business to avoid treatment as a regulated broker-dealer subject to segregation and regulatory requirements.

489.  According to a January 31, 1999 memorandum from Refco to Mayer Brown, Mayer Brown also was involved in and familiar with various other "projects underway with respect to Refco's FX business," which caused Mayer Brown to be aware of the diversion of RCM FX customer-entrusted assets to other Refco entities.

490.    In June 2004, questions were raised by THL's counsel concerning Refco's "average cash on hand." THL inquired about "house cash," which Mayer Brown characterized as "a difficult concept." In response to a question regarding having Grant Thornton provide a better explanation in future filings of Refco's "average cash on hand" and the distinctions between "house cash," "customer cash," and "regulated cash," Mayer Brown noted emphatically, "No! ! Impossible to breakout. Too restrictive operationally *i.e.* funding." Mayer Brown was fully aware that Refco was siphoning RCM customer funds to finance Refco's operations and to dress up Refco's financials.

491.    Mayer Brown's knowledge of and participation in the overall scheme is clearly shown through emails from Refco employee Thomas Yorke to Collins in January 2005. In those emails, Yorke sought advice from Mayer Brown on impending regulatory changes that "could mean an extremely large asset transfer away from RCM," how to avoid the potential impact of those changes and how to minimize "the cash transfer" from customer accounts at RCM to customer accounts at other Refco entities. As Mayer Brown, Collins, and Best were aware, Yorke wanted to keep cash at RCM because Refco used RCM customer accounts to fund Refco's operations. Mayer Brown's proposed solutions included "stall" and "avoid immediate application" of the new rule and "convince the adviser that its clients' assets . . . are beyond the scope" of the new rule.

492.    A Mayer Brown draft memorandum conveniently dated October 11, 2005, (just as the massive fraud at Refco was unraveling), shows that Mayer Brown was aware that as a result of the repatriation of RCM to the United States:

(a)    RCM's activities were actually conducted by RSL, and RCM had no personnel available to look out for the interests of its customers;

(b)    "RCM no longer maintains any personnel or operations in Bermuda, and . . . all of its functions and operations are performed by RSL personnel that are located in the United States";

(c)    While assets in RCM customer accounts were "carried on the books of RCM," those assets were in fact not held by RCM;

(d)    RCM engaged in "significant" conduct in the United States, had structured its activities to "avoid U.S. regulatory requirements" and could not properly claim to be exempt from United States regulatory requirements; and

(e)    RCM was not in fact a "foreign broker-dealer."

493.    Mayer Brown's preparation of such a memorandum in October 2005, at precisely the same time as the public disclosure of the Refco fraud, is inherently suspicious. By preparing to advise RCM that it should consider changing the way it conducted its business after the fraud had already been disclosed and RCM had been effectively shut down, Mayer Brown, Collins, and Best were simply trying to "paper the file," "cover its tracks," and create the appearance after the fact that it had rendered appropriate advice to RCM. In fact, Mayer Brown, Collins, and Best had advised RCM on its repatriation from Bermuda to the United States at a time when the law was no different than it was in October 2005. Indeed, all of the authorities cited in that draft Mayer Brown memorandum pre-dated the advice rendered by Mayer Brown in 2001 and 2002 with respect to RCM's repatriation.

494.    Mayer Brown, Collins, Best, and Koury knew that Refco's activities were fraudulent and actively aided and abetted the fraud.

        (d)    **Conduct in the LBO.**

495.    Further evidence that Mayer Brown participated in Refco's scheme to hide the RGHI Receivable is Mayer Brown's conduct in the LBO. Mayer Brown, Collins, Best, and Koury represented both Refco Group and RGHI in connection with the LBO and, according to

116

the Examiner, were "deeply involved" in the LBO process, negotiating the agreement with THL and handling the Refco side of THL's due diligence.

496.    The Equity Purchase and Merger Agreement underlying the LBO transaction, a document negotiated and reviewed by Mayer Brown, Collins, Best, and Koury represented that there were no undisclosed intercompany loans between Refco and RGHI, and specifically required that Refco not assume or guarantee any indebtedness in excess of $5 million.  The representation was false and Mayer Brown, Collins, Best, and Koury knew that the guarantee requirement would immediately be breached.  There were, in fact, massive related-party loans between Refco and RGHI that had not been disclosed, but rather had been hidden by the RTLs documented by Mayer Brown, Collins, Best, and Koury.  Moreover, at the same time Mayer Brown, Collins, and Best were reviewing these provisions in the Equity Purchase and Merger Agreement, they were also preparing documents for a $720 million RTL in which a Refco entity – RGL – was guaranteeing the debt.

497.    Mayer Brown, Collins, Best, and Koury affirmatively participated in a scheme to hide the RGHI Receivable.  Mayer Brown, Collins, Best, and Koury reviewed the LBO prospectus and issued a legal opinion in connection with the LBO.  The Offering Circular:  (a) did not mention the existence of RTLs; (b) stated that $105 million owed to RGHI as of February 28, 2003, had been received as of February 29, 2004; (c) did not disclose the guaranty—that Mayer Brown itself had prepared — to a RTL Participant for a $720 million RTL that would come due a week later; (d) did not disclose that repayment of that RTL would result in an increase in the RGHI Receivable in that amount; and (e) falsely stated that the LBO bond debt was effectively junior to the payables owed to RCM.

117

(e)    **Conduct Before and After the IPO.**

498.    After the LBO closed, Refco began the process of registering the Senior Subordinated Notes so that they could become publicly traded and also began preparing a prospectus that would lead to an IPO. Mayer Brown, Collins, Best, and Koury were involved with both processes.

499.    During this time, Mayer Brown, Collins, Best, and Koury continued to prepare documents for RTLs ($485 million in August 2004, $545 million in November 2004, and $550 million in December 2004, $345 million in February 2005, and $450 million in May 2005). In addition, Mayer Brown, Collins, Best, and Koury continued to receive and respond to periodic requests for audit response letters—keyed to Refco's relevant reporting periods. Mayer Brown, Collins, Best, and Koury therefore knew that the RTLs straddled Refco's reporting periods and that the round-trip loans were intended to falsify Refco's financial statements.

500.    As the disclosure process with the SEC moved forward, Mayer Brown, Collins, Best, and Koury reviewed Refco's S-1 registration statements, including the final S-1 which failed to disclose (a) the existence of the multi-million dollar RGHI Receivable reflecting debt owed by RGHI to Refco; and (b) the RTLs used to hide the RGHI Receivable and temporarily pay down its debt to Refco at year-end and quarter-end financial reporting periods.

501.    On August 16, 2005 – the day the IPO was completed – Mayer Brown issued its opinion letter in connection with preparation and filing of the S-1 that made limited representations similar to those it had made in its August 5, 2004 legal opinion included in the LBO Offering Circular. The prospectus was misleading in substantially the same manner as the previous Offering Circular.

502.   In late August 2005, after the IPO was completed, Mayer Brown, Collins, Best, and Koury assisted Refco in engaging in another $420 million RTL designed to cover the existence of the RGHI Receivable.

503.   Mayer Brown, Collins, Best, and Koury understood that Refco's continued operation, despite its massive losses, required a continuous infusion of cash. Mayer Brown, Collins, Best, and Koury knew that the only sources of cash available to Refco were its three principal operating entities—RSL, Refco LLC, and RCM—and that only RCM was purportedly unregulated and had no segregation or net capital requirements. Mayer Brown, Collins, Best, and Koury thus understood that Refco was diverting and consuming RCM customer assets, which included SMFF assets, to support the fraud.

504.   Mayer Brown, Collins, Best, and Koury further understood that the goal of both the RTLs and the theft of RCM customer funds was to misrepresent Refco as being financially strong and healthy, growing quickly, yet with a low-risk, high profit business model. By their actions, Mayer Brown, Collins, Best, and Koury not only violated applicable ethical rules, it substantially assisted and participated in the fraud and breach of fiduciary duty of Refco and its agents.

### B.    Accountants.

#### 1.    PwC and Mari Ferris.

505.   PwC owed to SPhinX and PlusFunds the duty to refrain from engaging in conduct that PwC knew or should have known would be harmful to SPhinX and/or PlusFunds.

506.   PwC owed to SPhinX and PlusFunds the duty to refrain from aiding and abetting any breach of duty, including fiduciary duties, owed by any other person or entity to SPhinX and PlusFunds.

119

507.    PwC owed to SPhinX and PlusFunds the duty to refrain from aiding and abetting fraud perpetrated on SPhinX or PlusFunds.

508.    During the years 2003, 2004, and 2005 PwC also provided tax consulting and other advisory services to SPhinX. As such, PwC owed SPhinX fiduciary duties, including the duties of due care, loyalty, and full disclosure of all facts known by PwC that were material to the business and best interests of SPhinX.

### (a)    PwC's Role as Refco Accountant and Consultant.

509.    PwC was engaged by numerous Refco portfolio funds, including SPhinX Managed Futures Index Fund LP, S&P Managed Futures Index Fund LP, Refco SPhinX Managed Futures Fund Ltd., and Refco Advantage Multi Manager Fund, among others, to audit the financial statements of those funds for the fiscal years 2003 through 2005.

510.    PwC partner Defendant Mari Ferris was the engagement partner on the Refco fund audits referenced above. As such, Ferris was in a unique position to gain knowledge of Refco's business operations and structure. At the same time PwC was conducting those Refco fund audits, Mari Ferris was also serving as engagement partner on the 2003, 2004, and 2005 PwC audits of the annual financial statements of the SPhinX funds.

511.    On May 5, 2004, PwC was engaged by Refco in connection with the LBO bond offering to provide advisory services, including (a) helping Refco to plan and prepare for the LBO and (b) advising Refco with "accounting and financial reporting matters" relevant to the offering, including the contents of the offering documents.

512.    On June 7, 2004, PwC's engagement was broadened to include analyzing the planned LBO by performing a Transaction Costs Analysis intended to optimize the tax treatment of professional fees (accounting, financial, legal, etc.) associated with the LBO. As part of that

analysis, PwC was authorized to conduct "interviews with the outside service providers," as well as "internal personnel involved in the transactions."

513.    After the LBO, PwC's engagement was broadened to cover two additional areas. On September 28, 2004, PwC's role was extended to include "advice and assistance related to the accounting and financial reporting matters for the quarter ended August 31, 2004." On November 10, 2004, PwC's engagement was further extended to helping "improve bottom line performance" by proposing alterations to Refco's "commissions and payouts" in numerous lines of business, including foreign exchange and prime brokerage services.

514.    In response to the disclosure that there were accounting control deficiencies at Refco, PwC also became the *de facto* Chief Accounting Officer for Refco and was charged with "assisting in the initial planning and staffing of audits" and implementing improved accounting controls.

515.    Furthermore, on March 8, 2005, PwC was engaged by RGL to provide an assortment of services in connection with Refco's preparation of the Form S-1, including (a) assistance in drafting and reviewing the Form S-1, (b) "consultation on disclosures within the Form S-1 and the Company's financial statements," (c) providing Refco's "management" with support in preparing any "Underwriters' comfort letter," and (d) assisting Refco with draft responses to SEC comments.

516.    PwC was also engaged by RGL in the summer of 2004 to provide tax-consulting services and, on April 1, 2005, was engaged to prepare Refco's 2004 state and federal tax returns.

517.    As a result of the various auditing, advisory, and tax services and the unfettered access PwC had to Refco personnel and accounting systems, PwC was in a unique position and

became aware of all the facts alleged herein giving rise to fiduciary duties owed by Refco and its agents, including Defendants Bennett, Grant, Trosten, Hackl and Maggio, to SPhinX and PlusFunds, including but not limited to the fact that Refco was acting as custodian of SPhinX customer funds, which were required to be held in customer-segregated accounts. In this same manner PwC became aware and knew of each of these Defendants' breaches of fiduciary duty described herein and provided substantial assistance to those breaches as described herein.

518.    As a result of these auditing, advisory and tax services and the unfettered access PwC had to Refco personnel and accounting systems, PwC was in a unique position and became aware and knew of Refco's fraudulent scheme and, more specifically, the RGHI Receivable, the RTLs, the use of RCM customer assets (including SPhinX customer funds) to fund Refco and the inappropriateness of the LBO and IPO in light of Refco's true financial condition.

519.    Through its provision of various auditing, advisory and tax services, PwC knowingly participated and substantially assisted in the fraud alleged herein. Without these services, Refco would have been unable to continue hiding its true financial condition long enough to complete its fraudulent scheme.

520.    Through the due diligence undertaken as Refco's principal advisor concerning accounting and financial reporting in connection with the LBO and the IPO and its role as the *de facto* Chief Accounting Officer for Refco, PwC learned of and/or consciously avoided knowledge of the existence of both the RGHI Receivable and the RTLs.

521.    Indeed, an email exchange between PwC and Victor Zarate, Assistant Controller of New Refco Group Ltd., LLC ("New Refco Group"), establishes that PwC was fully aware of the wire transfer RTLs in which BAWAG served as the conduit.

522.    On November 22, 2004, Zarate sent Henri Steenkamp, manager of Global Capital Markets at PwC, a schedule of the BAWAG RTLs, referred to as "BAWAG deposits." The schedule listed the exact sum of money Refco deposited in BAWAG to fund the fraudulent wire transfer RTLs. The "deposits" were each made at the end of Refco's fiscal year—*i.e.*, the last day of February – for the years 2001, 2002, 2003 and 2004, and also around the time of the LBO, in July and August of 2004.

523.    Evidencing that PwC understood that those "deposits" related to improper RTLs, PwC responded to the Zarate email listing the BAWAG deposits by asking for "the RGHI loan balances as well for th[ose] periods . . . ."

524.    Given PwC's knowledge and familiarity with Refco's financial reporting periods, PwC knew or consciously avoided knowing that at the end of each annual reporting period, and just before the LBO, Refco was "depositing" money with BAWAG and that, concurrently, the RGHI Receivable was being reduced by a like amount.

525.    As Refco's principal advisor on accounting and financial reporting matters in connection with the LBO and the IPO, PwC knew, or consciously avoided knowing, that there was no legitimate business purpose for these wire transfer RTLs, except to conceal the RGHI Receivable before the end of each relevant reporting and/or audit period.

526.    As Refco's 2004 tax year preparer, PwC also carefully reviewed Refco's prior tax returns and Refco's financial statement as of each *calendar*, not fiscal, year-end. As the RTLs were used to conceal the RGHI Receivable in *fiscal* year reporting and audit periods, PwC discovered, or consciously avoided knowledge of, the full extent of the RGHI Receivable.

527.    Furthermore, because PwC knew the wire transfer RTLs reduced the RGHI Receivable balance, it also knew that the $105 million receivable from RGHI disclosed on

Refco's financial statements did not reflect the full amount of the related-party receivable owed by RGHI to Refco.

528.    If PwC had fulfilled its professional obligations, it would have investigated the wire transfer RTLs and the RGHI Receivable, uncovered the full scope and nature of both the RGHI Receivable and the RTLs, and advised Refco's innocent directors, officers, agents and others of the Refco Insiders' fraudulent scheme.  Instead, PwC chose to substantially assist the Refco fraudulent scheme.

529.    Despite the fact that PwC knew or consciously avoided knowing that Refco was concealing the full amount of the RGHI Receivable, PwC actively assisted Refco in mischaracterizing the $105 million receivable from RGHI that was, in fact, disclosed.

530.    PwC knew or consciously avoided knowing that Refco routinely referred to intercompany and related-party obligations as receivables and payables owed to and from "customers."  As PwC knew, given its understanding of Refco's operations and accounting, the reason Refco sought to mischaracterize intercompany and related-party transactions as "customer" activity was to obfuscate and conceal improper intercompany and related-party transactions from regulators and customers, including SPhinX and PlusFunds.

531.    Nonetheless, in its role as Refco's principal adviser in connection with accounting and financial reporting matters, PwC prepared and/or reviewed and commented on Refco's initial S-4 registration statement which mischaracterized the $105 million receivable from RGHI as a "customer receivable."  It was this misleading language in the S-4 that prompted the SEC to question why related-party transactions with equity members should be booked as receivables from "customers."  While the SEC forced Refco to change the S-4 registration statement to reflect that the receivables were due from "equity members," the final S-4 did not disclose the

124

wire transfer RTLs, that part of the receivable owed by RGHI was concealed by the RTLs and that the $105 million was only a portion of the overall amount owed by RGHI to Refco.

532.    Furthermore, PwC chose not to require disclosure of any portion of the RGHI Receivable in the S-1 registration statement prepared and filed with the SEC in connection with Refco's IPO.  While early drafts of the S-1 included the $105 million related-party receivable reflected in the S-4 and the reference to the receivable being owed by "equity members," the final version of the S-1 filed with the SEC omitted reference to any portion of the RGHI Receivable despite the fact that PwC, even knowing about the wire transfer RTLs, did not receive, or seek, any confirmation that the $105 million receivable from RGHI disclosed in the S-4 had, in fact, been paid down, or that there were no other material related-party receivables due from RGHI and others.

533.    Similarly, in connection with commenting on the consolidated financial statements that would be attached to the offering prospectus, it was PwC that edited Note K-Related Party Transactions and characterized the $105 million receivable from RGHI as a receivable "from customers."  PwC thus intentionally sought to conceal from the public, the related-party nature of even the small amount of the receivable from RGHI that was disclosed.

534.    PwC also knew and/or consciously avoided knowing that Refco was looting the assets of RCM's customers, including SPhinX, in order to satisfy Refco's substantial working capital needs and to create the perception that Refco was an appropriate candidate for the LBO and IPO.

535.    Indeed, the fraudulent scheme perpetrated through RCM was so fundamental to the operation and financing of Refco that it had to be apparent to PwC.  The volume and size of the transfers from RCM customer accounts, involving, on many occasions, hundreds of millions

125

of dollars each, ensured that the amount of RCM funds that were "loaned" to other entities substantially outsized Refco's total capital. By the time Refco filed for bankruptcy, the net uncollectible transfers totaled $2 billion, while RGL claimed only $515 million in capital in 2002, $566 million in 2003, $616 million in 2004, and only $150 million in 2005.

536.    Furthermore, PwC was responsible for assisting Refco with the LBO offering materials, the IPO offering materials and the financial reports and registration statements that had to be prepared and filed in connection with both the LBO and the IPO, including the S-1 and the S-4 registration statements. PwC was thus fully familiar with and helped prepare and/or received and commented on the "payable to customers" line item on the condensed consolidated financial information.

537.    Based on PwC's involvement in preparing and/or reviewing and commenting on these condensed consolidated financial statements, PwC knew that the "payable to customer" line item referred to intercompany loans and that there were approximately $2 billion in payables owed by RGL and its affiliates to RCM as of the time of the LBO and that these amounts were not repaid in the LBO.

538.    Indeed, one of PwC's comments to Refco's consolidated financial statements was to eliminate from the Summary of Significant Accounting Policies (Note B) -- Receivable From And Payable To Brokers, Dealers and Customers and move to Related Party Transactions (Note K) the following language: "In the normal course of business, a member of the Group engages in customer-related activities which result in receivable from or payable to customer balances, which change daily." The only reason PwC would have moved this language to the related-party section of the financials was because PwC understood that these "payables to customer balances"

126

referenced RCM customer assets that were being siphoned to fund the operations of other Refco related entities.

539.    As PwC knew, or consciously avoided knowing, the enormous "payables to customers" that were eliminated in consolidation were actually intercompany payables owed to RCM and, accordingly, the incurrence of $1.4 billion of debt by RGL and RCC in the LBO would have a devastating impact on RCM and its customer accounts, including SPhinX accounts.

540.    Underscoring PwC's willingness to aid and abet Refco at the expense of adhering to their professional standards, on October 12, 2005, two days after the RGHI Receivable had been publicly disclosed, PwC agreed to allocate BAWAG's 10% distributive share of RGL's 2004 income to RGHI based on Bennett's oral representation that the BAWAG affiliate that held a 10% interest in RGHI had merged into RGHI. Even a minimal investigation, however, would have caused PwC to conclude that the merger of this BAWAG affiliate into RGHI occurred on August 5, 2004, eight months into the tax year, making redistribution of BAWAG's 10% share for the entire tax year inappropriate.

541.    By relying on the oral instructions of Bennett, who was on indefinite leave from Refco at the time, without undertaking any investigation of its own, PwC violated required standards of professional conduct.

542.    Moreover, PwC further provided substantial assistance to the Refco fraud and breaches of fiduciary duty by issuing unqualified or "clean" audit opinions on the 2003 and 2004 financial statements of SPhinX when, as described in detail below, PwC knew or was reckless in *not* knowing that those financial statements were grossly and materially misstated and misleading due to their misrepresentation and concealment of the fact that hundreds of millions

127

of dollars of SPhinX assets had been wrongfully transferred from customer-segregated accounts to non-segregated accounts where those funds were placed at substantial and material risk of loss. Had these material facts been disclosed to innocent decision-makers of SPhinX and PlusFunds, those innocent decision-makers could and would have taken immediate action to protect the SPhinX assets by demanding their immediate return from RCM, and deposit in properly segregated accounts, protected from the insolvency and claims of creditors of the custodian of those assets.

### (i)    PwC and Ferris' Professional Duties as Auditor of SPhinX's and PlusFunds' Financial Statements.

543.    Defendants PwC and Ferris served as outside auditor of SPhinX's financial statements for the years 2003-2005. PwC and Ferris owed SPhinX and PlusFunds professional duties of care in connection with the audits of SPhinX's financial statements.

544.    Defendants PwC and Ferris served as outside auditor of PlusFunds' financial statements for at least the years 2003 and 2004. PwC owed SPhinX and PlusFunds professional duties of care in connection with the audits of PlusFunds' financial statements.

545.    Defendants PwC and Ferris knew, by virtue of the services they provided to SPhinX and PlusFunds that the vast majority of PlusFunds' revenues and net income were generated from PlusFunds' engagement as funds manager of the SPhinX Funds. It was thus reasonably foreseeable to PwC and Ferris, and in fact highly probable that a business failure of SPhinX would result in the business failure of PlusFunds.

546.    By no later than the time it conducted its audits of SPhinX's financial statements for the fiscal year 2004, PwC was aware and knew of the Refco fraud, including the use of RCM customer assets (including SPhinX Funds) to fund Refco and its fraudulent schemes.

547.    On or about December 29, 2003, PwC LLP and PwC Cayman Islands separately executed and issued engagement letters memorializing their agreements with SPhinX and PlusFunds to audit the 2003 financial statements of the various SPhinX entities, including SMFF. PwC LLP and PwC Cayman Islands estimated their audit fees would be $252,000 and $213,000 (plus expenses), respectively, but Ferris testified the actual fees totaled at least "nine hundred to a million" due the additional time required to obtain the necessary documents and information and to perform additional audit procedures in excess of what had been planned.  Although a significant portion of the SPhinX audits was performed by PwC Cayman Islands, the PwC Cayman Islands engagement was placed under the control of the PwC LLP engagement partner, Michael Greaney.  Both PwC LLP and PwC Cayman Islands agreed to conduct audits of SPhinX's financial condition in accordance with auditing standards generally accepted in the United States.  Both PwC LLP and PwC Cayman Islands represented that they would plan and perform their audits to obtain reasonable assurance that SPhinX's statements of financial condition were free of material misstatement.

548.    PwC LLP and PwC Cayman Islands executed and issued similar engagement letters, dated November 8, 2004 and November 9, 2005, respectively, memorializing their agreements with SPhinX and PlusFunds to audit the 2004 and 2005 financial statements of the various SPhinX entities, including SMFF.  PwC LLP and PwC Cayman Islands estimated their audit fees for 2004 would be $1,729,000 and $774,000 (plus expenses), respectively, and for 2005, $3,223,000 combined.  Ferris testified the significant increase in audit fees was "based on our expectation around the quality of the information [and] the time it would take to get the information that we needed [and] there were also more entities in '04."  PwC Cayman Islands,

which again performed a significant portion of the SPhinX audits, ceded control of the audits to PwC LLP's engagement partner, Mari Ferris.

549.    On or about December 31, 2003, PwC LLP issued an engagement letter memorializing PwC LLP's agreement with PlusFunds to audit the 2003 financial statements of PlusFunds.

550.    PwC was similarly engaged to audit PlusFunds' 2004 financial statements.

551.    In or about March 2004, various SPhinX entities, including SPhinX Ltd., SPhinX Strategy Fund Ltd., and SMFF, issued their financial statements for 2003, in connection with which PwC issued clean and unqualified audit opinions on March 30, 2004.

552.    Note 1 to SMFF's Notes to Financial Statements for 2003 recognizes that SMFF is organized under the Cayman Islands Companies Law and that SMFF's assets are segregated and insulated:

> [SMFF] was organized on June 6, 2002 as a Cayman Islands Exempted Segregated Portfolio Company ("SPC") and operates pursuant to Part XIV of the Companies Law (2002 Revision). Under Cayman law, an SPC may create segregated portfolios. The assets of each segregated portfolio are insulated from the claims of creditors and liabilities of the other segregated portfolios.

553.    Note 8 to SMFF's Notes to its 2003 annual Financial Statements represents that PlusFunds, as Investment Manager, had procedures in place to control market risk exposure. These procedures focus primarily on monitoring the trading of the Portfolio Managers and calculating the Net Asset Value of each class of the Company's shares as of the close of business each day.

554.    In or about March 2005, various SPhinX entities, including SPhinX Ltd., SPhinX Strategy Fund Ltd., and SMFF, issued their financial statements for 2004, in connection with which PwC issued clean and unqualified audit opinions on March 30, 2005.

130

555.    Note 1 to SMFF's Notes to its 2004 Financial Statements recognizes that SMFF is organized under the Cayman Islands Companies Law and that SMFF's assets are segregated and insulated:

> [SMFF] was organized on June 6, 2002 as a Cayman Islands Exempted Segregated Portfolio Company ("SPC") and operates pursuant to Part XIV of the Companies Law (2002 Revision). Under Cayman law, an SPC may create segregated portfolios. The assets of each segregated portfolio are insulated from the claims of creditors and liabilities of the other segregated portfolios.

556.    Note 9 to SMFF's Notes to its 2004 annual Financial Statements represents that PlusFunds, as Investment Manager, had procedures in place to control market risk exposure. These procedures focus primarily on monitoring the trading of the Portfolio Managers and calculating the Net Asset Value of each class of the Company's shares as of the close of business each day. In addition, each Portfolio Manager applies market risk controls to its portfolio.

557.    In or about February 2004, PlusFunds issued its financial statements for the fiscal year ended December 31, 2003, in connection with which PwC issued a clean and unqualified audit opinion on February 2, 2004. Those financial statements contained no disclosure regarding any aspect of the Refco fraud, including the RGHI receivable or the RTL's. Nor did those financial statements contain any disclosure of the fact that hundreds of millions of dollars of SPhinX cash was exposed to the insolvency and credit risk of Refco and RCM.

### (ii)    PwC and Ferris' Duties Pursuant to Professional Auditing Standards.

558.    PwC and Ferris owed to SPhinX and PlusFunds the duty to perform their audits in accordance with the Standards promulgated by the American Institute of Certified Public Accountants ("AICPA").

131

559.    There are ten generally accepted auditing standards ("GAAS") promulgated by the AICPA: three General Standards, three Standards of Field Work, and four Standards of Reporting.  Those standards are as follows:

(a)    **General Standards**.

1.    The audit is to be performed by a person or persons having adequate technical training and proficiency as an auditor.

2.    In all matters relating to the assignment, an independence of mental attitude is to be maintained by the auditor or auditors.

3.    Due professional care is to be exercised in the performance of the audit and the preparation of the report.

(b)    **Standards of Field Work**.

1.    That the work is to be adequately planned and assistants, if any, are to be properly supervised.

2.    That sufficient understanding of internal control is to be obtained to plan the audit to determine the nature, timing, and extent of tests to be performed.

3.    Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmation to afford a reasonable basis for an opinion regarding the financial statements under audit.

(c)    **Standards of Reporting**.

1.    The report shall state whether the financial statements are presented in accordance with generally accepted accounting principles.

2.    The report shall identify those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period.

3.    Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.

4.    The report shall contain either an expression of opinion regarding the financial statements, taken as a whole, or an

132

assertion to the effect that an opinion cannot be expressed. When an overall opinion cannot be expressed, the reasons therefore should be stated. In all cases where an auditor's name is associated with financial statements, the report should contain a clear-cut indication of the character of the auditor's work, if any, and the degree of responsibility the auditor is taking.

560.    The requirement of independence embodied in the second general standard requires that "the auditor must be intellectually honest; to be recognized as independent, he must be free from any obligation to or interest in the client, its management, or its owners." AU § 220.03.

561.    Moreover, "[a]n audit of financial statements in accordance with generally accepted auditing standards should be planned and performed with an attitude of professional skepticism." AU § 316.16.

562.    In addition, in conducting an audit in accordance with generally accepted auditing standards, the auditor must recognize that "[m]anagement integrity is important because management can direct subordinates to record transactions or conceal information in a manner that can materially misstated financial statement. When approaching difficult-to-substantiate assertions, the auditor should recognize the increased importance of his consideration of factors that bear on management integrity." AU § 316.17.

563.    "The auditor should assess the risk that errors and irregularities may cause the financial statements to contain a material misstatement. Based on that assessment, the auditor should design the audit to provide reasonable assurance of detecting errors and irregularities that are material to the financial statements." AU § 316.05.

564.    GAAS requires that the auditor "be aware of the possible existence of material related party transactions ... ," AU § 367.04, and that the auditor "place emphasis on testing material transactions with parties he knows are related to the reporting entity." AU § 367.07.

565.    GAAS requires that the auditor audit material related-party transactions with heightened skepticism because such transactions are presumed to not be arms-length transactions.

566.    With respect to related-party transactions, GAAS requires that the auditor apply procedures necessary to obtain satisfaction concerning the purpose, nature, and extent of these transactions and their effect on the financial statements. Such procedures "should extend beyond inquiry of management." AU § 367.09.

567.    According to GAAS, "[u]ntil the auditor understands the business sense of material transactions, he cannot complete his audit." AU § 367.09, n. 6.

568.    In its audits of SPhinX's financial statements and in its audits of PlusFunds' financial statements PwC was obligated by GAAS " to evaluate whether there is substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time, not to exceed one year beyond the date of the financial statements being audited... ." AU § 341.02.

569.    PwC also had a duty to comply with all of the Statements on Auditing Standards (SAS), which are issued by the Auditing Standards Board (ASB) of the AICPA and incorporated into GAAS.

570.    GAAS required that PwC obtain an understanding of the business organization and operating characteristics of SPhinX and PlusFunds sufficient for PwC to conduct its audits in accordance with GAAS.

571.    As part of its audits, PwC was thus required to read and become familiar with SPhinX's and PlusFunds' organizational documents, Offering Memoranda pertaining to the SPhinX Funds, and promotional materials provided to potential investors pertaining to the

SPhinX Funds in order to familiarize itself with the business of SPhinX and PlusFunds. PwC was also required to read and understand the prior year's financial statements of SPhinX and Plus Funds, and the prior year auditor's working papers pertaining to the audits of those financial statements. PwC and Ferris thus knew, or consciously disregarded, that SMFF's assets were to be maintained in customer-segregated accounts at a regulated entity, and that those assets were to be protected from the insolvency or claims of creditors of the custodian of those assets.

572. The maintenance and protection of SPhinX's customer assets in customer-segregated accounts, "ring-fenced" from claims against the other segregated portfolios and claims of creditors of the prime broker or custodian of SPhinX's customer assets, as represented in SPhinX's PwC-audited financial statements, was material to the fair presentation of SPhinX's financial condition. A failure to maintain this segregation of customer accounts would make the representations regarding segregated accounts false and would place those assets at substantial risk of loss, a fact that would have to be disclosed in SPhinX's financial statements. Thus, GAAS required that PwC plan and perform its audits of SPhinX's financial statements in such manner as to obtain reasonable assurance that SPhinX's customer assets were in fact maintained and protected in such segregated and protected accounts.

573. Explanatory notes to the financial statements are an integral part of the financial statements, AU § 551.02. GAAS thus requires that the auditor implement sufficient audit procedures and obtain sufficient competent evidential matter to give the auditor reasonable assurance of the accuracy of representations and assertions made in the notes to the financial statements. In the case of its audits of the SPhinX Funds' financial statements, PwC was thus obligated by GAAS to implement audit procedures and obtain sufficient competent evidential matter to give PwC reasonable assurance of the accuracy of, among other representations and

135

assertions, the assertion in Note 1 to SPhinX's financial statements that SPhinX Funds assets were in fact held in customer-segregated accounts.

574.    GAAS further required that PwC evaluate the impact on the SPhinX financial statements of any failure of the SPhinX Funds to comply with investment restrictions imposed by contract or by governmental regulation.    AICPA Audit and Accounting Guide, Audits of Investment Companies ("AIC"), § 5.72 – 5.75.    Among other things, a failure to comply with governmentally imposed investment restrictions or requirements could constitute an illegal act (AIC, § 2.140) and must be disclosed in the financial statements.

575.    As disclosed in the Offering Memorandum of the SPhinX Funds, reviewed by PwC, SPhinX's securities were registered with the Irish Stock Exchange.    As also disclosed in the Offering Memorandum, reviewed by PwC, the SPhinX Funds were thus subject to investment restrictions and diversification requirements imposed by the Irish Stock Exchange. Those regulations required that:

- no more than 20% of the value of the gross assets of each Portfolio of the Company may be lent to or invested in the securities of any one issuer or may be exposed to the creditworthiness or solvency of any one counterparty and no more than 20% of the assets of a Series of a Class in respect of "hot issues" may be invested in the securities of any one issuer of "hot issues or exposed to the creditworthiness or solvency of any one counterparty;"

* * *

- the Company must observe the general principle of diversification of risk in its derivatives trading.

576.    The accumulation of hundreds of millions of dollars of SPhinX Funds' assets in the cash account at RCM, exposed to the risk of insolvency and claims of creditors of Refco and/or RCM, all of which facts PwC and Ferris were at all relevant times either actually aware or knowingly failed to observe, constituted violations of the investment restrictions and diversification requirements imposed by the Irish Stock Exchange.    The SPhinX Funds' non-

compliance with the rules of the Irish Stock Exchange should have been, but was not, disclosed in SPhinX's and PlusFunds' PwC-audited financial statements for the fiscal years 2003 and 2004.

577.    PwC partner Mari Ferris has testified that she was actually aware at the time of PwC's audit work that hundreds of millions of dollars of SPhinX Funds' cash was concentrated and exposed to credit risk at RCM.  Nonetheless PwC failed to require disclosure of this material fact in the SPhinX and PlusFunds' financial statements, or in the notes to those financial statements, thus rendering the financial statements materially misleading, and failed to otherwise disclose it to the innocent decision-makers of SPhinX and PlusFunds despite the duties PwC owed to SPhinX and PlusFunds.

### (b)    PwC Identified Numerous Material Weaknesses in Internal Controls, Which Should Have Prompted PwC to Audit with Heightened Skepticism and Enhanced Audit Procedures.

578.    Before accepting the engagement to audit the financial statements of SPhinX for the fiscal year 2003, PwC was required by GAAS to communicate with Deloitte & Touche as predecessor auditor of SPhinX financial statements, and to inquire of Deloitte & Touche as to, among other things:

(a)    disagreements with management regarding accounting principles, auditing procedures, or similar significant matters;

(b)    management integrity;

(c)    communications to audit committees or others with equivalent authority and responsibility regarding fraud, illegal acts by clients, and internal-control related matters; and

(d)    the reason for the change of auditors.

AU § 315.09.

579.    GAAS further required that PwC request to, and actually, review the working papers of Deloitte & Touche as predecessor auditors, at least those working papers including documentation of planning, internal control, audit results, and other matters of continuing accounting and auditing significance. AU § 315.11.

580.    Had PwC properly conducted the communication with and inquiry of the predecessor auditor, as required by GAAS, PwC would have known even before beginning its audit work of serious internal control deficiencies at DPM.

581.    As part of its planning for each of its audits of the annual financial statements of SPhinX and PlusFunds, PwC was required by GAAS to consider and evaluate the existence, operation, and effectiveness of internal controls. In the case of SPhinX, those controls included, but were not limited to, cash and securities reconciliations of customer accounts, and the maintenance and protection of those assets in segregated accounts.

582.    GAAS also required that PwC report to SPhinX's and PlusFunds' Audit Committee and/or Board of Directors any material weaknesses in internal controls identified during the audit. These weaknesses are known as "reportable conditions" and consist of "significant deficiencies in the design or operation of the internal control structure, which could adversely affect the organization's ability to record, process, summarize, and report financial data consistent with the assertions of management in the financial statements." AU § 325.02.

583.    In the course of its audit of SPhinX's 2003 financial statements, PwC and Ferris identified numerous and extensive internal control weaknesses and deficiencies in DPM's performance as funds administrator.

584.    On or about August 16, 2004, PwC and Ferris issued a letter to the Boards of Directors of PlusFunds (the "2003 Material Weakness Letter") relating to the 2003 audits of the

SPhinX Funds, "for which PlusFunds is the Investment Manager." The letter indicated that PwC had "rendered unqualified reports that these financial statements are fairly stated in accordance with accounting principles generally accepted in the United States of America."

585.    The letter further indicated that PwC had "considered the Funds' internal controls over financial reporting" and "noted matters . . . involving internal control and its operation that we [PwC] consider to be material weaknesses . . ."

586.    Appendix B to the 2003 Material Weakness Letter identified numerous "Internal Control Deficiencies" relating to the SPhinX Funds.

587.    PwC and Ferris found numerous deficiencies in DPM's work as fund administrator including, but not limited to:  (1) DPM's failure to reconcile adequately cash balances of portfolio managers, (2) DPM's inability to reconcile DPM's records with the records maintained by SPhinX's prime brokers, (3) DPM's failure to reconcile intercompany and intracompany accounts and (4) DPM's failure to perform adequately monthly reconciliations of cash and securities.

588.    The 2003 Material Weakness Letter identified an extensive list of serious control deficiencies, including but not limited to the following:

- "Use of cash as a suspense account."

- "DPM did not have a complete list of brokerage accounts and accordingly not all accounts were reconciled."

- "Explanations provided for reconciling items were not always sufficient to understand the nature of the item."

- "Explanations were not always accurate."

- "Generally, the reconciliations did not contain sufficient support from which to verify the explanation provided."

- "Instances where the reconciliation was incomplete."

139

- "The accurate performance and timely clearance of cash and securities reconciliations is a key control to ensure the accuracy of financial records and ensure the ownership and existence of assets. During the course of the 12/31/03 audits, DPM was required to reperform the monthly reconciliations in order for us to gain assurance that the financial statements were not materially misstated."

- "Prior to our request as part of the 12/31/2003 audits, the intercompany accounts were not reconciled. The subsequent performance and audit of such reconciliations resulted in numerous reclassification entries (generally involving subscriptions received in advance) made late in the financial reporting process."

- "There is currently no policy and no established practice to ensure that interest accruals are stopped on instruments when the receipt of such interest is determined to be unlikely, or to write off the portion of interest accrued that is determined unlikely to be collected. Such omission could lead to overstatement of income and assets."

- "There is no complete listing of all brokerage accounts for the Funds, and it took an inordinate amount of time to create a simple list of the accounts maintained for each entity."

589. In addition to the material weaknesses in internal control identified in the August 16, 2004 letter, PwC was also aware of or consciously failed to know of the accumulation of hundreds of millions of dollars of SPhinX Funds cash at RCM, an unregulated entity, where that cash was subject to and exposed to the insolvency and credit risk of Refco and RCM was a substantial and material weakness in internal control. In breach of its contractual and fiduciary duties and professional duties pursuant to GAAS, PwC failed to inform the Boards of Directors of SPhinX and PlusFunds of this material internal control weakness.

590. In the course of auditing SPhinX's and PlusFunds' 2004 financial statements, PwC and Ferris again identified numerous and extensive internal control weaknesses and deficiencies in DPM's performance as fund administrator.

591. In or about July 2005, PwC and Ferris issued a letter to the Boards of Directors of the SPhinX Funds relating to the 2004 audits (the "2004 Material Weakness Letter"). The letter indicated that PwC had "rendered unqualified reports that these financial statements are fairly

stated in accordance with accounting principles generally accepted in the United States of America."

592.    The letter further indicated that PwC had considered the Funds' internal controls and "noted matters . . . involving internal control and its operation that we [PwC] consider to be material weaknesses ...."

593.    Appendix B to the 2004 Material Weakness Letter identified numerous "Internal Control Deficiencies," which were similar if not identical to the internal control deficiencies described in the 2003 material weakness letter, relating to the SPhinX Funds.

594.    The 2004 Material Weakness Letter identified the following internal control deficiencies relating to monthly reconciliations:

- "Reconciliations were not completed prior to DPM reporting final NAV."

- "Topsides on the reconciliation did not agree with the topside posted to the general ledger or were not booked."

- "Reconciliations were not performed adequately at the time of the 12/31/04 final close. . ."

- "Reconciling items were not being cleared on a timely basis."

- "DPM was unable to reconcile cash . . ."

- "Explanations provided for reconciling items were not always sufficient to understand the nature of the item."

- "Instances where the reconciliation was complete."

- "DPM did not have a complete list of brokerage accounts and accordingly not all accounts were reconciled."

- "There is no review by a supervisor / manager of the reconciliations once they have been performed.  The accurate performance and timely clearance of cash and securities reconciliations is a key control to ensure the accuracy of financial records and ensure the existence and ownership of assets."

595.    In addition to the material weaknesses in internal control identified in the July 29, 2005 letter, PwC was also aware or consciously failed to know that the accumulation of hundreds of millions of dollars of SPhinX Funds cash at RCM, an unregulated entity, where that cash was subject and exposed to the insolvency and credit risk of Refco and RCM was a substantial and material weakness in internal control.    In breach of its contractual, fiduciary, and other professional duties pursuant to GAAS, PwC failed to inform the Boards of Directors of SPhinX and PlusFunds of this material internal control weakness.

596.    In addition to its role as the SPhinX Funds' auditor, PwC was retained by Rydex Partners, a fund that invested directly in a number of the SPhinX Funds, to audit or review the SPhinX Funds in connection with Rydex's investment in the SPhinX Funds.

597.    In the course of its review, PwC issued a report titled, "Rydex Capital Partners SPhinX Funds Audit Committee Report Resolution and Completion" (the "PwC Rydex Report") dated August 30, 2004.

598.    In the PwC Rydex Report, PwC indicated that it undertook procedures to "gain an understanding of key controls employed by DPM" in connection with its role as administrator of the SPhinX Funds.    The PwC Rydex Report noted a number of "documentation deficiencies" regarding DPM's services, including but not limited to the following:

- "There was no clear evidence of supervisory review of cash/position reconciliations (e.g. signatures)."

- "In certain instances, no formal documentation existed evidencing that reconciliation of certain security types (swaps, treasury securities and bank debt) had occurred."

- "In certain instances, explanations for reconciling items descriptions were incomplete and support was unavailable and had to be re-researched upon audit."

599.    Rydex retained PwC to conduct a similar review of the SPhinX Funds in 2005.

600.    As a result of its investigations on behalf of Rydex, PwC also became aware of severe internal control deficiencies at DPM relating to the accounting of the SPhinX Funds.

### (c)    PwC Failed to Conduct its Audits of SPhinX and PlusFunds in Accordance with GAAS.

601.    PwC failed to conduct its audits of SPhinX and of PlusFunds with heightened professional skepticism as required by GAAS in light of PwC's knowledge of the Refco fraud and the fact that hundreds of millions of dollars of SPhinX Funds cash was deposited in an unprotected RCM account, and in light of the numerous material weaknesses in, and consequent unreliability of, internal controls as discussed above.

602.    PwC failed to obtain sufficient competent evidential matter to afford a reasonable basis for an opinion regarding SPhinX and PlusFunds' financial statements.  Specifically, PwC failed to obtain sufficient competent evidential matter to support the representation in SPhinX's financial statements that SMFF's assets were, in fact, maintained in customer-segregated accounts.  Had it done so, PwC would have known that the representation was false.  PwC would also have known that the financial statements of PlusFunds were materially false and misleading by failing to disclose the insolvency and credit risk to which the SPhinX Funds assets at RCM were exposed.

603.    In light of the numerous and severe internal control deficiencies at DPM and failures by DPM as administrator, PwC could not rely on internal controls in the conduct of PwC's audits of SPhinX's financial statements.

604.    Due to the ineffectiveness and unreliability of internal controls of DPM as Fund Administrator, GAAS required that PwC conduct "substantive" audits of the financial statements of SPhinX.  A substantive audit requires statistically sampling transactions to establish a demonstrably and scientifically representative list of transactions the auditor must then audit in

accordance with GAAS. Without such statistical sampling, a substantive audit requires that the auditor audit *every* transaction impacting the financial statements.

605.    If an auditor cannot rely on internal controls and does not perform a substantive audit, then the auditor cannot complete an audit in accordance with GAAS, and must refrain from issuing an unqualified audit opinion.

606.    Mari Ferris has testified that due to the internal control deficiencies at DPM, PwC did not rely on internal controls in the conduct of its audits at the financial statements of the SPhinX Funds. Although PwC recognized the need to conduct substantive audits, Ferris admitted that PwC's SPhinX audits were not based on a statistical sampling of transactions. Nor did PwC audit every transaction impacting SPhinX's financial statements. For these reasons alone, PwC had no reasonable basis upon which to represent it had conducted a GAAS audit or to issue unqualified audit opinions on either the 2003 or 2004 financial statements of SPhinX.

607.    In light of the material weaknesses identified by PwC in the internal controls of DPM, PwC should not have issued unqualified audit reports on either the SPhinX or PlusFunds financial statements.

608.    In light of the material weaknesses identified by PwC in the internal controls of DPM, and PwC's failure to perform substantive audits of the SPhinX funds, PwC's representations in its audit reports on the financial statements of SPhinX and PlusFunds that it had conducted GAAS audits were false and known to be false by PwC.

609.    As discussed more fully herein, PwC failed to maintain independence in mental attitude in the conduct of its audit work. Moreover, PwC conducted its audits despite a clear conflict of interest.

144

610.  PwC's services as the SPhinX Funds' independent auditors were compromised by a conflict of interest arising from PwC's role as Refco's "*de facto* Chief Accounting Officer" beginning in or about May 2004.

611.  By virtue of its role as consultant to Refco, PwC was aware of the wrongdoing by Refco and its agents and/or consciously avoided knowledge of it.  By its actions, PwC actively participated in and substantially assisted Refco in carrying out the scheme detailed herein.

612.  Despite its knowledge of the Refco fraud and other misconduct, and despite its own flagrant breaches of its professional obligations pursuant to GAAS, PwC nonetheless issued unqualified audit opinions on the 2003 and 2004 financial statements of SPhinX Funds and PlusFunds.

613.  PwC and Ferris failed to exercise due professional care in the course of the PwC audits of SPhinX's financial statements and of PlusFunds' financial statements, and as a result breached its contractual and professional obligations to PlusFunds and the SPhinX Funds, including SMFF.  PwC failed to adequately plan and conduct its audits so as to obtain reasonable assurance that SMFF assets were held in properly-segregated accounts, protected from the insolvency and claims of creditors of the custodian of those assets.  In fact, PwC partner Mari Ferris has admitted that she was aware at the time of the PwC audits that the hundreds of millions of dollars of SPhinX fund assets held at RCM were subject to credit risk.

614.  PwC partner Mari Ferris has testified that PwC did not implement audit procedures to obtain reasonable assurance of the accuracy of the representations and assertions in the notes to the SPhinX financial statements, including the assertion in Note 1 that SPhinX Funds' assets were held in protected, customer-segregated accounts.  She has also testified that

PwC did not implement any audit procedures designed to determine whether SPhinX Funds assets were in fact held in protected and segregated accounts.

615.    PwC failed to identify, or knowingly disregarded, and failed to require disclosure in the financial statements of the fact that hundreds of millions of dollars of SMFF assets had been diverted to unprotected, unregulated accounts at RCM, an offshore entity where customer segregation and other protections were unavailable. Without this disclosure, the disclosures in Note 1 to the financial statements were false and misleading.

616.    PwC failed to adequately plan and conduct its audits so as to obtain reasonable assurance that the SPhinX Funds were in compliance with applicable investment restrictions and requirements imposed by contract or governmental regulation, including the rules of the Irish Stock Exchange, failed to evaluate the impact of the SPhinX Funds' non-compliance with the rules of the Irish Stock Exchange on the financial statements of SPhinX, and failed to require disclosure of that non-compliance in the PwC-audited financial statements of SPhinX, all in violation of GAAS.

617.    Despite its knowledge and knowing audit failures described herein, PwC, in violation of its obligations pursuant to applicable professional standards, failed to require disclosure in the SPhinX Funds and PlusFunds financial statements of the material facts that hundreds of millions of dollars of SPhinX Funds cash, an unquestionably material amount of the SPhinX Funds' total assets:

(a)    had been swept into and were on deposit at RCM, which was an unregulated Bermuda entity;

(b)    was not being held in segregated customer accounts;

146

(c)     was exposed and subject to the insolvency and credit risk of Refco and RCM;

(d)     was concentrated in, and exposed to the credit risk of, a single entity in such manner as to constitute violations of the investment restrictions and diversification requirements of the Irish Stock Exchange; and

(e)     was in fact being utilized to fund the round trip loans and the Suffolk loans, and to otherwise finance and perpetrate the fraudulent schemes of Bennett and others described herein.

As a result, the 2003 and 2004 financial statements of SPhinX and of PlusFunds were grossly and materially misstated and misleading, and PwC was obligated to, but did not, refrain from issuing unqualified audit opinions thereon. PwC was obligated to, but did not, inform the innocent decision-makers of SPhinX and PlusFunds of the facts listed in subparagraphs (a) through (e) above.

618.    PwC failed to properly evaluate or consciously disregarded its duty to evaluate the ability of SPhinX and PlusFunds to continue in operation as going concerns for a reasonable period of time.

**(d)     By Issuing Unqualified Audit Opinions, PwC Made Affirmative Misrepresentations to Innocent Decision-Makers Within SPhinX and PlusFunds.**

619.    On or about March 30, 2004, PwC issued its "report of independent auditors" regarding its audit of SMFF's 2003 financial statements. In this report, PwC issued an unqualified, or "clean," audit opinion on the financial statements of SMFF for the fiscal year 2003. Defendant Ferris signed the report in the name of PwC.

620.    The following year, on or about March 30, 2005, PwC issued its "report of independent auditors" regarding its audit of SMFF's 2004 financial statements. In this report,

147

PwC issued an unqualified, or "clean," audit opinion on the financial statements of SMFF for the fiscal year 2004. Defendant Ferris signed the report in the name of PwC.

621.    On or about February 2, 2004, PwC issued its "Report of Independent Auditors" regarding its audit of PlusFunds' 2003 financial statements. In this report, PwC issued an unqualified, or "clean," audit opinion on the financial statements of PlusFunds for the fiscal year 2003.

622.    On or about February 14, 2005, PwC issued its "Report of Independent Auditors" regarding its audit of the 2004 financial statements of PlusFunds. In this report, PwC issued an unqualified or "clean," audit opinion on the financial statements of PlusFunds for the fiscal year 2004. On information and belief, Defendant Ferris signed the report in the name of PwC.

623.    PwC's audit reports and unqualified audit opinions contained affirmative misrepresentations to the innocent decision-makers of SPhinX and PlusFunds.

624.    In both its March 30, 2004 and March 30, 2005 audit reports of the financial statements of SPhinX and the February 2, 2004 and February 14, 2005 audit reports on the financial statements of PlusFunds, PwC and Ferris represented that PwC was "independent." In fact, as alleged herein, PwC and Ferris knew that PwC was not independent in connection with its audit of the 2003 or 2004 financial statements of SPhinX.

625.    In its audit reports, PwC and Ferris represented that PwC had conducted its audits "in accordance with auditing standards generally accepted in the United States of America." In fact, as alleged above, PwC and Ferris knew at the time they made these representations that PwC had knowingly and repeatedly violated GAAS in the conduct of its audits.

626.    In its audit reports, PwC and Ferris represented that they believed that PwC's audits "provide a reasonable basis for our opinions." As alleged above, PwC and Ferris had no

reasonable basis for its unqualified audit opinion, and PwC and Ferris actually knew or were reckless in not knowing as much.

627.    In the audit reports on SPhinX financial statements, PwC and Ferris represented that in their opinion the financial statements of SMFF, "present fairly, in all material respects, the financial position" of the various entities constituting SMFF at December 31, 2003, and December 31, 2004, and the results of each of their operations, the changes in each of their net assets, their cash flows and their financial highlights for the years then ended, "in conformity with accounting principles generally accepted in the United States of America."  As alleged above, PwC and Ferris knew or were reckless in not knowing that the financial statements of SMFF were not fairly presented in conformity with GAAP and PwC and Ferris had no reasonable basis for representing otherwise.  Rather, they were, as discussed above, grossly and materially misstated and misleading.

628.    In the audit reports on the financial statements of PlusFunds, PwC and Ferris represented that in their opinion the financial statements of PlusFunds present fairly in all material respects the financial position of PlusFunds at December 31, 2003 and December 31, 2004 and the results of its operations, the changes in net assets, cash flows, and financial highlights for the year ended in conformity with accounting principles generally accepted in the United States of America.  As alleged above, PwC and Ferris knew or were reckless in not knowing that PlusFunds' financial statements were not fairly presented in conformity with GAAP, and PwC and Ferris had no reasonable basis for representing otherwise.  Rather, those financial statements were grossly and materially misstated and misleading.

629.    In light of the substantial and material amount of SPhinX Funds cash exposed to credit risk at RCM, and in light of the fact that virtually all of PlusFunds revenues were derived

from its services as manager of the SPhinX Funds, and in light of PwC's knowledge of these facts, PwC was obligated to, but did not, include "going concern" qualifications in its audit opinions on the financial statements of SPhinX and PlusFunds expressing substantial doubt as to the ability of SPhinX and PlusFunds to continue operations as going concerns for a reasonable period of time.

### (e)    Innocent Decision-Makers of SPhinX and PlusFunds Reasonably Relied On PwC's Misrepresentations.

630.    PwC and Ferris knew that PwC's audit reports on the financial statements of SPhinX and the unqualified audit opinions therein would be, and in fact were, distributed to innocent decision-makers within SPhinX and PlusFunds, who would use and rely upon PwC's opinions in making significant business decisions for SPhinX.

631.    PwC and Ferris knew that PwC's audit reports on the financial statements of PlusFunds and the unqualified audit opinions therein would be, and in fact were, distributed to innocent decision-makers within SPhinX and PlusFunds who would use and rely upon PwC's opinions in making significant business decisions for SPhinX and PlusFunds.

632.    PwC and Ferris knew that PwC's audit reports and the unqualified audit opinions therein would be, and in fact were, incorporated into the financial statements of SMFF for the fiscal years ended December 31, 2003, and December 31, 2004.

633.    PwC and Ferris knew that PwC's audit reports and the unqualified audit opinions thereon would be, and in fact were, incorporated into the financial statements of PlusFunds for the fiscal years ended December 31, 2003 and December 31, 2004.

634.    PwC and Ferris intended that innocent decision-makers within SPhinX and PlusFunds would use and rely upon PwC's audit reports and the unqualified audit opinions therein in making significant business decisions for SPhinX, including decisions to continue to

allow deposit of SPhinX assets in Refco accounts and to allow DPM to continue to administer SPhinX assets.

635.    Innocent decision-makers of SPhinX and PlusFunds in fact relied upon PwC's audit reports and the unqualified audit opinions therein in making significant business decisions for SPhinX, including the decision to continue to retain DPM as administrator of the SPhinX Funds, and the decision not to demand the return or the immediate segregation and credit-risk protection of SPhinX Funds' assets in the RCM account. As a result of this reasonable reliance, both SPhinX and PlusFunds sustained damages.

636.    Had the innocent decision-makers of SPhinX and PlusFunds known that material amounts of SPhinX Funds' assets were on deposit in an unregulated and non-segregated cash account at RCM, exposed and subject to the insolvency and claims of creditors of Refco and/or RCM, those innocent decision-makers could have and would have taken action to protect those assets by demanding their immediate return from RCM and deposited in properly segregated accounts, protected from the insolvency and claims of creditors of the custodian of those assets. Such action on the part of the innocent decision-makers of SPhinX and PlusFunds would have prevented the loss of the SPhinX Funds' assets at issue in this case, and the demise of SPhinX and PlusFunds.

### 2.    Grant Thornton and Mark Ramler.

637.    Grant Thornton issued audit reports on the consolidated financial statements of Refco Group for the fiscal years ended February 2002 through 2005 certifying: (1) that it had audited Refco Group's financial statements in accordance with GAAS; (2) that it had planned and performed its audits "to obtain reasonable assurance about whether the financial statements are free of material misstatements"; and (3) that, in its opinion, Refco's financial statements "present fairly, in all material respects, the financial position" of Refco in conformity with

GAAP; and (4) that is audits provided "a reasonable basis for [its] opinions." Grant Thornton provided accounting services for Refco prior to and in connection with the company's August 2004 9% Notes Offering and August 2005 stock IPO, which included the issuance of "clean" or "unqualified" opinions on Refco's fiscal year 2003-2004 financial statements. Grant Thornton also reviewed the approved Refco's interim financial statements included in the 9% Notes Offering and IPO Registration Statement.

638.    Grant Thornton owed to SPhinX and PlusFunds the duty to refrain from engaging in conduct that Grant Thornton knew or should have known would be harmful to SPhinX and/or PlusFunds.

639.    Grant Thornton owed to SPhinX and PlusFunds the duty to refrain from aiding and abetting Refco's breach of duties to its customers, including SPhinX and PlusFunds.

640.    Grant Thornton owed to SPhinX and PlusFunds the duty to refrain from aiding and abetting the Refco fraud.

641.    Grant Thornton replaced Arthur Andersen as auditor for Refco and RCM for audits after 2002. After it took over the Refco engagement, Grant Thornton provided auditing and accounting services to Refco and issued clean and unqualified audit opinions with respect to Refco's financial statements for fiscal years 2003, 2004 and 2005. As Grant Thornton knew, the financial statements it audited were also included in Refco's various registration statements filed in connection with the LBO and IPO.

642.    Refco's financial statements were audited by Grant Thornton on a consolidated basis under RGL's name. RGHI's financial information was not consolidated with Refco Group. As a result, as Grant Thornton knew, the RGHI Receivable was hidden from the public in order

to preserve Refco's reputation with its customers, including PlusFunds and SPhinX, and to conceal millions of dollars in Refco losses.

643.    Grant Thornton's longstanding relationship with Refco through Mark Ramler (the former AA partner who took Refco's business to Grant Thornton) gave it a complete picture of the finances, operations, and business of RCM, RGHI and the rest of Refco. Grant Thornton had access to all material information, Refco's third-party transactions with RGHI and the RTLs. Given its intimate familiarity with Refco's finances, Grant Thornton knew or consciously avoided knowing the details of the Refco fraud and substantially assisted Refco's fraud and breaches of fiduciary duty against Refco's customers, including PlusFunds and SPhinX, who had deposited assets with Refco.

644.    Grant Thornton became aware and knew of and/or consciously avoided knowledge of the Refco fraud and, more specifically, the RGHI Receivable, the RTLs, the use of RCM customer assets (including SPhinX customer funds) to fund Refco and the inappropriateness of the LBO and IPO in light of Refco's true financial condition.

645.    Through its provision of auditing and accounting services, Grant Thornton knowingly participated and substantially assisted in the fraud alleged herein. Without such participation and assistance, Refco would have been unable to continue hiding its true financial condition long enough to complete its fraudulent scheme.

646.    Grant Thornton knew and understood or consciously avoided knowing that Refco Group and RCM were insolvent at least as of December 2002. Accordingly, Grant Thornton understood that Refco's officers and directors owed fiduciary duties to Refco's creditors, including SPhinX and SMFF.

647.     In violation of the duties it owed to SPhinX and PlusFunds, Grant Thornton actively participated and substantially assisted Refco's fraud and breach of fiduciary duties to its customers as well as the breach of Refco's officers' and directors' breach of fiduciary duties and fraud.

648.     As described in more detail below, Grant Thornton substantially assisted Refco's tortious conduct, by, among other things: ignoring numerous and substantial red flags that alerted Grant Thornton to the existence of accounting fraud; knowingly issuing unqualified opinions on Refco's consolidated financial statements for each of fiscal years 2003, 2004 and 2005, all of which materially misrepresented Refco's financial condition; opining separately on the financial statements of RCM; and continuing to act as Refco's auditor despite its knowledge of fraud.

649.     As Grant Thornton knew, clean audit opinions were essential to Refco's continued functioning and ability to retain for its own use the assets of customers, including PlusFunds and SPhinX.

650.     As the Refco examiner concluded, Grant Thornton learned first-hand of the fraud and then aided and abetted that fraud by continuing to provide clean audit opinions in the face of "grotesque accounting manipulations." Grant Thornton was aware of, or consciously avoided knowledge of, all aspects of the scheme to prop up Refco's finances, from the fraudulent RTLs to the theft of RCM customer funds.

651.     Before 2002, AA served as Refco's auditor. The lead partner on the engagement, Ramler, had abandoned any pretense of independence and objectivity. While at AA, Ramler once boasted that he had such a close relationship with Refco that its management did not engage in any transactions without his input. Ramler also bragged that Bennett and other senior Refco management called him daily to discuss transactions and business issues.

652.    After AA collapsed, Ramler moved to Grant Thornton, taking the Refco account with him. Refco was a marquee client for Grant Thornton. Refco stood to be an even better client for Grant Thornton if, as Grant Thornton anticipated, Refco went public. Grant Thornton's hope in the wake of the collapse of Arthur Andersen was that, by collecting former Arthur Andersen partners, such as Ramler, and their clients, such as Refco, Grant Thornton could rise in stature and compete with the remaining "big four" accounting firms for major national and international clients. Grant Thornton had substantial motives to perpetuate Refco's façade of solvency.

653.    During the course of the Refco engagement, Grant Thornton earned over $9 million in fees.

654.    Based on his long experience with Refco, Ramler brought to Grant Thornton knowledge of the following facts:

- As early as May 1998, Bennett desired to sell a significant portion of RGHI's interest in Refco over the next three to ten years.

- Refco's internal accounting controls were deficient, and readily capable of being overridden by Refco's management, including Bennett.

- As of February 28, 2002, RGHI was a shell entity with no operations that owed RGL approximately $170 million, and whose financial results were not included in RGL's consolidated financial statements.

- Refco was engaging in substantial and complex related-party transactions with RGHI, and there was a high risk of material misstatement arising from related-party transactions between Refco and RGHI.

- Bennett had promised AA that the RGHI Receivable would no longer increase and would be paid down, and that $35 million of the receivable would be paid off in fiscal year 2003.

- In 2001 Bennett improperly recorded a $43 million arbitration award against Refco LLC, over the CFTC's objections, and ultimately transferred the expense to RGHI's books.

155

655. Grant Thornton was thus aware from the outset of the Refco engagement that Bennett had a motive to manipulate Refco's financial results, that Refco's books were susceptible to manipulation, and that the RGHI Receivable, which was not reflected in RGL's consolidated financial statements, was a viable tool—and in fact had been used—for accomplishing such manipulation. Grant Thornton was also aware of the inherently high audit risk that related-party transactions represent, and the mandate from applicable professional standards of the need to apply far more scrutiny to related-party transactions than to arm's length transactions, when conducting an audit. Accordingly, Grant Thornton internally categorized Refco as a "high-risk" client in part because it engaged in significant and complex related-party transactions, lacked an internal audit function, and was dominated by a limited number of senior executives and managers who had a direct financial interest in maximizing Refco's apparent financial condition and operating results.

656. Transactions among entities consolidated on Refco's financial statements, as well as transactions between these entities and RGHI (which was not consolidated with Refco's financial statements), were related-party transactions within the meaning of GAAS. Therefore, GAAS required, as explained above, heightened scrutiny of these transactions by Grant Thornton when conducting its audits of Refco's financial statements.

657. Nevertheless, Grant Thornton failed to audit Refco's related-party transactions. As a result, even though Grant Thornton knew or consciously avoided knowing that the RGHI Receivable was used to inflate Refco's operating results and learned of the RTLs, it continued to issue clean audit opinions for Refco.

658. Grant Thornton's work papers from the 2003 audit demonstrate that Grant Thornton contemplated steps to scrutinize related-party transactions, but simply chose not to

implement them. For example, in conducting its audit of RCC in 2003, Grant Thornton told Refco that it needed to see certain loan receivables to RCC on the books of the affiliate owing the money. When making this inquiry, Grant Thornton specifically requested the information about a loan from RCC to RGHI purporting to have a balance of approximately $71 million, including documents to verify the existence and terms of the loan and ensure that RGHI was actually making payments that were received by RCC and reflected in its bank statements. In violation of Grant Thornton's own practices, as well as GAAS as outlined above, Grant Thornton never carried out these procedures. Had it done so, Grant Thornton would have quickly exposed the fraud and customers, including PlusFunds and SPhinX, would not have continued to entrust their assets with Refco.

659.    Grant Thornton's audit plan for 2003 also called for Grant Thornton to review loan documents concerning the receivable balance in RCM's account at RCC and to perform an assessment of the interest income represented by Refco to have accrued on this balance. Grant Thornton failed to perform either procedure. The substantial accrued interest income associated with the RGHI Receivable indicated to Grant Thornton that the receivable was far greater than the $105 million falsely disclosed by Bennett.

660.    In fact, after the 2003 audit Grant Thornton failed to perform any procedures whatsoever to test the RGHI Receivable at RCC. One glaring omission in Grant Thornton's work papers after 2003 is the absence of a document called "Schedule of Loans to Stockholders and Unconsolidated Affiliates." This document, which Grant Thornton had obtained and reviewed as part of every Refco audit from 1996 to 2003, detailed Refco's related-party receivables. Grant Thornton failed to require Refco to provide it with this critical document for the 2004 and 2005 audits and did nothing to investigate this change in documentation, even

though the customer statements for RGHI's account at RCC during the 2004 and 2005 audits made clear that RGHI still had a large debt balance in favor of RCC. Grant Thornton intentionally turned a blind eye to this issue.

661. Similarly, Grant Thornton failed to examine the RGHI balances at RCM. Though Ramler knew that RGHI historically owed substantial sums of money to Refco through an account at RCM, Grant Thornton failed to perform even the simplest procedure to ensure that this related-party account was being properly recorded in Refco's books. Had Grant Thornton looked at the RGHI customer statement at RCM for February 2003 (Refco's fiscal year-end), Grant Thornton would have seen the following:

- The debit balance in the account as of February 1, 2003, was approximately $150 million.

- On February 7, 2003, an adjustment was made to credit the account for approximately $150 million, leaving a small debit balance on February 28, 2003, of approximately $70,000.

Scanning the customer statement for later financial reporting periods would have shown similar manipulations of RGHI's account at RCM.

662. Grant Thornton's failure to examine the customer account statements of the related-party RGHI was so obviously a violation of its own policies, and so clearly a violation of GAAS, that it can only be evidence of a willful blindness and an intentional effort to avoid exposing evidence of the accounting fraud at Refco.

663. Following the disclosure of the RGHI receivable and the collapse of Refco, Grant Thornton actually withdrew its certification and unqualified audit opinions on the financial statements of Refco back to early 2002.

(a)    **The RTL Transactions.**

664.    The RTLs during the periods audited by Grant Thornton were accomplished by RCM falsely recording loans as "reverse repos" or "time deposits" in the RTL Participant's customer account. (A "reverse repo" is a securities sale and repurchase agreement executed between two parties, and "time deposit" is a loan extended to a customer for purposes of trading.) Both "reverse repos" and "time deposits" require the posting of collateral, and, because both involve agreements with third parties who may fail to perform, both kinds of transactions raise serious financial statement risks, and warrant heightened scrutiny by auditors. Professional audit standards advise that when confirming high-risk transactions such as these, the auditor should confirm the terms of the transactions, and not merely their amount.

665.    Grant Thornton ignored these standards and deliberately failed to inquire into the obviously suspicious circumstances of these transactions.    As Grant Thornton knew or consciously avoided knowing, the RTLs were not actually "reverse repos" or "time deposits." The RTLs lacked the hallmark of both transactions—collateral.  Nor did the RTL Participants' total capital provide Refco with adequate security for these substantial advances.  Nevertheless, Grant Thornton accepted at face value Refco management's characterization of these transactions despite clear evidence that they were not what they purported to be.

666.    For example, during its audit of RCM for 2003, Grant Thornton noted large, period-end, round-dollar "reverse repo" transactions between RCM and two RTL Participants (Liberty Corner and Delta Flyer) totaling $650 million.  The transactions were timed just before and unwound just after Refco's fiscal year-end.  On April 16, 2003, Grant Thornton sent simple confirmation requests to these two RTL Participants, which were signed and returned.  Although Grant Thornton performed additional balance sheet testing on other RCM customer accounts for 2003, Grant Thornton did not conduct additional credit risk testing on these RTL Participants'

accounts, and Grant Thornton did not inquire into the circumstances of these transactions, despite the fact that the amount of the transaction dwarfed each RTL Participant's total capital.

667.    In the 2004 audit, for example, Grant Thornton noted a $720 million period-end transaction characterized as a "reverse repo" with Liberty Corner. As in 2003, Grant Thornton sent a request to Liberty Corner to confirm the account balance, which Liberty Corner did. This year, however, Grant Thornton took the additional step of reviewing the potential credit risk from the transaction. Grant Thornton noted that the entire amount of Liberty Corner's debit balance -- $720 million -- was at risk, meaning that no collateral secured it. However, Grant Thornton did not identify the account as a credit risk and ignored the fact that a real "reverse repo" transaction is secured by collateral.

668.    As these examples illustrate, in every review and every audit that it conducted of Refco, Grant Thornton received information that RCM was engaging in large, period-end, unsecured credit transactions, purported "reverse repo" or "time deposit" transactions with the RTL Participants for hundreds of millions of dollars. Yet in each case, Grant Thornton declined to investigate further based on information – often merely a representation from management – that the unsecured balance had been repaid. Moreover, despite being engaged for years as Refco's auditors, Grant Thornton never questioned why Refco entered into these unusual, uncollateralized transactions straddling every relevant reporting and audit period.

669.    Further evidence that Grant Thornton understood that the RTLs were used to hide the RGHI Receivable comes from Ramler himself. In Ramler's own handwritten notes, Ramler writes the words "$450,000 million" and "contract loan," with a line drawn between "$450,000 million" and the words "Liberty Corner Capital Strategy Fund LLC" (one of the RTL Participants). Next to the name of Liberty Corner appear the words "mature transaction" and

below it are the words "clean-up of interco accounts." During the quarter ended May 31, 2005, there was in fact a $450 million "loan" characterized on Refco's books as a "reverse repo" that was used to "clean up" Refco's intercompany accounts. These handwritten notes demonstrate that Ramler and Grant Thornton had actual knowledge of the fraud.

670.    Records of internal communications within Grant Thornton's management show that Grant Thornton understood that Refco was not an appropriate candidate for an IPO and that Grant Thornton could be subject to liability for its conduct with respect to Refco. In late December 2004, Ramler had a conversation with a member of Grant Thornton's Professional Standards Group regarding Refco's response to an SEC inquiry regarding the IPO. The note states, in part: "Atty called – also this AM – Refco makes Firm uncomfortable . . . issue is sig. def. . . . Issue is no CFO. Probably had weak one before. We might not want to participate in IPO once this S-4 is done." The note goes on to demonstrate Grant Thornton's concerns about Refco and the upcoming IPO: "They are moving very fast – too fast for comfort... what to do – we would be sued."

671.    Grant Thornton knew or consciously avoided knowing that Refco was misappropriating RCM customer assets. Grant Thornton also knew, or consciously avoided knowing, that Refco engaged in the RTL scheme in order to hide massive losses from uncollectible receivables, and that RGL was saddled with guarantees of the RTLs. In sum, Grant Thornton knew, or consciously avoided knowing, that Refco was fraudulently "dressing up" its books using these schemes. Grant Thornton was a sophisticated audit and accounting firm that, when faced with knowledge of the Refco fraud, chose to look the other way to keep a marquee customer happy. Grant Thornton not only knowingly violated the governing standards of GAAS, it substantially assisted and participated in Refco's fraud and the breach of Refco's

officers' and directors' fiduciary duties to Refco's customers, including PlusFunds and SPhinX, who relied on Refco's financial statements and reputation in deciding whether to place funds in Refco's care.

672.    As the Examiner concluded, Grant Thornton was "in possession of a series of 'red flags' that should have alerted a properly skeptical auditor to the fraud," yet it "failed to adequately test high-risk related party transactions, failed to approach [its] audits with the appropriate degree of skepticism, and failed to adequately consider and evaluate the potential for fraud within Refco, a company controlled by a few individuals who could override controls and who intended to sell the company."

**(b)    Maintaining the Fraudulent Business Model.**

673.    Each year, Grant Thornton issued, among other things, unqualified audit opinions claiming that RCM's financial statements fairly presented its financial condition in accordance with Generally Accepted Accounting Principles ("GAAP"). In addition, Grant Thornton consented to the incorporation of its audit opinion in RCM's financial statements.

674.    The RCM financial statements for years 2003, 2004 and 2005 were false and misleading and failed to state material facts necessary to make the statements contained therein not misleading. In particular, the RCM financial statements were false because they failed to disclose that the enormous "loans" RCM had made to other Refco affiliates were uncollectible and should have been written off in their entirety—a fact which would have shown RCM's net income, net assets, and stockholders equity were negative; in other words, RCM, the unregulated entity holding SPhinX's assets, was insolvent.

675.    For example, RCM's 2003 financial statements failed to recognize losses with respect to approximately $275 million in uncollectible obligations the financial statements falsely characterized as "receivable from customers." In fact, as Grant Thornton was aware,

162

these were simply RCM customer-entrusted assets, which had been improperly diverted to other Refco entities and were not properly characterized as "receivable from customers." Moreover, had Grant Thornton properly audited the 2003 financial statements, it would have recognized the need to write off approximately $650 million in uncollectible payables owed to RCM by Refco affiliates that were used to finance RTLs at the end of the 2003 fiscal reporting period. SPhinX's and PlusFunds' innocent decision-makers relied on these financial statements and the reported solvency and financial strength of RCM in deciding whether to allow and continue to allow Refco to hold SPhinX assets in RCM.

676.  The 2004 RCM financial statements again failed to recognize losses with respect to approximately $1 billion in uncollectible related party obligations which the financial statements falsely characterized as "receivable from customers." Again, as Grant Thornton was aware, these were simply RCM customer assets which had been improperly diverted to other uncreditworthy Refco entities and were not properly characterized as "receivable from customers." Had Grant Thornton properly audited the 2004 financial statements, it would have recognized the need to write off approximately $720 million in uncollectible payables owed to RCM by Refco affiliates used to finance RTLs at the end of the 2004 fiscal reporting period. SPhinX's and PlusFunds' innocent decision-makers relied on these financial statements and the reported solvency and financial strength of RCM in deciding whether to allow and continue to allow Refco to hold SPhinX assets in RCM.

677.  The 2005 RCM financial statements, once again, failed to recognize losses with respect to the now $2 billion in uncollectible obligations which the financial statements falsely characterized as "receivable from customers." As Grant Thornton was aware, these were simply RCM customer assets that had been improperly diverted and were not properly characterized as

"receivable from customers." Had Grant Thornton properly audited the 2005 financial statements, it would have recognized the need to write off approximately $345 million in uncollectible payables owed to RCM by Refco affiliates used to finance RTLs at the end of the 2005 fiscal reporting period. SPhinX's and PlusFunds' innocent decision-makers relied on these financial statements and the reported solvency and financial strength of RCM in deciding whether to allow and continue to allow Refco to hold SPhinX assets in RCM.

678.    Grant Thornton knew, or consciously avoided knowing, that these assertions in the RCM financial statements were false because it not only had access to, but actually audited and analyzed material information concerning RCM and the intercompany transfers of RCM customer assets. Grant Thornton knowingly or recklessly failed to take the required steps to obtain audit evidence verifying the nature and accounting treatment of these assets or ignored the resulting audit evidence. At all relevant times, the affiliated companies lacked the financial intent and/or wherewithal to repay RCM, the loans had no legitimate business purpose for RCM, the loans were falsely documented as "customer" receivables, RCM's board of directors never approved the transactions and no collateral or security existed of any value. Each of these facts constituted a huge red flag which was known or consciously avoided by Grant Thornton; together, they are evidence of Grant Thornton's willfulness.

679.    Further evidence of Grant Thornton's knowledge of fraud, and Grant Thornton's active assistance in covering up the fraud, comes from a management deficiency letter (the "Management Letter") prepared by Grant Thornton following the February 29, 2004 year audit which raised significant "internal control" and accounting deficiencies at Refco. As set forth in this letter, among the categories of accounting irregularities and deficiencies known by Grant Thornton were:    "Consolidation Process," "Formalized Reporting and Closing Process,"

164

"Internal Audit Function," "Accounting Procedures and Policies," "Accounting Function," "RCM Custody Reconciliations," "Audit Coordination," and "IT Environment Deficiencies."

680.    As the Management Letter revealed, Grant Thornton was aware that Refco's internal accounting and auditing functions were deficient, that there was no internal audit function, there was insufficient audit coordination, and that there were deficiencies in accounting procedures and functions and in the consolidation processes.    Despite these numerous longstanding problems, Grant Thornton provided Refco with clean audit opinions for each audit from 2003 through 2005.

681.    Even after belatedly presenting the Management Letter to Bennett in October, 2004, Grant Thornton failed to follow-up with Bennett or anyone else at the Company regarding the numerous deficiencies until early 2005, when Gerald Sherer, the new Refco CFO, was appointed.    Even then, Grant Thornton modified its findings at Refco's instruction and affirmatively lied about the letter's existence when Grant Thornton was asked by THL whether any such management letter existed.

682.    In late March 2005, after THL had consummated the LBO, THL learned of the existence of the Management Letter.    In an April 1, 2005 internal email, a THL executive expressed his anger that neither Refco nor Grant Thornton had provided the Management Letter to THL during the due diligence leading up to the LBO.

683.    The same day, in another internal email, another THL executive explained his discovery that at or about the time that Grant Thornton provided the Management Letter to the company, members of Refco management had pressured Grant Thornton to change or retract many of its conclusions in an effort to avoid taking appropriate steps to remedy the significant deficiencies identified by Grant Thornton:

> These are the facts as I've heard them . . . . A draft of the letter was first issued in October. Gerry [Sherer, Refco's new Chief Financial Officer] received it when he first got there [in early 2005] and "tore Grant Thornton a new one" for using the words "significant deficiency" with regard to the systems. Grant Thornton printed a revised version of the letter omitting those words and without management's response on March 29th and gave to Gerry. Gerry responded in writing two days ago with regard to the systems comment.

684. A few days later, another internal THL email discussed the fact that Weil Gotshal & Manges, THL's lawyers during due diligence, believed they had asked both Refco and Grant Thornton if there were any management letters and were told there were none:

> [W]e wanted to chat about 2 issues raised by Weil. First is the Grant Thornton management letter. As we discussed on Monday neither the company nor Grant Thornton shared this letter with us, the audit committee or Weil. Weil believes they asked both the company and Grant Thornton if there were management letters and was told no.

685. In sum, Grant Thornton not only knew of and left unaddressed numerous accounting and controls deficiencies at Refco, Grant Thornton eagerly softened its findings to please Refco management and later lied about the existence of the Management Letter. These facts demonstrate both Grant Thornton's knowledge of and substantial assistance in the fraud and breaches of fiduciary duty by Refco and its management.

686. Ramler not only took Bennett and other Refco employees at their word, he personally vouched for their trustworthiness. Ramler's motivation for doing so was obvious; Refco was an extremely valuable account that he himself managed, and keeping the account through a successful IPO would constitute a coup both for Grant Thornton and for Ramler. In a conscious attempt to maintain the illusion that Refco was financially solid, Grant Thornton routinely issued unqualified audit opinions following a procedure that amounted to no audit at all.

687. By choosing not to apply appropriate auditing standards, Grant Thornton allowed Refco to loot RCM customer accounts, including SPhinX accounts. Similarly, Grant Thornton failed to examine the legitimacy of related-party transactions and thinly-concealed related-party transactions (the RTLs), despite professional obligations to ascertain the financial capability of other parties to repay balances owed, to review the agreements and other pertinent documents associated with the transactions, to inspect or confirm and obtain satisfaction concerning collateral for the transactions, and most importantly, to understand the business purpose for the transactions. None of these steps was taken for the RTLs, despite the fact that they were unusual and large-scale, related-party transactions repeatedly timed to coincide with the close of every relevant reporting and audit periods and despite the fact that they lacked any legitimate business purpose.

688. An audit properly performed in accordance with GAAS easily would have uncovered the fraud alleged herein. Grant Thornton's auditors, including Ramler, knew that the RTLs and other suspicious transactions were evidence of ongoing and massive financial manipulation. Grant Thornton's repeated failure to conduct an appropriate audit and its decision to ignore innumerable red flags requiring a high degree of skepticism and a rigorous examination of Refco's books and records, demonstrates that Grant Thornton and Ramler made the conscious decision to conceal the massive ongoing fraud in order to keep Bennett happy, boost the profile of Grant Thornton and continue collecting professional fees.

689. Despite its knowledge of the fraud and breaches of fiduciary duty of the Refco defendants described herein, Grant Thornton participated and substantially assisted Refco by issuing unqualified "clean" audit opinions on the financial statements of Refco for each of the

167

years 2003, 2004 and 2005. These audit opinions hid Refco fraud and breaches of fiduciary duty and Refco's true financial condition.

690. Grant Thornton knew and intended that its audit reports on the financial statements of Refco and the unqualified audit opinions contained therein would be, and in fact were, incorporated in Refco's financial statements and distributed to Refco's customers, including SPhinX and PlusFunds.

691. Grant Thornton knew and intended that Refco's customers, including SPhinX and PlusFunds, would use and rely upon Grant Thornton's audit report and the unqualified audit opinions therein in deciding to maintain and continue to maintain customer accounts at Refco. Without the funds deposited into these accounts, the Refco defendants would have been unable to fund and continue their fraudulent scheme.

692. In each of its audit reports and the unqualified audit opinions contained therein on the financial statements of Refco for the years 2003, 2004 and 2005, Grant Thornton made misrepresentations that had the effect of hiding Refco's true financial condition, fraud, breaches of fiduciary duty and other tortious conduct.

693. In each of its audit reports Grant Thornton represented that it was "independent." In fact, as described herein, Grant Thornton knew that it was not independent and knew that it did not maintain an independence in mental attitude in the conduct of its audits. Rather, Grant Thornton chose to participate in and substantially assist the Refco defendants' fraud and breaches of fiduciary duty.

694. In each of its audit reports on the financial statements of Refco, Grant Thornton represented that it had conducted its audits in accordance with GAAS. In fact, as alleged above, Grant Thornton knowingly and repeatedly violated GAAS in the conduct of its audits.

695.    In each of its audit reports on the financial statements of Refco, Grant Thornton represented that it believed that its audits provided a reasonable basis for its opinions.    As alleged, above, however, Grant Thornton had no reasonable basis for its unqualified audit opinions, and Grant Thornton actually knew or was reckless in not knowing as much at the time it issued its audit reports.

696.    In each of its audit reports on the financial statements of Refco, Grant Thornton represented that in its opinion the financial statements of Refco for the annual reporting period then ending present fairly, and in all material respects, the financial position of Refco and the results of its operations in conformity with GAAP.    As alleged above, Grant Thornton knew or consciously avoided knowing that the financial statements of Refco were not fairly presented in conformity with GAAP.    Rather, those financial statements were grossly and materially false and misleading in that, among other things, they concealed the Refco fraud, including the RGHI receivables and the sham and related-party nature of the RGHI receivables, the RTLs and the Suffolk loans described herein.

697.    Innocent decision-makers within SPhinX and PlusFunds actually and reasonably relied upon Grant Thornton's unqualified audit opinions in deciding to maintain and continue to maintain and fund with SPhinX assets accounts at Refco.

698.    By inducing such reasonable reliance on the part of innocent decision-makers within SPhinX and PlusFunds, Refco was able to misappropriate and misuse SPhinX customer funds, ultimately resulting in the loss of those funds.

699.    As the direct and proximate result of their reasonable reliance on the misrepresentations of Grant Thornton, SPhinX and PlusFunds sustained damages.

3.    **Ernst & Young.**

(a)    **Ernst & Young's Role in the Fraudulent Scheme.**

700.    Ernst & Young provided Refco with tax advice on numerous issues, served as Refco's independent registered tax accounting firm, prepared tax returns for Refco and RGHI from 1991 through 2002, and continued to provide tax advice and assistance to Refco from 2002 until 2005. As Refco's tax accountant, Ernst & Young owed a duty not to aid and abet Refco or others in fraud, breaches of fiduciary duties, and other torts directed at Refco's depositors, including PlusFunds and SPhinX.

701.    Ernst & Young was aware of Refco's activities alleged herein and/or consciously avoided knowledge of them. By its actions, Ernst & Young actively participated in and substantially assisted Refco and others in carrying out the scheme detailed herein.

702.    Ernst & Young began working for Refco around 1991 with the understanding that its client was RGHI and all of the subsidiaries below it, including RGL and Refco, Inc. (which became Refco, LLC). In 1993 or 1994, Ernst & Young began preparing tax returns and later helped with IRS, state and municipal tax audits. In 2001-2002, Ernst & Young provided Bennett with tax advice and proposed structures through which a partial sale of Refco could be effectuated with favorable tax treatment. During this time period, Ernst & Young also prepared tax returns for RGL and its subsidiaries and affiliates, including RGHI, through the tax year 2002. Ernst & Young and its affiliates continued to provide advice and services to Refco through as late as 2005, including preparing RGL's New York City tax returns.

703.    Ernst & Young was not simply a tax preparer for Refco, but provided tax consulting and advice with respect to numerous Refco transactions, including corporate restructurings among the various Refco entities, proposed sales and acquisitions by Refco, and

potential third-party investments involving Refco. Ernst & Young thus assisted and enabled Refco insiders to monetize and cash-out their interests in Refco.

704.    As a result of Ernst & Young's consulting advice, Ernst & Young knew and understood that Refco was insolvent as of August 2004 and that its officers and directors owed fiduciary duties to customers and creditors, including SPhinX and PlusFunds.

705.    As a result of Ernst & Young's tax consulting advice and involvement in Refco's schemes and attempts to sell the insiders' interests in Refco, Ernst & Young knew and understood all facts establishing that Refco owed fiduciary duties to customers like SPhinX.

706.    As a result of Ernst & Young's consulting advice, Ernst & Young knew and understood that Refco and its agents, including Bennett and Maggio, were engaging in the massive fraudulent scheme described herein, including the RGHI Receivable, the round-trip loans and the misuse of customer funds, including the funds of customers of SPhinX.

707.    As a result of Ernst & Young's consulting advice, Ernst & Young knew and understood that the Refco defendants were breaching the fiduciary duties they owed to SPhinX and PlusFunds as described herein.

708.    Despite its knowledge of the Refco defendants' fraud and breaches of fiduciary duties, Ernst & Young knowingly participated and substantially assisted Refco's fraud and breaches of fiduciary duty as described herein by hiding the Refco defendants' wrongdoing through the preparation and dissemination of Refco's tax returns.

709.    Ernst & Young understood no later than 2001 that Refco's insiders were seeking to achieve a lucrative cashing-out of their interests in Refco.

710.    From 2001 to 2002, Ernst & Young performed a substantial amount of work for Refco in connection with proposals to sell all or part of Refco to BAWAG or another third party.

171

During the course of this work, Trosten asked Ernst & Young to assume the existence of a receivable owed by RGHI to RGL in the amount of $720 million. Ernst & Young's advice on this issue ultimately led Bennett to structure Refco's proposed July 2002 transaction with BAWAG as a Proceeds Participation Agreement in which a BAWAG affiliate made payments to Refco in exchange for the right to participate in the proceeds of a future sale of RGL. Ernst & Young understood that certain senior Refco executives stood to profit directly and considerably by a sale of the company and had a corresponding incentive to manipulate Refco's financial statements and related disclosures in addition to its tax returns.

711.    Through rendering advice to Refco, Ernst & Young also learned that Refco, aided by Grant Thornton and Mayer Brown, was falsifying Refco's financial statements. In 1999, Ernst & Young provided advice in connection with the structuring of BAWAG's purchase of a 10% interest in RGL. In connection with this process, Ernst & Young reviewed and commented on the deal documents that Mayer Brown drafted. An Ernst & Young internal memorandum shows that Ernst & Young disagreed with representations contained in these draft documents to the effect that there were no undisclosed liabilities on the audited RGL financial statements and that all tax returns had been filed and withholding taxes had been repaid. In fact, the RGL financial statements were false because they did not disclose the RGHI Receivable being masked by the RTLs.

712.    Moreover, as a result of its work for Refco, Ernst & Young was aware that the RGHI Receivable was not a bona fide debt, but was a sham, based on, among other things, the following:

- Ernst & Young knew and/or consciously avoided knowing that the RGHI Receivable consisted, at least in part, of bad debts of Refco customers that were "sold" or assigned to RGHI for a price that vastly exceeded fair market value, and that RGHI lacked the ability to pay off the RGHI Receivable;

172

- Ernst & Young knew and/or consciously avoided knowing that Refco's officers were using the RGHI Receivable to manipulate Refco's balance sheet and operating results for the purpose of bolstering the financial appearance of the company;

- By as early as September 2001, Ernst & Young understood the RGHI Receivable was approximately $720 million to $900 million and that these receivables were concealed on Refco's audited financial statements;

- As early as February 2002, Ernst & Young knew and/or consciously avoided knowing about the RTLs to pay down the RGHI Receivable. Ernst & Young also knew and/or consciously avoided knowing that these transactions occurred in late February and would be reversed in early March, straddling the end of Refco's financial reporting fiscal year;

- Ernst & Young knew and/or consciously avoided knowing that at least one purpose of the RTLs was to improve Refco's balance sheet by concealing the RGHI Receivable.

713.    Based on Ernst & Young's knowledge of the Refco fraud, the senior Ernst & Young advisor on the Refco engagement decided in late 2003 that Ernst & Young should resign from its engagement with Refco. Nevertheless, Ernst & Young continued to work for Refco through as late as 2005, several months after the LBO, and carried out its withdrawal from Refco assignments in such a way as to allow the fraudulent scheme to continue.

### (b)    Knowledge of Refco's Trading Losses and Balance Sheet Problems.

714.    As early as 1998, Ernst & Young was aware of a related-party receivable owed by RGHI to Refco that was created when RGHI purchased "bad debt receivables" for full face value from Refco. Ernst & Young was also aware that this receivable had been sitting on RGL's books accruing interest "for years" while a corresponding payable grew on RGHI's books.

715.    Ernst & Young also knew and/or consciously avoided knowing that Bennett had a practice of allocating vaguely described expenses—often listed as IT and computer expenses — to RGHI, but having RGL actually pay the expense and then book them as part of the RGHI Receivable.

716.    Ernst & Young clearly understood that the purpose of the RGHI Receivable was to improve the financial appearance of RGL.  In an email dated August 8, 2001, an Ernst & Young partner observed that a write-off of the RGHI Receivable would have a deleterious effect on RGL's earnings, which were "protected and buffered" by RGHI.

717.    In addition, Ernst & Young was fully aware that the RGHI Receivable was a sham based on the following evidence:

- Ernst & Young never saw a written agreement evidencing the RGHI debt, never knew the terms and conditions of the debt or its repayment schedule, and never knew of any valuable consideration for the debt;

- Ernst & Young never received a requested confirmation directly from Refco's counsel that the debt was valid;

- Other than the sham RTLs, RGHI never made a payment to service or pay down its debt during Ernst & Young's engagement;

- RGHI never made interest payments on its debt and instead simply added accrued interest to the outstanding receivable balance; and

- RGHI never expressed an intention to repay the debt and, never could repay the debt, because, as Ernst & Young knew, RGHI was "basically insolvent."

### (c)    The RTL Transactions.

718.    In approximately September 2001, Ernst & Young discovered that the receivable owed by RGHI to RGL was much larger than what appeared on RGL's audited financial statements.  While the financial statements reported a related-party receivables of approximately $219 million, the RGHI Receivable was in the range of at least $700 to $900 million.  When Ernst & Young asked a Refco officer about the discrepancy, Ernst & Young was told directly that Refco utilized the RTLs at fiscal year end in order to "clean up" the balance sheet and, for that reason, the related-party receivable balances did not appear on RGL's financial statements.

174

719.    Ernst & Young has admitted to the Examiner that by no later than February 28, 2002, it knew that at the end of every Refco's fiscal year, RGHI would borrow funds from a third party to pay down the RGHI Receivable and the transaction would be reversed a few days later.

720.    Ernst & Young also knew and/or consciously avoided knowing that the source of the third-party funds in these annual fraudulent transactions was actually RCM.  Several Ernst & Young documents refer to "circular flows of cash" in the context of discussions of pay down of the RGHI Receivable at fiscal year-end.  For example, a November 6, 1997, Ernst & Young handwritten memo regarding the Neiderhoffer Loss (which Ernst & Young knew to be part of the RGHI Receivable) states, in part, "Did RCM advance funds.  Circular flow of cash."  The handwritten notes of an Ernst & Young partner dated March 4, 2002, contains the phrases "borrowed cash from RGL," "third-party customer," and "Neiderhoffer."  In other words, the third-party customer had actually borrowed funds from RGL (via its subsidiary, RCM) to in turn loan to RGHI to hide the RGHI Receivable.

(d)    **Maintaining the Fraudulent Business Model.**

721.    Ernst & Young's own documents demonstrate that as early as 1997, Ernst & Young had significant concerns about potential fraud at Refco and Ernst & Young's own potential liability arising out of its involvement with Refco.

722.    In November 1997, Kurt Neidhardt, the Ernst & Young partner handling the Refco engagement, was concerned about how Refco had treated the Neiderhoffer Loss.  Concerned that Ernst & Young could be viewed as "being an accessory to some type of fraud," Neidhardt met with the head of Ernst & Young's Financial Services Department, Jerry Goldman.  Instead of advising Neidhardt to alert the public to the Refco accounting fraud or withdraw from representing Refco, Goldman informed Neidhardt that so long as Ernst & Young prepared

Refco's tax returns correctly and never gave Refco any accounting advice, Ernst & Young should not be concerned.

723.    Ernst & Young continued to have concerns about Refco, specifically about Refco's use of the sham RGHI Receivable to hide losses and other expenses. In 2001 through 2003, Ernst & Young sent Refco a letter asking Refco to provide, inter alia:  (a) a representation from Refco's legal counsel that the related-party receivable payable from RGHI to RGL was a legally enforceable obligation; (b) a schedule of any expenses that RGL allocated to RGHI per a "5/12/99 Certification and Assumption by RGHI'; and (c) an analysis of related-party accounts. Despite these requests, Ernst & Young never received a written or oral representation directly from Refco's legal counsel that the related-party payable was a legally enforceable obligation. Instead, Ernst & Young accepted a representation from a Refco officer to that effect without demanding anything further.  In addition, Ernst & Young never received the requested schedule of expenses or analysis of related-party accounts.

724.    On July 8, 2002, Neidhardt met with the number two partner in Ernst & Young's tax department, Mile Kelley, to discuss Ernst & Young's knowledge that RGHI owed RGL a payable of $750 million, that RGL's audited financial statements reflected a related-party receivable of only around $225 million, and that RGHI would borrow money to reduce this receivable just before fiscal year-end and reinstate it just afterwards so that only $225 million would be reflected on RGL's audited financial statements.  Ernst & Young also prepared tax returns for RGHI and knew it was unaudited.  Echoing Goldman's earlier reaction, Kelley concluded that this was not a tax return issue, despite the obvious manipulation of the audited financial statements.

725.    On January 16, 2003, Neidhardt met again with Kelley to discuss concerns over Refco. This time, Neidhardt described another RGHI transaction in which a third party would allow RGHI to pay down the RGHI Receivable at fiscal year-end in a manner that would hide the related party nature of the receivable and improve the balance sheet without disclosing why the balance sheet improved. Once again, the number two partner in Ernst & Young's tax department chose to ignore this obviously fraudulent manipulation of Refco's audited balance sheet because he believed that as long as Ernst & Young got Refco's tax returns correct, the fraud was not Ernst & Young's concern.

726.    Refco's Fraud Examiner concluded that Ernst & Young knew that Refco's officers were intentionally manipulating Refco's balance sheet for the purpose of bolstering the financial appearance of the company.

727.    In or about November 2003, Ernst & Young purported to resign from the Refco engagement based in large part on its concerns over potential liability for aiding and abetting the Refco fraud as a result of its knowledge of the massive RGHI Receivable and the fiscal year-end paydown and reinstatement of the RGHI Receivable.

728.    Although Ernst & Young did not prepare Refco's federal 2003 tax returns, Ernst & Young continued to perform tax services for Refco through at least 2005, preparing, among other things, misleading New York City tax returns for RGL. Moreover, despite its concerns, Ernst & Young did not tell Refco's subsequent tax accountants (or anyone else) the true reasons for its decision to resign its concerns about Refco.

729.    Ernst & Young continued to be nervous about its relationship with Refco. In October 2005, Rory Alex, an Ernst & Young accountant who did not work on the prior Refco engagement, sent Neidhardt an email asking about the possibility of doing work for RGL. The

next day, Neidhardt sent an email to another Ernst & Young tax partner who had worked on the Refco account previously, saying "we need to be very careful here. I left [Rory Alex] all my numbers . . . anything [sic] we tell him must be strictly confidential. I may have Nancy Altobello shut him down."

730.    Ernst & Young was clearly aware that the RGHI Receivable was a sham transaction and not a bona fide debt on which interest income could properly accrue for tax purposes. Accordingly, the RGL tax returns reflected interest income associated with the RGHI Receivable that Ernst & Young knew and/or consciously avoided knowing was partially or entirely inaccurate. Ernst & Young also knew and/or consciously avoided knowing that the RGL tax return balance sheets (Schedule L) included as assets the RGHI Receivable. Thus, the Schedules showed an erroneous and inflated income for tax reporting purposes by RGL. These falsehoods substantially assisted Refco's efforts to create the illusion that it was profitable and financially healthy.

731.    Ernst & Young also understood that Refco's continued operation, despite the losses reflected in the RGHI Receivable, required a continuous infusion of cash. Ernst & Young knew and/or consciously avoided knowing that the only sources of cash available to Refco were its three principal operating entities – RSL, Refco LLC, and RCM – and that only RCM was unregulated and had no net capital requirements. Ernst & Young thus understood that Refco was consuming RCM customer funds.

732.    Ernst & Young further understood that the goal of both the RTLs and the theft of RCM customer funds and the hiding of losses was to falsely portray Refco as financially strong and healthy, growing quickly, yet with a low-risk, high profit business model. By its actions,

Ernst & Young substantially assisted and participated in the Refco and in the breaches of fiduciary duty by Refco and its officers and directors.

733.    By its conduct described above, Ernst & Young knowingly participated in and substantially assisted the Refco Defendants' breaches of the fiduciary duties they owed to SPhinX.    As alleged in detail herein the breaches of those fiduciary duties directly and proximately caused SPhinX and PlusFunds' damages.

734.    Ernst & Young substantially assisted the Refco fraud by preparing and filing tax returns that Ernst & Young knew and/or consciously avoided knowing were inaccurate or false and that effectively concealed the Refco fraud and by otherwise assisting in the concealment of the fraud through its tax and advisory services, Ernst & Young knew those tax returns would be reviewed by RGL's innocent directors, officers and agents and presented to lenders, potential investors, underwriters, and other third parties in connection with Refco insiders' continuous efforts to get financing for Refco and, ultimately, to facilitate a lucrative cashing out of their interests in Refco.  The Refco fraud alleged herein directly and proximately caused SPhinX and PlusFunds' damages.

## C.    Underwriters:  Credit Suisse and Banc of America Securities.

735.    Credit Suisse served as a financial advisor to Refco in connection with the LBO and IPO transactions.    Specifically, Credit Suisse was a lead financial advisor, joint book-running manager, underwriter, and/or initial purchaser for the bond offering made as part of the LBO, and was the lead, joint book-running manager and lead underwriter of the August 2005 IPO.  Credit Suisse acted as the exclusive financial advisor to Bennett and/or RGHI and/or RGL. By assuming these roles in connection with Refco's LBO and IPO transactions, Credit Suisse assumed due diligence and disclosure obligations in connection with Refco's public filings related to those transactions.

736.    Credit Suisse received $15.5 million in fees and a share of over $70 million in fees paid to the investment banking professionals.

737.    Credit Suisse knew that Refco was insolvent at least as of December 2002. Credit Suisse also knew that Refco's business model centered around performing transactions and holding assets for its customers, including SPhinX. As a result, Credit Suisse knew or should have known that Refco and its management owed fiduciary duties to Refco's creditors and customers, including SPhinX. As with other Defendants, Credit Suisse owed a duty not to aid and abet Refco, its officers, and affiliates in fraud and breach of fiduciary duty.

738.    Banc of America Securities' position is very similar to Credit Suisse's position. Banc of America Securities served as a financial advisor to Refco in connection with the LBO and IPO transactions. Specifically, Banc of America Securities acted in roles as a financial advisor, joint book-running manager, underwriter and/or initial purchaser for the bond offering made as part of the LBO and as a joint book-running manager for the IPO.

739.    Banc of America Securities received $125,000 in fees and a share of over $70 million in fees paid to the investment banking professionals. Like the other Defendants, Banc of America Securities owed a duty to not aid and abet Refco's fraud and breach of fiduciary duty. In addition, Banc of America Securities was aware that Refco was insolvent and that its business model centered around performing transactions and holding assets for its customers and, as a result, owed fiduciary duties to SPhinX and other customers and creditors of Refco. By virtue of Banc of America Securities' role as financial advisor in connection with the LBO and IPO transactions, it assumed due diligence responsibilities and disclosure obligations in connection with Refco's public filings.

740.    Each of the investment banker Defendants knew and/or consciously avoided knowing that a broker-dealer such as Refco was an inappropriate candidate for a leveraged buy-out.  Based on their experience and expertise, they knew and/or consciously avoided knowing that LBOs required real cash flows to service such a large amount of debt, and that broker-dealers such as Refco typically did not have sufficient unencumbered cash flows of their own to service such debt loads.

741.    However, Credit Suisse and Banc of America Securities quickly recognized that they could use the RCM funds being siphoned by Refco as a proxy for the cash flows that they would need to pitch the LBO.

742.    Tellingly, neither Credit Suisse nor Banc of America Securities was comfortable putting its own money into the LBO, and at least one of the investment banker defendants' internal credit departments denied approvals to do the same.  It was only after senior executives at Credit Suisse and Banc of America Securities overrode these denials and concerns based on the fees that could be earned, the opportunity to do a deal with THL and Refco and the small amount of investment (in exchange for sizeable fees) that would be required by the investment banker Defendants themselves, that they agreed to facilitate the deal.

743.    As Credit Suisse and Banc of America Securities conducted due diligence to justify the LBO, they strived for ways to show that Refco had free cash flow that could be used to service the LBO debt.  They discovered that they could not recreate management's projected free cash flows and that they could not rely on cash distributions from the regulated subsidiaries.  Fortunately for those with a stake in the LBO, Refco had been and would continue to make RCM's customer assets available to RGL and its affiliates for cash flow purposes.  Although they knew and/or consciously avoided knowing that a credit risk like Refco was not a good

181

candidate for leverage, they allowed the transaction to proceed because of the ready availability of RCM's cash.

744.    The investment banker Defendants irreparably damaged RCM by arranging $1.4 billion of LBO financing that "primed" RCM's pre-existing receivables due from RGL and the guarantors on the LBO debt. And, despite the fact that they found management, and particularly Refco's CFO, to be dishonest, they blindly accepted and endorsed management's unreasonable projections to service the LBO debt – projections which never even took into account the $2 billion owed to RCM.

### 1.    Knowledge of the Looting of RCM Assets.

745.    Through the due diligence undertaken in connection with the LBO, the investment banker Defendants learned that Refco was illicitly funding its operations with RCM customer assets, that RCM held between $1 and $2 billion in worthless intercompany IOUs, and that the LBO would altogether foreclose the Refco affiliates' ability to pay down their debt to RCM and jeopardize customer assets held by RCM, including SMFF's cash.

746.    However, as soon as Banc of America Securities and Credit Suisse were offered the prospect of earning lucrative fees in the LBO and IPO, they ignored their concerns.

747.    Credit Suisse and Banc of America Securities were always more concerned about upsetting Refco's management than they were about the potential harm to pre-existing creditors (like RCM and its customers, including SPhinX) who would be devastated by layering $1.4 billion of "senior" debt onto Refco. The investment banker Defendants remained completely focused on securing a lead role and the related fees in the transaction and even when they had concerns about Refco's financial condition. As one investment banker internally noted, the strategy always was to "keep the list [of due diligence] very short," as "[w]e didn't want to frighten management with a 4-page list"

748.    As early as May 2004, senior Banc of America Securities employees were questioning "how Refco use[d] its capital and how the company's net capital change[d] from period to period." After undertaking a review of RGL's intercompany receivables and obtaining a schedule from Trosten, Banc of America Securities concluded that it "need[ed] more information to be able to answer what Refco is doing with their capital and why."

749.    Before the LBO closed, employees for the investment banker Defendants continued to question how "money flow[ed] into and out of the regulated entities" and the magnitude of "affiliate loans to regulated entities . . . ." Banc of America Securities employees, for example, sought an explanation of capital flows over "eight quarters between regulated and non-regulated entities. What is the driver of capital movements and where is capital being used (besides what is in the regulated entity) and for what purpose?" And, in connection with determining how Bennett could legitimately request a pre-closing dividend of $500 million from Refco, Banc of America Securities senior executive William Coupe noted that "[e]xcess capital to pay $500 MM pre-closing dividend also resides outside the regulated entities and consolidates up through Refco Capital Holdings, LLC." Given Banc of America Securities' particularized knowledge of Refco's corporate structure, Banc of America Securities knew and/or consciously avoided knowing that RCM was the purportedly unregulated subsidiary that consolidates up through Refco Capital Holdings, LLC, whose customers' money was constantly being used by the holding company.

750.    Indeed, the investment banker Defendants were keenly aware of the difference between how Refco used cash at RCM and its regulated subsidiaries. They knew that SEC regulations limited the cash that Refco could have moved from its regulated operations and that Refco had to be drawing on customer assets from Refco's other operations—namely, RCM—to

183

cover its operational expenses. Yet they did not consider how and when RCM's IOUs would ever be repaid given that the investment banker Defendants were subordinating those IOUs to $1.4 billion in additional LBO debt. Indeed, none of the projections used by the investment banker Defendants even factored this into the cash needs of Refco's LBO debt parties—despite the fact that RCM's largest receivables came from RGL and RCC, both of which were guarantors on the LBO debt.

751.    As the investment banker Defendants knew but failed to disclose, to make the LBO work, Refco had to draw on RCM money to fund Refco's operations because the "Customer-Segregated Funds" in the regulated entities were off limits and had to be accounted for separately on Refco's balance sheet. Indeed, in response to inquiries as to why certain customer assets were not being used to "pay down debt," one senior Credit Suisse executive explained that it is "[b]ecause it is restricted customer cash that must be held for regulatory purposes *i.e.* it is not the company's cash." In stark contrast, the investment banker Defendants were elated that Refco did not restrict access to and regularly drew on RCM customer funds that could be used to pay down Refco's LBO debt. As one Banc of America Securities employee proclaimed in an email, "FYI . . . looks like Refco Capital Markets isn't regulated . . . that's good for us!"

752.    In reviewing and commenting on the condensed financial information attached to the LBO offering prospectus, the S-4, the S-1 and the IPO prospectus, the investment banker Defendants understood that at the time of the LBO there was over a billion dollars in payables owed to RCM by RGL and other guarantors on the LBO debt and that as of the IPO, the siphoned amount had climbed to over $2 billion.

753.    As the investment banker Defendants recognized, given their detailed knowledge of Refco, the enormous "payables to customers" that were eliminated in consolidation were actually intercompany payables owed to RCM and, accordingly, the assumption (in order to pay Refco's insiders) of $1.4 billion of new debt by RGL and RCC would have a devastating impact on RCM and its customers, including SPhinX. Indeed, the investment banker Defendants understood, as referenced in their own documents, that "payables to customers" constituted "obligations of Refco subsidiaries to repay client monies" and that, therefore, the intercompany loans made by RCM to RGL and its affiliates were comprised of RCM customer funds.

754.    The fraudulent scheme perpetrated on RCM was fundamental to the operation and financing of Refco, and each of the investment banker Defendants was fully aware and/or consciously avoided knowing that the LBO and IPO only worked by robbing RCM and leaving its receivables unpaid and unrecoverable, this virtually assuring that customer funds, including those of SPhinX, would be lost.

755.    Indeed, as the investment banker Defendants knew and/or consciously avoided knowing, the amounts stolen from RCM substantially outsized Refco's total capital. By the time Refco filed for bankruptcy, RCM's net uncollectible receivables totaled over $2 billion, while RGL claimed only $515 million in capital in 2002, $566 million in 2003, $616 million in 2004, and only $150 million in 2005. As the investment banker Defendants knew, and as their own projections showed, there was no cash to pay down the receivable to RCM and even Refco's projected "goodwill," which was entirely illusory given the Refco fraud, was insufficient to meet RGL and its affiliates' obligations to RCM.

## 2.    The Investment Banker Defendants' Motivations.

756.    Despite this knowledge, the investment banker Defendants, preoccupied with the lucrative fees they expected to make on the LBO and IPO, prepared the misleading offering

documents needed to facilitate the LBO and ignored the impropriety of the LBO for RCM and RGL.

757.    On July 22, 2004, Refco Finance Holdings LLC and Refco Finance Inc. issued an Offering Circular regarding the $600 million of senior subordinated notes, with Credit Suisse and Banc of America Securities as "joint book-running managers." Thus, the investment banker Defendants overcame their credit concerns about Refco motivated by the lucrative fees and opportunity to get close to THL and Refco for future business, including the IPO.

### 3.    Investment Bankers' Use of Patently Unreasonable Projections.

758.    The investment banker Defendants never trusted Refco. Indeed, one Banc of America Securities employee noted in an email dated April 23, 2004, that he could not "look at the CFO [Trosten] without thinking of [John] Lovitz and his pathological liar routine on [Saturday Night Live]." Nevertheless, the investment banker Defendants were all too willing to adopt and use patently unreasonable projections prepared by management in arranging and facilitating the LBO and IPO. None of the projections used by the investment bankers included any repayment of RCM's pre-existing receivables. The investment bankers who had been studying Refco's cash flows knew and/or consciously avoided knowing that significant cash was historically taken and could still be taken from RCM, and yet never took into account how the $1.4 billion of additional leverage on Refco or the payout of RGL's assets to Refco would impact RCM's ability to be repaid. Unlike a properly executed leveraged buy-out, the investment bankers knowingly left behind over a billion dollars of unpaid debts owed to RCM.

4.    **Impact on RCM Was Actively Concealed by Investment Banker Defendants.**

759.    The April 16, 2004 letter of intent regarding the LBO sent to Refco expressly advised the company that all debt would be paid down in the LBO except "secured" financing used for customer related activity:

> Our proposal is for a debt-free Company. Accordingly, we would expect that the Sellers would fund from their cash proceeds (or cause the Company to fund at Closing with a concomitant reduction in cash proceeds paid to the Sellers) all of the Company's indebtedness for borrowed money . . . . We understand that the secured financing (if any) used principally for customer related activity in the ordinary course of business will not be repaid.

760.    Similarly, the LBO Offering Circular, jointly prepared by the investment banker Defendants falsely states that the LBO bond debt was "effectively junior to all existing and future liabilities of our subsidiaries [including RCM] that have not guaranteed the notes." This was simply not true. As Credit Suisse and Banc of America Securities knew, the LBO layered on $1.4 billion in debt that would have to be paid off before RCM's intercompany loans could be paid. Nowhere did the Offering Circular explain that the RCM assets were routinely diverted from RCM and distributed to other Refco entities without security or collateral and without regard for RCM's obligations to its customers; that RCM's most significant assets were approximately $2 billion of undocumented, uncollateralized receivables from RGL and RCC – two of the entities obligated to repay the LBO borrowings; and that the LBO transactions resulted in "priming" these receivables with $1.4 billion of third-party bank and bond debt without regard for the interests of RCM.

761.    Despite the statements in the Offering Circular to the effect that RCM would not be harmed by the LBO, Section 7.03 of the Credit Agreement dated as of August 5, 2004, states that if Refco incurs "Indebtedness" that constitutes an "Investment" (which is defined to include

an intercompany payable), then "all such Indebtedness" by any Refco entity obligated to repay the bank debt owing to a Refco entity that is not obligated (*i.e.*, RCM) "must be expressly subordinated to the Obligations" to repay the bank debt. In other words, the investment banker Defendants knew and/or consciously avoided knowing that the borrower and guarantors on the LBO bank debt were also obligated to pay RCM back for the use of RCM's cash, but they insisted that RCM's right to be repaid must be subordinated to their right to repayment.

762.    Similarly, Section 4.04(b)(15) of the bond debt Indenture allowed RGL and the guarantor subsidiaries to repay "intercompany Indebtedness . . . provided that no Default has occurred and is continuing or would result therefrom." Thus, as long as the LBO bond debt was not in default, RGL and RCC could – although they were not required to do so and arguably were precluded from doing so by the bank debt subordination requirements – repay the billions of dollars owed to RCM. But if ever the bond debt were in trouble, RCM's right to be repaid would be trumped by the LBO debt, which is what ultimately happened following Refco's bankruptcy.

763.    Pursuant to a July 22, 2004 Purchase Agreement, Credit Suisse (as representative of itself and Banc of America Securities) agreed that Credit Suisse, Banc of America Securities and non-party Deutsche Bank would severally purchase – at 97.5% of the principal amount of the notes – the $600 million of senior subordinated notes. Credit Suisse agreed to purchase $270 million (or 45%) of the notes, and Banc of America Securities and Deutsche Bank each agreed to purchase $165 million (or 27.5% each) of the notes. As the Notes were issued pursuant to SEC Rule 144A, they did not have to be registered.

764.    Nonetheless, Refco agreed to file a registration statement with the SEC and then to conduct an "Exxon Capital exchange" of registered notes for the Rule 144A Notes so that the

investment bankers would be permitted to resell the Refco notes to others. Credit Suisse took the lead in drafting the risk factors for the SEC filings that facilitated the resale of the LBO notes and the subsequent IPO.

### 5. The Harm of the IPO to Refco Inc.

765.    The IPO Registration Statement became effective on August 10, 2005. In connection with the IPO, Refco Inc. issued 26,500,000 shares of common stock to the public at $22/share The offering consisted of 12,500,000 initial shares by Refco Inc. and 14,000,000 shares of a secondary offering by THL, RGHI, Bennett and others. An additional 3.975 million shares in overallotment were also issued. The offering generated $258.5 million in proceeds for Refco Inc., approximately $289,520,000 in proceeds for the selling shareholders and $82.2 million in greenshoe dividend.

766.    As the investment banker Defendants had contemplated, and as was set forth in the IPO prospectus, on September 16th, 2005, Refco Inc. used the vast majority of its IPO proceeds to pay $231,262,500 towards the redemption of $210 million of the principal amount of RGL's senior subordinated notes plus $18.9 million in accrued interest and prepayment penalty. As RGL was insolvent at the time, Refco Inc. was induced to make a $231 million contribution to RGL for no consideration.

767.    The investment banker Defendants received their share of approximately $45 million in fees in connection with the LBO. The investment banker Defendants further received their share of approximately $40 million more in fees in connection with the IPO.

768.    Refco was forced to file for bankruptcy mere weeks after the IPO.

### D. JP Morgan Chase & Co.

769.    JP Morgan Chase & Co. ("Chase") aided and abetted the breach of fiduciary duty by SPhinX's fiduciaries, including Refco and its agents, by substantially assisting Refco in

189

maintaining SPhinX money in non-segregated accounts at RCM, extending credit, providing underwriting services and otherwise participating in Refco's and Bennett's business, all with knowledge that RCM's customer assets, including SMFF's cash, were at risk in non-segregated RCM accounts in spite of representations that SPhinX money was held in segregated accounts.

770.    Chase owed duties not to aid and abet fraud, breaches of fiduciary duty or other torts against SPhinX, PlusFunds, and SPhinX investors.

771.    At all relevant times, Chase understood that SMFF customer assets should have been maintained in customer-segregated accounts.  Chase was thoroughly familiar with the SPhinX/PlusFunds platforms and business from Chase's own business dealings with SPhinX.  In or about 2004, Chase invested approximately $200 million in the SPhinX Funds.  In connection with that investment, Chase received and reviewed SPhinX's Offering Memoranda, informational and marketing materials, and corporate documents which discussed the SPhinX platform, the Cayman Islands SPC structure, and the customer segregation requirements.  As a result, Chase understood the SPhinX customer segregation requirements.  Chase also understood that SMFF's assets were maintained at Refco LLC and that SMFF's assets were being swept back and forth between customer-segregated Refco LLC accounts at Harris Bank and RCM's non-segregated account at Chase because the wire transfers clearly identify SPhinX as the beneficiary.  Chase knew that SMFF's assets were not held in customer-segregated accounts as they were required and represented to be under the Offering Memoranda, marketing materials, corporate documents and Cayman Islands law.  Chase knew that Refco and Refco's officers and directors were breaching their fiduciary duties to Refco's customers, including SPhinX.

772.    In 2005, Chase investigated the opportunity of creating its own managed account platform that would directly funnel investors' money into the various SPhinX funds.   In

190

connection with this opportunity, Chase conducted substantial due diligence into the operations of SPhinX and PlusFunds. According to PlusFunds e-mails, Chase's "detailed due diligence on PlusFunds" began on March 7, 2005.

773.    To coordinate Chase's due diligence efforts, PlusFunds presented to Chase a January 26, 2005 summary of discussion points emphasizing the SPC structure requirements under Cayman Islands law and the requirement for "ring fence accounts." The presentation indicated that ring fencing "allows for the use of a single legal entity for multiple accounts whilst ring fencing each account from a point of view of a counterparty credit risk." The presentation detailed the need to "implement and maintain all allocation rules for all feeder, SMF and SPCV vehicles." The presentation also highlighted the need to "implement and enforce cash management policies" and contained a comprehensive analysis of risk management issues.

774.    In an e-mail dated February 22, 2005, from Chris Rose to PlusFunds' management and board of directors, Rose discussed Chase's due diligence, indicating that "the other people that they need to see and understand are Tia [Urban] and Ricardo [Mosquera] since they are the ones that supervised the various functions that make the platform less risky, e.g., cash management, portfolio, p&l, capital flows." Chase was clearly focused on cash management issues in its investigation of the SPhinX Funds. Chase knew that SPhinX money was being moved from Refco LLC to RCM where it was no longer protected. Chase knew that this was inconsistent with the legal requirements imposed by Cayman Islands law and contrary to the express representation in the Offering Memorandum, marketing materials and corporate documents.

775.    On February 28, 2005, Roslyn Kelly, the due diligence project manager at Chase, e-mailed the list of Chase attendees who would be participating in Chase's investigation of

PlusFunds. In that same e-mail, Kelly indicated "our objective is to gain a thorough understanding of your platform in terms of infrastructure (operations, information feeds, legal setup, etc.), risk management (operations, credit and market), and third party relationships where services are outsourced."

776. The preparatory work culminated in a comprehensive presentation on the "SPhinX Investment Program" given to Chase in March 2005. Contained in that presentation was a detailed analysis of the structure and operations of the SPhinX Funds. As a result of Chase's own investment in the SPhinX Funds and its due diligence in connection with their efforts to establish a managed account platform, Chase fully understood the SPhinX business structure and knew that SMFF's cash was required to be segregated. Chase also knew that money that should have been held in Refco LLC was in fact moved to unregulated, non-segregated accounts at RCM.

777. Chase knew and understood that the officers and directors of SPhinX, PlusFunds and DPM owed fiduciary duties to SPhinX and to SPhinX Funds investors, and that these included the duties to take reasonable steps to ensure that investors received a reasonable return on their investment and that SPhinX Funds assets be maintained in customer-segregated accounts protected from the insolvency and credit risk of the custodian of those assets.

778. At all relevant times, Chase knew that RCM commingled its proprietary and customer assets, including SPhinX assets, in a single bank account at Chase including hundreds of millions of dollars of cash. Chase initially paid no interest to RCM and therefore no interest to SPhinX on customer assets held in that account, although the amounts held totaled in the hundreds of millions of dollars. Chase therefore had access to hundreds of millions of dollars – essentially free.

779.    Chase understood that the money held in RCM's Chase Account represented customer assets, including SPhinX assets, entrusted to RCM, and Chase understood that it was not a customer-segregated account. Chase actively promotes a commodity customer-segregated account service to provide customer segregation for cash related to commodities trading, and so understands regulatory requirements and customer segregation issues relevant to such accounts.

780.    Not only was Chase knowledgeable about SPhinX and PlusFunds business, Chase also fully understood Refco's business. It possessed this knowledge because it served as one of Refco's underwriters on the IPO and acquired that knowledge via due diligence. Chase also had direct business dealings with Refco and direct connections with Bennett and other Refco officers and agents because of their former employment at and their ongoing business relations with Chase.

781.    Chase had a long history of dealings with Bennett and other Refco officers. Bennett was employed at Chase as a commodity and commercial lender from 1972 to 1982. In 1982, Bennett moved from Chase to Refco. During his employment at Chase, Bennett established and developed critical relationships with former and current Chase personnel and maintained those relationships after moving to Refco.

782.    After his departure, Bennett maintained part of his personal fortune in Chase accounts. For example, at the time of his indictment, Bennett, through RGHI, maintained at least $111 million in Chase account number 066-636752. Bennett and his wife also maintained at least $15.5 million in Chase account number 024-302791 as well as an additional $13.6 million in a Bennett Family Trust in Chase account number 51605-00-7.

783.    Other Refco officers also had connections to Chase. William Sexton, Refco's Executive Vice President and Chief Operating Officer, was employed at Chase from 1991

through 1997. Joseph Murphy, Refco's Executive Vice President and Refco Global Futures' President and CEO, was previously employed at Chase. Both of these individuals were recently identified by the U.S. Attorney General as unindicted co-conspirators in the federal prosecution of Trosten and Grant. Thomas H. Lee, a director of Refco after the LBO in 2004 and a principal of the THL Defendants, is also affiliated with Chase.

784.    Beginning in or about August 2004, Chase extended an $800 million line of credit to Refco secured by Refco's deposits at Chase, including SPhinX assets in RCM's accounts. Chase undertook due diligence of Refco and its business in connection with Chase's decision to extend hundreds of millions of dollars of credit to Refco, and thus understood Refco's business structure and financial condition.

785.    The ongoing relationship between Refco and Chase continued with Chase's participation in the Refco IPO. JP Morgan Securities, Inc., a Chase subsidiary, acted as a co-underwriter and co-manager on the August 2005 IPO. By participating as an underwriter, Chase undertook additional due diligence obligations and again investigated Refco to ensure that the IPO offering materials were accurate and that Refco's financial condition was suitable for an IPO. As a result of all of these connections, Chase understood the business dealings and relationship between Refco, SPhinX and PlusFunds.

786.    Chase knew and understood that the Refco Defendants owed fiduciary duties to SPhinX and SPhinX Funds investors.

787.    Chase knew and understood that certain officers and/or directors of SPhinX, PlusFunds, and DPM, named as Defendants herein, and that the Refco Defendants, all breached the fiduciary duties they owed to SPhinX by causing, assisting, or knowingly allowing the

transfer of SPhinX assets to RCM's non-segregated account at Chase, where those assets were exposed and subject to the insolvency and credit risk of Refco and RCM.

788.    Despite its understanding that SMFF's assets were to be maintained in customer-segregated accounts and its understanding that SMFF assets were moved back and forth between Refco LLC's regulated accounts at Harris Bank and RCM's non-segregated accounts at Chase, Chase remained silent.    By doing so, Chase understood that fiduciaries charged with the protection of SMFF's assets were violating their duties and placing SMFF assets at risk.    Chase actively aided and abetted those breaches of fiduciary duty.

789.    Chase aided and abetted Refco because of its profitable relationship with Refco. Refco maintained hundreds of millions of dollars at Chase for which Chase initially paid no interest.

790.    The intimate relationship between Chase and Refco is further demonstrated by Chase's willingness to assist Refco—to the tune of $201 million—even after the disclosure of the Bennett fraud.  On or about October 12, 2005, in response to Sugrue's demand that SMFF's cash be removed from RCM and transferred to SMFF's customer-segregated accounts at Refco LLC, Bennett turned to Chase to provide the liquidity necessary to transfer cash back to Refco LLC.  Because RCM's assets had been diverted to fund Refco's business operations elsewhere, RCM did not have sufficient assets to cover Sugrue's demand for the withdrawal of SMFF's cash from RCM.

791.    On one day's notice, Chase provided a $201 million loan to Refco *after* the disclosure of the $400 million Refco fraud.  Refco used the proceeds of the Chase loan to satisfy Sugrue's demand that SMFF's cash to be transferred to Refco LLC.

792.    After disclosure of the Refco fraud, Chase redeemed approximately $176 million of its investment in the SPhinX Funds, including approximately $10 million from SMFF.

793.    By facilitating transactions, extending credit, promoting the Refco IPO and otherwise participating in Refco's business and operations, Chase aided and abetted Refco's fraud and breach of fiduciary duty.    Chase was fully aware of Refco's obligations to its customers in general and to SPhinX in particular, and was aware that Refco was in breach of those obligations.    By remaining silent and by actively participating in and profiting from Refco's business, Chase caused damages to SPhinX and PlusFunds.

**E.    RTL Participants.**

**1.    BAWAG P.S.K.**

794.    Defendant BAWAG is a banking and financial services corporation organized and existing under Austrian Corporate Code Governance ("ACCG") and law of Austria.    BAWAG is Austria's fourth largest bank.

795.    BAWAG owed to SPhinX and PlusFunds duties not to aid and abet fraud, breach of fiduciary duty or other tortuous conduct by Refco or its officers, directors or agents.

796.    The relationship between BAWAG and Refco dates back until at least the early 1990s when BAWAG's long time chairman and CEO Walter Flöttl used approximately $2 billion in BAWAG funds to help his son, Wolfgang Flöttl, establish a Bermuda based hedge fund.    That hedge fund, Ross Capital, used Refco as its primary broker and upon information and belief was one of the Refco customers that suffered trading losses that were not properly disclosed and accounted for by Refco.

797.    In 1998, BAWAG and Refco expanded their relationship with a joint venture to provide clearing services for futures and options traded on European exchanges.    Bennett's close relationship with BAWAG also resulted in the company's hiring of Thomas Hackl who was head

of investment banking at BAWAG from 1991 to 2000, as executive vice president in charge of global asset management of Refco Group. Hackl is also believed to be a director of Bank Frick & Company in which BAWAG holds a 26% stake and Refco Global Finance Ltd. holds a 4% stake.

798.    BAWAG had the power to dominate, influence, control, and did dominate, influence and control directly and indirectly Bennett and Refco. In a 1999 transaction brokered by Sugrue on behalf of Refco and Hackl on behalf of BAWAG, BAWAG acquired a significant equity interest in Refco, including (i) BAWAG's publicly disclosed 10% equity stake in Refco (that BAWAG held through its affiliates Alinea Holding, GmBH, and BAWAG Overseas, Inc.); and (ii) BAWAG's undisclosed additional 27% or more equity stake in Refco. By virtue of these transactions and other substantial loans between BAWAG and Refco, BAWAG exercised actual control over Bennett and Refco.

799.    In 2001 and 2002, Refco explored the possibility of selling substantial portions and perhaps all of Refco to BAWAG.

800.    In or about June 2002, BAWAG and Refco executed a Proceeds Participation Agreement, which provided BAWAG with rights to participate in the proceeds of any sale of the equity of Refco in exchange for a series of payments from BAWAG and/or its affiliates.

801.    As a result of these transactions, BAWAG also enjoyed a position of influence and control at Refco. As part of its close relationship with Refco, BAWAG and Refco helped each other conceal trading losses and fraudulently improve their respective financial statements.

802.    As a result of its close relationship to, and substantial interests in Refco, BAWAG had an intimate knowledge of Refco and its affiliated entities, including RCM.

197

803.    As a result of BAWAG's close relationship with, and interests in, Refco, and its ability to and actual exercise of influence and control over Bennett and Refco, Refco was at all relevant times acting as an agent of BAWAG. BAWAG is thus vicariously liable for the acts of Bennett and the Refco entities alleged herein.

804.    Both BAWAG and Refco have admitted that BAWAG directly and knowingly participated in the Refco fraud and helped Refco to conceal the RGHI Receivable by participating in RTLs. BAWAG has also been named as an unindicted co-conspirator in the Bennett/Trosten/Grant criminal proceedings.

805.    Beginning as early as 2000, BAWAG acted in concert with Bennett and Refco-related entities to convert and misappropriate RCM customer assets to offset and conceal the RGHI Receivable.

806.    BAWAG participated with Bennett in covering up the RGHI Receivable. In each of February 2000, February 2001 and February 2002, BAWAG loaned Refco approximately $300 million dollars to be used by Refco in conducting RTLs. In February of 2003 and February of 2004, BAWAG loaned Refco an additional $250 million dollars for RTLs. BAWAG knew that the proceeds of these loans would be, and were, used by Refco to engage in RTLs.

807.    In an April 21, 2006 pleading, Refco disclosed that BAWAG was among the entities that entered into RTLs designed to conceal the RGHI Receivable.

808.    BAWAG itself has admitted in a June 2, 2006 Non-Prosecution Agreement with federal prosecutors that it intentionally assisted Refco's efforts to conceal the RGHI Receivable by participating in RTLs. BAWAG entered into the non-prosecution agreement in order to mitigate its potential criminal and civil exposure for its activities involving its participation in the Refco round trip transactions, including its work with, and knowledge of Refco's efforts to

conceal its losses. As part of its settlement, BAWAG agreed to guarantee at least $506 million dollars in cash to be paid to the Refco estate. In addition, BAWAG agreed to waive a total of $480 million dollars in claims in the Refco bankruptcy. In connection with the settlement, Refco made a series of admissions concerning its conduct and knowledge relating to the round trip transactions.

809.    BAWAG admitted, "in or about the fiscal year end for Refco beginning in 2000 and concluding in February of 2005 with the approval and authorization of the chairman of the bank in each year, and in the years 2000 through 2002, … the bank made short term loans of hundreds of millions of dollars to RGHI so that RGHI could manipulate certain inter-company accounts in order to deceptively 'improve Refco's balance sheet'."

810.    BAWAG admitted that the Bank made short term loans to RGHI spanning Refco's financial statement year end in the following amounts for the following years:  February year end 2000, $300 million dollars; February year end 2001, $300 million dollars; February year end 2002, $300 million dollars; February year end 2003, $250 million dollars; February year end 2004, $250 million dollars; and February year end 2005, $250 million dollars.

811.    BAWAG admitted that, "these loans were secured in substantial part by temporary deposits by Refco Capital Markets at the Bank."

812.    BAWAG admitted, "from in or about 1999 through 2004, the Bank made direct and indirect equity investments and loans to Refco Group Ltd., LLC and ("RGL"), the holding company for Refco, a privately held New York based commodity brokerage with which the Bank also did substantial trading business."

813.    BAWAG admitted, "in 1999, the Bank indirectly through a Delaware holding corporation, paid approximately $95 million dollars for a 10% ownership interest in RGL."

814.    BAWAG admitted, "the Bank's senior officers understood that Phillip R. Bennett, the President and Chief Executive Officer of Refco, had a substantial ownership interest in RGHL."

815.    BAWAG admitted that "also in 1999, the Bank made a subordinated loan of $85 million dollars indirectly to RGL, and was entitled to receive interest and indirectly approximately 10% of RGL's net income."

816.    BAWAG admitted that "as of in or about 2000, certain former senior officers of the Bank, including the then-Chairman of the Bank and a member of the Managing Board who would succeed to the Chairmanship of the Bank in or around 2003, knew that Bennett and/or RGHI wanted to manipulate certain intercompany balances. In fact, Bennett was secretly hiding amounts RGHI owned to Refco."

817.    BAWAG admitted, "in 2002, certain former senior officers of the Bank, including the then-Chairman of the Bank's Supervisory Board and Managing Secretary of the OGB, utilized [sic] a second Delaware corporation ("Corporation 1") to enter into a proceeds participation agreement ("PPA") with RGL a Delaware corporation ("Corporation 1") indirectly owned by OGB."

818.    BAWAG admitted that "under the PPA, Corporation 1, which was indirectly owned through a Liechtenstein-based foundation by the OGB, entered into a proceeds participation agreement ("PPA") with RGL, under which it would be entitled to a share of the proceeds of any sale of RGL in stated proportions linked to the total amount of its investment in RGL."

819.    BAWAG admitted that "under the PPA, Corporation 11 [sic] made two contributions to RGL. One of these contributions was made using the proceeds of a loan from

the Bank of approximately $220 million. The other contribution to RGL was made by Corporation 1.1. [sic]."

820.    BAWAG admitted that "as of year-end 2003, Corporation 1 had purchased, for a total of approximately $475 million, the right to share in approximately 27.2% of the proceeds of a sale of RGL."

821.    BAWAG admitted that "in or about August 2004, Thomas H. Lee Partners purchased 57% of Refco in a leveraged buyout transaction. All participants in that leveraged buyout transaction (including Thomas H. Lee Partners; the purchasers of $600 million in bonds sold by Refco; and the banks that lend Refco $800 million as part of the transaction) relied on Refco's financial statements, which did not disclose the existence of Bennett's related party debt to Refco.

822.    BAWAG admitted that upon closing of the transaction, "the Bank received, directly or indirectly, a total of approximately $952 million. These payments included repayment of various loans made directly and indirectly to Refco and Corporation 1 by the Bank and payments to Corporation 11."

823.    BAWAG admitted that on or about August 10, 2005, in reliance on, among other things, Refco's public filings and the accompanying audited financial statements, the public bought approximately $583 million of Refco's common stock."

824.    BAWAG admitted that "on or about 2000, the Bank, through the purchase of certain bonds, entrusted approximately €350 million to a company controlled by Wolfgang Floettl to finance Floettl's trading investments, with the Bank entitled to a portion of any gain on such trading."

825.    BAWAG admitted that "by December 2000, Floettl reported to the Bank's Managing Board . . . that he had lost substantially all of the €350 million."

826.    BAWAG admitted that "in order to disguise this loss on its balance sheet, the former Managing Board directed that the bonds representing the now worthless obligations of Floettl's company to the Bank ('Impaired Assets') be sold via a set of circular transactions to an investment fund that would be owned by the Bank."

827.    BAWAG admitted that "the fund would then be carried on the Bank's books at the original asset value, and would appear to be a legitimate and liquid investment.  The Bank also obtained a guarantee of the Impaired Assetsse assets from the President of the ÖGB, backed in part with the assets of the ÖGB's strike fund."

828.    BAWAG admitted, "At the end of December 2000, the Bank sold the bonds representing the Impaired Assets, through Refco, to the Liquid Opportunities-Plus Fund Ltd., a British Virgin Islands mutual fund.  The Bank received $338.5 (€364) million for these bonds.  Simultaneously, the Bank invested $338.5 million in the Liquid Opportunities-Plus Fund Ltd., becoming its principal owner."

829.    BAWAG admitted, "in particular, on or about December 28, 2000, the Bank wired $338.5 million via intermediary banks to a Liquid Opportunities-Plus Fund Ltd. account at Refco in New York to pay for the Bank's ownership interest in the Liquid Opportunities fund."

830.    BAWAG admitted that "the same day, Liquid Opportunities-Plus Fund Ltd. Wired $338.5 million to the Bank to pay for the bonds purchased from the Bank."

831.    BAWAG admitted that "the Bank's $338.5 million paid for both its interest in the Liquid Opportunities fund and that funds' purchase of the bonds from the Bank.  The bonds sold to the Liquid Opportunities-Plus Fund, Ltd. were named York Capital Limited, Fordham Capital

Limited, Columbia Capital Limited, Huntington Capital Limited, Pace Capital Limited, West End Capital Holdings, Ltd., and Madison Capital Limited (the 'Bonds')."

832.    BAWAG admitted, "Liquid Opportunities-Plus Funds, Ltd. was managed by SIAM Capital Management, of Orlando, Florida.  SIAM Capital Management was responsible for the 'independent pricing' of the Liquid Opportunities-Plus Fund, Ltd. and the Bonds.  At various times between 2001 and 2004, share of Liquid Opportunities-Plus Fund, Ltd. were listed on the Bermuda and Irish Stock Exchanges."

833.    BAWAG admitted, "during the period from the end of 2000 through in or about November 2004, the Bank held substantially all of the shares of Liquid Opportunities-Plus Fund, Ltd. (for most of that time in an account at Refco), and the Liquid Opportunities-Plus Fund, Ltd. held the Bonds in its account at Refco."

834.    BAWAG admitted, "in or about November 2001, shares of 'CAP' stock were purchased by the Liquid Opportunities-Plus Fund, Ltd. account at Refco for no value.  The CAP stock represented an investment made indirectly by the Bank in a casino that, as of in or about 2004, had ceased all business operations."

835.    BAWAG admitted, "At November 2001 month end, the Liquid Opportunities-Plus Fund, Ltd. account at Refco was valued at €470 million.  During this entire period, the Bonds were carried in the Refco accounts at or close to par, with a total value of approximately €350 million."

836.    BAWAG admitted, "Also, beginning in or about March 2002, the Liquid Opportunities-Plus Fund, Ltd. shares held by the Bank at Refco, which were purportedly valued based on the value of the Bonds and CAP stock held by Liquid Opportunities-Plus Fund, Ltd. were carried at a total value of between approximately €494 and €514 million."

837.    BAWAG admitted, "From in or about November 2001 through August 2005, the Bank held approximately 49,416,269 shares of the Liquid Opportunities-Plus Fund, Ltd. in its account at Refco. In or about November 2004, the Bank restructured the manner in which it held the Bonds and the CAP stock."

838.    BAWAG admitted, "In particular, the Bank caused the Bonds and the CAP stock to be transferred from the Liquid Opportunities-Plus Fund, Ltd. account at Refco to accounts in the name of seven Anguillan companies, of which the Bank was the beneficial owner. These companies were Bettio Asset Investment, Tuvalu Holding Company, Chaco City Investments, Monte Brook Corp, Catamarca Assets, Tecka Asset Holdings and Rabaul Holdings."

839.    BAWAG admitted, "After the restructuring, the Bank's holdings of the Bonds and the CAP stock were valued at approximately €370 million, plus approximately €85 million in accrued interest. The shares of the seven Anguillan companies were carried on the Bank's account at Refco and valued at approximately €513 million."

840.    RTLs involving BAWAG occurred at each fiscal year end for the years 2000-2005 and involved loans of over $1 billion.

841.    In exchange for its participation in the Refco fraud, BAWAG "sought and obtained Bennett's assistance in disguising on the Bank's balance sheet the existence of approximately €350 million of investment losses sustained by the Bank."

842.    In addition to complete knowledge of, and participation in, the Refco fraud, BAWAG fully understood the SPhinX program and platform. BAWAG and affiliated entities invested millions in the SPhinX Funds, and therefore received and reviewed SPhinX's Offering Memoranda and informational materials. BAWAG understood the Cayman SPC structure, the

customer segregation requirement of the SPhinX Funds, and the requirement that the SPhinX Funds' assets be protected from the insolvency and credit risk of the custodian of those assets.

843.    BAWAG thus also knew and understood the fiduciary duties owed to SPhinX and PlusFunds by Bennett and the Refco entities and by the officers and director Defendants of SPhinX, PlusFunds, and DPM described herein, and further knew that the deposit of SPhinX cash in the non-segregated, unprotected RCM account and use of that cash for the fraudulent purposes described herein constituted breaches of those fiduciary duties.

844.    As a result of its close relationship with, and interest in Refco, BAWAG also understood that SPhinX assets were entrusted to Refco and that substantial and material amounts of SPhinX cash was deposited with RCM, where it was subject to the insolvency and credit risk of Refco and RCM.  BAWAG also knew and understood that SPhinX Funds cash, which had been commingled with assets of RCM, was being used to fund the fraudulent activities of Bennett and the Refco entities described herein, including the RTL's in which BAWAG itself participated.

845.    In October and November 2005, after disclosure of the Refco fraud but before the preference litigation against SPhinX was initiated, BAWAG redeemed at least $50 million of its investment in the SPhinX Funds, including $3.3 million invested in SMFF.

846.    As detailed above, BAWAG was an active and knowing participant in the Refco fraud.  BAWAG conspired with Refco and Bennett to conceal Refco's losses, loot RCM customer assets and misstate Refco's financials.  BAWAG was a primary beneficiary of the Refco fraud, receiving hundreds of millions in connection with the LBO.  BAWAG conspired and directly aided and abetted the Refco fraud and is liable for damages caused to Refco's customers, including SPhinX and PlusFunds.

2.    **Other RTL Participants.**

847.    Each of the RTL Participants owed duties not to aid and abet the fraud and breach of fiduciary duty of Refco and its officers and directors.

848.    Liberty Corner, which was owned and managed by Pigott, engaged in the largest number of RTLs. In February 2002, Pigott arranged for Liberty Corner's first RTL with Refco for $325 million. Demonstrating Piggott's awareness that the RTLs were improper, Pigott rejected using an active fund he managed as the RTL conduit, and instead substituted Liberty Corner because Liberty Corner was a personal management company that would take all actions directed by Pigott.

849.    Over the next three years, Pigott and Refco engaged in nine additional RTLs, concealing hundreds of millions of dollars in related-company receivables owed to Refco. Liberty Corner, Pigott's alter ego (and at times Pigott directly, with no corporate intermediary) received $1.1 million in "fees" for serving as the conduit in these RTLs. Underscoring that Pigott understood that the sole purpose of the RTLs was to "dress up" Refco's financial statements, Pigott had RGL guarantee each of the Liberty Corner RTL loans. These guarantees were signed solely by Bennett.

850.    Defendant EMF Financial (managed by Flanagan) was a hedge fund that used Refco as the prime broker for its funds. Like Liberty Corner, EMF Financial repeatedly authorized and arranged for its affiliates, Defendants EMF Core Fund and Delta Flyer, to engage in RTLs with Refco.

851.    The transactions Flanagan arranged through EMF Financial, and affiliated entities EMF Core Fund and Delta Flyer, concealed $575 million in related-party receivables over the course of Refco's fiscal year-end reporting periods in 2000, 2001, 2002 and 2003. Flanagan, like Pigott, was a sophisticated fund manager. As such, Flanagan (and by extension EMF Financial)

would have known and understood that: (i) Refco's year-end reporting period ended February 28; (ii) no cash moved as a result of these transactions (except for the payment to EMF Financial for agreeing to serve as a conduit in the transactions); and (iii) Refco was using these transactions to manipulate its financial statements and misreport its financial condition.

852.    Indeed, in the wake of the Enron financial scandal, one RTL participant, Defendant Ingram Micro, having previously served as a conduit in $400 million of RTLs in 2000 and 2001, opted to cease participating in the RTLs precisely because of concerns about their propriety. Before entering into a February 2002 RTL, Ingram Micro sent an email to Maggio advising him that its participation with the planned third RTL was too risky because "the Enron debacle is putting pressure on the SEC to increase the level of financial disclosure by large companies like [Ingram Micro]."

853.    Similarly, Defendants Petitt (using Coast's subsidiary CS Land) and Krieger (who used his Beckenham Trading entity as his RTL conduit) were both sophisticated parties that used Refco as a prime broker. Thus, at the time of their RTL participation, both Petitt and Krieger knew and/or consciously avoided knowing (like Pigott and Flanagan) that: (i) Refco's year-end reporting period ended February 28; (ii) no cash moved as a result of these transactions (except for the payments to third parties for agreeing to serve as a conduit in the transactions); and (iii) Refco was using these transactions to manipulate its financial statements and misreport its financial condition.

854.    The RTL Participants thus directly and knowingly participated in and facilitated the RTLs, knowingly helping Refco manipulate its financial statements and conceal Refco's losses.

855.   The RTL Participants had existing business with Refco and/or a personal relationship with Bennett and each had an incentive to further their relationship with Bennett and Refco by agreeing to serve as conduits in the RTLs.

856.   The RGHI Receivable, RTLs, and other fraudulent actions alleged herein, were at all times unknown to innocent SPhinX and PlusFunds directors, officers, and agents, who would have ceased doing business with Refco had they been aware of the Refco fraud.

857.   The RTL Participants engaged in RTL's including at least the following:

| Start Date | End Date | RTL Participant | Amount |
|---|---|---|---|
| 02/25/2000 | 03/09/2000 | CIM Ventures, Inc. | $150,000,000 |
| 02/25/2000 | 03/03/2000 | EMF Core Fund Ltd. | $50,000,000 |
| 02/25/2000 | 03/03/2000 | CS Land Management, LLC | $110,000,000 |
| **2000 TOTAL** | | | **$310,000,000** |
| 02/23/2001 | 03/06/2001 | CIM Ventures, Inc. | $250,000,000 |
| 02/26/2001 | 03/02/2001 | Delta Flyer Fund, LLC | $200,000,000 |
| **2001 TOTAL** | | | **$450,000,000** |
| 02/25/2002 | 03/04/2002 | Liberty Corner Capital Strategies, LLC | $325,000,000 |
| 02/25/2002 | 03/04/2002 | Delta Flyer Fund, LLC | $175,000,000 |
| 02/25/2002 | 03/04/2002 | Beckenham Trading Company, Inc. | $125,000,000 |
| **2002 TOTAL** | | | **$625,000,000** |
| 02/21/2003 | 03/04/2003 | Liberty Corner Capital Strategies, LLC | $500,000,000 |
| 02/21/2003 | 03/04/2003 | Delta Flyer Fund, LLC | $150,000,000 |
| **2003 TOTAL** | | | **$650,000,000** |
| 02/20/2004 | 03/04/2004 | Liberty Corner Capital Strategies, LLC | $720,000,000 |
| 05/27/2004 | 06/07/2004 | Liberty Corner Capital Strategies, LLC | $700,000,000 |
| 08/25/2004 | 09/07/2004 | Liberty Corner Capital Strategies, LLC | $485,000,000 |
| 11/26/2004 | 12/03/2004 | Liberty Corner Capital Strategies, LLC | $545,000,000 |
| 12/30/2004 | 01/05/2005 | Liberty Corner Capital Strategies, LLC | $550,000,000 |
| **2004 TOTAL** | | | **$3,000,000,000** |
| 02/23/2005 | 03/08/2005 | Liberty Corner Capital Strategies, LLC | $345,000,000 |
| 05/25/2005 | 06/06/2005 | Liberty Corner Capital Strategies, LLC | $450,000,000 |
| 08/26/2005 | 09/06/2005 | Liberty Corner Capital Strategies, LLC | $420,000,000 |
| **2005 TOTAL** | | | **$1,215,000,000** |

858.   The RTL Participants were a crucial participant in the Refco scheme to hide the RGHI Receivable. From 1999 to 2005, each of the RTLs was designed to, and in fact did, conceal the nature and extent of the RGHI Receivable.

208

859. As each of the RTL Participants knew, the RTLs did not serve any legitimate business purpose for RCM, RGL, or for any other Refco affiliate.

860. By agreeing to act as a conduit for these fraudulent transactions, the RTL Participants substantially assisted in the execution of the fraudulent scheme. Indeed, without the RTL Participants' active assistance, it would have been impossible for Refco to conceal the RGHI Receivable or to facilitate the cashing-out of insiders' interests in Refco.

861. Each of the RTL Participants knew and/or consciously avoided knowing, among other things, the following facts:

(a) First, that the timing of the RTLs was designed to manipulate Refco's financial condition during its fiscal year-end or quarter-end financial or audit reporting periods. The RTL Participants did business with Refco and were each aware that Refco's annual reporting year closed at the end of February and that the RTLs were designed to occur at the end of this fiscal year and were unwound shortly after the new reporting period began.

(b) Second, that the RTLs were not isolated transactions; they were systematic elements in a large-scale fraud, necessitating their use at the end of financial reporting periods. Moreover, at least Liberty Corner (and Pigott) were well aware that the RTLs were occurring with more frequency as Refco's LBO and IPO approached.

(c) Third, the size of the RTLs was suspicious. Each RTL was for a specific and extremely large dollar amount. Moreover, the RTL Participants who participated in multiple RTLs year after year, such as Liberty Corner (and Pigott), were aware that the annual aggregate amount of the RTLs was increasing.

(d) Fourth, the RTLs were without any legitimate business purpose. The RTLs provided the RTL Participants with lucrative interest payments (in Pigott's case, more than $1.1 million) in exchange for their participation in a risk-free transaction. Moreover, the RTL Participants knew and/or consciously avoided knowing that they had been selected to provide large-figure loans despite the fact that the RTL Participants lacked the financial wherewithal to receive loans of such magnitude on an uncollateralized basis. Similarly, the RTL Participants whose transactions were guaranteed by RGL knew and/or consciously avoided knowing that the loan transactions were guaranteed by the corporate subsidiary of an insolvent parent.

(e)    Finally, the RTL loan documents indicated that each RTL Defendant was bound to act as a conduit for transfers from a Refco entity to RGHI just before the end of the relevant period, and that these "loans" were unwound just after the beginning of the new period.

862.    Given the sophistication of the RTL Participants, each knew and/or consciously avoided knowing that the RTLs were designed to conceal a significant related-party receivable at the end of Refco's reporting and audit periods.  The RTL Participants knew Refco was manipulating its financials and intentionally participated.

**F.    Administrator.**

**1.    DPM.**

863.    DPM and DPM-Mellon acted as administrator of the SPhinX Funds.  Pursuant to the Service Agreement, the DPM parties provided accounting services and were responsible for preparing financial statements for each of the Companies, calculating NAVs, reconciling cash and security positions reported by the prime brokers and custodians, maintaining a general ledger, processing subscription and redemptions and acting as registrar and transfer agent maintaining share register.

864.    DPM and DPM-Mellon owed fiduciary duties to SPhinX and PlusFunds arising out of DPM's role as administrator and the terms of the Service Agreement.  It was DPM's fiduciary duty to understand and monitor SPhinX's assets, oversee the investment of SMFF's cash and reconcile all of SPhinX's positions.

865.    DPM's fiduciary and contract duties ran both to SPhinX and PlusFunds. PlusFunds made the decision to retain DPM as the Funds' administrator, and the majority of DPM's interactions as administrator took place with PlusFunds agents.  PlusFunds delegated authority and important tasks to DPM as the administrator, including the reconciliation of assets,

producing the NAVs and investing cash.  PlusFunds was a signatory on the 2004 Amended Service Agreement.

866.    DPM owed additional fiduciary duties to SPhinX and PlusFunds arising out of Aaron's role as a SPhinX director.  Aaron sat on the SPhinX Board as DPM's representative; accordingly, DPM is responsible for Aaron's actions.

867.    As discussed in specific detail above, DPM's Service Agreement required DPM to provide services to the SPhinX Funds including but not limited to the following:

- Generate daily and monthly accounting and financial reports;

- Monitor, calculate and reconcile all cash and security positions;

- Produce daily, monthly and final NAV reports;

- Support the companies' risk committee;

- Maintain records of the general ledger, FCMs' and brokers' statements, trader reports and other relevant reports;

- Perform treasury functions, including "investment of excess cash;"

- Prepare complete financial statements in conformity with US GAAP; and

- Fulfill one board of director position for the SPhinX Funds.

868.    The Service Agreement expressly required DPM to review the Funds' subscription documents.  DPM was fully aware and understood the SPC structure and customer segregation requirements of the SPhinX Funds.  DPM and its agent, Aaron, reviewed and signed off on SPhinX's various Offering Memoranda, which identified DPM as the administrator and discussed the customer segregation requirements.  DPM's role as administrator required DPM to understand the business of the SPhinX Funds.

211

869.    The DPM parties breached their fiduciary duties to SPhinX and PlusFunds. DPM, through Aaron, authorized the movement of SMFF cash to non-segregated accounts at RCM and understood the impact of the movement of those assets. The authorization to move SMFF's cash to non-segregated accounts completely undermined the SPhinX business model, put SMFF's cash at risk and led directly to the loss of SMFF's cash in RCM's bankruptcy.

870.    Understanding that assets at RCM were at risk, DPM authorized and facilitated the regular movement of SMFF's excess cash to RCM. DPM was in breach of its fiduciary duties from the inception of SMFF and continuing until 2006.

### G.    Others.

#### 1.    RAI.

871.    RAI at all material times was a commodity pool operator and provided a number of services to the SPhinX Funds at PlusFunds' request. Specifically, as discussed above, RAI's agents monitored margin requirements in SMFF's Refco LLC accounts and determined how much excess cash would be transferred between the Refco LLC and RCM accounts.

872.    RAI also managed a number of external funds, such as S&P Managed Futures Index Fund LP, that invested in the various SPhinX Funds. S&P Managed Futures Index Fund LP invested directly in SMFF.

873.    By virtue of its role as an advisor to external funds with investments in SPhinX in general and SMFF in particular, RAI understood the importance of the Cayman SPC structure and the customer segregation requirements to the SPhinX Funds. RAI was in possession of SPhinX's Offering Memoranda and marketing materials at all relevant times.

874.    As a result, RAI knew that SMFF's customer assets were required to be held in customer-segregated accounts to protect SMFF's assets. RAI owed contractual and fiduciary

duties with respect to SPhinX's assets, including duties to use and hold those assets for SPhinX's benefit and not to use those assets for the benefit of RAI or its principals and affiliates.

875.    RAI knew, at all relevant times, that Refco LLC, RCM, PlusFunds, DPM and their respective officers and directors owed fiduciary duties to the SPhinX Funds in general and SMFF in particular to protect and safeguard assets in customer-segregated accounts.

876.    RAI substantially assisted in the breach of Refco LLC, RCM, PlusFunds, and DPM's fiduciary duties by causing, in conjunction with DPM and PlusFunds agents, excess cash to be moved from SMFF's customer-segregated accounts at Refco LLC to RCM.

877.    RAI understood that Refco LLC, RCM, PlusFunds and DPM owed fiduciary duties to SMFF, and that the movement of SMFF assets out of customer-segregated accounts constituted a breach of their fiduciary duties.

878.    At all relevant times, RAI knew and understood that RCM was not a regulated entity and that it did not offer customer segregation of customer assets.  At all relevant times, RAI knew and understood that SMFF's assets maintained by RCM were not protected in customer-segregated accounts.

879.    Notwithstanding this knowledge, RAI participated in and enabled the transfer of SMFF's cash from Refco LLC to RCM.

880.    In the weeks after the disclosure of the Refco fraud in October 2005, but before the temporary restraining order in December 2005, the RAI-advised funds with investments in the SPhinX Funds redeemed approximately $100 million.  The redemption requests were signed by Richard Butt on behalf of RAI.

881.    In causing and allowing the commingling of SPhinX account monies, RAI breached fiduciary duties to SPhinX and PlusFunds.

882.    The movement of SMFF's cash to RCM placed those assets at risk, and SMFF's cash was lost because it was moved to RCM.

883.    RAI's breaches of duty and its aiding and abetting in others' breaches of fiduciary duties proximately caused the damages suffered by SPhinX and PlusFunds. Had RAI fulfilled its responsibilities, SMFF's cash would never have been swept to RCM, and the SPhinX Funds and PlusFunds would have avoided their losses entirely.

884.    RAI's breaches of duty and its aiding and abetting in others' breaches of fiduciary duties were a substantial factor in causing the losses suffered by SPhinX and PlusFunds. But for RAI's actions, SMFF's cash would not have been moved to RCM and would not have been lost. Both SMFF and PlusFunds would have avoided the losses they suffered and would have continued in business.

885.    The losses suffered by SPhinX and PlusFunds were reasonably foreseeable to RAI. RAI could have foreseen, and in fact did foresee, that its actions would result in the loss of SMFF assets because RAI knew that the placement of assets at RCM exposed RAI to the risk of RCM's insolvency. RAI also understood that PlusFunds' primary business was the management of the SPhinX Funds, and that the collapse of the SPhinX Funds would destroy PlusFunds' business.

### 2.    Refco Associates Inc.

886.    Refco used Refco Associates Inc. as a conduit for cash transfers from unregulated accounts to Refco, primarily for purposes of the RTLs. Based on the unusually large and infrequent nature of the transfers, Refco Associates Inc. would have been on notice that the transfers were for an improper purpose. Between October 2004 and October 2005, 62% of the dollar amount of the transfers from SMFF accounts at RCM that were over $20 million passed through Refco Associates Inc.

### 3.    **THL Defendants.**

887.    In June 2004, THLP and related entities acquired a 57% equity stake in Refco for approximately $507 million.  As a result, THLP held a majority stake in Refco and exercised control over its operations from the date of the LBO until the Refco IPO in August 2005.

888.    After the IPO, THLP continued to own approximately 42.7% of Refco and continued to exercise control over the company.

889.    The THL Defendants exercised control over Refco in the following ways:  (1) THL owned a controlling majority interest in Refco; (2) THL was granted contractual rights, including a August 2004 Management Agreement, that gave THL additional control and access to information; (3) THL appointed four of the new Refco entity's eight directors and jointly appointed a fifth with another shareholder; (4) THL appointed three of the eight directors of Refco Inc. and jointly appointed a fourth with another shareholder; (5) THL was represented on key Refco committees, including the audit committee; (6) THL's agents Schoen, Jaeckel and George Taylor became President, Treasurer and Secretary of Refco.

890.    The Offering Memorandum for Refco's bonds issued in connection with the LBO indicated that the THL entities would "have the ability to control all aspects of [Refco's] business."

891.    The THL entities exercised actual control over the Refco entities after the LBO.

892.    In the course of THL's due diligence in connection with the LBO, THL became aware of various problems at Refco.  THL's due diligence professionals were stonewalled when they tried to obtain key information from Refco agents.  Specifically, Refco withheld key financial information regarding the nature of receivables owed to Refco and other data underlying certain Refco reports.

215

893.    Later in THL's due diligence, THL discovered that Refco's management had withheld material information regarding a number of transactions. Specifically, THL discovered that Refco had attempted to conceal a significant legal obligation to Edward McElwreath, who demanded a commission from introducing Refco to THL, and attempted to conceal information regarding litigation with Tradewinds Financial.

894.    Also toward the end of THL's due diligence, THL learned of a Refco insider (called "Deep Throat" by KPMG) who had reported that Refco had sloughed off trading losses into a Refco subsidiary. KPMG proposed a number of procedures to investigate the Deep Throat allegations, but THL failed to follow KPMG's advice and instead relied upon a verbal explanation from Bennett.

895.    By the time of the IPO, the THL Defendants were well aware that Refco's existing management was dishonest and had lied to THL and others at the time of the THL Defendants' investment in Refco. THL also had ample reason and red flags that should have alerted THL to potential financial and accounting problems at Refco, if not fraud.

896.    After the LBO but before the IPO, the THL Defendants discovered that Refco's financial condition and internal and external accounting functions and controls were poor, and that Refco should never have been taken public.

897.    Post-LBO, THL appointed four members of Refco's board, and Schoen, Jaeckel and Taylor became President, Treasurer and Secretary, respectively. In addition, Refco's amended LLC agreement provided that the company's affairs would be controlled by a board of managers, which included THL appointees Harkins, Lee, Jaeckel, and Schoen.

898.    After the LBO, one of the THL entities, THL Managers V LLC ("Managers V"), entered into an August 5, 2004 Management Agreement, which provided for Managers V to

provide financial advisory services to Refco in exchange for millions of dollars in fees. On the date the Management Agreement was executed, Managers V received in excess of $30 million in an initial payment.

899.    After taking control of Refco, THL discovered that Refco's auditing and accounting functions were a disaster.

900.    THL's executives openly discussed whether Refco should replace Grant Thornton as its auditors and bring in a Big Four firm, acknowledging that Grant Thornton was not providing adequate services. The THL Defendants elected not to replace Grant Thornton because it might result in a restatement of Refco's financials and a re-audit. The THL Defendants recognized that Refco's financial statements might be materially misstated, but pressed forward regardless with an eye toward profiting from Refco's IPO.

901.    In March 2005, as THL prepared for the IPO, THL learned that Refco executives had lied to THL to conceal a "horrendous" letter to Refco's management from Refco's auditors. The letter discussed significant accounting deficiencies at Refco in connection with Grant Thornton's audit of Refco's fiscal year ending February 29, 2004, but was withheld from THL.

902.    The Grant Thornton letter listed nine broad categories of "Internal Control Deficiencies" at Refco, including RCM "Custody Reconciliations." Grant Thornton's letter commented that Refco "could not produce any custody reconciliations at or around year end for EQ." Had the THL parties asked for RCM's custody reconciliations, they would have discovered that Refco was funding its operations with RCM assets.

903.    Later, THL discovered that Refco executives had lied to THL regarding their participation in a lucrative compensation scheme. In 2001, eight Refco executives entered into an agreement with Refco Group to participate in proceeds of a sale of Refco in excess of $900

million.  On the eve of the LBO in 2004, Refco agreed to redeem these interests by paying the executives a portion of the proceeds derived from the sale of Refco in amounts ranging from $2 to $25 million.

904.    None of the eight Refco executives disclosed this arrangement despite specific requests from THL's counsel, Weil Gotshal.  After the closing of the LBO, Weil Gotshal sent identical requests, and this time, in March 2005, Murphy and Sexton disclosed their participation.  THL then discovered additional details regarding the arrangement and discovered, once again, that Refco's executives had lied to THL in the course of THL's due diligence.

905.    In March 2005, on the THL Defendants' watch, Refco Capital issued approximately $200 million in the sham Suffolk loans to Sugrue and Kavanagh.  The THL entities knew about the Suffolk loans and authorized them.

906.    By the time of the IPO in August 2005, THL knew of numerous problems at Refco that should have prevented the IPO, including:

- indicia of fraud, including repeated dishonesty by Refco and its agents;

- disastrous internal and external auditing; and

- historical financial statements that would likely need to be restated.

907.    Despite knowledge of significant problems at Refco, THL pressed forward and consummated the IPO in order to cash out THL's own interests.  THL caused Refco Inc. to issue a Prospectus in connection with the IPO that included Refco's audited financial statements and Grant Thornton's audit opinion, despite the knowledge that those financial statements were inaccurate and would need to be restated.

908.    THL participated in a two-week Refco roadshow in connection with the IPO to market Refco to public investors.  In that roadshow, THL pitched Refco and its financial

218

viability despite knowledge of Refco's financial troubles and its need to restate its financial statements.

909.    THL received approximately $162.5 million in proceeds from its Refco stock sales in the IPO, while retaining approximately 42.7 percent ownership interest post-IPO.

910.    THL and Bennett agreed to structure the IPO with the principal goal of allowing themselves to cash out, as opposed to raising funds for Refco to reduce the enormous debt assumed by Refco in the LBO.

911.    In addition, THL received additional amounts in connection with the greenshoe dividend.  On August 10, 2005, the Refco board agreed to pay a dividend to pre-IPO shareholders, including THL.  The board determined that after the IPO and the exercise of the underwriters' option to purchase additional shares, Refco would have a "sufficient surplus" of funds to permits payment of the dividend to its shareholders, despite the fact that Refco still held debt exceeding one billion dollars incurred in the LBO.

912.    The THL parties received in excess of $40 million in connection with the greenshoe dividend.

913.    By the date of the IPO, THL was aware of financial and accounting problems at Refco, knew that Refco's executives had lied to THL on numerous occasions, and knew that Refco's financials would likely need to be restated.

914.    By the date of the IPO, the THL parties were aware that Refco and its subsidiaries, including RCM, were insolvent.

915.    In addition, THL was responsible for Refco's finances after assuming control in connection with the IPO.  Refco's RTLs continued after THL assumed control of Refco and after

THL had determined that Refco's financial and accounting controls were inadequate. The RTLs continued after THL was in possession of numerous red flags of fraud at Refco.

916.    Moreover, THL became aware that Refco relied upon the fraudulent conversion of billions of dollars of customer assets—including SMFF's assets—deposited at RCM. The fraudulent scheme and misappropriation of RCM's assets was so fundamental to the operation and financing of Refco that it had to be apparent to each of the THL parties. The volume and size of the transfers involved ensured that the amounts stolen in RCM customer assets substantially outsized Refco's total capital. Without continued access to RCM's customer assets, Refco would not have had sufficient liquidity to continue functioning.

917.    Given the amounts generated for Refco from RCM, the THL parties were well aware that RCM customer funds were not protected and segregated in accordance with US regulatory requirements. While Refco's board papers in the relevant time period monitor segregation and net capital requirements for other Refco entities, those same board papers make clear that no such segregation requirements were observed in relation to RCM.

918.    The Refco conspirators kept careful track of intercompany transactions and customer assets maintained at RCM at any given time. Refco's treasury operations generated regular reports for Refco management showing the amount of customer assets available at RCM. The THL parties had access to these reports in the relevant time period.

919.    While THL was in control of Refco, Refco used converted customer assets to fund business acquisitions, including the Suffolk Loan transactions, including approximately $50 million in payments to Sugrue and Kavanagh.

920.    The THL parties had access to information regarding RCM and intercompany transfers of RCM assets, including presentations regarding Grant Thornton's audits of Refco's

financial statements.  The THL Defendants were aware of RCM's practice of "repo"ing securities from RCM customer accounts to raise cash for Refco affiliates.  THL understood that Refco used converted assets from RCM to fund Refco's operations and did nothing to stop it from occurring.

921.    THL knew that Refco was insolvent.  Because Refco was insolvent as of the LBO and/or the IPO, THL, as Refco's controlling party, owed fiduciary duties to Refco's creditors, including the SPhinX Funds.

922.    Had the THL parties disclosed the Refco fraud, the looting of RCM assets, the RTLs or Refco's insolvency and dire financial situation, PlusFunds and the SPhinX Funds would not have continued to do business with Refco and could have avoided their losses entirely.

923.    The THL parties knew that Refco was diverting customer assets to support its fraud and ongoing operations.  The THL parties knew that RCM and Refco in general owed fiduciary duties to their customers and creditors and that they were breaching those duties by diverting customer assets to fund operations and continue in business.  It was reasonably foreseeable to THL that the breach of Refco's fiduciary duties to its customers would cause customers' losses.

## XIII.  CAUSES OF ACTION.

### COUNT I
### BREACH OF FIDUCIARY DUTY
#### (Against Sugrue, Kavanagh and Owens)

924.    Plaintiffs incorporate by reference the allegations set forth above.

925.    PlusFunds owed SPhinX fiduciary duties by virtue of its role as SPhinX's investment manager and the responsibilities delegated PlusFunds under the Investment Management Agreement.

221

926.    Sugrue, Kavanagh and Owens shared in PlusFunds' fiduciary duties to SPhinX by virtue of their positions as PlusFunds' officers, directors and agents.

927.    As SPhinX's director and agent, Owens owed fiduciary duties to SPhinX.

928.    Sugrue, Kavanagh and Owens owed fiduciary duties to PlusFunds by virtue of their roles as PlusFunds' officers, directors and agents.

929.    Each of these Defendants was familiar with the terms of the Offering Memoranda and Articles of Association for each of the SPhinX entities and SMFF, in particular.  Each of these Defendants understood that SMFF's customer assets were required to be held in customer-segregated accounts.  As fiduciaries of SPhinX, each of these Defendants was responsible for ensuring that SMFF's cash was held and protected in customer-segregated accounts.

930.    Sugrue, Owens and Kavanagh breached their fiduciary duties of care and loyalty to SPhinX and PlusFunds by, among other things, (1) directing or causing Aaron to sign the July 31, 2002 Document; (2) authorizing or allowing the movement of SMFF's cash to unprotected accounts at RCM; (3) concealing the July 31, 2002 Document and the movement of SMFF cash to RCM from one or more innocent SPhinX directors or members of PlusFunds' management and/or board; (4) failing to ensure that SPhinX's assets were maintained in customer-segregated accounts; and (5) approving financial statements on behalf of SPhinX that falsely stated that excess cash was historically held in segregated accounts when they knew such cash was being held in non-segregated accounts at RCM.

931.    Sugrue, Owens and Kavanagh breached fiduciary duties of care and loyalty to SPhinX and PlusFunds because, among other things, they (1) knew that SMFF's cash was held in non-segregated accounts at RCM, but concealed this fact from one or more innocent SPhinX directors and/or PlusFunds' directors and/or management; (2) through entities they owned and

222

controlled, obtained more than $204 million in loans and/or payments from Refco; (3) concealed the true nature of the Suffolk loans to innocent officers and/or directors of SPhinX and PlusFunds; and (4) approved financial statements on behalf of SPhinX that falsely stated that excess cash was historically held in segregated accounts when they knew it was being held in non-segregated accounts at RCM.

932.    Owens' breach of fiduciary duty constituted willful neglect, willful default, fraud, and/or dishonesty.

933.    The breaches of fiduciary duty by Sugrue, Kavanagh, and Owens constituted willful misfeasance, bad faith, gross negligence, and/or reckless disregard of duty.

934.    At all relevant times, there was at least one director of SPhinX and/or one member of PlusFunds' board or management who was unaware that (1) Sugrue, Kavanagh and Owens had breached their fiduciary duties to SPhinX by permitting Aaron to execute the July 31, 2002 Document; (2) SMFF's excess cash was being held in non-segregated accounts at RCM; and (3) Sugrue, Kavanagh and Owens, through entities they owned and/or controlled, had received in excess of $204 million in loans and/or payments from Refco in the Suffolk loans.

935.    At all relevant times, innocent SPhinX directors or members of PlusFunds' board or management, had they known of the breaches of fiduciary duty by Sugrue, Kavanagh and Owens, could have and would have prevented or stopped those breaches by consulting an attorney, by reporting the breach of duty by Sugrue, Kavanagh, and Owens, by causing SPhinX to transfer its cash out of RCM into customer-segregated accounts at Refco LLC or by causing SPhinX to terminate its relationship with Refco and transfer the funds at RCM to a different financial institution.

936.    SPhinX and PlusFunds have been damaged in an amount to be proven at trial.

937.    The breaches of fiduciary duty by Sugrue, Kavanagh, and Owens were the proximate cause of the damages suffered by SPhinX and PlusFunds.

### COUNT II
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against Sugrue, Kavanagh and Owens)

938.    Plaintiffs incorporate by reference the allegations set forth above.

939.    PlusFunds owed SPhinX fiduciary duties by virtue of its role as SPhinX's investment manager and the responsibilities delegated to PlusFunds under the Investment Management Agreement.

940.    Sugrue, Kavanagh, and Owens shared in PlusFunds' fiduciary duties to SPhinX by virtue of their positions as PlusFunds' officers, directors and/or agents.

941.    As SPhinX's director and agent, Owens owed fiduciary duties to SPhinX.

942.    Sugrue, Kavanagh, and Owens owed fiduciary duties to PlusFunds by virtue of their roles as PlusFunds' officers, directors and/or agents.

943.    As alleged in greater detail above, Refco LLC owed SPhinX and PlusFunds fiduciary duties by virtue of Refco LLC's role as, among other things, SPhinX's custodian.

944.    As alleged in greater detail above, RCM owed SPhinX and PlusFunds fiduciary duties by virtue of RCM's role as, among other things, SPhinX's custodian.

945.    As alleged in greater detail above, DPM owed SPhinX and PlusFunds fiduciary duties by virtue of DPM's role as SPhinX's administrator and the responsibilities delegated to DPM as part of that relationship and under the DPM Service Agreement.

946.    As alleged in greater detail above, Aaron owed SPhinX and PlusFunds fiduciary duties by virtue of his role as SPhinX's director and agent and by virtue as his role as an officer and agent of DPM.

224

947.    As alleged in greater detail above, Sugrue, Owens and Kavanagh each breached their fiduciary duties by, among other things, (1) directing, allowing or causing Aaron to sign the July 31, 2002 Document; (2) failing to ensure that SMFF's cash was maintained in customer-segregated accounts; (3) allowing SMFF's cash to be moved from customer-segregated accounts at Refco LLC to unregulated accounts at RCM; (4) approving financial statements on behalf of SPhinX that falsely stated SPhinX's excess cash was historically held in segregated accounts; (5) concealing the movement of SMFF's cash to RCM; (6) through entities they owned and controlled, obtaining more than $204 million in loans and/or payments from Refco; (7) concealing the true nature of the Suffolk loans to innocent officers and/or directors of SPhinX and PlusFunds.

948.    As alleged in greater detail above, Refco LLC and RCM breached their fiduciary duties to SPhinX and/or PlusFunds by arranging and participating in the movement of SPhinX assets to unprotected accounts at RCM and the diversion of SMFF assets for use in Refco's business operations, acquisitions, RTLs and fraudulent schemes, including the Suffolk loans.

949.    As alleged in greater detail above, DPM and Aaron breached their fiduciary duties to SPhinX and/or PlusFunds by (1) executing the July 31, 2002 Document; (2) authorizing, allowing and facilitating the movement of SMFF's cash from Refco LLC to RCM; and (3) concealing the July 31, 2002 Document and movement of SMFF's cash to RCM from innocent members of SPhinX's board and PlusFunds' board and management.

950.    Sugrue, Kavanagh and Owens were aware of and understood that the movement of SMFF's cash to RCM constituted a breach of the fiduciary duties owed by Sugrue, Kavanagh, Owens, PlusFunds, Refco LLC, RCM, DPM and Aaron.  Sugrue, Kavanagh and Owens

understood that each of those entities and individuals breached their fiduciary duties to SPhinX and PlusFunds.

951.    As alleged in greater detail above, Sugrue, Kavanagh and Owens substantially assisted in the breach of the above-described fiduciary duties by authorizing the movement of SPhinX's assets to unprotected, non-segregated accounts at RCM and preventing Bousbib and other innocent PlusFunds agents from removing SMFF's assets from RCM.

952.    As a result of the movement of SMFF's cash to RCM and the breaches of the fiduciary duties owed by Sugrue, Kavanagh, Owens, PlusFunds, Refco LLC, RCM, DPM and Aaron, SPhinX and PlusFunds were damaged in an amount to be proven at trial.

953.    The damages suffered by SPhinX and PlusFunds were directly and proximately caused by the breaches of fiduciary duty described above.

## COUNT III
### FRAUD
### (Against Sugrue, Kavanagh and Owens)

954.    Plaintiffs incorporate by reference the allegations set forth above.

955.    For the reasons alleged in Count I, Sugrue, Kavanagh and Owens owed fiduciary duties to SPhinX and PlusFunds; therefore, Sugrue, Kavanagh and Owens owed the duty to candidly disclose all material facts to PlusFunds, SPhinX and their innocent decision-makers.

956.    In violation of their duty of disclosure, Sugrue, Kavanagh and Owens each failed to disclose facts that they knew were material to SPhinX and PlusFunds, including the fact that SPhinX cash had been moved from regulated, protected, customer-segregated accounts at Refco LLC to unregulated, unprotected, commingled, offshore accounts at RCM.

226

957.    Sugrue, Kavanagh and Owens also failed to disclose the fact that SPhinX cash held at RCM was being used to support the fraud at Refco, including the round-trip loan transactions, and to prop up Refco's financial statements.

958.    Sugrue, Kavanagh and Owens further failed to disclose numerous, material facts pertaining to the Suffolk loans, including the fact that the Suffolk loans were funded from customer accounts at RCM and thus were indirectly funded by SPhinX and that the Suffolk loans were part of a *quid pro quo* agreement giving Refco increased influence over PlusFunds and continued access to SPhinX cash in exchange for cash payments to Sugrue, Kavanagh and Owens.

959.    In addition to their non-disclosures, Sugrue, Kavanagh and Owens made numerous statements to the innocent decision-makers of PlusFunds and SPhinX that were false or misleadingly incomplete.

960.    For example, Owens stated to the SPhinX Board that "some changes" had been made to cash management procedures but failed to disclose that SPhinX cash had been, and would continue to be, swept from regulated, protected, customer-segregated accounts at Refco LLC to unprotected, unregulated, non-segregated accounts at RCM or that SPhinX's cash had not been earning interest at RCM.

961.    When asked by an innocent SPhinX board member whether any event that might have led to Bousbib's departure would affect SPhinX, Owens responded, "No." Owens' response was false because Bousbib's departure arose directly out of Bousbib's challenging the Suffolk loans, which affected SPhinX in that the Suffolk loans led to the buyout of three of PlusFunds' innocent board members, were funded by SPhinX money held at RCM, and were

227

designed to reward Sugrue, Kavanagh, and Owens for allowing SPhinX cash to be taken and misused by Refco.

962.    Plaintiffs relied on the misrepresentations and omissions by Sugrue, Kavanagh, and Owens.

963.    Plaintiffs' reliance was reasonable.

964.    Plaintiffs' reliance directly and proximately caused damages in an amount to be proven at trial.

## COUNT IV
### AIDING AND ABETTING CONVERSION
### (Against Sugrue, Kavanagh and Owens)

965.    Plaintiffs incorporate by reference the allegations set forth above.

966.    Plaintiffs had a right of possession of cash and other assets held by Refco and RCM.

967.    As alleged in greater detail above, Sugrue, Kavanagh and Owens understood the customer segregation requirements set forth in SPhinX's Offering Memoranda, marketing materials and organizational documents, and understood that innocent members of SPhinX's board and PlusFunds' management and board believed at all times that SMFF's assets were maintained in protected, customer-segregated accounts.

968.    As alleged in greater detail above, Refco LLC, RCM, Bennett and other Refco-related parties understood the customer segregation requirements set forth in SPhinX's Offering Memoranda, marketing materials and organizational documents, and understood that innocent members of SPhinX's board and PlusFunds' management and board believed at all times that SMFF's assets were maintained in protected, customer-segregated accounts.

969.    As alleged in greater detail above, Refco LLC, RCM, Bennett, Maggio, Trosten and other Refco-related parties intentionally interfered to the exclusion of SMFF's property rights in its assets by (1) arranging and participating in the movement of SMFF's cash to unprotected accounts at RCM, and (2) diverting SMFF's cash to finance Refco's operations, acquisitions and fraudulent schemes.

970.    As alleged in greater detail above, Sugrue, Kavanagh and Owens, with knowledge of SMFF's property rights and the interference therewith, substantially assisted the conversion of SMFF's cash by allowing and authorizing the movement of SMFF's cash to RCM, by concealing the movement of SMFF cash to RCM from innocent members of SPhinX's board and PlusFunds board and/or management and by preventing Bousbib and other PlusFunds agents from removing SMFF's assets from RCM.

971.    The conversion of SMFF's cash directly and proximately caused the damages suffered by SPhinX and PlusFunds.

972.    As a result of the misconduct by Aaron and the DPM entities, SPhinX and PlusFunds were damaged in an amount to be proven at trial.

## COUNT V
### OFFICER/DIRECTOR LIABILITY
### (Against Sugrue, Kavanagh and Owens)

973.    Plaintiffs incorporate by reference the allegations set forth above.

974.    New York Bus. Corp. Law § 720 provides a cause of action against an officer or director of a corporation for "neglect of, or failure to perform, or other violation of his duties in the management and disposition of corporate assets committed to his charge."

975.    New York Bus. Corp. Law § 720 provides for a cause of action against an officer or director of a corporation for "acquisition by himself, transfer to others, loss or waste of corporate assets due to any neglect of, or failure to perform, or other violation of his duties."

976.    Sugrue, Kavanagh and Owens each served as an officer and/or director of PlusFunds, which was a corporation doing business in New York.

977.    As alleged in greater detail above, PlusFunds suffered damages caused by the neglect, failure to perform and violation of duties by Sugrue, Kavanagh and Owens.

978.    As alleged in greater detail above, PlusFunds suffered damages caused by the transfer of PlusFunds corporate assets to Refco and to themselves, and the loss and waste of corporate assets as described herein.

979.    The breaches of duty by Sugrue, Kavanagh and Owens directly and proximately caused damages suffered by PlusFunds in an amount to be proven at trial.

## COUNT VI
### ACCOUNTANT MALPRACTICE
### (Against PwC and Ferris)

980.    Plaintiffs incorporate by reference the allegations set forth above.

981.    PwC was retained to act as the auditor for 2003, 2004 and 2005 for various SPhinX entities, including SPhinX Ltd., SPhinX Strategy Fund Ltd. and SMFF. As a result of this engagement, PwC owed professional duties to SPhinX.

982.    PwC was retained by PlusFunds to conduct the SPhinX audit. PwC had direct communication with PlusFunds agents, including PlusFunds' CFO Chris Aliprandi among others, in the course of performing the SPhinX audits. PwC understood that PlusFunds was SPhinX's investment manager and conducted the daily business of the SPhinX Funds. PwC

dealt directly with PlusFunds in performing its audits and directed correspondence relating to the audits, including the material deficiency letters, directly to PlusFunds on behalf of SPhinX.

983.    PwC and Ferris understood that PlusFunds would utilize PwC's audit opinions to market and sell investments in the SPhinX Funds.

984.    PwC and Ferris owed both the SPhinX Funds and PlusFunds a duty to exercise due professional care in the course of the engagement to audit the SPhinX Funds.

985.    As alleged in greater detail above, PwC and Ferris departed from the accepted standard of practice in the accounting industry.

986.    As alleged in greater detail above, PwC and Ferris' breach of its duty proximately caused the injuries suffered by SPhinX. Had PwC and Ferris conducted a GAAS audit and fulfilled its responsibilities as SPhinX's auditor, it would have discovered that SMFF's cash was exposed to improper risk in RCM's non-regulated, commingled accounts. Had PwC and Ferris disclosed that SMFF's cash was at risk or simply refused to issue an unqualified audit report, innocent decision-makers at SPhinX and PlusFunds would have caused SMFF's cash and other SPhinX assets to be removed from RCM and Refco.

987.    As alleged in greater detail above, PwC's engagement as SPhinX's auditor was compromised by an undisclosed conflict of interest. Beginning in May 2004, at the same time PwC was serving as SPhinX's auditor, PwC served as Refco's *de facto* chief accounting officer. In its relationship with Refco, PwC became aware of the Refco fraud and knew that RCM customer assets (including SMFF's cash) were being diverted to fund Refco's business and conceal Refco's losses and true financial condition. PwC actively assisted Refco's diversion of RCM assets and supported the Refco fraud.

988.    As alleged in greater detail above, PwC's and Ferris' actions, breach of duty, conflict of interest and assistance in the Refco fraud constitute willful and/or intentional neglect, misconduct or wrongdoing or at least gross negligence reflecting a reckless indifference to the rights of SPhinX and PlusFunds. Because PwC actively aided and abetted the Refco fraud, PwC's conduct rises to the level of fraudulent behavior.

989.    PwC's breach of duty proximately caused SPhinX and PlusFunds damages in an amount to be determined at trial.

## COUNT VII
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against PwC and Ferris)

990.    Plaintiffs incorporate by reference the allegations set forth above.

991.    PlusFunds owed SPhinX fiduciary duties by virtue of its role as SPhinX's investment manager and the responsibilities delegated to PlusFunds under the Investment Management Agreement.

992.    Sugrue, Kavanagh, and Owens shared in PlusFunds' fiduciary duties to SPhinX by virtue of their positions as PlusFunds' officers, directors, and/or agents.

993.    As SPhinX's director and agent, Owens owed fiduciary duties to SPhinX.

994.    Sugrue, Kavanagh, and Owens owed fiduciary duties to PlusFunds by virtue of their roles as PlusFunds' officers, directors, and/or agents.

995.    As alleged in greater detail above, Refco LLC owed SPhinX and PlusFunds fiduciary duties by virtue of Refco LLC's role as, among other things, custodian of SPhinX assets.

996.    As alleged in greater detail above, RCM owed SPhinX and PlusFunds fiduciary duties by virtue of RCM's role as, among other things, custodian of SPhinX assets.

232

997.   As alleged in greater detail above, DPM, DPM-Mellon, and Mellon owed SPhinX and/or PlusFunds fiduciary duties by virtue of DPM's role as SPhinX's administrator and the responsibilities delegated to DPM as part of that relationship and under the DPM Service Agreement.

998.   As alleged in greater detail above, Aaron owed SPhinX and/or PlusFunds fiduciary duties by virtue of his role as SPhinX's director and agent and by virtue as his role as an officer and agent of DPM.

999.   As alleged in greater detail above, Sugrue, Owens and Kavanagh each breached their fiduciary duties by, among other things, (1) directing, allowing or causing Aaron to sign the July 31, 2002 Document; (2) failing to ensure that SMFF's cash was maintained in customer-segregated accounts; (3) allowing SMFF's cash to be moved from customer-segregated accounts at Refco LLC to unregulated accounts at RCM; (4) approving financial statements on behalf of SPhinX that falsely stated SPhinX's excess cash was historically held in segregated accounts; (5) concealing the movement of SMFF's cash to RCM; (6) through entities they owned and controlled, obtaining more than $204 million in loans and/or payments from Refco; (7) concealing the true nature of the Suffolk loans to innocent officers and/or directors of SPhinX and PlusFunds.

1000.   As alleged in greater detail above, Refco LLC and RCM breached their fiduciary duties to SPhinX and/or PlusFunds by arranging and participating in the movement of SPhinX assets to unprotected accounts at RCM and the diversion of SMFF assets for use in Refco's business operations, acquisitions, RTLs and fraudulent schemes, including the Suffolk loans.

1001.   As alleged in greater detail above, DPM and Aaron breached their fiduciary duties to SPhinX and/or PlusFunds by (1) executing the July 31, 2002 Document; (2) authorizing,

233

allowing and facilitating the movement of SMFF's cash from Refco LLC to RCM; and (3) concealing the July 31, 2002 Document and movement of SMFF's cash to RCM from innocent members of SPhinX's board and PlusFunds' board and management.

1002.  By virtue of knowledge gained by PwC and Ferris as SMFF's auditor and as auditors for an advisory to Refco, PwC and Ferris were aware of and understood that the movement of SMFF's cash to RCM constituted a breach of the fiduciary duties owed by Sugrue, Kavanagh, Owens, PlusFunds, Refco LLC, RCM, DPM, and Aaron.  PwC understood that each of those entities and individuals breached their fiduciary duties.

1003.  As alleged in greater detail above, PwC and Ferris substantially assisted in the breach of the above-described fiduciary duties by issuing unqualified audit opinions and failing to disclose the movement of SMFF's cash to unprotected, non-segregated accounts at RCM.

1004.  As a result of the movement of SMFF's cash to RCM and the breaches of the fiduciary duties owed by Sugrue, Kavanagh, Owens, Refco LLC, RCM, DPM and Aaron, SPhinX and PlusFunds were damaged in an amount to be proven at trial.

1005.  The damages suffered by SPhinX and PlusFunds were directly and proximately caused by the breaches of fiduciary duty described above.

## COUNT VIII
### NEGLIGENT MISREPRESENTATION
#### (Against PwC and Ferris)

1006.  Plaintiffs incorporate by reference the allegations set forth above.

1007.  PwC was retained to act as the auditor of the financial statements of various SPhinX entities, including SPhinX Ltd., SPhinX Strategy Fund Ltd., and SMFF for 2003, 2004, and 2005.  As a result of this engagement, PwC owed professional duties to SPhinX.

234

1008.  PwC was retained by PlusFunds to conduct the SPhinX audit. PwC and Ferris had direct communication with PlusFunds agents, including PlusFunds' CFO Chris Aliprandi among others, in the course of performing the SPhinX audits. PwC and Ferris understood that PlusFunds was SPhinX's investment manager and conducted the daily business of the SPhinX Funds. PwC and Ferris dealt directly with PlusFunds and DPM in performing its audits and directed correspondence relating to the audits, including the material deficiency letters, directly to PlusFunds on behalf of SPhinX.

1009.  PwC and Ferris understood that PlusFunds would utilize PwC's audit opinions to market and sell investments in the SPhinX Funds.

1010.  PwC was also retained by PlusFunds to audit the financial statements of PlusFunds for the years 2003, 2004, and 2005.

1011.  As alleged in greater detail above, PwC issued in the course of its business its "report of independent auditors" in connection with its audit of SMFF's 2003 financial statements on or about March 30, 2004. In this report, signed by Ferris in PwC's name, PwC issued an unqualified, or "clean," audit opinion on the financial statements of SPhinX, including SMFF, for the fiscal year 2003.

1012.  As alleged in greater detail above, PwC in the course of its business issued its "report of independent auditors" in connection with its audit of SMFF's 2004 financial statements on or about March 30, 2005. In this report, signed by Ferris in PwC's name, PwC issued an unqualified, or "clean," audit opinion on the financial statements of SPhinX, including SMFF, for the fiscal year 2004.

1013.  PwC and Ferris knew that PwC's audit reports and the unqualified audit opinions therein would be, and in fact were, incorporated into the financial statements of SPhinX,

including SMFF, for the fiscal years ended December 31, 2003 and December 31, 2004, and distributed to innocent decision-makers.

1014.  As alleged in greater detail above, on or about February 2, 2004, PwC issued in the course of its business its audit report in connection with its audit of PlusFunds' 2003 financial statements.  In this report PwC issued an unqualified, or "clean," audit opinion on the financial statements of PlusFunds for the fiscal year ended December 31, 2003.

1015.  As alleged in greater detail above, on or about February 14, 2005, PwC issued in the course of its business its audit report in connection with the audit of PlusFunds' 2004 financial statements.  In this report, signed by Ferris in PwC's name, PwC issued an unqualified, or "clean," audit opinion on the financial statements of PlusFunds for the fiscal year 2004.

1016.  PwC and Ferris knew that PwC's audit reports and the unqualified audit opinions therein would be, and in fact were, incorporated into the financial statements of PlusFunds for the fiscal years ended December 31, 2003 and December 31, 2004, and distributed to innocent decision-makers within PlusFunds and SPhinX.

1017.  As alleged in greater detail above, PwC and Ferris knew and intended that innocent decision-makers within SPhinX and PlusFunds would use and rely upon PwC's audit reports and the unqualified audit opinions therein in making significant business decisions for SPhinX, including decisions to continue to deposit SPhinX assets in Refco accounts and to allow DPM to continue to manage SPhinX assets.

1018.  PwC's audit reports and unqualified audit opinions on the financial statements of PlusFunds and SPhinX, including SMFF, contained affirmative misrepresentations to the innocent decision-makers of SPhinX and PlusFunds.

236

1019.  In both its March 30, 2004 and March 30, 2005 audit reports on the financial statements of SMFF and in its February 2, 2004 and February 14, 2005 audit reports on the financial statements of PlusFunds, PwC represented that it was "independent." In fact, as alleged in greater detail above, PwC and Ferris knew that PwC was not independent in connection with its audit of the 2003 or 2004 financial statements of SMFF.

1020.  In its audit reports, PwC represented that it had conducted its audits "in accordance with auditing standards generally accepted in the United States of America." In fact, as alleged in greater detail above, PwC and Ferris knowingly and repeatedly violated GAAS in the conduct of its audits, and were aware of these audit failures at the times the unqualified reports were issued.

1021.  In its audit reports, PwC represented that it believed that its audits "provide a reasonable basis for our opinions." As alleged in greater detail above, PwC and Ferris had no reasonable basis for its unqualified audit opinions on the financial statements of SPhinX, including SMFF, or of PlusFunds, and PwC actually knew or reckless in not knowing as much.

1022.  In its audit reports on the financial statements of SPhinX, including SMFF, PwC represented that in its opinion the financial statements of SMFF and the other SPhinX entities, "present fairly, in all material respects, the financial position" of SPhinX, including the various entities constituting SMFF at December 31, 2003 and December 31, 2004 and the results of each of their operations, the changes in each of their net assets, their cash flows and their financial highlights for those years then ended, "in conformity with accounting principles generally accepted in the United States of America." As alleged in greater detail above, PwC and Ferris knew or were reckless in not knowing that the financial statements of SMFF and the other

SPhinX entities were not fairly presented in conformity with GAAP. Rather, they were, as discussed above, grossly and materially misstated and misleading.

1023. In its audit reports on the financial statements of SPhinX, including SMFF, PwC represented that in its opinion the financial statements of SMFF and the other SPhinX entities, "present fairly, in all material respects, the financial position" of SPhinX including the various entities constituting SMFF at December 31, 2003 and December 31, 2004 and the results of each of their operations, the changes in each of their net assets, their cash flows and their financial highlights for those years then ended, "in conformity with accounting principles generally accepted in the United States of America." As alleged in greater detail above, PwC and Ferris knew or were reckless in not knowing that the financial statements of SMFF and the other SPhinX entities were not fairly presented in conformity with GAAP. Rather, they were, as discussed above, grossly and materially misstated and misleading.

1024. PwC and Ferris failed to exercise reasonable care and competence in obtaining and communicating the representations included in its audit reports and opinions on the financial statements of SPhinX, including SMFF, and PlusFunds described above.

1025. As alleged in greater detail above, innocent decision-makers and SPhinX and PlusFunds actually relied upon and were deceived by PwC's false and misleading audit opinions in making significant business decisions for SPhinX and for PlusFunds, including the decision to continue to retain DPM as administrator of the SPhinX Funds, and the decision not to demand the return or the immediate segregation and credit risk protection of SPhinX Funds assets on deposit at RCM. Such reliance was reasonable. As a result of this reasonable reliance, both SPhinX and PlusFunds sustained damages.

238

1026.   Had PwC and Ferris refused to issue unqualified audit opinions or disclosed to the innocent decision-makers of SPhinX and PlusFunds that material amounts of SPhinX Funds' assets were on deposit in an unregulated and non-segregated cash account at RCM, exposed and subject to the insolvency and claims of creditors of Refco and/or RCM, those innocent decision-makers could have and would have taken action to protect those assets by demanding their immediate return from RCM and deposited in properly segregated accounts, protected from the insolvency and claims of creditors of the custodian of those assets.  Such action on the part of the innocent decision-makers of SPhinX and PlusFunds would have prevented the loss of the SPhinX funds assets at issue in this case, and the demise of SPhinX and PlusFunds.

1027.   As alleged in greater detail above, PwC's and Ferris' misrepresentations, breach of duty, conflicts of interest and assistance in the Refco fraud evidence willful and/or intentional neglect, misconduct or wrongdoing or at least gross negligence reflecting a reckless indifference to the rights of SPhinX and PlusFunds.  Because PwC and Ferris actively aided and abetted the Refco fraud and breaches of fiduciary duty, PwC's conduct rises to the level of fraudulent behavior.

1028.   As a direct and proximate result of PwC's and Ferris' misconduct, and the reasonable reliance of the innocent decision-makers of SPhinX and PlusFunds on PwC's and Ferris' negligent misrepresentations, SPhinX and PlusFunds were damaged in an amount to be proven at trial.

**COUNT IX**
**FRAUD**
**(Against PwC and Ferris)**

1029.   Plaintiffs incorporate by reference the allegations set forth above.

1030.  PwC was retained to act as the auditor of the financial statements of various SPhinX entities, including SPhinX Ltd., SPhinX Strategy Fund Ltd., and SMFF for 2003, 2004, and 2005.  As a result of this engagement, PwC owed professional duties to SPhinX.

1031.  PwC was retained by PlusFunds to conduct the SPhinX audit.  PwC and Ferris had direct communication with PlusFunds agents, including PlusFunds' CFO Chris Aliprandi among others, in the course of performing the SPhinX audits.  PwC and Ferris understood that PlusFunds was SPhinX's investment manager and conducted the daily business of the SPhinX Funds.  PwC and Ferris dealt directly with PlusFunds and DPM in performing its audits and directed correspondence relating to the audits, including the material deficiency letters, directly to PlusFunds on behalf of SPhinX.

1032.  PwC and Ferris understood that PlusFunds would utilize PwC's audit opinions to market and sell investments in the SPhinX Funds.

1033.  PwC was also retained by PlusFunds to audit the financial statements of PlusFunds for the years 2003, 2004, and 2005.

1034.  As alleged in greater detail above, PwC issued its "report of independent auditors" in connection with its audit of SMFF's 2003 financial statements on or about March 30, 2004.  In this report, signed by Ferris in PwC's name, PwC issued an unqualified, or "clean," audit opinion on the financial statements of SPhinX, including SMFF, for the fiscal year 2003.

1035.  As alleged in greater detail above, PwC issued its "report of independent auditors" in connection with its audit of SMFF's 2004 financial statements on or about March 30, 2005.  In this report, signed by Ferris in PwC's name, PwC issued an unqualified, or "clean," audit opinion on the financial statements of SPhinX, including SMFF, for the fiscal year 2004.

1036.   PwC and Ferris knew that PwC's audit reports and the unqualified audit opinions therein would be, and in fact were, incorporated into the financial statements of SPhinX, including SMFF, for the fiscal years ended December 31, 2003 and December 31, 2004, and distributed to innocent decision-makers within SPhinX and PlusFunds.

1037.   As alleged in greater detail above, on or about February 2, 2004, PwC issued its audit report in connection with its audit of PlusFunds' 2003 financial statements. In this report PwC issued an unqualified, or "clean," audit opinion on the financial statements of PlusFunds for the fiscal year ended December 31, 2003.

1038.   As alleged in greater detail above, on or about February 14, 2005, PwC issued its audit report in connection with its audit of PlusFunds' 2004 financial statements. In this report, signed by Ferris in PwC's name, PwC issued an unqualified, or "clean" audit opinion on the financial statements of PlusFunds for the fiscal year 2004.

1039.   PwC and Ferris knew that PwC's audit reports and the unqualified audit opinions therein would be, and in fact were, incorporated into the financial statements of PlusFunds for the fiscal years ended December 31, 2004, and distributed to innocent decision-makers within PlusFunds and SPhinX.

1040.   As alleged in greater detail above, PwC and Ferris knew and intended that innocent decision-makers within SPhinX and PlusFunds would use and rely upon PwC's audit reports and the unqualified audit opinions therein in making significant business decisions for SPhinX, including decisions to continue to deposit SPhinX assets in Refco accounts and to allow DPM to continue to manage SPhinX assets.

1041. PwC's audit reports and unqualified audit opinions on the financial statements of PlusFunds and of SPhinX, including SMFF, contained affirmative misrepresentations to the innocent decision-makers of SPinX and PlusFunds.

1042. In both its March 30, 2004 and March 30, 2005 audit reports on the financial statements of SMFF and in its February 2, 2004 and February 14, 2005 audit reports on the financial statements of PlusFunds, PwC represented that it was "independent." In fact, as alleged in greater detail above, PwC and Ferris knew that PwC was not independent in connection with its audit of the 2003 or 2004 financial statements of PlusFunds or of SPhinX, including SMFF.

1043. In its audit reports, PwC represented that it had conducted its audits "in accordance with auditing standards generally accepted in the United States of America." In fact, as alleged in greater detail above, PwC and Ferris knowingly and repeatedly violated GAAS in the conduct of its audits, and were aware of these audit failures at the times the unqualified audit reports were issued.

1044. In its audit reports, PwC represented that it believed that its audits "provide a reasonable basis for our opinions." As alleged in greater detail above, PwC and Ferris had no reasonable basis for its unqualified audit opinions on the financial statements of SPhinX, including SMFF, or of PlusFunds, and PwC actually knew or was reckless in not knowing as much.

1045. In its audit reports on the financial statements of SPhinX, including SMFF, PwC represented that in its opinion the financial statements of SMFF and the other SPhinX entities, "present fairly, in all material respects, the financial position" of SPhinX including the various entities constituting SMFF at December 31, 2003 and December 31, 2004 and the results of each of their operations, the changes in each of their net assets, their cash flows and their financial

242

highlights for those years then ended, "in conformity with accounting principles generally accepted in the United States of America." As alleged in greater detail above, PwC and Ferris knew or were reckless in not knowing that the financial statements of SMFF and the other SPhinX entities were not fairly presented in conformity with GAAP. Rather, they were, as discussed above, grossly and materially misstated and misleading.

1046. In its audit reports on the financial statements of PlusFunds, PwC, and Ferris likewise represented that in its opinion the financial statements of PlusFunds at December 31, 2003 and December 31, 2004 presented fairly, in all material respects, the financial position of PlusFunds, the results of its operations, changes in net assets, its cash flows, and financial highlights for the years then ended in conformity with accounting principles generally accepted in the United States of America. As alleged in greater detail in above, PwC and Ferris knew or were reckless in not knowing that the financial statements of PlusFunds were not fairly presented in conformity with GAAP. Rather, they were, as discussed above, grossly and materially misstated and misleading.

1047. As alleged in greater detail above, innocent decision-makers and SPhinX and PlusFunds actually relied upon and were deceived by PwC's false and misleading audit opinions in making significant business decisions for SPhinX and for PlusFunds, including the decision to continue to retain DPM as administrator of the SPhinX Funds, and the decision not to demand the return on the immediate segregation and credit risk protection of SPhinX Funds assets on deposit t RCM. Such reliance was reasonable. As a result of this reasonable reliance, both SPhinX and PlusFunds sustained damages.

1048. Had PwC and Ferris refused to issue unqualified audit opinions or disclosed to the innocent decision-makers of SPhinX and PlusFunds that material amounts of SPhinX Funds'

assets were on deposit in an unregulated and non-segregated cash account at RCM, exposed and subject to the insolvency and claims of creditors of Refco and/or RCM, those innocent decision-makers could have and would have taken action to protect those assets by demand their immediate return from RCM and deposited in properly segregated accounts, protected from the insolvency and claims of creditors of the custodian of those assets. Such action on the part of the innocent decision-makers of SPhinX and PlusFunds would have prevented the loss of the SPhinX funds assets at issue in this case, and the demise of SPhinX and PlusFunds.

1049. As alleged in greater detail above, PwC's and Ferris' misrepresentations, breach of duty, conflicts of interest and assistance in the Refco fraud evidence willful and/or intentional neglect, misconduct or wrongdoing or at least gross negligence reflecting a reckless indifference to the rights of SPhinX and PlusFunds. Because PwC and Ferris actively aided and abetted the Refco fraud and breaches of fiduciary duty, PwC's conduct rises to the level of fraudulent behavior.

1050. As a direct and proximate result of PwC's and Ferris' misconduct, and the reasonable reliance of the innocent decision-makers of SPhinX and PlusFunds on PwC's and Ferris' fraudulent misrepresentations, SPhinX and PlusFunds were damaged in an amount to be proven at trial.

## COUNT X
## BREACH OF FIDUCIARY DUTY
### (Against Gibson Dunn)

1051. Plaintiffs incorporate by reference the allegations set forth above.

1052. Gibson Dunn owed a fiduciary duty to PlusFunds by virtue of their attorney-client relationship.

244

1053.  As alleged in greater detail above, Gibson Dunn breached its fiduciary duties to PlusFunds by documenting the Suffolk loan transactions, concealing the substance of the Suffolk Loan transactions from PlusFunds' innocent officers and directors and advising Sugrue, Kavanagh, Owens and the Suffolk entities not to disclose the Suffolk loans as related party transactions.

1054.  As alleged in greater detail above, Gibson Dunn breached its fiduciary duties to PlusFunds by representing Sugrue, Kavanagh, Owens, and the Suffolk entities to the detriment of PlusFunds.

1055.  Gibson Dunn's breach of fiduciary duty directly and proximately caused PlusFunds damages in an amount to be proven at trial.

## COUNT XI
### CONSPIRACY
### (Against Sugrue, Kavanagh, Owens, Bennett, and Hackl)

1056.  Plaintiffs incorporate by reference the allegations set forth above.

1057.  As alleged in greater detail above, Defendants Sugrue, Kavanagh and Owens entered into a corrupt agreement with parties at Refco, including Refco LLC, RCM, Bennett, Hackl and others, to place SMFF's cash in unprotected accounts at RCM, where those assets were diverted and misappropriated by RCM and Refco insiders, including Bennett, Trosten, Maggio, Hackl and others.  In exchange for their participation in the placement of SMFF's cash at RCM, Sugrue, Kavanagh, and Owens received in excess of $204 million in loans and/or payments in the Suffolk loans.

1058.  As alleged in greater detail above, Sugrue, Owens and Kavanagh committed overt acts in furtherance of the conspiracy by (1) authorizing and/or allowing the movement of SMFF's cash to RCM; (2) preventing Bousbib and other innocent members of PlusFunds'

management from removing SPhinX's assets, including the SMFF cash, from RCM and Refco; and (3) removing innocent members of PlusFunds board and management by buying out their interests with proceeds of the Suffolk loans.

1059.  As alleged in greater detail above, Sugrue, Kavanagh and Owens intended to participate in the plan and intended to ensure that SMFF cash remained at Refco.  Sugrue, Kavanagh, and Owens each personally benefited from their participation because they received millions of dollars from Refco in the Suffolk Loan transactions.

1060.  As alleged in greater detail above, Bennett committed overt acts in furtherance of the conspiracy by (1) arranging and/or facilitating the movement of SMFF's cash to RCM; (2) negotiating and agreeing to provide in excess of $204 million to entities controlled by Sugrue, Owens and Kavanagh to buy out the interests of innocent members of PlusFunds' board and management for the purpose of keeping SMFF's cash at RCM; (3) diverting RCM's customer assets, including SMFF's cash for use in the Refco fraud.

1061.  As alleged in greater detail above, Hackl committed overt acts in furtherance of the conspiracy by informing Bousbib in the fall of 2004 that SMFF's cash was held in customer-segregated accounts.

1062.  The conspiracy and the wrongful conduct committed pursuant to the conspiracy directly and proximately caused injury to the plaintiffs.

1063.  By virtue of their conspiracy, Sugrue, Kavanagh, Owens, Bennett, and Hackl are liable for the breaches of fiduciary duty, conversion and other torts committed by members of the conspiracy, including themselves, Refco LLC and RCM.

## COUNT XII
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against Gibson Dunn)

1064.   Plaintiffs incorporate by reference the allegations set forth above.

1065.   As alleged in greater detail in, Sugrue, Kavanagh and Owens owed fiduciary duties to PlusFunds and SPhinX by virtue of their roles as PlusFunds and SPhinX officers and directors.

1066.   Gibson Dunn understood the relationship among Sugrue, Kavanagh, Owens, PlusFunds, and SPhinX and understood that Sugrue, Kavanagh, and Owens owed fiduciary duties to both SPhinX and PlusFunds.

1067.   As alleged in greater detail above, Gibson Dunn knew and understood that Sugrue, Owens, and Kavanagh breached their fiduciary duties to SPhinX and PlusFunds by participating in the Suffolk loans.

1068.   As alleged in greater detail above, Gibson Dunn gave substantial assistance to Sugrue, Owens and Kavanagh by documenting the Suffolk loan transactions, improperly and intentionally advising Sugrue, Owens and Kavanagh that the Suffolk loans did not need to be disclosed and concealing the Suffolk loans from PlusFunds and SPhinX.

1069.   Gibson Dunn's actions directly and proximately caused SPhinX and PlusFunds damages in an amount to be determined at trial.

## COUNT XIII
### FRAUD/NEGLIGENT MISREPRESENTATION
### (Against Gibson Dunn)

1070.   Plaintiffs incorporate by reference the allegations set forth above.

247

1071.  As alleged in greater detail above, Gibson Dunn owed PlusFunds fiduciary duties as its counsel, including a fiduciary duty of disclosure of facts relating to PlusFunds' interests and a duty of loyalty.

1072.  As alleged in greater detail above, Gibson Dunn knowingly or recklessly failed to disclose and affirmatively concealed the facts and details of the Suffolk loans from PlusFunds' innocent officers and directors.

1073.  Gibson Dunn owed PlusFunds a duty to disclose the true nature of the Suffolk loans to PlusFunds.

1074.  Had Gibson Dunn disclosed or refrained from concealing the terms of the Suffolk loans from innocent PlusFunds officers and directors, PlusFunds would have opposed the Suffolk transactions and would have removed its assets from Refco.

1075.  Gibson Dunn's negligent misrepresentation directly and proximately caused PlusFunds damages in a mount to be proven at trial.

## COUNT XIV
### FRAUD
**(Against Bennett, Trosten, Maggio, Grant, and Hackl)**

1076.  Plaintiffs incorporate by reference the allegations set forth above.

1077.  As alleged in greater detail above, Bennett, Maggio, Grant, and Trosten were the masterminds of the Refco fraud, controlling and directing every aspect of the fraud.  Each has pleaded guilty to criminal fraud and conspiracy charges in the Southern District of New York and awaits sentencing.

1078.  Bennett, Maggio, Grant, and Trosten, and persons or entities acting in concert or participation with them made, directed, or are otherwise responsible for all of the fraudulent statements and omissions of Refco and RCM alleged herein.

248

1079.  As a result of the Refco fraud, RCM was able to continue its business model and remain available to receive and maintain customer cash and securities, including SMFF's cash, despite the fact that RCM and Refco were insolvent.  Absent the fraud, RCM would not have been able to attract, receive, and retain cash and securities from customers, and SPhinX would not have placed and held its property in accounts at RCM, where it was available to be improperly siphoned by Refco, Bennett, Maggio and Trosten, and persons and entities acting in concert or participation with them.

1080.  One of the individuals acting in concert with Bennett, Maggio, Grant, and Trosten was Thomas Hackl.  In the fourth quarter of 2004, in connection with negotiations regarding interest rates earned on SMFF's cash, Hackl misrepresented to PlusFunds' President Bousbib that SMFF's cash was maintained in customer-segregated accounts.  Hackl made this representation to ensure that SMFF's cash remained at Refco, with knowledge of its falsity.  Hackl has been identified as an unindicted co-conspirator in the criminal proceedings against Bennett, Trosten, and Tone Grant.

1081.  Bennett, Maggio, Trosten, Grant, and Hackl and persons or entities acting in concert or participation with them were in a position of unique and superior knowledge regarding the true facts concerning the siphoning of RCM customers' cash and securities, the manner in which the siphoning was concealed and the fact that the appearance of Refco's financial health and strength were the product of fraud and were false.

1082.  As expected and anticipated by Bennett, Maggio, Trosten, Grant, and Hackl, RCM customers, including SPhinX, placed and maintained cash and securities into RCM accounts in ignorance of the Refco fraud.  Had the facts been fully disclosed, RCM's customers, including SPhinX, would not have done business with RCM, and their cash and securities would

249

not have been available to be diverted by Bennett, Maggio, Trosten, Grant, and Hackl or others acting in concert or participation with them.

1083. SPhinX and PlusFunds relied upon the fraudulent appearance of Refco's health created by Bennett, Maggio, Grant, Trosten, Grant, and Hackl. PlusFunds' risk committee monitored publicly available information to limit its exposure to trading counterparties, including Refco. In addition, innocent decision-makers at SPhinX and PlusFunds were aware of the LBO and IPO transactions and relied upon public statements made by Refco in connection with those transactions regarding Refco's financial position. In placing and maintaining funds in accounts at RCM, SPhinX relied to its detriment on the appearance of financial health and strength fraudulently created by Bennett, Maggio, Trosten, Grant, Hackl and other Refco insiders acting in concert with them, and on SPhinX's ignorance of the facts with respect to the improper diversion and conversion of funds from SMFF's accounts at RCM.

1084. PlusFunds relied upon Hackl's statement that SMFF's cash was maintained in customer-segregated accounts as a basis for leaving SMFF's assets at RCM.

1085. As a result of the Refco fraud perpetuated by Bennett, Maggio, Trosten, Grant, Hackl and others, SPhinX and PlusFunds were damaged in an amount to be proven at trial.

## COUNT XV
### BREACH OF FIDUCIARY DUTY
**(Against Bennett, Trosten, Maggio, Grant, Hackl, and Klejna)**

1086. Plaintiffs incorporate by reference the allegations set forth above.

1087. As alleged in greater detail above, Refco and RCM were insolvent as of August 2004. Accordingly, at all relevant times, Bennett, Maggio, Trosten, Grant, Hackl, and Klejna as officers and directors of Refco and RCM, owed fiduciary duties of loyalty, care, honesty, good

faith, disclosure, and trust to RCM and its customers, including SMFF, who were creditors of RCM.

1088. At all relevant times, RCM owed fiduciary duties to its customers, including SMFF, the discharge of which was under direction and control of Bennett, Maggio, Trosten, Grant, Hackl, Klejna, and other parties acting in concert or participation with them.

1089. As alleged in greater detail above, Bennett, Trosten, Hackl, Klejna, Grant, and Maggio breached their fiduciary duties to SMFF by diverting RCM customer assets, including SMFF's cash, to fund Refco business, acquisitions, RTLs and fraud, including the Suffolk loans. Bennett, Maggio, Trosten, Grant, Hackl, and Klejna were aware of those duties and actively participated in and assisted the breach of those duties.

1090. As alleged in greater detail above, Bennett, Trosten, Hackl, Klejna, Grant and Maggio breached their fiduciary duties to SMFF by failing to disclose the true financial condition of Refco and RCM and by actively concealing it.

1091. As alleged in greater detail above, the breaches of fiduciary duty by Bennett, Trosten, Hackl, Klejna, Grant, and Maggio caused damages to SPhinX and PlusFunds in an amount to be determined at trial.

1092. As alleged in greater detail above, the damages suffered by SPhinX and PlusFunds were a direct and proximate result of the breaches of fiduciary duty by Bennett, Trosten, Hackl, Klejna, Grant, and Maggio. Each of these Defendants should have reasonably foreseen that RCM's customers, whose assets were diverted to fund the Refco fraud, would be unable to recover their assets as a result of the Refco fraud.

## COUNT XVI
### CONVERSION
**(Against Bennett, Trosten, Maggio, Grant, and Hackl)**

1093.   Plaintiffs incorporate by reference the allegations set forth above.

1094.   Plaintiffs had a right of possession of cash and other assets held by Refco and RCM.

1095.   As alleged in greater detail above, SMFF entrusted assets to Refco for specific, limited purposes, and the amounts entrusted to Refco were reflected on periodic account statements from Refco.

1096.   By the actions alleged herein, Bennett, Maggio, Trosten, Grant, and Hackl, and persons or entities acting in concert with them, wrongfully converted funds that had been entrusted to Refco for specific limited purposes by SMFF.

1097.   In the alternative, Bennett, Maggio, Hackl, Grant, and Trosten are liable for aiding and abetting RCM's and/or Refco's conversion of SMFF's funds that had been entrusted to Refco because, among other things, they were aware of the conversion and actively participated in and substantially assisted the conversion.

1098.   As a result of the conversion alleged herein, SMFF was damaged in an amount to be proved at trial.

## COUNT XVII
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
**(Against Bennett, Trosten, Maggio, Grant, Hackl, Klejna, and Chase)**

1099.   Plaintiffs incorporate by reference the allegations set forth above.

1100.   As alleged in greater detail above, Refco LLC and RCM, as the custodians of SMFF's assets, owed fiduciary duties to SMFF.

252

1101.  As alleged in greater detail above, Refco LLC and RCM breached their fiduciary duties to SMFF by diverting RCM customer assets, including SMFF's cash, to fund Refco business, acquisitions, RTLs, and fraud, including the Suffolk loans.  Refco LLC and RCM breached their fiduciary duties to SMFF by failing to disclose the true financial condition of Refco and RCM and by actively concealing it.

1102.  As alleged in greater detail above, Bennett, Maggio, Trosten, Grant, Hackl, Klejna, and Chase knew about and understood these breaches and gave substantial assistance to the breaches of fiduciary duty by the other defendants by participating in the movement and diversion of RCM customer assets and by concealing the Refco fraud.

1103.  Hackl gave substantial assistance to the breaches of fiduciary duty by the other defendants by making misrepresentations to PlusFunds to keep SMFF's assets at RCM. Specifically, in the fourth quarter of 2004, Hackl informed PlusFunds' President Bousbib that SMFF's cash was maintained in customer-segregated accounts.

1104.  As alleged in greater detail above, the breaches of fiduciary duty by Refco LLC and RCM caused damages to SPhinX and PlusFunds in an amount to be determined at trial.

1105.  As alleged in greater detail above, the damages suffered by SPhinX and PlusFunds were a direct and proximate result of the breaches of fiduciary duty by Refco LLC and RCM.  Each of these Defendants should have reasonably foreseen that RCM's customers, whose assets were diverted to fund the Refco fraud, would be unable to recover their assets as a result of the Refco fraud.

## COUNT XVIII
### AIDING AND ABETTING FRAUD
**(Against Grant Thornton, Ramler, Ernst & Young, PwC, Ferris, Collins, Best, Koury, Mayer Brown, and Chase)**

1106.  Plaintiffs incorporate by reference the allegations set forth above.

1107.  As alleged in greater detail above, Refco LLC, RCM, Bennett, Trosten, Maggio, Grant, and Hackl, and others acting in concert with them, committed fraud in connection with the misrepresentation of Refco's financial condition.

1108.  Mayer Brown, Collins, Best, Koury, Ernst & Young, PwC, Ferris, Grant Thornton, Ramler, and Chase had actual knowledge of the fraud alleged herein.  In the alternative, Mayer Brown, Collins, Ernst & Young, PwC, Ferris, Grant Thornton, Ramler, and Chase each intentionally and consciously avoided the truth regarding the Refco fraud.

1109.  Notwithstanding their knowledge of the Refco fraud, Mayer Brown, Collins, Best, Koury, PwC, Ernst & Young, Ferris, Grant Thornton, and Ramler substantially assisted in the Refco fraud.

1110.  As set forth in greater detail above, Grant Thornton and Ramler gave substantial assistance to the Refco fraud by issuing clean audit opinions on Refco's books and records and helping conceal the Refco fraud.

1111.  As set forth in greater detail above, Ernst & Young gave substantial assistance to the Refco fraud by helping conceal the Refco fraud, preparing Refco's tax statements and providing tax and financial consulting and advisory services, despite knowledge that Refco was misappropriating its customers assets.

1112.  As set forth in greater detail above, PwC gave substantial assistance to the Refco fraud by concealing the Refco fraud, advising Refco on financial matters and preparing and approving Refco's financial statements and public filings in connection with the LBO and IPO offerings.

1113.  PwC and Ferris further gave substantial assistance to the Refco fraud by issuing unqualified audit opinions on the financial statements of SPhinX and PlusFunds, which financial

statements concealed and failed to disclose the Refco fraud and the diversion and use of SPhinX cash at RCM to fund that fraud.

1114.  As set forth in greater detail above, Mayer Brown, Collins, Best, and Koury gave substantial assistance to the Refco fraud by advising Refco in connection with its financial affairs; documenting transactions and transfers to RGHI in connection with the RGHI Receivable; concealing the RGHI Receivable; preparing, negotiating and documenting the RTLs; and advising Refco and preparing fraudulent public filings in connection with the LBO and IPO transactions, among other things.

1115.  SPhinX and PlusFunds' innocent decision-makers reasonably relied on the misstatements of Refco's financial condition, as set forth in greater detail above.

1116.  As a direct and proximate result of the Refco fraud, SPhinX and PlusFunds were damaged in an amount to be proven at trial.

1117.  The damages suffered by SPhinX and PlusFunds were a direct and proximate result of the Refco fraud.  The damages suffered by SPhinX and PlusFunds were reasonably foreseeable to Mayer Brown, Collins, Best, Koury, PwC, Grant Thornton, Ferris, Ramler, Ernst & Young, and Chase who understood that Refco was insolvent and that its customers would be unable to recover their assets deposited with RCM.

### COUNT XIX
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
**(Against Grant Thornton, Ramler, Ernst & Young, PwC, Ferris, Collins, and Mayer Brown)**

1118.  Plaintiffs incorporate by reference the allegations set forth above.

1119.  As alleged in greater detail above, Refco LLC and RCM owed fiduciary duties to SPhinX arising out of their roles as among other things, custodian of assets

1120.  As alleged in greater detail above, Refco, Refco LLC and RCM were insolvent as of August 2004.

1121.  Because Refco, Refco LLC, and RCM were insolvent, the officers and directors of Refco, Refco LLC, and RCM owed fiduciary duties to those entities' creditors and customers, including SMFF and PlusFunds.

1122.  As set forth in greater detail above, Grant Thornton, Ramler, Ernst & Young, PwC, Ferris, Mayer Brown, Collins, Best, and Koury each understood the fiduciary relationship between Refco, Refco LLC, and RCM and their customers.

1123.  As set forth in greater detail above, Grant Thornton, Ramler, Ernst & Young, PwC, Ferris, Mayer Brown, Collins, Best, and Koury each understood that Refco, Refco LLC and RCM were insolvent, and that as a result, their officers and directors owed fiduciary duties to their creditors and customers, including SPhinX and PlusFunds.

1124.  As set forth in greater detail above, Grant Thornton, Ramler, Ernst & Young, PwC, Ferris, Mayer Brown, Collins, Best, and Koury each understood that Refco, RCM and Refco's officers and directors were causing customer assets at RCM to be converted and used in the furtherance of Refco's fraudulent scheme, all in violation of their fiduciary duties to RCM's customers, including SPhinX and PlusFunds.

1125.  As set forth in greater detail above, Grant Thornton and Ramler gave substantial assistance to the breaches of fiduciary duty by Refco, Refco LLC, RCM and their officers and directors by issuing clean audit opinions on Refco's books and records and helping conceal the Refco fraud.

1126.  As set forth in greater detail above, Ernst & Young gave substantial assistance to the breaches of fiduciary duty by Refco, Refco LLC, RCM and their officers and directors by

256

helping conceal the Refco fraud, preparing Refco's tax statements and providing tax and financial consulting and advisory services, despite knowledge that Refco was misappropriating its customers' assets.

1127.  As set forth in greater detail above, PwC and Ferris gave substantial assistance to the breaches of fiduciary duty by Refco, Refco LLC, RCM and their officers and directors by concealing the Refco fraud, advising Refco on financial matters and preparing and approving Refco's financial statements and public filings in connection with the LBO and IPO offerings.

1128.  PwC and Ferris further gave substantial assistance to the breaches of fiduciary duty be Refco, Refco LLC, RCM, and their offices and directors by issuing unqualified audit opinions on the financial statements of SPhinX and PlusFunds, which financial statements concealed and failed to disclose the Refco fraud, and the deposit of substantial and material amounts of SPhinX assets in a non-segregated and unregulated account at RCM where they were exposed to the insolvency and credit risk of Refco and RCM, and the use of those assets to fund the Refco fraud.

1129.  As set forth in greater detail above, Mayer Brown, Collins, Best, and Koury gave substantial assistance to the breaches of fiduciary duty by Refco, RCM and their officers and directors by advising Refco in connection with its financial affairs; documenting transactions and transfers to RGHI in connection with the RGHI Receivable; concealing the RGHI Receivable; preparing, negotiating and documenting the RTLs; and advising Refco and preparing fraudulent public filings in connection with the LBO and IPO transactions, among other things.

1130.  As a direct and proximate result of the breaches of fiduciary duty by Refco, Refco LLC, and RCM and their officers and directors, SPhinX and PlusFunds were damaged in an amount to be proven at trial.

1131.  The damages suffered by SPhinX and PlusFunds were a direct and proximate result of the breaches of fiduciary duty by Refco, Refco LLC, and RCM.  The damages suffered by SPhinX and PlusFunds were reasonably foreseeable to Mayer Brown, Collins, Best, Koury, PwC, Grant Thornton, Ramler and Ernst & Young, who understood that Refco was insolvent and that its customers would be unable to recover their assets deposited with RCM.

## COUNT XX
### AIDING AND ABETTING CONVERSION
**(Against Grant Thornton, Ramler, Ernst & Young, PwC, Ferris, Collins, Best, Koury, Mayer Brown, and Chase)**

1132.  Plaintiffs incorporate by reference the allegations set forth above.

1133.  Plaintiffs had a right of possession of cash and other assets held by Refco, Refco LLC, and RCM.

1134.  Refco, Refco LLC, RCM and Refco's officers and agents converted customer assets held at RCM, including SMFF's cash by intentionally interfering with those assets to the exclusion of SMFF's property rights.

1135.  As alleged in greater detail above, Mayer Brown, Collins, Best, Koury, Grant Thornton, Ramler, Ernst & Young, PwC, Ferris, and Chase had actual knowledge of the conversion of customer assets from SMFF as alleged herein.  Alternatively, Mayer Brown, Best, Koury, Grant Thornton, Ernst & Young, PwC, Ferris, and Chase consciously avoided knowledge of the conversion.

1136.  As set forth in greater detail above, Grant Thornton and Ramler gave substantial assistance to the conversion of SMFF's customer assets by Refco, Refco LLC, RCM and their officers and directors by issuing clean audit opinions on Refco's books and records and helping conceal the Refco fraud.

258

1137.  As set forth in greater detail above, Ernst & Young gave substantial assistance to the conversion of SMFF's customer assets by Refco, Refco LLC, RCM and their officers and directors by helping conceal the Refco fraud, preparing Refco's tax statements and providing tax and financial consulting and advisory services, despite knowledge that Refco was misappropriating its customers assets.

1138.  As set forth in greater detail above, PwC and Ferris gave substantial assistance to the conversion of SMFF's customer assets by Refco, Refco LLC, RCM and their officers and directors by concealing the Refco fraud, advising Refco on financial matters and preparing and approving Refco's financial statements and public filings in connection with the LBO and IPO offerings.

1139.  PwC and Ferris further gave substantial assistance to the conversion of SMFF assets by issuing unqualified audit opinions on the financial statements of SPhinX and PlusFunds, which financial statements concealed and failed to disclose the Refco fraud and the deposit of substantial and material amounts of SMFF's assets in non-segregated and unregulated account at RCM where they were opposed to the insolvency and credit risk of Refco and RCM, and the use of those assets to fraud the Refco fraud.

1140.  As set forth in greater detail above, Mayer Brown, Collins, Best, and Koury gave substantial assistance to the conversion of SMFF's customer assets by Refco, Refco LLC RCM and their officers and directors by advising Refco in connection with its financial affairs; documenting transactions and transfers to RGHI in connection with the RGHI Receivable; concealing the RGHI Receivable; preparing, negotiating and documenting the RTLs; and advising Refco and preparing fraudulent public filings in connection with the LBO and IPO transactions, among other things.

259

1141.  As a direct and proximate result of the conversion of SMFF customer assets by Refco LLC and RCM and their officers and directors, SPhinX and PlusFunds were damaged in an amount to be proven at trial.

1142.  The damages suffered by SPhinX and PlusFunds were reasonably foreseeable to Mayer Brown, Collins, Best, Koury, PwC, Ferris, Grant Thornton, Ramler Ernst & Young, and Chase who understood that Refco was insolvent and that its customers would be unable to recover their assets deposited with RCM.

## COUNT XXI
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
#### (Against RAI and Refco Associates Inc.)

1143.  Plaintiffs incorporate by reference the allegations set forth above.

1144.  As alleged in greater detail above, Refco, Refco LLC and RCM and their officers and directors owed fiduciary duties to their customers, including SPhinX.

1145.  As alleged in greater detail above, DPM and Aaron owed fiduciary duties to SPhinX and PlusFunds, which included the obligation to maintain SMFF's assets in regulated, protected, customer-segregated accounts.

1146.  As alleged in greater detail above, Sugrue, Kavanagh and Owens owed fiduciary duties to SPhinX and PlusFunds, which included the obligation to maintain SMFF's assets in regulated protected, customer-segregated accounts.

1147.  RAI and Refco Associates Inc. knew and understood that SMFF's assets were to be maintained in regulated, protected, customer-segregated accounts.  RAI advised funds that invested in the SPhinX Funds, including SMFF.  RAI received and was familiar with SPhinX's offering materials, which included the requirement that assets be maintained in regulated, protected, customer-segregated accounts.

260

1148.  RAI and Refco Associates Inc. knew that SMFF's excess cash was swept on a weekly basis to unregulated, unprotected, non-segregated accounts at RCM.  RAI and Refco Associates Inc. knew and understood that assets placed at RCM were commingled in a single RCM account with other customer assets and with RCM's own assets.  RAI and Refco Associates Inc. knew that RCM was unregulated and did not provide customer-segregation, as required in SPhinX's Offering Memoranda and materials.

1149.  RAI and Refco Associates Inc. knew and understood that Refco, Refco LLC, RCM, DPM, Aaron, Sugrue, Kavanagh, and Owens were breaching their fiduciary duties by allowing SMFF's excess cash to be placed in non-segregated accounts at RCM.

1150. . RAI and Refco Associates Inc. substantially assisted the breach of fiduciary duty by monitoring SMFF's margin cash requirement at Refco LLC and facilitating the movement of SMFF cash from Refco LLC to RCM.

1151.  As a direct and proximate result of the breaches of fiduciary duty by RCM, Refco LLC, Aaron, DPM, Sugrue, Kavanagh and Owens, SPhinX and PlusFunds were damaged in an amount to be proven at trial.

## COUNT XXII
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against Credit Suisse and Banc of America Securities)

1152.  Plaintiffs incorporate by reference the allegations set forth above.

1153.  As alleged in greater detail above, Refco, Refco LLC and RCM owed fiduciary duties to their customers, including SPhinX and PlusFunds, arising out of Refco's roles as, among other things, custodian of customer assets.

261

1154.  As alleged in greater detail above, Refco, Refco LLC and RCM were insolvent as of August 2004.  As a result, Refco, Refco LLC, RCM and their officers and directors owed direct fiduciary duties to creditors and customers, including SPhinX and PlusFunds.

1155.  As alleged in greater detail above, Defendants Credit Suisse and Banc of America Securities became aware that Refco, Refco LLC, and RCM were insolvent and therefore knew and understood that Refco, Refco LLC and RCM, and their officers and directors, owed fiduciary duties to creditors and customers, including SPhinX and PlusFunds.

1156.  As alleged in greater detail above, Defendants Credit Suisse and Banc of America Securities knew and understood that (1) Refco, Refco LLC, and RCM were insolvent and in no financial position to conduct the LBO and/or IPO transactions; and that (2) Refco was diverting customer assets from RCM to fund its business and fraud.  As alleged in greater detail above, Refco, Refco LLC, RCM and their officers and directors breached their fiduciary duties to customers of RCM.

1157.  Credit Suisse and Banc of America Securities knew and understood that Refco, Refco LLC RCM and officers and directors were in breach of their fiduciary duties to customers, including SPhinX and PlusFunds.

1158.  Notwithstanding this knowledge, As alleged in greater detail above, Banc of America Securities and Credit Suisse substantially assisted the fraud and breaches of fiduciary duty by Refco, Refco LLC, RCM and their officers and directors by underwriting and providing services in connection with Refco's LBO and IPO transactions and concealing the nature and extent of the Refco fraud, the breaches of fiduciary duty by Refco, Refco LLC, RCM and their officers and directors and by preparing and approving false and misleading public offering materials submitted by Refco in connection with the IPO and LBO transactions.

1159. The breaches of fiduciary duty by Refco and its agents proximately caused damages to SPhinX and PlusFunds in an amount to be determined at trial.

## COUNT XXIII
### AIDING AND ABETTING FRAUD
### (Against Credit Suisse and Banc of America Securities)

1160. Plaintiffs incorporate by reference the allegations set forth above.

1161. As alleged in greater detail above, Refco, Refco LLC, RCM, Bennett, Trosten, Grant, Maggio and Hackl, and others acting in concert with them, committed fraud in connection with the misrepresentation of Refco's financial condition.

1162. As alleged in greater detail above, Defendants Credit Suisse and Banc of America Securities knew and understood that (1) Refco and RCM were insolvent and in no financial position to conduct the LBO and/or IPO transactions; and that (2) Refco was diverting customer assets from RCM to fund its business and fraud.

1163. Credit Suisse and Banc of America Securities had actual knowledge of the fraud alleged herein. In the alternative, Credit Suisse and Banc of America Securities each intentionally and consciously avoided knowledge of the truth regarding the Refco fraud.

1164. Notwithstanding their knowledge of the Refco fraud, Credit Suisse and Banc of America Securities substantially assisted in the Refco fraud.

1165. As set forth in greater detail above, Credit Suisse and Banc of America Securities gave substantial assistance to the Refco fraud by helping conceal the Refco fraud, providing underwriting, financial consulting and advisory services and preparing and approving Refco's financial statements and public filings in connection with the LBO and IPO offerings.

1166. SPhinX and PlusFunds received and reasonably relied on Refco's financial statements and public filings in connection with the LBO and IPO offerings.

263

1167.  As a direct and proximate result of the Refco fraud, SPhinX and PlusFunds were damaged in an amount to be proven at trial.

1168.  The damages suffered by SPhinX and PlusFunds were a direct and proximate result of the Refco fraud.  The damages suffered by SPhinX and PlusFunds were reasonably foreseeable to Credit Suisse and Banc of America Securities, who understood that Refco was insolvent and that its customers would be unable to recover their assets deposited with RCM.

**COUNT XXIV**
**CONSPIRACY**
**(Against BAWAG, Bennett, Trosten, Hackl, Grant, Maggio, Chase, and the RTL Participants)**

1169.  Plaintiffs incorporate by reference the allegations set forth above.

1170.  As alleged in greater detail above, Refco, Bennett, BAWAG, Trosten, Grant, Hackl, Maggio, Chase, RGHI, and the RTL Participants entered into a corrupt agreement to conceal hundreds of millions of trading losses from Refco's financial statements by transferring losses and expenses to RGHI via the RGHI Receivable and concealing the RGHI Receivable through the RTLs.

1171.  As alleged in greater detail above, each member of the conspiracy knew and understood that the purpose of the RTLs was to fraudulently manipulate Refco's financial statements.

1172.  As alleged in greater detail above, Bennett, Trosten, Grant, Hackl, Maggio, RGHI, and Chase committed overt acts in furtherance of the conspiracy by coordinating, negotiating, and/or executing documentation to effectuate the RTLs.

1173.  As alleged in greater detail above, BAWAG committed overt acts in furtherance of the conspiracy by advancing funds and directly participating in RTLs designed to conceal

264

Refco's losses. BAWAG has admitted its participation and knowledge of the purpose of the loans to conceal Refco's losses and manipulate its financial statements.

1174. As alleged in greater detail above, each of the RTL Participant Defendants and Chase committed overt acts in furtherance of the conspiracy by participating in and profiting from RTLs and commingling of customer funds.

1175. The conspiracy and the wrongful conduct committed pursuant to the conspiracy directly and proximately caused injury to the plaintiffs.

1176. By virtue of their conspiracy, Bennett, Maggio, Grant, Trosten, BAWAG, Hackl, Chase, RGHI, and the RTL Participants are liable for the breaches of fiduciary duty, conversion and other torts committed in furtherance of the conspiracy, including themselves and Refco.

## COUNT XXV
### AIDING AND ABETTING FRAUD
#### (Against BAWAG and RTL Participants)

1177. Plaintiffs incorporate by reference the allegations set forth above.

1178. As alleged in greater detail above, Refco, Refco LLC, RCM, Bennett, Trosten, Maggio and Hackl, and others acting in concert with them, committed fraud in connection with the misrepresentation of Refco's financial condition.

1179. As alleged in greater detail above, an important part of the Refco fraud was the concealment of the RGHI Receivable by temporarily paying it down at the end of reporting periods through the RTLs.

1180. As alleged in greater detail above, BAWAG gave substantial assistance to the Refco fraud by participating in a series of RTLs. BAWAG knew and understood that the purpose of the RTLs was to fraudulently manipulate Refco's financial statements.

1181.  As alleged in greater detail above, each of the RTL Participant Defendants and RGHI gave substantial assistance to the Refco fraud by participating in RTLs.  RGHI and each of the RTL Participants knew and understood that the purpose of the RTLs was to fraudulently manipulate Refco's financial statements.

1182.  SPhinX and PlusFunds received and reasonably relied on Refco's financial statements.

1183.  As a direct and proximate result of the Refco fraud, SPhinX and PlusFunds were damaged in an amount to be proven at trial.

1184.  The damages suffered by SPhinX and PlusFunds were a direct and proximate result of the Refco fraud.  The damages suffered by SPhinX and PlusFunds were reasonably foreseeable to RGHI, BAWAG, and the RTL Participants, who understood that Refco's financial statements were fraudulent and that investors and customers would rely on Refco's financial condition in deciding to do business with Refco and entrust assets to Refco's custody.

## COUNT XXVI
### BREACH OF FIDUCIARY DUTY/AIDING AND ABETTING
### (Against THL Defendants)

1185.  Plaintiffs incorporate by reference the allegations set forth above.

1186.  As alleged in greater detail above, Refco, Refco LLC and RCM owed fiduciary duties to their customers, including SPhinX and PlusFunds, arising out of Refco's roles as, among other things, custodian of customer assets.

1187.  As alleged in greater detail above, Refco, Refco LLC and RCM were insolvent as of August 2004.  As a result, Refco, Refco LLC, RCM and their officers and directors owed direct fiduciary duties to Refco's creditors and customers, including SPhinX and PlusFunds.

266

1188.   As alleged in greater detail above, the THL Defendants became aware that Refco, Refco LLC, and RCM were insolvent and therefore knew and understood that Refco, Refco LLC and RCM, and their officers and directors, owed fiduciary duties to Refco's customers, including SPhinX and PlusFunds.

1189.   As alleged in greater detail above, as officers and directors of Refco, the THL Individuals owed direct fiduciary duties to Refco's creditors and customers, including SPhinX and PlusFunds.   As alleged in greater detail above, Refco, Refco LLC, RCM and their officers and directors breached their fiduciary duties to customers of RCM.

1190.   As alleged in greater detail above, the THL Defendants exercised actual control over Refco and its business activities after the LBO transaction in August 2004 by virtue of their majority interest in Refco and representation on and control on Refco's board and management committees.

1191.   As alleged in greater detail above, the THL Defendants knew and understood that (1) Refco, Refco LLC, and RCM were insolvent and in no financial position to conduct the IPO transaction; and (2) Refco was diverting customer assets from RCM to fund its business operations and fraudulent activities, including the RTLs.

1192.   As alleged in greater detail above, the THL Defendants knew and understood that Refco, Refco LLC, RCM and their officers and directors were in breach of their fiduciary duties to customers, including SPhinX and PlusFunds.

1193.   Notwithstanding this knowledge, As alleged in greater detail above, the THL Defendants breached their fiduciary duties to Refco's creditors and customers by authorizing the RTLs after assuming control of Refco, by concealing Refco's insolvency and the Refco fraud

from creditors and customers (including SPhinX) and by allowing and authorizing the continuing diversion of RCM assets to fund Refco's operations and fraud.

1194. In the alternative, the THL Defendants aided and abetted the breaches of fiduciary duty by Refco, Refco LLC and RCM and their officers and directors by allowing and participating in the diversion of RCM assets and RTLs and concealing Refco's insolvency from Refco's creditors and customers, including SPhinX and PlusFunds, after assuming control of Refco.

## COUNT XXVII
### INTERFERENCE WITH CONTRACT/PROSPECTIVE CONTRACT
### (Against All Defendants)

1195. Plaintiffs incorporate by reference the allegations set forth above.

1196. As alleged in greater detail above, there was a valid contractual relationship between SPhinX and PlusFunds as evidenced by the IMA.

1197. As alleged in greater detail above, Defendants intentionally interfered with the performance of the IMA by, among other things, causing the IMA to be breached by allowing cash balances to be invested improperly, allowing SPhinX money to be moved from Refco LLC to RCM, allowing SPhinX money to be commingled, participating in and allowing SPhinX money to be used for the RTLs, and concealing these facts from SPhinX, PlusFunds, and SPhinX investors.

1198. Defendants' intentional interference with the IMA was without justification or excuse.

1199. Defendants' intentional interference caused the breach of the IMA and the loss of the contract by also driving SPhinX and PlusFunds into bankruptcy.

1200. Defendants' intentional interference with the IMA resulted in damage to PlusFunds and SPhinX.

1201. As alleged in greater detail above, there was a valid contract between SPhinX and DPM, DPM-Mellon, and Mellon, as evidenced by the Service Agreement.

1202. As alleged in greater detail above, Defendants interfered with the performance of the Service Agreement by, among other things, causing DPM, DPM-Mellon and Mellon to breach the Service Agreement as a result of misstatements of cash, receivables, and payables; failure to maintain SPhinX assets in segregated accounts; allowing the movement of SPhinX cash from Refco LLC to RCM; failure to provide accurate financial statements; allowing SPhinX money to be commingled; participating in and allowing SPhinX money to be used for the RTLs; and concealing the truth from SPhinX, PlusFunds, and SPhinX investors.

1203. Defendants' intentional interference with the Service Agreement was without justification or excuse.

1204. Defendants' intentional interference caused the breach of the Service Agreement by also driving SPhinX into bankruptcy.

1205. Defendants' intentional interference with the Service Agreement resulted in damage to SPhinX.

1206. As alleged in greater detail above, each investor in SPhinX executed a valid contract with SPhinX regarding the handling of their invested cash.

1207. As alleged in greater detail above, Defendants interfered with the performance of each of those investor contracts by, among other things, causing the breach of each of those contracts by allowing SPhinX cash to be moved from Refco LLC to unregulated and non-segregated accounts to RCM; allowing SPhinX money to be commingled; participating in and

269

allowing SPhinX money to be used for the RTLs; and concealing the truth from SPhinX, PlusFunds and SPhinX investors.

1208. Defendants' intentional interference with each of the investor contracts was without justification.

1209. Defendants' intentional interference with each of the investor contracts resulted in damage to SPhinX by, among other things, causing investors to redeem their investments once the Refco scheme was disclosed. This in turn also damaged PlusFunds by driving down the AUMs. The SPhinX investors were also damaged because they were unable to redeem their shares in SPhinX.

1210. As alleged in greater detail above, there was a valid contractual relationship between SPhinX and PlusFunds and each portfolio manager, as evidenced by the DIMAs.

1211. As alleged in greater detail above, Defendants intentionally interfered with the performance of each DIMA by causing SPhinX and PlusFunds to be damaged by the movement of funds from protected accounts at Refco LLC to unprotected, non-segregated accounts at RCM, thereby causing SPhinX and PlusFunds to file bankruptcy.

1212. Defendants' intentional interference with the DIMAs was without justification or excuse.

1213. Defendants' interference with the DIMAs caused the loss of contract between SPhinX/PlusFunds and the portfolio managers.

1214. As alleged in greater detail above, there was a prospective contract among PlusFunds, SPhinX, and Lehman Brothers that would have resulted in an additional $500 million plus in AUM. As a direct and proximate result of the disclosure of the Refco scheme and the

exposure of Defendants' complicit conduct involving that scheme, Lehman Brothers declined to execute their agreement with SPhinX and PlusFunds, thereby damaging SPhinX and PlusFunds.

1215.   Defendants were aware of the negotiations with Lehman Brothers and were aware of the potential $500 million increase in AUM.

1216.   Defendants intentionally interfered with that prospective contractual relationship.

1217.   Defendants' intentional interference with that prospective relationship was without justification or excuse.

1218.   Defendants' interference with that prospective contractual relationship caused the loss of the contract among PlusFunds, SPhinX, and Lehman Brothers.

1219.   Defendants' interference with the contracts resulted in damage to PlusFunds and SPhinX. Further, punitive damages are warranted based on Defendants conduct.

WHEREFORE, Plaintiffs respectfully request judgment as follows:

i.        on the First Cause of Action, compensatory and punitive damages against Sugrue, Kavanagh, and Owens in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

ii.       on the Second Cause of Action, compensatory and punitive damages against Sugrue, Kavanagh, and Owens in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

iii.      on the Third Cause of Action, compensatory and punitive damages against Sugrue, Kavanagh, and Owens in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

    iv.    on the Fourth Cause of Action, compensatory and punitive damages against Sugrue, Kavanagh, and Owens in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

    v.    on the Fifth Cause of Action, compensatory and punitive damages against Sugrue, Kavanagh, and Owens in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

    vi.    on the Sixth Cause of Action, compensatory and punitive damages against PwC and Ferris in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

    vii.    on the Seventh Cause of Action, compensatory and punitive damages against PwC and Ferris in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

    viii.    on the Eighth Cause of Action, compensatory and punitive damages against PwC and Ferris in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

    ix.    on the Ninth Cause of Action, compensatory and punitive damages against PwC and Ferris in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

    x.    on the Tenth Cause of Action, compensatory and punitive damages against Gibson Dunn in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

xi.    on the Eleventh Cause of Action, compensatory and punitive damages against Sugrue, Kavanagh, Owens, Bennett, and Hackl in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

xii.    on the Twelfth Cause of Action, compensatory and punitive damages against Gibson Dunn in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

xiii.    on the Thirteenth Cause of Action, compensatory and punitive damages against Gibson Dunn in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

xiv.    on the Fourteenth Cause of Action, compensatory and punitive damages against Bennett, Trosten, Maggio, Grant, and Hackl in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

xv.    on the Fifteenth Cause of Action, compensatory and punitive damages against Bennett, Trosten, Maggio, Grant, Klejna, and Hackl in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

xvi.    on the Sixteenth Cause of Action, compensatory and punitive damages against Bennett, Trosten, Maggio, Grant, and Hackl in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

xvii.    on the Seventeenth Cause of Action, compensatory and punitive damages against Bennett, Trosten, Maggio, Grant, Klejna, Hackl, and Chase in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

xviii.    on the Eighteenth Cause of Action, compensatory and punitive damages against Grant Thornton, Ramler, Ernst & Young, PwC, Collins, Best, Koury, Mayer Brown, and Chase

273

in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

     xix.   on the Nineteenth Cause of Action, compensatory and punitive damages against Grant Thornton, Ramler, Ernst & Young, PwC, Ferris, Collins, Best, Koury, and Mayer Brown in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

     xx.   on the Twentieth Cause of Action, compensatory and punitive damages against Grant Thornton, Ramler, Ernst & Young, PwC, Ferris, Collins, Best, Koury, Mayer Brown, and Chase in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

     xxi.   on the Twenty-First Cause of Action, compensatory and punitive damages against RAI and Refco Associates Inc. in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

     xxii.   on the Twenty-Second Cause of Action, compensatory and punitive damages against Credit Suisse and Banc of America Securities in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

     xxiii.  on the Twenty-Third Cause of Action, compensatory and punitive damages against Credit Suisse and Banc of America Securities in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

     xxiv.  on the Twenty-Fourth Cause of Action, compensatory and punitive damages against BAWAG, Bennett, Trosten, Hackl, Grant, Maggio, Chase, RGHI, and the RTL Participants in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

xxv.    on the Twenty-Fifth Cause of Action, compensatory and punitive damages against BAWAG, RGHI, and the RTL Participants in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

xxvi.    on the Twenty-Sixth Cause of Action, compensatory and punitive damages against the THL Defendants in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

xxvii.    for such other and further relief as the Court deems just and proper.

275

Dated: New York, New York
       March 5, 2008

BROWN RUDNICK BERLACK ISRAELS LLP

By _____

David Molton, Esq.
Andrew Dash, Esq.
Steven B. Smith, Esq.

Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801

- and -

BEUS GILBERT PLLC
Leo Beus, Esq.
Dennis Blackhurst, Esq.
4800 North Scottsdale Road
Suite 6000
Scottsdale, AZ 85251
Telephone: (480) 429-3000
Facsimile: (480) 429-3100

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on Wednesday, March 26, 2008, I caused to be served, by Federal Express, a true and correct copy of the Removing Defendants' Notice of Removal of Action, and the Declaration of Ross E. Firsenbaum in Support of the Removing Defendants' Notice of Removal of Action, including Exhibits A-B thereto, on the individuals shown below:

| | |
|---|---|
| Leo R. Beus<br>BEUS GILBERT PLLC<br>4800 North Scottsdale Road<br>Suite 600<br>Scottsdale, Arizona 85251<br>*Counsel for Plaintiffs Kenneth R. Krys and Christopher Stride as Joint Official Liquidators of the Sphinx Funds and James P. Sinclair, as Trustee of the Sphinx Trust* | David Molton<br>BROWN RUDNICK LLP<br>Seven Times Square<br>Times Square Tower<br>New York, NY 10036<br>*Counsel for Plaintiffs Kenneth R. Krys and Christopher Stride as Joint Official Liquidators of the Sphinx Funds and James P. Sinclair, as Trustee of the Sphinx Trust* |
| Mitchell A. Karlan<br>GIBSON, DUNN & CRUTCHER LLP<br>200 Park Avenue<br>New York, NY 10166-0193<br>*Counsel to Defendant Gibson, Dunn & Crutcher LLP* | James J. Capra, Jr.<br>ORRICK HERRINGTON & SUTCLIFFE LLP<br>666 Fifth Avenue<br>New York, NY 10103<br>*Counsel to Defendants PricewaterhouseCoopers LLP and Mari Ferris* |
| David W. Wiltenburg<br>HUGHES HUBBARD & REED, LLP<br>One Battery Park Plaza<br>New York, NY 10004<br>*Counsel to Defendant PricewaterhouseCoopers Cayman Islands* | Refco Alternative Investments LLC<br>c/o CT Corporation System<br>111 Eighth Avenue<br>New York, NY 10011 |
| David Emilio Mollon<br>WINSTON & STRAWN LLP<br>200 Park Avenue<br>New York, NY<br>*Counsel to Defendants Grant Thornton LLP and Mark S. Ramler* | Mr. Christopher Sugrue<br>150 Central Park South, Apt. 2010<br>New York, NY 10019 |
| Christopher R. Harris<br>LATHAM & WATKINS LLP<br>885 Third Avenue<br>Suite 1000<br>New York, NY 10022<br>*Counsel to Defendant Ernst & Young U.S. LLP* | John K. Villa<br>WILLIAMS & CONNOLLY LLP<br>725 Twelfth Street, N.W.<br>Washington, D.C. 20005<br>*Counsel to Defendant Mayer Brown LLP* |

| | |
|---|---|
| Jonathan Paul Bach<br>COOLEY GODWARD KRONISH LLP<br>1114 Avenue of the Americas<br>New York, NY 10036<br>*Counsel to Defendant Joseph Collins* | Edward S. Best<br>MAYER BROWN LLP<br>71 S. Wacker Drive<br>Chicago, IL 60606 |
| Charles E. Clayman<br>CLAYMAN & ROSENBERG<br>305 Madison Avenue, Suite 1301<br>New York, NY 10165<br>*Counsel to Defendant Paul Koury* | Jeffrey T. Golenbock<br>GOLENBOCK EISEMAN ASSOR<br>BELL & PESKIE LLP<br>437 Madison Avenue<br>New York, NY 10022-7302<br>*Counsel to Defendants Phillip R. Bennett and*<br>*Refco Group Holdings Inc.* |
| Barbara Moses<br>MORVILLO, ABRAMOWITZ, GRAND,<br>IASON, ANELLO, & BOHRER, P.C.<br>565 Fifth Avenue<br>New York, NY 10017<br>*Counsel to Defendant Robert C. Trosten* | Melinda Sarafa<br>ZUCKERMAN SPAEDER LLP<br>1540 Broadway<br>Suite 1604<br>New York, NY 10036<br>*Counsel to Defendant Tone Grant* |
| Scott E. Hershman<br>HUNTON & WILLIAMS LLP<br>200 Park Avenue<br>New York, NY 10166-0091<br>*Counsel to Defendant Santo C. Maggio* | Mr. Thomas Hackl<br>150 Central Park South<br>New York, NY 10019 |
| Helen B. Kim<br>BAKER & HOSTETLER LLP<br>333 South Grand Avenue<br>Suite 1800<br>Los Angeles, CA 90071<br>*Counsel to Defendant Dennis Klejna* | Nicolle L. Jacoby<br>DECHERT LLP<br>30 Rockefeller Plaza<br>New York, NY 10112-2200<br>*Counsel to Defendant BAWAG P.S.K. Bank fur*<br>*Arbeit und Wirtschaft und Osterreichische*<br>*Postsparkasse Aktiengesellschaft* |

| | |
|---|---|
| Philip D. Anker<br>WILMER CUTLER PICKERING<br>    HALE AND DORR<br>399 Park Avenue<br>New York, NY 10128<br>*Counsel to Defendants JP Morgan Chase &*<br>*Co.; Credit Suisse Securities (USA) LLC; and*<br>*Banc of America Securities LLC* | Greg A. Danilow<br>WEIL, GOTSHAL & MANGES LLP<br>767 Fifth Avenue<br>New York, NY 10153<br>*Counsel to Defendants Thomas H. Lee Partners*<br>*L.P., Thomas H. Lee Advisors, LLC, THL*<br>*Managers V, LLC, THL Equity Advisors V.,*<br>*L.P., Thomas H. Lee Equity Fund V, L.P.,*<br>*Thomas H. Lee Parallel Fund V., L.P., Thomas*<br>*H. Lee Equity (Cayman) Fund V., L.P., Thomas*<br>*H. Lee Investors Limited Partnership, 1997*<br>*Thomas H. Lee Nominee Trust, Thomas H. Lee,*<br>*David V. Harkins, Scott A. Schoen, and Scott L.*<br>*Jaeckel* |
| John D. Tortorella<br>MARINO TORTORELLA PC<br>437 Southern Boulevard<br>Chatham, NJ 07928<br>Counsel to *Defendants Liberty Corner Capital*<br>*Strategies, LLC and William T. Pigott* | Veronica E. Rendon<br>ARNOLD & PORTER LLP<br>399 Park Avenue<br>New York, NY 10022-4690<br>*Counsel to Defendants Eric M. Flanagan,*<br>*EMF Financial Products, LLC and Delta Flyer*<br>*Fund, LLC* |
| Peter C. John<br>WILLIAMS MONTGOMERY & JOHN LTD.<br>20 North Wacker Drive<br>Suite 2100<br>Chicago, IL 60606<br>*Counsel to Ingram Micro Inc. and CIM*<br>*Ventures, Inc.* | Aaron E. Albert<br>FISCHER PORTER & THOMAS, P.C.<br>440 Sylvan Avenue<br>Suite 130<br>Englewood Cliffs, NJ 07632-2700<br>*Counsel to Defendants Beckenham Trading*<br>*Co. Inc. and Andrew Krieger* |
| Joel A. Blanchet<br>KIRKLAND & ELLIS LLP<br>200 East Randolph Drive<br>Chicago, IL 60601<br>*Counsel to Defendants Coast Asset*<br>*Management LLC*<br>*f/k/a Coast Asset Management LP; and CS*<br>*Land Management, LLC* | Ronald M. Lepinskas<br>DLA PIPER<br>203 North LaSalle Street, Suite 1900<br>Chicago, Illinois 60601-1293<br>*Counsel to Defendant Christopher Petitt* |

| Anthony Mathias Candido<br>CLIFFORD CHANCE US LLP<br>31 West 52nd Street<br>New York, NY 10019-6131<br>*Counsel for Mayer Brown International LLP* | |
| --- | --- |
| Dated: March 26, 2008<br>New York, New York | Ross E. Firsenbaum |