UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                                                                   :
In re REFCO INC. SECURITIES LITIGATION           :     Case No. 07-md-1902 (GEL)
                                                                   :
-------------------------------------------------------------------X

This Document Relates to:

-------------------------------------------------------------------X
KENNETH M. KRYS and CHRISTOPHER           :
STRIDE, as JOINT OFFICIAL LIQUIDATORS      :
of SPHINX LTD., SPHINX STRATEGY FUND       :     Case No. 08-cv-3065 (GEL)
LTD.;                                                              :
SPHINX PLUS SPC LTD., SPHINX                     :     Case No. 08-cv-3086 (GEL)
DISTRESSED LTD., SPHINX MERGER               :
ARBITRAGE LTD.; SPHINX SPECIAL                  :
SITUATIONS LTD., SPHINX MACRO LTD.;         :
SPHINX LONG/SHORT EQUITY LTD.;               :
SPHINX MANAGED FUTURES LTD.; SPHINX      :     **DECLARATION OF**
EQUITY MARKET NEUTRAL LTD.; SPHINX        :     **DAVID J. MOLTON IN**
CONVERTIBLE ARBITRAGE LTD.; SPHINX        :     **SUPPORT OF PLAINTIFFS'**
FIXED INCOME ARBITRAGE LTD.; SPHINX       :     **MOTION FOR REMAND**
DISTRESSED FUND SPC; SPHINX MERGER        :     **AND/OR ABSTENTION**
ARBITRAGE FUND SPC; SPHINX SPECIAL         :
SITUATIONS FUND SPC; SPHINX MACRO          :
FUND SPC; SPHINX LONG/SHORT EQUITY        :
FUND SPC; SPHINX MANAGED FUTURES          :
FUND SPC; SPHINX EQUITY MARKET               :
NEUTRAL FUND SPC; SPHINX                            :
CONVERTIBLE ARBITRAGE FUND SPC;           :
SPHINX FIXED INCOME ARBITRAGE FUND       :
SPC; PLUSFUNDS MANAGED ACCESS FUND     :
SPC LTD.; KENNETH M. KRYS and                   :
CHRISTOPHER STRIDE as assignees of claims   :
assigned by MIAMI CHILDREN'S HOSPITAL     :
FOUNDATION, OFI, GREEN & SMITH               :
INVESTMENT MANAGEMENT LLC, THALES       :
FUND MANAGEMENT LLC, KELLNER                :
DILEO & CO., LLC, MARTINGALE ASSET          :
MANAGEMENT LP, LONGACRE FUND                :
MANAGEMENT LLC, ARNHOLD & S.                  :
BLEICHROEDER ADVISERS LLC, PICTET &       :
CIE, RGA AMERICA REINSURANCE                  :
COMPANY, DEUTSCHE BANK (SUISSE) SA,        :

ARAB MONETARY FUND, HANSARD          :
INTERNATIONAL LTD., CONCORDIA        :
ADVISORS LLC, GABELLI SECURITIES, INC., :
CITCO GLOBAL CUSTODY; and JAMES      :
P. SINCLAIR as Trustee of the SPHINX TRUST, :
                                     :
                    Plaintiffs,      :
                                     :
        -against-                    :
                                     :
CHRISTOPHER SUGRUE; MARK             :
KAVANAGH; BRIAN OWENS;               :
PRICEWATERHOUSECOOPERS L.L.P.; MARI  :
FERRIS; PRICEWATERHOUSECOOPERS       :
CAYMAN ISLANDS; GIBSON, DUNN &       :
CRUTCHER LLP; REFCO ALTERNATIVE      :
INVESTMENTS LLC; GRANT THORNTON      :
LLP; MARK RAMLER; ERNST & YOUNG U.S. :
LLP; MAYER BROWN LLP f/k/a MAYER     :
BROWN ROWE & MAW LLP; JOSEPH         :
COLLINS; EDWARD S. BEST; PAUL KOURY; :
PHILLIP R. BENNETT; ROBERT C. TROSTEN; :
TONE GRANT; SANTO MAGGIO; THOMAS     :
HACKL; DENNIS KLEJNA; BAWAG P.S.K.   :
BANK FUR ARBEIT UND WIRTSCHAFT UND   :
OSTERREICHISCHE POSTPARKASSE         :
AKTIENGESELLSCHAFT; JP MORGAN        :
CHASE & CO.; CREDIT SUISSE SECURITIES :
(USA) LLC f/k/a CREDIT SUISSE FIRST  :
BOSTON LLC; BANC OF AMERICA          :
SECURITIES LLC; THOMAS H. LEE        :
PARTNERS, L.P.; THOMAS H. LEE        :
ADVISORS, LLC; THL MANAGERS V, LLC;  :
THL EQUITY ADVISORS V, L.P.; THOMAS H. :
LEE EQUITY FUND V, L.P.; THOMAS H. LEE :
PARALLEL FUND V, L.P.; THOMAS H. LEE :
EQUITY (CAYMAN) FUND V, L.P.; THOMAS :
H. LEE INVESTORS LIMITED PARTNERSHIP; :
1997 THOMAS H. LEE NOMINEE TRUST;    :
THOMAS H. LEE; DAVID V. HARKINS;     :
SCOTT L. JAECKEL; SCOTT A. SCHOEN;   :
WILLIAM T. PIGOTT; LIBERTY CORNER    :
CAPITAL STRATEGIES, LLC; EMF         :
FINANCIAL PRODUCTS LLC; EMF CORE     :
FUND LTD.; DELTA FLYER FUND LLC; ERIC :
M. FLANAGAN; INGRAM MICRO, INC.; CIM :

8181709

VENTURES, INC.; BECKENHAM TRADING          :
CO., INC.; ANDREW KRIEGER; COAST           :
ASSET MANAGEMENT, LLC, f/k/a COAST         :
ASSET MANAGEMENT LP; CS LAND               :
MANAGEMENT LLC; CHRISTOPHER                :
PETTIT; and REFCO GROUP HOLDINGS,          :
INC.; and REFCO ASSOCIATES, INC.,          :
                                           :
                    Defendants             :
-------------------------------------------------------------------X

DAVID J. MOLTON declares as follows:

1.      I am a member of the law firm of Brown Rudnick Berlack Israels LLP, co-counsel for plaintiffs Kenneth M. Krys and Christopher Stride, as Joint Official Liquidators of Sphinx Ltd., et al. in the above-captioned action.  I respectfully submit this Declaration in support of Plaintiffs' Motion For Remand and/or Abstention.

2.      Annexed hereto as Exhibit A is a true and correct copy of the June 28, 2007 Fifth Amended Plan of Liquidation of Plusfunds Group, Inc. Under Chapter 11 of the United States Bankruptcy Code executed by the parties in the Chapter 11 case entitled Plusfunds Group, Inc., No. 06-10402 (JMP) (Bankr. S.D.N.Y.).

3.      Annexed hereto as Exhibit B is a true and correct copy of the August 7, 2007 Order (I) Confirming The Debtors' Fifth Amended Plan of Liquidation of Plusfunds Group, Inc. Under Chapter 11 of the United States Bankruptcy Code Section 1129 And Bankruptcy Rule 3020; (II) Approving Settlements In Connection Therewith; And (III) Granting Related Relief entered by the Hon. James M. Peck, United States Bankruptcy Judge in the Chapter 11 Proceeding.

4.      Annexed hereto as Exhibit C is a true and correct copy of the Commercial Division of the Supreme Court of the State of New York, *Report of the Office of Court Administration to the Chief Judge on the Commercial Division Focus Groups* (2006).

5. Annexed hereto as <u>Exhibit D</u> is a true and correct copy of an Article by Tamara Loomis, *High–Profile Case Casts Spotlight On Well-Regarded Court*, 227 N.Y. L.J. 5, col.2 (2002).

6. Annexed hereto as <u>Exhibit E</u> is a true and correct copy of an Article by David Klingsberg <u>*et al*</u>., *Techniques For Expediting And Streamlining Litigation*, 4 N.Y. Prac., Com. Litig. In New York State Courts § 56:2 (2d ed.) (2007).

7. Annexed hereto as <u>Exhibit F</u> is a true and correct copy of materials from the website for the Commercial Division of the Supreme Court of the State of New York, New York County, *Court for the New Millennium and History of the Commercial Division* (last visited April 9, 2008).

8. Annexed hereto as <u>Exhibit G</u> is a true and correct copy of a Report by the National Center for State Courts, *Case Processing Time Standards In State Courts*, 2002-2003.

I declare under penalty of perjury that the foregoing is true and correct.

Executed April 25, 2008

       /s/ David J. Molton
       David J. Molton

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------- x
In re:                                             :    Chapter 11
                                                   :
PLUSFUNDS GROUP, INC.,                             :    Case No. 06-10402 (JMP)
a Delaware corporation,                            :
                                                   :
                              Debtor.              :
-------------------------------------------------- x
```

**FIFTH AMENDED PLAN OF LIQUIDATION OF PLUSFUNDS GROUP, INC.**
**UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

**CURTIS, MALLET-PREVOST,  COLT & MOSLE LLP**

Steven J. Reisman (SR 4906)
L.P. Harrison 3rd (LH 5540)
Jerrold L. Bregman (JB 0784)
101 Park Avenue
New York, New York  10178-0061
Telephone:  (212) 696-6000
Facsimile:  (212) 697-1559

Attorneys for PlusFunds Group, Inc.

Dated:  June 28, 2007
        New York, New York

3045794

# Table of Contents

Page #

ARTICLE I.  DEFINED TERMS, RULES OF INTERPRETATION,  COMPUTATION OF TIME AND GOVERNING LAW ...................................................................... 1

    A.    Rules of Interpretation, Computation of Time and Governing Law ..................... 1
    B.    Defined Terms.......................................................................................................... 1

ARTICLE II.  ADMINISTRATIVE CLAIMS, PROFESSIONAL FEES AND PRIORITY TAX CLAIMS ...................................................................................................... 11

    A.    Introduction ........................................................................................................... 11
    B.    Administrative Claims Other Than Professional Fee Claims................................ 11
    C.    Professional Fee Claims ....................................................................................... 12
    D.    Priority Tax Claims ............................................................................................... 12

ARTICLE III.  CLASSIFICATION AND TREATMENT OF  CLASSIFIED CLAIMS AND EQUITY INTERESTS ......................................................................................... 12

    A.    Summary ............................................................................................................... 12
    B.    Classification and Treatment of Claims Against the Debtor................................ 13

ARTICLE IV.  ACCEPTANCE OR REJECTION OF THE PLAN ..................................... 14

    A.    Voting Classes...................................................................................................... 14
    B.    Acceptance by Impaired Classes ......................................................................... 14
    C.    How to Vote .......................................................................................................... 15
    D.    Confirmation Hearing ........................................................................................... 15

ARTICLE V.  EFFECT OF CONSUMMATION ................................................................ 15

    A.    Vesting of Cash and Assets in the Trusts ............................................................ 15
    B.    Establishment of the Trusts .................................................................................. 16
    C.    Securities Laws ..................................................................................................... 16
    D.    Authority to Effectuate Plan................................................................................. 16
    E.    Post-Confirmation Status Report ......................................................................... 16
    F.    Binding Effect ....................................................................................................... 16
    G.    Limitation of Liability .......................................................................................... 17
    H.    General Release ..................................................................................................... 17
    I.    Injunction ............................................................................................................. 18
    J.    Terms of Existing Injunctions or Stays ............................................................... 18
    K.    Good Faith............................................................................................................. 18

ARTICLE VI.  IMPLEMENTING THE PLAN ................................................................... 18

    A.    Generally .............................................................................................................. 18
    B.    Funding of the Plan .............................................................................................. 19
    C.    Post Confirmation Estate...................................................................................... 19
    D.    Assignment of Policyholder Interests ................................................................. 19
    E.    PlusFunds General Trust ...................................................................................... 19
    F.    The SPhinX Trust ................................................................................................. 22
    G.    Exculpation ........................................................................................................... 24

ARTICLE VII.  TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .............................................................................................................. 24

    A.    Rejection of Executory Contracts and Unexpired Leases ................................... 24
    B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases........... 25

ARTICLE VIII.  PROVISIONS GOVERNING DISTRIBUTIONS ................................... 25

    A.    Distributions for Claims Allowed as of the Effective Date................................. 25

i

|   | B.  | Distributions; Preservation of Causes of Action; Closing the Chapter 11 Case | 25 |
|---|-----|------------------------------------------------------------------------------|----|
|   | C.  | Manner of Payment and Transfer Tax | 26 |
|   | D.  | Transmittal of Distributions to Parties Entitled Thereto | 26 |
|   | E.  | Disputed Claims and Unclaimed Property | 26 |
|   | F.  | Setoffs | 27 |
|   | G.  | Vesting Of Remaining Assets | 27 |
|   | H.  | Corporate Action | 28 |
|   | I.  | No Release | 28 |
|   | J.  | DeMinimis Payments and Distributions | 28 |

ARTICLE IX.  PROCEDURES FOR RESOLVING DISPUTED CLAIMS ........................... 28

|   | A.  | Prosecution of Objections to Claims | 28 |
|---|-----|-------------------------------------|----|
|   | B.  | Estimation of Claims | 29 |
|   | C.  | Cumulative Remedies | 29 |

ARTICLE X.  CONDITIONS PRECEDENT TO CONFIRMATION AND
CONSUMMATION OF THE PLAN ......................... 29

|   | A.  | Conditions Precedent to Confirmation and Consummation | 29 |
|---|-----|-------------------------------------------------------|----|
|   | B.  | Effect of Non-Occurrence of Conditions to Consummation | 30 |
|   | C.  | Notice of Effective Date and Second Administrative Bar Date | 30 |

ARTICLE XI.  RETENTION OF JURISDICTION ......................... 30

ARTICLE XII.  MISCELLANEOUS PROVISIONS ......................... 32

|   | A.  | Post Effective Date Disposition of Debtor Entity | 32 |
|---|-----|--------------------------------------------------|----|
|   | B.  | Post Effective Date Disposition of PFG-LLC and SPhinX Onshore | 32 |
|   | C.  | Payment of Statutory Fees | 32 |
|   | D.  | Modification of Plan | 33 |
|   | E.  | Professional Fee Claims | 33 |
|   | F.  | Successors and Assigns | 33 |
|   | G.  | Reservation of Rights | 33 |
|   | H.  | Further Assurances | 33 |
|   | I.  | Retiree Benefits | 33 |
|   | J.  | Notices | 34 |
|   | K.  | Filing of Additional Documents | 34 |
|   | L.  | Enforceability | 34 |
|   | M.  | Document Retention | 34 |
|   | N.  | Conflict | 35 |
|   | O.  | Headings | 35 |
|   | P.  | Severability | 36 |

3045794

Pursuant to Chapter 11 of the Bankruptcy Code (defined below), PlusFunds Group, Inc., the debtor and debtor-in-possession in the above-captioned Chapter 11 case, respectfully proposes this Plan of Liquidation.

Reference is made to the Disclosure Statement accompanying the Plan, including the exhibits thereto, for a discussion of the Debtor's history, business, assets, and for a summary and analysis of this Plan. All Holders of Claims should read the Disclosure Statement and the Plan carefully – and consult with their legal counsel and other advisors of their choosing – before voting to accept or reject the Plan.

# ARTICLE I.

## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW

**A.     Rules of Interpretation, Computation of Time and Governing Law**

1.     For purposes of the Plan: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and each pronoun, whether stated in the masculine, feminine or neuter gender, shall include the masculine, feminine and the neuter gender; (b) any reference in the Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference in the Plan to an existing document or exhibit Filed, or to be Filed, shall mean such document or exhibit, as it may have been or may be amended, modified or supplemented; (d) unless otherwise specified, all references in the Plan to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to the Plan; (e) the words "herein" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles and Sections are inserted for reference only and are not intended to be a part of or to affect the interpretation of the Plan; (g) the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply hereto; and (h) any term used in capitalized form in the Plan that is not defined herein but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to such term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

2.     In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

3.     Except to the extent that the Bankruptcy Code or Bankruptcy Rules are applicable, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, for contracts that are entered into and to be performed within New York, without giving effect to the principles of conflict of laws thereof.

**B.     Defined Terms**

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form in the Plan:

1.     "Accounts Receivable" means the Debtor's interest in amounts owing to the Debtor for value provided by the Debtor but only to the extent listed in Exhibit 4 hereof.

1

2.    "Administrative Claim" means a Claim for costs and expenses of administration under Section 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate and operating the business of the Debtor; (b) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses awarded or allowed under Section 330(a) or 331 of the Bankruptcy Code; (c) all fees and charges assessed against the Estate under 28 U.S.C. §§ 1911-1930; and (d) all obligations designated as Allowed Administrative Claims pursuant to an order of the Bankruptcy Court.

3.    "Administrative Claims Bar Date" means September 22, 2006 at 4:00 p.m. (prevailing Eastern Time), the date set by the Bankruptcy Court as the last day for filing all requests for payment of Administrative Claims incurred or accruing on or before August 31, 2006, other than those Administrative Claims expressly excluded therefrom pursuant to the Order entered August 29, 2006.

4.    "Advisory Board" means the trust advisory board provided for in the SPhinX Trust Agreement, which shall have oversight function with respect to the SPhinX Trust.

5.    "Allowed" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that has been scheduled by the Debtor in its Schedules as other than disputed, contingent or unliquidated and as to which the Debtor or other party in interest has not Filed an objection on or before the 365th day after the Effective Date or such further date set by the Bankruptcy Court; (b) a Claim Filed by the Bar Date or Administrative Bar Date, as applicable, which is neither contingent nor unliquidated, and as to which no party in interest has filed an objection or motion to estimate such Claim on or before the 365th day after the Effective Date or such further date set by the Bankruptcy Court; (c) a Claim that has been allowed by a Final Order; (d) a Claim that is allowed: (i) in any stipulation of amount and nature of Claim executed by the Debtor prior to the Effective Date and approved by the Bankruptcy Court; (ii) in any stipulation of amount and nature of Claim executed by the Trustee or the Debtor, as the case may be, on or after the Effective Date and, to the extent necessary, approved by the Bankruptcy Court; (iii) in any stipulation of amount and nature of any Administrative Claim, Priority Claim or Priority Tax Claim executed by the Debtor or the Trustee and, to the extent necessary, approved by the Bankruptcy Court; or (iv) in any stipulation of amount and nature of any Assumed Disputed Claim executed by the Trustee or the Debtor, as the case may be, and the JOLs or SPhinX Trustee, as the case may be, and any holders of any of the Assumed Disputed Claims, (e) a Claim relating to a rejected executory contract or unexpired lease that either (i) is not a Disputed Claim or (ii) has been allowed by a Final Order, in either case only if a proof of Claim has been Filed by the Bar Date or Administrative Bar Date or Second Administrative Bar Date, as applicable, or has otherwise been deemed timely Filed under applicable law; or (f) a Claim that is allowed pursuant to the terms of this Plan.

6.    "Allowed Claim" means a Claim that has been Allowed.

7.    "Assets" means all property of the Estate described in Section 541 of the Bankruptcy Code, including, without limitation, Cash, Intellectual Property Rights, D&O Coverage, Causes of Action, Documents, claims, furniture, fixtures, equipment, accounts, chattel paper, deposits, deposit accounts, reserves, contractual rights, improvements, privileges, easements, leases, subleases, licenses, supplies, and other general intangibles of any nature.

8.    "Assumed Disputed Claims" means the Disputed Administrative Claims consisting of approximately $900,000 of Administrative Claims filed by Fund Managers of non-U.S.-based SPhinX Funds against the Debtor, as set forth in Exhibit C of the Plan Term Sheet, for such Fund Managers' unpaid management fees, and up to approximately $400,000 of Administrative Claims asserted by S&P.

2

9.     "Avoidance Actions" mean all claims and causes of action which the Debtor has or had arising under any of Sections 510, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code, including, without limitation, the Preference Claims.

10.     "Ballot Date" means the date stated in the Voting Instructions by which all Ballots must be received, which date shall be July 30, 2007 at 4:00 p.m. (prevailing Eastern Time).

11.     "Ballots" mean the ballots upon which Holders of Claims shall indicate their acceptance or rejection of the Plan in accordance with the Plan and the Voting Instructions.

12.     "Bankruptcy Code" means Title I of the Bankruptcy Reform Act of 1978, as amended from time to time, as set forth in Sections 101 *et seq*. of Title 11 of the United States Code, and applicable portions of Titles 18 and 28 of the United States Code.

13.     "Bankruptcy Court" means the United States District Court for the Southern District of New York having jurisdiction over the Debtor's Chapter 11 Case and, to the extent of any reference made pursuant to Section 157 of Title 28 of the United States Code and/or the General Order of such District Court pursuant to Section 151 of Title 28 of the United States Code, the bankruptcy court unit of such District Court.

14.     "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 11 Case, promulgated under 28 U.S.C. § 2075 and the Local Rules of the Bankruptcy Court.

15.     "Bar Date" means May 15, 2006, the date set by the Bankruptcy Court as the last day for filing a proof of a Claim arising prior to the Petition Date against the Debtor in the Chapter 11 Case, other than those Claims expressly excluded therefrom pursuant to the Order approving the Bar Date.

16.     "Business Day" means any day, other than a Saturday, Sunday or legal holiday (as defined in Bankruptcy Rule 9006(a)).

17.     "Cash" means cash and cash equivalents, including, but not limited to, bank deposits, wire transfers, checks, and readily marketable securities, instruments and legal tender of the United States of America.

18.     "Causes of Action" means, except for the Retained Assets, all of the Debtor's legal and equitable interests in any claim (as defined in Section 101(5) of the Bankruptcy Code) against any Entity, including, without limitation, the right to recover anything of value in respect of (a) any Avoidance Action, (b) any Indemnity Claim, (c) any Preference Claim, (d) any Director Claim, (e) the S&P Adversary Proceeding, (f) the D&O Coverage, (g) Refco Non-Debtor Claims, (h) Other Claims, (i) the Excess Refco Recovery and (j) any claim against the SPhinX Funds or the JOLs in their capacity as such, other than the right to enforce the Plan Term Sheet, the SPhinX License, the Plan and the Confirmation Order, which Causes of Action are to be assigned to and vested in the SPhinX Trust pursuant to the Plan. For the avoidance of doubt, the Causes of Action do not include the Retained Assets.

19.     "Certain PlusFunds' Claims Against Its Agents" means any (a) Avoidance Actions or Preference Claims against XRoads Solutions Group, LLC or Curtis, Mallet-Prevost, Colt & Mosle LLP, or (b) any claim (as defined in Section 101(5) of the Bankruptcy Code), arising after PlusFunds' Petition Date, that PlusFunds may have against any of its officers, directors, employees, consultants, agents, representatives, attorneys, accountants, financial advisors, lenders, experts, or professionals and agents of the foregoing, for any actions taken or omitted to be taken arising out of or relating exclusively to the

following: (i) PlusFunds' operations and/or administration of its bankruptcy case after the Petition Date; (ii) PlusFunds' Chapter 11 case; or (iii) the formulation, preparation, pursuit, dissemination, implementation, administration, confirmation, or consummation of the Plan and Disclosure Statement.

20.     "Chapter 11 Case" means the case commenced under Chapter 11 of the Bankruptcy Code by the Debtor on the Petition Date, styled *In re PlusFunds Group, Inc.*, Case No. 06-10402 (JMP), currently pending before the Bankruptcy Court.

21.     "Claim" means a claim (as defined in Section 101(5) of the Bankruptcy Code) against the Debtor, including, but not limited to: (a) any right to payment from the Debtor whether or not such right is reduced to judgment, liquidated, unliquidated, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (b) any right to an equitable remedy for breach of performance if such performance gives rise to a right of payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

22.     "Class" means a category of Holders of Claims or Equity Interests as set forth in Article III of the Plan.

23.     "Confirmation" means the entry of the Confirmation Order, subject to the conditions specified in Article XI of the Plan having been (a) satisfied or (b) waived pursuant to Article XI.

24.     "Confirmation Date" means the date upon which the Confirmation Order is entered by the Bankruptcy Court on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

25.     "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code.

26.     "Consummate" or "Consummation" means the occurrence of or to achieve the Effective Date.

27.     "Contingent Claim" means a Claim that has accrued but nonetheless remains dependent on the occurrence of a future event that may never occur.

28.     "Creditor" means any Holder of a Claim against the Debtor.

29.     "Creditor Distributable Assets" means all interests in the Remaining Assets and proceeds thereon held or generated by the General Trust net of the expenses of administering the General Trust, including, without limitation, the fees and expenses of the Trustee and his/her professionals.

30.     "Debtor" means PlusFunds Group, Inc.

31.     "Debtor in Possession" means the Debtor as debtor-in-possession in the Chapter 11 Case pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

32.     "DIMAs" means the discretionary investment management agreements between the Debtor and the various Fund Managers pursuant to which the Debtor delegated certain of its investment management authority over the SPhinX Funds' segregated investment portfolios to the Fund Managers.

33.     "Director Claim" means any right the Debtor or the SPhinX Trust may have to pursue any action against any past or present director of the Debtor, including, without limitation, claims, if any,

for breach of contract, breach of fiduciary duty, negligence, fraud, conspiracy, malice, willful misconduct or dereliction of duty.

34. "D&O Coverage" means any right the Debtor or the SPhinX Trust may have to insurance coverage in respect of any claims, defense costs, losses, or similar matters that are suffered or payable by the Debtor or any of its officers and directors, under any insurance policies, including any policy issued by Westchester Surplus Lines Insurance Company, Illinois Union Insurance Company, INA Surplus Insurance Company, or any other Entity, and any professional liability coverage.

35. "Disclosure Statement" means the Disclosure Statement with Respect to the Fifth Amended Plan of Liquidation of PlusFunds Group, Inc., dated June 28, 2007, as amended, supplemented, or modified from time to time, describing this Plan.

36. "Disclosure Statement Hearing" means the hearing at which the Bankruptcy Court is to consider whether the Disclosure Statement contains adequate information for solicitation purposes within the meaning of Section 1125 of the Bankruptcy Code.

37. "Disputed" means, with respect to any Claim or Equity Interest, any Claim or Equity Interest: (a) listed on the Schedules as unliquidated, disputed or contingent; or (b) as to which the Debtor or any other party in interest has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules or is otherwise disputed in accordance with applicable law, which objection, request for estimation or dispute has not been withdrawn or determined by a Final Order.

38. "Distribution" means any consideration to be distributed to any Entity under Article IX of the Plan.

39. "Distribution Dates" means collectively the Initial Distribution Date, any Subsequent Distribution Date and the Final Distribution Date.

40. "Distribution Record Date" means the close of business on the Business Day immediately preceding the Effective Date.

41. "Documents" means all of the Debtor's books, records, agreements, correspondence, offering memoranda, email, and other documents concerning its business of which it was in possession as of the Petition Date.

42. "Effective Date" means the date selected by the Debtor that is a Business Day after the Confirmation Date on which all conditions specified in Article XI.B of the Plan have been satisfied or waived.

43. "Entity" means an entity as defined in Section 101(15) of the Bankruptcy Code.

44. "Equity Interest" means any equity interest in the Debtor, including, but not limited to, all issued, unissued, authorized or outstanding shares or stock, together with any warrants, options or contract rights to purchase, acquire or sell such interests at any time.

45. "Estate" means the estate of the Debtor in the Chapter 11 Case, created pursuant to Section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

46.     "Excess Refco Recovery" means any recovery on account of the Refco Proofs of Claim solely to the extent that the Refco Proofs of Claim are allowed against the Refco Debtors in an amount in excess of $7 million.

47.     "File" or "Filed" means to file, or to have filed, a document with the Bankruptcy Court.

48.     "Final Decree" means the decree contemplated under Bankruptcy Rule 3022.

49.     "Final Distribution Date" means the date of the last payment to Holders of Allowed Claims in accordance with the Plan.

50.     "Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek *certiorari* has expired and no appeal or petition for *certiorari* has been timely taken, or as to which any appeal that has been taken or any petition for *certiorari* that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought.

51.     "Fund Managers" means third-party managers selected by S&P to whom the Debtor delegated certain of its investment management authority with respect to the SPhinX Funds' segregated investment portfolios pursuant to the DIMAs.

52.     "General Trust" means the "General Creditor Trust" within the meaning of the Plan Term Sheet, namely, the liquidating trust established under the Plan for the exclusive benefit of the Holders of Allowed Claims in Class 4.

53.     "General Trust Agreement" means the agreement, substantially in the form annexed as Exhibit 1 hereto, as it may be subsequently modified, pursuant to which the General Trust is to be created and governed.

54.     "General Unsecured Claim" means any Unsecured Claim against the Debtor that is not entitled to priority under Section 507(a) of the Bankruptcy Code.

55.     "HFI IP" means the intellectual property comprising the S&P Hedge Fund Index and certain other intellectual property that the Debtor may have the right to purchase pursuant to the option granted to the Debtor under the S&P License Agreement and other agreements with S&P.

56.     "Holder" means an Entity holding a Claim or Equity Interest.

57.     "IMAs" means the investment management agreement, as amended and modified, between the Debtor and the various SPhinX Funds pursuant to which the Debtor provided investment management services to the SPhinX Funds.

58.     "Impaired" means with respect to a Claim or Class of Claims, a Claim or Class of Claims that is impaired within the meaning of Section 1124 of the Bankruptcy Code.

59.     "Indemnity Claim" means any right the Debtor may have to be indemnified for any claims or losses for any reason from any Entity, including, without limitation, any of the SPhinX Funds, SMF-LP, SIF-LP, PFG-LLC, and SPhinX-Onshore.

6

60.    "Initial Distribution Date" means the first date upon which the initial Distribution shall be made to the Holders of Allowed Claims in Class 4, which shall be as soon as possible as determined by the Trustee in the exercise of the Trustee's business judgment.

61.    "Insider" means an insider of the Debtor, as defined in Section 101(31) of the Bankruptcy Code.

62.    "Intellectual Property Rights" means the PlusFunds Intellectual Property, as defined in Paragraph 8 of the Wind-Down Agreement, including the HFI IP and the OTC License, plus any and all other intellectual property owned by the Estate as of the Effective Date, including, without limitation, Transaction Data.

63.    "Investors" means the holders of Investor Claims.

64.    "Investor Claims" means the timely filed General Unsecured Claims filed by various investors in the SPhinX Funds and the U.S.-based funds that were part of the SPhinX Funds platform, in their capacity as investors, estimated, collectively, at approximately $274 million, as set forth in Exhibit 5 hereto.

65.    "IRS" means the Internal Revenue Service of the United States Department of the Treasury.

66.    "JOLs" means the Joint Official Liquidators of the Cayman Islands-based SPhinX Funds.

67.    "Lien" means any charge against or interest in property (including, but not limited to, any mortgage, lien, pledge, charge, security interest, encumbrance or other security device of any kind) to secure payment of a debt or performance of an obligation.

68.    "Liquidating Debtor" means the Debtor on and after the Effective Date.

69.    "Non-SPhinX Claims" means Allowed General Unsecured Claims other than the SPhinX Claim.

70.    "Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction.

71.    "OTC License" means all of the rights and interests that the Debtor acquired pursuant to the settlement agreement, dated September 2, 2005, between the Debtor and OTC, Inc. and parties related to OTC.

72.    "Other Claims" means, collectively, all additional Causes of Action that PlusFunds may have, including, without limitation, claims against Bank fur Arbeit und Wirtschaft (BAWAG), DMP Mellon, PricewaterhouseCoopers, the former officers and directors of the SPhinX Funds and the Refco entities, including, without limitation, Phillip Bennett and Robert Trosten, and possibly others.

73.    "Petition Date" means March 6, 2006, the date on which the Debtor filed its voluntary petition for relief commencing the Chapter 11 Case.

74.    "PFG-LLC" means PlusFunds GP LLC, a Delaware limited liability company, of which the Debtor is the managing member. PFG-LLC is the general partner of SMF-LP and SIF-LP.

75. "Plan" means the Chapter 11 Plan of Liquidation, including any exhibits and schedules thereto, either in its present form or as it may be altered, amended, modified or supplemented from time to time in accordance with the Plan, the Bankruptcy Code and the Bankruptcy Rules.

76. "Plan Objection Deadline" means July 30, 2007 at 4:00 p.m. (prevailing Eastern Time), the deadline established by the Bankruptcy Court for filing and serving objections to Confirmation of the Plan.

77. "Plan Supplement" means the documents that supplement the Disclosure Statement and Plan which may contain, among other things, the Debtor's financial projections and other documents, and identifies the SPhinX Trustee, to be filed by the Debtor at or prior to the Confirmation Hearing.

78. "Plan Term Sheet" means that certain term sheet, dated April 26, 2007, between PlusFunds, the SPhinX Funds and the JOLs, annexed hereto as Exhibit 3.

79. "Preference Claim" means any right the Debtor or the SPhinX Trust may have to pursue avoidance and any recovery of any transfer made by the Debtor within one year of the Petition Date, under Sections 547 and 550 of the Bankruptcy Code, including, without limitation, claims, if any, against the Debtor's former officers, directors and employees who received payments in respect of reimbursement requests, and against their professionals, as well as claims against other Entities who received from the Debtor potentially preferential transfers.

80. "Priority Claim" means any Claim, other than an Administrative Claim or a Priority Tax Claim, to the extent entitled to priority under Section 507(a) of the Bankruptcy Code.

81. "Priority Tax Claim" means a Claim of a governmental unit of the kind specified in Sections 502(i) and 507(a)(8) of the Bankruptcy Code.

82. "Pro Rata" means proportionately so that, with respect to a Claim, the ratio of (a) (i) the amount of property distributed on account of a particular Claim to (ii) the Allowed amount of the Claim, is the same as the ratio of (b) (i) the amount of property distributed or held on account of all Claims of the Class in which the particular Claim is included (other than Claims disallowed by Final Order) to (ii) the amount of all Claims in that Class (other than Claims disallowed by Final Order).

83. "Professional" means an Entity (a) employed by the Debtor pursuant to a Final Order of the Bankruptcy Court, (b) for whom compensation and reimbursement has been allowed by the Bankruptcy Court, and (c) any attorneys, accountants, appraisers, or other persons deemed by the Trustee to have qualifications necessary to assist in the proper administration of the Trust.  Professionals include (i) XRoads Solutions Group, LLC, (ii) Bankruptcy Services LLC, (iii) Curtis, Mallet-Prevost, Colt & Mosle LLP, and (iii) Robert E. Malchman, Attorney at Law (in his capacity as counsel in connection with the S&P Adversary Proceeding).

84. "Professional Fee Claim" means those fees and expenses claimed by Professionals that are accrued and unpaid as of the Effective Date (this does not include fees paid to Professionals prior to the Effective Date in accordance with procedures approved by the Bankruptcy Court, which procedures are unaffected by the Plan).

85. "Proof of Claim" means a proof of claim, together with supporting documents, Filed pursuant to Section 501 of the Bankruptcy Code and/or any order of the Bankruptcy Court.

3045794

86.    "Remaining Assets" means the Estate's interest in the Assets as of the Effective Date immediately after the Debtor has satisfied its payment and distribution obligations under the Plan, including to vest the Causes of Action in the SPhinX Trust.

87.    "Refco Committee" means the official committee of unsecured creditors serving in the Refco Debtors' bankruptcy cases.

88.    "Refco Debtors" means the Refco entities whose bankruptcy cases are pending in the Southern District of New York, including the entities whose bankruptcy cases have been procedurally consolidated under Case Number 05-60006, and Refco, LLC.

89.    "Refco Proofs of Claim" mean, collectively, all of the Debtor's legal and equitable interests in the proofs of claim that the Debtor filed in the Refco Debtors' cases, as amended.

90.    "Refco Non-Debtor Claims" means any and all claims against affiliates of the Refco Debtors who are not debtors in bankruptcy proceedings, including, without limitation, against Refco Alternative Investments.

91.    "Reserve Amount" means the amount of Creditor Distributable Assets reserved on behalf of a particular Creditor's Claim.

92.    "Retained Assets" means all of the Debtor's legal and equitable interests in (i) the Refco Proofs of Claim, (ii) Certain PlusFunds' Claims Against its Agents, (iii) the Accounts Receivable, (iv) the Intellectual Property Rights, (v) the right to use the Causes of Action solely for the purposes, as necessary, of defending, setting off, offsetting, or otherwise objecting to, the Claims set forth in Exhibit B of the Plan Term Sheet, and (vi) any Indemnity Claim against SMF-LP, SIF-LP, PFG-LLC, SPhinX-Onshore and/or any direct or indirect investor therein, including the right to recover from any insurance policy for the benefit of SMF-LP, SIF-LP, PFG-LLC, and/or SPhinX-Onshore, but only to the extent of any asserted Claim against the Debtor, whether or not Allowed, by SMF-LP, SIF-LP, PFG-LLC, and/or SPhinX-Onshore, or by a direct or indirect investor in, or creditor of, SMF-LP, SIF-LP, PFG-LLC, and/or SPhinX-Onshore.

93.    "S&P" means Standard & Poor's, a Division of The McGraw Hill Companies, Inc.

94.    "S&P Adversary Proceeding" means the adversary proceeding captioned *PlusFunds Group, Inc. v. Standard & Poor's, a Division of The McGraw Hill Companies, Inc.*, Adv. Pro. No.: 06-01630 (JMP).

95.    "S&P License Agreement" means the license agreement to which the Debtor is a party with S&P, dated as of December 20, 2001, as amended.

96.    "Schedules" means the schedules of assets and liabilities the Bankruptcy Court requires the Debtor to file pursuant to Section 521 of the Bankruptcy Code, the Official Bankruptcy Forms and the Bankruptcy Rules, as they may be amended and supplemented from time to time, and the Debtor's Filed statement of financial affairs.

97.    "Secured Claim" means any Claim that is (a) secured in whole or part, as of the Petition Date, by a Lien which is valid, perfected and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, or (b) subject to setoff under Section 553 of the Bankruptcy Code, but, with respect to both (a) and (b) above, only to the extent of the

9

value, net of any senior Lien, of the Estate's interest in the assets or property securing any such Claim or the amount subject to setoff, as the case may be.

98.     "Shareholders" means the Holders of Equity Interests.

99.     "SIF-LP" means SPhinX Investment Fund, LP, a Delaware limited partnership, the general partner of which is PFG-LLC.

100.     "SMF-LP" means SPhinX Managed Futures Fund, L.P., a Delaware limited partnership, the general partner of which is PFG-LLC.

101.     "Solicitation Package" means the documents approved by the Bankruptcy Court for distribution to Holders of Claims in connection with the Debtor's solicitation of such Holders' votes to accept or reject the Plan.

102.     "SPhinX Claim" means the proof of claim filed by the JOLs on behalf of the Cayman Islands-based SPhinX Funds on May 15, 2006, as reduced and Allowed in the amount of $250 million.

103.     "SPhinX Committee" means the members of the liquidation committee in the insolvency proceedings of the SPhinX Funds pending in the Grand Court of the Cayman Islands.

104.     "SPhinX Funds" means the entities for which the Debtor provided investment management services pursuant to the IMAs, which together comprise the platform of funds that were created to track the performance of the S&P Hedge Fund Index, and which are listed on Exhibit E to the Plan Term Sheet.

105.     "SPhinX Onshore" means SPhinX Onshore Investment Fund LLC, a Delaware limited liability company of which the Debtor is the Manager and SPhinX Access LLC (of which Merrill Lynch Alternative Investments LLC is the Manager) is the sole Member.

106.     "SPhinX Trust" means the liquidating trust established under the Plan for the exclusive benefit of the SPhinX Funds.

107.     "SPhinX Trust Agreement" means the agreement, substantially in the form annexed as Exhibit 2 hereto, as it may be subsequently modified, pursuant to which the SPhinX Trust is to be created and governed.

108.     "SPhinX Trustee" means any individual(s) or Entity(ies) initially designated by the JOLs on behalf of the SPhinX Funds and retained, as of the Effective Date or thereafter, as the trustee(s) of the SPhinX Trust.

109.     "Subsequent Distribution Date" means any date after the Initial Distribution Date (a) that is (i) set by the Trustee or (ii) otherwise ordered by the Bankruptcy Court, and (b) upon which the Trustee makes a Distribution to any Holders of Class 4 claimants.

110.     "Tax" means any tax, charge, fee, levy, or other assessment by any federal, state, local or foreign taxing authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, *ad valorem*, estimated, severance, stamp, occupation and withholding tax. "Tax" shall include any interest or additions attributable to, imposed on or with respect to such assessments.

10

111.    "Transaction Data" means data and related information belonging to the Debtor that is stored on any of the Debtor's computers arising from, reflecting, or relating to the trading activities and performance of the various managed accounts for which the Debtor has provided investment management and related services.

112.    "Trustee" means the trustee of the General Trust, proposed to be Florence V. Lentini and/or any other individual or Entity(ies) designated by the Debtor and retained, as of the Effective Date or thereafter, as the fiduciary responsible for administering the General Trust.

113.    "Unimpaired Claim" means an unimpaired Claim within the meaning of Section 1124 of the Bankruptcy Code.

114.    "U.S. Trustee" means the Office of the United States Trustee for the Southern District of New York.

115.    "Voting Instructions" means the instructions for voting on the Plan contained in Article I of the Disclosure Statement as well as the Voting Instructions approved by the Bankruptcy Court for inclusion as part of the Solicitation Package.

116.    "Voting Record Date" means the date as of which the identity of Holders of Claims is set for purposes of determining the Entities entitled to receive and vote on the Plan. Pursuant to Bankruptcy Rules 3017(d) and 3018(a), this date is the date of entry of the Bankruptcy Court's order approving the Disclosure Statement or such other date as the Bankruptcy Court may set.

117.    "Wind-Down Agreement" means the letter agreement, dated May 8, 2006, between the Debtor and the SPhinX Funds, as modified and approved by the Bankruptcy Court on May 15, 2006, as amended, and subsequently modified and extended through September 30, 2006, pursuant to agreements between the Debtor and the JOLs, dated July 31, 2006, August 15, 2006, and August 31, 2006.

## ARTICLE II.

## ADMINISTRATIVE CLAIMS, PROFESSIONAL FEES AND PRIORITY TAX CLAIMS

**A.    <u>Introduction</u>**

Certain types of Claims are not placed into voting Classes; instead they are unclassified. They are not considered Impaired and they do not vote on the Plan because they are automatically entitled to the specific treatment provided for them in the Bankruptcy Code. As such, the Debtor has not placed the following Claims in a Class:

**B.    <u>Administrative Claims Other Than Professional Fee Claims</u>**

The Debtor shall pay each Holder of an Allowed Administrative Claim the full amount of its Allowed Claim, without interest, in Cash on the latter of the Effective Date and the date such Claim becomes an Allowed Administrative Claim; however, the JOLs shall pay the Assumed Disputed Claims to the extent they are Allowed. The Holder of an Allowed Administrative Claim may be paid on such other date and upon such other terms as may be agreed upon in writing by that Holder and the Debtor. Without limiting the foregoing, all fees payable under 28 U.S.C. § 1930 that have not been paid, shall be paid on or before the Effective Date. The Debtor estimates that Allowed Administrative Claims will total approximately $125,000 net of Professional Fee Claims as of the Effective Date.

11

Any person or entity (exclusive of the Claims of Professionals) holding an Administrative Claim against the Debtor pursuant to Section 503(b) of the Bankruptcy Code arising on or after September 1, 2006, that has not been paid on or before the Effective Date, may File a request for payment with the Bankruptcy Court and shall serve a copy of the same on counsel for the Debtor, the Trustee and the U.S. Trustee. The deadline to file any such Administrative Claim shall be sixty (60) days after the Effective Date (the "Second Administrative Bar Date"). If any such Administrative Claim is not Filed on or before the Second Administrative Bar Date, then such Claim shall be deemed disallowed and no payment shall be made on such Claim. The Debtor, the Trustee and the U.S Trustee shall be afforded a period of sixty (60) days following the Second Administrative Bar Date to File an objection to the allowance of any such Filed Administrative Claim. If no objection is Filed within such time, or if such objection is overruled, then such Filed Administrative Claim shall be deemed Allowed and thereafter promptly paid by the Trustee. The Confirmation Order shall set forth the Second Administrative Bar Date and shall constitute notice of the same.

**C.      Professional Fee Claims**

For all pre-Effective Date Professional Fee Claims, except Bankruptcy Clerk's Office fees, U.S. Trustee's fees and XRoads' fees, the subject Professional must file and serve a properly noticed final fee application and the Bankruptcy Court must rule on the application. Only the amount of fees and expenses Allowed by the Bankruptcy Court will be owed and required to be paid under the Plan, if not yet paid, or retained, if previously paid. The Debtor estimates that Professional Fee Claims will total approximately $2,449,926 as of the Effective Date. CMP and XRoads have agreed to accept a discount and/or deferral of a portion of their fees and expenses in amounts to be disclosed at the Confirmation Hearing.

The Liquidating Debtor and the General Trust may retain and compensate Professionals for services rendered following the Effective Date without any order of the Bankruptcy Court.

**D.      Priority Tax Claims**

Holders of Allowed Priority Tax Claims shall be paid an amount that, as of the Effective Date, is equal to the Allowed Priority Tax Claim without interest or penalty accruing after the Petition Date, which shall be paid in one or more installments as soon as possible consistent with the best interests of all parties as determined by the Trustee in the exercise of the Trustee's business judgment, but not later than the third year anniversary of the Effective Date. The Debtor believes that there will be no Allowed Priority Tax Claims as of the Effective Date.

<div align="center">

**ARTICLE III.**

**CLASSIFICATION AND TREATMENT OF
CLASSIFIED CLAIMS AND EQUITY INTERESTS**

</div>

**A.      Summary**

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including voting, Confirmation and Distribution pursuant to the Plan and pursuant to Sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is to be deemed included in a particular Class only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled or disallowed prior

<div align="center">12</div>

to the Effective Date. No Claim will be paid prior to the latter of the Effective Date and the date such Claim is Allowed.

**B.**    **Classification and Treatment of Claims Against the Debtor**

The Plan's classification of Claims and Equity Interests against the Debtor and the treatment of such Claims and Equity Interests is set forth below.

**1.**    **Class 1 – Priority Employee and Consultant Claims**

Class 1 consists of all Allowed Priority Claims held by the Debtor's former employees and current and former consultants based on prepetition wages, commissions and similar claims under Section 507(a)(4) of the Bankruptcy Code.

**Impairment:** Class 1 Claims are unimpaired.

**Treatment:** The Debtor shall pay Allowed Priority Claims in full in Cash on the Effective Date. The Holder of an Allowed Priority Claim may be paid on such other date and upon such other terms as may be agreed upon in writing by that Holder and the Debtor. The portion of any Filed Priority Claim that exceeds the $10,000 statutory limit specified in Section 507(a)(4) of the Bankruptcy Code shall be treated as a General Unsecured Claim in Class 4. Class 1 is deemed to accept the Plan and Holders of Class 1 Claims are not entitled to vote on the Plan.

**2.**    **Class 2 – Secured Claims**

Class 2 consists of Allowed Secured Claims. The Debtor believes that there are no Secured Claims that will be Allowed.

**Impairment:** If there are any Class 2 Claims, they will be impaired.

**Treatment:** Each Holder of an Allowed Class 2 Claim, if any, shall receive in respect of such Claim one or more payments as soon as possible consistent with the best interests of all parties as determined by the Trustee in the exercise of the Trustee's business judgment, but not later than the third year anniversary of the Effective Date, which payments will equal the value, as of the Effective Date, of any assets that secure such Claim. Alternatively, at the discretion of the Trustee, Holders may receive the Debtor's interest in any property that is subject to the Holders' lien(s) or offsets in satisfaction of such Secured Claims. Any setoff rights of Holders of Claims are preserved in accordance with Section 553 of the Bankruptcy Code.

**3.**    **Class 3 – The SPhinX Claim**

Class 3 consists of the SPhinX Claim.

**Impairment:** Class 3 Claims is impaired.

**Treatment:** The SPhinX Claim shall be treated as follows:

A.    The SPhinX Claim shall be reduced by $62 million, from not less than $312 million, and Allowed in the amount of $250 million.

13

3045794

B.    The JOLs on behalf of the SPhinX Fund shall be the exclusive beneficiaries of the SPhinX Trust which shall be vested with the Causes of Action.[1]

C.    The SPhinX Funds shall receive no interest in the General Trust.

### 4.    Class 4 – General Unsecured Claims (but not the SPhinX Claim)

Class 4 consists of Allowed General Unsecured Claims, other than the SPhinX Claim, in the collective amount ranging from approximately $5 million to approximately $19 million, plus any Investor Claims (filed in the aggregate amount of approximately $274 million) that are Allowed.

**Impairment**:  Class 4 General Unsecured Claims are impaired.

**Treatment**:  Holders of Allowed Claims in this Class 4 to receive a *pro rata* beneficial interest in the General Trust, a liquidating trust for the exclusive benefit of Class 4 claimants.  The General Trust is to be vested with at least $1.5 million in cash plus the Retained Assets which have nominal realizable value.  Class 4 will receive the proceeds of the General Trust's assets after payment of administrative expenses of the General Trust.  The Allowed General Unsecured Claims in Class 4 shall receive such Distribution as soon as possible as determined by the Trustee in the exercise of the Trustee's business judgment.

### 5.    Class  5 – Equity Interests

Class 5 consists of all Allowed Equity Interests.

**Impairment:  Class 5 Equity Interests are impaired.**

**Treatment:**  All Class 5 Equity Interests shall be deemed cancelled and extinguished as of the Effective Date.  Holders of Equity Interests shall receive no distribution under the Plan in respect of such Equity Interests.

### ARTICLE IV.

### ACCEPTANCE OR REJECTION OF THE PLAN

#### A.    Voting Classes

Each Holder of an Allowed Claim in any of Classes 2, 3 and 4 and is entitled to vote either to accept or to reject the Plan.  Class 1 is deemed to accept the Plan, and Class 5 is deemed to reject the Plan, and neither is entitled to vote on the Plan.  Only those votes cast shall be counted in determining whether acceptances have been received sufficient in number and amount to obtain Confirmation.

#### B.    Acceptance by Impaired Classes

An Impaired Class of Claims shall have accepted the Plan if the Holders (without counting any Holder designated under Section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount, and more than one-half in number, of the Allowed Claims actually voting in such Class have voted to accept the Plan.

---

[1]    The vesting of the Causes of Action in the SPhinX Trust is subject to the right of the General Trust to use such Causes of Action solely for the purposes, as necessary, of defending, setting off, offsetting, or otherwise objecting to, the Claims set forth in Exhibit B of the Plan Term Sheet.

C.     **How to Vote**

A form of Ballot is being provided to Holders of Claims in Classes 2, 3 and 4 by which Creditors may vote their acceptance or rejection of the Plan.  To vote on the Plan, Holders of Claims who are entitled to vote should complete the Ballot as indicated thereon, (1) by indicating that such Holders accept or reject the Plan, and (2) by signing such Holders' names and mailing the Ballot in the envelope provided for this purpose.  Bankruptcy Services LLC, as the claims and balloting agent, will count the Ballots.

IN ORDER TO BE COUNTED, BALLOTS MUST BE COMPLETED, SIGNED AND RECEIVED NO LATER THAN 4:00 p.m. (prevailing Eastern Time) ON JULY 30, 2007.  BALLOTS MAY BE DELIVERED BY HAND, MAIL OR OVERNIGHT DELIVERY SERVICE TO THE FOLLOWING ADDRESS:

> **Bankruptcy Services LLC**
> **757 Third Avenue, 3rd Floor**
> **New York, NY 10017**
> **Attn: PlusFunds Group, Inc.**
> **Ballot Processing**

BALLOTS THAT ARE NOT PROPERLY COMPLETED, SIGNED AND RECEIVED AS DESCRIBED, WILL NOT BE COUNTED.  IF YOUR BALLOT IS DAMAGED OR LOST, YOU MAY REQUEST A REPLACEMENT BY ADDRESSING A WRITTEN REQUEST TO BANKRUPTCY SERVICES LLC AT THE ADDRESS SHOWN ABOVE.  FACSIMILE OR ELECTRONICALLY SUBMITTED BALLOTS WILL NOT BE COUNTED.

D.     **Confirmation Hearing**

The Bankruptcy Court shall schedule the Confirmation Hearing to determine whether this Plan has been accepted by the requisite parties in interest and whether the other requirements for Confirmation have been satisfied.  Each Creditor and Equity Interest Holder will receive notice of the Confirmation Hearing which is scheduled to commence on August 2, 2007 at 10:00 a.m (prevailing Eastern Time), before The Honorable James M. Peck, United States Bankruptcy Judge, in Courtroom 601 of the United States Bankruptcy Court, Southern District of New York, One Bowling Green, New York, New York 10004.

### ARTICLE V.

### EFFECT OF CONSUMMATION

A.     **Vesting of Cash and Assets in the Trusts**

On the Effective Date, the Causes of Action shall be transferred to and vest in the SPhinX Trust free of any Claims, Liens and Equity Interests, to be managed and used by the SPhinX Trustee for the sole benefit of the SPhinX Funds in accordance with the Plan and SPhinX Trust Agreement.  Notwithstanding the foregoing, the General Trust may use the Causes of Action vested in the SPhinX Trust solely for the purposes, as necessary, of defending, setting off, offsetting, or otherwise objecting to, those Claims which are set forth in Exhibit B of the Plan Term Sheet.

On the Effective Date, the Remaining Assets, including not less than $1.5 million in cash, shall be transferred to and vest in the General Trust free of any Claims, Liens and Equity Interests, to be managed

15

and used by the Trustee for the sole purposes of carrying out the Plan and effectuating the Distributions to Class 4 claimants provided for in the Plan.

**B.**    **Establishment of the Trusts**

The Debtor shall have the sole authority to administer all Assets prior to their transfer to the trusts created under the Plan. On or before the Effective Date, the Debtor shall establish the General Trust for the benefit of the Holders of Allowed General Unsecured Claims other than the SPhinX Claims, and the JOLs shall establish the SPhinX Trust for the exclusive benefit of the JOLs on behalf of the SPhinX Funds (and ultimately the creditors and interest holders of the SPhinX Funds). From and after the Confirmation Date, the Debtor shall not take any action with respect to the Causes of Action pending the Effective Date except that which is necessary to preserve them for the exclusive benefit of the SPhinX Trust.

**C.**    **Securities Laws**

The issuance of beneficial interests in the General Trust and the SPhinX Trust, respectively, to the beneficiaries of such trusts, are exempt from registration under the Securities Act of 1933, as amended, and all applicable state and local laws requiring registration of securities, pursuant to Section 1145 of the Bankruptcy Code. Nevertheless, if the Trustee and/or the SPhinX Trustee determine, with the advice of counsel, that their respective trust is required to comply with the registration and reporting requirements of the Securities and Exchange Act of 1934, as amended, or the Investment Company Act of 1940, as amended, the Trustee and/or the SPhinX Trustee, at the expense of their respective trust, shall take any and all actions to comply with such reporting requirements and file necessary periodic reports with the Securities and Exchange Commission.

**D.**    **Authority to Effectuate Plan**

Upon the entry of the Confirmation Order by the Bankruptcy Court, all matters provided under the Plan shall be deemed to be authorized and approved without further approval from the Bankruptcy Court. The Confirmation Order shall act as an order modifying the Debtor's by-laws such that the provisions of the Plan may be effectuated without any action by the Debtor's board of directors or Shareholders. The Debtor shall be authorized, without further application to or order of the Bankruptcy Court, to take whatever action is necessary to achieve Consummation and carry out the Plan and to effectuate the Distributions provided for thereunder.

**E.**    **Post-Confirmation Status Report**

Unless the Bankruptcy Court orders otherwise, within 90 days after the entry of the Confirmation Order, the Liquidating Debtor shall file a status report with the Bankruptcy Court explaining what progress has been made toward Consummation of the confirmed Plan. The status report shall be served on the U.S. Trustee and those parties who have requested special notice post-Confirmation. The General Trust shall file post-confirmation operating reports thereafter on a quarterly basis in accordance with the requirements of the U.S. Trustee and served on the same entities until such time as a Final Decree has been entered closing the Chapter 11 Case.

**F.**    **Binding Effect**

Except as otherwise expressly provided in the Plan, on and after the Effective Date, the Plan and all exhibits thereto shall bind the Liquidating Debtor, the Trustee and the SPhinX Trustee and all Holders of Claims and Equity Interests.

16

## G.    Limitation of Liability

There are no releases in the Plan for the benefit of any of the Debtor's past or present officers, directors, employees, members, agents, representatives, shareholders, attorneys, accountants, financial advisors, investment bankers, lenders, consultants, experts, or Professionals and agents for the foregoing, for any action taken prior to the Petition Date.

Except as expressly set forth in the Plan or otherwise provided by a Final Order of the Bankruptcy Court, on and after the Confirmation Date, neither the Debtor, nor its successors or assigns, including the Trustee, nor any of their respective past and present officers, directors, employees, members, agents, representatives, shareholders, attorneys, accountants, financial advisors, investment bankers, lenders, consultants, experts, and Professionals and agents for the foregoing, nor the SPhinX Trustee nor SPhinX Trust, nor the Advisory Board nor its members (in their capacity as such), shall have or incur any liability for, and are expressly exculpated and released from, any claim (as defined in Section 101(5) of the Bankruptcy Code) or any past or present actions taken or omitted to be taken under or in connection with, related to, effecting, or arising out of the following: (i) the Debtor's operations after the Petition Date; (ii) this Chapter 11 Case; (iii) the postpetition administration of the Debtor's Case and Assets; (iv) the pursuit of Confirmation; (v) the formulation, preparation, dissemination, implementation, administration, confirmation, or Consummation of the Plan Term Sheet, Plan and Disclosure Statement; (vi) the sale and liquidation of the Assets (including the prosecution of Causes of Action), or the property to be distributed under the Plan; (vii) any other act taken or omitted to be taken in connection with the Debtor's business after the Petition Date; or (viii) any contract, instrument, release, or other agreement entered into or created in connection with the foregoing; except only for actions or omissions to act to the extent determined by a court of competent jurisdiction (in a Final Order) to be by reason of such party's gross negligence, willful misconduct, or fraud, and in all respects, such party shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities; it being expressly understood that any act or omission with the approval of the Bankruptcy Court will be conclusively deemed not to constitute gross negligence, willful misconduct, or fraud unless the approval of the Bankruptcy Court was obtained by fraud. This provision is effective only to the extent it does not conflict with DR 6-102 of the New York Code of Professional Responsibility.

Notwithstanding anything herein or other section of the Plan or Disclosure Statement to the contrary, the foregoing limitation of liability, exculpation, and release, in this Article V, Section G, shall not apply to the Cayman Islands-based SPhinX Funds, any investors in such SPhinX Funds in their capacity as such or the JOLs, for any purpose, including, without limitation, with respect to the Plan Term Sheet, the Wind-Down Agreement or the SPhinX License.

## H.    General Release

As of the Effective Date, the Debtor and the SPhinX Funds shall be deemed to have generally released each other from any and all claims (within the meaning of Section 101(5) of the Bankruptcy Code), known and unknown, including, without limitation, any and all recovery actions arising under the Bankruptcy Code and all other applicable law (including Cayman Islands law); provided, however, that the foregoing general release shall not apply to the rights of the parties to enforce the Plan, the Confirmation Order, the SPhinX License, or the Plan Term Sheet.

Pursuant to Section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration of the classification, treatment, releases and other benefits provided under the Plan, upon the Effective Date the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to the Plan.

3045794

As discussed in Section 6.10 of the Disclosure Statement, and as otherwise provided herein, pursuant to Section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration of the benefits the Debtor is to receive from the SPhinX Funds pursuant to the Plan Term Sheet as embodied in the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all claims and controversies between the Debtor and the SPhinX Funds as specified hereunder.

I.      **Injunction**

**All Entities that have held, hold or may hold Claims against or Equity Interests in the Debtor as of the Effective Date are permanently enjoined, from and after the Effective Date, from taking any actions, other than enforcing the terms of the Plan, in respect of such Claims or Equity Interests against the Debtor, its Estate, the General Trust, the Advisory Board or its members (in their capacity as such), the SPhinX Trust, the Trustee, the SPhinX Trustee, the Professionals or any of their property (but not as to independent claims such entities may have against them), including, without limitation: (i) commencing or continuing in any manner any action or other proceeding of any kind; (ii) enforcing, attaching, collecting or recovering by any manner or in any place or means any judgment, award, decree or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind; and (iv) asserting any right of setoff against any obligation, debt or liability due to the Debtor. Except as expressly provided in the Plan or Plan Term Sheet, the Debtor, its Estate, the Trustee, the General Trust, the SPhinX Trustee and the SPhinX Trust reserve all rights and defenses that the Debtor may have (including, without limitation, the rights of subrogation and recoupment) with respect to any obligation, debt or liability allegedly due to any Entity. In addition, all non-Debtor Entities are permanently enjoined from commencing or continuing, in any manner, any action or proceeding, whether directly or derivatively, in order to recover any Asset of the Estate that was either released under the Plan or transferred to the General Trust or the SPhinX Trust under the Plan.**

J.      **Terms of Existing Injunctions or Stays**

Unless otherwise provided in the Plan, all injunctions or stays provided for in this Chapter 11 Case pursuant to Sections 105, 362 or 525 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date. The Confirmation Order will permanently enjoin the commencement or prosecution by any Entity, whether directly, derivatively or otherwise, of any Claims, Equity Interests, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released or enjoined pursuant to the Plan.

K.      **Good Faith**

Confirmation of the Plan shall constitute a finding that:  (i) the Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code; and (ii) the solicitation of acceptances or rejections of the Plan by all Entities has been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

**ARTICLE VI.**

**IMPLEMENTING THE PLAN**

A.      **Generally**

This Plan serves as the mechanism for the orderly liquidation of all Assets and provides for the distribution to Creditors of funds realized through this process.  A final distribution to Creditors will need

18

3045794

to await the conclusion of any litigation by, on behalf of, or against the Debtor and/or the General Trust, including objections to the Investor Claims and any other objections to Claims that may be Filed. An interim distribution to Holders of Allowed Claims may be made if circumstances warrant in the business judgment of the Trustee.

## B.    Funding of the Plan

The source of funds to achieve Consummation, and to carry out the provisions of the Plan, shall be the Debtor's Cash on hand plus $4 million in cash and up to an additional $1.3 million for the payment of Assumed Disputed Claims, pursuant to the Plan Term Sheet. As reflected in the Liquidation Analysis appended to the Disclosure Statement as Exhibit B, the Debtor anticipates transferring at least $1.5 million of cash to the General Trust on the Effective Date, as that amount may be supplemented. Payments to be made by the SPhinX Funds pursuant to the Plan Term Sheet will be used by the Debtor or Liquidating Debtor, as the case may be, to make payments that are due on the Effective Date of the Plan or thereafter to holders of Allowed Claims, including Allowed Administrative Claims and Allowed Priority Claims, with the balance, but not less than $1.5 million, to be vested in the General Trust for payment of the administrative expenses of the General Trust and distributions to Allowed Class 4 claimants.

## C.    Post Confirmation Estate

On the Effective Date, the Debtor shall be deemed to have relinquished any and all rights in and to the Assets that shall be vested, respectively, in the SPhinX Trust and the General Trust. The General Trust shall be established for the primary purpose of liquidating the Remaining Assets for and on behalf of Creditors in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business. Neither the General Trust or the SPhinX Trust shall be deemed a successor-in-interest of the Debtor for any purpose other than as specifically set forth herein. Each of the General Trust and the SPhinX Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the beneficiaries treated as grantors and owners of the respective trusts.

## D.    Assignment of Policyholder Interests

The Debtor or Liquidating Debtor, as the case may be, shall assign to the SPhinX Trust the Debtor's interests as a policyholder in insurance policies, including any policy issued by Westchester Surplus Lines Insurance Company, Illinois Union Insurance Company, INA Surplus Insurance Company, or any other Entity, and any professional liability coverage.

## E.    PlusFunds General Trust

### 1.    Generally

A Trustee shall be retained pursuant to the General Trust Agreement. The Trustee shall be deemed to have been appointed by the Bankruptcy Court as a representative of the Estate pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code.

The General Trust shall be established for the primary purpose of liquidating and distributing the Remaining Assets for or on behalf of the Class 4 Allowed Claims in accordance with Treasury Regulation § 301.7701-4(d), with no objective to engage in the conduct of a trade or business.

3045794

In the event that the Trustee resigns, is removed, terminated or otherwise unable to serve as the Trustee, then the U.S. Trustee may select a successor. Any successor Trustee shall be bound by and comply with the terms of the Plan, the Confirmation Order and the General Trust Agreement.

Notwithstanding any state law to the contrary, the Trustee (including any successor) shall be exempt from giving or posting any bond or security in any jurisdiction.

On the Effective Date, the Trustee will be the sole authorized representative and signatory of, and on behalf of, the General Trust, with authority to render any and all services necessary to effectuate the terms of the Plan. The powers, authority, responsibilities and duties of the Trustee shall be governed by the Plan, the Confirmation Order and the General Trust Agreement. The Trustee may execute, deliver, file or record such documents, instruments, releases and other agreements, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

2.    **Transfer of Remaining Assets**

The transfer of the Remaining Assets to the General Trust will be made for the benefit of the beneficiaries of the General Trust, but only to the extent such beneficiaries are entitled to Distributions under the Plan. Upon completion of the transfer of the Remaining Assets into the General Trust, the Debtor will have no interest in, or with respect to, such assets or the General Trust. For federal income tax purposes, all parties (including, without limitation, the Debtor, the Trustee and the beneficiaries) will treat the transfer of assets to the General Trust in accordance with the terms of the Plan as a transfer to the beneficiaries, followed by a transfer by such beneficiaries to the General Trust, and the beneficiaries will be treated as the grantors and owners thereof.

3.    **Valuation of Remaining Assets**

As soon as practicable after the Effective Date, the Trustee shall apprise the beneficiaries of the General Trust of the Trustee's estimate of the value of the Remaining Assets which will consist primarily of Cash. The estimated valuation shall be used consistently by all parties (including the Trustee and the beneficiaries of the Trust) for all federal income tax purposes. The purpose of the estimated valuation is to comply with the general criteria for obtaining an IRS ruling that an entity created pursuant to a confirmed plan of reorganization under Chapter 11 of the Bankruptcy Code will be classified as a grantor trust. Any dispute regarding the estimated valuation of these assets shall be resolved by the Bankruptcy Court.

4.    **Responsibilities of the Trustee**

The responsibilities and authority of the Trustee shall include: (a) taking action with respect to the prosecution or settlement of objections to, and estimations of, General Unsecured Claims; (b) calculating and implementing all distributions from the Creditor Distributable Assets in accordance with the Plan; (c) filing all required tax returns and paying taxes and all other obligations on behalf of the General Trust from funds held by the Trust; (d) periodically reporting to the U.S. Trustee and beneficiaries of the General Trust on the status of the Claims resolution process and distributions under the Plan; (e) liquidating the assets of the General Trust and providing for the distribution of the net proceeds thereof in accordance with the provisions of the Plan; (f) retaining and paying at normal and customary rates or on a contingency fee basis, or a monthly basis, professionals in connection with the Trustee's duties; and (g) such other responsibilities as may be vested in the Trustee pursuant to the Plan, General Trust Agreement or Bankruptcy Court Order or as may be necessary and proper to carry out the provisions of the Plan. In addition, the Trustee shall be responsible for winding down the Debtor's estate,

administering the Chapter 11 Case, and performing other obligations of the Debtor, including the payment of fees to the U.S. Trustee, as may be required.

### 5.    Powers of the Trustee

The powers of the Trustee to administer the General Trust shall, without any further Bankruptcy Court approval in each of the following cases, include inter alia, (a) the power to invest, and withdraw, make distributions and pay taxes and other obligations owed by the General Trust from, funds held by the Trustee in accordance with the Plan and General Trust Agreement, (b) the power to engage and compensate, without prior Bankruptcy Court order or approval, employees, consultants and professional Entities to assist the Trustee with respect to his/her responsibilities, (c) the power to prosecute, compromise, settle, or transfer objections to Claims on behalf of or against the General Trust in accordance with the General Trust Agreement, and (d) such other powers as may be vested in or assumed by the Trustee pursuant to the Plan, the General Trust Agreement, any Bankruptcy Court Order, or as may be necessary and proper to carry out the provisions of the Plan.

The Trustee, on behalf of the General Trust, shall have the absolute discretion to investigate, pursue or not to pursue, or to settle, assign, transfer or sell, any and all Remaining Assets as the Trustee determines is in the best interests of the beneficiaries and consistent with the purposes of the General Trust, and shall have no liability for the outcome of his/her decision, other than those decisions constituting gross negligence or willful misconduct; provided however, that the Trustee shall be entitled to rely upon the advice of counsel with respect to his/her duties and responsibilities. The Trustee may incur and pay from the assets of the General Trust any reasonable and necessary expenses in liquidating and converting the assets in the General Trust to Cash.

The Trustee need not obtain an order or approval of the Bankruptcy Court, or account to the Bankruptcy Court, concerning the taking of any action or exercise of any power, rights or discretion conferred hereunder or under the General Trust Agreement, and the Trustee's actions and exercise of power, rights and discretion shall be immediately effective without any order or approval of, or accounting to, the Bankruptcy Court. The Trustee may, but shall not be required, to seek the Bankruptcy Court's adjudication of any matter that is within the Bankruptcy Court's jurisdiction.

The Trustee shall serve on the terms and conditions set forth in the Plan, Confirmation Order and the General Trust Agreement. The Trustee shall not be required to file a fee application to receive compensation. The compensation for the Trustee shall be fair and reasonable in accordance with his/her customary rates, which shall be a charge against and paid out of the assets of the General Trust subject to the procedure set forth in the General Trust Agreement, including the submission of periodic fee statements to the U.S. Trustee, who shall have an opportunity to review and object to such compensation.

In connection with the Trustee's investigation of any of the Remaining Assets, the Trustee may compel the attendance of an entity for examination and for production of documents to the extent, and within the scope, specified in Bankruptcy Rule 2004.

### 6.    Retention and Payment of Professionals

The Trustee may retain the services of attorneys, accountants, and other professionals and agents in the discretion of the Trustee to assist and advise the Trustee in the performance of his/her duties and compensate such professionals from the assets of the General Trust on an hourly or contingency basis without obtaining any Order of the Bankruptcy Court.

3045794

**F.    The SPhinX Trust**

    1.    **Generally**

        The SPhinX Trustee shall be retained pursuant to the SPhinX Trust Agreement.  The SPhinX Trustee shall be deemed to have been appointed by the Bankruptcy Court as a representative of the Estate pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code.  The SPhinX Trustee shall perform the duties specified in the SPhinX Trust Agreement.

        The SPhinX Trust shall be established for the primary purpose of liquidating the Causes of Action for or on behalf of the JOLs in their capacity as JOLs for the SPhinX Funds in accordance with Treasury Regulation § 301.7701-4(d), with no objective to engage in the conduct of a trade or business.

        The SPhinX Trustee and his/her Professionals shall have responsibility for acting in the best interests of the JOLs and SPhinX Funds (and ultimately the creditors and interest holders of the SPhinX Funds) as determined by the SPhinX Trustee in the exercise of such trustee's discretion.

        In the event that the SPhinX Trustee resigns, is removed, terminated or otherwise unable to serve as the SPhinX Trustee, then the Advisory Board may designate a successor without the need of any Bankruptcy Court approval thereof.  Any successor SPhinX Trustee shall be bound by and comply with the terms of the Plan, the Confirmation Order and the SPhinX Trust Agreement.

        Notwithstanding any state law to the contrary, the SPhinX Trustee (including any successor) shall be exempt from giving or posting any bond or security in any jurisdiction.

        On the Effective Date, the SPhinX Trustee will be the sole authorized representative and signatory of, and on behalf of, the SPhinX Trust, with authority to render any and all services necessary to effectuate the terms of the Plan.  The powers, authority, responsibilities and duties of the SPhinX Trustee shall be governed by the Plan, the Confirmation Order and the SPhinX Trust Agreement.  The SPhinX Trustee may execute, deliver, file or record such documents, instruments, releases and other agreements, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

    2.    **Vesting of Causes of Action**

        On the Effective Date, the Causes of Action shall be transferred to, and vest in, the SPhinX Trust free and clear of any Claim, Lien and Equity Interest.  The vesting of the Causes of Action in the SPhinX Trust will be for the exclusive benefit of the JOLs on behalf of the SPhinX Funds (and ultimately the creditors and interest holders of the SPhinX Funds).  Upon completion of the transfer of the Causes of Action into the SPhinX Trust, the Debtor and the General Trust will have no interest in, or with respect to, such assets or the SPhinX Trust; provided, however, that the vesting of the Causes of Action in the SPhinX Trust is subject to the right of the General Trust to use such Causes of Action solely for the purposes, as necessary, of defending, setting off, offsetting, or otherwise objecting to, the Claims set forth in Exhibit B of the Plan Term Sheet.  For federal income tax purposes, all parties (including, without limitation, the Debtor, the SPhinX Trustee and the SPhinX Funds) will treat the transfer of assets to the SPhinX Trust in accordance with the terms of the Plan as a transfer to the beneficiaries, followed by a transfer by such beneficiaries to the SPhinX Trust, and the SPhinX Funds will be treated as the grantors and owners thereof subject to the terms of the Plan and the SPhinX Trust Agreement.

3045794

3.    **Valuation of Remaining Assets**

As soon as practicable after the Effective Date, the SPhinX Trustee shall apprise the SPhinX Funds of the SPhinX Trustee's estimate of the value of the Causes of Action to be vested in the SPhinX Trust. The estimated valuation shall be used consistently by all parties (including the SPhinX Trustee and the SPhinX Funds) for all federal income tax purposes. The purpose of the estimated valuation is to comply with the general criteria for obtaining an IRS ruling that an entity created pursuant to a confirmed plan of reorganization under Chapter 11 of the Bankruptcy Code will be classified as a grantor trust. Any dispute regarding the estimated valuation of these assets shall be resolved by the Bankruptcy Court.

4.    **Responsibilities of the SPhinX Trustee**

The responsibilities and authority of the SPhinX Trustee include pursuing or not pursuing the Causes of Action to be vested in the SPhinX Trust in a manner that is in the exclusive best interest of the SPhinX Funds, consistent with the General Trust's right to use certain Causes of Action, as provided above. Where required under the SPhinX Trust Agreement, the SPhinX Trustee shall consult with, and/or obtain the approval of, the Advisory Board, before taking those actions that require the SPhinX Trustee to consult with or obtain the approval of the Advisory Board.

5.    **Powers of the SPhinX Trustee**

The powers of the SPhinX Trustee to administer the SPhinX Trust shall, without any further Bankruptcy Court approval in each of the following cases, include inter alia, (a) the power to invest, and withdraw, make distributions and pay taxes and other obligations owed by the SPhinX Trust from, funds held by the SPhinX Trustee in accordance with the Plan and SPhinX Trust Agreement, (b) the power to engage and compensate, without prior Bankruptcy Court order or approval, employees, consultants and professional Entities to assist the SPhinX Trustee with respect to his/her responsibilities, (c) the power to prosecute, compromise, or settle objections to Causes of Actions in the name of the SPhinX Trustee on behalf of the SPhinX Trust in accordance with the SPhinX Trust Agreement, and (d) such other powers as may be vested in or assumed by the SPhinX Trustee pursuant to the Plan, the SPhinX Trust Agreement, any Bankruptcy Court Order, or as may be necessary and proper to carry out the provisions of the Plan.

The SPhinX Trustee, on behalf of the SPhinX Trust, shall have the absolute discretion to investigate, pursue or not to pursue, or to settle, consistent with the SPhinX Trust Agreement, any and all Causes of Action vested in the SPhinX Trust as the SPhinX Trustee determines is in the best interests of the SPhinX Funds.

The SPhinX Trustee need not obtain an order or approval of the Bankruptcy Court, or account to the Bankruptcy Court, concerning the taking of any action or exercise of any power, rights or discretion conferred hereunder or under the SPhinX Trust Agreement, and the SPhinX Trustee's actions and exercise of power, rights and discretion shall be immediately effective without any order or approval of, or accounting to, the Bankruptcy Court. The SPhinX Trustee may, but shall not be required, to seek the Bankruptcy Court's adjudication of any matter that is within the Bankruptcy Court's jurisdiction.

The SPhinX Trustee shall serve on the terms and conditions set forth in the Plan, Confirmation Order and the SPhinX Trust Agreement. The SPhinX Trust Agreement gives the Advisory Board the power to replace the SPhinX Trustee at any time, without cause or notice to any parties in interest. The SPhinX Trustee shall not be required to file a fee application to receive compensation. The

compensation for the SPhinX Trustee shall be determined by the Advisory Board and shall be the sole obligation and responsibility of the SPhinX Trust.

In connection with the SPhinX Trustee's investigation of any of the Causes of Action vested in the SPhinX Trust, the SPhinX Trustee may compel the attendance of an entity for examination and for production of documents to the extent, and within the scope, specified in Bankruptcy Rule 2004. The Bankruptcy Court shall retain jurisdiction to hear and determine motions brought by the SPhinX Trustee pursuant to Bankruptcy Rule 2004.

### 6.    Retention and Payment of Professionals

The SPhinX Trustee may retain the services of attorneys, accountants, and other professionals and agents in the discretion of the SPhinX Trustee to assist and advise the SPhinX Trustee in the performance of his/her duties and compensate such professionals from the assets of the SPhinX Trust on an hourly or contingency basis without obtaining any Order of the Bankruptcy Court.

### G.    Exculpation

No Creditor or Shareholder or any other party-in-interest will have, or otherwise may pursue, any Claim or cause of action against the Trustee, the Advisory Board, the SPhinX Trustee, the General Trust or the SPhinX Trust, or any of their employees, agents or professionals (solely in the performance of their duties thereas), for making payments in accordance with the Plan or for implementing the provisions of the Plan, except for any acts or omissions to act that are the result of gross negligence, willful misconduct, or fraud, and in all respects, such party shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities; it being expressly understood that any act or omission with the approval of the Bankruptcy Court will be conclusively deemed not to constitute gross negligence, willful misconduct, or fraud unless the approval of the Bankruptcy Court was obtained by fraud.  This provision is effective only to the extent it does not conflict with DR 6-102 of the New York Code of Professional Responsibility.

## ARTICLE VII.

## TREATMENT OF EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES

### A.    Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except for executory contracts or unexpired leases that were previously assumed or rejected, or are the subject of a pending notice of assumption or rejection served in accordance with the procedures approved by the Wind-Down Order, each executory contract and unexpired lease entered into by the Debtor prior to the Petition Date that has not previously expired or terminated pursuant to its own terms shall be deemed rejected pursuant to Section 365 of the Bankruptcy Code.  The Confirmation Order shall constitute an Order of the Bankruptcy Court approving such rejections as of the Effective Date.  The non-Debtor party(ies) to any rejected personal property leases shall be responsible for taking all steps necessary to retrieve the personal property, if any, that is the subject of such executory contracts and leases.

**B.**     **Claims Based on Rejection of Executory Contracts or Unexpired Leases**

All proofs of claim with respect to Claims arising from the rejection of executory contracts or unexpired leases under Article VII of the Plan, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the Confirmation Date. Any Claims arising from the rejection of an executory contract or unexpired lease not Filed within such time will be forever barred from assertion against the Debtor, the Estate, the Trustee, the General Trust and each of their property, unless otherwise ordered by the Bankruptcy Court or provided in the Plan. All such Claims for which proofs of claim are timely and properly Filed and ultimately Allowed will be treated as Class 4 General Unsecured Claims.

## ARTICLE VIII.

## PROVISIONS GOVERNING DISTRIBUTIONS

**A.**     **Distributions for Claims Allowed as of the Effective Date**

Except as otherwise provided in the Plan, or as may be ordered by the Bankruptcy Court, Distributions on account of those Claims that are Allowed and entitled to receive Distributions under the Plan shall be made by the Debtor and/or the Trustee on the Initial Distribution Date. Distributions on account of Claims that become Allowed after the Initial Distribution Date shall be made on the next Subsequent Distribution Date or Final Distribution Date, as the case may be, in each case without interest.

**B.**     **Distributions; Preservation of Causes of Action; Closing the Chapter 11 Case**

The Trustee will make all Distributions from the General Trust for the benefit of Class 4 claimants provided for under the Plan and General Trust Agreement, and the SPhinX Trustee will make all Distributions from the SPhinX Trust for the benefit of the SPhinX Funds under the Plan and SPhinX Trust Agreement. The Debtor will make all other Distributions provided for under the Plan. Neither the Trustee nor the SPhinX Trustee shall be required to post any bond.

Unless a Remaining Asset that includes a claim (within the meaning of Section 101(5) of the Bankruptcy Code) against a Creditor or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or in a Final Order, all rights with respect to such Remaining Asset are reserved solely to the General Trust, and the Trustee, in accordance with the Plan and Plan Term Sheet, may pursue any such claims against any Entities on and after the Effective Date.

Upon the completion of liquidation of the Remaining Assets and disbursement of the entire proceeds thereof, the Trustee may file a report with the Bankruptcy Court and request the entry of a Final Decree closing the Chapter 11 Case; provided, however, that the Trustee shall refrain from requesting entry of a Final Decree until any Causes of Action pending in the Bankruptcy Court have been concluded provided the SPhinX Funds pay all costs and charges assessed by, or otherwise due to, the U.S. Trustee and/or the Bankruptcy Court, plus all reasonable fees and expenses of the General Trust for complying with any administrative obligations, in connection with the Chapter 11 Case, from and after the date the Trustee is otherwise prepared to file a request for a Final Decree. The Bankruptcy Court shall hear and determine any dispute between the Trustee and the SPhinX Trustee regarding the payment of any such costs, charges, fees or expenses.

3045794

C.    **Manner of Payment and Transfer Tax**

Any payment of Cash made under the Plan may be made either by check drawn on a domestic bank, by wire transfer or by automated clearing house transfer from a domestic bank, at the option of the Liquidating Debtor and/or the Trustee.

Under Section 1146(a) of the Bankruptcy Code, the making or delivery of an instrument of transfer under a plan may not be taxed under any law imposing a stamp tax or similar tax. Pursuant thereto and because the Debtor is liquidating its Assets under and in connection with its Plan, entry of the Confirmation Order shall be a determination that no stamp tax, transfer tax or similar tax may be imposed on any sale of property by the Debtor and/or Trustee.

The Trustee, in making Distributions under the General Trust, shall comply with applicable tax withholding and reporting requirements imposed by any governmental unit. Distributions otherwise due to any Holder of an Allowed Claim may be withheld until such time as such Holder provides the necessary information to comply with any reporting and withholding requirements of any governmental unit. Any funds so withheld will then be paid to the appropriate authority. If the Holder of an Allowed Claim fails to provide to the Trustee the information necessary to comply with any reporting and withholding requirements of any governmental unit within thirty (30) days from the date of first notification by the Trustee to the Holder about the need for such information to comply with any applicable withholding requirements, then the Holder's Distribution shall be treated as an undeliverable Distribution in accordance with the Plan.

D.    **Transmittal of Distributions to Parties Entitled Thereto**

All Distributions by check shall be deemed made at the time such check is duly deposited in the United States mail, postage prepaid. All Distributions by wire transfer shall be deemed made as of the date the Federal Reserve or other wire transfer is made. Except as otherwise agreed with the Holder of an Allowed Claim in respect thereof or as provided in the Plan, any property to be distributed on account of an Allowed Claim shall be distributed by mail, upon compliance by the Holder with the provisions of the Plan, to (a) the latest mailing address Filed for the Holder of an Allowed Claim entitled to a Distribution, (b) the latest mailing address Filed for a Holder of a Filed power of attorney designated by the Holder of such Claim to receive Distributions, (c) the latest mailing address Filed for the Holder's transferee as identified in a Filed notice served on the Debtor pursuant to Bankruptcy Rule 3001(e), or (d) if no such mailing address has been Filed, the mailing address reflected on the Schedules or in the Debtor's books and records.

E.    **Disputed Claims and Unclaimed Property**

Notwithstanding all references in the Plan to Claims that are Allowed, in undertaking the Pro Rata calculations concerning Allowed Claims under the Plan, including the determination of the amount of Distributions due to Class 4 claimants, each Disputed Claim shall be treated as if it were an Allowed Claim, except that if the Bankruptcy Court estimates the portion of a Disputed Claim to be Allowed or otherwise determines the amount which would constitute a sufficient reserve for a Disputed Claim (which estimations and determinations may be requested by the Debtor or the Trustee, as the case may be), such amount as determined by the Bankruptcy Court shall be used as to such Claim.

The Distributions due in respect of Disputed Claims based on the calculations required by the Plan shall be reserved for the Holders of the Disputed Claims at the time that distributions in respect of the Allowed Claims in the same class as the Disputed Claim are to be made.

3045794

After an objection to a Disputed Claim is withdrawn or determined by Final Order, the Distributions due on account of any resulting Allowed Claim shall be paid by the Trustee from funds held in reserve for such Creditor. Such payment shall be made on the next Subsequent Distribution Date. No interest shall be due to a Disputed Claim Holder based on the delay attendant to determining the allowance of such Claim.

Should the Distribution on account of any Allowed Claim of such Creditor exceed the amount held in reserve, the shortfall may be paid from available sums, if any, for the next Distribution, provided that, in no event shall the Creditor have recourse to any payments already made to others or to sums reserved by the Debtor or the Trustee, as the case may be, for ongoing fees and costs of administering the General Trust or effectuating the Plan.

At the election of the Trustee, any property that is unclaimed for ninety (90) days after Distribution thereof by mail to the last known mailing address of the party entitled thereto shall revest in the General Trust as available funds for ongoing costs and fees or for distribution to other Creditors. Notwithstanding the foregoing, if any mail sent to a Creditor at the last known mailing address by the General Trust is returned without a forwarding address and the Creditor does not Claim its Distribution within ninety (90) days after it is mailed to the Creditor, the General Trust may strike the Creditor's Claim from the Creditor list, issue no more checks to such Creditor and, for the purposes of future Distributions, treat the Creditor's Claim as if it were disallowed.

Contingent Claims against the Debtor for indemnity, reimbursement or contribution shall be disallowed to the extent set forth in Section 502(e) of the Bankruptcy Code, and any such disallowed Claim shall not be counted for voting purposes or entitled to receive any Distribution or be included in any calculation for the purpose of determining the amount of Distributions under the Plan, and no Reserve Amount shall be created for such Claims, unless such Claims are Allowed by a Final Order or Allowed for voting and/or distribution purposes in accordance with Section 502(c) of the Bankruptcy Code, after notice and a hearing.

F.     **Setoffs**

The General Trust may, but shall not be required to, setoff against any Claim, and the payments and/or Distribution of other property to be made under the Plan in respect of such Claim, any claims of any nature whatsoever against the Creditor or Shareholder that are vested in the General Trust, or that may be used by the General Trust solely for the purposes, as necessary, of defending, setting off, offsetting, or otherwise objecting to, the Claims set forth in Exhibit B of the Plan Term Sheet, but the failure to do shall not constitute a waiver by the Debtor and/or the General Trust of any such claim.

G.     **Vesting Of Remaining Assets**

As of the Effective Date, all Assets vested, respectively, in the General Trust and the SPhinX Trust, shall be free and clear of all Claims and Equity Interests of Holders of Claims and Holders of Equity Interests except as otherwise specifically provided in the Plan. As of the Effective Date, all mortgages, deeds of trust, Liens or security interests in any Assets will be released and all the right, title and interest of any Holder of any such mortgages, deeds of trust, Liens or security interests shall be canceled, annulled, terminated and become null and void, except as otherwise specifically provided in the Plan. The Trustee or the SPhinX Trustee, as the case may be, shall be authorized to act as attorney-in-fact for any such Holder to cause any public records to properly reflect and effectuate this provision of the Plan.

3045794

**H.**    **Corporate Action**

Upon the entry of the Confirmation Order all matters provided under the Plan involving the corporate structure of the Debtor, and any Entity controlled by the Debtor, shall be deemed to be authorized and approved without any requirement of further action by the Debtor's Shareholders, the Debtor's board of directors, or the Trustee.

**I.**    **No Release**

There are no releases in this Plan for the benefit of any of the Debtor's past or present officers, directors, employees, members, agents, representatives, shareholders, attorneys, accountants, financial advisors, investment bankers, lenders, consultants, experts, or Professionals and agents for the foregoing, for any action taken prior to the Petition Date.  Except as otherwise provided in the Plan, no Entity and/or any such Entity's parents, subsidiaries, affiliates, related Entities, officers, directors, agents and/or employees shall be released and/or discharged of any liabilities under the Plan.  Consequently, except as specifically provided in the Plan, all Entities shall remain liable to the extent presently provided under any applicable law or contract with respect to any claims of the Debtor against any such Entity.

**J.**    **DeMinimis Payments and Distributions**

Notwithstanding any other provision of the Plan, Distributions of less than $100 need not be made by the Trustee on account of any Allowed Claim; such amounts shall neither be distributed nor will they carry over for any purpose, and shall be treated as undeliverable Distributions.

Notwithstanding any other provision of the Plan, if and to the extent that the Creditor Distributable Assets, including Cash, have a value at any time of less than $5,000, the Trustee may, in lieu of making Distributions, donate same to a nonprofit organization or organizations that are exempt pursuant to Section 501(c) of the Internal Revenue Code (Title 26 of the United States Code); provided that any donations made pursuant to this section shall be made to one or more organizations that perform or fund non-denominational activities in which the Trustee has no economic interest.

<div align="center">

**ARTICLE IX.**

**PROCEDURES FOR RESOLVING DISPUTED CLAIMS**

</div>

**A.**    **Prosecution of Objections to Claims**

The Debtor, the Trustee or the SPhinX Trustee, as the case may be, shall have until 365 days (1) following the Effective Date to File objections to any Claim Filed prior to the Effective Date, and (2) following the Filing of any Administrative Claim after the Effective Date to File objections to any Administrative Clam Filed after the Effective Date; provided, however, that the Trustee may apply to the Bankruptcy Court for an extension of the foregoing deadlines for cause.

The JOLs and, following the Effective Date, the SPhinX Trustee (who shall substitute for the JOLs with respect to any pending objection) shall be authorized to pursue objections to the Assumed Disputed Claims.

Except as expressly set forth in the Plan and Plan Term Sheet, nothing in the Plan, the Disclosure Statement, the Plan Term Sheet, the Confirmation Order or any order in aid of Confirmation, shall constitute, or be deemed to constitute, a waiver or release of any claim, Cause of Action, right of setoff, or other legal or equitable defense that the Debtor had immediately prior to the commencement of the

Chapter 11 Case or the Effective Date, against or with respect to any Claim or Equity Interest, all of which are preserved.

**B.**    **Estimation of Claims**

The Debtor and/or the Trustee may, at any time, request that the Bankruptcy Court estimate any Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether the Debtor and/or the Trustee previously objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time, including during the pendency of any appeal relating to any such Claim. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtor or the Trustee, as the case may be, may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.

**C.**    **Cumulative Remedies**

All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism permitted by the Plan or otherwise by the Bankruptcy Court. Until such time as such Claim becomes an Allowed Claim, such Claim shall be treated as a Disputed Claim for purposes of allocations, Distributions, and voting under the Plan.

<div align="center">

**ARTICLE X.**

**CONDITIONS PRECEDENT TO CONFIRMATION
AND CONSUMMATION OF THE PLAN**

</div>

**A.**    **Conditions Precedent to Confirmation and Consummation**

It is a condition to Confirmation that (a) the Confirmation Order shall approve in all respects all of the provisions, terms and conditions of the Plan, (b) the Confirmation Order is satisfactory in form and substance to the Debtor and the JOLs, and (c) to the extent insufficient Cash exists to make distributions on the Effective Date, Holders of Claims required to be paid on the Effective Date have agreed to defer, reduce or waive payment of a portion or all of such Claims as exceed the Cash available for distribution.

It is a condition of Consummation that (a) the Confirmation Order shall have been signed by the Bankruptcy Court and duly entered on the docket for the Chapter 11 Case by the Clerk of the Bankruptcy Court in form and substance acceptable to the Debtor; (b) the Confirmation Order shall be a Final Order; (c) the conditions to closing the transaction contemplated by the Plan Term Sheet, including that at least 97% of the Investor Claims have been withdrawn or disallowed and that the Plan Term Sheet has been approved by a Final Order of the Bankruptcy Court and the Grand Court, have been satisfied or waived, (d) the Debtor and Trustee, and the Debtor and the SPhinX Trustee, shall have executed the General Trust Agreement and the SPhinX Trust Agreement, respectively; and (d) the Debtor shall have transferred the General Trust and the SPhinX Trust the assets to be vested in such trusts.

The Debtor and the JOLs jointly may waive the foregoing requirement that the Confirmation Order shall be a Final Order, and the Debtor exclusively may waive the foregoing requirement that at least 97% of the Investors Claims have been withdrawn or disallowed. These waivers may be made in whole or in part, at any time, without notice, without leave or order of the Bankruptcy Court, and without

<div align="center">29</div>

any formal action other than proceeding to obtain Confirmation and/or achieve Consummation of the Plan.

**B.    Effect of Non-Occurrence of Conditions to Consummation**

If the Confirmation Order is vacated, the Plan shall be null and void in all respects, however, all action taken in reliance on the Confirmation Order prior to such vacation shall be deemed to have been authorized by the Bankruptcy Court and shall not be subject to challenge or avoidance.

**C.    Notice of Effective Date and Second Administrative Bar Date**

On the Effective Date, or as soon thereafter as reasonably practicable, the Debtor shall File with the Bankruptcy Court a "Notice of Effective Date," which notice shall constitute appropriate and adequate notice that the Plan has become effective and shall notify parties in interest of the Second Administrative Bar Date. The Plan shall be deemed effective as of 12:01 a.m. (prevailing Eastern Time) on the Effective Date specified in such filing. A courtesy copy of the Notice of Effective Date may be sent by first class mail, postage prepaid, or by e-mail, to those Entities who have Filed with the Bankruptcy Court requests for notices pursuant to Bankruptcy Rule 2002.

**ARTICLE XI.**

**RETENTION OF JURISDICTION**

Notwithstanding entry of the Confirmation Order or Consummation having occurred, the Chapter 11 Case having been closed, or a Final Decree having been entered, the Bankruptcy Court shall have jurisdiction of matters arising out of, and related, to the Chapter 11 Case and the Plan under, and for the purposes of, Sections 105(a), 1127, 1142 and 1144 of the Bankruptcy Code and for, among other things, to:

A.    allow, disallow, determine, liquidate, classify, estimate or establish the priority or status of any Claim, including the resolution of any request for payment of any Administrative Claim or Priority Tax Claim and the resolution of any and all objections to the allowance or priority of Claims;

B.    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

C.    resolve any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which the Debtor is a party or with respect to which the Debtor may be liable and to hear, determine, and if necessary, liquidate, any Claims arising therefrom;

D.    ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan, including ruling on any motion or objection Filed pursuant to the Plan;

E.    decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtor or it affiliates, directors, employees, agents or Professionals that may be pending on the Effective Date;

F.    hear and determine the Avoidance Actions and Preference Claims by the SPhinX Trustee on behalf of the SPhinX Trust;

3045794

G.      enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan or the Disclosure Statement, including, without limitation, the Plan Term Sheet;

H.      hear and determine requests made by the Liquidating Debtor, the Trustee and/or the SPhinX Trustee, to compel the attendance of an entity for examination and for production of documents to the extent, and within the scope, specified in Bankruptcy Rule 2004, and to enter orders in connection therewith;

I.      resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of the Plan, General Trust Agreement, SPhinX Trust Agreement, or any Entity's obligations incurred in connection with the Plan, including, among other things, any avoidance actions or subordination actions under Sections 510, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code;

J.      issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan, except as otherwise provided in the Plan;

K.      resolve any cases, controversies, suits or disputes with respect to the releases, injunction and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunction and other provisions;

L.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

M.      determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, General Trust Agreement, SPhinX Trust Agreement or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan or this Disclosure Statement;

N.      enter an order and/or Final Decree concluding the Chapter 11 Case;

O.      consider any modification of the Plan under Section 1127 of the Bankruptcy Code and/or modification of the Plan before "substantial consummation" as defined in Section 1101(2) of the Bankruptcy Code;

P.      protect the property of the Estate and/or the General Trust and/or the SPhinX Trust from adverse Claims or interference inconsistent with the Plan, including to hear actions to quiet or otherwise clear title to such property based upon the terms and provisions of the Plan, or to determine the Debtor's exclusive ownership of claims and Causes of Action retained or otherwise dealt with under the Plan;

Q.      hear and determine matters pertaining to abandonment of property of the Estate;

R.      consider any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

S.      interpret, enforce and address any and all issues relating to any Orders entered in the Chapter 11 Case pursuant to Section 363 of the Bankruptcy Code, previously entered in the Chapter 11 Case to the extent such Orders are not superseded or inconsistent with the Plan;

T.      facilitate the monetization of the Remaining Assets wherever located;

U.      hear and determine matters concerning state, local, and federal taxes in accordance with Sections 345, 505, and 1146 of the Bankruptcy Code;

V.      hear and act on any other matter not inconsistent with the Bankruptcy Code;

W.      consider and act on the compromise and settlement of any litigation, Claim against or cause of action on behalf of the Estate or Trust or SPhinX Trust for which Bankruptcy Court approval is required or requested; and

X.      interpret and enforce the injunctions contained in the Confirmation Order and Plan.

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

### A.      Post Effective Date Disposition of Debtor Entity

After the Effective Date has occurred, the Debtor entity will have no realizable value for the benefit of Creditors or Holders of Equity Interests.  Any time after the Effective Date, the Trustee may dissolve the Debtor entity without any further order of the Bankruptcy Court or authorization or other action by the Debtor's Shareholders or board of directors.  Dissolution of the Debtor pursuant to the Plan shall become effective immediately upon the Trustee filing (a) a "Notice of Dissolution of Debtor" with the Bankruptcy Court, which references the relevant section(s) of the Plan and Confirmation Order, and (b) a certified copy of such notice with the Delaware Secretary of State.

### B.      Post Effective Date Disposition of PFG-LLC and SPhinX Onshore

Any time after the Effective Date, the Trustee may dispose of the General Trust's interests in PFG-LLC and/or SPhinX Onshore without any further order of the Bankruptcy Court or other Court or action or approval of any Entity, including by (a) resigning as the manager of SPhinX Onshore, (b) divesting or abandoning its membership interest in PFG-LLC, and/or (c) filing bankruptcy for PFG-LLC. The Trustee may effectuate the General Trust's resignation as the managing member of PFG-LLC and/or manager of SPhinX Onshore and/or its abandonment of the General Trust's interests in such entities by filing (i) a notice of same with the Bankruptcy Court, which references the relevant section(s) of the Plan and Confirmation Order, and (ii) a certified copy of such notice with the Delaware Secretary of State.

### C.      Payment of Statutory Fees

All fees payable pursuant to 28 U.S.C § 1930 shall be paid on or before the Effective Date.  The General Trust shall pay the fees that accrue under 28 U.S.C § 1930 until a Final Decree is entered in the Debtor's Chapter 11 Case, or the Bankruptcy Court orders otherwise.  The Liquidating Debtor or the Trustee shall File U.S. Trustee quarterly fee status reports with respect to the Debtor with each quarterly fee paid after Confirmation.

3045794

**D.**     **Modification of Plan**

The Debtor reserves the right to amend or modify the Plan prior to the entry of the Confirmation Order in accordance with Section 1127(a) of the Bankruptcy Code.

The Debtor may, upon order of the Bankruptcy Court, amend or modify the Plan, after its Confirmation in accordance with Section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan, if (a) the Plan has not been substantially consummated and (b) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

**E.**     **Professional Fee Claims**

All final requests for payment of Professional Fee Claims pursuant to sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code must be filed and served on the Debtor, the U.S. Trustee, the Trustee and their counsel no later than sixty (60) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Objections to applications of such Professionals or other Persons for compensation or reimbursement of expenses must be filed and served on the Debtor, the U.S. Trustee, and the Trustee and their counsel and the requesting Professional or other Person no later than thirty (30) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable application for compensation or reimbursement was served.

**F.**     **Successors and Assigns**

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

**G.**     **Reservation of Rights**

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. The filing of the Plan, the statements or provisions contained herein, or the taking of any action by the Debtor with respect to the Plan shall not be, and shall not be deemed to be, an admission of any fact or waiver of any right of the Debtor.

Nothing in the Plan or the Plan Term Sheet, including, without limitation, the allowance, treatment or reduction of the SPhinX Claim, or the existence of the Plan Term Sheet itself or any terms thereof, shall have any effect on, or evidentiary impact whatsoever, or be admissible for any purpose, in connection with any claim that any persons or entities may assert against any other persons or entities, including, without limitation, any claim by the SPhinX Funds against anyone who is presently or formerly affiliated with the Debtor.

**H.**     **Further Assurances**

The Debtor, the Trustee and the SPhinX Trustee, and all Holders of Claims and Equity Interests shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**I.**     **Retiree Benefits**

The Debtor has no employees and will not pay retiree benefits.

3045794

**J.**    <u>**Notices**</u>

Any pleading, notice or other document required by the Plan to be served on or delivered to the Debtor shall be sent by first class U.S. mail, postage prepaid to:

> Florence V. Lentini
> PlusFunds Group, Inc.
> c/o XRoads Solutions Group, LLC
> 400 Madison Avenue, 3rd floor
> New York, NY 10017
> Telephone:  (212) 610-5663
> Facsimile:  (212) 610-5601

<u>With copy to</u>:

> L.P. Harrison 3rd, Esq.
> Jerrold L. Bregman, Esq.
> Curtis, Mallet-Prevost, Colt & Mosle LLP
> 101 Park Avenue
> New York, NY  10178-0061
> Telephone:  (212) 696-6000
> Facsimile:  (212) 697-1559

> Counsel for the Debtor

<u>And</u>:

> [Address for the SPhinX Trust to be disclosed at or before the Plan confirmation hearing.]

<u>With copy to</u>:

> [Name and address of counsel for the SPhinX Trust to be disclosed at or before the Plan confirmation hearing.]

> Counsel for the SPhinX TrustCounsel for the SPhinX Trust

**K.**    <u>**Filing of Additional Documents**</u>

On or before the Effective Date, the Debtor may File such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**L.**    <u>**Enforceability**</u>

Subject to Section Q below, should any provision in the Plan be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of the Plan.

**M.**    <u>**Document Retention**</u>

The Debtor's Documents will be maintained for a period of five years in accordance with the Debtor's "Document Retention Protocol" and the Plan Term Sheet, and the cost of storing the Documents

34

for this term is to be funded by the SPhinX Funds, who will benefit from the retention of, and non-exclusive access to, the Documents in accordance with the License and Equipment Sale Agreement and the Plan Term Sheet. Except as explicitly provided in the Order approving the Document Retention Protocol and the Plan Term Sheet, the Trustee is authorized to abandon and/or destroy any and all of the Documents after the period during which the Documents are to be maintained pursuant to the Document Retention Protocol. The Debtor's rights and interests in the Documents, subject to the Plan Term Sheet, shall be among the Remaining Assets transferred to the General Trust on the Effective Date.

The Debtor and the General Trust shall provide the JOLs with reasonable access to the Debtor's books and record, in accordance with the SPhinX License. In addition, the Debtor shall provide the JOLs and the SPhinX Trust with reasonable access to the Excluded Data and all E-Mail Data (each as defined in the SPhinX License), subject to the JOLs' and the SPhinX Trust' entry into, and compliance with, a common interest agreement with the Debtor and the General Trust that preserves all privileges as to third parties, and subject to the confidentiality obligations of the Debtor relating to such data. The SPhinX Trust shall also be entitled to obtain reasonable access to the Debtor's books and records (including the Excluded Data and the E-Mail Data) in the same manner that the JOLs are entitled to under the SPhinX License under the Plan Term Sheet. The General Trust shall assume and perform the Debtor's obligations under the SPhinX License. The Debtor and the General Trust and their respective professionals and advisors shall, at their own expense, reasonably cooperate and assist the JOLs, the SPhinX Trustee and the SPhinX Trust in accessing the Debtor's books and records (including the Excluded Data and the E-Mail Data) and in obtaining the cooperation of the Debtor's former personnel; provided, however, that the reasonable expenses of significant activities, or creation of any work product requested by the JOLs, the SPhinX Trustee or the SPhinX Funds, in connection with such cooperation and assistance shall be paid by the person or entity requesting same.

**N.**     **Conflict**

In the event of any conflict between the Plan and the Confirmation Order, the terms of the Confirmation Order shall control.

**O.**     **Headings**

The headings used in the Plan are inserted for convenience only and neither constitute a portion of the Plan nor in any manner shall affect the provisions or interpretation(s) of the Plan.

3045794

**P.**     **Severability**

The provisions of the Plan shall not be severable unless such severance is agreed to by the Debtor and the Trustee and such severance would constitute a permissible modification of the Plan pursuant to Section 1127 of the Bankruptcy Code.

Dated:  June 28, 2007

PlusFunds Group, Inc.

By:  /s/ Florence V. Lentini
Its:  Chief Restructuring Officer

*Submitted by:*

**CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP**

By: /s/  L.P. Harrison 3rd
    Steven J. Reisman (SR 4906)
    L.P. Harrison 3rd (LH 5540)
    Jerrold L. Bregman (JB 0784)
101 Park Avenue
New York, New York  10178-0061
Telephone:  (212) 696-6000
Facsimile:  (212) 697-1559

Attorneys for PlusFunds Group, Inc.

3045794

Exhibit 1 to the Plan

PlusFunds General Trust Agreement

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
----------------------------------------------------------------  x
In re:                                            :    Chapter 11
                                                  :
PLUSFUNDS GROUP, INC.,                            :    Case No.  06-10402 (JMP)
a Delaware corporation,                           :
                                                  :
                          Debtor.                 :
----------------------------------------------------------------  x
```

## PLUSFUNDS GENERAL TRUST

      This agreement creating the PlusFunds General Trust (the "Agreement"), dated as of August __, 2007, is by and between PlusFunds Group, Inc. (the "Settlor"), and Florence V. Lentini (the "Trustee"), for the benefit of the Creditors holding Allowed General Unsecured Claims[1] (the "Beneficiaries"), under the terms of the Plan confirmed by the Bankruptcy Court in Settler's Chapter 11 Case by Order entered August __, 2007.

      WHEREAS, the Trust is created pursuant to, and to effectuate, the Plan;

      WHEREAS, the Trust is created on behalf, and for the sole benefit, of the Beneficiaries under the Plan;

      WHEREAS, the Trust is established for the purpose of collecting, distributing and liquidating the Remaining Assets (hereinafter, the "Assets") for the benefit of the Beneficiaries in accordance with the terms of this Agreement and the Plan;

      WHEREAS, the Trust shall not continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Trust;

      WHEREAS, pursuant to the Plan, the Settlor, the Trustee, and the Beneficiaries are required to treat, for all U.S. federal income tax purposes, the transfer of the Assets to the Trust as a transfer of the Assets by the Settlor to the Beneficiaries in satisfaction of their Claims and Interests, followed by a transfer of the Assets by the Beneficiaries to the Trust in exchange for the beneficial interest herein, and to treat the Beneficiaries as the grantors and owners of the Trust in accordance with Treasury Regulation Section 301.7701-4(d);

      WHEREAS, the Trust is intended to be treated as a grantor trust for U.S. federal income tax purposes;

      NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein and in the Plan, the Settlor and the Trustee agree as follows:

---

[1] Terms that are not herein defined shall have the meanings ascribed to them in the Fifth Amended Chapter 11 Plan of Liquidation of PlusFunds Group, Inc., dated June 28, 2007, as it may be thereafter amended or supplemented (the "Plan").

3044375

## ARTICLE I.
## DEFINITIONS AND INTERPRETATIONS

1.1     Definitions

    1.1.1     "Agreement" shall mean this PlusFunds General Trust Agreement.

    1.1.2     "Assets" shall mean the "Remaining Assets" as defined in the Plan, including the proceeds and/or income related thereto, held from time to time pursuant to this Agreement by the Trustee.

    1.1.3     "Beneficiaries" shall have the meaning ascribed above.

    1.1.4     "Effective Date" shall have the same meaning as set forth in the Plan.

    1.1.5     "Settlor" shall have the meaning ascribed above.

    1.1.6     "Trust" shall mean the trust established pursuant to the terms of this Agreement and the Plan.

    1.1.7     "Trustee" shall mean (x) initially, the person named herein as the Trustee, and (y) any successors or replacements duly appointed under the terms of this Agreement.

    1.1.8     "Trust Professional" shall mean any attorneys, accountants, appraisers, or other persons, including XRoads, CMP, or any other person who is employed by the Debtor pursuant to an order of the Bankruptcy Court, deemed by the Trustee to have qualifications necessary to assist in the proper administration of the Trust.

1.2     Interpretation. The headings in this Agreement are for convenience only and shall not limit or otherwise affect the provisions of this Agreement. Words denoting the singular number shall include the plural number and vice versa, and words denoting one gender shall include the other gender.

1.3     Particular Words. Reference in this Agreement to any Section or Article is, unless otherwise specified, to that such Section or Article. The words "hereof," "herein," and similar terms shall refer to this Agreement and not to any particular Section or Article of this Agreement.

## ARTICLE II.
## DECLARATION OF TRUST

2.1     Creation and Name. There is hereby created the Trust, which shall be known as the "PlusFunds General Trust," and is the trust referred to as the "PlusFunds General Trust" or the "Trust" in the Plan. The Trustee may conduct the affairs of the Trust under the name **PlusFunds General Trust.**"

2.2     Purpose of Trust. The Settlor, on behalf of the Beneficiaries and the Trustee, pursuant to the Plan and in accordance with the Bankruptcy Code, hereby creates the Trust for the purpose of collecting, distributing and liquidating the Assets for the benefit of the Beneficiaries in accordance with the terms of this Agreement and the Plan. The activities of the Trust shall be limited to those activities set forth in Article III hereof and as otherwise contemplated by the Plan. The Trustee understands and agrees that the Trust will not continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Trust.

2

2.3    Transfer of Assets.

A.    The Settlor hereby grants, releases, assigns, conveys, transfers and delivers, on behalf of the Beneficiaries, the Assets to the Trustee as of the Effective Date to be held in trust for the benefit of the Beneficiaries for the uses and purposes specified in this Agreement and the Plan. The Settlor shall from time to time as and when reasonably requested by the Trustee execute and deliver or cause to be executed and delivered all such documents (in recordable form where necessary or appropriate) and the Settlor shall take or cause to be taken all such further action as the Trustee deems necessary or appropriate, in the exercise of the Trustee's business judgment, to vest or perfect in or confirm to the Trustee title to and possession of the Assets.

B.    For all federal, state and local income tax purposes, the Settlor, the Beneficiaries, and the Trustee shall treat the transfer of the Assets to the Trust as a transfer of the Assets by the Settlor to the Beneficiaries in satisfaction of their Allowed Claims, followed by a transfer of the Assets by the Beneficiaries to the Trust in exchange for their beneficial interests in the Trust. Thus, the Beneficiaries shall be treated as the grantors and owners of the Trust.

2.4    Securities Law. Under Section 1145 of the Bankruptcy Code, the issuance of beneficial interests in the Trust to the Beneficiaries under the Plan are exempt from registration under the Securities Act of 1933, as amended, and all applicable state and local laws requiring registration of securities. If the Trustee determines, with the advice of counsel, that the Trust is required to comply with the registration and reporting requirements of the Securities and Exchange Act of 1934, as amended, or the Investment Company Act of 1940, as amended, the Trustee, at the Trust's expense, shall take any and all actions to comply with such reporting requirements and file necessary periodic reports with the Securities and Exchange Commission.

## ARTICLE III.
## ADMINISTRATION OF THE TRUST

3.1    Rights, Powers and Privileges. The Trustee shall have only the rights, powers and privileges expressly provided in this Agreement and the Plan. The Trustee shall have the power to take the actions granted in the subsections below and any powers reasonably incidental thereto, which the Trustee, in the exercise of the Trustee's business judgment, deems necessary or appropriate to fulfill the purpose of the Trust, unless otherwise specifically limited or restricted by the Plan or this Agreement:

A.    Hold legal title to any and all rights of the Settlor and the Beneficiaries in or arising from the Assets;

B.    In reliance upon the official claims register maintained in the Chapter 11 Case, maintain on the Trustee's books and records, a register evidencing the beneficial interest herein held by each Beneficiary;

C.    Protect and enforce the rights to the Assets vested in the Trustee by this Agreement by any method deemed appropriate including, without limitation, by judicial proceedings or otherwise;

D.    To institute, pursue and try or settle litigation in accordance with the terms of the Plan, and to pursue and conduct Rule 2004 discovery concerning the Assets, including potential Claims;

E.    Make Distributions to Holders of Claims as provided for in, or contemplated by, the Plan and this Agreement;

F.    Open and maintain bank accounts on behalf of or in the name of the Trust, including the Debtor's interest in bank accounts transferred to the Trust on the Effective Date;

3

3044375

G.      Make all tax withholdings, file tax information returns, make tax elections by and on behalf of the Trust and file returns for the Trust pursuant to Article VII, Section 7.9 B hereof;

H.      Send annually to each Beneficiary, as soon as reasonably practicable after the end of each calendar year, a separate statement stating the Beneficiary's share of income, gain, loss, deduction or credit and instruct all such Beneficiaries to report such items on their federal tax returns;

I.      Establish such reserves for Disputed Claims, taxes, assessments, Trustee's fees and professional fees and other expenses of administration of the Trust as may be necessary and appropriate for the proper operation of the Trust;

J.      Pay all expenses and make all other payments relating to the Assets;

K.      Retain and pay third parties pursuant to Article III, Section 3.2 hereof;

L.      Carry insurance coverage or obtain one or more bonds in such amounts as the Trustee deems advisable as an expense of the Trust;

M.      Pursue or not to pursue, or settle, assign, transfer or sell, any Assets as the Trustee determines is in the best interests of the Beneficiaries and consistent with the purposes of the Trust;

N.      All powers provided under the Plan to the Trustee, including, without limitation, to allow, object to and/or reconcile Claims, marshal, liquidate, sell, assign, transfer, abandon and/or distribute the Assets;

O.      Invest any moneys held as part of the Assets in accordance with the terms of Article III, Section 3.3 hereof; and

P.      Terminate this Trust and seek to close the Chapter 11 Case pursuant to Section 350(a) of the Bankruptcy Code and the Plan.

3.2      Agents and Professionals.  The Trustee may, but shall not be required to, consult with and retain one or more Trust Professionals.  The Trustee may pay the reasonable salaries, fees and expenses of the Trustee and each Trust Professional, including contingency fees, out of the Assets in the ordinary course of business.

3.3      Investment and Safekeeping of Assets.  All moneys and other Assets received by the Trustee shall, until distributed or paid over as herein provided, be held in trust for the benefit of the Beneficiaries, but need not be segregated from other Assets, unless and to the extent required by law or the Plan.  The Trustee shall be under no liability for interest or producing income on any moneys received by it herein and held for distribution or payment to the Beneficiaries, except as such interest or income shall actually be received by the Trustee.  When investing any moneys held on behalf of the Trust, the Trustee shall act in a manner similar to the manner in which individuals of ordinary prudence, discretion and judgment would act in the management of their own affairs; provided, however, that the right and power of the Trustee to invest moneys held by the Trust, the proceeds from any sale of shares of stock, or any income earned by the Trust, shall be limited to the right and power to invest such moneys, pending periodic distributions in accordance with this Agreement and the Plan.  For the avoidance of doubt, the investment powers of the Trustee, other than those reasonably necessary to maintain the value of the Assets and to effectuate the liquidating purpose of the Trust, are limited to powers to invest in demand and time deposits, such as short-term certificates of deposit, in banks or other savings institutions, or other temporary, liquid investments, such as Treasury bills.

3.4      Limitations on Trustee.  Except as provided herein or in the Plan, the Trustee shall not at any

4

3044375

time, on behalf of the Trust or Beneficiaries: (i) enter into or engage in any trade or business, and no part of the Trust's Assets or the proceeds, revenue or income therefrom shall be used or disposed of by the Trust in furtherance of any trade or business, or (ii) except as provided in this Agreement, reinvest any Assets.

        A.      The Trustee may only invest funds held in the Trust consistent with the requirements of the Bankruptcy Code or any order of the Bankruptcy Court modifying such requirements and, provided that the Trustee does so, he or she shall have no liability in the event of insolvency of any institution in which he or she has invested any funds of the Trust.

        B.      The Trustee shall hold, collect, conserve, protect and administer the Trust in accordance with the provisions of this Agreement and the Plan, and pay and distribute amounts as set forth herein for the purposes set forth in this Agreement. Any determination by the Trustee as to what actions are in the best interests of the Trust shall be determinative.

        3.5      <u>Bankruptcy Court Approval of Trustee Actions.</u> Except as expressly specified in the Plan or this Agreement, the Trustee need not obtain an order or approval of the Bankruptcy Court, or account to the Bankruptcy Court, concerning the taking of any action or exercise of any power, rights or discretion conferred hereunder, and the Trustee's actions and exercise of power, rights and discretion shall be immediately effective without any order or approval of, or accounting to, the Bankruptcy Court. The Trustee may, but shall not be required, to seek the Bankruptcy Court's adjudication of any matter that is within the Bankruptcy Court's jurisdiction.

        3.6      <u>Management/Dissolution of Debtor, PFG-LLC and SPhinX Onshore.</u>

        Any time after the Effective Date, the Trustee may dissolve the Debtor entity without any further order of the Bankruptcy Court or authorization or other action by the Debtor's shareholders or board of directors. Dissolution of the Debtor pursuant to the Plan shall become effective immediately upon the Trustee filing (a) a "Notice of Dissolution of Debtor" with the Bankruptcy Court, which references the relevant section(s) of the Plan and Confirmation Order, and (b) a certified copy of such notice with the Delaware Secretary of State.

        Any time after the Effective Date, the Trustee may dispose of the Trust's interests in PFG-LLC and/or SPhinX Onshore without any further order of the Bankruptcy Court or other Court or action or approval of any Entity, including by (a) resigning as the manager of SPhinX Onshore, (b) divesting or abandoning its membership interest in PFG-LLC, and/or (c) filing bankruptcy for PFG-LLC. The Trustee may effectuate the Trust's resignation as the managing member of PFG-LLC and/or manager of SPhinX Onshore and/or its abandonment of the Trust's interests in such entities by filing (i) a notice of same with the Bankruptcy Court, which references the relevant section(s) of the Plan and Confirmation Order, and (ii) a certified copy of such notice with the Delaware Secretary of State.

        3.7      <u>Valuation of Assets.</u> Pursuant to the Plan, the Trustee shall apprise the Beneficiaries of the Trustee's estimate of the value of the Assets. The estimated valuation shall be used consistently by all parties (including the Trustee and Beneficiaries) for all income tax purposes.

<div align="center">

**ARTICLE IV.**
**<u>DISTRIBUTIONS FROM THE TRUST</u>**

</div>

        4.1      <u>Distributions.</u> As soon as possible consistent with the best interests of all parties as determined by the Trustee in the exercise of the Trustee's business judgment, but not later than the third year anniversary of the Effective Date, the Trustee shall distribute to Creditors the Creditor Distributable Assets in accordance with the Plan.

4.2     _Pro Rata_ Share of Distributions.  Each Beneficiary shall receive its _pro rata_ share of any and all Distributions in accordance with the Plan.

4.3     Priorities of Distribution.  Subject to the limitations set forth in the Plan and this Agreement, the Trustee must pay the operating and administrative expenses of the Trust before approving Distributions to or for the benefit of Beneficiaries.

4.4     United States Trustee Fees and Reports.  After the Effective Date, the Trust shall pay as an expense of the Trust any fees incurred under 28 U.S.C. § 1930(a)(6) by reason of the Trust's disbursements until the Debtor's Chapter 11 Case is closed.  After the Confirmation Date, the Trust shall prepare and serve on the U.S. Trustee such quarterly disbursement reports for the Trust as required by the U.S. Trustee for as long as the Chapter 11 Case remains open.

## ARTICLE V.
## BENEFICIARIES

5.1     Beneficial Interest Only.  The ownership of an interest in the Trust shall not entitle any Beneficiary or the Settlor to any title in or to the Assets or to any right to call for a partition or division of such assets or to require an accounting, except as specifically provided herein.

5.2     Ownership of Beneficial Interests Hereunder.  Each Beneficiary shall own an interest herein equal to its _pro rata_ share of such Beneficiary's Allowed Claim in accordance with the Plan.

5.3     Evidence of Beneficial Interest.  Ownership of a beneficial interest in the Assets shall not be evidenced by any certificate, security, or receipt or in any other form or manner whatsoever, except as recorded on the books and records of the Trust by the Trustee.

5.4     Limitation on Transferability.  A Beneficiary's interest herein shall be non-assignable during the term of this Agreement except by operation of law.  An assignment by operation of law shall not be effective until appropriate notification and proof thereof is submitted to the Trustee, and the Trustee may continue to pay all amounts to or for the benefit of the assigning Beneficiary until receipt of proper notification and proof of assignment by operation of law.  The Trustee may rely upon such notification and proof without the requirement of any further investigation.

5.5     Notice of Transfer of Beneficial Interest.  Any notice of a change of beneficial interest ownership as described in Section 10.1 of this Agreement shall be forwarded to the Trustee by registered or certified mail as set forth herein.  The notice shall be executed by both the transferee and the transferor, and the signatures of the parties shall be acknowledged before a notary public and as required by Bankruptcy Rule 3001(e).  The notice shall clearly describe the interest to be transferred.  The Trustee may rely upon such signatures and acknowledgments as evidence of such transfer without the requirement of any investigation.

## ARTICLE VI.
## THIRD PARTY RIGHTS AND LIMITATION OF LIABILITY

6.1     Parties Dealing With the Trustee.  In the absence of actual knowledge to the contrary, any person dealing with the Trust or the Trustee shall be entitled to rely on the authority of the Trustee or any of the Trustee's agents to act in connection with the Assets.  No person or Entity dealing with the Trustee shall be required to inquire into the validity or expediency or propriety of any transaction by the Trustee or any agent of the Trustee.

6.2     Limitation of Trustee's Liability.  Anything herein to the contrary notwithstanding, in exercising the rights granted herein, the Trustee shall exercise the Trustee's business judgment, to the end that the affairs of

3044375

the Trust shall be properly managed and the interests of all the Beneficiaries and the Settlor are safeguarded; but the Trustee shall not incur any responsibility or liability by reason of any error of law or of any matter or thing done or suffered or omitted to be done under this Agreement, except for gross negligence, willful misconduct or fraud.

6.3    Indemnification.  The Trustee shall be indemnified and receive reimbursement against and from all loss, liability, expense (including reasonable legal fees and expenses) or damage which the Trustee may incur or sustain in the exercise and performance of any of the Trustee's powers and duties under this Agreement, to the maximum extent permitted by applicable law, except if such loss, liability, expense or damage is finally determined by a court of competent jurisdiction to have resulted from the Trustee's gross negligence, willful misconduct or fraud.  The amounts necessary for such indemnification and reimbursement shall be paid by the Trustee out of the Assets, and such amounts may include, without limitation, the cost of insurance to provide for such indemnity, if any, as the Trustee, in the exercise of the Trustee's business judgment, deems necessary.  The Trustee shall not be personally liable for the payment of any Trust expense or claim or other liability of the Trust, and no Entity shall look to the Trustee personally for the payment of any such expense or liability.  This indemnification shall survive the death, dissolution, resignation or removal, as may be applicable, of the Trustee, or the termination of the Trust, and shall inure to the benefit of the Trustee's heirs, personal representatives and assigns.

6.4    Access to Documents and Information.  The Trustee and the Trustee's professionals and advisors shall, at the expense of the Trust, reasonably cooperate and assist the JOLs, the SPhinX Trustee and the SPhinX Trust in accessing the Debtor's books and records (including the Excluded Data and the E-Mail Data) and in obtaining the cooperation of the Debtor's former personnel; provided, however, that the reasonable expenses of significant activities, or creation of any work product requested by the JOLs, the SPhinX Trustee or the SPhinX Funds, in connection with such cooperation and assistance shall be paid by the person or entity requesting same.

## ARTICLE VII.
## SELECTION, REMOVAL AND COMPENSATION OF TRUSTEE

7.1    Initial Trustee.  The initial Trustee shall be Florence V. Lentini.

7.2    Term of Service.  The Trustee shall serve until (a) the completion of all the Trustee's duties, responsibilities and obligations under this Agreement and the Plan; (b) termination of the Trustee in accordance with this Agreement; or (c) the Trustee's death, resignation, incapacity or removal.

7.3    Removal of a Trustee.  The U.S. Trustee shall have the authority to file a motion with the Bankruptcy Court to remove any person serving as the Trustee and appoint a successor Trustee, which motion may be considered on shortened notice, finding that "cause" (as defined in Section 324 of the Bankruptcy Code) exists to remove the Trustee.  The removal shall be effective on the date specified in an Order of the Bankruptcy Court.

7.4    Resignation of Trustee.  A Trustee may resign at any time by giving the Beneficiaries and the U.S. Trustee at least thirty (30) days' written notice of his or her intention to do so.  In the event of a resignation, the resigning Trustee shall render to the Beneficiaries a full and complete accounting of monies and assets received, disbursed, and held during the term of office of that Trustee.  The resignation shall be effective on the later of: (i) the date specified in the notice; (ii) the date that is thirty (30) days after the date the notice is delivered; or (iii) the date the accounting described in the preceding sentence is delivered.

7.5    Appointment of Successor Trustee.  Upon the resignation, death, incapacity, or removal of a Trustee, the U.S. Trustee shall appoint a successor Trustee to fill the vacancy so created.  Any successor Trustee so appointed shall consent to and accept in writing the terms of this Agreement and agree that the provisions of

this Agreement shall be binding upon and inure to the benefit of the successor Trustee.

7.6     _Powers and Duties of Successor Trustee._  A successor Trustee shall have all the rights, privileges, powers and duties of his or her predecessor under this Agreement and the Plan.

7.7     _Trust Continuance._  The death, resignation, incapacity or removal of the Trustee shall not terminate the Trust or revoke any existing agency created pursuant to this Agreement or invalidate any action theretofore taken by the Trustee.  In the event that a successor Trustee is not appointed within thirty (30) days of when required under this Agreement, any Beneficiary may apply to the Bankruptcy Court for appointment of a successor Trustee upon notice to the U.S. Trustee and, if possible, the Trustee to be succeeded.

7.8     _Compensation and Costs of Administration._  The Trustee shall receive fair and reasonable compensation for his/her services in accordance with his/her customary rates, which shall be a charge against and paid out of the Assets (subject to the limitations set forth in this Agreement and the Plan), provided, that no compensation may be paid to the Trustee unless and until the following procedures have been followed with respect to any individual request for compensation: (i) no more frequently than monthly and no less frequently than quarterly, the Trustee shall submit to the U.S. Trustee a statement (a "Statement") reflecting all fees (itemized, as applicable, to indicate the individual performing services, such individual's billable rate, a description of the services performed, the time spent, and the fees incurred) and itemized costs to be reimbursed, (ii) the amount reflected in any such Statement may be paid to the Trustee 30 days after the delivery of the Statement as specified in clause (i) above, unless prior to the expiration of such 30-day period, the U.S. Trustee shall have objected in writing to any compensation reflected in the Statement, in which case the undisputed amounts may be paid and the disputed amounts may only be paid by agreement of the Trustee and the U.S. Trustee, or pursuant to Final Order of the Bankruptcy Court, which shall retain exclusive jurisdiction over all disputes regarding the Trustee's compensation.  All costs, expenses, and obligations, including, without limitation, professional fees and filing fees, incurred by the Trustee (or professionals who may be employed by the Trustee) shall be paid from the Assets prior to any distribution to the Beneficiaries (subject to any limitations set forth in this Agreement and the Plan).

7.9     _Annual Reporting and Filing Requirements._

A.     As soon as reasonably practicable after the end of each calendar year, starting with the report for 2007 due in 2008, the Trustee shall furnish a report to the U.S. Trustee of all Assets received by the Trust, all Assets disbursed to Beneficiaries, and all Assets held by the Trust during the preceding calendar year. The Trustee's report will be available and provided to any Beneficiary upon request.

B.     The Trustee shall file tax returns for the Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) and any other applicable laws or regulations.

## ARTICLE VIII.
## MAINTENANCE OF RECORDS

8.1     The Trustee shall maintain books and records containing a description of all property from time to time constituting the Assets and an accounting of all receipts and disbursements.  Said books shall be open to inspection by any Beneficiary at any reasonable time during normal business hours.  The Trustee shall furnish to any Beneficiary upon written request the most recent annual statement of receipts and disbursements of the Trust, if any.  Records of the Trust may be disposed of in accordance with Section 9.4 hereof.

3044375

## ARTICLE IX.
## DURATION OF TRUST

9.1     <u>Duration.</u>  The Trust shall become effective upon the Effective Date of the Plan.  Thereupon, the Trust and its provisions herein shall remain and continue in full force and effect until the Trust is terminated in accordance with the terms hereof and the Plan.

9.2     <u>Termination Upon Distribution of All Assets.</u>  Upon the payment of all costs, expenses, and obligations (including the final distribution to Beneficiaries) incurred in connection with administering the Trust, the Trustee shall terminate the Trust by filing (a) with the Bankruptcy Court a "Notice of Termination of the PlusFunds General Trust," which references the Plan and the Confirmation Order, and (b) a certified copy of such notice with the New York Secretary of State, upon which the Trustee shall have no further responsibility in connection with the Trust.

9.3     <u>Termination After Four Years.</u>  If the Trust has not been previously terminated pursuant to Section 9.2 hereof, on the fourth anniversary of the Effective Date, unless otherwise extended for cause by the Bankruptcy Court, the Trustee shall distribute all of the Assets in accordance with the Plan and immediately thereafter, the Trust shall terminate and the Trustee shall have no further responsibility in connection therewith, except as provided in Section 9.4 below.  The Trustee, by the filing of a Motion with the Bankruptcy Court prior to the expiration of the Trust, may extend the life of the Trust for up to one year.  Multiple extensions may be obtained so long as Bankruptcy Court approval is sought prior to the expiration of each extended term and so long as the Bankruptcy Court finds that the extension is necessary to the liquidating purpose of the Trust; provided, however, that the aggregate of all such extensions shall not exceed two (2) years unless the Trustee determines, in the exercise of the Trustee's business judgment, that additional extensions shall not jeopardize the status of the Trust as a liquidating trust for U.S. federal income tax purposes based on the applicable Internal Revenue Code, Treasury Regulations, and IRS Administrative Pronouncements.

9.4     <u>Continuance of Trust for Winding-Up.</u>  After the termination of the Trust, the Trustee shall retain for a period of two (2) years the books, records, Beneficiary lists, and certificates and other documents and files which shall have been delivered to or created by the Trustee.  At the Trustee's discretion, all of such records and documents may, but need not, be destroyed at any time after two (2) years from the completion and winding up of the affairs of the Trust.  Except as otherwise specifically provided herein, upon the discharge of all liabilities of the Trust and final distribution of the Trust, the Trustee shall have no further duties or obligations hereunder.

## ARTICLE X.
## MISCELLANEOUS

10.1     <u>Notices.</u>  All notices to be given to Beneficiaries may be given by ordinary mail, e-mail, or may be delivered personally, to the Beneficiaries at the addresses appearing on the books received from the Debtor, if any, and/or maintained at the Trustee's direction.  Any notice or other communication which may be or is required to be given, served, or sent to the Trustee shall be in writing and shall be sent by registered or certified United States mail, return receipt requested, postage prepaid, or transmitted by hand delivery or facsimile (if receipt is confirmed) addressed as follows:

> Florence V. Lentini
> PlusFunds General Trust
> c/o XRoads Solutions Group, LLC
> 400 Madison Avenue, 3rd floor
> New York, NY 10017
> Telephone:  (212) 610-5663
> Facsimile:  (212) 610-5601

9

or to such other address as may from time to time be provided in written notice by the Trustee.

10.3    <u>No Bond.</u>  Notwithstanding any state law to the contrary, the Trustee (including any successor) shall be exempt from giving any bond or other security in any jurisdiction.

10.4    <u>Governing Law.</u>  This Agreement shall be governed by and construed in accordance with the laws of the State of New York for contracts that are entered into and to be fully performed within the State of New York.

10.5    <u>Successors and Assigns.</u>  This Agreement shall inure to the benefit of and shall be binding upon the parties hereto, the Beneficiaries, and their respective representatives, successors and assigns.

10.6    <u>Headings.</u>  The various headings of this Agreement are inserted for convenience only and shall not affect the meaning, interpretation or understanding of this Agreement or any provision hereof.

10.7    <u>No Execution.</u>  All funds in the Trust shall be deemed *in custodia legis* until such times as the funds have actually been paid to or for the benefit of a Beneficiary, and no Beneficiary or any other Person can execute upon, garnish or attach the Assets of the Trust in any manner or compel payment from the Trust except by Final Order of the Bankruptcy Court.  Payment will be solely governed by the Plan and this Agreement.

10.8    <u>Amendment.</u>  Any substantive provision of this Agreement may be amended or waived only upon the written consent of Beneficiaries holding a majority of the interests in the Trust.[2]  Technical amendments to this Agreement may be made, as necessary in the business judgment of the Trustee, to clarify this Agreement or enable the Trustee to effectuate the terms of this Agreement, by the Trustee without Bankruptcy Court approval but with notice to the U.S. Trustee.  Any amendments to this Agreement pursuant to this section shall not be inconsistent with the purpose and intention of the liquidating trust to liquidate in an expeditious but orderly manner the Assets in accordance with Treasury Regulations Section 301.7701-4(d) and Section 3.1 hereof.

10.10    <u>Severability.</u>  If any term, provision, covenant or restriction contained in this Agreement is finally held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions contained in this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

---

[2]  For purposes of this Section 10.8, only the beneficial interests in the Trust derived from Allowed Class 4 Claims shall be considered.

3044375

IN WITNESS WHEREOF, the parties have executed this Agreement (or are deemed to have so executed this Agreement) as of the day and year written above.

Dated: August \_\_\_, 2007

                    PLUSFUNDS GROUP, INC.

                    By: _____
                    Its: Chief Restructuring Officer

                    PLUSFUNDS GENERAL TRUST

                    By: _____
                        Florence V. Lentini
                        Trustee

11

3044375

Exhibit 2 to the Plan

SPhinX Trust Agreement

[To be filed on or before the date of the Plan confirmation hearing.]

Exhibit 3 to the Plan

Plan Term Sheet

*In re PlusFunds Group, Inc., Chapter 11 Case No.: 06-10402 (JMP)*
Term Sheet for PlusFunds' Asset Sale to the SPhinX Funds
Dated April 26, 2007

**Parties:**   The parties to this agreement (the "Agreement") are PlusFunds Group, Inc. ("PlusFunds"), and the Joint Official Liquidators of the SPhinX Funds[1] in their capacity as such (the "JOLs" and, collectively with the SPhinX Funds and PlusFunds, the "Parties").

**Agreement:**   This Agreement shall be implemented through PlusFunds' Chapter 11 plan of liquidation which, together with the Plan's accompanying disclosure statement and agreements governing the SPhinX Trust and the General Creditor Trust (each as defined below), shall be consistent with this Agreement and shall be in form and substance acceptable to the JOLs (the "Plan"). PlusFunds shall only propose and/or support the Plan and it will not propose or support any Chapter 11 plan that (1) does not contain the material terms of this Agreement, or (2) which contains any term that contravenes any term of this Agreement.

**Intent:**   The Parties intend this Agreement to (i) resolve any and all claims and disputes between them that exist or may arise in the future based on facts extant as of the date of this Agreement, (ii) facilitate the confirmation of the Plan, (iii) provide for the payment of allowed administrative and priority claims and a distribution to unsecured creditors, and (iv) vest certain causes of action in a trust for the exclusive benefit of the SPhinX Funds.

**Claims:**   This Agreement is made with reference to SPhinX Funds' timely filed General Unsecured Claim against PlusFunds in an amount of not less than $312 million (the "SPhinX Claim"). Moreover, General Unsecured Claims have been timely filed by various investors in the SPhinX Funds in their capacity as investors, estimated, collectively, at approximately $250 million (the "Investor Claims").

*The Parties agree as follows:*

1.   At the Closing (defined below), in addition to the payments called for in Paragraphs 7 and 8 below, if any, the SPhinX Funds shall pay PlusFunds $4.0 million (the "Purchase Price") in cash in exchange for all of PlusFunds' rights, title and interest in and to all of PlusFunds' causes of action described in **Exhibit A** hereto (the "Causes of Action") being assigned to and vested in a liquidating trust established by the Plan for the exclusive benefit of the JOLs on behalf of the SPhinX Funds (the "SPhinX Trust"); provided, however, that the Disclosure Statement and Plan shall identify the Causes of Action in such detail and specificity as the JOLs may desire. The JOLs on

---

[1] Unless otherwise indicated, terms not herein defined shall have the meanings ascribed to them in the Second Amended Plan of Liquidation of PlusFunds Group, Inc. Under Chapter 11 of the United States Bankruptcy Code, filed on November 6, 2006.

behalf of the SPhinX Funds shall be the sole and exclusive beneficiaries of the SPhinX Trust and shall be entitled to all recoveries and proceeds of the Causes of Action. Other than the Causes of Action, no other assets of PlusFunds shall be assigned to the SPhinX Funds. The Purchase Price is also in satisfaction of the $424,953 owing by the SPhinX Funds to PlusFunds under the Wind-Down Agreement (the "Wind-Down Portion"). The Causes of Action are to be assigned to and vested in the SPhinX Trust "as is" and "where is," with no representations or warranties of any kind, express or implied, including any warranty of value, merchantability or fitness for a particular use.

2.  Within 10 calendar days of the execution of this Agreement, the SPhinX Funds shall pay the Wind-Down Portion to PlusFunds in full, in cash, without any reduction, setoff, subordination or contest of any kind. The JOLs' obligations under the Wind-Down Agreement shall be deemed fulfilled and satisfied upon their performance of this paragraph.

3.  Subject to paragraph 4, below, the Closing shall occur on or before 5:00 p.m. (prevailing Eastern Time) on the second business day after the latter to occur of the entry of a final order (i) by the Bankruptcy Court confirming the Plan, and (ii) by the Grand Court in the Cayman Islands that is presiding over the SPhinX Funds' insolvency proceedings authorizing the JOLs to enter into the Agreement. The Parties may, at their option, waive the requirement that the foregoing orders be final orders. The Parties shall cooperate and use their best efforts to obtain the foregoing approvals at the earliest practicable time. At the Closing, the JOLs shall pay PlusFunds the Purchase Price, less the Wind-Down Portion, in full, in cash, without any reduction, setoff, subordination or contest of any kind. The effective date of the Plan (the "Effective Date") shall occur simultaneously with the Closing.

4.  A condition to the Closing is that a minimum of 97% of the Investor Claims shall be either withdrawn or disallowed as against PlusFunds. PlusFunds, at its option, may waive the foregoing condition.

5.  The SPhinX Trust shall permit PlusFunds and the General Creditor Trust to use the Causes of Action solely for the purposes, as necessary, of defending, setting off, offsetting, or otherwise objecting to, those claims asserted against PlusFunds which are set forth in **Exhibit B** thereto.

6.  The Plan shall establish a liquidating trust (the "General Creditor Trust") for the benefit of holders of Allowed General Unsecured Claims of PlusFunds (including Investor Claims to the extent Allowed), other than the SPhinX Claim. On the Effective Date, provided the JOLs have fulfilled all of their obligations hereunder, PlusFunds shall deposit into an account not less than $1.5 million of the Purchase Price for the General Creditor Trust for the exclusive benefit of holders of Allowed General Unsecured Claims (other than the SPhinX Claim) and the General Creditor Trust's reasonable operating expenses. There shall be no distribution from the General Creditor Trust in respect of the SPhinX Claim.

7.  The SPhinX Funds and/or the SPhinX Trust shall be authorized to pursue the disallowance of the administrative claims asserted by Standard & Poor's (the "S&P Admin Claim") for the S&P licensing fee; provided, however, the SPhinX Funds shall pay any portion of the S&P Admin Claim that is Allowed in full, in cash, on the latter to occur of (i) the Effective Date and (ii) the date such claims, or any portion thereof, become Allowed in PlusFunds' case. PlusFunds and the General Creditor Trust shall cooperate, at their own expense, with and assist in a commercially reasonable manner the SPhinX Funds and the SPhinX Trust in their effort to disallow the S&P Admin Claim; provided, however, that the reasonable expenses of significant activities, or creation of any work product requested by the JOLs or the SPhinX Funds, in connection with such cooperation and assistance shall be paid by the SPhinX Funds.

8.  Certain Fund Managers of the non-U.S. based SPhinX Funds have filed administrative claims against PlusFunds for unpaid management fees as set forth on Exhibit C hereto (the "Management Fee Claims"). The SPhinX Funds and/or the SPhinX Trust shall be authorized to pursue the disallowance of the Management Fee Claims; provided, however, the SPhinX Funds shall pay any portion of the Management Fee Claims that is Allowed in full, in cash, on the latter to occur of (i) the Effective Date and (ii) the date such claims, or any portion thereof, become Allowed in PlusFunds' case. PlusFunds and the General Creditor Trust shall, at their own expense, cooperate with and assist in a commercially reasonable manner the SPhinX Funds and the SPhinX Trust in their effort to reconcile and/or disallow the Management Fee Claims; provided, however, that the reasonable expenses of significant activities, or creation of any work product requested by the JOLs or the SPhinX Funds, in connection with such cooperation and assistance shall be paid by the SPhinX Funds.

9.  PlusFunds shall promptly file objections to the Investor Claims. The JOLs shall promptly use commercially reasonable efforts to convince the holders of Investor Claims to withdraw their claims filed in PlusFunds' case, including by promptly notifying the holders of Investor Claims that such holders' assertion of claims against PlusFunds may have an adverse impact on their ability to recover, or may delay recovery, in respect of their claims in the SPhinX Funds' insolvency proceedings in the Cayman Islands.

10. Members of the Liquidation Committee of the SPhinX Funds (the "Committee Members") have filed Investor Claims against PlusFunds totaling approximately $152.4 million (the "Committee Claims"), as set forth on Exhibit D hereto. If 50% or less of the amount of the Committee Claims is withdrawn by May 30, 2007, then the SPhinX Funds shall pay 100% of PlusFunds' reasonable litigation fees and expenses of objecting to the Investor Claims without regard to the outcome of such litigation. If more than 50% of the amount of the Committee Claims is withdrawn by May [10], 2007, then the SPhinX Funds shall pay the proportionate share of PlusFunds' reasonable litigation fees and expenses of objecting to the Investor Claims without regard to the outcome of such litigation, calculated by dividing the amount of the unwithdrawn Committee Claims by the total, remaining, unwithdrawn Investor Claims. For the avoidance of doubt, and by way of example, if $50 million of the Committee Claims is not withdrawn, and the total, remaining, unwithdrawn Investor Claims is $100 million (inclusive of the $50 million of the unwithdrawn Committee

3313391

Claims), then the SPhinX Funds shall pay 50% of the PlusFunds' reasonable litigation fees and expenses of objecting to the Investor Claims without regard to the outcome of such litigation. The SPhinX Funds shall pay or object to PlusFunds' reasonable litigation fees and expenses under this paragraph within 20 days of invoicing by PlusFunds.

11. The Committee Members, and their Investor Committee against PlusFunds, are as set forth on **Exhibit D** hereto, and the JOLs warrant and represent that Exhibit D lists all of the Committee Members as of the date of this Agreement.

12. This Agreement shall not affect the Parties' rights and obligations under the SPhinX License, including the obligation to store, preserve and maintain PlusFunds' books and records and provide the JOLs with reasonable access thereto, in accordance with the SPhinX License. In addition, PlusFunds agrees to provide the JOLs and the SPhinX Trust with reasonable access to the Excluded Data and all E-Mail Data (each as defined in the SPhinX License), subject to the JOLs' and the SPhinX Trust' entry into, and compliance with, a common interest agreement with PlusFunds and the General Creditor Trust that preserves all privileges as to third parties, and subject to the confidentiality obligations of PlusFunds relating to such data. The SPhinX Trust shall also be entitled to obtain reasonable access to PlusFunds' books and records (including the Extended Data and the E-Mail Data) in the same manner that the JOLs are entitled to under the SPhinX License and hereunder. The General Creditor Trust shall assume and perform PlusFunds' obligations under the SPhinX License. PlusFunds and the General Creditor Trust and their respective professionals and advisors shall, at their own expense, reasonably cooperate and assist the JOLs and the SPhinX Trust in accessing PlusFunds' books and records (including the Excluded Data and the E-Mail Data) and in obtaining the cooperation of former PlusFunds' personnel; provided, however, that the reasonable expenses of significant activities, or creation of any work product requested by the JOLs or the SPhinX Funds, in connection with such cooperation and assistance shall be paid by the SPhinX Funds.

13. The JOLs shall not object to the Plan or any documents PlusFunds files in support thereof provided they are in accordance with this Agreement.

14. The SPhinX Claim shall be an Allowed General Unsecured Claim in the amount of $250 million. The JOLs shall cause the SPhinX Funds to support the Plan, take all reasonable action in furtherance of confirmation of the Plan, and vote to accept the Plan when solicited to vote on the Plan. This covenant is conditional upon the Bankruptcy Court having entered an order approving PlusFunds' Disclosure Statement including findings and holdings that the Parties' entry into this Agreement, and the performance of their obligations hereunder, does not violate any law, including Section 1125 of the Bankruptcy Code, and may not give rise to any claim or remedy against any of the Parties, including the designation of the vote of the JOLs on behalf of the SPhinX Funds.

15. Upon the occurrence of the Effective Date, the Parties shall generally release all claims they may have against each other, including, without limitation, PlusFunds' claim against the SPhinX Funds for indemnity in the amount of no less than $329,877.

3313391

After the Effective Date has occurred, the Parties' respective right to enforce this Agreement, the SPhinX License, the Plan and the Confirmation Order, shall be their exclusive remedy against each other.

16. Nothing in this Agreement shall release or otherwise affect any claims that the JOLs or the SPhinX Funds may have against any persons or entities other than PlusFunds, including, without limitation, the SPhinX Funds' claims, if any, against PlusFunds' current and former officers, directors, employees, shareholders, representatives and professionals.

17. Nothing in this Agreement or the Plan, including, without limitation, the allowance, treatment or reduction of the SPhinX Claim, or the existence of this Agreement, the Plan or any terms thereof, shall have any effect on, or evidentiary impact whatsoever, or be admissible for any purpose, in connection with any claim or defense that any persons or entities may assert against any other persons or entities, including, without limitation, any claim by the SPhinX Funds against anyone who is presently or formerly affiliated with PlusFunds; provided that nothing herein shall prevent this Agreement or the Plan from being admitted in evidence in connection with the Plan or in any action or proceeding by either party to enforce, and/or for breach of, any terms, provisions or conditions of this Agreement.

18. The JOLs shall select the liquidating trustee for the SPhinX Trust. There shall not be any advisory board with respect to the SPhinX Trust. PlusFunds shall select the liquidating trustee for the General Creditor Trust. The Plan need not provide for an Advisory Board with respect to the General Creditor Trust. If the Plan does provide for an Advisory Board with respect to the General Creditor Trust, the JOLs shall have no right to any seat on, or control over, such Advisory Board.

19. PlusFunds hereby warrants and represents that, by stipulated agreement among PlusFunds, Refco Inc. and its affiliated debtors, and the trustee for Refco Capital Markets, Ltd. (collectively, with Refco, Inc. and its affiliated debtors, the "Refco Debtors"), the Refco Proofs of Claim (as defined in Exhibit A hereto) are, to the extent allowed, capped in the aggregate as a $7 million claim against the Refco Debtors.

20. This agreement shall be interpreted and governed in accordance with New York law applicable to contracts entered into, and to be performed within, the State of New York, without regard to any contrary legal or equitable principles; provided that, as set forth above, it is contemplated that this Agreement will be implemented through the Plan and accompanying documents in form and substance acceptable to the Parties.

21. This Agreement contains the Parties' entire agreement, and supersedes all of their prior written and oral agreements, negotiations and understandings, concerning the subject matter hereof.

### ACKNOWLEDGED AND AGREED:

THE JOINT OFFICIAL LIQUIDATORS OF
EACH SPHINX ENTITY LISTED ON EXHIBIT E

By. _____    Signed: April 26, 2007
    Name: Kenneth Krys
    Title: Joint Official Liquidator
    (without personal liability)

PLUSFUNDS GROUP INC.

By. _____    Signed: April 26 2007
Name: Florence V. Lentini
Title: Chief Restructuring Officer

–6–

3313391

**EXHIBIT A**
<u>Causes of Action</u>

**"Causes of Action" includes, except as specified below, all of PlusFunds' legal and equitable interests in any claim (as defined in Section 101(5) of the Bankruptcy Code) against any Entity, including, without limitation, the right to recover anything of value in respect of (a) any Avoidance Action, (b) any Indemnity Claim, (c) any Preference Claim, (d) any Director Claim, (e) the S&P Adversary Proceeding, (f) the D&O Coverage, (g) Refco Non-Debtor Claims, (h) Other Claims, (i) the Excess Refco Recovery and (j) any claim against the SPhinX Funds or the JOLs in their capacity as such, other than the right to enforce this Agreement, the SPhinX License, the Plan and the Confirmation Order.**

"**Avoidance Actions**" means, subject to the exclusion below, all claims and causes of action that PlusFunds has arising under any of Sections 510, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code, including, without limitation, the Preference Claims.

"**Preference Claims**" means, subject to the exclusion below, any right PlusFunds may have to pursue avoidance and any recovery of any transfer made by PlusFunds within one year of the Petition Date, under Sections 547 and 550 of the Bankruptcy Code, including, without limitation, claims, if any, against PlusFunds's former officers, directors and employees who received payments in respect of reimbursement requests, and against their professionals, as well as claims against other Entities who received from PlusFunds potentially preferential transfers.

"**Indemnity Claim**" means any right PlusFunds may have to be indemnified for any claims or losses for any reason from any Entity, including, without limitation, any of SMF-LP, SIF-LP, PFG-LLC, and SPhinX-Onshore.

"**Director Claim**" means any right PlusFunds may have to pursue any action against any past or present director of PlusFunds, including, without limitation, claims, if any, for breach of contract, breach of fiduciary duty, negligence, fraud, conspiracy, malice, willful misconduct or dereliction of duty.

"**S&P Adversary Proceeding**" means the adversary proceeding captioned *Source Enterprises, Inc. v. Standard & Poor's, a Division of The McGraw Hill Companies, Inc.*, Adv. Pro. No.: 06-01630 (JMP).

"**D&O Coverage**" means any right PlusFunds or the Trust may have to insurance coverage in respect of any claims, defense costs, losses, or similar matters that are suffered or payable by PlusFunds or any of its officers and directors, under any insurance policies, including any policy issued by Westchester Surplus Lines Insurance Company, Illinois Union Insurance Company, INA Surplus Insurance Company, or any other Entity, and any professional liability coverage.

"**Refco Non-Debtor Claims**" means any and all claims against affiliates of the Refco Debtors who are not debtors in bankruptcy proceedings, including, without limitation, against Refco Alternative Investments.

1

"**Other Claims**" means, collectively, all additional Causes of Action that PlusFunds may have, including, without limitation, claims against Bank für Arbeit und Wirtschaft (BAWAG), DMP Mellon, PricewaterhouseCoopers, the former officers and directors of the SPhinX Funds and the Refco entities, including, without limitation, Phillip Bennett and Robert Trosten, and possibly others.

"**Excess Refco Recovery**" means any recovery on account of the Refco Proofs of Claim solely to the extent that the Refco Proofs of Claim are allowed against the Refco Debtors in an amount in excess of $7 million.

**Exclusion:** "**Causes of Action**" does not include the Refco Proofs of Claim or Certain PlusFunds' Claims Against Its Agents.

"**Refco Proofs of Claim**" means the proofs of claim that PlusFunds filed in the Refco Debtors' bankruptcy cases.

"**Certain PlusFunds' Claims Against Its Agents**" means any (a) Avoidance Actions or Preference Claims against XRoads Solutions Group, LLC or Curtis, Mallet-Prevost, Colt & Mosle LLP, or (b) any claim (as defined in Section 101(5) of the Bankruptcy Code), arising after PlusFunds' Petition Date, that PlusFunds may have against any of its officers, directors, employees, consultants, agents, representatives, attorneys, accountants, financial advisors, lenders, experts, or professionals and agents of the foregoing, for any actions taken or omitted to be taken arising out of or relating exclusively to the following: (i) PlusFunds' operations and/or administration of its bankruptcy case after the Petition Date; (ii) PlusFunds' Chapter 11 case; or (iii) the formulation, preparation, pursuit, dissemination, implementation, administration, confirmation, or consummation of the Plan and Disclosure Statement.

3313391

**EXHIBIT B**
**Claims Described in Paragraph 5 of the Agreement**

| Creditor | Description | Claim Value | Potential Duplicates | Date Filed | Claim ID # |
|---|---|---|---|---|---|
| ADMINISTAFF COMPANIES II, L.P. | Contingent/Unliquidated * | $           - | | 5/15/2006 | 59 |
| ALIPRANDI, CHRIS | | 24,539.42 | | 5/9/2006 | 1000016 |
| ARKIN KAPLAN LLP | | 25,576.00 | | 5/11/2006 | 25 |
| ARKIN KAPLAN LLP | | - | $    25,576.00 | 5/12/2006 | 40 |
| BOUSBIB, GABRIEL | Contingent/Unliquidated * | - | | 5/12/2006 | 53 |
| MARK KAVANAGH / BRIAN OWENS | | 284,821.90 | | Scheduled Claim | 1000039 |
| REFCO ALTERNATIVE INVESTMENTS, LLC | | - | | 5/15/2006 | 91 |
| REFCO ALTERNATIVE INVESTMENTS, LLC | | 42,000.00 | | 5/15/2006 | 90 |
| DERIVATIVES PORTFOLIO MANAGEMENT LLC | | 2,000.00 | | Scheduled Claim | 1000024 |
| EILENBERG & KRAUSE | | 1,087.00 | | 5/11/2006 | 1000027 |
| SEWARD & KISSEL, LLP | | 58,657.42 | | Scheduled Claim | 1000060 |
| STANDARD & POORS | | 256,663.36 | | Scheduled Claim | 1000062 |
| WALKERS SPV | | 11,638.68 | | Scheduled Claim | 1000066 |
| REFCO FUND HOLDING LLC | Contingent/Unliquidated * | | | 5/15/2006 | 89 |

| Total | | $   716,712.78 | $    25,576.00 | | |

Note:
* Each contingent & unliquidated claim is capped at $100,000 in offsets for purposes of paragraph 5 of the Agreement.

**EXHIBIT C**
**Management Fee Claims**

Ellington Management Group                $658,697.70

Forest Investment Management              $184,394.21

SPARX Asset Management                    $ 38,976.00

Cumberland Associates                     $ 39,745.67.

**EXHIBIT D**
Committee Members and Amounts of Committee Claims

| | |
|---|---|
| UBS AG | 42,500,000.00 |
| IXIS Corporate-Investment Bank | |
| SPhinX Managed Futures Index Fund, LP | 38,391,594.00 |
| Trustees of Masonic Hall-Asylum Fund | |
| GinsGlobal Index Funds | |
| Rydex Capital Partners LLC | |
| Deutsche Bank AG | 18,216,097.00 |
| OFI Palmares F/K/A Ofivalmo Palmares | 12,977,577.07 |
| Global Macro Fund Ltd. | 40,384,865.70 |
| Merrill Lynch Alternative Investments, LLC | |

3313391

**EXHIBIT E**
**SPHINX FUNDS**

SPhinX, Ltd.

SPhinX Strategy Fund, Ltd.

PlusFunds Manager Access Fund SPC, Ltd.

SPhinX Plus SPC Ltd.

SPhinX Distressed Ltd.

SPhinX Merger Arbitrage Ltd.

SPhinX Special Situations Ltd.

SPhinX Macro Ltd

SPhinX Long/Short Equity Ltd

SPhinX Managed Futures Ltd

SPhinX Equity Market Neutral Ltd

SPhinX Convertible Arbitrage Ltd

SPhinX Fixed Income Arbitrage Ltd

SPhinX Distressed Fund SPC

SPhinX Merger Arbitrage Fund SPC

SPhinX Special Situations Fund SPC

SPhinX Macro Fund SPC

SPhinX Long/Short Equity Fund SPC

SPhinX Managed Futures Fund SPC

SPhinX Equity Market Neutral Fund SPC

SPhinX Convertible Arbitrage Fund SPC

SPhinX Fixed Income Arbitrage Fund SPC

Exhibit 4 to the Plan
Schedule of Accounts Receivable

The term "Accounts Receivable" for purposes of the Plan means the Debtor's interest, as of the Effective Date, in the following:

1. Any tax refunds owing from any taxing authority;

2. Any security deposit provided by the Debtor;

3. Right to reimbursement from SIF-LP and SMF-LP for professional fees, including of CMP, XRoads and the Debtor's consultants, for services provided by the Debtor on behalf of their general partner in its capacity as such; and

4. Right to payment from Refco Alternative Investment of approximately $95,000 for management fees owing for the fourth quarter of 2005.

3668774

Exhibit 5 to the Plan

## SCHEDULE OF OFFSHORE INVESTORS' CLAIMS

| Investor | Amount | Claim # |
|---|---|---|
| 1 AFL INVESTIMENTOS SA | $          22,645.00 | 54 |
| 2 ANB 400 & CO./NORMAN H. READ 1985 TRUST | 107,257.51 | 33 |
| 3 ANB 400 & CO/BIVINS FOUNDATION EQUITY AGENCY SUB | 791,142.90 | 31 |
| 4 APACS, LP | 72,302.00 | 29 |
| 5 BEACH CAPITAL MGMT LTD | 183,954.77 | 267 |
| 6 CALYON PARIS BRANCH | 3,735,385.62 | 43 |
| 7 CALYON PARIS BRANCH | 3,400,000.00 | 282 |
| 8 CANYON CAPITAL ADVISORS LLC | 465,882.00 | 75 |
| 9 CITCO GLOBAL CUSTODY NV REF 103561 | 94,323.00 | 272 |
| 10 CITCO GLOBAL CUSTODY NV REF 156111 | 1,002,742.00 | 271 |
| 11 CITCO GLOBAL CUSTODY NV REF 160111 | 238,733.00 | 269 |
| 12 CITCO GLOBAL CUSTODY NV REF LYXORMF 10342437 | 1,038,142.00 | 268 |
| 13 CITCO GLOBAL CUSTODY NV REF LYXORMF 10724545 | 3,310,602.00 | 273 |
| 14 CITCO GLOBAL CUSTODY NV REF REINVEST UBS JERSEY | 226,272.00 | 270 |
| 15 COMINVEST ASSET MANAGEMENT GMBH [1] | 4,105,600.00 | 84 |
| 16 COMINVEST HEDGE CONSERVATIVE [1] | 4,105,600.00 | 83 |
| 17 COMINVEST HEDGE DYNAMIC [1] | 4,105,600.00 | 85 |
| 18 COMMUNITY FOUNDATION FOR GREATER TORONTO | 5,183,487.44 | 68 |
| 19 COMMUNITY FOUNDATION FOR GREATER TORONTO | 5,183,487.44 | 274 |
| 20 CROSSBORDER CAPITAL (BERMUDA) LTD.; CROSSBORDER CAP. | 8,290,291.27 | 93 |
| 21 DEUTSCHE BANK AG | 18,216,097.00 | 255 |
| 22 DRURY CAPITAL INC | 65,088.03 | 55 |
| 23 FUNDACAO CALOUSTE GULBENKIAN | 333,291.27 | 65 |
| 24 GLOBAL MACRO FUND LIMITED | 40,384,865.70 | 94 |
| 25 KBC INVESTMENTS LTD. | 1,400,000.00 | 92 |
| 26 MIAMI CHILDREN'S HOSPITAL FOUNDATION, INC. | 728,007.20 | 71 |
| 27 OFI PALMARES (F/K/A OFIVALMO PALMARES) | 12,977,577.07 | 79 |
| 28 PICTET ALTERNATIVE FUNDS II | 1,202,170.68 | 80 |
| 29 PICTET ALTERNATIVE FUNDS II (1) | 1,202,170.68 | 82 |
| 30 REFCO SPHINX MANAGED FUTURES INDEX FUND, LTD. | 13,838,451.00 | 44 |
| 31 RGA AMERICAS REINSURANCE LTD | 1,175,867.94 | 21 |
| 32 S&P MANAGED FUTURES INDEX FUND, LP | 41,000,000.00 | 46 |
| 33 SPHINX MANAGED FUTURES INDEX FUND, LP | 38,391,594.00 | 45 |
| 34 THAMES SPC | 9,524,358.75 | 69 |
| 35 UBS AG | 42,500,000.00 | 253 |
| 36 WILLOWBRIDGE ASSOCIATES, INC | 72,000.00 | 32 |
| Total, not including unliquidated portions of claims* | $ 268,674,989.27 | |

## SCHEDULE OF ONSHORE INVESTORS' CLAIMS

| Creditor Name | Claim Amount | Claim No. |
|---|---|---|
| APACS, LP | $ 104,847.00 | 28 |
| ANB 400 & CO. | 83,658.79 | 30 |
| BURTON, NATALIE R., TRUSTEE OF THE | 24,727.79 | 95 |
| WEINSTEIN SPHINX PARTNERSHIP | 139,755.03 | 96 |
| MALONE, CLAUDIA FBO MATTHEW IRA | 28,481.46 | 97 |
| MALONE, CLAUDIA FBO ROBERT JR., IRA | 28,481.46 | 98 |
| SPEARS FAMILY HOLDINGS LIMITED PARTNERSHIP | 68,898.00 | 99 |
| WILLIAM J. VON LIEBIG 1995 CRUT | 113,925.84 | 100 |
| HARRY E. TEASLEY CHARIT REMAINDER TR | 8,414.08 | 101 |
| ALEC ENGELSTEIN 2000 FAMILY IRREV TRUST | 11,512.22 | 102 |
| STERCHI, LINTON ALLEN TR DTD 8-31-73 | 62,024.35 | 103 |
| ALLEN, HELEN IVES CO-TUA | 11,130.28 | 104 |
| VARGO, JAMES; AS TTEE OF THE SBD-GGD IRREV. TRUST | 23,206.18 | 105 |
| LITES, DEANNA | 25,874.96 | 106 |
| SUSAN P. MCCARTHY IA | 35,699.16 | 107 |
| TIBURON FINANCIAL SERVICES, INC. - PLEDGED | 15,360.48 | 108 |
| WILLIAM J. RYAN IRA | 34,317.63 | 109 |
| PENNINGTON, BROOKS M., III | 27,973.51 | 110 |
| PENNINGTON, PATRICIA C. | 16,784.09 | 111 |
| BPCB PARTNERS, L.P. | 21,259.86 | 112 |
| PENNINGTON INVESTMENTS I, L.P. | 286,854.22 | 113 |
| WALRAVEN, VERGIL RANKIN | 26,349.70 | 114 |
| WALRAVEN, WESLEY MERLYN | 50,543.02 | 115 |
| V VZWEHL TR FBO DANIEL VON ZWEHL | 32,892.40 | 116 |
| V VZWEHL TR FBO JOHN VINCNET VON ZWEHL | 32,892.40 | 117 |
| VON ZWEHL, PAUL | 7,713.19 | 118 |
| HOLLIS, PRESTON TAYLOR | 11,179.83 | 119 |
| HOLLIS, HOWELL IV | 20,875.36 | 120 |
| CO TR UA N. GOULD FBO FRAN - TR A | 14,661.11 | 121 |
| CO TR UA N. GOULD FBO MARY - TR B | 14,661.11 | 122 |
| TR. MARY G. HERSHEY IRA | 4,163.99 | 123 |
| POLANSKY, MICHAEL W. | 10,749.25 | 124 |
| POLANSKY, BENJAMIN J. | 3,821.98 | 125 |
| WOODS, ELLEN W. | 10,037.96 | 126 |
| CECIL VAN DEVENDER TUA-GR | 5,873.98 | 127 |
| SPECIAL, MARGARET WOODS | 17,236.99 | 128 |
| SPECIAL, KATHLEEN WOODS | 23,064.54 | 129 |
| G AVERYT TTEE UA MMA 2003 CRUT | 29,859.06 | 130 |
| G. AVERYT TTEE EFA 2003 CRUT | 32,466.68 | 131 |
| LYDIA DENKLER UA REV. TRUST | 8,574.47 | 132 |
| ALLEGRA, JOSEPH C. JR. | 11,499.98 | 133 |
| ALLEGRA, KATHARINE E. | 11,499.98 | 134 |
| PRUITT, CINDY | 16,696.67 | 135 |
| KRAMER, AMY | 19,442.39 | 136 |
| TR FBO WILLIAMS GRANDCHILDREN | 77,790.92 | 137 |
| SCOTT L. PROBASCO JR CRUT II | 178,898.63 | 138 |
| TR FBO ELIZABETH CHAZEN | 8,236.24 | 139 |

3668794

| | | |
|---|---|---|
| TR FBO JESSICA CHAZEN | 8,579.43 | 140 |
| TR FBO GENEVIEVE CHAZEN | 8,236.24 | 141 |
| PRICE FAMILY FOUNDATION, INC., THE | 9,689.74 | 142 |
| PRICE, WILLIAM K. | 5,795.51 | 143 |
| PRICE, JOHN & CHRISTINE | 8,091.33 | 144 |
| CARUSO, CONCETTINA G. | 5,226.99 | 145 |
| S L PROBASCO JR CRUT | 217,072.63 | 146 |
| S L PROBASCO JR CHAR LEAD TUA | 142,852.97 | 147 |
| LINDSEY CIGARRAN 2004 TRUST | 5,131.99 | 148 |
| CHRISTOPHER CIGARRAN 2004 | 5,131.99 | 149 |
| RS PARTNERS, LP | 8,571.87 | 150 |
| TR DENNIE L. MCCRARY IRA | 2,903.88 | 151 |
| HEYWARD GLOBER MAIN GIFT TR | 2,858.16 | 152 |
| LAURA FRANCES HOFFACKER GIFT TR | 2,858.16 | 153 |
| MARY LOUISE HOFFACKER GIFT TR | 2,858.16 | 154 |
| DENNIE BURNELL HOFFACKER GIFT TR | 2,858.16 | 155 |
| ANNA CATHERINE MCCRARY GIFT TRUST | 2,858.16 | 156 |
| LILLIAN CARR MCCRARY GIFT TR | 2,858.16 | 157 |
| CAROLINE MCCRARY MAIN GIFT TRUST | 2,858.16 | 158 |
| 1998 NORMA P. FRASER GS TR | 5,147.65 | 159 |
| EDITH TRUST | 3,170.69 | 160 |
| GERTRUDE LIEBIG TRUST | 5,019.36 | 161 |
| SUZANNE VON LIEBIG IRA | 4,854.82 | 162 |
| BURTON, MATTHEW N. & NATALIE R.; TRUSTEES | 13,644.71 | 163 |
| GERTRUDE M. NOVAK TRUST | 3,359.36 | 164 |
| ROBERT KREILING - IRA | 4,699.20 | 165 |
| DMMB, L.L.C. | 1,795.26 | 166 |
| PANWY FOUNDATION | 6,906.78 | 167 |
| BUCK, DANIEL STEVEN | 30,803.59 | 168 |
| BUCK, MEAGAN FUESEL | 20,162.35 | 169 |
| JOHN T. ELMES IRA | 5,789.19 | 170 |
| SUZANNE KOCH SEP IRA | 11,615.71 | 171 |
| MCCARTEN FAMILY LLC | 84,585.46 | 172 |
| WILLIAM J SHAW FAMILY FDT, THE | 67,680.59 | 173 |
| SNEAD FAMILY FOUNDATION | 58,231.14 | 174 |
| LOIS ARREGUIN IRA | 14,885.55 | 175 |
| DOUGLAS G DICKERSON IRREV TR #3 FBO DG DIKERSON II | 62,371.69 | 176 |
| DOUGLAS G. DICKERSON IRREV. TR. #3 FBO PAIGE L. DICKERS | 62,371.69 | 177 |
| DOUGLAS G. DICKERSON IRREV. TR #3 FBO MEREDITH D. WALT | 62,371.69 | 178 |
| RICHARD DICKERSON IRREV TR #3 FBO KIMBERLY D. NIKKI | 37,069.97 | 179 |
| RICHARD DICKERSON IRREV TR #3 FBO RC DICKERSON, JR. | 35,304.73 | 180 |
| RICHARD DICKERSON IRREV TR #3 FBO ANDREW G. | 37,069.97 | 181 |
| RICHARD DICKERSON IRREV TR #3 FBO RYAN C. | 37,069.97 | 182 |
| RICHARD DICKERSON IRREV TR #3 FBO C B DICKERSON | 35,304.73 | 183 |
| RICHARD DICKERSON IRREV TR 1998 FBO COURTNEY | 68,144.80 | 184 |
| DOUGLAS AND MARIANNE DICKERSON FOUNDATION | 57,265.64 | 185 |
| INGA O NYLANDER TESTAMENTARY TR FBO INGA OLSSON | 71,606.38 | 186 |
| MCGEE CHILDREN TR - B.M. KINDER | 17,480.41 | 187 |
| MCGEE CHILDREN TR.- C.M. MEBANE | 11,653.59 | 188 |
| MCGEE CHILDREN TR.-C.V. SMEDLEY | 14,567.01 | 189 |

3668794

| | | |
|---|---|---|
| MCGEE GRANDCHILD TR-B. MEBANE | 2,994.27 | 190 |
| MCGEE GRANDCHILD TR.-B. KINDER | 3,593.14 | 191 |
| MCGEE GRANDCHILD TR-E KINDER | 2,994.27 | 192 |
| MCGEE GRANDCHILD TR.- S. SMEDLEY | 4,311.75 | 193 |
| MCGEE GRANDCHILD TR.-MR. WILLIAM D. MEBANE, JR. | 2,994.27 | 194 |
| MCGEE GRANDCHILD TR. - J. MEBANE MOBLEY | 2,994.27 | 195 |
| MCGEE GRANDCHILD TR. - C. MEBANE | 2,994.27 | 196 |
| WILLIAM DE BRNIERE MEBANE IRA | 17,148.94 | 197 |
| MEBANE, WILLIAM D., JR. | 2,947.30 | 198 |
| VIRGINIA E. DWYER IRREV. TRUST | 17,301.53 | 199 |
| E.H. DARDEN CHILDREN'S TR FBO JOSHUA E. SZYMCZAK | 6,216.59 | 200 |
| E.H. DARDEN CHILDREN'S TRUST FBO MARGARET SZYMCAZK | 4,432.19 | 201 |
| CO TR UA LL GELLERSTEDT III UNI | 54,116.85 | 202 |
| JOHN PORTMAN 1999 TRUST | 35,209.61 | 203 |
| DLIN, CAROL B. | 10,431.95 | 204 |
| MICHELE M. ROLLINS REV TRUST - PLEDGED | 5,540.18 | 205 |
| LUIS DE HECHAVARRIA, JR. REVOCABLE TRUST - PLEDGED | 20,146.24 | 206 |
| ANNE DE HECHAVARRIA SCOTT REVOCABLE TRUST - PLEDGED | 22,946.57 | 207 |
| SUSAN HECHAVARIA WHELAN REVOCABLE INVST TRUST | 19,861.55 | 208 |
| PAUL MICHAEL DE HECHAVARRIA REV TRUST - PLEDGED | 24,061.34 | 209 |
| LEANNE DISANTO ROTH IRA | 7,051.86 | 210 |
| CRAIG S. BUSHEY TRUST | 5,429.58 | 211 |
| BUSHEY CHILDREN'S TRUST | 6,159.18 | 212 |
| TRUST FBO MASON ELLIOT SKLUT | 4,026.24 | 213 |
| TRUST FBO HALEY MELISSA SKLUT | 4,026.24 | 214 |
| TRUST FBO BLAIR MICHELLE SKLUT | 4,026.24 | 215 |
| SMITH TRUST UAD 12-23-00, (THE) REBA BLACKSTOCK TTEE | 102,708.78 | 216 |
| ALEXANDER TRUST, THE; UAD 12-23-00 NARVEL BLACKSTOCK | 102,708.78 | 217 |
| SUSAN DAVIS IRREV TR FBO PENNIE DAVIS UA 1-10-91 | 10,309.04 | 218 |
| SUSAN DAVIS IRR TR FBO JESSIE DAVIS | 5,136.85 | 219 |
| H & S DAVIS IRREV TR FBO JESSIE DAVIS | 2,875.91 | 220 |
| H. DAVIS 1984 IRREV. TR FBO AMY DAVIS | 4,229.80 | 221 |
| H. DAVIS 1984 IRREV TR FBO JULIA DAVIS | 16,605.08 | 222 |
| JOSEPH GOLDFARB MARITAL TRUST | 20,706.44 | 223 |
| WEINSTEIN, DOV | 3,449.99 | 224 |
| WEINSTEIN, JAY & SHARON | 10,894.26 | 225 |
| STUART HENSLEY MARITAL TR A GST | 11,417.41 | 226 |
| GAYLA HENSLEY REVOCABLE TR IA | 27,401.79 | 227 |
| SAM TORCISE GST EXEMPT MAR TR | 2,875.91 | 228 |
| JACOBUS, JENNIFER | 28,758.96 | 229 |
| MICHAEL & JOY MURRAY 1997 UNITRUST | 40,787.63 | 230 |
| TR U/A RALPH M SNOW, JR | 11,163.05 | 231 |
| CHASE, PHILIP R. | 2,255.41 | 232 |
| POLISH, SHELDON IRA | 39,468.27 | 233 |
| STEVEN J MASON IRA | 12,883.98 | 234 |
| ANNA M HOGAN TR | 2,183.18 | 235 |
| HINES & NGO FAMILY 2000 FAMILY TRUST | 6,505.24 | 236 |
| LINDA S CHAPMAN IRA | 2,148.40 | 237 |
| TUA PHIL & PAM PFEFFER | 18,262.27 | 238 |
| MUSEUM OF SCIENCE & HISTORY | 66,221.74 | 239 |

-4-

| | | |
|---|---:|---:|
| JAN LARSON IM RESERVE | 12,447.75 | 240 |
| MATTILENE GOSS IM J CARL | 2,338.57 | 241 |
| E HAROLD NELSON IRA | 61,997.42 | 242 |
| MURPHY, DENNIS A | 42,360.89 | 243 |
| BRUCE & JEANENE WEINER IMA | 93,613.42 | 244 |
| WADE T MITCHELL IRA | 88,038.40 | 245 |
| WHITE, W HOWARD OR JANICE; BY JTIE | 39,112.16 | 246 |
| PATRICK A. EGBE IMA | 42,856.44 | 247 |
| WILLIAM U (BILL) WEISS LIVING TRUST | 42,180.00 | 248 |
| ARLENE A. FORASTIERE IRA | 36,478.81 | 249 |
| STEPHEN LUGAR IRA | 393,300.61 | 250 |
| SCHOFF, SARAH M. | 139,061.29 | 251 |
| EDWARDS, SCOTT J | 394,311.62 | 252 |
| TAYLOR, JOHN N JR | 219,845.51 | 266 |
| | | |
| Total, not including unliquidated portions of claims* | $ 5,708,021.08 | |

\* These schedules are subject to adjustment.

3668794

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
----------------------------------------------------------x
In re:                                      :   Chapter 11
                                            :
PLUSFUNDS GROUP, INC.,                      :   Case No. 06-10402 (JMP)
A Delaware Corporation,                     :
                                            :
                        Debtor.             :
                                            :
----------------------------------------------------------x
```

## ORDER (I) CONFIRMING THE DEBTOR'S FIFTH AMENDED PLAN OF LIQUIDATION, DATED JUNE 28, 2007, UNDER BANKRUPTCY CODE SECTION 1129 AND BANKRUPTCY RULE 3020; (II) APPROVING SETTLEMENTS IN CONNECTION THEREWITH; AND (III) GRANTING RELATED RELIEF

### RECITALS

a.      On March 6, 2006, PlusFunds Group, Inc., the above-captioned debtor and debtor-in-possession (the "Debtor") commenced its bankruptcy case by filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code").

b.      Pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor is winding down its business and managing its affairs as debtor-in-possession.

c.      On May 26, 2007, the Debtor filed the Motion for an Order (A) Approving the Adequacy of PlusFunds' Disclosure Statement Describing its Third Amended Plan of Liquidation, (B) Scheduling Hearing to Confirm the Plan, (C) Establishing Plan Objection Deadline; (D) Approving Form of Ballot, Voting Deadline and Solicitation Procedures; and (E) Approving Form and Manner of Notice.

3798362

d.      On June 28, 2007, the Bankruptcy Court entered the Order (A) Approving the Adequacy of PlusFunds' Disclosure Statement Describing its Fifth Amended Plan of Liquidation, (B) Scheduling Hearing to Confirm the Plan, (C) Establishing Plan Objection Deadline; (D) Approving Form of Ballot, Voting Deadline and Solicitation Procedures; and (E) Approving Form and Manner of Notice (the "Solicitation Approval Order").

e.      On September 27, 2006, the Debtor filed its original proposed plan of liquidation and accompanying disclosure statement which were superseded by corresponding documents the Debtor filed on each of November 2, 2006 (the first amended plan of liquidation and accompanying disclosure statement), November 6, 2006 (the second amended plan of liquidation and accompanying disclosure statement), May 25, 2007 (the third amended plan of liquidation and accompanying disclosure statement) and June 26, 2007 (the fourth amended plan of liquidation and accompanying disclosure statement).  On June 28, 2007, the Debtor filed its fifth amended plan of liquidation and accompanying disclosure statement, dated June 28, 2007, which became the operative documents (and as modified pursuant to this Confirmation Order, the "Plan" and "Disclosure Statement," respectively) under Section 1127(a) of the Bankruptcy Code.[1]

f.      This Court set August 2, 2007, at 10:00 a.m. (prevailing Eastern Time), as the date and time of the hearing pursuant to Rules 3017 and 3018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Sections 1125, 1126, 1128 and 1129 of the Bankruptcy Code to consider the confirmation of the Plan (the "Confirmation Hearing").

g.      The Debtor caused the Solicitation Package, including the Plan and Disclosure Statement, to be served on all holders of Claims and Interests on July 2, 2007, in accordance with the Solicitation Approval Order.

h.     On July 30, 2007, the Debtor filed various documents comprising the Plan Supplement (the "Initial Plan Supplement"), on August 1, 2007, the Debtor filed its First Augmentation of Plan Supplement to Fifth Amended Plan of Liquidation of PlusFunds Group, Inc., dated June 28, 2007 (the "First Augmentation"), and on August 2, 2007, the Debtor filed its Second Augmentation of Plan Supplement to Fifth Amended Plan of Liquidation of PlusFunds Group, Inc., dated June 28, 2007 (collectively, with the Initial Plan Supplement and First Augmentation, the "Plan Supplement").

i.     On August 1, 2007, the Debtor filed its Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Liquidation of PlusFunds Group, Inc. (the "Plan Confirmation Memorandum") together with the declaration of Florence V. Lentini, a principal of XRoads Solutions Group, LLC and the Debtor's Chief Restructuring Officer, in support of confirmation of the Plan (the "Lentini Declaration"), and the Affidavit of James Katchadurian, a Vice President and Senior Consultant of Epiq Systems (f/k/a Bankruptcy Services LLC), the Debtor's claims, noticing and balloting agent (the "BSI Affidavit"), as to the voting results.

j.     The Confirmation Hearing was held before this Court on August 2, 2007.

k.     This Court has reviewed the Plan, the Disclosure Statement, the Plan Confirmation Memorandum, the Lentini Declaration, the BSI Affidavit, the Plan Supplement, all filed pleadings, exhibits, statements and comments regarding confirmation, including the objection to confirmation of the Plan filed by Refco Offshore Managed Futures Funds, Ltd. and Refco Public Commodity Pool, LP (collectively, the "Refco Creditors"); this Court having heard the statements of counsel in respect of the Confirmation Hearing; this Court having considered all testimony, documents and declarations offered in support of confirmation of the Plan

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Plan.

("Confirmation"); and this Court having overruled any unresolved objections to the Plan and/or Disclosure.

l.      After due deliberation thereon and good cause appearing therefor, this Court hereby makes and issues the following Findings of Facts, Conclusions of Law and Order.[2]

## I.
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

A.    The Recitals.  Each of the foregoing recitals constitutes a finding of fact of this Court.

B.    The Debtor.  On March 6, 2006, the Debtor commenced its bankruptcy case by filing a petition for relief under Chapter 11 of Title 11 of the Bankruptcy Code.  The Debtor was (and is) qualified to be a debtor under Section 109 of the Bankruptcy Code.

C.    Jurisdiction and Venue.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (L) and (O) and this Court has jurisdiction to enter a final order with respect thereto.  Venue in the Southern District of New York was proper on the Petition Date and continues to be proper under 28 U.S.C. §§ 1408 and 1409.

D.    Judicial Notice.  The Bankruptcy Court takes judicial notice of the docket of the Debtor's Chapter 11 Case maintained by the Clerk of the Bankruptcy Court, including, without limitation, all pleadings, declarations, affidavits and other documents filed, all orders entered, and the transcripts of, and all evidence and arguments made, proffered or adduced at, the hearings held before the Bankruptcy Court during the pendency of the Chapter 11 Case.

---

[2] This Confirmation Order constitutes findings of fact and conclusions of law under Fed. R. Civ. P. 52, as made applicable by Bankruptcy Rules 7052 and 9014.  Any and all findings of fact shall constitute findings of fact even if they are stated as conclusions of law, and any and all conclusions of law shall constitute conclusions of law even if they are stated as findings of fact.

3798362

E.    Burden of Proof.  The Debtor, as proponent of the Plan, has met the burden of proving the satisfaction of each of the applicable elements of Section 1129 of the Bankruptcy Code, in each case, by a preponderance of the evidence.

F.    Solicitation and Notice.  On June 28, 2007, the Bankruptcy Court entered the Solicitation Approval Order.  The Solicitation Approval Order, among other things, approved the Disclosure Statement as containing "adequate information" of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtor's creditors to make an informed judgment whether to vote to accept or reject the Plan.  The Debtor caused the Solicitation Package (as defined in the Solicitation Approval Order ) to be served upon: the U.S. Trustee, the JOLs, all Entities who have filed a Claim in the Debtor's Chapter 11 Case, all holders of Equity Interests, all Persons who have requested special notice in the Debtor's Chapter 11 Case pursuant to Rule 2002 of the Bankruptcy Rules on or prior to June 28, 2007, the Internal Revenue Service, the Secretary of State of New York, the Securities and Exchange Commission, any entity that has filed with the Bankruptcy Court a notice of transfer of a claim under Bankruptcy Rule 3001(e) on or prior to June 28, 2007, all Entities listed in the Debtor's schedules not otherwise identified above in this paragraph, and all other known creditors of the Debtor.  The Solicitation Package consisted of the (1) Notice of Confirmation Hearing and Procedures Confirmation; (2) the (a) Plan and (b) Disclosure Statement; (3) Ballot or Notice of Non-Voting Status (as applicable, in accordance with the Solicitation Approval Order); and (4) a letter in support of the Plan from the Debtor's Chief Restructuring Officer, Florence V. Lentini.  The Solicitation Package was served in compliance with the Solicitation Approval Order, the Bankruptcy Code and the Bankruptcy Rules on June 28, 2007, and the Liquidation Analysis, Exhibit B to the Disclosure Statement, was served on parties in interest as a separate document on July 9, 2007 (see Docket No. 462).  As described in the Solicitation Approval Order, and as

-5-

evidenced by the BSI Affidavit and the certificates of service filed in connection therewith,

(i) the service of the Solicitation Package was adequate and sufficient under the circumstances of

the Chapter 11 Case, and (ii) adequate and sufficient notice of the Confirmation Hearing and

other requirements, deadlines, hearings, and matters described in the Solicitation Approval Order

was timely provided in compliance with the Bankruptcy Code and Bankruptcy Rules, and

provided due process and an opportunity to appear and be heard to all parties in interest. No

other or further notice is required.

      G.    <u>Voting</u>. The Solicitation Approval Order fixed July 30, 2007, as the Voting

Deadline. Votes on the Plan, whether accepting or rejecting, were solicited and tabulated fairly,

in good faith, and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules, the

Disclosure Statement and the Solicitation Approval Order. As set forth in the BSI Affidavit, the

Plan has been accepted, within the meaning of Section 1126(c) of the Bankruptcy Code, by each

Class of impaired Claims entitled to vote on the Plan: Classes 3 and 4 voted to accept the Plan.

As the Debtor anticipated, Class 2 (Secured Claims) did not have any Claimants, thus Class 2 is

a nullity. Class 5 (Equity Interests) is deemed to have rejected the Plan because the Plan

provides for no distribution to Holders of Equity Interests.

      H.    <u>Objections</u>. All objections and responses to, and statements and comments

regarding, the Plan, to the extent not already withdrawn or resolved pursuant to representations

on the record at the Confirmation Hearing, including the objection of the Refco Creditors, are

overruled.

      I.    <u>Grand Court Approval</u>. The SPhinX Funds and the JOLs have represented

to this Court that they have obtained all approvals necessary or required (including, without

limitation, approval of the court overseeing the SPhinX Funds' Cayman Islands liquidation

proceedings) to perform their obligations under the Plan Term Sheet.

J.    <u>Section 1129(a)(1) - Compliance of the Plan with Applicable Provisions of</u> <u>the Bankruptcy Code</u>. The Plan complies with all applicable provisions of the Bankruptcy Code as required by Section 1129(a)(1) of the Bankruptcy Code, including, without limitation, Sections 1122 and 1123 of the Bankruptcy Code. The Plan is dated and identifies the Debtor as proponent of such Plan. Pursuant to Sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, the Plan designates Classes of Claims and Equity Interests, other than Administrative Claims and Priority Tax Claims. As required by Section 1122(a) of the Bankruptcy Code, each Class of Claims and Equity Interests contains only Claims or Equity Interests that are substantially similar to the other Claims or Equity Interests within such Class. A reasonable basis exists for the classifications in the Plan. Pursuant to Sections 1123(a)(2) and 1123(a)(3) of the Bankruptcy Code, Article III of the Plan specifies all Claims and Equity Interests that are not impaired and the treatment of all Claims and Equity Interests that are impaired. Article III of the Plan identifies Classes 2, 3, 4 and 5 as impaired under the Plan. Pursuant to Section 1123(a)(4) of the Bankruptcy Code, the Plan also provides the same treatment for each Claim or Equity Interest within a particular Class. Pursuant to Section 1123(a)(5) of the Bankruptcy Code, the Plan provides adequate means for the Plan's implementation, as set forth in Articles V and VI of the Plan. The Debtor will have, immediately upon the Effective Date of the Plan, sufficient cash available to make all payments that are required to be made on the Effective Date pursuant to the terms of the Plan.

K.    <u>Section 1129(a)(2) - Compliance of the Debtor with Applicable Provisions</u> <u>of the Bankruptcy Code</u>. As required by Section 1129(a)(2) of the Bankruptcy Code, the Debtor, as proponent of the Plan, has complied with all applicable provisions of the Bankruptcy Code, including, without limitation, Sections 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rules 3017, 3018 and 3019. In particular, the solicitation of votes to accept or reject the Plan

was (i) in compliance with all applicable non-bankruptcy laws, rules, and regulations governing

the adequacy of disclosure in connection with such solicitation, and (ii) solicited after disclosure

of adequate information as defined in Section 1125(a) of the Bankruptcy Code. The Debtor has

further complied with all the provisions of the Bankruptcy Code and the Bankruptcy Rules

governing notice of the Plan and the Confirmation Hearing. The record in the Chapter 11 Case

further reflects that the Debtor has attempted in good faith to comply with the orders of the

Bankruptcy Court entered during the pendency of the Chapter 11 Case.

      L.    <u>Section 1129(a)(3) - Proposal of Plan in Good Faith</u>. The Debtor proposed

the Plan in good faith and not by any means forbidden by law. The Bankruptcy Court has

examined the totality of the circumstances surrounding the formulation of the Plan and the

evidence submitted in connection with the Confirmation Hearing. The Plan has been accepted

by the requisite Holders of Claims in all Classes entitled to vote on the Plan, and such acceptance

evidences the informed judgment of creditors that the Plan is in their best interests. The Plan

was proposed after arms'-length and good-faith negotiations among the parties, including their

counsel, and for the legitimate and honest purpose of maximizing the value of the Debtor's

Estate and effectuating a fair and equitable distribution of such value to creditors. The Plan also

has the support of the majority of Creditors voting on the Plan. Therefore, the Plan has been

proposed in good faith, as such term is used in Sections 1129(a)(3) and 363(m) of the

Bankruptcy Code.

      M.    <u>Section 1129(a)(4) - Bankruptcy Court Approval of Certain Payments as</u>

<u>Reasonable</u>. Pursuant to Section 1129(a)(4) of the Bankruptcy Code, any payment made or

promised by the Debtor or by any person acquiring property under the Plan, for services or for

costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan

and incident to the Chapter 11 Case, has been or will be disclosed to the Bankruptcy Court, and has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

     N.     Section 1129(a)(5) - Disclosure of Identity and Proposed Management, Compensation of Insiders, and Consistency with the Interests of Affiliations of Creditors and Public Policy. Pursuant to Section 1129(a)(5) of the Bankruptcy Code, the Plan Supplement discloses the identity and affiliations of the Trustee of the General Trust, Florence V. Lentini, and the SPhinX Trustee, James P. Sinclair. The nature of the compensation to be received by each of the trustees was also disclosed in the Plan Supplement, and each of the trustees' *curriculum vitae* is attached to the Plan Supplement. Although Ms. Lentini will continue to be an officer of the Liquidating Debtor, the Plan provides that the Trustee may dissolve the Liquidating Debtor with no further action of its board or shareholders or order of this Court, and the Liquidating Debtor which will have no other officers and no directors on its board. Based on the foregoing, the Plan satisfies the requirements of Section 1129(a)(5) of the Bankruptcy Code.

     O.     Section 1129(a)(6) - Approval of Rate Changes. No governmental regulatory commission has jurisdiction over the rates of the Debtor. Accordingly, Section 1129(a)(6) is inapplicable to the Chapter 11 Case.

     P.     Section 1129(a)(7) - Best Interests of Creditors. With respect to each Impaired Class of Claims, each holder of a Claim in such Class has accepted the Plan or will receive or retain under the Plan on account of such Claim or Equity Interest property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtor was liquidated on the Effective Date under Chapter 7 of the Bankruptcy Code. A conversion of the Chapter 11 Case to Chapter 7 would likely be accompanied by a decrease in the amount of recovery that creditors would receive on account of their Claims, as indicated in the Liquidation Analysis. Thus, the Plan provides a superior recovery to creditors relative to

-9-

conversion of the Chapter 11 Case and is in the best interests of creditors under Section 1129(a)(7) of the Bankruptcy Code.

Q.    Section 1129(a)(8) - Acceptance of the Plan By Each Impaired Class.  The Debtor is unable to comply with the provisions of Section 1129(a)(8) of the Bankruptcy Code, requiring that all impaired classes accept the plan, because Class 5 is conclusively presumed to have rejected the Plan.  As described below, however, the Plan satisfied Section 1129(b) of the Bankruptcy Code as to Class 5.

R.    Section 1129(a)(9) - Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code.  The Plan provides for treatment of Administrative Claims, Priority Tax Claims and Other Priority Claims in the manner consistent with the requirements of Section 1129(a)(9) of the Bankruptcy Code.

S.    Section 1129(a)(10) - Acceptance by at Least One Impaired Class.  As required by Section 1129(a)(10) of the Bankruptcy Code, at least one Class of Claims that is Impaired under the Plan has accepted the Plan, excluding the votes cast by Insiders, specifically, each of Classes 3 and 4 has voted to accept the Plan.

T.    Section 129(a)(11) - Feasibility.  The Plan meets the requirement of Section 1129(a)(11) of the Bankruptcy Code because the evidence establishes there is a reasonable probability that the provisions of the Plan can be performed.  The Debtor will have sufficient funds to satisfy its obligations under the Plan, as shown in the Liquidation Analysis.

U.    Section 1129(a)(12) - Payment of Statutory Fees.  In accordance with Section 1129(a)(12) of the Bankruptcy Code, Article XIV(C) of the Plan provides for the payment of all fees payable under 28 U.S.C. § 1930 on or before the Effective Date.  The General Trust, who will be responsible for paying such fees, has adequate means to pay all such fees.

V.    <u>Section 1129(a)(13) - Retiree Benefits</u>.  The Debtor is not obligated to provide any retiree benefits, as such term is defined in Section 1114 of the Bankruptcy Code. Accordingly, Section 1129(a)(13) of the Bankruptcy Code is inapplicable to the Chapter 11 Case.

W.    <u>Section 1129(a)(14) - Domestic Support Obligations</u>.  The Debtor is not required by a judicial or administrative order, or by statute, to pay domestic support obligations. Accordingly, Section 1129(d)(14) of the Bankruptcy Code is inapplicable to the Chapter 11 Case.

X.    <u>Section 1129(a)(15) – Debtor is Not an Individual</u>.  The Debtor is not an individual.  Accordingly, Section 1129(a)(15) of the Bankruptcy Code is inapplicable to the Chapter 11 Case.

Y.    <u>Section 1129(a)(16) - No Applicable Nonbankruptcy Law Regarding Transfers</u>.  The Debtor is a moneyed business or commercial corporation.  Accordingly, Section 1129(a)(16) of the Bankruptcy Code is inapplicable to the Chapter 11 Case.

Z.    <u>Sections 1129(b)(1) and (2) - Cramdown</u>.  Class 5 is deemed to reject the Plan. Class 5 will not receive or retain any property under the Plan in respect of its Equity Interests, which are cancelled under the Plan, and there is no junior creditor or interest holder that will receive or retain anything under the Plan on account of such junior interest. The Plan does not discriminate unfairly, and is fair and equitable, with respect to the Holders of Equity Interests in Class 5, as required by Sections 1129(b)(1) and (2) of the Bankruptcy Code.  The Plan is to be confirmed notwithstanding the inability to satisfy Section 1129(a)(8) of the Bankruptcy Code with respect to Class 5, pursuant to Section 1129(b)(1) of the Bankruptcy Code.  Upon the Confirmation and the occurrence of the Effective Date, the Plan shall be binding upon all Holders of Equity Interests.

3798362

AA.   <u>Section 1129(c) - Only One Plan</u>.  The Plan is the only plan filed in the Chapter 11 Case.  Accordingly, Section 1129(c) of the Bankruptcy Code is inapplicable to the Chapter 11 Case.

BB.   <u>Section 1129(d) - Principal Purpose of the Plan</u>.  The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act of 1933, thus, the requirements of Section 1129(d) of the Bankruptcy Code are satisfied.

CC.   <u>Section 1125(e) - Good Faith Solicitation</u>.  Based on the record before the Bankruptcy Court in the Chapter 11 Case, (i) the Debtor is deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and the Solicitation Approval Order, including without limitation, Sections 1125(c) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation, and (ii) the Debtor, and all of its respective members, officers, directors, agents, financial advisers, attorneys, employees, equity holders, partners, affiliates, and representatives shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the solicitation of the Plan and are entitled to the protections afforded under the Plan and by Section 1125(e) of the Bankruptcy Code.

DD.   <u>PlusFunds GP LLC</u>.  A sound business purpose exists for the Debtor's transferring any and all of its membership interests in PlusFunds GP LLC, a Delaware limited liability company of which the Debtor is the managing member, to Carroll Services, the Liquidator of SIF-LP, and Carroll Services has agreed to accept such interests subject to the terms of this Confirmation Order.

-12-

EE.    <u>Satisfaction of Confirmation Requirements</u>.  Based upon the foregoing, the Plan satisfies the requirements for Confirmation set forth in Section 1129 of the Bankruptcy Code.

FF.    <u>Authority</u>.  The Liquidating Debtor has the authority, pursuant to the Plan and this Confirmation Order, to enter into the Trust Agreements (as defined below) upon the Effective Date.

GG.    <u>Good Faith</u>.  The Debtor and the JOLs, and all of their respective professionals, will be acting in good faith if they proceed to: (i) consummate the Plan; and (ii) take the actions authorized and directed by this Confirmation Order.

HH.    <u>Releases</u>.  The Releases (defined below) under the Plan are in the best interests of the Debtor and the Creditors and are necessary and appropriate under the circumstances of this Chapter 11 Case and confirmation of the Plan would not be possible without them.  No Creditors or other parties in interest filed any objection to the Releases.

II.    <u>Settlement</u>.  The Settlement (defined below) does not violate the priority scheme of the Bankruptcy Code.  No Creditors or other parties in interest filed any objection to the Settlement which Settlement is in the best interests of the Debtor and the Creditors and necessary and appropriate under the circumstances of this Chapter 11 Case.  In approving the Settlement, this Court has considered, among other things: (i) the nature of the claims asserted or potentially assertable by and between the Debtor, the Creditors, the SPhinX Funds and the JOLs; (ii) the balance of the likelihood of success of claims which might be asserted by the Debtor against the likelihood of success of the defenses or counterclaims; (iii) the complexity, cost and delay of litigation that would result in the absence of the Settlement; (iv) the lack of objections by any creditor or party in interest to the Settlement, and the acceptance of the Plan by the majority of Creditors voting on the Plan; (v) that the Debtor's Estate will receive substantial

-13-

consideration as a consequence of such Settlement; and (vi) that the Plan, which gives effect to the Settlement, is the product of extensive arms'-length and good-faith negotiations among the parties.

JJ.    Plan Term Sheet.  The Plan Term Sheet embodied in the Plan is in the best interests of the Debtor and its Creditors, and is fair, equitable and appropriate under the circumstances of this Chapter 11 Case.

# II.
# ORDER

BASED UPON THE FOREGOING FINDINGS OF FACT, IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:

1.    Confirmation.  Subject to the terms hereof and except as explicitly stated herein, the Plan, each of its provisions, and the exhibits thereto (including the General Trust Agreement and the SPhinX Trust Agreement, collectively, the "Trust Agreements") shall be, and hereby are, CONFIRMED and approved in each and every respect pursuant to Section 1129 of the Bankruptcy Code.  The terms of the Plan and the Trust Agreements, and the record of the Confirmation Hearing held on August 2, 2007, are incorporated by reference into, and are an integral part of, this Confirmation Order.

2.    Plan Term Sheet.  The Plan Term Sheet is approved and the Debtor is authorized to enter into, and to take any and all actions it determines, in the exercise of its business judgment, are necessary and appropriate in connection with its performance of the Plan Term Sheet.

3.    Objections.  All objections and responses to the Plan, to the extent not already withdrawn or resolved pursuant to representations on the record at the Confirmation Hearing, shall be, and hereby are, overruled.

-14-

3798362

4.     <u>Omission of Reference to Particular Provisions of the Plan or Plan Term Sheet</u>.  The failure to specifically describe or include any particular provision of the Plan or the Plan Term Sheet in this Confirmation Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Plan and the Plan Term Sheet be approved and confirmed in its entirety, subject to the terms of this Confirmation Order.  Each provision of the Plan and the Plan Term Sheet (except, in either case, as modified or amended hereby) shall be deemed authorized and approved by this Confirmation Order and shall have the same binding effect of every other provision of the Plan and the Plan Term Sheet, whether or not mentioned in this Confirmation Order.

5.     <u>Plan Classification Controlling</u>.  The classification of Claims and Equity Interests for purposes of distributions to be made under the Plan shall be governed solely by the terms of the Plan.  The classifications set forth on the Ballots tendered to or returned by the Holders of Claims in connection with voting on the Plan: (i) were set forth on the Ballots solely for the purposes of voting to accept or reject the Plan; (ii) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of such Claims under the Plan for distribution purposes; (iii) may not be relied upon by any creditors as representing the actual classification of such Claims under the Plan for distribution purposes; and (iv) shall not be binding on the Debtor, the Liquidating Debtor, the General Trust or the SPhinX Trust, or their respective trustees, for any purposes other than tabulating votes on the Plan.

6.     <u>Distributions Under the Plan</u>.  All distributions under the Plan shall be made in accordance with Article VIII of the Plan.

7.     <u>Vesting of Assets</u>.  The Causes of Action shall vest in the SPhinX Trust, and all Assets other than the Causes of Action shall vest in the General Trust, each to the extent set forth in the Plan, as of the Effective Date of the Plan, free and clear of any and all Liens,

3798362

Claims and/or Equity Interests, without the need for any further filings, notices,

acknowledgements, or any other further action, and without any further order of the Bankruptcy

Court. As of the Effective Date, and except as provided in the Plan, all mortgages, deeds of

trust, liens, encumbrances, or security interests in any property of the Estate, will be released and

all the rights, title and interests of any Holder of any such mortgage, deeds of trust, liens,

encumbrances, or security interests shall be canceled, annulled, terminated and become null and

void. The Trustee and/or the SPhinX Trustee, as the case may be, shall be authorized to act as

attorney-in-fact for any such Holder to cause all public records to properly reflect and effectuate

this provision. For the avoidance of doubt, notwithstanding the inclusion of SIF-LP in the

definition of "Indemnity Claims" in the Plan and any other provisions that could be read to the

contrary, the Debtor is not assigning to the SPhinX Trust any indemnification rights the Debtor

may have against SIF-LP.

        8.    Establishment of the SPhinX Trust. As set forth in Article VI of the Plan,

on the Effective Date, the Plan will be implemented through funding to be provided by the

SPhinX Funds in exchange for which the Causes of Action shall vest in the SPhinX Trust for the

exclusive benefit of the JOLs and SPhinX Funds (and ultimately the creditors and interest

holders of the SPhinX Funds).

        9.    Trustee of the SPhinX Trust. As of the Effective Date, James P. Sinclair is

hereby approved to serve as the initial SPhinX Trustee pursuant to the Plan and the SPhinX Trust

Agreement.

        10.    Establishment of the General Trust. The General Trust shall be vested with

the Retained Assets, primarily Cash, for the benefit of Holders of Allowed General Unsecured

Claims other than the SPhinX Funds. The General Trust shall be funded with not less than $1.5

million of Cash on the Effective Date.

11.    <u>Trustee of the General Trust</u>.  As of the Effective Date, Florence V. Lentini is hereby approved to serve as the initial Trustee of the General Trust pursuant to the Plan and the General Trust Agreement.

12.    <u>Executory Contracts and Unexpired Leases</u>.  On the Effective Date, each executory contract and unexpired lease entered into by the Debtor prior to the Petition Date that (i) has not previously expired or terminated pursuant to its terms, and (ii) is not the subject of a pending notice of assumption and assignment in accordance with the terms of the Wind-Down Order (an "<u>Assumption Notice</u>"), shall be deemed rejected pursuant to Section 365 of the Bankruptcy Code.  The entry of this Confirmation Order, or other order approving such motion, or effectuation of an Assumption Notice, as the case may be, shall constitute an order of the Bankruptcy Court approving the Debtor's rejection, or assumption and assignment, as the case may be, of such executory contracts and/or unexpired leases as of the Effective Date or other date if specified in an order of the Bankruptcy Court or Assumption Notice, and approving the cure amount, if any, stated in the Plan Supplement or Assumption Notice, as the case may be.  This Confirmation Order constitutes an order of the Bankruptcy Court approving such rejections, and assumption and assignments, pursuant to Section 365 of the Bankruptcy Code. Notwithstanding anything to the contrary herein, nothing herein or in the Plan shall have any effect whatsoever on any insurance policies, insurance coverages (including, but not limited to, the D&O Coverage) or contracts of insurance issued to, or for the benefit of, the Debtor, its Estate, the Liquidating Debtor, or that cover claims against any other Entity, all of which shall continue in full force and effect for the benefit of the covered Entities unless otherwise ordered by a separate order of the Bankruptcy Court.

13.    <u>D&O Coverage</u>. Upon the Effective Date, the Debtor's interest in the insurance policies providing the D&O Coverage (including but not limited to policies issued by

Westchester Surplus Lines Insurance Company, Illinois Union Insurance Company, and INA Surplus Insurance Company) shall be deemed to be, and shall be, assigned to the SPhinX Trust without any further order of the Bankruptcy Court. For the avoidance of doubt, notwithstanding anything in the Confirmation Order or Plan to the contrary, the Debtor and the General Trust, as the case may be, shall retain any rights the Debtor may have to insurance coverage for losses or claims arising out of (i) the Document Retention Protocol, (ii) the SPhinX License, or (iii) claims against the Debtor under (1) Title VII of the Civil Rights Act of 1964; (2) 42 U.S.C. §§, 1985 (conspiracy to interfere with civil rights), and 1986 (negligence for failure to prevent interference with civil rights); (3) the Occupational Health and Safety Act; (4) the Age Discrimination in Employment Act; (5) the Equal Pay Act; (6) any anti-discrimination laws including discrimination, harassment, or retaliation on the basis of race, color, creed, religion, national origin, disability, marital status, status with regard to public assistance, sex, sexual orientation or age; (7) any workers' compensation laws; (8) any wage, benefits, and other labor laws; (9) the federal Fair Labor Standards Act; (10) the Employment Retirement Income Security Act (ERISA); (11) the Consolidated Omnibus Budget Reconciliation Act (COBRA); (12) the Americans with Disabilities Act; (13) the Federal Rehabilitation Act (disability discrimination); (14) the Older Workers Benefit Protection Act of 1990 (OWBPA); or (15) any other federal, state or local laws or regulations prohibiting employment discrimination or restricting the Debtor's right to terminate employees.

14. <u>Claims for Rejection Damages</u>. All Proofs of Claim with respect to Claims arising from the rejection of executory contracts or unexpired leases, if any, must be filed no later than thirty (30) days after the effective date of the rejection of such executory contracts or unexpired leases. Any Claims arising from the rejection of an executory contract or unexpired lease not filed within such time shall be forever barred from assertion against the Debtor, its

-18-

Estate and property, the Liquidating Debtor, the General Trust, the Trustee, the SPhinX Trust and the SPhinX Trustee, unless otherwise ordered by the Bankruptcy Court or explicitly provided in the Plan. All such Claims for which Proofs of Claim are required to be filed will be, and will be treated as, Class 4 General Unsecured Claims, subject to the provisions of Article III of the Plan. Nothing contained herein shall release any party from filing its Claim prior to any otherwise applicable Bar Date.

15. <u>Exculpation, Releases, Injunctions and Related Provisions</u>. The exculpation, release and injunctive provisions (collectively, the "<u>Releases</u>") specified in Article V of the Plan are hereby approved. The Releases are fair and equitable, are given for valuable consideration, are in the best interests of the Debtor's Estate and its Creditors, and shall be effective and binding upon all Entities.

16. <u>Exculpation</u>. The Entities who shall receive the benefit of limitation of liability under Article V, Section G of the Plan (the "<u>Exculpation</u>") are the Entities identified therein (the "<u>Identified Parties</u>") and also SIF-LP and its partners, agents, liquidators, counsel, officers, directors, employees and retained professionals (the "<u>SIF Parties</u>" and, collectively, with the Identified Parties, the "<u>Protected Parties</u>"). Exculpation shall only protect the Protected Parties (in their respective capacities as such) to the extent provided in Article V, Section G of the Plan. Notwithstanding anything in this Confirmation Order, the Plan or Disclosure Statement to the contrary, the limitation of liability, exculpation, and release in Article V, Section G of the Plan and in this Confirmation Order shall not apply to, nor restrain or enjoin in any manner, the Cayman Islands-based SPhinX Funds, any investors in such SPhinX Funds in their capacity as such or the JOLs, for any purpose, including, without limitation, with respect to the Plan Term Sheet, the Wind-Down Agreement or the SPhinX License.

3798362

17.    <u>Settlement</u>.  The beneficiaries of Article V, Section H (the "<u>Settlement</u>")
are the Debtor and the SPhinX Funds.  Pursuant to Section 1123 of the Bankruptcy Code and
Bankruptcy Rule 9019, and in consideration of the classification, treatment, releases and other
benefits provided under the Plan, upon the Effective Date the provisions of the Plan shall
constitute a good faith compromise and settlement of all controversies resolved pursuant to the
Plan.  This Settlement is essential and integral to the Plan, and the consideration to be provided
by the SPhinX Funds is fair and reasonable value for such Settlement.  Without the funding to be
provided by the SPhinX Funds, which depends on the inclusion of the Settlement, the Plan could
not be confirmed.  Accordingly, the Settlement is in the best interests of the Debtor's Estate and
its Creditors, and is hereby approved.

18.    <u>Injunction</u>.  Except as expressly set forth in the Plan, all Entities that have
held, hold or may hold Claims against or Equity Interests in the Debtor as of the Effective Date
are permanently enjoined, from and after the Effective Date, from taking any actions, other than
enforcing the terms of the Plan, in respect of such Claims or Equity Interests against the
Protected Parties or any of their property (but not as to independent claims such entities may
have against them), including, without limitation:  (i) commencing or continuing in any manner
any action or other proceeding of any kind; (ii) enforcing, attaching, collecting or recovering by
any manner or in any place or means any judgment, award, decree or order; (iii) creating,
perfecting, or enforcing any Lien or encumbrance of any kind; and (iv) asserting any right of
setoff against any obligation, debt or liability due to the Debtor.  Except as expressly provided in
the Plan or Plan Term Sheet, (a) the Identified Parties reserve all rights and defenses that the
Debtor may have (including, without limitation, the rights of subrogation and recoupment) with
respect to any obligation, debt or liability allegedly due to any Entity, and (b) the SIF Parties
reserve all rights and defenses that the Debtor and PlusFunds GP LLC may have, solely with

-20-

respect to PlusFunds GP LLC or the Debtor's actions or omissions with respect to PlusFunds GP

LLC (including, without limitation, the rights of subrogation and recoupment) with respect to

any obligation, debt or liability allegedly due to any Entity. In addition, all non-Debtor Entities

are permanently enjoined from commencing or continuing, in any manner, any action or

proceeding, whether directly or derivatively, in order to recover any Asset of the Estate that was

either released under the Plan or transferred to the General Trust, the SPhinX Trust, or Carroll

Services under the Plan and this Confirmation Order. Unless otherwise provided in the Plan, all

injunctions or stays provided for in this Chapter 11 Case pursuant to Sections 105, 362 or 525 of

the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in

full force and effect until the Effective Date. All Entities are permanently enjoined from the

commencement or prosecution against the Protected Parties whether directly, derivatively or

otherwise, of any Claims, Equity Interests, obligations, suits, judgments, damages, demands,

debts, rights, causes of action or liabilities released or enjoined pursuant to the Plan.

      19.    <u>Preservation of Bankruptcy Causes of Action</u>. Unless a claim (within the

meaning of Section 101(5) of the Bankruptcy Code) against any Entity is, in writing, expressly

waived, relinquished, released, assigned, compromised, or settled in the Plan, or in a Final Order,

all rights with respect to such claim are reserved to, and vested in, the SPhinX Trust or the

General Trust, as the case may be, in accordance with the Plan. All such claims are specifically

preserved with respect to the Entities identified on the schedule of "Amended and Superseding

List of Persons and Entities Whom the JOLs Believe May Possibly be Targets of One or More of

the Causes of Action," included in the Plan Supplement [Docket No. 511].

      20.    <u>Trust Interests Exempt from Securities Act of 1933, as Amended</u>. The

issuance of beneficial interests in the General Trust and the SPhinX Trust, respectively, to the

beneficiaries of such trusts, are exempt from registration under the Securities Act of 1933, as

amended, and all applicable state and local laws requiring registration of securities, pursuant to Section 1145 of the Bankruptcy Code.

21.    <u>Reservation of Rights</u>.  With respect to Article VIII, Section E of the Plan, none of the previously filed claims of Winton Capital Management Ltd. ("<u>Winton</u>"), Forest Investment Management LLC ("<u>Forest</u>"), SPARX Asset Management Co., Ltd. ("<u>SPARX</u>"), or XL Investment Ltd. ("<u>XL</u>," and, collectively, with Winton, Forest and SPARX, the "<u>WFG Claimants</u>"), shall be disallowed by operation of the Plan; <u>provided</u>, <u>however</u>, that each such claim asserted by any of the WFG Claimants for indemnification, reimbursement or contribution (a "<u>Fund Manager Contingent Claim</u>") shall be estimated by the Debtor at $0 for Class 4 reserve and distribution purposes subject to the rights of any of the WFG Claimants to seek in the future the establishment of a reserve by the General Trust, to the extent any funds for such a reserve may remain in the General Trust, if and when such Fund Manager Contingent Claim becomes liquidated, and if no such funds or insufficient funds are remaining in the General Trust at such time, then such WFG Claimant shall have no further remedy or right to recover from the General Trust or otherwise under the Plan in respect of such claim.  For the avoidance of doubt, a Fund Manager Contingent Claim shall not include such Fund Manager's claim for management fees, incentive allocations or any liquidated portion of its asserted claims, including, but not limited to, Disputed Administrative Claims.  Nothing in this section shall affect the Debtor's, the Liquidating Debtor's, the General Trust's, the Trustee's, the SPhinX Trust's or the SPhinX Trustee's rights to object at any time to all or any portion of all or any of the WFG Claimant's Fund Manager Contingent Claims (whether or not liquidated).

22.    <u>Reservation of Rights</u>.  The transfer of the Causes of Action to any trust or other party pursuant to the Plan will in no way be deemed to alter, prejudice, limit or waive any substantive or procedural defenses that any of the WFG Claimants or their affiliates, or any of

3798362

the Managers (defined below) or their affiliates, may have had immediately prior to the transfer

of such Causes of Action other than any defense or challenge to the transferability of such

Causes of Action in accordance with the Plan and this Confirmation Order.

23.    Reservation of Rights.  With respect to the WFG Claimants, Refco

Alternative Investments, LLC, ("RAI") and RefcoFund Holdings, LLC (collectively, with RAI,

the "RAI Claimants"), Bridgewater Associates, Inc. ("Bridgewater"), Graham Capital

Management, L.P. ("Graham Capital") and Ellington Management Group, L.L.C. ("Ellington"

and, collectively, with Bridgewater and Graham Capital, the "Managers") and the Refco

Creditors (collectively, with the WFG Claimants, the RAI Claimants and the Managers, the

"Designated Creditors"), neither the Plan nor this Confirmation Order shall have the effect of

altering, prejudicing, limiting or waiving any of the Designated Creditors' rights to set-off

pursuant to Section 553 of the Bankruptcy Code, including any of their rights to a secured claim

pursuant to Section 553 of the Bankruptcy Code, and neither the Plan nor the Confirmation

Order shall effect the Debtor's, the Liquidating Debtor's, the General Trust's, the Trustee's, the

SPhinX Trust's or the SPhinX Trustee's rights to oppose any such claim for setoff.

24.    Binding Nature of Plan.  The rights, benefits and obligations of any Entity

named or referred to in the Plan shall be binding on and inure to the benefit of any heir, executor,

administrator, successor or assign of such Entity.

25.    Corporate Action / Dissolution.  On the Effective Date, the matters under

the Plan involving or requiring corporate action of the Debtor shall be deemed to have been

authorized by this Confirmation Order and to have occurred and be in effect from and after the

Effective Date without any further action by any Entity, including the Bankruptcy Court or such

officers, managers, shareholders, members or directors, of the Debtor.

26.     <u>Exemption from Taxation</u>.  Under Section 1146(c) of the Bankruptcy Code, the making or delivery of an instrument of transfer under a Chapter 11 plan may not be taxed under any law imposing a stamp tax or similar tax.  Pursuant thereto, and because the Debtor is liquidating its Assets hereunder, entry of the Confirmation Order shall be a determination that no stamp or similar tax may be imposed on any sale or transfer pursuant to the Plan of property by the Debtor, the Liquidating Debtor, the General Trust or the SPhinX Trust.

27.     <u>Distributions</u>.  The Liquidating Debtor, the Trustee and the SPhinX Trustee will make all distributions as provided for under the Plan, the General Trust Agreement and the SPhinX Trust Agreement, respectively, in accordance with their terms.

28.     <u>Retention of Jurisdiction</u>.  Notwithstanding entry of the Confirmation Order or the Effective Date having occurred, the Chapter 11 Case having been closed or a Final Decree having been entered, the Bankruptcy Court shall in accordance with the Plan continue to have jurisdiction over matters arising out of, and related to, the Chapter 11 Case and the Plan (i) under, and for the purposes of, Sections 105(a), 1127, 1142, and 1144 of the Bankruptcy Code and (ii) for, among other things, the purposes set forth in Article XI of the Plan.

29.     <u>Payment of Statutory Fees</u>.  All fees payable pursuant to 28 U.S.C § 1930 shall be paid on or before the Effective Date.  The Liquidating Debtor (or the SPhinX Trust, to the extent provided in this Confirmation Order), shall pay fees owing that accrue under 28 U.S.C § 1930 after the Effective Date until a Final Decree is entered in the Debtor's Chapter 11 Case, or the Bankruptcy Court orders otherwise.  The Liquidating Debtor or the Trustee shall file United States Trustee quarterly fee status reports with each quarterly fee paid after Confirmation, such reports shall be filed after the Effective Date until a Final Decree is entered in the Debtor's Chapter 11 Case, or the Bankruptcy Court orders otherwise.

3798362

30.    <u>Final Decree</u>.  Upon the completion of liquidation of the Remaining Assets and disbursement of the entire proceeds thereof, the Trustee may file a report with the Bankruptcy Court and request the entry of a Final Decree closing the Chapter 11 Case; <u>provided, however</u>, that the Trustee shall refrain from requesting entry of a Final Decree until any Causes of Action pending in the Bankruptcy Court or any other Federal or state court have been concluded provided the SPhinX Funds pay all costs and charges assessed by, or otherwise due to, the U.S. Trustee and/or the Bankruptcy Court, plus all reasonable fees and expenses of the General Trust for complying with any administrative obligations, in connection with the Chapter 11 Case, from and after the date the Trustee is otherwise prepared to file a request for a Final Decree.  The Bankruptcy Court shall hear and determine any dispute between the Trustee and the SPhinX Trustee regarding the payment of any such costs, charges, fees or expenses.

31.    <u>Notices to SPhinX Trust</u>.  The notice address for the SPhinX Trust and its counsel for purposes of Article XII, Section J of the Plan is (a) James P. Sinclair, 4 East 95th Street, New York, New York 10128, Phone: (212) 534-0611, Fax: (212) 828-1581, (b) Beus Gilbert PLLC, 4800 North Scottsdale Road, Suite 6000, Scottsdale, Arizona 85251-7630, Phone: (480) 429-3000, Fax: (480) 429-3100, Attention: Leo Beus, and (c) Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York 10104-0050, Phone: (212) 468-8000, Fax: (212) 468-7900, Attention: Gary Lee.

32.    <u>Investment and Trading Records and Data</u>.  The Debtor's successors in interest, including, without limitation, the Trustee of the General Trust, any plan administrator or other successor to the Debtor appointed under the Plan confirmed hereby, and any trustee appointed under any Chapter of the Bankruptcy Code, including a Chapter 7 trustee, shall be bound by the terms, conditions and obligations specified in the Final Agreement Regarding Investment and Trading Records and Data that was "So Ordered" by the Bankruptcy Court on

3798362

August 2, 2007 [Docket No. 514] (the "Final Stipulation"), as well as the substantively similar stipulation the Debtor has agreed to enter into with R. G. Niederhoffer Capital Management, Inc. (the "RGNCM Stipulation"), and any substantively similar stipulation the Debtor enters into with any of the WFG Claimants at the WFG Claimants' option as reflected on the record of the Confirmation Hearing (collectively, with the Final Stipulation and the RGNCM Stipulation, the "Standstill Stipulations"). The Standstill Stipulations, including all of their terms, conditions, agreements and obligations, shall survive confirmation of the Plan and shall not be discharged, released or in any manner altered by the Plan, any document or agreement entered into in connection with the Plan or this Confirmation Order.

33.    Notice of Entry of Confirmation Order.  Pursuant to Bankruptcy Rules 2002(f)(7) and 3020(c), the Debtor or the Trustee may, but is not required, to serve a notice of the entry of this Confirmation Order on the U.S. Trustee and all holders of Claims or Equity Interests to whom the Notice of Confirmation Hearing and Procedures was sent.  The Debtor or the Trustee, as applicable, shall be, and hereby is, directed to serve copies of this Confirmation Order, by e-mail or United States mail, on each party that has filed a notice of appearance in the Chapter 11 Case pursuant to Bankruptcy Rule 2002 and on each party who filed an objection or response to, or statement or comment regarding the Disclosure Statement, and/or the Plan, no later than thirty (30) days after the entry of this Confirmation Order.  On the Effective Date, or as soon thereafter as reasonably practicable, the Debtor shall File with the Bankruptcy Court a "Notice of Effective Date," which notice shall constitute appropriate and adequate notice that the Plan has become effective and shall notify parties in interest of the Second Administrative Bar Date. The Plan shall be deemed effective as of 12:01 a.m. (prevailing Eastern Time) on the Effective Date specified in such filing.  A courtesy copy of the Notice of Effective Date may be sent by first class mail, postage prepaid, or by e-mail, to those Entities who have Filed with the

3798362

Bankruptcy Court requests for notices pursuant to Bankruptcy Rule 2002. No further notice of the entry of this Confirmation Order, or of the Effective Date, shall be required.

34.     Fee Applications. Except to the extent that another Bar Date applies pursuant to an order of the Bankruptcy Court, Professionals or other Entities requesting compensation or reimbursement of expenses, pursuant to Sections 327, 328, 330, 331, 503(b), and 1103 of the Bankruptcy Code, for services rendered and/or expenses incurred prior to the Effective Date of the Plan, must file and serve an application for final allowance of compensation and reimbursement of expenses, so that such service is received by counsel to the Debtor/Liquidating Debtor, the JOLs, the Trustee, the SPhinX Trustee and the U.S. Trustee at the addresses listed in Article XII(J) of the Plan and in this Confirmation Order, no later than sixty (60) days after the Effective Date unless the Bankruptcy Court orders otherwise, including upon an order modifying such requirement being presented to the Bankruptcy Court on three days' notice to counsel for the U.S. Trustee and the Entities who requested notice under Bankruptcy Rule 2002. All such applications for final allowance of compensation and reimbursement of expenses shall be subject to the authorization and approval of the Bankruptcy Court. Holders of Professional Fee Claims requesting compensation or reimbursement of expenses that do not file such requests by the applicable Bar Date shall be forever barred from asserting such Claims against the Debtor, the Liquidating Debtor, their successors, their assigns (including, without limitation, the General Trust and the Trustee or the SPhinX Trust and the SPhinX Trustee), or their Assets. Any objection to any application for allowance of Professional Fee Claims shall be filed on or before the date specified in such application. Notwithstanding anything herein to the contrary, the Final Order Establishing Procedures for Interim Fee Application and Expense Reimbursement for Professionals and Committee Members, entered in the Debtor's Case on April 11, 2006 (the "Fee Procedures Order"), shall continue in force and

3798362

effect, and the Debtor is authorized, without further order of the Bankruptcy Court, to pay on the Effective Date any amounts that are due and owing to Professionals and other Entities for monthly statements submitted pursuant to the Fee Procedures Order.

35.    <u>Post-Effective Date Liquidating Debtor's Expenses</u>.  The Liquidating Debtor, the General Trust and the SPhinX Trust may retain and compensate Professionals for services rendered following the Effective Date without order of the Bankruptcy Court except as otherwise specified in the Plan or the General Trust Agreement or the SPhinX Trust Agreement.

36.    <u>PlusFunds GP LLC</u>.  Upon the Effective Date, any and all of the Debtor's interests in PlusFunds GP LLC, shall be deemed transferred to Carroll Services, without any further order of the Bankruptcy Court, authorization or other action, including, without limitation, the filing of any notice(s), upon which Carroll Services shall become the managing member of PlusFunds GP LLC.  Carroll Services shall (a) receive the Debtor's interests in PlusFunds GP LLC free and clear of any and all (i) successor liability and (ii) Claims against, or Interests in, the Debtor, and (b) be exculpated and released from any claim related to (i) all acts or omissions of PlusFunds FP LLC prior to the Effective Date and (ii) any and all of the Debtor's actions or omissions prior to the Effective Date with respect to PlusFunds GP LLC.  PlusFunds' claims against SIF-LP for reimbursement of professional fees, including, without limitation, of CMP, XRoads and the Debtor's consultants, and all rights and defenses that SIF-LP may have with respect to any such claims, are unaffected by this Confirmation Order.

37.    <u>Assumed Disputed Claims</u>.  Notwithstanding anything to the contrary contained in the Plan or this Confirmation Order, if and to the extent the Assumed Disputed Claims filed in this Chapter 11 Case by any of Ellington, Forest, SPARX and Cumberland Associates LLC are Allowed, in accordance with the Plan Term Sheet, the SPhinX Funds shall pay such Claims, to the maximum amount scheduled in Exhibit C of the Plan Term Sheet, in

-28-

Cash on the latter of the Effective Date and the date such Claim becomes an Allowed

Administrative Claim, and this Court shall retain jurisdiction (including, without limitation, with

respect to the SPhinX Funds and the JOLs) to enforce such treatment of such Assumed Disputed

Claims. Nothing in the Plan or this Confirmation Order shall prejudice, or otherwise constitute a

waiver or release of, any claims that any of the Managers or WFG Claimants have asserted, or

may assert, against the SPhinX Funds and/or any of their affiliates in their Cayman Islands

liquidation proceedings, nor shall it affect any defenses thereto.

38. <u>Termination of Equity Interests</u>. Upon the Effective Date, all Equity

Interests, and other rights of equity security holders, in the Debtor shall terminate.

39. <u>Further Assurances</u>. The Debtor, the Liquidating Debtor, the General

Trust, the Trustee, the SPhinX Trust and the SPhinX Trustee shall, from time to time, prepare,

execute and deliver any agreements or documents, and take any other actions as may be

necessary or advisable, to effectuate the provisions and intent of the Plan, without further order

of the Bankruptcy Court.

40. <u>Document Retention</u>. Article XII, Section M of the Plan, entitled

"Document Retention," is hereby approved and the Court retains jurisdiction to hear any dispute

regarding and to enforce such provision.

41. <u>Inconsistencies</u>. To the extent of any inconsistency between the provisions

of the Plan and the Disclosure Statement, the terms and conditions of the Plan shall govern. To

the extent of any inconsistency between the Plan and this Confirmation Order, the terms and

conditions contained in this Confirmation Order shall govern.

42. <u>Headings and Integration</u>. The headings used herein are for the

convenience of the reader and are not to be construed for any purpose to be part of any finding of

fact or conclusion of law herein.  The provisions of this Confirmation Order are integrated with each other and are nonseverable and mutually dependent.

Dated: August 7, 2007
      New York, New York

                                           s/ *James M. Peck*
                                          THE HONORABLE JAMES M. PECK
                                          UNITED STATES BANKRUPTCY JUDGE

3798362

# REPORT OF THE OFFICE OF COURT ADMINISTRATION
## *to the* CHIEF JUDGE
### *on the*
# COMMERCIAL DIVISION FOCUS GROUPS

**JULY 2006**



## THE COMMERCIAL DIVISION *of the* SUPREME COURT
## *of the* STATE *of* NEW YORK

# TABLE OF CONTENTS

**PART I:**       Executive Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

**PART II:**      A Brief History of the Commercial Division . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

**PART III:**     The Commercial Division Focus Group Project . . . . . . . . . . . . . . . . . . . . . . . . . .5

**PART IV:**      What the Focus Groups Revealed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

**PART V:**       Ideas for Exportation to Other Parts of the Court System . . . . . . . . . . . . . . . . . . .8

      **A.** Use of TROs on Notice Except in Extraordinary Circumstances . . . . . . . . . . . . . .8

      **B.** Address Electronic Discovery Issues Before They Become Problems . . . . . . . . . .9

      **C.** Issue Stays of Discovery Upon Dispositive Motions on a Case-By-Case Basis . .10

      **D.** Proactive Involvement of Judges in Settlement and Creative Use of ADR . . . . . .11

      **E.** Support the Use of Technology at Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

      **F.** Proactive, Hands On, But Adaptable Case Management . . . . . . . . . . . . . . . . . . . .14

      **G.** Optional Statements of Material Fact on Summary Judgment Motions . . . . . . . .14

      **H.** Require Page Limitations on Motion Papers . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

      **I.** Use Uniform Rules to Enhance Predictability and Transparency . . . . . . . . . . . .16

      **J.** Increase Use of *In Limine* Motions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

      **K.** Increase Use of E-Filing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

      **L.** Pre-Motion Conferences for Discovery Motions . . . . . . . . . . . . . . . . . . . . . . . . . .18

**PART VI:**      The Focus Groups' Recommendations for the Commercial Division . . . . . . . . . . .19

      **A.** Permit Expert Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

      **B.** Provide Additional Judicial Support for the Commercial Division . . . . . . . . . . .20

      **C.** Implement Online Scheduling Orders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

      **D.** Update Jury Instructions Applicable to Commercial Cases . . . . . . . . . . . . . . . . .21

      **E.** Make Accommodations for Commercial Matters
      in the Appellate Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

**APPENDIX A:** List of Commercial Division Justices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

**APPENDIX B:** Invitation Letter to Focus Groups . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

**APPENDIX C:** List of Topics – Commercial Division Focus Groups . . . . . . . . . . . . . . . . . . . . . .25

**APPENDIX D:** Uniform Commercial Division Rules [22 NYCRR 202.70] . . . . . . . . . . . . . . . . . .27

# I

## EXECUTIVE SUMMARY

The Commercial Division is functioning well and provides many practices and innovations worthy of consideration for use in other parts of the New York State court system. That is the clear-cut conclusion of this Report of the Office of Court Administration to the Chief Judge on the Commercial Division Focus Groups.*

The Focus Groups, conducted in five locations throughout the State between December 2005 and February 2006, brought together current and retired judges, prominent commercial litigators and in-house counsel of major corporations for a meaningful dialogue about the Commercial Division. Their discussions generated a list of ideas that might work well elsewhere. This was not the only purpose of the Focus Groups. Consistent with their charge, they also identified areas of the Commercial Division and commercial practice in New York State that could be improved.

The Focus Groups additionally demonstrated that they are a good tool for the court system to gather and analyze information. Thus, one recommendation of this Report is to expand the focus group information-gathering model to other areas in the court system.

The Focus Groups identified a dozen features of the Commercial Division that might be useful in other courts, including:

- require notice of applications for temporary restraining orders ("TROs"), except in extraordinary circumstances;
- address electronic discovery issues at an early conference;
- encourage judges to exercise discretion whether or not to stay discovery, in whole or in part, on the making of a dispositive motion;
- encourage more proactive involvement of judges in settlement and alternative dispute resolution ("ADR");
- improve support for use of outside technology in courtrooms;
- encourage proactive, hands on, but adaptable case management;
- give courts discretion to require a statement of uncontroverted material facts in support of (or in opposition to) a motion for summary judgment;
- impose page limits on motion papers;
- establish uniform rules for other courts;
- increase the use of *in limine* motions;
- increase the use of e-filing; and
- require pre-motion conferences prior to the filing of discovery motions.

These twelve items are the subject of Part V of this Report. The Focus Groups' ideas targeted more specifically at improving the Commercial Division and commercial practice generally in New York State are treated in Part VI of this Report.

---

* For the preparation of this report we are especially grateful to Robert L. Haig, Esq. of Kelley Drye & Warren LLP, and Jeremy R. Feinberg, Esq. and Gretchen Walsh, Esq. of the Office of Court Administration.

# II

## A BRIEF HISTORY OF THE COMMERCIAL DIVISION

The Commercial Division evolved from an experiment that began on January 1, 1993, when four Justices of the Supreme Court were assigned to hear commercial cases in New York County. Their courtrooms were called Commercial Parts and the Justices were assigned cases involving contracts, corporations, insurance, the Uniform Commercial Code, business torts, bank transactions, complex real estate matters and other commercial law issues.

This experiment involved significant collaboration between the Bench and Bar. Indeed, the idea behind a permanent Commercial Division came from the State Bar Association's Commercial and Federal Litigation Section. Its comprehensive 1995 report studied the Commercial Parts initiative, deemed it highly successful and recommended that it be institutionalized Statewide. The 1995 report advanced several reasons supporting the creation of a separate division to handle commercial matters, including New York's role as a center of commerce, which the Section believed a commercial court would enhance, and the unique attributes and complexity of commercial cases, which warrant specialized judicial treatment. Such a court could combat a disturbing trend: businesses were increasingly resorting to other forums such as Federal District Court, Delaware Chancery Court and private ADR methods to avoid what had been perceived as New York's overburdened state court system.

In response to the 1995 report, Chief Judge Judith S. Kaye created the Commercial Courts Task Force, co-chaired by Hon. E. Leo Milonas and Robert L. Haig, Esq., to examine the Section's report and develop a blueprint for its implementation. The Task Force called for establishing a Commercial Division of the Supreme Court in areas of the State with significant commercial litigation. On November 6, 1995, the Commercial Division officially opened its doors in New York and Monroe Counties. Since then, the Division has expanded to Albany, Erie, Kings, Nassau, Queens, Suffolk and Westchester Counties, and throughout the Seventh Judicial District. Current Justices of the Division are listed in Appendix A to this Report. The *Commercial Division Law Report*, issued four times per year in hard copy and electronically on the Commercial Division website, contains summaries of recent leading opinions of the Commercial Division Justices. The Commercial Division website can be found at www.nycourts.gov/comdiv.

The State's business community, the commercial bar as a whole, and the Commercial and Federal Litigation Section in particular, have all responded enthusiastically to the Commercial Division. The Section referred to the Division as "a case study in successful judicial administration." Business and legal publications throughout the United States have commented favorably on the Commercial Division. At the time of its inception, the Wall Street Journal stated "[w]hile several other States have been pushing for trial courts devoted exclusively to business litigation, New York is the first in which a general trial court has implemented such a program." The National Law Journal touted the Commercial Division Justices for their rigorous management of cases through "rapid disposition of motion practice, realistic and practical scheduling, and [the early setting of] trial dates…to promote efficiency." The Division has also received excellent reviews from business leaders and groups like the New York State Business Council. For example, in 1999, Peter I. Bijur, Chairman of The Business Council of New York State, remarked "We have now gone in four years' time from a court system that often evoked frustration among businesses, to a business court that is the envy of other states."

Ten and a half years after formally opening its doors, the Commercial Division has improved all aspects of commercial litigation, achieving several goals set by Chief Judge Kaye at the time of its creation: providing litigants with a justice system commensurate with New York's status as a world commercial and finance center and its historical role as an innovator in commercial law; enhancing the State's business climate; and creating a laboratory for new courtroom technologies and innovative practices that could be used elsewhere in the court system. All of the successes of the Commercial Division have led to a much greater volume of cases. In 2005, there were an estimated 6,657 cases filed or brought in the Commercial Division Statewide. That number grew nearly ten percent from an estimated 6,095 cases in 2004. Based on early returns from the first half of 2006, it appears that a similar rate of growth can be expected for this year as well. Further information about the Commercial Division as well as numerous other aspects of commercial litigation in state courts is available in the comprehensive five volume treatise entitled *Commercial Litigation in New York State Courts*, Second Edition (Robert L. Haig ed.) (West & New York County Lawyers' Association 2005).

# III

## THE COMMERCIAL DIVISION FOCUS GROUP PROJECT

Acommon strategic planning tool in the private sector, focus groups are unusual in our court system. Nonetheless, the Commercial Division Focus Groups were envisioned as a means of promoting candid dialogue among judges, lawyers and clients to generate new ideas, identify potential areas of improvement, and assess application of "best practices" that have evolved in the Commercial Division to the court system as a whole.

The Focus Groups were structured to ensure that the discussions would remain on point and key subjects would be addressed, while allowing for a range of views and frank discussion. Each session was limited to between twelve and eighteen participants, balanced among experienced litigators, in-house counsel from major corporations, and active and retired judges. Invitations – sent by letter by Chief Administrative Judge Jonathan Lippman – included a pre-set list of topics such as Commercial Division rules, the role of the judge and court staff, ADR, technology and general performance evaluation. A sample invitation letter is annexed as Appendix B, and the list of Focus Group topics is annexed as Appendix C.

Each session was moderated by an experienced commercial litigator, Robert L. Haig, who in addition to serving as Co-Chair of the Commercial Courts Task Force, has from the start had substantial involvement in the expansion and refinement of the Commercial Division. Participants were assured that commentary would be kept confidential; stenographic transcriptions of each Focus Group session referred to participants by number, rather than name.

The Focus Groups took place in five locations over three months. The first two sessions were held in December 2005 in New York and Nassau Counties. At the time, the Uniform Commercial Division Rules (22 NYCRR 202.70) had not yet been adopted, and discussion included the varied practices that were in effect at that time as well as the proposed uniform rules, which had already been the subject of public comment. The new rules, effective in January 2006, provided fertile ground for discussion at the subsequent sessions in Monroe in January, and in Albany and Onondaga Counties in February. A copy of the Uniform

Commercial Division Rules is annexed as Appendix D to this Report.

Onondaga County, the only location that did not have a Commercial Division, was chosen because it is a candidate for Commercial Division expansion. Indeed, as one attorney at the Onondaga Focus Group recognized, the Fifth Judicial District is the only one with a major metropolitan area (Syracuse) without a Commercial Division. Despite the presence of multiple Federal District and Magistrate Judges with court-rooms and chambers in Syracuse, in-house litigation counsel from the area indicated that they would be pleased to have a state court alternative for commercial disputes in Syracuse.

The use of the Focus Groups to gather feedback about the Commercial Division was a successful experiment that bodes well for the model's continued use throughout the court system. The Commercial Division was envisioned as only the first of several areas in which frank discussion through Focus Groups could lead to useful feedback. The New York court system had no past experience from which to draw upon in designing and implementing this new means of research, however, leading to a number of concerns that ultimately proved unfounded.

One concern had been whether people would actually attend and participate. In fact, they did, taking time out of their days, whether they were lawyers, clients or judges. Some even traveled substantial distances to participate in Focus Groups well outside their home counties. Including judges in the Focus Groups raised two other concerns: would other participants be intimidated, and would judges dominate the discussion? Neither concern proved to be a problem. All speakers appeared to be open and free with their comments. The moderator kept discussion flowing, and no particular speaker or group of speakers dominated. Another concern that did not materialize was that participants would simply air complaints rather than provide constructive feedback and comments. Although participants had ample opportunity, they did not criticize the Commercial Division significantly and their remarks were largely positive and constructive.

Clearly, the court system should embrace focus groups as an information-gathering tool for use in other areas.

# IV

## WHAT THE FOCUS GROUPS REVEALED

**M**any common themes emerged. Chief among these was that the Commercial Division has achieved a great deal of success and is viewed as a positive development in which the court system can and should take pride. Among many illustrative comments is this one from a commercial litigator participant:

> The only comment I would make is that, by and large, the members of the bar are very happy with the commercial parts. I think, by and large, people are very happy and appreciate the fact that OCA did establish it…. But I think the certainty and the regularity have been a real incentive just to bring cases in the Commercial Division.

Indeed, enhanced predictability has made the Commercial Division a popular choice. As another commercial litigator stated:

It's two things. I think that, one, when you go in, the judges are going to be familiar with, say, the rules regarding restrictive covenants so you're not explaining something for the first time.

I think the second thing is there is an expectation that the court is going to give you time, if you need it, to sit down and hammer through, say, a contested TRO or something where the business is being jeopardized.

And so, while you can't predict the result, you can at least say to the client, "I'm going to go in and I'll be able to present the information and we should get a reasonable result," which is not necessarily the case in an ordinary IAS part, where there are a million things going on.

So, when I look at predictability, it's that the judges are familiar with the general issues in commercial practice and they will give you the time if you need it.

A senior in-house litigation counsel noted that the Commercial Division is particularly sensitive to the difficulties of litigation involving business strategies, trade secrets and other confidential information, which if made public could cause more difficulty than the underlying litigation itself:

The other factor that we appreciate in the Commercial Division is the appreciation or the perceived appreciation from the judges in that area of the proprietary nature of some of the issues that may come up, and there's some concern that absent a Commercial Division that those issues may not be appreciated across the board but particularly when you're dealing with sensitive business strategy issues and those sort of things that are not clearly IP issues but have some proprietary concerns that we want redacted from records and such.

Even participants who have taken a skeptical view of specialized courts had kind words for the Commercial Division. As a former judge stated:

I have been opposed to specialized parts and specialized divisions as a matter of principle, because I really believe in the merger of the courts. But having said that I have to concede the Commercial Division seems to be working well where we have it. I'm not sure it is exportable to the smaller counties, but it certainly is working well where we have had it. So I have to put a little asterisk next to my "merge the court" in those specialized courts for this court here.

The Focus Groups were seeking not only feedback on the Commercial Division as a whole but also reaction to certain aspects of its operation and practice. The next section of this Report will address successes identified as worthy of consideration for use in other areas of the court system. These are not ranked in terms of priority or degree of consensus, because the participants were asked not to attempt any rankings. The output from the Focus Groups is exactly what was hoped for: a list of good ideas that may benefit other courts, judges, lawyers and litigants.

There seems to be no doubt that the recently adopted uniform rules will significantly change current practice in the Commercial Division. Indeed, much of the discussion in the final three Focus Groups centered on the new rules. Focus Group participants had many other suggestions as to how to improve the Commercial Division, which are addressed in Part VI of this Report.

# V

# IDEAS FOR EXPORTATION TO OTHER PARTS OF THE COURT SYSTEM

## A.  Use of TROs on Notice Except in Extraordinary Circumstances

The Focus Groups overwhelmingly supported wider usage of the Commercial Division Rule requiring notice to the adversary in applications seeking Temporary Restraining Orders, absent unusual circumstances. Although the Focus Groups generally did not "vote" on any of their suggestions, whenever the moderator asked if there was anyone opposed to this proposition, no one dissented.

Uniform Commercial Division Rule 20 requires that unless the moving party, "can demonstrate that there will be significant prejudice by reason of giving notice," applications for TROs should only be made with notice to the adversary. As one upstate practitioner noted, the "significant prejudice" required would be very rare, with the burden falling squarely on the moving party:

> [O]ne, it is impractical because you just don't have time. Literally, you just heard somebody is doing something and you have to run and get the judge and you can't take the time to try to track down the attorney, which is a very small number of cases. Two, when you tell your adversary that you are going to do something, your adversary takes the action in anticipation of the TRO. Other than those two circumstances, I can't imagine a situation in which you shouldn't give notice to your adversary.

Although Uniform Commercial Division Rule 20 codifies the practice that has long existed in the Commercial Division, and in many other courts, participants raised a variety of potential problems that could ensue unless the practice was followed in all courts. Some noted that litigants might engage in forum shopping, refuse to bring cases in the Commercial Division, or disguise commercial matters in the hope of litigating in other courts where they could seek TROs without notice.

Another major concern was incongruous results in the granting and denial of TROs. Participants shared "war stories" of different judges treating multiple TRO applications in the same case inconsistently and of procedural "nightmares" in which one losing party appealed and another losing party instead sought relief in the court that issued the TRO. These problems, it was agreed, could be avoided if TROs normally would be available only on notice, allowing the parties and the court to coordinate.

Requiring notice to the adversary on TRO applications would also have some positive side effects according to the Focus Groups. Several judges, relying on their experience, recognized that requiring notice might obviate the need for the TRO entirely. Appearing in chambers and working with the court, the parties might be able to resolve their differences sufficiently by stipulation and prepare for a preliminary injunction hearing. Another participant commented that requiring notice in all but the rarest of cases not only fosters fairness but also helps speed resolutions:

> That is particularly of interest to the business person who wants to get to the business courts, as some of our clients call it, because they believe they're going to get a more expeditious resolution, when we spend the first month and a half of the case dealing with whether or not notice should have been given or shouldn't have been given up to the Appellate Division, back down to the trial Court. Notice is fairness.

Accordingly, the Focus Groups' loud and clear recommendation is to export the requirement of notice for TRO applications to the rest of the New York court system.

## B.  Address Electronic Discovery Issues Before They Become Problems

The Focus Groups revealed that issues of electronic discovery are emerging throughout New York State courts, and in the Commercial Division in particular. Some jurisdictions have thus far had relatively little experience with electronic discovery, while others have seen electronic discovery issues become so hotly contested that they overshadow the entire case. That range of experience did not prevent the Focus Groups from reaching a general consensus that electronic discovery issues were only going to grow in magnitude and frequency and that they were not going to go away any time soon. Participants recognized that "everybody has a computer," that there has been "an exponential explosion of evidentiary material," and that there is a "delicious and wonderful feeling" to be able to get damning evidence from a computer that might otherwise not have been available. As one senior litigator from New York County lamented:

> It is going to affect every one of the rules. It is going to affect how you litigate and whether you can lit-
> igate any complex litigation; and, of course, it starts with the question of how do you handle discovery
> and then the next question is if you ever get [through] discovery, how do you handle trials.

In an attempt to address this powerful new force in litigation, Uniform Commercial Division Rule 8(b) requires the parties to consult about nine enumerated electronic discovery issues in advance of the prelim-inary conference, and then address them with the court at that conference. Even at Focus Group sessions preceding promulgation of Uniform Commercial Division Rule 8(b), participants generally favored its approach. They suggested that although some types of cases (*e.g.,* automobile accidents and medical mal-practice) might not present the same magnitude of electronic discovery issues as commercial cases, it would be worth considering sharing this practice with other courts (particularly in those counties without Commercial Divisions, but with equally complex cases).

Those preliminary conferences can head off many electronic discovery issues. Spoliation motions have become tactical weapons in litigation, and electronic discovery a "gotcha game," where litigators are sometimes more interested in obtaining adverse inference instructions than in obtaining the documents demanded by their discovery requests. As participants noted, those scenarios can be minimized through preliminary conferences when the court can also address any unfair financial burdens of electronic discov-ery or even stay discovery (as discussed in the next section) pending a dispositive motion.

Although some participants were concerned that addressing electronic discovery issues at an initial conference risked filling every case with battles over electronic evidence, the consensus was that these issues were likely to arise anyway, with more disruptive effects, later in the litigation. The view was that the disruptions could be minimized if the parties and the court worked to resolve them early in the case. The rationale for addressing electronic discovery up front was neatly summarized by one upstate Commercial Division Justice, who commented:

> I guess it's here to stay and we are going to have to learn to deal with it and that's the way it is, and all of
> us judges are going to have to accommodate ourselves to it and everybody else. Electronic life is a fun-
> damental reality and we have to learn to deal with it.

Using the preliminary conference to address electronic discovery issues is one way to "learn to deal with it." It should be among the Commercial Division practices considered for use elsewhere in the New York courts, particularly as these issues inevitably continue to grow in size and frequency.

## C.  Issue Stays of Discovery Upon Dispositive Motions on a Case-By-Case Basis

The effect of a dispositive motion on discovery also generated substantial discussion. Three different rules have existed in New York, along with a multitude of judicial opinions about them, many of which were addressed in the Focus Group sessions. Pursuant to CPLR 3214(b), discovery is stayed pending resolution of a dispositive motion "unless the court orders otherwise." Until recently, a rule of some downstate Division Justices had the practical effect of creating the opposite presumption – that discovery is not stayed "unless the Justice directs." Uniform Commercial Division Rule 11(d) eliminates any presumption and provides that the Justice has discretion in each case whether or not discovery should go forward.

With that backdrop, the participants recognized that a party's role as plaintiff or defendant would likely control its view of the stay. Plaintiffs seeking to get to trial as quickly as possible or gain settlement leverage would generally oppose the stay, while defense counsel, seeking to dispose of meritless or flawed cases as inexpensively as possible, would want the stay. Several participants commented that with the rising costs and burdens of electronic discovery, even a stay of only that type of disclosure could be of substantial benefit. As one practitioner explained:

> I'll say it, for the people who we are representing, our customers, who say they want to get to a courthouse where they believe there will be an ability to resolve the case across the courtroom table as though it was right across the board room table. That's the atmosphere we need to create. And I believe by staying discovery while the motion is pending, saving the business person money, and having the opportunity for the business person to see what the other side has to say about their case…will help us resolve the case.

Participants also recognized that different cases have different needs. To some upstate practitioners, stays should usually be ordered as they allow cases to "take a breath" and prevent disproportionate amounts of money from being spent by clients up front, especially in cases involving questionable merits. Due to the more limited litigation budgets of smaller corporations, practitioners expressed the concern that allowing discovery to proceed could have the detrimental effect of extracting premature settlements (or abandonment of otherwise viable cases) simply to avoid the huge expense associated with discovery. In contrast, other practitioners and judges recognized that limited discovery could be quite useful in some cases even with a motion pending. If there are questions of witness availability, or other evidence where timing is important, the court should have the ability to stay some, but not all, discovery. Similarly, if focused discovery would help resolve a pending motion, it should take place.

The consensus favored a case-by-case approach on stays. As one Division Justice stated:

> What concerns me about the stay of discovery is sometimes it's a very tactical motion to do just that, stay discovery. Not because you really think you have the likelihood of success on the merits. So having the discretion to evaluate that case and deal with that case appropriately I think would be very useful.

The Division Justices who addressed this approach commented that they believed it would not be difficult, from reading the motion papers and hearing argument, to determine whether and to what extent a stay should issue. Participants generally felt that getting the court involved, through early discussions of the motion and a potential stay, might have the additional benefit of helping the court resolve the motion faster (obviating the need for a stay), or establishing protocols to help the court and the parties jointly manage the case more efficiently if it proceeds.

Thus, participants were generally of the view that judges in other New York courts should be encour-

aged to exercise their discretion to decide whether or not to allow a stay upon a dispositive motion. Nevertheless, participants also noted two issues that should be weighed. First, although not inconsistent with CPLR 3214(b), which allows the court to direct that there shall be no stay, it may be necessary to consider legislative action to implement the discretionary rule on a broader basis. Second, participants recognized that deciding stays on a case-by-case basis places an added burden on the courts' already congested dockets.

## D.  Proactive Involvement of Judges in Settlement and Creative Use of ADR

Discussion of settlement approaches and ADR practices in the Commercial Division generated some particularly innovative ideas. Litigators and in-house counsel who spoke about settlement, although quite complimentary of the Commercial Division's ability to resolve matters, were eager to have the Justices more involved in settlement negotiations. They routinely commented that judicial involvement can make a huge difference in resolving matters or, at a minimum, precipitate further meaningful discussions between the parties that ultimately leads to settlement. For example, at the New York County Focus Group, an in-house counsel commented:

> Any time a judge will get involved, where we think a settlement makes sense and we get the help, we can usually settle it. It's an enormous savings for us, because when I was in private practice, I liked to litigate. When I went "in house," we're a back office expense and it makes no sense if you can be businesslike. Also, plaintiff's counsel needs to feel that a judge has said what they did is reasonable, because they are worried about malpractice or they are worried about not being tough. And if the judge actually says that your case is not meritorious, or this part of it is not meritorious, or they say that "this witness is going to kill you," that actually makes a huge impact.

Although all of the Division Justices were willing to help settle matters, several expressed some concern that it might not be appropriate for the court to handle settlement talks in cases involving a bench trial. As one Justice explained:

> The first problem is that the judge says things in the course of the settlement discussion that may give the litigants a view of what the judge's thinking is, and that's not appropriate until you've heard all the case. I think that's wrong.

> You may say something that you might change your mind about, and that might influence the outcome of the settlement negotiations, and that's not fair.

> The second is that I'm trying a case in which there are different amounts involved and people make offers, and I have to determine what is a fair amount of compensation in a particular case. I've now determined what the defendant is prepared to pay. I'm certainly not going to – the tendency is that I'm not going to find less than that amount.

The participants also identified a related problem: although consent of the parties and their lawyers could cure much of the perceived difficulties in matters to be tried by the court, obtaining that consent could be "illusory." Lawyers might be reluctant to tell a judge that they do not want him or her to handle settlement talks, rendering their consent less than meaningful.

Recognizing that different judges might have different comfort levels, and indeed different levels of success in settling cases, the Focus Groups addressed other approaches of the Commercial Division that could be adapted and used in other New York courts. First, the courts could use a consent form for parties to prepare should they wish, at any time, to have the judge who is to preside over a bench trial oversee and

direct settlement talks. The judge would not need to ask for consent, and the parties could approve the judicial involvement without the risk of feeling pressured to do so. The consent form could also ensure that the parties would not use the judge's involvement in settlement as the basis for a later recusal motion.

Second, participants commented that additional resources should be available to judges in settling cases, such as other judicial or quasi-judicial officers or alternative dispute resolution methods. The Commercial Division has used such resources to varying degrees throughout the State. Although Division Justices had varying views of the effectiveness of each of those options, they generally agreed that being able to use any of them in a specific case would help. The Focus Groups agreed that individual cases might be more or less susceptible to resolution through various different means, but that having court attorney referees, Judicial Hearing Officers, lists of neutrals or even other judges from the same court available for referral, could make a big difference.

Third, the Focus Groups noted with approval the new Uniform Commercial Division Rule 3, permitting Justices to order that the parties attend free mediation through a court referral. The genesis of this rule was the ADR program implemented in New York County where Division Justices have had the ability to send cases to uncompensated mediators for the purpose of resolving all or some of the issues presented. These mediators are lawyers who have attended training sessions focused on mediating commercial matters and who have agreed to volunteer their time to mediate Commercial Division cases. The new Uniform Commercial Division Rule 3 provided a framework for discussion. Those in the New York County Focus Group, where the essence of the rule had been in practice for a long time, gave their practical views and suggestions on how other counties with Commercial Divisions, and indeed other courts, might take advantage of similar practices. Those participants in other Focus Groups, applauding the new rule, offered their respective experiences with ADR outside the New York courts, and offered similarly helpful suggestions on how to make use of this good idea such as (1) avoiding interruptions during mediation since there is a natural momentum that is lost if the parties are free to leave before the matter has been resolved, (2) requiring that the corporate executive responsible for approving the legal bills be present at the mediation, and (3) setting the proper mindset for the parties to a mediation (*i.e.,* each party should be prepared to make a major move and avoid trying to convince the other side of the weaknesses in its case).

Participants acknowledged that many cases, with the right mediator and involvement of the decision-making parties, could reach settlement quickly and effectively through mediation. For example, one in-house counsel at the New York County Focus Group commented "I believe if mediation is orderly and the discussion process begins early, we are more likely ultimately to get a settlement." He also commented that even failed mediations were a good thing because they "began the process." Other participants echoed this sentiment by stating that even if the matters did not settle immediately, mediation could open a fruitful dialogue between business people on each side.

With regard to timing, in response to a Division Justice's comment that he relies on counsel to advise him whether mediation would be most appropriate before or after discovery, an in-house counsel quipped:

> The only thing I would say…is that I wouldn't assume that outside lawyers are giving you fully accurate answers to those questions. I think if you talk to some of us on this side of the table, you would find that, as a general matter, we're ready sooner than the lawyers are.

The Focus Groups' approval of the new rule, however, was tempered by a recognition that mediation should not be forced on parties who are not ready. Some participants complained that even preparing for

mediation in a large complex matter could be costly. Others, including one participant who regularly serves as a mediator, noted that the process simply does not work if the parties are not willing to engage in the effort in good faith:

> People who have mediated I'm sure say the same thing that I have in the opening conference. I make it very clear that both sides are there with the idea of actively participating in settlement discussions and working with the mediator with the purpose of resolving the dispute. If they aren't, we might as well quit right now, go home. Because I'm not going to go any farther because you can't — you cannot force people into mediation. So I think compulsory mediation, basically, is difficult.

Other useful comments emanating from the discussions included providing consistently "user-friendly" mediator lists that would include, in addition to the mediators' names in alphabetical order, detailed information concerning the mediators' backgrounds (*e.g.,* admissions, education and professional experience) and permitting the parties to choose their mediator rather than having one selected for them by the judge. Some proposed encouraging the parties to agree in advance that after a certain time period of volunteer mediation, the parties will share the expense of compensating the mediator should they wish to continue the process. Additional suggestions included developing an anonymous method for parties to declare their desire to participate in mediation so that they do not appear weak in open court; limiting mandatory mediation to certain types of cases (*e.g.,* promissory notes) or monetary limits (*e.g.,* cases involving *ad damnum* clauses of $ X or less); and calling on the Bar to provide feedback on their experiences with the mediators so that ineffective mediators are taken off the list.

Expansion of the Commercial Division's settlement practices and ADR methods to other parts of the court system should bear these suggestions in mind.

## E.   Support the Use of Technology at Trial

The complex trials that have taken place in the Commercial Division have led to technological innovations as well. The establishment of Courtroom 2000 in New York County (later named the "Courtroom of the Future") allowed jurors to view documents on individual monitors and provided a degree of technological support then unparalleled in the New York courts. Use of the Courtroom's technology has decreased, however, in favor of litigants using their own technology and support teams.

The Focus Groups' discussions left no doubt that supporting litigants' use of technology at trial, and particularly a jury trial, was favored and should be considered for use outside the Commercial Division. Many participants related "war stories" about how trials could never have succeeded without the use of technology. As one practitioner noted:

> You don't need paper. In a commercial case it is death to have jurors try to read seven pieces of correspondence and put it up on the screen. So I think as a goal for our Division would be to look for those techniques which make it easier for those cases.

Being able to use PowerPoint presentations (which one upstate participant called "the toy of the present"), or employing large screens to place highlighted portions of key documents before the trier of fact, seems to make a big difference. Some participants suggested that the court decide in the early conferences whether use of technology at trial should be mandatory. In smaller cases, involving fewer documents, technology might still be helpful: having a large screen in the courtroom to display documents or play back portions of deposition videos could be of great benefit.

Focus Group participants were concerned, however, that the parties work together and not choose technological trial support vendors using conflicting systems. The immense benefits of avoiding a paper trial can quickly diminish if the court is required, at the eleventh hour, to resolve disputes about logistical issues in these situations. One possible solution is to have the parties choose their vendors and then have the vendors jointly select a third party to provide equipment they can all use.

## F.   Proactive, Hands On, But Adaptable Case Management

One of the hallmarks of the Commercial Division has been the involvement of the Justices in shaping the cases before them from the beginning. Through the use of proactive, hands on, adaptable case management, the Commercial Division has left litigants and their lawyers with a sense that they have had their day in court, and that they have received the judicial attention their matters needed.

Focus Group participants recognized that not every case in the New York state courts needs this degree of judicial involvement, and not every court within the system has the resources to provide it. But there was consensus that spending time at the beginning of a case, setting ground rules, demonstrating interest and energy in resolving a dispute, could pay great dividends for the parties and the court later in the case. There was also a strong consensus that certain aspects of the Commercial Division's flexible and adaptable approach ought to be emphasized, if this approach were to be shared with other parts of the court system.

First, participants noted that it is very important to allow lawyers to work together and agree on realistic deadlines for discovery, motion practice and other scheduling matters. If the court interferes with the lawyers' agreed-to <u>reasonable</u> timetables, hoping to move the case faster, the case can become overly compressed, making it even more expensive and difficult to litigate efficiently. As one lawyer explained, contrasting the Commercial Division with the "rocket docket" in the Eastern District of Virginia:

> I think the [Commercial Division] does a great job. There are some cases in the federal court in Virginia and I think it is a waste of money. The schedules are so tight they don't leave time for reflection or time for consideration. They don't leave time for settlement discussion. I think this court has it mixed pretty right.

Although the participants did not want their cases moved too quickly, they also did not want them to languish. Some judges and lawyers contrasted Commercial Division matters with cases that might never move forward without court involvement. Other participants lamented what happens when a case has a "hiatus." The lawyers, no longer focusing on the matter due to the lack of realistic deadlines they know will be enforced, have to "relearn" the matter quickly, often inefficiently and at great expense, once it restarts. Courts should do what they can to prevent such lulls.

Finally, a number of participants spoke about how useful telephone conferences could be. Division Justices observed that it is simply more cost-effective and efficient for certain conferences to be conducted by telephone rather than in person. This could help combat the inevitable delays in calendar calls, and attendant time waiting in courtrooms. Practitioners – particularly in upstate New York where some have significant travel burdens to reach the court – agreed that being able to "appear" by telephone would be beneficial.

## G.   Optional Statements of Material Fact on Summary Judgment Motions

New Uniform Commercial Division Rule 19-a permits, but does not require, Division Justices to

direct attorneys filing a motion for summary judgment to provide a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends that there is no genuine issue to be tried." The other party has the opportunity to submit a corresponding statement demonstrating how and why there are issues of fact that should lead to denial of the motion. When such statements of material fact ("SMF") are used, each side is to include citations to evidentiary materials that support (or counter) the assertions that the facts are undisputed.

Participants expressed a wide range of views about the use of SMFs. The general consensus supported the rule's making SMFs permissive rather than mandatory. Some recognized that not every case, and not every Division Justice, would benefit from using SMFs. There was recognition that SMFs are useful if the parties coordinate with each other, perhaps after a conference with the court. If they follow the same format in preparing their papers and ensure that supporting evidence is properly cited, SMFs can be a cost- and time-saving benefit, that can aid in analyzing complex factual matters. Additionally, as one judicial participant noted, an SMF can also force the attorneys to focus on issues, earlier in the case, that they might not ordinarily focus on until later, if at all.

The biggest benefit, however, may be to the clients whose interests are most directly affected by Commercial Division litigation. As one practitioner noted:

> And our customers, the people to whom we provide the service, they all say that to me "I thought you said summary judgment, you'd narrow the proof, and I cannot figure out what this guy's saying about my case." But if there was a statement of uncontested material facts to which the other side must deny and then provide the contrary statement of facts, that would go a long way to assist in the adjudication of justice and satisfy the folks we serve.

The Focus Groups also identified a number of reasons why the court should retain discretion not to use SMFs in a given case. Certain matters, as some judges noted, are simple enough that good questioning at oral argument can get to the heart of the issues without the need for added papers, time or expense. In other matters, where the parties have disparate resources, one party could misuse the SMF to force the other side to respond, paragraph by paragraph, to an unwieldy and lengthy SMF. And in some matters where the attorneys are already quite good at focusing their arguments and engaging each other (and the court) in their briefing, this added tool would not have the same benefit.

For all of these reasons, participants thought it was appropriate to consider SMFs in other parts of the court system, so long as the court has discretion to decide whether they are appropriate in a given case.

## H.  Require Page Limitations on Motion Papers

Another common theme of discussion in the Focus Groups was that finding ways to decrease the massive mountain of motion papers that passes through the Commercial Division would be a good thing. That volume of paper overburdens judicial resources and only underscores the benefit of new Uniform Commercial Division Rule 17, limiting main and reply briefs to 25 and 15 pages respectively, and affidavits to 25 pages.

Focus Group participants generally favored exporting this simple rule outside the Commercial Division, with two caveats. Among the benefits of the rule, participants commented that limitations protect judges and their staffs from loquacious litigants and unwieldy legal arguments and force attorneys to be more concise in their positions. As one Justice noted, if coupled with statements of material facts, attorneys could remove most or all of the facts from their briefs and use the saved space for additional legal arguments.

Participants did warn, however, of a potential risk of "sideshow" litigation over the length of briefs. A motion to strike the brief or affidavit for exceeding or circumventing space limitations could require more time and effort than would be saved by a shorter document. At a minimum, there might be an increase in applications seeking (and opposing) court approval to exceed the page limit. Elsewhere, a practitioner noted that *pro se* litigants present special problems for this type of rule since they may need greater latitude in presenting their arguments to the court.

Any consideration of page limits should keep these concerns in mind.

## I.   Use Uniform Rules to Enhance Predictability and Transparency

Particularly in those Focus Group sessions occurring after the January 17, 2006 adoption of the Uniform Commercial Division Rules, many participants weighed in on whether similar statewide uniform rules would be appropriate for other areas of the court system. It became clear that because of the nuances of practice in different geographic areas of the State not every rule can or should be uniform.

Nonetheless, the general consensus favored uniform rules. Some practitioners and in-house lawyers noted that attorneys should not have to relearn the rules applicable to each court where they practice. The resulting inefficiency, both in attorney time and client money, of having to adjust to each court's specific guidelines, could easily be avoided if uniform rules were established across types of courts to simplify practice in those forums. One Division Justice pointed out that uniformity – in instances where recusal of a Division Justice is necessary – makes clear that the rules of litigation are not going to drastically change because the case is being reassigned to another judge who does not ordinarily sit in the Commercial Division:

> [I]f the case is assigned to another jurist in [my] county, will the commercial rules apply? It was important to the practitioner to know that the commercial rules would apply in a case that was going to be transferred out of my part to another jurist because of recusal. That tells me that the bar can work with the rules, wants to work with the rules and wants to make sure when they litigate a case that those rules are going to be complied with no matter what jurist is handling the case. I thought that was a significant plus for the rules that we have in place.

Practitioners did offer a pair of caveats about adopting additional uniform rules, which are instructive, however. First, participants recognized that uniformity is particularly helpful because everyone knows where to find uniform rules. Thus, a uniform format would be a potential first step. Commenting on how easy it is to find the uniform rules, another practitioner stated:

> What I think the advantage is, as I look at these rules, is that if somebody needed to look them up, they would know where to find them. Where for the rest of the practice throughout the districts if you tried to look at the uniform rules in one district, summary judgment motions may be in 200, another one they might be under 540 so I guess you want uniform format of the rules….

But as one upstate practitioner noted, uniformity only works if all of the courts operating under the uniform rules embrace them:

> [U]niformity and uniform rules means uniform across the state. And if the court system can do anything to help the practitioner it would be to make sure that all the judges understand that uniform means uniform and that no one should have their own individual rules, to trump the uniform rules.

## J.    Increase Use of *In Limine* Motions

Perhaps more than any other trial court in New York, the Commercial Division receives *in limine* motions in which lawyers attempt to persuade the court to rule in advance of trial on evidence, expert witnesses and, in some matters, even theories of the case. There seem to be substantial reason, based on the discussions of the Focus Groups, why *in limine* motions should be encouraged throughout the New York courts.

Among other benefits, participants noted that judges appreciate the opportunity to resolve evidentiary issues before trial, rather than in the midst of testimony. This, of course, allows the court to give thoughtful consideration to the issues presented and, in a jury trial, prevents delay and waste of jurors' time. Other participants cited the potential benefit that resolving *in limine* motions early could have in aiding case resolution. Particularly under Uniform Commercial Division Rule 27, requiring *in limine* motions to be made at least 10 days in advance of the pre-trial conference, a court's ruling on a disputed evidentiary matter could, in appropriate cases, foster case resolution (or at least additional settlement talks). At a minimum, as still other participants noted, early resolution of *in limine* motions saves the court, lawyers and litigants time and resources, to the extent the motions can clarify (if not minimize) the dimensions of the case, and the need for proof.

## K.    Increase Use of E-Filing

The use of Filing By Electronic Means (or e-filing), has become a staple of Federal practice. New York State also has an e-filing program in the Commercial Division (as well as certain other types of matters) in selected counties throughout the State. Within the Focus Groups opinions differed on the use of e-filing in the Commercial Division and its potential expansion. Just as there were impassioned pleas not to make e-filing mandatory (as it is in Federal courts), there were practitioners who recognized that it needs to have a place in the court system. As one upstate lawyer remarked:

> The whole idea of New York as being the world's center of litigation, means we have to get with it. As attorneys get used to making the filings in federal court and as all other things get done electronically in the commercial world, you just can't justify not doing it if you are the world center of commercial litigation. You just can't justify it. It is a ridiculous anachronism. We might as well wear wigs.

In support of e-filing, participants from both the Bench and Bar cited the ease of handling materials containing trade secrets or other confidential information. They also noted that e-filing could spare attorneys the time and effort, and their clients the cost, of having to re-submit prior pleadings from the case referenced in later motion papers. Attorneys and clients who e-file would have the added benefit of easier tracking of court filings and case progress through the program's computerized docketing system.

Conversely, some participants raised concerns about the inability, or unwillingness, of practitioners to rely on computers to file papers. Some noted that small firm or solo practitioners, or those who are not computer savvy, would be at a distinct disadvantage to the extent that e-filings received preferential treatment, or were otherwise encouraged by the court. Others commented that if e-filing extended the deadline for filing papers from the close of business (*i.e.,* while the courthouse was open), until midnight of that day (*i.e.,* before the computer's time stamp changed to the next day), there would be potential for abuse. Attorneys would have to check for notification from the e-filing system well after normal business hours to see whether their adversary's papers had been filed and determine what response, if any, would be needed.

On balance, the Focus Groups suggested that e-filing be expanded, so long as it is not made mandatory and those concerns are kept in mind. At a minimum, legislative action will be necessary to make this a system-wide reality. Those cautioning against a rapid expansion also noted the need for additional training and lawyer assistance.

## L.   Pre-Motion Conferences for Discovery Motions

Among the most active and vigorous discussion in the Focus Groups was over new Uniform Commercial Division Rule 24, which generally requires parties seeking to make certain motions to file a two-page letter in support of a proposed motion or cross-motion, followed by a telephone or in-court conference with the judge. One of the benefits of this rule is to clarify or narrow the issues involved in the motion or, in appropriate cases, obviate the need for the motion, by addressing the merits and possibly narrowing the issues to be briefed. Although the rule was not promulgated to stop parties from making motions but instead to help the court control its docket and work with the attorneys to avoid unnecessary motions, numerous participants in the Focus Groups expressed concern over the new Rule's potential effects.

In some Focus Groups, judicial participants commented that, no matter how gently the court might suggest that a lawyer reconsider the merits of a proposed motion, the court could be perceived as signaling how the motion would be received (*i.e.,* an automatic denial regardless of the motion's merits). Numerous participants identified the added cost of pre-motion practice as an unfair burden on lawyers and clients. Practitioners noted that in smaller counties, with fewer judges and lawyers, reputation was a more effective deterrent to frivolous or wasteful motion practice than any pre-motion letter or conference. Finally, participants cited concerns about revealing their theory of the motion in advance, either causing the court to prejudge the issues on an incomplete record, or divulging more to their adversary than they would otherwise wish.

Time will tell what impact the rule will have on statewide practice. Participants generally expressed the view that, due to the experience of the Commercial Division judges and the complexity of the cases, the rule is more beneficial in the Division than elsewhere. Participants were virtually unanimous in suggesting that a Rule 24-like procedure, both in the Commercial Division and elsewhere, would be an effective way to limit the number of discovery motions. Even those expressing doubts about Rule 24 were supportive of its use in the discovery context. As one upstate participant noted:

> Discovery is different. Let me be clear on that. I am very much in favor of eliminating discovery motions altogether. I mean, I think the idea of writing a letter and asking for a conference with the Court on the discovery issue is the way to go because we waste way too much time on motions to compel.

Indeed, judicial participants said that the courts would benefit from a rule that would help curtail discovery motions, which are often counterproductive. One Division Justice said:

> They're very hard to decide on papers, because I'm going to boil it down to, I ask them for everything, they gave me nothing, we gave them everything they asked for. And that's not what we get. But for us to go through it and figure out exactly what it is will take hours or days, whereas I can say to counsel, refine it down, tell me what's missing, in a conversation. We can get through that far more quickly than if I sit there with the motion, the opposition, the reply, and I try and figure out what is it this interrogatory… that's why we would prefer to have the opportunity to deal with those discovery issues. And a lot of times the solution is not going to be the request or the opposition, it's going to be the middle ground that, you know, through the conversation we figured out.

A few participants noted that some counties, some parts and even some courts might lack sufficient support resources to successfully implement a rule like Uniform Commercial Division Rule 24 for discovery motions. Others noted that whatever the temporary strain on resources the rule would create, this burden would be easily outweighed by the ultimate time savings court staff would achieve through reduction of unnecessary motions.

# VI

## THE FOCUS GROUPS' RECOMMENDATIONS FOR THE COMMERCIAL DIVISION

One of the goals of the Focus Groups was to identify those areas of the Commercial Division's practices and procedures that might be exported for use elsewhere within the court system – the preceding sections identify many possible candidates. Another purpose of the Focus Groups was development of ideas for improvement of the Commercial Division itself, to which this Report next turns.

The newly-adopted Uniform Commercial Division Rules significantly changed practice within the Commercial Division and were themselves the subject of extensive discussion before they were adopted. The new rules ensure consistency regarding rules of practice throughout the State. They address key aspects of commercial litigation, including motion practice, electronic discovery, pre-trial conferences, temporary restraining orders and trial scheduling. They also delineate definitive requirements governing the cases that may be heard in the Commercial Division, including monetary thresholds throughout the State. While the new rules also generated substantial discussion within the Focus Groups, the suggestions below are independent of them. Needless to say, these suggestions for change within the Commercial Division may themselves also be candidates for later expansion to other areas of the New York State courts.

## A.  Permit Expert Discovery

In discussions about the costs and benefits of bringing and defending actions in the Commercial Division, the Federal courts or elsewhere, commercial litigators and in-house counsel consistently described their decision-making process as a balancing test. Some viewed the availability of interlocutory appeals in New York, and therefore the ability to appeal an adverse summary judgment or other ruling immediately, as a strong reason to choose the Commercial Division. Indeed, one practitioner referred to this as "one of [New York's] biggest attractions." On the other hand, several participants cited the lack of expert discovery as a reason to use other forums. Some practitioners commented that it was of interest to their clients to be able to conduct meaningful and appropriate expert discovery.

Article 31 of the CPLR does not provide nearly the same degree of expert disclosure that the Federal Rules of Civil Procedure contemplate. However, participants believed that Commercial Division cases could benefit from more expert discovery. By their nature, commercial cases tend to have complex issues that need particularly knowledgeable experts. Expert paper disclosure and even expert depositions may well assist the court, the lawyers and the parties to clarify and narrow the issues.

## B.  Provide Additional Judicial Support for the Commercial Division

Throughout the Focus Groups, participants agreed that it would be helpful to have additional judges involved in the Commercial Division, particularly in those counties with only one or two judges currently involved. Judges expressed the concern, echoing the comments regarding settlement practices described above, that they would like to have another judge to whom they could refer a case for settlement discussions (or trial) if the matter is a bench trial. They also recognized that there will be times when vacations or other scheduling conflicts would mean that a single judge (or even both judges in a two-judge county) may not be available. One judge noted that practitioners may be justified in their concern that the Commercial Division rules and practices might be disregarded by a substitute judge lacking knowledge and experience with them.

Practitioners raised the separate concern that reliance on a single judge to cover all Commercial Division matters in one Judicial District could be problematic for practitioners who have had a bad experience with that judge. As one lawyer stated:

> [I]t does seem that the concept of a commercial part would be more attractive to many practitioners if they knew that their fate in that Division would not rest in the hands, as its been touched upon, by a single judge with whom they get along, don't get along or whatever, but for many practitioners perhaps to have their role in the commercial system in the hands of one predesignated jurist might seem very formidable. It would be almost the difference between practicing in Supreme Court and Surrogate's Court….

Relatedly, other participants noted that limiting the Commercial Division to a single judge would have the unintended (if not undesirable) result of excluding excellent judges with both the interest and aptitude in commercial matters from helping resolve the cases and furthering the Commercial Division's mission.

The additional judicial support for the Commercial Division need not, however, be a judge assigned to the Division. It could be designating other Supreme Court Justices or even Judicial Hearing Officers, whether on an ongoing or one-time basis, to handle settlement discussions, trials or even overflow of motions, as the needs of the court require. This practice has informally developed in several counties (New York, Suffolk, and Kings), and it may be worthy of continuation and expansion to other counties in the future.

## C.  Implement Online Scheduling Orders

All Focus Group participants viewed the Commercial Division's proactive case management approaches as positive. Some participants, however, offered suggestions for making the conferencing system, and the preliminary conference in particular, even more efficient. Implementing online scheduling orders, which could be made available on the Commercial Division's website (www.nycourts.gov/comdiv), could have multiple benefits. It would allow attorneys and clients to have a realistic sense of the areas the court expected to cover and resolve in the conference. It would facilitate discussion, and perhaps even resolution, of some issues before the court even got involved. And, perhaps most importantly, it would provide an easy means for the parties to submit any agreed-upon terms to the court, allowing them to be "so ordered." This, in itself, could save both the court and attorneys the time spent conferencing certain scheduling matters in person.

## D.  Update Jury Instructions Applicable to Commercial Cases

More than one judge, as well as practitioners, noted that the jury instructions available for commercial matters, particularly contracts, needed updating. As one judge stated:

> If the goal is to make New York courts a nationwide model in commercial litigation, then we can't have [jury instructions] that are this outdated. It's just, you know, because that's the intellectual foundation for everything else you do, not just for judges, for lawyers. That's where it really all starts. We need to have them updated.

Focus Group participants specifically identified a need for attention to such topics as spoliation, electronic discovery and modern business transactions – subjects that have undergone great change recently. Several participants volunteered to serve as a resource for revising instructions.

## E.  Make Accommodations for Commercial Matters in the Appellate Process

New York's role as the business and commercial center of the United States is bolstered by the development of commercial law in its appellate courts as well as in its Commercial Division. Issues of vital interest to the community – including those relating to commercial disputes – should be winding their way through the intermediate appellate courts for final resolution in the New York Court of Appeals. Yet question has been raised regarding why so few commercial cases (as compared to vast number of commercial cases found at the trial court level) are appealed to the Appellate Division and the Court of Appeals.

Focus Group participants advanced several explanations for the relatively small number of commercial appeals, in addition to the obvious factor of the economics of settlement. First, there are times that the appeals have become mooted when the trial judge and the Appellate Division have refused to grant a stay of the trial pending appeal. This experience seems to be reflected in a comment made by one Commercial Division Justice that, although the number of appeals emanating from Commercial Divisions is equal to the number of appeals emanating from other parts, his experience was that a much lower number is actually perfected and argued. Second, a commercial litigator suggested that the reason so few cases make their way to the Court of Appeals is the concern that the Court will not grant leave; the statistics are discouraging.

A third factor weighing against appeals was the risk of broader consequences an appellate decision might have for the litigant, beyond the particular case. It was noted that the last thing a corporation wants is to be saddled with "bad law" from its perspective for collateral estoppel purposes. The decision whether to pursue an appeal rested both on "internal" factors (has the case been fully evaluated in-house?) and external factors (will the appeal receive the attention from the court it deserves?). There was a range of views about the current treatment of commercial appeals, particularly among the litigators and clients.

Despite the variety of opinions, the participants raised several constructive suggestions. Some said that because commercial matters, by their nature, tend to be more complex, the appellate courts should allow more time for oral argument and longer briefs. Others called upon the bar to be more active in educating the appellate courts about the more esoteric issues involved in commercial matters today, perhaps through amicus briefs or even CLE programs. Another suggestion was for bar associations to actively support commercially savvy appellate judges in judicial screening panels.

Finally, some expressed the concern that because of finite resources and a huge volume of appeals found in certain Appellate Division Departments, it is difficult, if not impossible, for those courts to play a vital role in developing commercial law. Overwhelmingly, cases are necessarily resolved by those courts

in memoranda, which are often one or two paragraphs in length, instead of full decisions. Greater resources directed at these cases could assist in the development of commercial law.

Several Commercial Division Justices expressed concern that, although interlocutory appeals were generally viewed as a positive feature by practitioners and clients, the passage of time while cases were on appeal still counted against the court's standards and goals statistics. They suggested that the Office of Court Administration include a tolling provision to address this. Other participants suggested that it might be worthwhile for OCA to study the percentage of Commercial Division cases that are reversed in the Appellate Division. Finally, there was a suggestion that the Commercial Division itself be expanded to other parts of the State – the more trial courts there are with a specialty in commercial matters, the more commercial law will develop.

APPENDIX A: List of Commercial Division Justices

## JUSTICES OF THE COMMERCIAL DIVISION
## OF THE SUPREME COURT OF THE STATE OF NEW YORK

### ALBANY COUNTY
Hon. William E. McCarthy

### ERIE COUNTY
Hon. Eugene M. Fahey

### KINGS COUNTY
Hon. Carolyn E. Demarest

Hon. Ann T. Pfau

### MONROE COUNTY and SEVENTH JUDICIAL DISTRICT
Hon. Kenneth R. Fisher

### NASSAU COUNTY
Hon. Leonard B. Austin

Hon. Ira B. Warshawsky

Hon. Stephen A. Bucaria

### NEW YORK COUNTY
Hon. Herman Cahn

Hon. Helen E. Freedman

Hon. Bernard J. Fried

Hon. Ira Gammerman

Hon. Richard B. Lowe III

Hon. Karla Moskowitz

Hon. Charles E. Ramos

### QUEENS COUNTY
Hon. Marguerite A. Grays

Hon. Orin R. Kitzes

### SUFFOLK COUNTY
Hon. Elizabeth Hazlitt Emerson

Hon. Sandra L. Sgroi

### WESTCHESTER COUNTY
Hon. Kenneth W. Rudolph

## APPENDIX B: Invitation Letter to Focus Groups

*State of New York*



*140 Grand Street, Suite 704*
*White Plains, N.Y. 10601*
*(914) 997-7980*

*Jonathan Lippman*
Chief Administrative Judge
and
Justice of the Supreme Court

November 2, 2005

XXXXX
XXXXXXXXXX
XXXXXXXXXXXX

Dear _____:

As a regular practitioner of the Commercial Division, I am writing to request your participation in a focus group panel designed to identify areas in which the operations, rules and procedures of the Commercial Division can be improved. We hope to use the information obtained: (1) to identify gaps in services and generate ideas for future improvements; and (2) to assess the feasibility of transferring the "best practices" of the Commercial Division to other areas within our court system.

The focus group will consist of commercial litigators, Chief Litigation Counsel of major corporations, and justices from the Commercial Division, New York County. We believe your expertise and insights would be very beneficial to this project, which is of particular interest to Chief Judge Judith Kaye in the 10th Anniversary year of the establishment of the Commercial Division. The focus group will be facilitated by Robert Haig, Esq. of Kelley Drye & Warren, LLP, and Co-Chair of the Commercial Courts Task Force, which was established by Chief Judge Kaye to create and refine the Commercial Division.

During this session, which is expected to last 2 1/2 hours, Mr. Haig will be engaging you in a discussion concerning a variety of topics (a copy of the list of discussion topics is enclosed for your review). All focus group discussions will remain confidential. The session will be tape recorded and transcribed. All focus group participants' comments included in the final report will be reported anonymously.

The focus group is scheduled to take place on Thursday, December 1, 2005 at 2 p.m. at the New York County Supreme Court, 60 Centre Street, 7th Floor Conference Room. Please contact my Principal Law Clerk, Gretchen Walsh (914) 997-7980, **no later than November 14, 2005**, regarding your availability to attend the focus group session. I hope you will be able to participate in this important effort.

Very truly yours,

**A P P E N D I X   C :** List of Topics – Commercial Division Focus Groups

## I. Rules

**A.** Should changes be made to the current Guidelines for assignment of cases to the Commercial Division? If so, what changes are needed most? These questions encompass the definition of a commercial case in the Guidelines as well as the procedures for assignment of a case to the Commercial Division at the inception of the case and for subsequently transferring cases into and out of the Commercial Division.

**B.** Should changes to be made to the current Rules of Practice in the Commercial Division? If so, what changes are needed most?

**C.** Should the Guidelines, Rules and procedures in the Commercial Division be uniform throughout New York State (or at least within particular counties or Judicial Departments)? Is uniformity appropriate for some Guidelines, Rules and procedures and inappropriate for others? If so, which ones?

**D.** Does the Commercial Division have appropriate procedures for requesting adjournments? Does the Commercial Division respond appropriately to such requests?

**E.** What are your views on the following Commercial Division innovations?

1. New York Rule 12 providing that a motion to dismiss or for summary judgment shall not stay disclosure unless the Justice directs.

2. The requirement of statements of undisputed facts in connection with summary judgment motions.

3. The requirement of notice to the opposing party prior to an application for a temporary restraining order.

4. The use of pre-motion conferences.

## II. The Role of the Judge

**A.** Does the Commercial Division do a good job of facilitating settlement of cases? What improvements should be made in the Commercial Division's approach to settlement?

**B.** Should the Judges in the Commercial Division be more proactive or less proactive in case management? In what respects?

**C.** Does the Commercial Division make effective use of preliminary conferences? What improvements should be made?

**D.** What changes, if any, should be made in the way the Commercial Division handles motions? Why?

**E.** What changes, if any, should be made in the way the Commercial Division manages disclosure? Why?

**F.** What changes, if any, should be made to the Commercial Division's pre-trial conferences and other pre-trial procedures? This question focuses on conferences and procedures after disclosure is completed.

**G.** What improvements, if any, should be made to trials in the Commercial Division?

## III.  Alternative Dispute Resolution

**A.** What role should alternative dispute resolution play in the Commercial Division? Are improvements needed in the current use of ADR in the Commercial Division and, if so, what improvements are

needed most?  Should use of ADR be mandatory in more cases or fewer?  Why?  What kinds of ADR should be used in Commercial Division cases under various circumstances?

## IV.  Technology

**A.** Is the Commercial Division using technology effectively to achieve its objectives?  What improvements should be made in the Commercial Division's use of technology?  In particular, please discuss electronic filing of cases and other papers as well as technology provided by the Commercial Division for use during trials, case management technology, and file storage and access technology.

## V.  General Evaluation

**A.** Does the Commercial Division dispose of cases too fast or too slow?  What is the rationale for your answer?

**B.** If you had a choice in commencing a case either in the Commercial Division or in other courts or dispute resolution facilities, what would cause you to select an alternative to the Commercial Division?  Please consider, in particular, federal courts, other state courts such as the Delaware Chancery Court, and private arbitration.

**C.** Are the decisions of the Commercial Division sufficiently predictable to enable businesses to develop reliable business and litigation strategies?  If not, what can and should the Commercial Division do to increase predictability of its decisions?

**D.** Is the Commercial Division a cost-effective way to resolve commercial disputes?  How can its cost-effectiveness be improved?

**E.** What are your feelings about the ways in which the Judges, non-judicial personnel, litigators, and clients interact and relate to each other in the Commercial Division?

**F.** Are any changes needed either in the non-judicial personnel assigned to the Commercial Division or in the jobs to which they are assigned or in the way they do their jobs?  If so, what specific changes would you recommend?

**G.** Should the Commercial Division be doing more to educate the bar and the business community about the operations and procedures of the Commercial Division?  If so, what specific types of education would be most effective and most useful?

# §202.70  Rules of the Commercial Division of the Supreme Court

## (a) Monetary thresholds

Except as set forth in subdivision (b), the monetary thresholds of the Commercial Division, exclusive of punitive damages, interests, costs, disbursements and counsel fees claimed, is established as follows:

Albany County  . . . . . . . . . . .$25,000

Erie County  . . . . . . . . . . . . . .$25,000

Kings County  . . . . . . . . . . . .$50,000

Nassau County . . . . . . . . . . .$75,000

New York County . . . . . . . .$100,000

Queens County  . . . . . . . . . .$50,000

Seventh Judicial District  . .$25,000

Suffolk County  . . . . . . . . . . .$25,000

Westchester County . . . . .$100,000

## (b) Commercial cases

Actions in which the principal claims involve or consist of the following will be heard in the Commercial Division provided that the monetary threshold is met or equitable or declaratory relief is sought:

**(1)** Breach of contract or fiduciary duty, fraud, misrepresentation, business tort (e.g., unfair competition), or statutory and/or common law violation where the breach or violation is alleged to arise out of business dealings (e.g., sales of assets or securities; corporate restructuring; partnership, shareholder, joint venture, and other business agreements; trade secrets; restrictive covenants; and employment agreements not including claims that principally involve alleged discriminatory practices);

**(2)** Transactions governed by the Uniform Commercial Code (exclusive of those concerning individual cooperative or condominium units);

**(3)** Transactions involving commercial real property, including Yellowstone injunctions and excluding actions for the payment of rent only;

**(4)** Shareholder derivative actions — without consideration of the monetary threshold;

(5)  Commercial class actions — without consideration of the monetary threshold;

(6)  Business transactions involving or arising out of dealings with commercial banks and other financial institutions;

(7)  Internal affairs of business organizations;

(8)  Malpractice by accountants or actuaries, and legal malpractice arising out of representation in commercial matters;

(9)  Environmental insurance coverage;

(10)  Commercial insurance coverage (e.g. directors and officers, errors and omissions, and business interruption coverage);

(11)  Dissolution of corporations, partnerships, limited liability companies, limited liability partnerships and joint ventures — without consideration of the monetary threshold; and

(12)  Applications to stay or compel arbitration and affirm or disaffirm arbitration awards and related injunctive relief pursuant to CPLR Article 75 involving any of the foregoing enumerated commercial issues — without consideration of the monetary threshold.

## (c) Non-commercial cases

The following will not be heard in the Commercial Division even if the monetary threshold is met:

(1)  Suits to collect professional fees;

(2)  Cases seeking a declaratory judgment as to insurance coverage for personal injury or property damage;

(3)  Residential real estate disputes, including landlord-tenant matters, and commercial real estate disputes involving the payment of rent only;

(4)  Proceedings to enforce a judgment regardless of the nature of the underlying case;

(5)  First-party insurance claims and actions by insurers to collect premiums or rescind non-commercial policies; and

(6)  Attorney malpractice actions except as otherwise provided in paragraph (b)(8).

## (d) Assignment to the Commercial Division

(1)  A party seeking assignment of a case to the Commercial Division shall indicate on the Request for Judicial Intervention (RJI) that the case is "commercial."  A party seeking a designation of a special proceeding as a commercial case shall check the "other commercial" box on the RJI, not the "special proceedings" box.

(2)  The party shall submit with the RJI a brief signed statement justifying the Commercial Division designation, together with a copy of the proceedings.

## (e) Transfer into the Commercial Division

If a case is assigned to a non-commercial part because the filing party did not designate the case as "com-

mercial" on the RJI, any other party may apply by letter application (with a copy to all parties) to the Administrative Judge, within ten days after receipt of a copy of the RJI, for a transfer of the case into the Commercial Division. The determination of the Administrative Judge shall be final and subject to no further administrative review or appeal.

## (f) Transfer from the Commercial Division

**(1)** In the discretion of the Commercial Division justice assigned, if a case does not fall within the jurisdiction of the Commercial Division as set forth in this section, it shall be transferred to a non-commercial part of the court.

**(2)** Any party aggrieved by a transfer of a case to a non-commercial part may seek review by letter application (with a copy to all parties) to the Administrative Judge within ten days of receipt of the designation of the case to a non-commercial part. The determination of the Administrative Judge shall be final and subject to no further administrative review or appeal.

## (g) Rules of practice for the Commercial Division

Unless these rules of practice for the Commercial Division provide specifically to the contrary, the rules of Part 202 also shall apply to the Commercial Division, except that Rules 7 through 15 shall supersede section 202.12 (Preliminary Conference) and Rules 16 through 24 shall supersede section 202.8 (Motion Procedure).

**Rule 1. Appearance by Counsel with Knowledge and Authority.** Counsel who appear in the Commercial Division must be fully familiar with the case in regard to which they appear and fully authorized to enter into agreements, both substantive and procedural, on behalf of their clients. Counsel should also be prepared to discuss any motions that have been submitted and are outstanding. Failure to comply with this rule may be regarded as a default and dealt with appropriately. See Rule 12. It is important that counsel be on time for all scheduled appearances.

**Rule 2. Settlements and Discontinuances.** If an action is settled, discontinued, or otherwise disposed of, counsel shall immediately inform the court by submission of a copy of the stipulation or a letter directed to the clerk of the part along with notice to chambers via telephone or e-mail. This notification shall be made in addition to the filing of a stipulation with the County Clerk.

**Rule 3. Alternative Dispute Resolution (ADR).** At any stage of the matter, the court may direct or counsel may seek the appointment of an uncompensated mediator for the purpose of mediating a resolution of all or some of the issues presented in the litigation.

**Rule 4. Electronic Submission of Papers.**

**(a)** Papers and correspondence by fax. Papers and correspondence filed by fax should comply with the requirements of section 202.5-a except that papers shall not be submitted to the court by fax without advance approval of the justice assigned. Correspondence sent by fax should not be followed by hard copy unless requested.

**(b)** Papers submitted in digital format. In cases not pending in the court's Filing by Electronic Means System, the court may permit counsel to communicate with the court and each other by e-mail. In the court's discretion, counsel may be requested to submit memoranda of law by e-mail or on a computer disk along with an original and courtesy copy.

**Rule 5. (This rule shall apply only in the First and Second Judicial Departments) Information on Cases.** Information on future court appearances can be found at the court system's future appearance site (www.nycourts.gov/ecourts). Decisions can be found on the Commercial Division home page of the Unified Court System's internet website: www.courts.state.ny.us/comdiv or in the New York Law Journal. The clerk of the part can also provide information about scheduling in the part (trials, conferences, and arguments on motions). Where circumstances require exceptional notice, it will be furnished directly by chambers.

**Rule 6. Form of Papers.** All papers submitted to the Commercial Division shall comply with CPLR 2101 and section 202.5(a). Papers shall be double-spaced and contain print no smaller than twelve-point, or 8 1/2 x 11 inch paper, bearing margins no smaller than one inch. The print size of footnotes shall be no smaller than ten-point. Papers also shall comply with Part 130 of the Rules of the Chief Administrator.

**Rule 7. Preliminary Conference; Request.** A preliminary conference shall be held within 45 days of assignment of the case to a Commercial Division justice, or as soon thereafter as is practicable. Except for good cause shown, no preliminary conference shall be adjourned more than once or for more than 30 days. If a Request for Judicial Intervention is accompanied by a dispositive motion, the preliminary conference shall take place within 30 days following the decision of such motion (if not rendered moot) or at such earlier date as scheduled by the justice presiding. Notice of the preliminary conference date will be sent by the court at least five days prior thereto.

**Rule 8. Consultation prior to Preliminary and Compliance Conferences.**

**(a)** Counsel for all parties shall consult prior to a preliminary or compliance conference about (i) resolution of the case, in whole or in part; (ii) discovery and any other issues to be discussed at the conference; and (iii) the use of alternate dispute resolution to resolve all or some issues in the litigation. Counsel shall make a good faith effort to reach agreement on these matters in advance of the conference.

**(b)** Prior to the preliminary conference, counsel shall confer with regard to anticipated electronic discovery issues. Such issues shall be addressed with the court at the preliminary conference and shall include but not be limited to (i) implementation of a data preservation plan; (ii) identification of relevant data; (iii) the scope, extent and form of production; (iv) anticipated cost of data recovery and proposed initial allocation of such cost; (v) disclosure of the programs and manner in which the data is maintained; (vi) identification of computer system(s) utilized; (vii) identification of the individual(s) responsible for data preservation; (viii) confidentiality and privilege issues; and (ix) designation of experts.

**Rule 9.  (Reserved)**

**Rule 10.  Submission of Information.**  At the preliminary conference, counsel shall be prepared to furnish the court with the following: (i) a complete caption, including the index number; (ii) the name, address, telephone number, e-mail address and fax number of all counsel; (iii) the dates the action was commenced and issue joined; (iv) a statement as to what motions, if any, are anticipated; and (v) copies of any decisions previously rendered in the case.

**Rule 11.  Discovery**

**(a)**  The preliminary conference will result in the issuance by the court of a preliminary conference order. Where appropriate, the order will contain specific provisions for means of early disposition of the case, such as (i) directions for submission to the alternative dispute resolution program; (ii) a schedule of limited-issue discovery in aid of early dispositive motions or settlement; and/or (iii) a schedule for dispositive motions before disclosure or after limited-issue disclosure.

**(b)**  The order will also contain a comprehensive disclosure schedule, including dates for the service of third-party pleadings, discovery, motion practice, a compliance conference, if needed, a date for filing the note of issue, a date for a pre-trial conference and a trial date.

**(c)**  The preliminary conference order may provide for such limitations of interrogatories and other discovery as may be necessary to the circumstances of the case.

**(d)**  The court will determine, upon application of counsel, whether discovery will be stayed, pursuant to CPLR 3214(b), pending the determination of any dispositive motion.

**Rule 12.  Non-Appearance at Conference.**  The failure of counsel to appear for a conference may result in a sanction authorized by section 130.2.1 of the Rules of the Chief Administrator or section 202.27, including dismissal, the striking of an answer, an inquest or direction for judgment, or other appropriate sanction.

**Rule 13.  Adherence to Discovery Schedule**

**(a)** Parties shall strictly comply with discovery obligations by the dates set forth in all case scheduling orders.  Such deadlines, however, may be modified upon the consent of all parties, provided that all discovery shall be completed by the discovery cutoff date set forth in the preliminary conference order. Applications for extension of a discovery deadline shall be made as soon as practicable and prior to the expiration of such deadline.  Non-compliance with such an order may result in the imposition of an appropriate sanction against that party pursuant to CPLR 3126.

**(b)**  If a party seeks documents as a condition precedent to a deposition and the documents are not produced by the date fixed, the party seeking disclosure may ask the court to preclude the non-producing party from introducing such demanded documents at trial.

**Rule 14.  Disclosure Disputes.**  Counsel must consult with one another in a good faith effort to resolve all disputes about disclosure.  See section 202.7.  Except as provided in Rule 24 hereof, if counsel are unable to resolve any disclosure dispute in this fashion, the aggrieved party shall contact the court to arrange a conference as soon as practicable to avoid exceeding the discovery cutoff date.  Counsel should request a conference by telephone if that would be more convenient and efficient than an appearance in court.

**Rule 15.  Adjournments of Conferences.**  Adjournments on consent are permitted with the approval of the court for good cause where notice of the request is given to all parties.  Adjournment of a conference will not change any subsequent date in the preliminary conference order, unless otherwise directed by the court.

**Rule 16.  Motions in General.**

**(a)  Form of Motion Papers.**  The movant shall specify in the notice of motion, order to show cause, and in a concluding section of a memorandum of law, the exact relief sought.  Counsel must attach copies of all pleadings and other documents as required by the CPLR and as necessary for an informed decision on the motion (especially on motions pursuant to CPLR 3211 and 3212).  Counsel should use tabs when submitting papers containing exhibits.  Copies must be legible.  If a document to be annexed to an affidavit or affirmation is voluminous and only discrete portions are relevant to the motion, counsel shall attach excerpts and submit the full exhibit separately.  Documents in a foreign language shall be properly translated.  CPLR 2101(b). Whenever reliance is placed upon a decision or other authority not readily available to the court, a copy of the case or of pertinent portions of the authority shall be submitted with the motion papers.

**(b)  Proposed Orders.**  When appropriate, proposed orders should be submitted with motions, e.g., motions to be relieved, pro hac vice admissions, open commissions, etc.  No proposed order should be submitted with motion papers on a dispositive motion.

**(c)  Adjournment of Motions.**  Dispositive motions (made pursuant to CPLR 3211, 3212 or 3213) may be adjourned only with the court's consent.  Non-dispositive motions may be adjourned on consent no more than three times for a total of no more than 60 days unless otherwise directed by the court.

**Rule 17.  Length of Papers.**  Unless otherwise permitted by the court:  (i) briefs or memoranda of law shall be limited to 25 pages each; (ii) reply memoranda shall be no more than 15 pages and shall not contain any arguments that do not respond or relate to those made in the memoranda in chief; (iii) affidavits and affirmations shall be limited to 25 pages each.

**Rule 18.  Sur-Reply and Post-Submission Papers.**  Absent express permission in advance, sur-reply papers, including correspondence, addressing the merits of a motion  are not permitted, except that counsel may inform the court by letter of the citation of any post-submission court decision that is relevant to the pending issues, but there shall be no additional argument.  Materials submitted in violation hereof will not be read or considered.  Opposing counsel who receives a copy of materials submitted in violation of this Rule shall not respond in kind.

**Rule 19. Orders to Show Cause.** Motions shall be brought on by order to show cause only when there is genuine urgency (e.g., applications for provisional relief), a stay is required or a statute mandates so proceeding. See Rule 20. Absent advance permission, reply papers shall not be submitted on orders to show cause.

**Rule 19-a. Motions for Summary Judgment; Statements of Material Facts.**

**(a)** Upon any motion for summary judgment, other than a motion made pursuant to CPLR 3213, the court may direct that there shall be annexed to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried.

**(b)** In such a case, the papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party and, if necessary, additional paragraphs containing a separate short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried.

**(c)** Each numbered paragraph in the statement of material facts required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.

**(d)** Each statement of material fact by the movant or opponent pursuant to subdivision (a) or (b), including each statement controverting any statement of material fact, must be followed by citation to evidence submitted in support of or in opposition to the motion.

**Rule 20. Temporary Restraining Orders.** Unless the moving party can demonstrate that there will be significant prejudice by reason of giving notice, a temporary restraining order will not be issued. The applicant must give notice to the opposing parties sufficient to permit them an opportunity to appear and contest the application.

**Rule 21. Courtesy Copies.** Courtesy copies should not be submitted unless requested or as herein provided. However, courtesy copies of all motion papers and proposed orders shall be submitted in cases in the court's Filing by Electronic Means System.

**Rule 22. Oral Argument.** Any party may request oral argument on the face of its papers or in an accompanying letter. Except in cases before justices who require oral argument on all motions, the court will determine, on a case-by-case basis, whether oral argument will be heard and, if so, when counsel shall appear. Notice of the date selected by the court shall be given, if practicable, at least 14 days before the scheduled oral argument. At that time, counsel shall be prepared to argue the motion, discuss resolution of the issue(s) presented and/or schedule a trial or hearing.

**Rule 23. 60-Day Rule.** If 60 days have elapsed after a motion has been finally submitted or oral argument held, whichever was later, and no decision has been issued by the court, counsel for the movant shall send the court a letter alerting it to this fact with copies to all parties to the motion.

**Rule 24.  Advance Notice of Motions**

**(a)** Nothing in this rule shall be construed to prevent or limit counsel from making any motion deemed appropriate to best represent a party's interests.  However, in order to permit the court the opportunity to resolve issues before motion practice ensues, and to control its calendar in the context of the discovery and trial schedule, pre-motion conferences in accordance herewith must be held.  The failure of counsel to comply with this rule may result in the motion being held in abeyance until the court has an opportunity to conference the matter.

**(b)** This rule shall not apply to disclosure disputes covered by Rule 14 nor to dispositive motions pursuant to CPLR 3211, 3212 or 3213 made at the time of the filing of the Request for Judicial Intervention or after discovery is complete.  Nor shall the rule apply to motions to be relieved as counsel, for pro hac vice admission, for reargument or in limine.

**(c)** Prior to the making or filing of a motion, counsel for the moving party shall advise the Court in writing (no more than two pages) on notice to opposing counsel outlining the issue(s) in dispute and requesting a telephone conference.  If a cross-motion is contemplated, a similar motion notice letter shall be forwarded to the court and counsel. Such correspondence shall not be considered by the court in reaching its decision on the merits of the motion.

**(d)** Upon review of the motion notice letter, the court will schedule a telephone or in-court conference with counsel.  Counsel fully familiar with the matter and with authority to bind their client must be available to participate in the conference.  The unavailability of counsel for the scheduled conference, except for good cause shown, may result in granting of the application without opposition and/or the imposition of sanctions.

**(e)** If the matter can be resolved during the conference, an order consistent with such resolution may be issued or counsel will be directed to forward a letter confirming the resolution to be "so ordered." At the discretion of the court, the conference may be held on the record.

**(f)** If the matter cannot be resolved, the parties shall set a briefing schedule for the motion which shall be approved by the court.  Except for good cause shown, the failure to comply with the briefing schedule may result in the submission of the motion unopposed or the dismissal of the motion, as may be appropriate.

**(g)** On the face of all notices of motion and orders to show cause, there shall be a statement that there has been compliance with this rule.

**(h)** Where a motion must be made within a certain time pursuant to the CPLR, the submission of a motion notice letter, as provided in subdivision (a), within the prescribed time shall be deemed the timely making of the motion.  This subdivision shall not be construed to extend any jurisdictional limitations period.

**Rule 25.  Trial Schedule.**  Counsel are expected to be ready to proceed either to select a jury or to begin presentation of proof on the scheduled trial date.  Once a trial date is set, counsel shall immediately determine the availability of witnesses.  If, for any reason, counsel are not prepared to proceed on the scheduled date, the court is to be notified within ten days of the date on which counsel are given the

trial date or, in extraordinary circumstances, as soon as reasonably practicable.  Failure of counsel to provide such notification will be deemed a waiver of any application to adjourn the trial because of the unavailability of a witness.  Witnesses are to be scheduled so that trials proceed without interruption.  Trials shall commence each court day promptly at such times as the court directs.  Failure of counsel to attend the trial at the time scheduled without good cause shall constitute a waiver of the right of that attorney and his or her client to participate in the trial for the period of counsel's absence.  There shall be no adjournment of a trial except for good cause shown.  With respect to trials scheduled more than 60 days in advance, section 125.1(g) of the Rules of the Chief Administrator shall apply and the actual engagement of trial counsel in another matter will not be recognized as an acceptable basis for an adjournment of the trial.

**Rule 26.  Estimated Length of Trial.**  At least ten days prior to trial or such other time as the court may set, the parties, after considering the expected testimony of and, if necessary, consulting with their witnesses, shall furnish the court with a realistic estimate of the length of the trial.

**Rule 27.  Motions in Limine.**  The parties shall make all motions in limine no later than ten days prior to the scheduled pre-trial conference date, and the motions shall be returnable on the date of the pre-trial conference, unless otherwise directed by the court.

**Rule 28. Pre-Marking of Exhibits.**  Counsel for the parties shall consult prior to the pre-trial conference and shall in good faith attempt to agree upon the exhibits that will be offered into evidence without objection.  At the pre-trial conference date, each side shall then mark its exhibits into evidence as to those to which no objection has been made.  All exhibits not consented to shall be marked for identification only.  If the trial exhibits are voluminous, counsel shall consult the clerk of the part for guidance.  The court will rule upon the objections to the contested exhibits at the earliest possible time.  Exhibits not previously demanded which are to be used solely for credibility or rebuttal need not be pre-marked.

**Rule 29.  Identification of Deposition Testimony.**  Counsel for the parties shall consult prior to trial and shall in good faith attempt to agree upon the portions of deposition testimony to be offered into evidence without objection.  The parties shall delete from the testimony to be read questions and answers that are irrelevant to the point for which the deposition testimony is offered.  Each party shall prepare a list of deposition testimony to be offered by it as to which objection has not been made and, identified separately, a list of deposition testimony as to which objection has been made.  At least ten days prior to trial or such other time as the court may set, each party shall submit its list to the court and other counsel, together with a copy of the portions of the deposition testimony as to which objection has been made.  The court will rule upon the objections at the earliest possible time after consultation with counsel.

**Rule 30.  Settlement and Pretrial Conferences.**

**(a) Settlement Conference.**  At the time of certification of the matter as ready for trial or at any time after the discovery cut-off date, the court may schedule a settlement conference which shall be

attended by counsel and the parties, who are expected to be fully prepared to discuss the settlement of the matter.

**(b) Pre-trial Conference.** Prior to the pretrial conference, counsel shall confer in a good faith effort to identify matters not in contention, resolve disputed questions without need for court intervention and further discuss settlement of the case. At the pre-trial conference, counsel shall be prepared to discuss all matters as to which there is disagreement between the parties, including those identified in Rules 27-29, and settlement of the matter. At or before the pre-trial conference, the court may require the parties to prepare a written stipulation of undisputed facts.

### Rule 31.  Pre-Trial Memoranda, Exhibit Book and Requests for Jury Instructions

**(a)** Counsel shall submit pre-trial memoranda at the pre-trial conference, or such other time as the court may set. Counsel shall comply with CPLR 2103(e). A single memorandum no longer than 25 pages shall be submitted by each side. No memoranda in response shall be submitted.

**(b)** At the pre-trial conference or at such other time as the court may set, counsel shall submit an indexed binder or notebook of trial exhibits for the court's use. A copy for each attorney on trial and the originals in a similar binder or notebook for the witnesses shall be prepared and submitted. Plaintiff's exhibits shall be numerically tabbed and defendant's exhibits shall be tabbed alphabetically.

**(c)** Where the trial is by jury, counsel shall, on the pre-trial conference date or such other time as the court may set, provide the court with case-specific requests to charge and proposed jury interrogatories. Where the requested charge is from the New York Pattern Jury Instructions - Civil, a reference to the PJI number will suffice. Submissions should be by hard copy and disk or e-mail attachment in WordPerfect 12 format, as directed by the court.

### Rule 32.  Scheduling of witnesses.  At the pre-trial conference or at such time as the court may direct, each party shall identify in writing for the court the witnesses it intends to call, the order in which they shall testify and the estimated length of their testimony, and shall provide a copy of such witness list to opposing counsel. Counsel shall separately identify for the court only a list of the witnesses who may be called solely for rebuttal or with regard to credibility.

### Rule 33.  Preclusion. Failure to comply with Rules 28, 29, 31 and 32 may result in preclusion pursuant to CPLR 3126.

*Westlaw.*

6/20/2002 NYLJ 5, (col. 2)                                        Page 1
6/20/2002 N.Y.L.J. 5, (col. 2)

New York Law Journal
Volume 227, Number 118
© 2002 NLP IP Company

Thursday, June 20, 2002

COMMERCIAL DIVISION

HIGH-PROFILE CASE CASTS SPOTLIGHT ON WELL-REGARDED COURT

By Tamara Loomis

THE RECENT case of Allen v. Doumanian as a heady 15 minutes of fame for the commercial division of the New York State Supreme Court. Woody Allen, the city's most famous film director, got on the stand to offer a glimpse into his life and craft, crack jokes, and spar good-naturedly with the judge.

By all accounts, the nine-day trial, prompted by Mr. Allen's $14 million lawsuit against his former friend and partner, Jean Doumanian, was filled with entertaining moments.

At one point, Manhattan Supreme Court Justice Ira Gammerman ordered Mr. Allen, who was rambling on in response to a question, to "stop talking."

"Stop talking?" Mr. Allen asked, flailing his arms.

"I'm the director here," Justice Gammerman retorted.

But alas, last week the parties settled their dispute mid-trial, and for the commercial division it was back to business as usual.

For most people, Mr. Allen's suit was the first - and probably the last - time they will encounter New York's specialized court for commercial disputes, or the unique charms of Justice Gammerman. Yet for New York's commercial litigators, the division, now in its seventh year of operation, has become a familiar fixture.

And for the chronically overburdened and underfunded state court system, the commercial division is also that rare and wonderful thing: a virtually unqualified success.

Commercial litigators and their clients sing its praises, lauding the judges, their intelligence, dedication and efficiency with which they process cases.

"The bar tells me at every opportunity how well it's working," said New York State Chief Judge Judith S. Kaye, who described the commercial section as "a favorite subject of mine."

Copyright © 2008 The New York Law Pub. Co.

6/20/2002 NYLJ 5, (col. 2)                                                                          Page 2
6/20/2002 N.Y.L.J. 5, (col. 2)

"It's been successful beyond anyone's expectations, including mine," echoed Robert
L. Haig, a partner at Kelley Drye & Warren who as co-chairman of the Commercial
Courts Task Force, helped develop the division. "And mine were quite high," he
added.

John C. Rice, an Albany lawyer who serves as general counsel for the Business
Council of New York, the main lobbying group for New York businesses, said
companies also like it. "The members of the Business Council are so happy with the
commercial division they constantly urge us to seek to expand it," he said.

The program's accomplishments have inspired a number of other states, including
Pennsylvania, California, Connecticut, Massachusetts and Rhode Island, to set up
their own commercial sections, modeled in large part on the New York system. About
a dozen other states now have business courts, according to Mr. Haig, and another
10 or so are considering them.

The division has even attracted attention overseas. Judges and others from
countries as far flung as Zambia, Australia, Russia and France have come here to
study the division, said its chief clerk, Robert C. Meade.

High Caseload a Downside

The only downside, said some litigators, is the enormous caseload of its judges,
who carry well over 300 cases each on their dockets. As a result, the level of
personal attention given to a case is less than what you generally get in federal
court, they said.

"I have had arguments on motions before federal judges that lasted an hour or
more," said one lawyer who asked not to be named. "In the commercial division, you
typically have five minutes at the bench to argue your position."

The caseload for judges of the Southern District of New York is not that much less
- around 300 per judge - but they have magistrate judges to help with the work.
"It's a tremendous advantage," said the lawyer.

Another lawyer, who also asked not to be named, said that given a choice, he would
still go to federal court, especially on a complex matter.

On the other hand, he said, if you want your case to move, the commercial division
is a good option. Judges make it a priority to decide motions and other issues
quickly and efficiently, he said.

Chief Judge Kaye acknowledged the state court system's huge docket "is a general
problem." But, she said, "the commercial cases are much better handled in a
specialized division."

Even critics of the commercial division agreed that it is a vast improvement over
the old free-for-all system, in which cases were not even assigned to a particular
judge, let alone one with an expertise in commercial matters. And they were quick

Copyright © 2008 The New York Law Pub. Co.

6/20/2002 NYLJ 5, (col. 2)                                                                    Page 3
6/20/2002 N.Y.L.J. 5, (col. 2)

to give high marks to the division's bench, with Justices Gammerman and Charles
Edward Ramos drawing especially high praise.

1992 Trial Run

 The commercial division, which handles cases involving contracts, corporations,
the Uniform Commercial Code, real estate, insurance and other commercial matters,
grew out of a 1992 trial run with commercial parts.

 At the time, New York state courts were considered among the worst in the country
for handling large complex commercial cases.

 "Businesses would do anything they could to stay out of the New York state court
system," said Kelley Drye's Mr. Haig. "They hated the state courts."

 He said the problem was partly how long matters would drag on - the average
contract case took nearly two years to resolve - but also "a general feeling that
their cases weren't understood."

 To stem the exodus of business disputes to federal and other state courts, in 1995
Chief Judge Kaye authorized the creation of the commercial division, with five
judges in Manhattan and one in Monroe County, which serves Rochester. At the time,
only Delaware and Illinois had commercial courts.

 Since then, New York's program has been expanded to Erie, Nassau, Westchester, and
most recently, Albany county. Next on the list is Suffolk County, which will be
getting a commercial section sometime this fall.

 Each section is assigned one or more judges with an interest in business cases,
with the idea that by building an expertise, judges could move cases more
efficiently.

 The numbers bear out this theory. In 2000, the typical commercial division case
took a little over a year to resolve, an eight-month improvement over the average
time a contract case spent in the system before the division's creation.

 Throughout its tenure, the section has served as a kind of judicial petri dish for
other innovations. It has a successful mediation program, settling about half the
cases referred to it. Its 18-month-old electronic filing program has been more of a
disappointment - so far just 32 cases have been e-filed, according to Mr. Meade,
the division's clerk.

 "We need the bar to break old habits," exhorted Chief Judge Kaye.

 A key refinement took place last year when the court issued written guidelines
defining commercial cases.

 "Before that, nobody knew," said Mark C. Zauderer, a partner at Solomon, Zauderer,
Ellenhorn, Frischer & Sharp and former chair of the New York State Bar
Association's Commercial and Federal Litigation Section. "It was kind of like, 'I

Copyright © 2008 The New York Law Pub. Co.

6/20/2002 NYLJ 5, (col. 2)                                                                    Page 4
6/20/2002 N.Y.L.J. 5, (col. 2)

know it when I see it.' "

 The clarification was important, Mr. Zauderer explained, because the division's
clerks and judges have discretion to kick out non-commercial cases. Mr. Meade, the
chief clerk, estimated that about half the cases get transferred to the general
part.

Uncertainty

 There is still some uncertainty, Mr. Zauderer said. For instance, real estate
disputes are listed under both commercial and non-commercial categories. "You don't
know whether you're in or out," he said.

 Quibbles notwithstanding, Mr. Zauderer and other business litigators seemed
genuinely pleased to have the commercial division as an option.

 "The commercial part has given businesses a real choice between federal and state
court," said Jay G. Safer, a partner at LeBoeuf, Lamb, Greene & MacRae and another
former chair of the New York State Bar Association's Commercial and Federal
Litigation Section.

 "This not just propaganda," he said. "I really believe this."

6/20/2002 NYLJ 5, (col. 2)

END OF DOCUMENT

Copyright © 2008 The New York Law Pub. Co.



New York Practice Series - Commercial Litigation in New York State Courts
Database updated September 2007

Robert L. Haig

Chapter 56. Techniques for Expediting and Streamlining Litigation
by David Klingsberg and Jeffrey A. Fuisz[FN*]

II. Commercial Division

## § 56:2.Generally

**Treatises and Practice Aids**

Carmody-Wait 2d, §§ 20:29, 20:57

Before the advent of the Commercial Division, litigators often blanched at the prospect of filing a complex commercial case in a New York State court, and instead opted — where jurisdictional facts permitted — for the efficiencies of the federal courts, the business expertise of the Delaware Chancery Court, or the cost-effective approach of alternative dispute resolution.[FN1] Concerned that New York would lose its prominence as the business capital of the world if companies were driven elsewhere to avoid its court system,[FN2] New York established the Commercial Division in 1995.[FN3] Creation of this new forum recognized the need for specialized and cost-effective resolution of complex litigation. By all accounts, the Commercial Division has met its goals and is now often the forum of choice for such lawsuits.[FN4]

The Commercial Division facilitates the streamlining of litigation by applying specific methods, some of which are absent from procedures applicable to New York's general docket, that enable the delivery of efficient judicial service.[FN5]

[FN*] The authors thank W. Stewart Wallace, Dan Norber, Andrew Berkowitz and Devaleena Das of Kaye Scholer LLP for their contributions to the preparation of this chapter.

[FN1] A Commercial Court for New York 1995 N.Y.S.B.A. Sec. Commercial & Fed. Litig. Rep. 1-2, 8-9 (quoting results of survey which found that "substantial majority of respondents said they were either somewhat dissatisfied or very dissatisfied with the handling of business disputes in New York state courts").

[FN2] A Commercial Court for New York 1995 N.Y.S.B.A. Sec. Commercial & Fed. Litig. Rep. 6 (stating that "a specialized court for commercial cases would enhance New York's role as the center of commerce and would foster a more favorable environment for establishing or — equally important — maintaining business activities within our borders").

[FN3] The Commercial Division currently operates in the following counties: New York, Queens, Erie, Albany, Westchester, Nassau, Suffolk, Kings, Monroe (in the 7th Judicial District) and now, as of March 2007, Onondaga County. http://www.courts.state.ny.us/press/pr2007_2a.shtml. *See generally* Chapter 31,

"Practice before the Commercial Division."

[FN4] Chief Judge Judith S. Kaye has said that "[t]he bar tells me at every opportunity how well [the commercial division is] working." Tamara Loomis, Commercial Division, High-Profile Case Casts Spotlight on Well-Regarded Court, 6/20/2002 N.Y. L.J. 5, (col. 2) (calling the Commercial Division a "virtually unqualified success"). Statistics collected from the Commercial Division bear out this claim. In 1992 the average contract case in New York County took 648 days from filing to disposition. By 2002, Commercial Division Justices resolved contract cases in an average of 364 days, a reduction of 44 percent. Today, it takes an average of 396 days to resolve a contract action in New York County's Commercial Division. Once a Note of Issue is filed, contract cases are resolved in 195 days, a reduction of 49% from the 382 days it took prior to the establishment of the Commercial Division. Hon. Ann Pfau, Comprehensive Civil Justice Program 2005: Study and Recommendations 19–20, available at http://www.courts.state.ny.us/reports/Civil_Justice_Program_2005.pdf. Sharon M. Porcellio, Innovation, Successes for Litigation, 1/22/2001 N.Y. L.J. § 3, (col.1); 2000 Md. Bus. & Tech. Ct. Task Force Rep. 24, available at http://www.courts.state.md.us/finalb&treport.pdf.In 2006, the Commercial Division initiated a series of focus groups to "identify areas in which the Commercial Division might be even further improved." Each focus group brought together 18 to 20 commercial litigators, corporate counsel and judges, and covered a wide range of topics. In July of that year, the Office of Court Administration issued a report to the Chief Judge of the State of New York on the findings of these focus groups, available at http://www.nycourts.gov/reports/ComDivFocusGroupReport.pdf.

[FN5] On January 17, 2006, the Commercial Division adopted statewide uniform rules to "provide for operational uniformity throughout the state and greater predictability of practice for the commercial bar." http://www.nycourts.gov/press/pr2006_1.pdf. According to Chief Administrative Judge Jonathan Lippman, "The new rules take the guesswork out of litigating in the Commercial Division by defining clearly what constitutes a Commercial Division case, as well as ensuring the consistency regarding rules of practice throughout the state. These rules have been keenly anticipated by both the commercial bar and the business sector and will unquestionably enhance the process of commercial litigation in New York State." http://www.nycourts.gov/press/pr2006_1.pdf. The Statewide Uniform Rules are available at: http://www.nycourts.gov/rules/UniformRulesofCommercialDivision.pdf.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

NYPRAC-COMM § 56:2

END OF DOCUMENT

# Commercial Division

Select a County...

What's New   History   Publications   Statewide Rules   Contact Us

## *New York County*

**Hon. Eileen Bransten**
Biography
Parts & Chambers

**Hon. Herman Cahn**
Biography
Parts & Chambers

**Hon. Helen E. Freedman**
Biography
Parts & Chambers

**Hon. Bernard J. Fried**
Biography
Parts & Chambers
Practices in Part 60

**Hon. Ira Gammerman (JHO)**
Biography
Parts & Chambers

**Hon. Richard B. Lowe III**
Biography
Parts & Chambers

**Hon. Charles E. Ramos**
Biography
Parts & Chambers
P.C. Rules for Part 53

Law Secretaries & Clerks

**Operational Info
Decisions Online**

 Links require
Adobe Acrobat

## Courtroom for the New Millennium

The Commercial Division of the Supreme Court of the State of New York operates a pioneering Courtroom 2000 containing the latest in courtroom technology. This Courtroom has helped to place the Commercial Division at the forefront of technological innovation in the state court systems of the country. The Courtroom

-- provides litigants with state-of-the-art technology, allowing cases to proceed in the most efficient and effective manner.

-- provides the Bar, Judges and court staff with the latest technological options for the litigation process.

-- serves as a technological laboratory for all courts in the State.

-- provides a training ground for attorneys, Judges, court staff, law students and court reporting students.

**Courtroom 2000 features the following:**

**Real-time Court Reporting Facilities:** Allows for instantaneous voice-to-text transcription, word indexing in transcripts, exhibit indexing and paperless transcripts.

**Electronic Transcripts:** By means of special software, transcripts can be delivered securely by e-mail with enhanced viewing, mouse-click searching, and indexing capabilities.

**Presentation of Electronic Evidence:** Attorneys are able to present evidence to the Judge and jury through a wireless communicator or in the form of digitized evidence on CD-ROM by video monitors conveniently placed around the courtroom. A presenting attorney can "zoom in" on a portion of an item of electronic evidence on screen. A "kill switch" on the bench will permit the Judge to turn off monitors until a particular item of evidence is admitted or if the Judge determines that certain images should not be made available to the jury. Digitized video depositions will be displayable along with synchronization to real-time transcripts, greatly facilitating examination of prior deposition testimony and trial testimony.

**An Interactive "Whiteboard":** This replaces the conventional blackboard. Presentation of drawings or writings can be made in large format on video monitors in the courtroom using a sophisticated touch-sensitive screen. An attorney or witness can highlight aspects of a document of particular interest by writing over

or drawing on an image of it and can store the notations on a computer. The screen interacts with virtually any computer-based material. Hard copies of the displayed items can be obtained from a color laser printer.

**Touch Screen Monitor:** Located at the witness box, this monitor and a connected light pen can be used by a witness to mark pieces of evidence for illustrative purposes. An expert witness, for instance, can mark drawings on a display to explain testimony clearly and dramatically for the Judge or jury.

**Animation:** Computer-generated animation may be displayed on monitors for the Judge and jury. Attorneys can present animated explanations for events, functions, constructions and the like to supplement the testimony of expert and fact witnesses. Such presentations can have a powerful impact in helping finders of fact to understand complex events, processes and bodily functions.

**Customized Integrated Electronic Podium:** Replacing the traditional podium, the electronic podium serves the normal function of permitting attorneys to rest papers during examination in the course of questioning but also does much more -- it holds equipment used to present evidence electronically in the Courtroom: a light pen for annotation by counsel on items of evidence displayed on monitors to the Judge and jury; a bar code pen; a flat monitor on which the attorney can see the item of evidence being displayed to the Judge or the jury; a video cassette recorder; a wireless communicator that projects items of proof on monitors; and a visual image printer to capture any frame from a video or still source for preservation purposes.

**Personal Computer Docking Stations:** Located at counsel's table, the witness box, the bench, and the podium, these connections permit the presentation or analysis of evidence by witness or counsel. Attorneys will be able to receive real-time transcription and to communicate electronically with locations outside the courthouse, such as their law offices, while the proceedings are taking place or during recesses.

**Video Cassette Recorder:** Connected to the evidence presentation system, the recorder facilitates presentation and playback of taped evidence.

**Component Computer:** This computer is specifically designed to handle the processing of all information and to run software needed in the Courtroom.

**Other Equipment:** The courtroom is equipped with a portable infrared acoustical system and an LED display system.

The Courtroom accommodates Commercial Division cases and cases from outside the Division that would benefit from access to this equipment.

## Commercial Division

Select a County...

What's New   History   Publications   Statewide Rules   Contact Us

## *A Brief History*

### History of the Commercial Division

In 1993, the Supreme Court, Civil Branch, NY County, under the leadership of then-Administrative Judge Stanley S. Ostrau, established four Commercial Parts on an experimental basis. The aim was to test whether it would be possible, by concentrating commercial litigation in those Parts, to improve the efficiency with which such matters were addressed by the court and, at the same time, to enhance the quality of judicial treatment of those cases. The court's experience with the Commercial Parts was positive and the reaction of commercial practitioners to the Parts was very favorable.

In January 1995, a task force of the Commercial and Federal Litigation Section of the New York State Bar Association recommended expansion of the Commercial Parts. Specifically, the Section proposed establishing a Commercial Division of the Supreme Court in those areas of the State in which there are significant amounts of commercial litigation.

Shortly thereafter, Chief Judge Judith S. Kaye created the Commercial Courts Task Force, headed by Hon. E. Leo Milonas and Robert L. Haig, Esq., to examine the Section's report and make recommendations. The Task Force proposed that a Commercial Division be established in appropriate jurisdictions and also made suggestions and various recommendations regarding case management, technology and other issues integral to the efficient resolution of Commercial cases. The Chief Judge thereafter established the Commercial Division on a statewide basis.

In November 1995, the Commercial Division opened in Monroe County (Rochester) and in New York County. Over the course of the ensuing years, the Division has steadily expanded in response to requests of the commercial Bar and the Office of Court Administration's analysis of case data and statistics. As of mid-2007, the Commercial Division spans ten different jurisdictions Statewide: Albany, Erie, Kings, Nassau, New York, Onondaga, Queens, Suffolk and Westchester Counties as well as the entire Seventh Judicial District.

View a list of all of the Justices to serve on the Commercial Division since its creation

The Commercial Division serves as a vehicle for resolution of complicated commercial disputes. Successful resolution of these disputes requires particular expertise across the broad and complex expanse of commercial law. Because disclosure in commercial cases can be complicated, protracted and expensive, particularly in light of electronic discovery, the Division makes use of vigorous and efficient case management. The court sets deadlines and enforces them, managing discovery as needed to protect the rights of the parties to fair disclosure while minimizing expense and delay. Motion practice,

especially in the form of motions to dismiss or for summary judgment, is particularly common in commercial cases. The caseload of the Division is thus particularly demanding, requiring of the court scholarship in commercial law, experience in the management of complex cases, and a wealth of energy.

The Commercial Division has remained on top of cutting edge technology to assist in handling its caseload effectively. The Commercial Division, for instance, contributed to the development of and pioneered implementation of case management software, now widely used in New York State. New York County's Commercial Division has long used the Courtroom for the New Millennium, which is dedicated to the memory of former Commercial Division Justice Lewis R. Friedman, and which is equipped and wired with advanced technology, to assist in commercial trials.

The Commercial Division is at the forefront of the Unified Court System's Electronic Filing program—all Commercial Division matters are eligible for such filing by electronic means. In 2007, leading Bar groups, including the New York State Bar Association, the New York County Lawyers' Association, and the Association of the Bar of the City of New York, urged further expansion of electronic filing in New York State.

The Commercial Division also has made full use of an Alternative Dispute Resolution Program ("ADR") first established in New York County in early 1996. Justices may send matters to ADR at any time upon an order of referral. Detailed rules and protocols and rosters of seasoned ADR neutrals have been established in many jurisdictions around the State.

As with the Commercial Parts, the Bar has responded very favorably to the work of the Division, as have leading representatives of the business community. For example, the Commercial and Federal Litigation Section referred to the Division as "a case study in successful judicial administration." The Business Council of New York State applauded the work of the Division, describing the court in 2000 as "the envy of businesses in other states." The American Corporate Counsel Association has expressed its appreciation and support for the Division and urged other states to follow New York's lead. The American Bar Association's Business Law Section described the Division in 2000 as "a model of a specialized court devoted to the resolution of business disputes." The 87th Annual Dinner of the New York County Lawyers' Association in December 2001 saluted the Division and honored the Division Justices.

The year 2006 was a particularly significant one for the Commercial Division. The Commercial and Federal Litigation Section awarded its prestigious Stanley H. Fuld Award to the entire Commercial Division at its January 25, 2006 Annual Meeting.

Only days earlier, on January 17, 2006, the Commercial Division adopted Statewide Standards for Assignment of Cases and Rules of Practice. These Standards provide clarity as to which cases are heard in the Commercial Division and which are not and established uniform practices and procedures for cases once they are within the

Commercial Division.

This same year, OCA created the new position of Statewide Special Counsel for the Commercial Division. This office provides added support for all the Justices of the Division and their staff. It also seeks to provide a communication resource to commercial practitioners maintaining the flow of communication between Bench and Bar that has always been a hallmark of the Division.

Perhaps most significantly, 2006 marked the completion of the Commercial Division Focus Group Project. OCA structured the Focus Groups to promote candid dialogue among judges, lawyers and clients to generate new ideas, identify potential areas of improvement and assess application of "best practices" that have evolved in the Commercial Division to the court system as a whole. Focus Group sessions spanned the State, bringing together lawyers, former and current judges and in-house counsel of major corporations.

OCA later issued the Report to the Chief Judge on the Commercial Division Focus Groups, in July 2006, summarizing the work and conclusions of the Focus Groups. The Report contained two types of findings: a list of "good ideas" that had developed within the Commercial Division that could be considered for exportation and use elsewhere within the court system and suggestions for improvements to the Commercial Division itself.

As a further step in the Commercial division's long-standing close relationship with the practicing Bar, in 2007, the Commercial Division began the tenth year of publication of the Commercial Division Law Report, a newsletter that summarizes leading Commercial Division cases statewide. The text of the decisions are linked to the summaries in the on-line version of the Report. The Report is now being issued with the assistance of a special committee of the Commercial and Federal Litigation Section and the Statewide Special Counsel for the Commercial Division.



# Case Processing Time Standards
# In State Courts, 2002-03

### Knowledge & Information Services
Heather Dodge and Kenneth Pankey

---

**Background and Introduction** : : **Findings** : : **Appendix A** : : **Appendix B** : : **Appendix C** : : **Appendix D**

## Background and Introduction

This report continues efforts originally carried out in 1984 by Dr. Howard P. Schwartz, Judicial Administrator of Kansas, to compile state-by-state information about case processing time standards and how courts monitor them. The National Center's Information Service updated Dr. Schwartz's work in 1992 and 1994. In 1999 the National Center distributed a new survey instrument to the 50 states and the District of Columbia to update information on the use and monitoring of their case processing time standards. Responses were received from 44 jurisdictions,[1] but the survey results were not published. In the fall of 2002, the National Center's Knowledge and Information Services Office (KIS) began another updating effort. States that had responded to the 1999 survey were asked to verify or amend the information they had sent that year. States that had not responded in 1999 were sent an updated copy of the 1999 survey instrument. KIS received responses from 41 jurisdictions.[2]

The information in this report summarizes the latest available information about case processing time standards in use among state courts. Most of this information is current as of late 2002 or early 2003, but for states that have not responded to recent survey efforts, information may be from 1999 or even 1994. Obviously, the age of some of this information reduces the reliability of some statements with respect to aggregate data. The year of each state's last response is indicated in the tables that follow this document (see esp. **Appendix A**).

Case processing time standards are continuously being adopted, implemented, amended, and reevaluated in various states around the country. States may use case processing time standards in their trial courts, appellate courts, or both as a means of monitoring case disposition times and evaluating their efforts in delay reduction. By providing an average time for disposing of different case types, along with specified events in the case disposition process to be used as beginning and ending points for the time measurement (e.g., arrest to disposition), case processing time standards allow courts to promote expedition and timeliness and to examine whether their goals for delay reduction and case management are being met. Case processing time standards help to identify areas that need improvement. Backlogged cases categorized by court, case type, or individual judge are more easily recognized, addressed, and prioritized. Although it is unanimously recognized that time standards are *average* goals and that certain extraordinary cases may need to be considered beyond the given standard, it is also widely

---

[1] The following states did not respond to the 1999 survey: Illinois, Maine, New Hampshire, North Carolina, Oklahoma, Pennsylvania, Texas, West Virginia, and Wyoming.
[2] The following states did not respond to the 2002 request for updates: Arizona, Illinois, New Hampshire, New Mexico, North Carolina, Oklahoma, Oregon, South Dakota, Texas, West Virginia, and Wyoming.

recognized that time standards provide a means to a more efficient and well-organized court system.

Top

## Findings

As of fall 2002, 38 states and the District of Columbia had adopted some form of case processing time standards, three more than had done so in 1995.  The states that have adopted time standards are as follows:

- Alabama
- Alaska
- Arizona
- Arkansas
- California
- Colorado
- Connecticut
- Delaware
- Florida
- Hawaii
- Idaho
- Iowa
- Kansas
- Louisiana
- Maryland*
- Massachusetts
- Michigan
- Minnesota
- Mississippi
- Missouri
- Montana*
- Nebraska
- New Hampshire*
- New Jersey
- New Mexico
- New York
- North Dakota
- Ohio
- Oregon
- Rhode Island
- South Carolina
- Texas
- Vermont
- Virginia
- Washington
- West Virginia
- Wisconsin
- Wyoming
- District of Columbia

\*    States that have adopted standards since 1995.

The actual standards that have been adopted by each state are listed in Appendix B. Fifteen states have amended, updated, or added to their standards since 1995:

Alabama revised its trial standards in 1997.  The beginning points of measurement in circuit, traffic, and district criminal cases were changed from arrest date to filing date. The standard time for case disposition was increased in circuit-criminal (other than capital or felony) and small-claims cases.  Time increments were changed for traffic and district-criminal, district-civil, small-claims, and juvenile cases. In 1995 Alabama rescinded its former appellate standards, adding new standards that included time increments for the Supreme Court, Court of Civil Appeals, and Court of Criminal Appeals.

Alaska submitted new standards to the Supreme Court in 1999 that were approved and adopted on February 17, 2000. For trial courts, including criminal, civil, domestic, and juvenile cases, the court superseded a single recommended percentage of conclusion (at 100 percent) with incremental standards (at 75 percent, 90 percent, and 98 percent). The length of standards was extended for felony, misdemeanor, civil, and divorce cases. Juvenile standards were added, as well as incremental appellate standards (at 50 percent, 75 percent, and 90 percent). Appellate standards cover the period from submission to the court until publication of the decision.

Delaware made several changes to its standards in 2001.  The starting date for time measurement was changed from arrest to indictment in all capital and felony cases.  In the Court of Common Pleas, the starting date for time measurement in all criminal cases was changed from arrest to filing.  Standards were developed and implemented for appellate courts, as well.

Top

Florida added small-claims time standards, as well as standards for appellate courts, in 2000.

Top

Hawaii added appellate standards in 1996.

Idaho added small-claims standards in 1997.  The time standard for felony cases was extended; juvenile standards were amended; and an extra time increment was added to the standard for child support enforcement cases.

Massachusetts amended the time standard for felony cases in 1996.

Minnesota added appellate standards in 2002.

Mississippi adopted trial court time standards effective January 1, 2001, in addition to the appellate time standards adopted in 1995. The trial court time standards cover criminal, civil, domestic, and juvenile cases.

Missouri implemented new time increments for civil, criminal, and domestic cases.  In addition, the time standard for felony cases was halved.

Montana added appellate standards in 1996.

Nebraska added juvenile standards in 1997.

New Hampshire adopted appellate standards in 2001 as part of an overall performance standards initiative.

New Jersey amended their standards in 2002. The amendments included adding additional domestic time standards, designating four different tracks for civil cases, and specifying pre-indictment and post-indictment criminal standards.

New Mexico amended their appellate standards in 1997.

New York extended its regular civil standards and added matrimonial standards in 1996.

North Dakota added district standards and standards for misdemeanor cases in 1996.  The time standard for domestic cases was reduced.

Oregon updated its standards to reflect the merger of circuit and district courts in 1998.

(For details on the new or altered standards, please refer to the shaded sections in **Appendix B**).

Top

Since 1986, when Idaho became the first court to implement standards for its appellate courts, many other states have chosen to follow suit.  As of 1995, 9 states had adopted some

form of appellate time standards, and as of fall 2002, 18 states had done so.  The states that have adopted case processing time standards for their appellate courts are as follows:

- Alabama
- Alaska*
- Arkansas
- Delaware*
- Florida*
- Hawaii*
- Idaho
- Louisiana
- Michigan
- Minnesota*
- Mississippi*
- Montana*
- New Hampshire*
- New Jersey
- New Mexico*
- Ohio
- Rhode Island
- Virginia

\* States that have adopted appellate standards since 1995.

Top

The Conference of State Court Administrators (COSCA) adopted time standards for case processing in 1983 for civil, criminal, juvenile, and domestic cases.  The American Bar Association (ABA) also proposed time standards in *Standards Relating to Trial Courts* (1987) for the same case types.  Both sets of standards can be found in **Appendix C**.  Although Florida was the only state to entirely adopt the standards provided by COSCA (and has since made additions), many other states have used either the ABA or COSCA standards as a reference or guideline in developing their own standards.

Nine states have adopted the felony standard selected by COSCA.  These states are Florida, Hawaii, Idaho, Iowa, Nebraska, New York, South Carolina, West Virginia, and Wisconsin.  Idaho is the only addition since 1995.

As of 1995, three states had adopted the felony standard specified by the ABA.  These states were Delaware, Minnesota, and Virginia.  Since then, Delaware has amended its felony standard so that it no longer matches that given by the ABA.

Five states have adopted the civil standards specified by COSCA.  These states are Alaska, Florida, Iowa, Nebraska, and West Virginia.  Since 1995 Florida has added an additional civil standard for small-claims cases that is not included in the COSCA standards.

Five jurisdictions have adopted the civil standards promulgated by the ABA—California, Oregon, Virginia, Washington, and the District of Columbia.  There have been no additions or changes to this list since 1995.

In Maryland, time standards for case processing were developed in 2001 using the ABA's *Standards Relating to Trial Courts,* with adjustments made according to Maryland rules and statutes.  Although Georgia does not have case processing time standards, it does informally use the ABA *Standards of Timely Disposition* (ABA Standards 1992) to assess case processing time.

Top

In some states the case processing time standards are mandatory, while in others they are voluntary. Mandatory standards are generally viewed as requirements, sometimes paired with

consequences for failure to comply, whereas voluntary standards are usually understood to be goals or guidelines. The distinction is not always clear; for this report, the staff has accepted state characterizations. Of the 39 jurisdictions that have adopted time standards, 8 states have mandatory standards, and 20 states have voluntary standards.  In 11 jurisdictions, the mandatory or voluntary quality of the standards depends upon case type.  In Connecticut, the civil standards are mandatory, and the criminal standards are voluntary. In Washington, D.C., the civil standards are voluntary, and the criminal and domestic standards are mandatory. In Alabama, Arkansas, Delaware, Michigan, Minnesota, New Jersey, and Ohio, the trial court standards are mandatory, but the appellate standards are voluntary.  In Hawaii and Mississippi, the trial court standards are voluntary while the appellate court standards are mandatory.  (For details on which states have voluntary or mandatory standards please refer to **Appendix A.**)

Many of the states that have adopted case processing time standards have also implemented measures to monitor compliance with the time standards. Though each state has individual methods of evaluation, the majority produce some form of computer-generated report that includes information on the number of cases filed and the number of cases disposed of within a given time period.  Many states view the reports as informational—a way to distinguish areas that need improvement and to assess whether goals are being met—not as a basis for punitive action.  Some states do, however, require explanation when time standards are exceeded:

> Arkansas directs judges of circuit, chancery, probate, and juvenile courts to submit reports of cases that have been under advisement for more than 90 days to the Administrative Office at the end of each calendar quarter.  Justices and judges of the Supreme Court and Court of Appeals must submit reports of cases in which an opinion has not been issued within 60 days to the chief justice of the Supreme Court.  The reports are reviewed and appropriate actions are taken to dispose of the cases.  Willful noncompliance constitutes grounds for discipline.

> Delaware requires a judge who wants to depart from the adopted criminal time standards to first provide a written explanation to the Supreme Court within 10 days of any order that would prevent compliance with the one-year standard.

> (For details on state-specific monitoring procedures, please refer to **Appendix  D.**)

If states have procedures in place to produce periodic reports regarding performance against time standards, they sometimes make these reports available to the public, most often through an open records request or in their annual reports.  Additionally, publishing the reports on the Web is becoming an increasingly popular way to make the reports accessible to the public. (For details about which states make time standards reports available to the public, please refer to **Appendix A.**)

Top

# Appendix A: Case Processing Time Standards Overview

Rpt.

| State | Response to 1999 survey? | Response to 2002 update request? | Have they adopted time standards? (If yes, when were they implemented?) | Do they have standards in trial courts, appellate, or both? | Are the standards voluntary or mandatory? | Are there procedures in place to produce reports about time standards? | Are reports about time standards made available to the public? (If yes, through what means?) |
|---|---|---|---|---|---|---|---|
| Alabama | Y | Y | 1990(trial)/ revised 1997(trial)/ 1995(appellate) | Both | Voluntary (appellate)/ Mandatory (trial) | Y | N |
| Alaska | Y | Y | 1982(trial)/ amended 2000(trial)/ 2000(appellate) | Both | Voluntary | Y | Annual Reports, Open Records Requests, Annual Report to Legislature |
| Arizona | Y | N | 1989 | Trial | Voluntary | N | |
| Arkansas | Y | Y | 1991 | Both | Voluntary (appellate)/ Mandatory (trial) | Y | Open Records Request |
| California | Y | Y | 1987 | Trial | Voluntary | Y | Annual Reports, Web Site |
| Colorado | Y | Y | 1989 | Trial | Voluntary | Y | Annual Reports, Open Records Requests |
| Connecticut | Y | Y | 1994 | Trial | Voluntary (criminal)/ Mandatory (civil) | Y | Annual Reports, Open Records Requests, Court Publications |
| Delaware | Y | Y | 1990(criminal)/ 1991(civil)/ amended 2001(criminal)/ 2001(appellate) | Both | Voluntary (appellate)/ Mandatory (trial) | Y | Open Records Request |
| Florida | Y | Y | 1985 (trial)/ 2000(appellate) | Both | Voluntary | Y | Contacting the OSCA Staff |
| Georgia | Y | Y | N | N/A | N/A | N/A | N/A |
| Hawaii | Y | Y | 1982(trial)/ 1996(appellate) | Both | Voluntary (trial)/ Mandatory (appellate) | Y | Annual Statistical Report, Annual Variance Report |
| Idaho | Y | Y | 1984(trial)/ 1986(appellate)/ amended 1997(trial) | Both | Voluntary | Y | Open Records Request |
| Illinois | N | N | N | N/A | N/A | N/A | N/A |
| Indiana | Y | Y | N | N/A | N/A | N/A | N/A |
| Iowa | Y | Y | 1985/ amended 1988 | Trial | Voluntary | Y | Annual Reports, Web Site |
| Kansas | Y | Y | 1980 | Trial | Voluntary | Y | Annual Reports, Court Publications |
| Kentucky | Y | Y | N | N/A | N/A | N/A | N/A |
| Louisiana | Y | Y | 1993 | Both | Voluntary | N | N |
| Maine | N | Y | N | N/A | N/A | N/A | N/A |
| Maryland | Y | Y | 2001 | Trial | Voluntary | Y | Open Records Request |
| Massachusetts | Y | Y | 1988/ amended (felony) 1996 | Trial | Mandatory | Y | Annual Reports |
| Michigan | Y | Y | 1991 | Both | Voluntary (appellate)/ Mandatory (trial) | | May Be Available Locally |
| Minnesota | Y | Y | 1985(trial)/ amended 1992(trial)/ 2002(appellate) | Both | Voluntary (appellate)/ Mandatory (trial) | Y | Open Records Request |
| Mississippi | Y | Y | 1995(appellate)/ 2002(trial) | Both | Voluntary (trial)/ Mandatory (appellate) | Y | By Request |
| Missouri | Y | Y | 1993/ amended 1997 | Trial | Mandatory | Y | Annual Reports, Web Site |

| State | Response to 1999 survey? | Response to 2002 update request? | Have they adopted time standards? (If yes, when were they implemented?) | Do they have standards in trial courts, appellate, or both? | Are the standards voluntary or mandatory? | Are there procedures in place to produce reports about time standards? | Are reports about time standards made available to the public? (If yes, through what means?) |
|---|---|---|---|---|---|---|---|
| Montana | Y | Y | 1996 | Appellate | Voluntary | Y | N |
| Nebraska | Y | Y | 1982/1997(juvenile) | Trial | Voluntary | Y | N |
| Nevada | Y | Y | N | N/A | N/A | N/A | N/A |
| New Hampshire | N | N | 2001 | Appellate | Voluntary | ? | ? |
| New Jersey | Y | Y | 1982/amended 2002 | Both | Voluntary (appellate)/ Mandatory (trial) | | Court Publications, Web Site |
| New Mexico | Y | N | 1990/ amended 1997(appellate) | Both | Mandatory | Y | Open Records Request |
| New York | Y | Y | 1970/ revised 1979/ revised 1996 | Trial | Mandatory | Y | Open Records Request, Web Site |
| North Carolina | N | N | N | N/A | N/A | N/A | N/A |
| North Dakota | Y | Y | 1980/ amended 1996 | Trial | Mandatory | Y | Annual Reports, Open Records Requests, Court Publications |
| Ohio | Y | Y | 1971(common pleas, appellate)/ 1975(municipal and county) | Both | Voluntary (appellate)/ Mandatory (trial) | Y | Annual Reports, Open Records Requests, Court Publications, Newspapers |
| Oklahoma | N | N | | N/A | N/A | N/A | N/A |
| Oregon | Y | N | 1990/amended 1991/ updated 1998 | Trial | Voluntary | Y | Open Records Request |
| Pennsylvania | N | Y | N | N/A | N/A | N/A | N/A |
| Rhode Island | Y | Y | 1977 | Both | Voluntary | Y | Court Publications |
| South Carolina | Y | Y | 1983/revised 1992 | Trial | Voluntary | Y | Annual Reports, Open Records Requests |
| South Dakota | Y | N | N | N/A | N/A | N/A | N/A |
| Tennessee | Y | Y | N | N/A | N/A | N/A | N/A |
| Texas | N | Y | 1984/readopted 1987 | Trial | Voluntary | ? | ? |
| Utah | Y | Y | N | N/A | N/A | N/A | N/A |
| Vermont | Y | Y | 1981 | Trial | Mandatory | Y | Annual Reports, Web Site, Newspapers, Court/Bar Publications |
| Virginia | Y | Y | 1989(appellate)/ 1991(trial)/ 1994(General District Court) | Both | Voluntary | Y | Annual Report |
| Washington | Y | Y | 1992/ revised 1997 | Trial | Voluntary | Y | Annual Report, Court Publications |
| West Virginia | N | N | 1986 | Trial | Mandatory | ? | ? |
| Wisconsin | Y | Y | 1985 | Trial | Voluntary | Y | Annual Report, Web Site |
| Wyoming | N | N | 1984(felonies)/ 1986(misdemeanors) | Trial | Mandatory | ? | ? |
| District of Columbia | Y | Y | 1991 | Trial | Voluntary (civil) Mandatory (criminal and domestic) | | N |
| **?**—No information—question was new in the 1999 survey, to which this state did not respond. | | | | | | | |

Rpt.
App. A

# Appendix B: Case Processing Time Standards

AL :: AK :: AZ :: AR :: CA :: CO :: CT :: DC :: DE :: FL :: GA :: HI :: ID :: IL :: IN :: IA :: KS :: KY :: LA :: ME ::
MD :: MA :: MI :: MN :: MS :: MO :: MT :: NE :: NV :: NH :: NJ :: NM :: NY :: NC :: ND :: OH :: OK :: OR :: PA ::
RI :: SC :: SD :: TN :: TX :: UT :: VT :: VA :: WA :: WV :: WI :: WY

Rpt.

## ALABAMA

**TRIAL COURTS**
**IMPLEMENTING AUTHORITY:** Supreme Court Order
**EFFECTIVE DATE:** October 1, 1990; revised 1997
**STATUS:** Mandatory

### CIVIL

**CIRCUIT:**
(filing to disposition)
- 90% within 18 months
- 95% within 24 months
- 100% within 30 months

**DISTRICT:**
(filing to disposition)
- 95% within 10 months
- 100% within 15 months

**SMALL CLAIMS:**
(filing to disposition)
- 95% within 8 months
- 100% within 12 months

### CRIMINAL

**CIRCUIT:**

**CAPITAL**
(arrest to disposition)
- 90% within 9 months
- 100% within 12 months

**FELONY**
(filing to disposition)
- 90% within 9 months
- 100% within 12 months

**OTHER**
(filing to disposition)
- 90% within 9 months
- 100% within 12 months

**DISTRICT:**

**TRAFFIC AND MISDEMEANORS**
(filing to disposition)
- 95% within 4 months
- 100% within 6 months

### JUVENILE

**GENERAL:**
(petition date to disposition)
- 80% within 4 months
- 100% within 9 months

**DRAFT**

Appendix B

**ALABAMA cont.**

**DOMESTIC**

GENERAL:
(filing to disposition)
- 90% within 6 months
- 98% within 12 months
- 100% within 18 months

**APPELLATE COURTS**
IMPLEMENTING AUTHORITY: Supreme Court Order
EFFECTIVE DATE: 1989; rescinded April 10, 1995
STATUS: Voluntary

**STANDARDS**

THE COURT OF CIVIL APPEALS AND THE COURT OF CRIMINAL APPEALS
(filing of the notice of appeal to resolution)
- 75% within 290 days
- 95% within 365 days

SUPREME COURT:
(filing to resolution)
- 50% within 290 days
- 90% within 365 days

**Notes:**

Time standards apply to all cases. However, no punitive action is taken against a judge if the standards are exceeded.

The *goals* for the time standards are public information. However, only the individual judge, his/her presiding judge, the chief justice, and the state court administrator receive case management reports/summaries providing caseload statistics. The reports/summaries are reviewed monthly and semiannually.

They consider the most useful measures of court timeliness to be *% of cases resolved within days/months* (trial courts) and *percentage of cases resolved within existing time standards* (appellate courts).

Rpt.
App. B

9

Appendix B

### ALASKA

> **TRIAL COURTS**
> **IMPLEMENTING AUTHORITY:** Supreme Court Order
> **EFFECTIVE DATE:** 1982; amended February 17, 2000
> **STATUS:** Voluntary

**CIVIL**

> **GENERAL:**
> (complaint to judgment)
> - 75% within 365 days
> - 90% within 540 days
> - 98% within 720 days
>
> **CIVIL POST-TRIAL MOTIONS:**
> (motion ripe to ruling)
> - 98% within 30 days
>
> **SMALL CLAIMS:**
> (complaint to judgment)
> - 75% within 75 days
> - 90% within 90 days
> - 98% within 120 days

**CRIMINAL**

> **FELONY:**
> (arrest to trial)
> - 75% within 120 days
> - 90% within 210 days
> - 98% within 270 days
>
> **MISDEMEANORS:**
> (filing to trial)
> - 75% within 75 days
> - 90% within 120 days
> - 98% within 180 days

**JUVENILE**

> **GENERAL:**
> (complaint to judgment)
> - 75% within 75 days
> - 90% within 120 days
> - 98% within 180 days

**DOMESTIC**

> **DIVORCE:**
> (complaint to judgment)
> - 75% within 270 days
> - 90% within 365 days
> - 98% within 540 days
>
> **CUSTODY/CHILD SUPPORT:**
> (post-judgment motion)
> - 75% within 90 days
> - 90% within 120 days
> - 98% within 180 days

Appendix B

**ALASKA cont.**

**APPELLATE COURTS**
**IMPLEMENTING AUTHORITY:** Supreme Court
**EFFECTIVE DATE:** 2000
**STATUS:** Voluntary

**STANDARDS**

**EXPEDITED CASES:**
(submission to publication of decision)
- 50% within 3 months
- 75% within 4 months
- 90% within 6 months

**ALL CASES:**
(submission to publication of decision)
- 50% within 6 months
- 75% within 9 months
- 90% within 1 year

**Notes:**

In Appellate Courts, all standards over one year old are treated in an expedited manner and listed separately by the appellate clerk in the reports.

Alaska finds the most useful measure of court timeliness to be *% of cases exceeding existing time standards classified by court location.*

Case processing time standards reports are published in court publications and are available to the public through annual reports and open records requests.

Reports/summaries are received by the magistrates, the clerk of court, all judges, the presiding/chief judge, the local court administrator, the state court administrator, the AOC staff, the chief justice, the Supreme Court members, and the trial court administrator. These reports/summaries are reviewed quarterly.

Rpt.
App. B

Appendix B

## ARIZONA

| TRIAL COURTS |
|---|
| **IMPLEMENTING AUTHORITY:** Supreme Court |
| **EFFECTIVE DATE:** 1989 |
| **STATUS:** Voluntary |

## CIVIL

**GENERAL:**
(filing to termination)
- 90% within 9 months
- 95% within 18 months
- 99% with 24 months

**LIMITED:**

**SMALL CLAIMS**
(filing to termination)
- 90% within 45 days
- 99% within 60 days

**FORCIBLE DETAINERS**
(filing to termination)
- 99% within 5 days

**HARASSMENT**
(request to hearing)
- 99% within 10 days

**TRAFFIC**
(filing to termination)
- 90% within 45 days
- 99% within 60 days

**GARNISHMENT**
(request to hearing)
- 99% within 10 days
(answer filed to judgment)
- 99% within 90 days

## CRIMINAL

**GENERAL:**

**FELONY**
(filing to sentencing)
- 90% within 100 days
- 99% within 180 days

**LIMITED:**

**MISDEMEANOR (NON-TRAFFIC)**
(filing to termination)
- 90% within 60 days
- 99% within 90 days

**TRAFFIC:**
(filing to termination)
- 90% within 60 days
- 99% within 90 days

**INITIAL APPEARANCE**
(arrest to hearing)
- 100% within 24 hours

Appendix B

**ARIZONA cont.**

PRELIMINARY HEARINGS
(initial appearance to preliminary hearings)
- 90% within 15 days

ARRAIGNMENT
(preliminary hearings to arraignment)
- 90% within 10 days
- 98% within 15 days

## JUVENILE

## DOMESTIC

GENERAL:
(filing to termination)
- 90% within 3 months
- 95% within 6 months
- 99% within 12 months

LIMITED:

DOMESTIC VIOLENCE ORDERS OF PROTECTION
(date required by party under O.P. to hearing)
- 99% within 10 days

## TAX COURT

SMALL-CLAIMS CASES:
(filing to termination)
- 90% within 7 months
- 95% within 9 months
- 99% within 12 months

TAX CASES:
(filing to termination)
- 90% within 9 months
- 95% within 12 months
- 99% within 24 months

## PROBATE

CONSENTED:
(joinder of issue to termination)
- 99% within 3 months

---

**APPELLATE COURTS**
None: Recommended as part of Appellate Case Processing Study in 1995, but not formally adopted by the Supreme Court or Court of Appeals. The Court of Appeals uses "informal" time standards that may vary from presiding judge to presiding judge.

---

Appendix B

**ARIZONA cont.**

---

**Notes:**

Arizona did not respond to the Fall 2002 Update request; therefore, this information is current as of 1999.

Since 1998 the Supreme Court has made a concerted effort to implement felony case processing standards, and they have been put in statute as "goals."

They do not currently have, but are working on, procedures to document court performance relevant to time standards and goals.

In order to accommodate special problems within individual cases, there are no time standards set at 100%. Instead, the final goal of 100% (ABA Standards) has been adjusted to 99%.

---

Rpt.
App. B

Appendix B

**ARKANSAS**

---

**TRIAL COURTS**
**IMPLEMENTING AUTHORITY:** Administrative Order # 3
**EFFECTIVE DATE:** January 1991
**STATUS:** Mandatory

---

**CIRCUIT, CHANCERY, PROBATE, JUVENILE**

**TRIAL BRIEFS:**
(completion of trial to filing of brief)
- 100% within 30 days

**TRIAL COURT DECISIONS:**
(final submission to decision)
- 100% within 90 days

---

**APPELLATE COURTS**
**IMPLEMENTING AUTHORITY:** Administrative Order #3
**EFFECTIVE DATE:** January 1991
**STATUS:** Voluntary

---

**STANDARDS**

**GENERAL:**
(case's submission to opinion)
- 100% within 60 days

---

**Notes:**

Judges of circuit, chancery, probate, and juvenile courts are directed to submit reports of cases that have been under advisement for more than 90 days to the Administrative Office at the end of each calendar quarter. If the AOC determines that the parties or their counsel did not cause the delay, it recommends to the Supreme Court that a judge be assigned to dispose of the delayed case. Noncompliance with the order constitutes grounds for discipline.

Justices and judges of the Supreme Court and Court of Appeals are directed to submit reports of cases in which an opinion has not been issued within 60 days to the chief justice of the Supreme Court. The report will be reviewed and reassigned or appropriate actions will be taken to dispose of the case. Willful noncompliance will constitute grounds for discipline.

Reports are available to the public through open records requests. Reports/summaries are received by the state court administrator, the AOC staff, the chief justice, and the Supreme Court members, and are reviewed quarterly.

Rpt.
App. B

Appendix B

## CALIFORNIA

---

**TRIAL COURTS**
**IMPLEMENTING AUTHORITY:** State and Judicial Council
**EFFECTIVE DATE:** July 1, 1987
**STATUS:** Voluntary

---

## CIVIL

**REGULAR:**
(filing to disposition)
- 90% within 12 months
- 98% within 18 months
- 100% within 24 months

**LIMITED:**

**GENERAL**
(filing to disposition)
- 90% within 12 months
- 98% within 18 months
- 100% within 24 months

**UNLAWFUL DETAINER**
(filing to disposition)
- 90% within 30 days
- 100% within 45 days

**SMALL CLAIMS**
(filing to disposition)
- 90% within 70 days
- 100% within 90 days

## CRIMINAL

**FELONY:**
(appearance to disposition)
- 100% within 1 year

**FELONY PRELIMINARY EXAMINATIONS:**
(first court appearance to disposition by certified plea, finding of probable cause, or dismissal)
- 90% within 30 days
- 98% within 45 days
- 100% within 90 days

**MISDEMEANORS:**
(first court appearance to disposition)
- 90% within 30 days
- 98% within 90 days
- 100% within 120 days

## JUVENILE

---

**APPELLATE COURTS**
none

---

Appendix B

**CALIFORNIA cont**.

---

**Notes:**

Case processing time standards reports are available to the public through annual reports, the Web site, and other court publications.

Reports/summaries containing time standards are reviewed yearly, and are received by the magistrates, clerk of court, all judges, state court administrator, the AOC staff, the chief judge, and the Supreme Court members.

---

Rpt.
App. B

Appendix B

## COLORADO

---

**TRIAL COURTS**
**IMPLEMENTING AUTHORITY:** Supreme Court Directive
**EFFECTIVE DATE:** March 21, 1989
**STATUS:** Voluntary

---

## CIVIL
---

**REGULAR:**
  **GENERAL**
  (filing to disposition)
   • 100% within 15 months
  **COUNTY COURT**
  (filing to disposition)
   • 100% within 6 months
  **SUMMARY**
  (filing to disposition)
   • 100% within 30 days
**LIMITED:**
  **COUNTY COURT**
  (filing to disposition)
   • 95% within 10 months
   • 100% within 15 months
  **SUMMARY CIVIL:**
  (filing to disposition)
   • 100% within 30 days

## CRIMINAL
---

**FELONY:**
(not-guilty plea to disposition)
  • 100% within 6 months

## JUVENILE
---

**DETENTION AND SHELTER HEARINGS:**
(admission to hearing)
  • 100% within 48 hours
**ADJUDICATORY OR TRANSFER (WAIVER HEARINGS):**
(filing of petition to hearing)
  • 100% within 90 days
**DISPOSITION HEARINGS:**
(adjudicatory hearing to dispositional hearing)
  • 100% within 45 days

## DOMESTIC
---

**NON-CONTESTED DIVORCE:**
(date jurisdiction attaches to all parties to conclusion)
  • 100% within 6 months
**CONTESTED ACTIONS:**
(date jurisdiction attaches to all parties to conclusion)
  • 100% within 12 months
**INITIAL TEMPORARY ORDER:**
(setting date to hearing)
  • 100% within 4 weeks

Appendix B

## COLORADO cont.

**CONTEMPT CITATIONS:**
(setting date to hearing)
- 100% within 4 weeks

**MAITENENCE, SUPPORT, AND CUSTODY:**
(setting date to hearing)
- 100% within 2 months (less than 2 hours of court time)
- 100% within 6 months (½ day of court time)

---

**APPELLATE COURTS**
none

---

**Notes:**

Reports are available to the public through open records requests, and are published in the annual reports.

The clerk of court, the presiding/chief judge, the local court administrator, the state court administrator, and the AOC staff receive reports/summaries.  These reports/summaries are reviewed both monthly and quarterly.

The measure that Colorado finds to be most useful in determining court timeliness is *% of cases exceeding existing time standards*.

Colorado is currently in the process of making some changes that will include new standards.  However, they do not estimate having any recommendations to the Supreme Court until 2004.

Rpt.
App. B

Appendix B

## CONNECTICUT

---

**TRIAL COURTS**
**IMPLEMENTING AUTHORITY:** Administrative Policy (civil); Chief Judge (criminal)
**EFFECTIVE DATE:** July 1994
**STATUS:** Mandatory (civil); Voluntary (criminal)

---

### CIVIL

**GENERAL:**
(complaint to close pleadings)
- 100% within 12 months

**CONTRACT COLLECTION AND SMALL CLAIMS:**
(complaint to close pleadings)
- 100% within 6 months

### CRIMINAL

**FELONY:**

**CLASS D AND UNCLASSIFIED**
(arrest to entry of plea)
- 100% within 90 days

(arrest to disposition)
- 100% within 9 months

**CLASS B AND CLASS C**
(arrest to entry of plea)
- 100% within 90 days

(arrest to disposition)
- 100% within 1 year

**CLASS A**
(arrest to entry of plea)
- 100% within 90 days

(arrest to disposition)
- 100% within 18 months

**MISDEMEANORS:**
(arrest to entry of plea)
- 100% within 60 days

(arrest to disposition)
- 100% within 120 days

### JUVENILE

---

**APPELLATE COURTS**
none

---

Appendix B

**CONNECTICUT cont.**

---

**Notes:**

For Civil Trial Courts, Connecticut finds the most helpful measure of court timeliness to be *age of pending caseload*.  For Criminal Courts, the most helpful measure is *% of cases exceeding time standards classified by court location*.

Reports/summaries with time standards are available to the public through open records requests, and are published in the annual report and in court publications.

Reports/summaries are received by the clerk of court, the presiding/chief judge, the division manager, the caseflow management/delay reduction unit, the chief court administrator, the chief justice, and administrative personnel.  Reports/summaries with time standards are reviewed monthly and semiannually.

Rpt.
App. B

Appendix B

## DELAWARE

<div style="border:1px solid black; padding:8px;">

**TRIAL COURTS**
**IMPLEMENTING AUTHORITY:** Superior Court Civil Administrative Order (civil); Supreme Court Criminal Administrative Directive #130 (criminal)
**EFFECTIVE DATE:** June 1, 1991 (civil); May 16, 1990 (criminal) ; amended July 11, 2001
**STATUS:** Mandatory

</div>

## CIVIL

**REGULAR:**
(filing to disposition)
- 90% within 365 days
- 98% within 550 days
- 100% within 730 days

## CRIMINAL

**CAPITAL:**
(indictment to trial and/or adjudication)
- 100% within 1 year

**SUPERIOR COURT:**
(indictment/information to adjudication)
- 90% within 120 days
- 98% within 180 days
- 100% within 1 year

**COURT OF COMON PLEAS:**
(filing to adjudication)
- 100% within 90 days

## JUVENILE

**CRIMINAL OR DELINQUENCY:**
(filing to adjudication)
- 80% within 60 days
- 100% within 120 days

**EFFECTIVE JULY 11, 2003**
- 90% within 45 days
- 100% within 90 days

<div style="border:1px solid black; padding:8px;">

**APPELLATE COURTS**
**IMPLEMENTING AUTHORITY:** Supreme Court Administrative Directive #94
**EFFECTIVE DATE:** July 11, 2001
**STATUS:** Voluntary

</div>

## STANDARDS

**ORAL ARGUMENTS:**
(answering brief to filing)
- 100% within 45 days

**ISSUING OF DECISION:**
(submission to issuance)
- 100% within 90 days

Appendix B

**DELAWARE cont.**

---

**Notes:**

Reports/summaries with standards are received by the presiding/chief trial and appellate judges, the local court administrator, the state court administrator, the AOC staff, the chief justice, and the Supreme Court members.

Reports/summaries with time standards are reviewed monthly and are made available to the public through open records requests.

Delaware finds *median time to disposition (number of days from filing to disposition)* to be the most helpful measure of court timeliness.

In 2000 the Speedy Trial Committee observed that the courts are not responsible for moving cases through the justice system between the time of arrest and indictment.  The change of the beginning time point in felony and capital cases from arrest to indictment reflects this observation.

In order for a judge to depart from the time guidelines for a capital case, he/she must provide written explanation to the Superior Court within 10 days of any order that would preclude compliance with the 1 year standard.

Rpt.
App. B

Appendix B

## FLORIDA

> **TRIAL COURTS**
> **IMPLEMENTING AUTHORITY:** Supreme Court Order, approved for inclusion in the Florida Rules of Judicial Administration April 12, 1985
> **EFFECTIVE DATE:** July 1, 1985
> **STATUS:** Voluntary

### CIVIL

**REGULAR:**
    **NON-JURY**
    (filing to disposition)
- 100% within 12 months

    **JURY**
    (filing to disposition)
- 100% within 18 months

**SMALL CLAIMS:**
(filing to disposition)
- 100% within 95 days

### CRIMINAL

**FELONY:**
(arrest to disposition)
- 100% within 180 days

**MISDEMEANOR:**
(arrest to disposition)
- 100% within 90 days

### JUVENILE

**DETENTION HEARING:**
(arrest to hearing)
- 100% within 24 hours

**ADJUDICATORY HEARING FOR DEPENDENCY:**
(admission to hearing)
- 100% within 180 days

**ADJUDICATORY HEARING FOR DELINQUENCY:**
(admission to hearing)
- 100% within 90 days

**ADJUDICATORY HEARING (DETAINED):**
(petition to hearing)
- 100% within 21 days

### DOMESTIC

**UNCONTESTED:**
(filing to disposition)
- 100% within 90 days

**CONTESTED:**
(filing to disposition)
- 100% within 180 days

### PROBATE

**UNCONTESTED:**
(filing to discharge)
- 100% within 12 months

Appendix B

**FLORIDA cont.**

**CONTESTED:**
(filing to discharge)
- 100% within 24 months

---

**APPELLATE COURTS**
**IMPLEMENTING AUTHORITY:** Supreme Court Rule
**EFFECTIVE DATE:** 2000
**STATUS:** Voluntary

---

**STANDARDS**

**SUPREME AND DISTRICT COURTS OF APPEAL:**
(oral argument or submission to rendering of a decision)
- 100% within 180 days

---

**Notes:**

Reports with time standards are received by the presiding/chief trial and appellate judges, OSCA staff, the chief justice, Supreme Court members, the trial court administrator, and the judicial council.

Time standards are available to the public by contacting the OSCA staff.

Both appellate and trial committees on performance and accountability document court performance relevant to time standards.

Rpt.
App. B

Appendix B

## GEORGIA

| TRIAL COURTS |
|---|
| none |

| APPELLATE COURTS |
|---|
| none |

| Notes: |
|---|
| Georgia does not have, nor are they considering the development of, case processing time standards.  However, it does informally use the ABA Standards of Timely Disposition (ABA Standards 1992) to assess case processing time and to produce an information report received by general jurisdiction courts upon request. |

Rpt.
App. B

Appendix B

## HAWAII

---

**TRIAL COURTS**
**IMPLEMENTING AUTHORITY:** Developed as part of the judiciary's planning efforts
**EFFECTIVE DATE:** 1982
**STATUS:** Voluntary

---

**CIVIL**
    **CIRCUIT:**
    (filing to termination)
        • 100% within 360 days
    **DISTRICT:**
        **REGULAR**
        (filing to termination)
            • 100% within 60 days
        **SMALL CLAIMS**
        (filing to termination)
            • 100% within 30 days

**CRIMINAL**
    **CIRCUIT:**
    (filing to termination)
        • 100% within 180 days
    **DISTRICT:**
    (filing to termination)
        • 100% within 30 days

**JUVENILE**
    **DETENTION HEARING:**
    (admission to hearing)
        • 100% within 24 hours
    **LAW VIOLATIONS AND STATUS OFFENSES:**
    (filing to disposition)
        • 100% within 90 days

**PROBATE**
    **REGULAR:**
    (filing to termination)
        • 100% within 720 days
    **SMALL ESTATES:**
    (filing to termination)
        • 100% within 360 days

---

**APPELLATE COURTS**
**IMPLEMENTING AUTHORITY:** Developed as part of the judiciary's planning effort
**EFFECTIVE DATE:** March 11, 1996
**STATUS:** Mandatory

---

**STANDARDS**
    **SUPREME COURT:**
    (oral argument or submission to opinion)
        • 100% within 12 months

Appendix B

**HAWAII cont.**

**INTERMEDIATE COURT OF APPEALS:**
(oral argument or submission to opinion)
- 100% within 6 months

**Notes:**

Hawaii finds that the *median time from filing to termination* to be the most helpful measurement of court timeliness.

Reports/summaries with time standards are received by the clerk of court, all judges, the presiding/chief judge of both trial and appellate courts, the division manager, the local court administrator, the state court administrator, the AOC staff, the chief justice, the Supreme Court members, and the trial court administrator, and are reviewed quarterly, semiannually, and yearly.

Time standards reports are available to the public through the annual statistical report and the annual variance report.

Rpt.
App. B

Appendix B

**IDAHO**

---

**TRIAL COURTS**
**IMPLEMENTING AUTHORITY:** Court Order
**EFFECTIVE DATE:** 1984; amended 1997
**STATUS:** Voluntary

---

**CIVIL**
_____

    **MAGISTRATE (EXCEPT PROBATE):**
    (complaint to disposition)
       • 100% within 180 days
    **DISTRICT:**
    (complaint to disposition)
       • 100% within 540 days
    **SMALL CLAIMS:**
    (complaint to disposition)
       • 100% within 90 days

**CRIMINAL**
_____

    **FELONIES:**
        **MAGISTRATE**
        (first appearance to bind over order)
           • 100% within 30 days
        **DISTRICT**
        (first appearance to disposition)
           • 100% within 150 days
    **MISDEMEANORS, DUI CASES, AND TRAFFIC:**
    (first appearance to disposition)
       • 100% within 90 days

**JUVENILE**
_____

    **JUVINILE CORRECTIONS ACT CASES:**
    (admit/deny hearing to disposition)
       • 100% within 90 days
    **INFRACTIONS:**
    (first appearance to disposition)
       • 100% within 60 days

**DOMESTIC**
_____

    **GENERAL:**
    (complaint to disposition)
       • 100% within 180 days
    **CHILD SUPPORT ENFORCEMENT:**
    (filing to trial)
       • 100% within 60 days
    (filing to disposition)
       • 100% within 90 days

Appendix B

**IDAHO cont.**

---

**APPELLATE COURTS**
**IMPLEMENTING AUTHORITY:** Court Order
**EFFECTIVE DATE:** 1986
**STATUS:** Voluntary

---

**STANDARDS**

**APPEALS:**

(judgment to file notice of appeal)
- 100% in 42 days

(notice to lodge/transcript record)
- 100% within 42 days

(lodging to settle record)
- 100% within 21 days

(record filed to appellate brief)
- 100% in 35 days

(appellate brief filed to respondent brief)
- 100% within 28 days

(respondent brief filed to reply brief)
- 100% within 0 days

(appeal is at issue)
- 100% within 175 days

(at issue to screening/assignment retention)
- 100% within 21 days

(assignment/retention to oral argument)
- 100% in 90-180 days

(oral argument to opinion)
- 100% within 90 days

(opinion to remittitur)
- 100% within 42 days

**TOTAL TIME:**

(filing to disposition)
- 100% within 418-508 days

---

**Notes:**

These time standards are used as a guideline for judges, lawyers, and litigants to assist in the determination of the average length of time it should take to conclude a case in the trial courts.

It was ordered in 1997 that these time standards be communicated to judges and lawyers in order to enlist their support in achieving the time goals established.

Reports/summaries with time standards are received by the magistrates, all judges, the local court administrator, the state court administrator, the AOC staff, the chief justice, and the trial court administrator, and are reviewed monthly and yearly.

Case processing time standards reports are available to the public through open records requests.

Rpt.
App. B

Appendix B

**ILLINOIS**

| **TRIAL COURTS** |
| none |

| **APPELLATE COURTS** |
| none |

| **Notes:** |
| Illinois did not respond to the 1999 survey or to the Fall 2002 update request; therefore, this information is current as of 1995. |

Rpt.
App. B

Appendix B

## INDIANA

| **TRIAL COURTS** |
| --- |
| none |

| **APPELLATE COURTS** |
| --- |
| none |

| **Notes** |
| --- |
| Indiana has not adopted formal case processing time standards.  Some courts have chosen to use the ABA standards as informal guidelines to case processing; however, this practice is neither uniform nor required. Indiana uses a caseload management system to monitor the "minutes per type" of specific case categories, but does not have official time standards by which these cases must be processed. |

Rpt.
App. B

Appendix B

# IOWA

| TRIAL COURTS |
|---|
| **IMPLEMENTING AUTHORITY:** Court Rule |
| **EFFECTIVE DATE:** 1985; amended 1988 |
| **STATUS:** Voluntary |

## CIVIL

**NON-JURY:**
(filing to disposition)
- 100% within 12 months

**JURY:**
(filing to disposition)
- 100% within 18 months

## CRIMINAL

**FELONY:**
(arrest to trial)
- 100% within 6 months

**MISDEMEANORS:**
(arrest to trial)
- 100% within 4 months

## JUVENILE

**DETENTION AND SHELTER HEARINGS:**
(detention facility admission to hearing)
- 100% within 24 hours

(admission to shelter care facility pursuant to Iowa Code section 232.21 court order to hearing)
- 100% within 48 hours

**PRE-ADJUDICATORY HEARINGS FOR PHYSICAL AND MENTAL HEALTH EXAMINATIONS:**
(court-ordered admission to detention or shelter care facility to hearing)
- 100% within 15 hours

(filing to hearing **if juvenile is not in detention or shelter care facility**)
- 100% within 48 hours

**ADJUDICATORY HEARINGS:**
(court-ordered admission to detention or shelter care facility to hearing)
- 100% within 15 days

(filing to hearing **if juvenile is not in detention or shelter care facility**)
- 100% within 30 days

(entry of order for physical or mental examination to hearing)
- 100% within 45 days

**DISPOSITIONAL HEARINGS:**
    **JUVENILE IS IN A DETENTION OR SHELTER CARE FACILITY**
    (entry of adjudicatory order to hearing)
    - 100% within 30 days
    **JUVENILE IS NOT IN A DETENTION OR SHELTER CARE FACILITY**
    (entry of adjudicatory order to hearing)
    - 100% within 40 days

**TERMINATION OF PARENTAL RIGHTS:**
(filing to hearing)
- 100% within 60 days

(filing to disposition)
- 100% within 5 months

Appendix B

## IOWA cont.

**DOMESTIC**

**UNCONTESTED:**
(filing to disposition)
- 100% within 4 months

**CONTESTED:**
(filing to disposition)
- 100% within 8 months

**APPELLATE COURTS**
none

**Notes:**

The Iowa Judicial Branch had plans to implement a new court management information system in 2000. This system would monitor the number of days from petition to disposition. The current (1999) manual system did not collect the information necessary to produce case processing analyses. The computer-generated reports will allow the Judicial Branch for the first time to measure trial court compliance with the case processing time standards.

Rpt.
App. B

Appendix B

## KANSAS

```
TRIAL COURTS
IMPLEMENTING AUTHORITY: Supreme Court Rule
EFFECTIVE DATE: 1980
STATUS: Voluntary
```

### CIVIL

**REGULAR:**
(filing to termination)
- 100% within 6 months

**LIMITED:**
(filing to termination)
- 100% within 2 months

### CRIMINAL

**FELONY:**
(first appearance to trial or plea)
- 100% within 120 days

**MISDEMEANORS:**
(first appearance to trial or plea)
- 100% within 60 days

### JUVENILE

### DOMESTIC

**GENERAL:**
(filing to termination)
- 100% within 4 months

### PROBATE

**GENERAL:**
(filing to disposition)
- 100% within 1 year

```
APPELLATE COURTS
none
```

```
Notes:

Reports/summaries with time standards are received by the clerk of court, both the presiding/chief trial and
appellate judges, the state court administrator, the chief justice, Supreme Court members, and the trial court
administrator, and are reviewed quarterly.

Kansas finds median time to disposition to be the most helpful measure of court timeliness.
```

Rpt.
App. B

Appendix B

## KENTUCKY

**TRIAL COURTS**
none

**APPELLATE COURTS**
none

**Notes:**

Currently Kentucky does not have, nor is it considering the development of, case processing time standards.

Rpt.
App. B

Appendix B

# LOUISIANA

**TRIAL COURTS**
**IMPLEMENTING AUTHORITY:** Supreme Court Administration Rules Part G, §6
**EFFECTIVE DATE:** October 1, 1993
**STATUS:** Voluntary

## CIVIL

**GENERAL:**
(filing to conclusion)
- 100% within 9 months

**SUMMARY:**
(service of process to conclusion)
- 100% within 45 days

## CRIMINAL

**FELONY:**
- Code of Criminal Procedure Article 701

**MISDEMEANORS:**
- Code of Criminal Procedure Article 701.  Part G, §2

## JUVENILE

**GENERAL:**
- Children's Code Provisions

## DOMESTIC

**GENERAL:**
(filing to conclusion)
- 100% within 4 months

**APPELLATE COURTS**
**IMPLEMENTING AUTHORITY:** Supreme Court Resolution dated June 3, 1993
**EFFECTIVE DATE:** October 1, 1993
**STATUS:** Voluntary

## STANDARDS

**SUPREME COURT (ADMINISTRATIVE RULE, PART J):**
**APPEALS**
- opinion by the end of the 6-week cycle

**WRIT APPLICATIONS**
(filing to decision on the writ)
- 100% within 120 days
(writ grant to oral argument)
- 100% within 90 days
(oral argument to decision)
- 100% within the following 6-week cycle.

**CIRCUIT COURT OF APPEAL:**
(payment of costs by appellant to lodging of a civil appeal)
- 100% within 105 days
(signing of the order of appeal to lodging of a criminal appeal)
- 100% within 120 days
(lodging of the appeal to the argument)
- 100% within 175 days

Appendix B

**LOUISIANA cont.**

(argument to rendering of opinion)
- 100% within 70 days

---

**Notes:**

Louisiana monitors and reports time standards relative to the Supreme Court and the five Courts of Appeal

Reports/summaries with time standards are available in the general annual report and the report on judicial performance.

---

Rpt.
App. B

Appendix B

**MAINE**

| **TRIAL COURTS** |
| none |

| **APPELLATE COURTS** |
| none |

| **Notes:** |
| Maine did not respond to the 1999 survey. However, in fall 2002 they did respond to the update request and answered that they have not adopted case processing time standards. |

Rpt.
App. B

Appendix B

**MARYLAND**

| **TRIAL COURTS** |
| IMPLEMENTING AUTHORITY: Judicial Council |
| EFFECTIVE DATE: April 2001 |
| STATUS: Voluntary |

| **APPELLATE COURTS** |
| none |

**Notes:**

Maryland did not provide actual case processing time standards, though they did complete a survey, and confirm that standards had been adopted as of 2001.

In 1999 Maryland was in the process of implementing case processing time standards for all major case types in civil, family, criminal, and juvenile courts. In April of 2001, the Judicial Council adopted time standards for all major case types. Standards were developed using the ABA's Standards Relating to Trial Courts, with adjustments made according to Maryland rules and statues.

Rpt.
App. B

Appendix B

## MASSACHUSETTS

---

**TRIAL COURTS**
**IMPLEMENTING AUTHORITY:** Standing Order I-88
**EFFECTIVE DATE:** July 1988; amended 1996 (felony)
**STATUS:** Mandatory

---

**CIVIL**
_____

**REGULAR:**

    **ACCELERATED TRACK (X)**
    (filing to disposition)
       • 100% within 6 months

    **FAST TRACK (F)**
    (filing to disposition)
       • 100% within 14 months

    **AVERAGE TRACK (A)**
    (filing to disposition)
       • 100% within 36 months

**LIMITED:**
(filing to disposition)
    • 100% within 24 months

**CRIMINAL**
_____

    **FELONY:**
    (arraignment to disposition)
       • 100% within 12 months

**JUVENILE**
_____

**ARRAIGNMENT/BAIL DETERMINATION:**
(entering a detention facility by any person under arrest to arraignment/bail determination)
    • 100% within the next court business day

**TRANSFER HEARING PART A:**
(complaint to transfer hearing Part A)
    • 100% within 30 days

**TRANSFER HEARING PART B:**
(Part A to Part B)
    • 100% within 45 days

**NON-JURY CASES:**

    **FOR PERSON IN DETENTION**
    (complaint or transfer hearing Part B to adjudication)
       • 100% within 21 days

    **FOR PERSON NOT IN DETENTION**
    (complaint or transfer hearing Part B to adjudication)
       • 100% within 30 days

**JURY CAES:**
(complaint to adjudication)
    • 100% within 60 days

**CARE AND PROTECTION:**
(petition to adjudication)
    • 100% within 75 days

Appendix B

## MASSACHUSETTS cont.

**PROBATE AND FAMILY**

> **UNCONTESTED:**
> (request for trial to trial)
> - 100% within 1 month
>
> **CONTESTED:**
> (request for trial to trial)
> - 100% within 3 months

---

**APPELLATE COURTS**
none

---

**Notes:**

Reports/summaries with time standards are received by the clerk of court, the presiding chief judge of both trial and appellate courts, the caseflow management/delay reduction unit, the state court administrator, the chief justice, and the regional administration justices.  The reports/summaries are reviewed monthly and semiannually.

The age of civil and criminal data is available in the annual reports.

Rpt.
App. B

Appendix B

## MICHIGAN

---

**TRIAL COURTS**[3]
**IMPLEMENTING AUTHORITY:** Supreme Court Administrative Order
**EFFECTIVE DATE:** June 11, 1991
**STATUS:** Mandatory

---

## CIVIL

**CIRCUIT:**
(filing to conclusion)
- 75% within 12 months
- 95% within 18 months
- 100% within 24 months

**DISTRICT:**
**GENERAL**
(filing to conclusion)
- 90% within 6 months
- 98% within 9 months
- 100% within 12 months

**SUMMARY:**
**NON-JURY TRIAL**
(date of service to conclusion)
- 100% within 35 days

**JURY TRIAL**
(date of service to conclusion)
- 100% within 63 days

## CRIMINAL

**CIRCUIT:**
(date of entry of order binding the defendant over to circuit court to conclusion)
- 90% within 91 days
- 98% within 154 days
- 100% within 10 months

**DISTRICT:**
**FELONY**
(arraignment to conclusion of preliminary examination)
- 100% within 12 days

**MISDEMEANOR**
(first appearance to adjudication or conclusion)
- 90% within 63 days
- 98% within 91 days
- 100% within 126 days

---

[3] On May 20, 2003, the Michigan Supreme Court entered **Order 2003-23**, a proposed administrative order, for comment. The order would change the case processing time standards currently applicable in Michigan trial courts. The comment period expires September 1, 2003.

Appendix B

**MICHIGAN cont.**

**JUVENILE**

**IN-CUSTODY:**
(petitions/complaints to disposition)
- 90% within 84 days
- 100% within 98 days

**NON-CUSTODY:**
(authorization of petition to disposition)
- 75% within 119 days
- 90% within 6 months
- 100% within 7 months

**DOMESTIC**

**DIVORCE WITHOUT CHILDREN:**
(filing to conclusion)
- 90% within 91 days
- 98% within 9 months
- 100% within 12 months

**DIVORCE WITH CHILDREN:**
(filing to conclusion)
- 90% within 8 months
- 98% within 10 months
- 100% within 12 months

**PATERNITY:**
(date of service to conclusion)
- 90% within 3 months
- 98% within 6 months
- 100% within 12 months

**INITIATING INTERSTATE:**
(filing to conclusion)
- 100% within 24 hours

**RESPONDING INTERSTATE:**
(filing to conclusion)
- 90% within 91 days
- 98% within 6 months
- 100% within 12 months

**CHILD CUSTODY:**
(notice of request or hearing to conclusion)
- 100% within 91 days

**PROBATE**

**CONTESTED:**
(joinder of issue to resolution)
- 75% within 6 months
- 90% within 9 months
- 100% within 12 months

**MICHIGAN cont.**

**APPEALS TO THE CIRCUIT COURT**

**APPEALS FROM COURTS OF LIMITED JURISDICTION:**
(filing of claim of appeal to conclusion)
- 100% within 154 days

**APPEALS FROM ADMINISTRATIVE AGENCIES:**
(filing to conclusion)
- 100% within 154 days

**EXTRAORDINARY WRITS:**
(filing to conclusion)
- 98% within 35 days
- 100% within 91 days

**APPELLATE COURTS**
**IMPLEMENTING AUTHORITY:** (UNKNOWN)
**EFFECTIVE DATE:** (UNKNOWN)
**STATUS:** Voluntary

**STANDARDS**

**COURT OF APPEALS:**
(filing to disposition)
- 90% within 18 months[4]

**Notes:**

Reports/summaries with time standards are reviewed regularly and are received by the magistrates, the clerk of court, all judges, the division manager, the local court administrator, the caseflow management/delay reduction unit, the state court administrator, the AOC staff, trial court administrators, administrative personnel, and judicial council.

Case processing time standards reports are generated by local courts and provided on request.

Rpt.
App. B

---

[4] Under the terms of the court's ongoing Delay Reduction Project and if necessary funding is provided, the standard will become *95% within 18 months* for cases filed on or after October 1, 2003. See reports about the **court's special projects**.

Appendix B

## MINNESOTA

---

**TRIAL COURTS**
**IMPLEMENTING AUTHORITY:** Conference of Chief Judges
**EFFECTIVE DATE:** 1985; amended 1992
**STATUS:** Mandatory

---

## CIVIL

**REGULAR:**
(filing to disposition)
- 90% within 12 months
- 97% within 18 months
- 99% within 24 months

## CRIMINAL

**FELONY:**
(first appearance to disposition)
- 90% within 120 days
- 97% within 180 days
- 99% within 1 year

**MISDEMEANORS:**

**GENERAL**
(first appearance to disposition)
- 90% within 120 days
- 97% within 150 days
- 99% within 180 days

**GROSS**
(first appearance to disposition)
- 90% within 4 months
- 97% within 6 months
- 99% within 12 months

## JUVENILE

**GENERAL:**
(filing to disposition)
- 90% within 3 months
- 97% within 5 months
- 99% within 12 months

## DOMESTIC

**DISSOLUTION:**
(filing to disposition)
- 90% within 12 months
- 97% within 18 months
- 99% within 24 months

**SUPPORT:**
(filing to disposition)
- 90% within 6 months
- 97% within 9 months
- 99% within 12 months

Appendix B

## MINNESOTA cont.

**ADOPTION:**
(filing to disposition)
- 90% within 4 months
- 97% within 6 months
- 99% within 12 months

**OTHER FAMILY:**
(filing to disposition)
- 90% within 12 months
- 97% within 18 months
- 99% within 24 months

**ABUSE:**
(filing to disposition)
- 90% within 2 months
- 97% within 3 months
- 99% within 4 months

## PROBATE

**GENERAL:**
(filing to disposition)
- 90% within 18 months
- 97% within 21 months
- 99% within 24 months

---

**APPELLATE COURTS**
**IMPLEMENTING AUTHORITY:** 480A.08 Decision of the Court
**EFFECTIVE DATE:** 2002
**STATUS:** Voluntary

---

## STANDARDS

**COURT OF APPEALS:**
(oral argument or final submission of briefs to decision)
- 100% in 90 days

---

**Notes:**

Although the appellate standards are not formalized, both the Supreme Court and the Court of Appeals track cases for timelines to ensure the guidelines are met.

Reports/summaries with time standards are posted on the court system intranet for view by all court employees.

Reports/summaries are available to the public in form of a print out upon request.

Minnesota finds *% of cases resolved within existing time standards* and *clearance rates* to be the most helpful measures of court timeliness.

There are no statutory time frames set in stone for SPC appeals. However, according to the Minnesota Rules of Court (2002), the time frames are as follows:
--One has 30 days to file a petition
--One has 20 days to respond to this petition
--SPC the has 40 days to consider the petition

Appendix B

Rpt.
App. B

Appendix B

## MISSISSIPPI

**TRIAL COURTS**
**IMPLEMENTING AUTHORITY:** Supreme Court Administrative Order
**EFFECTIVE DATE:** January 1, 2002
**STATUS:** Voluntary

**CIVIL**

**GENERAL:**
(filing to conclusion)
- 100% within 18 months

**CRIMINAL**

**FELONY:**
(arraignment to conclusion)
- 100% within 270 days
**MISDEMEANOR (ORIGINATING IN CIRCUIT OR COUNTY COURT):**
(filing to conclusion)
- 100% within 120 days
**PRELIMINARY HEARING**
(arrest or initial appearance to preliminary hearing)
- 100% within 30 days
**POST-TRIAL MOTIONS**
(arrest or initial appearance to conclusion)
- 100% within 30 days
**SENTENCING**
(verdict or ruling on post-trial motions to sentencing)
- 100% within 90 days

**DOMESTIC**

**UNCONTESTED:**
(filing of complaint to conclusion)
- 100% within 180 days
**CONTESTED:**
(filing of complaint to conclusion)
- 100% within 1 year

**JUVENILE**

**DETENTION/SHELTER HEARINGS:**
(taking into temporary custody to detention/shelter hearing)
- 100% within 48 hours
**ADJUDICATORY HEARING (IF IN DETENTION):**
(first detention hearing to adjudicatory hearing)
- 100% within 21 days
**ADJUDICATORY HEARING (IF IN SHELTER):**
(taking into custody to adjudicatory hearing)
- 100% within 21 days
**ADJUDICATORY HEARING (IF NOT DETAINED, NOT IN SHELTER, NOT IN PROTECTIVE CUSTODY):**
(filing of petition to adjudicatory hearing)
- 100% within 90 days
**DISPOSITION HEARING:**
(adjudicatory hearing to disposition hearing)
- 100% within 14 days

Appendix B

**MISSISSIPPI cont.**

---

**APPELLATE COURTS**
**IMPLEMENTING AUTHORITY:** Statutory
**EFFECTIVE DATE:** January 1, 1995
**STATUS:** Mandatory

---

**STANDARDS**

**COURT OF APPEALS:**
(final briefs filed with court to issuing of a decision)
- 100% within 270 days

**SUPREME COURT (CASES WITHIN ITS JURISDICTION):**
(final briefs filed with court to issuing of a decision)
- 100% within 270 days

**SUPREME COURT (CASES RECEIVED ON CERTIORARI FROM COURT OF APPEALS):**
(final briefs filed with court to issuing of a decision)
- 100% within 180 days

---

**Notes:**

For trial courts, the standards excuse individual cases in which the court determines by written order that exceptional circumstances exist and for which a continuing review should occur.

For felony cases, Mississippi uses the time frame of arraignment to conclusion as a basis for case processing measurement.

For trial and appellate courts, Mississippi finds *case activity by calendar* to be the most useful measure of court timeliness.

Mississippi produces manual reports relevant to time standards. Both the AOC and local entities are authority for the reporting schedule.

Reports with time standards are received by the presiding/chief appellate judge, the state court administrator, the chief justice, and the Supreme Court members. The reports relevant to time standards are reviewed monthly.

Reports with time standards are not published, but are available to the public upon request.

Rpt.
App. B

Appendix B

## MISSOURI

**TRIAL COURTS**
**IMPLEMENTING AUTHORITY:** Court Operating Rule #17
**EFFECTIVE DATE:** 1993; amended January 1, 1997
**STATUS:** Mandatory

**CIVIL**

**CIRCUIT:**
(filing to disposition)
- 50% within 12 months
- 90% within 18 months
- 98% within 24 months

**ASSOCIATE:**
(filing to disposition)
- 50% within 4 months
- 90% within 6 months
- 98% within 12 months

**CRIMINAL**

**CIRCUIT:**
**FELONY**
(indictment to disposition**excluding period of time during which a warrant is outstanding**)
- 50% within 4 months
- 90% within 8 months
- 98% within 12 months

**ASSOCIATE:**
(indictment to disposition**excluding period of time during which a warrant is outstanding**)
- 50% within 3 months
- 90% within 4 months
- 98% within 6 months

**JUVENILE**

**DOMESTIC**

**GENERAL:**
(filing to disposition)
- 50% within 4 months
- 90% within 8 months
- 98% within 12 months

**APPELLATE COURTS**
none

51

Appendix B

**MISSOURI cont.**

**Notes:**

The final standard is set at less than 100 percent because it is recognized that litigation involving extraordinary circumstances may require additional time.

The age of a case at resolution is used to determine compliance with the standards.

The Office of State Courts Administrator provides implementation assistance in the following forms:
1.) the provision of management reports showing the status of cases
2.) the provision of information and training on effective case management
3.) the identification of courts needing additional judicial and non-judicial resources and, as possible, the provision of these courts with the necessary resources.

Court Operating Rule #17 was ordered published in the *Journal of the Missouri Bar* and the *South Western Reporter*.  A copy was provided to all trial judges, as well.

Reports/summaries with time standards are received by all judges, the local court administrator, the state court administrator, and some AOC staff, and are reviewed quarterly and semiannually.

Reports/summaries are published in the annual reports and are also available to the public on the Web site.

Rpt.
App. B

Appendix B

**MONTANA**

| TRIAL COURTS |
|---|
| none |

| APPELLATE COURTS |
|---|
| **IMPLEMENTING AUTHORITY:** Supreme Court Rule<br>**EFFECTIVE DATE:** 1996<br>**STATUS:** Voluntary |

**STANDARDS**

> **GENERAL:**
> (submission date to final opinion)
> - 100% within 180 days

| Notes: |
|---|
| Montana is not in the process of implementing or considering the future development of case processing time standards for its trial courts.<br><br>The appellate standard is a basic aim, and it is realized that complexities of issues and caseload may require additional time.<br><br>The Supreme Court members receive reports/summaries with time standards.  These reports/summaries are reviewed monthly.<br><br>Reports/summaries are not published or available to the public. |

Rpt.
App. B

Appendix B

## NEBRASKA

**TRIAL COURTS**
**IMPLEMENTING AUTHORITY:** Supreme Court Rule
**EFFECTIVE DATE:** 1982; 1997 (juvenile)
**STATUS:** Voluntary

## CIVIL

**DISTRICT:**
    **NON-JURY**
    (filing to judgment)
- 100% within 1 year

    **JURY**
    (filing to judgment)
- 100% within 18 months

**COUNTY:**
(filing to judgment)
100% within 6 months

## CRIMINAL

**DISTRICT:**
(filing to trial)
- 100% within 6 months

**COUNTY:**
    **MISDEMEANORS AND TRAFFIC OFFENSES:**
    **NON-JURY**
    (filing to trial)
- 100% within 60 days

    **JURY**
    (filing to trial)
- 100% within 6 months

## JUVENILE

**PROBABLE CAUSE HEARINGS:**
(detention to probable cause hearing)
- 100% within 48 hours

**ADJUDICATION HEARINGS:**
    **DEPENDENT/NEGLECT**
    (filing to hearing)
- 100% within 180 days

    **LAW VIOLATION**
    (filing to hearing)
- 100% within 180 days

**DISPOSITION HEARINGS:**
(adjudication hearing to disposition hearing)
- 100% within 60 days

## DOMESTIC

**DISTRICT:**
(filing to judgment)
- 100% within 9 months

Appendix B

## NEBRASKA cont.

### PROBATE

**GENERAL:**
(filing to judgment)
- 100% within 1 year

**FEERAL ESTATE TAX REQUIRED**
(filing to final disposition)
- 100% within 18 months

**APPELLATE COURTS**
none

**Notes:**

Nebraska added juvenile case processing time standards in 1997.

Rpt.
App. B

Appendix B

**NEVADA**

| TRIAL COURTS |
|---|
| none |

| APPELLATE COURTS |
|---|
| none |

**Notes:**

The state of Nevada does not have any case processing time standards at this time. They have recently implemented the Uniform System for Judicial Records, which is the reporting and collection of statewide statistics.

The development of case processing time standards will be considered once sufficient data have been obtained through the statewide statistical reporting.

Rpt.
App. B

Appendix B

**NEW HAMPSHIRE**

| TRIAL COURTS |
|---|
| none |

| APPELLATE COURTS |
|---|
| **IMPLEMENTING AUTHORITY:** Supreme Court |
| **EFFECTIVE DATE:** 2001 |
| **STATUS:** Voluntary |

**STANDARDS**

**SCREENING:**
- within 90 days

**FILING OF APPELLANT'S BRIEF**
(record filed to brief filed)
- within 60 days

**FILING OF APPELLEE'S BRIEF**
(appellant brief to appellee brief)
- within 50 days

**ORAL ARGUMENT:**
(appellant's brief to argument)
- within 180 days

**OPINION:**
(submission to opinion)
- within 180 days

**MOTIONS FOR RECONSIDERATION/REHEARING:**
- within 60 days

| Notes: |
|---|
| New Hampshire did not respond to the 1999 survey or to the fall 2002 update request. However, in 2000, an operational review of the court's case processing practices was conducted by the NCSC. In July 2001 the Supreme Court adopted performance standards that included case processing time standards. These standards are used to benchmark the court's performance in appellate procedure. |

Rpt.
App. B

Appendix B

## NEW JERSEY

---

**TRIAL COURTS**
**IMPLEMENTING AUTHORITY:** Judiciary's Judicial Council
**EFFECTIVE DATE:** 1982; amended September 2000
**STATUS:** Mandatory

---

## CIVIL

**GENERAL:**
    **CIVIL TRACK 1**
    (filing to disposition)
        • 100% within 12 months
    **CIVIL TRACK 2**
    (filing to disposition)
        • 100% within 18 months
    **CIVIL TRACK 3**
    (filing to disposition)
        • 100% within 24 months
    **CIVIL TRACK 4**
    (filing to disposition)
        • 100% within 24 months

**SPECIAL:**
    **SMALL CLAIMS AND TENANCY**
    (filing to disposition)
    • 100% within 2 months
    **AUTO NEGLIGANCE, CONTRACT, FORFEITURE, PENALTY ENFORCCEMENT, AND OTHER TORT:**
    (filing to disposition)
    • 100% within 4 months

## CRIMINAL

**PRE-INDICTMENT:**
(complaint to pre-indictment disposition)
    • 100% within 2 months
**POST-INDICTMENT:**
(complaint to post-indictment disposition)
    • 100% within 4 months

## JUVENILE

**DELINQUENCY:**
(filing to disposition)
    • 100% within 3 months

## DOMESTIC

**NEW DISSOLUTION:**
(filing to disposition)
    • 100% within 12 months
**REOPENED DISSOLUTION**
(filing to disposition)
    • 100% within 6 months
**NON DISSOLUTION:**
(filing to disposition)

Appendix B

**NEW JERSEY cont.**

- 100% within 60 days

**DOMESTIC VIOLENCE**
(filing to disposition)

- 100% within 1 month

## PROBATE

**GENERAL:**
(filing to disposition)

- 100% within 12 months

---

**APPELLATE COURTS**
**IMPLEMENTING AUTHORITY:** Judiciary's Judicial Council
**EFFECTIVE DATE:** 1982
**STATUS:** Voluntary

---

## STANDARDS

**MUNICIPLE APPEALS:**
(filing to opinion)

- 100% within 3 months

---

**Notes:**

The judiciary's judicial council consists of the chief justice, all 15 assignment judges, 3 presiding judges, the acting administrative director, and the deputy administrative director.

New Jersey uses *backlog per 100 average monthly filings* as their primary backlog statistic.

Reports/summaries with time standards are received by the clerk of court, both the presiding trial and appellate judges, the division director, the local court administrator, the AOC staff, the state court administrator, the chief justice, the trial court administrator, the administrative personnel, and the judicial council. Reports/summaries are reviewed monthly and are published in court publications and on the Web site.

Rpt.
App. B

Appendix B

## NEW MEXICO

---

**TRIAL COURTS**
**IMPLEMENTING AUTHORITY:** Supreme Court Rule
**EFFECTIVE DATE:** 1990
**STATUS:** Mandatory

---

### STANDARDS

**PRETRIAL SCHEDULING ORDER:**
(filing of complaint to pretrial scheduling order)
- 100% within 120 days

**TRIAL:**
(filing of scheduling order to trial)
- 100% within 18 months

**APPEALS:**
(filing to decision or disposition)
- 100% within 10 months

(date of submission to panel to decision or disposition)
- 100% within 3 months

---

**APPELLATE COURTS**
**IMPLEMENTING AUTHORITY:** Rule and Policy
**EFFECTIVE DATE:** July 1, 1990; amended 1997
**STATUS:** Mandatory

---

### STANDARDS

**WRIT APPLICATIONS:**
(denial of petition to filing with Supreme Court clerk)
- 100% within 30 days

**COURT OF APPEALS:**
(filing to resolution)
- 50% within 180 days
- 75% within 365 days
- 95% within 540 days

**APPELLATE JUDGES:**
- file an opinion in 50% of cases assigned to the judge within 90 days of submission
- file an opinion in 75% of cases assigned to the judge within 150 days of submission
- file an opinion in 95% of cases assigned to the judge within 300 days of submission

---

**Notes:**

New Mexico did not respond to the fall 2002 update request; therefore, this information is current as of 1999.

In the case that a pretrial scheduling order is not filed, the court shall set the case for trial in a timely manner, but no later than 18 months.

The Court of Appeals, and individual judges understand that no single fixed time standard is appropriate for each appeal. This is why the resolution goals only go up to 95 percent. The remaining 5 percent of cases are to be resolved as expeditiously as possible given the complexity of the issue, or any unusual circumstances.

Reports/summaries with time standards are received by the clerk of court, all judges, and both the presiding trial and appellate judges, and are reviewed yearly.

Appendix B

**NEW MEXICO cont.**

**Notes (cont.):**

Case processing time standards reports are available to the public through an open records request.

New Mexico is not included in the 1995 report.

Rpt.
App. B

Appendix B

## NEW YORK

**TRIAL COURTS**
**IMPLEMENTING AUTHORITY:** Supreme Court Order
**EFFECTIVE DATE:** 1975; revised in 1979 and 1996
**STATUS:** Mandatory

## CIVIL

**REGULAR:**
(filing to trial readiness)
- 100% within 8-15 months
(trial readiness certificate to disposition)
- 100% within 15 months
**TOTAL TIME:**
(filing to disposition)
- 100% within 23-30 months

## CRIMINAL

**FELONY:**
(indictment to disposition)
- 100% within 180 days
**MISDEMEANORS:**
(filing of petition to disposition)
- 100% within 90 days

## JUVENILE

**GENERAL:**
(filing of petition to disposition)
- 100% within 6 months

## MATRIMONIAL

**GENERAL:**
(filing with court to trial readiness)
- 100% within 6 months
(trial readiness certificate to disposition)
- 100% within 6 months
**TOTAL TIME:**
(filing to disposition)
- 100% within 12 months

**APPELLATE COURTS**
none

**Notes:**

New York finds the most helpful measurement of court timeliness to be the *% of cases exceeding existing time standards.*

Reports/summaries with time standards are received by the clerk of court, all judges, the division manager, the local court administrator, the caseflow management/delay reduction unit, the state court administrator, the AOC staff, the chief justice, the trial court administrator, and administrative personnel. The reports/summaries are reviewed on a daily basis.

Appendix B

**NEW YORK cont.**

---

**Notes (cont.):**

Case processing time standards reports are published in the annual report and are also available to the public through an open records request.

---

Rpt.
App. B

Appendix B

## NORTH CAROLINA

| TRIAL COURTS |
| --- |
| none |

| APPELLATE COURTS |
| --- |
| none |

| Notes: |
| --- |
| North Carolina did not respond to the 1999 survey or to the fall 2002 update request; therefore, this information is current as of 1995. |

Rpt.
App. B

Appendix B

## NORTH DAKOTA

---

**TRIAL COURTS**
**IMPLEMENTING AUTHORITY:** Supreme Court Rule
**EFFECTIVE DATE:** 1980, amended 1996
**STATUS:** Mandatory

---

## CIVIL
---

**REGULAR:**
(filing to judgment entered)
- 100% within 24 months

**DISTRICT:**

**GENERAL**
(filing to judgment entered)
- 100% within 24 months

**SMALL CLAIMS**
(date of proof of service to judgment entered)
- 100% within 60 days

**ADMINISTRATIVE APPEALS**
(date filing to notice of appeal)
- 100% within 120 days

## CRIMINAL
---

**GENERAL:**
(filing of charging document to judgment)
- 100% within 180 days
(end of trial to judgment)
- 100% within 90 days

**MISDEMEANORS:**
(filing of complaint to judgment)
- 100% within 120 days
(end of trial to judgment)
- 100% within 90 days

## JUVENILE
---

## DOMESTIC
---

**GENERAL:**
(filing to order)
- 100% within 90 days

---

**APPELLATE COURTS**
None: Official caseflow management standards have not been adopted.  However, the ABA guidelines along with court rules provide the appellate courts with caseflow management deadlines.  Regular management reports are provided to the judges.

---

Appendix B

**NORTH DAKOTA cont.**

| |
|---|
| **Notes:** |
| Juvenile Docket Currency standards are currently under consideration by the Supreme Court. |
| Case processing time standards are a topic that is discussed at the Council of Presiding Judges meetings and sessions on caseflow management are conducted as part of regular educational programs.  Caseflow management is discussed with all new judges as part of their orientation. |
| North Dakota finds their *clearance rate* to be the most helpful measure of court timeliness. |
| Reports/summaries with time standards are received by the clerk of court, all judges, the local court administrator, the state court administrator, the AOC staff, the trial court administrator, and administrative personnel.  These reports/summaries are reviewed on a monthly basis. |
| Case processing reports are published in annual reports and in court publications.  They are available to the public through publications and open records requests. |

Rpt.
App. B

Appendix B

## OHIO

---

**TRIAL COURTS**
**IMPLEMENTING AUTHORITY:** Supreme Court Rules of Superintendence
**EFFECTIVE DATE:** September 30, 1971 (Common Pleas); January 1, 1975 (Municipal and County Courts)
**STATUS:** Mandatory

---

### CIVIL

**REGULAR:**
(filing to termination)
- 100% within 9 to 24 months

**LIMITED:**
(filing to termination)
- 100% within 6 to 24 months

**COMPLEX LITIGATION:**
(filing to termination)
- 100% within 36 months

### CRIMINAL

**FELONY:**
(arraignment to termination)
- 100% within 180 days

**MISDEMEANORS:**
(warrant/summons to termination)
- 100% within 6 to 24 months

### JUVENILE

**GENERAL:**
(complaint/summons to disposition)
- 100% within 3 to 12 months

### DOMESTIC

**GENERAL:**
(filing to termination)
- 100% within 1 to 18 months

---

**APPELLATE COURTS**
**IMPLEMENTING AUTHORITY:** Court of Appeals
**EFFECTIVE DATE:** 1971
**STATUS:** Voluntary

---

### STANDARDS

**CRIMINAL APPEALS (common pleas, with death penalty, municipal, and county), CIVIL APPEALS (common pleas, domestic relations and probate/juvenile, municipal, and county), AND COURT OF CLAIMS (10th District only):**
(filing to disposition)
- 100% within 210 days

**ORIGINAL ACTIONS**
(filing to disposition)
- 100% within 180 days

**ADMINISTRATIVE APPEALS**
(filing to disposition)

Appendix B

**OHIO cont.**

- 100% within 200 days

---

**Notes:**

Ohio finds the most helpful measures of court timeliness to be the *% of cases exceeding time standards by classified type,* and *clearance rate.*

Reports/summaries with time standards are received by the magistrates, the clerk of court, all judges, the division manager, the local court administrator, the state court administrator, the caseflow management section, the chief justice, the AOC staff, the trial court administrator, administrative personnel, and the judicial conference. These reports/summaries are reviewed on a monthly basis.

Reports/ summaries are published in the annual reports, in the newspaper, and in court and bar publications. They are also available to the public through an open records request.

---

Rpt.
App. B

Appendix B

## OKLAHOMA

| TRIAL COURTS |
|---|
| none |

| APPELLATE COURTS |
|---|
| none |

| Notes: |
|---|
| Oklahoma did not respond to the 1999 survey or to the fall 2002 update request; therefore, this information is current as of 1995. |

Rpt.
App. B

## OREGON

---

**TRIAL COURTS**
**IMPLEMENTING AUTHORITY:** Judicial Conference Resolution
**EFFECTIVE DATE:** May 1, 1990; amended April 31, 1991; updated 1998
**STATUS:** Voluntary

---

**CIVIL**

> **GENERAL:**
> (filing to conclusion [settled, tried, or otherwise])
> - 90% within 12 months
> - 98% within 18 months
> - 100% within 24 months
>
> **SUMMARY:**
> (filing to conclusion [settled, tried, or otherwise])
> - 100% within 75 days

**CRIMINAL**

**FELONY:**
(arraignment to adjudication or conclusion)
- 90% within 90 days
- 98% within 180 days
- 100% within 1 year

**MISDEMEANORS:**
(arraignment to adjudication or conclusion)
- 90% within 90 days
- 98% within 180 days
- 100% within 1 year

**JUVENILE**

**DETENTIONAL SHELTER HEARINGS:**
(admission to hearing)
- 100% within 24 hours

**ADJUDICATORY OR TRANSFER HEARINGS:**
**CONCERNING A JUNENILE IN DETENTION OR SHELTER FACILITY**
(admission to hearing)
- 100% within 15 days

**CONCERNING A JUVENILE NOT IN DETENTION OR SHELTER FACILITY**
(filing of petition to hearing)
- 100% within 30 days

**DOMESTIC**

**GENERAL:**
(filing to conclusion [settled, tried, or otherwise])
- 90% within 9 months
- 100% within 1 year

---

**APPELLATE COURTS**
None: Although the Oregon Appellate Courts have not formally adopted case processing time standards, the clerk's office has developed internal benchmarks used to monitor case processing performance.

---

Appendix B

**OREGON cont.**

| |
|---|
| **Notes:** |
| Oregon did not respond to the fall 2002 update request; therefore, this information is current as of 1999. |
| Oregon finds the most helpful measure of court timeliness to be *% of cases resolved within existing time standards*. |
| Reports/summaries with time standards are received by the clerk of court, all judges, the division manager, the local court administrator, the state court administrator, the caseflow management/delay reduction unit, the chief justice, and the trial court administrator.  These reports/summaries are reviewed on a semiannual basis. |
| The reports/summaries are available to the public through an open records request, and within the next year they should also be available on the Web site. |
| The case processing time standards changed in 1998 to reflect the merger of circuit and district courts. |
| The standards were re-approved by the Executive Committee of the Judicial Conference on March 3, 1999. |

Rpt.
App. B

Appendix B

**PENNSYLVANIA**

| TRIAL COURTS |
| --- |
| none |

| APPELLATE COURTS |
| --- |
| none |

| Notes: |
| --- |
| Pennsylvania did not respond to the 1999 survey. However, they did respond to the fall 2002 update request, answering that, though they do follow speedy trial statutes, they have not officially adopted case processing time standards. |
| Case processing time standards were being developed by an ad hoc committee of president judges and trial court administrators in 1999. |

Rpt.
App. B

Appendix B

## RHODE ISLAND

> **TRIAL COURTS**
> **IMPLEMENTING AUTHORITY:** Voluntary Boards Committee of the Supreme Court and Chief Judges of the Trial Courts
> **EFFECTIVE DATE:** 1977
> **STATUS:** Voluntary

## CIVIL

**REGULAR:**
(motion to assign to trial)
- 100% within 18 months

## CRIMINAL

**FELONY:**
(arraignment to disposition)
- 100% within 180 days

**MISDEMEANORS:**
**DISTRICT**
(arraignment to disposition)
- 100% within 60 days
**TRAFFIC**
(arraignment to disposition)
- 100% within 60 days

## JUVENILE

**WAYWARD/DELINQUENT AND CHILD PROTECTION:**
(filing to disposition)
- 100% within 180 days

## DOMESTIC

**CONTESTED:**
(assignment to calendar to disposition)
- 100% within 1 year

> **APPELLATE COURTS**
> **IMPLEMENTING AUTHORITY:** Voluntary Boards Committee of the Supreme Court and Chief Judges of the Trial Courts
> **EFFECTIVE DATE:** 1977
> **STATUS:** Voluntary

**STANDARDS**

**GENERAL:**
(docketing to disposition)
- 100% within 300 days

Appendix B

**RHODE ISLAND cont.**

---

**Notes:**

Rhode Island uses *% of cases resolved within existing time standards* to help measure court timeliness.

Reports/summaries with time standards are received by the magistrates, the clerk of court, all judges, the state court administrator, the caseflow management/delay reduction unit, the AOC staff, the chief justice, the Supreme Court members, the administrative personnel, and the trial court administrator. These reports/summaries are reviewed on a quarterly basis.

Reports/summaries are published in court publications.

---

Rpt.
App. B

Appendix B

## SOUTH CAROLINA

> **TRIAL COURTS**
> **IMPLEMENTING AUTHORITY:** Supreme Court Order
> **EFFECTIVE DATE:** August 17, 1983; revised June 5, 1992
> **STATUS:** Voluntary

### CIVIL

**REGULAR:**
(filing to final disposition)
- 100% within 365 days

**LIMITED:**
(filing to final disposition)
- 100% within 90 days

### CRIMINAL

**GENERAL:**
(arrest to final disposition)
- 100% within 180 days

**SUMMARY:**
(arrest to final disposition)
- 100% within 60 days

### JUVENILE

**GENERAL:**
(filing to final disposition)
- 100% within 270 days

### DOMESTIC

**GENERAL:**
(filing to final disposition)
- 100% within 270 days

> **APPELLATE COURTS**
> None: Although neither the Supreme Court nor the Court of Appeals have established standards for appellate case processing times, they do prepare statistical reports, which compare the number of filed appeals, motions, petitions, and other matters with the number of decided appeals, motions, petitions, and other matters.

> **Notes:**
>
> General sessions for criminal courts may hear felonies and certain misdemeanors.  Summary courts, including Municipal and Magistrate's, may hear traffic offenses and misdemeanors with penalties not to exceed 30 days incarceration and/or $500 fine.
>
> Statistical information related to time standards is available to the public through annual reports and by request. Reports will be available to the public via the Judicial Department's Web site in the near future.
>
> South Carolina uses *% listing of cases exceeding time standards classified by court location* to measure court timeliness.

## SOUTH DAKOTA

Appendix B

---

**TRIAL COURTS**
none

---

**APPELLATE COURTS**
none

---

**Notes:**

South Dakota did not respond to the fall 2002 update request; therefore, this information is current as of 1999.

South Dakota does not currently have any case processing time standards.  They are implementing time standards for criminal cases, and are considering the development of time standards for civil cases.

Rpt.
App. B

Appendix B

**TENNESSEE**

| TRIAL COURTS |
|---|
| none |

| APPELLATE COURTS |
|---|
| none |

| Notes: |
|---|
| Tennessee courts do not have formal case processing time standards, with the exception of statutes that require hearings to be held or dispositions to be made for specific case types.  In addition, other statutes require certain cases, such as capital cases in the appellate courts, to be given priority, but no specific time standards are set.  The appellate courts have unpublished internal rules that require opinion drafts to be circulated within a certain time frame.  Judges are to self-report noncompliance with statutes creating time lines for cases involving post-conviction petitions in criminal cases.  The AOC then compiles the records of noncompliance into an annual report to the general assembly. |

<div align="right">

Rpt.

App. B

</div>

Appendix B

## TEXAS

| TRIAL COURTS |
|---|
| **IMPLEMENTING AUTHORITY:** Supreme Court Order |
| **EFFECTIVE DATE:** 1984; readopted 1987 |
| **STATUS:** Voluntary |

## CIVIL

**REGULAR:**

    **NON JURY**
    (appearance to trial)
- 100% within 12 months

    **JURY**
    (appearance to trial)
- 100% within 18 months

## CRIMINAL

**FELONY:**
(complaint to announcement of reading by state)
- 100% within 120 days

**MISDEMEANORS:**

    **CLASS A**
    (complaint to announcement of reading by state)
- 100% within 90 days

    **CLASS B AND C**
    (complaint to announcement of reading by state)
- 100% within 60 days

## JUVENILE

**DETENTION HEARING:**
(admission to hearing)
- 100% within the next business day

**ADJUDICATORY OR TRANSFER HEARINGS:**

    **CONCERNING A JUVENILE IN DETENTION FACILITY**
    (admission to hearing)
- 100% within 10 days

    **CONCERNING A JUVENILE NOT IN DETENTION OR SHELTER FACILITY**
    (filing of petition to hearing)
- 100% within 30 days

**DISPOSITIONAL HEARING:**
(adjudicatory hearing to dispositional hearing)
- 100% within 15 days

## DOMESTIC

**UNCONTESTED:**
(appearance date to trial)
- 100% within 3 months

**CONTESTED:**
(appearance date to trial)
- 100% within 6 months

Appendix B

**TEXAS cont.**

| APPELLATE COURTS |
| --- |
| none |

| **Notes:** |
| --- |
| Texas did not respond to the 1999 survey or to the fall 2002 update request; therefore, this information is current as of 1995. |

Rpt.
App. B

Appendix B

**UTAH**

| TRIAL COURTS |
|---|
| none |

| APPELLATE COURTS |
|---|
| none |

| Notes: |
|---|
| Although the Utah State Courts have not formally adopted a specific set of time standards, their 1999 survey response stressed that they have gone to great lengths to reduce delays and to develop timeliness and responsiveness as core values among judiciary and staff.

The Utah State Courts (all eight districts) conduct annual case management/delay reduction workshops that focus on improving case processing times.

The AOC has developed a statewide court data system through which judges may see how long their cases are taking to process in relation to the district or statewide average.  The data system may be used by trial court executives and presiding judges to compare workloads between different judges and make adjustments accordingly.

The data warehouse helps the AOC to follow caseload trends.  Generally, the AOC uses the time frame of filing to disposition to produce statistics. |

Rpt.
App. B

Appendix B

## VERMONT

> **TRIAL COURTS**
> **IMPLEMENTING AUTHORITY:** Trial Judges; Supreme Court
> **EFFECTIVE DATE:** 1981
> **STATUS:** Mandatory

## CIVIL

**REGULAR:**
(filing to disposition)
- 80% within 1 year

**LIMITED:**
(filing to disposition)
- 80% within 6 months

## CRIMINAL

**FELONY:**
(filing to disposition)
- 80% within 90 days

**MISDEMEANORS:**
(filing to disposition)
- 80% within 60 days

## JUVENILE

## DOMESTIC

**UNCONTESTED:**
(filing to disposition)
- 80% within 6 months

**CONTESTED:**
(filing to disposition)
- 80% within 1 year

> **APPELLATE COURTS**
> none

> **Notes:**
>
> Although the above time standards remain correct, Vermont does not consider them realistic or appropriate. Vermont plans to modify its time standards for divorce and juvenile matters this year, and for criminal matters next year.
>
> Vermont finds *% listing of cases exceeding time standards classified by court location* to be the most helpful measure of court timeliness.
>
> Reports/summaries with time standards are received by the magistrates, the clerk of court, all judges, the division manager, the local court administrator, the state court administrator, the AOC staff, the chief justice, the Supreme Court members, and the trial court administrator.  The reports/summaries are reviewed monthly, quarterly, and yearly.

Appendix B

**VERMONT cont.**

| Notes (cont.): |
|---|
| Reports/summaries are available to the public through annual reports, the Web site, and bar publications. |

Rpt.
App. B

Appendix B

## VIRGINIA

---

**TRIAL COURTS**
**IMPLEMENTING AUTHORITY:** Judicial Council of Virginia
**EFFECTIVE DATE:** July 1, 1991; 1994 (General District Court)
**STATUS:** Voluntary

---

## CIVIL

**REGULAR:**
(filing to conclusion)
- 90% within 12 months
- 98% within 18 months
- 100% within 24 months

**LIMITED:**

**UNCONTESTED**
(filing to disposition)
- 95% within 60 days
- 100% within 120 days

**CONTESTED**
(filing to disposition)
- 90% within 90 days
- 100% within 180 days

## CRIMINAL

**FELONY:**
(arrest to conclusion)
- 90% within 120 days
- 98% within 180 days
- 100% within 1 year

**PRELIMINARY HEARINGS**
(arrest to conclusion)
- 100% within 45 days

**TRAFFIC AND MISDEMEANORS:**
(arrest or citation to conclusion)
- 90% within 60 days
- 100% within 90 days

## JUVENILE

---

**APPELLATE COURTS**
**IMPLEMENTING AUTHORITY:** Court of Appeals
**EFFECTIVE DATE:** 1989
**STATUS:** Voluntary

---

## STANDARDS

**MUNICIPAL APPEALS:**
(filing to opinion)
- 100% within 3 months

**COURT OF APPEALS:**
(filing of notice of appeal to conclusion)
- 100% within 280 days

Appendix B

**VIRGINIA  cont.**

**SUPREME COURT:**
(filing of notice of appeal to disposal)
- 100% within 12 months

---

**Notes:**

Virginia is considering the development of case processing time standards for juvenile courts.

The time standards are viewed as voluntary guidelines or goals, not as mandatory "standards."

The magistrates, clerk of court, all judges, the AOC staff, the chief judge, and the Supreme Court members receive reports/summaries with time standards through the *Annual State of the Judiciary Report.*  These reports/summaries are reviewed yearly.

Case processing time standards reports are available to the public through the annual report.

Rpt.
App. B

Appendix B

## WASHINGTON

---

**TRIAL COURTS**
**IMPLEMENTING AUTHORITY:** Board for Judicial Administration and Court Management Council
**EFFECTIVE DATE:** May 1992; revised 1997
**STATUS:** Voluntary

---

## CIVIL
**REGULAR:**
(filing to resolution)
- 90% within 12 months
- 98% within 18 months
- 100% within 24 months

**LIMITED:**
(filing to resolution)
- 90% within 3 months
- 98% within 6 months
- 100% within 9 months

**SMALL CLAIMS:**
(filing to resolution)
- 90% within 45 days
- 98% within 2 months
- 100% within 4 months

## CRIMINAL
**FELONY:**
(filing to resolution)
- 90% within 4 months
- 98% within 6 months
- 100% within 9 months

**MISDEMEANORS:**
(filing to resolution)
- 90% within 3 months
- 98% within 6 months
- 100% within 9 months

## JUVENILE
none

## DOMESTIC
**GENERAL:**
(filing to resolution)
- 90% within 8 months
- 98% within 10 months
- 100% within 14 months

## PROBATE
**GENERAL:**
(filing to resolution)
- 90% within 10 months
- 98% within 14 months
- 100% within 18 months

Appendix B

**WASHINGTON cont.**

| APPELLATE COURTS |
| --- |
| none |

| Notes: |
| --- |
| Washington has not adopted appellate time standards.  However, standards are measured at the appellate level. |
| Monthly reports and on-demand reports are available for generation by clerks and administration in superior courts, as well as by the AOC staff.  Calendar year reports are published. |
| Voluntary trial court standards are available in the court rules book. |
| Case processing time standards reports are available to the public through the annual report and court publications. |
| The trial court standards, though advisory, are measured and published for all superior and general jurisdiction courts. |

Rpt.
App. B

Appendix B

# WEST VIRGINIA

**TRIAL COURTS**
**IMPLEMENTING AUTHORITY:** Administrative Order of the Supreme Courts
**EFFECTIVE DATE:** January 1986
**STATUS:** Mandatory

## CIVIL

**REGULAR:**

**NON-JURY**
(filing to disposition)
- 100% within 12 months

**JURY**
(filing to disposition)
- 100% within 18 months

## CRIMINAL

**FELONY:**
(arrest to trial)
- 100% within 180 days

**MISDEMEANORS:**
(arrest to trial)
- 100% within 90 days

## JUVENILE

**GENERAL:**
(petition to dispositional hearing)
- 100% within 45 days

**ADJUDICATORY HEARING:**
(detention to hearing)
- 100% within 30 days

## DOMESTIC

**UNCONTESTED:**
(filing to disposition)
- 100% within 3 months

**CONTESTED:**
(filing to disposition)
- 100% within 6 months

**APPELLATE COURTS**
none

**Notes:**

West Virginia did not respond to the 1995 update, to the 1999 survey, or to the fall 2002 update request. Therefore, this information is current as of 1992.

Rpt.
App. B

Appendix B

## WISCONSIN

---
**TRIAL COURTS**
**IMPLEMENTING AUTHORITY:** Committee of Chief Judges and District Court Administrators
**EFFECTIVE DATE:** 1985
**STATUS:** Voluntary
---

## CIVIL

**REGULAR:**
    **GENERAL**
    (filing to disposition)
        • 100% within 12 months
    **PERSONAL INJURY**
    (filing to disposition)
        • 100% within 18 months
**LIMITED:**
(filing to disposition)
    • 100% within 3 months

## CRIMINAL

**FELONY:**
(first appearance to adjudication)
    • 100% within 180 days

**MISDEMEANORS:**
    **IN CUSTODY**
    (first appearance to adjudication)
        • 100% within 2 months
    **NOT IN CUSTODY**
    (first appearance to adjudication)
        • 100% within 3 months
    **TRAFFIC**
    (first appearance to adjudication)
        • 100% within 4 months
    **FORFEITURES**
    (first appearance to adjudication)
        • 100% within 4 months

## JUVENILE

## DOMESTIC

**DIVORCE:**
(filing to disposition)
    • 100% within 12 months
**OTHER FAMILY:**
(filing to disposition)
    • 100% within 6 months

---
**APPELLATE COURTS**
none
---

Appendix B

**WISCONSIN cont.**

---

**Notes:**

The clerk of court, the presiding trial judge, the state court administrator, the AOC staff, and the trial court administrator receive reports/summaries with time standards.  These reports/standards are reviewed monthly.  Case processing time standards reports are available to the public through the annual report and on the Web site.

Wisconsin finds the most helpful measure of court timeliness to be the *median time to disposition*.

---

Rpt.
App. B

Appendix B

## WYOMING

**TRIAL COURTS**
**IMPLEMENTING AUTHORITY:** Wyoming Judicial Conference (felony); Wyoming Supreme Court (misdemeanors)
**EFFECTIVE DATE:** 1984 (felony); 1986 (misdemeanors)
**STATUS:** Mandatory

### CIVIL

### CRIMINAL

**DISTRICT:**
**FELONY**
(filing of information or indictment to trial)
- 100% within 120 days

**COUNTY:**
**MISDEMEANORS**
(filing of information or indictment to trial)
- 100% within 120 days

### JUVENILE

**APPELLATE COURTS**
none

**Notes:**

Wyoming did not respond to the 1999 survey or to the fall 2002 update request; therefore, this information is current as of 1995.

Rpt.
App. B

Appendix B

# DISTRICT OF COLUMBIA

**TRIAL COURTS**
**IMPLEMENTING AUTHORITY:** Published by Chief Judge
**EFFECTIVE DATE:** 1991
**STATUS:** Voluntary (civil); Mandatory (criminal and domestic)

## CIVIL

**GENERAL**
(filing to disposition)
- 90% within 1 year
- 98% within 18 months
- 100% within 24 months

**LANDLORD/TENANT**
(jury demand to trial)
- 100% within 90 days

**SMALL CLAIMS**
(jury demand to trial)
- 100% within 90 days

## CRIMINAL

**FELONIES AND MISDEMEANORS:**
none

**PREVENTIVE DETENTION CASES:**
(filing to trial)
- 100% within 180 days

## JUVENILE

## DOMESTIC

**ABUSE AND NEGLECT:**
(removal from home to adjudication)
- 100% within 105 days

**PERMANANCY HEARING:**
(removal from home to hearing)
- 100% within 12-14 months

**PATERNITY AND SUPPORT:**
(filing to hearing)
- 100% within 45 days

**APPELLATE COURTS**
none

**Notes:**

Reports/summaries with time standards are received by the presiding/chief judges, the division director/managers, and the executive officer. The reports/summaries are reviewed monthly.

The case processing time standards reports are neither published nor available to the public. The District finds *% of cases resolved within existing time standards* to be the most helpful measure of court timeliness.

Rpt.
App. B

# APPENDIX C: COSCA and ABA Case Processing Time Standards

## COSCA NATIONAL TIME STANDARDS FOR CASE PROCESSING*

Rpt.

**TRIAL COURTS**
**ADOPTED:** July 27, 1983

## CIVIL

**NON-JURY TRIAL:**
(date of filing or service of complaint to trial, settlement, or disposition)
- 100% within 12 months

**JURY TRIAL:**
(date of filing or service of complaint to trial, settlement, or disposition)
- 100% within 18 months

## CRIMINAL

**FELONY:**
(arrest to trial)
- 100% within 180 days

**MISDEMEANOR:**
(arrest to trial)
- 100% within 90 days

## JUVENILE

**DETENTION AND SHELTER HEARINGS:**
(admission to hearings)
- 100% within 24 hours

**ADJUDICATORY OR TRANSFER HEARINGS:**
**CONCERNING A JUVENILE IN A DETENTION OR SHELTER FACILITY**
(admission to hearing)
- 100% within 15 days

**CONCERNING A JUVENILE NOT IN A DETENTION OR SHELTER FACILITY**
(admission to hearing)
- 100% within 30 days

## DOMESTIC

**UNCONTESTED:**
(date of filing to trial, settlement, or disposition)
- 100% within 3 months

**CONTESTED:**
(date of filing to trial, settlement, or disposition)
- 100% within 6 months

**Notes:**

*These standards were to apply in all cases, except for individual cases in which the court determined exceptional circumstances exist.  COSCA no longer advocates these particular standards.

Rpt.
App. C

Appendix C

## ABA STANDARDS RELATING TO TRIAL COURTS

Rpt.
App. C

| **TRIAL COURTS**<br>**ADOPTED:** 1992 |
| --- |

## CIVIL

**GENERAL:**
(filing to trial, settlement, or conclusion)
- 90% within 12 months
- 98% within 18 months
- 100% within 24 months

**SUMMARY:**
(filing to conclusion)
- 100% within 30 days

## CRIMINAL

**FELONY:**
(arrest to adjudication or conclusion)
- 90% within 120 days
- 98% within 180 days
- 100% within 1 year

**SENTENCING**
(rendering of the court's decision to filing with the court)
- 90% within 14 days
- 98% within 21 days
- 100% within 28 days

**MISDEMEANOR:**
(arrest or citation to adjudication or conclusion)
- 90% within 30 days
- 100% within 90 days

**PERSONS IN PRETRIAL CUSTODY:**
(arrest to determination of custodial status or bail set)
- 100% within 24 hours

**JUDGMENT ENTRY (ALSO PERTAINS TO DOMESTIC CASES):**
(rendering of court's decision to filing with court)
- 90% within 14 days
- 98% within 21 days
- 100% within 28 days

**(CONT.)**

Appendix C

**ABA cont.**

## JUVENILE

**DETENTION AND SHELTER HEARINGS:**
(admission to hearings)
- 100% within 24 hours

**ADJUDICATORY OR TRANSFER HEARINGS:**
    **CONCERNING A JUVENILE IN A DETENTION OR SHELTER FACILITY**
    (admission to hearing)
- 100% within 15 days

    **CONCERNING A JUVENILE NOT IN A DETENTION OR SHELTER FACILITY**
    (admission to hearing)
- 100% within 30 days

**DISPOSITIONAL HEARINGS:**
(adjudicatory hearing to dispositional hearing)
- 100% within 15 days

## DOMESTIC

**GENERAL:**
(case filing to trial, settlement, or conclusion)
- 90% within 3 months
- 98% within 6 months
- 100% within 1 year

---

**Notes:**

These standards are to apply in all cases, except for individual cases in which the court determines exceptional circumstances exist.

Rpt.
App. C

# APPENDIX D:
# The Monitoring of Case Processing Time Standards

Rpt.

**Alabama** documents court performance relevant to time standards by producing computer-generated reports with information compiled at both local and statewide levels. The time standards themselves are public information; however, only the individual judge, his/her presiding judge, the chief justice, and the state court administrator receive performance information in the form of case management reports/summaries providing caseload statistics. The reports/summaries are reviewed monthly and semiannually. Alabama considers the most useful measure of court timeliness to be *% of cases resolved within a specified number of days or months* (trial courts) and *percentage of cases resolved within existing time standards* (appellate courts). Time standards apply to all cases; however, no punitive action is taken against a judge if the standards are exceeded.

**Alaska** documents court performance relevant to time standards by producing computer-generated reports with information compiled at both local and statewide levels. Reports/summaries are received by the magistrates, the clerk of court, all judges, the presiding/chief judge, the local court administrator, the state court administrator, the AOC staff, the chief justice, the Supreme Court members, and the trial court administrator. These reports/summaries are reviewed quarterly. Case processing time standards reports are published in court publications, and are available to the public through annual reports and open records requests. Alaska finds the most useful measure of court timeliness to be *% of cases exceeding existing time standards classified by court location*.

**Arizona** does not currently have, but is working on the development of, procedures to document court performance relevant to time standards and goals.

**Arkansas** documents court performance relevant to time standards by producing manual reports. Reports/summaries are received by the state court administrator, the AOC staff, the chief justice, and the Supreme Court members and are reviewed quarterly. Reports are available to the public through open records requests. Judges of criminal, civil, domestic relations, probate and juvenile courts are directed to submit reports of cases that have been under advisement for more than 90 days to the Administrative Office at the end of each calendar quarter. If the AOC determines that the parties or their counsel did not cause the delay, it recommends to the Supreme Court that a judge be assigned to dispose of the delayed case. Noncompliance with the order constitutes grounds for discipline. Justices and judges of the Supreme Court and Court of Appeals are directed to submit reports of cases in which an opinion has not been issued within 60 days to the chief justice of the Supreme Court. The report will be reviewed and reassigned or appropriate actions will be taken to dispose of the case. Willful noncompliance will constitute grounds for discipline.

Rpt.
App. D

Rpt.
App. D

**California** documents court performance relevant to time standards by producing both manual and computer-generated reports with information compiled on a statewide level. Case processing time standards reports are available to the public through annual reports, the Web site, and court publications. Reports/summaries containing time standards are reviewed yearly, and are received by the magistrates, clerk of court, all judges, the state court administrator, the AOC staff, the chief judge, and the Supreme Court members.

**Colorado** documents court performance relevant to time standards on a statewide level. Reports are available to the public through open records requests, and are published in the annual reports. The clerk of court, the presiding/chief judge, the local court administrator, the state court administrator, and the AOC staff receive reports/summaries with time standards. These reports/summaries are reviewed both monthly and quarterly. The measure that Colorado finds to be most useful in determining court timeliness is *% of cases exceeding existing time standards*.

**Connecticut** documents court performance relevant to time standards by producing computer-generated reports with information compiled at both local and statewide levels. Reports/summaries are received by the clerk of court, the presiding/chief judge, the division manager, the caseflow management/delay reduction unit, the chief court administrator, the chief justice, and administrative personnel and are reviewed monthly and semiannually. Reports/summaries with time standards are available to the public through open records requests, and are published in the annual report and in court publications. For civil trial courts, Connecticut finds the most helpful measure of court timeliness to be *age of pending caseload*. For criminal courts, the most helpful measure is *% of cases exceeding time standards classified by court location*.

**Delaware** documents court performance relevant to time standards by producing both computed and manually generated reports with information compiled at local and statewide levels. Reports/summaries with standards are received by the presiding/chief trial and appellate judges, the local court administrator, the state court administrator, the AOC staff, the chief justice, and the Supreme Court members. Reports/summaries with time standards are reviewed monthly and are made available to the public through open records requests. Delaware finds *median time to disposition (number of days from filing to disposition)* to be the most helpful measure of court timeliness.

Rpt.
App. D

Rpt.
App. D

**Florida** documents court performance relevant to time standards by producing statewide reports that are received by the presiding/chief trial and appellate judges, AOC staff, the chief justice, Supreme Court members, the trial court administrator, and the judicial council.  Both an appellate and trial committee on performance and accountability document court performance relevant to time standards.  Time standards are available to the public by contacting the OSCA staff.

**Georgia** district court administrators typically monitor case processing time for judges within their districts as requested.  When asked, the district court administrators produce an informational report to general jurisdiction courts based on the informal use of the ABA *Standards of Timely Disposition* (ABA Standards 1992).  The district court administrators use the ABA standards as the basis of comparison for case processing times in the particular court.

**Hawaii** documents court performance relevant to time standards by producing both manual and computer-generated reports with information compiled at statewide levels.  Reports/summaries with time standards are received by the clerk of court, all judges, the division manager, the local court administrator, the state court administrator, the AOC staff, the chief justice, the Supreme Court members, and the trial court administrator and are reviewed quarterly, semiannually, and yearly.  Time standards reports are available to the public through the *Annual Statistical Report* and the *Annual Variance Report*.  Hawaii finds the *median time from filing to termination* to be the most helpful measurement of court timeliness.

**Idaho** documents court performance relevant to time standards by producing computer-generated reports with information compiled at both local and statewide levels.  Reports/summaries with time standards are received by the magistrates, all judges, the state court administrator, the AOC staff, the chief justice, and the trial court administrator and are reviewed monthly and yearly.  Case processing time standards reports are available to the public through open records requests.  It was ordered in 1997 that the time standards be communicated to judges and lawyers in order to enlist their support in achieving the time goals established.

The **Iowa** Judicial Branch implemented a new court management information system in 2002.  This system monitors the number of days from petition to disposition. The computer-generated reports will allow the Judicial Branch for the first time to measure trial court compliance with the case processing time standards.

Rpt.
App. D

Rpt.
App. D

**Kansas** documents court performance relevant to time standards by producing both computer-generated and manual reports compiled at a statewide level. Reports/summaries with time standards are received by the clerk of court, both the presiding/chief trial and appellate judges, the state court administrator, the chief justice, Supreme Court members, and the trial court administrator and are reviewed quarterly. Case processing time standards reports are available to the public through annual reports and court publications.

**Louisiana** monitors and reports time standards relative to the Supreme Court and the five Courts of Appeal. Reports/summaries with time standards are available in the general annual report and the report on judicial performance.

**Massachusetts** documents court performance relevant to time standards by producing computer-generated and manual reports with information compiled at both local and statewide levels. Reports/summaries with time standards are received by the clerk of court, the presiding/chief judge of both trial and appellate courts, the caseflow management/delay reduction unit, the state court administrator, the chief justice, and the regional administration justices. The reports/summaries are reviewed monthly and semiannually. The age of civil and criminal data is available in the annual report.

**Michigan** documents court performance relevant to time standards by producing computer-generated and manual reports with information compiled at local levels. Reports/summaries with time standards are reviewed regularly and are received by the magistrates, the clerk of court, all judges, the division manager, the local court administrator, the caseflow management/delay reduction unit, the state court administrator, the AOC staff, trial court administrators, administrative personnel, and the judicial council. Michigan is currently updating and implementing case age reporting procedures.

**Minnesota** documents court performance relevant to criminal time standards by producing computer-generated reports with information compiled at both local and statewide levels. Reports/summaries with time standards are posted on the court system intranet for viewing by all court employees. Reports/summaries are available to the public in the form of a print out upon request. Minnesota finds *% of cases resolved within existing time standards* and *clearance rates* to be the most helpful measures of court timeliness.

Rpt.
App. D

**Mississippi** produces manual reports relevant to time standards. Both the AOC and local entities are authorities for the reporting schedule. Reports with time standards are received by the presiding/chief appellate judge, the state court administrator, the chief justice, and the Supreme Court members. The reports relevant to time standards

are reviewed monthly. Reports with time standards are not published, but are available to the public upon request. For trial and appellate courts, Mississippi finds *case activity by calendar* to be the most useful measure of court timeliness. At the trial level, improvements in case processing credited to case processing reports are too early to articulate, having just started in 2001. However, at the appellate level, reports relevant to time standards have been useful in performing self-assessments, identifying problem judges, and recommending possible solutions.

<div align="right">Rpt.<br>App. D</div>

**Missouri** documents court performance relevant to time standards by producing computer-generated reports with information compiled at both local and statewide levels. Reports/summaries with time standards are received by all judges, the local court administrator, the state court administrator, and some AOC staff and are reviewed quarterly and semiannually. Reports/summaries are published in the annual reports and are also available to the public on the Web site. The implementing Court Operating Rule #17 was ordered published in the *Journal of the Missouri Bar* and the *South Western Reporter*. A copy of the rule was also provided to all trial judges. The age of a case at resolution is used to determine compliance with the standards. The Office of State Courts Administrator provides implementation assistance in the following forms:

> 1.) the provision of management reports showing the status of cases
> 2.) the provision of information and training on effective case management
> 3.) the identification of courts needing additional judicial and non-judicial resources and, as possible, the provision of these courts with the necessary resources

In March of 1995 the Case Management Committee was appointed by the Supreme Court to monitor the efficacy of Court Operating Rule #17. In July of 2000 this committee worked with David Steelman from the National Center for State Courts to develop the Missouri CTE (Caseflow Timeliness and Efficiency) Index, the criteria used to identify circuits that appear to be in the greatest need of assistance in improving their case processing time standards.

**Montana** does not publish or make available to the public reports/summaries with time standards. The Supreme Court members receive reports/summaries with appellate time standards. These reports/summaries are reviewed monthly.

**Nebraska** documents court performance relevant to time standards by producing local computer-generated and manual reports with information compiled at statewide levels. Reports/summaries with time standards are received by magistrates, clerks of court, all judges, the state court administrator, AOC staff, and Supreme Court members. Nebraska anticipates dropping the manual reports shortly as computer-generated reporting will soon be in place, and fully applicable.

<div align="right">Rpt.<br>App. D</div>

Appendix D

Rpt.
App. D

**Nevada** does not have any case processing time standards at this time. They have recently implemented the Uniform System for Judicial Records, which is the reporting and collection of statewide statistics. The development of case processing time standards will be considered once sufficient data have been obtained through the statewide statistical reporting.

**New Jersey** documents court performance relevant to time standards by producing computer-generated reports with information compiled at statewide levels. Reports/summaries with time standards are received by the clerk of court, both the presiding trial and appellate judges, the division director, the local court administrator, the AOC staff, the state court administrator, the chief justice, the trial court administrator, administrative personnel, and the judicial council. Reports/summaries are reviewed monthly and are published in court publications and on the Web site. New Jersey uses *backlog per 100 average monthly filings* as their primary backlog statistic. (New Jersey defines *backlog* cases as those that are older than the time goals; those younger than time goals are considered to be in inventory.) This statistic allows the court to look at backlog while controlling volume. While *backlog per 100 average monthly filings* has become the primary measure of court timeliness, New Jersey still reports on other traditional measures, including *number of cases in backlog, percent change in backlog*, and *percent of cases in backlog*.

**New Mexico** documents court performance relevant to time standards by producing computer-generated and manual reports with information on the *median time for resolution*, and the *% of cases resolved*. Reports/summaries with time standards are received by the clerk of court and all judges, and are reviewed yearly. Case processing time standards reports are available to the public through an open records request.

**New York** documents court performance relevant to time standards by producing manual and computer-generated reports with information compiled at both local and statewide levels. Reports/summaries with time standards are received by the clerk of court, all judges, the division manager, the local court administrator, the caseflow management/delay reduction unit, the state court administrator, the AOC staff, the chief justice, the trial court administrator, and administrative personnel. The reports/summaries are reviewed on a daily basis. Case processing time standards reports are published in the annual report and are also available to the public through an open records request. New York finds the most helpful measurement of court timeliness to be the *% of cases exceeding existing time standards*.

Rpt.
App. D

Rpt.
App. D

**North Dakota** makes reports with time standards available to the clerk of court, all judges, administrative personnel, the state court administrator, and the AOC staff.. These reports/summaries are reviewed on a monthly basis. Case processing reports are published in annual reports and in court publications. They are available to the public through publications and open records requests. North Dakota finds their *clearance rate* to be the most helpful measure of court timeliness.

**Ohio** documents court performance relevant to time standards by producing manual and computer-generated reports with information compiled at both local and statewide levels. Reports/summaries with time standards are received by the magistrates, the clerk of court, all judges, the division manager, the local court administrator, the state court administrator, the caseflow management section, the chief justice, the AOC staff, the trial court administrator, administrative personnel, and the judicial conference. These reports/summaries are reviewed on a monthly basis. Reports/summaries are published in the annual reports, the newspaper, and in court and bar publications. They are also available to the public through an open records request. Ohio finds the most helpful measures of court timeliness to be the *% of cases exceeding time standards by classified type,* and *clearance rate*.

**Oregon** documents court performance relevant to time standards by producing computer-generated reports with information compiled at both local and statewide levels. Reports/summaries with time standards are received by the clerk of court, all judges, the division manager, the local court administrator, the state court administrator, the caseflow management/delay reduction unit, the chief justice, and the trial court administrator. These reports/summaries are reviewed on a semiannual basis. The reports/summaries are available to the public through an open records request, and within the next year they should also be available on the Web site. Oregon finds the most helpful measure of court timeliness to be *% of cases resolved within existing time standards*.

**Rhode Island** documents court performance relevant to time standards by producing reports with information compiled at statewide levels. Reports/summaries with time standards are received by the magistrates, the clerk of court, all judges, the state court administrator, the caseflow management/delay reduction unit, the AOC staff, the chief justice, the Supreme Court members, the administrative personnel, and the trial court administrator. These reports/summaries are reviewed on a quarterly basis. Reports/summaries are published in court publications. Rhode Island uses *% of cases resolved within existing time standards* to help measure court timeliness and *number of cases pending that exceed the time standard*.

Rpt.
App. D

Rpt.
App. D

**South Carolina** makes statistical information related to time standards available to the public through annual reports and by request. Reports will be available to the public via the Judicial Department's Web site in the near future. South Carolina uses *% listing of cases exceeding time standards classified by court location* to measure court timeliness.

In **Tennessee**, though formal case processing time standards have not been adopted, judges are to self-report any noncompliance with statutes creating timelines for cases involving post-conviction petitions in criminal cases.  The AOC then compiles the records of noncompliance into an annual report to the General Assembly.  The reports are available to the public through annual reports and open records requests.

In **Utah**, though formal case processing time standards have not been adopted, the AOC has developed a statewide court data system through which trial court executives and presiding judges compare workloads between different judges and make adjustments accordingly.  The data warehouse helps the AOC to follow caseload trends. Generally, the AOC uses the time frame of *filing to disposition* to produce statistics.

**Vermont** documents court performance relevant to time standards by producing manual and computer-generated reports with information compiled at both local and statewide levels.  Reports/summaries with time standards are received by the magistrates, the clerk of court, all judges, the division manager, the local court administrator, the state court administrator, the AOC staff, the chief justice, the Supreme Court members, and the trial court administrator.  The reports/summaries are reviewed monthly, quarterly, and yearly.  Reports/summaries are available to the public through annual reports, the Web site, and bar publications.  Vermont finds *% listing of cases exceeding time standards classified by court location* to be the most helpful measure of court timeliness.

**Virginia** documents court performance relevant to time standards by producing computer-generated reports with information compiled at both local and statewide levels.  The magistrates, clerk of court, all judges, the AOC staff, and the Supreme Court members receive reports/summaries with time standards through the Annual State of the Judiciary Report.  These reports/summaries are reviewed yearly.  Case processing time standards reports are available to the public through the annual report.

Rpt.
App. D

Appendix D

Rpt.
App. D

**Washington** documents court performance relevant to superior court time standards by producing computer-generated reports with data input at local levels. Monthly reports and on-demand reports are available for generation by clerks and administration in superior courts, as well as by the AOC staff. Calendar year reports are published. Case processing time standards reports are available to the public through the annual report and court publications.

**Wisconsin** documents court performance relevant to time standards by producing computer-generated reports with information compiled at both local and statewide levels. The clerk of court, the presiding trial judge, the state court administrator, the AOC staff, and the trial court administrator receive reports/summaries with time standards. These reports/standards are reviewed monthly. Case processing time standards reports are available to the public through the annual report and on the Web site. Wisconsin finds the most helpful measure of court timeliness to be the *median time to disposition*.

The **District of Columbia** documents court performance relevant to time standards by producing computer-generated reports. Reports/summaries with time standards are received by the presiding/chief judge, the division director/manager, and the executive officer. The reports/summaries are reviewed monthly; they are not available to the public. The District of Columbia finds *% of cases resolved within existing time standards* to be the most helpful measure of court timeliness.

Rpt.
App. D