UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                         :
                                                         :
                                                         :
In re REFCO, INC. SECURITIES LITIGATION                  :        07 MDL No. 1902 (GEL)
                                                         :
                                                         :
                                                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                         :
KENNETH M. KRYS and CHRISTOPHER                          :
STRIDE, as JOINT OFFICIAL LIQUIDATORS                    :        08 Civ. 3086 (GEL)
of SPHINX LTD.,                                          :
                                                         :
                        Plaintiffs,                      :
                                                         :
        -against-                                        :
                                                         :
CHRISTOPHER SUGRUE, et al.,                              :
                                                         :
                        Defendants.                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

### DECLARATION OF ROSS E. FIRSENBAUM
### IN SUPPORT OF THE REMOVING DEFENDANTS'
### OPPOSITION TO PLAINTIFFS' MOTION FOR REMAND AND/OR ABSTENTION

I, ROSS E. FIRSENBAUM, hereby declare under penalty of perjury as follows:

1.      I am an associate at the firm of Wilmer Cutler Pickering Hale and Dorr LLP,

counsel for Defendants JP Morgan Chase & Co., Credit Suisse Securities (USA) LLC, and Banc

of America Securities LLC (the "Bank Defendants") in the above-captioned action. I

respectfully submit this Declaration in further support of the Removing Defendants' Opposition

to Plaintiffs' Motion for Remand and/or Abstention.

2.      Attached hereto as Exhibit A is a true and correct copy of the Complaint in

*Kirschner v. Grant Thornton LLP et al.*, No. 07 L 8818 (Ill. Ct. Cl. Aug. 21, 2007).

3.     Attached hereto as Exhibit B is a true and correct copy of the Memorandum-Decision, Findings of Fact, and Recommendation in *In re Agway, Inc.*, No. 02-65872, Adv. Pro. 04-80269 (Bankr. N.D.N.Y. Mar. 6, 2006).

4.     Attached hereto as Exhibit C is a true and correct copy of the Memorandum of Law in Support of Plaintiffs' Motion to Remand, or in the Alternative, for Abstention in *Krys et al. v. Aaron et al.*, No. 08 Civ. 1902 (JBS) (D. N.J. May 16, 2008).

5.     Attached hereto as Exhibit D is a true and correct copy of the Fifth Amended Plan of Liquidation of PlusFunds Group, Inc. Under Chapter 11 of the United States Bankruptcy Code executed by the parties in the Chapter 11 case entitled PlusFunds Group, Inc., No. 06-10402 (JMP) (Bankr. S.D.N.Y. June 28, 2007).

6.     Attached hereto as Exhibit E is a true and correct copy of the SPhinX Trust Agreement in the Chapter 11 case entitled PlusFunds Group, Inc., No. 06-10402 (JMP) (Bankr. S.D.N.Y. July 26, 2007).

7.     Attached hereto as Exhibit F is a true and correct copy of the Order (I) Confirming the Debtor's Fifth Amended Plan of Liquidation of Plusfunds Group, Inc., dated June 28, 2007, under Chapter 11 of the United States Bankruptcy Code Section 1129 and Bankruptcy Rule 3020; (II) Approving Settlements in Connection Therewith; and (III) Granting Related Relief entered by the Honorable James Peck in the Chapter 11 case entitled PlusFunds Group, Inc., No. 06-10402 (JMP) (Bankr. S.D.N.Y. Aug. 7, 2007).

8.     Attached hereto as Exhibit G is a true and correct copy of the Motion of Trustee for the Sphinx Funds Trust for Rule 2004 Examinations filed in the Chapter 11 case entitled PlusFunds Group, Inc., No. 06-10402 (JMP) (Bankr. S.D.N.Y. Dec. 20, 2007).

9.     Attached hereto as Exhibit H is a true and correct copy of the Notes to Schedules of Assets and Liabilities and Statement of Financial Affairs filed by PlusFunds Group, Inc. in the

Chapter 11 case entitled PlusFunds Group, Inc., No. 06-10402 (JMP) (Bankr. S.D.N.Y. March 22, 2006).

10.     Attached hereto as Exhibit I is a true and correct copy of the Order Granting the Plan Administrators' Motions for Summary Judgment on Proofs of Claim of PlusFunds Group, Inc., entered by Judge Drain in *In re Refco Inc.*, No. 05 Civ. 60006 (Bankr. S.D.N.Y. July 20, 2007).

11.     Attached hereto as Exhibit J is a true and correct copy of the Modified Joint Chapter 11 Plan of Refco Inc. and Certain of its Direct and Indirect Subsidiaries in *In re Refco Inc.*, No. 05 Civ. 60006 (Bankr. S.D.N.Y. Dec. 14, 2006).

12.     Attached hereto as Exhibit K are true and correct copies of the Original Proof of Claim filed by Grant Thornton LLP in *In re Refco Inc.*, No. 05 Civ. 60006 (Bankr. S.D.N.Y.) on July 17, 2006 and the Amended Proof of Claim filed by Grant Thornton LLP in *In re Refco Inc.*, No. 05 Civ. 60006 (Bankr. S.D.N.Y.) on March 16, 2007.

13.     Attached hereto as Exhibit L is a true and correct copy of the Stipulation and Order: (A) Withdrawing Plan Administrators' Tenth Omnibus Motion for Order Under 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 and 9014 Disallowing and Expunging Claims of Tone N. Grant; and (B) Pursuant to 11 U.S.C. § 502(c)(1), Estimating Such Claims at $0, in *In re Refco Inc.*, No. 05 Civ. 60006 (Bankr. S.D.N.Y. Jun. 6, 2007).

14.     Attached hereto as Exhibit M is a true and correct copy of the Order Granting Motions for Summary Judgment entered in *Axis Reinsurance Co. v. Bennett et al. (In re Refco Inc.)*, Adv. Proc. 07-01712 (Bankr. S.D.N.Y. Oct. 19, 2007).

15.     Attached hereto as Exhibit N is a true and correct copy of the Transcript of Hearing before the Honorable Robert D. Drain, United States Bankruptcy Judge, in *Axis*

*Reinsurance Co. v. Bennett et al. (In re Refco Inc.)*, Adv. Proc. 07-2005 (Bankr. S.D.N.Y.  Sept. 11, 2007).

16.     Attached hereto as Exhibit O is a true and correct copy of an April 11, 2008 letter sent from Philip D. Anker to Andrew Dash.

17.     I declare under penalty of perjury that the foregoing is true and correct.

Dated:  New York, New York
        May 27, 2008

                        WILMER CUTLER PICKERING
                        HALE AND DORR LLP

            By:     _____
                        Ross E. Firsenbaum

                        399 Park Avenue
                        New York, New York 10022
                        Tel:  (212)-230-8800
                        Fax:  (212)-230-8888

                        *Attorneys for Defendants J.P. Morgan
                        Chase & Co., Credit Suisse Securities
                        (USA) LLC (formerly Credit Suisse First
                        Boston LLC), and Banc of America
                        Securities LLC*

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| MARC S. KIRSCHNER,<br>as Trustee of the Refco Litigation Trust,<br><br>Plaintiff,<br><br>-vs-<br><br>GRANT THORNTON LLP, MAYER,<br>BROWN, ROWE & MAW, LLP, ERNST &<br>YOUNG U.S. LLP,<br>PRICEWATERHOUSECOOPERS LLP,<br>CREDIT SUISSE SECURITIES (USA) LLC<br>(f/k/a CREDIT SUISSE FIRST BOSTON<br>LLC), BANC OF AMERICA SECURITIES<br>LLC, DEUTSCHE BANK SECURITIES<br>INC., PHILLIP R. BENNETT, SANTO C.<br>MAGGIO, ROBERT C. TROSTEN, TONE N.<br>GRANT, REFCO GROUP HOLDINGS,<br>INC., LIBERTY CORNER CAPITAL<br>STRATEGIES, LLC, WILLIAM T. PIGOTT,<br>EMF FINANCIAL PRODUCTS, LLC, EMF<br>CORE FUND, LTD., DELTA FLYER FUND,<br>LLC, ERIC M. FLANAGAN, INGRAM<br>MICRO, INC., CIM VENTURES, INC.,<br>BECKENHAM TRADING CO. INC.,<br>ANDREW KRIEGER, COAST ASSET<br>MANAGEMENT, LLC (f/k/a COAST ASSET<br>MANAGEMENT LP), CS LAND<br>MANAGEMENT, LLC, and CHRISTOPHER<br>PETITT,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>Case No. _____<br><br><br>Jury Trial Demanded |

## **COMPLAINT**

This action is brought by Marc S. Kirschner (the "Trustee"), the Court-approved Trustee for

the Refco Litigation Trust (the "Trust"), as the duly authorized representative to commence all

claims and causes of action formerly owned by the bankruptcy estates of Refco Inc. and certain of its

direct and indirect subsidiaries (collectively, "Refco" and, individually or collectively, the

"Company"), including Refco Group Ltd., LLC ("RGL") and Refco Capital Markets, Ltd. ("RCM"),

against defendants Grant Thornton LLP ("GT"), Mayer, Brown, Rowe & Maw LLP ("MB"), Ernst

& Young U.S. LLP ("E&Y"), PricewaterhouseCoopers LLP ("PwC"), Credit Suisse Securities (USA) LLC (f/k/a Credit Suisse First Boston LLC) ("Credit Suisse"), Banc of America Securities LLC ("BAS"), Deutsche Bank Securities Inc. ("Deutsche"), Phillip R. Bennett ("Bennett"), Santo C. Maggio ("Maggio"), Robert C. Trosten ("Trosten"), Tone N. Grant ("Grant"), Refco Group Holdings, Inc. ("RGHI"), Liberty Corner Capital Strategies, LLC ("Liberty Corner"); William T. Pigott ("Pigott"), EMF Financial Products, LLC ("EMF Financial"), EMF Core Fund, Ltd. ("EMF Core Fund"), Delta Flyer Fund, LLC ("Delta Flyer"), Eric M. Flanagan ("Flanagan"), Ingram Micro, Inc. ("Ingram Micro"), CIM Ventures, Inc. ("CIM Ventures"), Beckenham Trading Co. Inc. ("Beckenham"), Andrew Krieger ("Krieger"), Coast Asset Management, LLC (f/k/a Coast Asset Management LP) ("Coast"), CS Land Management, LLC ("CS Land"), and Christopher Petitt ("Petitt") for their roles in a massive scheme to loot Refco -- a scheme that resulted in one of the swiftest corporate meltdowns in U.S. history and caused Refco over $2 billion in damages.

The Trustee as and for his complaint against the defendants states as follows based on information and belief, such information and belief based on the investigation of the Trustee and his counsel and a review of, among other things:

(a)    the filings of Refco with the U.S. Securities and Exchange Commission ("SEC");

(b)    a review of the filings, documents, and testimony produced pursuant to Refco's re-organization under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court of the Southern District of New York (the "Bankruptcy Proceedings") (assigned to the Honorable Judge Robert Drain and jointly administered under the caption "*In re Refco Inc., et al.,* Case No. 05-60006 (RDD)");

(c)    the Final Report of the Court-appointed Independent Examiner (the "Examiner") in the Bankruptcy Proceedings;

(d)    the Third Superseding Indictment in *U.S. v. Phillip R. Bennett, et al.*, S3 05 Cr. 1192 (NRB) (S.D.N.Y. Jan. 16, 2007); and

(e)    other relevant public documents:

**Nature of the Case**

1.    The defendants include a "who's who" of some of the biggest names in corporate finance, law, and accounting, whose reputations and substantial assistance were required for Bennett, Maggio, Trosten, and Grant (the "Refco Insiders") to strip out billions of dollars in Refco assets. Bennett and other Refco Insiders face criminal charges for their misconduct. The Trustee brings this action to recover from the Refco Insiders and those who knowingly assisted them in stripping out Refco's assets, causing billions of dollars in damage to the Company and its creditors.

2.    The Refco Insiders' looting of Refco was not a simple, straight-forward theft. With the active assistance of the Company's auditors and legal and financial advisors, the Refco Insiders and their cohorts devised an elaborate scheme through which they maintained the illusion that Refco was a highly successful, financially secure broker-dealer. It was this illusion of a thriving company that enabled the Refco Insiders to steal billions of dollars from Refco by positioning Refco for, and ultimately carrying out, what appeared on the surface to be a legitimate "buy-out" of their interests in RGL.

3.    However, as the professionals who advised Refco and facilitated this lucrative cashing-out knew and/or consciously avoided knowing, Refco's financial condition was not sufficient to warrant a lucrative sale, and the buy-out was, in fact, nothing more than an outright looting of Refco's assets. As Refco's auditors and financial, legal, and tax advisors knew and/or consciously avoided knowing, Refco sustained hundreds of millions of dollars in customer and proprietary trading losses in the late 1990s -- trading losses which the Refco Insiders did not disclose because doing so would have shaken customer confidence, negatively impacted Refco's financial condition, and foreclosed any lucrative "cashing-out" of the Refco Insiders' interests.

4.    To maintain the illusion of financial and operational strength and stability long enough for the Refco Insiders to line their pockets with Refco's assets, the Refco Insiders conspired for over seven years to conceal Refco's trading losses, true operating expenses, and marginal performance by fraudulently inflating Refco's revenues and funding virtually every aspect of Refco's operations and expenses with assets belonging to customers of RCM, Refco's unregulated

broker-dealer.  It was a three-part scheme: create the illusion of solid financial health; maintain that illusion; and orchestrate a lucrative cashing-out of their interests.

5.      <u>Part One -- Cleaning up the Financial Statements.</u>  The Refco Insiders created the illusion that Refco was a financially solid and healthy broker-dealer by concealing Refco's trading losses and operating expenses from its financial statements, recording them as receivables owed by RGHI (a related-party company owned and controlled by Bennett and, prior to the leveraged buy-out ("<u>LBO</u>"), by Bennett and Grant, Refco's former CEO), and inflating Refco's revenues by recording hundreds of millions of dollars in accrued interest income on these phantom receivables.

6.      <u>Part Two -- Keep the Illusion Going Long Enough to Cash-Out.</u>  Once these losses and operating expenses were concealed as a receivable *owed to* Refco (along with hundreds of millions of dollars in fictitious accrued interest on that receivable), the Refco Insiders, with the assistance of Refco's lawyers, MB, carefully designed and implemented a series of fraudulent transactions -- the so-called Round Trip Loans ("<u>RTLs</u>") -- whose sole purpose was to prevent these related-party receivables from being disclosed.  These RTLs purported to be loans involving third parties, but were, in fact, little more than bogus bookkeeping entries that served to hide the fact that RGHI -- a related-party company owned and controlled by Bennett and Grant, the principal asset of which was stock of Refco -- was being used to hide Refco's trading losses and operating expenses by making them appear to be a debt owed by RGHI to Refco (the "<u>RGHI Receivable</u>").  Each of defendants Liberty Corner, Pigott,  EMF Financial, EMF Core Fund, Delta Flyer, Flanagan, Ingram Micro, CIM Ventures, Beckenham, Krieger, Coast, CS Land, and Petitt made this concealment of Refco's true financial condition possible by participating in the RTLs in exchange for a fee.

7.      At the same time that the RGHI Receivable was concealed through fraudulent RTLs, the Refco Insiders funded Refco's operations by routinely swiping RCM's customer assets and using them to finance RGL and other Refco affiliates that had essentially no ability and no intention of repaying the RCM customer funds.

8.      Refco's auditors, legal advisors, and financial advisors actively assisted in manufacturing and maintaining this illusion not only by lending their reputations and an aura of

respectability to Refco's finances and operations but, as detailed below, by actively participating in the fraudulent scheme. Indeed, the fraudulent scheme perpetrated by the Refco Insiders only could have worked with the active assistance of Refco's cadre of outside auditors, professionals, and advisors.

9.    Part Three -- the Cash-Out.    Having successfully maintained the illusion of Refco's financial health, in 2004 the Refco Insiders, with the substantial assistance of the Company's outside accounting and auditing professionals, and legal and financial advisors, caused RGL to borrow $1.4 billion of bank and bond debt to fund a LBO that enriched the Refco Insiders at the expense of Refco and its creditors, including its largest creditor -- RCM. As a result of the LBO, RGL was stripped of its assets and saddled with $1.4 billion in new debt. RCM was left with approximately $2 billion in worthless intercompany "IOUs" and was unable to repay the customers from whose accounts assets had been swiped to fund Refco's business as part of the fraud.

10.    A year later, as was always the plan, the LBO was followed up with an initial public offering (the "IPO") that further impaired Refco's assets. The IPO established Refco Inc., a new public company through which the Refco Insiders' fraud was perpetuated. The ill-advised IPO (i) impaired Refco Inc.'s financial condition through the fraudulent sale of more than $583 million of shares of common stock, resulting in damages of as much as a billion dollars from securities fraud claims, (ii) caused Refco Inc. to pay down over $230 million of RGL's LBO debt (despite the fact that RGL was insolvent), approximately $40 million in underwriting fees and expenses, and more than $80 million in the form of a "greenshoe" dividend, for which it received no value, and (iii) thereby allowed the Refco Insiders to strip out all of Refco's remaining assets.

11.    As the Company's auditors, legal advisors, and financial advisors knew and/or consciously avoided knowing, given Refco's true financial state, neither the LBO nor the IPO served any legitimate purpose for Refco. The LBO and IPO were only entered into to allow the Refco Insiders to cash-out their interests in Refco at vastly inflated values that bore no relationship to Refco's true financial condition.

12.     Throughout this scheme, the Refco Insiders acted outside the course and scope of their employment, totally abandoning the Company's interests at every turn in entering into the RTLs, the LBO, and the IPO.  They acted solely to enrich themselves, conferring absolutely no benefit on RCM, RGL, Refco Inc., or the other Refco entities, all of which were left destitute and forced to file for bankruptcy as a result of the fraudulent scheme merely weeks after the IPO, and days after public disclosure of the RGHI Receivable.

13.     The Refco Insiders could not have cashed-out on their fraud if Refco's auditors, GT, had not blessed Refco's fraudulent financial statements despite knowing the nature and massive extent of the fraud being perpetrated by the Refco Insiders.  The illusion of Refco's financial stability and health could not have been maintained without the complicity of MB, Refco's attorneys, who, over the course of more than five years, prepared fraudulent RTLs at the end of each and every relevant reporting and audit period that were solely designed to conceal hundreds of millions of dollars in undisclosed trading losses, misallocated operating expenses, and the fictitious accrued interest on the RGHI Receivable.  Nor could the RTLs have occurred without the complicity of the RTL participants named as defendants in this action.  Similarly, the hoax could not have been maintained if E&Y had not willingly generated false Refco tax returns or if PwC had not validated Refco's deficient internal controls throughout the LBO and IPO process.  Further, Credit Suisse, BAS, and Deutsche structured and facilitated the lucrative cashing-out of the Refco Insiders' interests, all the while recognizing that the LBO would leave RCM's intercompany IOUs unpaid and unrecoverable and cause harm to both RGL and RCM.  And each and every one of these defendants received significant fees and other payments, some amounting to millions of dollars, in return for their support and participation in the Refco Insiders' fraudulent scheme.

## Jurisdiction and Venue

14.     At all relevant times, Refco had substantial operations in Chicago including, among others, its futures business and significant segments of its securities and foreign currency trading businesses as well as back-office administration functions for these and other parts of Refco's businesses and operations.  Refco employed nearly a thousand people in Chicago and maintained

numerous offices in Chicago and the Chicago suburbs. Refco's Chicago headquarters was located at 550 West Jackson Boulevard, Chicago, Illinois.

15.    Defendant GT is a Illinois Limited Liability Partnership with its headquarters at 175 West Jackson Blvd., Chicago, Illinois.

16.    Defendant MB is an Illinois Limited Liability Partnership with its headquarters at 71 South Wacker Drive, Chicago, Illinois.

17.    Defendant E&Y has offices at 233 South Wacker Drive, Chicago, Illinois, and has substantial contacts with Illinois. E&Y does substantial business in Illinois, has a substantial presence in Illinois, and routinely provides professional services to clients, such as Refco, who reside in Illinois and/or provides professional services in connection with matters that affect property in Illinois or otherwise impact on Illinois.

18.    Defendant PwC has offices at One North Wacker Drive, Chicago, Illinois, and has substantial contacts with Illinois. PwC does substantial business in Illinois, has a substantial presence in Illinois, and routinely provides professional services to clients, such as Refco, who reside in Illinois and/or provides professional services in connection with matters that affect property in Illinois or otherwise impact on Illinois.

19.    Defendant Credit Suisse has offices at Franklin Center, 227 West Monroe Street, Chicago, Illinois, and has substantial contacts with Illinois. Credit Suisse does substantial business in Illinois, has a substantial presence in Illinois, and routinely provides professional services to clients, such as Refco, who reside in Illinois and/or provides professional services in connection with matters that affect property in Illinois or otherwise impact on Illinois.

20.    Defendant BAS has offices at 231 South LaSalle Street, Chicago, Illinois, and has substantial contacts with Illinois. BAS does substantial business in Illinois, has a substantial presence in Illinois, and routinely provides professional services to clients, such as Refco, who reside in Illinois and/or provides professional services in connection with matters that affect property in Illinois or otherwise impact on Illinois.

21.    Defendant Deutsche has offices at 222 South Riverside Plaza, Chicago, Illinois, and 2333 Waukegan Road, Bannockburn, Illinois, and has substantial contacts with Illinois. Deutsche does substantial business in Illinois, has a substantial presence in Illinois, and routinely provides professional services to clients, such as Refco, who reside in Illinois and/or provides professional services in connection with matters that affect property in Illinois or otherwise impact on Illinois.

22.    Defendants Bennett, Maggio, Trosten, and Grant each traveled to Chicago and did business in Chicago in connection with their management of the Refco businesses. Bennett, Maggio, Trosten, and Grant met with MB and GT, among others, in Chicago to perpetrate the fraudulent activities and scheme detailed herein. Defendant Grant is an Illinois resident, residing at 706 Roslyn Terrace, Evanston, Illinois.

23.    Defendant RGHI has an office at 111 West Jackson Boulevard, Chicago, Illinois.

24.    Defendants Liberty Corner and Pigott do or have done substantial business, including with Refco, in Illinois and have substantial contacts to Illinois.

25.    Defendants EMF Financial, EMF Core Fund, Delta Flyer, and Flanagan do or have done substantial business, including with Refco, in Illinois and have substantial contacts to Illinois.

26.    Defendants Ingram Micro and CIM Ventures do or have done substantial business, including with Refco, in Illinois and have substantial contacts to Illinois. Defendant Ingram Micro has an office in Illinois.

27.    Defendants Beckenham and Krieger do or have done substantial business, including with Refco, in Illinois and have substantial contacts to Illinois.

28.    Defendants Coast, CS Land, and Petitt do or have done substantial business, including with Refco, in Illinois and have substantial contacts to Illinois.

29.    Defendants Liberty Corner, Pigott, EMF Financial, EMF Core Fund, Delta Flyer, Flanagan, Ingram Micro, CIM Ventures, Beckenham, Krieger, Coast, CS Land, and Petitt are collectively referred to as the "RTL Defendants."

30.    Venue is proper in Cook County pursuant to 735 ILCS 5/2-101, and the Court has personal jurisdiction over Defendants pursuant to 735 ILCS 5/2-209.

## Parties

### The Refco Entities

31.     Plaintiff Marc S. Kirschner is the court-approved Trustee of the Refco Litigation Trust, which was established in connection with the Modified Joint Chapter 11 Plan of Refco Inc. and Certain of its Direct and Indirect Subsidiaries (the "Plan") confirmed on December 15, 2006, by the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") in the Chapter 11 cases and proceedings of Refco (the "Bankruptcy Proceedings") on December 15, 2006. Upon the substantial consummation and effectiveness of the Plan, on December 26, 2006, the claims and causes of action asserted herein were transferred from the bankruptcy estates of three principal entities and distributed to creditors and equity interest holders of Refco, and such creditors and equity interest holders in turn granted such claims and causes of action to the Refco Litigation Trust in exchange for beneficial interests therein.

32.     The claims and causes of action asserted herein are based on the harm caused to the following three principal entities:

(a)     Refco Group Ltd., LLC - RGL was formed in 1999 and is a Delaware limited liability company.  Before the LBO, RGL was the corporate parent of Refco.  As set forth herein, RGL was induced to enter into an improvident LBO based on a false and inaccurate understanding of its financial condition, causing RGL to saddle itself with $1.4 billion in debt and to allow its assets to be stripped out and paid to the Refco Insiders while still owing RCM approximately $2 billion in unpaid IOUs.  Had the true, precarious, financial condition of RGL not been concealed through the misconduct of the corrupt Refco Insiders and the other defendants, RGL never would have entered into the LBO.  RGL filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code on October 17, 2005.

(b)     Refco Capital Markets, Ltd. - Before the LBO, RCM was an indirect subsidiary of RGL.  RCM was organized and existed under the laws of Bermuda.  At all relevant times, RCM was an unregulated securities broker and foreign exchange broker, and one of three principal operating subsidiaries of Refco.  RCM traded in over-the-counter

derivatives and other financial products on behalf of its customers.  Although RCM was organized under the laws of Bermuda, RCM had no significant operations in Bermuda and, as a Bermuda exempt company, was statutorily prohibited from operating in Bermuda. RCM closed its Bermuda office in December 2001 and, since that time, its presence in Bermuda has been limited to a mailbox address.  As set forth herein, RCM's assets were looted by the Refco Insiders and used to fund and prop up Refco's operations so those insiders could engineer a lucrative cashing-out of their interests in Refco.  The Refco entities who used RCM's assets to fund their operations had little to no ability or intention of repaying these loans, and repayment of the RCM IOUs was altogether foreclosed by the LBO and IPO, which stripped out Refco's remaining assets and subordinated RCM's right to repayment to $1.4 billion in new LBO debt.  At the time of the LBO, RCM had approximately $2 billion in unpaid IOUs owed to it by RGL and its Refco affiliates; by the time of the IPO, this number had grown to over $2 billion.  RCM filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code on October 17, 2005.

(c)    <u>Refco Inc.</u> - Refco Inc., a Delaware corporation, was the corporate parent of both RGL and RCM.  Before its bankruptcy filing, Refco Inc. was a publicly traded holding company that, through its subsidiaries, provided securities brokerage, execution, and clearing services for exchange-trade derivatives and prime brokerage services in the fixed income and foreign exchange markets.  Refco Inc. was formed in connection with Refco's August 2005 IPO, and was the issuer of the stock sold in the August 2005 IPO.  As set forth herein, Refco Inc. was induced to enter into an IPO based on a false and inaccurate understanding of its financial condition, which caused Refco Inc. to incur significant liabilities to its shareholders and to unnecessarily retire $231 million in debt owed by RGL, an insolvent subsidiary.

33.     Set out below is an organizational diagram illustrating Refco's basic corporate structure.



34.     As reflected above, the relevant affiliates and subsidiaries of Refco Inc. include:

(a)     Refco Securities, LLC ("RSL") is a non-debtor, indirect Refco Inc. subsidiary. RSL is a Delaware limited liability company and registered broker-dealer.

(b)     Refco Global Finance Ltd. ("RGF") is an indirect subsidiary of Refco Inc. organized and existing under the laws of Delaware. RGF filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code on October 17, 2005.

(c)     Refco Capital LLC ("RCC") is an indirect subsidiary of Refco Inc. organized and existing under the laws of Delaware. As detailed below, Bennett and others used RCC as the "treasury" and "disbursing agent" through which RCM's assets were diverted and

distributed to fund the operations of the other Refco entities.  RCC filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code on October 17, 2005.

(d)    Refco LLC is an indirect subsidiary of Refco Inc. organized and existing under the laws of Delaware.  Refco LLC was a registered Futures Commission Merchant and, along with RSL and RCM, was one of three primary Refco operating subsidiaries. Refco LLC filed for bankruptcy protection under Chapter 7 of the Bankruptcy Code on November 25, 2005.

35.    Defendant Refco Group Holdings, Inc. ("RGHI") is a Delaware, subchapter S corporation that, before the LBO, was owned 50% by Bennett and 50% by Grant.  In connection with the LBO, Bennett acquired Grant's interest in RGHI and became the sole owner of RGHI. From 1999 until the LBO, RGHI had a 90% interest in RGL (the principal Refco holding company before the LBO) and was the controlling shareholder of RGL.  The remaining 10% in RGL was held by a subsidiary of Bank fur Arbeit und Wirtschaft und Osterreichische Postparkasse Aktiengesellschaft ("BAWAG"), a foreign financial institution closely tied to Bennett.

**The Officer Defendants**

36.    Defendant Phillip R. Bennett was the highest ranking corporate officer of various Refco entities until he was forced to resign in October 2005 following the disclosure of the massive fraud he, Maggio, Trosten, and Grant perpetrated on Refco with the assistance of the other defendants.  Among his other positions within Refco, at all relevant times, he served as a director and officer of RGL, RCM, and Refco Inc.  Before serving as President, Chief Executive Officer, and Chairman of RGL from September 1998 on, Bennett had been the Chief Financial Officer of RGL. Bennett has been indicted for, among other things, conspiring to commit securities fraud, wire fraud, making false filings to the SEC, and committing bank fraud and money laundering, based, in part, upon the acts alleged herein.

37.    Defendant Santo C. Maggio, also known as "Sandy" Maggio, joined Refco in 1985, and held executive positions with various Refco entities until he was forced to resign in October 2005 following the disclosure of the massive fraud he, Bennett, Trosten, and Grant perpetrated on

Refco with the active assistance of the other defendants.  Among his other positions within Refco, he served as Executive Vice President of RGL and President and a director of RCM.  At all relevant times Maggio ran the brokerage operations of RSL and RCM and directed, orchestrated, and supervised the diversion of RCM assets alleged herein.  According to press reports, Maggio is cooperating with the United States Justice Department and the SEC in relation, *inter alia*, to his role in various frauds perpetrated during his tenure at Refco.

38.    Defendant Robert C. Trosten was a member of Refco's corporate finance team from 1997 to 2001, and RGL's Chief Financial Officer from 2001 to October 2004.  Trosten was intimately familiar with all details of the fraud he, Bennett, Maggio, and Grant perpetrated on Refco with the active assistance of the other defendants.  Trosten has been indicted for, among other things, conspiring to commit securities fraud, wire fraud, making false filings to the SEC, and committing bank fraud and money laundering, based, in part, upon the acts alleged herein.

39.    Defendant Tone N. Grant joined RGL in 1981.  Up through 1998, Grant was President and CEO of RGL.  Prior to August 2004, through his ownership interest in RGHI, Grant held a significant ownership stake in Refco.  From 1999 through August 2004, Bennett and Grant each held a 50% interest in RGHI.  In or around August 2004, concurrently with the LBO, Grant sold his interest in RGHI to Bennett, leaving Bennett the sole owner of RGHI.   Grant has been indicted for, among other things, conspiracy to commit securities fraud, bank fraud, and money laundering.

40.    Defendant RGHI was, before the LBO, owned 50% by Bennett and 50% by Grant and was at all relevant times an alter-ego of Bennett and Grant.  RGHI was, before the LBO, the controlling shareholder of Refco.

**The Professional Defendants**

41.    Defendant Mayer, Brown, Rowe & Maw LLP, with more than 1,500 lawyers, is among the largest law practices in the world.  MB is a combination of two limited liability partnerships, each named Mayer, Brown, Rowe & Maw LLP, one established in Illinois, USA, and one organized in England.  MB's global operations are headquartered in Chicago.  MB served as

Refco's principal outside counsel from 1994 until October 2005.  As set forth below in more detail, MB was intimately involved in numerous aspects of the Refco Insiders' fraudulent scheme, including preparing the loan documents through which Refco concealed the RGHI Receivable that hid Refco's trading loses and operational expenses, advising the Refco Insiders how to continue diverting RCM's assets to fund Refco's businesses, and playing an active role in the LBO and IPO which it knew was premised on a fictitious picture of Refco's financial condition.  Indeed, the Bankruptcy Examiner ("Examiner") in the bankruptcy proceedings in the United States Bankruptcy Court of the Southern District of New York, after exhaustive review of MB's documents and interviews of the responsible MB attorneys, issued a report concluding, among other things, that the evidence establishes that MB understood that the RTLs it structured for Refco were designed to "fraudulently bolster Refco's financial appearance to lenders and investors."  MB received at least $23.5 million from Refco for its services.

42.    Defendant Grant Thornton LLP is the Chicago-based United States member firm of Grant Thornton International, one of six global accounting, tax, and business advisory organizations with member firms in 11 countries.  GT served as Refco's purportedly independent auditor at all relevant times after 2002, when it replaced Arthur Andersen LLP ("AA") in that role.  GT issued clean and unqualified audit opinion letters on Refco's financial statements for fiscal years 2003, 2004, and 2005.  GT also served as the purportedly independent auditor for RCM.  According to the Examiner, whose investigation was limited by an inability to speak to any GT employees or Refco employees who dealt with the lead GT partner on the engagement (Mark Ramler), GT was "in possession of a series of 'red flags' that should have alerted a properly skeptical auditor to the fraud" and "circumstantial evidence suggests that [GT] may have had actual knowledge of the fraud."  GT received at least $10 million from Refco for its services.

43.    Defendant Ernst & Young U.S. LLP is the United States member firm of Ernst & Young Global Limited.  E&Y is a public accounting firm that provides a range of business and professional advisory services to companies worldwide, including assisting firms with complex tax issues.  E&Y is a Delaware limited liability partnership with 83 offices and over 26,000 employees

across the United States, including Chicago. E&Y and its affiliates provided Refco with tax advice on numerous issues, served as Refco's independent registered tax accounting firm, prepared tax returns for Refco and RGHI from approximately 1991 through the 2002 tax year, and continued to provide tax advice and assistance to RGL thereafter until 2005 on a worldwide basis. As explained in more detail below, during the course of its engagement with Refco and RGHI, E&Y became aware of the fraud alleged herein and actively aided and abetted it. After the Bankruptcy Court-appointed Examiner catalogued and reviewed the "considerable evidence," he concluded that, like MB and GT, "E&Y knew that . . . Refco's officers were intentionally manipulating Refco's balance sheet for the purpose of bolstering the financial appearance of the company." E&Y received at least $5 million from Refco for its services.

44.    Defendant PricewaterhouseCoopers LLP is the United States member of PricewaterhouseCoopers International Limited, a UK membership based public accounting firm that provides a range of business and professional advisory services to companies worldwide, including assisting firms with complex tax issues and management consulting. PwC is a Delaware limited liability partnership with over 25,000 employees in offices throughout the United States, including Chicago. PwC was retained to advise Refco in connection with the LBO and IPO. PwC provided Refco with advice and consulting services in numerous accounting and financial reporting matters, including analyzing the propriety of the LBO and preparing documents to be filed with the SEC in connection with the LBO and IPO. In the period between the LBO and the IPO, in response to concerns over Refco's internal accounting controls, PwC was also engaged to review and strengthen Refco's internal accounting controls, provide tax return services for the tax year beginning January 1, 2004, and serve as Refco's *de facto* Chief Accounting Officer. PwC received approximately $4 million from Refco for its services. While the Examiner included PwC as a part of his initial investigation, a conflict with the Examiner's counsel, and subsequent discussions with the Bankruptcy Court and others, resulted in the Examiner discontinuing its investigation of possible claims against PwC.

45.    Defendant Credit Suisse, a subsidiary of Credit Suisse Group, is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products and services.  Credit Suisse was a lead financial advisor, joint book-running manager, underwriter, and/or initial purchaser for the bond offering made as part of the LBO, and the lead joint book-running manager and lead underwriter of the August 2005 IPO.  Credit Suisse was also the "exclusive" financial advisor to Bennett and/or RGHI and/or RGL in determining the ways in which the Refco Insiders could facilitate a lucrative cashing-out of their interests in Refco.  Credit Suisse is a Delaware limited liability company.  Credit Suisse collectively received $15.5 million in fees and its share of over $70 million in fees paid to the investment banking professionals in connection with the Refco LBO, IPO and other services it provided for the Company.

46.    Defendant BAS, a subsidiary of Bank of America Corporation, is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products and services.  BAS was a financial advisor, joint book-running manager, underwriter, and/or initial purchaser for the bond offering made as part of the LBO and was a joint book-running manager of the August 2005 IPO.  BAS is a Delaware limited liability company that maintains its headquarters in North Carolina.  BAS received $125,000 in fees and its share of over $70 million in fees paid to the investment banking professionals in connection with the Refco LBO and IPO.

47.    Defendant Deutsche, a subsidiary of Deutsche Bank, A.G., is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products and services.  Deutsche was a financial advisor, joint book-running manager, underwriter, and/or initial purchaser for the bond offering made as part of the LBO and was a co-manager and underwriter of the August 2005 IPO.  Deutsche is a Delaware corporation.  Deutsche received a share of over $70 million in fees paid to the investment banking professionals in connection with the Refco LBO and IPO.

48.     Credit Suisse, BAS, and Deutsche are collectively referred to as the "Investment Banker Defendants."  The Court-appointed Examiner did not examine the conduct of the Investment Banker Defendants in connection with the Refco LBO or the IPO.

49.     MB, GT, E&Y, PwC, and the Investment Banker Defendants are collectively referred to as the "Professional Defendants."

**The RTL Defendants**

50.     Defendant Liberty Corner Capital Strategies, LLC was a hedge fund management company located in Summit, New Jersey and organized under the laws of Delaware.  Liberty Corner used Refco as its prime broker up until the time of Refco's bankruptcy.  At all relevant times, Liberty Corner was wholly owned and controlled by defendant William T. Pigott.  As described below, Pigott, through the instrumentality of Liberty Corner, agreed to serve as a conduit for over $5 billion of fictitious loans spread across ten transactions, through which substantial Refco trading losses and operational expenses were concealed.

51.     Defendant EMF Financial Products, LLC is a Delaware corporation founded by and at all relevant times run by, and controlled by, defendant Eric M. Flanagan ("Flanagan").  Flanagan used Refco as EMF Financial's prime broker up to the time of Refco's bankruptcy.  Flanagan directed two entities affiliated with EMF Financial, defendants EMF Core Fund and Delta Flyer, to serve as the conduit in four fictitious loan transactions through which $575 million of the RGHI Receivable was concealed over four successive fiscal year-end reporting periods from February 2000 to February 2003.

52.     Defendant Ingram Micro, Inc., a Delaware corporation, is a technology sales and distribution enterprise based in Santa Ana, California.  Ingram Micro agreed to use its subsidiary, defendant CIM Ventures, Inc, to participate in two RTLs with Refco in 2000 and 2001 through which $400 million of the RGHI Receivable was concealed.

53.     Defendant Beckenham Trading Co. Inc., a New Jersey corporation, is an investment fund wholly owned and operated by defendant Andrew Krieger ("Krieger").  Krieger had a long-standing relationship with Refco, having used Refco as a prime broker for his various entities since

the late 1990s and continuing to use the company until its bankruptcy.  Beckenham engaged in a $125 million RTL with Refco in February 2002 in exchange for a fee.

54.    Defendant Coast Asset Management, L.P., a Delaware corporation, is a hedge fund manager based in Santa Monica, California.  At the time of the RTLs, Christopher Petitt was the CEO of Coast.  Coast had a long-standing relationship with Refco, having done business with the company since 1996 and having used Refco as its prime broker since 1998.  In February 2000, Coast's subsidiary, defendant CS Land Management, LLC, entered into a $110 million RTL with Refco in exchange for a fee.

55.    Although the Court-appointed Examiner was not directed to specifically examine the conduct of the RTL Defendants, the Examiner concluded that the RTLs had no genuine business purpose and were solely designed to improperly conceal hundreds of millions of dollars in unpaid related-party receivables so as to "fraudulently bolster Refco's financial appearance to lenders and investors."  These fraudulent RTL transactions could not have been carried out without the active involvement and participation of the RTL Defendants.

## Factual Background

## Overview of Refco's Business

56.    Before its implosion, Refco was one of the world's largest providers of brokerage and clearing services in the international derivatives, currency, and futures markets.  Refco provided financial services by executing trades on behalf of its customers and then recording and "clearing" those trades.  Refco offered these services to a wide variety of customers, including individuals, corporations, hedge funds, financial institutions, retail clients and professional traders, on a broad spectrum of derivative exchanges and over-the-counter, cash and securities markets.

57.    Refco had three major operating subsidiaries through which these services were provided:

(a)    RSL, a registered broker-dealer through which Refco offered prime brokerage services, such as securities financing, securities lending, and trade processing.  RSL was a registered broker-dealer regulated by the SEC and the National Association of Securities

Dealers ("NASD"), and was subject to the net capital and other regulatory requirements of those entities.

(b)     Refco LLC, a regulated futures commission merchant through which Refco executed and cleared customers' orders for exchange-traded derivatives.  Refco LLC was regulated by, among other entities, the Commodity Futures Trading Commission ("CFTC") and the National Futures Association ("NFA"), and was subject to the net capital and other regulatory requirements of those entities.

(c)     RCM, a broker-dealer for securities and foreign currency trades.  Because it was incorporated in Bermuda, RCM was purportedly "unregulated."  While some of its operations were originally located in Bermuda, most of RCM's operations and business were located and conducted in the United States.  In December 2001, Refco shut down RCM's Bermuda operations and  "repatriated" all of RCM's operations to the United States with the assistance and guidance of defendant MB.

58.     Refco's legitimate revenues were primarily comprised of (i) transaction fees earned from executing customer orders at its operating subsidiaries, and (ii) interest income earned on cash balances in its customers' trading accounts and from providing financing through repurchase transactions.

**The Refco Insiders' Fraudulent Scheme**

59.     In late 1997, the Refco Insiders decided to engineer a lucrative cashing-out of their interests in Refco for far more than these interests were worth.  To this end, the Refco Insiders engaged in a three-part fraudulent scheme through which they concealed Refco's trading losses and operating expenses, inflated Refco's revenues, and hid their manipulation of Refco's financial statements through fraudulent round trip loans, all the while funding Refco's operations with customer assets looted from RCM.

**Part One -- Cleaning Up Refco's Financial Statements**

60.     The Refco Insiders avoided writing off hundreds of millions of dollars in trading losses, misallocated operating expenses and inflated Refco's revenue with phantom interest income,

by booking these amounts as receivables owed by RGHI (a related-party company owned and controlled by Bennett and, prior to the LBO, by Bennett and Grant) resulting in a massive related-party receivable owed to various Refco entities. This, in turn, concealed Refco's true financial results, and allowed the Refco Insiders and others (i) to overstate Refco's financial condition and related operating results, and (ii) to fraudulently continue to project to the public an illusion of financial health and strength -- falsely securing customer confidence and ensuring the continued deposits of cash and securities from customers needed to facilitate and fund the Refco Insiders' lucrative cashing-out of their interests.

**Refco's Trading Losses**

61.    As part of its trading business, Refco regularly extended credit to customers who engaged in securities, commodities, and futures trades. As a result, when markets fluctuated drastically, such as they did during the Asian market collapse in 1997, and Refco customers trading on credit could not cover their losses, Refco was forced to assume those losses.

62.    For example, in 1997, Refco was exposed to over $100 million in losses when some of its customers were over-extended in the Asian market collapse. In the same time frame, other over-extended Refco customers trading in other markets incurred additional staggering losses in the $100 million range. Refco was simultaneously suffering substantial losses in its own proprietary trading and lost $50 million in a single transaction in 1998 on an investment in Russian securities and bonds.

63.    Collectively, it is believed that customer and proprietary trading losses assumed and sustained by Refco in 1997-1999 alone amounted to hundreds of millions of dollars. If disclosed, trading losses of this magnitude would have raised many tough questions for Refco, devastated customer confidence in Refco's management, and severely damaged Refco's business. The Refco Insiders recognized that customers would not do business with Refco's operating subsidiaries, and Refco's considerable goodwill would be severely eroded, if the public did not believe that Refco had sound internal risk management controls, was appropriately capitalized, and was financially healthy.

(This belief was confirmed in October 2005, when Refco's above-described losses were revealed and Refco's operating subsidiaries experienced a "run" on customer accounts.)

64.     Faced with these debilitating trading losses, the Refco Insiders set out to prop up Refco's reputation -- and its perceived strong financial condition and attractiveness to investors -- through fraud.  Instead of disclosing and writing these losses off as bad debts, the Refco Insiders caused Refco's losses and uncollectible obligations to be secretly transferred to RGHI as a receivable *owed to* Refco by RGHI.

65.     These trading losses were converted to a receivable owed to Refco by RGHI through one of three mechanisms: either (i) the obligation to repay Refco for covering a customer's bad trade on an exchange was transferred by the Refco Insiders from the customer to RGHI; (ii) the obligation to repay money loaned to a Refco customer (where the customers' devalued collateral did not cover its obligation to Refco) was transferred from the customer to RGHI by the Refco Insiders; or (iii) in Refco's own proprietary trading, the Refco Insiders booked losses on trades executed on behalf of Refco at RGHI, creating a receivable owed to Refco by RGHI.  While some of these trading losses were permanently parked at RGHI, others were held at Refco and moved to RGHI just prior to reporting and audit periods.

66.     As a result of this scheme, instead of being written off as bad debt, hundreds of millions of dollars in customer and proprietary trading losses were "converted" from patently worthless receivables into what appeared to be a legitimate and collectible receivable, albeit from RGHI -- a related party whose principal asset was Refco stock.  This had the effect of making Refco's financial position look materially stronger than it actually was.

**Concealing Refco Operating Expenses**

67.     Focused on perpetuating the illusion that Refco was in healthy financial condition and a good prospect for a lucrative buy-out or sale, the Refco Insiders also hid tens of millions of dollars of Refco expenses (and thereby fraudulently increased Refco's apparent profits) by transferring them to RGHI.  Though these expenses were incurred by numerous Refco entities and paid by Refco, they were transferred to RGHI, further increasing the RGHI Receivable.

68.     Through this scheme, tens of millions of dollars in expenses unrelated to RGHI, including tens of millions in computer systems expenses and millions more in payroll and outside professional expenses, were moved off Refco's books and concealed as a receivable owed to Refco by RGHI.  As the Examiner determined, Bennett and those acting in active concert or participation with him ensured that Refco's operating expenses were "transferred to RGHI and added to the [RGHI R]eceivable balance," thereby overstating the earnings capability of RGL.

69.     Other items were also improperly transferred to RGHI and added to the RGHI Receivable.  For example, in or around February 2000, a Refco entity paid $6.5 million relating to the settlement of a lawsuit against Refco.  The related expense, however, was recorded on the books of RGHI along with a corresponding $6.5 million payable to Refco.  On Refco's books, Refco increased the amount of the RGHI Receivable by $6.5 million.

**Inflating RGL's Revenues with Phantom Income**

70.     The Refco Insiders also caused Refco to inflate its income as a result of "transactions" with RGHI.  This practice served as a significant source of Refco's income, inflating revenue.  On January 28, 2004, for example, the RGHI Receivable was increased by two entries totaling approximately $13 million, both of which resulted in the recording by the Refco Insiders of income at Refco.  The description of the transaction on the account statement said only "Transfer" for each item.

71.     The Refco Insiders also fraudulently inflated Refco's revenues and financial results by charging RGHI usurious interest of as much as 35% on the RGHI Receivable.  This was fictitious income being recorded (but not paid) on the hundreds of millions of dollars in trading losses, operating expenses and other transactions that comprised the RGHI Receivable.  For example, on or about January 28, 2004, Refco increased its receivable from RGHI by $62.75 million through a transaction described as "Compound Interest To Principal."  The $62.75 million of interest had been recorded as income by Refco.

72.     Indeed, between 2001 and 2005 alone, fictitious recorded interest on the RGHI Receivable amounted to at least $250 million.  But no interest payments were ever made, and

because the RGHI Receivable was falsely created, held by a related party, and not subject to any form of repayment obligation, the interest income was entirely fictional and should never have been recorded.

73.     As set forth in the chart below, between the trading losses, operating expenses and other transactions that made up the RGHI Receivable, and the accrued interest on the Receivable, just prior to the LBO, the RGHI Receivable ballooned to nearly $1 billion.

**RGHI Receivable Balance**

| Date | RGHI Receivable[*] |
|------|-----------|
| 31-Mar-98 | $ 387,708,449 |
| 31-Mar-99 | 455,135,660 |
| 31-Mar-00 | 596,676,711 |
| 31-Mar-01 | 709,888,962 |
| 31-Mar-02 | 849,144,785 |
| 31-Mar-03 | 943,939,524 |
| 31-Mar-04 | 918,410,130 |

* Reflects full amount of RGHI Receivable, including amounts added to RGHI Receivable prior to end of reporting and audit periods.

## Part Two - Keeping the Illusion Going Long Enough to Cash-out

74.     After the Refco Insiders  moved Refco's losses and operating expenses from Refco's books and artificially inflated the company's operating results and apparent value, they had to prevent the fictitious nature of the RGHI Receivable, the trading losses and operating expenses it concealed, and Refco's true financial condition from being disclosed.   The Refco Insiders accomplished this through fraudulent RTLs and by funding Refco's operations with RCM customer assets.   These schemes created the perception that Refco was robust and financially healthy long enough for the Refco Insiders to personally enrich themselves through a lucrative cashing-out.

## The RTL Shell Game

75.     A large receivable owed to Refco by a related-party, owned by its current and former Chief Executive Officer, would have to be disclosed on Refco's financial statements and would have invited scrutiny and skepticism.   To conceal the magnitude and related-party nature of this receivable, with the active assistance of MB, GT, E&Y and the RTL Defendants, the Refco Insiders

devised and implemented a series of sham "loans" -- the RTLs -- timed to straddle Refco's financial reporting and audit periods.

76.    Like a street-corner shell game, this financial sleight-of-hand enabled the Refco Insiders to temporarily transfer massive amounts of uncollectible related-party receivables off of Refco's books by shifting them between wholly-owned Refco subsidiaries, RGHI, and several third-party Refco customers (or their affiliates) who agreed to serve, for a fee, as conduits in the deceptive RTLs.

77.    The RTLs were implemented at the end of each fiscal year starting in 1998 (and also, starting just before the LBO in 2004, at the end of fiscal quarters) to temporarily "pay-down" the RGHI Receivable and replace it on Refco's books with a receivable purportedly owed by an unrelated third-party customer of Refco. In order to further conceal the size of the RGHI Receivable, a number of RTLs were often employed, temporarily replacing the nearly $1 billion RGHI Receivable with a number of smaller third-party receivables.

78.    Thus, as set forth in the below diagram, at the end of every relevant reporting and audit period, a Refco entity (typically RCM) would extend a "loan" for an amount up to $720 million to a third-party with no apparent relation to Refco, Bennett or RGHI.  That third-party entity would then "loan" the same amount to RGHI (typically via a transfer to one of RGHI's accounts at Refco).  The RTL was completed when RGHI used the "loan" from the third-party to pay down the debt it owed to Refco (typically via a credit to one of RGHI's accounts at Refco).  Thus, on Refco's financial statements, the RGHI Receivable was transformed into a payable on a loan owed to Refco from an unrelated third-party.



79.    Right after the start of each new reporting or audit period, the RTL was "unwound" by reversing the entire process.  As set forth in the below diagram, the temporary pay-down of the RGHI Receivable was reversed, RGHI returned the funds it had "borrowed" from the RTL Defendants, and the RTL Defendants in turn paid back the money they had borrowed from Refco (keeping as a fee the spread between the interest charge on the "loan" made to RGHI by the RTL Defendant and the loan made to the RTL Defendant by Refco).  Once the transaction was unwound, the RGHI Receivable was restored to its full value.  This "unwinding" process, like the initial execution of each RTL, often occurred only on paper; with no actual transfer of funds occurring other than the payment of the fees to the RTL Defendants.



80.     For agreeing to participate in the RTLs and conceal the related-party nature of the RGHI Receivable, the RTL Defendants received payment of the "spread" between the interest rates of the two "loans."  The Refco Insiders generally caused RCM to make these payments to the third parties, even though RCM obtained no benefit from the RTLs.  In this manner, for example, Pigott received, either through direct personal payments or through payments to Liberty Corner, at least $1.1 million in interest charges as a reward for his participation in the RTL scheme.  The other RTL Defendants also received fees for their participation in the RTL shell game.

81.     In addition, for many of the transactions, Bennett caused RGL to guarantee repayment of the obligation to the supposed "third-party lenders" on RGHI's behalf, again despite the fact that the RTLs provided no benefit to RGL.  Thus, participants in the RTLs knew and/or consciously avoided knowing that the transactions involved risk-free, paper-only transfers of large round-dollar value amounts only days before the end of Refco's reporting or audit periods, and that these transfers would be unwound days after the start of the new reporting or audit periods.

82.     The Refco Insiders, with the active assistance of MB and the RTL Defendants, engaged in these RTLs at least 18 times from 2000 through 2005, always at the end of a financial reporting or audit period, and never at any other time (with one exception).  In addition,  from 2000 through 2005 Refco engaged in approximately 12 additional wire transfer RTLs with, among others, longtime Refco customer -- and 10% RGL equity owner -- BAWAG.  These loans involved transfers of amounts from BAWAG to RGHI in late February, with those transactions being subsequently reversed in early March.

83.     In this manner, at the end of each relevant reporting or audit period, the corrupt Refco Insiders together with MB and the RTL Defendants caused Refco's financial statements to falsely suggest that the RGHI Receivable had been repaid or never existed. This process altogether concealed the magnitude and related-party nature of the RGHI Receivable at the end of each relevant reporting and audit period and thereby concealed Refco's trading losses, its true operating expenses and the fictitious nature of hundreds of millions of dollars in revenue.

84.    The RTLs facilitated by MB and the RTL Defendants included, at the least, the

following:

| Start Date | End Date | RTL Participant | Amount |
|---|---|---|---|
| 02/25/2000 | 03/09/2000 | CIM Ventures, Inc. | $150,000,000 |
| 02/25/2000 | 03/03/2000 | EMF Core Fund, Ltd. | $50,000,000 |
| 02/25/2000 | 03/03/2000 | CS Land Management, LLC | $110,000,000 |
| **2000 TOTAL** | | | **$310,000,000** |
| 02/23/2001 | 03/06/2001 | CIM Ventures, Inc. | $250,000,000 |
| 02/26/2001 | 03/02/2001 | Delta Flyer Fund, LLC | $200,000,000 |
| **2001 TOTAL** | | | **$450,000,000** |
| 02/25/2002 | 03/04/2002 | Liberty Corner Capital Strategies, LLC | $325,000,000 |
| 02/25/2002 | 03/04/2002 | Delta Flyer Fund, LLC | $175,000,000 |
| 02/25/2002 | 03/04/2002 | Beckenham Trading Company, Inc. | $125,000,000 |
| **2002 TOTAL** | | | **$625,000,000** |
| 02/21/2003 | 03/04/2003 | Liberty Corner Capital Strategies, LLC | $500,000,000 |
| 02/21/2003 | 03/04/2003 | Delta Flyer Fund, LLC | $150,000,000 |
| **2003 TOTAL** | | | **$650,000,000** |
| 02/20/2004 | 03/04/2004 | Liberty Corner Capital Strategies, LLC | $720,000,000 |
| 05/27/2004 | 06/07/2004 | Liberty Corner Capital Strategies, LLC | $700,000,000 |
| 08/25/2004 | 09/07/2004 | Liberty Corner Capital Strategies, LLC | $485,000,000 |
| 11/26/2004 | 12/03/2004 | Liberty Corner Capital Strategies, LLC | $545,000,000 |
| 12/30/2004 | 01/05/2005 | Liberty Corner Capital Strategies, LLC | $550,000,000 |
| **2004 TOTAL** | | | **$3,000,000,000** |
| 02/23/2005 | 03/08/2005 | Liberty Corner Capital Strategies, LLC | $345,000,000 |
| 05/25/2005 | 06/06/2005 | Liberty Corner Capital Strategies, LLC | $450,000,000 |
| 08/26/2005 | 09/06/2005 | Liberty Corner Capital Strategies, LLC | $420,000,000 |
| **2005 TOTAL** | | | **$1,215,000,000** |

85.    Of all the RTL Defendants, Liberty Corner, which was owned and managed by

Pigott, engaged in the largest number of RTLs.  In February 2002, Pigott arranged for Liberty

Corner's first RTL with Refco for $325 million.  Demonstrating Pigott's awareness that the RTLs

were improper, Pigott rejected using an active fund he managed that was engaged in treasury bill

arbitrage as the RTL conduit, and instead substituted Liberty Corner because Liberty Corner was a

personal management company that could be made to take any and all actions directed by Pigott.

86.    As set forth in the above chart, over the next three years, Pigott and Refco engaged in

nine additional RTLs, concealing hundreds of millions of dollars in related-company receivables

owed to Refco.  Liberty Corner, Pigott's alter ego (and at times Pigott directly, with no corporate

intermediary) received $1.1 million in "fees" for serving as the conduit in these RTLs.  Underscoring

that Pigott understood that the sole purpose of the RTLs was to fraudulently "dress up" Refco's

financial statements, Pigott had RGL guarantee each of the Liberty Corner RTL loans. These guarantees were signed solely by Bennett.

87.    Defendant EMF Financial (managed by Flanagan) was a hedge fund that used Refco as the prime broker for its funds. Like Liberty Corner, EMF Financial repeatedly authorized and arranged for its affiliates, defendant EMF Core Fund and defendant Delta Flyer, to engage in RTL transactions with Refco.

88.    The transactions Flanagan arranged through EMF Financial, and affiliated entities EMF Core Fund and Delta Flyer, concealed $575 million in related-party receivables over the course of Refco's fiscal year-end reporting periods in 2000, 2001, 2002, and 2003. Flanagan, like Pigott, was a sophisticated fund manager. As such, Flanagan (and by extension EMF Financial) would have known and understood that: (i) Refco's year-end reporting period ended February 28; (ii) no cash was moving as a result of these transactions (except for the payment to EMF Financial for agreeing to serve as a conduit in the transactions); and (iii) Refco was using these transactions to manipulate its financial statements and misreport its financial condition.

89.    Indeed, in the wake of the Enron financial scandal, one RTL participant, defendant Ingram Micro, having previously served as a conduit in $400 million of RTLs in 2000 and 2001, opted to cease participating in the RTLs precisely because of concerns about their propriety. On the eve of entering into a February 2002 RTL, Ingram Micro sent an email to Maggio advising him that its participation with the planned third RTL was too risky because "the Enron debacle is putting pressure on the SEC to increase the level of financial disclosure by large companies like [Ingram Micro]."

90.    Similarly, defendants Petitt (using Coast's subsidiary CS Land) and Krieger (who used his Beckenham Trading entity as his RTL conduit) were both sophisticated parties that used Refco as a prime broker. Thus, at the time of their RTL participation, both Petitt and Krieger knew and/or consciously avoided knowing (like Pigott and Flanagan) that: (i) Refco's year-end reporting period ended February 28; (ii) no cash was moving as a result of these transactions (except for the

payments to third parties for agreeing to serve as a conduit in the transactions); and (iii) Refco was using these transactions to manipulate its financial statements and misreport its financial condition.

91.     The RTL Defendants thus directly and knowingly participated in and facilitated the RTLs set up by the Refco Insiders, knowingly helping these corporate insiders manipulate Refco's financial statements in a manner that concealed Refco's losses from innocent members of Refco's management.

92.     The RTL Defendants had existing business with Refco and/or a personal relationship with Bennett and each had an incentive to further their relationship with Bennett and Refco by agreeing to serve as conduits in the RTL transactions.

93.     The RGHI Receivable, RTLs, and other fraudulent actions alleged herein, were at all times unknown to certain Refco directors, officers, and agents, including Refco's inside counsel and others, who would have put a stop to the fraudulent activity had they been aware of it.

**Looting RCM's Assets**

94.     For the Refco Insiders' scheme to succeed, they had to make Refco appear to be fast-growing, highly profitable, and able to satisfy its substantial working capital needs without having to borrow money.  This was a tall order for a company that was, in reality, owed hundreds of millions of dollars from a related party (based upon substantial trading losses and improperly allocated operating expenses).  In order to keep Refco appearing to be a fast-growing group of companies, and to maintain the illusion that Refco was highly profitable, healthy, and able to satisfy its substantial working capital needs from what it called its "internally generated cash flow and available funds," the Refco Insiders needed cash.  As Refco itself stated, "[r]eady access to cash is essential to our business."

95.     Instead of owning up to Refco's true financial condition and borrowing the money they needed as part of an overall restructuring of Refco's operations, the Refco Insiders stole it from RCM and its customers.  The Refco Insiders simply took the money and property entrusted to RCM by its customers and sent the funds to other Refco entities.  None of these entities provided RCM with assurances of their ability, intent, or obligation to repay those assets; none provided RCM with

security or collateral for the diverted assets; and none had the financial wherewithal to repay RCM on demand or otherwise.

96.     On a daily basis, assets in the accounts of RCM customers were transferred out of RCM for use by other Refco entities.  The Refco Insiders caused RCM to keep as little cash as possible on hand.  In fact, even though RCM purported to hold billions of dollars of customer cash and securities entrusted to it at all relevant times, RCM in fact maintained only about $50 million in cash and those securities it did not need to fund the current operations of RGL and its affiliates.

97.     Without the knowledge, authorization, or consent of RCM's innocent directors and officers or its customers, the money would then generally be transferred by RCM to RCC, in a series of undocumented intercompany "loans."  RCC, functioning as a "disbursing" agent, would then distribute the looted property wherever it was needed in the Refco organization.

98.     The diverted RCM assets were used for a wide variety of general and specific funding purposes by various Refco affiliates who would not have been able to sustain their reported financial health and operations without using funds stolen from RCM.

99.     These transfers, which purportedly took the form of unsecured intercompany "loans" from RCM to other Refco entities, often occurred without any "loan" documentation between RCM and the Refco entities that received the funds.  The purported "loans" of RCM funds to other Refco entities for purposes unrelated to the business of RCM and without benefit to RCM were not arm's length transactions, reflecting blatant and undisclosed conflicts of interest by the Refco Insiders, and were made:

(a)     without compensation, security or collateral;

(b)     without assurances that the funds would or could be repaid on demand or at all by the Refco entities that received them;

(c)     without informed decision making at RCM or any analysis, much less informed and objective analysis, on behalf of RCM of the ability of the Refco entities to which the funds were "loaned" to repay the funds on demand or at all;

(d)    to other Refco entities that in fact lacked both the intention and the financial wherewithal to repay the diverted RCM assets on demand or at all;

(e)    for the purpose of maintaining the perception of Refco's financial strength and health so that the Refco Insiders could personally benefit from a lucrative cashing out of their interests in Refco.

100.    Because Refco's overall financial health and strength depended on a constant influx of RCM assets, the Refco Insiders kept careful track of the intercompany transactions and of the customer funds that were available for diversion at RCM at any given time. Those who were directed by the Refco Insiders to divert RCM's assets created daily "cash flow" statements setting forth the amount of customer assets available at RCM for diversion. The reports were circulated to Bennett, Maggio, and Trosten.

101.    The outside Director and outside alternative Director of RCM, Anthony Whaley ("Whaley") and Charles Collis ("Collis") (collectively the "RCM Outside Directors") were, and are, partners in the Bermuda law offices of Conyers Dill & Pearman. The RCM Outside Directors were at all times unaware of the form, substance, and magnitude of the intercompany transfers from RCM to the other Refco entities. The RCM Outside Directors were unaware that RCM customer assets were diverted daily without any loan documents or collateral or security to other Refco entities that had little, if any, ability, or intention of repaying the diverted assets. If either Whaley or Collis had learned of the fraudulent nature of the diversion of RCM's assets in daily undocumented and uncollateralized intercompany transactions to other uncreditworthy Refco entities, they would have taken steps to stop the misappropriation.

102.    At the time of the LBO, RCM was owed approximately $2 billion by Refco affiliates that were never required to post security or collateral for the RCM funds they received and had no intention or ability to repay RCM. As of October 2005, this number had climbed to over $2 billion.

103.    Without continued, fresh infusions of RCM customer assets, RGL and its affiliates would not have been able to maintain the illusion of financial strength that made them candidates for the LBO and the Refco Insiders would not have been able to cash-out their interests in Refco.

104.    The fraudulent scheme perpetrated on the RCM customers was so fundamental to the operation and financing of Refco that it had to have been apparent to each of the Professional Defendants.  The volume and size of the transfers involved, on many occasions hundreds of millions of dollars each, ensured that the amounts stolen in RCM customer assets substantially outsized Refco's total capital.  By the time Refco filed for bankruptcy, the net uncollectible RCM transfers totaled over $2 billion, while RGL claimed only $515 million in capital in 2002, $566 million in 2003, $616 million in 2004, and only $150 million in 2005.

105.    Indeed, when disclosures in October 2005 relating to the fraud prompted RCM customers to lose confidence in Refco and RCM and to begin to withdraw their securities and funds from RCM, the immediate response by Refco was to impose a moratorium on all activities of RCM, including withdrawals from customer accounts.  Without the continued availability of RCM customer assets, Refco collapsed, filing for bankruptcy just days later.

## Part Three: The Cash-Out

### The 2004 LBO

106.    The purpose of the entire scheme was to allow the Refco Insiders to sell their interests in Refco at a fraudulently inflated price.  Indeed, in the years before the LBO, the Refco Insiders made a number of attempts at partial or complete sale of their interests in Refco with the assistance of various defendants:

- At the end of 1998, with MB's assistance, Bennett, Maggio, and Grant sold a 10% ownership interest in RGL to a subsidiary of longtime Refco customer BAWAG for $95 million and received an additional $85 million for granting BAWAG an option to purchase an additional 10% interest in the company.

- In 2001 and 2002, the Refco Insiders, with E&Y's assistance, explored the possibility of selling substantial portions, and perhaps all, of Refco to BAWAG or to third parties in ways that maximized the tax benefits of any such sale.

- In 2001 and 2002, the Refco Insiders hired Credit Suisse to try to find a major investment bank or commercial bank to purchase Refco outright.  Credit Suisse was unable to identify a suitable purchaser.

107.    Through these and other attempted transactions, each of Refco's professional advisers became well aware that the Refco Insiders intended to line their pockets by selling their interests in Refco.

108.    As the Court-appointed Examiner observed, GT "was aware as early as 1998 of Bennett's plan to sell," when Bennett informed GT that he "intended to restructure Refco over the next 3-10 years" and "to increase earnings and maintain RGL's book value," because he and others working with him wanted "to liquidate their positions."

109.    The Examiner concluded that "E&Y understood since before . . . January 1, 1997 that the goal of Refco's owners was to sell the entire [company]."  In mid-2001, Refco Insiders specifically asked E&Y to develop a "tax free" way of selling all or part of Refco.  Although the Refco Insiders seriously considered an outright sale of a portion of Refco to BAWAG in 2001-2002, a satisfactory structure that addressed the various tax considerations raised by E&Y could not be developed and an outright sale to BAWAG was abandoned in 2002.  While no outright sale of a portion of Refco to BAWAG was realized in 2002, BAWAG entered into or contemplated entering into a "proceeds participation" agreement prepared by MB, pursuant to which a BAWAG affiliate ("DFI") made three payments to RGL in exchange for the right to participate in the proceeds of a future sale of RGL.

110.    The Examiner also observed that "no later than February 6, 2002," and possibly long before that, "[MB] knew that the ultimate goal of . . . Bennett and other [Refco employees] . . . was to sell RGL."

111.    Similarly, Credit Suisse knew no later than 2001 that Bennett and the other Refco Insiders wished to cash-out their interests in Refco.  Stymied in his effort to effect a partial sale of Refco, in June 2003, Bennett hired Credit Suisse as Refco's exclusive financial advisor to assist in, among other things, selling Refco.  Bennett asked Credit Suisse to find a major investment or commercial bank to purchase Refco, but Credit Suisse was unable to identify a satisfactory purchaser.  After efforts to sell Refco outright failed, Credit Suisse devised other ways through which the Refco Insiders could sell all or a portion of Refco.

112.    In November 2003, Bennett and others at Refco began negotiations with Thomas H. Lee Partners ("THL"), a private equity firm headquartered in Boston, Massachusetts, regarding that entity's possible purchase of a controlling stake in Refco as part of a leveraged buyout transaction.

113.    The LBO was ultimately carried out on August 5, 2004, and was structured as follows:  THL, through its affiliates, purchased 57% ownership interest in Refco for approximately $507 million; Refco sold $600 million in notes and obtained $800 million in financing from a syndicate of banks.  As a result of the lucrative LBO, Bennett and others acting in active concert or participation with him received $106 million, with at least $25 million going to Bennett personally.  In addition, hundreds of millions of dollars were transferred to RGHI in connection with the LBO.

114.    Although THL became aware of certain red flags in its pre-LBO due diligence, any concerns about the financial condition of Refco prior to and in entering into the LBO were allayed by the Refco Insiders.  Leading up to the LBO, the Refco Insiders and the Professional Defendants continued to generate misleading financial statements and to conceal the ballooning RGHI Receivable through the RTL scheme.

115.    In the due diligence process, Bennett and other Refco Insiders made false statements to THL.  By way of example, in connection with the LBO, Bennett executed an officer's questionnaire in which he falsely certified, among other things, that (a) he had no direct or indirect interest in any transaction with Refco or its affiliates within the prior fiscal year of more than $60,000, and (b) he had not, in the prior fiscal year, been indebted to Refco or its affiliates.  In fact, during the prior 12 months Bennett owned a substantial interest in RGHI, which had engaged in RTLs worth over $1.5 billion and which owed Refco approximately $1 billion as of late February 2004.

116.    Additionally, before the LBO, Bennett falsely represented to THL that Refco had accumulated approximately $500 million cash in retained profits and that it would be distributing those retained profits through a dividend to its shareholders at the time of the LBO.  The purported profits Bennett was referring to were, in fact, $110 million of RCM customer funds and the proceeds of a $390 million loan from BAWAG that Bennett placed into a BAWAG account.  None of these monies were "retained profits" and none were "distributed" as a dividend to shareholders.

117.    Before the LBO was completed, Bennett and other Refco Insiders also sought to conceal the RGHI Receivable and the RTLs from THL.

118.     Had THL learned the substance and scope of (a) the RGHI Receivable, (b) the RTLs, and (c) the resulting house of cards Refco relied upon, THL would not have gone ahead with the LBO, and the failure of the LBO transaction would have prevented RGL and its domestic subsidiaries from assuming $1.4 billion in new debt obligations.

**The LBO Destroyed RGL and RCM's Asset Value**

119.     There was a price to be paid for the Refco Insiders' misconduct leading up to the LBO, and that price, ultimately, was paid by RGL and RCM.  By the time of the LBO, the trading losses and operational expenses that had been pushed onto RGHI's books and hidden through the RTLs had grown to over $700 million and the diversion of RCM property had grown to approximately $2 billion.

120.     Immediately before the LBO, the Refco Insiders were still causing Refco to record hundreds of millions of dollars in trading losses and misallocated expenses as a receivable owed to it by RGHI.  The Refco Insiders were also still boosting Refco's revenues with hundreds of millions of dollars in fictitious interest on the RGHI Receivable and were using billions of dollars in diverted RCM assets to fund Refco's operations, making RCM the biggest creditor of RGL and its affiliates before the LBO.

121.     Even though this was well known to the Refco Insiders and certain of the sophisticated legal and financial advisors and auditors involved in the LBO, RGHI and the Refco Insiders caused RGL (together with all of its domestic subsidiaries, including RCC) to borrow $1.4 billion of bank and bond debt to fund THL's buyout of RGHI's control of Refco.  The LBO proceeds were not used to retire the full amount of the RGHI Receivable, pay the operating expenses that had been concealed on RGHI's books, or repay <u>any</u> of the loans owed to RCM.  Instead, Refco was induced to use the proceeds of its new debt to cash-out the Refco Insiders.

122.     Refco's auditors and legal advisors each played key roles in addressing and allaying THL's concerns in connection with entering into the LBO, and concealing from Refco's innocent directors, officers and agents, including inside counsel and others, and the RCM Outside Directors,

how severely both RGL and RCM would be damaged by the LBO. Nowhere in the Offering Circular was RGL's use of RCM's assets disclosed; nor was the RGHI Receivable.

123.    To divert attention from RCM's role as a primary funder of Refco's operations, RCM was not made a guarantor of the debt issued in connection with the LBO and reference to RCM was glaringly absent in the Offering Circular for the LBO bonds. Nowhere did the Offering Circular explain: (i) that RCM customer assets were routinely diverted from RCM and distributed to other Refco entities without security or collateral and without regard for RCM's obligations to its customers; (ii) that RCM's most significant assets were approximately $2 billion of undocumented, uncollateralized receivables from RGL and other Refco affiliates who were obligated to repay the LBO borrowings; (iii) that Refco's business plan did not provide for repayment of these receivables; and (iv) that the LBO transactions resulted in "priming" these receivables with $1.4 billion of new bank and bond debt without regard for the interests of RCM.

124.    Instead, the Offering Circular falsely stated that the LBO bond debt was "effectively junior to all existing and future liabilities of our subsidiaries [including RCM] that have not guaranteed the notes." Similarly, the Offering Circular stated elsewhere that "[t]he effect of this subordination is that, in the event of a bankruptcy . . . , the assets of [RCM] could not be used to pay you [bondholders] until after all other claims against [RCM], including trade payables, have been fully paid." These and similar statements describe how the LBO should have been structured -- consistent with the duties the directors of RGL had to RGL, RCM and RCM's customers -- *i.e.*, ensuring that any obligations incurred by any Refco affiliate in connection with the new LBO debt would not be satisfied until after all of RCM's intercompany IOUs were. This is not, however, how the LBO was structured. In fact, as set forth below, the LBO debt was laid in on top of RCM's IOUs, rendering them worthless and, despite the Offering Circular's representations to the contrary, severely damaging RCM.

125.    The Professional Defendants working on the LBO each knew and/or consciously avoided knowing that the magnitude and significance of the Refco entities' obligations to RCM. Each of these defendants would have reviewed, helped prepare, or been aware of the following

information set forth in the "payable to customers" line of the condensed consolidating balance sheet to Note O of the financial statements attached to the LBO Offering Circular, which is labeled Condensed Consolidating Financial Information:

| Condensed consolidating balance sheet | | | | | |
|---|---|---|---|---|---|
| | **February 29, 2004** | | | | |
| | Parent **[RGL]** | Guarantor Subsidiaries **[Includes RCC]** | Non-Guarantor Subsidiaries **[Includes RCM and RGF]** | Consolidation Adjustments | Consolidation Totals |
| Liabilities (in thousands) Payable to customers | $465,681 | $1,556,529 | $6,647,453 | ($3,573,946) | $5,095,717 |

126.    By performing professional services for the Company and/or performing detailed due diligence of the Company in connection with the LBO, each of these Professional Defendants were deeply familiar with Refco's corporate structure and its operations.  While an outsider would have been unable to discern from the condensed consolidating information the full extent to which RCM funds had been siphoned off to RGL and its other affiliates, these Professional Defendants understood, at least, the following:

(a)    that in order to obfuscate Refco's financial statements and conceal their fraudulent scheme, the Refco Insiders misleadingly referred to intercompany and related-party obligations as receivables and payables owed to and from "customers";

(b)    as a result, when the condensed consolidating financial statement referred to RGL's liabilities of approximately $465,681,000 as a "Payable to customers," these Professional Defendants knew and/or consciously avoided knowing that this $465,681,000 liability represented RGL's payable on intercompany obligations to its subsidiaries because RGL was a parent holding company with no trading operations and no "customers";

(c)    RCC, the principal guarantor of the LBO debt, and the other guarantor subsidiaries could not have had $1.556 billion of payables to "customers" because RCC did

37

not have any significant customer obligations and the other guarantors did not engage in business that had the potential to generate that magnitude of customer payables; and

(d)     that only RCM had the volume of unsegregated customer assets necessary to fund billions of dollars in intercompany loans.

127.     Furthermore, as these Professional Defendants knew, each intercompany transfer by RCM to RCC was booked in a back-to-back fashion through a non-Guarantor Subsidiary, Refco Global Finance, Ltd. ("RGF").  Thus, these Professional Defendants knew and/or consciously avoided knowing that the $3.573 billion in consolidation adjustments were the result of eliminating the approximately $465,681,000 of RGL's intercompany debt owed to RCM, the approximately $1.556 billion of RGF's intercompany debt owed to RCM, and the approximately $1.556 billion of RCC's intercompany debt owed to RGF, and that RCM was thus owed $2 billion ($465 million owed from RGL and $1.556 billion owed from RCC, which when booked in a back-to-back fashion through RGF, added another $1.556 billion to the consolidation adjustment).

128.     Given their due diligence, detailed in-depth understanding of Refco's financial structure and operations, and access to and preparation of the type of condensed consolidating financial information set forth in Note O, each of the Professional Defendants who assisted and advised the Company in connection with the LBO was fully aware of the massive $2 billion payable owed by RGL and its affiliates to RCM.

129.     These Professional Defendants further understood that none of this debt would be repaid as a result of the LBO, which took $1.4 billion in loan proceeds and used them instead to cash-out the Refco Insiders' interests in Refco.

130.     The ultimate effect of the LBO was to pledge RGL's and RCM's asset base in favor of bank and bond lenders, so as to put cash in the Refco Insiders' pockets, leaving RGL and RCM without any assets to satisfy their outstanding obligations to their creditors.

131.     Furthermore, as these Professional Defendants knew and/or consciously avoided knowing, this LBO was atypical because RGL went into the LBO with hundreds of millions of

dollars of concealed trading losses, misallocated operating expenses, phantom revenues, and unpaid billions owing to RCM, whose assets had been used to fund Refco's entire operations.

132.    Given Refco's true financial condition -- and the devastating impact the concealed trading losses and hidden operational expenses would ultimately have on its business if properly recorded and disclosed in its financial statements -- the LBO irreparably undermined Refco's already precarious financial condition.  By saddling RGL with $1.4 billion in secured and senior debt that Refco's operations could not service, and by continuing their plan and siphoning out all of RGL's assets, the Refco Insiders sealed Refco's fate and undermined RCM's ability to collect on its approximately $2 billion of IOUs from its Refco affiliates.

133.    RCM's ability to collect on its IOUs was further undermined when Refco's IPO proceeds were, as in the LBO, principally used to line the pockets of the Refco Insiders and the Investment Banker Defendants, leaving approximately $2 billion in RCM IOUs unpaid.

**The IPO Further Damages Refco**

134.    Less than one year after the LBO, the Refco Insiders and THL led Refco through an initial public offering of its stock.  In the IPO, Bennett sold approximately 7 million shares through his holding vehicles RGHI and Phillip R. Bennett Three Year Annuity Trust, for a total price of approximately $146 million.  THL and its affiliates and co-investors sold approximately 10 million shares of Refco common stock, with a total sale price of approximately $223 million.

135.    A "greenshoe" option was also exercised whereby the Investment Banker Defendants agreed to purchase approximately 4 million shares of Refco common stock for over $80 million. The proceeds from the overallotment sale were used to pay an aggregate dividend to Refco's pre-IPO shareholders.

136.    As evidenced by this dividend, the IPO was structured with the principal goal of allowing the Refco Insiders to cash-out, as opposed to raising funds for Refco to reduce the enormous debt Refco had been saddled with in the LBO.  Furthermore, as RGL was insolvent or operating in the zone of insolvency no later than the LBO, the $231 million in proceeds from the IPO that Refco Inc. used to retire part of RGL's LBO debt was entirely wasted; Refco was induced to

spend over $200 million dollars on RGL -- an insolvent subsidiary that was going to file for bankruptcy merely weeks later.

137. As a result of the IPO, Refco was saddled with hundreds of millions of dollars in liabilities to the purchasers of Refco stock in the IPO who had claims against Refco based on its false and misleading registration statement and prospectus. Through the IPO, Refco was again saddled with liabilities it could not satisfy -- this time the liability to pay back investors who had purchased Refco stock.

138. The Professional Defendants who advised the company in connection with the IPO knew and/or consciously avoided knowing that Refco was in no state to undertake an IPO.

139. Indeed, the most blatant indication that GT, MB, and PwC understood that the Refco Insiders were attempting to hide hundreds of millions of dollars in undisclosed related-party receivables was the conscious editing of SEC disclosure documents to conceal the RGHI Receivable.

140. Given the planned IPO, Refco had to file an S-4 with the SEC to register the $600 million of senior subordinated notes issued in the LBO. In early drafts of the S-4 registration statement, which were reviewed and commented on by GT, MB, and PwC and subsequently submitted to the SEC for comment, the S-4 disclosed a $105 million receivable owed from RGHI to Refco, which was characterized as a "customer receivable." As this was a related-party receivable owed to Refco from RGHI, the SEC questioned characterizing "amounts due from equity members (RGHI) as receivable from customers." Given the SEC's comment, GT, MB, and PwC were forced to amend subsequent drafts of the S-4 registration statement to reflect that the receivables were due from "equity members." The final S-4 filed with the SEC on October 12, 2004 reflected that the receivable was owed by "equity members" and not customers.

141. The Investment Banker Defendants also reviewed and commented on the S-4 registration statement and the SEC's comments on the S-4 registration statement.

142. The Professional Defendants involved in the LBO thus substantially assisted the Refco Insiders in trying to deceive the SEC and the investing public about the RGHI Receivable. Furthermore, those that were aware of the full massive size of the RGHI Receivable and/or that

RTLs were used to reduce the RGHI Receivable at the end of reporting periods, such as MB, GT, and PwC also knew and/or consciously avoided knowing that the actual amount due from "equity members" was well above $105 million and that the S-4 was therefore still materially false.

143.    Despite being aware of these related-party receivables, none of the Professional Defendants disclosed the RGHI Receivable in the S-1 registration statement that had to be prepared and filed with the SEC in connection with Refco's IPO.

144.    The S-1 was reviewed by and prepared in consultation with GT, MB, PwC, and the Investment Banker Defendants.   While early drafts of the S-1 included the $105 million intercompany receivable reflected in the S-4 and the reference to the receivable being owed by "equity members," the final version of the S-1 filed with the SEC omitted any reference to any portion of the RGHI Receivable despite the fact that none of the Professional Defendants received, or sought, any confirmation that even the limited $105 million portion receivable from RGHI disclosed in the S-4 had, in fact, been paid down, or that there were no other related-party receivables owed by RGHI to Refco.

145.    The final S-1, reviewed by GT, MB, PwC, and the Investment Banker Defendants, that was signed by Bennett and publicly filed with the SEC on August 8, 2005, thus failed to disclose: (a) the existence of the multi-million dollar RGHI Receivable reflecting debt owed by RGHI to Refco; and (b) the RTLs used to hide the RGHI Receivable and temporarily pay down RGHI's debt to Refco at year-end and quarter-end financial reporting periods.  Nevertheless, the IPO went forward on August 10, 2005.

146.    In hopes of concealing the fraud and maintaining the illusion of Refco's financial health for as long as possible, in late August 2005, after the IPO was completed, Bennett, with the active participation and assistance of MB, caused Refco to carry out yet another $420 million RTL with Liberty Corner to, once again, cover up the existence of the RGHI Receivable.

147.    Approximately two months after consummation of the IPO, on October 10, 2005, the entire fraudulent scheme fell apart when a non-conspiring Refco employee discovered a $430 million receivable owed to Refco from RGHI.  Refco demanded repayment of the debt by Bennett,

who tried unsuccessfully to cover up the fraud by instantly paying down the RGHI Receivable with the proceeds of an emergency loan from BAWAG.

148.    In a press release issued that same day, Refco announced that it had discovered a $430 million receivable from an entity controlled by Bennett and that the receivable, "which may have been uncollectible," was not shown on the company's balance sheet as a related-party transaction. As a result, Refco announced that "its financial statements, as of, and for the periods ended, February 28, 2002, February 28, 2003, February 28, 2004, February 28, 2005, and May 31, 2005, taken as a whole, for each of Refco Inc., Refco Group Ltd., LLC and Refco Finance, Inc. should no longer be relied upon."

149.    Once the fraud was revealed, the market for Refco stock plummeted, leading to well over $1 billion in lost market capitalization. Refco's stock was delisted by the New York Stock Exchange, and the Company -- along with its subsidiaries represented in this action -- were forced into bankruptcy.

### The Defendants' Knowledge of and Substantial Assistance in the Fraud

150.    The Refco Insiders could never have carried out their fraudulent scheme without the knowing, active, and willing participation of a host of supporters and professional advisors. Each of the defendants played important roles in the Refco Insiders' fraud.

### GT's Role in the Fraudulent Scheme

151.    GT was aware of the activities alleged herein. By its actions, as alleged herein, GT actively participated and substantially assisted the Refco Insiders and others acting in active concert or participation with them in carrying out the fraud, breach of fiduciary duties, and gross malpractice alleged herein.

152.    After it took over the Refco engagement from AA in 2002, GT provided auditing and accounting services to Refco and issued clean and unqualified audit opinions with respect to Refco's financial statements for fiscal years 2003, 2004, and 2005. GT served as the purportedly independent auditor of RGL and its affiliates, not just on a consolidated basis, but also audited

subsidiaries, such as RCM, on a stand-alone basis. As GT knew, the financial statements it audited were included in Refco's various registration statements filed in connection with the LBO and IPO.

153.    Refco's financial statements were audited by GT on a consolidated basis under RGL's name. The financial information of RGHI -- RGL's parent company "shell" -- was not consolidated with Refco. As a result, as GT knew, the ballooning RGHI Receivable was hidden from the public in order to preserve Refco's reputation in the marketplace and to conceal the millions of dollars that Refco was owed by a related-party entity owned by Bennett and Grant.

154.    GT's longstanding relationship with Refco through Mark Ramler ("Ramler") (the former AA partner who took Refco's business to GT in the wake of the Enron scandal) gave it a complete picture of the finances, operations, and business of RCM, RGHI, and the rest of Refco. Given GT's exposure to a range of Refco's subsidiary businesses, it had access to all material information. As Refco's auditor, GT also had a complete picture of Refco's third-party transactions, including its related-party transactions with RGHI. Further, GT knew and/or consciously avoided knowing from its review and audit of Refco's financial statements that Bennett caused RGL to guarantee repayment of the obligation to the supposed "third-party lenders" on RGHI's behalf. GT thus had access to all material information regarding the RTLs and the fraudulent scheme to hide the RGHI Receivable from Refco's books. Given its intimate familiarity with Refco's finances, GT thus knew and/or consciously avoided knowing the details of the fraud described herein and substantially assisted the Refco Insiders in perpetrating the fraud that inflicted billions of dollars in damages on RCM and RGL.

155.    GT substantially assisted the fraud, thereby allowing the fraud to continue and advancing the objectives of the fraud, by, among other things: ignoring red flags that alerted GT to the existence of accounting fraud; knowingly issuing unqualified opinions on Refco's consolidated financial statements for each of fiscal years 2003, 2004, and 2005 that materially misrepresented Refco's financial condition; opining separately on the financial statements of RCM; and continuing to act as Refco's auditor despite its knowledge of a fraud.

43

156.    GT also substantially assisted the Refco Insiders by issuing an unqualified opinion in connection with its re-audit of Refco's 2002 financial statements in the Fall of 2004 in connection with the LBO. As GT knew, it was a closing condition to the LBO that Refco's financial statements be compliant with SEC Regulation S-X for fiscal years 2002 through 2004. Nonetheless, in re-auditing Refco's 2002 financial statements, which had not been compliant with Regulation S-X, GT again chose to consciously avoid knowledge of the Refco Insiders' fraud.

157.    As GT knew, clean audit opinions were essential to Refco's continued functioning. Had GT ever failed to issue a clean audit opinion for Refco in general or for RCM in particular, the entire fraudulent scheme would have been immediately publicized to all interested persons and come to a crashing halt, as it in fact did when the fraud was first revealed in October 2005 notwithstanding GT's efforts to assist the Refco Insiders and others acting in active concert or participation with them to hide the true facts.

158.    This is not a case of an auditor overlooking a few details. GT completely abandoned its obligations of independence, learned first-hand of the fraud, and then aided and abetted that fraud by continuing to provide clean audit opinions in the face of grotesque accounting manipulations. GT was aware of and/or consciously avoided knowledge of all aspects of the Refco Insider's scheme to prop up Refco long enough to cash-out their interests, from the fraudulent RTLs designed to hide Refco's losses to the theft of RCM customer funds.

**Knowledge of Refco's Trading Losses and Balance Sheet Problems**

159.    GT was well aware of the RGHI Receivable.

160.    Before 2002, AA served as Refco's supposedly independent auditor. In fact, the lead partner on the engagement, Ramler, had abandoned any pretense of independence and objectivity. While at AA, Ramler once boasted that he had such a close relationship with Refco that its management did not engage in any transactions without his input. Ramler also bragged that Bennett and other senior Refco management called him on an almost daily basis to discuss transactions and business issues.

161.    After AA collapsed under the weight of the Enron debacle, Ramler moved to GT, taking the Refco engagement with him.  Refco was a marquee client for GT, was Ramler's ticket to partnership at GT, and stood to be an even better client for GT if, as GT anticipated, Refco went public.  During the course of the Refco engagement, GT earned over $9 million in fees.  With Ramler heading the engagement, GT continued AA's practice of turning a blind eye to billions of dollars of questionable accounting transactions in Refco's consolidated financial statements.

162.    Based on his long experience with Refco, when Ramler joined GT, he  brought with him knowledge of the following facts:

- As early as May 1998, Bennett desired to sell a significant portion of RGHI's interest in Refco over the next 3 to 10 years.

- Refco's internal accounting controls were deficient, and readily capable of being overridden by Refco's management.

- As of February 28, 2002, RGHI was a shell entity with no operations that owed RGL approximately $170 million, and whose financial results were not included in RGL's consolidated financial statements.

- Refco was engaging in substantial and complex related-party transactions with RGHI and there was a high risk of material misstatement arising from related-party transactions between Refco and RGHI.

- Bennett had promised AA that the RGHI Receivable would no longer increase, would be paid down, and that $35 million of the receivable would be paid off in fiscal year 2003.

- In 2001 Bennett improperly recorded a $43 million arbitration award against Refco LLC, over the CFTC's objections, and ultimately transferred the expense to RGHI's books.

163.    GT was thus aware from the outset of the Refco engagement that Bennett had a motive to manipulate Refco's financial results, that Refco's books were susceptible to manipulation, and that the RGHI Receivable, which was not reflected in RGL's consolidated financial statements, was a viable tool for accomplishing such manipulation.  GT was also aware of the inherently high audit risk that related-party transactions represent, and the mandate from applicable professional standards of the need to apply far more scrutiny to related-party transactions than to ordinary arm's length transactions, when conducting an audit.  Accordingly, GT internally categorized Refco as a "high-risk" client in part because it engaged in significant and complex related-party transactions,

lacked an internal audit function, and was dominated by a limited number of senior executives and managers who had an interest in maximizing Refco's apparent financial condition and operating results.

164.    Nevertheless, GT utterly failed to properly audit Refco's related-party transactions. As a result, even though GT knew and/or consciously avoided knowledge that the RGHI Receivable was used to fraudulently inflate Refco's operating results and learned of the RTLs which served to hide the RGHI Receivable, it continued to issue clean audit opinions for Refco.

165.    For example, in connection with the 2003 audit, on April 28, 2003, Ramler obtained a letter from Bennett concerning Bennett's intent to pay down the receivable due from RGHI.  In that letter, Bennett noted that the RGHI shareholders intended to reduce the amount of the receivable, then totaling $105 million, by at least $35 million per year, resulting in full payment by February 28, 2006.  GT made no effort to determine whether those payments actually were made -- and indeed, they were not.  Nor did GT perform any testing to verify the accuracy of the $105 million figure (which was false) or whether RGHI and/or its shareholders had the financial wherewithal to repay the amount.  During its 2004 and 2005 audits, GT likewise failed to obtain sufficient evidence to provide any reasonable assurance that related-party transactions were properly reflected in the financial statements.

166.    GT's work papers from the 2003 audit demonstrate that GT contemplated steps to scrutinize related-party transactions, but simply chose not to implement any of them.  For example, in conducting its audit of RCC in 2003, GT told Refco that it needed to see certain loan receivables to RCC on the books of the affiliate owing the money.  When making this inquiry, GT specifically requested the information about a loan from RCC to RGHI purporting to have a balance of approximately $71 million, including documents to verify the existence and terms of the loan and ensure that RGHI was actually making payments that were received by RCC and reflected in its bank statements.  In violation of GT's own practices, as well as Generally Accepted Auditing Standards ("GAAS"), GT never carried out any of these procedures.  Had GT done so, GT would have quickly exposed the fraud.

167.    Furthermore, despite the high degree of risk GT knew was connected with related-party transactions at Refco, GT deliberately chose not to take the simple and obvious step of examining the customer statement for the RGHI account at RCC for the months of February and March 2003.  Had GT done so, it would have seen the following:

- Until February 21, 2003 (*i.e.*, just seven days before Refco's fiscal year-end), RGHI owed Refco over $600 million.

- On February 21, 2003, RGHI's account at RCC received $308.5 million from a transaction described in the account statement as "TRANSFER FUNDS," reducing the amount that RGHI owed RCC.

- On February 25, 2003, RGHI received two credits for an aggregate of $250 million from a wire transfer from a bank in New York.

- By March 4, 2003 (*i.e.*, just 4 days after Refco's fiscal year-end), the above entries were reversed, and the amount RGHI owed to RCC ballooned from $71.8 million on February 28, 2003, back up to over $600 million.

168.    Moreover, the 2003 disclosed portion of the receivable balance from RGHI's account at RCC of over $70 million represented an approximately $30 million increase over the prior year. Although GT inquired as to the reason for the increase, it took at face value the explanation from Refco that the $30 million represented "additional loans" and never questioned why, during a time when Bennett had promised that RGHI would pay down the RGHI Receivable, Refco was extending further credit to RGHI.

169.    GT's audit plan for 2003 also called for GT to review loan documents concerning the receivable balance in RGHI's account at RCC and to perform an assessment of the interest income represented by Refco to have accrued on this balance.  GT failed to perform either procedure.  The substantial accrued interest income associated with the RGHI Receivable would have indicated to GT that the receivable had to be massive and far greater than the $105 million falsely disclosed by Bennett.

170.    In fact, after the 2003 audit GT failed to perform any procedures whatsoever to test the RGHI Receivable at RCC.  One glaring omission in GT's work papers after 2003 is the absence of a document called "Schedule of Loans to Stockholders and Unconsolidated Affiliates."  This document, which GT had obtained and reviewed as part of every Refco audit from 1996 to 2003,

47

detailed Refco's related-party receivables.  GT failed to require Refco to provide it with this critical document for the 2004 and 2005 audits and did nothing to investigate this change in documentation, even though the customer statements for RGHI's account at RCC during the 2004 and 2005 audits made clear that RGHI still had a massive debt balance in favor of RCC.  GT intentionally turned a blind eye to this issue.

171.    Similarly, GT failed to properly examine the RGHI balances at RCM.  Though Ramler knew that in the past RGHI owed substantial sums of money to Refco through an account at RCM, GT failed to perform even the simplest procedure to ensure that this related-party account was being properly recorded in Refco's books.  Had GT looked at the RGHI customer statement at RCM for February 2003 (Refco's fiscal year-end), GT would have seen the following:

- The debit balance in the account as of February 1, 2003, was approximately $150 million.

- On February 7, 2003, an adjustment was made to credit the account for approximately $150 million, leaving a small debit balance on February 28, 2003, of approximately $70,000.

Scanning the customer statement for later financial reporting periods would have shown similar manipulations of RGHI's account at RCM.

172.    GT's failure to examine the customer account statements of the related-party RGHI was so obviously a violation of its own policies, and so clearly a violation of GAAS, that it can only be evidence of a willful blindness -- an intentional effort to avoid exposing evidence of the accounting fraud at Refco.

**The RTL Transactions**

173.    During its audits of Refco, GT not only knew of, consciously avoided knowledge of, and failed to properly audit the RGHI Receivable, but it also came face-to-face with the RTLs themselves.  Again, GT deliberately ignored numerous red flags indicating that these RTLs were part and parcel of the accounting fraud being perpetrated by the Refco Insiders and those acting in active concert or participation with them.

174.    The RTLs with Refco customers during the periods audited by GT were accomplished by RCM falsely recording a loan as a "reverse repo" or "time deposit" in the RTL

Defendant's customer account.  A "reverse repo" is a securities sale and repurchase agreement executed between two parties, and "time deposit" is a loan extended to a customer for purposes of trading.  Both "reverse repos" and "time deposits" require the use of collateral, and because both involve agreements with third parties who may fail to perform, both kinds of transactions raise serious financial statement risks and warrant heightened scrutiny by auditors.  Professional audit standards advise that when confirming high-risk transactions such as these, the auditor should confirm the terms of the transactions, and not merely their amount.

175.    GT ignored these standards and deliberately failed to inquire into the obviously suspicious circumstances of these transactions and subjected them to little or no scrutiny at all.  As noted, the RTLs were not actually "reverse repos" or "time deposits."  The RTLs lacked the hallmark of both transactions -- collateral.  Nor did the RTL Defendants' total capital provide Refco with adequate security for these substantial advances.  Nevertheless, GT accepted at face value Refco management's characterization of these transactions despite clear evidence that they were not what they purported to be.

176.    For example, during its audit of RCM for 2003, GT noted large, period-end, round-dollar so-called "reverse repo" transactions between RCM and two of the RTL Defendants (Liberty Corner and Delta Flyer) totaling $650 million.  The transactions were timed to span and be unwound at Refco's fiscal year-end.  On April 16, 2003, GT sent simple confirmation requests to these two RTL Defendants, which were signed and returned to GT.  Although GT performed additional balance sheet testing on other RCM customer accounts for 2003, GT did not conduct additional credit risk testing on these RTL Defendants' accounts and GT did not inquire into the circumstances of these transactions, despite the fact that the amount of the transaction dwarfed each RTL Defendants' total capital.

177.    In the 2004 audit, GT noted a $720 million period-end transaction characterized as a "reverse repo" with Liberty Corner.  As in 2003, GT sent a request to Liberty Corner to confirm the account balance, which Liberty Corner did.  This year, however, GT took the additional step of reviewing the potential credit risk from the transaction.  GT noted that the entire amount of Liberty

Corner's debit balance -- $720 million -- was at risk, meaning that no collateral secured it. However, GT did not identify the account as a credit risk, and ignored the fact that a real "reverse repo" transaction should be secured by collateral.

178.    As these examples illustrate, in every review and every audit that it conducted of Refco, GT received information that RCM was engaging in large, period-end, unsecured credit transactions, purported "reverse repo" or "time deposit" transactions with the RTL Defendants. In each case, GT understood that the transactions were in fact unsecured loans of hundreds of millions of dollars made to entities without the financial wherewithal to repay the loan, rather than collateralized "reverse repo" transactions. Yet in each case, GT declined to investigate further based on information -- often merely a representation from management -- that the unsecured balance had been repaid. Moreover, despite being engaged for years as Refco's auditors, GT never alerted Refco's directors and officers or anyone else to the pattern and never questioned why Refco entered into these uncollateralized transactions at the end of each and every relevant reporting and audit period. Nor did GT ever question why Refco was characterizing these transactions as "reverse repos" or "time deposits" when they were not collateralized.

179.    Further evidence that GT understood that the RTLs were being used to hide the RGHI Receivable comes from Ramler himself. In Ramler's own handwritten notes, Ramler writes the words "$450,000 million" and "contract loan," with a line drawn between "$450,000 million" and the words "Liberty Corner Capital Strategy Fund LLC" (one of the RTL Defendants). Next to the name of Liberty Corner appear the words "mature transaction" and below it are the words "clean-up of interco accounts." During the quarter ended May 31, 2005, there was in fact a $450 million "loan" characterized on Refco's books as a "reverse repo" that was used to "clean up" Refco's intercompany accounts. This is a connection Ramler would not have made unless he, and thus GT, had actual knowledge of the fraud.

180.    Records of internal communications within GT's management show that GT understood that Refco was not an appropriate candidate for an IPO and that GT could be subject to liability for its conduct with respect to Refco. In late December 2004, Ramler had a conversation

with a member of GT's Professional Standards Group regarding Refco's response to an SEC inquiry regarding the IPO. The note states, in part: "Atty called – also this AM – Refco makes Firm uncomfortable . . . issue is sig. def. . . . Issue is no CFO. Probably had weak one before. We might not want to participate in IPO once this S-4 is done." The note goes on to demonstrate GT's concerns about Refco and the upcoming IPO: "They are moving very fast – too fast for comfort . . . what to do – we would be <u>sued.</u>"

181.    Indeed, GT knew and/or consciously avoided knowing that Refco was misappropriating RCM customer assets and using them for other Refco purposes. GT also knew and/or consciously avoided knowledge that Refco was engaging in the RTL scheme in order to hide the fact that Refco was suffering massive losses due to uncollectible receivables, and that RGL was being saddled with guarantees for the RTLs. In sum, GT knew and/or consciously avoided knowledge that Bennett and the other Refco Insiders were fraudulently "dressing up" Refco using these schemes in order to cash-out their own Refco interests. GT was a sophisticated audit and accounting firm that, when faced with knowledge of this fraudulent scheme, chose to look the other way -- apparently to keep a marquee customer happy. GT not only violated the governing standards of GAAS, it substantially assisted and participated in a scheme that ultimately cost RCM and RGL hundreds of millions, if not billions, of dollars in losses. GT is liable for the damages that were incurred as a result of its malfeasance.

182.    In auditing Refco financial statements, GT came to learn of the RGHI Receivable, knew that it was dealing with related companies with which it had to maintain its professional auditing skepticism and saw numerous red flags alerting it to the existence of the RTLs. As the Examiner concluded, GT was "in possession of a series of 'red flags' that should have alerted a properly skeptical auditor to the fraud," and yet it "failed to adequately test high-risk related party transactions, failed to approach [its] audits with the appropriate degree of skepticism, and failed to adequately consider and evaluate the potential for fraud within Refco, a company controlled by a few individuals who could override controls and who intended to sell the company."

**Maintaining the Fraudulent Business Model**

183.    Each year, GT issued, among other things, unqualified audit opinions claiming that, after applying GAAS, the financial statements of RCM fairly presented RCM's financial condition in accordance with Generally Accepted Accounting Principles ("GAAP").  In addition, GT consented to the incorporation of its audit opinion in RCM's financial statements. (GT's audit opinions were, as a matter of course, included in RGL's financial statements, which represented the financial statements for the whole of Refco, but excluded RGHI.)

184.    The RCM financial statements for each of years 2003, 2004, and 2005 were false and misleading and failed to state material facts necessary to make the statements contained therein not misleading.  In particular, the RCM financial statements were false because they failed to disclose that the "loans" that RCM had made to other Refco affiliates were uncollectible and  should have been written off -- a fact which would have shown RCM's net income, net assets, and stockholders equity were negative.

185.    For example, RCM's 2003 financial statements failed to recognize losses with respect to approximately $275 million in uncollectible obligations which the financial statements falsely characterized as "receivable from customers."  In fact, as GT was aware, these were simply RCM customer-entrusted assets, which had been improperly diverted to other uncreditworthy Refco entities, and were not properly characterized as "receivable from customers."  Moreover, had GT properly audited the 2003 financial statements, it would have recognized the need to write off an additional approximately $650 million in uncollectible payables owed to RCM by Refco affiliates that were being used to finance RTLs at the end of the 2003 fiscal reporting period.

186.    The 2004 RCM financial statements similarly failed to recognize losses with respect to approximately $1 billion in uncollectible related party obligations which the financial statements falsely characterized as "receivable from customers."  Again, as GT was aware, these were simply RCM customer-entrusted assets which had been improperly diverted to other uncreditworthy Refco entities, were not properly characterized as "receivable from customers." Moreover, had GT properly audited the 2004 financial statements, it would have recognized the need to write off an additional

approximately $720 million in uncollectible payables owed to RCM by Refco affiliates that were being used to finance RTLs at the end of the 2004 fiscal reporting period.

187.    The 2005 RCM financial statements failed to recognize losses with respect to approximately $2 billion in uncollectible obligations which the financial statements falsely characterized as "receivable from customers." As GT was aware, these were simply RCM customer-entrusted assets which had been improperly diverted to other uncreditworthy Refco entities, were not properly characterized as "receivable from customers." Moreover, had GT properly audited the 2005 financial statements, it would have recognized the need to write off an additional approximately $345 million in uncollectible payables owed to RCM by Refco affiliates that were being used to finance RTLs at the end of the 2005 fiscal reporting period.

188.    Although in each case, the RCM financial statements stated that a portion of these "receivables from customers" were attributable to "related-party transactions," the financial statements falsely mischaracterized these transactions as having consisted of "securities and other financial instrument transactions" that RCM had transacted with related parties "in the normal course of business." In fact, as GT was aware, a significant portion of these transactions were simply diversions of RCM's customer-entrusted assets, with no collateral, and were certainly not in the normal course of business, as the affiliated companies that received RCM customer assets lacked both the intention and the financial wherewithal to repay the diverted assets.

189.    GT knew and/or consciously avoided knowledge that these assertions in the RCM financial statements were false because it not only had access to, but actually audited and analyzed material information concerning RCM and the intercompany transfers of RCM customer assets. GT knowingly or recklessly failed to take the required audit steps or avoided the resulting audit evidence. At all relevant times, the affiliated companies lacked the financial intent and/or wherewithal to repay RCM, the loans had no legitimate business purpose for RCM but benefited only the affiliates, the loans were falsely documented as "customer" receivables, RCM's board of directors never approved the transactions, and no collateral or security existed of any value. These

facts constituted huge red flags which were known and/or consciously avoided by GT.  Any proper audit examination would have revealed these facts and uncovered the fraud alleged herein.

190.     Further evidence of GT's knowledge of fraud, and GT's active assistance in covering up the fraud, comes from a management deficiency letter (the "Management Letter") prepared by GT following the February 29, 2004 year audit which raised significant "internal control" and accounting deficiencies at Refco.  As set forth in this letter, among the accounting irregularities and deficiencies known by GT to have existed well before the LBO were: "Consolidation Process," "Formalized Reporting and Closing Process," "Internal Audit Function," "Accounting Procedures and Policies," "Accounting Function," "RCM Custody Reconciliations," "Audit Coordination, " and "IT Environment Deficiencies."

191.     As the Management Letter revealed, GT was fully aware that Refco's internal accounting and auditing functions were in a shambles, that there was no internal audit function, there was insufficient audit coordination, and that there were deficiencies in accounting procedures and functions and in the consolidation processes.  Despite these numerous longstanding deficiencies, the correction of which would have made the various accounting improprieties and frauds conducted by the Refco Insiders harder to conceal, GT provided Refco with a clean audit opinion before and in connection with the LBO.

192.     Despite being aware of these deficiencies before the LBO and having "previously discussed" these longstanding deficiencies with Trosten and other Refco Insiders, it was only after the LBO that, to cover its inaction and failure to properly audit Refco, GT "papered" the deficiencies in a letter to Bennett dated October 15, 2004.  As GT alludes to in its Deficiency Letter, Refco's "accounting function d[id] not have the necessary resources or expertise in accounting and financial reporting expected of a public issuer."  As GT recognized, Refco's deficient accounting practices, and the fraud they helped conceal, could not withstand the increased scrutiny that Refco would be receiving from regulators and investors given the impending IPO.  Nonetheless, in its cover letter to Bennett, GT refers to these significant deficiencies as merely "several matters that are opportunities for strengthening internal control and operating efficiency."

193.    Even after belatedly presenting the Management Letter to Bennett in October, 2004, GT failed to follow-up with Bennett or anyone else at the Company regarding the numerous deficiencies until early 2005, when Gerald Sherer, the new Refco CFO, was appointed. Even then, GT modified its findings at the instructions of Refco management and then affirmatively lied about the letter's existence when GT was asked by THL whether any such management letter existed during the due diligence process.

194.    In late March 2005, long after the conclusion of the LBO, THL learned of the existence of the Management Letter. In an April 1, 2005 internal email, a THL executive expressed his anger that neither Refco nor GT had provided the Management Letter to THL during the due diligence leading up to the LBO. As THL stated internally, "when was the letter issued? i can't remember if we sa[w] auditor letters during diligence, perhaps we should send it to berndsen [at KPMG] to get his views and see if he remembers it. if this letter was release[d] in oct and neither mgmt nor gt [Grant Thornton] told us about it i am ANGRY at both[.]"

195.    The same day, in another internal email, another THL executive explained his discovery that at or about the time that GT provided the Management Letter to the company, Refco management had pressured GT to change or retract many of its conclusions in an effort to avoid taking appropriate steps to remedy the significant deficiencies identified by GT:

> These are the facts as I've heard them . . . . A draft of the letter was first issued in October. Gerry [Sherer, Refco's new Chief Financial Officer] received it when he first got there [in early 2005] and "tore GT a new one" for using the words "significant deficiency" with regard to the systems. GT printed a revised version of the letter omitting those words and without management's response on March 29th and gave to Gerry. Gerry responded in writing two days ago with regard to the systems comment.

196.    A few days later, another internal THL email discussed the fact that Weil Gotshal & Manges, THL's lawyers during due diligence, believed they had asked both Refco and GT if there were any management letters and were told there were none:

> [W]e wanted to chat about 2 issues raised by Weil. First is the GT management letter. As we discussed on Monday neither the company nor GT shared this letter with us, the audit committee or Weil. Weil believes they asked both the company and GT if there were management letters and was told no.

197.    In sum, GT not only knew of and left unaddressed numerous accounting and controls deficiencies at Refco before, during and after the LBO, GT also eagerly softened its findings to please Refco management and later lied about the existence of the Management Letter.  These facts demonstrate both GT's knowledge of and substantial assistance in the Refco Insiders' fraud.

**Failure to Follow Generally Accepted Practices and Standards**

198.    In each of its audits for Refco and affiliated entities, GT failed to satisfy the minimum acceptable standards of professional conduct, including but not limited to GAAS, and failed to ensure that Refco's financials were consistent with GAAP.  But for those failures, the Refco Insiders and others acting in concert or participation with them would not have been able to loot and otherwise deprive RCM and RGL of their valuable corporate assets.  As set out below, audits performed with the appropriate degree of diligence and professional skepticism would have uncovered the fraudulent scheme alleged herein, and would have prevented the damage inflicted on RCM and RGL by the Refco Insiders and others acting in concert or participation with them (including, but not limited to, the unnecessary bond and bank debt foisted on RGL as a consequence of the LBO).

199.    Auditors are not permitted to accept corporate assurances at face value; if directors and corporate records were to be blindly accepted, there would be little or no point in performing an audit.  For that reason, auditors must conduct themselves at all times with a high degree of professional skepticism and with an independence in mental attitude.  Ramler, throughout his tenure both at AA and at GT, consistently failed to act with the requisite degree of professional skepticism. Ramler not only took Bennett and other Refco employees at their word -- he personally vouched for their trustworthiness and veracity.  Ramler's motivation for doing so was obvious; Refco was an extremely valuable account that he himself managed, and keeping the account through a successful IPO would constitute a coup both for GT and for Ramler.  In a conscious attempt to maintain the illusion that Refco was financially solid so as to allow the Refco Insiders to cash-out, GT regularly issued unqualified audit opinions following a procedure that amounted to no audit at all.

200.    GT failed to perform sufficient fieldwork by neglecting to obtain competent evidence to afford a reasonable basis for forming an opinion regarding Refco's financial statements. Essentially all of Refco's records, including RTL documents within the possession of MB and numerous Refco entities and employees, were readily available to GT.  Yet GT failed to inspect these documents.  Similarly, despite their availability, GT failed to analyze account statements for RCM and RCC accounts held by Refco entities, related parties or by RTL participants.  Contrary to GAAS requirements, GT failed to satisfy itself that Refco had implemented adequate safeguards, procedures and controls.  GAAS specifically identifies a number of "red flags" for auditors to consider that GT knew and/or consciously avoided knowing were present in this case, including, without limitation: (a) significant related-party transactions totaling hundreds of millions of dollars annually; (b) strong pressures to perpetrate fraud, since the Refco Insiders, and those acting in active concert or participation with them, had confessed a desire to maintain Refco's value for a personally enriching sale of the company in the near future; (c) weaknesses in internal control; (d) numerous undocumented intercompany transfers; and (e) unusual or unexpected analytical relationships evidenced by asymmetrical balance sheets that did not accurately reflect intercompany transactions, including significant funds diverted from RCM without any loan documentation or any record of a receivable at other Refco entities.  Yet GT failed to take appropriate precautions, including (as discussed above) failing to obtain and analyze competent supporting materials, verify management representations, and investigate large and complex intercompany and related-party transactions.

201.    GT also failed to scrutinize numerous intercompany and related-party transactions involving Refco, its affiliates, and entities controlled by the Refco Insiders, and those acting in concert or participation with them.  This violated numerous applicable professional standards, including those warning that related-party transactions -- which cannot be presumed to be carried out on an arm's length basis -- must be thoroughly examined and substantiated.  Moreover, GT failed to follow applicable professional standards that require scrutiny of ostensibly third-party transactions that can be used to obscure or conceal related-party transactions.  At a minimum, the frequent large-value round-dollar risk-free loans that Refco repeatedly engaged in at the end of every fiscal year

(and after 2004, every fiscal quarter) were just such transactions, and a competent analysis of these transactions -- including but not limited to an analysis of customer accounts and an examination of loan documents drafted by MB -- would have revealed the fraud.

202.    GT further failed to implement procedures for identifying intercompany transactions and disclosing the details associated with those transactions, including the likelihood that funds upstreamed from RCM would or could be repaid in the future.  Applicable professional standards required GT to test the validity and appropriateness of these transactions and evaluate the probability that these uncollected balances could be realized, particularly given that they were increasing over time.  By knowingly not applying appropriate auditing standards, GT allowed the Refco Insiders to continue looting RCM customer accounts.  Similarly, GT failed to examine the legitimacy of related-party transactions and thinly-concealed related-party transactions (the RTLs), despite professional obligations to ascertain the financial capability of other parties to repay balances owed, to review the agreements and other pertinent documents associated with the transactions, to inspect or confirm and obtain satisfaction concerning collateral for the transactions, and most importantly, to understand the business purpose for the transactions.  None of these steps was taken for the RTLs, despite the fact that they were unusual and large-scale transactions repeatedly timed to coincide with the close of every relevant reporting and audit periods, and despite the fact that they lacked any legitimate business purpose.

203.    An audit properly performed in accordance with GAAS easily would have uncovered the fraud alleged herein.  GT's auditors, including Ramler, would have known that the RTLs and other suspicious transactions were evidence of ongoing and massive financial manipulation.  GT's repeated failure to conduct an appropriate audit and its decision to ignore innumerable red flags requiring a high degree of skepticism and a rigorous examination of Refco's books and records, strongly suggests that GT and Ramler made the conscious decision to conceal the massive ongoing fraud in order to keep Bennett happy and continue collecting professional fees.

204.    At a minimum, GT failed to meet the minimum professional standards of care in discharging its audit duties.  Without this professional failure, the fraudulent scheme alleged herein could not have wrought massive damage to the assets of RCM and of RGL.

## MB's Role in the Fraudulent Scheme

205.    MB was aware of the activities alleged herein and was a direct participant in a number of aspects of the Refco Insiders' fraud.  By its actions, as alleged herein, MB actively participated and substantially assisted the Refco Insiders in carrying out the fraud, breach of fiduciary duties, and gross malpractice alleged herein.

206.    MB's relationship with Bennett, Maggio, and Grant dates back to 1994, when MB partner Joseph P. Collins ("Collins") brought the Refco account to MB from his previous law firm. Until October 2005, MB was Refco's primary law firm, and Collins was Refco's primary outside legal counsel.  With bills, on average, of approximately $4 million a year, Refco was an extremely lucrative client for MB, and as Collins' largest client, accounted for half of the billings for which he was responsible.  Between 1994 and October 2005, MB provided a broad range of legal services to Refco -- representing Refco in SEC investigations, drafting profit sharing plans for key executives, advising Refco on corporate governance issues and United States and foreign regulations regarding its operations and activities, drafting Refco's customer agreements, providing Refco with tax advice, leading financings for senior note and loan agreements, and drafting and negotiating the RTLs.  As a result of the varied engagements MB undertook on behalf of Refco, the firm became thoroughly familiar with the inner machinations of the Company.  The vast majority of important transactions and deals at Refco, including the LBO and IPO, were cleared through Collins or the attorneys working under his direct supervision, and Collins was aware of the work that everyone was doing on Refco matters by virtue of his review of the bills before they were submitted to Refco.

207.    As the Court-appointed Examiner found, MB was aware of the Refco Insiders' fraud and aided and abetted it.  As discussed in more detail below:

- MB was aware of Refco customer losses during the late 1990s through, among other things, its legal work helping the Refco Insiders hide these losses by transferring them to RGHI.  MB thus knew and/or consciously avoided knowledge of the

existence of the RGHI Receivable as early as 1999, and by no later than June 2002, MB knew that RGHI owed a related party debt to RGL of at least $350 million.

- MB drafted virtually all of the RTL documents with respect to 18 separate transactions, negotiated the terms of the RTLs with the third-party RTL Defendants, and fully understood the nature of the RTLs.

- MB understood that the RTLs ultimately involved lending hundreds of millions of dollars by Refco, for a period of only a few days, through the RTL Defendants to RGHI, an entity that was controlled by Bennett. MB knew that these massive loans were risk-free to the RTL Defendants and that they served no legitimate business purpose.

- MB knew the implementation of the RTLs were tied to Refco's financial reporting periods. For example, MB knew and/or consciously avoided knowing that prior to the LBO in 2004, Refco was required to submit audited financial statements on an annual basis and, after the LBO, on a quarterly basis. MB knew that the RTLs straddled Refco's financial reporting and audit periods and occurred only at those times (with one exception).

- MB drafted guarantees and indemnities on behalf of RGL in favor of the RTL Defendants to guarantee RGHI's repayment obligation, and MB knew that Bennett signed virtually all of the guarantees and indemnities on behalf of RGL or RCM and the loan documents on behalf of RGHI. MB knew and/or consciously avoided knowing that the guarantees and indemnities Refco was signing in connection with the RTLs violated the terms of other loan agreements that MB had prepared for Refco.

**Awareness of Refco's Trading Losses and Balance Sheet Problems**

208.    Starting in 1997, MB provided legal services to Refco in connection with various transactions involving "bad debts" incurred by Refco. In those cases, the "bad debts" were assigned to RGHI or related entities. For example, in late 1997, a group of Refco customers to whom Refco had extended credit sustained large losses, some in connection with the Asian debt crisis. By the end of 1998, these losses amounted to hundreds of millions dollars. MB attorneys were involved in the resolution of Refco's claims against these customers, which debts later became part of the RGHI Receivable.

209.    In October 1997, a Refco customer named Victor Neiderhoffer and several funds he controlled lost more than $90 million (the "Neiderhoffer Loss"). Instead of disclosing the losses -- losses which Neiderhoffer could not cover -- Refco, with MB's assistance, sold this account receivable to an RGHI subsidiary (Wells Ltd.). These losses were subsequently added to the RGHI

Receivable. Because MB was advising both RGHI and Refco throughout the relevant time, MB was thus aware that Refco could and did use RGHI as a repository for bad debts incurred by Refco itself.

210.    MB continued to be aware of the RGHI Receivable. In a letter dated October 15, 1999, Bennett wrote to Collins to provide arguments to be used to support the apparent net worth of RGHI. Bennett stated that RGHI's value was the value of its investment in RGL. Collins, aware of the RGHI Receivable, jotted in his handwritten notes: "Minus loans to RGH[I]." These handwritten notes show that Collins knew RGHI owed money to RGL.

211.    By June 2002, MB was clearly aware that the RGHI Receivable existed and totaled at least $350 million. On June 11, 2002, in connection with legal work for Refco, MB revised legal documents that included a "Letter Agreement" to be signed by, among others, RGL and RGHI, in which RGL agreed that "$350 million" would be used "for the retirement of related party debt of [RGHI]."

212.    The RGHI Receivable was not the only method by which MB actively participated in an effort to hide Refco's "bad debts." For example, in late 1999 and early 2000, MB was instrumental in hiding what Maggio perceived to be a $6.3 million "bad debt" (the "Deere Park Debit Balance") owed to Refco by a customer called Deere Park Capital LLC ("Deere Park"). Maggio asked his advisors, MB and E&Y, to develop a transaction -- the Minglewood scheme -- that would conceal the Deere Park Debit Balance. Based on tax advice from E&Y and legal advice from MB, the parties created a joint venture called Minglewood Investments LLC to which Deere Park contributed certain worthless or highly speculative securities and $2 million in cash, while Refco contributed the Deere Park Debit Balance. As Maggio admitted to one of Deere Park's principals, Refco entered into this joint venture to avoid having to write off the Deere Park Debit Balance. Under the terms of the agreement drafted by MB, the $6.3 million debit balance was converted into a note that would only be payable from profits Minglewood Investments LLC earned on its securities, and would convert to a zero balance -- in other words, disappear -- after a set time period. As MB understood, the entire purpose and effect of the Minglewood transaction was to hide the $6.3 million debt from Refco's financial statements. A Deere Park principal has testified under oath to having

had conversations with an MB attorney regarding the fact that Refco was entering into the Minglewood transaction so that it would not have to write off a receivable.

**The RTL Transactions**

213.    MB was not only aware of the huge RGHI Receivable, but MB drafted and negotiated the fraudulent RTLs whose sole purpose was to hide its existence. Indeed, over the course of five years, MB drafted virtually all of RTL documents for at least 18 RTL transactions that collectively amounted to billions of dollars in fraudulent loans.

214.    In February 2000, MB drafted RTL documents for a $50 million RTL with defendant EMF Core Fund (a subsidiary of defendant EMF Financial, picked by defendant Flanagan to participate in the scheme).  On February 24, 2000, an MB associate sent Flanagan a packet of materials containing (a) a loan agreement for $50 million from Refco Capital Markets to EMF Core Fund, (b) a loan agreement for $50 million from EMF Core Fund to RGHI, (c) an indemnification agreement by RGHI, and a guarantee by RGL of RGHI's repayment obligation.  The loans were to take place just before the end of Refco's 2000 fiscal year, and were to be unwound just after the beginning of the next fiscal year.

215.    MB employed the same loan structure for each of the RTLs, and drafted (at times even negotiated) RTLs not only with Flanagan's EMF Financial and Delta Flyer entities but with Coast (through its subsidiary CS Land), with Krieger (through his Beckenham Trading entity), and with Ingram Micro (through its subsidiary CIM Ventures).

216.    Although this loan structure -- whereby a loan was made at the close of a financial reporting period only to be unwound shortly after Refco's financial reporting and audit periods -- was suspicious on its face, MB proceeded to draft and transmit the documents necessary to carry out not only the February 2000 RTL with EMF Core Fund, but all of the RTLs discussed herein. Indeed, MB drafted (and at times even negotiated) nearly identical loan documents at least an additional 14 times over the next four years.

217.    MB continued to participate actively in the RTL scheme without hesitation, and to draft all documents necessary for the execution of that scheme, even as the amount of the RTLs

increased dramatically. For example, while the February 2000 RTL with EMF Core Fund was for $50 million, MB executed a single RTL for $720 million with RTL Defendant Liberty Corner in February 2004.

218.    Indeed, the $720 million February 2004 RTL was significant not only because of its size; the RTL also occurred at a time when MB was representing Refco in connection with the planned LBO. During that period, MB was well aware that THL would be conducting due diligence seeking to discover Refco's true financial condition, yet MB proceeded to negotiate and draft RTL agreements that transferred huge round-dollar amounts from one Refco entity to RGHI through the RTL Defendants just days before the end of Refco's financial reporting periods.

219.    Moreover, MB knew and/or consciously avoided knowing that the RTLs were designed to hide the RGHI Receivable as Refco went to great lengths to hit specific targets for each RTL. In February 2004, Refco initially planned two RTLs -- a $500 million RTL with Liberty Corner, and a $200 million RTL with RTL Defendant Delta Flyer (an entity affiliated with RTL Defendant EMF Financial). When EMF Financial notified Refco that Delta Flyer could no longer participate, MB revised numerous documents to consolidate the loans, resulting in a single $720 million loan with Liberty Corner. These last-minute changes clearly signaled Refco's need to manipulate its financial records by specific amounts prior to the February close of its 2004 fiscal year.

220.    No later than June 2002, MB knew that RGHI owed a receivable of at least $350 million to RGL. Yet MB continued to facilitate additional RTLs for the Refco Insiders.

221.    MB not only continued its work on the RTLs, but escalated that work, as RTLs began to occur on a quarterly basis right before the LBO. Thus, like clock-work, the RTLs always straddled the end of Refco's financial reporting periods and never occurred at any other time (with one exception). Despite this additional obvious sign that the RTLs were intended solely to manipulate Refco's financial statements, MB continued to participate willingly in the RTL scheme by drafting new documents for the now-quarterly transactions.

222.     As Refco's principal outside counsel from 1994 until October 2005, MB was intimately familiar with Refco's financial reporting and audit periods.  For example, Collins and other MB attorneys received numerous requests to contact Refco's auditors every February in connection with Refco's audits, and received many of these same requests at the end of each quarter following the LBO.  Indeed, Collins advised Bennett and other Refco employees in connection with audit letter responses, and even reviewed footnotes to accompany Refco's financial statements.  Yet MB willingly drafted documents for, negotiated terms of, and otherwise assisted in executing numerous RTLs moving large round-dollar amounts between Refco, RGHI and the RTL Defendants only days before and days after the end of each and every relevant reporting period that Refco faced.

223.     Indeed, MB willingly participated in the RTLs even though MB knew that Refco's bank financings contained covenants specifically prohibiting Refco from incurring additional indebtedness, such as guaranteeing a third party's debts, beyond certain limits.  MB knew these covenants existed because MB had participated in the negotiation and drafting of the LBO financing documents.  Thus, by preparing the RTL documents, MB assisted in transactions that it knew violated loan covenants in financing documents that MB had previously negotiated and drafted.

224.     Additionally, MB knew and/or consciously avoided knowing (through its role as an advisor on finance-related legal matters) that the RTLs had no legitimate business purpose.  These were uncollateralized, short-term loans involving the lending of hundreds of millions of dollars by one Refco entity through a third party to a Refco related-party (RGHI), with guarantees and indemnities by RGL to eliminate any risk to the RTL Defendants.  The transactions, which MB knew to be risk-free for the RTL Defendants by virtue of the RGL guarantees, clearly lacked any economic substance and were inherently suspicious.

225.     Moreover, MB's awareness of the impropriety of the RTLs is obvious from the fact that certain RTL Defendants backed out of the deals based on their concerns over the propriety of the transactions in the wake of the Enron scandal.  In February 2000 and again in February 2001, MB drafted the necessary documents for two RTLs ($150 million and $250 million, respectively) with affiliates of Ingram Micro.  Like the RTLs with Pigott's Liberty Corner entity and with Flanagan's

EMF/Delta entities, these loans moved large round-dollar amounts from RCM to RGHI via an Ingram Micro affiliate before the end of the fiscal year, and then back from RGHI to RCM after the new fiscal year began. They also included a guarantee by RGL of RGHI's obligations, as well as an indemnity in favor of the Ingram Micro affiliate -- all signed by Bennett.

226.     In 2002, Ingram Micro was prepared to go forward with yet another RTL, going so far as to send a mark-up of the 2001 loan documents to Collins. However, on January 30, 2002, Ingram Micro had second thoughts about engaging in the RTLs due to recent news about the Enron scandal. Later that same day, Ingram Micro sent Refco an email backing out of the proposed RTL, referencing the Enron debacle and heightened scrutiny from the SEC.

227.     As the Examiner concluded, "there is significant evidence that Mayer Brown . . . assisted Refco by drafting and negotiating documents in connection with the Round Trip Loan transactions, which Mayer Brown knew or should have known were fraudulent and undertaken for the purpose of manipulating Refco's financial statements," and "there is evidence showing that Mayer Brown knew that the Round Trip Loans were a scheme to avoid disclosure of the RGHI Receivable on Refco's audited financial statements in order to fraudulently bolster Refco's financial appearance to lenders and investors."

**Maintaining the Fraudulent Business Model**

228.     The Refco Insiders facilitated their fraudulent scheme to attract and siphon RCM assets by purporting to maintain RCM as an unregulated offshore broker-dealer despite the fact that it conducted substantial activity in the United States and did not even maintain any Bermuda operations after 2001. MB advised Refco and RCM on these efforts beginning no later than October 1996 and continuing through October 2005.

229.     In 2001, in furtherance of the fraudulent scheme described herein, the Refco Insiders desired to close down RCM's Bermuda operations and to "repatriate" RCM to the United States. This was actually accomplished in 2002. In so doing, Bennett enlisted the assistance of MB, which advised RCM on the implications of repatriating to the United States. In the course of so doing and as reflected in, among other things, a June 24, 2002 MB memorandum, MB became intimately

familiar with the business and operations of RCM through discussions with Maggio and others. As reflected in an August 3, 1998 MB memorandum, MB was aware when it did this work that RCM was engaging in repurchase agreements, or "repos," and buying and selling customer securities "for its own account." In connection with the repatriation of RCM's Bermuda operations to the United States, MB advised RCM on, among other things, ways to structure its business so as to attempt to avoid being treated as a regulated broker-dealer subject to, *inter alia*, segregation requirements imposed by United States law.

230.    According to a January 31, 1999, memorandum from Refco to MB, MB also was involved in and familiar with various other "projects underway with respect to Refco's FX business," which caused MB -- along with other aspects of MB's engagements for Refco and RCM -- MB to be aware of the diversion of RCM FX customer-entrusted assets to other Refco entities as alleged herein.

231.    In June 2004, in connection with a discussion of financial covenants for a Credit Agreement with Refco Finance Holdings LLC as Borrower, questions were raised by THL's counsel concerning Refco's "average cash on hand." One phrase used in connection with this discussion was "house cash," which MB characterized as "a difficult concept." In response to a question regarding whether it would be feasible to have GT provide a better explanation in future quarterly filings of the composition of Refco's "average cash on hand" and the distinctions between "house cash," "customer cash," and "regulated cash," MB noted emphatically, "No!! Impossible to breakout. Too restrictive operationally i.e. funding." This shows that MB was fully aware of the manner in which the Refco Insiders were siphoning RCM customer-entrusted funds to finance Refco's overall business operations and to fraudulently dress Refco up to facilitate a lucrative cashing-out of the Refco Insiders' interests.

232.    MB's knowledge of and participation in the overall scheme is clearly shown through emails from Refco employee Thomas Yorke to Joseph Collins in January 2005. In those emails, Yorke sought advice from MB on impending regulatory changes that "could mean an extremely large asset transfer away from RCM" and on how to avoid the potential impact of those changes and

how to minimize "the cash transfer" from customer accounts at RCM to customer accounts at other Refco entities. As MB was aware, the reason that Yorke wanted to minimize any transfer of cash from RCM customer accounts to customer accounts at other Refco entities was that Refco treated the cash in customer accounts at RCM as available to fund Refco's operations and would not be able to treat cash in customer accounts held at other Refco entities as available for this purpose. MB's proposed solutions included "stall" and "avoid immediate application" of the new rule and "convince the adviser that its clients' assets . . . are beyond the scope" of the new rule.

233. As indicated in a MB memorandum draft dated October 11, 2005, just as the massive fraud at Refco was unraveling, MB was fully aware that as a result of the repatriation from Bermuda to the United States on which it had previously advised RCM:

(a) RCM's activities were conducted by RSL and not by RCM, and RCM had no personnel available to look out for the legitimate interests of RCM's customers;

(b) "RCM no longer maintains any personnel or operations in Bermuda, and . . . all of its functions and operations are performed by RSL personnel that are located in the United States";

(c) While assets in RCM customer accounts were "carried on the books of RCM," those assets were in fact not held by RCM;

(d) RCM was engaging in "significant" conduct in the United States and, with MB's knowledge and advice, had structured its activities with an intent to "avoid U.S. regulatory requirements" and could not properly claim to be exempt from the regulatory requirements of United States law; and

(e) RCM was not in fact a "foreign broker-dealer."

234. The fact that MB was preparing such a memorandum in October 2005, at precisely the same time as the public disclosure of the massive fraud at Refco, is inherently suspicious. By preparing to advise RCM that it should consider changing the way it conducted its business after the fraud had already been disclosed and RCM had been effectively shut down, MB was simply trying to paper the file, cover its tracks, and create the appearance after the fact that it had rendered

67

appropriate, objective advice to RCM when in fact MB had been intimately involved in advising RCM on RCM's earlier repatriation from Bermuda to the United States at a time when the law was no different than it was in October 2005. Indeed, all of the authorities cited in that draft MB memorandum pre-dated the advice rendered by MB in 2001 and 2002 with respect to RCM's repatriation.

**Conduct in the LBO**

235.    Further evidence that MB affirmatively participated in a scheme to hide the existence and nature of the RGHI Receivable comes from MB's conduct in the LBO. MB was closely involved in the LBO process. MB represented Refco and RGHI in connection with the LBO and, according to the Examiner, was "deeply involved" in the LBO process, negotiating the agreement with THL and handling the Refco side of THL's due diligence. Given its knowledge of the misconduct at Refco, MB was hopelessly conflicted in representing both Refco and RGHI. At no time, however, did MB advise RGL's innocent directors, officer or agents of the Refco Insiders fraudulent scheme or that the LBO was a transaction with no business purpose for RGL, and one that would cause RGL to incur substantial additional indebtedness that it was not in a condition to assume. Certain Refco directors, officers, and agents (including THL, inside counsel and others) were unaware of the fraudulent scheme and of the extensive adverse impact that the LBO would have on RGL. As a result of defendants' efforts to conceal the scheme, these directors, officers, and agents (including inside counsel and others) were unaware of Refco's true financial condition (namely, the true nature and extent of the RGHI Receivable), and could not have made themselves aware through reasonable investigatory efforts. Had they learned of the Refco Insiders' fraudulent scheme, they would have taken steps to prevent RGL from becoming saddled with $1.4 billion of bank and bond debt.

236.    The Equity Purchase and Merger Agreement underlying the LBO transaction, a document negotiated and reviewed by MB, represented that there were no undisclosed intercompany loans between Refco and RGHI, and specifically required that Refco not assume or guarantee any indebtedness in excess of $5 million. The representation was false and MB knew that the guarantee

requirement would immediately be breached.  There were, in fact, massive related-party loans between Refco and RGHI that had not been disclosed, but rather had been hidden by the RTL scheme that MB had been effectuating.  Moreover, at the very same time MB was reviewing these provisions in the Equity Purchase and Merger Agreement, MB was also preparing documents for a $720 million RTL in which a Refco entity -- RGL -- was guaranteeing the debt.

237.    In addition, the Examiner found that during the LBO diligence process, MB "appears to have failed to disclose key information to THL."  MB met frequently with THL's counsel and reviewed the due diligence and corporate documents provided to them.  When asked by THL's counsel, MB boldly represented, despite having prepared and overseen the execution of dozens of RTLs, that there were no transactions or deals between Refco and RGHI.  In fact, at the same time that MB was making these representations, MB was preparing documents for the $720 million RTL involving Refco, Liberty Corner and RGHI.

238.    Further evidence that MB affirmatively participated in a scheme to hide the existence and nature of the RGHI Receivable comes from its failure to disclose the existence of the RGHI Receivable despite its review of the LBO prospectus and its issuance of a legal opinion making representations in connection with the LBO.  Furthermore, the Offering Circular:  (a) did not mention the existence of RTLs; (b) stated that $105 million owed to RGHI as of February 28, 2003, had been received as of February 29, 2004; (c) did not disclose the guaranty -- that MB itself had prepared -- to a RTL participant for a $720 million RTL that would come due a week later; (d) did not disclose that repayment of that RTL would result in an increase in the RGHI Receivable in that amount; and (e) as discussed above, falsely stated that the LBO bond debt was effectively junior to the payables owed to RCM.

**Conduct Before and After the IPO**

239.    After the LBO closed, Refco began the process of registering the Senior Subordinated Notes so that they could become publicly traded, and also began preparing a prospectus that would lead to an IPO.  MB was involved with both processes.

240.    MB reviewed the initial disclosure document pertaining to the notes registration (the S-4), and received and reviewed the SEC's comments to Refco's S-4 disclosures.  Thus, MB was aware that Refco had first listed the RGHI Receivable as being from a customer, but changed the language to reflect that the receivable was due from equity members.

241.    During this time, MB continued to prepare documents for RTLs ($485 million in August 2004, $545 million in November 2004, and $550 million in December 2004, $345 million in February 2005, and $450 million in May 2005).  In addition, MB continued to receive and respond to periodic requests for audit response letters -- keyed to Refco's relevant reporting periods.

242.    As the disclosure process with the SEC moved forward, MB reviewed Refco's S-1 registration statements, including the final S-1 which failed to disclose (a) the existence of the multi-million dollar RGHI Receivable reflecting debt owed by RGHI to Refco; and (b) the RTLs used to hide the RGHI Receivable and temporarily pay down its debt to Refco at year-end and quarter-end financial reporting periods.

243.    On August 16, 2005 -- the day the IPO was completed -- MB issued an opinion letter in connection with preparation and filing of the S-1 that made limited representations similar to those it had made in its August 5, 2004 legal opinion included in the LBO Offering Circular.  Even though the prospectus was misleading in substantially the same manner as its previous Offering Circular, MB apparently made no efforts to correct or bring those misrepresentations to the attention of Refco's innocent directors, officers and agents, including inside counsel and others.

244.    In late August 2005, after the IPO was completed, MB assisted Refco in engaging in yet another $420 million RTL designed to cover the existence of the RGHI Receivable.

*          *          *

245.    Given MB's awareness (a) of the massive RGHI Receivable; (b) that the RTLs were merely sham transactions designed to allow RGHI to temporarily pay down its obligation to Refco at each financial reporting period; (c) of Bennett's dual roles in the RTLs; (d) that the RTLs violated Refco's financing covenants; and (d) that Refco executives had an incentive to maximize Refco's annual profits and ultimate sale price, MB understood that the purpose of the RTLs was to hide the

RGHI Receivable from Refco's books in order to create a false impression of Refco's financial health and strength.

246.    MB also understood that Refco's continued operation, despite its massive losses, required a continuous infusion of cash.  MB knew that the only sources of cash available to Refco were its three principal operating entities -- RSL, Refco LLC, and RCM -- and that only RCM was purportedly unregulated and had no segregation or net capital requirements.  MB thus understood that Refco was diverting and consuming RCM customer-entrusted assets.

247.    MB further understood that the goal of both the RTLs and the theft of RCM customer funds was to falsely portray Refco as being financially strong and healthy, growing quickly, yet with a low-risk, high profit business model.  MB understood that the ultimate purpose of this deception was to allow the Refco Insiders and others to cash-out their interests in Refco.  By its actions, MB not only violated applicable ethical and disciplinary rules, it substantially assisted and participated in a scheme that ultimately cost RCM and RGL billions of dollars in losses.  MB is liable for the damages that were incurred as a result of its malfeasance.

### E&Y's Role in the Fraudulent Scheme

248.    E&Y was aware of the activities alleged herein and/or consciously avoided knowledge of them.  By its actions, E&Y actively participated in and substantially assisted the Refco Insiders and others acting in active concert or participation with them in carrying out the scheme detailed herein.

249.    E&Y began working for Refco around 1991 with the understanding that its client was RGHI and all of the subsidiaries below it, including RGL and Refco, Inc. (which became Refco, LLC).  Initially, E&Y was retained to review tax returns and answer tax questions.  In 1993 or 1994, E&Y began preparing tax returns and later helped with IRS audits as well as state and municipal tax audits.  In 2001-2002, E&Y provided Bennett with tax advice and proposed structures through which a partial sale of Refco could be effectuated with favorable tax treatment.  During this time period, E&Y also prepared tax returns for RGL and its subsidiaries and affiliates, including RGHI, through

the tax year 2002. E&Y and its affiliates continued to provide advice and services to Refco through as late as 2005, including preparing RGL's New York City tax returns.

250.   E&Y understood that the tax returns it was preparing for Refco were not only submitted to the IRS and state and local authorities, but would also be reviewed by innocent RGL directors, officers, and agents, and would be presented by Refco to lenders, potential investors, underwriters, and other third parties in connection with the Refco Insiders' continuous efforts to sell their interests in Refco.

251.   E&Y was not simply a tax preparer for Refco. E&Y also repeatedly provided tax consulting and advice with respect to numerous Refco transactions, including corporate restructurings among the various Refco entities, proposed sales and acquisitions by Refco, and potential third-party investments involving Refco. E&Y thus actively assisted and enabled the Refco Insiders to monetize and cash-out their interests in Refco for far more than those interests were worth. Among the most significant transactions and issues on which E&Y assisted Refco were: (a) RGHI's 1997 conversion to an S corporation and the efforts to avoid "busting" the S election or triggering a "Built-in-Gain" tax; (b) planning which began in 1997 to take advantage of the Neiderhoffer Loss; (c) BAWAG's 1999 acquisition of a 10% interest in RGL; (d) the 2000 Minglewood transaction designed to avoid the need to write off a $6.3 million "bad debt"; (e) the 2001 conversion of RGL subsidiary Refco, Inc. from a C corporation to an LLC (Refco, LLC); (f) structuring and analyzing the tax consequences of plans for profits-only interests in RGL for certain Refco executives; (g) a 2001/2002 proposed acquisition by BAWAG of a controlling interest in RGL while minimizing or avoiding tax consequences to RGHI; and (h) a 2002 proposed BAWAG investment of hundreds of millions of dollars in RGL in three installments in exchange for BAWAG's right to "participate" in the proceeds of a sale of Refco.

252.   E&Y's assistance in facilitating the Refco Insiders' fraudulent scheme was also a two-way street. In 2000 and 2001, E&Y used Refco as a vehicle for a series of improper and fraudulent tax shelter transactions termed "Contingent Deferred Swaps" ("<u>CDS</u>"). These transactions were designed to create the illusion that the E&Y clients participating in the tax shelter

scheme were losing money in trading activities (*i.e.* suffering business expenses) that could then be charged against these customers' sizable taxable incomes. The success of these tax shelters depended on E&Y fooling the IRS into believing that E&Y's clients were actually engaging in legitimate currency trading. Refco provided E&Y with the vehicle through which it could create that illusion.

253.    E&Y placed its clients' funds in Refco trading accounts and engaged in a high volume of short term-trades designed to create the illusion that the money was being traded and was subject to trading risk. In reality, the trades were designed to preserve the clients' capital so it could be returned to the client once the tax benefit  -- *i.e.*, the fraudulent write offs -- had been obtained.

254.    On May 22, 2007, four E&Y partners were indicted in connection with these CDS tax shelters. As the U.S. Senate's Permanent Subcommittee on Investigations noted in its reports on the Role of Professional Firms in the U.S. Tax Shelter Industry, E&Y enlisted a number of professional firms to help carry out CDS transactions "including investment firms, law firms, and . . . Refco Bank, who participated as the counter-parties for swaps . . . from 2000-2001."

255.    As a result of E&Y's tax consulting, advice, and involvement in the Refco Insider's schemes and attempts to sell their interests in Refco, E&Y understood no later than 2001 that the Refco Insiders were seeking to achieve a lucrative cashing-out of their interests in Refco.

256.    In mid-2001 through mid-2002, E&Y performed a substantial amount of work for Refco in connection with proposals to sell all or part of Refco to BAWAG or another third party. During the course of this work, Trosten asked E&Y to assume the existence of a receivable owed by RGHI to RGL in the amount of $720 million to $1 billion. E&Y's advice on this issue ultimately led Bennett to structure Refco's proposed July 2002 transaction with BAWAG as a Proceeds Participation Agreement in which a BAWAG affiliate made payments to Refco in exchange for the right to participate in the proceeds of a future sale of RGL. E&Y understood that certain senior Refco executives stood to profit directly and considerably by a sale of the company and had a corresponding incentive to manipulate Refco's financial statements and related disclosures in addition to its tax returns.

257.    Through rendering advice to Refco, E&Y also learned that the Refco Insiders, aided by GT and MB, were falsifying Refco's financial statements.  In 1999, E&Y provided advice in connection with the structuring of BAWAG's purchase of a 10% interest in RGL.  In connection with this process, E&Y reviewed and commented on the deal documents that MB drafted.  An E&Y internal memorandum shows that E&Y disagreed with representations contained in these draft documents to the effect that there were no undisclosed liabilities on the audited RGL financial statements and that all tax returns had been filed and withholding taxes had been repaid.  In fact, the RGL financial statements were false because they did not disclose the RGHI Receivable being masked by the RTLs.

258.    Moreover, as a result of its work for Refco, E&Y was aware that the RGHI Receivable was not a bona fide debt, but was a sham, based on, among other things, the following:

- E&Y knew and/or consciously avoided knowing that the RGHI Receivable consisted, at least in part, of bad debts of Refco customers that were "sold" or assigned to RGHI for a price that vastly exceeded fair market value, and that RGHI lacked the ability to pay off the RGHI Receivable;

- E&Y knew and/or consciously avoided knowing that Refco's officers were using the RGHI Receivable to intentionally manipulate Refco's balance sheet and operating results for the purpose of bolstering the financial appearance of the company;

- By as early as September 2001, E&Y understood the RGHI Receivable was approximately $720 million to $900 million and that these receivables were concealed on Refco's audited financial statements, as Refco posted a related-party receivable balance of only $219 million on its February 28, 2001 audited financial statements;

- E&Y knew and/or consciously avoided knowing that by September 2002 the Neiderhoffer Loss, which made up part of the RGHI Receivable, was entirely uncollectible because the debt had been settled and released in 1997;

- As early as February 2002, E&Y knew and/or consciously avoided knowing that the RTLs whereby Refco loaned funds to a third party, who in turn loaned the funds to RGHI to pay down the RGHI Receivable.  E&Y also knew and/or consciously avoided knowing that these transactions occurred in late February and would be reversed in early March, straddling the end of Refco's financial reporting fiscal year;

- E&Y knew and/or consciously avoided knowing that at least one purpose of the RTLs was to improve Refco's balance sheet by concealing the fact that the RGHI Receivable was composed of trading losses and operating expenses that were inappropriately moved to RGHI for the sole purpose of overstating Refco's financial position and operating results; and

- E&Y knew and/or consciously avoided knowing that Refco's income for tax reporting purposes was inaccurate and that correspondingly the income or loss of RGHI for tax reporting purposes was also inaccurate.

259.    Based on E&Y's knowledge of the Refco fraud, the senior E&Y advisor on the Refco engagement decided in late 2003 that E&Y should resign from its engagement with Refco. Nevertheless, E&Y continued to work for Refco through as late as 2005, several months after the LBO, and carried out its withdrawal from Refco assignments in such a way as to allow the fraudulent scheme to continue.

## Knowledge of Refco's Trading Losses and Balance Sheet Problems

260.    As early as 1998, E&Y was aware of a related-party receivable owed by RGHI to Refco that was created when RGHI purchased "bad debt receivables" for full face value from Refco. E&Y was also aware that this receivable had been sitting on RGL's books accruing interest "for years" while a corresponding payable grew on RGHI's books.

261.    In particular, E&Y was aware that one component of the RGHI Receivable was the Neiderhoffer Loss involving a $71 million "bad debt" "purchased" by an RGHI subsidiary, Wells, Ltd., at face value -- a price that vastly exceeded fair market value.  By at least September 2002, and likely much earlier, E&Y knew and/or consciously avoided knowing that the Neiderhoffer Loss was completely uncollectible from Neiderhoffer because there had been a settlement and release in 1997 between Neiderhoffer and Refco, Inc. pertaining to the losses.  In addition, numerous E&Y documents discuss the "Wells losses," which pertain to losses of approximately $50 million on Russian Securities involving the same wholly owned subsidiary of RGHI (Wells, Ltd.) which purchased the Neiderhoffer Loss.  E&Y documents show that E&Y understood these losses also formed part of the RGHI Receivable.

262.    E&Y also knew and/or consciously avoided knowing that Bennett had a practice of allocating vaguely described  expenses -- often listed as IT and computer expenses -- to RGHI, but having RGL actually pay the expense and then book them as part of the RGHI Receivable.

263.    E&Y clearly understood that the purpose of the RGHI Receivable was to improve the financial appearance of RGL.  In an email dated August 8, 2001, an E&Y partner observed that a

write-off of the RGHI Receivable would have a deleterious effect on RGL's earnings, which were "protected and buffered" by RGHI. This email demonstrates that E&Y knew that the RGHI Receivable was being maintained, not because it was legitimate debt, but because elimination of the receivable would destroy RGL's appearance of profitability.

264.    In addition, E&Y was fully aware that the RGHI Receivable was a sham based on the following evidence:

- E&Y never saw a written agreement evidencing the RGHI debt, never knew the terms and conditions of the debt or its repayment schedule, and never knew of any valuable consideration for the debt;

- E&Y never received a requested confirmation directly from Refco's counsel that the debt was valid;

- Other than the sham RTLs, RGHI never made a payment to service or pay down its debt during E&Y's engagement;

- RGHI never made interest payments on its debt and instead simply added accrued interest to the outstanding receivable balance; and

- RGHI never expressed an intention to repay the debt and, never could repay the debt, because, as E&Y knew, RGHI was "basically insolvent."

**The RTL Transactions**

265.    In approximately September 2001, E&Y discovered that the receivable owed by RGHI to RGL was much larger than what appeared on RGL's audited financial statements. While the financial statements reported a related-party receivables of approximately $219 million, the RGHI Receivable was in the range of at least $700 to $900 million. When E&Y asked a Refco officer about the discrepancy, E&Y was told directly that Refco utilized the RTLs at fiscal year end in order to "clean up" the balance sheet and, for that reason, the related-party receivable balances did not appear on RGL's financial statements.

266.    E&Y has admitted to the Examiner that by no later than February 28, 2002, it knew that at the end of every Refco's fiscal year, RGHI would borrow funds from a third party to pay down the RGHI Receivable and the transaction would be reversed a few days later.

267.    E&Y also knew and/or consciously avoided knowing that the source of the third-party funds in these annual fraudulent transactions was actually RCM. Several E&Y documents refer to

76

"circular flows of cash" in the context of discussions of pay down of the RGHI Receivable at fiscal year-end. For example, a November 6, 1997, E&Y handwritten memo regarding the Neiderhoffer Loss (which E&Y knew to be part of the RGHI Receivable) states, in part, "Did RCM advance funds. Circular flow of cash." The handwritten notes of an E&Y partner dated March 4, 2002, contains the phrases "borrowed cash from RGL," "third-party customer," and "Neiderhoffer." In other words, the third-party customer had actually borrowed funds from RGL (via its subsidiary, RCM) to in turn loan to RGHI to hide the RGHI Receivable, which was partly composed of the Neiderhoffer Loss. These notes demonstrate that E&Y understood that a Refco entity was likely the source of the money which RGHI was using to temporarily pay down its receivable.

**Maintaining the Fraudulent Business Model**

268.    E&Y's own documents demonstrate that as early as 1997, E&Y had significant concerns about potential fraud at Refco and E&Y's own potential liability arising out of its involvement with Refco. Yet E&Y did nothing to address these concerns, and instead chose to assist Refco in perpetuating the fraud.

269.    For example, in November 1997, Kurt Neidhardt, the E&Y partner handling the Refco engagement, was concerned about how Refco had treated the Neiderhoffer Loss. Concerned that E&Y could be viewed as "being an accessory to some type of fraud," Neidhardt met with the head of E&Y's Financial Services Department, Jerry Goldman. Incredibly, instead of advising Neidhardt to alert the innocent directors and officers of RGL to this obvious accounting fraud and instead of demanding that E&Y withdraw from representing Refco, Goldman informed Neidhardt that so long as E&Y prepared Refco's tax returns correctly and never gave Refco any accounting advice, E&Y should not be concerned. This cavalier attitude towards Refco's fraud would be shocking enough from one of the world's largest accounting firms. But even more egregious was the fact that E&Y was not preparing Refco's tax returns correctly. As discussed below, the RGL tax returns E&Y prepared were inaccurately reporting interest income that was not being paid and that E&Y knew RGHI did not have the wherewithal to pay, and were shown as erroneous and inflated income on RGL's tax reporting documents.

270.    E&Y continued to have concerns about Refco, specifically about Refco's use of the sham RGHI Receivable to hide losses and other expenses.  In the years 2001 through 2003, E&Y sent Refco a letter asking Refco to provide, *inter alia*: (a) a representation from Refco's legal counsel that the related-party receivable payable from RGHI to RGL was a legally enforceable obligation; (b) a schedule of any expenses that RGL allocated to RGHI per a "5/12/99 Certification and Assumption by RGHI"; and (c) an analysis of related-party accounts.  Despite these requests, E&Y never received a written or verbal representation directly from Refco's legal counsel that the related-party payable was a legally enforceable obligation.  Instead, E&Y accepted a representation from a Refco officer to that effect without demanding anything further.  In addition, E&Y never received the requested schedule of expenses or analysis of related-party accounts.  Despite Refco management having ignored E&Y's request, E&Y took no action and continued to prepare for filing and distribution false and misleading tax returns and supporting tax documents that E&Y knew and/or consciously avoided knowing included a huge uncollectible related-party receivable.

271.    On July 8, 2002, Neidhardt met with the number two partner in E&Y's tax department, Mike Kelley, to discuss E&Y's knowledge that RGHI (which E&Y also prepared the tax returns for and knew was unaudited) owed RGL a payable of $750 million, that RGL's audited financial statements reflected a related-party receivable of only around $225 million, and that RGHI would borrow money to reduce this receivable just before fiscal year-end and reinstate it just afterwards so that only $225 million would be reflected on RGL's audited financial statements.  Echoing Goldman's earlier outrageous (and erroneous) reaction, Kelley concluded that this was not a tax return issue, despite the obvious manipulation of the audited financial statements.  E&Y did not, however, request further information from Refco or its auditors.  E&Y simply continued to prepare false tax returns for Refco based on inflated operating results, and continued to provide the Refco Insiders with tax advice regarding their exit strategies.

272.    On January 16, 2003, Neidhardt met again with Kelley to discuss concerns over Refco.  This time, Neidhardt described another RGHI transaction in which a third party would allow RGHI to pay down the RGHI Receivable at fiscal year-end in a manner that would hide the related-

party nature of the receivable and improve the balance sheet without disclosing why the balance sheet improved. Once again, the number two partner in E&Y's tax department chose to ignore this obviously fraudulent manipulation of Refco's audited balance sheet because he believed that as long as E&Y got Refco's tax returns correct (which E&Y didn't), the fraud was not E&Y's concern.

273.     In or about November 2003, E&Y purported to resign from the Refco engagement based in large part on its concerns over potential liability for aiding and abetting the Refco fraud as a result of its knowledge of the massive RGHI Receivable and the fiscal year-end paydown and reinstatement of the RGHI Receivable.

274.     But E&Y did not really resign. Though E&Y did not prepare Refco's federal 2003 tax returns, E&Y continued to perform tax services for Refco through at least 2005, preparing, among other things, misleading and false New York City tax returns for RGL. Moreover, despite its concerns, E&Y did not tell Refco's subsequent tax accountants (or anyone else) the true reasons for its decision to resign or the concerns it had about Refco.

275.     E&Y continued to be nervous about its relationship with Refco even after December 2004. In October 2005, Rory Alex, an E&Y accountant who did not work on the prior Refco engagement, sent Neidhardt an email asking about the possibility of doing work for RGL. The next day, Neidhardt sent an email to another E&Y tax partner who had worked on the Refco account previously, saying "we need to be very careful here. I left [Rory Alex] all my numbers . . . anything [sic] we tell him must be strictly confidential. I may have Nancy Altobello shut him down."

276.     E&Y was clearly aware that the RGHI Receivable was a sham transaction and that it was not a bona fide debt on which interest income could properly accrue for tax purposes. Accordingly, the RGL tax returns reflected interest income associated with the RGHI Receivable that E&Y knew and/or consciously avoided knowing was partially or entirely inaccurate. E&Y also knew and/or consciously avoided knowing that the RGL tax return balance sheets (Schedule L) included as assets the RGHI Receivable. Thus, the Schedules showed an erroneous and inflated income for tax reporting purposes by RGL. These falsehoods substantially assisted the Refco Insiders' efforts to create the illusion that Refco was profitable and financially healthy.

277.    E&Y substantially assisted the Refco Insiders' fraud by preparing and filing tax returns that E&Y knew and/or consciously avoided knowing were inaccurate or false, but that E&Y knew would be reviewed by RGL's innocent directors, officers and agents and presented to lenders, potential investors, underwriters, and other third parties in connection with the Refco Insiders' continuous efforts to get financing for Refco and, ultimately, to facilitate a lucrative cashing out of their interests in Refco.

278.    E&Y also actively assisted Refco in hiding its bad debts.  As discussed above, in late 1999 and early 2000, Refco entered into the Minglewood joint venture to avoid having to write off the Deere Park Debit Balance.  E&Y substantially assisted Refco with this goal by devising the structure of the Minglewood transaction, a structure that allowed Refco to keep the Deere Park Debit Balance off its financial statements.

279.    E&Y also understood that Refco's continued operation, despite the massive losses reflected in the RGHI Receivable, required a continuous infusion of cash.  E&Y knew and/or consciously avoided knowing that the only sources of cash available to Refco were its three principal operating entities -- RSL, Refco LLC, and RCM -- and that only RCM was purportedly unregulated and had no net capital requirements.  E&Y thus understood that Refco was consuming RCM customer funds.

280.    E&Y further understood that the goal of both the RTLs and the theft of RCM customer funds and the hiding of losses was to falsely portray Refco as being financially strong and healthy, growing quickly, yet with a low-risk, high profit business model.  E&Y understood that the ultimate purpose of this deception was to allow the Refco Insiders to cash-out their interests in Refco at an inflated value.  By its actions, E&Y substantially assisted and participated in a scheme that ultimately caused RGL and RCM to incur billions of dollars in damages.  E&Y is liable for the damages that were incurred as a result of its malfeasance.

## PwC's Role in the Fraudulent Scheme

281.     PwC was aware of the activities alleged herein and/or consciously avoided knowledge of them.  By its actions, PwC actively participated in and substantially assisted the Refco Insiders in carrying out the scheme detailed herein.

282.     PwC was engaged by Refco to provide advisory services in connection with the LBO and IPO.

283.     On May 5, 2004, PwC was engaged by RGL in connection with the LBO bond offering to provide advisory services, including (a) helping Refco to plan and prepare for the LBO, and (b) advising Refco with "accounting and financial reporting matters" relevant to the offering, including the contents of the offering documents.

284.     On June 7, 2004, PwC's engagement was broadened to include analyzing the planned LBO by performing a Transaction Costs Analysis intended to optimize the tax treatment of professional fees (accounting, financial, legal, etc.) associated with the LBO.  As part of that analysis, PwC was authorized to conduct "interviews with the outside service providers," as well as "internal personnel involved in the transactions."

285.     After the LBO, to help prepare Refco for the IPO, PwC's engagement was broadened to cover two additional areas.  On September 28, 2004, PwC's role was broadened to include "advice and assistance related to the accounting and financial reporting matters for the quarter ended August 31, 2004."  On November 10, 2004, PwC's engagement was further extended to helping "improve bottom line performance" by proposing alterations to Refco's "commissions and payouts" in numerous lines of business, including FX and prime brokerage services.

286.     In response to the disclosure that there were accounting control deficiencies at Refco, PwC also became the *de facto* chief accounting officer for Refco and was charged with "assisting in the initial planning and staffing of audits" and implementing improved accounting controls.

287.     Furthermore, on March 8, 2005, PwC was engaged by RGL to provide an assortment of services in connection with Refco's preparation of the Form S-1, including (a) assistance in drafting and reviewing the Form S-1, (b) "consultation on disclosures within the Form S-1 and the

Company's financial statements," (c) providing Refco's "management" with support in preparing any "Underwriters' comfort letter," and (d) assisting Refco with draft responses to SEC comments.

288.    PwC was also engaged by RGL in the summer of 2004 to provide tax consulting services and on April 1, 2005, was engaged to prepare Refco's 2004 state and federal tax returns. Notably, given all the business it was receiving from Refco, PwC offered those services to Refco at "a discount of 30% off of our customary market rates."

289.    As a result of these various auditing, advisory, and tax services and the unfettered access PwC had to Refco personnel and accounting systems, PwC was in a unique position and became aware of the fraudulent scheme of the Refco Insiders, and more specifically, the RGHI Receivable, the RTLs, the use of RCM customer assets to fund Refco, and the inappropriateness of the LBO and IPO in light of Refco's true financial condition.

290.    Through its provision of various auditing, advisory, and tax services, PwC substantially assisted in the fraud alleged herein.  Without these services, Refco's true financial condition would have come to light long before the fraudulent scheme had been completed, and before the Refco Insiders, and others, could have saddled RGL with $1.4 billion in unnecessary LBO debt and allowed the Refco Insiders to strip out RGL's assets.

**Knowledge of the RTLs and Refco's Balance Sheet Problems**

291.    Through the due diligence undertaken as Refco's principal advisor concerning accounting and financial reporting in connection with the LBO and the IPO, and its role as the *de facto* chief accounting officer for Refco, PwC learned of and/or consciously avoided knowledge of the existence of both the RGHI Receivable and the RTLs.

292.    Indeed, an email exchange between PwC and Victor Zarate, Assistant Controller of New Refco Group Ltd., LLC ("New Refco Group") establishes that PwC was fully aware of the wire transfer RTLs in which BAWAG served as the conduit.

293.    On November 22, 2004, Zarate sent Henri Steenkamp, manager of Global Capital Markets at PwC, a schedule of the BAWAG round trip loans, referred to as "BAWAG deposits." The schedule listed the exact sum of money Refco deposited in BAWAG to fund the fraudulent wire

transfer RTLs. The "deposits" were each made at the end of Refco's fiscal year -- *i.e.*, the last day of February -- for the years 2001, 2002, 2003 and 2004 and also, around the time of the LBO, in July and August of 2004.

294.    Evidencing that PwC understood that these "deposits" related to improper RTLs, PwC responded to the Zarate email listing the BAWAG deposits by asking for "the RGHI loan balances as well for th[ose] periods . . . ."

295.    Given PwC's knowledge and familiarity with Refco's financial reporting periods, PwC accordingly knew and/or consciously avoided knowing that at the end of each annual reporting period, and just before the LBO, Refco was "depositing" money with BAWAG and that, concurrently, the RGHI Receivable was being reduced by a like amount.

296.    As Refco's principal advisor on accounting and financial reporting matters in connection with the LBO and the IPO, PwC knew and/or consciously avoided knowing that there was no legitimate business purpose for these wire transfer RTLs, except to conceal the RGHI Receivable before the end of each relevant reporting or audit period.

297.    As Refco's 2004 tax year preparer, PwC also carefully reviewed Refco's prior tax returns and Refco's financial statement as of each annual, not fiscal, year-end. As the RTLs were used to conceal the RGHI Receivable in fiscal year reporting and audit periods, PwC discovered and/or consciously avoided knowledge of the full extent of the RGHI Receivable.

298.    Furthermore, because PwC knew the wire transfer RTLs reduced the RGHI Receivable balance, it also knew that the $105 million receivable from RGHI disclosed on Refco's financial statements did not reflect the full amount of the related-party receivable owed by RGHI to Refco.

299.    If PwC had fulfilled its professional obligations, it would have investigated the wire transfer RTLs and the RGHI Receivable, uncovered the full scope and nature of both the RGHI Receivable and the RTLs, and advised Refco's innocent directors, officers, agents, and others of the Refco Insiders' fraudulent scheme. Instead, PwC chose to substantially assist the Refco Insiders in their fraudulent scheme.

300.    Despite the fact that PwC knew and/or consciously avoided knowing that the Refco Insiders were concealing the full amount of the RGHI Receivable, PwC actively assisted the Refco Insiders in mischaracterizing the $105 million receivable from RGHI that was, in fact, disclosed.

301.    PwC knew and/or consciously avoided knowing that the Refco Insiders routinely referred to intercompany and related-party obligations as receivables and payables owed to and from "customers." As PwC knew, given its understanding of Refco's operations and accounting, the reason the Refco Insiders sought to mischaracterize intercompany and related-party transactions as "customer" activity was to obfuscate and conceal improper intercompany and related-party transactions from Refco's innocent directors, officers, agents and others, and from regulators and the investing public.

302.    Nonetheless, in its role as Refco's principal adviser in connection with accounting and financial reporting matters, PwC prepared and/or reviewed and commented on Refco's initial S-4 registration statement which mischaracterized the $105 million receivable from RGHI as a "customer receivable." It was this misleading language in the S-4 that prompted the SEC to question why related-party transactions with equity members should be booked as receivables from "customers." While the SEC forced the Refco Insiders to change the S-4 registration statement to reflect that the receivables were due from "equity members," the final S-4 did not disclose the wire transfer RTLs, that part of the receivable owed by RGHI was concealed by these RTLs and that the $105 million was only a portion of the overall amount owed by RGHI to Refco.

303.    Furthermore, PwC chose not to disclose any portion of the RGHI Receivable in the S-1 registration statement prepared and filed with the SEC in connection with Refco's IPO. While early drafts of the S-1 included the $105 million related-party receivable reflected in the S-4 and the reference to the receivable being owed by "equity members," the final version of the S-1 filed with the SEC omitted any reference to any portion of the RGHI Receivable despite the fact that PwC, even knowing about the wire transfer RTLs, did not receive, or seek, any confirmation that the $105 million receivable from RGHI disclosed in the S-4 had, in fact, been paid down, or that there were no other material related-party receivables due from RGHI and others.

304.     Similarly, in connection with commenting on the consolidated financial statements that would be attached to the offering prospectus, it was PwC that edited Note K-Related Party Transactions and characterized the $105 million receivable from RGHI as a receivable "from customers."  PwC, thus, intentionally sought to conceal the related-party nature of even the small amount of the receivable from RGHI that was being disclosed by the Refco Insiders.

**PwC's Awareness of the Looting of RCM Assets**

305.     PwC also knew and/or consciously avoided knowing that Refco was looting RCM's customer assets in order to satisfy Refco's substantial working capital needs and to create the perception that Refco was an appropriate candidate for the LBO and IPO.

306.     Indeed, the fraudulent scheme perpetrated on RCM was so fundamental to the operation and financing of Refco that it had to have been apparent to PwC.  The volume and size of the transfers, involving, on many occasions, hundreds of millions of dollars each, ensured that the amount of RCM funds that were "loaned" to other entities substantially outsized Refco's total capital.  By the time Refco filed for bankruptcy, the net uncollectible transfers totaled $2 billion, while RGL claimed only $515 million in capital in 2002, $566 million in 2003, $616 million in 2004, and only $150 million in 2005.

307.     Furthermore, PwC was responsible for assisting Refco with the LBO offering materials, the IPO offering materials and the financial reports and registration statements that had to be prepared and filed in connection with both the LBO and the IPO, including the S-1 and the S-4 registration statements.  PwC was thus fully familiar with and helped prepare and/or received and commented on the "payable to customers" condensed consolidated financial information.

308.     Based on PwC's involvement in preparing and/or reviewing and commenting on these condensed consolidated financial statements, PwC knew that the "payable to customer" line item referred to intercompany loans and that there was approximately $2 billion payable owed by RGL and its affiliates to RCM as of the time of the LBO and that these amounts were not repaid in the LBO.

309.    Indeed, one of PwC's comments to Refco's consolidated financial statements was to eliminate from the Summary of Significant Accounting Policies (Note B) -- Receivable From And Payable To Brokers, Dealers and Customers and move to Related Party Transactions (Note K) the following language: "In the normal course of business, a member of the Group engages in customer-related activities which result in receivable from or *payable to customer balances*, which change daily." (Emphasis added).  The only reason PwC would have moved this language to the related-party section of the financials is because PwC understood that these "payables to customer balances" referenced RCM customer assets that were being siphoned to fund the operations of other Refco related entities.

310.    As PwC knew and/or consciously avoided knowing, the enormous "payables to customers" that were eliminated in consolidation were actually intercompany payables owed to RCM and, accordingly, the incurrence (in order to pay the Refco Insiders) of $1.4 billion of debt by RGL and RCC in the LBO would have a devastating impact on RCM.

311.    Underscoring PwC's willingness to blindly follow the Refco Insiders at the expense of adhering to their professional standards, on October 12, 2005, two days after the RGHI Receivable had been publicly disclosed, PwC agreed to allocate BAWAG's 10% distributive share of RGL's 2004 income to RGHI based on Bennett's oral representation that the BAWAG affiliate that held a 10% interest in RGHI had merged into RGHI.  Even a minimal investigation, however, would have caused PwC to conclude that the merger of this BAWAG affiliate into RGHI occurred on August 5, 2004, eight months into the tax year, making redistribution of BAWAG's 10% share for the entire tax year inappropriate.

312.    By relying on the oral instructions of Bennett, who was on indefinite leave at the time, without undertaking any investigation of its own, PwC failed to live up to its standards of professional conduct.

### The Investment Banker Defendants' Role in the Fraudulent Scheme

313.    Each of the Investment Banker Defendants knew and/or consciously avoided knowing that a broker-dealer such as Refco was an inappropriate candidate for a leveraged buy-out.

Based on their experience and expertise, they knew and/or consciously avoided knowing that leveraged buy-outs required real cash flows to service such a large amount of debt, and that broker-dealers such as Refco typically did not have sufficient unencumbered cash flows of their own to service such debt loads. However, as they understood that the LBO was to be followed by a near-term IPO and that the LBO was an important first step toward the lucrative cashing-out desired by the Refco Insiders, they ignored their concerns.

314.    Moreover, the Investment Banker Defendants quickly recognized that they could use the RCM funds being siphoned by the Refco Insiders as a proxy for the cash flows Refco lacked that the Investment Banker Defendants would need to successfully pitch the LBO.

315.    Tellingly, none of the Investment Banker Defendants was comfortable putting its own money into the LBO, and at least one of the Investment Banker Defendant's internal credit departments denied approvals to do the same. It was only after senior executives at the Investment Banker Defendants overrode these denials and concerns based on the fees that could be earned, the opportunity to do a deal with THL and Refco, and the small amount of investment (in exchange for sizeable fees) that would be required by the Investment Banker Defendants themselves, that they agreed to facilitate the deal.

316.    As the Investment Banker Defendants conducted due diligence to justify the LBO, they strived for ways to show that Refco had free cash flow that could be used to service the LBO debt. Yet they discovered that (i) they could not recreate management's projected free cash flows, (ii) they could not rely on cash distributions from the regulated subsidiaries, and (iii) fortunately for them, Refco had been and would continue to make RCM's customer assets available to RGL and its affiliates. Although they knew and/or consciously avoided knowing that a credit risk like Refco was not a good target for leverage, they were comfortable proceeding because of the ready availability of RCM's cash.

317.    The Investment Banker Defendants irreparably damaged RCM by arranging $1.4 billion of LBO financing that "primed" RCM's pre-existing receivables due from RGL and the guarantors on the LBO debt. And despite the fact that they found management, and particularly the

CFO, to not be credible, they blindly accepted management's patently unreasonable projections to service the LBO debt -- projections which never even took into account the $2 billion owed to RCM.

**Knowledge of the Looting of RCM Assets**

318.    In the due diligence undertaken in connection with the LBO, the Investment Banker Defendants learned that Refco was funding its operations with RCM customer assets, that RCM held between $1 and $2 billion in worthless intercompany IOUs, and that the LBO would altogether foreclose the Refco affiliates' ability to pay down their debt to RCM.

319.    Indeed, Deutsche's Credit Risk Management committee (the "CRM") initially rejected Deutsche's participation in the LBO precisely because it recognized that that an entity whose assets Refco was not segregating, such as RCM, might have its assets siphoned out through intercompany loans that the Refco regulated entities would be unable to pay back.  As the CRM observed in a May 12, 2004 memo initially rejecting Deutsche's involvement in the LBO, "there are constant inter-company receivables/payables which can obscure the true capital position of any particular entity.  This type of liquidity deployment is of particular concern when the receivable is from a regulated subsidiary.  Should [Refco] enter into financial difficulty, regulators would not allow payment of these inter-company receivables which would adversely impact debt service anticipated from the unregulated subsidiary."

320.    Regardless of their concerns, as soon as BAS and Deutsche were offered the prospect of earning lucrative fees in the LBO and IPO, their concerns disappeared.  Instead of critical skepticism and full disclosure to Refco's innocent directors, officers and agents of their concerns, the Investment Banker Defendants each jockeyed for a lead position on both the LBO and IPO, substantially assisting the Refco Insiders in stripping out Refco's assets and leaving RCM with over $2 billion in uncollectible IOUs.

321.    The Investment Banker Defendants were always more concerned about upsetting management than they were about the potential harm that might befall pre-existing creditors (like RCM) who would be devastated by layering $1.4 billion of "senior" debt onto Refco.  Each of the Investment Banker Defendants instead remained completely focused on securing a lead role and the

related fees in the transaction and even when they had concerns about Refco's financial condition, as one Investment Banker Defendant internally noted, the strategy always was to "keep the list [of due diligence] very short," as "[w]e didn't want to frighten management with a 4-page list."

322.    As early as May 2004, senior BAS employees were questioning "how Refco use[d] its capital and how the company's net capital change[d] from period to period."  After undertaking a review of RGL's intercompany receivables and obtaining a schedule from Trosten, BAS concluded that it "need[ed] more information to be able to answer what Refco is doing with their capital and why."

323.    Before the LBO closed, employees for the Investment Banker Defendants continued to question how "money flow[ed] into and out of the regulated entities" and the magnitude of "affiliate loans to regulated entities . . . ."  BAS employees, for example, sought an "[e]xplanation of capital flows over . . . eight quarters between regulated and non-regulated entities.  What is the driver of capital movements and where is capital being used (besides what is in the regulated entity) and for what purpose?"  And in connection with determining how Bennett could legitimately request a pre-closing dividend of $500 million from Refco, BAS senior executive William Coupe noted that "[e]xcess capital to pay $500 MM pre-closing dividend also resides outside the regulated entities and consolidates up through Refco Capital Holdings, LLC."  Given BAS's particularized knowledge of Refco's corporate structure, BAS knew and/or consciously avoided knowing that RCM was the purportedly unregulated subsidiary that consolidates up through Refco Capital Holdings, LLC, whose money was constantly being used by the holding company.

324.    Indeed, the Investment Banker Defendants were keenly aware of the difference between how Refco used cash at RCM and its regulated subsidiaries.  They knew that SEC regulations limited the cash that Refco could have moved from its regulated operations and that Refco had to be drawing on customer assets from Refco's other operations -- namely, RCM -- to cover its operational expenses.  Yet they did not consider how and when RCM's IOUs would ever be repaid given that the Investment Banker Defendants were subordinating those IOUs to $1.4 billion in additional LBO debt.  Indeed, none of the projections used by the Investment Banker Defendants

even factored this into the cash needs of Refco's LBO debt parties -- despite the fact that RCM's primary receivables came from RGL and RCC, both of which were guarantors on the LBO debt.

325.     As the Investment Banker Defendants knew, to make the LBO work, the Refco Insiders had to draw on RCM money to fund Refco's operations because the "Customer Segregated Funds" in the regulated entities were off limits and had to be accounted for separately on Refco's balance sheet.  Indeed, in response to inquiries as to why certain customer assets were not being used to "pay down debt," one senior Credit Suisse executive explained that it is "[b]ecause it is restricted customer cash that must be held for regulatory purposes ie it is not the company's cash."   In stark contrast, the Investment Banker Defendants were elated that Refco Insiders did not restrict access to and regularly drew on RCM customer funds that could be used to pay down Refco's LBO debt.  As one BAS employee proclaimed in an email, "FYI . . . looks like Refco Capital Markets isn't regulated . . . that's good for us!"

326.     In reviewing and commenting on the condensed financial information attached to the LBO offering prospectus, the S-4, the S-1, and the IPO prospectus, the Investment Banker Defendants understood that at the time of the LBO there were over a billion dollars in payables owed to RCM by RGL and other guarantors on the LBO debt and that as of the IPO, the siphoned amount had climbed to over $2 billion.

327.     As the Investment Banker Defendants recognized, given their detailed knowledge of the Company, the enormous "payables to customers" that were eliminated in consolidation were actually intercompany payables owed to RCM and, accordingly, the assumption (in order to pay the Refco Insiders) of $1.4 billion of new debt by RGL and RCC would have a devastating impact on RCM.  Indeed, the Investment Banker Defendants understood, as referenced in their own documents, that "payables to customers" constituted "obligations of Refco subsidiaries to repay client monies" and that, therefore, the intercompany loans made by RCM to RGL and its affiliates were comprised of RCM customer funds.

328.     The fraudulent scheme perpetrated on RCM was fundamental to the operation and financing of Refco and each of the Investment Banker Defendants was fully aware and/or

consciously avoided knowing that the LBO and IPO only worked by robbing RCM and leaving its receivables unpaid and unrecoverable.

329.     Indeed, as the Investment Banker Defendants knew and/or consciously avoided knowing, the amounts stolen from RCM substantially outsized Refco's total capital.  By the time Refco filed for bankruptcy, RCM's net uncollectible receivables totaled over $2 billion, while RGL claimed only $515 million in capital in 2002, $566 million in 2003, $616 million in 2004, and only $150 million in 2005. As the Investment Banker Defendants knew, and as their own projections showed, there was no cash to pay down the receivable to RCM and even Refco's projected "goodwill," which was entirely illusory given the Refco Insiders' fraud, was insufficient to meet RGL and its affiliates' obligations to RCM.

## The Investment Banker Defendants' Motivations

330.     Despite this knowledge, the Investment Banker Defendants, preoccupied with the lucrative fees they expected to make on the LBO and IPO, prepared the offering documents needed to facilitate the LBO and did not focus on the propriety of the LBO for either RCM or RGL.  For example, on May 4, 2004 Michael Paasche, a Deutsche banker, pleaded with a senior Deutsche executive to override the CRM's rejection of the Refco LBO transaction as too risky (first emphasis in original):

> Preliminary feedback from credit suggests we will have an important transaction for TH Lee DECLINED by crm middle of this week.  We need your help in preparing to appeal that decision . . . .
>
> * * *
> So in broad summary, we anticipate being one of three banks providing committing to the term loan conditioned upon successfully placing $600 mm of bonds on a best efforts basis. In other words, after successful placement of the bonds, a max underwrite to DB of $250 mm of B loan with a hold target of zero and a take and hold of $25 mm on the revolver.  **The ultimate hold of $25 mm compares very favorably with expected fees of about $10 mm.** Furthermore, the bank debt is a very acceptable 35% of total purchase price protected by substantial amounts of equity and sub debt.
>
> Unfortunately, it looks like we will get a DECLINE from credit on the grounds that **levering FIG [financial institutions group] counterparties isn't good due to the potential for "double leverage"** and the difficulty in collecting payments from a regulated entity to pay interest and amortize debt in periods of market declines. . . .

I think the structure is responsive to the concerns of credit but as no one has levered a transaction like this, its not easy for CRM to signoff. Furthermore, *the hold of $25 mm is very attractive for a deal of this size and in light of the $10 mm fee potential*. . . .

331.    Indeed, Mr. Paasche was correct in thinking Deutsche's CRM group would reject the risky Refco deal. On May 11, 2004, Anne Binstock of Deutsche's CRM group stated: "Given the politics and fees, I suppose it is appropriate to provide the business [group] a hearing on this. They do know that I cannot get there on this name/this risk." In response, Lothar Weber of Deutsche noted CRM's decision must stand although it may be overturned for business reasons: "I suggest that this be elevated to Michael Cohrs/ExCo directly for a business decision. Paasche has had intensive discussions with Cohrs and he seems to be supportive on business reason, i.e. *limited risk (hold)/high reward*." (emphasis added). He further stated, however, that "A point to mention is the Refco (past) reputation and the related reputational risk DB is taking."

332.    On July 22, 2004, Refco Finance Holdings LLC and Refco Finance Inc. issued a Offering Circular regarding the $600 million of senior subordinated notes, with Credit Suisse, BAS, and Deutsche as "joint book-running managers." Thus, the Investment Banker Defendants overcame their credit concerns about Refco motivated by the lucrative fees and opportunity to get close to THL and Refco for future business, including the IPO.

## Investment Bankers' Use of Patently Unreasonable Projections

333.    The Investment Banker Defendants never trusted the Refco Insiders. Indeed, one BAS employee noted in an email dated April 23, 2004, that he could not "look at the cfo [Trosten] without thinking of [john] lovitz and his pathological liar routine on [Saturday Night Live]." Nevertheless, the Investment Banker Defendants were all too willing to adopt and use patently unreasonable projections prepared by management in arranging and facilitating the LBO and IPO. Vikrant Sawhney of Deutsche advised others internally by email that "[i]n terms of projections, *THL thinks we should take the mgmt projections that were recently distributed at more or less face value*. Though they acknowledge 15% top-line growth long-term is difficult, they believe s/b in the bag (higher) for next 2-3 years, just based on secular trends. Certainly *we should address the challenge of being able to convince the street of our ability to hit these #s, but we don't want to*

*undersell ourselves on valuation etc b/c we have too much knowledge*." (emphasis added). None of the projections used by the Investment Banker Defendants included any repayment of RCM's pre-existing receivables. The Investment Banker Defendants who had been studying Refco's cash-flows knew and/or consciously avoided knowing that significant cash was historically taken and could still be taken from RCM, and yet never took into account how the $1.4 billion of additional leverage on Refco or the payout of RGL's assets to the Refco Insiders would impact RCM's ability to be repaid. Unlike a properly executed leveraged buy-out, the Investment Banker Defendants knowingly left behind over a billion dollars of unpaid debts owed to RCM.

**Impact on RCM was Actively Concealed by Investment Banker Defendants**

334. The April 16, 2004 letter of intent regarding the LBO sent to Refco expressly advised the company that all debt would be paid down in the LBO except "secured" financing used for customer related activity:

> "Our proposal is for a debt-free Company. Accordingly, we would expect that the Sellers would fund from their cash proceeds (or cause the Company to fund at Closing with a concomitant reduction in cash proceeds paid to the Sellers) all of the Company's indebtedness for borrowed money . . . . We understand that the *secured* financing (if any) used principally for customer related activity in the ordinary course of business will not be repaid." (emphasis added)

335. Similarly, the LBO Offering Circular falsely states that the LBO bond debt was "effectively junior to all existing and future liabilities of our subsidiaries [including RCM] that have not guaranteed the notes." This was, simply, not true. As the Investment Banker Defendants knew, the LBO layered on $1.4 billion in debt that would have to be paid off before RCM's intercompany loans could be paid. Nowhere did the Offering Circular explain that the RCM assets were routinely diverted from RCM and distributed to other Refco entities without security or collateral and without regard for RCM's obligations to its customers; that RCM's most significant assets were approximately $2 billion of undocumented, uncollateralized receivables from RGL and RCC – two of the entities obligated to repay the LBO borrowings; and that the LBO transactions resulted in "priming" these receivables with $1.4 billion of third-party bank and bond debt without regard for the interests of RCM.

336.    Knowing full well the size of RCM's IOUs, the Investment Banker Defendants ensured that repayment of these receivables would be subordinated to the new LBO debt. Despite the statements in the Offering Circular to the effect that RCM would not be harmed by the LBO, Section 7.03 of the Credit Agreement dated as of August 5, 2004, states that if Refco incurs "Indebtedness" that constitutes an "Investment" (which is defined to include an intercompany payable), then "all such Indebtedness" by any Refco entity obligated to repay the bank debt owing to a Refco entity that is not obligated (*i.e.*, RCM) "must be expressly subordinated to the Obligations" to repay the bank debt. In other words, the Investment Banker Defendants knew and/or consciously avoided knowing that the borrower and guarantors on the LBO bank debt were also obligated to pay RCM back for the use of RCM's cash, but **they insisted that RCM's right to be repaid must be subordinated to their right to repayment.**

337.    Similarly, Section 4.04(b)(15) of the bond debt Indenture allowed RGL and the guarantor subsidiaries to repay "intercompany Indebtedness . . . **provided that no Default has occurred and is continuing or would result therefrom**." (emphasis added.) Thus, as long as the LBO bond debt was not in default, RGL and RCC could – although they were not required to do so and arguably were precluded from doing so by the bank debt subordination requirements – repay the billions of dollars owed to RCM. But if ever the bond debt were in trouble, RCM's right to be repaid would be trumped by the LBO debt, which is what ultimately happened following Refco's bankruptcy.

338.    Pursuant to a July 22, 2004, purchase agreement, Credit Suisse (as representative of itself, BAS, and Deutsche) agreed that the three Investment Banker Defendants would severally purchase – at 97.5% of the principal amount of the notes – the $600 million of senior subordinated notes. Credit Suisse agreed to purchase $270 million (or 45%) of the notes, and BAS and Deutsche Bank each agreed to purchase $165 million (or 27.5% each) of the notes. As the Notes were issued pursuant to SEC Rule 144A, they did not have to be registered.

339.    Nonetheless, Refco Finance Holdings LLC and Refco Finance Inc. agreed to file a registration statement with the SEC and then to conduct an "Exxon Capital exchange" of registered

notes for the Rule 144A Notes so that the Investment Banker Defendants would be permitted to resell the Refco notes to others, thereby consummating their low-risk-high-reward strategy for the LBO financing by dumping the notes and just holding a small portion of the even more senior bank debt. Credit Suisse took the lead in drafting the risk factors for the SEC filings that facilitated the resale of the LBO notes and the subsequent IPO.

**The Harm of the IPO to Refco Inc.**

340. The IPO Registration Statement became effective on August 10th. In connection with the IPO, Refco Inc. issued 26,500,000 shares of common stock to the public at $22/share. The offering consisted of 12,500,000 initial shares by Refco Inc. and 14,000,000 shares of a secondary offering by THL, RGHI, Bennett, and others. An additional 3.975 million shares in overallotment were also issued. The offering generated $258,500,000 in proceeds for Refco Inc., approximately $289,520,000 in proceeds for the selling shareholders and $82.2 million in greenshoe dividend.

341. As the Investment Banker Defendants always contemplated, and as was set forth in the IPO prospectus, on September 16th, 2005, Refco Inc. used the vast majority of its IPO proceeds to pay $231,262,500 towards the redemption of $210 million of the principal amount of RGL's senior subordinated notes plus $18.9 million in accrued interest and prepayment penalty. As RGL was insolvent at the time, Refco Inc. was induced to make a $231 million contribution to RGL for no consideration.

342. The Investment Banker Defendants received their share of approximately $45 million in fees in connection with the LBO. The Investment Banker Defendants further received their share of approximately $40 million more in fees in connection with the IPO.

343. Refco was forced to file for bankruptcy mere weeks after the IPO.

**The RTL Defendants' Role in the Fraudulent Scheme**

344. The RTL Defendants were a crucial participant in the Refco Insiders' fraudulent scheme to hide the RGHI Receivable. From 1999 to 2005, each of the RTLs was designed to, and in fact did, conceal from the innocent RCM and RGL directors, officers and agents, including inside counsel and others, the nature and extent of the RGHI Receivable.

345.     As each of the RTL Defendants knew, the RTL transactions did not serve any legitimate business purpose for RCM, RGL, or for any other Refco affiliate.

346.     By agreeing to act as a conduit for these fraudulent transactions, the RTL Defendants substantially assisted in the execution of the fraudulent scheme.   Indeed, without the RTL Defendants' active participation in the scheme alleged herein, it would have been impossible for the Refco Insiders to conceal the nature and extent of the RGHI Receivable, or to facilitate a lucrative cashing-out of their interests in Refco.

347.     Each of the RTL Defendants knew and/or consciously avoided knowing, among other things, the following facts:

(a)     First, that the timing of the RTLs was designed to manipulate Refco's financial condition during its fiscal year-end or quarter-end financial or audit reporting periods.   The RTL Defendants did business with Refco and were each aware that Refco's annual reporting year closed at the end of February, and that the RTLs were designed to occur at the end of this fiscal year (and also, starting in 2004, at the end of fiscal quarters) and were unwound shortly after the new reporting period began.

(b)     Second, that the RTLs were not isolated transactions; they were systematic elements in a large-scale fraud, necessitating their use at the end of  financial reporting periods.   Moreover, at least Liberty Corner (and Pigott) were well aware that the RTLs were occurring with more frequency as Refco's LBO and IPO approached.

(c)     Third, the size of the RTLs alone was suspicious.   Each RTL was for a specific and extremely large dollar amount.   Moreover, the RTL Defendants who participated in multiple RTLs year after year, such as Liberty Corner (and Pigott), were aware that the annual aggregate amount of the RTLs was increasing.

(d)     Fourth, the RTLs were suspicious and without any legitimate business purpose.   The RTLs provided the RTL Defendants with lucrative interest payments (in Pigott's case, more than $1.1 million ) in exchange for their participation in a risk-free transaction.   Moreover, the RTL Defendants knew and/or consciously avoided knowing that

they had been selected to provide large-figure loans despite the fact that most or all of the RTL Defendants lacked the financial wherewithal to receive loans of such magnitude on an uncollateralized basis. Similarly, the RTL Defendants whose transactions were guaranteed by RGL knew and/or consciously avoided knowing that the loan transactions were guaranteed by the corporate subsidiary of an insolvent parent, despite that subsidiary's complete lack of interest in or benefit from the transaction.

(e)    Finally, the RTL loan documents indicated that each RTL Defendant was bound to act as a conduit for transfers from a Refco entity to RGHI just before the end of the relevant period, and that these "loans" were unwound just after the beginning of the new period.

348.    Given the sophistication of the RTL Defendants, each knew and/or consciously avoided knowing that the RTL transactions were designed to conceal a significant related-party receivable at the end of Refco's reporting and audit periods.


# RCM CLAIMS


### FIRST CLAIM FOR RELIEF
### (Breach of Fiduciary Duty Claim by RCM Against Bennett and Maggio)

349.    Paragraphs 1 to 348 are incorporated as if fully set forth herein.

350.    At all relevant times, RCM was insolvent or operating in the zone of insolvency.

351.    At all relevant times, Bennett and Maggio, as directors of RCM, owed fiduciary duties of loyalty, care, honesty, good faith, and trust to RCM and RCM's customers, who were creditors of RCM.

352.    In furtherance of their scheme to conceal Refco's true financial condition and prop Refco up long enough to facilitate a lucrative cashing-out of their interests in Refco, Bennett and Maggio caused RCM to transfer its valuable assets to RGL and its affiliates. These transfers, which amounted to approximately $2 billion at the time of the LBO, and over $2 billion at the time of the IPO, were unrelated to the business of RCM, did not benefit RCM, were for the sole purpose of

maintaining the perception of Refco's financial strength and health so that Bennett, Maggio, and the other Refco Insiders could personally benefit from a lucrative cashing-out of their interests in Refco, and occurred, among other things: (a) without any "loan" documentation between RCM and the Refco entities that received the funds; (b) without providing RCM with any compensation, security, or collateral; (c) without assurances that the "loaned" RCM funds would or could be repaid by the Refco entities that received them; and (d) without informed decision making at RCM or any analysis, much less informed and objective analysis, on behalf of RCM of the appropriateness or suitability of the "loans" or of the ability of the Refco entities to which the funds were "loaned" to repay the funds.

353.    Bennett and Maggio knew that the Refco affiliates to whom RCM's assets were being transferred would not repay these amounts for various reasons, including, but not limited to, the following: (a) RGL and the other Refco entities to whom RCM's assets were loaned did not have the financial wherewithal or intent to repay RCM; (b) the LBO subordinated RCM's right to repayment to $1.4 billion in new LBO debt; (c) the negative impact that disclosure of the RGHI Receivable (and the trading losses and operating expenses concealed in the RGHI Receivable) would have on Refco's financial condition, customer confidence and ability to repay RCM; (d) hundreds of millions of dollars in Refco revenue were, in fact, illusory accrued interest on the RGHI Receivable; (e) the negative impact the disclosure that the Refco Insiders had used RTLs to conceal the RGHI Receivable at the end of each relevant reporting and audit period would have on Refco's financial condition, consumer confidence, and ability to repay RCM; and (f) as a result of the foregoing facts that were concealed from RCM, its Outside Directors, and innocent officers and agents, there was no intention or ability to repay the funds RCM had loaned to RGL and the other Refco affiliates, rendering RCM unable to satisfy its obligations to its customers and insolvent or operating in the zone of insolvency.

354.    By orchestrating these transfers despite their undisclosed conflict of interest and their knowledge of the foregoing, Bennett and Maggio breached their fiduciary duties of loyalty, care, honesty, good faith, and trust to RCM.

355.    Bennett and Maggio were in a position of unique and superior knowledge regarding, among other things, the true facts concerning the condition of RCM, the diversion of RCM assets to fund Refco's operations, the RGHI Receivable, the RTLs, and the fact that there was no intention or ability to repay the funds RCM had loaned to RGL and the other Refco affiliates.

356.    In the alternative, Bennett and Maggio are liable for aiding and abetting each other's breaches of fiduciary duties to RCM because, among other things, Bennett and Maggio knew of each other's fiduciary duties to RCM, yet participated in and substantially assisted the other's breaches of those duties, as alleged herein.

357.    As a proximate result of these breaches of fiduciary duty, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against Bennett and Maggio for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.


### SECOND CLAIM FOR RELIEF
### (Fraud Claim by RCM Against Bennett and Maggio)

358.    Paragraphs 1 to 357 are incorporated as if fully set forth herein.

359.    In order to facilitate a lucrative sale of their interests in Refco, Bennett and Maggio engaged in a fraudulent scheme through which they caused RCM's assets to be transferred to and used by RGL and other Refco affiliates to pay operating expenses, fund acquisitions, and improve Refco's overall perceived financial condition, all the while knowing that these Refco affiliates did not have the financial wherewithal or intent to repay RCM's assets.

360.    In furtherance of this fraudulent scheme, Bennett and Maggio, with the active participation of RCM's professional advisors, concealed from RCM, its Outside Directors, and innocent officers and agents, each of the following components, among others, of their fraudulent

scheme: (a) RCM's assets were transferred to fund the operations of Refco affiliates, pay for acquisitions, and improve Refco's overall perceived financial condition so that the Refco Insiders could facilitate a lucrative cashing-out of their interests through an LBO and IPO; (b) these purported intercompany RCM loans were not documented or negotiated and were made without any specific terms; (c) no credit analysis was performed in connection with these loans and no security or collateral was given for these loans; (d) with the active assistance of Refco's professional advisors, the Refco Insiders concealed substantial Refco trading losses and operating expenses through the RGHI Receivable, booked hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable as revenue, and engineered RTLs to conceal the RGHI Receivable at the end of each relevant reporting and audit period; (e) the LBO subordinated RCM's right to repayment to $1.4 billion in new LBO debt; and (f) as a result of the foregoing, there was no intention or ability to repay the funds RCM loaned to RGL and other Refco affiliates, rendering RCM unable to satisfy its obligations to its customers and insolvent or operating in the zone of insolvency.

361.    In addition, with the active assistance of RCM's professional advisors, Bennett and Maggio fraudulently misrepresented in RCM's financial statements that, among other things, the intercompany loans made by RCM to Refco affiliates were a "receivable from customers," when these receivables were, in fact, undocumented intercompany loans made by RCM to Refco affiliates.

362.    Bennett and Maggio made the foregoing material omissions and affirmative misrepresentations with the intent to deceive RCM, its Outside Directors, and innocent officers and agents so as to allow Bennett and Maggio to continue to use RCM assets to fund and prop up Refco and its affiliates until the Refco Insiders were able to complete their lucrative cashing-out of their interests in Refco for far more than those interests were worth.

363.    The true facts concerning the foregoing omissions and misrepresentations were material, and RCM, its Outside Directors, and innocent officers and agents would not have permitted RCM's assets to be transferred to uncreditworthy Refco affiliates had they known them.

364.    As directors of RCM, Bennett and Maggio owed fiduciary duties to, and had a special relationship of confidence and trust with, RCM and, given RCM's insolvent condition, its customers, who were creditors of RCM.

365.    Bennett and Maggio were in a position of unique and superior knowledge regarding the true facts concerning the foregoing omissions and material misrepresentations.  RCM's Outside Directors and innocent officers and agents did not have access to the books and records maintained by Bennett and Maggio through which these intercompany transfers were made, were limited by Bennett and Maggio to reviewing only certain information concerning RCM and Refco, and had no access to information from which they could have learned of the RGHI Receivable, the fraudulent inflation of Refco's operating results, the RTLs, the subordination of RCM's loans to $1.4 billion in new LBO debt, or any of the other fraudulent actions perpetrated by Bennett, Maggio, and the other Refco Insiders.

366.    RCM's  Outside Directors and innocent officers and agents of RCM were justified in relying on Bennett and Maggio, who were RCM directors and officers (with fiduciary duties to RCM) and whose statements regarding Refco's financial health were backed by Trosten, Refco's Chief Financial Officer, and RCM's outside professional advisors, including GT and MB.

367.    In the alternative, Bennett and Maggio are liable for aiding and abetting each other's fraudulent conduct because, among other things, they actively participated in and knowingly and substantially assisted each other's misrepresentations and omissions.

368.    As expected and anticipated by Bennett and Maggio, as a proximate result of their fraudulent omissions and misrepresentations, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

369.    Had the true facts been fully disclosed, RCM would not have allowed its assets to be diverted and would have sought to stop the LBO or required repayment of the approximately $2 billion it was owed as a condition to Refco's entry into the LBO.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against Bennett and Maggio for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

### THIRD CLAIM FOR RELIEF
#### (Malpractice Claim by RCM Against GT)

370.     Paragraphs 1 to 369 are incorporated as if fully set forth herein.

371.     At all relevant times, GT was employed by and acted as RCM's auditor.

372.     GT owed a duty of care to RCM on account of its professional relationship with RCM.

373.     GT breached its duty of care to RCM by, among other things, issuing unqualified audit opinions for RCM's financial statements that were false, failing to require disclosure in RCM's financial statements or to advise RCM's Outside Directors and innocent officers and agents that RCM's assets were being routinely transferred to Refco affiliates, and instead allowing these intercompany loans to be characterized as a "receivable from customers" on RCM's audited financial statements.  GT also breached its duty of care by failing to require disclosure that the Refco affiliates to whom these loans were made lacked the intention or ability to repay these loans for the reasons set forth above.

374.     Any audit examination conducted with the care and diligence required of professional auditors would have revealed these facts and required their disclosure in RCM's financial statements and/or to RCM's Outside Directors and innocent officers and agents.

375.     As a proximate result of GT's breach of its duty of care, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against GT for the amount of damages sustained, including attorneys' fees,

related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

### FOURTH CLAIM FOR RELIEF
#### (Negligent Misrepresentation Claim by RCM Against GT)

376.    Paragraphs 1 to 375 are incorporated as if fully set forth herein.

377.    At all relevant times, GT was employed by and acted as RCM's auditor.

378.    As RCM's auditor, GT owed a duty to RCM to verify the accuracy of information concerning the financial condition of RCM, including the actual value of intercompany loans and receivables.

379.    In its annual financial audits of RCM, GT, among other things, allowed the misclassification of intercompany receivables owed to RCM by Refco affiliates as a "receivable from customers" and otherwise misrepresented RCM's true financial condition by providing unqualified audit opinions indicating that RCM was in sound financial condition.

380.    GT negligently failed to require disclosure of the intercompany receivables owed by Refco affiliates to RCM and negligently failed to require a write down of these purported "receivables," despite knowing, or negligently disregarding, as the auditor of RGL and the other Refco affiliates, including RCM, that RCM could not collect on these "receivables" because the Refco affiliates to whom RCM had loaned its funds did not have the intention or ability to repay these amounts for the reasons set forth above.

381.    As RCM's auditors, GT knew and intended that RCM's Outside Directors and innocent officers and agents would and did reasonably rely on the unqualified audit opinions that GT issued.

382.    The GT audit opinions were false and misleading and contained materially false statements of fact, including false statements regarding the absence of material intercompany transfers of RCM's assets to Refco affiliates and the unimpaired value of these receivables.

383.    RCM's reliance on GT's false statements was reasonable and justified under the circumstances.

103

384.    As a proximate result of GT's material misrepresentations, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against GT for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

### FIFTH CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty Claims by RCM Against GT)

385.    Paragraphs 1 to 384 are incorporated as if fully set forth herein.

386.    By virtue of its role as the auditor for RCM and RGL and its affiliates, GT knew and/or consciously avoided knowing that, among other things: (a) Bennett and Maggio were causing RCM's assets to be transferred to fund the operations of Refco affiliates, pay for acquisitions, and improve Refco's overall perceived financial condition so that the Refco Insiders could facilitate a lucrative cashing-out of their interests through an LBO and IPO; (b) these transfers, which purportedly took the form of unsecured intercompany "loans" from RCM to other uncreditworthy Refco entities, were unrelated to the business of RCM, did not benefit RCM, often occurred without any "loan" documentation, and were entered into without compensation, security, or collateral; (c) RCM's loans were made to Refco entities that lacked the intention or ability to repay the diverted RCM assets; (d) the Refco Insiders concealed substantial Refco trading losses and operating expenses through the RGHI Receivable, booked hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable as revenue, and concealed the RGHI Receivable through the RTLs at the end of each relevant reporting and audit period; (e) the LBO subordinated RCM's right to repayment to $1.4 billion in new LBO debt; (f) RCM was unable to satisfy its obligations to its customers and was insolvent or operating in the zone of insolvency; and (g) Bennett and Maggio were, by virtue of the foregoing, breaching their fiduciary duties to RCM.

387.     GT was aware of its own role in Bennett and Maggio's overall scheme.

388.     Notwithstanding this knowledge, GT knowingly and substantially assisted in Bennett and Maggio's breaches of their fiduciary duties to RCM by, among other things: (a) allowing the misclassification of the uncollectible intercompany receivables owed to RCM by Refco affiliates as a "receivable from customers" in RCM's financial statements; (b) failing to require a write down of RCM's intercompany receivables, despite its knowledge of the true financial condition of RGL and its affiliates; and (c) providing unqualified audit opinions that indicated that RCM was in sound financial condition when, in fact, as GT knew and/or consciously avoided knowing, RCM was unable to satisfy its obligations to its customers and was insolvent or operating in the zone of insolvency.

389.     As a proximate result of GT's knowing and substantial assistance, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against GT for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## SIXTH CLAIM FOR RELIEF
### (Aiding and Abetting Fraud Claim by RCM Against GT)

390.     Paragraphs 1 to 389 are incorporated as if fully set forth herein.

391.     GT had actual knowledge of and/or consciously avoided knowing that Bennett and Maggio concealed from RCM, its Outside Directors, and innocent officers and agents each of the following components, among others, of their fraudulent scheme: (a) RCM's assets were transferred to Refco entities in the form of unsecured and uncollectible "loans" used to fund the operations of Refco affiliates, pay for acquisitions, and improve Refco's overall perceived financial condition so that the Refco Insiders could facilitate a lucrative cashing-out of their interests through an LBO and

IPO; (b) these transfers, which purportedly took the form of unsecured intercompany "loans" from RCM to other uncreditworthy Refco entities, were unrelated to the business of RCM, did not benefit RCM, often occurred without any "loan" documentation, and were entered into without compensation, security, or collateral; (c) the Refco Insiders concealed substantial Refco trading losses and operating expenses through the RGHI Receivable, booked hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable as revenue and concealed the RGHI Receivable through the RTLs at the end of each relevant reporting and audit period; (d) the Refco Insiders orchestrated an LBO which lined their own pockets at RCM's expense as it subordinated RCM's intercompany receivables to $1.4 billion in new LBO debt; and (e) there was no intention or ability to repay the funds RCM had loaned to RGL and the other Refco affiliates, rendering RCM unable to satisfy its obligations to its customers and insolvent or operating in the zone of insolvency.

392. GT also knew that Bennett and Maggio affirmatively misrepresented to RCM's Outside Directors and innocent officers and agents that, among other things, the intercompany loans made by RCM to Refco affiliates were a "receivable from customers," rather than uncollectible intercompany loans.

393. GT was aware of its own role in Bennett and Maggio's overall scheme.

394. Notwithstanding this knowledge, GT knowingly and substantially assisted in the fraud by, among other things: (a) allowing the misclassification of the intercompany receivables owed to RCM by Refco affiliates as a "receivable from customers" in RCM's audited financial statements; (b) failing to require a write down of RCM's intercompany receivables, despite its knowledge of the foregoing components of Bennett and Maggio's fraudulent scheme; and (c) providing unqualified audit opinions that indicated that RCM was in sound financial condition when, in fact, as GT knew and/or consciously avoided knowing, RCM was unable to satisfy its obligations to its customers and was insolvent or operating in the zone of insolvency.

395. As a proximate result of GT's knowing and substantial assistance, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts,

did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against GT for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## SEVENTH CLAIM FOR RELIEF
### (Malpractice Claim by RCM Against MB)

396.    Paragraphs 1 to 395 are incorporated as if fully set forth herein.

397.    At all relevant times, MB was employed by and acted as Refco's outside counsel.

398.    MB provided legal advice to RCM regarding, among other things: (a) the customer agreements utilized by RCM; (b) the applicability and impact of United States and foreign regulations and law to and on RCM's activities, operations, and use of customer funds; and (c) the repatriation of RCM to the United States.

399.    MB owed a duty of care to RCM on account of its professional relationship with RCM.

400.    MB breached its duty of care to RCM by, among other things, not properly advising RCM concerning its obligations to safeguard customer funds; improperly advising RCM as to the impact of United States and foreign regulations and law on its activities and operations, including its use and treatment of customer funds; representing both Refco and RGHI in the LBO and the RTLs, despite being conflicted due to its knowledge and/or conscious avoidance of the misconduct at Refco; and failing to advise RCM, its Outside Directors, and innocent officers and agents that RCM funds were improperly being transferred to Refco affiliates that lacked the financial wherewithal or intent to repay these amounts for the reasons set forth above.

401.    Given MB's knowledge of the RGHI Receivable, MB's preparation of the documents for each RTL transaction, and MB's role as legal advisor to Refco (including RCM) in all matters, including corporate governance, United States and foreign regulations and law governing Refco's

(and RCM's) operations, activities, and use and treatment of client funds, securities, and other property, and preparation and review of Refco's customer agreements, among other things, MB knew that it was improper for RCM to transfer its funds to Refco affiliates that lacked the financial wherewithal or intent to repay RCM.

402.    Any law firm acting properly under the ethical standards of the profession would have revealed these facts to RCM and required their disclosure in RCM's financial statements and/or to RCM's Outside Directors and innocent officers and agents.

403.    As a proximate result of MB's breach of its duty of care, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against MB for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## EIGHTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty Claim by RCM Against MB)

404.    Paragraphs 1 to 403 are incorporated as if fully set forth herein.

405.    At all relevant times, MB served as RCM's outside counsel and provided legal advice to RCM regarding, among other things: (a) the customer agreements utilized by RCM; (b) the applicability and impact of United States and foreign regulations and law to and on RCM's activities, operations, and use of customer funds; and (c) the repatriation of RCM to the United States.

406.    As RCM's legal outside counsel, MB owed fiduciary duties to RCM. At all relevant times, MB also served as outside counsel and provided legal advice to RGHI and RGL.

407.    MB had an undisclosed conflict of interest and breached its fiduciary duty to RCM by, among other things, not properly advising RCM concerning its obligations to safeguard customer

funds and not disclosing that RCM funds were improperly being transferred to Refco affiliates that lacked the financial wherewithal or intent to repay these amounts for the reasons set forth above.

408.    As a proximate result of MB's breaches of fiduciary duty, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against MB for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## NINTH CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty Claims by RCM Against MB)

409.    Paragraphs 1 to 408 are incorporated as if fully set forth herein.

410.    By virtue of its role as outside counsel for RCM and RGL and its affiliates, MB knew and/or consciously avoided knowing that, among other things: (a) Bennett and Maggio were causing RCM's assets to be transferred to fund the operations of Refco affiliates, pay for acquisitions, and improve Refco's overall perceived financial condition so that the Refco Insiders could facilitate a lucrative cashing-out of their interests through an LBO and IPO; (b) these transfers, which purportedly took the form of unsecured intercompany "loans" from RCM to other uncreditworthy Refco entities, were unrelated to the business of RCM, did not benefit RCM, often occurred without any "loan" documentation, and were entered into without compensation, security, or collateral; (c) RCM's loans were made to Refco entities that lacked the intention or ability to repay the diverted RCM assets; (d) the Refco Insiders concealed substantial Refco trading losses and operating expenses through the RGHI Receivable, booked hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable as revenue, and concealed the RGHI Receivable through the RTLs at the end of each relevant reporting and audit period; (e) the LBO subordinated RCM's right to

repayment to $1.4 billion in new LBO debt; (f) RCM was unable to satisfy its obligations to its customers and was insolvent or operating in the zone of insolvency; and (g) Bennett and Maggio were, by virtue of the foregoing, breaching their fiduciary duties to RCM.

411.    MB was aware of its own role in Bennett and Maggio's overall scheme.

412.    Notwithstanding this knowledge, MB knowingly and substantially assisted in Bennett and Maggio's breaches of their fiduciary duties to RCM by, among other things: (a) not properly advising RCM concerning its obligations to safeguard customer funds; (b) improperly advising RCM as to the impact of United States and foreign regulations and law on its activities and operations, including its use and treatment of customer funds; (c) failing to advise RCM's Outside Directors and innocent officers and agents that RCM funds were improperly being transferred to Refco affiliates that lacked the financial wherewithal or intent to repay them; (d) preparing the documentation for each of the RTLs used to conceal the existence of the RGHI Receivable at the end of each relevant reporting and audit period; and (e) advising Refco in connection with the LBO, through which the RCM intercompany loans were subordinated to $1.4 billion in new LBO debt.

413.    As a proximate result of MB's knowing and substantial assistance, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against MB for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## TENTH CLAIM FOR RELIEF
### (Aiding and Abetting Fraud Claim by RCM Against MB)

414.    Paragraphs 1 to 413 are incorporated as if fully set forth herein.

415.    MB had actual knowledge of and/or consciously avoided knowing that Bennett and Maggio concealed from RCM, its Outside Directors, and innocent officers and agents each of the

following components, among others, of their fraudulent scheme: (a) RCM's assets were transferred to Refco entities in the form of unsecured and uncollectible "loans" used to fund the operations of Refco affiliates, pay for acquisitions, and improve Refco's overall perceived financial condition so that the Refco Insiders could facilitate a lucrative cashing-out of their interests through an LBO and IPO; (b) these transfers, which purportedly took the form of unsecured intercompany "loans" from RCM to other uncreditworthy Refco entities, were unrelated to the business of RCM, did not benefit RCM, often occurred without any "loan" documentation, and were entered into without compensation, security, or collateral; (c) the Refco Insiders concealed substantial Refco trading losses and operating expenses through the RGHI Receivable, booked hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable as revenue, and concealed the RGHI Receivable through the RTLs at the end of each relevant reporting and audit period; (d) the Refco Insiders orchestrated an LBO which lined their own pockets at RCM's expense as it subordinated RCM's intercompany receivables to $1.4 billion in new LBO debt; and (e) there was no intention or ability to repay the funds RCM had loaned to RGL and the other Refco affiliates, rendering RCM unable to satisfy its obligations to its customers and insolvent or operating in the zone of insolvency.

416.    MB also knew that Bennett and Maggio affirmatively misrepresented to RCM's Outside Directors and innocent officers and agents that, among other things, the intercompany loans made by RCM to Refco affiliates were a "receivable from customers," rather than uncollectible intercompany loans.

417.    MB was aware of its own role in Bennett and Maggio's overall scheme.

418.    Notwithstanding this knowledge, MB knowingly and substantially assisted in the fraud by, among other things: (a) not properly advising RCM concerning its obligations to safeguard customer funds; (b) improperly advising RCM as to the impact of United States and foreign regulations and law on its activities and operations, including its use and treatment of customer funds; (c) failing to advise RCM's Outside Directors and innocent officers and agents that RCM funds were improperly being transferred to Refco affiliates that lacked the financial wherewithal or intent to repay them; (d) preparing the documentation for each of the RTLs used to conceal the

existence of the RGHI Receivable at the end of each relevant reporting and audit period; and (e) advising Refco in connection with the LBO, through which the RCM intercompany loans were subordinated to $1.4 billion in new LBO debt.

419.    As a proximate result of MB's knowing and substantial assistance, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against MB for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## ELEVENTH CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty Claims by RCM Against E&Y)

420.    Paragraphs 1 to 419 are incorporated as if fully set forth herein.

421.    By virtue of its substantial work for Refco, E&Y knew and/or consciously avoided knowing that, among other things: (a) Bennett and Maggio were causing RCM's assets to be transferred to fund the operations of Refco affiliates, pay for acquisitions, and improve Refco's overall perceived financial condition so that the Refco Insiders could facilitate a lucrative cashing-out of their interests for more than these interests were worth; (b) the Refco Insiders concealed substantial Refco trading losses and operating expenses through the RGHI Receivable, booked hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable as revenue, and concealed the RGHI Receivable through the RTLs at the end of each relevant reporting and audit period; (c) RGL and its affiliates were unable to repay RCM; (d) RCM was unable to satisfy its obligations to its customers and was insolvent or operating in the zone of insolvency; and (e) Bennett and Maggio were, by virtue of the foregoing, breaching their fiduciary duties to RCM.

422.    E&Y was aware of its own role in Bennett and Maggio's overall scheme.

423.    Notwithstanding this knowledge, E&Y knowingly and substantially assisted in Bennett and Maggio's breaches of their fiduciary duties to RCM by, among other things: (a) preparing and filing inaccurate federal, state, and municipal tax returns on behalf of RGHI, RGL, and Refco affiliates that concealed the existence of the RGHI Receivable (and, along with it, the Refco entities' trading losses and operating expenses); (b) preparing and filing federal, state, and municipal tax returns of behalf of RGL that falsely reflected interest income associated with the RGHI Receivable; and (c) as a result of the foregoing, creating the illusion that RGL and its other affiliates were financially healthy and creditworthy when in fact they lacked the financial wherewithal to repay RCM.

424.    As a proximate result of E&Y's knowing and substantial assistance, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against E&Y for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.


### TWELFTH CLAIM FOR RELIEF
### (Aiding and Abetting Fraud Claim by RCM Against E&Y)

425.    Paragraphs 1 to 424 are incorporated as if fully set forth herein.

426.    E&Y had actual knowledge of and/or consciously avoided knowing that Bennett and Maggio concealed from RCM, its Outside Directors, and innocent officers and agents each of the following components, among others, of their fraudulent scheme: (a) RCM's assets were transferred to Refco entities in the form of unsecured and uncollectible "loans" used to fund the operations of Refco affiliates, pay for acquisitions, and improve Refco's overall perceived financial condition so that the Refco Insiders could facilitate a lucrative cashing-out of their interests for more than these interests were worth; (b) the Refco Insiders concealed substantial Refco trading losses and operating

expenses through the RGHI Receivable, booked hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable as  revenue, and concealed the RGHI Receivable through the RTLs at the end of each relevant reporting and audit period; and (c) there was no intention or ability to repay the funds RCM had loaned to RGL and the other Refco affiliates, rendering RCM unable to satisfy its obligations to its customers and insolvent or operating in the zone of insolvency.

427.     E&Y was aware of its own role in Bennett and Maggio's overall scheme.

428.     Notwithstanding this knowledge, E&Y knowingly and substantially assisted in the fraud by, among other things: (a) preparing and filing inaccurate federal, state, and municipal tax returns on behalf of RGHI, RGL, and Refco affiliates that concealed the existence of the RGHI Receivable (and, along with it, the Refco entities' trading losses and operating expenses); (b) preparing and filing federal, state, and municipal tax returns of behalf of RGL that falsely reflected interest income associated with the RGHI Receivable; and (c) as a result of the foregoing, creating the illusion that RGL and its affiliates were financially healthy and creditworthy when in fact they lacked the financial wherewithal to repay RCM.

429.     As a proximate result of E&Y's knowing and substantial assistance, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against E&Y for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

### THIRTEENTH CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty Claims by RCM
### Against PwC)

430.    Paragraphs 1 to 429 are incorporated as if fully set forth herein.

431.    By virtue of its role as a financial and tax advisor and *de facto* Chief Accounting Officer for Refco, PwC knew and/or consciously avoided knowing that, among other things: (a) Bennett and Maggio were causing RCM's assets to be transferred to fund the operations of Refco affiliates, pay for acquisitions, and improve Refco's overall perceived financial condition so that the Refco Insiders could facilitate a lucrative cashing-out of their interests through an LBO and IPO; (b) RCM's loans were made to Refco entities that lacked the intention or ability to repay the diverted RCM assets; (c) the Refco Insiders concealed substantial Refco trading losses and operating expenses through the RGHI Receivable, booked hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable as revenue, and concealed the RGHI Receivable through the RTLs at the end of each relevant reporting and audit period; (d) the LBO subordinated RCM's right to repayment to $1.4 billion in new LBO debt; (e) RCM was unable to satisfy its obligations to its customers and was insolvent or operating in the zone of insolvency; and (f) Bennett and Maggio were, by virtue of the foregoing, breaching their fiduciary duties to RCM.

432.    PwC was aware of its own role in Bennett and Maggio's overall scheme.

433.    Notwithstanding this knowledge, PwC knowingly and substantially assisted in Bennett and Maggio's breaches of their fiduciary duties to RCM by, among other things: (a) advising and guiding Refco through the LBO in which the RCM intercompany loans were subordinated to $1.4 billion in new LBO debt; and (b) preparing and commenting on disclosures filed with the United States regulators in connection with Refco's LBO and IPO, which failed to disclose the RGHI Receivable and the RTLs.

434.    As a proximate result of PwC's knowing and substantial assistance, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

115

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against PwC for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## FOURTEENTH CLAIM FOR RELIEF
### (Aiding and Abetting Fraud Claim by RCM Against PwC)

435.    Paragraphs 1 to 434 are incorporated as if fully set forth herein.

436.    PwC had actual knowledge of and/or consciously avoided knowing that Bennett and Maggio concealed from RCM, its Outside Directors, and innocent officers and agents each of the following components, among others, of their fraudulent scheme: (a) RCM's assets were being transferred to Refco entities in the form of unsecured and uncollectible "loans" used to fund the operations of Refco affiliates, pay for acquisitions, and improve Refco's overall perceived financial condition so that the Refco Insiders could facilitate a lucrative cashing-out of their interests through an LBO and IPO; (b) the Refco Insiders concealed substantial Refco trading losses and operating expenses through the RGHI Receivable, booked hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable as revenue, and concealed the RGHI Receivable through the RTLs at the end of each relevant reporting and audit period; (c) the Refco Insiders orchestrated an LBO which lined their own pockets at RCM's expense as it subordinated RCM's intercompany receivables to $1.4 billion in new LBO debt; and (d) there was no intention or ability to satisfy the funds RCM had loaned to the other Refco affiliates, rendering RCM unable to satisfy its obligations to its customers and insolvent or operating in the zone of insolvency.

437.    PwC was aware of its own role in Bennett and Maggio's overall scheme.

438.    Notwithstanding this knowledge, PwC knowingly and substantially assisted in the fraud by, among other things: (a) advising and guiding Refco through the LBO through which the RCM intercompany loans were subordinated to $1.4 billion in new LBO debt; and (b) preparing and commenting on disclosures filed with the United States regulators in connection with Refco's LBO and IPO, which failed to disclose the RGHI Receivable and the RTLs.

116

439. As a proximate result of PwC's knowing and substantial assistance, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against PwC for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

### FIFTEENTH CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty Claims by RCM
### Against Credit Suisse, BAS, and Deutsche )

440. Paragraphs 1 to 439 are incorporated as if fully set forth herein.

441. By virtue of their role as financial advisors to Refco in connection with the LBO and the IPO, Credit Suisse, BAS, and Deutsche knew and/or consciously avoided knowing that, among other things: (a) Bennett and Maggio were causing RCM's assets to be transferred to fund the operations of Refco affiliates, pay for acquisitions, and improve Refco's overall perceived financial condition  so that the Refco Insiders could facilitate a lucrative cashing-out of their interests through an LBO and IPO; (b) RCM's loans were made to Refco entities that lacked the intention or ability to repay the diverted RCM assets; (c) the LBO subordinated RCM's right to repayment to $1.4 billion in new LBO debt; (d) RCM was unable to satisfy its obligations to its customers and was insolvent or operating in the zone of insolvency; and (e) Bennett and Maggio were, by virtue of the foregoing, breaching their fiduciary duties to RCM.

442. Credit Suisse, BAS, and Deutsche were aware of their own roles in Bennett and Maggio's overall scheme.

443. Notwithstanding this knowledge, Credit Suisse, BAS, and Deutsche knowingly and substantially assisted in Bennett and Maggio's breaches of their fiduciary duties to RCM by, among other things, devising and facilitating an LBO through which the RCM receivables were

subordinated to $1.4 billion in new LBO debt, leaving Refco with no meaningful capital with which to repay RCM.

444.    As a proximate result of Credit Suisse, BAS, and Deutsche's knowing and substantial assistance, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal or intent to repay these amounts, did not seek prompt repayment of these intercompany loans, was unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against Credit Suisse, BAS, and Deutsche for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

# RGL CLAIMS

### SIXTEENTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty Claim by RGL Against
### Bennett, Maggio, and Trosten)

445.    Paragraphs 1 to 444 are incorporated as if fully set forth herein.

446.    At all relevant times, RCM was the principal creditor of RGL.

447.    As officers of RGL, Bennett, Maggio, and Trosten owed fiduciary duties of loyalty, care, honesty, and good faith to RGL, and, at all times RGL was insolvent or operating in the zone of insolvency, to RGL's creditors, including RCM.

448.    Bennett, Maggio, and Trosten breached these fiduciary duties by causing RGL and its affiliates to enter into an LBO through which Bennett, Maggio, and Trosten would receive a lucrative cashing-out of their interests in Refco for more than those interests were worth, while knowingly failing to advise the innocent RGL directors, officers and agents, including inside counsel and others, of the following facts, among others, each of which constituted a separate and distinct breach of the fiduciary duties Bennett, Maggio, and Trosten owed to RGL and RGL's principal creditor, RCM: (a) there were material related-party transactions between Refco and RGHI through

which substantial undisclosed Refco trading losses and operating expenses were moved off Refco's books and concealed; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue; (c) the RTLs were used to conceal the RGHI Receivable at the end of each relevant reporting and audit period; (d) RGL and its affiliates were using RCM's assets to finance their operations and acquisitions so as to prop up RGL's overall perceived financial condition and suitability to undergo the LBO; (e) the LBO which would line the Refco Insiders' pockets would leave RGL with insufficient capital to meet its obligations, including repaying RCM's intercompany loans; and (f) as a result of the foregoing breaches of fiduciary duty, RGL was insolvent or operating in the zone of insolvency.

449.     Bennett, Maggio, and Trosten knew that their representations to the innocent RGL directors, officers and agents, including inside counsel and others, regarding the financial health of RGL and its affiliates were false because, among other things, they were intimately involved in and directed the RGHI Receivable scheme, the RTLs, the diversion of RCM assets to RGL and its affiliates, and the other fraudulent conduct alleged herein.

450.     Bennett, Maggio, and Trosten were in a position of unique and superior knowledge regarding, among other things, the true facts concerning the condition of RGL, the true substance and scope of the RGHI Receivable, the RTLs, the diversion of RCM assets to fund Refco's operations, and the fact that the appearance of RGL's financial health and strength was fabricated.

451.     In the alternative, Bennett, Maggio, and Trosten are liable for aiding and abetting each other's breaches of fiduciary duties to RGL because, among other things, Bennett, Maggio, and Trosten knew of each other's fiduciary duties as directors and officers of RGL, yet actively participated in and knowingly and substantially assisted the other's breaches of those duties, as alleged herein.

452.     As a proximate result of these breaches of fiduciary duty, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against Bennett, Maggio, and Trosten for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

### SEVENTEENTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty Claim by RGL Against RGHI, Bennett, and Grant)

453.    Paragraphs 1 to 452 are incorporated as if fully set forth herein.

454.    Prior to the LBO, RGHI held a 90% interest in RGL and was the controlling shareholder of RGL.  RGHI owed fiduciary duties of loyalty, care, honesty, and good faith to RGL as its controlling shareholder.

455.    Prior to the LBO, Bennett and Grant each held 50% interests in RGHI and, therefore, as the sole owners of RGL's controlling shareholder, owed fiduciary duties of loyalty, care, honesty, and good faith to RGL.

456.    RGHI, Bennett, and Grant breached their duties to RGL by, among other things, causing RGL and its affiliates to enter into an LBO through which the Refco Insiders would receive a lucrative cashing-out of their interests in Refco for more than those interests were worth, while knowingly failing to advise the innocent RGL directors, officers and agents, including inside counsel and others, of the following facts, among others, each of which constituted a separate and distinct breach of the fiduciary duties RGHI, Bennett, and Grant owed to RGL: (a) there were material related-party transactions between Refco and RGHI through which substantial undisclosed Refco trading losses and operating expenses were moved off Refco's books and concealed; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue; (c) the RTLs were used to conceal the RGHI Receivable at the end of each relevant reporting and audit period; (d) RGL and its affiliates were using RCM's assets to finance their operations and acquisitions so as to prop up RGL's overall perceived financial condition and suitability to undergo the LBO; (e) the LBO which would line the Refco Insiders' pockets would leave RGL with insufficient capital to meet its obligations, including repaying RCM's intercompany

loans; and (f) as a result of the foregoing breaches of fiduciary duty, RGL was insolvent or operating in the zone of insolvency.

457.    RGHI, Bennett, and Grant knew that their representations to the innocent RGL directors, officers and agents, including inside counsel and others, regarding the financial health of RGL and its affiliates were false because they were intimately involved in and directed the RGHI Receivable scheme, the RTLs, the diversion of RCM assets to RGL and its affiliates, and the other fraudulent conduct alleged herein.

458.    RGHI, Bennett, and Grant were in a position of unique and superior knowledge regarding the true facts concerning the condition of RGL, the true substance and scope of the RGHI Receivable, the RTLs, the diversion of RCM assets to fund Refco's operations, and the fact that the appearance of RGL's financial health and strength was fabricated.

459.    In the alternative, Bennett and Grant are liable for aiding and abetting each other's and/or RGHI's breach of its fiduciary duties to RGL because, among other things, they were aware of the existence of those duties, yet actively participated in and knowingly and substantially assisted the breach of those duties, as alleged herein.

460.    As a proximate result of these breaches of fiduciary duty, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against RGHI, Bennett, and Grant for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## EIGHTEENTH CLAIM FOR RELIEF
### (Fraud Claim by RGL Against Bennett, Maggio, and Trosten)

461.    Paragraphs 1 to 460 are incorporated as if fully set forth herein.

462.    Bennett, Maggio, and Trosten were the masterminds behind the fraudulent scheme alleged herein, controlling and directing every aspect of the fraud.

463.    In order to facilitate a lucrative sale of their interests in Refco, Bennett, Maggio, and Trosten engaged in a fraudulent scheme through which they propped up the perceived financial condition of RGL and its affiliates and caused RGL to enter into an imprudent LBO whereby RGL was saddled with $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, and was left unable to satisfy it obligations, including its obligation to repay the RCM intercompany loans.

464.    In furtherance of this scheme, Bennett, Maggio, and Trosten affirmatively misrepresented Refco's financial condition to the innocent RGL directors, officers and agents, including inside counsel and others, and falsely represented that RGL did not engage in any material related-party transactions.

465.    Bennett, Maggio and Trosten knew the falsity of the foregoing material misrepresentations and concealed, among other things, the following fraudulent components of their overall scheme: (a) there were material related-party transactions between Refco and RGHI through which substantial undisclosed Refco trading losses and operating expenses were moved off Refco's books and concealed; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue; (c) the RTLs were used to conceal the RGHI Receivable at the end of each relevant reporting and audit period; (d) RGL and its affiliates used RCM's assets to finance their operations and acquisitions so as to prop up RGL's overall perceived financial condition and its suitability to undergo the LBO; (e) the LBO which would line the Refco Insiders' pockets would leave RGL with insufficient capital to meet its obligations, including repaying RCM's intercompany loans; and (f) as a result of the foregoing, RGL was insolvent or operating in the zone of insolvency.

466.    Bennett, Maggio, and Trosten knew that their representations regarding the financial health of RGL and its affiliates were false because they were intimately involved in and directed the RGHI Receivable scheme, the RTLs, the diversion of RCM assets to RGL and its affiliates, and the other fraudulent conduct alleged herein.

467.    Bennett, Maggio, and Trosten made the foregoing material omissions and affirmative misrepresentations with the intent to deceive RGL, the innocent RGL directors, officers and agents, including inside counsel and others, so as to induce RGL to enter into an imprudent LBO which would solely benefit the Refco Insiders at RGL's expense.

468.    As officers of RGL, Bennett, Maggio, and Trosten had fiduciary duties to, and a special relationship of confidence and trust with, RGL and, given RGL's insolvent condition, its creditors, including RCM.

469.    The innocent RGL directors, officers and agents, including inside counsel and others, were justified in relying on Bennett, Maggio, and Trosten, who were Refco senior officers (with fiduciary duties to Refco) and whose statements regarding Refco's financial health were backed by outside professional advisors, including MB, GT, E&Y, PwC, and the Investment Banker Defendants.

470.    Bennett, Maggio, and Trosten were in a position of unique and superior knowledge regarding the true facts concerning the condition of RGL, the true substance and scope of the RGHI Receivable, the RTLs, the diversion of RCM assets to fund Refco's operations, and the fact that the appearance of RGL's financial health and strength was fabricated.

471.    As expected and anticipated by Bennett, Maggio, and Trosten, and those acting in active concert or participation with them, RGL entered into the LBO in ignorance of its true precarious financial condition.  Had the true facts been fully disclosed, RGL would not have entered into the LBO.

472.    In entering into the LBO, RGL relied to its detriment on the appearance of financial health and strength fraudulently created by Bennett, Maggio, and Trosten with the active

participation and assistance of the Professional Defendants, and on its ignorance of the true facts with respect to RGL's true precarious financial condition.

473.    The true facts concerning the foregoing omissions and misrepresentations were material, and the innocent RGL directors, officers and agents, including inside counsel and others, would not have permitted the LBO to go forward had they known them.

474.    The innocent RGL directors, officers and agents, including inside counsel and others, were justified in relying on Bennett, Maggio, and Trosten who were RGL's directors and officers (with fiduciary duties to RGL) and whose statements regarding Refco's financial health were backed by RGL's outside professional advisors, including GT, MB, E&Y, PwC, and the Investment Banker Defendants.

475.    In the alternative, Bennett, Maggio, and Trosten are liable for aiding and abetting each other's fraudulent conduct because, among other things, they actively participated in and knowingly and substantially assisted each other's misrepresentations and omissions.

476.    As expected and anticipated by Bennett, Maggio, and Trosten, as a proximate result of their fraudulent omissions and misrepresentations, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against Bennett, Maggio, and Trosten for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## NINETEENTH CLAIM FOR RELIEF
### (Malpractice Claim by RGL Against MB)

477.    Paragraphs 1 to 476 are incorporated as if fully set forth herein.

478.    At all relevant times, MB was employed by and acted as the outside counsel to RGL and its affiliates.

479.    MB provided legal advice to RGL and its affiliates regarding, among other things: (a) the customer agreements utilized by RGL and its affiliates; (b) the applicability and impact of United States and foreign regulations and law on RGL's activities and operations; (c) corporate governance of Refco; (d) loan and financing transactions entered into by RGL and its affiliates; and (e) the disclosures filed with regulators and the public in connection with the LBO.

480.    MB owed a duty of care to RGL on account of its professional relationship with RGL.

481.    MB breached its duty of care to RGL by preparing, negotiating, and facilitating the RTLs and failing to advise the innocent RGL directors, officers and agents, including inside counsel and others that, among other things: (a) there were material related-party transactions between Refco and RGHI through which substantial undisclosed Refco trading losses and operating expenses were moved off Refco's books and concealed; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue; (c) the RTLs MB prepared were used to conceal the RGHI Receivable at the end of each relevant reporting and audit period; (d) RGL and its affiliates were using RCM's assets to finance their operations and acquisitions so as to prop up RGL's overall perceived financial condition and suitability to undergo the LBO; (e) the LBO which would line the Refco Insiders' pockets would leave RGL with insufficient capital to meet its obligations, including repaying RCM's intercompany loans; and (f) as a result of the foregoing, RGL was insolvent or operating in the zone of insolvency.

482.    Given MB's knowledge of the RGHI Receivable, MB's preparation of the documents for the RTL transactions and MB's role as legal advisor to RGL, MB knew that RGL was not in a suitable condition to undergo the LBO.

483.    Any law firm acting properly under the ethical standards of the profession would have revealed these facts and required their disclosure in RGL's financial statements and/or to the innocent RGL directors, officers and agents, including inside counsel and others.

484.    As a proximate result of MB's breach of its duty of care, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and

other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against MB for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## TWENTIETH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty Claim by RGL Against MB)

485.    Paragraphs 1 to 484 are incorporated as if fully set forth herein.

486.    At all relevant times, MB served as RGL's outside counsel and provided legal services to RGL.

487.    At the same time, MB served as RGHI's counsel and provided legal services to RGHI.

488.    As RGL's outside counsel, MB had a fiduciary duty to protect RGL's interests.

489.    MB had an undisclosed conflict of interest and breached its fiduciary duties to RGL by facilitating an LBO that benefited RGHI at RGL's expense.

490.    As a proximate result of MB's breach of its fiduciary duties, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against MB for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

### TWENTY-FIRST CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty Claims by RGL
### Against MB)

491.    Paragraphs 1 to 490 are incorporated as if fully set forth herein.

492.    By virtue of its role as outside counsel for RGL and its affiliates, MB knew and/or consciously avoided knowing that, among other things: (a) there were material related-party transactions between Refco and RGHI through which substantial undisclosed Refco trading losses and operating expenses were moved off Refco's books and concealed; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue; (c) the RTLs MB prepared were used to conceal the RGHI Receivable at the end of each relevant reporting and audit period; (d) RGL and its affiliates were using RCM's assets to finance their operations and acquisitions so as to prop up RGL's overall perceived financial condition and suitability to undergo the LBO; (e) the LBO which would line the Refco Insiders' pockets would leave RGL with insufficient capital to meet its obligations, including repaying RCM's intercompany loans; (f) as a result of the foregoing, RGL and its affiliate were insolvent or were operating in the zone of insolvency; and (g) Bennett, Maggio, Trosten, Grant and RGHI were, by virtue of the foregoing, breaching their fiduciary duties to RGL.

493.    MB was aware of its own role in the Refco Insiders and RGHI's overall scheme.

494.    Notwithstanding this knowledge, MB knowingly and substantially assisted in Bennett, Maggio, Trosten, Grant, and RGHI's breaches of their fiduciary duties to RGL by, among other things: (a) preparing the documentation for each of the RTLs, which were used to conceal the existence of the RGHI Receivable at the end of each relevant reporting and audit period; (b) advising Refco in connection with an LBO that would leave RGL unable to satisfy its obligations, including repayment of the funds diverted from RCM; (c) improperly advising RCM that it could transfer its customer funds to RGL and its affiliates despite knowing that these entities did not have the financial wherewithal to satisfy these additional obligations; and (d) failing to disclose its knowledge of the RGHI Receivable and the RTLs to the innocent RGL directors, officers and agents, including inside counsel and others.

495.    As a proximate result of MB's knowing and substantial assistance, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against MB for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.


## TWENTY-SECOND CLAIM FOR RELIEF
### (Aiding and Abetting Fraud Claim by RGL Against MB)

496.    Paragraphs 1 to 495 are incorporated as if fully set forth herein.

497.    MB had actual knowledge of and/or consciously avoided knowing that Bennett, Maggio, and Trosten concealed from the innocent RGL directors, officers and agents, including inside counsel and others, the following components, among others, of their fraudulent scheme: (a) there were material related-party transactions between Refco and RGHI through which substantial undisclosed Refco trading losses and operating expenses were moved off Refco's books and concealed; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue;  (c) the RTLs MB prepared were used to conceal the RGHI Receivable at the end of each relevant reporting and audit period; (d) RGL and its affiliates were using RCM's assets to finance their operations and acquisitions so as to prop up RGL's overall perceived financial condition and suitability to undergo the LBO; (e) the LBO which would line the Refco Insiders' pockets would leave RGL with insufficient capital to meet its obligations, including repaying RCM's intercompany loans; and (f) as a result of the foregoing, RGL was insolvent or operating in the zone of insolvency.

498.    MB was aware of its own role in Bennett, Maggio, and Trosten's overall scheme.

499.    Notwithstanding this knowledge, MB knowingly and substantially assisted in Bennett, Maggio, and Trosten's fraud by, among other things: (a) preparing the documentation for

each of the RTLs which were used to conceal the existence of the RGHI Receivable at the end of each relevant reporting and audit period; (b) advising Refco in connection with an LBO that would leave RGL unable to satisfy its obligations, including repayment of the funds diverted from RCM; (c) improperly advising RCM that it could transfer its customer funds to RGL and its affiliates despite knowing that these entities did not have the financial wherewithal to satisfy these additional obligations; and (d) failing to disclose its knowledge of the RGHI Receivable and the RTLs to the innocent RGL directors, officers and agents, including inside counsel and others.

500.    As a proximate result of MB's knowing and substantial assistance, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against MB for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## TWENTY-THIRD CLAIM FOR RELIEF
### (Malpractice Claim by RGL Against GT)

501.    Paragraphs 1 to 500 are incorporated as if fully set forth herein.

502.    At all relevant times, GT was employed by and acted as RGL's auditor.

503.    GT owed a duty of care to RGL on account of its professional relationship with RGL.

504.    GT breached its duty of care to RGL by, among other things, issuing unqualified audit opinions that were false and failing to require disclosure in RGL's financial statements or to advise the innocent RGL directors, officers and agents, including inside counsel and others that, among other things: (a) there were material related-party transactions between Refco and RGHI through which substantial undisclosed Refco trading losses and operating expenses were moved off Refco's books and concealed; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue; (c) the RTLs were used to conceal the

RGHI Receivable at the end of each relevant reporting and audit period; (d) RGL and its affiliates were using RCM's assets to finance their operations and acquisitions so as to prop up RGL's overall perceived financial condition and suitability to undergo the LBO; (e) the LBO which would line the Refco Insiders' pockets would leave RGL with insufficient capital to meet its obligations, including repaying RCM's intercompany loans; and (f) as a result of the foregoing, RGL was insolvent or operating in the zone of insolvency.

505.    Any audit examination conducted with the care and diligence required of professional auditors would have revealed these facts and required their disclosure in RGL's financials and/or to the innocent RGL directors, officers and agents, including inside counsel and others.

506.    As a proximate result of GT's breach of its duty of care, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against GT for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

### TWENTY-FOURTH CLAIM FOR RELIEF
#### (Negligent Misrepresentation Claim by RGL Against GT)

507.    Paragraphs 1 to 506 are incorporated as if fully set forth herein.

508.    At all relevant times, GT was employed by and acted as RGL's auditor.

509.    As RGL's auditor, GT had a duty to RGL to verify the accuracy of the information concerning RGL's financial condition.

510.    In its annual financial audits of RGL, GT negligently misrepresented RGL's financial condition and negligently issued unqualified audit opinions that were false despite knowing, or negligently disregarding, that, among other things: (a) there were material related-party transactions between Refco and RGHI through which substantial undisclosed Refco trading losses and operating

expenses were moved off Refco's books and concealed; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue; (c) the RTLs were used to conceal the RGHI Receivable at the end of each relevant reporting and audit period; (d) RGL and its affiliates were using RCM's assets to finance their operations and acquisitions so as to prop up RGL's overall perceived financial condition and suitability to undergo the LBO; (e) the LBO which would line the Refco Insiders' pockets would leave RGL with insufficient capital to meet its obligations, including repaying RCM's intercompany loans; and (f) as a result of the foregoing, RGL was insolvent or operating in the zone of insolvency.

511.    As RGL's auditors, GT knew and intended that the innocent RGL directors, officers and agents, including inside counsel and others, regulators, investors, and future purchasers of Refco would and did reasonably rely on the unqualified audit opinions that GT issued.

512.    RGL's reliance on GT's false statements was reasonable and justified under the circumstances.

513.    As a proximate result of GT's material misrepresentations and omissions about RGL's financial condition, which gave the appearance of financial health and strength, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against GT for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## TWENTY-FIFTH CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty Claims by RGL Against GT)

514.    Paragraphs 1 to 513 are incorporated as if fully set forth herein.

515.    By virtue of its role as RGL's auditor, GT knew and/or consciously avoided knowing that, among other things: (a) there were material related-party transactions between Refco and RGHI through which substantial undisclosed Refco trading losses and operating expenses were moved off Refco's books and concealed; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue; (c) the RTLs were used to conceal the RGHI Receivable at the end of each relevant reporting and audit period; (d) RGL and its affiliates were using RCM's assets to finance their operations and acquisitions so as to prop up RGL's overall perceived financial condition and suitability to undergo the LBO; (e) the LBO which would line the Refco Insiders' pockets would leave RGL with insufficient capital to meet its obligations, including repaying RCM's intercompany loans; (f) as a result of the foregoing, RGL was insolvent or operating in the zone of insolvency; and (g) Bennett, Maggio, Trosten, Grant, and RGHI were, by virtue of the foregoing, breaching their fiduciary duties to RGL.

516.    GT was aware of its own role in the Refco Insiders and RGHI's overall scheme.

517.    Notwithstanding this knowledge, GT knowingly and substantially assisted in Maggio, Bennett, Trosten, Grant, and RGHI's breaches of their fiduciary duty to RGL by, among other things, issuing unqualified audit opinions that were false, and failing to require disclosure in RGL's audited financial statements or to advise the innocent RGL directors, officers and agents, including inside counsel and others, that, among other things: (a) there were material related-party transactions between Refco and RGHI through which substantial undisclosed Refco trading losses and operating expenses were moved off Refco's books and concealed; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue;  (c) the RTLs were used to conceal the RGHI Receivable at the end of each relevant reporting and audit period; (d) RGL and its affiliates were using RCM's assets to finance their operations and acquisitions so as to prop up RGL's overall perceived financial condition and suitability to undergo

the LBO; (e) the LBO which would line the Refco Insiders' pockets would leave RGL with insufficient capital to meet its obligations, including repaying RCM's intercompany loans; and (f) as a result of the foregoing, RGL was insolvent or operating in the zone of insolvency.

518.    As a proximate result of GT's knowing and substantial assistance, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against GT for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## TWENTY-SIXTH CLAIM FOR RELIEF
### (Aiding and Abetting Fraud Claim by RGL Against GT)

519.    Paragraphs 1 to 518 are incorporated as if fully set forth herein.

520.    GT had actual knowledge of and/or consciously avoided knowing that Bennett, Maggio, and Trosten concealed from the innocent RGL directors, officers and agents, including inside counsel and others, the following components, among others, of their fraudulent scheme: (a) there were material related-party transactions between Refco and RGHI through which substantial undisclosed Refco trading losses and operating expenses were moved off Refco's books and concealed; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue;  (c) the RTLs were used to conceal the RGHI Receivable at the end of each relevant reporting and audit period; (d) RGL and its affiliates were using RCM's assets to finance their operations and acquisitions so as to prop up RGL's overall perceived financial condition and suitability to undergo the LBO; (e) the LBO which would line the Refco Insiders' pockets would leave RGL with insufficient capital to meet its obligations, including repaying RCM's intercompany loans; and (f) as a result of the foregoing, RGL was insolvent or operating in the zone of insolvency.

521.     GT also knew that Bennett, Maggio, and Trosten affirmatively misrepresented to the innocent RGL directors, officers and agents, including inside counsel and others, that, among other things, there were no material related-party transactions.

522.     GT was aware of its own role in Bennett, Maggio, and Trosten's overall scheme.

523.     Notwithstanding this knowledge, GT knowingly and substantially assisted in Bennett, Maggio, and Trosten's fraud by, among other things, issuing unqualified audit opinions that were false and failing to require disclosure in RGL's financial statements or to advise the innocent RGL directors, officers and agents, including inside counsel and others, that, among other things: (a) there were material related-party transactions between Refco and RGHI through which substantial undisclosed Refco trading losses and operating expenses were moved off Refco's books and concealed; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue; (c) the RTLs were used to conceal the RGHI Receivable at the end of each relevant reporting and audit period; (d) RGL and its affiliates were using RCM's assets to finance their operations and acquisitions so as to prop up RGL's overall perceived financial condition and suitability to undergo the LBO; (e) the LBO which would line the Refco Insiders' pockets would leave RGL with insufficient capital to meet its obligations, including repaying RCM's intercompany loans; and (f) as a result of the foregoing, RGL was insolvent or operating in the zone of insolvency.

524.     As a proximate result of GT's knowing and substantial assistance, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against GT for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

### TWENTY-SEVENTH CLAIM FOR RELIEF
### (Malpractice Claim by RGL Against E&Y)

525.    Paragraphs 1 to 524 are incorporated as if fully set forth herein.

526.    E&Y prepared federal, state, and municipal tax returns for Refco, assisted Refco in audits, and repeatedly provided tax consulting and advice with respect to numerous Refco transactions, including corporate restructurings among the various Refco entities, proposed sales and acquisitions by Refco, potential third-party investments involving Refco, and the actual sale of a 10% interest in RGL to BAWAG.

527.    E&Y owed a duty of care to RGL on account of its professional relationship with RGL.

528.    E&Y breached its duty of care to RGL by, among other things, preparing false tax returns for RGL without disclosing in RGL's tax documents or advising the innocent RGL directors, officers and agents, including inside counsel and others, that, among other things: (a) there were material related-party transactions between Refco and RGHI through which substantial undisclosed Refco trading losses and operating expenses were moved off Refco's books and concealed; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue; and (c) the RTLs were used to conceal the RGHI Receivable at the end of each relevant reporting and audit period.

529.    Any tax return prepared with the care and diligence required of a professional tax preparer would have revealed these facts, and such a professional tax preparer would have required their disclosure in RGL's tax documents.

530.    As a proximate result of E&Y's breach of its duty of care, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against E&Y for the amount of damages sustained, including attorneys'

135

fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## TWENTY-EIGHTH CLAIM FOR RELIEF
### (Negligent Misrepresentation Claim by RGL Against E&Y)

531.    Paragraphs 1 to 530 are incorporated as if fully set forth herein.

532.    E&Y prepared federal, state, and municipal tax returns for Refco, assisted Refco in audits, and repeatedly provided tax consulting and advice with respect to numerous Refco transactions, including corporate restructurings among the various Refco entities, proposed sales and acquisitions by Refco, potential third-party investments involving Refco, and the actual sale of a 10% interest in RGL to BAWAG.

533.    As RGL's tax advisor and preparer, at all relevant times, E&Y owed duties to provide RGL with accurate information concerning the tax obligations of RGL.

534.    In preparing RGL's tax returns, E&Y negligently misrepresented RGL's financial condition by preparing and filing inaccurate federal, state, and municipal tax returns on behalf of RGL that failed to disclose that, among other things: (a) there were material related-party transactions between Refco and RGHI through which substantial undisclosed Refco trading losses and operating expenses were moved off Refco's books and concealed; and (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue.

535.    E&Y should have known, but instead negligently disregarded, the falsity of the RGL tax returns that it prepared.

536.    As RGL's tax preparer and advisor, E&Y knew and intended that the innocent RGL directors, officers and agents, including inside counsel and others, regulators, investors, and future purchasers of Refco would and did reasonably rely on the tax returns E&Y prepared.

537.    RGL's reliance on E&Y's false statements was reasonable and justified under the circumstances.

538.    As a proximate result of E&Y's material misrepresentations and omissions about RGL's financial condition, which gave the appearance of financial health and strength, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against E&Y for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## TWENTY-NINTH CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty Claims by RGL Against E&Y)

539.    Paragraphs 1 to 538 are incorporated as if fully set forth herein.

540.    By virtue of its role as RGL's tax advisor and preparer, E&Y knew and/or consciously avoided knowing that, among other things: (a) there were material related-party transactions between Refco and RGHI through which substantial undisclosed Refco trading losses and operating expenses were moved off Refco's books and concealed; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue; (c) the RTLs were used to conceal the RGHI Receivable at the end of each relevant reporting and audit period; (d) RGL and its affiliates were using RCM's assets to finance their operations and acquisitions so as to prop up RGL's overall perceived financial condition to facilitate a lucrative sale of the Refco Insiders' interests for more than these interests were worth; and (e) Bennett, Maggio, Trosten, Grant, and RGHI were, by virtue of the foregoing, breaching their fiduciary duties to RGL.

541.    E&Y was aware of its own role in the Refco Insiders and RGHI's overall scheme.

542.    Notwithstanding this knowledge, E&Y knowingly and substantially assisted in Bennett, Maggio, Trosten, Grant, and RGHI's breaches of their fiduciary duties to RGL by, among other things: (a) preparing and filing inaccurate federal, state, and municipal tax returns on behalf of

RGHI and Refco that concealed the existence of the RGHI Receivable (and, along with it, RGL's trading losses and operating expenses); (b) preparing and filing federal, state, and municipal tax returns on behalf of RGL that falsely reflected interest income associated with the RGHI Receivable; and (c) advising the Refco Insiders in connection with the concealment of trading losses through the Minglewood transaction.

543. As a proximate result of E&Y's knowing and substantial assistance, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against E&Y for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## THIRTIETH CLAIM FOR RELIEF
### (Aiding and Abetting Fraud Claim by RGL Against E&Y)

544. Paragraphs 1 to 543 are incorporated as if fully set forth herein.

545. E&Y had actual knowledge of and/or consciously avoided knowing that Bennett, Maggio, and Trosten concealed from the innocent RGL directors, officers and agents, including inside counsel and others the following components, among others, of their fraudulent scheme: (a) there were material related-party transactions between Refco and RGHI through which substantial undisclosed Refco trading losses and operating expenses were moved off Refco's books and concealed; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue; (c) the RTLs were used to conceal the RGHI Receivable at the end of each relevant reporting and audit period; and (d) RGL and its affiliates were using RCM's assets to finance their operations and acquisitions so as to prop up RGL's overall perceived financial condition to facilitate a lucrative sale of the Refco Insiders' interests for more than these interests were worth.

546.    E&Y was aware of its own role in Bennett, Maggio, and Trosten's overall scheme.

547.    Notwithstanding this knowledge, E&Y knowingly and substantially assisted in Bennett, Maggio, and Trosten's fraud by, among other things: (a) preparing and filing inaccurate federal, state, and municipal tax returns on behalf of RGHI and Refco that concealed the existence of the RGHI Receivable (and, along with it, RGL's trading losses and operating expenses); (b) preparing and filing federal, state, and municipal tax returns on behalf of RGL that falsely reflected interest income associated with the RGHI Receivable; and (c) advising the Refco Insiders in connection with the concealment of trading losses through the Minglewood transaction.

548.    As a proximate result of E&Y's knowing and substantial assistance, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against E&Y for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## THIRTY-FIRST CLAIM FOR RELIEF
### (Malpractice Claim by RGL Against PwC)

549.    Paragraphs 1 to 548 are incorporated as if fully set forth herein.

550.    PwC provided consulting services to RGL in numerous accounting and financial relevant reporting matters, including analyzing the propriety of the LBO and preparing registration statements and other documents to be filed with the SEC in connection with the LBO and IPO, reviewing and strengthening Refco's internal accounting controls, and serving as Refco's *de facto* Chief Accounting Officer.  In addition, PwC served as RGL's tax preparer and tax consultant for the tax year beginning January 1, 2004.

551.    PwC owed a duty of care to RGL on account of its professional relationship with RGL.

552.    PwC breached its duty of care to RGL by, among other things, advising and guiding Refco through the LBO and IPO, preparing and commenting on disclosures filed with the United States regulators in connection with Refco's LBO and IPO, and preparing false tax returns for RGL without disclosing in these disclosures and tax returns or advising the innocent RGL directors, officers and agents, including inside counsel and others, that, among other things: (a) there were material related-party transactions between Refco and RGHI through which substantial undisclosed Refco trading losses and operating expenses were moved off Refco's books and concealed; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue; (c) the RTLs were used to conceal the RGHI Receivable at the end of each relevant reporting and audit period; (d) RGL and its affiliates were using RCM's assets to finance their operations and acquisitions so as to prop up RGL's overall perceived financial condition and suitability to undergo the LBO; (e) the LBO which would line the Refco Insiders' pockets would leave RGL with insufficient capital to meet its obligations, including repaying RCM's intercompany loans; and (f) as a result of the foregoing, RGL was insolvent or operating in the zone of insolvency.

553.    Given PwC's role as RGL's *de facto* Chief Accounting Officer and its role as a financial and accounting consultant for RGL in connection with RGL's LBO and its preparation for the IPO, PwC knew that RGL was not in a position to undergo the LBO.

554.    As a proximate result of PwC's breach of its duty of care, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against PwC for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

**THIRTY-SECOND CLAIM FOR RELIEF**
**(Aiding and Abetting Breach of Fiduciary Duty Claims by RGL**
**Against PwC)**

555.    Paragraphs 1 to 554 are incorporated as if fully set forth herein.

556.    By virtue of its role as a financial and tax advisor and *de facto* Chief Accounting Officer for Refco, PwC knew and/or consciously avoided knowing that, among other things: (a) there were undisclosed material related-party transactions between Refco and RGHI through which substantial undisclosed Refco trading losses and operating expenses were moved off Refco's books and concealed; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue; (c) the RTLs were used to conceal the RGHI Receivable at the end of each relevant reporting and audit period; (d) RGL and its affiliates were using RCM's assets to finance their operations and acquisitions so as to prop up RGL's overall perceived financial condition and suitability to undergo the LBO; (e) the LBO which would line the Refco Insiders' pockets would leave RGL with insufficient capital to meet its obligations, including RCM's intercompany loans; (f) as a result of the foregoing, RGL was insolvent or operating in the zone of insolvency; and (g) Bennett, Maggio, Trosten, Grant, and RGHI were, by virtue of the foregoing, breaching their fiduciary duties to RGL.

557.    PwC was aware of its own role in the Refco Insiders and RGHI's overall scheme.

558.    Notwithstanding this knowledge, PwC knowingly and substantially assisted in Bennett, Maggio, Trosten, Grant, and RGHI's breaches of fiduciary duties to RGL by, among other things: (a) advising and guiding Refco through the LBO; (b) preparing and commenting on disclosures filed with the United States regulators in connection with Refco's LBO, which failed to disclose the RGHI Receivable, the RTLs, the RCM intercompany receivables, or Refco's inability to repay these loans to RCM; and (c) preparing false tax returns for RGL which failed to disclose or account for the RGHI Receivable and the RTLs.

559.    As a proximate result of PwC's knowing and substantial assistance, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco

Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against PwC for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## THIRTY-THIRD CLAIM FOR RELIEF
### (Aiding and Abetting Fraud Claim by RGL Against PwC)

560.     Paragraphs 1 to 559 are incorporated as if fully set forth herein.

561.     PwC had actual knowledge of and/or consciously avoided knowing that Bennett, Maggio, and Trosten concealed from the innocent RGL directors, officers and agents, including inside counsel and others, the following components, among others, of their fraudulent scheme: (a) there were material related-party transactions between Refco and RGHI through which substantial undisclosed Refco trading losses and operating expenses were moved off Refco's books and concealed; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue; (c) the RTLs were used to conceal the RGHI Receivable at the end of each relevant reporting and audit period; (d) RGL and its affiliates were using RCM's assets to finance their operations and acquisitions so as to prop up RGL's overall perceived financial condition and suitability to undergo the LBO; (e) the LBO which would line the Refco Insiders' pockets would leave RGL with insufficient capital to meet its obligations, including repaying RCM's intercompany loans; and (f) as a result of the foregoing, RGL was insolvent or operating in the zone of insolvency.

562.     PwC was aware of its own role in Bennett, Maggio, and Trosten's overall scheme.

563.     Notwithstanding this knowledge, PwC knowingly and substantially assisted in Bennett, Maggio, and Trosten's fraud by, among other things: (a) advising and guiding RGL through the LBO; (b) preparing and commenting on disclosures filed with the United States regulators in connection with Refco's LBO which failed to disclose the RGHI Receivable, the RTLs, the RCM

intercompany receivables, or Refco's inability to repay these loans to RCM; and (c) preparing false tax returns for RGL which failed to disclose or account for the RGHI Receivable and the RTLs.

564.     As a proximate result of PwC's knowing and substantial assistance, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against PwC for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

### THIRTY-FOURTH CLAIM FOR RELIEF
#### (Malpractice Claim by RGL Against Credit Suisse)

565.     Paragraphs 1 to 564 are incorporated as if fully set forth herein.

566.     At all relevant times, Credit Suisse was employed by and acted as RGL's "exclusive financial advisor" in connection with marketing and selling RGL.

567.     Among other responsibilities, Credit Suisse was charged with "evaluating the business, operations and financial position of [RGL]" and assisting RGL with evaluating proposals from potential purchasers and with structuring and negotiating the sale of the company.

568.     Credit Suisse owed a duty of care to RGL on account of its professional relationship with RGL.

569.     Credit Suisse was grossly negligent in breaching its duty of care to RGL by, among other things, developing an LBO in which RGL would be left with unreasonably small capital to pay its debts, including its obligation to repay the RCM intercompany loans.

570.     As a proximate result of Credit Suisse's breach of its duty of care, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against Credit Suisse for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## THIRTY-FIFTH CLAIM FOR RELIEF
### (Negligent Misrepresentation Claim by RGL Against Credit Suisse)

571. Paragraphs 1 to 570 are incorporated as if fully set forth herein.

572. At all relevant times, Credit Suisse was employed by and acted as RGL's "exclusive financial advisor."

573. Among other responsibilities, Credit Suisse was charged with "evaluating the business, operations and financial position of [RGL]" and assisting RGL with evaluating proposals from potential purchasers and with structuring and negotiating the sale of the company.

574. As RGL's exclusive financial advisor, Credit Suisse owed duties to provide RGL with accurate information concerning the financial condition of RGL, including its ability to satisfy its obligations after the LBO.

575. In the projections it prepared in connection with the LBO, Credit Suisse negligently misrepresented that, among other things, RGL would be able to satisfy its obligations after the LBO, despite knowing, or negligently disregarding, that the LBO which would line the Refco Insiders' pockets would leave RGL with insufficient capital to meet its obligations, including repayment of RCM's intercompany loans, and render RGL insolvent or operating in the zone of insolvency.

576. Credit Suisse should have known, and negligently disregarded, the falsity of the foregoing material misrepresentations and omissions.

577. As RGL's exclusive financial advisor, Credit Suisse knew and intended that the innocent RGL directors, officers and agents, including inside counsel and others, regulators, investors, and future purchasers of Refco would and did reasonably rely on the projections that Credit Suisse prepared in connection with their evaluation of the LBO.

578.    RGL's reliance on Credit Suisse's false projections was reasonable and justified under the circumstances.

579.    As a proximate result of Credit Suisse's material misrepresentations and omissions about RGL's financial condition, which gave the appearance of financial health and strength, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against Credit Suisse for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

### THIRTY-SIXTH CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty Claim by RGL
### Against Credit Suisse, BAS, and Deutsche)

580.    Paragraphs 1 to 579 are incorporated as if fully set forth herein.

581.    By virtue of their roles as financial advisors to Refco in connection with the LBO and the IPO, Credit Suisse, BAS, and Deutsche knew and/or consciously avoided knowing that, among other things: (a) RGL and its affiliates were using RCM's assets to finance their operations and acquisitions so as to prop up RGL's overall perceived financial condition and suitability to undergo the LBO; (b) the LBO which would line the Refco Insiders' pockets would cause RGL to incur $1.4 billion in new LBO debt and leave RGL with insufficient capital to meet its obligations, including repaying RCM's intercompany loans; (c) the LBO would render RGL insolvent or in the zone of insolvency; and (d) by having RGL enter into the LBO, Bennett, Maggio, Trosten, Grant, and RGHI were thereby breaching their fiduciary duties to RGL.

582.    Credit Suisse, BAS, and Deutsche were aware of their own roles in the Refco Insiders and RGHI's overall scheme.

583.    Notwithstanding this knowledge, Credit Suisse, BAS, and Deutsche knowingly and substantially assisted in Bennett, Maggio, Trosten, Grant, and RGHI's breaches of their fiduciary duties to RGL by, among other things, purposefully advising and facilitating an LBO through which RGL's assets were distributed to Refco Insiders and other RGL equity holders and RCM's right to repayment was subordinated to $1.4 billion in new LBO debt, thereby leaving RGL unable to satisfy its obligations, including repaying the RCM intercompany loans, and insolvent or operating in the zone of insolvency.

584.    As a proximate result of Credit Suisse, BAS, and Deutsche's knowing and substantial assistance, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against Credit Suisse, BAS, and Deutsche for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## THIRTY-SEVENTH CLAIM FOR RELIEF
### (Aiding and Abetting Fraud Claim by RGL Against the RTL Defendants)

585.    Paragraphs 1 to 584 are incorporated as if fully set forth herein.

586.    Each of the RTL Defendants knew and/or consciously avoided knowing that Bennett, Maggio, and Trosten concealed from the innocent RGL directors, officers and agents, including inside counsel and others, that, among other things, the RTLs were concealing a related-party receivable at the end of each relevant reporting and audit period.

587.    The RTL Defendants were aware of their own roles in Bennett, Maggio, and Trosten's scheme to conceal the RGHI Receivable.

588.    Notwithstanding this knowledge, the RTL Defendants knowingly and substantially assisted in Bennett, Maggio, and Trosten's fraud by, among other things, knowingly entering into

and facilitating the fraudulent RTL transactions, without which Bennett, Maggio, and Trosten could not have fraudulently concealed Refco's true financial condition.

589.    As a proximate result of the RTL Defendants' knowing and substantial assistance, RGL entered into the LBO whereby it incurred $1.4 billion in new LBO debt, distributed its assets to the Refco Insiders and other RGL equity holders, was no longer able to repay the funds diverted from RCM to RGL and its affiliates, and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against the RTL Defendants for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial.

## REFCO INC. CLAIMS

### THIRTY-EIGHTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty Claim by Refco Inc. Against Bennett and Maggio)

590.    Paragraphs 1 to 589 are incorporated as if fully set forth herein.

591.    At all relevant times, Bennett and Maggio owed fiduciary duties of loyalty, care, honesty, and good faith to Refco Inc. (hereinafter defined to include Refco's corporate parents -- RGL and New Refco Group -- prior to the IPO).

592.    Bennett and Maggio breached these fiduciary duties by, among other things: (a) engaging in an IPO transaction based on inaccurate financial information that saddled Refco Inc. with liabilities to the purchasers of its stock; (b) causing Refco Inc. to pay down, as part of the IPO structure, $231 million in debt obligations owed by RGL, which was insolvent; and (c) distributing Refco Inc.'s assets to the Refco Insiders and other New Refco Group equity holders without paying down the significant amounts RGL owed to RCM.

593.    As a proximate result of Bennett and Maggio's breaches of their fiduciary duties, Refco Inc. undertook an IPO based on an inaccurate understanding of its financial condition and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against Bennett and Maggio for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $1 billion and are to be determined at trial.

## THIRTY-NINTH CLAIM FOR RELIEF
### (Malpractice Claim by Refco Inc. Against MB)

594.    Paragraphs 1 to 593 are incorporated as if fully set forth herein.

595.    At all relevant times, MB was employed by and acted as Refco's outside counsel.

596.    MB provided legal advice to RGL and its affiliates regarding, among other things: (a) the customer agreements utilized by RGL and its affiliates; (b) the applicability and impact of United States and foreign regulations and law on RGL's activities and operations; (c) corporate governance of Refco; (d) loan and financing transactions entered into by RGL and its affiliates; (e) the disclosures filed with regulators and the public in connection with the IPO; and (f) its legal opinion based on its review of the IPO prospectus.

597.    MB owed a duty of care to Refco Inc. on account of its professional relationship with Refco Inc.

598.    MB breached its duty of care to Refco Inc. by, among other things, reviewing and commenting on the documents necessary to facilitate the IPO and the disclosures submitted in connection with the IPO, and providing a legal opinion in connection with the IPO without advising Refco Inc.'s innocent directors, officers and agents, including inside counsel and others, that, among other things: (a) substantial Refco trading losses and operating expenses were being concealed by the RGHI Receivable; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue; (c) the RGHI Receivable was being concealed at the end of each relevant reporting and audit period through the RTLs MB prepared, negotiated, and facilitated; (d) RCM funds were being used to pay the operating expenses of RGL and its affiliates so as to make Refco's overall perceived financial condition suitable for the IPO; (e) Refco's financial statements were inaccurate and that, as a result of the IPO, Refco Inc. would be saddled

with liabilities to the purchasers of its stock; and (f) as part of the IPO, Refco Inc. would pay down $231 million in debt obligations owed by RGL, an insolvent subsidiary, and distribute Refco Inc.'s assets to the Refco Insiders, other New Refco Group equity holders, and the Investment Banker Defendants without first paying down other significant Refco Inc. obligations, including the amounts owed to RCM.

599.    Given MB's knowledge of the RGHI Receivable, MB's preparation of the documents for the RTL transactions, MB's role as legal advisor to Refco in all matters, including corporate governance and United States and foreign regulations and law governing Refco's operations, activities, and use and treatment of client funds, securities, and other property, and preparation and review of Refco's customer agreements, MB knew that Refco Inc. was not in a suitable financial condition to undergo the IPO.

600.    Any law firm acting properly under the ethical standards of the profession would have revealed these facts and required their disclosure in Refco Inc.'s financial statements and/or to Refco Inc.'s innocent directors, officers and agents, including inside counsel and others.

601.    As a proximate result of MB's breach of its duty of care, Refco Inc. undertook an IPO based on an inaccurate understanding of its financial condition and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against MB for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $1 billion and are to be determined at trial.

### FORTIETH CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty Claim by Refco Inc. Against MB

602.    Paragraphs 1 to 601 are incorporated as if fully set forth herein.

603.    By virtue of its role as outside counsel for Refco Inc. and its affiliates, MB knew and/or consciously avoided knowing that, among other things: (a) substantial Refco trading losses and operating expenses were being concealed by the RGHI Receivable; (b) hundreds of millions of

dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue; (c) the RGHI Receivable was being concealed at the end of each relevant reporting and audit period through the RTLs MB prepared, negotiated, and facilitated; (d) RCM funds were being used to pay the operating expenses of RGL and its affiliates so as to make Refco's overall perceived financial condition suitable for the IPO; (e) as a result of the IPO, Refco Inc. would be saddled with liabilities to the purchasers of its stock; and (f) as part of the IPO, Refco Inc. would pay down $231 million in debt obligations owed by RGL, an insolvent subsidiary, and distribute Refco Inc.'s assets to the Refco Insiders, other New Refco Group equity holders, and the Investment Banker Defendants without first paying down other significant Refco Inc. obligations, including the amounts owed to RCM; and (g) Bennett and Maggio were thereby breaching their fiduciary duties to Refco Inc.

604.    MB was aware of its own role in Bennett and Maggio's overall scheme.

605.    Notwithstanding this knowledge, MB substantially assisted in Bennett and Maggio's breaches of their fiduciary duties to Refco Inc. by, among other things: (a) preparing the documentation for each of the RTLs which were used to conceal the existence of the RGHI Receivable at the end of each relevant reporting and audit period; and (b) advising on and facilitating the IPO by reviewing IPO documents and disclosures and preparing a legal opinion in connection with the IPO without disclosing to Refco's innocent directors, officers and agents, including inside counsel and others, the foregoing facts of Bennett and Maggio's breaches of their fiduciary duties.

606.    As a proximate result of MB's knowing and substantial assistance, Refco Inc. undertook an IPO based on an inaccurate understanding of its financial condition and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against MB for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $1 billion and are to be determined at trial.

### FORTY-FIRST CLAIM FOR RELIEF
### (Malpractice Claim by Refco Inc. Against GT)

607.    Paragraphs 1 to 606 are incorporated as if fully set forth herein.

608.    At all relevant times, GT was employed by and acted as Refco Inc.'s auditor.

609.    GT owed a duty of care to Refco Inc. on account of its professional relationship with Refco Inc.

610.    GT breached its duty of care to Refco Inc. by, among other things, issuing unqualified audit opinions that were false and failing to require disclosure in the financial statements which accompanied the IPO prospectus or to advise Refco Inc.'s innocent directors, officers and agents, including inside counsel and others, that, among other things: (a) substantial Refco trading losses and operating expenses were being concealed by the RGHI Receivable; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue; (c) the RGHI Receivable was being concealed at the end of each relevant reporting and audit period through the RTLs; (d) Refco's financial statements were inaccurate and that, as a result of the IPO, Refco Inc. would be saddled with liabilities to the purchasers of its stock; and (e) as part of the IPO, Refco Inc. would pay down $231 million in debt obligations owed by RGL, an insolvent subsidiary.

611.    Any audit examination conducted with the care and diligence required of professional auditors would have revealed these facts and required their disclosure in the audited financial statements attached to the IPO prospectus.

612.    As a proximate result of GT's breach of its duty of care, Refco Inc. undertook an IPO based on an inaccurate understanding of its financial condition and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against GT for the amount of damages sustained, including attorneys' fees, related expenses and, pre- and post-judgment interest, which are in excess of $1 billion and are to be determined at trial.

**FORTY-SECOND CLAIM FOR RELIEF**
**(Aiding and Abetting Breach of Fiduciary Duty Claim by Refco Inc.**
**Against GT**

613.    Paragraphs 1 to 612 are incorporated as if fully set forth herein.

614.    By virtue of its role as Refco Inc.'s auditor, GT knew and/or consciously avoided knowing that, among other things: (a) substantial undisclosed Refco trading losses and operating expenses were being concealed by the RGHI Receivable; (b) hundreds of millions of dollars in fictitious accrued interest on the RGHI Receivable was being recorded by RGL as revenue; (c) the RGHI Receivable was being concealed at the end of each relevant reporting and audit period through the RTLs; (d) RCM funds were being used to pay the operating expenses of RGL and its affiliates so as to make Refco's overall perceived financial condition suitable for the IPO; (e) as a result of the IPO, Refco Inc. would be saddled with liabilities to the purchasers of its stock; and (f) as part of the IPO, Refco Inc. would pay down $231 million in debt obligations owed by RGL, an insolvent subsidiary, and distribute Refco Inc.'s assets to Bennett, Maggio, and Trosten, other New Refco Group equity holders, and the Investment Banker Defendants without first paying down other significant Refco Inc. obligations, including the amounts owed to RCM; and (g) Bennett and Maggio were thereby breaching their fiduciary duties to Refco Inc.

615.    GT was aware of its own role in Bennett and Maggio's overall scheme.

616.    Notwithstanding this knowledge, GT substantially assisted in Bennett and Maggio's breaches of their fiduciary duties to Refco Inc. by, among other things, issuing unqualified audit opinions that were false, failing to disclose Refco's true financial position in the audited financial statements attached to the IPO prospectus, and failing to advise Refco's innocent directors, officers and agents, including inside counsel and others, of these facts.

617.    As a proximate result of GT's knowing and substantial assistance, Refco Inc. undertook an IPO based on an inaccurate understanding of its financial condition and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against MB for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $1 billion and are to be determined at trial.

### FORTY-THIRD CLAIM FOR RELIEF
#### (Malpractice Claim by Refco Inc. Against Credit Suisse)

618.    Paragraphs 1 to 617 are incorporated as if fully set forth herein.

619.    At all relevant times, Credit Suisse was employed by and acted as Refco Inc.'s "exclusive financial advisor" in connection with the LBO and IPO.

620.    Among other responsibilities, Credit Suisse was charged with "evaluating the business, operations and financial position of [RGL]" and assisting Refco Inc. with evaluating proposals from potential purchasers and with structuring and negotiating the sale of the company.

621.    Credit Suisse owed a duty of care to Refco Inc. on account of its professional relationship with Refco Inc.

622.    Credit Suisse was grossly negligent in breaching its duty of care to Refco Inc. by, among other things, failing to advise Refco Inc.'s innocent directors, officers and agents, including inside counsel and others, that, among other things: (a) the IPO would leave Refco Inc. with insufficient capital to pay its obligations including over $2 billion it owed to RCM; and (b) as part of the IPO, Refco Inc. would pay down $231 million in debt obligations owed by RGL, an insolvent subsidiary.

623.    As a proximate result of Credit Suisse's breach of its duty of care, Refco Inc. undertook an IPO based on an inaccurate understanding of its financial condition and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against Credit Suisse for the amount of damages sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $1 billion million and are to be determined at trial.

**FORTY-FOURTH CLAIM FOR RELIEF**
**(Aiding and Abetting Breach of Fiduciary Duty Claim by Refco Inc.**
**Against Credit Suisse, BAS, and Deutsche)**

624.    Paragraphs 1 to 623 are incorporated as if fully set forth herein.

625.    By virtue of their roles as financial advisors to Refco in connection with the LBO and the IPO, Credit Suisse, BAS, and Deutsche knew and/or consciously avoided knowing that, among other things: (a) RGL and its affiliates had borrowed upwards of $2 billion in RCM funds to finance their operations, fund acquisitions, and improve Refco's overall perceived financial condition so that the Refco Insiders could facilitate a lucrative cashing-out of their interests through the IPO; (b) the IPO would leave Refco Inc. with insufficient capital to pay its obligations, including over $2 billion it owed to RCM; (c) as part of the IPO, Refco Inc. would pay down $231 million in debt obligations owed by RGL, an insolvent subsidiary, and distribute Refco Inc.'s assets to the Refco Insiders, other New Refco Group equity holders, and the Investment Banker Defendants without first paying down other significant Refco Inc. obligations; and (d) Bennett and Maggio were thereby breaching their fiduciary duties to Refco Inc.

626.    By virtue of the foregoing knowledge, Credit Suisse, BAS, and Deutsche were aware of their roles in Bennett and Maggio's overall scheme.

627.    Notwithstanding this knowledge, Credit Suisse, BAS, and Deutsche substantially assisted in Bennett and Maggio's breaches of their fiduciary duties to Refco Inc. by, among other things, purposefully facilitating the IPO and providing inaccurate financial projections that failed to take into account repayment of RCM's intercompany loans.

628.    As a proximate result of Credit Suisse, BAS, and Deutsche's knowing and substantial assistance, Refco Inc. undertook an IPO based on an inaccurate understanding of its financial condition and was thereby damaged.

WHEREFORE, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against Credit Suisse, BAS and Deutsche for the amount of damages

sustained, including attorneys' fees, related expenses, and pre- and post-judgment interest, which are in excess of $1 billion and are to be determined at trial.

WHEREFORE, as to all the foregoing claims, Marc S. Kirschner, as Trustee of the Refco Litigation Trust, prays for a judgment in his favor and against GT, MB, E&Y, PwC, the Investment Banker Defendants, Bennett, Maggio, Trosten, Grant, RGHI, and the RTL Defendants for the amount of damages sustained, including attorneys' fees, related expenses and pre- and post-judgment interest, which are in excess of $2 billion and are to be determined at trial and demands trial by jury for all matters asserted by law.

Dated: August 21, 2007

Respectfully submitted,

MARC S. KIRSCHNER, as Trustee of the Refco Litigation Trust

By: _____

One of His Attorneys

Of Counsel
Richard I. Werder, Jr.
Michael B. Carlinsky
Susheel Kirpalani
Sascha N. Rand
Robert C. Juman
QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Phone: (212) 849-7000
Facsimile: (212) 849-7100

John R. McCambridge
Todd C. Jacobs
Gary M. Miller
GRIPPO & ELDEN LLC
111 South Wacker Drive
Chicago, IL 60606
Phone: (312) 704-7700
Facsimile: (312) 558-1195
Firm No. 17044

131028

155

## GLOSSARY

**AA** - Arthur Andersen

**BAS** - Banc of America Securities LLC (Professional Defendant)

**BAWAG** - Bank fur Arbeit und Wirtschaft und Osterreichische Postparkasse Aktiengesellschaft

**Beckenham** - Beckenham Trading Co. Inc. (RTL Defendant)

**Bennett** - Phillip R. Bennett (Refco Insider)

**CFTC** - Commodity Futures Trading Commission

**CIM Ventures** - CIM Ventures, Inc. (RTL Defendant)

**Coast** - Coast Asset Management, LLC (f/k/a Coast Asset Management LP) (RTL Defendant)

**Collins** - Joseph P. Collins, MB partner

**Collis** - Charles Collis, RCM Outside Director

**The Company** - Refco Inc. and its direct and indirect subsidiaries

**Credit Suisse** - Credit Suisse Securities (USA) LLC (f/k/a Credit Suisse First Boston LLC) (Professional Defendant)

**CRM** - Deutsche's Credit Risk Management committee

**CS Land** - CS Land Management, LLC (RTL Defendant)

**Deere Park** - Deere Park Capital LLC

**Delta Flyer** - Delta Flyer Fund, LLC (RTL Defendant)

**Deutsche** - Deutsche Bank Securities Inc. (Professional Defendant)

**E&Y** - Ernst & Young U.S. LLP (Professional Defendant)

**Eastern** - Eastern Trading Company

**EMF Core Fund** - EMF Core Fund, Ltd. (RTL Defendant)

**EMF Financial** - EMF Financial Products, LLC (RTL Defendant)

**The Examiner** - Bankruptcy Court-appointed Examiner

**Flanagan** - Eric M. Flanagan (RTL Defendant)

**Grant** - Tone N. Grant (Refco Insider)

**GT** - Grant Thornton LLP (Professional Defendant)

**Ingram Micro** - Ingram Micro, Inc. (RTL Defendant)

**Investment Banker Defendants** - Credit Suisse, BAS and Deutsche

**IPO** - 2005 Refco initial public offering

**Krieger** - Andrew Krieger (RTL Defendant)

**LBO** - 2004 Refco leveraged buy-out

**Liberty Corner** - Liberty Corner Capital Strategies, LLC (RTL Defendant)

**Maggio** - Santo C. Maggio (Refco Insider)

**Management Letter** - GT management deficiency letter

**MB** - Mayer, Brown, Rowe & Maw LLP (Professional Defendant)

**Minglewood** - Minglewood Investments, LLC

**NASD** - National Association of Securities Dealers

**New Refco Group** - New Refco Group Ltd., LLC

**NFA** - National Futures Association

**Petitt** - Christopher Petitt (RTL Defendant)

**Pigott** - William T. Pigott (RTL Defendant)

**The Plan** - Modified Joint Chapter 11 Plan of Refco Inc. and Certain of its Direct and Indirect Subsidiaries

**PwC** - PricewaterhouseCoopers LLP (Professional Defendant)

**RCC** - Refco Capital LLC

**RCM** - Refco Capital Markets, Ltd.

**RCM Outside Directors** - Anthony Whaley and Charles Collis

**Refco** - Refco Inc. and certain of its direct and indirect subsidiaries

**The Refco Insiders** - Bennett, Maggio, Trosten and Grant

**RGHI** - Refco Group Holdings, Inc. (Defendant)

**RGF** - Refco Global Finance Ltd.

**RGL** - Refco Group Ltd., LLC

**RSL** - Refco Securities, LLC

**RTL** - Round trip loan transaction

**RTL Defendants** - Liberty Corner, Pigott, EMF Financial, EMF Core Fund, Delta Flyer, Flanagan, Ingram Micro, CIM Ventures, Beckenham, Krieger, Coast, CS Land, and Petitt

**THL** - Thomas H. Lee Partners

**Trosten** - Robert C. Trosten (Refco Insider)

**The Trust** - Refco Litigation Trust

**Wells Ltd.** - RGHI subsidiary

**Whaley** - Anthony Whaley, RCM Outside Director

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

MARC S. KIRSCHNER,                                )
as Trustee of the Refco Litigation Trust,          )
                                                  )
                                                  )    No. _____
                    Plaintiff,                     )
                                                  )
v.                                                )
                                                  )
GRANT THORNTON LLP, et al.,                       )
                                                  )
                    Defendant.                     )

## SUPREME COURT RULE 222 AFFIDAVIT

We, Grippo & Elden LLC, on behalf of Marc S. Kirschner, as Trustee of the

Refco Litigation Trust, do state that the damages sought in this cause of action exceed Fifty

Thousand Dollars ($50,000.00), plus costs.

By: 

John R. McCambridge

SUBSCRIBED and SWORN to
before me this 21st day of August 2007

_____
Notary Public

"OFFICIAL SEAL"
CONSTANCE L ROBERTS
COMMISSION EXPIRES 11/07/08

Of Counsel

Richard I. Werder, Jr.
Michael B. Carlinsky
Susheel Kirpalani
Sascha N. Rand
Robert Juman
QUINN EMANUEL URQUHART OLIVER
& HEDGES, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Phone: (212) 849-7000
Facsimile: (212) 849-7100

John R. McCambridge
Todd C. Jacobs
Gary M. Miller
GRIPPO & ELDEN LLC
111 South Wacker Drive
Chicago, IL 60606
Phone: (312) 704-7700
Facsimile: (312) 558-1195
Firm No. 17044

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------
IN RE:

     AGWAY, INC.

                                         Debtor

CASE NO. 02-65872 through
                 02-65877
Chapter 11
Jointly Administered

-----------------------------------------------------------------
IN RE:

     AGWAY GENERAL AGENCY, INC.

                                           Debtor

-----------------------------------------------------------------
IN RE:

     BRUBAKER AGRONOMIC CONSULTING
     SERVICE LLC

                                           Debtor

-----------------------------------------------------------------
IN RE:

     COUNTRY BEST ADAMS, LLC

                                           Debtor

-----------------------------------------------------------------
IN RE:

     COUNTRY BEST-DEBERRY LLC

                                           Debtor

-----------------------------------------------------------------
IN RE:

     FEED COMMODITIES INTERNATIONAL
     LLC

                                           Debtor

-----------------------------------------------------------------

2

AGWAY LIQUIDATING TRUST

Plaintiff

vs.                                          ADV. PRO. NO. 04-80269

STANLEY J. BURKEHOLDER, DONALD
P. CARDARELLI, KEITH H. CARLISLE,
D. GILBERT CROUSER, JOHN R. COOK,
ANDREW J. GILBERT, THOMAS G. HARDY,
JOHN R. LIGO, ROBERT L. MARSHMAN,
JEFFREY B.MARTIN, SAMUEL F. MINOR,
PETER J. O'NEILL, MATT E. ROGERS,
RICHARD H. SKELLIE, CARL D. SMITH,
THOMAS E. SMITH, GARY K. VAN SLYKE,
JOEL L. WENGER, EDWIN C. WHITEHEAD,
DENNIS C. WOLFF, and WILLIAM W. YOUNG

Defendants
-----------------------------------------------------------
APPEARANCES:

| | |
|---|---|
| WILMER CUTLER PICKERING HALE AND<br>    DORR, LLP<br>Attorneys for Movant/Defendants<br>399 Park Avenue<br>New York, New York 10022 | PHILIP D. ANKER, ESQ.<br>Of Counsel |
| HISCOCK & BARCLAY, LLP<br>Attorneys for Movant/Defendants<br>Financial Plaza<br>P.O. Box 4878<br>Syracuse, new York 13221-4878 | SUSAN R. KATZOFF, ESQ.<br>Of Counsel |
| STAMELL & SCHAGER, LLP<br>Attorneys for Agway Liquidating Trustee<br>One Liberty Plaza, 35th Floor<br>New York, NY 10006-1414 | JOHN C. CROW, ESQ.<br>Of Counsel |

Hon. Stephen D. Gerling, Chief U.S. Bankruptcy Judge

**MEMORANDUM-DECISION, FINDINGS OF FACT,
AND RECOMMENDATION**

Currently under consideration by the Court is a motion filed on April 29, 2005,[1] by Stanley J. Burkeholder, Donald P. Cardarelli ("Cardarelli"), Keith H. Carlisle, D. Gilbert Couser, John R. Cook, Andrew J. Gilbert, Thomas G. Hardy, John R. Ligo, Robert L. Marshman, Jeffrey B. Martin, Samuel F. Minor, Peter J. O'Neill, Matt E. Rogers, Richard H. Skellie, Carl D. Smith, Thomas E. Smith, Gary K. Van Slyke, Joel L. Wenger, Edwin C. Whitehead, Dennis C. Wolff and William W. Young (the "Defendants").[2] The motion seeks dismissal of a complaint ("Complaint") filed on behalf of the Agway Liquidating Trust ("Liquidating Trust" or "Plaintiff") by D. Clark Ogle ("Liquidating Trustee") on November 19, 2004, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Fed.R.Civ.P."), incorporated in Rule 7012 of the Federal Rules of Bankruptcy Procedure ("Fed.R.Bankr.P."). Opposition to the motion was filed by the Plaintiff on May 24, 2005.

The motion was heard by the Court at its regular motion term in Syracuse, New York, on May 31, 2005. Following oral argument, the Court afforded the parties an opportunity to file memoranda of law. The matter was originally submitted for decision on June 30, 2005.[3]

---

[1] On April 4, 2005, the Court signed an Order approving a Stipulation which set a deadline of April 29, 2005, for the Defendants to either "move, answer or otherwise respond to the Complaint . . . ." (Docket No. 8).

[2] The Defendants are alleged to be former directors and officers of Agway, Inc. ("Agway" or "Debtor"). Cardarelli was Agway's president and chief executive officer until he was terminated postpetition in April 2003.

[3] By letter dated July 1, 2005, the Plaintiff requested that the Court disregard three arguments made on behalf of the Defendants in the memorandum of law, filed on June 30, 2005, which the Plaintiff asserted had not been raised previously. By letter dated July 5, 2005, counsel for the Defendants responded that they had, indeed, raised the arguments in their prior briefs, as well as at the May 31st hearing. The Court responded on July 8, 2005, indicating that it would

4

Ultimately that date was extended to September 2, 2005.[4]

## JURISDICTIONAL STATEMENT

"Whenever a proceeding is brought in a bankruptcy court, there must be jurisdiction over each dispute within the proceeding." *In re Fisher*, 151 B.R. 895, 899 (Bankr. N.D. Ill. 1993). The Court has the inherent power to raise the issue of its subject matter jurisdiction in any given proceeding before it. *See In re Incor, Inc.*, 110 B.R. 790, 793 (Bankr. D. Md. 1989); *see also In re Terracor*, 86 B.R. 671, 677 (D. Utah 1988) (indicating that it is within the court's purview to raise the question of subject matter jurisdiction *sua sponte*). On August 11, 2005, the Court

---

not consider the defense of collateral estoppel in view of the fact that it had been raised for the first time in the Defendants' June 30th memorandum of law. The Court concluded that the Defendants had previously raised the issue concerning whether the debt at issue could be recharacterized as equity and, accordingly, determined that it would consider that argument. Finally, the Court found that although the Defendants had not raised the business judgment rule as a defense to Plaintiff's second cause of action prior to their submission of the June 30th memorandum of law, nevertheless, the Court has indicated that it would consider it on the basis that it "bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes." *See* Court's Letter, dated July 8, 2005.

However, based upon a review of the case law, the Court concludes that "while the business judgment rule is a presumption that directors act in good faith, on an informed basis, honestly believing that their action is in the best interests of the company," it is inappropriate for the Court to rely on an affirmative defense such as the business judgment rule in considering a motion pursuant to Fed.R.Civ.P. 12(b)(6). *In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005); *see also In re Southeast Banking Corp.*, 827 F.Supp. 742, 754-55 (S.D. Fla.1993), rev'd in part on other grounds, 69 F.3d 1539 (11th Cir.1995) (indicating that any purported exercise of business judgment by the defendants is "a question of fact that should not be considered in a motion to dismiss").

[4] On August 22, 2005, the Court requested that the parties file supplemental memoranda of law on or before September 2, 2005, addressing the limited issue of the Court's jurisdiction to adjudicate the issues under consideration. *See* Court's Letter, dated August 11, 2005.

5

requested that the parties file supplemental memoranda of law on or before September 2, 2005,

addressing the limited issue of the Court's jurisdiction to adjudicate the issues under

consideration.  *See* Court's Letter, dated August 11, 2005.

The Court's subject matter jurisdiction is defined in 28 U.S.C. §§ 157 and 1334.  *See*

*Plaza at Latham Associates v. Citicorp North America, Inc.*, 150 B.R. 507, 510 (N.D.N.Y. 1993).

This Court has subject matter jurisdiction with respect to (1) cases "under title 11," (2) civil

proceedings "arising under title 11," (3) civil proceedings "arising in" a case under title 11 and

(4) civil proceedings "related to" a case under title 11.  *See* 28 U.S.C. § 157(a).  "Bankruptcy

judges *may hear and determine* all cases under title 11 and all core proceedings arising under title

11 . . . and may enter appropriate orders and judgments. . . ."  28 U.S.C. § 157(b)(1) (emphasis

added).

> A bankruptcy judge may also *hear* non-core proceedings that are otherwise related
> to a title 11 case.  In such a proceeding, however, the bankruptcy judge may not
> *determine* the issue, but may only submit proposed findings of fact and
> conclusions of law to the district court.

*In re Best Products Co., Inc.*, 68 F.3d 26, 30 (2d Cir. 1995), citing 28 U.S.C. § 157(c)(1).

Section 157(b)(3) authorizes the bankruptcy judge to make a determination whether a

proceeding is a "core" proceeding or otherwise "related to" the bankruptcy case.  In this regard,

a review of the legislative history of 28 U.S.C. § 157 supports the conclusion that Congress

intended "a broad interpretation of the parameters of a core proceeding."  *See id.* at 31, citing *In

re Ben Cooper, Inc.*, 896 F.2d 1394, 1398 (2d Cir.), *vacated sub nom. Insurance Co. of State of

Pennsylvania v. Ben Cooper, Inc.,* 498 U.S. 964 (1990), *reinstated*, 924 F.2d 36 (2d Cir. 1991).

The fact that the resolution of the matter may be impacted by state law does not prevent the

6

bankruptcy court from finding that it is a core matter. *See* 28 U.S.C. § 157(b)(3). Indeed, the Second Circuit has made it clear that "bankruptcy courts are not precluded from adjudicating state law claims when such claims are at the heart of the administration of the bankruptcy estate." *Ben Cooper*, 896 F.2d at 1399.

Whether or not a proceeding is a "core" proceeding depends on the nature of the proceeding if it is not one of those specifically listed in 28 U.S.C. 157(b)(2). *See In re Kings Falls Power Corp.*, 185 B.R. 431, 438 (Bankr. N.D.N.Y. 1995), citing *In re S.G.Phillips Constructors, Inc.*, 45 F.3d 702, 707 (2d Cir. 1995). The Court's main focus of inquiry must be on whether the essence of the proceeding is "'at the core of the federal bankruptcy power.'" *S.G. Phillips Constructors*, quoting *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982).

The test of whether a proceeding is core is to ask whether it invokes a substantive right provided by title 11 or by its nature could arise only in the context of a bankruptcy case. A cause of action "arising under" title 11 is one involving a cause of action created or determined by a statutory provision of the Bankruptcy Code. Proceedings "arising in" a bankruptcy case are those that are not based on any right expressly created by title 11 but nevertheless would have no existence outside of the bankruptcy. In this case, the causes of action alleged in the complaint are not at the core of the Court's bankruptcy power. They do not arise under title 11 and would certainly have existence outside of bankruptcy under state law.

Plaintiff makes the argument that it is a core proceeding in that the Court has been asked to interpret its Order of Confirmation in connection with the Defendants' assertion of the defense of res judicata. However, this is not a basis for the Court's determination concerning the extent

7

of its jurisdiction.  *See In re Conseco, Inc.*, 318 B.R. 425, 428-432 (Bankr. N.D. Ill. 2004) (concluding that "the well-pleaded complaint rule should be applied in determining whether a [bankruptcy] court has jurisdiction pursuant to § 1334.").   The Court concludes that the causes of action do not constitute a basis for finding the adversary proceeding to be core.

There remains the question of whether the Court has "related to" jurisdiction.  The answer is complicated by the fact that the adversary proceeding was commenced on behalf of the Liquidating Trust postconfirmation.  In that situation, the Court's "related to" jurisdiction has been found to diminish based on the premise that the bankruptcy estate no longer exists after confirmation of the plan.  *See In re Resorts Int'l, Inc.*, 372 F.3d 154, 166 (3d Cir. 2004); *see also In re Boston Reg'l Med. Ctr., Inc.* 410 F.3d 100, 106 (1st Cir. 2005) (noting that "[w]hile courts have interpreted the term 'related to' more grudgingly in some post-confirmation settings, context is important"); *Conseco*, 318 B.R. at 432 (pointing out that "[t]he extent of related jurisdiction is even more limited after confirmation of a Chapter 11 plan").  In addition, a confirmation order cannot confer jurisdiction upon a bankruptcy court unless it already exists pursuant to 28 U.S.C. § 1334 or 28 U.S.C. § 157.  *In re Insilco Technologies, Inc.*, 330 B.R. 512, 519 (Bankr. D. Del. 2005).  As pointed out by the court in *Resorts International*, the "essential inquiry appears to be whether there is a close nexus to the bankruptcy plan or proceeding sufficient to uphold bankruptcy court jurisdiction over the matter."  *Id.* at 166-67.

In *Boston Regional*, the court emphasized the difference between a chapter 11 reorganization plan and a chapter 11 liquidating plan, pointing out that in the latter, "the reorganized debtor's sole purpose is to wind up its affairs, convert its assets to cash, and pay creditors a pro rata dividend." *Boston Regional*, 410 F.3d at 106.  It has no interest in reentering

8

the marketplace, as in the case of a reorganization plan.  Thus the "specter of endless bankruptcy jurisdiction and a kindred concern about unfairly advantaging reorganized debtors" does not exist in the context of a liquidation plan.  *Id.*  The court in *Boston Regional* concluded that "when a debtor (or a trustee acting to the debtor's behoof) commences litigation designed to marshal the debtor's assets for the benefit of its creditors pursuant to a liquidating plan of reorganization, the compass of related to jurisdiction persists undiminished after plan confirmation." *Id.* at 107; *see also In re AstroPower Liquidating Trust*, 335 B.R. 309, 324 (Bankr. D. Del. 2005) (distinguishing *Resorts* and concluding that the claims were "linked to the debtor's prepetition losses and entrusted to the plaintiff *via the Plan for the benefit of creditors"* (emphasis in original)).

According to the Liquidating Trust Agreement (Docket No. 5036), filed April 21, 2004, "the Liquidating Trust [was] established for the sole purpose of liquidating its assets for the benefit of the holders of the Allowed General Unsecured Claims . . . ."  Pursuant to the Liquidating Trust Agreement, the Trustee has

> the power to prosecute for the benefit of the Liquidating Trust all claims, rights, and causes of action transferred to the Liquidating Trust, whether such suits are brought in the name of the Liquidating Trust, the Debtors or otherwise for the benefit of the holders of beneficial interests in the Liquidating Trust.

*Id.* at § 4.2.  In this case, the adversary proceeding is designed to marshal the Debtor's assets for the benefit of the creditors pursuant to the liquidating plan approved by this Court on April 24, 2004, and has the potential for having a conceivable effect on the estate being administered by the Liquidating Trustee.  *See, generally, Cuyahoga Equip.*, 980 F.2d at 114; *In re Victory Markets, Inc. v. NYS Unemployment Ins. (In re Victory Markets, Inc.)*, 263 B.R. 9, 15 (Bankr. N.D.N.Y. 2000); *In re 610 W. 142 Owners Corp.*, 219 B.R. 363, 370-71 (Bankr. S.D.N.Y. 1998).

9

While the possibility for enhancement of the post-confirmation entity's assets, in and of itself, generally does not serve as a basis for finding "related to" jurisdiction (*see In re LGI, Inc.*, 322 B.R. 95, 106 n.16 (Bankr. D. N.J. 2005)), because the Liquidating Trust was given the power to prosecute the action under the terms of the Debtor's Plan and because it is a plan of liquidation, rather than reorganization, the Court concludes that there is a sufficient nexus to the plan to find that it has "related to" jurisdiction to consider the motion presently before it and to present a report and recommendation to the U.S. District Court for the Northern District of New York pursuant to 28 U.S.C. § 157(c)(1). *See In re Blackwell ex rel. Estate of I.G. Services, Ltd.,* 279 B.R. 818, 824 (Bankr. W.D. Tex. 2002) (concluding that the motions to dismiss a complaint in the context of "related to" jurisdiction are appropriately considered by a bankruptcy court despite having to submit a report and recommendations to the district court). Accordingly, the Court finds that it has non-core related to jurisdiction over the parties and subject matter of this adversary proceeding matter pursuant to 28 U.S.C. §§ 1334(b), 157(a), 157(b)(3) and 157(c)(1).


## FACTS


The following facts are as alleged in the Complaint and do not constitute findings by the Court:

1.    Plaintiff, the Agway Liquidating Trust, was established by this Court's Order, dated April 28, 2004, confirming the Debtor's Second Amended Joint Plan of Liquidation, and is authorized to prosecute the claims set forth herein. D. Clark Ogle was appointed the Trustee of the Liquidating Trust by order of this Court, dated April 28, 2004, and has directed the Liquidating

10

Trust to prosecute these claims through its counsel.  *Id.* at ¶ 3.

2.      Agway was an agricultural cooperative formed in 1964 that was headquartered in DeWitt,

New York. On October 12, 2002, Agway and several of its wholly-owned subsidiaries filed for

bankruptcy protection pursuant to chapter 11 of Title 11 of the United States Code, 11 U.S.C. §

1101 et seq.  On April 28, 2004, Agway's Plan was confirmed, and liquidation of the estate

currently continues under the Trustee.  *Id.* at ¶ 15.

3.      Agway common shares could only be held by persons eligible to be members, i.e., owners

or operators of working farms, or an immediate family member.  As of the petition date, Agway's

members totaled approximately 69,000.  Agway members became members by purchasing a share

of Agway common stock at its $25 par value. As Agway disclosed:

> The Membership Common Stock, $25 par value, is held only by active Agway
> members. Ownership of Membership Common Stock is different from ownership
> of common stock in typical business corporations because Agway is an
> agricultural cooperative. Membership Common Stock may only be purchased by
> persons who qualify as Agway members and is transferrable only with Agway's
> consent. Membership Common Stock indicates membership in Agway rather than
> indicating a significant equity interest in Agway.

*Id.* at ¶ 17.

4.      Agway also issued four series of cumulative preferred shares: Series A $100 par value

held only by members; Series B $100 par value held by the Agway thrift plan; Series B-1 $100

par value held by the public; and Series HM $25 par value, held only by former Agway members.

The equity interest of preferred shareholders was limited to par value. Series A and B holdings

accounted for 96% of all preferred shareholdings.  *Id.* at ¶ 18.

5.      To generate cash it needed to fund capital expenditures and repay its debt, Agway steadily

increased its debt beginning in the 1990's through 2002. From 1990 to 2002, Agway's long-term

11

debt grew from approximately $156 million to $459 million and its subordinated debt grew from

approximately $267 million to $462 million. Between 1988 and 2001, Agway (directly and

through AFC, its financing subsidiary later merged into Agway in 2001) made several offerings

of subordinated debt in the form of subordinated debentures, and later subordinated money

market certificates and member subordinated money market certificates ("Member MMCs"), due

between October 1990 and October 2016. *Id.* at ¶ 24.

6.     Agway sold subordinated money market certificates primarily to its farmer-members.

Their maturities ranged from four to fifteen years, and their denominations ranged from $100 to

$5,000 and multiples thereof. The Member MMCs could only be purchased by Agway members

and could not be transferred to non-members, except by will. *Id.* at ¶ 25.

7.     Agway represented that its "traditional practice was to redeem certain money market

certificates on presentation with accrued interest, even though no payment of principal was due

under the terms of the certificates. All Member MMCs were subject to this redemption policy.

Agway stated in its public filings that it:

> . . . offers [through AFC] subordinated money market certificates (and previously
> offered subordinated debentures) to the public. AFCs subordinated debt is not
> redeemable by the holder, though AFC historically has had a practice of
> repurchasing at face value, plus interest accrued at the stated price, certain
> subordinated debt whenever presented for repurchase prior to maturity. However,
> AFC is under no obligation to repurchase such debt when so presented, and AFC
> may stop or suspend this repurchase practice at any time.

> Indeed, Agway redeemed certificates it had no obligation to repurchase, thereby depleting

the company of cash necessary to meet its loan covenants and other business obligations. *Id.* at

¶ 26.

8.     From 1998 to 2002, Agway maintained the following levels of subordinated debt, and

12

voluntarily redeemed subordinated debt in excess of the amount of subordinated debt on which payment was due, as follows:

|  | (A)<br>Total Subordinated<br>Debt | (B)<br>Currently Due<br>Subordinated Debt | (C)<br>Subordinated Debt<br>Redemptions | (C-B)<br>Early Debt<br>Redemptions |
|---|---|---|---|---|
| 1998 | $462,196,000 | $75,589,000 | $ 94,302,000 | $ 18,713,000 |
| 1999 | $486,303,000 | $76,968,000 | $109,842,000 | $ 32,874,000 |
| 2000 | $474,874,000 | $57,125,000 | $143,001,000 | $ 85,876,000 |
| 2001 | $449,368,000 | $55,948,000 | $169,792,000 | $113,844,000 |
| 2002 | $425,366,000 | $36,917,000 | $103,172,000 | $ 66,255,000 |

*Id.* at ¶ 27.

9.    By the third quarter of 2000, Agway had sold its retail store business, several pipeline terminal storage facilities, and its consumer products supply system, partly in order to service its debt. *Id.* at ¶ 32.

10.    By June 2000, Agway's debt covenants required it to maintain at least $425 million in preferred stock and subordinated debt. Although Agway stated, "[t]he required minimum level of preferred stock and subordinated debt has historically been at levels that do not interfere with the normal volume of requests Agway has received and fulfilled to repurchase such securities[,]" it also cautioned that it might have to restrict its voluntary redemption practice, stating, "[i]n addition, the terms or conditions of the line of credit discussed above, as ultimately negotiated, may cause AFC to limit or cease its past practices with regard to the repurchase of subordinated debt." *Id.* at ¶ 33.

11.    Notwithstanding its debt covenant violations, negative net earnings, and negative current ratio, Agway continued to voluntarily redeem subordinated money market certificates through 2000. *Id.* at ¶ 34.

12.    In March 2001, the Board authorized the issuance of an additional $495 million in money market certificates. *Id.* at ¶ 35.

13.    Also in March 2001, Agway replaced its senior debt with a new $175 million credit facility. The terms of this facility were even more restrictive than the one it replaced, for example, requiring Agway not to reduce preferred stock and subordinated debt below $455 million and $465 million, while also restricting redemptions of subordinated debt. *Id.* at ¶ 36.

14.    By June 2001, Agway was still in violation of its loan covenants. It agreed, *inter alia*, to pledge its ownership interest in its largest and most profitable operating subsidiary, Telmark (its leasing subsidiary), and to maintain at least $465 million (rather than $455 million) in preferred stock and subordinated debt as conditions to obtain a waiver of the covenant violations. *Id.* at ¶ 37.

15.    Beginning in August, 2001, Cardarelli began formulating a 3-year plan to deal with Agway's financial distress, which he presented at Agway's October 2001 annual meeting. The key to Cardarelli's plan was to raise cash by selling Telmark and several other businesses. *Id.* at ¶ 38.

16.    Notwithstanding the steps taken and its debt covenant violations, negative net earnings, and negative current ratio, Agway continued to voluntarily redeem the Member MMCs through 2001, although it had no obligation to do so. In fact, voluntary redemptions of subordinated debt reached an all time high in 2001 of $113.8 million, in addition to payment of $55.8 million on certificates that were due. *Id.* at ¶ 39.

17.    Agway announced on March 6, 2002, that it would suspend sales of its securities, including subordinated money market certificates:

14

The anticipated financial impact of our [divestiture] plan will be more fully described in the quarterly report we will file with the Securities and Exchange Commission for the quarter ending March 31, 2002. We will temporarily stop selling our Agway Securities to the public until we file this report.

*Id.* at 42.

18.     At the June 2002 board meeting, upon presentation by Cardarelli, the Agway board

suspended repurchase of Agway securities, with the following resolutions, *inter alia*:

**RESOLVED,** That the President, Senior Vice President and Chief Financial Officer, and the Senior Vice President and General Counsel for the Company may, after consultation with its legal and other advisors, cease Agway's historical practice of repurchasing its securities to avoid breaching financial covenants that Agway has in its agreements with lenders or to avoid the violation of any legal requirements applicable to the sale or repurchase of Agway's securities; and be it

**FURTHER RESOLVED**, That the President, Senior Vice President and Chief Financial Officer, and the Senior Vice President and General Counsel of the Company, may reinstitute the repurchase practice at such time that it is determined that repurchases will no longer lead to a breach of any financial covenants under agreements with the Company's lenders or applicable legal requirements; . . .

*Id.* at ¶ 46.

19.     In a June 17, 2002 8-K statement, Agway finally announced the suspension of voluntary

redemptions explaining:

The primary reason for the Board's decision to suspend the Company's repurchase of eligible Agway Inc. subordinated debentures and Agway Inc. preferred stock is to preserve the Company's liquidity during the implementation phase of its planned divestiture of certain business operations (discussed below) and to provide the Company with greater flexibility in the event those divestitures do not go as planned. In addition, because the Company is not currently actively raising capital through new sales of securities, the Board determined that suspending the Company's repurchase practice would become necessary in the near future in order to allow the Company to satisfy its obligation under the Credit Agreement to maintain a minimum balance, ranging from $440 million to $450 million throughout the year, of preferred stock, subordinated debt and certain other interest-bearing debt outstanding. As of June 14, 2002, the Company had

approximately $459 million of preferred stock, subordinated debentures and other interest bearing debt outstanding.

*Id.* at ¶ 47.

20.    In addition, Agway's 2002 10-K statement contained a going concern statement that made the following disclosures:

> As reported in our periodic reports, in recent years cash flow from operations for Agway Inc. and certain of its business segments and subsidiaries has been supplemented by external borrowings and the sale of both discontinued business operations and other assets, in order to meet the cash requirements for capital improvements, scheduled debt repayments, and maintenance of a voluntary repurchase practice with regard to Agway securities.
>
> As previously reported, we have violated the financial covenants contained in that agreement a number of times since its origination, principally due to insufficient earnings. As previously reported, based on Agway's June 30, 2001, financial results, Agway was in violation of certain financial covenants within its Credit Agreement.

*Id.* at ¶ 48.

21.    Until the June 2002 suspension, Agway had voluntarily redeemed $66.3 million in subordinated debt in 2002, notwithstanding its continuing loan covenant violations and its precarious financial condition, although it had no obligation to do so.  *Id.* at ¶ 49.

22.    According to public filings, from 1998 to 2002, Agway's total liabilities, total assets, net assets, capital stock and surplus were as follows:

|      | Total Assets | Total Liabilities | Net Assets | Capital Stock | Surplus |
|------|-------------|-------------------|------------|---------------|---------|
| 1998 | $1,418,321,000 | $1,211,393,000 | $206,928,000 | $50,442,000 | $156,486,000 |
| 1999 | $1,437,172,000 | $1,238,225,000 | $198,947,000 | $45,423,000 | $153,524,000 |
| 2000 | $1,572,659,000 | $1,390,968,000 | $181,691,000 | $42,168,000 | $139,523,000 |
| 2001 | $1,642,797,000 | $1,473,467,000 | $169,330,000 | $40,048,000` | $129,282,000 |
| 2002 | $1,574,360,000 | $1,510,258,000 | $64,102,000 | $34,470,000 | $ 29,632,000 |

*Id.* at ¶ 51.

23.    According to public filings, from 1998 to 2002, Agway redeemed the following amounts

of common stock and preferred stock, and paid the following amounts of dividends on common

and preferred stock:

|  | Common Stock Redeemed | Preferred Stock Redeemed | Dividends Paid | Total Dividends and Redemptions |
|---|---|---|---|---|
| 1998 | $68,000 | $9,670,000 | $3,634,000 | $13,372,000 |
| 1999 | $65,000 | $4,954,000 | $3,394,000 | $ 8,413,000 |
| 2000 | $33,000 | $3,222,000 | $3,165,000 | $ 6,420,000 |
| 2001 | $33,000 | $2,092,000 | $2,951,000 | $ 5,076,000 |
| 2002 | $32,000 | $5,578,000 | $2,659,000 | $ 8,269,000 |

*Id.* at ¶ 52

24.    From 1998 to 2002 the total amount of subordinated debt redemptions, stock

redemptions, and stock dividends were as follows:

|  | Stock Dividends and Stock Redemptions | Redemptions in Excess of Current Subordinated Debt | Total |
|---|---|---|---|
| 1998 | $13,372,000 | $ 18,713,000 | $ 32,085,000 |
| 1999 | $ 8,413,000 | $ 32,874,000 | $ 41,287,000 |
| 2000 | $ 6,420,000 | $ 85,876,000 | $ 92,296,000 |
| 2001 | $ 5,076,000 | $113,844,000 | $118,920,000 |
| 2002 | $ 8,269,000 | $ 66,255,000 | $ 74,524,000 |

*Id.* at ¶ 53.

25.    From 1998 to 2002, total subordinated debt redemptions, stock redemptions, and

stock dividends compared to net earnings and to surplus were as follows:

| | Total Dividends and Redemptions | Surplus | Net Earnings |
|---|---|---|---|
| 1998 | $ 32,085,000 | $156,486,000 | $1,145,000 |
| 1999 | $ 41,287,000 | $153,524,000 | $1,795,000 |
| 2000 | $ 92,296,000 | $139,523,000 | ($ 9,377,000) |
| 2001 | $118,920,000 | $129,282,000 | ($ 8,927,000) |
| 2002 | $74,524,000 | $ 29,632,000 | ($98,247,000) |

*Id.* at ¶ 54.

Based on these allegations, Plaintiff asserts three causes of action. In the first cause of action, the Plaintiff takes the position that because the Member MMCs could only be purchased by Agway members, their purchase was "effectively an equity investment in Agway and Agway's voluntary redemption of these certificates represented both a drain on the company's cash and distribution of cash to its members." *Id.* at 55. The same argument is asserted with respect to the Series A preferred shares of stock in Agway, as well as the common stock redemptions and dividends. *Id.* at 56-57. On this basis, Plaintiff contends that "[t]he voluntary redemption of subordinated debt in excess of the current amount due, redemption of preferred and common stock redemptions [*sic*] and dividends, together totaling $74.5 million in 2002, violated DEL. CODE ANN. tit. 8, § 170 as illegal dividends because they exceed[ed] both surplus and net earnings." *Id.* at 57. On that basis, the Plaintiff contends that the Defendants are jointly and severally liable in the amount of $74,524,000.

Plaintiff's second cause of action asserts that the Defendants violated their duty of care by "declaring dividends and failing to suspend and/or allow the voluntary redemptions of subordinated money market certificates when Agway was unable to pay its debts as they became due." *Id.* at 62.

The third cause of action is based on allegations of corporate waste as a result of the practice of allowing voluntary redemptions in excess of current amounts due, which Plaintiff contends caused a drain on necessary cash.  *Id.* at 68.


## ARGUMENTS


The Defendants contend that res judicata and judicial estoppel prevent the Plaintiff from asserting a claim against them under Delaware corporation law[5] based on the Plan's classification of the Member MMCs as general unsecured debt.  It is the Defendants' position that DEL. CODE ANN. tit. 8, § 170, on which the Plaintiff relies, allows for the payment of "dividends upon shares of []capital stock, or to its members if the corporation is a nonstock corporation, either (1) out of its surplus . . . or (2) in case there shall be no such surplus, out of its net profits . . . ."  Defendants contend that DEL. CODE ANN. tit. 8, § 170 does not apply to the payment of debt.

Plaintiff acknowledges that the Member MMC's were treated by Agway as debt and appropriately provided for as such in Agway's Plan.  However, the Plaintiff argues that the Court should focus on the nature of the transactions which occurred prior to the suspension of the voluntary redemption practice by the Defendants in June 2002 of preferred stock and subordinated debentures, as well as the Member MMCs.  Plaintiff contends that the economic substance of the transactions involved the payment of "dividends" for purposes of the statute because the payments constituted the distribution of Agway's cash to its owners.

---

[5] Neither party disputes that the Complaint is governed by Delaware law based on the fact that Agway was incorporated in Delaware.  *See Pereira v. Farace*, 413 F.3d 330, 341 (2d Cir. 2005) ("*Pereira III"*).

19

The Plaintiff also contends that the Defendants violated their fiduciary duty to Agway by failing to halt the voluntary Member MMC redemptions earlier at a time when "(a) the company was violating its loan convenants, (b) was losing money, (c) its net current assets were negative, (d) the company was forced to sell assets to pay both senior and subordinated debt and (e) when it was not required to redeem Member MMCs that were not due."  Plaintiff's Memorandum in Opposition to Defendants' Motion, filed May 24, 2005, at 12.  In response, the Defendants argue that "it is hardly a breach of fiduciary duty for directors to continue a 'traditional' corporate practice to permit creditors to redeem their debentures and certificates upon presentation." Defendants' Supplemental Memorandum of Law, filed June 30, 2005, at 9.

With respect to the cause of action based on alleged corporate waste, the Defendants assert that there is no legal support for the proposition that "the failure of a corporation's directors to cease repayment of its own valid debts - whether at or before maturity - constitutes corporate waste or a breach of fiduciary duty."  *Id.* at 10.  However, the Plaintiff asserts that if the payments had not been made, millions of dollars would have been available to all of Agway's creditors. *See* Plaintiff's Opposition, filed May 24, 2005, at 14.  The Plaintiff contends that "it was improper and unnecessary to pay the money to the members when Agway could not meet its debt covenants or pay its debts."  *Id.* at 15.

## DISCUSSION

In considering a motion pursuant to Fed.R.Civ.P. 12(b)(6), the Court must accept all of the Plaintiff's allegations as true, and will grant the motion to dismiss "only if it is clear no relief

could be granted under any set of facts that can be proved consistent with the allegations." *Hishon v. King & Spaulding*, 467 U.S. 69, 73 (1984). The Court is not only to accept Plaintiff's allegations of fact as true, it is also to draw all reasonable inferences as may be drawn from those facts in favor of the Plaintiff. *See Sheppard v. Beerman*, 18 F.3d 147, 150 (2d. Cir. 1994); *Steward v. Jackson & Nash*, 976 F.2d 86, 87 (2d. Cir. 1992); *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir. 1989). The issue is not whether the Plaintiff will ultimately prevail but whether it is entitled to offer evidence to support its claims. *Hishon*, 467 U.S. at 73. The motion is only to be granted if "'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69 (2d Cir. 2001), quoting *Hishon*, 467 U.S. at 73.

In this case, the Defendants seek dismissal of the Plaintiff's first cause of action, which is based on DEL. CODE ANN. tit. 8, § 170. It is the Defendants' position that by Plaintiff's own admission, Agway's payment of stock dividends and stock redemption between 1998 and 2002 never exceeded the company's surplus. Instead, the Defendants assert, Plaintiff has included the redemption of the Member MMCs and subordinated debenture redemptions in the category of "dividends" in arguing that the sum total paid exceeded the surplus in 2002 and, therefore, were in violation of the statute.

Defendants argue that it is inappropriate to construe the payments before maturity of the Member MMCs and debentures as the payment of dividends. Rather, Defendants contend that they constituted a payment of a corporate debt. In this regard, the Defendants argue that res judicata should prevent the Court from finding otherwise. The Defendants assert that the Plaintiff should be barred from now arguing that the same subordinated debt securities represent equity

for which various individuals, holding the Member MMC's and the subordinated debentures, received payment from Agway through June 2002.

Their position rests in large part on the fact that Agway's Plan categorized "any Agway Subordinated Debt Securities Claim" as a "General Unsecured Claim" for purposes of treatment of Class 4(c).  *See* Second Amended Joint Plan of Liquidation at Art. I, § 1.51 and § 5.06. "Agway Subordinated Debt Securities" are further defined in the Debtor's Plan as "those certain unsecured subordinated debt securities, subordinated member debt securities and subordinated debentures issued from time-to-time by Agway and its predecessors, but shall not include any Section 510(b) Claims relating to Agway subordinated securities."  *Id.* at § 1.06.  Furthermore, "Agway Subordinated Debt Securities Claim" "means a Claim[6] arising on account of Agway Subordinated Debt Securities, including any interest accrued and owing thereon as of September 30, 2002." *Id.* at § 1.07.

The doctrine of res judicata or claim preclusion bars parties or their privies from relitigating issues that were or could have been raised in a prior action for which a final judgment was issued.  *See U.S. v. Envicon Dev. Corp.,* 153 F.Supp.2d 114, 123 (D.Conn. 2001).

> In the context of a prior bankruptcy reorganization confirmation, "[t]o determine whether the doctrine of res judicata bars a subsequent action, [the court must] consider whether 1) the prior decision was a final judgment on the merits, 2) the litigants were the same parties, 3) the prior court was of competent jurisdiction, and 4) the causes of action were the same." *Corbett v. MacDonald Moving Servs.*, 124 F.3d 82, 87-88 (2d Cir.1997). "In the bankruptcy context, [the court must] ask as well whether an independent judgment in a separate proceeding would impair,

---

[6]  "Claim" is defined at § 101(5) of the Bankruptcy Code, 11 U.S.C. §§ 101-1330 ("Code"),  as (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured . . . ."  11 U.S.C. § 101(5)(A).  "Debt" is separately defined as "liability on a claim."  11 U.S.C. § 101(12)

> destroy, challenge, or invalidate the enforceability or effectiveness of the reorganization plan." *Id.* at 88 (quoting *Sure-Snap Corp. v. State Street Bank and Trust Co.,* 948 F.2d 869, 875-76 (2d Cir. 1991).

*Envicon Dev. Corp.*, 153 F.Supp.2d at 123-24.

The Order confirming the Debtor's Plan, dated April 28, 2004, constitutes a final judgment on the merits and res judicata applies to it with respect to any issues raised or that could have been raised during the confirmation proceedings. *In re G-P Plastics, Inc.*, 320 B.R. 861, 865 (Bankr. E.D. Mich. 2005); *In re USN Commc'ns, Inc.*, 280 B.R. 573, 586 (Bankr. D. Del. 2002). The question is whether the issues "raised or that could have been raised during the confirmation proceedings" are the same issues raised in the Plaintiff's Complaint.

The Court must agree with the Plaintiff that the doctrine of res judicata does not apply to the position it now takes in the Complaint. The confirmation proceedings addressed the treatment of claims that existed at the time the Debtor's petition was filed, including those identified as "Agway Subordinated Debt Securities" claims, which were included in Class 4(c) as general unsecured claims. The proceedings did not address the payment to members which occurred prior to June 2002 as part of the voluntary redemption practice of Agway. The prepetition redemption of the Member MMC's, as well as the subordinated debentures, of course, eliminated any future right to payment those members might have had, which would have served as a basis for asserting a claim in the Debtor's bankruptcy. Accordingly, res judicata does not preclude the Plaintiff from taking its current position that their redemption prepetition constituted payment of dividends, rather than corporate debt.

Defendants also seek dismissal of the first cause of action based on judicial estoppel. "'The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding

23

that is inconsistent with a claim taken by that party in a previous proceeding.'" *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001), quoting 18 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 134.30, p. 134-62 (3d ed. 2000).  For the same reasons discussed above, the Court concludes that  the Plaintiff's claim, as asserted in its first cause of action, is not inconsistent with the position taken by the Debtor in connection with confirmation of its plan.

Thus, the Court must determine whether the Plaintiff is entitled to offer evidence to support its claims based on DEL. CODE ANN. tit. 8, § 170.  As noted above, the Plaintiff asserts that the Court should examine the economic substance of the transactions, which Plaintiff contends merely distributed Agway's cash to its owners.  The Plaintiff asserts that the purpose of DEL. CODE ANN. tit. 8, § 170 is to preserve a company's capital for the payment of debt.  In support of this assertion, Plaintiff cites to *In re Buckhead America Corp.*, 178 B.R. 956, 972 (D.Del. 1994), which examined what the legislature intended in enacting § 170 in deciding whether to apply the statute to the facts before the Delaware state court.  The court in *Buckhead* examined the possibility that the long-term financing of $175 million by Days Inn of America, Inc.("DIA"), a subsidiary of Days Inn of America Corp. ("DIC"), in order to purchase DIC's outstanding stock, might be considered an unlawful dividend payment to its sole shareholder, DIC.  *Id.* at 973-74.  The court, however, came to no definitive conclusion on that issue and merely denied defendants' motion to dismiss that particular claim because it was awaiting "further briefing and further development of the factual record."  *Id.* at 974.

This Court does not believe it is necessary for there to be further development of a factual record in connection with this portion of Defendant's motion.  According to BLACK'S LAW DICTIONARY, "debt security" is defined as "[a] security representing funds borrowed by the

corporation from the holder of the debt obligation; esp. a bond, note or debenture. Generally a debt security is any security that is not an equity security." BLACK'S LAW DICTIONARY 1385 (8th ed. 2004). This is to be compared with "equity security," which is defined as "[a] security representing an ownership interest in a corporation, such as a share of stock, rather than a debt interest, such as a bond, any stock or similar security, or any security that is convertible into stock or similar security or carrying a warrant or right to subscribe to or purchase stock or a similar security, and any such warrant or right." *Id.* In this case, Agway's Plan made reference to the obligations as "subordinated debt securities," not "equity securities."

In addition, the Court notes that Delaware Corporation law does not define "dividend." However, the dictionary defines it as "[a] portion of a company's earnings or profits distributed pro rata to its shareholders, usu. in the form of cash or additional shares." BLACK'S LAW DICTIONARY 512 (8th ed. 2004). In *Buckhead,* DIC was the sole shareholder of DIA. Accordingly, any earnings or profits would have been distributed to only one entity, namely, DIC.

In *Crowthers McCall Pattern, Inc. v. Lewis (In re Crowthers McCall Pattern, Inc.)*, 129 B.R. 992 (S.D.N.Y. 1991), a case also cited by the Plaintiff, the court examined the economic substance of certain transactions in connection with a leveraged buyout in which the additional debt was assumed by the debtor in funding the purchase of stock owned by TLC Group, Inc. and other individuals in a company known as TLC Pattern, Inc. *Id.* at 1001. In that case, the plaintiff argued that the payments received by the defendants in connection with the sale of TLC Pattern, Inc. should be characterized "in substance" as dividends or distributions made by TLC Pattern, Inc. *Id.* In *Crowthers* all of the shareholders received payments.

However, the payments made by Agway in connection with its redemption or purchase

25

of the Member MMC's and the subordinated debentures prior to June 2002 was not done on a pro rata basis to <u>all</u> its members. Rather, payment was made by Agway on an individual basis based upon presentation by a member of his/her money market certificate(s) or debentures, whether they had matured or not. They were not payments made "across the board" to all members holding money market certificates and debentures. Thus, it would appear that the payments were not dividends, as defined in the dictionary, and merely represent repayment of debt.

Accordingly, the Court must conclude that Defendants' motion seeking dismissal of Plaintiff's first cause of action should be granted based on the conclusion that the redemption of the Member MMC's and subordinated debentures did not constitute a payment of a dividend. By Plaintiff's own admission, payments of dividends, as well as redemption of preferred and common stock, did not exceed surplus in the years from 1998-2002. *Compare* ¶ 51 and ¶ 52 of the Complaint.

With respect to the its second cause of action, Plaintiff asserts that the Defendants breached their fiduciary duty of care.[78] Defendants assert that even if that were true, Plaintiff

---

[7] Neither party has indicated whether Agway's certificate of incorporation contains a provision eliminating or limiting the personal liability of directors to the corporation or its stockholders for monetary damages for breach of their fiduciary duty of care as permitted by DEL. CODE ANN. tit. 8 § 102(b)(7). *See Pereira III* at 341.

[8] Defendants assert that the "Plaintiff's claim for breach of fiduciary duty is also time-barred at least to the extent it is based upon debt repayments made or dividends issued prior to November 19, 2001," based on the Delaware three-year statute of limitations under 10 Del. Code § 8106. *See* Defendants' Motion at 14, n. 9. However, "a federal court exercising its 'related to' bankruptcy jurisdiction over state law claims applies the choice of law rules of the forum state in order to determine the applicable statute of limitations." *See Pereira v. Cogan*, Case No. 000 CIV. 619, 2001 WL 243537, at *17 (S.D.N.Y. March 8, 2001) ("*Pereira I*"). Thus, under New York's choice of law rule for statutes of limitation, where an entity is suing "as a representative of the estate of a bankrupt corporation, it is the residency of the corporation that is applicable." *Id.* The residence of a corporation for purposes of New York's "borrowing statute" is the

26

cannot demonstrate that the repayment of the subordinated debt caused harm to Agway or its stockholders.  It is the Defendants' position that the redemptions of the Member MMC, in particular, represented repayment of legitimate obligations of the Debtors, i.e. the repayment of valid debt which must be paid before providing any return to equity holders.  *See* Defendants' Motion at 13.  With respect to creditors of the Debtors, Defendants assert that if Agway had ceased redeeming the debentures and certificates earlier than it did, there is a question whether this would have resulted in additional monies being available to pay unsecured creditors since 90% of the general unsecured claims were for repayment of the debentures and money market certificates.  *See* Defendants' Supplemental Memorandum, filed June 30, 2005 at 11.

Nowhere in the Complaint is there an indication concerning whether the allegations in the Complaint are based on a duty of care owed to the corporation and its stockholders or one based on its duty to creditors.  The Court does note that according to the Liquidating Trust Agreement (Docket No. 5036), filed April 21, 2004, "the Liquidating Trust [was] established for the sole purpose of liquidating its assets for the benefit of the holders of the Allowed General Unsecured Claims . . . ."  Pursuant to the Liquidating Trust Agreement, the Trustee has

> the power to prosecute for the benefit of the Liquidating Trust all claims, rights, and causes of action transferred to the Liquidating Trust, whether such suits are brought in the name of the Liquidating Trust, the Debtors or otherwise for the benefit of the holders of beneficial interests in the Liquidating Trust.

*Id.* at § 4.2.

Thus, it would appear from the language of the Liquidating Trust Agreement that the

---

corporation's principal place of business, which in this case is in New York.  Accordingly New York's six-year statute of limitations would apply to a cause of action based on breach of fiduciary duty.  *Id.* at *18.

27

action is brought on behalf of both the corporation and, more importantly, the unsecured creditors.

With respect to the latter, "[u]nder Delaware law, the fiduciary duty owed to creditors arises at

a point short of actual insolvency, that is, when the corporation is 'in the vicinity of insolvency.'"

*Pereira I* at *8 (citations omitted); *see also Healthco Int'l, Inc. v. Hicks, Muse & Co., Inc.*, 208

B.R. 288, 300 (Bankr D. Mass. 1997) (noting that "directors breach their fiduciary obligations

when they authorize a transaction which prejudices creditors"). However, as pointed out by the

court in *Pereira III*, the duties owed to creditors by the officers and directors "do not expand the

circumscribed rights of the trustee,[9] who may only assert claims of the bankrupt corporation, not

its creditors." *Pereira III* at 342.

> In establishing a breach of fiduciary duty, it is important to note that

> "[m]ost of the decisions that a corporation, acting through its human agents, makes are, of course, not the subject of director attention. Legally the board itself will be required only to authorize the most significant acts or transactions: mergers, changes in capital structure, fundamental changes in business, appointment and compensation of the CEO, etc. . . . ordinary business decisions that are made by officers and employees deeper in the interior of the organization can, however, vitally affect the welfare of the corporation and its ability to achieve its various strategic and financial goals . . . ."

*Pereira v. Cogan*, 294 B.R. 449, 530 (S.D.N.Y. 2003) ("*Pereira II*"), *vacated on other grounds

and remanded sub nom. Pereira v. Farace,* 413 F.3d 330 (2d Cir. 2005), quoting *In re Caremark

Int'l Inc. Deriv. Litig.,*698 A.2d 959, 968 (Del. Ch. 1996). Directors may be found to have

breached their fiduciary duty of care if it is established that they failed to keep themselves fully

informed before voting, or if it is established that they were inattentive to their obligations and

---

[9] The Liquidating Trust has the same standing as the trustee in the bankruptcy context to allege breach of fiduciary duty claims. *See In re Adelphia Commc'ns Corp.*, 322 B.R. 509, 529 (Bankr. S.D.N.Y. 2005) (*dicta*).

28

demonstrated a "'blindness to problems that later caused substantial harm . . . .'" *Pereira I* at

*13, quoting American Law Institute, *Principles of Corporate Governance: Analysis and*

*Recommendations*, § 401 at 155 (1994); *see also Healthco Int'l*, 208 B.R. at 305 (noting that the

duty of care includes a duty of directors "'to inform themselves, prior to making a business

decision, of all material information reasonably available to them'") (quoting ERNEST L. FOLK

III, ET AL., FOLK ON DELAWARE GENERAL CORPORATION LAW, A COMMENTARY AND ANALYSIS

§ 141.21 (3d ed. 1992). Obviously, these are factual determinations that warrant denial of the

Defendants' motion to dismiss the second cause of action to the extent that it alleges that the

failure to suspend the voluntary redemptions of Member MMCs and subordinated debentures, as

well as the redemption of preferred and common stock, at a time when Agway was unable to pay

its debts, constituted a violation of the Defendants' duty of care. Plaintiff should be afforded an

opportunity to establish that there was a breach of Defendants' fiduciary duty and that damages

ensued as a result.

Whether or not a transaction constitutes corporate waste depends on whether the transfers

or payments in connection with the redemptions served no corporate purpose or were for no

consideration. *Lewis v. Vogelstein*, 699 A.2d 327, 336 (Del. Ch. 1997). As the court in

*Vogelstein* noted, "[i]f, however, there is *any substantial* consideration received by the

corporation, and if there is a *good faith judgment* that in the circumstances the transaction is

worthwhile, there should be no finding of waste . . . ." *Id.* Keeping in mind that the standard for

dismissal does not require the Court to determine that the Plaintiff ultimately will prevail, the

Court finds no basis to dismiss Plaintiff's third cause of action. Plaintiff should have the

opportunity to offer evidence to support its claim of corporate waste by Defendants in allowing

29

the voluntary redemptions of Member MMCs, subordinated debentures and preferred and common stock, i.e that the transactions were for no legitimate corporate purpose.

Based on the foregoing, it is hereby

RECOMMENDED to the U.S. District Court for the Northern District of New York that

(1) Defendants' motion seeking dismissal of the Plaintiff's first cause of action based on DEL. CODE ANN. tit. 8, § 170 be granted; and that

(2) Defendants' motion seeking dismissal of the Plaintiff's second and third causes of action based on allegations of breach of fiduciary duty of care and on allegations of corporate waste, respectively, be denied.

Dated at Utica, New York

this 6th day of March 2006

<div style="text-align: center">

s/s Stephen D. Gerling
STEPHEN D. GERLING
Chief U.S. Bankruptcy Judge

</div>

**BROWN RUDNICK BERLACK ISRAELS LLP**
David J. Molton (DM-1106)
Steven B. Smith (SS-5906)
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
dmolton@brownrudnick.com
ssmith@brownrudnick.com

- and -

**BEUS GILBERT PLLC**
Leo R. Beus (not a member of the New Jersey Bar)
Dennis K. Blackhurst (not a member of the New Jersey Bar)
4800 North Scottsdale Road, Suite 6000
Scottsdale, Arizona  85251
Telephone: (480) 429-3000
Facsimile: (480) 429-3100
lbeus@beusgilbert.com
dblackhurst@beusgilbert.com

*Co-Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

-------------------------------------------------------------------X

KENNETH M. KRYS and CHRISTOPHER
STRIDE, as JOINT OFFICIAL LIQUIDATORS
of SPHINX LTD., SPHINX STRATEGY FUND
LTD.; SPHINX PLUS SPC LTD., SPHINX
DISTRESSED LTD., SPHINX MERGER
ARBITRAGE LTD.; SPHINX SPECIAL
SITUATIONS LTD., SPHINX MACRO LTD.;
SPHINX LONG/SHORT EQUITY LTD.;
SPHINX MANAGED FUTURES LTD.; SPHINX
EQUITY MARKET NEUTRAL LTD.; SPHINX
CONVERTIBLE ARBITRAGE LTD.; SPHINX
FIXED INCOME ARBITRAGE LTD.; SPHINX
DISTRESSED FUND SPC; SPHINX MERGER
ARBITRAGE FUND SPC; SPHINX SPECIAL
SITUATIONS FUND SPC; SPHINX MACRO
FUND SPC; SPHINX LONG/SHORT EQUITY
FUND SPC; SPHINX MANAGED FUTURES
FUND SPC; SPHINX EQUITY MARKET
NEUTRAL FUND SPC; SPHINX

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

08-cv-1902 (JBS)

**MEMORANDUM OF
LAW IN SUPPORT OF
PLAINTIFFS' MOTION TO
REMAND OR, IN THE
ALTERNATIVE,
FOR ABSTENTION**

**Hearing Date and
Time:  June 20, 2008
at 10:00 a.m.**

CONVERTIBLE ARBITRAGE FUND SPC;                          :
SPHINX FIXED INCOME ARBITRAGE FUND                        :
SPC; PLUSFUNDS MANAGED ACCESS FUND                        :
SPC LTD.; KENNETH M. KRYS and                             :
CHRISTOPHER STRIDE as assignees of claims                 :
assigned by MIAMI CHILDREN'S HOSPITAL                     :
FOUNDATION, OFI, GREEN & SMITH                            :
INVESTMENT MANAGEMENT LLC, THALES                         :
FUND MANAGEMENT LLC, KELLNER                              :
DILEO & CO., LLC, MARTINGALE ASSET                        :
MANAGEMENT LP, LONGACRE FUND                              :
MANAGEMENT LLC, ARNHOLD & S.                              :
BLEICHROEDER ADVISERS LLC, PICTET &                       :
CIE, RGA AMERICA REINSURANCE                              :
COMPANY, DEUTSCHE BANK (SUISSE) SA,                       :
ARAB MONETARY FUND, HANSARD                               :
INTERNATIONAL LTD., CONCORDIA                             :
ADVISORS LLC, GABELLI SECURITIES, INC.,                   :
CITCO GLOBAL CUSTODY; and JAMES                           :
P. SINCLAIR as Trustee of the SPHINX TRUST,               :
                                                          :
                     Plaintiffs,                          :
                                                          :
                     -against-                            :
                                                          :
ROBERT AARON; GUY CASTRANOVA;                             :
DERIVATIVE PORTFOLIO                                      :
MANAGEMENT LLC; DERIVATIVE                                :
PORTFOLIO MANAGEMENT LTD.;                                :
DPM-MELLON LLC; DPM-MELLON LTD.;                          :
and BANK OF NEW YORK MELLON                               :
CORPORATION f/k/a MELLON                                  :
FINANCIAL CORP.,                                          :
                                                          :
                     Defendants.                          :
-------------------------------------------------------------X

# TABLE OF CONTENTS

Page

Table of Contents ........................................................................................................... i

Table of Authorities ..................................................................................................... iii

Preliminary Statement .................................................................................................... 1

Background of the Case ................................................................................................. 3

Argument ....................................................................................................................... 5

I.  THE SPHINX CHAPTER 15 PROCEEDING DOES NOT PROVIDE
    A BASIS FOR "RELATED TO" JURISDICTION ............................................... 5

    A.  A Chapter 15 Proceeding Cannot Provide the Basis for Related
        To Jurisdiction .......................................................................................... 5

    B.  DPM and Aaron Chose to Assert Their Purported Indemnification
        Right in the Cayman Islands, and the Chapter 15 Proceeding
        Cannot Be Used as a Basis for "Related To" Jurisdiction ........................ 9

II.  THE PLUSFUNDS BANKRUPTCY CANNOT CREATE "RELATED TO"
     JURISDICTION OVER THIS CASE .................................................................. 11

    A.  Because the PlusFunds Plan Has Been Approved, Bankruptcy
        Court Jurisdiction is Circumscribed and Cannot Support
        "Related To" Jurisdiction ....................................................................... 11

    B.  Because PlusFunds' Litigation Claims Were Transferred to SPhinX,
        the Outcome of this Action Cannot Have any Conceivable Effect on
        the PlusFunds Estate or Administration of the PlusFunds Plan ............... 13

III.  THE REFCO BANKRUPTCY IS NOT EVEN REMOTELY RELATED
      TO THIS ACTION ............................................................................................. 16

    A.  This Case Can Neither Augment Nor Detract From The Refco Estate .... 16

    B.  This Action Does Not and Cannot Affect the Administration of the
        Refco Plan or Estate ............................................................................... 18

IV.  EVEN IF THIS COURT CONCLUDES THAT IT HAS "RELATED TO"
     JURISDICTION, THE CASE SHOULD BE REMANDED TO THE
     STATE COURT ON THE BASES OF ABSTENTION OR
     EQUITABLE REMAND ..................................................................................... 19

|  | A. | The Case Should Be Remanded Under Mandatory Abstention Principles | 19 |
|  | B. | This Case is Equally Appropriate for Remand on the Basis of Permissive Abstention and Equitable Remand | 21 |
| V. |  | COURTS HAVE A THRESHOLD DUTY TO EVALUATE THEIR JURISDICTION | 23 |
|  | A. | Removal Was Improper | 25 |
|  | B. | The New Jersey Action and the New York Action Raise Different Factual and Legal Issues | 26 |
|  | C. | The Balancing Test Does Not Support a Stay | 27 |
|  |  | 1. Judicial Economy Does Not Favor a Stay | 27 |
|  |  | 2. The Balance of Hardships Favors Plaintiff | 27 |
| Conclusion |  |  | 29 |

# TABLE OF AUTHORITIES

Page

## Cases

*Abrams v. General Nutrition Companies, Inc.*,
    2006 WL 2739642 (D.N.J. September 25, 2006) .......................................... 6

*Austro v. Niagara Mohawk Power Corp.*,
    66 N.Y.2d 674, N.Y.S.2d 410 (1985) ........................................................ 11

*Boyer v. Snap-On Tools Corp.*,
    913 F.2d 108 (3d Cir. 1990).................................................................... 6

*Clark v. Pfizer*,
    2004 U.S. Dist. LEXIS 17813 (E.D. Pa. Sept. 4, 2004) ............................. 24

*Donaldson v. Bernstein*, 104 F.3d 547 (3d Cir. 1997)....................................... 12

*Gibbs-Alfano v. Burton*, 281 F.3d 12 (2d Cir. 2002) ......................................... 11

*Group Hospitalization and Med. Serv. v. Merck-Medco Managed Care*,
    295 F. Supp. 2d 457 (D.N.J. 2003) .......................................................... 24

*In re Artimm*, 335 B.R. 149 (Bankr. C.D. Cal. 2005) ......................................... 7

*In re Combustion Eng'g, Inc.*, 391 F.3d 190 (3d Cir. 2004)............................... 12

*In re Donington*, 194 B.R. 750 (D.N.J. 1996) ................................ 19, 21, 22, 23

*In re Iida*, 377 B.R. 243 (B.A.P. 9th Cir. 2007) .................................................. 6

*In re Kamine/Besicorp Allegany, LP*,
    214 B.R. 953 (Bankr. D.N.J. 1997) .......................................................... 19

*In re Marconi PLC*, 363 B.R. 361 (S.D.N.Y. 2007)....................................... 6, 8, 9

*In re Mid-Atlantic Handling Systems, LLC*,
    304 B.R. 111 (Bankr. D.N.J. 2003) ............................................. 19, 20, 22

*In re Petition of Blackwell*,
    267 B.R. 732 (Bankr. W.D. Tex. 2001).......................................................... 7

*In re Raimondo,*
    2007 WL 2248068 (Bankr. D.N.J., July 31, 2007)...................................................... 17

*In re Refco Sec. Litig.,* Case No.
    07 MDL 1902 (S.D.N.Y. April 28, 2008)................................................................. 13

*In re Refco Sec. Litig.,*
    530 F.Supp. 2d 1350 (J.P.M.L. 2007)..................................................................... 26

*In re Resorts Int'l., Inc.,* 372 F.3d 154 (3d Cir. 2004) ............................................. passim

*In re Smouha,* 136 B.R. 921 (S.D.N.Y. 1992) ................................................................ 6, 7

*In re Thornhill Global Deposit Fund, Ltd.,*
    245 B.R. 1 (Bankr. D. Mass. 2000) ........................................................................ 7

*In re Treco,* 227 B.R. 343 (Bankr. S.D.N.Y. 1998)................................................... 6, 7, 16

*In re Wachsmuth,* 272 B.R. 766 (Bankr. M.D. Fla. 2001) ................................................. 7

*Jazz Photo Corp. v. Kaplan & Gilman, LLP,*
    2006 WL 2000230 (D.N.J. July 17, 2006) ............................................................ 17

*Koreag v. Refco F/X Associates, Inc.,*
    961 F.2d 341 (2d Cir. 1992).................................................................................. 6, 7

*Meyers v. Bayer AG,*
    143 F. Supp. 2d 1044 (E.D. Wis. 2001)...................................................... 24, 25, 27

*Nekritz v. Canary Capital Partners, LLC,*
    2004 U.S. Dist. LEXIS 12473 (D.N.J. Jan. 12, 2004) ......................................... 24

*Pacor, Inc. v. Higgins,* 743 F.2d 984 (3d Cir. 1984) ................................................. 12, 17

*Retirement Sys. v. JP Morgan Chase & Co.,*
    285 B.R. 519 (M.D. Ala. 2002) ............................................................................ 11

*Steel Co. v. Citizens for a Better Environment,*
    523 U.S. 83 (1998).............................................................................................. 24

*Steel Workers Pension Trust v. Citigroup, Inc.,*
    295 B.R. 747 (E.D. Pa. 2003) ............................................................................ 175

*Stoe v. Flaherty,* 436 F.3d 209 (3d Cir. 2006) ................................................................ 21

*Universal Casualty & Surety Co., Ltd. v. Gee,*
    53 B.R. 891 (Bankr. S.D.N.Y. 1985)..................................................................... 7

*Wal-Mart Stores, Inc. v. Electric Ins. Co.*,
    2007 WL 137238 (D.N.J. Jan. 18, 2007) ................................................................. 18

**Statutes**

28 U.S.C. § 157(b) ........................................................................................................ 1

28 U.S.C. § 1334 ........................................................................................................ 20

28 U.S.C. § 1334(b) ...................................................................................................... 1

28 U.S.C. § 1334(c)(1) ........................................................................................... 21, 22

28 U.S.C. § 1334(c)(2) .............................................................................................. 19

28 U.S.C. § 1452(b) .................................................................................................... 22

**Rules**

Federal Rule of Bankruptcy Procedure 9027(a)(1) ...................................................... 1

**Treatises**

2 *Collier on Bankruptcy* ¶304.17 (15th ed. 2007) ................................................ 6

Plaintiffs respectfully submit this Memorandum of Law in support of their Motion to Remand or, In the Alternative, For Abstention. This case should be remanded to the New Jersey Superior Court for lack of subject matter jurisdiction. In the alternative, if the Court finds that subject matter jurisdiction exists, it nonetheless should remand on the basis of mandatory or permissive abstention or equitable remand.

## **Preliminary Statement**

Defendants' April 17, 2008 Notice of Removal (the "Notice") advances a single basis for federal court jurisdiction: "this Court has jurisdiction to hear all civil proceedings that are 'related to cases under Title 11'" under 28 U.S.C. § 1334(b). Notice at 6. Defendants advance no other basis for federal subject matter jurisdiction; they assert neither diversity nor federal question jurisdiction, recognizing that the Amended Complaint advances *only* New Jersey state law claims.[1] Moreover, Defendants do not maintain that this action "arises under" the Bankruptcy Code or that it "arises in" a case under the Bankruptcy Code. Indeed, by admitting that Plaintiffs' claims are "non-core" within the meaning of 28 U.S.C. § 157(b), Defendants concede that Plaintiffs' claims do not "arise in" or "arise under" the Bankruptcy Code. *See* Notice at 11.[2]

Seeking to identify some basis for federal jurisdiction, Defendants assert that Plaintiffs' action is purportedly "related to" three separate bankruptcy proceedings. Arguing first that this action is related to SPhinX's Chapter 15 proceeding, Defendants misperceive the nature and

---

[1] The Amended Complaint alleges causes of action for: breach of contract (Count I); breach of the covenant of good faith and fair dealing (Count II); indemnity (Count III); declaratory relief (Count IV); breach of fiduciary duty (Count V); aiding and abetting breach of fiduciary duty (Count VI); interference with contract/prospective contract (Count VII); fraud (Count VIII); aiding and abetting interference with contract/prospective contract (Count IX); and violation of New Jersey's civil RICO statute (Count X).

[2] Fed. R. Bankr. P. 9027(a)(1) requires that the removing defendants state whether the claims against them are non-core within the meaning of 28 U.S.C. § 157(b). Defendants have so stated in their Notice of Removal. "Cases under title 11, proceedings arising under title 11, and proceedings arising in a case under title 11 are referred to as 'core' proceedings." *In re Resorts Int'l., Inc.*, 372 F.3d 154, 162 (3d Cir. 2004).

purpose of such a proceeding.  Chapter 15 proceedings cannot form a basis for "related to" jurisdiction because they do not and cannot relate to a U.S. bankruptcy case.  SPhinX's liquidation proceedings were initiated and remain pending in the Cayman Islands, not in the U.S. As a result, Defendants' alleged indemnification claim against the SPhinX Funds cannot support related to jurisdiction because it can only affect a *foreign* estate.  Defendants implicitly conceded as much when they asserted their indemnification claim in the Cayman Islands proceedings. Because SPhinX's liquidation is centered in the Cayman Islands, any effect on the SPhinX estate cannot support related to jurisdiction in the United States.

Nor does Plaintiffs' Complaint relate to the PlusFunds bankruptcy proceedings in the Southern District of New York.  The PlusFunds Plan of Liquidation (the "PlusFunds Plan") was confirmed by the Bankruptcy Court, and, as a matter of law, post-confirmation jurisdiction for is extremely limited.  Under the PlusFunds Plan, PlusFunds' litigation claims were sold for $5 million and other consideration to the SPhinX Funds, represented by James Sinclair, as Trustee. Despite Defendants' claims to the contrary, the transfer of litigation claims from PlusFunds to SPhinX does not require interpretation of the PlusFunds confirmed Plan; to the contrary, the PlusFunds Plan is unambiguous, and it is transparent that the PlusFunds estate retains *no interest* in the claims which the current Plaintiffs are prosecuting against these Defendants.

Finally, the Refco bankruptcy – which provides the third imagined stone in the foundation of Defendants' "related to" argument – is not even remotely related to this action. None of the parties here is a debtor or party to the Refco bankruptcy.  Whether Plaintiffs win or lose can have no conceivable effect on the Refco bankruptcy; it will not augment or diminish the Refco estate, and it will not affect in any way the rights and liabilities of the Refco estate.  Nor will this action affect the administration of the Refco plan – also confirmed – or the Refco estate.

As a consequence, Defendants cannot meet their burden of showing there is the requisite "close nexus" between this case and the Refco bankruptcy.

As demonstrated herein, under applicable Third Circuit precedents, neither the SPhinX Chapter 15 case, nor the PlusFunds or Refco bankruptcies is "related to" this lawsuit for jurisdiction purposes. The only effect this action can have on any bankruptcy estate is the effect it will have on the estate of the SPhinX Funds administered in the Cayman Islands. Because, as a matter of law, an action that has an effect on a foreign insolvency proceeding cannot form the basis of federal court jurisdiction, this action must be remanded to the New Jersey Superior Court in which it was initially filed. However, even if this Court somehow concludes that "related to" jurisdiction does exist, the case still should be remanded based on settled principles of mandatory and permissive abstention and equitable remand.

### Background of the Case

In 2001, PlusFunds entered into a license agreement with Standard & Poor's ("S&P") to create and market investment products designed to track the S&P Hedge Fund Index, a composite index measuring major hedge fund strategies. *See* Amended Complaint ¶¶ 50-51. In order to effectuate this plan, PlusFunds created the SPhinX Funds, a family of Cayman Islands hedge funds designed to offer investment products. *See id.* ¶ 53. Central to the SPhinX plan was the use of segregated portfolio companies ("SPCs") under Cayman Islands law. The Cayman SPC structure allowed for the segregation of assets and liabilities into separate portfolios within a single SPC entity and provided each SPC with immunity from claims of creditors of the prime broker or custodian of SPhinX's customer assets. *See id.* ¶¶ 57-81.

The SPhinX Funds were immediately successful. By 2004-2005, the SPhinX Funds had $3 billion in assets under management. *See id.* ¶ 85. However, unknown to innocent members

of the SPhinX and PlusFunds boards and management, certain SPhinX and PlusFunds agents/fiduciaries – including Defendants in this action – allowed SPhinX cash to be diverted from regulated, protected, customer-segregated accounts to non-regulated offshore accounts, where those assets were commingled with monies from non-SPhinX sources and exposed to the risk of the custodians' insolvency. *See id.* ¶¶ 130-133. As a result, hundreds of millions of dollars of SPhinX cash was transferred from Refco LLC, a regulated entity where SPhinX's assets were maintained in regulated, customer-segregated accounts, to non-segregated, commingled accounts at Refco Capital Markets Ltd. ("RCM"), an unregulated Bermuda entity. *See id.* ¶¶ 151, 233.

The pervasive fraud that characterized the Refco-related companies has been well-aired in the media. But, unknown at the time to innocent SPhinX and PlusFunds board members and managers was the fact that Refco was, in part, using *SPhinX assets* to perpetrate the Refco fraud. As of October 10, 2005 – the date the Refco fraud became public – approximately $312 million of SPhinX cash was held at RCM. *See id.* ¶ 233. On October 17, 2005, RCM and 23 other Refco subsidiaries and affiliates filed bankruptcy petitions in the Southern District of New York. *See id.* ¶ 239.

On October 11, 2005, days before Refco's bankruptcy petition, a SPhinX executive demanded the return of $312 million in SPhinX cash held at RCM. On October 12, 2005, the $312 million was, in fact, transferred from RCM to SPhinX's customer-segregated accounts at Refco LLC. *See id.* ¶ 12. Two months after the Refco bankruptcy, RCM's Committee of Unsecured Creditors commenced an adversary proceeding against SPhinX to recover the $312 million as a preferential transfer from RCM's estate. *See id.* The New York bankruptcy court subsequently froze SPhinX's accounts and a flood of customer redemptions submitted by

SPhinX investors soon followed. *See id.* ¶ 240. These redemptions resulted in the death knell for both SPhinX and PlusFunds. PlusFunds itself filed for Chapter 11 protection in the Southern District of New York on March 6, 2006. *See id.* ¶ 32.

On April 26, 2006, SPhinX settled the preference litigation with RCM's bankruptcy trustee and, as part of that agreement, agreed to relinquish approximately $263 million of its $312 million. *See id.* ¶¶ 14, 241. Two months later, on June 30, 2006, SPhinX was placed into voluntary liquidation in the Cayman Islands. *See id.* ¶ 15. Thereafter, the Grand Court of the Cayman Islands appointed the Joint Official Liquidators, Kenneth Krys and Christopher Stride (the "JOLs"), who are Plaintiffs in the present action, who obtained orders for the winding up of the SPhinX companies, subject to the supervision of the Grand Court. *See id.* ¶ 30.

As a result of the actions of these Defendants and others, both PlusFunds and SPhinX, valuable, growing companies, collapsed. Plaintiffs now seek recompense for the destruction of these companies: the $263 million of SPhinX cash that was lost in the Refco scandal and related damages suffered by SPhinX and its investors, as well as lost profits and enterprise value and other damages suffered by PlusFunds.

## Argument

## I.  THE SPHINX CHAPTER 15 PROCEEDING DOES NOT PROVIDE A BASIS FOR "RELATED TO" JURISDICTION

### A.  A Chapter 15 Proceeding Cannot Provide the Basis for Related To Jurisdiction

Defendants assert that SPhinX's Chapter 15 proceeding provides a basis for "related to" jurisdiction. *See* Notice at 8-10. They argue that Plaintiffs seek to recover assets located in the United States or otherwise subject to the jurisdiction of the United States courts that would increase the size of the SPhinX estate. And, they contend that the DPM Defendants have indemnification claims against the SPhinX Funds based on a written contract with SPhinX and

that the indemnification provides a basis for "related to" jurisdiction. *See* Notice at 9. Both arguments fail.

It is well established that "[w]hen a motion for remand is filed, the removing party bears the burden of establishing the elements of subject matter jurisdiction." *Abrams v. General Nutrition Companies, Inc.*, 2006 WL 2739642, at *3 (D.N.J. Sept. 25, 2006), *citing Boyer v. Snap-On Tools Corp.*, 913 F.2d 108, 111 (3d Cir. 1990) ("a party who urges jurisdiction on a federal court bears the burden of proving that jurisdiction exists"). Here, Defendants cannot meet that burden because, as a matter of law, a Chapter 15 proceeding cannot provide a basis for related to jurisdiction.

On July 31, 2006, the JOLs filed a Chapter 15 petition in the Bankruptcy Court for the Southern District of New York. Although that court entered an order recognizing the Cayman Islands bankruptcy proceedings of the SPhinX entities as "foreign nonmain proceedings," practically nothing else has happened in the Chapter 15 proceedings.[3]

A case filed under Chapter 15 – and its predecessor section of the Bankruptcy Code, Section 304 – "does not create a bankruptcy estate that must be 'administered' by the Court."[4] *In re Marconi PLC*, 363 B.R. 361, 365 (S.D.N.Y. 2007); 2 *Collier on Bankruptcy* ¶304.17 (15th ed. 2007). Indeed, "most of the provisions of Chapters 3, 5, 7 and 11 do not automatically apply to an ancillary proceeding" such as a Section 304 proceeding. *In re Treco*, 227 B.R. 343, 349 (Bankr. S.D.N.Y. 1998); *see In re Smouha*, 136 B.R. 921, 929 (S.D.N.Y. 1992); *Koreag v. Refco*

---

[3] On January 11, 2008, the JOLs sought (and were denied) leave to discover documents produced to the Refco Trustee under Bankruptcy Rule 2004. However, seeking a Rule 2004 order in Chapter 15 proceedings is far from sufficient to create "related to" jurisdiction.

[4] Chapter 15 was enacted in October, 2005 and supplanted prior Section 304 of Title 11 relating to the recognition of foreign bankruptcy proceedings. While case law developed under Section 304 no longer directly controls Chapter 15 cases, courts have stated that it continues to inform determinations under Chapter 15 to a large extent. *See In re Iida*, 377 B.R. 243, 256 (B.A.P. 9th Cir. 2007).

*F/X Associates, Inc.*, 961 F.2d 341, 348-349 (2d Cir. 1992) (reference in Section 304 to "such estate" is to the <u>foreign</u> estate).

As stated in *Treco*, a proceeding under Section 304 (Chapter 15's predecessor) is "an ancillary case . . . not a full-fledged bankruptcy case." 227 B.R. at 349. Such proceeding "is not a bankruptcy that implicates the full range of procedural and substantive provisions applicable to domestic bankruptcies." *Koreag*, 961 F.2d at 358. Rather, "it is a limited [proceeding] designed to function in aid of a proceeding pending in a foreign court." *Universal Casualty & Surety Co., Ltd. v. Gee*, 53 B.R. 891, 896 (Bankr. S.D.N.Y. 1985). Thus, claims "in the nature of tort or contract claims" brought by a foreign debtor do not implicate the foreign debtor's assets in this country and do not give rise to federal "related to" jurisdiction. *See Treco*, 227 B.R. at 350.

Again, in *In re Artimm*, 335 B.R. 149 (Bankr. C.D. Cal. 2005), the court noted that "[t]he estate of a foreign debtor, for the purposes of § 304, is created and defined by the law of the jurisdiction in which the foreign case is pending." *Id.* at 158 (citing *Koreag*, 961 F.2d at 348, and *In re Thornhill Global Deposit Fund, Ltd.*, 245 B.R. 1, 10 (Bankr. D. Mass. 2000)); *see Smouha*, 136 B.R. at 929 ("a § 304 proceeding does not create a bankruptcy 'estate' that must be 'administered' by the court"); *In re Petition of Blackwell*, 267 B.R. 732, 739 (Bankr. W.D. Tex. 2001) ("Even though [foreign debtor] IGS has filed a § 304 proceeding, a § 304 proceeding does not create an estate under Title 11. . . . The actual estate is in the Cayman Islands, not the United States. Thus, we do not have subject matter jurisdiction over Ltd.'s claims merely because any recovery by Ltd. on its claims may potentially benefit the estate of IGS and its creditors"); *In re Wachsmuth*, 272 B.R. 766, 770 (Bankr. M.D. Fla. 2001) ("The limitation of this Court's power under § 304[] . . . does not include a suit to utilize state law to recover money or property even

though the transactions under consideration occurred in this State and even though the Defendants are residents and citizens of the State").

The conclusion that Section 304 (now, Chapter 15) proceedings do not support "related to" jurisdiction was most recently confirmed in *Marconi*, 363 B.R. 361, 366, an opinion issued by Judge Lynch, the New York federal judge handling the Refco securities litigation, the complex of cases to which these Defendants would like the present case transferred. In *Marconi*, the plaintiff brought suit in California state court against Marconi, his former employer, three years after the termination of his employment. However, subsequent to the plaintiff's termination, Marconi entered into a scheme of arrangement in England and, through an ancillary proceeding in the Southern District of New York, an injunction was issued giving effect in the U.S. to the foreign debtor's discharge. The California federal court, after removal, dismissed the case, finding it barred by the bankruptcy court's injunction. Plaintiff then refiled his case in the New York bankruptcy court, where it was dismissed for lack of subject matter jurisdiction. On appeal, Judge Lynch agreed that "related to" federal jurisdiction was absent because there was no estate to administer in the ancillary proceeding. Accordingly, the plaintiff's claims, although brought directly against Marconi in the ancillary proceeding, could have no conceivable effect on a bankruptcy estate and, therefore, did not support "related to" jurisdiction. *See Marconi*, 363 B.R at 362-63, 366.

Judge Lynch explained the nature of a Section 304 proceeding in Marconi as follows:

> [T]he filing of a § 304 petition "does not create a bankruptcy estate that must be 'administered' by the court." An ancillary proceeding under § 304 "is not a bankruptcy that implicates the full range of procedural and substantive provisions applicable to domestic bankruptcies." *Koreag*, 961 F.2d at 357. In such a proceeding, a bankruptcy court lacks the full range of jurisdiction that applies when the Court is seized of a domestic bankruptcy matter. As the Bankruptcy Court ruled in *Treco*, "to the extent that [an] action

preserves, protects or recovers property of the foreign debtor, we have jurisdiction under § 304 to adjudicate it.  By contrast *claims that are unrelated to the preservation or recovery of property in aid of a foreign proceeding are outside the ambit of our limited § 304 jurisdictional mandate.*"

*   *   *

Section 304 thus does not permit the filing by domestic creditors of adversary proceedings to establish claims against a foreign bankrupt.  Indeed, its very purpose is to centralize such proceedings (where the bankruptcy court determines that such centralization is appropriate) in the foreign court administering the bankruptcy.  To permit the filing of such actions under the rubric of the bankruptcy court's § 304 'matter' would defeat the entire purpose of that provision.

*   *   *

*[I]n a § 304 proceeding . . . there is no "estate being administered in bankruptcy" in the United States.  Accordingly, even under this quite expansive test, there is no basis for contending that . . . common-law tort and contract claims are related to any bankruptcy case.*

*Marconi*, 363 B.R. at 365-66 (citations omitted) (second emphasis added).

Just as in *Marconi*, Defendants' asserted indemnification rights here can have no conceivable effect on the SPhinX ancillary proceeding because there is no estate being administered and, therefore, this case is not "related to" the SPhinX ancillary proceeding for purposes of creating federal jurisdiction.  SPhinX's Chapter 15 proceedings simply cannot provide a basis for "related to" jurisdiction of the federal courts.

**B.  DPM and Aaron Chose to Assert Their Purported Indemnification Right in the Cayman Islands, and the Chapter 15 Proceeding Cannot Be Used as a Basis for "Related To" Jurisdiction**

Despite the limited nature of Chapter 15 proceedings, Defendants argue that the indemnification claim of Defendants DPM and Aaron against the SPhinX Funds "would

potentially diminish the estates and the amount available for creditors."[5] *See* Notice at 9. This argument, too, fails.

First, assuming *arguendo* that the DPM Defendants have a valid indemnification right against the SPhinX Funds (and they do not), where is the estate located that will be affected by that indemnification claim? The answer is clear: in the Cayman Islands, where the SPhinX Estates are administered by the Grand Court. The DPM Defendants' purported indemnification claim – even if proven valid – would have no effect whatever on a U.S. bankruptcy estate; it would only affect the estate in the Cayman Islands. As such, this purported indemnification claim cannot form the basis of related to subject matter jurisdiction in a United States court.

Second, there is an even more obvious reason why DPM Defendants indemnification claim cannot form the basis of related to jurisdiction. On November 29, 2007, DPM submitted, *in the Cayman Islands*, a "Proof of Debt," the vehicle for advancing a claim in a Cayman Island liquidation proceeding. *See* March 6, 2008 letter from Ritch & Conolly to Campbells (Ex. A to the accompanying Declaration of David J. Molton, dated May 16, 2008 ("Molton Decl.")). (Aaron also submitted an indemnification claim to the JOLs in the Cayman Islands.) The JOLs rejected the Proof of Debt in the Cayman Islands on March 6, 2008. *See id.* DPM then filed in the Cayman Court its "Points of Claim," contesting the JOLs' denial of DPM's indemnification claim. *See* April 25, 2008 Points of Claim (Ex. B to Molton Decl.) In its Points of Claim, DPM specifically references this case – "proceedings . . . commenced in the Superior Court of New Jersey by the Liquidators." *See id.* at 5, ¶ 13. Thus, the DPM Defendants asserted their indemnity claim in the court in which the affected estate is located – the Cayman Islands.

---

[5] Defendant Bank of New York Mellon Corporation does not assert an indemnification claim.

Finally, the DPM Defendants' contingent indemnity claim is, in any event, insufficient to establish "related to" jurisdiction. Plaintiffs allege intentional or grossly negligent wrongdoing against Defendants, claims that are not indemnifiable under the DPM Service Agreement or New York law. *See* Points of Claim (Ex. B to Molton Decl.) ¶ 11 ("Nothing contained herein shall require either party to indemnify the other for acts of the others, which constitute gross negligence, malfeasance or willful misconduct"). *See Austro v. Niagara Mohawk Power Corp.*, 66 N.Y.2d 674, 676, 496 N.Y.S.2d 410, 410 (1985) (indemnification agreements held unenforceable for public policy reasons "to the extent that they purport to indemnify a party from damages flowing from the intentional causation of injury"); *Gibbs-Alfano v. Burton*, 281 F.3d 12, 21 (2d Cir. 2002) (same). Therefore, the illusory potential of an indemnity claim is insufficient to create jurisdiction in the United States. *See Retirement Sys. v. JP Morgan Chase & Co.*, 285 B.R. 519, 529-31 (M.D. Ala. 2002) (holding that because potential indemnitee had to establish that it made no untrue statements or omissions to debtor, potential effect of third-party litigation on bankruptcy was too "speculative" and jurisdiction was denied).

In sum, SPhinX's Chapter 15 proceeding in New York cannot provide the basis for "related to" jurisdiction.

## II. THE PLUSFUNDS BANKRUPTCY CANNOT CREATE "RELATED TO" JURISDICTION OVER THIS CASE

### A. Because the PlusFunds Plan Has Been Approved, Bankruptcy Court Jurisdiction is Circumscribed and Cannot Support "Related To" Jurisdiction

Defendants contend that this case is related to PlusFunds' bankruptcy proceedings in the Southern District of New York. *See* Notice at 7-8. A brief review of the PlusFunds Plan of Liquidation quickly dispels any notion that that bankruptcy – now essentially complete – can form the basis of "related to" jurisdiction. (*See* Point II(B) below.)

As a foundational point, in the Third Circuit, bankruptcy court jurisdiction contracts materially upon the approval of a plan such as the confirmed PlusFunds Plan. Since the decision in *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1984), the courts in this Circuit have recognized limitations on federal bankruptcy jurisdiction. The generally recognized test for "related to" jurisdiction is whether "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Id.*, 743 F.2d at 994. That "there may be common issues of fact between a civil proceeding and a controversy involving the bankruptcy estate does not bring the matter within the scope of Section 1471(b)." *Id.*; *see In re Combustion Eng'g, Inc.*, 391 F.3d 190, 226 (3d Cir. 2004). Once a plan is confirmed, jurisdiction is far more limited: the "essential inquiry" is "whether there is a close nexus to the bankruptcy plan or proceeding sufficient to uphold bankruptcy court jurisdiction over the matter." *In re Resorts Int'l., Inc.*, 372 F.3d 154, 166-67 (3d Cir. 2004).

In line with these jurisdictional parameters, the Third Circuit has also held that "the possibility of recovering damages which could be used to fund a Plan is also an inadequate basis to provide jurisdiction." *Donaldson v. Bernstein*, 104 F.3d 547, 553 (3d Cir. 1997). And, the likelihood that the outcome of civil litigation "could alter the debtor's rights, liabilities, options or freedom of action" is greatly lessened upon the approval of the bankruptcy Plan. *See Resorts Int'l*, 372 F.2d at 164 ("At the most literal level, it is impossible for the bankrupt debtor's estate to be affected by a post-confirmation dispute because the debtor's estate ceases to exist once confirmation has occurred.") As the Third Circuit noted in *Donaldson*, "the jurisdiction of the bankruptcy courts must be confined within appropriate limits and does not extend indefinitely, particularly after the confirmation of a plan and the closing of a case." 104 F.3d at 553.

Thus, even if the present litigation could augment the PlusFunds estate – and, as shown below, this is absolutely not true – such augmentation would not form the basis of related to jurisdiction: "[I]f the mere possibility of a gain or loss of trust assets suffices to confer bankruptcy court jurisdiction, any lawsuit involving a continuing trust would fall under the 'related to' grant. Such a result would widen the scope of bankruptcy court jurisdiction beyond what Congress intended for non-Article III bankruptcy courts." *Resorts Int'l*, 372 F.3d at 170.

Here, the PlusFunds Plan of liquidation was confirmed by the bankruptcy court on August 7, 2007. *See* August 7, 2007 Confirmation Order, (Ex. C to Molton Decl.). In a post-confirmation context, the requisite "close nexus" to a bankruptcy case exists "when a matter affects the interpretation, implementation, consummation, execution, or administration of a confirmed plan or incorporated litigation trust agreement." *Resorts Int'l*, 372 F.3d at 168-69. Here, where the JOLs are bringing claims purchased from the PlusFunds estate for material consideration, the connection between these claims and the PlusFunds Plan and the PlusFunds post-confirmation litigation trust have been completely severed and such claims are no longer related to the Plus Funds bankruptcy case.[6]

**B.     Because PlusFunds' Litigation Claims Were Transferred to SPhinX, the Outcome of this Action Cannot Have any Conceivable Effect on the PlusFunds Estate or Administration of the PlusFunds Plan**

A cursory review of the PlusFunds Plan (Ex. D to Molton Decl.) confirms that this litigation is unrelated to PlusFunds' bankruptcy. Article VI(F) of the Plan discusses the SPhinX

---

[6] The recent decision in the Refco MDL by Judge Lynch supports and does not contradict this conclusion. In this decision, Judge Lynch found that "related to" jurisdiction did exist, in the post-confirmation context, because the claims transferred to the Refco Litigation Trust from the Refco estate and brought by the Refco Litigation Trustee involved the "implementation" and "execution" of the Refco plan and were, therefore, related to the Refco bankruptcy case. *In re Refco, Inc. Securities Litigation*, Case No. 07 MDL No. 1902 (S.D.N.Y. April 28, 2008). In the instant case, the PlusFunds-related claims are not being brought by a PlusFunds litigation trust but instead by the JOLs, as the representatives of a foreign bankruptcy estate which purchased the claims for $5 million and other consideration. Accordingly, the pursuit of these claims does not implicate the "interpretation, implementation, consummation, execution, or administration" of the PlusFunds Plan or any incorporated litigation trust agreement.

Trust. *See id,* Art. VI(F). Specifically, the Plan provides that the SPhinX Trust was created to liquidate certain assigned causes of action (the "Causes of Action") for the benefit of the SPhinX JOLs. *See id.,* Art. VI(F)(1). The Causes of Action were vested in the SPhinX Trust for the *exclusive benefit of the JOLs on behalf of the SPhinX funds.* Accordingly, neither the Debtor (PlusFunds) nor the General Trust created under the PlusFunds Plan will have any interest in such assets of the SPhinX Trust.[7]

The Plan also states that the SPhinX Trustee has the absolute discretion to pursue or not to pursue the Causes of Action that are vested in the Trust in the *exclusive best interest of the SPhinX Funds. See id.,* Art. VI(F)(4). No bankruptcy court approval is required for the SPhinX Trustee to prosecute, compromise or settle Causes of Action. *Id.* Art. VI(F)(5). The Plan further states that "neither the General Trust [nor] the SPhinX Trust shall be deemed a successor-in-interest of the Debtor for any purpose other than as specifically set forth in the Plan." *Id.* Art. VI(C). Moreover, each of the SPhinX Funds Trust Agreement and PlusFunds General Trust Agreement, attached as Exs. E and F to Molton Decl., confirms that the PlusFunds post-confirmation trusts are to operate free from bankruptcy court supervision. *See, e.g.,* Ex. E, SPhinX Trust Agreement ¶ 3.1(c). Further, the only assets left in the PlusFunds General Trust are the PlusFunds estate's "interest in the assets as of the Effective Date immediately *after* the Debtor has satisfied its payment and distribution obligations under the Plan, including [its obligation] to vest the Causes of Action in the SPhinX Trust." Ex. D, Art. I(B)(86) (emphasis added); *see* PlusFunds General Trust, Art. I (Ex. F to Molton Decl.). The only assets that PlusFunds retains are its own proofs of claim filed in the Refco bankruptcy cases, as well as

---

[7] Except to the extent that the General Trust may, but is not required to, use the Causes of Action for the sole purpose, as necessary, of defending, offsetting or objecting to claims. *See id.,* Art. VI(F)(2).

certain PlusFunds claims against specified agents.[8]  None of these claims is or can be asserted in this litigation.

Defendants further assert that the PlusFunds Plan retains federal subject matter jurisdiction "over disputes about whether the PlusFunds Estate 'owns' or has standing to assert a particular claim."  Notice at 8.  That is sophistry; no amount of interpretive gymnastics can transmute Plaintiffs' present claims into claims that are somehow owned by the PlusFunds estate. The Plan is clear and unambiguous.  Indeed, the same argument was advanced, and rejected, in *Resorts Int'l*.  There, the Third Circuit concluded that "*the debtor is not a party to this litigation because*, as stated, under Section 1.1 of the Litigation Trust Agreement, *it has assigned away its right, title, and interest in the litigation claims*."  372 F.3d at 170 (emphasis added).  That is *precisely* what PlusFunds did here; it assigned its claims to the SPhinX Trust in exchange for a payment in excess of $5 million.

Even if the PlusFunds Bankruptcy Court retained jurisdiction over proceedings that the SPhinX Trustee might initiate, it would not be dispositive of the jurisdictional issue.  As the Third Circuit made clear in *Resorts Int'l.*, "retention of jurisdiction provisions will be given effect, assuming there is bankruptcy court jurisdiction. . . .  Where a court lacks subject matter jurisdiction over a dispute, the parties cannot create it by agreement even in a plan of reorganization."  *Id.*, 372 F.3d at 161.

Defendants also argue that the SPhinX Trustee invoked the jurisdiction of the PlusFunds Bankruptcy Court in seeking pre-litigation discovery.  In October and December 2007, the

---

[8] These are clearly defined in the Plan and Term Sheet (of April 26, 2007) as (a) certain avoidance actions or preference actions against XRoads Solutions Group, LLC or Curtis, Mallet-Prevost, Colt & Mosle LLP, or (b) any claim arising after PlusFunds' petition date that PlusFunds may have against any of its officers, directors, employees, agents, representatives, attorneys, accountants, experts, professionals or agents for any actions taken or omitted to be taken arising out of or relating to the following: (i) PlusFunds' operations and/or administration of its bankruptcy case after the Petition Date; (ii) PlusFunds' Chapter 11 case; or (iii) the formulation, preparation, pursuit, etc. or consummation of the Plan and Disclosures Statement.

8184051v1

Trustee obtained two orders to conduct Bankruptcy Rule 2004 examinations pursuant the Bankruptcy Court's express reservation of jurisdiction to order discovery under Rule 2004. *See* Ex. D, Art VI(F)(5). However, that fact has no bearing on whether the PlusFunds Bankruptcy Court retained jurisdiction over this action. The Trustee's pursuit of Rule 2004 discovery in the PlusFunds bankruptcy does not establish the necessary "close nexus" between this case and the PlusFunds bankruptcy. *See In re Treco*, 227 B.R. at 348 ("plaintiffs make much of the fact that MIBL conducted discovery in this ancillary case regarding their efforts to market the Aircraft . . . even so, and as we explain below, that action cannot vest us with subject matter jurisdiction").

In conclusion, there is no "close nexus" between this action and the PlusFunds bankruptcy. This action does not require interpretation of the PlusFunds Plan in order to ascertain who owns these claims. Stated differently, the PlusFunds Plan is unambiguous in transferring these claims to the SPhinX Trust. This case is, in actuality, wholly separate from what remains of the PlusFunds bankruptcy, and that bankruptcy cannot provide the basis for federal jurisdiction Defendants seek.

## III.    THE REFCO BANKRUPTCY IS NOT EVEN REMOTELY RELATED TO THIS ACTION

### A.    This Case Can Neither Augment Nor Detract From The Refco Estate

An even more attenuated basis for "related to" jurisdiction advanced by Defendants is their claim that this action is somehow related to the Refco bankruptcy. Because Refco's Chapter 11 Plan (the "Refco Plan"), like that of PlusFunds, has been confirmed by the Refco Bankruptcy Court, this Court should focus on whether this action has a "close nexus" to the Refco bankruptcy. The issue does not require much analysis, as there is no connection whatever between the Refco bankruptcy and the present action. Plaintiffs do not make a claim against the Refco estate or a Refco debtor. This action does not involve any defendants who are also defendants in any Refco bankruptcy adversary proceeding or in the Refco securities litigation.

Still, Defendants insist that "a threshold determination that this Court will have to make is to whom each of the claims asserted in this action rightfully belong – the Plaintiffs, the Refco Litigation Trust, the Refco Private Action Trust, or some other party." Notice at 10. The Court, however, has no need to make such a determination. Plaintiffs are not seeking damages on behalf of any Refco debtor or creditor. As noted above, Defendants participated in wrongdoing that caused the loss of SPhinX's money. The fact that SPhinX's money was in the custody of a Refco debtor prior to Refco's bankruptcy does not somehow transform this case into an effort to vindicate Refco's rights. Moreover, the Refco Litigation Trustee is well aware of this action (and other actions filed by these Plaintiffs) and has made no objection to them. It is true that the present action involves allegations concerning fraud by certain Refco insiders. But, as the Third Circuit has stressed, "that there may be common issues of fact between a civil proceeding and a controversy involving the bankruptcy estate does not bring the matter within the scope of Section 1471(b)." *Pacor*, 743 F.2d at 994; *see also Steel Workers Pension Trust v. Citigroup, Inc.*, 295 B.R. 747, 750 (E.D. Pa. 2003); *In re Raimondo*, 2007 WL 2248068 at *7 (Bankr. D.N.J., July 31, 2007) (quoting *Pacor*).

The Refco Plan was confirmed by the Bankruptcy Court in the Southern District of New York on December 15, 2006. Thus, to establish federal jurisdiction on the basis of this post-confirmation case, Defendants must demonstrate a "'close nexus' to the bankruptcy plan or proceeding sufficient to uphold bankruptcy court jurisdiction over the matter." *Resorts Int'l.*, 372 F.3d at 166-67; *see Jazz Photo Corp. v. Kaplan & Gilman, LLP*, 2006 WL 2000230 at * 6 (D.N.J. July 17, 2006).

There is, however, no "close nexus" between this action and the Refco bankruptcy, and Defendants' bald assertion that this Court will somehow have to make a determination as to

whom Plaintiffs' present claims belong cannot support related to jurisdiction. If Plaintiffs prevail in this action or not, it will in no way augment or detract from the Refco estate.

**B.    This Action Does Not and Cannot Affect the Administration of the Refco Plan or Estate**

Citing the *Pacor* decision, Defendants also broadly assert that this action may "impact upon the handling and administration of the bankrupt [Refco] estate." Notice at 10. Defendants do not explain how. The Amended Complaint alleges damage to SPhinX, not to Refco. Defendants have not identified *any* provision or aspect of the Refco Plan that would be affected by this action, far less the requisite "close nexus" between this action and the Refco bankruptcy. They cannot do so.

\* \* \*

In conclusion, none of the proceedings suggested by Defendants – SPhinX, PlusFunds or Refco – can be used as a basis for "related to" jurisdiction over this action. This case represents straightforward state law damage claims against Defendants. The only effect this action can have on a bankruptcy estate is the effect it will have on the estate of the SPhinX Funds administered in the Cayman Islands. Because Defendants cannot show that an action which has an effect on a foreign insolvency proceeding can form the basis of United States federal court jurisdiction, this action must be remanded to the New Jersey Superior Court in which it was initially filed. *See Wal-Mart Stores, Inc. v. Electric Ins. Co.*, 2007 WL 137238 at \*3 (D.N.J. Jan. 18, 2007) (recognizing policy of "giving deference to a plaintiff's choice of forum and of resolving doubts against removal and in favor of remand").

## IV. EVEN IF THIS COURT CONCLUDES THAT IT HAS "RELATED TO" JURISDICTION, THE CASE SHOULD BE REMANDED TO THE STATE COURT ON THE BASES OF ABSTENTION OR EQUITABLE REMAND

Plaintiffs have shown that the Defendants cannot base subject matter jurisdiction on "related to" jurisdiction. Nevertheless, should the Court conclude that it has related to jurisdiction, principles of both permissive and mandatory abstention require remand.

### A. The Case Should Be Remanded Under Mandatory Abstention Principles

The factors for mandatory abstention under 28 U.S.C. § 1334(c)(2) are settled in this District:

1) A timely motion for abstention is made by a party in the proceeding;

2) The proceeding is based upon a state law claim or state law cause of action;

3) The proceeding is related to a case under title 11;

4) The proceeding does not arise under title 11;

5) The action could not have been commenced in a federal court absent jurisdiction under 28 U.S.C. § 1334; and

6) An action is commenced, and can be timely adjudicated, in a state forum of appropriate jurisdiction.

See In re Mid-Atlantic Handling Systems, LLC, 304 B.R. 111, 121 (Bankr. D.N.J. 2003) citing In re Donington, 194 B.R. 750, 757 (D.N.J. 1996); In re Kamine/Besicorp Allegany, LP, 214 B.R. 953, 974-75 (Bankr. D.N.J. 1997).

Each of these elements is easily met here. First, this motion is timely filed within the time allotted for remand following removal and pursuant to the Court's scheduling order. Second, this action is based entirely on state law claims. Third, this alternative motion for abstention is based on the supposition that this Court has found "related to" jurisdiction under Title 11. Fourth, removing Defendants have conceded that this action is non-core and thus that this proceeding does not arise under Title 11. Fifth, the action could not have been commenced

in the federal court absent jurisdiction under 28 U.S.C. § 1334; "related to" jurisdiction is the only ground for federal jurisdiction alleged by Defendants.

Finally, <u>sixth</u>, as evidenced by the accompanying Declaration of Steven B. Smith, this action can be timely adjudicated in the New Jersey Superior Court. *See* the accompanying Declaration of Steven B. Smith ("Smith Decl."), dated May 16, 2008. According to the New Jersey Judicial Council, which studies and makes recommendations for improving the administration of the New Jersey judicial system and, in turn, collects and issues comprehensive statewide statistics on the operation of the New Jersey courts, the generally accepted case processing time standards for Track IV civil cases in the New Jersey Superior Courts, such as this action (*see* Smith Decl. ¶ 6; Ex. D), is 24 months from the commencement of an action.[9] *See* Smith Decl. ¶¶ 5, 6; Ex. A at 58-59; Ex. C at III. Further, according to the State of New Jersey Judiciary Administrative Office of Courts' Quantitative Research Unit, the median time for resolution of jury trial civil cases in the County of Camden is just over two-and-a half years (30.88 months). *See* Smith Decl. ¶¶ 7, 8; Ex. E at I; Ex. F; *see also Mid-Atlantic Handling*, 304 B.R. at 125 ("[T]here is no reason to believe that this matter could not be timely adjudicated in the Superior Court of New Jersey").

Moreover, in this District, this sixth factor is informed by concepts of comity and judicial economy, which support the conclusion that state court is the proper forum for this dispute. *See Mid-Atlantic*, 304 B.R. at 125 ("notions of comity and judicial economy warrant a conclusion that the state court is the proper forum for adjudicating this dispute"). As in *Mid-Atlantic*, there is no reason to believe that the timing of this matter "will be short-circuited by having the federal

---

[9] In order to resolve as many cases as possible within these standards, the New Jersey judiciary has implemented backlog standards for virtually every case type, including Track IV civil cases, to ensure cases are being processed as quickly and efficiently as possible. *See* Smith Declaration, ¶ 6, n. 1; Ex. B at 7-8.

court adjudicate" it.  *Id.*  In addition, deference should be accorded to plaintiffs' choice of forum absent a clear demonstration by the removing defendants of federal subject matter jurisdiction. *See Stoe v. Flaherty*, 436 F.3d 209, 214 (3d Cir. 2005) ("out of deference to state courts and concern over the constitutional validity of the broad staturoty reach of bankruptcy court jurisdiction, Congress sought to give effect to the preferences of litigants who prefer a state forum, when state court adjudication would not unduly interfere with the administration of the estate").

Indeed, the removing Defendants have made no showing whatever that this action could not be "timely adjudicated" in the New Jersey Superior Court.  New Jersey authorities placed the burden in this connection on the removing Defendants – where it should be placed.  As stated in *Donington*, "[p]laintiff commenced the action in New Jersey Superior Court, *and the removing defendants have demonstrated no concrete reason* why the action could not be "timely adjudicated" in that forum."  194 B.R. at 757 (emphasis added).  For these reasons, should the Court conclude that it has related to jurisdiction, the test for mandatory abstention has been met and the case should be remanded to the New Jersey Superior Court on the basis of mandatory abstention.  "Section 1334(c)(2) is based on comity and, on its face, reflects a congressional judgment that a party who wishes to litigate a state claim in a state court, but finds himself in a federal court solely because the controversy is related to a bankruptcy, should be able to insist upon a state adjudication if that will not adversely affect the bankruptcy proceedings." *Stoe*, 436 F.3d at 214.

**B.    This Case is Equally Appropriate for Remand on the Basis of Permissive Abstention and Equitable Remand**

28 U.S.C. § 1334(c)(1) provides, in pertinent part, that "[n]othing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect

for State law, from abstaining from hearing a particular proceeding arising under Title 11 or arising in or related to a case under Title 11."

In this District, "[t]he equitable considerations relevant to determine the appropriateness of equitable remand and permissive abstention" under Sections 1452(b) and 1334(c)(1), respectively, are essentially identical, and therefore, a court's analysis is substantially the same for both types of relief. *Donington*, 194 B.R. at 759-60; *see also Mid-Atlantic Handling*, 304 B.R. at 126. In deciding whether to exercise discretion by permissively abstaining from a matter, the Court in this District considers the following:

(1)  The effect on the efficient administration of the bankruptcy estate;

(2)  The extent to which issues of state law predominate;

(3)  The difficulty or unsettled nature of the applicable state law;

(4)  Comity;

(5)  The degree of relatedness or remoteness of the proceeding to the main bankruptcy case;

(6)  The existence of the right to a jury trial; and

(7)  Prejudice to the involuntarily removed defendants.

*See Mid-Atlantic*, 304 B.R. at 126; *Donington*, 194 B.R. at 760.

Once again, each of these factors militates strongly in favor of remand. <u>First</u>, this litigation involves only contract and tort claims, the resolution of which will "neither significantly hinder nor materially advance the efficient administration of the bankruptcy estate" (*Donington*, 194 B.R. at 760) in either the PlusFunds or Refco bankruptcy proceedings or in the SPhinX liquidation in the Cayman Islands. <u>Second</u>, issues of state law clearly predominate because no federal claims are alleged. <u>Third</u> and <u>fourth</u>, the federal courts defer state-law based claims to the state courts, "which are better able to respond to such claims." *Donington*, 194

B.R. at 760. <u>Fifth</u>, assuming that there is "related to" jurisdiction, this action relates, at best, "only tangentially" to a foreign liquidation, the SPhinX proceedings in the Cayman Islands. As shown above, this action does not relate at all to either the PlusFunds bankruptcy or the Refco bankruptcy. <u>Sixth</u>, Plaintiffs have asserted a right to a jury trial. <u>Seventh</u>, there are no involuntarily removed defendants, so this factor is irrelevant.

For these reasons, assuming the Court finds the existence of related to jurisdiction, this case is well suited for remand to the New Jersey Superior Court based on the doctrines of permissive abstention and equitable remand.

## V. COURTS HAVE A THRESHOLD DUTY TO EVALUATE THEIR JURISDICTION

The Defendants, anticipating this Remand Motion, have filed a motion and accompanying memorandum of law (the "Stay Motion") seeking a stay of all proceedings pending a decision by the Judicial Panel on Multi-District Litigation ("JPMDL") on Defendants' application to transfer this case to the Southern District of New York. Plaintiffs are scheduled to file their opposition to Defendants' Stay Motion on or before June 2, 2008. Nonetheless, for the convenience of this Court, Plaintiffs will briefly summarize below the reasons why this Court should consider and decide this Remand Motion notwithstanding the Defendants' Stay Motion.

Defendants suggest that there exists a "general rule" favoring the stay of a remand motion when a transfer application is simultaneously pending before the JPMDL. *See* Defendants' Stay Mem. at 10. Indeed, they assert that "courts across the country have concluded that granting a stay pending resolution of a motion to transfer by the JPMDL is generally the most efficient use of judicial resources, whether or not the plaintiff has moved to remand." *See id.*

Defendants' argument is incorrect as a matter of law and their description of a purported trend among courts is inaccurate. Courts in the Third Circuit consider subject matter jurisdiction

as a paramount consideration. This is predicated upon the bedrock constitutional principle that federal courts have an overriding duty to assess subject matter jurisdiction at the outset of a case. *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 93-101 (1998) ("[w]ithout jurisdiction the court cannot proceed at all in any cause") (citations omitted); *Clark v. Pfizer*, 2004 U.S. Dist. LEXIS 17813, at \*4 (E.D. Pa. Sept. 4, 2004) ("This Court begins with the threshold issue of its own jurisdiction, the resolution of which obviates the need to consider Defendants' motion for a stay.").

Indeed, the general practice in the Third Circuit and elsewhere is contrary to Defendants' assertions. Courts, including this Court, have often remanded cases to state court, despite the pendency of JPMDL transfer applications. *See Group Hospitalization and Med. Serv. v. Merck-Medco Managed Care*, 295 F. Supp. 2d 457, 460 (D.N.J. 2003) (Simandle, J.) (granting plaintiff's motion to remand case to New Jersey Superior Court for lack of federal question jurisdiction, despite a conditional transfer order previously issued by the Judicial Panel on Multidistrict Litigation). This is consistent with the rules of the JPMDL, which specifically instruct that the filing of a transfer application does not affect or suspend "pretrial proceedings" or "in any way limit the pretrial jurisdiction of the district court in which the action is pending." *See* JPMDL R. 1.5.

One court in this District, consistent with many decisions in other districts, has followed the analytical framework set out in *Meyers v. Bayer AG*, 143 F. Supp. 2d 1044, 1049 (E.D. Wis. 2001), for determining motions to stay proceedings pending a JPMDL transfer decision, when there is a contemporaneous motion to remand. *See Nekritz v. Canary Capital Partners, LLC*, 2004 U.S. Dist. LEXIS 12473, at \*6 - \*7 (D.N.J. Jan. 12, 2004) (following the *Meyers* analytical framework) (cited in Defendants' Stay Mem. at 11, 15).

Under the *Meyers* framework, a court should first undertake a preliminary assessment of the jurisdictional issues. Then, "[i]f this preliminary assessment suggests that removal was improper, the court should promptly complete its consideration and remand the case to state court." *Meyers*, 143 F. Supp. 2d at 1049. When a remand motion "appears factually or legally difficult," the Court should then move to step two of its analysis – determining whether identical or similar jurisdictional issues have been raised in other cases that have been or may be transferred to the MDL proceeding. *See id.* "Only if the jurisdictional issue is both difficult and similar to or identical to those in cases transferred or likely to be transferred should the court proceed to the third step and consider the motion to stay." *Id.* The third step of the analysis involves a balancing test. The court asks whether granting the stay makes sense in light of the interests of judicial economy and the hardships to the moving party and non-moving party. *See id.* The first two steps of *Meyers* are often decisive and result in denial of the stay motion and adjudication of the remand motion.

## A.      Removal Was Improper

The first step of the *Meyers* framework is to take a "preliminary" look at the merits of the Remand Motion. Deciding the Remand Motion in this case will be relatively easy, as demonstrated above, because Defendants have improperly removed this case to federal court. There is simply no related to jurisdiction in this matter: Plaintiffs' claims can have no conceivable effect on the Refco or PlusFunds bankruptcy estates, and the only estate that can possibly be affected is the SPhinX liquidation in the Cayman Islands, which cannot give rise to United States federal jurisdiction. Even so, abstention would be appropriate and mandatory under the factors discussed above.

There is, thus, no reason to reach the second step of the *Meyers* framework. The Court should either remand the case to state court or abstain from exercising federal jurisdiction.

**B. The New Jersey Action and the New York Action Raise Different Factual and Legal Issues**

However, if the Court believes the remand motion raises difficult issues, it should then go to the second step of the *Meyers* analysis, which asks whether other courts are facing or are likely to face similar jurisdictional issues in cases that have been or may be transferred to a multidistrict proceeding. This Remand Motion and the remand motion filed by Plaintiffs in New York (the "New York Action") do both raise questions of "related to" jurisdiction, but that is where the similarities end.

In contrast to this case, where only the existence of "related to" jurisdiction is in dispute, in the New York Action, one of the removing defendants (BAWAG) has asserted that the bankruptcy court has core jurisdiction over Plaintiffs' claims and has asked that the proceedings be referred to the bankruptcy court. Moreover, these Defendants are not named in the New York Action, nor have these Defendants been named in any of Refco-related actions that have been transferred by the JPMDL to the Southern District of New York. *See In re Refco Sec. Litig.*, 530 F. Supp. 2d 1350 (J.P.M.L. 2007).

Still more, the claims asserted in the New York Action are materially different from the claims asserted in this case. Plaintiffs' claims in the New York Action, with certain exceptions, revolve around other defendants' aiding and abetting fraud and breach of fiduciary duty in violation of New York law. In contrast, in this case, the DPM entities and the successor DPM-Mellon entities were the administrators of the SPhinX funds pursuant to contract. Defendant Robert Aaron was a director of the SPhinX funds. Aaron was also founder, CEO, part owner and member of the board of directors of the DPM entities. Defendant Guy Castronova was President, part owner and member of the board of directors of the DPM entities. Accordingly,

Plaintiffs' have direct claims against Defendants for breaches of contractual, fiduciary and other duties under New Jersey law.

As such, this is not a case where the jurisdictional issue raised in the Remand Motion is similar or identical to the jurisdictional issues that will be decided in the New York Action. Staying consideration of, and decision on, the Remand Motion will not conserve judicial resources. On the contrary, a stay would only delay Plaintiffs and, assuming Defendants are successful in their transfer application to the JPMDL, multiply the burden of the transferee court in the Southern District of New York.

### C.    The Balancing Test Does Not Support a Stay

Even if this Court finds the first two steps of the *Meyers* analysis have been satisfied, the third step of the framework tips decidedly against a stay and in favor of deciding Plaintiffs' remand motion – evaluation of the interests of judicial economy and the balance of hardships to the proponent and opponent of the stay. *See Meyers*, 143 F. Supp. 2d at 1049.

#### 1.    Judicial Economy Does Not Favor a Stay

Defendants assert that a stay would conserve judicial resources, but in truth judicial economy would be better served by a prompt ruling on the Remand Motion. As demonstrated above, the jurisdictional issues raised by this Remand Motion and the remand motion in the New York Action are not similar or identical. A stay followed by a transfer would not conserve judicial resources, but would only multiply the burden on the transferee court.

#### 2.    The Balance of Hardships Favors Plaintiff

Defendants argue that they would be prejudiced by a denial of their stay motion. Specifically, they contend that, absent a stay, they would be required to litigate similar issues of bankruptcy jurisdiction in two different district courts and would be subject to the risk of inconsistent results. But this argument is without merit.

The briefing schedule agreed to by the parties calls for the Remand Motion to be briefed on a parallel track with the Stay Motion. Both will be fully briefed and submitted to the Court by June 20, 2008. In contrast, the JPMDL transfer determination will follow a much longer time course. A conditional transfer order issued on May 8, 2008. A notice of opposition will be filed by Plaintiffs by May 23, 2008 and a motion to vacate the conditional transfer order and supporting brief will be filed by June 9, 2008. Thereafter, Defendants will have until June 30, 2008 to file an opposition, if any. Plaintiffs will subsequently have until July 7, 2008 to file a reply brief. It is possible that oral argument will not have occurred until September. Therefore, the JPMDL will not hear and decide the transfer request until the fall. Thus, the parties will have already fully "litigated" the Remand Motion in this Court before the case could even get to New York. If anything, a stay would force the parties to rebrief the same issues over again before the transferee court, taking into account any differences in applicable law, assuming the JPMDL grants the transfer application.

Moreover, Defendants' purported fear of prejudice from potential "inconsistent rulings" has no basis. *These Defendants are not defendants in the New York Action.* Defendants essentially ask this Court to presume that they will be brought into the New York Action as third parties in the future and, further, that there will be rulings in the New York Action contrary to the rulings of this Court. Under these circumstances, there is nothing unfair or prejudicial in allowing two courts to decide these very different remand motions based on distinct facts involving different defendants.

On the other side of the prejudice equation, a stay would lead to substantial delay for the Plaintiffs and would mean that the remand motion would be heard in Defendants' preferred forum rather than the forum chosen by the Plaintiffs. Indeed, given the complexity of the

JPMDL transfer motion, and the potential need to re-brief the remand motion in the Southern District of New York, a remand decision by the transferee court could be postponed until the end of 2008.

On balance, both the interests of judicial economy and the prejudice to the Plaintiffs outweigh any prejudice to the Defendants from denying the Stay Motion and proceeding to a prompt decision on the Remand Motion.

## Conclusion

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their Motion for Remand and/or Abstention, and that in any order issuing from this Court, the Court specifically states that the remand to the New Jersey Superior Court is based on the ground of a lack of subject matter jurisdiction.

Dated: New York, New York
      May 16, 2008

Respectfully submitted,

**BROWN RUDNICK BERLACK ISRAELS LLP**

By:   s/ David J. Molton
David J. Molton (DM-1106)
Steven B. Smith (SS-5906)
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
dmolton@brownrudnick.com
ssmith@brownrudnick.com
        - and -

**BEUS GILBERT PLLC**
Leo R. Beus (not a member of the New Jersey Bar)
Dennis K. Blackhurst (not a member of the New Jersey Bar)
4800 North Scottsdale Road, Suite 6000
Scottsdale, Arizona 85251
Telephone: (480) 429-3000
Facsimile: (480) 429-3100
lbeus@beusgilbert.com
dblackhurst@beusgilbert.com
*Co-Counsel for Plaintiffs*

8184051v1

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------ x
In re:                                                                    :    Chapter 11
                                                                              :
PLUSFUNDS GROUP, INC.,                                      :    Case No. 06-10402 (JMP)
a Delaware corporation,                                          :
                                                                              :
                                  Debtor.                             :
------------------------------------------------------------------ x

### FIFTH AMENDED PLAN OF LIQUIDATION OF PLUSFUNDS GROUP, INC. UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE

**CURTIS, MALLET-PREVOST,  COLT & MOSLE LLP**

Steven J. Reisman (SR 4906)
L.P. Harrison 3rd (LH 5540)
Jerrold L. Bregman (JB 0784)
101 Park Avenue
New York, New York  10178-0061
Telephone:  (212) 696-6000
Facsimile:  (212) 697-1559

Attorneys for PlusFunds Group, Inc.

Dated:  June 28, 2007
            New York, New York

## Table of Contents

Page #

ARTICLE I.  DEFINED TERMS, RULES OF INTERPRETATION,  COMPUTATION OF TIME AND GOVERNING LAW .......................................................................... 1

    A.   Rules of Interpretation, Computation of Time and Governing Law ...................................... 1
    B.   Defined Terms ........................................................................................................................ 1

ARTICLE II.  ADMINISTRATIVE CLAIMS, PROFESSIONAL FEES AND PRIORITY TAX CLAIMS ................................................................................. 11

    A.   Introduction ......................................................................................................................... 11
    B.   Administrative Claims Other Than Professional Fee Claims .............................................. 11
    C.   Professional Fee Claims ...................................................................................................... 12
    D.   Priority Tax Claims ............................................................................................................. 12

ARTICLE III.  CLASSIFICATION AND TREATMENT OF  CLASSIFIED CLAIMS AND EQUITY INTERESTS ........................................................................ 12

    A.   Summary ............................................................................................................................. 12
    B.   Classification and Treatment of Claims Against the Debtor ............................................... 13

ARTICLE IV.  ACCEPTANCE OR REJECTION OF THE PLAN ................................................ 14

    A.   Voting Classes .................................................................................................................... 14
    B.   Acceptance by Impaired Classes ........................................................................................ 14
    C.   How to Vote ........................................................................................................................ 15
    D.   Confirmation Hearing ......................................................................................................... 15

ARTICLE V.  EFFECT OF CONSUMMATION ........................................................................... 15

    A.   Vesting of Cash and Assets in the Trusts ........................................................................... 15
    B.   Establishment of the Trusts ................................................................................................ 16
    C.   Securities Laws ................................................................................................................... 16
    D.   Authority to Effectuate Plan ............................................................................................... 16
    E.   Post-Confirmation Status Report ....................................................................................... 16
    F.   Binding Effect .................................................................................................................... 16
    G.   Limitation of Liability ........................................................................................................ 17
    H.   General Release .................................................................................................................. 17
    I.   Injunction ........................................................................................................................... 18
    J.   Terms of Existing Injunctions or Stays .............................................................................. 18
    K.   Good Faith .......................................................................................................................... 18

ARTICLE VI.  IMPLEMENTING THE PLAN ............................................................................. 18

    A.   Generally ............................................................................................................................ 18
    B.   Funding of the Plan ............................................................................................................ 19
    C.   Post Confirmation Estate .................................................................................................... 19
    D.   Assignment of Policyholder Interests ................................................................................ 19
    E.   PlusFunds General Trust .................................................................................................... 19
    F.   The SPhinX Trust ............................................................................................................... 22
    G.   Exculpation ........................................................................................................................ 24

ARTICLE VII.  TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................................................................................. 24

    A.   Rejection of Executory Contracts and Unexpired Leases ................................................... 24
    B.   Claims Based on Rejection of Executory Contracts or Unexpired Leases .......................... 25

ARTICLE VIII.  PROVISIONS GOVERNING DISTRIBUTIONS ............................................. 25

    A.   Distributions for Claims Allowed as of the Effective Date ................................................ 25

i

B.    Distributions; Preservation of Causes of Action; Closing the Chapter 11 Case ................. 25
C.    Manner of Payment and Transfer Tax................................................................................. 26
D.    Transmittal of Distributions to Parties Entitled Thereto ..................................................... 26
E.    Disputed Claims and Unclaimed Property ......................................................................... 26
F.    Setoffs ................................................................................................................................ 27
G.    Vesting Of Remaining Assets ............................................................................................ 27
H.    Corporate Action ............................................................................................................... 28
I.    No Release ......................................................................................................................... 28
J.    DeMinimis Payments and Distributions............................................................................. 28

ARTICLE IX.  PROCEDURES FOR RESOLVING DISPUTED CLAIMS.......................................... 28

A.    Prosecution of Objections to Claims .................................................................................. 28
B.    Estimation of Claims.......................................................................................................... 29
C.    Cumulative Remedies ........................................................................................................ 29

ARTICLE X.  CONDITIONS PRECEDENT TO CONFIRMATION  AND
CONSUMMATION OF THE PLAN ..................................................................... 29

A.    Conditions Precedent to Confirmation and Consummation................................................. 29
B.    Effect of Non-Occurrence of Conditions to Consummation ............................................... 30
C.    Notice of Effective Date and Second Administrative Bar Date ........................................... 30

ARTICLE XI.  RETENTION OF JURISDICTION.................................................................... 30

ARTICLE XII.  MISCELLANEOUS PROVISIONS ................................................................. 32

A.    Post Effective Date Disposition of Debtor Entity .............................................................. 32
B.    Post Effective Date Disposition of PFG-LLC and SPhinX Onshore ................................... 32
C.    Payment of Statutory Fees.................................................................................................. 32
D.    Modification of Plan .......................................................................................................... 33
E.    Professional Fee Claims ..................................................................................................... 33
F.    Successors and Assigns ...................................................................................................... 33
G.    Reservation of Rights ......................................................................................................... 33
H.    Further Assurances ............................................................................................................ 33
I.    Retiree Benefits ................................................................................................................. 33
J.    Notices............................................................................................................................... 34
K.    Filing of Additional Documents......................................................................................... 34
L.    Enforceability .................................................................................................................... 34
M.    Document Retention........................................................................................................... 34
N.    Conflict.............................................................................................................................. 35
O.    Headings............................................................................................................................ 35
P.    Severability ....................................................................................................................... 36

Pursuant to Chapter 11 of the Bankruptcy Code (defined below), PlusFunds Group, Inc., the debtor and debtor-in-possession in the above-captioned Chapter 11 case, respectfully proposes this Plan of Liquidation.

Reference is made to the Disclosure Statement accompanying the Plan, including the exhibits thereto, for a discussion of the Debtor's history, business, assets, and for a summary and analysis of this Plan. All Holders of Claims should read the Disclosure Statement and the Plan carefully – and consult with their legal counsel and other advisors of their choosing – before voting to accept or reject the Plan.

## ARTICLE I.

## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW

### A.     Rules of Interpretation, Computation of Time and Governing Law

1.      For purposes of the Plan: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and each pronoun, whether stated in the masculine, feminine or neuter gender, shall include the masculine, feminine and the neuter gender; (b) any reference in the Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference in the Plan to an existing document or exhibit Filed, or to be Filed, shall mean such document or exhibit, as it may have been or may be amended, modified or supplemented; (d) unless otherwise specified, all references in the Plan to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to the Plan; (e) the words "herein" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles and Sections are inserted for reference only and are not intended to be a part of or to affect the interpretation of the Plan; (g) the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply hereto; and (h) any term used in capitalized form in the Plan that is not defined herein but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to such term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

2.      In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

3.      Except to the extent that the Bankruptcy Code or Bankruptcy Rules are applicable, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, for contracts that are entered into and to be performed within New York, without giving effect to the principles of conflict of laws thereof.

### B.     Defined Terms

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form in the Plan:

1.      "Accounts Receivable" means the Debtor's interest in amounts owing to the Debtor for value provided by the Debtor but only to the extent listed in Exhibit 4 hereof.

1

2.      "Administrative Claim" means a Claim for costs and expenses of administration under Section 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate and operating the business of the Debtor; (b) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses awarded or allowed under Section 330(a) or 331 of the Bankruptcy Code; (c) all fees and charges assessed against the Estate under 28 U.S.C. §§ 1911-1930; and (d) all obligations designated as Allowed Administrative Claims pursuant to an order of the Bankruptcy Court.

3.      "Administrative Claims Bar Date" means September 22, 2006 at 4:00 p.m. (prevailing Eastern Time), the date set by the Bankruptcy Court as the last day for filing all requests for payment of Administrative Claims incurred or accruing on or before August 31, 2006, other than those Administrative Claims expressly excluded therefrom pursuant to the Order entered August 29, 2006.

4.      "Advisory Board" means the trust advisory board provided for in the SPhinX Trust Agreement, which shall have oversight function with respect to the SPhinX Trust.

5.      "Allowed" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that has been scheduled by the Debtor in its Schedules as other than disputed, contingent or unliquidated and as to which the Debtor or other party in interest has not Filed an objection on or before the 365th day after the Effective Date or such further date set by the Bankruptcy Court; (b) a Claim Filed by the Bar Date or Administrative Bar Date, as applicable, which is neither contingent nor unliquidated, and as to which no party in interest has filed an objection or motion to estimate such Claim on or before the 365th day after the Effective Date or such further date set by the Bankruptcy Court; (c) a Claim that has been allowed by a Final Order; (d) a Claim that is allowed: (i) in any stipulation of amount and nature of Claim executed by the Debtor prior to the Effective Date and approved by the Bankruptcy Court; (ii) in any stipulation of amount and nature of Claim executed by the Trustee or the Debtor, as the case may be, on or after the Effective Date and, to the extent necessary, approved by the Bankruptcy Court; (iii) in any stipulation of amount and nature of any Administrative Claim, Priority Claim or Priority Tax Claim executed by the Debtor or the Trustee and, to the extent necessary, approved by the Bankruptcy Court; or (iv) in any stipulation of amount and nature of any Assumed Disputed Claim executed by the Trustee or the Debtor, as the case may be, and the JOLs or SPhinX Trustee, as the case may be, and any holders of any of the Assumed Disputed Claims, (e) a Claim relating to a rejected executory contract or unexpired lease that either (i) is not a Disputed Claim or (ii) has been allowed by a Final Order, in either case only if a proof of Claim has been Filed by the Bar Date or Administrative Bar Date or Second Administrative Bar Date, as applicable, or has otherwise been deemed timely Filed under applicable law; or (f) a Claim that is allowed pursuant to the terms of this Plan.

6.      "Allowed Claim" means a Claim that has been Allowed.

7.      "Assets" means all property of the Estate described in Section 541 of the Bankruptcy Code, including, without limitation, Cash, Intellectual Property Rights, D&O Coverage, Causes of Action, Documents, claims, furniture, fixtures, equipment, accounts, chattel paper, deposits, deposit accounts, reserves, contractual rights, improvements, privileges, easements, leases, subleases, licenses, supplies, and other general intangibles of any nature.

8.      "Assumed Disputed Claims" means the Disputed Administrative Claims consisting of approximately $900,000 of Administrative Claims filed by Fund Managers of non-U.S.-based SPhinX Funds against the Debtor, as set forth in Exhibit C of the Plan Term Sheet, for such Fund Managers' unpaid management fees, and up to approximately $400,000 of Administrative Claims asserted by S&P.

2

9.      "Avoidance Actions" mean all claims and causes of action which the Debtor has or had arising under any of Sections 510, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code, including, without limitation, the Preference Claims.

10.      "Ballot Date" means the date stated in the Voting Instructions by which all Ballots must be received, which date shall be July 30, 2007 at 4:00 p.m. (prevailing Eastern Time).

11.      "Ballots" mean the ballots upon which Holders of Claims shall indicate their acceptance or rejection of the Plan in accordance with the Plan and the Voting Instructions.

12.      "Bankruptcy Code" means Title I of the Bankruptcy Reform Act of 1978, as amended from time to time, as set forth in Sections 101 *et seq.* of Title 11 of the United States Code, and applicable portions of Titles 18 and 28 of the United States Code.

13.      "Bankruptcy Court" means the United States District Court for the Southern District of New York having jurisdiction over the Debtor's Chapter 11 Case and, to the extent of any reference made pursuant to Section 157 of Title 28 of the United States Code and/or the General Order of such District Court pursuant to Section 151 of Title 28 of the United States Code, the bankruptcy court unit of such District Court.

14.      "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 11 Case, promulgated under 28 U.S.C. § 2075 and the Local Rules of the Bankruptcy Court.

15.      "Bar Date" means May 15, 2006, the date set by the Bankruptcy Court as the last day for filing a proof of a Claim arising prior to the Petition Date against the Debtor in the Chapter 11 Case, other than those Claims expressly excluded therefrom pursuant to the Order approving the Bar Date.

16.      "Business Day" means any day, other than a Saturday, Sunday or legal holiday (as defined in Bankruptcy Rule 9006(a)).

17.      "Cash" means cash and cash equivalents, including, but not limited to, bank deposits, wire transfers, checks, and readily marketable securities, instruments and legal tender of the United States of America.

18.      "Causes of Action" means, except for the Retained Assets, all of the Debtor's legal and equitable interests in any claim (as defined in Section 101(5) of the Bankruptcy Code) against any Entity, including, without limitation, the right to recover anything of value in respect of (a) any Avoidance Action, (b) any Indemnity Claim, (c) any Preference Claim, (d) any Director Claim, (e) the S&P Adversary Proceeding, (f) the D&O Coverage, (g) Refco Non-Debtor Claims, (h) Other Claims, (i) the Excess Refco Recovery and (j) any claim against the SPhinX Funds or the JOLs in their capacity as such, other than the right to enforce the Plan Term Sheet, the SPhinX License, the Plan and the Confirmation Order, which Causes of Action are to be assigned to and vested in the SPhinX Trust pursuant to the Plan. For the avoidance of doubt, the Causes of Action do not include the Retained Assets.

19.      "Certain PlusFunds' Claims Against Its Agents" means any (a) Avoidance Actions or Preference Claims against XRoads Solutions Group, LLC or Curtis, Mallet-Prevost, Colt & Mosle LLP, or (b) any claim (as defined in Section 101(5) of the Bankruptcy Code), arising after PlusFunds' Petition Date, that PlusFunds may have against any of its officers, directors, employees, consultants, agents, representatives, attorneys, accountants, financial advisors, lenders, experts, or professionals and agents of the foregoing, for any actions taken or omitted to be taken arising out of or relating exclusively to the

3

following:  (i) PlusFunds' operations and/or administration of its bankruptcy case after the Petition Date; (ii) PlusFunds' Chapter 11 case; or (iii) the formulation, preparation, pursuit, dissemination, implementation, administration, confirmation, or consummation of the Plan and Disclosure Statement.

20.    "Chapter 11 Case" means the case commenced under Chapter 11 of the Bankruptcy Code by the Debtor on the Petition Date, styled *In re PlusFunds Group, Inc.*, Case No. 06-10402 (JMP), currently pending before the Bankruptcy Court.

21.    "Claim" means a claim (as defined in Section 101(5) of the Bankruptcy Code) against the Debtor, including, but not limited to:  (a) any right to payment from the Debtor whether or not such right is reduced to judgment, liquidated, unliquidated, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (b) any right to an equitable remedy for breach of performance if such performance gives rise to a right of payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

22.    "Class" means a category of Holders of Claims or Equity Interests as set forth in Article III of the Plan.

23.    "Confirmation" means the entry of the Confirmation Order, subject to the conditions specified in Article XI of the Plan having been (a) satisfied or (b) waived pursuant to Article XI.

24.    "Confirmation Date" means the date upon which the Confirmation Order is entered by the Bankruptcy Court on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

25.    "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code.

26.    "Consummate" or "Consummation" means the occurrence of or to achieve the Effective Date.

27.    "Contingent Claim" means a Claim that has accrued but nonetheless remains dependent on the occurrence of a future event that may never occur.

28.    "Creditor" means any Holder of a Claim against the Debtor.

29.    "Creditor Distributable Assets" means all interests in the Remaining Assets and proceeds thereon held or generated by the General Trust net of the expenses of administering the General Trust, including, without limitation, the fees and expenses of the Trustee and his/her professionals.

30.    "Debtor" means PlusFunds Group, Inc.

31.    "Debtor in Possession" means the Debtor as debtor-in-possession in the Chapter 11 Case pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

32.    "DIMAs" means the discretionary investment management agreements between the Debtor and the various Fund Managers pursuant to which the Debtor delegated certain of its investment management authority over the SPhinX Funds' segregated investment portfolios to the Fund Managers.

33.    "Director Claim" means any right the Debtor or the SPhinX Trust may have to pursue any action against any past or present director of the Debtor, including, without limitation, claims, if any,

4

for breach of contract, breach of fiduciary duty, negligence, fraud, conspiracy, malice, willful misconduct or dereliction of duty.

34.    "D&O Coverage" means any right the Debtor or the SPhinX Trust may have to insurance coverage in respect of any claims, defense costs, losses, or similar matters that are suffered or payable by the Debtor or any of its officers and directors, under any insurance policies, including any policy issued by Westchester Surplus Lines Insurance Company, Illinois Union Insurance Company, INA Surplus Insurance Company, or any other Entity, and any professional liability coverage.

35.    "Disclosure Statement" means the Disclosure Statement with Respect to the Fifth Amended Plan of Liquidation of PlusFunds Group, Inc., dated June 28, 2007, as amended, supplemented, or modified from time to time, describing this Plan.

36.    "Disclosure Statement Hearing" means the hearing at which the Bankruptcy Court is to consider whether the Disclosure Statement contains adequate information for solicitation purposes within the meaning of Section 1125 of the Bankruptcy Code.

37.    "Disputed" means, with respect to any Claim or Equity Interest, any Claim or Equity Interest: (a) listed on the Schedules as unliquidated, disputed or contingent; or (b) as to which the Debtor or any other party in interest has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules or is otherwise disputed in accordance with applicable law, which objection, request for estimation or dispute has not been withdrawn or determined by a Final Order.

38.    "Distribution" means any consideration to be distributed to any Entity under Article IX of the Plan.

39.    "Distribution Dates" means collectively the Initial Distribution Date, any Subsequent Distribution Date and the Final Distribution Date.

40.    "Distribution Record Date" means the close of business on the Business Day immediately preceding the Effective Date.

41.    "Documents" means all of the Debtor's books, records, agreements, correspondence, offering memoranda, email, and other documents concerning its business of which it was in possession as of the Petition Date.

42.    "Effective Date" means the date selected by the Debtor that is a Business Day after the Confirmation Date on which all conditions specified in Article XI.B of the Plan have been satisfied or waived.

43.    "Entity" means an entity as defined in Section 101(15) of the Bankruptcy Code.

44.    "Equity Interest" means any equity interest in the Debtor, including, but not limited to, all issued, unissued, authorized or outstanding shares or stock, together with any warrants, options or contract rights to purchase, acquire or sell such interests at any time.

45.    "Estate" means the estate of the Debtor in the Chapter 11 Case, created pursuant to Section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

5

46.    "Excess Refco Recovery" means any recovery on account of the Refco Proofs of Claim solely to the extent that the Refco Proofs of Claim are allowed against the Refco Debtors in an amount in excess of $7 million.

47.    "File" or "Filed" means to file, or to have filed, a document with the Bankruptcy Court.

48.    "Final Decree" means the decree contemplated under Bankruptcy Rule 3022.

49.    "Final Distribution Date" means the date of the last payment to Holders of Allowed Claims in accordance with the Plan.

50.    "Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek *certiorari* has expired and no appeal or petition for *certiorari* has been timely taken, or as to which any appeal that has been taken or any petition for *certiorari* that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought.

51.    "Fund Managers" means third-party managers selected by S&P to whom the Debtor delegated certain of its investment management authority with respect to the SPhinX Funds' segregated investment portfolios pursuant to the DIMAs.

52.    "General Trust" means the "General Creditor Trust" within the meaning of the Plan Term Sheet, namely, the liquidating trust established under the Plan for the exclusive benefit of the Holders of Allowed Claims in Class 4.

53.    "General Trust Agreement" means the agreement, substantially in the form annexed as Exhibit 1 hereto, as it may be subsequently modified, pursuant to which the General Trust is to be created and governed.

54.    "General Unsecured Claim" means any Unsecured Claim against the Debtor that is not entitled to priority under Section 507(a) of the Bankruptcy Code.

55.    "HFI IP" means the intellectual property comprising the S&P Hedge Fund Index and certain other intellectual property that the Debtor may have the right to purchase pursuant to the option granted to the Debtor under the S&P License Agreement and other agreements with S&P.

56.    "Holder" means an Entity holding a Claim or Equity Interest.

57.    "IMAs" means the investment management agreement, as amended and modified, between the Debtor and the various SPhinX Funds pursuant to which the Debtor provided investment management services to the SPhinX Funds.

58.    "Impaired" means with respect to a Claim or Class of Claims, a Claim or Class of Claims that is impaired within the meaning of Section 1124 of the Bankruptcy Code.

59.    "Indemnity Claim" means any right the Debtor may have to be indemnified for any claims or losses for any reason from any Entity, including, without limitation, any of the SPhinX Funds, SMF-LP, SIF-LP, PFG-LLC, and SPhinX-Onshore.

6

60.    "Initial Distribution Date" means the first date upon which the initial Distribution shall be made to the Holders of Allowed Claims in Class 4, which shall be as soon as possible as determined by the Trustee in the exercise of the Trustee's business judgment.

61.    "Insider" means an insider of the Debtor, as defined in Section 101(31) of the Bankruptcy Code.

62.    "Intellectual Property Rights" means the PlusFunds Intellectual Property, as defined in Paragraph 8 of the Wind-Down Agreement, including the HFI IP and the OTC License, plus any and all other intellectual property owned by the Estate as of the Effective Date, including, without limitation, Transaction Data.

63.    "Investors" means the holders of Investor Claims.

64.    "Investor Claims" means the timely filed General Unsecured Claims filed by various investors in the SPhinX Funds and the U.S.-based funds that were part of the SPhinX Funds platform, in their capacity as investors, estimated, collectively, at approximately $274 million, as set forth in Exhibit 5 hereto.

65.    "IRS" means the Internal Revenue Service of the United States Department of the Treasury.

66.    "JOLs" means the Joint Official Liquidators of the Cayman Islands-based SPhinX Funds.

67.    "Lien" means any charge against or interest in property (including, but not limited to, any mortgage, lien, pledge, charge, security interest, encumbrance or other security device of any kind) to secure payment of a debt or performance of an obligation.

68.    "Liquidating Debtor" means the Debtor on and after the Effective Date.

69.    "Non-SPhinX Claims" means Allowed General Unsecured Claims other than the SPhinX Claim.

70.    "Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction.

71.    "OTC License" means all of the rights and interests that the Debtor acquired pursuant to the settlement agreement, dated September 2, 2005, between the Debtor and OTC, Inc. and parties related to OTC.

72.    "Other Claims" means, collectively, all additional Causes of Action that PlusFunds may have, including, without limitation, claims against Bank fur Arbeit und Wirtschaft (BAWAG), DMP Mellon, PricewaterhouseCoopers, the former officers and directors of the SPhinX Funds and the Refco entities, including, without limitation, Phillip Bennett and Robert Trosten, and possibly others.

73.    "Petition Date" means March 6, 2006, the date on which the Debtor filed its voluntary petition for relief commencing the Chapter 11 Case.

74.    "PFG-LLC" means PlusFunds GP LLC, a Delaware limited liability company, of which the Debtor is the managing member.  PFG-LLC is the general partner of SMF-LP and SIF-LP.

7

75.    "Plan" means the Chapter 11 Plan of Liquidation, including any exhibits and schedules thereto, either in its present form or as it may be altered, amended, modified or supplemented from time to time in accordance with the Plan, the Bankruptcy Code and the Bankruptcy Rules.

76.    "Plan Objection Deadline" means July 30, 2007 at 4:00 p.m. (prevailing Eastern Time), the deadline established by the Bankruptcy Court for filing and serving objections to Confirmation of the Plan.

77.    "Plan Supplement" means the documents that supplement the Disclosure Statement and Plan which may contain, among other things, the Debtor's financial projections and other documents, and identifies the SPhinX Trustee, to be filed by the Debtor at or prior to the Confirmation Hearing.

78.    "Plan Term Sheet" means that certain term sheet, dated April 26, 2007, between PlusFunds, the SPhinX Funds and the JOLs, annexed hereto as Exhibit 3.

79.    "Preference Claim" means any right the Debtor or the SPhinX Trust may have to pursue avoidance and any recovery of any transfer made by the Debtor within one year of the Petition Date, under Sections 547 and 550 of the Bankruptcy Code, including, without limitation, claims, if any, against the Debtor's former officers, directors and employees who received payments in respect of reimbursement requests, and against their professionals, as well as claims against other Entities who received from the Debtor potentially preferential transfers.

80.    "Priority Claim" means any Claim, other than an Administrative Claim or a Priority Tax Claim, to the extent entitled to priority under Section 507(a) of the Bankruptcy Code.

81.    "Priority Tax Claim" means a Claim of a governmental unit of the kind specified in Sections 502(i) and 507(a)(8) of the Bankruptcy Code.

82.    "Pro Rata" means proportionately so that, with respect to a Claim, the ratio of (a) (i) the amount of property distributed on account of a particular Claim to (ii) the Allowed amount of the Claim, is the same as the ratio of (b) (i) the amount of property distributed or held on account of all Claims of the Class in which the particular Claim is included (other than Claims disallowed by Final Order) to (ii) the amount of all Claims in that Class (other than Claims disallowed by Final Order).

83.    "Professional" means an Entity (a) employed by the Debtor pursuant to a Final Order of the Bankruptcy Court, (b) for whom compensation and reimbursement has been allowed by the Bankruptcy Court, and (c) any attorneys, accountants, appraisers, or other persons deemed by the Trustee to have qualifications necessary to assist in the proper administration of the Trust.  Professionals include (i) XRoads Solutions Group, LLC, (ii) Bankruptcy Services LLC, (iii) Curtis, Mallet-Prevost, Colt & Mosle LLP, and (iv) Robert E. Malchman, Attorney at Law (in his capacity as counsel in connection with the S&P Adversary Proceeding).

84.    "Professional Fee Claim" means those fees and expenses claimed by Professionals that are accrued and unpaid as of the Effective Date (this does not include fees paid to Professionals prior to the Effective Date in accordance with procedures approved by the Bankruptcy Court, which procedures are unaffected by the Plan).

85.    "Proof of Claim" means a proof of claim, together with supporting documents, Filed pursuant to Section 501 of the Bankruptcy Code and/or any order of the Bankruptcy Court.

8

86.     "Remaining Assets" means the Estate's interest in the Assets as of the Effective Date immediately after the Debtor has satisfied its payment and distribution obligations under the Plan, including to vest the Causes of Action in the SPhinX Trust.

87.     "Refco Committee" means the official committee of unsecured creditors serving in the Refco Debtors' bankruptcy cases.

88.     "Refco Debtors" means the Refco entities whose bankruptcy cases are pending in the Southern District of New York, including the entities whose bankruptcy cases have been procedurally consolidated under Case Number 05-60006, and Refco, LLC.

89.     "Refco Proofs of Claim" mean, collectively, all of the Debtor's legal and equitable interests in the proofs of claim that the Debtor filed in the Refco Debtors' cases, as amended.

90.     "Refco Non-Debtor Claims" means any and all claims against affiliates of the Refco Debtors who are not debtors in bankruptcy proceedings, including, without limitation, against Refco Alternative Investments.

91.     "Reserve Amount" means the amount of Creditor Distributable Assets reserved on behalf of a particular Creditor's Claim.

92.     "Retained Assets" means all of the Debtor's legal and equitable interests in (i) the Refco Proofs of Claim, (ii) Certain PlusFunds' Claims Against its Agents, (iii) the Accounts Receivable, (iv) the Intellectual Property Rights, (v) the right to use the Causes of Action solely for the purposes, as necessary, of defending, setting off, offsetting, or otherwise objecting to, the Claims set forth in Exhibit B of the Plan Term Sheet, and (vi) any Indemnity Claim against SMF-LP, SIF-LP, PFG-LLC, SPhinX-Onshore and/or any direct or indirect investor therein, including the right to recover from any insurance policy for the benefit of SMF-LP, SIF-LP, PFG-LLC, and/or SPhinX-Onshore, but only to the extent of any asserted Claim against the Debtor, whether or not Allowed, by SMF-LP, SIF-LP, PFG-LLC, and/or SPhinX-Onshore, or by a direct or indirect investor in, or creditor of, SMF-LP, SIF-LP, PFG-LLC, and/or SPhinX-Onshore.

93.     "S&P" means Standard & Poor's, a Division of The McGraw Hill Companies, Inc.

94.     "S&P Adversary Proceeding" means the adversary proceeding captioned *PlusFunds Group, Inc. v. Standard & Poor's, a Division of The McGraw Hill Companies, Inc*., Adv. Pro. No.: 06-01630 (JMP).

95.     "S&P License Agreement" means the license agreement to which the Debtor is a party with S&P, dated as of December 20, 2001, as amended.

96.     "Schedules" means the schedules of assets and liabilities the Bankruptcy Court requires the Debtor to file pursuant to Section 521 of the Bankruptcy Code, the Official Bankruptcy Forms and the Bankruptcy Rules, as they may be amended and supplemented from time to time, and the Debtor's Filed statement of financial affairs.

97.     "Secured Claim" means any Claim that is (a) secured in whole or part, as of the Petition Date, by a Lien which is valid, perfected and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, or (b) subject to setoff under Section 553 of the Bankruptcy Code, but, with respect to both (a) and (b) above, only to the extent of the

value, net of any senior Lien, of the Estate's interest in the assets or property securing any such Claim or the amount subject to setoff, as the case may be.

98.    "Shareholders" means the Holders of Equity Interests.

99.    "SIF-LP" means SPhinX Investment Fund, LP, a Delaware limited partnership, the general partner of which is PFG-LLC.

100.    "SMF-LP" means SPhinX Managed Futures Fund, L.P., a Delaware limited partnership, the general partner of which is PFG-LLC.

101.    "Solicitation Package" means the documents approved by the Bankruptcy Court for distribution to Holders of Claims in connection with the Debtor's solicitation of such Holders' votes to accept or reject the Plan.

102.    "SPhinX Claim" means the proof of claim filed by the JOLs on behalf of the Cayman Islands-based SPhinX Funds on May 15, 2006, as reduced and Allowed in the amount of $250 million.

103.    "SPhinX Committee" means the members of the liquidation committee in the insolvency proceedings of the SPhinX Funds pending in the Grand Court of the Cayman Islands.

104.    "SPhinX Funds" means the entities for which the Debtor provided investment management services pursuant to the IMAs, which together comprise the platform of funds that were created to track the performance of the S&P Hedge Fund Index, and which are listed on Exhibit E to the Plan Term Sheet.

105.    "SPhinX Onshore" means SPhinX Onshore Investment Fund LLC, a Delaware limited liability company of which the Debtor is the Manager and SPhinX Access LLC (of which Merrill Lynch Alternative Investments LLC is the Manager) is the sole Member.

106.    "SPhinX Trust" means the liquidating trust established under the Plan for the exclusive benefit of the SPhinX Funds.

107.    "SPhinX Trust Agreement" means the agreement, substantially in the form annexed as Exhibit 2 hereto, as it may be subsequently modified, pursuant to which the SPhinX Trust is to be created and governed.

108.    "SPhinX Trustee" means any individual(s) or Entity(ies) initially designated by the JOLs on behalf of the SPhinX Funds and retained, as of the Effective Date or thereafter, as the trustee(s) of the SPhinX Trust.

109.    "Subsequent Distribution Date" means any date after the Initial Distribution Date (a) that is (i) set by the Trustee or (ii) otherwise ordered by the Bankruptcy Court, and (b) upon which the Trustee makes a Distribution to any Holders of Class 4 claimants.

110.    "Tax" means any tax, charge, fee, levy, or other assessment by any federal, state, local or foreign taxing authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, *ad valorem*, estimated, severance, stamp, occupation and withholding tax.  "Tax" shall include any interest or additions attributable to, imposed on or with respect to such assessments.

111.    "Transaction Data" means data and related information belonging to the Debtor that is stored on any of the Debtor's computers arising from, reflecting, or relating to the trading activities and performance of the various managed accounts for which the Debtor has provided investment management and related services.

112.    "Trustee" means the trustee of the General Trust, proposed to be Florence V. Lentini and/or any other individual or Entity(ies) designated by the Debtor and retained, as of the Effective Date or thereafter, as the fiduciary responsible for administering the General Trust.

113.    "Unimpaired Claim" means an unimpaired Claim within the meaning of Section 1124 of the Bankruptcy Code.

114.    "U.S. Trustee" means the Office of the United States Trustee for the Southern District of New York.

115.    "Voting Instructions" means the instructions for voting on the Plan contained in Article I of the Disclosure Statement as well as the Voting Instructions approved by the Bankruptcy Court for inclusion as part of the Solicitation Package.

116.    "Voting Record Date" means the date as of which the identity of Holders of Claims is set for purposes of determining the Entities entitled to receive and vote on the Plan.  Pursuant to Bankruptcy Rules 3017(d) and 3018(a), this date is the date of entry of the Bankruptcy Court's order approving the Disclosure Statement or such other date as the Bankruptcy Court may set.

117.    "Wind-Down Agreement" means the letter agreement, dated May 8, 2006, between the Debtor and the SPhinX Funds, as modified and approved by the Bankruptcy Court on May 15, 2006, as amended, and subsequently modified and extended through September 30, 2006, pursuant to agreements between the Debtor and the JOLs, dated July 31, 2006, August 15, 2006, and August 31, 2006.

## ARTICLE II.

## ADMINISTRATIVE CLAIMS, PROFESSIONAL FEES AND PRIORITY TAX CLAIMS

### A.    Introduction

Certain types of Claims are not placed into voting Classes; instead they are unclassified.  They are not considered Impaired and they do not vote on the Plan because they are automatically entitled to the specific treatment provided for them in the Bankruptcy Code.  As such, the Debtor has not placed the following Claims in a Class:

### B.    Administrative Claims Other Than Professional Fee Claims

The Debtor shall pay each Holder of an Allowed Administrative Claim the full amount of its Allowed Claim, without interest, in Cash on the latter of the Effective Date and the date such Claim becomes an Allowed Administrative Claim; however, the JOLs shall pay the Assumed Disputed Claims to the extent they are Allowed.  The Holder of an Allowed Administrative Claim may be paid on such other date and upon such other terms as may be agreed upon in writing by that Holder and the Debtor. Without limiting the foregoing, all fees payable under 28 U.S.C. § 1930 that have not been paid, shall be paid on or before the Effective Date.  The Debtor estimates that Allowed Administrative Claims will total approximately $125,000 net of Professional Fee Claims as of the Effective Date.

11

Any person or entity (exclusive of the Claims of Professionals) holding an Administrative Claim against the Debtor pursuant to Section 503(b) of the Bankruptcy Code arising on or after September 1, 2006, that has not been paid on or before the Effective Date, may File a request for payment with the Bankruptcy Court and shall serve a copy of the same on counsel for the Debtor, the Trustee and the U.S. Trustee. The deadline to file any such Administrative Claim shall be sixty (60) days after the Effective Date (the "Second Administrative Bar Date"). If any such Administrative Claim is not Filed on or before the Second Administrative Bar Date, then such Claim shall be deemed disallowed and no payment shall be made on such Claim. The Debtor, the Trustee and the U.S Trustee shall be afforded a period of sixty (60) days following the Second Administrative Bar Date to File an objection to the allowance of any such Filed Administrative Claim. If no objection is Filed within such time, or if such objection is overruled, then such Filed Administrative Claim shall be deemed Allowed and thereafter promptly paid by the Trustee. The Confirmation Order shall set forth the Second Administrative Bar Date and shall constitute notice of the same.

## C.     Professional Fee Claims

For all pre-Effective Date Professional Fee Claims, except Bankruptcy Clerk's Office fees, U.S. Trustee's fees and XRoads' fees, the subject Professional must file and serve a properly noticed final fee application and the Bankruptcy Court must rule on the application. Only the amount of fees and expenses Allowed by the Bankruptcy Court will be owed and required to be paid under the Plan, if not yet paid, or retained, if previously paid. The Debtor estimates that Professional Fee Claims will total approximately $2,449,926 as of the Effective Date. CMP and XRoads have agreed to accept a discount and/or deferral of a portion of their fees and expenses in amounts to be disclosed at the Confirmation Hearing.

The Liquidating Debtor and the General Trust may retain and compensate Professionals for services rendered following the Effective Date without any order of the Bankruptcy Court.

## D.     Priority Tax Claims

Holders of Allowed Priority Tax Claims shall be paid an amount that, as of the Effective Date, is equal to the Allowed Priority Tax Claim without interest or penalty accruing after the Petition Date, which shall be paid in one or more installments as soon as possible consistent with the best interests of all parties as determined by the Trustee in the exercise of the Trustee's business judgment, but not later than the third year anniversary of the Effective Date. The Debtor believes that there will be no Allowed Priority Tax Claims as of the Effective Date.

<div align="center">

**ARTICLE III.**

**CLASSIFICATION AND TREATMENT OF**
**CLASSIFIED CLAIMS AND EQUITY INTERESTS**

</div>

## A.     Summary

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including voting, Confirmation and Distribution pursuant to the Plan and pursuant to Sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is to be deemed included in a particular Class only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled or disallowed prior

<div align="center">12</div>

to the Effective Date.  No Claim will be paid prior to the latter of the Effective Date and the date such Claim is Allowed.

**B.**      **Classification and Treatment of Claims Against the Debtor**

The Plan's classification of Claims and Equity Interests against the Debtor and the treatment of such Claims and Equity Interests is set forth below.

**1.**      **Class 1 – Priority Employee and Consultant Claims**

Class 1 consists of all Allowed Priority Claims held by the Debtor's former employees and current and former consultants based on prepetition wages, commissions and similar claims under Section 507(a)(4) of the Bankruptcy Code.

**Impairment:**  Class 1 Claims are unimpaired.

**Treatment:**  The Debtor shall pay Allowed Priority Claims in full in Cash on the Effective Date.  The Holder of an Allowed Priority Claim may be paid on such other date and upon such other terms as may be agreed upon in writing by that Holder and the Debtor.  The portion of any Filed Priority Claim that exceeds the $10,000 statutory limit specified in Section 507(a)(4) of the Bankruptcy Code shall be treated as a General Unsecured Claim in Class 4.  Class 1 is deemed to accept the Plan and Holders of Class 1 Claims are not entitled to vote on the Plan.

**2.**      **Class 2 – Secured Claims**

Class 2 consists of Allowed Secured Claims.  The Debtor believes that there are no Secured Claims that will be Allowed.

**Impairment:**  If there are any Class 2 Claims, they will be impaired.

**Treatment**:  Each Holder of an Allowed Class 2 Claim, if any, shall receive in respect of such Claim one or more payments as soon as possible consistent with the best interests of all parties as determined by the Trustee in the exercise of the Trustee's business judgment, but not later than the third year anniversary of the Effective Date, which payments will equal the value, as of the Effective Date, of any assets that secure such Claim.  Alternatively, at the discretion of the Trustee, Holders may receive the Debtor's interest in any property that is subject to the Holders' lien(s) or offsets in satisfaction of such Secured Claims.  Any setoff rights of Holders of Claims are preserved in accordance with Section 553 of the Bankruptcy Code.

**3.**      **Class 3 – The SPhinX Claim**

Class 3 consists of the SPhinX Claim.

**Impairment**:  Class 3 Claims is impaired.

**Treatment**:  The SPhinX Claim shall be treated as follows:

A.    The SPhinX Claim shall be reduced by $62 million, from not less than $312 million, and Allowed in the amount of $250 million.

    B.    The JOLs on behalf of the SPhinX Fund shall be the exclusive beneficiaries of the SPhinX Trust which shall be vested with the Causes of Action.[1]

    C.    The SPhinX Funds shall receive no interest in the General Trust.

    **4.**    **Class 4 – General Unsecured Claims (but not the SPhinX Claim)**

Class 4 consists of Allowed General Unsecured Claims, other than the SPhinX Claim, in the collective amount ranging from approximately $5 million to approximately $19 million, plus any Investor Claims (filed in the aggregate amount of approximately $274 million) that are Allowed.

    **Impairment**: Class 4 General Unsecured Claims are impaired.

    **Treatment**: Holders of Allowed Claims in this Class 4 to receive a *pro rata* beneficial interest in the General Trust, a liquidating trust for the exclusive benefit of Class 4 claimants. The General Trust is to be vested with at least $1.5 million in cash plus the Retained Assets which have nominal realizable value. Class 4 will receive the proceeds of the General Trust's assets after payment of administrative expenses of the General Trust. The Allowed General Unsecured Claims in Class 4 shall receive such Distribution as soon as possible as determined by the Trustee in the exercise of the Trustee's business judgment.

    **5.**    **Class 5 – Equity Interests**

Class 5 consists of all Allowed Equity Interests.

    **Impairment: Class 5 Equity Interests are impaired.**

    **Treatment:** All Class 5 Equity Interests shall be deemed cancelled and extinguished as of the Effective Date. Holders of Equity Interests shall receive no distribution under the Plan in respect of such Equity Interests.

**ARTICLE IV.**

**ACCEPTANCE OR REJECTION OF THE PLAN**

**A.**    **Voting Classes**

Each Holder of an Allowed Claim in any of Classes 2, 3 and 4 and is entitled to vote either to accept or to reject the Plan. Class 1 is deemed to accept the Plan, and Class 5 is deemed to reject the Plan, and neither is entitled to vote on the Plan. Only those votes cast shall be counted in determining whether acceptances have been received sufficient in number and amount to obtain Confirmation.

**B.**    **Acceptance by Impaired Classes**

An Impaired Class of Claims shall have accepted the Plan if the Holders (without counting any Holder designated under Section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount, and more than one-half in number, of the Allowed Claims actually voting in such Class have voted to accept the Plan.

---

[1] The vesting of the Causes of Action in the SPhinX Trust is subject to the right of the General Trust to use such Causes of Action solely for the purposes, as necessary, of defending, setting off, offsetting, or otherwise objecting to, the Claims set forth in Exhibit B of the Plan Term Sheet.

14

C.     **How to Vote**

A form of Ballot is being provided to Holders of Claims in Classes 2, 3 and 4 by which Creditors may vote their acceptance or rejection of the Plan.  To vote on the Plan, Holders of Claims who are entitled to vote should complete the Ballot as indicated thereon, (1) by indicating that such Holders accept or reject the Plan, and (2) by signing such Holders' names and mailing the Ballot in the envelope provided for this purpose.  Bankruptcy Services LLC, as the claims and balloting agent, will count the Ballots.

IN ORDER TO BE COUNTED, BALLOTS MUST BE COMPLETED, SIGNED AND RECEIVED NO LATER THAN 4:00 p.m. (prevailing Eastern Time) ON JULY 30, 2007.  BALLOTS MAY BE DELIVERED BY HAND, MAIL OR OVERNIGHT DELIVERY SERVICE TO THE FOLLOWING ADDRESS:

> **Bankruptcy Services LLC**
> **757 Third Avenue, 3rd Floor**
> **New York, NY 10017**
> **Attn: PlusFunds Group, Inc.**
> **Ballot Processing**

BALLOTS THAT ARE NOT PROPERLY COMPLETED, SIGNED AND RECEIVED AS DESCRIBED, WILL NOT BE COUNTED.  IF YOUR BALLOT IS DAMAGED OR LOST, YOU MAY REQUEST A REPLACEMENT BY ADDRESSING A WRITTEN REQUEST TO BANKRUPTCY SERVICES LLC AT THE ADDRESS SHOWN ABOVE.  FACSIMILE OR ELECTRONICALLY SUBMITTED BALLOTS WILL NOT BE COUNTED.

D.     **Confirmation Hearing**

The Bankruptcy Court shall schedule the Confirmation Hearing to determine whether this Plan has been accepted by the requisite parties in interest and whether the other requirements for Confirmation have been satisfied.  Each Creditor and Equity Interest Holder will receive notice of the Confirmation Hearing which is scheduled to commence on August 2, 2007 at 10:00 a.m (prevailing Eastern Time), before The Honorable James M. Peck, United States Bankruptcy Judge, in Courtroom 601 of the United States Bankruptcy Court, Southern District of New York, One Bowling Green, New York, New York 10004.

## ARTICLE V.

## EFFECT OF CONSUMMATION

A.     **Vesting of Cash and Assets in the Trusts**

On the Effective Date, the Causes of Action shall be transferred to and vest in the SPhinX Trust free of any Claims, Liens and Equity Interests, to be managed and used by the SPhinX Trustee for the sole benefit of the SPhinX Funds in accordance with the Plan and SPhinX Trust Agreement. Notwithstanding the foregoing, the General Trust may use the Causes of Action vested in the SPhinX Trust solely for the purposes, as necessary, of defending, setting off, offsetting, or otherwise objecting to, those Claims which are set forth in Exhibit B of the Plan Term Sheet.

On the Effective Date, the Remaining Assets, including not less than $1.5 million in cash, shall be transferred to and vest in the General Trust free of any Claims, Liens and Equity Interests, to be managed

15

and used by the Trustee for the sole purposes of carrying out the Plan and effectuating the Distributions to Class 4 claimants provided for in the Plan.

**B.**     **Establishment of the Trusts**

The Debtor shall have the sole authority to administer all Assets prior to their transfer to the trusts created under the Plan.  On or before the Effective Date, the Debtor shall establish the General Trust for the benefit of the Holders of Allowed General Unsecured Claims other than the SPhinX Claims, and the JOLs shall establish the SPhinX Trust for the exclusive benefit of the JOLs on behalf of the SPhinX Funds (and ultimately the creditors and interest holders of the SPhinX Funds).  From and after the Confirmation Date, the Debtor shall not take any action with respect to the Causes of Action pending the Effective Date except that which is necessary to preserve them for the exclusive benefit of the SPhinX Trust.

**C.**     **Securities Laws**

The issuance of beneficial interests in the General Trust and the SPhinX Trust, respectively, to the beneficiaries of such trusts, are exempt from registration under the Securities Act of 1933, as amended, and all applicable state and local laws requiring registration of securities, pursuant to Section 1145 of the Bankruptcy Code.  Nevertheless, if the Trustee and/or the SPhinX Trustee determine, with the advice of counsel, that their respective trust is required to comply with the registration and reporting requirements of the Securities and Exchange Act of 1934, as amended, or the Investment Company Act of 1940, as amended, the Trustee and/or the SPhinX Trustee, at the expense of their respective trust, shall take any and all actions to comply with such reporting requirements and file necessary periodic reports with the Securities and Exchange Commission.

**D.**     **Authority to Effectuate Plan**

Upon the entry of the Confirmation Order by the Bankruptcy Court, all matters provided under the Plan shall be deemed to be authorized and approved without further approval from the Bankruptcy Court.  The Confirmation Order shall act as an order modifying the Debtor's by-laws such that the provisions of the Plan may be effectuated without any action by the Debtor's board of directors or Shareholders.  The Debtor shall be authorized, without further application to or order of the Bankruptcy Court, to take whatever action is necessary to achieve Consummation and carry out the Plan and to effectuate the Distributions provided for thereunder.

**E.**     **Post-Confirmation Status Report**

Unless the Bankruptcy Court orders otherwise, within 90 days after the entry of the Confirmation Order, the Liquidating Debtor shall file a status report with the Bankruptcy Court explaining what progress has been made toward Consummation of the confirmed Plan.  The status report shall be served on the U.S. Trustee and those parties who have requested special notice post-Confirmation.  The General Trust shall file post-confirmation operating reports thereafter on a quarterly basis in accordance with the requirements of the U.S. Trustee and served on the same entities until such time as a Final Decree has been entered closing the Chapter 11 Case.

**F.**     **Binding Effect**

Except as otherwise expressly provided in the Plan, on and after the Effective Date, the Plan and all exhibits thereto shall bind the Liquidating Debtor, the Trustee and the SPhinX Trustee and all Holders of Claims and Equity Interests.

3045794

G.     **Limitation of Liability**

There are no releases in the Plan for the benefit of any of the Debtor's past or present officers, directors, employees, members, agents, representatives, shareholders, attorneys, accountants, financial advisors, investment bankers, lenders, consultants, experts, or Professionals and agents for the foregoing, for any action taken prior to the Petition Date.

Except as expressly set forth in the Plan or otherwise provided by a Final Order of the Bankruptcy Court, on and after the Confirmation Date, neither the Debtor, nor its successors or assigns, including the Trustee, nor any of their respective past and present officers, directors, employees, members, agents, representatives, shareholders, attorneys, accountants, financial advisors, investment bankers, lenders, consultants, experts, and Professionals and agents for the foregoing, nor the SPhinX Trustee nor SPhinX Trust, nor the Advisory Board nor its members (in their capacity as such), shall have or incur any liability for, and are expressly exculpated and released from, any claim (as defined in Section 101(5) of the Bankruptcy Code) or any past or present actions taken or omitted to be taken under or in connection with, related to, effecting, or arising out of the following:  (i) the Debtor's operations after the Petition Date; (ii) this Chapter 11 Case; (iii) the postpetition administration of the Debtor's Case and Assets; (iv) the pursuit of Confirmation; (v) the formulation, preparation, dissemination, implementation, administration, confirmation, or Consummation of the Plan Term Sheet, Plan and Disclosure Statement; (vi) the sale and liquidation of the Assets (including the prosecution of Causes of Action), or the property to be distributed under the Plan; (vii) any other act taken or omitted to be taken in connection with the Debtor's business after the Petition Date; or (viii) any contract, instrument, release, or other agreement entered into or created in connection with the foregoing; except only for actions or omissions to act to the extent determined by a court of competent jurisdiction (in a Final Order) to be by reason of such party's gross negligence, willful misconduct, or fraud, and in all respects, such party shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities; it being expressly understood that any act or omission with the approval of the Bankruptcy Court will be conclusively deemed not to constitute gross negligence, willful misconduct, or fraud unless the approval of the Bankruptcy Court was obtained by fraud.  This provision is effective only to the extent it does not conflict with DR 6-102 of the New York Code of Professional Responsibility.

Notwithstanding anything herein or other section of the Plan or Disclosure Statement to the contrary, the foregoing limitation of liability, exculpation, and release, in this Article V, Section G, shall not apply to the Cayman Islands-based SPhinX Funds, any investors in such SPhinX Funds in their capacity as such or the JOLs, for any purpose, including, without limitation, with respect to the Plan Term Sheet, the Wind-Down Agreement or the SPhinX License.

H.     **General Release**

As of the Effective Date, the Debtor and the SPhinX Funds shall be deemed to have generally released each other from any and all claims (within the meaning of Section 101(5) of the Bankruptcy Code), known and unknown, including, without limitation, any and all recovery actions arising under the Bankruptcy Code and all other applicable law (including Cayman Islands law); provided, however, that the foregoing general release shall not apply to the rights of the parties to enforce the Plan, the Confirmation Order, the SPhinX License, or the Plan Term Sheet.

Pursuant to Section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration of the classification, treatment, releases and other benefits provided under the Plan, upon the Effective Date the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to the Plan.

17

As discussed in Section 6.10 of the Disclosure Statement, and as otherwise provided herein, pursuant to Section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration of the benefits the Debtor is to receive from the SPhinX Funds pursuant to the Plan Term Sheet as embodied in the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all claims and controversies between the Debtor and the SPhinX Funds as specified hereunder.

**I.      Injunction**

**All Entities that have held, hold or may hold Claims against or Equity Interests in the Debtor as of the Effective Date are permanently enjoined, from and after the Effective Date, from taking any actions, other than enforcing the terms of the Plan, in respect of such Claims or Equity Interests against the Debtor, its Estate, the General Trust, the Advisory Board or its members (in their capacity as such), the SPhinX Trust, the Trustee, the SPhinX Trustee, the Professionals or any of their property (but not as to independent claims such entities may have against them), including, without limitation:  (i) commencing or continuing in any manner any action or other proceeding of any kind; (ii) enforcing, attaching, collecting or recovering by any manner or in any place or means any judgment, award, decree or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind; and (iv) asserting any right of setoff against any obligation, debt or liability due to the Debtor.  Except as expressly provided in the Plan or Plan Term Sheet, the Debtor, its Estate, the Trustee, the General Trust, the SPhinX Trustee and the SPhinX Trust reserve all rights and defenses that the Debtor may have (including, without limitation, the rights of subrogation and recoupment) with respect to any obligation, debt or liability allegedly due to any Entity.  In addition, all non-Debtor Entities are permanently enjoined from commencing or continuing, in any manner, any action or proceeding, whether directly or derivatively, in order to recover any Asset of the Estate that was either released under the Plan or transferred to the General Trust or the SPhinX Trust under the Plan.**

**J.      Terms of Existing Injunctions or Stays**

Unless otherwise provided in the Plan, all injunctions or stays provided for in this Chapter 11 Case pursuant to Sections 105, 362 or 525 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.  The Confirmation Order will permanently enjoin the commencement or prosecution by any Entity, whether directly, derivatively or otherwise, of any Claims, Equity Interests, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released or enjoined pursuant to the Plan.

**K.      Good Faith**

Confirmation of the Plan shall constitute a finding that:  (i) the Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code; and (ii) the solicitation of acceptances or rejections of the Plan by all Entities has been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

**ARTICLE VI.**

**IMPLEMENTING THE PLAN**

**A.      Generally**

This Plan serves as the mechanism for the orderly liquidation of all Assets and provides for the distribution to Creditors of funds realized through this process.  A final distribution to Creditors will need

18

to await the conclusion of any litigation by, on behalf of, or against the Debtor and/or the General Trust, including objections to the Investor Claims and any other objections to Claims that may be Filed. An interim distribution to Holders of Allowed Claims may be made if circumstances warrant in the business judgment of the Trustee.

**B.      Funding of the Plan**

The source of funds to achieve Consummation, and to carry out the provisions of the Plan, shall be the Debtor's Cash on hand plus $4 million in cash and up to an additional $1.3 million for the payment of Assumed Disputed Claims, pursuant to the Plan Term Sheet. As reflected in the Liquidation Analysis appended to the Disclosure Statement as Exhibit B, the Debtor anticipates transferring at least $1.5 million of cash to the General Trust on the Effective Date, as that amount may be supplemented. Payments to be made by the SPhinX Funds pursuant to the Plan Term Sheet will be used by the Debtor or Liquidating Debtor, as the case may be, to make payments that are due on the Effective Date of the Plan or thereafter to holders of Allowed Claims, including Allowed Administrative Claims and Allowed Priority Claims, with the balance, but not less than $1.5 million, to be vested in the General Trust for payment of the administrative expenses of the General Trust and distributions to Allowed Class 4 claimants.

**C.      Post Confirmation Estate**

On the Effective Date, the Debtor shall be deemed to have relinquished any and all rights in and to the Assets that shall be vested, respectively, in the SPhinX Trust and the General Trust. The General Trust shall be established for the primary purpose of liquidating the Remaining Assets for and on behalf of Creditors in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business. Neither the General Trust or the SPhinX Trust shall be deemed a successor-in-interest of the Debtor for any purpose other than as specifically set forth herein. Each of the General Trust and the SPhinX Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the beneficiaries treated as grantors and owners of the respective trusts.

**D.      Assignment of Policyholder Interests**

The Debtor or Liquidating Debtor, as the case may be, shall assign to the SPhinX Trust the Debtor's interests as a policyholder in insurance policies, including any policy issued by Westchester Surplus Lines Insurance Company, Illinois Union Insurance Company, INA Surplus Insurance Company, or any other Entity, and any professional liability coverage.

**E.      PlusFunds General Trust**

**1.      Generally**

A Trustee shall be retained pursuant to the General Trust Agreement. The Trustee shall be deemed to have been appointed by the Bankruptcy Court as a representative of the Estate pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code.

The General Trust shall be established for the primary purpose of liquidating and distributing the Remaining Assets for or on behalf of the Class 4 Allowed Claims in accordance with Treasury Regulation § 301.7701-4(d), with no objective to engage in the conduct of a trade or business.

19

In the event that the Trustee resigns, is removed, terminated or otherwise unable to serve as the Trustee, then the U.S. Trustee may select a successor. Any successor Trustee shall be bound by and comply with the terms of the Plan, the Confirmation Order and the General Trust Agreement.

Notwithstanding any state law to the contrary, the Trustee (including any successor) shall be exempt from giving or posting any bond or security in any jurisdiction.

On the Effective Date, the Trustee will be the sole authorized representative and signatory of, and on behalf of, the General Trust, with authority to render any and all services necessary to effectuate the terms of the Plan. The powers, authority, responsibilities and duties of the Trustee shall be governed by the Plan, the Confirmation Order and the General Trust Agreement. The Trustee may execute, deliver, file or record such documents, instruments, releases and other agreements, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 2. Transfer of Remaining Assets

The transfer of the Remaining Assets to the General Trust will be made for the benefit of the beneficiaries of the General Trust, but only to the extent such beneficiaries are entitled to Distributions under the Plan. Upon completion of the transfer of the Remaining Assets into the General Trust, the Debtor will have no interest in, or with respect to, such assets or the General Trust. For federal income tax purposes, all parties (including, without limitation, the Debtor, the Trustee and the beneficiaries) will treat the transfer of assets to the General Trust in accordance with the terms of the Plan as a transfer to the beneficiaries, followed by a transfer by such beneficiaries to the General Trust, and the beneficiaries will be treated as the grantors and owners thereof.

### 3. Valuation of Remaining Assets

As soon as practicable after the Effective Date, the Trustee shall apprise the beneficiaries of the General Trust of the Trustee's estimate of the value of the Remaining Assets which will consist primarily of Cash. The estimated valuation shall be used consistently by all parties (including the Trustee and the beneficiaries of the Trust) for all federal income tax purposes. The purpose of the estimated valuation is to comply with the general criteria for obtaining an IRS ruling that an entity created pursuant to a confirmed plan of reorganization under Chapter 11 of the Bankruptcy Code will be classified as a grantor trust. Any dispute regarding the estimated valuation of these assets shall be resolved by the Bankruptcy Court.

### 4. Responsibilities of the Trustee

The responsibilities and authority of the Trustee shall include: (a) taking action with respect to the prosecution or settlement of objections to, and estimations of, General Unsecured Claims; (b) calculating and implementing all distributions from the Creditor Distributable Assets in accordance with the Plan; (c) filing all required tax returns and paying taxes and all other obligations on behalf of the General Trust from funds held by the Trust; (d) periodically reporting to the U.S. Trustee and beneficiaries of the General Trust on the status of the Claims resolution process and distributions under the Plan; (e) liquidating the assets of the General Trust and providing for the distribution of the net proceeds thereof in accordance with the provisions of the Plan; (f) retaining and paying at normal and customary rates or on a contingency fee basis, or a monthly basis, professionals in connection with the Trustee's duties; and (g) such other responsibilities as may be vested in the Trustee pursuant to the Plan, General Trust Agreement or Bankruptcy Court Order or as may be necessary and proper to carry out the provisions of the Plan. In addition, the Trustee shall be responsible for winding down the Debtor's estate,

3045794

administering the Chapter 11 Case, and performing other obligations of the Debtor, including the payment of fees to the U.S. Trustee, as may be required.

    **5.**    <u>**Powers of the Trustee**</u>

    The powers of the Trustee to administer the General Trust shall, without any further Bankruptcy Court approval in each of the following cases, include <u>inter alia</u>, (a) the power to invest, and withdraw, make distributions and pay taxes and other obligations owed by the General Trust from, funds held by the Trustee in accordance with the Plan and General Trust Agreement, (b) the power to engage and compensate, without prior Bankruptcy Court order or approval, employees, consultants and professional Entities to assist the Trustee with respect to his/her responsibilities, (c) the power to prosecute, compromise, settle, or transfer objections to Claims on behalf of or against the General Trust in accordance with the General Trust Agreement, and (d) such other powers as may be vested in or assumed by the Trustee pursuant to the Plan, the General Trust Agreement, any Bankruptcy Court Order, or as may be necessary and proper to carry out the provisions of the Plan.

    The Trustee, on behalf of the General Trust, shall have the absolute discretion to investigate, pursue or not to pursue, or to settle, assign, transfer or sell, any and all Remaining Assets as the Trustee determines is in the best interests of the beneficiaries and consistent with the purposes of the General Trust, and shall have no liability for the outcome of his/her decision, other than those decisions constituting gross negligence or willful misconduct; provided however, that the Trustee shall be entitled to rely upon the advice of counsel with respect to his/her duties and responsibilities. The Trustee may incur and pay from the assets of the General Trust any reasonable and necessary expenses in liquidating and converting the assets in the General Trust to Cash.

    The Trustee need not obtain an order or approval of the Bankruptcy Court, or account to the Bankruptcy Court, concerning the taking of any action or exercise of any power, rights or discretion conferred hereunder or under the General Trust Agreement, and the Trustee's actions and exercise of power, rights and discretion shall be immediately effective without any order or approval of, or accounting to, the Bankruptcy Court. The Trustee may, but shall not be required, to seek the Bankruptcy Court's adjudication of any matter that is within the Bankruptcy Court's jurisdiction.

    The Trustee shall serve on the terms and conditions set forth in the Plan, Confirmation Order and the General Trust Agreement. The Trustee shall not be required to file a fee application to receive compensation. The compensation for the Trustee shall be fair and reasonable in accordance with his/her customary rates, which shall be a charge against and paid out of the assets of the General Trust subject to the procedure set forth in the General Trust Agreement, including the submission of periodic fee statements to the U.S. Trustee, who shall have an opportunity to review and object to such compensation.

    In connection with the Trustee's investigation of any of the Remaining Assets, the Trustee may compel the attendance of an entity for examination and for production of documents to the extent, and within the scope, specified in Bankruptcy Rule 2004.

    **6.**    <u>**Retention and Payment of Professionals**</u>

    The Trustee may retain the services of attorneys, accountants, and other professionals and agents in the discretion of the Trustee to assist and advise the Trustee in the performance of his/her duties and compensate such professionals from the assets of the General Trust on an hourly or contingency basis without obtaining any Order of the Bankruptcy Court.

3045794

F.     **The SPhinX Trust**

1.     **Generally**

The SPhinX Trustee shall be retained pursuant to the SPhinX Trust Agreement. The SPhinX Trustee shall be deemed to have been appointed by the Bankruptcy Court as a representative of the Estate pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code. The SPhinX Trustee shall perform the duties specified in the SPhinX Trust Agreement.

The SPhinX Trust shall be established for the primary purpose of liquidating the Causes of Action for or on behalf of the JOLs in their capacity as JOLs for the SPhinX Funds in accordance with Treasury Regulation § 301.7701-4(d), with no objective to engage in the conduct of a trade or business.

The SPhinX Trustee and his/her Professionals shall have responsibility for acting in the best interests of the JOLs and SPhinX Funds (and ultimately the creditors and interest holders of the SPhinX Funds) as determined by the SPhinX Trustee in the exercise of such trustee's discretion.

In the event that the SPhinX Trustee resigns, is removed, terminated or otherwise unable to serve as the SPhinX Trustee, then the Advisory Board may designate a successor without the need of any Bankruptcy Court approval thereof. Any successor SPhinX Trustee shall be bound by and comply with the terms of the Plan, the Confirmation Order and the SPhinX Trust Agreement.

Notwithstanding any state law to the contrary, the SPhinX Trustee (including any successor) shall be exempt from giving or posting any bond or security in any jurisdiction.

On the Effective Date, the SPhinX Trustee will be the sole authorized representative and signatory of, and on behalf of, the SPhinX Trust, with authority to render any and all services necessary to effectuate the terms of the Plan. The powers, authority, responsibilities and duties of the SPhinX Trustee shall be governed by the Plan, the Confirmation Order and the SPhinX Trust Agreement. The SPhinX Trustee may execute, deliver, file or record such documents, instruments, releases and other agreements, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

2.     **Vesting of Causes of Action**

On the Effective Date, the Causes of Action shall be transferred to, and vest in, the SPhinX Trust free and clear of any Claim, Lien and Equity Interest. The vesting of the Causes of Action in the SPhinX Trust will be for the exclusive benefit of the JOLs on behalf of the SPhinX Funds (and ultimately the creditors and interest holders of the SPhinX Funds). Upon completion of the transfer of the Causes of Action into the SPhinX Trust, the Debtor and the General Trust will have no interest in, or with respect to, such assets or the SPhinX Trust; provided, however, that the vesting of the Causes of Action in the SPhinX Trust is subject to the right of the General Trust to use such Causes of Action solely for the purposes, as necessary, of defending, setting off, offsetting, or otherwise objecting to, the Claims set forth in Exhibit B of the Plan Term Sheet. For federal income tax purposes, all parties (including, without limitation, the Debtor, the SPhinX Trustee and the SPhinX Funds) will treat the transfer of assets to the SPhinX Trust in accordance with the terms of the Plan as a transfer to the beneficiaries, followed by a transfer by such beneficiaries to the SPhinX Trust, and the SPhinX Funds will be treated as the grantors and owners thereof subject to the terms of the Plan and the SPhinX Trust Agreement.

3.      **Valuation of Remaining Assets**

As soon as practicable after the Effective Date, the SPhinX Trustee shall apprise the SPhinX Funds of the SPhinX Trustee's estimate of the value of the Causes of Action to be vested in the SPhinX Trust. The estimated valuation shall be used consistently by all parties (including the SPhinX Trustee and the SPhinX Funds) for all federal income tax purposes. The purpose of the estimated valuation is to comply with the general criteria for obtaining an IRS ruling that an entity created pursuant to a confirmed plan of reorganization under Chapter 11 of the Bankruptcy Code will be classified as a grantor trust. Any dispute regarding the estimated valuation of these assets shall be resolved by the Bankruptcy Court.

4.      **Responsibilities of the SPhinX Trustee**

The responsibilities and authority of the SPhinX Trustee include pursuing or not pursuing the Causes of Action to be vested in the SPhinX Trust in a manner that is in the exclusive best interest of the SPhinX Funds, consistent with the General Trust's right to use certain Causes of Action, as provided above. Where required under the SPhinX Trust Agreement, the SPhinX Trustee shall consult with, and/or obtain the approval of, the Advisory Board, before taking those actions that require the SPhinX Trustee to consult with or obtain the approval of the Advisory Board.

5.      **Powers of the SPhinX Trustee**

The powers of the SPhinX Trustee to administer the SPhinX Trust shall, without any further Bankruptcy Court approval in each of the following cases, include inter alia, (a) the power to invest, and withdraw, make distributions and pay taxes and other obligations owed by the SPhinX Trust from, funds held by the SPhinX Trustee in accordance with the Plan and SPhinX Trust Agreement, (b) the power to engage and compensate, without prior Bankruptcy Court order or approval, employees, consultants and professional Entities to assist the SPhinX Trustee with respect to his/her responsibilities, (c) the power to prosecute, compromise, or settle objections to Causes of Actions in the name of the SPhinX Trustee on behalf of the SPhinX Trust in accordance with the SPhinX Trust Agreement, and (d) such other powers as may be vested in or assumed by the SPhinX Trustee pursuant to the Plan, the SPhinX Trust Agreement, any Bankruptcy Court Order, or as may be necessary and proper to carry out the provisions of the Plan.

The SPhinX Trustee, on behalf of the SPhinX Trust, shall have the absolute discretion to investigate, pursue or not to pursue, or to settle, consistent with the SPhinX Trust Agreement, any and all Causes of Action vested in the SPhinX Trust as the SPhinX Trustee determines is in the best interests of the SPhinX Funds.

The SPhinX Trustee need not obtain an order or approval of the Bankruptcy Court, or account to the Bankruptcy Court, concerning the taking of any action or exercise of any power, rights or discretion conferred hereunder or under the SPhinX Trust Agreement, and the SPhinX Trustee's actions and exercise of power, rights and discretion shall be immediately effective without any order or approval of, or accounting to, the Bankruptcy Court. The SPhinX Trustee may, but shall not be required, to seek the Bankruptcy Court's adjudication of any matter that is within the Bankruptcy Court's jurisdiction.

The SPhinX Trustee shall serve on the terms and conditions set forth in the Plan, Confirmation Order and the SPhinX Trust Agreement. The SPhinX Trust Agreement gives the Advisory Board the power to replace the SPhinX Trustee at any time, without cause or notice to any parties in interest. The SPhinX Trustee shall not be required to file a fee application to receive compensation. The

23

compensation for the SPhinX Trustee shall be determined by the Advisory Board and shall be the sole obligation and responsibility of the SPhinX Trust.

In connection with the SPhinX Trustee's investigation of any of the Causes of Action vested in the SPhinX Trust, the SPhinX Trustee may compel the attendance of an entity for examination and for production of documents to the extent, and within the scope, specified in Bankruptcy Rule 2004. The Bankruptcy Court shall retain jurisdiction to hear and determine motions brought by the SPhinX Trustee pursuant to Bankruptcy Rule 2004.

**6.        Retention and Payment of Professionals**

The SPhinX Trustee may retain the services of attorneys, accountants, and other professionals and agents in the discretion of the SPhinX Trustee to assist and advise the SPhinX Trustee in the performance of his/her duties and compensate such professionals from the assets of the SPhinX Trust on an hourly or contingency basis without obtaining any Order of the Bankruptcy Court.

**G.        Exculpation**

No Creditor or Shareholder or any other party-in-interest will have, or otherwise may pursue, any Claim or cause of action against the Trustee, the Advisory Board, the SPhinX Trustee, the General Trust or the SPhinX Trust, or any of their employees, agents or professionals (solely in the performance of their duties thereas), for making payments in accordance with the Plan or for implementing the provisions of the Plan, except for any acts or omissions to act that are the result of gross negligence, willful misconduct, or fraud, and in all respects, such party shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities; it being expressly understood that any act or omission with the approval of the Bankruptcy Court will be conclusively deemed not to constitute gross negligence, willful misconduct, or fraud unless the approval of the Bankruptcy Court was obtained by fraud.  This provision is effective only to the extent it does not conflict with DR 6-102 of the New York Code of Professional Responsibility.

## ARTICLE VII.

### TREATMENT OF EXECUTORY CONTRACTS
### AND UNEXPIRED LEASES

**A.        Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, except for executory contracts or unexpired leases that were previously assumed or rejected, or are the subject of a pending notice of assumption or rejection served in accordance with the procedures approved by the Wind-Down Order, each executory contract and unexpired lease entered into by the Debtor prior to the Petition Date that has not previously expired or terminated pursuant to its own terms shall be deemed rejected pursuant to Section 365 of the Bankruptcy Code.  The Confirmation Order shall constitute an Order of the Bankruptcy Court approving such rejections as of the Effective Date.  The non-Debtor party(ies) to any rejected personal property leases shall be responsible for taking all steps necessary to retrieve the personal property, if any, that is the subject of such executory contracts and leases.

24

**B.**    **Claims Based on Rejection of Executory Contracts or Unexpired Leases**

All proofs of claim with respect to Claims arising from the rejection of executory contracts or unexpired leases under Article VII of the Plan, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the Confirmation Date. Any Claims arising from the rejection of an executory contract or unexpired lease not Filed within such time will be forever barred from assertion against the Debtor, the Estate, the Trustee, the General Trust and each of their property, unless otherwise ordered by the Bankruptcy Court or provided in the Plan. All such Claims for which proofs of claim are timely and properly Filed and ultimately Allowed will be treated as Class 4 General Unsecured Claims.

<div align="center">

**ARTICLE VIII.**

**PROVISIONS GOVERNING DISTRIBUTIONS**

</div>

**A.**    **Distributions for Claims Allowed as of the Effective Date**

Except as otherwise provided in the Plan, or as may be ordered by the Bankruptcy Court, Distributions on account of those Claims that are Allowed and entitled to receive Distributions under the Plan shall be made by the Debtor and/or the Trustee on the Initial Distribution Date. Distributions on account of Claims that become Allowed after the Initial Distribution Date shall be made on the next Subsequent Distribution Date or Final Distribution Date, as the case may be, in each case without interest.

**B.**    **Distributions; Preservation of Causes of Action; Closing the Chapter 11 Case**

The Trustee will make all Distributions from the General Trust for the benefit of Class 4 claimants provided for under the Plan and General Trust Agreement, and the SPhinX Trustee will make all Distributions from the SPhinX Trust for the benefit of the SPhinX Funds under the Plan and SPhinX Trust Agreement. The Debtor will make all other Distributions provided for under the Plan. Neither the Trustee nor the SPhinX Trustee shall be required to post any bond.

Unless a Remaining Asset that includes a claim (within the meaning of Section 101(5) of the Bankruptcy Code) against a Creditor or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or in a Final Order, all rights with respect to such Remaining Asset are reserved solely to the General Trust, and the Trustee, in accordance with the Plan and Plan Term Sheet, may pursue any such claims against any Entities on and after the Effective Date.

Upon the completion of liquidation of the Remaining Assets and disbursement of the entire proceeds thereof, the Trustee may file a report with the Bankruptcy Court and request the entry of a Final Decree closing the Chapter 11 Case; provided, however, that the Trustee shall refrain from requesting entry of a Final Decree until any Causes of Action pending in the Bankruptcy Court have been concluded provided the SPhinX Funds pay all costs and charges assessed by, or otherwise due to, the U.S. Trustee and/or the Bankruptcy Court, plus all reasonable fees and expenses of the General Trust for complying with any administrative obligations, in connection with the Chapter 11 Case, from and after the date the Trustee is otherwise prepared to file a request for a Final Decree. The Bankruptcy Court shall hear and determine any dispute between the Trustee and the SPhinX Trustee regarding the payment of any such costs, charges, fees or expenses.

<div align="center">

25

</div>

C.    **Manner of Payment and Transfer Tax**

Any payment of Cash made under the Plan may be made either by check drawn on a domestic bank, by wire transfer or by automated clearing house transfer from a domestic bank, at the option of the Liquidating Debtor and/or the Trustee.

Under Section 1146(a) of the Bankruptcy Code, the making or delivery of an instrument of transfer under a plan may not be taxed under any law imposing a stamp tax or similar tax. Pursuant thereto and because the Debtor is liquidating its Assets under and in connection with its Plan, entry of the Confirmation Order shall be a determination that no stamp tax, transfer tax or similar tax may be imposed on any sale of property by the Debtor and/or Trustee.

The Trustee, in making Distributions under the General Trust, shall comply with applicable tax withholding and reporting requirements imposed by any governmental unit. Distributions otherwise due to any Holder of an Allowed Claim may be withheld until such time as such Holder provides the necessary information to comply with any reporting and withholding requirements of any governmental unit. Any funds so withheld will then be paid to the appropriate authority. If the Holder of an Allowed Claim fails to provide to the Trustee the information necessary to comply with any reporting and withholding requirements of any governmental unit within thirty (30) days from the date of first notification by the Trustee to the Holder about the need for such information to comply with any applicable withholding requirements, then the Holder's Distribution shall be treated as an undeliverable Distribution in accordance with the Plan.

D.    **Transmittal of Distributions to Parties Entitled Thereto**

All Distributions by check shall be deemed made at the time such check is duly deposited in the United States mail, postage prepaid. All Distributions by wire transfer shall be deemed made as of the date the Federal Reserve or other wire transfer is made. Except as otherwise agreed with the Holder of an Allowed Claim in respect thereof or as provided in the Plan, any property to be distributed on account of an Allowed Claim shall be distributed by mail, upon compliance by the Holder with the provisions of the Plan, to (a) the latest mailing address Filed for the Holder of an Allowed Claim entitled to a Distribution, (b) the latest mailing address Filed for a Holder of a Filed power of attorney designated by the Holder of such Claim to receive Distributions, (c) the latest mailing address Filed for the Holder's transferee as identified in a Filed notice served on the Debtor pursuant to Bankruptcy Rule 3001(e), or (d) if no such mailing address has been Filed, the mailing address reflected on the Schedules or in the Debtor's books and records.

E.    **Disputed Claims and Unclaimed Property**

Notwithstanding all references in the Plan to Claims that are Allowed, in undertaking the Pro Rata calculations concerning Allowed Claims under the Plan, including the determination of the amount of Distributions due to Class 4 claimants, each Disputed Claim shall be treated as if it were an Allowed Claim, except that if the Bankruptcy Court estimates the portion of a Disputed Claim to be Allowed or otherwise determines the amount which would constitute a sufficient reserve for a Disputed Claim (which estimations and determinations may be requested by the Debtor or the Trustee, as the case may be), such amount as determined by the Bankruptcy Court shall be used as to such Claim.

The Distributions due in respect of Disputed Claims based on the calculations required by the Plan shall be reserved for the Holders of the Disputed Claims at the time that distributions in respect of the Allowed Claims in the same class as the Disputed Claim are to be made.

After an objection to a Disputed Claim is withdrawn or determined by Final Order, the Distributions due on account of any resulting Allowed Claim shall be paid by the Trustee from funds held in reserve for such Creditor.  Such payment shall be made on the next Subsequent Distribution Date.  No interest shall be due to a Disputed Claim Holder based on the delay attendant to determining the allowance of such Claim.

Should the Distribution on account of any Allowed Claim of such Creditor exceed the amount held in reserve, the shortfall may be paid from available sums, if any, for the next Distribution, provided that, in no event shall the Creditor have recourse to any payments already made to others or to sums reserved by the Debtor or the Trustee, as the case may be, for ongoing fees and costs of administering the General Trust or effectuating the Plan.

At the election of the Trustee, any property that is unclaimed for ninety (90) days after Distribution thereof by mail to the last known mailing address of the party entitled thereto shall revest in the General Trust as available funds for ongoing costs and fees or for distribution to other Creditors. Notwithstanding the foregoing, if any mail sent to a Creditor at the last known mailing address by the General Trust is returned without a forwarding address and the Creditor does not Claim its Distribution within ninety (90) days after it is mailed to the Creditor, the General Trust may strike the Creditor's Claim from the Creditor list, issue no more checks to such Creditor and, for the purposes of future Distributions, treat the Creditor's Claim as if it were disallowed.

Contingent Claims against the Debtor for indemnity, reimbursement or contribution shall be disallowed to the extent set forth in Section 502(e) of the Bankruptcy Code, and any such disallowed Claim shall not be counted for voting purposes or entitled to receive any Distribution or be included in any calculation for the purpose of determining the amount of Distributions under the Plan, and no Reserve Amount shall be created for such Claims, unless such Claims are Allowed by a Final Order or Allowed for voting and/or distribution purposes in accordance with Section 502(c) of the Bankruptcy Code, after notice and a hearing.

**F.**     <u>**Setoffs**</u>

The General Trust may, but shall not be required to, setoff against any Claim, and the payments and/or Distribution of other property to be made under the Plan in respect of such Claim, any claims of any nature whatsoever against the Creditor or Shareholder that are vested in the General Trust, or that may be used by the General Trust solely for the purposes, as necessary, of defending, setting off, offsetting, or otherwise objecting to, the Claims set forth in Exhibit B of the Plan Term Sheet, but the failure to do shall not constitute a waiver by the Debtor and/or the General Trust of any such claim.

**G.**     <u>**Vesting Of Remaining Assets**</u>

As of the Effective Date, all Assets vested, respectively, in the General Trust and the SPhinX Trust, shall be free and clear of all Claims and Equity Interests of Holders of Claims and Holders of Equity Interests except as otherwise specifically provided in the Plan.  As of the Effective Date, all mortgages, deeds of trust, Liens or security interests in any Assets will be released and all the right, title and interest of any Holder of any such mortgages, deeds of trust, Liens or security interests shall be canceled, annulled, terminated and become null and void, except as otherwise specifically provided in the Plan.  The Trustee or the SPhinX Trustee, as the case may be, shall be authorized to act as attorney-in-fact for any such Holder to cause any public records to properly reflect and effectuate this provision of the Plan.

3045794

### H.      Corporate Action

Upon the entry of the Confirmation Order all matters provided under the Plan involving the corporate structure of the Debtor, and any Entity controlled by the Debtor, shall be deemed to be authorized and approved without any requirement of further action by the Debtor's Shareholders, the Debtor's board of directors, or the Trustee.

### I.      No Release

There are no releases in this Plan for the benefit of any of the Debtor's past or present officers, directors, employees, members, agents, representatives, shareholders, attorneys, accountants, financial advisors, investment bankers, lenders, consultants, experts, or Professionals and agents for the foregoing, for any action taken prior to the Petition Date.  Except as otherwise provided in the Plan, no Entity and/or any such Entity's parents, subsidiaries, affiliates, related Entities, officers, directors, agents and/or employees shall be released and/or discharged of any liabilities under the Plan.  Consequently, except as specifically provided in the Plan, all Entities shall remain liable to the extent presently provided under any applicable law or contract with respect to any claims of the Debtor against any such Entity.

### J.      DeMinimis Payments and Distributions

Notwithstanding any other provision of the Plan, Distributions of less than $100 need not be made by the Trustee on account of any Allowed Claim; such amounts shall neither be distributed nor will they carry over for any purpose, and shall be treated as undeliverable Distributions.

Notwithstanding any other provision of the Plan, if and to the extent that the Creditor Distributable Assets, including Cash, have a value at any time of less than $5,000, the Trustee may, in lieu of making Distributions, donate same to a nonprofit organization or organizations that are exempt pursuant to Section 501(c) of the Internal Revenue Code (Title 26 of the United States Code); provided that any donations made pursuant to this section shall be made to one or more organizations that perform or fund non-denominational activities in which the Trustee has no economic interest.

## ARTICLE IX.

## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

### A.      Prosecution of Objections to Claims

The Debtor, the Trustee or the SPhinX Trustee, as the case may be, shall have until 365 days (1) following the Effective Date to File objections to any Claim Filed prior to the Effective Date, and (2) following the Filing of any Administrative Claim after the Effective Date to File objections to any Administrative Clam Filed after the Effective Date; provided, however, that the Trustee may apply to the Bankruptcy Court for an extension of the foregoing deadlines for cause.

The JOLs and, following the Effective Date, the SPhinX Trustee (who shall substitute for the JOLs with respect to any pending objection) shall be authorized to pursue objections to the Assumed Disputed Claims.

Except as expressly set forth in the Plan and Plan Term Sheet, nothing in the Plan, the Disclosure Statement, the Plan Term Sheet, the Confirmation Order or any order in aid of Confirmation, shall constitute, or be deemed to constitute, a waiver or release of any claim, Cause of Action, right of setoff, or other legal or equitable defense that the Debtor had immediately prior to the commencement of the

28

Chapter 11 Case or the Effective Date, against or with respect to any Claim or Equity Interest, all of which are preserved.

**B.      Estimation of Claims**

The Debtor and/or the Trustee may, at any time, request that the Bankruptcy Court estimate any Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether the Debtor and/or the Trustee previously objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time, including during the pendency of any appeal relating to any such Claim.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtor or the Trustee, as the case may be, may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.

**C.      Cumulative Remedies**

All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism permitted by the Plan or otherwise by the Bankruptcy Court.  Until such time as such Claim becomes an Allowed Claim, such Claim shall be treated as a Disputed Claim for purposes of allocations, Distributions, and voting under the Plan.

<div align="center">

**ARTICLE X.**

**CONDITIONS PRECEDENT TO CONFIRMATION
AND CONSUMMATION OF THE PLAN**

</div>

**A.      Conditions Precedent to Confirmation and Consummation**

It is a condition to Confirmation that (a) the Confirmation Order shall approve in all respects all of the provisions, terms and conditions of the Plan, (b) the Confirmation Order is satisfactory in form and substance to the Debtor and the JOLs, and (c) to the extent insufficient Cash exists to make distributions on the Effective Date, Holders of Claims required to be paid on the Effective Date have agreed to defer, reduce or waive payment of a portion or all of such Claims as exceed the Cash available for distribution.

It is a condition of Consummation that (a) the Confirmation Order shall have been signed by the Bankruptcy Court and duly entered on the docket for the Chapter 11 Case by the Clerk of the Bankruptcy Court in form and substance acceptable to the Debtor; (b) the Confirmation Order shall be a Final Order; (c) the conditions to closing the transaction contemplated by the Plan Term Sheet, including that at least 97% of the Investor Claims have been withdrawn or disallowed and that the Plan Term Sheet has been approved by a Final Order of the Bankruptcy Court and the Grand Court, have been satisfied or waived, (d) the Debtor and Trustee, and the Debtor and the SPhinX Trustee, shall have executed the General Trust Agreement and the SPhinX Trust Agreement, respectively; and (d) the Debtor shall have transferred the General Trust and the SPhinX Trust the assets to be vested in such trusts.

The Debtor and the JOLs jointly may waive the foregoing requirement that the Confirmation Order shall be a Final Order, and the Debtor exclusively may waive the foregoing requirement that at least 97% of the Investors Claims have been withdrawn or disallowed.  These waivers may be made in whole or in part, at any time, without notice, without leave or order of the Bankruptcy Court, and without

<div align="center">29</div>

any formal action other than proceeding to obtain Confirmation and/or achieve Consummation of the Plan.

**B.** <u>**Effect of Non-Occurrence of Conditions to Consummation**</u>

If the Confirmation Order is vacated, the Plan shall be null and void in all respects, however, all action taken in reliance on the Confirmation Order prior to such vacation shall be deemed to have been authorized by the Bankruptcy Court and shall not be subject to challenge or avoidance.

**C.** <u>**Notice of Effective Date and Second Administrative Bar Date**</u>

On the Effective Date, or as soon thereafter as reasonably practicable, the Debtor shall File with the Bankruptcy Court a "<u>Notice of Effective Date</u>," which notice shall constitute appropriate and adequate notice that the Plan has become effective and shall notify parties in interest of the Second Administrative Bar Date. The Plan shall be deemed effective as of 12:01 a.m. (prevailing Eastern Time) on the Effective Date specified in such filing. A courtesy copy of the Notice of Effective Date may be sent by first class mail, postage prepaid, or by e-mail, to those Entities who have Filed with the Bankruptcy Court requests for notices pursuant to Bankruptcy Rule 2002.

## ARTICLE XI.

## <u>RETENTION OF JURISDICTION</u>

Notwithstanding entry of the Confirmation Order or Consummation having occurred, the Chapter 11 Case having been closed, or a Final Decree having been entered, the Bankruptcy Court shall have jurisdiction of matters arising out of, and related, to the Chapter 11 Case and the Plan under, and for the purposes of, Sections 105(a), 1127, 1142 and 1144 of the Bankruptcy Code and for, among other things, to:

A.      allow, disallow, determine, liquidate, classify, estimate or establish the priority or status of any Claim, including the resolution of any request for payment of any Administrative Claim or Priority Tax Claim and the resolution of any and all objections to the allowance or priority of Claims;

B.      grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

C.      resolve any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which the Debtor is a party or with respect to which the Debtor may be liable and to hear, determine, and if necessary, liquidate, any Claims arising therefrom;

D.      ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan, including ruling on any motion or objection Filed pursuant to the Plan;

E.      decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtor or it affiliates, directors, employees, agents or Professionals that may be pending on the Effective Date;

F.      hear and determine the Avoidance Actions and Preference Claims by the SPhinX Trustee on behalf of the SPhinX Trust;

G.    enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan or the Disclosure Statement, including, without limitation, the Plan Term Sheet;

H.    hear and determine requests made by the Liquidating Debtor, the Trustee and/or the SPhinX Trustee, to compel the attendance of an entity for examination and for production of documents to the extent, and within the scope, specified in Bankruptcy Rule 2004, and to enter orders in connection therewith;

I.    resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of the Plan, General Trust Agreement, SPhinX Trust Agreement, or any Entity's obligations incurred in connection with the Plan, including, among other things, any avoidance actions or subordination actions under Sections 510, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code;

J.    issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan, except as otherwise provided in the Plan;

K.    resolve any cases, controversies, suits or disputes with respect to the releases, injunction and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunction and other provisions;

L.    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

M.    determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, General Trust Agreement, SPhinX Trust Agreement or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan or this Disclosure Statement;

N.    enter an order and/or Final Decree concluding the Chapter 11 Case;

O.    consider any modification of the Plan under Section 1127 of the Bankruptcy Code and/or modification of the Plan before "substantial consummation" as defined in Section 1101(2) of the Bankruptcy Code;

P.    protect the property of the Estate and/or the General Trust and/or the SPhinX Trust from adverse Claims or interference inconsistent with the Plan, including to hear actions to quiet or otherwise clear title to such property based upon the terms and provisions of the Plan, or to determine the Debtor's exclusive ownership of claims and Causes of Action retained or otherwise dealt with under the Plan;

Q.    hear and determine matters pertaining to abandonment of property of the Estate;

R.    consider any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

31

S.      interpret, enforce and address any and all issues relating to any Orders entered in the Chapter 11 Case pursuant to Section 363 of the Bankruptcy Code, previously entered in the Chapter 11 Case to the extent such Orders are not superseded or inconsistent with the Plan;

T.      facilitate the monetization of the Remaining Assets wherever located;

U.      hear and determine matters concerning state, local, and federal taxes in accordance with Sections 345, 505, and 1146 of the Bankruptcy Code;

V.      hear and act on any other matter not inconsistent with the Bankruptcy Code;

W.      consider and act on the compromise and settlement of any litigation, Claim against or cause of action on behalf of the Estate or Trust or SPhinX Trust for which Bankruptcy Court approval is required or requested; and

X.      interpret and enforce the injunctions contained in the Confirmation Order and Plan.

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

### A.      Post Effective Date Disposition of Debtor Entity

After the Effective Date has occurred, the Debtor entity will have no realizable value for the benefit of Creditors or Holders of Equity Interests.  Any time after the Effective Date, the Trustee may dissolve the Debtor entity without any further order of the Bankruptcy Court or authorization or other action by the Debtor's Shareholders or board of directors.  Dissolution of the Debtor pursuant to the Plan shall become effective immediately upon the Trustee filing (a) a "Notice of Dissolution of Debtor" with the Bankruptcy Court, which references the relevant section(s) of the Plan and Confirmation Order, and (b) a certified copy of such notice with the Delaware Secretary of State.

### B.      Post Effective Date Disposition of PFG-LLC and SPhinX Onshore

Any time after the Effective Date, the Trustee may dispose of the General Trust's interests in PFG-LLC and/or SPhinX Onshore without any further order of the Bankruptcy Court or other Court or action or approval of any Entity, including by (a) resigning as the manager of SPhinX Onshore, (b) divesting or abandoning its membership interest in PFG-LLC, and/or (c) filing bankruptcy for PFG-LLC. The Trustee may effectuate the General Trust's resignation as the managing member of PFG-LLC and/or manager of SPhinX Onshore and/or its abandonment of the General Trust's interests in such entities by filing (i) a notice of same with the Bankruptcy Court, which references the relevant section(s) of the Plan and Confirmation Order, and (ii) a certified copy of such notice with the Delaware Secretary of State.

### C.      Payment of Statutory Fees

All fees payable pursuant to 28 U.S.C § 1930 shall be paid on or before the Effective Date.  The General Trust shall pay the fees that accrue under 28 U.S.C § 1930 until a Final Decree is entered in the Debtor's Chapter 11 Case, or the Bankruptcy Court orders otherwise.  The Liquidating Debtor or the Trustee shall File U.S. Trustee quarterly fee status reports with respect to the Debtor with each quarterly fee paid after Confirmation.

32

### D.    Modification of Plan

The Debtor reserves the right to amend or modify the Plan prior to the entry of the Confirmation Order in accordance with Section 1127(a) of the Bankruptcy Code.

The Debtor may, upon order of the Bankruptcy Court, amend or modify the Plan, after its Confirmation in accordance with Section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan, if (a) the Plan has not been substantially consummated and (b) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

### E.    Professional Fee Claims

All final requests for payment of Professional Fee Claims pursuant to sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code must be filed and served on the Debtor, the U.S. Trustee, the Trustee and their counsel no later than sixty (60) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.  Objections to applications of such Professionals or other Persons for compensation or reimbursement of expenses must be filed and served on the Debtor, the U.S. Trustee, and the Trustee and their counsel and the requesting Professional or other Person no later than thirty (30) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable application for compensation or reimbursement was served.

### F.    Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

### G.    Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  The filing of the Plan, the statements or provisions contained herein, or the taking of any action by the Debtor with respect to the Plan shall not be, and shall not be deemed to be, an admission of any fact or waiver of any right of the Debtor.

Nothing in the Plan or the Plan Term Sheet, including, without limitation, the allowance, treatment or reduction of the SPhinX Claim, or the existence of the Plan Term Sheet itself or any terms thereof, shall have any effect on, or evidentiary impact whatsoever, or be admissible for any purpose, in connection with any claim that any persons or entities may assert against any other persons or entities, including, without limitation, any claim by the SPhinX Funds against anyone who is presently or formerly affiliated with the Debtor.

### H.    Further Assurances

The Debtor, the Trustee and the SPhinX Trustee, and all Holders of Claims and Equity Interests shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### I.    Retiree Benefits

The Debtor has no employees and will not pay retiree benefits.

**J.**      <u>**Notices**</u>

Any pleading, notice or other document required by the Plan to be served on or delivered to the Debtor shall be sent by first class U.S. mail, postage prepaid to:

> Florence V. Lentini
> PlusFunds Group, Inc.
> c/o XRoads Solutions Group, LLC
> 400 Madison Avenue, 3rd floor
> New York, NY 10017
> Telephone:  (212) 610-5663
> Facsimile:  (212) 610-5601

<u>With copy to</u>:

> L.P. Harrison 3rd, Esq.
> Jerrold L. Bregman, Esq.
> Curtis, Mallet-Prevost, Colt & Mosle LLP
> 101 Park Avenue
> New York, NY  10178-0061
> Telephone:  (212) 696-6000
> Facsimile:  (212) 697-1559

> Counsel for the Debtor

<u>And</u>:
> [Address for the SPhinX Trust to be disclosed at or before the Plan confirmation hearing.]

<u>With copy to</u>:
> [Name and address of counsel for the SPhinX Trust to be disclosed at or before the Plan confirmation hearing.]

> Counsel for the SPhinX TrustCounsel for the SPhinX Trust

**K.**      <u>**Filing of Additional Documents**</u>

On or before the Effective Date, the Debtor may File such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**L.**      <u>**Enforceability**</u>

Subject to Section Q below, should any provision in the Plan be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of the Plan.

**M.**      <u>**Document Retention**</u>

The Debtor's Documents will be maintained for a period of five years in accordance with the Debtor's "Document Retention Protocol" and the Plan Term Sheet, and the cost of storing the Documents

for this term is to be funded by the SPhinX Funds, who will benefit from the retention of, and non-exclusive access to, the Documents in accordance with the License and Equipment Sale Agreement and the Plan Term Sheet.  Except as explicitly provided in the Order approving the Document Retention Protocol and the Plan Term Sheet, the Trustee is authorized to abandon and/or destroy any and all of the Documents after the period during which the Documents are to be maintained pursuant to the Document Retention Protocol.  The Debtor's rights and interests in the Documents, subject to the Plan Term Sheet, shall be among the Remaining Assets transferred to the General Trust on the Effective Date.

The Debtor and the General Trust shall provide the JOLs with reasonable access to the Debtor's books and record, in accordance with the SPhinX License.  In addition, the Debtor shall provide the JOLs and the SPhinX Trust with reasonable access to the Excluded Data and all E-Mail Data (each as defined in the SPhinX License), subject to the JOLs' and the SPhinX Trust' entry into, and compliance with, a common interest agreement with the Debtor and the General Trust that preserves all privileges as to third parties, and subject to the confidentiality obligations of the Debtor relating to such data.  The SPhinX Trust shall also be entitled to obtain reasonable access to the Debtor's books and records (including the Excluded Data and the E-Mail Data) in the same manner that the JOLs are entitled to under the SPhinX License under the Plan Term Sheet.  The General Trust shall assume and perform the Debtor's obligations under the SPhinX License.  The Debtor and the General Trust and their respective professionals and advisors shall, at their own expense, reasonably cooperate and assist the JOLs, the SPhinX Trustee and the SPhinX Trust in accessing the Debtor's books and records (including the Excluded Data and the E-Mail Data) and in obtaining the cooperation of the Debtor's former personnel; provided, however, that the reasonable expenses of significant activities, or creation of any work product requested by the JOLs, the SPhinX Trustee or the SPhinX Funds, in connection with such cooperation and assistance shall be paid by the person or entity requesting same.

**N.**    **Conflict**

In the event of any conflict between the Plan and the Confirmation Order, the terms of the Confirmation Order shall control.

**O.**    **Headings**

The headings used in the Plan are inserted for convenience only and neither constitute a portion of the Plan nor in any manner shall affect the provisions or interpretation(s) of the Plan.

3045794

**P.**     **Severability**

The provisions of the Plan shall not be severable unless such severance is agreed to by the Debtor and the Trustee and such severance would constitute a permissible modification of the Plan pursuant to Section 1127 of the Bankruptcy Code.

Dated:  June 28, 2007

<div style="margin-left:40%">

PlusFunds Group, Inc.

By:  /s/ *Florence V. Lentini*      
Its:  Chief Restructuring Officer

</div>

*Submitted by:*

<div style="margin-left:40%">

**CURTIS, MALLET-PREVOST,**
 **COLT & MOSLE LLP**

By: /s/  L.P. Harrison 3rd      
    Steven J. Reisman (SR 4906)
    L.P. Harrison 3rd (LH 5540)
    Jerrold L. Bregman (JB 0784)
101 Park Avenue
New York, New York  10178-0061
Telephone:  (212) 696-6000
Facsimile:  (212) 697-1559

Attorneys for PlusFunds Group, Inc.

</div>

3045794

## PLAN SUPPLEMENT – EXHIBIT C

SPhinX Trust Agreement

Draft 7/26/07

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
----------------------------------------------------  x
In re:                                                :   Chapter 11
                                                      :
PLUSFUNDS GROUP, INC.,                                :   Case No.  06-10402 (JMP)
a Delaware corporation,                               :
                                                      :
                                                      :
                          Debtor.                     :
----------------------------------------------------  x
```

## SPHINX FUNDS TRUST AGREEMENT

This agreement creating the SPhinX Funds Trust (the "Agreement"), dated as of August __, 2007, is by and between PlusFunds Group, Inc. (the "Debtor" or "Settlor"), and James P. Sinclair as liquidating trustee (the "Trustee"), for the benefit of the Joint Official Liquidators of the SPhinX Funds (the "JOLs") in their capacities as the JOLs for the SPhinX Funds (the "Beneficiaries"), pursuant to The Fifth Amended Plan of Liquidation of the PlusFunds Group, Inc., dated June 28, 2007 (the "Plan").

WHEREAS, the Debtor has liquidated under the provisions of Chapter 11 of the Bankruptcy Code in a case pending in the Bankruptcy Court styled as *In re PlusFunds Group, Inc.*, Case No. 06-10401(JMP), pending in the United States Bankruptcy Court for the Southern District of New York;

WHEREAS, the Plan filed by the Debtor has been confirmed by an order of the Bankruptcy Court dated August, __ 2007.

WHEREAS the SPhinX Trust is created pursuant to, and to effectuate, the Plan;

WHEREAS, the SPhinX Trust is created on behalf, and for the sole benefit, of the Beneficiaries under the Plan;

WHEREAS, the Debtor has assigned the Causes of Action to the SPhinX Trust in accordance with the terms of the Plan and this Agreement;

WHEREAS, the SPhinX Trust is established for the purpose of collecting, distributing and liquidating the Assets for the sole and exclusive benefit of the Beneficiaries in accordance with the terms of this Agreement and the Plan;

WHEREAS, the Trustee shall have sole and exclusive authority to prosecute the Causes of Action in the

3802593

name of the Trustee on behalf of the SPhinX Trust;

WHEREAS, the SPhinX Trust shall not continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the SPhinX Trust;

WHEREAS, pursuant to the Plan, the Settlor, the Trustee, and the Beneficiaries are required to treat, for all U.S. federal income tax purposes, the transfer of the Assets to the SPhinX Trust as a transfer of the Assets by the Settlor to the Beneficiaries in satisfaction of their Allowed Claims, followed by a transfer of the Assets by the Beneficiaries to the SPhinX Trust in exchange for the beneficial interest herein, and to treat the Beneficiaries as the grantors and owners of the SPhinX Trust in accordance with Sections 671 through 678 of the Internal Revenue Code, as amended, and the Treasury Regulations thereunder and Treasury Regulation Section 301.7701-4(d);

WHEREAS, the SPhinX Trust is intended to be a grantor trust, of which the Beneficiaries are the grantors, within the meaning of subpart E, part I, subchapter J, Chapter 1, subtitle A of the Internal Revenue Code of 1986, as amended, and shall be construed accordingly;

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein and in the Plan, the Settlor and the Trustee agree as follows:

## 1.-1
## DEFINITIONS AND INTERPRETATIONS

1.1    Definitions.    All capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to them in the Plan and the following terms shall have the following meanings.

1.1.1    "Agreement" shall mean this SPhinX Funds Trust Agreement.

1.1.2    "Assets" shall mean the Causes of Action held by the Estate as described on Exhibit "A" hereto, and certain other assets transferred and assigned to the SPhinX Trust pursuant to the Plan, including the proceeds and/or income related thereto, held from time to time pursuant to this Agreement by the Trustee.

1.1.3    "Beneficiaries" shall have the meaning set forth in the preamble to this Agreement.

1.1.4    "Effective Date" shall have the same meaning as set forth in the Plan.

1.1.5    "JOLs" shall have the meaning set forth in the preamble to this Agreement.

1.1.6    "Settlor" shall have the meaning set forth in the preamble to this Agreement.

1.1.7    "SPhinX License" shall mean the License and Equipment Sale Agreement between the Debtor and the SPhinX Funds approved by the Bankruptcy Court pursuant to an order entered on October 10, 2006.

1.1.8    "SPhinX Trust" shall mean the SPhinX Trust established pursuant to the terms of this Agreement and the Plan.

1.1.9    Treasury Regulation shall mean the regulations promulgated under the Internal Revenue Code of 1986, as amended.

2

1.1.10  "Trustee" shall mean (x) initially, the person named herein as the Trustee, and (y) any successors or replacements duly appointed under the terms of this Agreement.

1.1.11  "SPhinX Trust Professional" shall mean any attorneys, accountants, appraisers, or other persons, deemed by the Trustee to have qualifications necessary to assist in the proper administration of the SPhinX Trust.

1.2     Interpretation.  The headings in this Agreement are for convenience only and shall not limit or otherwise affect the provisions of this Agreement.  Words denoting the singular number shall include the plural number and vice versa, and words denoting one gender shall include the other gender.

1.3     Particular Words.  Reference in this Agreement to any Section or Article is, unless otherwise specified, to that such Section or Article.  The words "hereof," "herein," and similar terms shall refer to this Agreement and not to any particular Section or Article of this Agreement.

## 2.0.0
## DECLARATION OF SPHINX TRUST

2.1     Creation and Name.  There is hereby created the SPhinX Trust, which shall be known as the "SPhinX Trust," and is the trust referred to as the "SPhinX Trust" in the Plan.  The Trustee may conduct the affairs of the SPhinX Trust under the name **"SPhinX Trust"** and is authorized to assert claims and causes of action, including but not limited to the Causes of Action, in the name of the Trustee on behalf of the SPhinX Trust.

2.2     Purpose of Trust.  The Settlor, on behalf of the Beneficiaries and the Trustee, pursuant to the Plan and in accordance with the Bankruptcy Code, hereby creates the SPhinX Trust for the purpose of collecting, distributing and liquidating the Assets for the benefit of the Beneficiaries in accordance with the terms of this Agreement and the Plan.  The activities of the Trustee and the SPhinX Trust shall be limited to those activities set forth in Article III hereof and as otherwise contemplated by the Plan.  The Trustee understands and agrees that the SPhinX Trust will not continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the SPhinX Trust.

2.3     Transfer of Assets.

A.      The Settlor hereby grants, releases, assigns, conveys, transfers and delivers, on behalf of the Beneficiaries, the Assets to the Trustee as of the Effective Date to be held in trust for the benefit of the Beneficiaries for the uses and purposes specified in this Agreement and the Plan.  The Settlor shall from time to time as and when reasonably requested by the Trustee execute and deliver or cause to be executed and delivered all such documents (in recordable form where necessary or appropriate) and the Settlor shall take or cause to be taken all such further action as the Trustee deems necessary or appropriate, in the exercise of the Trustee's business judgment, to vest or perfect in or confirm to the Trustee title to and possession of the Assets.

B.      For all federal, state and local income tax purposes, the Settlor, the Beneficiaries, and the Trustee shall treat the transfer of the Assets to the SPhinX Trust as a transfer of the Assets by the Settlor to the Beneficiaries in satisfaction of their Allowed Claims, followed by a transfer of the Assets by the Beneficiaries to the SPhinX Trust in exchange for their beneficial interests in the SPhinX Trust.  Thus, the Beneficiaries shall be treated as the grantors and owners of the SPhinX Trust.

2.4     Securities Law.  Under Section 1145 of the Bankruptcy Code, the issuance of beneficial interests in the SPhinX Trust to the Beneficiaries under the Plan are exempt from registration under the

3

Securities Act of 1933, as amended, and all applicable state and local laws requiring registration of securities. If the Trustee determines, with the advice of counsel, that the SPhinX Trust is required to comply with the registration and reporting requirements of the Securities and Exchange Act of 1934, as amended, or the Investment Company Act of 1940, as amended, the Trustee, at the SPhinX Trust's expense, shall take any and all actions to comply with such reporting requirements and file necessary periodic reports with the Securities and Exchange Commission.

<div style="text-align:center">

**3..-1**
**ADMINISTRATION OF THE SPHINX TRUST**

</div>

3.1    <u>Rights, Powers and Privileges.</u>  The Trustee shall have only the rights, powers and privileges expressly provided in this Agreement and the Plan. The Trustee shall have the power to take the actions granted in the subsections below and any powers reasonably incidental thereto, which the Trustee, in the exercise of the Trustee's business judgment, deems necessary or appropriate to fulfill the purpose of the SPhinX Trust, unless otherwise specifically limited or restricted by the Plan or this Agreement:

A.    Hold legal title to any and all rights of the Settlor and the Beneficiaries in or arising from the Assets;

B.    Protect and enforce the rights to the Assets vested in the Trustee by this Agreement by any method deemed appropriate including, without limitation, by judicial proceedings or otherwise which shall be commenced in the name of the Trustee;

C.    To have the exclusive power to investigate, pursue or not pursue, prosecute or settle any or all of the Causes of Action (in the name of the Trustee) as the Trustee determines to be in the best interest of the Beneficiaries;

D.    Exercise all powers provided for under the Plan;

E.    To conduct discovery under Bankruptcy Rule 2004 concerning all or any part of the Assets and apply to the Bankruptcy Court for authority to do so;

F.    Prosecute objections to and seek the disallowance of, in the Bankruptcy Court, of the Assumed Disputed Claims or join in any such objection commenced by the JOLs, and with the prior approval of the Advisory Board, compromise and settle each of the Assumed Disputed Claims;

G.    Make distributions to the Beneficiaries as provided for in, or contemplated by, the Plan and this Agreement;

H.    Open and maintain bank accounts on behalf of or in the name of the SPhinX Trust;

I.    Make all tax withholdings, file tax information returns, make tax elections by and on behalf of the SPhinX Trust and file returns for the SPhinX Trust pursuant to Article VII, Section 7.10 B hereof;

J.    Send annually to each Beneficiary, as soon as reasonably practicable after the end of each calendar year, a separate statement stating the Beneficiary's share of income, gain, loss, deduction or credit in accordance with Treasury Regulation Section 1.671-4(a) and instruct all such Beneficiaries to report such items on their federal tax returns;

<div style="text-align:center">4</div>

K.    Establish such reserves for, taxes, assessments, Trustee's fees and professional fees and other expenses of administration of the SPhinX Trust as may be necessary and appropriate for the proper operation of the SPhinX Trust;

L.    Pay all expenses and make all other payments relating to the Assets;

M.    Retain and pay third parties pursuant to Article III, Section 3.2 hereof;

N.    Carry insurance coverage or obtain one or more bonds in such amounts as the Trustee deems advisable as an expense of the SPhinX Trust;

O.    Assign, transfer or sell, any Assets as the Trustee determines is in the best interests of the Beneficiaries and consistent with the purposes of the SPhinX Trust;

P.    Invest any moneys held as part of the Assets in accordance with the terms of Article III, Section 3.3 hereof;

Q.    Consult with the trustee for the General SPhinX Trust in furtherance of such trustee's duties under the General SPhinX Trust and the Plan, including but not limited to, such trustee's use of the Causes of Action for the purposes permitted by the Plan.

R.    Terminate this SPhinX Trust.

3.2    _Agents and Professionals._ The Trustee may, but shall not be required to, consult with and, with the prior approval of the Advisory Board, retain one or more SPhinX Trust Professionals. The Trustee may pay the reasonable salaries, fees and expenses of the Trustee and each SPhinX Trust Professional, including contingency fee arrangements approved by the Trustee, out of the Assets in the ordinary course of business.

3.3    _Investment and Safekeeping of Assets._ All moneys and other Assets received by the Trustee shall, until distributed or paid over as herein provided, be held in trust for the benefit of the Beneficiaries, but need not be segregated from other Assets, unless and to the extent required by law or the Plan. The Trustee shall be under no liability for interest or producing income on any moneys received by it herein and held for distribution or payment to the Beneficiaries, except as such interest or income shall actually be received by the Trustee. When investing any moneys held on behalf of the SPhinX Trust, the Trustee shall act in a manner similar to the manner in which individuals of ordinary prudence, discretion and judgment would act in the management of their own affairs; provided, however, that the right and power of the Trustee to invest moneys held by the SPhinX Trust, the proceeds from any sale of shares of stock, or any income earned by the SPhinX Trust, shall be limited to the right and power to invest such moneys, pending periodic distributions in accordance with this Agreement and the Plan. For the avoidance of doubt, the investment powers of the Trustee, other than those reasonably necessary to maintain the value of the Assets and to effectuate the liquidating purpose of the SPhinX Trust, are limited to powers to invest in demand and time deposits, such as short-term certificates of deposit, in banks or other savings institutions, or other temporary, liquid investments, such as Treasury bills. Investments will be held to maturity except to the extent liquidated to fund distributions or expenses, and will not be sold or liquidated prior to maturity for the purposes of reinvestment.

3.4    _Limitations on Trustee._ Except as provided herein or in the Plan, the Trustee shall not at any time, on behalf of the SPhinX Trust or the Beneficiaries: (i) enter into or engage in any trade or business, and no part of the SPhinX Trust's Assets or the proceeds, revenue or income therefrom shall be used or disposed of by the SPhinX Trust in furtherance of any trade or business, or (ii) except as provided in this Agreement, reinvest any Assets.

5

3.5    The Trustee shall hold, collect, conserve, protect and administer the SPhinX Trust in accordance with the provisions of this Agreement and the Plan, and pay and distribute amounts as set forth herein for the purposes set forth in this Agreement.  After consultation with and where required, the prior approval of the Advisory Board, any determination by the Trustee as to what actions are in the best interests of the SPhinX Trust shall be determinative.

3.6    Bankruptcy Court Approval of Trustee Actions.  The Trustee need not obtain an order or approval of the Bankruptcy Court, or account to the Bankruptcy Court, concerning the taking of any action or exercise of any power, rights or discretion conferred hereunder, and the Trustee's actions and exercise of power, rights and discretion shall be immediately effective without any order or approval of, or accounting to, the Bankruptcy Court.  The Trustee may, but shall not be required, to seek the Bankruptcy Court's adjudication of any matter that is within the Bankruptcy Court's jurisdiction.

3.7    Valuation of Assets.  Pursuant to the Plan, the Trustee shall apprise the Beneficiaries of the Trustee's estimate of the value of the Assets.  The estimated valuation shall be used consistently by all parties (including the Trustee and Beneficiaries) for all income tax purposes.

## 4.0.0
## DISTRIBUTIONS FROM THE SPHINX TRUST

4.1    Distributions.  As soon as possible consistent with the best interests of all parties as determined by the Trustee in the exercise of the Trustee's business judgment, the Trustee shall make one or more distributions to the Beneficiaries in accordance with the Plan; provided; however, that the Trustee shall distribute, at least annually, to the Beneficiaries the SPhinX Trust's net income plus all the SPhinX Trust's net proceeds from the monetization of Assets, except that the trust may retain an amount of net proceeds or net income reasonably necessary to maintain the value of the Assets (including an amount sufficient to satisfy the expenses of administering and operating the SPhinX Trust) or to meet claims and contingent liabilities (including disputed claims).

4.2    Priorities of Distribution.  Subject to the limitations set forth in the Plan and this Agreement, the Trustee must pay the operating and administrative expenses of the SPhinX Trust before approving distributions to or for the benefit of Beneficiaries.

## 5.0.0
## BENEFICIARIES

5.1    Beneficial Interest Only.  The ownership of an interest in the SPhinX Trust shall not entitle any Beneficiary or the Settlor to any title in or to the Assets or to any right to call for a partition or division of such assets or to require an accounting, except as specifically provided herein.

5.2    Ownership of Beneficial Interests Hereunder.  Each Beneficiary shall own an interest herein equal to its Pro Rata share of such Beneficiary's Allowed Claim in accordance with the Plan.

5.3    Evidence of Beneficial Interest.  Ownership of a beneficial interest in the Assets shall not be evidenced by any certificate, security, or receipt or in any other form or manner whatsoever, except as recorded on the books and records of the SPhinX Trust by the Trustee.

5.4    Limitation on Transferability.  A Beneficiary's interest herein shall be non-assignable during the term of this Agreement except by operation of law.  An assignment by operation of law shall not be effective until appropriate notification and proof thereof is submitted to the Trustee, and the Trustee may continue to pay all amounts to or for the benefit of the assigning Beneficiary until receipt of

3802593

proper notification and proof of assignment by operation of law. The Trustee may rely upon such notification and proof without the requirement of any further investigation.

5.5     Notice of Transfer of Beneficial Interest. Any notice of a change of beneficial interest ownership as described in Section 10.1 of this Agreement shall be forwarded to the Trustee by registered or certified mail as set forth herein. The notice shall be executed by both the transferee and the transferor, and the signatures of the parties shall be acknowledged before a notary public and as required by Bankruptcy Rule 3001(e). The notice shall clearly describe the interest to be transferred. The Trustee may rely upon such signatures and acknowledgments as evidence of such transfer without the requirement of any investigation.

## 6.0.0
## THIRD PARTY RIGHTS AND LIMITATION OF LIABILITY

6.1     Parties Dealing With the Trustee. In the absence of actual knowledge to the contrary, any person dealing with the SPhinX Trust or the Trustee shall be entitled to rely on the authority of the Trustee or any of the Trustee's agents to act in connection with the Assets. No person or Entity dealing with the Trustee shall be required to inquire into the validity or expediency or propriety of any transaction by the Trustee or any agent of the Trustee.

6.2     Limitation of Trustee's Liability. Anything herein to the contrary notwithstanding, in exercising the rights granted herein, the Trustee shall exercise the Trustee's business judgment, to the end that the affairs of the SPhinX Trust shall be properly managed and the interests of all the Beneficiaries are safeguarded; but the Trustee shall not incur any responsibility or liability by reason of any error of law or of any matter or thing done or suffered or omitted to be done under this Agreement, except for gross negligence, willful misconduct or fraud.

6.3     Indemnification. The Trustee shall be indemnified by and receive reimbursement from the SPhinX Trust against and from all loss, liability, expense (including reasonable legal fees and expenses) or damage which the Trustee may incur or sustain in the exercise and performance of any of the Trustee's powers and duties under this Agreement, to the maximum extent permitted by applicable law, except if such loss, liability, expense or damage is finally determined by a court of competent jurisdiction to have resulted from the Trustee's gross negligence, willful misconduct or fraud. The amounts necessary for such indemnification and reimbursement shall be paid by the SPhinX Trust out of the Assets, and such amounts may include, without limitation, the cost of insurance to provide for such indemnity, if any, as the Trustee, in the exercise of the Trustee's business judgment, deems necessary. The Trustee shall not be personally liable for the payment of any SPhinX Trust expense or claim or other liability of the SPhinX Trust, and no Entity shall look to the Trustee personally for the payment of any such expense or liability. This indemnification shall survive the death, dissolution, resignation or removal, as may be applicable, of the Trustee, or the termination of the SPhinX Trust, and shall inure to the benefit of the Trustee's heirs, personal representatives and assigns.

## 7.0.0
## SELECTION, REMOVAL AND COMPENSATION OF TRUSTEE

7.1     Initial Trustee. The initial Trustee shall be James P. Sinclair.

7.2     Term of Service. The Trustee shall serve until (a) the completion of all the Trustee's duties, responsibilities and obligations under this Agreement and the Plan; (b) termination of the Trustee in accordance with this Agreement; or (c) the Trustee's death, resignation, incapacity or removal.

3802593

7.3     Removal of a Trustee. The Advisory Board shall, in its sole and absolute discretion, with or without cause, have the authority to remove any person or Entity serving as the Trustee and appoint a successor Trustee.

7.4     Resignation of Trustee. Trustee may resign at any time by giving the Advisory Board and the JOLs at least thirty (30) days' written notice of his or her intention to do so. In the event of a resignation, the resigning Trustee shall render to the Beneficiaries a full and complete accounting of monies and assets received, disbursed, and held during the term of office of that Trustee. The resignation shall be effective on the later of: (i) the date specified in the notice; (ii) the date that is thirty (30) days after the date the notice is delivered; or (iii) the date the accounting described in the preceding sentence is delivered.

7.5     Change of Domicile. The Trustee shall furnish the Advisory Board and the JOLs with thirty (30) days prior notice of any change in the Trustee's domicile.

7.6     Appointment of Successor Trustee. Upon the resignation, death, incapacity, or removal of a Trustee, the Advisory Board shall appoint a successor Trustee to fill the vacancy so created. Any successor Trustee so appointed shall consent to and accept in writing the terms of this Agreement and agree that the provisions of this Agreement shall be binding upon and inure to the benefit of the successor Trustee and all his/her/its heirs and legal and personal representatives and assigns.

7.7     Powers and Duties of Successor Trustee. A successor Trustee shall have all the rights, privileges, powers, and duties of his or her predecessor under this Agreement and the Plan.

7.8     SPhinX Trust Continuance. The death, resignation, incapacity or removal of the Trustee shall not terminate the SPhinX Trust or revoke any existing agency created pursuant to this Agreement or invalidate any action theretofore taken by the Trustee.

7.9     Compensation and Costs of Administration. The Trustee shall receive fair and reasonable compensation for his/her services in accordance with his/her customary rates, or on such other appropriate terms subject to the approval of the Advisory Board, which shall be a charge against and paid out of the Assets (subject to the limitations set forth in this Agreement and the Plan), provided, that no compensation may be paid to the Trustee unless and until the following procedures have been followed with respect to any individual request for compensation: (i) no more frequently than monthly and no less frequently than quarterly, the Trustee shall submit to the Advisory Board (a "Statement") reflecting all fees (itemized, as applicable, to indicate the individual performing services, such individual's billable rate, a description of the services performed, the time spent, and the fees incurred) and itemized costs to be reimbursed, (ii) the amount reflected in any such Statement may be paid to the Trustee 30 days after the delivery of the Statement as specified in clause (i) unless, prior to the expiration of such 30-day period, the Advisory Board, or any member thereof, shall have objected in writing to any compensation reflected in the Statement, in which case the undisputed amounts may be paid and the disputed amounts may only be paid by agreement of the Trustee and the objecting party, or pursuant to Final Order of the Bankruptcy Court, which shall retain exclusive jurisdiction over all disputes regarding the Trustee's compensation. All costs, expenses, and obligations, including, without limitation, professional fees and filing fees, incurred by the Trustee (or professionals who may be employed by the Trustee) shall be paid from the Assets prior to any distribution to the Beneficiaries (subject to any limitations set forth in this Agreement and the Plan). The Bankruptcy Court shall retain exclusive jurisdiction to determine any dispute concerning the fees and expenses payable to any SPhinX Trust Professional engaged by the Trustee that is not otherwise resolved by the Trustee. The Advisory Board may request, from time to time, that the Trustee provide a monthly or quarterly budget and work plan on a periodic basis which reflects the Trustee's plans for administering the assets of the SPhinX Trust for the benefit of the beneficiaries of the SPhinX Trust.

8

7.10    Annual Reporting and Filing Requirements.

A.    As soon as reasonably practicable after the end of each calendar year, starting with the report for 2007 due in 2008, the Trustee shall furnish a report to the Advisory Board of all Assets received by the SPhinX Trust, all Assets disbursed to Beneficiaries, and all Assets held by the SPhinX Trust during the preceding calendar year and shall be available to meet with the Advisory Board periodically as reasonably requested by the Advisory Board. The Trustee's report will be available and provided to any Beneficiary upon request.

B.    The Trustee shall file tax returns for the SPhinX Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) and any other applicable laws or regulations.

## 8.☐.-1
## MAINTENANCE OF RECORDS

8.1    The Trustee shall maintain books and records containing a description of all property from time to time constituting the Assets and an accounting of all receipts and disbursements. Said books shall be open to inspection by any Beneficiary at any reasonable time during normal business hours. The Trustee shall furnish to any Beneficiary upon written request the most recent annual statement of receipts and disbursements of the SPhinX Trust, if any. Records of the SPhinX Trust may be disposed of in accordance with Section 10.4 hereof.

## 9.☐.-1
## ADVISORY BOARD

9.1    Advisory Board.

A.    The Advisory Board, which shall be comprised of at least two members and no more than five (5) members, will be initially selected by the JOLs. The Advisory Board shall have the authority and responsibility to oversee, review, and guide the activities and performance of the Trustee and shall have the authority to remove the Trustee for any reason. The Trustee shall consult with and provide information to the Advisory Board in accordance with and pursuant to the terms of this Agreement and the Plan. The Advisory Board may direct the Trustee to enter into or not take any action with respect to an Asset so long as such direction is consistent with the Plan, the terms of this Agreement, and the purposes of the Trust; *provided, however*, that that the Trustee, upon advice of counsel, may refuse to follow any direction that conflicts with law, this Agreement, or the Plan.

B.    The Trustee shall be obligated to obtain the prior consent of the Advisory Board to (i) sell, compromise or settle any Asset, including, but not limited to, any Cause of Action; (ii) retain professionals; and (iii) terminate the SPhinX Trust.

C.    The Advisory Board shall have the authority to select and engage such Entities, and select and engage such professional advisors, including, without limitation, any professional previously retained by the Debtor in accordance with the terms of the Plan and this Agreement, as the Advisory Board deems necessary and desirable to assist the Advisory Board in fulfilling its obligations under this Agreement and the Plan, and the SPhinX Trust shall pay the reasonable fees of such Entities and reimburse such Entities for their reasonable out-of-pocket costs and expenses.

9.2    Regular Meetings of the Trustee and the Advisory Board.    Meetings of the Trustee and the Advisory Board are to be held with such frequency and at such place as the Trustee and the Advisory Board may determine in their sole discretion, but in no event shall such meetings be held less frequently than annually.

9

9.3    <u>Special Meetings of Trustee</u>.  Special meetings of the Trustee and the Advisory Board may be held whenever and called either by the Trustee or any member of the Advisory Board on not less than 24 hours advance written notice.

9.4    <u>Manner of Acting</u>.

A.    A majority of the total number of the Advisory Board then in office shall constitute a quorum for the transaction of business at any meeting of the Advisory Board.  The affirmative vote of a majority of the members of the Advisory Board present at a meeting at which a quorum is present shall be the act of the Advisory Board except as otherwise required by the law or as provided in this Agreement.  Any or all of the members of the Advisory Board may participate in a regular or special meeting by, or conduct the meeting through the use of, conference telephone or similar communications equipment by means of which all persons participating in the meeting may hear each other, in which case any required notice of such meeting may generally describe the arrangements (rather than or in addition to the place) for the holding thereof.  Any member of the Advisory Board participating in a meeting by this means is deemed to be present in person at the meeting.

B.    Any member of the Advisory Board who is present at a meeting of the Advisory Board when action is taken is deemed to have assented to the action taken unless: (i) such member of the Advisory Board objects at the beginning of the meeting (or promptly upon his/her arrival) to holding it or transacting business at the meeting; or (ii) his/her dissent or abstention from the action taken is entered in the minutes of the meeting; or (iii) he/she delivers written notice of his/her dissent or abstention to the Advisory Board before its adjournment.  The right of dissent or abstention is not available to any member of the Advisory Board who votes in favor of the action taken.

9.5    <u>Advisory Board's Action Without a Meeting</u>.  Any action required or permitted to be taken by the Advisory Board at a meeting may be taken without a meeting if the action is taken by unanimous written consent of the Advisory Board as evidenced by one or more written consents describing the action taken, signed by the Advisory Board and filed with the minutes or proceedings of the Advisory Board.

9.6    <u>Tenure, Removal, and Replacement of the Members of the Advisory Board</u>.

The authority of the members of the Advisory Board will be effective as of the Effective Date and will remain and continue in full force and effect until the SphinX Trust is terminated in accordance with Section 10.3.  The service of the members of the Advisory Board will be subject to the following:

A.    The members of the Advisory Board will serve until death or resignation, or removal pursuant to subsection C below;

B.    A member of the Advisory Board may resign at any time by providing a written notice of resignation to the remaining members of the Advisory Board and the JOLs.

C.    The JOLs have the sole and exclusive right to remove any member of the Advisory Board (with or without cause) and to appoint any successor member to the Advisory Board.

D.    Immediately upon appointment of any successor member to the Advisory Board, all rights, powers, duties, authority, and privileges of the predecessor member of the Advisory Board hereunder will be vested in and undertaken by the successor member of the Advisory Board without any further act; and the successor member of the Advisory Board will not be liable personally for any act or omission of the predecessor member of the Advisory Board.

10

**10..-1**
**DURATION OF SPHINX TRUST**

10.1    Duration.  The SPhinX Trust shall become effective upon the Effective Date of the Plan. Thereupon, the SPhinX Trust and its provisions herein shall remain and continue in full force and effect until the SPhinX Trust is terminated in accordance with the terms hereof and the Plan.

10.2    Termination Upon Distribution of All Assets.  Upon the payment of all costs, expenses, and obligations (including the final distribution to Beneficiaries) incurred in connection with administering the SPhinX Trust, and distribution of Assets in accordance with the Plan, the Confirmation Order and this Agreement, the Trustee shall terminate the SPhinX Trust by filing (a) with the Bankruptcy Court a "Notice of Termination of the SPhinX Trust," which references the Plan and the Confirmation Order, and (b) a certified copy of such notice with the New York Secretary of State, upon which the Trustee shall have no further responsibility in connection with the SPhinX Trust.

10.3    Termination After Five Years.  If the SPhinX Trust has not been previously terminated pursuant to Section 10.2 hereof, on the fifth anniversary of the Effective Date, unless otherwise extended for cause by the Bankruptcy Court, the Trustee shall distribute all of the Assets in accordance with the Plan and immediately thereafter, the SPhinX Trust shall terminate and the Trustee shall have no further responsibility in connection therewith, except as provided in Section 10.4 below.  Upon motion to the Bankruptcy Court, the Trustee shall have the right, with the approval of the Bankruptcy Court, to extend the SPhinX Trust for successive one year periods; provided, however, such approval shall be obtained no earlier than six months prior to the SPhinX Trust's then stated termination.  Multiple extensions may be obtained so long as Bankruptcy Court approval is sought prior to the expiration of each extended term as provided in this Section 10.3 and so long as the Bankruptcy Court finds that the extension is necessary to the liquidating purpose of the SPhinX Trust.

10.4    Continuance of SPhinX Trust for Winding-Up.  After the termination of the SPhinX Trust, the Trustee shall retain for a period of two (2) years the books, records, Beneficiary lists, and certificates and other documents and files which shall have been delivered to or created by the Trustee. At the Trustee's discretion, all of such records and documents may, but need not, be destroyed at any time after two (2) years from the completion and winding up of the affairs of the SPhinX Trust. Except as otherwise specifically provided herein, upon the discharge of all liabilities of the SPhinX Trust and final distribution of the SPhinX Trust, the Trustee shall have no further duties or obligations hereunder.

**11.-1.-1**
**MISCELLANEOUS**

11.1    Notices.  All notices to be given to Beneficiaries may be given by ordinary mail, e-mail, or may be delivered personally, to the Beneficiaries at the addresses appearing on the books received from the Debtor, if any, and/or maintained at the Trustee's direction.  Any notice or other communication which may be or is required to be given, served, or sent to the Trustee shall be in writing and shall be sent by registered or certified United States mail, return receipt requested, postage prepaid, or transmitted by hand delivery or facsimile (if receipt is confirmed) addressed as follows:

If to the Trustee:
James P. Sinclair
SPhinX Trust
4 East 95th Street
New York, NY  10128

3802593

If to the Advisory Board:
Mr.: Kenneth M. Krys and Mr. Christopher Stride
c/o: SPhinX Funds (In Liquidation)
PO Box 11270
#10 Corporate Centre
Grand Cayman
Cayman Islands
KY1-1009

or to such other address as may from time to time be provided in written notice by the Trustee.

     11.2   <u>No Bond.</u>  Notwithstanding any state law to the contrary, the Trustee (including any successor) shall be exempt from giving any bond or other security in any jurisdiction.

     11.3   <u>Governing Law.</u>  This Agreement shall be governed by and construed in accordance with the laws of the State of New York for contracts that are entered into and to be fully performed within the State of New York.

     11.4   <u>Successors and Assigns.</u>  This Agreement shall inure to the benefit of and shall be binding upon the parties hereto, the Beneficiaries, and their respective representatives, successors and assigns.

     11.5   <u>Headings.</u>  The various headings of this Agreement are inserted for convenience only and shall not affect the meaning, interpretation or understanding of this Agreement or any provision hereof.

     11.6   <u>Books and Records.</u>

     A.    The Debtor and the General Trust shall provide the Trustee with reasonable access to the Debtor's books and records, in accordance with the SPhinX License and as provided for in the Plan and Plan Term Sheet. In addition, the Debtor shall provide the Trustee with reasonable access to the Excluded Data and all E-Mail Data (each as defined in the SPhinX License), subject to the Trustee's entry into, and compliance with, a common interest agreement with the Debtor and the General Trust that preserves all privileges as to the third parties, and subject to the confidentiality obligations of the Debtor relating to such data excluded under the Plan Term Sheet.

     B.    The General Trust shall assume and perform the Debtor's obligations under the SPhinX License. The Debtor and the General Trust and their respective professionals and advisors shall, at their own expense, reasonably cooperate and assist the Trustee in accessing the Debtor's books and records (including the Excluded Data and the E-Mail Data) and in obtaining the cooperation of the Debtor's former personnel; provided, however, that the reasonable expenses of significant activities, or creation of any work product requested by the Trustee, in connection with such cooperation and assistance shall be paid by the SPhinX Trust.

     11.7   <u>No Execution.</u>  All funds in the SPhinX Trust shall be deemed *in custodia legis* until such times as the funds have actually been paid to or for the benefit of a Beneficiary, and no Beneficiary or any other Person can execute upon, garnish or attach the Assets of the SPhinX Trust in any manner or compel payment from the SPhinX Trust except by Final Order of the Bankruptcy Court. Payment will be solely governed by the Plan and this Agreement.

     11.8   <u>Amendment.</u>  Any substantive provision of this Agreement may be or waived or amended only upon the written consent of the Advisory Board. Technical amendments to this Agreement may be

3802593

made, as necessary in the business judgment of the Trustee, to clarify this Agreement or enable the Trustee to effectuate the terms of this Agreement, by the Trustee without Bankruptcy Court approval but with notice to the Advisory Board. Any amendments to this Agreement pursuant to this section shall not be inconsistent with the purpose and intention of the liquidating trust to liquidate in an expeditious but orderly manner the Assets in accordance with Treasury Regulations Section 301.7701-4(d) and Section 3.1 hereof.

     11.9   <u>Severability.</u>  If any term, provision, covenant or restriction contained in this Agreement is finally held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions contained in this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

     IN WITNESS WHEREOF, the parties have executed this Agreement (or are deemed to have so executed this Agreement) as of the day and year written above.

Dated: August ___ 2007

<div style="text-align:center">PLUSFUNDS GROUP, INC.</div>

By: _____
Its:  Chief Restructuring Officer

<div style="text-align:center">SPHINX TRUST</div>

By: _____
    James P. Sinclair
    Trustee

3802593

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
In re:                                      :    Chapter 11
                                            :
PLUSFUNDS GROUP, INC.,                      :    Case No. 06-10402 (JMP)
A Delaware Corporation,                     :
                                            :
                        Debtor.             :
---------------------------------------------------------------x


**ORDER (I) CONFIRMING THE DEBTOR'S FIFTH AMENDED
PLAN OF LIQUIDATION, DATED JUNE 28, 2007, UNDER BANKRUPTCY CODE
SECTION 1129 AND BANKRUPTCY RULE 3020; (II) APPROVING SETTLEMENTS
IN CONNECTION THEREWITH; AND (III) GRANTING RELATED RELIEF**


## RECITALS

a.      On March 6, 2006, PlusFunds Group, Inc., the above-captioned debtor and

debtor-in-possession (the "Debtor") commenced its bankruptcy case by filing a voluntary

petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et

seq. (the "Bankruptcy Code").

b.      Pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor

is winding down its business and managing its affairs as debtor-in-possession.

c.      On May 26, 2007, the Debtor filed the Motion for an Order (A) Approving

the Adequacy of PlusFunds' Disclosure Statement Describing its Third Amended Plan of

Liquidation, (B) Scheduling Hearing to Confirm the Plan, (C) Establishing Plan Objection

Deadline; (D) Approving Form of Ballot, Voting Deadline and Solicitation Procedures; and (E)

Approving Form and Manner of Notice.

d.  On June 28, 2007, the Bankruptcy Court entered the Order (A) Approving the Adequacy of PlusFunds' Disclosure Statement Describing its Fifth Amended Plan of Liquidation, (B) Scheduling Hearing to Confirm the Plan, (C) Establishing Plan Objection Deadline; (D) Approving Form of Ballot, Voting Deadline and Solicitation Procedures; and (E) Approving Form and Manner of Notice (the "Solicitation Approval Order").

e.  On September 27, 2006, the Debtor filed its original proposed plan of liquidation and accompanying disclosure statement which were superseded by corresponding documents the Debtor filed on each of November 2, 2006 (the first amended plan of liquidation and accompanying disclosure statement), November 6, 2006 (the second amended plan of liquidation and accompanying disclosure statement), May 25, 2007 (the third amended plan of liquidation and accompanying disclosure statement) and June 26, 2007 (the fourth amended plan of liquidation and accompanying disclosure statement).  On June 28, 2007, the Debtor filed its fifth amended plan of liquidation and accompanying disclosure statement, dated June 28, 2007, which became the operative documents (and as modified pursuant to this Confirmation Order, the "Plan" and "Disclosure Statement," respectively) under Section 1127(a) of the Bankruptcy Code.[1]

f.  This Court set August 2, 2007, at 10:00 a.m. (prevailing Eastern Time), as the date and time of the hearing pursuant to Rules 3017 and 3018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Sections 1125, 1126, 1128 and 1129 of the Bankruptcy Code to consider the confirmation of the Plan (the "Confirmation Hearing").

g.  The Debtor caused the Solicitation Package, including the Plan and Disclosure Statement, to be served on all holders of Claims and Interests on July 2, 2007, in accordance with the Solicitation Approval Order.

h.      On July 30, 2007, the Debtor filed various documents comprising the Plan Supplement (the "Initial Plan Supplement"), on August 1, 2007, the Debtor filed its First Augmentation of Plan Supplement to Fifth Amended Plan of Liquidation of PlusFunds Group, Inc., dated June 28, 2007 (the "First Augmentation"), and on August 2, 2007, the Debtor filed its Second Augmentation of Plan Supplement to Fifth Amended Plan of Liquidation of PlusFunds Group, Inc., dated June 28, 2007 (collectively, with the Initial Plan Supplement and First Augmentation, the "Plan Supplement").

i.      On August 1, 2007, the Debtor filed its Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Liquidation of PlusFunds Group, Inc. (the "Plan Confirmation Memorandum") together with the declaration of Florence V. Lentini, a principal of XRoads Solutions Group, LLC and the Debtor's Chief Restructuring Officer, in support of confirmation of the Plan (the "Lentini Declaration"), and the Affidavit of James Katchadurian, a Vice President and Senior Consultant of Epiq Systems (f/k/a Bankruptcy Services LLC), the Debtor's claims, noticing and balloting agent (the "BSI Affidavit"), as to the voting results.

j.      The Confirmation Hearing was held before this Court on August 2, 2007.

k.      This Court has reviewed the Plan, the Disclosure Statement, the Plan Confirmation Memorandum, the Lentini Declaration, the BSI Affidavit, the Plan Supplement, all filed pleadings, exhibits, statements and comments regarding confirmation, including the objection to confirmation of the Plan filed by Refco Offshore Managed Futures Funds, Ltd. and Refco Public Commodity Pool, LP (collectively, the "Refco Creditors"); this Court having heard the statements of counsel in respect of the Confirmation Hearing; this Court having considered all testimony, documents and declarations offered in support of confirmation of the Plan

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Plan.

("<u>Confirmation</u>"); and this Court having overruled any unresolved objections to the Plan and/or Disclosure.

l. After due deliberation thereon and good cause appearing therefor, this Court hereby makes and issues the following Findings of Facts, Conclusions of Law and Order.[2]

**I.**
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

A. <u>The Recitals</u>.  Each of the foregoing recitals constitutes a finding of fact of this Court.

B. <u>The Debtor</u>.  On March 6, 2006, the Debtor commenced its bankruptcy case by filing a petition for relief under Chapter 11 of Title 11 of the Bankruptcy Code.  The Debtor was (and is) qualified to be a debtor under Section 109 of the Bankruptcy Code.

C. <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (L) and (O) and this Court has jurisdiction to enter a final order with respect thereto.  Venue in the Southern District of New York was proper on the Petition Date and continues to be proper under 28 U.S.C. §§ 1408 and 1409.

D. <u>Judicial Notice</u>.  The Bankruptcy Court takes judicial notice of the docket of the Debtor's Chapter 11 Case maintained by the Clerk of the Bankruptcy Court, including, without limitation, all pleadings, declarations, affidavits and other documents filed, all orders entered, and the transcripts of, and all evidence and arguments made, proffered or adduced at, the hearings held before the Bankruptcy Court during the pendency of the Chapter 11 Case.

---

[2] This Confirmation Order constitutes findings of fact and conclusions of law under Fed. R. Civ. P. 52, as made applicable by Bankruptcy Rules 7052 and 9014.  Any and all findings of fact shall constitute findings of fact even if they are stated as conclusions of law, and any and all conclusions of law shall constitute conclusions of law even if they are stated as findings of fact.

3798362

E.    Burden of Proof.  The Debtor, as proponent of the Plan, has met the burden

of proving the satisfaction of each of the applicable elements of Section 1129 of the Bankruptcy

Code, in each case, by a preponderance of the evidence.

F.    Solicitation and Notice.  On June 28, 2007, the Bankruptcy Court entered

the Solicitation Approval Order.  The Solicitation Approval Order, among other things, approved

the Disclosure Statement as containing "adequate information" of a kind and in sufficient detail

to enable hypothetical, reasonable investors typical of the Debtor's creditors to make an

informed judgment whether to vote to accept or reject the Plan.  The Debtor caused the

Solicitation Package (as defined in the Solicitation Approval Order ) to be served upon: the U.S.

Trustee, the JOLs, all Entities who have filed a Claim in the Debtor's Chapter 11 Case, all

holders of Equity Interests, all Persons who have requested special notice in the Debtor's

Chapter 11 Case pursuant to Rule 2002 of the Bankruptcy Rules on or prior to June 28, 2007, the

Internal Revenue Service, the Secretary of State of New York, the Securities and Exchange

Commission, any entity that has filed with the Bankruptcy Court a notice of transfer of a claim

under Bankruptcy Rule 3001(e) on or prior to June 28, 2007, all Entities listed in the Debtor's

schedules not otherwise identified above in this paragraph, and all other known creditors of the

Debtor.  The Solicitation Package consisted of the (1) Notice of Confirmation Hearing and

Procedures Confirmation; (2) the (a) Plan and (b) Disclosure Statement; (3) Ballot or Notice of

Non-Voting Status (as applicable, in accordance with the Solicitation Approval Order); and (4) a

letter in support of the Plan from the Debtor's Chief Restructuring Officer, Florence V. Lentini.

The Solicitation Package was served in compliance with the Solicitation Approval Order, the

Bankruptcy Code and the Bankruptcy Rules on June 28, 2007, and the Liquidation Analysis,

Exhibit B to the Disclosure Statement, was served on parties in interest as a separate document

on July 9, 2007 (see Docket No. 462).  As described in the Solicitation Approval Order, and as

evidenced by the BSI Affidavit and the certificates of service filed in connection therewith,

(i) the service of the Solicitation Package was adequate and sufficient under the circumstances of

the Chapter 11 Case, and (ii) adequate and sufficient notice of the Confirmation Hearing and

other requirements, deadlines, hearings, and matters described in the Solicitation Approval Order

was timely provided in compliance with the Bankruptcy Code and Bankruptcy Rules, and

provided due process and an opportunity to appear and be heard to all parties in interest.  No

other or further notice is required.

G.    Voting.  The Solicitation Approval Order fixed July 30, 2007, as the Voting

Deadline.  Votes on the Plan, whether accepting or rejecting, were solicited and tabulated fairly,

in good faith, and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules, the

Disclosure Statement and the Solicitation Approval Order.  As set forth in the BSI Affidavit, the

Plan has been accepted, within the meaning of Section 1126(c) of the Bankruptcy Code, by each

Class of impaired Claims entitled to vote on the Plan: Classes 3 and 4 voted to accept the Plan.

As the Debtor anticipated, Class 2 (Secured Claims) did not have any Claimants, thus Class 2 is

a nullity.  Class 5 (Equity Interests) is deemed to have rejected the Plan because the Plan

provides for no distribution to Holders of Equity Interests.

H.    Objections.  All objections and responses to, and statements and comments

regarding, the Plan, to the extent not already withdrawn or resolved pursuant to representations

on the record at the Confirmation Hearing, including the objection of the Refco Creditors, are

overruled.

I.    Grand Court Approval.  The SPhinX Funds and the JOLs have represented

to this Court that they have obtained all approvals necessary or required (including, without

limitation, approval of the court overseeing the SPhinX Funds' Cayman Islands liquidation

proceedings) to perform their obligations under the Plan Term Sheet.

J.    <u>Section 1129(a)(1) - Compliance of the Plan with Applicable Provisions of the Bankruptcy Code</u>.  The Plan complies with all applicable provisions of the Bankruptcy Code as required by Section 1129(a)(1) of the Bankruptcy Code, including, without limitation, Sections 1122 and 1123 of the Bankruptcy Code.  The Plan is dated and identifies the Debtor as proponent of such Plan.  Pursuant to Sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, the Plan designates Classes of Claims and Equity Interests, other than Administrative Claims and Priority Tax Claims.  As required by Section 1122(a) of the Bankruptcy Code, each Class of Claims and Equity Interests contains only Claims or Equity Interests that are substantially similar to the other Claims or Equity Interests within such Class.  A reasonable basis exists for the classifications in the Plan.  Pursuant to Sections 1123(a)(2) and 1123(a)(3) of the Bankruptcy Code, Article III of the Plan specifies all Claims and Equity Interests that are not impaired and the treatment of all Claims and Equity Interests that are impaired.  Article III of the Plan identifies Classes 2, 3, 4 and 5 as impaired under the Plan.  Pursuant to Section 1123(a)(4) of the Bankruptcy Code, the Plan also provides the same treatment for each Claim or Equity Interest within a particular Class.  Pursuant to Section 1123(a)(5) of the Bankruptcy Code, the Plan provides adequate means for the Plan's implementation, as set forth in Articles V and VI of the Plan.  The Debtor will have, immediately upon the Effective Date of the Plan, sufficient cash available to make all payments that are required to be made on the Effective Date pursuant to the terms of the Plan.

K.    <u>Section 1129(a)(2) - Compliance of the Debtor with Applicable Provisions of the Bankruptcy Code</u>.  As required by Section 1129(a)(2) of the Bankruptcy Code, the Debtor, as proponent of the Plan, has complied with all applicable provisions of the Bankruptcy Code, including, without limitation, Sections 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rules 3017, 3018 and 3019.  In particular, the solicitation of votes to accept or reject the Plan

was (i) in compliance with all applicable non-bankruptcy laws, rules, and regulations governing

the adequacy of disclosure in connection with such solicitation, and (ii) solicited after disclosure

of adequate information as defined in Section 1125(a) of the Bankruptcy Code.  The Debtor has

further complied with all the provisions of the Bankruptcy Code and the Bankruptcy Rules

governing notice of the Plan and the Confirmation Hearing.  The record in the Chapter 11 Case

further reflects that the Debtor has attempted in good faith to comply with the orders of the

Bankruptcy Court entered during the pendency of the Chapter 11 Case.

   L. <u>Section 1129(a)(3) - Proposal of Plan in Good Faith</u>.  The Debtor proposed

the Plan in good faith and not by any means forbidden by law.  The Bankruptcy Court has

examined the totality of the circumstances surrounding the formulation of the Plan and the

evidence submitted in connection with the Confirmation Hearing.  The Plan has been accepted

by the requisite Holders of Claims in all Classes entitled to vote on the Plan, and such acceptance

evidences the informed judgment of creditors that the Plan is in their best interests.  The Plan

was proposed after arms'-length and good-faith negotiations among the parties, including their

counsel, and for the legitimate and honest purpose of maximizing the value of the Debtor's

Estate and effectuating a fair and equitable distribution of such value to creditors.  The Plan also

has the support of the majority of Creditors voting on the Plan.  Therefore, the Plan has been

proposed in good faith, as such term is used in Sections 1129(a)(3) and 363(m) of the

Bankruptcy Code.

   M. <u>Section 1129(a)(4) - Bankruptcy Court Approval of Certain Payments as</u>

<u>Reasonable</u>.  Pursuant to Section 1129(a)(4) of the Bankruptcy Code, any payment made or

promised by the Debtor or by any person acquiring property under the Plan, for services or for

costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan

and incident to the Chapter 11 Case, has been or will be disclosed to the Bankruptcy Court, and

has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

      N.    Section 1129(a)(5) - Disclosure of Identity and Proposed Management,

Compensation of Insiders, and Consistency with the Interests of Affiliations of Creditors and

Public Policy.  Pursuant to Section 1129(a)(5) of the Bankruptcy Code, the Plan Supplement

discloses the identity and affiliations of the Trustee of the General Trust, Florence V. Lentini,

and the SPhinX Trustee, James P. Sinclair.  The nature of the compensation to be received by

each of the trustees was also disclosed in the Plan Supplement, and each of the trustees'

*curriculum vitae* is attached to the Plan Supplement.  Although Ms. Lentini will continue to be

an officer of the Liquidating Debtor, the Plan provides that the Trustee may dissolve the

Liquidating Debtor with no further action of its board or shareholders or order of this Court, and

the Liquidating Debtor which will have no other officers and no directors on its board.  Based on

the foregoing, the Plan satisfies the requirements of Section 1129(a)(5) of the Bankruptcy Code.

      O.    Section 1129(a)(6) - Approval of Rate Changes.  No governmental

regulatory commission has jurisdiction over the rates of the Debtor.  Accordingly, Section

1129(a)(6) is inapplicable to the Chapter 11 Case.

      P.    Section 1129(a)(7) - Best Interests of Creditors.  With respect to each

Impaired Class of Claims, each holder of a Claim in such Class has accepted the Plan or will

receive or retain under the Plan on account of such Claim or Equity Interest property of a value,

as of the Effective Date, that is not less than the amount such holder would receive or retain if

the Debtor was liquidated on the Effective Date under Chapter 7 of the Bankruptcy Code.  A

conversion of the Chapter 11 Case to Chapter 7 would likely be accompanied by a decrease in

the amount of recovery that creditors would receive on account of their Claims, as indicated in

the Liquidation Analysis.  Thus, the Plan provides a superior recovery to creditors relative to

conversion of the Chapter 11 Case and is in the best interests of creditors under Section 1129(a)(7) of the Bankruptcy Code.

Q.    Section 1129(a)(8) - Acceptance of the Plan By Each Impaired Class. The Debtor is unable to comply with the provisions of Section 1129(a)(8) of the Bankruptcy Code, requiring that all impaired classes accept the plan, because Class 5 is conclusively presumed to have rejected the Plan. As described below, however, the Plan satisfied Section 1129(b) of the Bankruptcy Code as to Class 5.

R.    Section 1129(a)(9) - Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code. The Plan provides for treatment of Administrative Claims, Priority Tax Claims and Other Priority Claims in the manner consistent with the requirements of Section 1129(a)(9) of the Bankruptcy Code.

S.    Section 1129(a)(10) - Acceptance by at Least One Impaired Class. As required by Section 1129(a)(10) of the Bankruptcy Code, at least one Class of Claims that is Impaired under the Plan has accepted the Plan, excluding the votes cast by Insiders, specifically, each of Classes 3 and 4 has voted to accept the Plan.

T.    Section 129(a)(11) - Feasibility. The Plan meets the requirement of Section 1129(a)(11) of the Bankruptcy Code because the evidence establishes there is a reasonable probability that the provisions of the Plan can be performed. The Debtor will have sufficient funds to satisfy its obligations under the Plan, as shown in the Liquidation Analysis.

U.    Section 1129(a)(12) - Payment of Statutory Fees. In accordance with Section 1129(a)(12) of the Bankruptcy Code, Article XIV(C) of the Plan provides for the payment of all fees payable under 28 U.S.C. § 1930 on or before the Effective Date. The General Trust, who will be responsible for paying such fees, has adequate means to pay all such fees.

V. <u>Section 1129(a)(13) - Retiree Benefits</u>. The Debtor is not obligated to provide any retiree benefits, as such term is defined in Section 1114 of the Bankruptcy Code. Accordingly, Section 1129(a)(13) of the Bankruptcy Code is inapplicable to the Chapter 11 Case.

W. <u>Section 1129(a)(14) - Domestic Support Obligations</u>. The Debtor is not required by a judicial or administrative order, or by statute, to pay domestic support obligations. Accordingly, Section 1129(d)(14) of the Bankruptcy Code is inapplicable to the Chapter 11 Case.

X. <u>Section 1129(a)(15) – Debtor is Not an Individual</u>. The Debtor is not an individual. Accordingly, Section 1129(a)(15) of the Bankruptcy Code is inapplicable to the Chapter 11 Case.

Y. <u>Section 1129(a)(16) - No Applicable Nonbankruptcy Law Regarding Transfers</u>. The Debtor is a moneyed business or commercial corporation. Accordingly, Section 1129(a)(16) of the Bankruptcy Code is inapplicable to the Chapter 11 Case.

Z. <u>Sections 1129(b)(1) and (2) - Cramdown</u>. Class 5 is deemed to reject the Plan. Class 5 will not receive or retain any property under the Plan in respect of its Equity Interests, which are cancelled under the Plan, and there is no junior creditor or interest holder that will receive or retain anything under the Plan on account of such junior interest. The Plan does not discriminate unfairly, and is fair and equitable, with respect to the Holders of Equity Interests in Class 5, as required by Sections 1129(b)(1) and (2) of the Bankruptcy Code. The Plan is to be confirmed notwithstanding the inability to satisfy Section 1129(a)(8) of the Bankruptcy Code with respect to Class 5, pursuant to Section 1129(b)(1) of the Bankruptcy Code. Upon the Confirmation and the occurrence of the Effective Date, the Plan shall be binding upon all Holders of Equity Interests.

AA.    <u>Section 1129(c) - Only One Plan</u>.  The Plan is the only plan filed in the Chapter 11 Case.  Accordingly, Section 1129(c) of the Bankruptcy Code is inapplicable to the Chapter 11 Case.

BB.    <u>Section 1129(d) - Principal Purpose of the Plan</u>.  The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act of 1933, thus, the requirements of Section 1129(d) of the Bankruptcy Code are satisfied.

CC.    <u>Section 1125(e) - Good Faith Solicitation</u>.  Based on the record before the Bankruptcy Court in the Chapter 11 Case, (i) the Debtor is deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and the Solicitation Approval Order, including without limitation, Sections 1125(c) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation, and (ii) the Debtor, and all of its respective members, officers, directors, agents, financial advisers, attorneys, employees, equity holders, partners, affiliates, and representatives shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the solicitation of the Plan and are entitled to the protections afforded under the Plan and by Section 1125(e) of the Bankruptcy Code.

DD.    <u>PlusFunds GP LLC</u>.  A sound business purpose exists for the Debtor's transferring any and all of its membership interests in PlusFunds GP LLC, a Delaware limited liability company of which the Debtor is the managing member, to Carroll Services, the Liquidator of SIF-LP, and Carroll Services has agreed to accept such interests subject to the terms of this Confirmation Order.

EE.    <u>Satisfaction of Confirmation Requirements</u>.  Based upon the foregoing, the Plan satisfies the requirements for Confirmation set forth in Section 1129 of the Bankruptcy Code.

FF.    <u>Authority</u>.  The Liquidating Debtor has the authority, pursuant to the Plan and this Confirmation Order, to enter into the Trust Agreements (as defined below) upon the Effective Date.

GG.    <u>Good Faith</u>.  The Debtor and the JOLs, and all of their respective professionals, will be acting in good faith if they proceed to: (i) consummate the Plan; and (ii) take the actions authorized and directed by this Confirmation Order.

HH.    <u>Releases</u>.  The Releases (defined below) under the Plan are in the best interests of the Debtor and the Creditors and are necessary and appropriate under the circumstances of this Chapter 11 Case and confirmation of the Plan would not be possible without them.  No Creditors or other parties in interest filed any objection to the Releases.

II.    <u>Settlement</u>.  The Settlement (defined below) does not violate the priority scheme of the Bankruptcy Code.  No Creditors or other parties in interest filed any objection to the Settlement which Settlement is in the best interests of the Debtor and the Creditors and necessary and appropriate under the circumstances of this Chapter 11 Case.  In approving the Settlement, this Court has considered, among other things: (i) the nature of the claims asserted or potentially assertable by and between the Debtor, the Creditors, the SPhinX Funds and the JOLs; (ii) the balance of the likelihood of success of claims which might be asserted by the Debtor against the likelihood of success of the defenses or counterclaims; (iii) the complexity, cost and delay of litigation that would result in the absence of the Settlement; (iv) the lack of objections by any creditor or party in interest to the Settlement, and the acceptance of the Plan by the majority of Creditors voting on the Plan; (v) that the Debtor's Estate will receive substantial

3798362

consideration as a consequence of such Settlement; and (vi) that the Plan, which gives effect to the Settlement, is the product of extensive arms'-length and good-faith negotiations among the parties.

       JJ.    <u>Plan Term Sheet</u>.  The Plan Term Sheet embodied in the Plan is in the best interests of the Debtor and its Creditors, and is fair, equitable and appropriate under the circumstances of this Chapter 11 Case.

## II.
## ORDER

BASED UPON THE FOREGOING FINDINGS OF FACT, IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:

       1.    <u>Confirmation</u>.  Subject to the terms hereof and except as explicitly stated herein, the Plan, each of its provisions, and the exhibits thereto (including the General Trust Agreement and the SPhinX Trust Agreement, collectively, the "<u>Trust Agreements</u>") shall be, and hereby are, CONFIRMED and approved in each and every respect pursuant to Section 1129 of the Bankruptcy Code.  The terms of the Plan and the Trust Agreements, and the record of the Confirmation Hearing held on August 2, 2007, are incorporated by reference into, and are an integral part of, this Confirmation Order.

       2.    <u>Plan Term Sheet</u>.  The Plan Term Sheet is approved and the Debtor is authorized to enter into, and to take any and all actions it determines, in the exercise of its business judgment, are necessary and appropriate in connection with its performance of the Plan Term Sheet.

       3.    <u>Objections</u>.  All objections and responses to the Plan, to the extent not already withdrawn or resolved pursuant to representations on the record at the Confirmation Hearing, shall be, and hereby are, overruled.

4.    <u>Omission of Reference to Particular Provisions of the Plan or Plan Term Sheet</u>.  The failure to specifically describe or include any particular provision of the Plan or the Plan Term Sheet in this Confirmation Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Plan and the Plan Term Sheet be approved and confirmed in its entirety, subject to the terms of this Confirmation Order.  Each provision of the Plan and the Plan Term Sheet (except, in either case, as modified or amended hereby) shall be deemed authorized and approved by this Confirmation Order and shall have the same binding effect of every other provision of the Plan and the Plan Term Sheet, whether or not mentioned in this Confirmation Order.

5.    <u>Plan Classification Controlling</u>.  The classification of Claims and Equity Interests for purposes of distributions to be made under the Plan shall be governed solely by the terms of the Plan.  The classifications set forth on the Ballots tendered to or returned by the Holders of Claims in connection with voting on the Plan: (i) were set forth on the Ballots solely for the purposes of voting to accept or reject the Plan; (ii) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of such Claims under the Plan for distribution purposes; (iii) may not be relied upon by any creditors as representing the actual classification of such Claims under the Plan for distribution purposes; and (iv) shall not be binding on the Debtor, the Liquidating Debtor, the General Trust or the SPhinX Trust, or their respective trustees, for any purposes other than tabulating votes on the Plan.

6.    <u>Distributions Under the Plan</u>.  All distributions under the Plan shall be made in accordance with Article VIII of the Plan.

7.    <u>Vesting of Assets</u>.  The Causes of Action shall vest in the SPhinX Trust, and all Assets other than the Causes of Action shall vest in the General Trust, each to the extent set forth in the Plan, as of the Effective Date of the Plan, free and clear of any and all Liens,

-15-

Claims and/or Equity Interests, without the need for any further filings, notices, acknowledgements, or any other further action, and without any further order of the Bankruptcy Court. As of the Effective Date, and except as provided in the Plan, all mortgages, deeds of trust, liens, encumbrances, or security interests in any property of the Estate, will be released and all the rights, title and interests of any Holder of any such mortgage, deeds of trust, liens, encumbrances, or security interests shall be canceled, annulled, terminated and become null and void. The Trustee and/or the SPhinX Trustee, as the case may be, shall be authorized to act as attorney-in-fact for any such Holder to cause all public records to properly reflect and effectuate this provision. For the avoidance of doubt, notwithstanding the inclusion of SIF-LP in the definition of "Indemnity Claims" in the Plan and any other provisions that could be read to the contrary, the Debtor is not assigning to the SPhinX Trust any indemnification rights the Debtor may have against SIF-LP.

8. Establishment of the SPhinX Trust. As set forth in Article VI of the Plan, on the Effective Date, the Plan will be implemented through funding to be provided by the SPhinX Funds in exchange for which the Causes of Action shall vest in the SPhinX Trust for the exclusive benefit of the JOLs and SPhinX Funds (and ultimately the creditors and interest holders of the SPhinX Funds).

9. Trustee of the SPhinX Trust. As of the Effective Date, James P. Sinclair is hereby approved to serve as the initial SPhinX Trustee pursuant to the Plan and the SPhinX Trust Agreement.

10. Establishment of the General Trust. The General Trust shall be vested with the Retained Assets, primarily Cash, for the benefit of Holders of Allowed General Unsecured Claims other than the SPhinX Funds. The General Trust shall be funded with not less than $1.5 million of Cash on the Effective Date.

-16-

11.    <u>Trustee of the General Trust</u>.  As of the Effective Date, Florence V. Lentini is hereby approved to serve as the initial Trustee of the General Trust pursuant to the Plan and the General Trust Agreement.

12.    <u>Executory Contracts and Unexpired Leases</u>.  On the Effective Date, each executory contract and unexpired lease entered into by the Debtor prior to the Petition Date that (i) has not previously expired or terminated pursuant to its terms, and (ii) is not the subject of a pending notice of assumption and assignment in accordance with the terms of the Wind-Down Order (an "<u>Assumption Notice</u>"), shall be deemed rejected pursuant to Section 365 of the Bankruptcy Code.  The entry of this Confirmation Order, or other order approving such motion, or effectuation of an Assumption Notice, as the case may be, shall constitute an order of the Bankruptcy Court approving the Debtor's rejection, or assumption and assignment, as the case may be, of such executory contracts and/or unexpired leases as of the Effective Date or other date if specified in an order of the Bankruptcy Court or Assumption Notice, and approving the cure amount, if any, stated in the Plan Supplement or Assumption Notice, as the case may be. This Confirmation Order constitutes an order of the Bankruptcy Court approving such rejections, and assumption and assignments, pursuant to Section 365 of the Bankruptcy Code. Notwithstanding anything to the contrary herein, nothing herein or in the Plan shall have any effect whatsoever on any insurance policies, insurance coverages (including, but not limited to, the D&O Coverage) or contracts of insurance issued to, or for the benefit of, the Debtor, its Estate, the Liquidating Debtor, or that cover claims against any other Entity, all of which shall continue in full force and effect for the benefit of the covered Entities unless otherwise ordered by a separate order of the Bankruptcy Court.

13.    <u>D&O Coverage</u>. Upon the Effective Date, the Debtor's interest in the insurance policies providing the D&O Coverage (including but not limited to policies issued by

Westchester Surplus Lines Insurance Company, Illinois Union Insurance Company, and INA Surplus Insurance Company) shall be deemed to be, and shall be, assigned to the SPhinX Trust without any further order of the Bankruptcy Court.  For the avoidance of doubt, notwithstanding anything in the Confirmation Order or Plan to the contrary, the Debtor and the General Trust, as the case may be, shall retain any rights the Debtor may have to insurance coverage for losses or claims arising out of (i) the Document Retention Protocol, (ii) the SPhinX License, or (iii) claims against the Debtor under (1) Title VII of the Civil Rights Act of 1964; (2) 42 U.S.C. §§, 1985 (conspiracy to interfere with civil rights), and 1986 (negligence for failure to prevent interference with civil rights); (3) the Occupational Health and Safety Act; (4) the Age Discrimination in Employment Act; (5) the Equal Pay Act; (6) any anti-discrimination laws including discrimination, harassment, or retaliation on the basis of race, color, creed, religion, national origin, disability, marital status, status with regard to public assistance, sex, sexual orientation or age; (7) any workers' compensation laws; (8) any wage, benefits, and other labor laws; (9) the federal Fair Labor Standards Act; (10) the Employment Retirement Income Security Act (ERISA); (11) the Consolidated Omnibus Budget Reconciliation Act (COBRA); (12) the Americans with Disabilities Act; (13) the Federal Rehabilitation Act (disability discrimination); (14) the Older Workers Benefit Protection Act of 1990 (OWBPA); or (15) any other federal, state or local laws or regulations prohibiting employment discrimination or restricting the Debtor's right to terminate employees.

14.    Claims for Rejection Damages.  All Proofs of Claim with respect to Claims arising from the rejection of executory contracts or unexpired leases, if any, must be filed no later than thirty (30) days after the effective date of the rejection of such executory contracts or unexpired leases.  Any Claims arising from the rejection of an executory contract or unexpired lease not filed within such time shall be forever barred from assertion against the Debtor, its

-18-

Estate and property, the Liquidating Debtor, the General Trust, the Trustee, the SPhinX Trust

and the SPhinX Trustee, unless otherwise ordered by the Bankruptcy Court or explicitly

provided in the Plan.  All such Claims for which Proofs of Claim are required to be filed will be,

and will be treated as, Class 4 General Unsecured Claims, subject to the provisions of Article III

of the Plan.  Nothing contained herein shall release any party from filing its Claim prior to any

otherwise applicable Bar Date.

      15.    <u>Exculpation, Releases, Injunctions and Related Provisions</u>.  The

exculpation, release and injunctive provisions (collectively, the "<u>Releases</u>") specified in

Article V of the Plan are hereby approved.  The Releases are fair and equitable, are given for

valuable consideration, are in the best interests of the Debtor's Estate and its Creditors, and shall

be effective and binding upon all Entities.

      16.    <u>Exculpation</u>.  The Entities who shall receive the benefit of limitation of

liability under Article V, Section G of the Plan (the "<u>Exculpation</u>") are the Entities identified

therein (the "<u>Identified Parties</u>") and also SIF-LP and its partners, agents, liquidators, counsel,

officers, directors, employees and retained professionals (the "<u>SIF Parties</u>" and, collectively,

with the Identified Parties, the "<u>Protected Parties</u>").  Exculpation shall only protect the Protected

Parties (in their respective capacities as such) to the extent provided in Article V, Section G of

the Plan.  Notwithstanding anything in this Confirmation Order, the Plan or Disclosure Statement

to the contrary, the limitation of liability, exculpation, and release in Article V, Section G of the

Plan and in this Confirmation Order shall not apply to, nor restrain or enjoin in any manner, the

Cayman Islands-based SPhinX Funds, any investors in such SPhinX Funds in their capacity as

such or the JOLs, for any purpose, including, without limitation, with respect to the Plan Term

Sheet, the Wind-Down Agreement or the SPhinX License.

17.     <u>Settlement</u>.  The beneficiaries of Article V, Section H (the "<u>Settlement</u>")
are the Debtor and the SPhinX Funds.  Pursuant to Section 1123 of the Bankruptcy Code and
Bankruptcy Rule 9019, and in consideration of the classification, treatment, releases and other
benefits provided under the Plan, upon the Effective Date the provisions of the Plan shall
constitute a good faith compromise and settlement of all controversies resolved pursuant to the
Plan.  This Settlement is essential and integral to the Plan, and the consideration to be provided
by the SPhinX Funds is fair and reasonable value for such Settlement.  Without the funding to be
provided by the SPhinX Funds, which depends on the inclusion of the Settlement, the Plan could
not be confirmed.  Accordingly, the Settlement is in the best interests of the Debtor's Estate and
its Creditors, and is hereby approved.

18.     <u>Injunction</u>.  Except as expressly set forth in the Plan, all Entities that have
held, hold or may hold Claims against or Equity Interests in the Debtor as of the Effective Date
are permanently enjoined, from and after the Effective Date, from taking any actions, other than
enforcing the terms of the Plan, in respect of such Claims or Equity Interests against the
Protected Parties or any of their property (but not as to independent claims such entities may
have against them), including, without limitation:  (i) commencing or continuing in any manner
any action or other proceeding of any kind; (ii) enforcing, attaching, collecting or recovering by
any manner or in any place or means any judgment, award, decree or order; (iii) creating,
perfecting, or enforcing any Lien or encumbrance of any kind; and (iv) asserting any right of
setoff against any obligation, debt or liability due to the Debtor.  Except as expressly provided in
the Plan or Plan Term Sheet, (a) the Identified Parties reserve all rights and defenses that the
Debtor may have (including, without limitation, the rights of subrogation and recoupment) with
respect to any obligation, debt or liability allegedly due to any Entity, and (b) the SIF Parties
reserve all rights and defenses that the Debtor and PlusFunds GP LLC may have, solely with

respect to PlusFunds GP LLC or the Debtor's actions or omissions with respect to PlusFunds GP

LLC (including, without limitation, the rights of subrogation and recoupment) with respect to

any obligation, debt or liability allegedly due to any Entity.  In addition, all non-Debtor Entities

are permanently enjoined from commencing or continuing, in any manner, any action or

proceeding, whether directly or derivatively, in order to recover any Asset of the Estate that was

either released under the Plan or transferred to the General Trust, the SPhinX Trust, or Carroll

Services under the Plan and this Confirmation Order.  Unless otherwise provided in the Plan, all

injunctions or stays provided for in this Chapter 11 Case pursuant to Sections 105, 362 or 525 of

the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in

full force and effect until the Effective Date.  All Entities are permanently enjoined from the

commencement or prosecution against the Protected Parties whether directly, derivatively or

otherwise, of any Claims, Equity Interests, obligations, suits, judgments, damages, demands,

debts, rights, causes of action or liabilities released or enjoined pursuant to the Plan.

19.    Preservation of Bankruptcy Causes of Action.  Unless a claim (within the

meaning of Section 101(5) of the Bankruptcy Code) against any Entity is, in writing, expressly

waived, relinquished, released, assigned, compromised, or settled in the Plan, or in a Final Order,

all rights with respect to such claim are reserved to, and vested in, the SPhinX Trust or the

General Trust, as the case may be, in accordance with the Plan.  All such claims are specifically

preserved with respect to the Entities identified on the schedule of "Amended and Superseding

List of Persons and Entities Whom the JOLs Believe May Possibly be Targets of One or More of

the Causes of Action," included in the Plan Supplement [Docket No. 511].

20.    Trust Interests Exempt from Securities Act of 1933, as Amended.  The

issuance of beneficial interests in the General Trust and the SPhinX Trust, respectively, to the

beneficiaries of such trusts, are exempt from registration under the Securities Act of 1933, as

amended, and all applicable state and local laws requiring registration of securities, pursuant to Section 1145 of the Bankruptcy Code.

21.  <u>Reservation of Rights</u>.  With respect to Article VIII, Section E of the Plan, none of the previously filed claims of Winton Capital Management Ltd. ("<u>Winton</u>"), Forest Investment Management LLC ("<u>Forest</u>"), SPARX Asset Management Co., Ltd. ("<u>SPARX</u>"), or XL Investment Ltd. ("<u>XL</u>," and, collectively, with Winton, Forest and SPARX, the "<u>WFG Claimants</u>"), shall be disallowed by operation of the Plan; <u>provided</u>, <u>however</u>, that each such claim asserted by any of the WFG Claimants for indemnification, reimbursement or contribution (a "<u>Fund Manager Contingent Claim</u>") shall be estimated by the Debtor at $0 for Class 4 reserve and distribution purposes subject to the rights of any of the WFG Claimants to seek in the future the establishment of a reserve by the General Trust, to the extent any funds for such a reserve may remain in the General Trust, if and when such Fund Manager Contingent Claim becomes liquidated, and if no such funds or insufficient funds are remaining in the General Trust at such time, then such WFG Claimant shall have no further remedy or right to recover from the General Trust or otherwise under the Plan in respect of such claim.  For the avoidance of doubt, a Fund Manager Contingent Claim shall not include such Fund Manager's claim for management fees, incentive allocations or any liquidated portion of its asserted claims, including, but not limited to, Disputed Administrative Claims.  Nothing in this section shall affect the Debtor's, the Liquidating Debtor's, the General Trust's, the Trustee's, the SPhinX Trust's or the SPinX Trustee's rights to object at any time to all or any portion of all or any of the WFG Claimant's Fund Manager Contingent Claims (whether or not liquidated).

22.  <u>Reservation of Rights</u>.  The transfer of the Causes of Action to any trust or other party pursuant to the Plan will in no way be deemed to alter, prejudice, limit or waive any substantive or procedural defenses that any of the WFG Claimants or their affiliates, or any of

the Managers (defined below) or their affiliates, may have had immediately prior to the transfer

of such Causes of Action other than any defense or challenge to the transferability of such

Causes of Action in accordance with the Plan and this Confirmation Order.

23.    Reservation of Rights.  With respect to the WFG Claimants, Refco

Alternative Investments, LLC, ("RAI") and RefcoFund Holdings, LLC (collectively, with RAI,

the "RAI Claimants"), Bridgewater Associates, Inc. ("Bridgewater"), Graham Capital

Management, L.P. ("Graham Capital") and Ellington Management Group, L.L.C. ("Ellington"

and, collectively, with Bridgewater and Graham Capital, the "Managers") and the Refco

Creditors (collectively, with the WFG Claimants, the RAI Claimants and the Managers, the

"Designated Creditors"), neither the Plan nor this Confirmation Order shall have the effect of

altering, prejudicing, limiting or waiving any of the Designated Creditors' rights to set-off

pursuant to Section 553 of the Bankruptcy Code, including any of their rights to a secured claim

pursuant to Section 553 of the Bankruptcy Code, and neither the Plan nor the Confirmation

Order shall effect the Debtor's, the Liquidating Debtor's, the General Trust's, the Trustee's, the

SPhinX Trust's or the SPhinX Trustee's rights to oppose any such claim for setoff.

24.    Binding Nature of Plan.  The rights, benefits and obligations of any Entity

named or referred to in the Plan shall be binding on and inure to the benefit of any heir, executor,

administrator, successor or assign of such Entity.

25.    Corporate Action / Dissolution.  On the Effective Date, the matters under

the Plan involving or requiring corporate action of the Debtor shall be deemed to have been

authorized by this Confirmation Order and to have occurred and be in effect from and after the

Effective Date without any further action by any Entity, including the Bankruptcy Court or such

officers, managers, shareholders, members or directors, of the Debtor.

26.    <u>Exemption from Taxation</u>.  Under Section 1146(c) of the Bankruptcy Code, the making or delivery of an instrument of transfer under a Chapter 11 plan may not be taxed under any law imposing a stamp tax or similar tax.  Pursuant thereto, and because the Debtor is liquidating its Assets hereunder, entry of the Confirmation Order shall be a determination that no stamp or similar tax may be imposed on any sale or transfer pursuant to the Plan of property by the Debtor, the Liquidating Debtor, the General Trust or the SPhinX Trust.

27.    <u>Distributions</u>.  The Liquidating Debtor, the Trustee and the SPhinX Trustee will make all distributions as provided for under the Plan, the General Trust Agreement and the SPhinX Trust Agreement, respectively, in accordance with their terms.

28.    <u>Retention of Jurisdiction</u>.  Notwithstanding entry of the Confirmation Order or the Effective Date having occurred, the Chapter 11 Case having been closed or a Final Decree having been entered, the Bankruptcy Court shall in accordance with the Plan continue to have jurisdiction over matters arising out of, and related to, the Chapter 11 Case and the Plan (i) under, and for the purposes of, Sections 105(a), 1127, 1142, and 1144 of the Bankruptcy Code and (ii) for, among other things, the purposes set forth in Article XI of the Plan.

29.    <u>Payment of Statutory Fees</u>.  All fees payable pursuant to 28 U.S.C § 1930 shall be paid on or before the Effective Date.  The Liquidating Debtor (or the SPhinX Trust, to the extent provided in this Confirmation Order), shall pay fees owing that accrue under 28 U.S.C § 1930 after the Effective Date until a Final Decree is entered in the Debtor's Chapter 11 Case, or the Bankruptcy Court orders otherwise.  The Liquidating Debtor or the Trustee shall file United States Trustee quarterly fee status reports with each quarterly fee paid after Confirmation, such reports shall be filed after the Effective Date until a Final Decree is entered in the Debtor's Chapter 11 Case, or the Bankruptcy Court orders otherwise.

3798362

30.     <u>Final Decree</u>.  Upon the completion of liquidation of the Remaining Assets and disbursement of the entire proceeds thereof, the Trustee may file a report with the Bankruptcy Court and request the entry of a Final Decree closing the Chapter 11 Case; <u>provided, however</u>, that the Trustee shall refrain from requesting entry of a Final Decree until any Causes of Action pending in the Bankruptcy Court or any other Federal or state court have been concluded provided the SPhinX Funds pay all costs and charges assessed by, or otherwise due to, the U.S. Trustee and/or the Bankruptcy Court, plus all reasonable fees and expenses of the General Trust for complying with any administrative obligations, in connection with the Chapter 11 Case, from and after the date the Trustee is otherwise prepared to file a request for a Final Decree.  The Bankruptcy Court shall hear and determine any dispute between the Trustee and the SPhinX Trustee regarding the payment of any such costs, charges, fees or expenses.

31.     <u>Notices to SPhinX Trust</u>.  The notice address for the SPhinX Trust and its counsel for purposes of Article XII, Section J of the Plan is (a) James P. Sinclair, 4 East 95th Street, New York, New York 10128, Phone: (212) 534-0611, Fax: (212) 828-1581, (b) Beus Gilbert PLLC, 4800 North Scottsdale Road, Suite 6000, Scottsdale, Arizona 85251-7630, Phone: (480) 429-3000, Fax: (480) 429-3100, Attention: Leo Beus, and (c) Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York 10104-0050, Phone: (212) 468-8000, Fax: (212) 468-7900, Attention: Gary Lee.

32.     <u>Investment and Trading Records and Data</u>.  The Debtor's successors in interest, including, without limitation, the Trustee of the General Trust, any plan administrator or other successor to the Debtor appointed under the Plan confirmed hereby, and any trustee appointed under any Chapter of the Bankruptcy Code, including a Chapter 7 trustee, shall be bound by the terms, conditions and obligations specified in the Final Agreement Regarding Investment and Trading Records and Data that was "So Ordered" by the Bankruptcy Court on

3798362

August 2, 2007 [Docket No. 514] (the "<u>Final Stipulation</u>"), as well as the substantively similar

stipulation the Debtor has agreed to enter into with R. G. Niederhoffer Capital Management, Inc.

(the "<u>RGNCM Stipulation</u>"), and any substantively similar stipulation the Debtor enters into with

any of the WFG Claimants at the WFG Claimants' option as reflected on the record of the

Confirmation Hearing (collectively, with the Final Stipulation and the RGNCM Stipulation, the

"<u>Standstill Stipulations</u>").  The Standstill Stipulations, including all of their terms, conditions,

agreements and obligations, shall survive confirmation of the Plan and shall not be discharged,

released or in any manner altered by the Plan, any document or agreement entered into in

connection with the Plan or this Confirmation Order.

        33.   <u>Notice of Entry of Confirmation Order</u>.  Pursuant to Bankruptcy Rules

2002(f)(7) and 3020(c), the Debtor or the Trustee may, but is not required, to serve a notice of

the entry of this Confirmation Order on the U.S. Trustee and all holders of Claims or Equity

Interests to whom the Notice of Confirmation Hearing and Procedures was sent.  The Debtor or

the Trustee, as applicable, shall be, and hereby is, directed to serve copies of this Confirmation

Order, by e-mail or United States mail, on each party that has filed a notice of appearance in the

Chapter 11 Case pursuant to Bankruptcy Rule 2002 and on each party who filed an objection or

response to, or statement or comment regarding the Disclosure Statement, and/or the Plan, no

later than thirty (30) days after the entry of this Confirmation Order.  On the Effective Date, or as

soon thereafter as reasonably practicable, the Debtor shall File with the Bankruptcy Court a

"<u>Notice of Effective Date</u>," which notice shall constitute appropriate and adequate notice that the

Plan has become effective and shall notify parties in interest of the Second Administrative Bar

Date.  The Plan shall be deemed effective as of 12:01 a.m. (prevailing Eastern Time) on the

Effective Date specified in such filing.  A courtesy copy of the Notice of Effective Date may be

sent by first class mail, postage prepaid, or by e-mail, to those Entities who have Filed with the

-26-

Bankruptcy Court requests for notices pursuant to Bankruptcy Rule 2002.  No further notice of the entry of this Confirmation Order, or of the Effective Date, shall be required.

          34.    <u>Fee Applications</u>.  Except to the extent that another Bar Date applies pursuant to an order of the Bankruptcy Court, Professionals or other Entities requesting compensation or reimbursement of expenses, pursuant to Sections 327, 328, 330, 331, 503(b), and 1103 of the Bankruptcy Code, for services rendered and/or expenses incurred prior to the Effective Date of the Plan, must file and serve an application for final allowance of compensation and reimbursement of expenses, so that such service is received by counsel to the Debtor/Liquidating Debtor, the JOLs, the Trustee, the SPhinX Trustee and the U.S. Trustee at the addresses listed in Article XII(J) of the Plan and in this Confirmation Order, no later than sixty (60) days after the Effective Date unless the Bankruptcy Court orders otherwise, including upon an order modifying such requirement being presented to the Bankruptcy Court on three days' notice to counsel for the U.S. Trustee and the Entities who requested notice under Bankruptcy Rule 2002.  All such applications for final allowance of compensation and reimbursement of expenses shall be subject to the authorization and approval of the Bankruptcy Court.  Holders of Professional Fee Claims requesting compensation or reimbursement of expenses that do not file such requests by the applicable Bar Date shall be forever barred from asserting such Claims against the Debtor, the Liquidating Debtor, their successors, their assigns (including, without limitation, the General Trust and the Trustee or the SPhinX Trust and the SPhinX Trustee), or their Assets.  Any objection to any application for allowance of Professional Fee Claims shall be filed on or before the date specified in such application.  Notwithstanding anything herein to the contrary, the Final Order Establishing Procedures for Interim Fee Application and Expense Reimbursement for Professionals and Committee Members, entered in the Debtor's Case on April 11, 2006 (the "<u>Fee Procedures Order</u>"), shall continue in force and

effect, and the Debtor is authorized, without further order of the Bankruptcy Court, to pay on the

Effective Date any amounts that are due and owing to Professionals and other Entities for

monthly statements submitted pursuant to the Fee Procedures Order.

35.    <u>Post-Effective Date Liquidating Debtor's Expenses</u>.  The Liquidating

Debtor, the General Trust and the SPhinX Trust may retain and compensate Professionals for

services rendered following the Effective Date without order of the Bankruptcy Court except as

otherwise specified in the Plan or the General Trust Agreement or the SPhinX Trust Agreement.

36.    <u>PlusFunds GP LLC</u>.  Upon the Effective Date, any and all of the Debtor's

interests in PlusFunds GP LLC, shall be deemed transferred to Carroll Services, without any

further order of the Bankruptcy Court, authorization or other action, including, without

limitation, the filing of any notice(s), upon which Carroll Services shall become the managing

member of PlusFunds GP LLC.  Carroll Services shall (a) receive the Debtor's interests in

PlusFunds GP LLC free and clear of any and all (i) successor liability and (ii) Claims against, or

Interests in, the Debtor, and (b) be exculpated and released from any claim related to (i) all acts

or omissions of PlusFunds FP LLC prior to the Effective Date and (ii) any and all of the Debtor's

actions or omissions prior to the Effective Date with respect to PlusFunds GP LLC.  PlusFunds'

claims against SIF-LP for reimbursement of professional fees, including, without limitation, of

CMP, XRoads and the Debtor's consultants, and all rights and defenses that SIF-LP may have

with respect to any such claims, are unaffected by this Confirmation Order.

37.    <u>Assumed Disputed Claims</u>.  Notwithstanding anything to the contrary

contained in the Plan or this Confirmation Order, if and to the extent the Assumed Disputed

Claims filed in this Chapter 11 Case by any of Ellington, Forest, SPARX and Cumberland

Associates LLC are Allowed, in accordance with the Plan Term Sheet, the SPhinX Funds shall

pay such Claims, to the maximum amount scheduled in Exhibit C of the Plan Term Sheet, in

Cash on the latter of the Effective Date and the date such Claim becomes an Allowed

Administrative Claim, and this Court shall retain jurisdiction (including, without limitation, with

respect to the SPhinX Funds and the JOLs) to enforce such treatment of such Assumed Disputed

Claims.  Nothing in the Plan or this Confirmation Order shall prejudice, or otherwise constitute a

waiver or release of, any claims that any of the Managers or WFG Claimants have asserted, or

may assert, against the SPhinX Funds and/or any of their affiliates in their Cayman Islands

liquidation proceedings, nor shall it affect any defenses thereto.

38.    Termination of Equity Interests.  Upon the Effective Date, all Equity

Interests, and other rights of equity security holders, in the Debtor shall terminate.

39.    Further Assurances.  The Debtor, the Liquidating Debtor, the General

Trust, the Trustee, the SPhinX Trust and the SPhinX Trustee shall, from time to time, prepare,

execute and deliver any agreements or documents, and take any other actions as may be

necessary or advisable, to effectuate the provisions and intent of the Plan, without further order

of the Bankruptcy Court.

40.    Document Retention.  Article XII, Section M of the Plan, entitled

"Document Retention," is hereby approved and the Court retains jurisdiction to hear any dispute

regarding and to enforce such provision.

41.    Inconsistencies.  To the extent of any inconsistency between the provisions

of the Plan and the Disclosure Statement, the terms and conditions of the Plan shall govern.  To

the extent of any inconsistency between the Plan and this Confirmation Order, the terms and

conditions contained in this Confirmation Order shall govern.

42.    Headings and Integration.  The headings used herein are for the

convenience of the reader and are not to be construed for any purpose to be part of any finding of

fact or conclusion of law herein.  The provisions of this Confirmation Order are integrated with

each other and are nonseverable and mutually dependent.

Dated: August 7, 2007
         New York, New York

                                        s/ *James M. Peck*
                                        THE HONORABLE JAMES M. PECK
                                        UNITED STATES BANKRUPTCY JUDGE

3798362

Hearing Date:  January 9, 2008 at 10:00 a.m.
Objection Deadline: January 4, 2008 at 4:00 p.m.

**BROWN RUDNICK BERLACK ISRAELS LLP**
David J. Molton, Esq. (DM-1106)
Andrew Dash, Esq. (AD-7913)
Seven Times Square
New York, New York 10036
Telephone:  (212) 209-4800

**BEUS GILBERT PLLC**
Adam C. Anderson (AA1975)
Leo R. Beus (admitted *pro hac vice*)
4800 North Scottsdale Road
Suite 6000
Scottsdale, Arizona 85281
(480) 429-3000

Co-Counsel for James P. Sinclair
as Trustee for the Sphinx Funds Trust

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
In re                                          :
                                               :   Chapter 15
PLUSFUNDS GROUP, INC.,                         :
A Delaware Corporation,                        :   Case No. 06-10402 (JMP)
                                               :
                    Reorganized Debtor.        :
---------------------------------------------------------x

## MOTION OF TRUSTEE FOR THE SPHINX FUNDS TRUST FOR RULE 2004 EXAMINATIONS

James P. Sinclair, the trustee (the "Trustee") for the Sphinx Funds Trust established

pursuant to the Debtor's plan of liquidation (the "Sphinx Trust"), by and through his undersigned

counsel, hereby respectfully moves this Court for the entry of an order pursuant to Rule 2004 of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), directing the following

individuals and entities (the "Respondents") to produce the documents set forth in Exhibits B - X

and/or to appear for examination by the Trustee.  The Respondents are: Grant Thornton LLP;

Arthur Andersen LLP; Mark Ramler; Ernst & Young U.S. LLP; JP Morgan Chase & Co. or

Chase Bank; Harris NA or Harris Bank; Standard & Poor's, a Division of the McGraw Hill Companies; Justin Dew; Steve Oyer; Christine Kuna; Richard Butt; David Henritze; David Kugler; Mellon Bank NA; Steve Palermo; Deutsche Bank Trust Companies America and Deutsche Bank Securities, Inc.; Credit Suisse Securities (USA) LLC; Bank of America Securities LLC; Mayer Brown Rowe & Maw LLP; PricewaterhouseCoopers LLP; Thomas H. Lee Partners LP; Schulte Roth & Zabel; Tim Phillips; Rydex Partners; Baker & Hostetler; and Lehman Brothers.  In support of this motion (the "Motion"), the Trustee respectfully represents and states as follows:

## JURISDICTION

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

2.     In addition, pursuant to paragraph 28 of the Confirmation Order and Section XI of the Plan, this Court retained jurisdiction over matters arising out of or relating to the Debtor's Chapter 11 Case and the Plan, including avoidance actions, preference claims and other cases or suits arising out of the Sphinx Trust.  Pursuant to Section 5.5 of the Disclosure Statement, this Court retained jurisdiction to hear and determine motions brought by the Trustee pursuant to Bankruptcy Rule 2004.

3.     The statutory predicates for the relief sought herein are Bankruptcy Rules 2004 and 9016.

## BACKGROUND

4.     On March 6, 2006 (the "Petition Date"), PlusFunds Group, Inc., (the "Debtor") filed a voluntary petition for relief under chapter 11 of Title 11, United States Code, 11 U.S.C.

§§ 101, *et seq.* (the "Bankruptcy Code").  Following the Petition Date, the Debtor continued to operate its business and manage its property as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

5.      By Order dated June 28, 2007, this Court approved the Debtor's Fifth Amended Disclosure Statement (the "Disclosure Statement") in connection with the Debtor's Fifth Amended Plan of Liquidation (the "Plan").[1]

6.      On August 7, 2007 this Court entered an order (the "Confirmation Order") confirming the Plan dated June 28, 2007 (the "Plan").  The Effective Date of the Plan occurred on September 20, 2007.

7.      Pursuant to Section VII.F of the Plan, the Debtor assigned to the Sphinx Trust (as defined in the Plan) all of the Debtor's legal and equitable interests in any claim (as defined in section 101(5) of the Bankruptcy Code) against any entity (as defined by in section 101(15) of the Bankruptcy Code).  The Plan incorporates at section I.B.18 a non-exclusive list of the claims and causes of action assigned to the Sphinx Trust which is defined in the Plan (the "Causes of Action").[2]  As set forth more fully in the Plan, the Causes of Action, include, without limitation, the right to recover anything of value in respect of (a) any avoidance action, (b) any indemnity claim, (c) any claim against directors, officers, advisors or others and any insurance related thereto, (d) the S & P adversary proceeding, (e) Refco non-debtor claims, and (f) the excess Refco recovery.

8.      The Sphinx Trust was established for the benefit of Kenneth M. Krys and Christopher Stride, in their capacities as Joint Official Liquidators (the "JOLs") for the following

---

[1]      Capitalized terms not defined herein shall have the meanings set forth in the Plan.

[2]      As used herein, the term "Causes of Action" shall have the meaning as set forth in the Plan.

entities (hereinafter, the "<u>Sphinx Funds</u>"):  Sphinx, Ltd., Sphinx Macro Fund SPC, Sphinx Macro Ltd., Sphinx Managed Futures Fund SPC, Sphinx Long/Short Equity Fund SPC, Sphinx Convertible Arbitrage Fund SPC, Sphinx Fixed Income Arbitrage Fund SPC, Sphinx Distressed Fund SPC, Sphinx Merger Arbitrage Fund SPC, Sphinx Special Situations Fund SPC, Sphinx Equity Market Neutral Fund SPC, Sphinx Strategy Fund Ltd., Sphinx Plus SPC, Ltd., Sphinx Managed Futures, Ltd., Sphinx Long/Short Equity Ltd., Sphinx Convertible Arbitrage Ltd., Sphinx Fixed Income Arbitrage Ltd., Sphinx Distressed Ltd., Sphinx Merger Arbitrage Ltd., Sphinx Special Situations Ltd., Sphinx Equity Market Neutral Ltd., Plus Funds Manager Access Fund, SPC Ltd.

9.     The Sphinx Trust is governed by the Sphinx Funds Trust Agreement (the "<u>Trust Agreement</u>").  The Trustee was appointed pursuant to the to the Plan and the Trust Agreement to pursue the Causes of Action and specifically to seek discovery under Bankruptcy Rule 2004 with respect to the Causes of Action.

## <u>SUMMARY OF RELIEF REQUESTED</u>

10.     By this Motion, the Trustee seeks entry of the Proposed Order annexed hereto as Exhibit A: (i) compelling production by the Respondents of the documents requested from each party set forth substantially in the form of Exhibits B-X attached hereto; (ii) authorizing the Trustee to request and conduct examinations of the Respondents; and (iii) granting such other relief as this Court deems necessary, without prejudice to the rights of the Trustee to apply for further discovery from the Respondents or any other person or entity.

11.     The purpose of the requested discovery is to assist the Trustee in fulfilling his duties to investigate potential Causes of Action pursuant to the Plan and the Trust Agreement. The Trustee requests the discovery sought herein in connection with his investigation into the

areas set forth below as expeditiously as possible and to assist him in evaluating what Causes of Action may be brought on behalf of the Sphinx Trust. In brief, the Trustee seeks by this Motion to conduct discovery to assist it in bringing claims related to the precipitous collapse of the Debtor's business following the Refco bankruptcy and demise of the Sphinx Funds and the connection among Refco, the SPhinX Funds and the Debtor.

## RELEVANT FACTS

12.    The Debtor was a New York-based financial services company, which was organized in 2002. Through July 2006, the Debtor provided investment management services as a U.S.-registered investment adviser. The Debtor ceased providing investment management services on or about July 31, 2006.

13.    The Debtor's primary business was the provision of investment management services to the Sphinx Funds, a platform of funds designed to track the performance of the Standard & Poor's ("S&P") Hedge Fund Index. Substantially all of the Debtor's income was derived from management fees relating to the Sphinx Funds, which fees were calculated as a percentage of the Sphinx Funds' assets under management ("AUM"). Each of the Sphinx Funds' segregated portfolios was managed by a third-party portfolio fund manager (the "Portfolio Fund Manager") pursuant to a discretionary investment management agreement ("DIMA") between the Debtor, the Sphinx Funds and the Portfolio Fund Manager.

14.    The Sphinx Funds, which had no employees or offices, delegated broad authority to the Debtor to manage the daily activities of the Sphinx Funds. Debtor received compensation for its services in the form of a fee based on a percentage of AUM in the Sphinx Funds. In its role as investment manager, the Debtor contracted with a number of parties, including the Sphinx Funds' administrator, legal counsel, accountants, bankers, custodians, brokers and other agents to

provide services necessary to the successful management and safeguarding of the Sphinx Funds' assets and business.  In addition, the Debtor relied upon its own officers, directors, employees and agents to fulfill their own fiduciary duties both to the Debtor and to the Sphinx Funds to safeguard and effectively manage the assets.

15.    A number of the Sphinx Funds are organized as "segregated portfolio companies" ("SPCs") under Cayman law.  Cayman law provides that a segregated portfolio company may create and maintain segregated portfolios such that claims against a particular portfolio cannot be asserted against another segregated portfolio within the SPC.  Accordingly, under Cayman law, the Sphinx Funds' organizational documents and controlling agreements, the portfolio assets of the Sphinx Funds, and in particular those held in SPCs, were to be held in segregated accounts and immune from cross-liability between the segregated portfolios.  In addition, the offering memoranda for Sphinx Ltd. and Sphinx Strategy Fund Ltd. required all of the Sphinx Funds' customer assets to be held by prime brokers in segregated accounts such that in the event of the insolvency of the prime broker, the assets would not be subject to claims of creditors of the prime broker, thus preserving and protecting those assets for the benefit of the Sphinx Funds and their investors.

16.    Notwithstanding the clear requirement that assets were to be maintained in segregated accounts, certain culpable directors and other parties, acting for their own personal benefit, allowed the assets of Sphinx Managed Futures Funds SPC ("SMFF") to be moved from segregated accounts at Refco LLC, a regulated entity, to non-segregated accounts at Refco Capital Markets, Ltd. ("RCM"), Refco LLC's unregulated offshore affiliate, where those assets would not be protected against the claims of other segregated portfolios or RCM's creditors in

the event of bankruptcy. Specifically, hundreds of millions of dollars belonging to SMFF were moved to RCM and commingled with RCM's assets and the assets of RCM's other customers.

17.    According to complaints filed by the Trustee of the Refco Litigation Trust, Refco agents diverted customer assets held at RCM for use in fraudulent schemes designed to improve the financial statements of Refco and its affiliates and enrich Refco insiders and others. [*See* August 8, 2007 Complaint, *Kirschner v. Thomas H. Lee Partners, L.P. et al.*, pp. 51-63, No. 07 Civ. 7074, Southern District of New York; August 21, 2007 Complaint, *Kirschner v. Grant Thornton L.L.P. et al.*, Circuit Court of Cook County, Illinois.] Specifically, customer assets deposited at RCM are alleged to have been used (i) in circular loan transactions (the "Round Trip Loans") designed to conceal hundreds of millions of dollars of debt owed to Refco by a company controlled by Refco's president, Phillip J. Bennett ("Bennett"); (ii) to fund Refco's business operations; and (iii) to fund the "Suffolk Loan Transactions," a series of loans from Refco entities to companies controlled by three PlusFunds directors, Christopher Sugrue, Brian Owens and Mark Kavanagh, for the purpose of acquiring outstanding minority shares of PlusFunds stock on behalf of Refco.

18.    The fraudulent diversion of funds from RCM allowed Bennett and other culpable parties to artificially inflate Refco's financial records and public filings, concealing Refco's precarious financial position. Had the pervasive fraud orchestrated by Bennett been known, innocent decision makers at the Debtor and/or Sphinx would have removed Sphinx assets from Refco entities, and the loss of Sphinx assets held at Refco would have been avoided.

19.    As of October 10, 2005, approximately $312 million of SMFF's cash was held at RCM. On that date, Refco announced that it had "discovered" a $430 million receivable owed to it by an entity owned by Refco's President, Bennett. It was later disclosed that Bennett was

involved in a fraudulent scheme utilizing Refco, Refco affiliates and third-parties to conceal hundreds of millions of dollars in losses from Refco's balance sheet, and that Refco's financial statements could not be relied upon. On October 17, 2005, a number of Refco entities, including RCM, filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Southern District of New York and the cases were assigned to Judge Robert D. Drain.

20.     Immediately prior to Refco's bankruptcy petition, at Christopher Sugrue's direction, the $312 million of SMFF's cash held in non-segregated accounts at RCM was transferred back to SMFF's accounts at Refco LLC and then to accounts elsewhere. However, on December 16, 2005, Refco's Official Committee of Unsecured Creditors commenced an adversary proceeding (Adv. Pro. No.05-03331 (RDD)) seeking avoidance of the $312 million transfer to SMFF pursuant to Sections 547 and 550 of the Bankruptcy Code in order to recover that property for the benefit of RCM's bankruptcy estate (the "Refco Preference Action"). The Refco Preference Action triggered a wave of redemptions by investors in the Sphinx Funds other than SMFF, resulting in a rapid and precipitous decline in AUM, and a corresponding decrease in the Debtor's income. The redemptions and resulting dramatic decrease in the Debtor's revenue led to a collapse of the Debtor's business and its subsequent bankruptcy filing in March 2006.

## SCOPE AND PURPOSE OF THE RULE 2004 DISCOVERY

21.     The Debtor has suffered substantial damage as a result of the destruction of the economic value of the Debtor's business, damages in the form of liability to the Sphinx Funds, potential liability to third-parties, damage to the Debtor's business reputation, loss of fee revenues as AUM at the Sphinx Funds declined, and the ultimate collapse of the Debtor's business that followed the demise of the Sphinx Funds.

22.    The purpose of the Rule 2004 discovery sought by this Motion is to (i) permit the Trustee to investigate the facts, circumstances and events that led to the collapse of the Debtor and whether the Trustee has viable claims against third parties arising therefrom, including claims for breach of fiduciary duty, fraud, conversion, negligence, gross negligence, negligent misrepresentation, breach of contract, breach of the duty of good faith and fair dealing, professional malpractice, fraudulent transfer and unjust enrichment, director liability, aiding and abetting and conspiracy, and (ii) to permit the Trustee to investigate avoidance and other potential claims of the Debtor's estate.

23.    The instant Rule 2004 request is directed at parties including (i) professionals and their agents retained by the Debtor that may have information or knowledge about the Debtor's financial condition and/or facts, circumstances and events related to the Debtor's collapse and potential causes of action; and (ii) professionals, including accountants, lawyers and financial advisors, retained by Refco entities that are alleged to have had knowledge of fraud or wrongdoing at Refco and may have aided and abetted the Refco fraudulent scheme.

24.    For example, the Trustee would like to investigate the facts, events and circumstances that led to movement of cash from Refco LLC to RCM.  The decision to allow the placement of the Sphinx Funds' excess liquidity not only destroyed the purpose for the creation of the Sphinx Funds (*i.e.*, segregation of assets, liabilities and risk by portfolio), but eventually led to the collapse of the Sphinx Funds and the Debtor's own business.

25.    The Trustee would also like to obtain information regarding certain entities and individuals affiliated with the Debtor, and entities and individuals who engaged in business transactions with the Debtor, who may have taken part in or have knowledge of uses of the Sphinx Funds' assets.  The Trustee would like to investigate the potential use of Sphinx assets to

fund: (i) the Bennett Round-Trip Transactions; and (ii) the Suffolk Loans made by a Refco affiliate to entities controlled by Kavanagh, Owens and Sugrue (three of Debtor's directors), the proceeds of which were used to buy out the minority shareholders' equity interests in the Debtor.[3]

26.     The Debtor also seeks documents and examination of Refco's lawyers, accountants and financial advisors relating to the Refco fraud.  The Refco Trustee, Marc S. Kirschner, has brought suit against a number of these entities, alleging knowledge of Refco's scheme to conceal receivables, fraudulently to improve its financial appearance and to file false and misleading financial statements and public filings in connection with Refco's August 2004 leveraged buyout transaction and August 2005 initial public offering.  This Request also seeks documents from other parties alleged by Kirschner to have participated in Refco's scheme to conceal its true financial condition.

I.     **Entities From Whom Documents And Testimony Are Sought**

    A.     **Grant Thornton LLP**

27.     The Trustee seeks documents from and/or examination of Grant Thornton LLP in connection with its role as outside auditor for Refco LLC and RCM.  The Trustee seeks to serve a document request on Grant Thornton LLP as set forth in Exhibit B.

28.     Grant Thornton served as Refco's auditor after 2002, when it replaced Arthur Andersen.  Grant Thornton issued "clean" and unqualified audit opinions on Refco's financial statements for fiscal years 2003, 2004, and 2005.  It also served as the independent auditor for RCM.  As a result of its role as auditor, Grant Thornton is expected to possess knowledge and

---

[3]     The Suffolk entities, Suffolk LLC, Suffolk-MKK LLC, Suffolk-KAV LLC and Suffolk-SUG LLC are debtors in the Bankruptcy Court in the district of Delaware and the Trustee does not at this time seek discovery from such entities.

information relevant to Refco and RCM business, the diversion of assets, including SMFF's assets, to fund round-trip loan transactions, the Suffolk loans and other fraudulent business practices of Refco.  Grant Thornton has been named as a defendant by Kirschner and in the Refco class action complaint for knowingly aiding and abetting the Refco fraud and other intentional misconduct.  The Trustee seeks documents and examination from Grant Thornton to investigate potential claims arising from Grant Thornton's role as Refco's accountants.

29.    The requested documents will also assist the Trustee to investigate potential claims against other parties, including culpable agents at the Debtor and/or the Sphinx Funds and other Refco agents.

### B.    <u>**Arthur Andersen**</u>

30.    The Trustee seeks documents from and/or examination of Arthur Andersen in connection with its role as outside auditor for Refco LLC and RCM.  The Trustee seeks to serve a document request on Arthur Andersen as set forth in Exhibit C.

31.    Arthur Andersen served as Refco's auditor until its demise in 2002.  Arthur Andersen issued "clean" and unqualified audit opinions on Refco's financial statements for fiscal years 1998 to 2002.  As a result of its role as auditor, Arthur Andersen is expected to possess knowledge and information relevant to Refco and RCM business, the diversion of assets, including SMFF's assets, to fund round-trip loan transactions and other fraudulent business practices of Refco.  Arthur Andersen has been named as a defendant by Kirschner and in the Refco class action complaint for knowingly aiding and abetting the Refco fraud and other intentional misconduct.  The Trustee seeks documents and examination from Arthur Andersen to investigate potential claims arising from Arthur Andersen's role as Refco's accountants.

32.     The requested documents will also assist the Trustee to investigate potential claims against other parties, including culpable agents at the Debtor and/or the Sphinx Funds and other Refco agents.

C.     **Mark Ramler**

33.     The Trustee seeks documents from and examination of Mark Ramler in connection with his role as Refco accountant.  The Trustee seeks to serve a document request on Arthur Andersen as set forth in Exhibit D.

34.     Mark Ramler was the engagement partner at both Arthur Andersen and Grant Thornton on the Refco engagement.   Ramler brought the Refco engagement from Arthur Andersen to Grant Thornton, and he was the most knowledgeable agent of both firms in connection with Refco.

D.     **Ernst & Young**

35.     The Trustee seeks documents from and/or examination of Ernst & Young in connection with its role as Refco's tax accounting firm and tax consultant.  The Trustee seeks to serve a document request on Ernst & Young as set forth in Exhibit E.

36.     Ernst & Young served as Refco's tax accounting and consulting firm and prepared Refco's tax returns from 1991 to 2002, and continued to provide Refco with tax advice until 2005.  As a result of its role as Refco's accountant, Ernst & Young is expected to possess knowledge and information relevant to Refco and RCM business, the diversion of assets, including SMFF's assets, to fund round-trip loan transactions and other fraudulent business practices of Refco.  Ernst & Young has been named as a defendant by Kirschner and in the Refco class action complaint for knowingly aiding and abetting the Refco fraud and other

intentional misconduct.  The Trustee seeks documents and examination from Ernst & Young to investigate potential claims arising from Ernst & Young's role as Refco's accountants.

37.    The requested documents will also assist the Trustee to investigate potential claims against other parties, including culpable agents at the Debtor and/or the Sphinx Funds and other Refco agents.

       E.    **Chase Bank**

38.    The Trustee seeks documents from and/or examination of Chase Bank in connection with its role as RCM's bank.  The Trustee seeks to serve a document request on Chase Bank as set forth in Exhibit F.

39.    The primary cause of the losses suffered by Sphinx, and the cause of the demise of the Sphinx Funds and PlusFunds, was the diversion of SMFF assets from protected, regulated accounts at Refco LLC to non-segregated accounts at RCM.  The SMFF assets diverted to RCM were maintained and commingled in RCM's account at Chase Bank.  The Trustee seeks bank records related to RCM's Chase account, which will allow the Trustee to investigate the use of SMFF's assets and trace funds diverted to fund Refco's round-trip transactions, the Suffolk loans and other fraudulent conduct.

40.    In addition, it appears that Chase and/or RCM paid little or no interest on several hundred million dollars of cash deposited in RCM's Chase account in 2002 and 2003, and very low, sub-market rates in 2004.  Chase Bank also extended a $200 million loan to Refco after disclosure of the Refco fraud in October 2005.

41.    The requested documents will also assist the Trustee to investigate potential claims against Chase Bank, as well as potential claims against Sphinx and PlusFunds agents, including accountants, lawyers, the administrator and others who should have ensured that

SMFF's assets were maintained in segregated accounts. The requested information will also assist the Trustee's investigation of claims against parties involved in the diversion of RCM customer assets and the Refco fraud.

F.  **Harris Bank**

42.    The Trustee seeks documents from and/or examination of Harris Bank in connection with its role as Refco LLC's bank. The Trustee seeks to serve a document request on Harris Bank as set forth in Exhibit G.

43.    The primary cause of the losses suffered by Sphinx, and the cause of the demise of the Sphinx Funds and PlusFunds, was the diversion of SMFF assets from protected, regulated accounts at Refco LLC to non-segregated accounts at RCM. The SMFF assets diverted to RCM were initially held in protected, segregated accounts at Harris Bank. The Trustee seeks bank records related to Refco LLC's Harris account, which will allow the Trustee to investigate the use of SMFF's assets and trace funds diverted to fund Refco's round-trip transactions, the Suffolk loans and other fraudulent conduct.

44.    The requested documents will also assist the Trustee to investigate potential claims against culpable Sphinx and PlusFunds agents, including accountants, lawyers, the administrator and others who should have ensured that SMFF's assets were maintained in segregated accounts. The requested information will also assist the Trustee's investigation of claims against parties involved in the diversion of RCM customer assets and the Refco fraud.

G.  **Standard & Poor's**

45.    The Trustee seeks documents from and/or examination of S&P in connection with its relationship with the Debtor. The Trustee seeks to serve a document request on S&P as set forth in Exhibit H.

46.     S&P published a series of hedge fund indices designed to track various hedge fund investment strategies.  S&P licensed its name and its hedge fund indices to PlusFunds and was instrumental in the establishment of the SPhinX funds.  Documents in S&P's custody will be relevant to the valuation of the Debtor and its contractual rights to the S&P license.

47.     In addition, the Trustee would like to investigate potential claims against S&P arising out of S&P's role in the management of PlusFunds.  PlusFunds had a risk committee that included a representative from S&P, Justin Dew.  S&P participated in PlusFunds' weekly risk committee reviews.  The Trustee desires to investigate S&P's knowledge, duties and role on its risk committee.  The requested documents will assist the Trustee to investigate potential claims to the extent S&P assumed an obligation to oversee PlusFunds management or controlled the SPhinX funds.  The requested information may also be relevant to potential claims against culpable PlusFunds or Sphinx agents.

I.     **Justin Dew**

48.     The Trustee seeks documents from and/or examination of Justin Dew in connection with his role at S&P and his position on the PlusFunds risk committee, discussed above.  The Trustee seeks to serve a document request on Mr. Dew as set forth in Exhibit I.

J.     **Steve Oyer**

49.     The Trustee seeks documents from and/or examination of Steve Oyer in connection with his position at PlusFunds.  The Trustee seeks to serve a document request on Mr. Oyer as set forth in Exhibit J.

50.     Steve Oyer was a PlusFunds agent and a former S&P employee.  Oyer resigned his PlusFunds employment in late 2005 with a number of other PlusFunds officers and agents

after disclosure of Refco's role in the Suffolk loan transaction. Oyer is expected to possess relevant information regarding the relationship between PlusFunds, Refco and S&P.

### K.    **Christine Kuna**

51.    The Trustee seeks documents from and/or examination of Christine Kuna in connection with her employment at DPM, the administrator for the Sphinx Funds. The Trustee seeks to serve a document request on Ms. Kuna as set forth in Exhibit K.

52.    Ms. Kuna is currently a vice-president of DPM and was employed at DPM throughout relevant time periods. She had direct involvement in the services DPM provided for the Sphinx Funds and the Debtor. Documents already in the possession of the Trustee suggest that Ms. Kuna was directly involved or aware of the diversion of SMFF assets from Refco LLC to RCM. The Trustee believes that Ms. Kuna's knowledge will be relevant to potential claims against DPM and other agents and parties involved in the handling and supervision of SMFF's assets.

### L.    **Richard Butt, David Henritze and David Kugler**

53.    The Trustee seeks documents from and/or examination of Richard Butt, David Henritze and David Kugler in connection with their roles as presidents of Refco Alternative Investments ("RAI"). The Trustee seeks to serve a document request on Messrs. Butt, Henritze and Kugler as set forth in Exhibit L.

54.    RAI is a Refco-affiliated commodity pool operator. RAI monitored margin requirements in SMFF's Refco LLC accounts and initiated the sweep of SMFF's excess cash from Refco LLC accounts to RCM. The Trustee wishes to examine Mr. Butt, Mr. Henritze and Mr. Kugler regarding the transfers from Refco LLC to RCM and parties with knowledge of the sweeps. The Trustee believes that the requested information will be relevant to potential claims

against culpable PlusFunds and Sphinx agents, DPM and other agents and parties involved in the handling and supervision of SMFF's assets.

      M.    **Mellon Bank NA**

55.    The Trustee seeks documents from and/or examination of Mellon Bank NA in connection with its contractual role as Sphinx's custodian and its relationship with DPM. The Trustee seeks to serve a document request on Mellon Bank as set forth in Exhibit M.

56.    Mellon Bank is identified in Sphinx Offering Memoranda and promotional materials as Sphinx's custodian, with responsibility to "maintain all assets of the Company and ensure the safekeeping of the assets in a segregated client account." The Trustee is in possession of a July 1, 2004 Custody Agreement between Mellon and Sphinx Ltd. The Trustee wishes to examine Mellon Bank and its documents in connection with Mellon's role as Sphinx's custodian.

57.    In addition, Mellon Bank acquired DPM in February 2005. Sphinx's board minutes reflect that Mellon Bank executives became involved in DPM's provision of services and made representations regarding improvement of DPM deficiencies as the Sphinx Funds' administrator in 2005. Witnesses have stated that Mellon Bank agents were in communication with Sphinx and PlusFunds regarding DPM's services possibly as early as 2004. Witnesses have also stated that senior management promised to devote resources to DPM to improve DPM's services as the Sphinx Funds' administrator. The Trustee would like to examine Mellon Bank relating to its relationship with DPM and its communications with Sphinx and PlusFunds.

      N.    **Steve Palermo**

58.    The Trustee seeks documents from and/or examination of Mr. Palermo in connection with his role as a senior officer at Mellon Bank. Witnesses have testified that Mr. Palermo interacted with representatives of Sphinx and PlusFunds regarding DPM's services to

the Funds as administrator and made representations regarding Mellon's role and intent to improve DPM's performance.  The Trustee seeks to serve a document request on Mellon Bank as set forth in Exhibit N and examine Mr. Palermo regarding the relationship among Sphinx, PlusFunds, DPM and Mellon.

> O.    **Deutsche Bank Trust Company Americas and Deutsche Bank Securities, Inc.**

59.    The Trustee seeks documents from and/or examination of Deutsche Bank entities. The Trustee seeks to serve a document request on Deutsche Bank as set forth in Exhibit O.

60.    Deutsche Bank Trust Company Americas is identified in Sphinx Offering Memoranda as Sphinx's prime broker and custodian, with responsibility to "maintain all assets of the Company and ensure the safekeeping of the assets in a segregated client account."  The Trustee is already in possession of an October 22, 2002 Custodian Agreement between Deutsche Bank and Sphinx.  The Trustee wishes to examine Deutsche Bank and its documents in connection with Deutsche Bank's role as Sphinx's custodian.

61.    In addition, Deutsche Bank Securities Inc. served as financial advisor, joint book-running manager, underwriter and/or initial purchaser on Refco's August 2004 LBO transaction and as joint book-running manager on Refco's August 2005 IPO.  Kirschner named Deutsche Bank as a defendant in connection with Deutsche Bank's role in the Refco public filings, alleging that Deutsche Bank knew or consciously avoided knowledge of the Refco fraud.

62.    The Trustee believes the requested discovery will be relevant to potential claims against Deutsche Bank arising from its role as Sphinx's custodian and/or prime broker, as well as claims arising from Deutsche Bank's role in connection with Refco's false public filings, as well as potential claims against other parties.

P.    **Credit Suisse Securities (USA) LLC and Bank of America Securities LLC**

63.    The Trustee seeks documents from and/or examination of Credit Suisse and Bank of America Securities in connection with their role as financial advisors to Refco in connection with Refco's LBO and IPO filings.  The Trustee seeks to serve a document request on Credit Suisse and Bank of America Securities as set forth in Exhibit P.

64.    Credit Suisse and Bank of America Securities served as financial advisors, joint book-running managers, underwriters and/or initial purchasers on Refco's August 2004 LBO transaction and as joint book-running managers and underwriters on Refco's August 2005 IPO. Kirschner named both Credit Suisse and Bank of America Securities as defendant in connection with their role in the Refco public filings, alleging that Credit Suisse and Bank of America Securities knew or consciously avoided knowledge of the Refco fraud.

65.    The Trustee believes the requested discovery will be relevant to potential claims against Credit Suisse and Bank of America Securities arising from their due diligence obligations and roles in connection with Refco's false public filings, as well as potential claims against other parties.

Q.    **Mayer Brown Rowe & Maw**

66.    The Trustee seeks documents from and/or examination of Mayer Brown Rowe & Maw in connection with its role as Refco's lawyers.  The Trustee seeks to serve a document request on Mayer Brown as set forth in Exhibit Q.

67.    Mayer Brown served as Refco's principal outside legal counsel from 1994 until October 2005.  Mayer Brown has been named as a defendant by Kirschner in connection with Meyer Brown's knowledge of and active assistance in the Refco fraud.  Specifically, Mayer Brown is alleged to have helped Refco transfer hundreds of millions of uncollectible debt to

RGHI, conceal the outstanding obligation from RGHI through at least 18 separate round-trip loan transactions at the end of reporting periods, and prepare and file false filings in connection with Refco's 2004 LBO and 2005 IPO. Kirschner alleges that Mayer Brown was aware of the Refco fraud and actively aided and abetted it.

68.     The Trustee seeks discovery to investigate potential claims against Mayer Brown and other parties involved in the Refco fraud.

R.     **PricewaterhouseCoopers**

69.     The Trustee seeks documents from and/or examination of PricewaterhouseCoopers ("PWC") in connection with its role as PlusFunds' auditor, as Refco's financial consultant and *de facto* chief accounting officer and as a consultant for Rydex Partners. The Trustee seeks to serve a document request on PWC as set forth in Exhibit R. The Trustee previously requested and this Court ordered Rule 2004 discovery of PWC in connection with its role as Sphinx's auditor.

70.     In addition to its role as Sphinx's auditor, PWC served as Refco's financial advisor in connection with Refco's 2004 LBO transaction and 2005 IPO. PWC provided consulting services relating to accounting and financial reporting matters, Refco's internal accounting controls and Refco's tax returns beginning in 2004. Kirschner alleges that PWC acted as Refco's *de facto* chief accounting officer.

71.     Kirschner further alleges that PWC understood Refco's business and knew of the Refco fraud, including the diversion of RCM customer assets, the RGHI Receivable, the round-trip loan transactions and problems with the LBO and IPO transactions.

72.    The Trustee seeks documents and testimony from PWC to investigate potential claims against PWC arising from PWC's role in the Refco fraud.  The Trustee believes that the information sought will also be relevant to claims against other potential parties.

S.    **Thomas H. Lee Partners LP**

73.    The Trustee seeks documents from and/or examination of Thomas H. Lee Partners LP ("THL") and related entities in connection with its relationship with Refco.  The Trustee seeks to serve a document request on THL as set forth in Exhibit S.

74.    THL acquired a majority interest in Refco in the August 2004 LBO transaction. Kirschner has filed suit against THL alleging that after acquiring its interest in Refco, THL discovered the Refco fraud and concealed it, hoping to profit from the IPO in August 2005. Kirschner alleges that THL exercised actual control over Refco after the 2004 LBO and concealed the Refco fraud.  The Trustee believes that the requested discovery will assist the Trustee's investigation of potential claims against THL and other parties.

T.    **Schulte Roth & Zabel**

75.    The Trustee seeks documents from and/or examination of Schulte Roth & Zabel ("SRZ") in connection with its role as legal counsel to the Sphinx Funds.  The Trustee seeks to serve a document request on SRZ as set forth in Exhibit T.

76.    SRZ served as legal counsel to the Sphinx Funds from their inception, and was responsible for drafting the Sphinx Funds' offering memoranda.  The Trustee believes that the documents sought from SRZ will be relevant to issues regarding the segregation of Sphinx assets, the proper treatment of the SPC entities under Cayman Islands law and the knowledge of Sphinx and PlusFunds agents at relevant times.  Witnesses have also informed counsel for the Trustee that SRZ met with Sphinx and PlusFunds agents to discuss conflicts of interest and

compliance issues in 2004 or 2005. The Trustee believes that the requested documents will assist in its investigation of potential claims against a number of parties.

U.    **Tim Phillips**

77.    The Trustee seeks documents from and/or examination of Tim Phillips in connection with his employment at Refco. The Trustee seeks to serve a document request on Mr. Phillips as set forth in Exhibit U.

78.    Tim Phillips was a Refco employee identified by other witnesses as having personal involvement in the establishment of Sphinx accounts at Refco and the transfer of Sphinx assets between Refco LLC and RCM accounts at relevant times. The Trustee believes that the requested documents will assist in its investigation of potential claims against a number of parties.

V.    **Rydex Partners**

79.    The Trustee seeks documents from and/or examination of Rydex Capital Partners ("Rydex") and related entities in connection with the Rydex's investment in the Sphinx Funds. The Trustee seeks to serve a document request on Rydex as set forth in Exhibit V.

80.    Rydex managed and controlled funds that invested directly in the Sphinx Funds. In early 2005, Rydex engaged PWC to conduct an audit or investigation of the Sphinx Funds and made significant redemptions from the Funds beginning in the summer of 2005. The Trustee believes that documents requested from Rydex will provide information relating to the condition of the funds in early 2005 and will assist in the Trustee's investigation of potential claims against Rydex, PWC and other parties.

W.    **Baker & Hostetler LLP**

81.    The Trustee seeks documents from and/or examination of Baker & Hostetler LLP regarding Baker & Hostetler's representation of PlusFunds.  The Trustee seeks to serve a document request on Baker & Hostetler as set forth in Exhibit W.

82.    Witnesses have stated that Baker & Hostetler was retained by PlusFunds and conducted an investigation relating to "ring fencing" of the Sphinx accounts in 2004.  The Trustee believes that documents requested from Baker & Hostetler will be relevant to segregation and ring-fencing issues and will assist in its investigation of potential claims against a number of parties.

X.    **Lehman Brothers**

83.    The Trustee seeks documents from and/or examination of Lehman Bros. in connection with its agreement in October 2005 to invest hundreds of millions of dollars in the Sphinx Funds.  The Trustee seeks to serve a document request on Lehman Brothers as set forth in Exhibit X.

84.    Witnesses have informed counsel for the Trustee that in October 2005, shortly before disclosure of the Refco fraud, Lehman Brothers had negotiated an agreement with PlusFunds to invest hundreds of millions of dollars in the Sphinx Funds.  The Trustee believes that the requested documents will assist in its investigation of potential claims against a number of parties and will be directly relevant to potential damages claims suffered by PlusFunds to be asserted by the Trustee.

## RELIEF REQUESTED

85.    By this Motion, the Trustee seeks authorization to obtain the production of documents from Respondents and to conduct examinations of Respondents and their current and

former officers, employees, agents, representatives, successors and/or assigns concerning (i) the

property of the Debtors; (ii) the assets, liabilities and financial condition of the Debtors; (iii)

matters that may affect the administration of the Debtors' estates; and (iv) the identification and

prosecution of potential claims against third parties by the Trustee.  The Trustee seeks entry of

the Proposed Order annexed hereto as Exhibit A (the "Proposed Order").  The Trustee reserves

its right to serve supplemental and additional document requests that relate to the foregoing

matters.

### LEGAL BASIS FOR RELIEF SOUGHT

86.    Bankruptcy Rule 2004(b) provides, in relevant part, as follows:

  (a)    Examination on Motion.  On motion of any party in interest, the
         court may order the examination of any entity.

  (b)    Scope of Examination. The examination of an entity under this rule
         or of the debtor under § 343 of the Code may relate only to the
         acts, conduct, or property or to the liabilities and financial
         condition of the debtor, or to any matter which may affect the
         administration of the debtor's estate, or to the debtor's right to a
         discharge…

  (c)    Compelling Attendance and Production of Documentary Evidence.
         The attendance of an entity for examination and the production of
         documentary evidence may be compelled in the manner provided
         in Rule 9016 for the attendance of witnesses at a hearing or trial.

87.     "The purpose of a Rule 2004 examination is 'to show the condition of the estate

and to enable the court to discover its extent and whereabouts and to come into possession of it

that the rights of creditors may be preserved.'" *In re Coffee Cupboard, Inc.*, 128 B.R. 509, 514

(Bankr. E.D.N.Y. 1991) (citing *Cameron v. United States*, 231 U.S. 710, 717 (1914)).  See also

*In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 432 (S.D.N.Y. 1993) ("Because the purpose of the

Rule 2004 examination is to aid in the discovery of assets, any third party who can be shown to

have a relationship with the debtor can be made subject to a Rule 2004 investigation." *Aff'd*, 17 F.3d 600 (2d Cir. 1994).

88.    The Second Circuit Court of Appeals has explained that the scope of inquiry permitted under a Rule 2004 examination is exceptionally broad. *Martin v. Schapp Moving Systems, Inc.*, 1998 U.S. App. LEXIS 15255 (2d. Cir. 1998) ("the very purpose of a Rule 2004 motion is to allow broad inquiry into the nature of the estate."); *see also In re Enron Corp.*, 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002 ("...absent pending adversary proceeding, Rule 2004 examinations are appropriate to determine the "nature and extent of the bankruptcy estate.").

89.    The scope of inquiry permitted under a Rule 2004 examination is generally very broad and can "legitimately be in the nature of a 'fishing expedition.'" *In re Wilcher*, 56 B.R. 428, 433 (Bankr. N.D. Ill. 1985). *See also In re Bakalis*, 199 B.R. 443, 447 (Bankr. E.D.N.Y. 1996) (same); In re Johns-Manville Corp., 42 B.R. 362, 364 (S.D.N.Y. 1984 (same).*In re M4 Enterprises, Inc.*, 190 B.R. 471, 474 (Bankr. N.D. Ga. 1995); *In re Valley Forge Plaza Associates*, 109 B.R. 669, 674 (Bankr. E.D. Pa. 1990), *appeal dismissed*, 116 B.R. 420 (E.D. Pa. 1990); *In re Continental Forge Co., Inc.*, 73 B.R. 1005, 1007 (Bankr. W.D. Pa. 1987).

90.    Although the scope of inquiry under Rule 2004 is recognizably broad, the Trustee's requests are tailored to assist in the investigation into the specific areas of inquiry described herein.

91.    The Trustee believes that the clear prejudice to the Trustee in not obtaining disclosure greatly outweighs any potential burden on the Respondents.    Moreover, the information sought by the Trustee is not readily available from other sources.

92.    The information sought by the Trustee is critical to the investigation of the assets, liabilities and financial affairs of the Debtor and the determination of the rights and remedies that may be pursued by the Trustee on behalf of the Sphinx Trust.

## NOTICE

93.    Notice of the Motion has been provided to each of the Respondents and the Office of the United States Trustee.

## WAIVER OF MEMORANDUM OF LAW

A.    As this Motion presents no novel issues of law and the authorities relied upon by the Committee are set forth herein, the Committee respectfully requests that the Court waive the requirement of Local Rule 9013-1(b) that a separate memorandum of law be submitted herewith. However, the Committee reserves the right to file a memorandum in reply to any objection to this Motion.

## PRIOR REQUEST FOR RELIEF

94.    No previous motion for the relief sought herein has been made to this or any other Court.  The Trustee previously requested and was granted leave to seek documents and examination of PricewaterhouseCoopers in connection with its role as Sphinx's auditors, but not for PWC's roles discussed herein.  Similarly, the Trustee requested documents from entities related to Mellon Bank regarding administration services provided to the SPhinX Funds and PlusFunds, but not relating to the issues discussed above.

**WHEREFORE**, the Trustee respectfully requests that the Court enter an order substantially in the form annexed hereto as Exhibit A: (i) granting the Motion in its entirety, (ii) compelling the Respondents to produce documents set forth in Exhibits B through X hereto within a reasonable period of time not to exceed twenty (20) days of the entry of the Proposed

Order, without prejudice to the Trustee's rights to seek further and other forms of discovery from the Respondents, (iii) authorizing the Trustee to request and conduct examinations of witnesses in connection with such document production; and (iv) granting such other and further relief as this Court deems just and proper under the circumstances.

Dated: New York, New York
       December 20, 2007

                   Respectfully submitted,

                   **BROWN RUDNICK BERLACK ISRAELS LLP**

                   By: /s/ David J. Molton, Esq.
                      David J. Molton (DM-1106)
                      Andrew Dash (AD-7913)
                      7 Times Square
                      New York, New York  10036
                      (212) 209-4800

                   **BEUS GILBERT PLLC**
                   Adam C. Anderson (AA1975)
                   Leo R. Beus (admitted *pro hac vice)*
                   4800 North Scottsdale Road
                   Suite 6000
                   Scottsdale, Arizona  85281
                   (480) 429-3000

                   Co-Counsel for James P. Sinclair
                   as Trustee for the Sphinx Funds Trust

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

In re:                                                                    Case No. 06-10402 (JMP)

**PlusFunds Group, Inc.**
**a Delaware corporation,**

                        Debtor.

**NOTES TO SCHEDULES OF ASSETS AND LIABILITIES**
**AND STATEMENT OF FINANCIAL AFFAIRS**

PlusFunds Group, Inc., a Delaware corporation (the "Debtor"), submits its Schedules of Assets and Liabilities (the "Schedules") and Statement of Financial Affairs (the "Statements") pursuant to 11 U.S.C. § 521 and Federal Rule of Bankruptcy Procedure 1007.

The Schedules and Statements have been prepared by the Debtor's management and are unaudited. While management of the Debtor has made every effort to ensure that the Schedules and Statements are accurate and complete based on information that was available at the time of preparation, the subsequent receipt of information may result in material changes in financial data contained in the Schedules and Statements. Except as noted, the assets and liability data contained in the Schedules and Statements are as of March 5, 2006.

The Debtor has made every effort to allocate liabilities between the pre-petition and post-petition periods, based on the information and research that was conducted in connection with the preparation of the Schedules and the Statements. As additional information becomes available and further research is conducted, the allocation of liabilities between pre-petition and post-petition periods may change.

While every effort has been made to file complete and accurate Schedules and Statement of Financial Affairs, inadvertent errors or omissions may exist. Accordingly, the Debtor reserves the right to amend its Schedules and Statements as necessary or appropriate.

Any failure to designate a claim listed on the Debtor's Schedules as "disputed", "contingent", or "unliquidated" does not constitute an admission by the Debtor that such amount is not "disputed", "contingent", or "unliquidated". The Debtor reserves the right to dispute, or to assert offsets or defenses to, any claim reflected on its Schedules as to amount, liability or classification, or to otherwise subsequently designate any claim as "disputed", "contingent", or "unliquidated".

The dollar amounts of claims listed may be exclusive of contingent and unliquidated amounts.

The claims of individual creditors for, among other things, merchandise, goods, services, or taxes are listed as the lower of the amounts invoiced by such creditor and the amounts entered on the Debtor's books and records and do not reflect credits or allowances due from such creditors to the Debtor. The Debtor reserves all of its rights respecting such credits and allowances.

The Bankruptcy Court has approved the payment of certain unsecured priority and non-priority claims against the Debtor, including, without limitation, certain claims of employees for wages, salaries, contributions to employee benefit plans, reimbursement of business expenses and other claims, as well as certain claims of the Debtor's customers, vendors, and service providers. Such claims may be reflected in Schedule E or Schedule F, respectively.

It would be prohibitively expensive and unduly burdensome to obtain current market valuations of the Debtor's property interests. Accordingly, unless otherwise noted, the carrying value on the Debtor's books, rather than the current market values, of the Debtor's interests in property is reflected on the Debtor's Schedules.

# United States Bankruptcy Court
## Southern District of New York

In re:   PlusFunds Group, Inc., a Delaware corporation             Case No.    06-10402 (JMP)

## SUMMARY OF SCHEDULES

Indicate as to each schedule whether that schedule is attached and state the number of pages in each. Report the totals from Schedules A, B, D, E, F, I, and J in the boxes provided. Add the amounts from Schedules A and B to determine the total amount of the debtor's assets. Add the amounts of all claims from Schedules D, E, and F to determine the total amount of the debtor's liabilities. Individual debtors must also complete the "Statistical Summary of Certain Liabilities."

| NAME OF SCHEDULE | ATTACHED (YES/NO) | NO. OF SHEETS | AMOUNTS SCHEDULED | | |
|---|---|---|---|---|---|
| | | | ASSETS | LIABILITIES | OTHER |
| A - Real Property | YES | 1 | $0.00 | | |
| B - Personal Property | YES | 5 | $4,732,765.85 | | |
| C - Property Claimed as Exempt | NO | 0 | | | |
| D - Creditors Holding Secured Claims | YES | 1 | | $0.00 | |
| E - Creditors Holding Unsecured Priority Claims | YES | 3 | | $618.27 | |
| F - Creditors Holding Unsecured Nonpriority Claims | YES | 9 | | $1,941,701.95 | |
| G - Executory Contracts and Unexpired Leases | YES | 18 | | | |
| H - Codebtors | YES | 1 | | | |
| I - Current Income of Individual Debtor(s) | NO | 0 | | | |
| J - Current Expenditures of Individual Debtor(s) | NO | 0 | | | |
| Total Number of sheets in all schedules | | 38 | | | |
| Total Assets | | | $4,732,765.85 | | |
| Total Liabilities | | | | $1,942,320.22 | |

In re:  PlusFunds Group, Inc., a Delaware corporation                    Case No.   06-10402 (JMP)

        **Debtor**

# SCHEDULE A - REAL PROPERTY

Except as directed below, list all real property in which the debtor has any legal, equitable, or future interest, including all property owned as a cotenant, community property, or in which the debtor has a life estate. Include any property in which the debtor holds rights and powers exercisable for the debtor's own benefit. If the debtor is married, state whether husband, wife, or both own the property by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community." If the debtor holds no interest in real property, write "None" under "Description and Location of Property."

**Do not include interests in executory contracts and unexpired leases on this schedule. List them in Schedule G - Executory Contracts and Unexpired Leases.**

If an entity claims to have a lien or hold a secured interest in any property, state the amount of the secured claim. See Schedule D. If no entity claims to hold a secured interest in the property, write "None" in the column labeled "Amount of Secured Claim."

If the debtor is an individual or if a joint petition is filed, state the amount of any exemption claimed in the property only in Schedule C - Property Claimed as Exempt.

| DESCRIPTION AND LOCATION OF PROPERTY | NATURE OF DEBTOR'S INTEREST IN PROPERTY | CURRENT MARKET VALUE OF DEBTOR'S INTEREST IN PROPERTY WITHOUT DEDUCTING ANY SECURED CLAIM OR EXEMPTION | AMOUNT OF SECURED CLAIM |
|---|---|---|---|
| **NONE** | | | |

Total

Subtotal
(Total of this page)

$0.00

In re: PlusFunds Group, Inc., a Delaware corporation          Case No.     06-10402 (JMP)

      Debtor

# SCHEDULE B - PERSONAL PROPERTY

Except as directed below, list all personal property of the debtor of whatever kind. If the debtor has no property in one or more of the categories, place an "x" in the appropriate position in the column labeled "None." If additional space is needed in any category, attach a separate sheet properly identified with the case name, case number, and the number of the category. If the debtor is married, state whether husband, wife, or both own the property by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community." If the debtor is an individual or a joint petition is filed, state the amount of any exemptions claimed only in Schedule C - Property Claimed as Exempt.

**Do not list interests in executory contracts and unexpired leases on this schedule. List them in Schedule G - Executory Contracts and Unexpired Leases.**

If the property is being held for the debtor by someone else, state that person's name and address under "Description and Location of Property." In providing the information requested in this schedule, do not include the name or address of a minor child. Simply state "a minor child."

| TYPE OF PROPERTY | NONE | DESCRIPTION AND LOCATION OF PROPERTY | | CURRENT MARKET VALUE OF DEBTOR'S INTEREST IN PROPERTY WITHOUT DEDUCTING ANY SECURED CLAIM OR EXEMPTION |
|---|---|---|---|---|
| 1.  Cash on hand | | Petty Cash Account located at 1500 Broadway, 11th floor, New York, NY 10036 | | $1,000.00 |
| 2.  Checking, savings or other financial accounts, certificates of deposit, or shares in banks, savings and loan, thrift, building and loan, and homestead associations, or credit unions, brokerage houses, or cooperatives. | | Checking account located at JP Morgan Chase Manhattan Bank located at 1411 Broadway, Ground Floor, New York, NY 10018 Acct # 250-5070199-66 | | $1,389,352.91 |
| | | Money Market Account located at JP Morgan Chase Manhattan Bank located at 1411 Broadway Gournd Floor, New York, NY 10018 MMA# 020-6243066-65 | | $201,070.99 |
| 3.  Security deposits with public utilities, telephone companies, landlords, and others. | | Zapco Investments Security deposit for leased premises at 1500 Broadway New York, NY 10036 | | $66,004.00 |
| 4.  Household goods and furnishings, including audio, video, and computer equipment. | X | | | |
| 5.  Books, pictures and other art objects, antiques, stamp, coin, record, tape, compact disc, and other collections or collectibles. | X | | | |
| 6.  Wearing apparel. | X | | | |
| 7.  Furs and jewelry. | X | | | |

Page Total     $1,657,427.90

In re:  PlusFunds Group, Inc., a Delaware corporation                    Case No.    06-10402 (JMP)

# SCHEDULE B - PERSONAL PROPERTY

## (Continuation Sheet)

| TYPE OF PROPERTY | NONE | DESCRIPTION AND LOCATION OF PROPERTY | | CURRENT MARKET VALUE OF DEBTOR'S INTEREST IN PROPERTY WITHOUT DEDUCTING ANY SECURED CLAIM OR EXEMPTION |
|---|---|---|---|---|
| 8.  Firearms and sports, photographic and other hobby equipment. | X | | | |
| 9.  Interests in insurance policies.  Name insurance company of each policy and itemize surrender or refund value of each. | | Debtor maintains applicable insurance policies. | | UNKNOWN |
| 10. Annuities.  Itemize and name each issuer. | X | | | |
| 11. Interests in an education IRA as defined in 26 U.S.C. § 530(b)(1) or under a qualified State tuition plan as defined in 26 U.S.C. § 529(b)(1). Give particulars. (File separately the record(s) of any such interest(s). 11 U.S.C. § 521(c); Rule 1007(b)). | X | | | |
| 12. Interests in IRA, ERISA, Keough, or other pension or profit sharing plans.  Itemize. | X | | | |
| 13. Stock and interests in incorporated and unincorporated businesses. Itemize. | | Sole Member of PlusFunds GP LLC | | UNKNOWN |
| 14. Interests in partnerships or joint ventures.  Itemize. | X | | | |
| 15. Government and corporate bonds and other negotiable and non negotiable instruments. | X | | | |
| 16. Accounts Receivable. | | Trade Accounts Receivable (Net of Reserves) | | $384,183.43 |
| 17. Alimony, maintenance, support, and property settlements in which the debtor is or may be entitled.  Give particulars. | X | | | |

| | | |
|---|---|---|
| | Page Total | $384,183.43 |

In re:  PlusFunds Group, Inc., a Delaware corporation          Case No.    06-10402 (JMP)

## SCHEDULE B - PERSONAL PROPERTY

### (Continuation Sheet)

| TYPE OF PROPERTY | NONE | DESCRIPTION AND LOCATION OF PROPERTY | | CURRENT MARKET VALUE OF DEBTOR'S INTEREST IN PROPERTY WITHOUT DEDUCTING ANY SECURED CLAIM OR EXEMPTION |
|---|---|---|---|---|
| 18. Other liquidated debts owing debtor including tax refunds. Give particulars. | X | | | |
| 19. Equitable or future interests, life estates, and rights or powers exercisable for the benefit of the debtor other than those listed in Schedule of Real Property. | X | | | |
| 20. Contingent and non contingent interests in estate of a decedent, death benefit plan, life insurance policy, or trust. | X | | | |
| 21. Other contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and right to set off claims. Give estimated value of each. | X | | | |
| 22. Patents, copyrights, and other intellectual property. Give particulars. | | "PlusFunds Group" trademark | | UNKNOWN |
| | | "Benign Transparency" trademark | | UNKNOWN |
| | | "Manager Access" trademark | | UNKNOWN |
| 23. Licenses, franchises, and other general intangibles. Give particulars. | | Standard & Poors License Global, perpetual, non-transferrable license to use S&P Hedge Fund Index as a component of PlusFunds Group, Inc.'s product(s). | | UNKNOWN |
| | | OTC License Global perpetual license in certain software code | | UNKNOWN |
| 24. Customer lists or other compilations containing personally identifiable information (as defined in 11 U.S.C. § 101(41A)) provided to the debtor by individuals in connection with obtaining a product or service from the debtor primarily for personal, family, or household purposes. | X | | | |

Page Total          $0.00

In re:  PlusFunds Group, Inc., a Delaware corporation                    Case No.     06-10402 (JMP)

# SCHEDULE B - PERSONAL PROPERTY

### (Continuation Sheet)

| TYPE OF PROPERTY | NONE | DESCRIPTION AND LOCATION OF PROPERTY | | CURRENT MARKET VALUE OF DEBTOR'S INTEREST IN PROPERTY WITHOUT DEDUCTING ANY SECURED CLAIM OR EXEMPTION |
|---|---|---|---|---|
| 25. Automobiles, trucks, trailers, and other vehicles and accessories. | X | | | |
| 26. Boats, motors, and accessories. | X | | | |
| 27. Aircraft and accessories. | X | | | |
| 28. Office equipment, furnishings, and supplies. | | Office Furniture & Equipment (Net Book Value) | | $616,565.85 |
| 29. Machinery, fixtures, equipment and supplies. | X | | | |
| 30. Inventory. | X | | | |
| 31. Animals. | X | | | |
| 32. Crop-growing or harvested. Give particulars. | X | | | |
| 33. Farming equipment and implements. | X | | | |
| 34. Farm supplies, chemicals, and feed. | X | | | |

Page Total     $616,565.85

In re:  PlusFunds Group, Inc., a Delaware corporation       Case No.    06-10402 (JMP)

## SCHEDULE B - PERSONAL PROPERTY

### (Continuation Sheet)

| TYPE OF PROPERTY | NONE | DESCRIPTION AND LOCATION OF PROPERTY | | CURRENT MARKET VALUE OF DEBTOR'S INTEREST IN PROPERTY WITHOUT DEDUCTING ANY SECURED CLAIM OR EXEMPTION |
|---|---|---|---|---|
| 35. Other personal property of any kind not already listed. Itemize. | | Prepaid Income Taxes | | $1,662,775.60 |
| | | Investment in Ibbotson SPhinX | | $25,177.60 |
| | | Prepaid Insurance | | $125,461.11 |
| | | Prepaid Expenses - computer software and maintenance | | $46,174.36 |
| | | Prepaid Retainer Makovsky & Company, Inc. | | $15,000.00 |
| | | Prepaid Retainer Seward & Kissel, LLP | | $100,000.00 |
| | | Prepaid Retainer XRoads Solutions Group LLC | | $100,000.00 |

Total     $4,732,765.85

Page Total     $2,074,588.67

In re:  PlusFunds Group, Inc., a Delaware corporation                               Case No.      06-10402 (JMP)
         **Debtor**

# SCHEDULE D - CREDITORS HOLDING SECURED CLAIMS

State the name, mailing address, including zip code, and last four digits of any account number of all entities holding claims secured by property of the debtor as of the date of filing of the petition. The complete account number of any account the debtor has with the creditor is useful to the trustee and the creditor and may be provided if the debtor chooses to do so. List creditors holding all types of secured interests such as judgment liens, garnishments, statutory liens, mortgages, deeds of trust, and other security interests.

List creditors in alphabetical order to the extent practicable. If a minor child is a creditor, indicate that by stating "a minor child" and do not disclose the child's name. See 11 U.S.C. § 112; Fed. R. Bankr. P. 1007(m). If all secured creditors will not fit on this page, use the continuation sheet provided.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor," include the entity on the appropriate schedule of creditors, and complete Schedule H – Codebtors. If a joint petition is filed, state whether husband, wife, both of them, or the marital community may be liable on each claim by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community."

If the claim is contingent, place an "X" in the column labeled "Contingent." If the claim is unliquidated, place an "X" in the column labeled "Unliquidated." If the claim is disputed, place an "X" in the column labeled "Disputed." (You may need to place an "X" in more than one of these three columns.)

Report the total of all claims listed on this schedule in the box labeled "Total" on the last sheet of the completed schedule. Report this total also on the Summary of Schedules.

[X]  Check this box if debtor has no creditors holding secured claims to report on this Schedule D

| CREDITOR'S NAME AND MAILING ADDRESS, INCLUDING ZIP CODE | CODEBTOR | DATE CLAIM WAS INCURRED, NATURE OF LIEN, AND DESCRIPTION AND MARKET VALUE OF PROPERTY VALUE OF SUBJECT TO LIEN | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM WITHOUT DEDUCTING VALUE OF COLLATERAL | UNSECURED PORTION, IF ANY |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

Total [                    ]

Subtotal
(Total of this page)  [                    ]

**Schedule E: Wages Disclaimer**

As of the Petition Date, PFGI's employees were variously owed (i) wages and salaries earned in the one hundred eighty (180) days prior to the Petition Date ("Priority Wages"); (ii) reimbursable business-related expenses ("Reimbursable Expenses"); (iii) accrued and unused paid time off for vacation, sick and paid leaves ("Prepetition PTO") earned prior to the Petition Date; and (iv) bonuses. Pursuant to the "Interim Order Authorizing the Debtor to Pay Prepetition Benefits to Employees and Continue Benefit Programs in the Ordinary Course," which was granted by the Court and entered on March 7, 2006, PFGI was authorized, on an interim basis, to (a) pay the Priority Wages and Reimbursable Expenses to its employees and (b) allow its employees to take Prepetition PTO at the Debtor's discretion in the ordinary course of the Debtor's business. Thus, although the Priority Wages and Reimbursable Expenses were outstanding as of the Petition Date, the outstanding amount per employee is not listed.

**Schedule E: Taxes Disclaimer**

Schedule "E" contains the Debtor's best estimate of all the claims against the Debtor's estate held by governmental and quasi-governmental entities. The Debtor has not determined whether, and to what extent, any of the creditors identified on Schedule "E" are entitled to priority under Section 507 of the Bankruptcy Code. The Debtor reserves the right to assert that claims identified on Schedule "E" are not claims of governmental entities and/or that such claims are not entitled to priority.

In re:  PlusFunds Group, Inc., a Delaware corporation                    Case No.    06-10402 (JMP)

         **Debtor**

# SCHEDULE E - CREDITORS HOLDING UNSECURED PRIORITY CLAIMS

    A complete list of claims entitled to priority, listed separately by type of priority, is to be set forth on the sheets provided.  Only holders of unsecured claims entitled to priority should be listed in this schedule.  In the boxes provided on the attached sheets, state the name, mailing address, including zip code, and last four digits of the account number, if any, of all entities holding priority claims against the debtor or the property of the debtor, as of the date of the filing of the petition.  Use a separate continuation sheet for each type of priority and label each with the type of priority.

    The complete account number of any account the debtor has with the creditor is useful to the trustee and the creditor and may be provided if the debtor chooses to do so.  If a minor child is a creditor, indicate that by stating "a minor child" and do not disclose the child's name.  See 11 U.S.C. § 112; Fed.R.Bankr.P. 1007(m).

    If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor," include the entity on the appropriate schedule of creditors, and complete Schedule H-Codebtors.  If a joint petition is filed, state whether husband, wife, both of them or the marital community may be liable on each claim by placing an "H,""W,""J," or "C" in the column labeled "Husband, Wife, Joint, or Community."  If the claim is contingent, place an "X" in the column labeled "Contingent."  If the claim is unliquidated, place an "X" in the column labeled "Unliquidated."  If the claim is disputed, place an "X" in the column labeled "Disputed."  (You may need to place an "X" in more than one of these three columns.)

    Report the total of claims listed on each sheet in the box labeled "Subtotal" on each sheet.  Report the total of all claims listed on this Schedule E in the box labeled "Total" on the last sheet of the completed schedule.  Report this total also on the Summary of Schedules.

    Report the total of amounts entitled to priority listed on each sheet in the box labeled "Subtotal" on each sheet.  Report the total of all amounts entitled to priority listed on this Schedule E in the box labeled "Total" on the last sheet of the completed schedule.  If applicable, also report this total on the Means Test form.

☐    Check this box if debtor has no creditors holding unsecured priority claims to report on this Schedule E.

## TYPES OF PRIORITY CLAIM    (Check the appropriate box(es) below if claims in that category are listed on the attached sheets)

☐  **Domestic Support Obligations**

    Claims for domestic support that are owed to or recoverable by a spouse, former spouse, or child of the debtor, or the parent, legal guardian, or responsible relative of such a child, or a governmental unit to whom such a domestic support claim has been assigned to the extent provided in

☐  **Extensions of credit in an involuntary case**

    Claims arising in the ordinary course of the debtor's business or financial affairs after the commencement of the case but before the earlier of the appointment of a trustee or the order for relief. 11 U.S.C. § 507(a)(3).

☐  **Wages, salaries, and commissions**

    Wages, salaries, and commissions, including vacation, severance, and sick leave pay owing to employees and commissions owing to qualifying independent sales representatives up to $10,000* per person earned within 180 days immediately preceding the filing of the original petition, or the cessation of business, whichever occurred first, to the extent provided in 11 U.S.C. § 507(a)(4).

☐  **Contributions to employee benefit plans**

    Money owed to employee benefit plans for services rendered within 180 days immediately preceding the filing of the original petition, or the cessation of business, whichever occurred first, to the extent provided in 11 U.S.C. § 507(a)(5).

☐  **Certain farmers and fishermen**

    Claims of certain farmers and fishermen, up to $4,925* per farmer or fisherman, against the debtor, as provided in 11 U.S.C. § 507(a)(6).

☐  **Deposits by individuals**

    Claims of individuals up to $2,225* for deposits for the purchase, lease, or rental of property or services for personal, family, or household use, that were not delivered or provided. 11 U.S.C. § 507(a)(7).

In re:   PlusFunds Group, Inc., a Delaware corporation                                      Case No.      06-10402 (JMP)

**Debtor**

---

☒   **Taxes and Certain Other Debts Owed to Governmental Units**

Taxes, customs duties, and penalties owing to federal, state, and local governmental units as set forth in 11 U.S.C. § 507(a)(8).

☐   **Commitments to Maintain the Capital of an Insured Depository Institution**

Claims based on commitments to the FDIC, RTC, Director of the Office of Thrift Supervision, Comptroller of the Currency, or Board of Governors of the Federal Reserve System, or their predecessors or successors, to maintain the capital of an insured depository institution. 11 U.S.C. § 507 (a)(9).

☐   **Claims for Death or Personal Injury While Debtor Was Intoxicated**

Claims for death or personal injury resulting from the operation of a motor vehicle or vessel while the debtor was intoxicated from using alcohol, a drug, or another substance. 11 U.S.C. § 507(a)(10).

\* Amounts are subject to adjustment on April 1, 2007, and every three years thereafter with respect to cases commenced on or after the date of adjustment.

In re:   PlusFunds Group, Inc., a Delaware corporation

Case No.   06-10402 (JMP)

**Debtor**

## SCHEDULE E - CREDITORS HOLDING UNSECURED PRIORITY CLAIMS
### (Continuation Sheet)

**Taxes and Certain Other Debts Owed to Governmental Units**

TYPE OF PRIORITY

| CREDITOR'S NAME AND MAILING ADDRESS, INCLUDING ZIP CODE | CODEBTOR | DATE CLAIM WAS INCURRED, AND CONSIDERATION FOR CLAIM | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT ENTITLED TO PRIORITY | TOTAL AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|
| ACCOUNT NO. <br><br> **STATE OF NEW JERSEY DIVISION OF TAXATION REVENUE PROCESSING CENTER P.O. BOX 666 TRENTON, NJ 08646-0666** | | **INCOME TAX FOR Y/E 12/31/05** | | | | $500.00 | $500.00 |
| ACCOUNT NO. VDA #05-019 <br><br> **STATE OF NEW JERSEY AUDIT OFFICE 50 BARRACKS ST. 5TH FLOOR TRENTON, NJ 08608** | | **TAXES OWING** | | | | $118.27 | $118.27 |
| | | | | | Total | $618.27 | $618.27 |

Form B6F
(10/05)

In re:  PlusFunds Group, Inc., a Delaware corporation                    Case No.    06-10402 (JMP)

    **Debtor**

# SCHEDULE F - CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS

State the name, mailing address, including zip code, and account number, if any, of all entities holding unsecured claims without priority against the debtor or the property of the debtor, as of the date of filing of the petition.  Do not inlcude claims listed in Schedules D and E.  If all creditors will not fit on the page, use the continuation sheet provided.   If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor," include the entity on the appropriate schedule of creditors, and complete schedule H - Codebtors.

If the claim is contingent, place an "X" in the column labeled "Contingent."  If the claim is unliquidated, place an "X" in the column labeled "Unliquidated."  If the claim is disputed, place an "X" in the column labeled "Disputed."  (You may need to place an "X" in more than one of these three columns.   Report the total of all claims listed in this schedule in the box labeled "Total" on the last sheet of the completed schedule.  Report this total also on the Summary of Schedules.

☐  Check this box if debtor has no creditors holding general unsecured claims to report on this Schedule.

| CREDITOR'S NAME AND MAILING ADDRESS, INCLUDING ZIP CODE | CODEBTOR | | DATE CLAIM WAS INCURRED, AND CONSIDERATION FOR CLAIM. IF CLAIM SUBJECT TO SETOFF, SO STATE. | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|
| A. L. RICH & ASSOCIATES, LLC<br>54 MICHELLE LANE<br>HILLSBOROUGH, NJ  08844 | | | TRADE VENDOR | | | | $938.00 |
| ACIES (F/K/A J&L)<br>THOMAS HACKL<br>118, RUE DU RHONE<br>CH 1204<br>GENEVA, SWITZERLAND | | | CONSULTING AGREEMENT | | | | $106.31 |
| ADVISOR CONSULTANT NETWORK, INC.<br>600 SUPERIOR AVENUE<br>SUITE 1300<br>CLEVELAND, OH  44114 | | | TRADE VENDOR | | | | $200.00 |
| ALLIANCE COURIER<br>28W 48TH ST.<br>4TH FLOOR<br>NEW YORK, NY  10036 | | | TRADE VENDOR | | | | $627.00 |
| AMA<br>3801 PGA BLVD.<br>SUITE 555<br>PALM BEACH GARDENS, FL  33410 | | | TRADE VENDOR | | | | $1,763.43 |
| BAKER & HOSTETLER LLP<br>666 FIFTH AVE<br>16TH FLOOR<br>NEW YORK, NY  10103 | | | PROFESSIONAL SERVICES | | | | $139,684.09 |

Page 1 of  9                                                                        Subtotal
                                                                      (Total of this page)          $143,318.83

In re:  PlusFunds Group, Inc., a Delaware corporation                              Case No.    06-10402 (JMP)

# SCHEDULE F - CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS

### (Continuation Sheet)

| CREDITOR'S NAME AND MAILING ADDRESS, INCLUDING ZIP CODE | CODEBTOR | DATE CLAIM WAS INCURRED, AND CONSIDERATION FOR CLAIM. IF CLAIM SUBJECT TO SETOFF, SO STATE. | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|
| BANK AUDI<br>2 RUE MASSOT<br>B.P. 384<br>GENEVE 12 1211, SWITZERLAND | | DISTRIBUTOR | | | | $1,046.57 |
| BANK OF NEW YORK INTER MARITIME BANK, GENEVA<br>QUAI DU MONT-BLANC 5<br>1201 GENEVE, SWITZERLAND | | DISTRIBUTOR | | | | $400.80 |
| BANTHAM ENTERPRISES LTD (PROVIDENCE CAPITAL)<br>701 BRICKELL AVENUE, SUITE 1480<br>MIAMI, FL  33131 | | DISTRIBUTOR | | | | $5,687.21 |
| BARRY BINIARIS (MIDDLEPOINT, LTD)<br>123 FRONT STREET WEST, SUITE 1601<br>TORONTO, ONTARIO M5J 2M2, CANADA | | DISTRIBUTOR | | | | $11,969.67 |
| BAWAG<br>FLEISCHMARKT 1<br>VIENNA, GRABER 21, 1010  AUSTRIA | | DISTRIBUTOR | | | | $5,724.89 |
| BNP PARIBAS ARBITRAGE SNC<br>20 BLVD DES ITALIENS 75009<br>PARIS, FRANCE | | DISTRIBUTOR | | | | $2,656.80 |
| BNP-ML<br>20 BLVD DES ITALIENS 75009<br>PARIS, FRANCE | | DISTRIBUTOR | | | | $4,973.53 |
| BUSINESS LAWS, INC.<br>WEST PAYMENT CENTER<br>P.O.BOX 6292<br>CAROL STRAM, IL  60197-6292 | | TRADE VENDOR | | | | $88.25 |
| CDW DIRECT, LLC<br>P.O.BOX 75723<br>CHICAGO, IL  60675-5723 | | TRADE VENDOR | | | | $1,235.47 |

Page 2 of  9

Subtotal
(Total of this page)                                    $33,783.19

In re:  PlusFunds Group, Inc., a Delaware corporation                                    Case No.   06-10402 (JMP)

# SCHEDULE F - CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS

(Continuation Sheet)

| CREDITOR'S NAME AND MAILING ADDRESS, INCLUDING ZIP CODE | CODEBTOR | DATE CLAIM WAS INCURRED, AND CONSIDERATION FOR CLAIM. IF CLAIM SUBJECT TO SETOFF, SO STATE. | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|
| CHRIS ALIPRANDI<br>C/O FULBRIGHT & JAWORSKI<br>ATTN: KEN BREEN<br>666 FIFTH AVENUE<br>NEW YORK, NY  10103 | | FORMER EMPLOYEE - LEGAL EXPENSES | | | | $24,539.42 |
| CIT TECHNOLOGY FINANCIAL SERVICE INC.<br>PO BOX 33076<br>NEWARK, NJ  07188-0076 | | TRADE VENDOR | | | | $1,588.77 |
| CITIGROUP GLOBAL MARKETS<br>390 GREENWICH STREET<br>NEW YORK, NY  10013 | | DISTRIBUTOR | | | | $15,604.33 |
| CLARIDEN BANK<br>CLARIDENSTR. 26<br>8022 ZURICH, SWITZERLAND | | DISTRIBUTOR | | | | $277.86 |
| CLELIA GAUTIER<br>124 W. 16TH STREET<br>NEW YORK, NY  10011 | | FORMER EMPLOYEE | | | X | $121.00 |
| CLIFFORD DESOUZA<br>C/O ROBERT D. KRAUS, ESQ.<br>KRAUS & ZUCHLEWSKI LLP<br>500 FIFTH AVENUE<br>NEW YORK, NY  10110 | | LITIGATION CLAIMANT<br>BREACH OF CONTRACT<br>TORT CLAIM | X | X | X | UNKNOWN |
| COMFORT ZONE MECHANICAL INC<br>132 W 31 STREET<br>NEW YORK, NY  10001 | | TRADE VENDOR | | | | $453.23 |
| CROSS BORDER CAPITAL (BERMUDA) LTD.<br>129 FRONT STREET, PO BOX 1916<br>HAMILTON, BERMUDA  HM HX | | SUB-INVESTMENT ADVISER AGREEMENT | | | | $8,301.02 |
| DERIVATIVES PORTFOLIO MANAGEMENT LLC<br>TWO WORLDS FAIR DRIVE<br>PO BOX 6741<br>SOMERSET, NJ  08875-6741 | | SERVICE PROVIDER | | | | $2,000.00 |

Subtotal
(Total of this page)                    $52,885.63

In re:  PlusFunds Group, Inc., a Delaware corporation                                     Case No.    06-10402 (JMP)

# SCHEDULE F - CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS

### (Continuation Sheet)

| CREDITOR'S NAME AND MAILING ADDRESS, INCLUDING ZIP CODE | CODEBTOR | DATE CLAIM WAS INCURRED, AND CONSIDERATION FOR CLAIM. IF CLAIM SUBJECT TO SETOFF, SO STATE. | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|
| DEUTSCHE BANK<br>CIB GLOBAL MARKETS - ICG<br>WINCHESTER HOUSE<br>1 WINCHESTER STREET<br>EC2N 2DB, ENGLAND | | DISTRIBUTOR | | | | $119,026.11 |
| DEUTSCHE BANK - RISK<br>60 WALL STREET<br>13 TH FLOOR<br>NEW YORK, NY  10005 | | SERVICE PROVIDER | | | | $38,333.32 |
| EILENBERG & KRAUSE<br>11 EAST 44TH STREET<br>NEW YORK, NY  10017 | | PROFESSIONAL SERVICES | | | | $625.00 |
| EXECUTIVE CHARGE, INC.<br>1440 39TH STREET<br>BROOKLYN, NY  11218 | | TRADE VENDOR | | | | $199.21 |
| FEDERAL EXPRESS<br>P.O. BOX 371461<br>PITTSBURGH, PA  15250-7461 | | TRADE VENDOR | | | | $34.96 |
| GEFORIN SA<br>2BIS, RUE ST-LEGER<br>CH-1205, GENEVA  SWITZERLAND | | DISTRIBUTOR | | | | $0.03 |
| GENEVA PARTNERS<br>33 QUAI WILSON<br>GENEVA, SWITZERLAND  1201 | | CONSULTING AGREEMENT | | | | $19,398.46 |
| GERHARD GREIF<br>DARMSTADTER LANDSTR 125<br>7TH FLOOR<br>FRANKFURT, GERMANY  60 598 | | EMPLOYEE | | | | $1,384.91 |
| GINSGLOBAL INDEX FUNDS. LTD<br>8501 WILSHIRE BLVD.<br>SUITE 220<br>BEVERLY HILLS, CA  90211 | | DISTRIBUTOR | | | | $243.14 |

Subtotal
(Total of this page)                  $179,245.14

In re:  PlusFunds Group, Inc., a Delaware corporation                                      Case No.    06-10402 (JMP)

# SCHEDULE F - CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS

### (Continuation Sheet)

| CREDITOR'S NAME AND MAILING ADDRESS, INCLUDING ZIP CODE | CODEBTOR | DATE CLAIM WAS INCURRED, AND CONSIDERATION FOR CLAIM. IF CLAIM SUBJECT TO SETOFF, SO STATE. | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|
| HANSARD DEVELOPMENT SERVICES LIMITED HARBOUR COURT LORD STREET PO BOX 192 ISLE OF MAN, IM 99 1QL | | DISTRIBUTOR | | | | $205.86 |
| HF INVESTMENT AG ZELTWEG 40 8032 ZURICH, SWITZERLAND | | CONSULTING AGREEMENT | | | | $22,011.70 |
| INTRANET EXPRESS C/O MCLAUGHLIN RESEARCH CORPORATION 130 EUGENE NEW LONDON, CT  06320 | | TRADE VENDOR | | | | $17,314.84 |
| JP MORGAN CHASE BANK 1411 BROADWAY GROUND FLOOR NEW YORK, NY  10018 | | DISTRIBUTOR | | | | $1,156.07 |
| KAMAL GHEIT 2 MAHMOUD EL ASHRI STREET HELIOLOLIS, CAIRO  EGYPT | | CONSULTING & REBATE AGREEMENT | | | | $1,046.57 |
| MARK KAVANAGH / BRIAN OWENS HARDWICKE 14 WELLINGTON RD. BALLSRIDGE, DUBLIN 4, IRELAND | | BOARD MEMBER LEGAL INDEMNITY | | | | $294,621.90 |
| MERCER 1166 AVENUE OF THE AMERICAS NEW YORK, NY  10036 | | TRADE VENDOR | | | | $5,000.00 |
| MERRILL LYNCH - RESERVED A14L 2 KING EDWARD STREET LONDON, EC1A 1HQ | | DISTRIBUTOR | | | | $5,742.52 |
| MERRILL LYNCH INTERNATIONAL 800 SCUDDERS MILL ROAD PLAINSBORO, NJ  08536 | | DISTRIBUTOR | | | | $171.50 |

Subtotal
(Total of this page)      $347,270.96

In re:  PlusFunds Group, Inc., a Delaware corporation          Case No.    06-10402 (JMP)

# SCHEDULE F - CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS

(Continuation Sheet)

| CREDITOR'S NAME AND MAILING ADDRESS, INCLUDING ZIP CODE | CODEBTOR | DATE CLAIM WAS INCURRED, AND CONSIDERATION FOR CLAIM. IF CLAIM SUBJECT TO SETOFF, SO STATE. | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|
| MERRILL LYNCH JAPAN AYA SUZUKI NIHONBASHI 1-CHOME BUILDING 7A 1-4-1 NIHONBASHI CHUO-TOKYO, 103-8230 JAPAN | | DISTRIBUTOR | | | | $6,369.88 |
| MERRILL LYNCH LONDON AMIT SHAH 2 KING EDWARD STREET LONDON, EC1A 1HQ | | DISTRIBUTOR | | | | $26,548.62 |
| NATIONWIDE INFORMATION SERVICES P.O BOX 679 ALBANY, NY  12201-0679 | | TRADE VENDOR | | | | $165.00 |
| NEED IT NOW COURIER 153 W 27TH STREET NEW YORK, NY  10001 | | TRADE VENDOR | | | | $156.50 |
| NEW YORK CITY FIRE DEPARTMENT CHURCH STREET STATION P.O. BOX 840 NEW YORK, NY  10008-0840 | | SERVICE PROVIDER | | | | $210.00 |
| OFIVALMO PALMARES ERIC BOUFFORT 1 RUE VERNIER PARIS, FRANCE  75017 | | CONSULTING AGREEMENT | | | | $16,448.83 |
| ON-SITE SOURCING P.O. BOX 75495 BALTIMORE, MD  21275 | | TRADE VENDOR | | | | $24,111.19 |
| PFGI EMPLOYEE BONUSES C/O PLUSFUNDS GROUP, INC. 1500 BROADWAY 11TH FLOOR NEW YORK, NY  10036 | | INDIVIDUAL NAMES AND AMOUNTS OWED AS OF THE FILING DATE HAVE BEEN OMITTED IN RESPECT OF PRIVACY CONSIDERATIONS. | | | | $590,000.00 |
| PICTET & CIE 29, BD. GEORGEO FARON CH-1204, GENEVA  SWITZERLAND | | DISTRIBUTOR | | | | $3,787.83 |

Subtotal
(Total of this page)            $667,797.85

In re:   PlusFunds Group, Inc., a Delaware corporation                    Case No.    06-10402 (JMP)

# SCHEDULE F - CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS

### (Continuation Sheet)

| CREDITOR'S NAME AND MAILING ADDRESS, INCLUDING ZIP CODE | CODEBTOR | DATE CLAIM WAS INCURRED, AND CONSIDERATION FOR CLAIM. IF CLAIM SUBJECT TO SETOFF, SO STATE. | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|
| PRIVATE WEALTH MANAGERS<br>71 MERRIO SQUARE<br>DUBLIN 2, IRELAND | | DISTRIBUTOR | | | | $3,993.49 |
| RAYMOND JAMES & ASSOCIATES<br>880 CARILLON PARKWAY<br>ST. PETERSBURG, FL  33716 | | PLACEMENT AND SERVICES AGREEMENT | | | | $38,208.33 |
| REFCO CAPITAL LLC<br>PHILLIP BENNETT<br>ATTN: GREG MILMOE, ESQ.<br>SKADDEN, ARPS ET AL.<br>FOUR TIMES SQUARE<br>NEW YORK, NY  10036 | | LENDER | | | | $31,250.01 |
| RICARDO A. MOSQUERA<br>25 PLAZA STREET<br>APT. 3E<br>BROOKLYN, NY  11217 | | COMPLAINT | x | x | x | UNKNOWN |
| RMB INTERNATIONAL<br>HEINRICH STIPP<br>1 MITRE SQUARE<br>LONDON<br>ENGLAND, UK  EC3 5AN | | PLACEMENT AND SERVICES AGREEMENT | | | | $139.81 |
| SAPPHIRE OFFICE SOLUTIONS<br>485 UNDERHILL<br>SUITE 203<br>SYOSSET, NY  11791 | | TRADE VENDOR | | | | $657.06 |
| SCHROEDER & CO BANQUE SA<br>SAMUEL MOULIN<br>8,RUE D'ITALIE<br>CH 1204<br>GENEVA, SWITZERLAND | | DISTRIBUTOR | | | | $157.93 |
| SENTINEL<br>ST. ANDREWS COURT<br>FREDERICK STREET STEPS<br>NASSAU, BAHAMAS | | TRADE VENDOR | | | | $7,519.75 |

Subtotal
(Total of this page)                    $81,926.38

In re: PlusFunds Group, Inc., a Delaware corporation                    Case No.   06-10402 (JMP)

# SCHEDULE F - CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS

(Continuation Sheet)

| CREDITOR'S NAME AND MAILING ADDRESS, INCLUDING ZIP CODE | CODEBTOR | DATE CLAIM WAS INCURRED, AND CONSIDERATION FOR CLAIM. IF CLAIM SUBJECT TO SETOFF, SO STATE. | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|
| SEWARD & KISSEL, LLP<br>ONE BATTERY PARK PLAZA<br>19TH FLOOR<br>NEW YORK, NY 10004 | | PROFESSIONAL SERVICES | | | | $58,657.42 |
| SSI<br>357 NORTH CANON DRIVE<br>BEVERLY HILLS, CA 90210 | | DISTRIBUTOR | | | | $0.68 |
| STANDARD & POOR'S<br>JOHN DESMOND<br>55 WATER STREET<br>42ND FLOOR<br>NEW YORK, NY 10041 | | LICENSE AGREEMENT | | | | $256,593.36 |
| STAPLES BUSINESS ADVANTAGE<br>DEPT NY 85106<br>P.O. BOX 30851<br>HARTFORD, CT 06150-0851 | | TRADE VENDOR | | | | $378.41 |
| TELE-DYNAMICS<br>330 SEVENTH AVE<br>21ST FLOOR<br>NEW YORK, NY 10001-5010 | | TRADE VENDOR | | | | $395.57 |
| TIA URBAN<br>310 EAST 23RD STREET<br>APT. 7A<br>NEW YORK, NY 10010 | | EEOC COMPLAINT | X | X | X | UNKNOWN |
| TNT<br>PO BOX 9002<br>MELVILLE, NY 11747-9002 | | TRADE VENDOR | | | | $53.31 |
| UBS WARBURG<br>RQKD<br>P.O. BOX 8098<br>ZURICH, SWITZERLAND | | TRADE VENDOR | | | | $4,086.47 |
| WALKERS SPV<br>WALKER HOUSE<br>P.O. BOX 908GT<br>MARY STREET<br>GEORGETOWN GRAND CAYMAN, CAYMAN ISLANDS | | PROFESSIONAL SERVICES | | | | $11,638.68 |

Subtotal
(Total of this page)          $331,803.90

In re:  PlusFunds Group, Inc., a Delaware corporation                                  Case No.   06-10402 (JMP)

## SCHEDULE F - CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS

### (Continuation Sheet)

| CREDITOR'S NAME AND MAILING ADDRESS, INCLUDING ZIP CODE | CODEBTOR | | DATE CLAIM WAS INCURRED, AND CONSIDERATION FOR CLAIM. IF CLAIM SUBJECT TO SETOFF, SO STATE. | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|
| WALL STREET GLOBAL RAYMOND PRIDE 25 BROAD STREET SUITE 201 NEW YORK, NY 10004 | | | CONSULTING AGREEMENT | | | | $349.97 |
| XL CAPITAL ONE BERMUDIANA ROAD HAMILTON BERMUDA, HM 11 | | | DISTRIBUTOR | | | | $103,320.10 |

Total   $1,941,701.95

Page 9 of 9

Subtotal
(Total of this page)   $103,670.07

# Schedule G Disclaimer

While every effort has been made to ensure the accuracy of the Statement of Executory Contracts, inadvertent errors or omissions may have occurred. The Debtor does not make, and specifically disclaims, any representation or warranty as to the validity or enforceability of any contracts, agreements or documents listed herein. The Debtor hereby reserves the right to dispute the validity, status or enforceability of any contracts, agreements or leases set forth herein and to amend or supplement this statement.

The contracts, agreements and leases listed on Schedule G may have expired or may have been modified, amended and supplemented from time to time by various amendments, restatements, waivers, estoppel certificates, letters and other documents, instruments and agreements which may not be listed herein. Certain of the real property leases listed on this Schedule G may contain renewal options, guarantees of payment, options to purchase, rights of the first refusal, rights to lease additional space and other miscellaneous rights. Such rights, powers, duties and obligations are not set forth on this Schedule G. Certain of the executory agreements may not have been memorialized and could be subject to dispute.

By listing a contract, agreement, lease or other document on Schedule G, the Debtor does not admit that such contract, agreement, lease or other document is an executory contract or unexpired lease of the Debtor or that the Debtor has any liability hereunder.

The Debtor has not listed certain employee-related agreements, investment management agreements, third party confidentiality agreements, distribution agreements and sub-advisory agreements due to the confidential nature and restrictive terms of those agreements. Upon written request to Debtor's counsel, the Debtor may provide certain information relating to those agreements.

Form B6G
(10/05)

In re:  PlusFunds Group, Inc., a Delaware corporation                                      Case No.    06-10402 (JMP)
        **Debtor**

# SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Describe all executory contracts of any nature and all unexpired leases of real or personal property.  Include any timeshare interests.  State nature of debtor's interest in contract, i.e ., "Purchaser," "Agent," etc.  State whether debtor is the lessor or lessee of a lease.  Provide the names and complete mailing addresses of all other parties to each lease or contract described.  If a minor child is a party to one of the leases or contracts, indicate that by stating "a minor child" and do not disclose the child's name. See 11 U.S.C. § 112; Fed.R. Bankr. P. 1007(m).

☐  Check this box if debtor has no executory contracts or unexpired leases.

| NAME AND MAILING ADDRESS, INCLUDING ZIP CODE, OF OTHER PARTIES TO LEASE OR CONTRACT | DESCRIPTION OF CONTRACT OR LEASE AND NATURE OF DEBTOR'S INTEREST, STATE WHETHER LEASE IS FOR NONRESIDENTIAL REAL PROPERTY, STATE CONTRACT NUMBER OR ANY GOVERNMENT CONTRACT |
|---|---|
| ABN-AMRO<br>PARK AVENUE PLAZA,<br>53 E. 52ND STREET<br>NEW YORK, NY  10055 | CONFIDENTIALITY AGREEMENT<br>12-MAR-04 |
| AKUL GROUP LLC<br>405 LEXINGTON AVENUE<br>26TH FLOOR<br>NEW YORK, NY  10174 | CONFIDENTIALITY AGREEMENT<br>31-OCT-03 |
| ALGORITHMICS (U.S.), INC.<br>196 MERCER STREET<br>8TH FLOOR<br>NEW YORK, NY  10103 | CONFIDENTIALITY AGREEMENT<br>15-SEP-05 |
| AMERICAN EXPRESS BANK LTD.<br>WORLD FINANCIAL CENTER<br>NEW YORK, NY  10285 | CONFIDENTIALITY AGREEMENT<br>2-FEB-05 |
| ANDREW SCHULMAN<br>SOFTWARE LITIGATION CONSULTING<br>703 7TH ST.<br>SANTA ROSA, CA  95404 | CONFIDENTIALITY AGREEMENT<br>30-JUN-05 |
| AQUILA CAPITAL CONCEPTS GMBH<br>FERDINANDSTRASSE 25/27<br>D-20095<br>HAMBURG, | CONFIDENTIALITY AGREEMENT<br>18-MAY-05 |
| AREL MBG INC.<br>445 CENTRAL AVENUE | CONFIDENTIALITY AGREEMENT<br>4-MAR-05 |
| BANK ONE<br>BANK ONE PLAZA, 7TH FLOOR<br>CHICAGO, IL  60670 | CONFIDENTIALITY AGREEMENT<br>6-NOV-03 |

In re:   PlusFunds Group, Inc., a Delaware corporation          Case No.   06-10402 (JMP)

# SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### (Continuation Sheet)

| NAME AND MAILING ADDRESS, INCLUDING ZIP CODE, OF OTHER PARTIES TO LEASE OR CONTRACT | DESCRIPTION OF CONTRACT OR LEASE AND NATURE OF DEBTOR'S INTEREST, STATE WHETHER LEASE IS FOR NONRESIDENTIAL REAL PROPERTY, STATE CONTRACT NUMBER OR ANY GOVERNMENT CONTRACT |
|---|---|
| BANK ONE<br>BANK ONE PLAZA, 7TH FLOOR<br>CHICAGO, IL  60670 | CONFIDENTIALITY AGREEMENT<br>6-NOV-03 |
| BANQUE PASCHE<br>RUE DE HOLLANDE 10<br>PO BOX 5760 CH1211<br>GENEVA, SWITZERLAND | CONFIDENTIALITY AGREEMENT<br>24-JUN-03 |
| BARCLAYS CAPITAL SECURITIES LIMITED<br>5 NORTH COLLONADE<br>CANARY WHARF<br>LONDON, ENGLAND  E144BB | CONFIDENTIALITY AGREEMENT<br>2-APR-04 |
| BEAR STEARNS PRICING DIRECT INC.<br>383 MADISON AVE.<br>NEW YORK, NY  10179 | PRICING DIRECT AGREEMENT<br>5/11/2005 |
| BENCHMARK FINANCIAL SERVICES GMBH<br>FRANZ-KLEIN-GASSE 5, DG<br>A-1190 VIENNA, AUSTRIA | CONFIDENTIALITY AGREEMENT<br>9/13/2005 |
| BERKSHIRE CAPITAL<br>535 MADISON AVE.<br>NEW YORK, NY  10022 | CONFIDENTIALITY AGREEMENT<br>10/22/2003 |
| BIH SA | CONSULTING/PLACEMENT/DISTRIBUTION/<br>RETROCESSION/REBATE ARRANGEMENTS<br>AMENDED AND RESTATED<br>9/14/2004 |
| BIH SA | MEMORANDUM OF AGREEMENT<br>9/14/2004 |
| BILL NELSON | CONFIDENTIALITY AGREEMENT<br>5/20/2003 |
| BYRON A. HERO, JR. ANDHERO & CO., INC. | CONFIDENTIALITY AGREEMENT<br>5/29/2003 |
| CACM EPM STRATEGY, LLC<br>UBS TOWER<br>1 NORTH WACKER DRIVE, 47TH FLOOR<br>CHICAGO, IL  60606 | LETTER AGREEMENT<br>27-AUG-04 |

In re:    PlusFunds Group, Inc., a Delaware corporation                    Case No.    06-10402 (JMP)

## SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### (Continuation Sheet)

| NAME AND MAILING ADDRESS, INCLUDING ZIP CODE, OF OTHER PARTIES TO LEASE OR CONTRACT | DESCRIPTION OF CONTRACT OR LEASE AND NATURE OF DEBTOR'S INTEREST, STATE WHETHER LEASE IS FOR NONRESIDENTIAL REAL PROPERTY, STATE CONTRACT NUMBER OR ANY GOVERNMENT CONTRACT |
|---|---|
| CALYON GLOBAL FUND BUSINESS UNIT<br>BROADWALK HOUSE, 5 APPOLO STREET<br>LONDON, ENGLAND  EC2A 2DA | CONFIDENTIALITY AGREEMENT<br>13-JUL-04 |
| CANTOR FITZGERALD SECURITIES<br>135 E. 57TH STREET<br>NEW YORK, NY  10022 | CONFIDENTIALITY AGREEMENT<br>20-MAY-04 |
| CARR FUTURES INC.<br>150 S. WACKER DRIVE<br>CHICAGO, IL  60606 | CONFIDENTIALITY AGREEMENT<br>10-OCT-03 |
| CARY WASSERMAN<br>C/O STRATEGIC WORKFORCE SOLUTIONS<br>110 E. 42ND STREET, SUITE 800<br>NEW YORK, NY  10017 | CONFIDENTIALITY AGREEMENT<br>8/11/2005 |
| CDC IXIS CAPITAL MARKETS<br>47 QUAI D'AUSTERLITZ<br>75648 PARIS, CEDEX 13, FRANCE | LETTER TO F. SELLES<br>10-MAR-04 |
| CDC IXIS CAPITAL MARKETS<br>47 QUAI D'AUSTERLITZ<br>75648 PARIS, CEDEX 13, FRANCE | LETTER TO F. SELLES<br>21-JAN-04 |
| CDC IXIS CAPITAL MARKETS<br>47 QUAI D'AUSTERLITZ<br>75648 PARIS, CEDEX 13, FRANCE | CONFIDENTIALITY AGREEMENT<br>24-JUL-03 |
| CDP CAPITAL<br>1000, PLACE JEAN-PAUL-RIOPELLE<br>MONTREAL, QUEBEC H2Z2B3, CANADA | CONFIDENTIALITY AGREEMENT<br>14-MAY-03 |
| CDP CAPITAL<br>1000, PLACE JEAN-PAUL-RIOPELLE<br>MONTREAL, QUEBEC H2Z2B3, CANADA | CONFIDENTIALITY AGREEMENT<br>7-MAY-03 |
| CHICAGO ALTERNATIVE INVESTMENT PARTNERS LLC<br>140 S. DEARBORN, SUITE 1620<br>CHICAGO, IL  60603 | CONFIDENTIALITY AGREEMENT<br>30-AUG-04 |
| CITIBANK CANADA<br>390 GREENWICH STREET<br>NEW YORK, NY  10013 | PORTFOLIO SERVICE AGREEMENT<br>24-FEB-04 |

In re:    PlusFunds Group, Inc., a Delaware corporation                    Case No.    06-10402 (JMP)

## SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES

(Continuation Sheet)

| NAME AND MAILING ADDRESS, INCLUDING ZIP CODE, OF OTHER PARTIES TO LEASE OR CONTRACT | DESCRIPTION OF CONTRACT OR LEASE AND NATURE OF DEBTOR'S INTEREST, STATE WHETHER LEASE IS FOR NONRESIDENTIAL REAL PROPERTY, STATE CONTRACT NUMBER OR ANY GOVERNMENT CONTRACT |
|---|---|
| CITIGROUP GLOBAL MARKETS<br>390 GREENWICH STREET<br>NEW YORK, NY  10013 | CONFIDENTIALITY AGREEMENT<br>9-AUG-04 |
| CITIGROUP GLOBAL MARKETS<br>390 GREENWICH STREET<br>NEW YORK, NY  10013 | OFFER LETTER<br>24-FEB-04 |
| COMMERZBANK<br>PLATZ DER EINHEIT 1<br>60327 FRANKFURT AM MAIN, GERMANY | CONFIDENTIALITY AGREEMENT<br>18-FEB-04 |
| COMMERZBANK AG<br>FRIEDRICH SCHMITZ<br>PLATZ DER EINHEIT 1<br>60327 FRANKFURT AM MAIN, GERMANY | LETTER AGREEMENT<br>19-MAY-04 |
| COMMERZBANK AG<br>FRIEDRICH SCHMITZ<br>PLATZ DER EINHEIT 1<br>60327 FRANKFURT AM MAIN, GERMANY | LETTER OF INTENT<br>19-MAY-04 |
| CONTINENTAL PARTNERS, LLC<br>14901 E. HAMPDEN AVE., #320<br>AURORA, CO  80014 | CONFIDENTIALITY AGREEMENT<br>5/27/2003 |
| CONTINENTAL PARTNERS, LLC<br>14901 E. HAMPDEN AVE., #320<br>AURORA, CO  80014 | CONFIDENTIALITY AGREEMENT<br>5/28/2003 |
| CORONATION FUND MANAGERS<br>25 HAYMARKET<br>LONDON  SWIY-4EN UK | CONFIDENTIALITY AGREEMENT<br>11-FEB-05 |
| COUNTRYWIDE FINANCIAL CORPORATION<br>4500 PARK GRANADA<br>CALABASAS, CA  91302 | CONFIDENTIALITY AGREEMENT<br>30-JUN-04 |
| CRA ROGERS CASEY<br>ONE PARKSLAND DRIVE<br>DARIEN, CT  06820 | CONFIDENTIALITY AGREEMENT<br>18-JUN-03 |
| CRANE CAPITAL ASSOCIATES<br>TANIA L. GASPARINI<br>146 DAVENPORT ROAD<br>TORONTO,  ON   M5R 1J2 | CONFIDENTIALITY AGREEMENT<br>20-NOV-03 |

In re:    PlusFunds Group, Inc., a Delaware corporation                                    Case No.    06-10402 (JMP)

## SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### (Continuation Sheet)

| NAME AND MAILING ADDRESS, INCLUDING ZIP CODE, OF OTHER PARTIES TO LEASE OR CONTRACT | DESCRIPTION OF CONTRACT OR LEASE AND NATURE OF DEBTOR'S INTEREST, STATE WHETHER LEASE IS FOR NONRESIDENTIAL REAL PROPERTY, STATE CONTRACT NUMBER OR ANY GOVERNMENT CONTRACT |
|---|---|
| DAIWA SECURITIES AMERICA, INC.<br>FINANCIAL SQUARE<br>32 OLD SLIP<br>NEW YORK, NY  10005-3538 | CONFIDENTIALITY AGREEMENT<br>6/14/2002 |
| DANIEL SCHARFMAN DESIGN, INC.<br>594 BROADWAY SUITE 1012<br>NEW YORK, NY  10012 | CONFIDENTIALITY AGREEMENT<br>13-JUN-05 |
| DARIUS CAPITAL PARTNERS<br>24 AVENUE<br>HOCHE 75008<br>PARIS, | CONFIDENTIALITY AGREEMENT<br>16-SEP-05 |
| DEPOSITORY TRUST & CLEARING CORPORATION<br>55 WATER STREET<br>22ND FLOOR<br>NEW YORK, NY  10041 | CONFIDENTIALITY AGREEMENT<br>23-AUG-05 |
| DERIVATIVES PORTFOLIO MANAGEMENT , LLC<br>TWO WORLDS FAIR DRIVE<br>SOMERSET, NJ  08875-6741 | CONFIDENTIALITY AGREEMENT<br>7-OCT-02 |
| DERIVATIVES PORTFOLIO MANAGEMENT LLC<br>MICHAEL PROCTOR / GEOFF RUDDICK<br>PO BOX 2199, GENESIS BUILDING<br>GRAND CAYMAN<br>CAYMAN ISLANDS, BRITISH WEST INDIES | FACILITY LEASE<br>AMENDED AND RESTATED<br>28-FEB-06 |
| DERIVATIVES PORTFOLIO MANAGEMENT LLC<br>GUY CASTRANOVA<br>TWO WORLDS FAIR DRIVE<br>PO BOX 6741<br>SOMERSET, NJ  08875-6741 | FACILITY LEASE<br>AMENDED AND RESTATED<br>28-FEB-06 |
| DEUTSCHE BANK AG<br>WINCHESTER HOUSE<br>1 GREAT WINCHESTER STREET<br>LONDON ECN-2DB, UK | LETTER AGREEMENT<br>21-DEC-05 |
| DEUTSCHE BANK SECURITIES INC.<br>31 W. 52ND STREET<br>NEW YORK, NY  10019 | RISK OFFICE SERVICE AGREEMENT<br>17-MAR-03 |
| DEUTSCHE BANK SECURITIES INC.<br>31 W. 52ND STREET<br>NEW YORK, NY  10019 | RISK OFFICE SERVICE AGREEMENT<br>17-MAR-02 |

In re:    PlusFunds Group, Inc., a Delaware corporation                  Case No.    06-10402 (JMP)

## SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES

(Continuation Sheet)

| NAME AND MAILING ADDRESS, INCLUDING ZIP CODE, OF OTHER PARTIES TO LEASE OR CONTRACT | DESCRIPTION OF CONTRACT OR LEASE AND NATURE OF DEBTOR'S INTEREST, STATE WHETHER LEASE IS FOR NONRESIDENTIAL REAL PROPERTY, STATE CONTRACT NUMBER OR ANY GOVERNMENT CONTRACT |
|---|---|
| DEUTSCHE BANK TRUST COMPANY AMERICAS<br>31 W. 52ND STREET<br>NEW YORK, NY 10019 | CONFIDENTIALITY AGREEMENT<br>12-NOV-02 |
| DIEGO LAGO<br>OTC CONSULTANT<br>PO BOX 1824<br>NEW YORK, NY 10013 | LICENSE AGREEMENT<br>SETTLEMENT AGREEMENT<br>9/2/2005 |
| DPM MELLON LIMITED<br>MICHAEL PROCTOR/GEOFF RUDDICK<br>PO BOX 2199, GENESIS BUILDING<br>GRAND CAYMAN, CAYMAN ISLANDS | SERVICE AGREEMENT<br>2/28/2006 |
| DPM MELLON, LLC<br>GUY CASTRANOVA<br>TWO WORLDS FAIR DRIVE<br>PO BOX 6741<br>SOMERSET, NY 08875-6741 | SERVICE AGREEMENT<br>2/28/2006 |
| DRESDNER KLEINWORT WASSERSTEIN SECURITIES LIMITED<br>20 FENCHURCH STREET<br>LONDON, ENGLAND EC3P3DB | CONFIDENTIALITY AGREEMENT<br>2-AUG-04 |
| DUEMME HEDGE SGR<br>VIA FILODRAMMATICA, S<br>I 20121 MILAN, ITALY | CONFIDENTIALITY AGREEMENT<br>26-OCT-04 |
| E. CAPITAL PARTNERS S.P.A<br>CORSO ITALIA<br>13 20122 MILAN<br>ITALY, | CONFIDENTIALITY AGREEMENT<br>30-NOV-05 |
| EDMOND DE ROTHSCHILD MULTI MANAGEMENT<br>47 RUE DE FAUBOURG SAINT HONORE<br>PARIS, FRANCE 75008 | CONFIDENTIALITY AGREEMENT<br>30-MAR-04 |
| EE WAH LIM<br>OTC CONSULTANT<br>PO BOX 1824<br>NEW YORK, NY 10013 | LICENSE AGREEMENT<br>SETTLEMENT AGREEMENT<br>9/2/2005 |
| EFG BANK<br>24 QUAI DU SEUJET<br>CH 1211<br>GENEVA 2, SWITZERLAND | CONFIDENTIALITY AGREEMENT<br>3-JUN-05 |

In re:    PlusFunds Group, Inc., a Delaware corporation                                    Case No.    06-10402 (JMP)

## SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES

(Continuation Sheet)

| NAME AND MAILING ADDRESS, INCLUDING ZIP CODE, OF OTHER PARTIES TO LEASE OR CONTRACT | DESCRIPTION OF CONTRACT OR LEASE AND NATURE OF DEBTOR'S INTEREST, STATE WHETHER LEASE IS FOR NONRESIDENTIAL REAL PROPERTY, STATE CONTRACT NUMBER OR ANY GOVERNMENT CONTRACT |
|---|---|
| EIM SA<br>2, CHEMIN DE CHATOURIL<br>1260 NYON, FRANCE | CONFIDENTIALITY AGREEMENT<br>18-OCT-04 |
| EXECUSEARCH<br>675 THIRD AVENUE<br>NEW YORK, NY 10017 | CONFIDENTIALITY AGREEMENT<br>1-AUG-05 |
| FERI TRUST GESELLSCHAFT FUR FONDSANALYSE,<br>MANAGERSELEKTION UND PORTFOLIOBERANTUNG MBH<br>RATHAUSPLATZ 8-10, 61348 BAD<br>HAMBURG, GERMANY | CONFIDENTIALITY AGREEMENT<br>14-MAR-04 |
| FINANCIAL MANAGEMENT PROFESSIONALS INC.<br>6034 WEST COURTYARD DRIVE<br>SUITE 380<br>AUSTIN, TX 78730 | CONFIDENTIALITY AGREEMENT<br>12-JAN-04 |
| FOLEY/MYERS COMMUNICATIONS<br>7 PETER COOPER ROAD<br>SUITE 2D<br>NEW YORK, NY 10010 | CONFIDENTIALITY AGREEMENT<br>13-JUN-05 |
| FOLEY/MYERS COMMUNICATIONS<br>7 PETER COOPER ROAD<br>SUITE 2D<br>NEW YORK, NY 10010 | CONFIDENTIALITY AGREEMENT<br>13-JUN-05 |
| FORUM FINANCIAL GROUP, LLC<br>C/O CITIGROUP GLOBAL TRANSACTION SERVICES<br>TWO PORTLAND SQUARE<br>PORTLAND, ME 04101 | CONFIDENTIALITY AGREEMENT<br>6/24/2003 |
| FREEMAN & CO.<br>645 FIFTH AVENUE<br>NEW YORK, NY 10012 | CONFIDENTIALITY AGREEMENT<br>5-DEC-05 |
| FTSE INTERNATIONAL LIMITED<br>1330 AVENUE OF THE AMERICAS<br>10TH FLOOR<br>NEW YORK, NY 10019 | CONFIDENTIALITY AGREEMENT<br>2/6/2003 |
| GEFORIN SA<br>MARIO DE POZZO<br>2BIS, RUE ST-LEGER<br>CH-1205, GENEVA SWITZERLAND | CONFIDENTIALITY AGREEMENT<br>23-JUL-04 |

In re:    PlusFunds Group, Inc., a Delaware corporation                Case No.    06-10402 (JMP)

## SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES

(Continuation Sheet)

| NAME AND MAILING ADDRESS, INCLUDING ZIP CODE, OF OTHER PARTIES TO LEASE OR CONTRACT | DESCRIPTION OF CONTRACT OR LEASE AND NATURE OF DEBTOR'S INTEREST, STATE WHETHER LEASE IS FOR NONRESIDENTIAL REAL PROPERTY, STATE CONTRACT NUMBER OR ANY GOVERNMENT CONTRACT |
|---|---|
| GERIFONDS SA<br>LAUSANNE, SWITZERLAND | CONFIDENTIALITY AGREEMENT<br>26-MAR-03 |
| GOLDMAN, SACHS & CO.<br>85 BROAD STREET<br>NEW YORK, NY  10004 | CONFIDENTIALITY AGREEMENT<br>11/29/2005 |
| GOLDSTREAM CAPITAL GROUP PTY LIMITED<br>281 ELIZABETH STREET<br>SUITE 2202, GPO BOX 3113<br>SYDNEY NWS 2001, AUSTRALIA | CONFIDENTIALITY AGREEMENT<br>30-SEP-04 |
| HARCOURT INVESTMENT CONSULTING AG<br>STAMPFENBACH STRASSE 48<br>ZURICH, SWITZERLAND | CONFIDENTIALITY AGREEMENT<br>13-MAY-04 |
| HITOSHI NAGATA OF ALBOURNE AMERICA, LLC<br>ONE FERRY BUILDING<br>SUITE 280<br>SAN FRANCISCO, CA  94111 | CONFIDENTIALITY AGREEMENT<br>28-FEB-05 |
| HSBC BANK PLC<br>452 5TH AVENUE<br>NEW YORK, NY  10018 | CONFIDENTIALITY AGREEMENT<br>12-MAY-05 |
| HSBC BANK PLC<br>452 5TH AVENUE<br>NEW YORK, NY  10018 | CONFIDENTIALITY AGREEMENT<br>8-SEP-04 |
| ING BANK, N.V.<br>FOPPINGADREEF 7<br>1000 BV AMSTERDAM, NETHERLANDS | CONFIDENTIALITY AGREEMENT<br>26-JAN-04 |
| INTEGRATED FINANCE LIMITED<br>630 FIFTH AVENUE<br>SUITE 2750<br>NEW YORK, NY  10111 | CONFIDENTIALITY AGREEMENT<br>2-DEC-05 |
| ITOCHU CAPITAL SECURITIES, LTD.<br>8-16 NIHONBASHI<br>HONCHO 4-CHOME<br>CHUO-KU, TOKYO 103-0023   JAPAN | CONFIDENTIALITY AGREEMENT<br>1-MAR-05 |
| J. PATRICK GORMAN<br>EXECU-SEARCH CONTACT<br>675 THIRD AVENUE<br>NEW YORK, NY  10017-5704 | CONFIDENTIALITY AGREEMENT<br>8/1/2005 |

In re:    PlusFunds Group, Inc., a Delaware corporation                                 Case No.    06-10402 (JMP)

## SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES

(Continuation Sheet)

| NAME AND MAILING ADDRESS, INCLUDING ZIP CODE, OF OTHER PARTIES TO LEASE OR CONTRACT | DESCRIPTION OF CONTRACT OR LEASE AND NATURE OF DEBTOR'S INTEREST, STATE WHETHER LEASE IS FOR NONRESIDENTIAL REAL PROPERTY, STATE CONTRACT NUMBER OR ANY GOVERNMENT CONTRACT |
|---|---|
| JOSEPH OHAYON<br>OTC CONSULTANT<br>PO BOX 1824<br>NEW YORK, NY 10013 | LICENSE AGREEMENT<br>SETTLEMENT AGREEMENT<br>9/2/2005 |
| JP MORGAN CHASE BANK<br>1411 BROADWAY, FLOOR GROUND<br>NEW YORK, NY 10018 | CONFIDENTIALITY AGREEMENT<br>9-DEC-05 |
| JP MORGAN SECURITIES LTD.<br>MAILPOINT 3/14AL, 3RD FLOOR<br>10 ALDERMANBURY<br>EC2V 7RF, LONDON UK | CONFIDENTIALITY AGREEMENT<br>16-JUL-03 |
| KBC FINANCIAL PRODUCTS USA INC.<br>140 EAST 45TH STREET<br>NEW YORK, NY 10017 | CONFIDENTIALITY AGREEMENT<br>11-AUG-03 |
| KRAUS PARTNER INVESTMENT SOLUTIONS AG<br>KASERNENSTRASSE 11 CH-80004<br>ZURICH, SWITZERLAND | CONFIDENTIALITY AGREEMENT<br>24-NOV-04 |
| KRUSEN CAPITAL<br>465 PARK AVENUE<br>NEW YORK, NY 10022 | CONFIDENTIALITY AGREEMENT<br>5-MAY-03 |
| KURTOSYS SYSTEMS LIMITED<br>35 BALLARDS LANE<br>N3 1XW<br>, LONDON UK | SERVICE AGREEMENT |
| LEHMAN BROTHERS<br>745 SEVENTH AVENUE<br>NEW YORK, NY 10019 | CONFIDENTIALITY AGREEMENT<br>4-AUG-05 |
| LEHMAN BROTHERS (INTERNATIONAL) EUROPE<br>25 BANK STREET<br>LONDON, E14 5LE, UK | CONFIDENTIALITY AGREEMENT<br>12-FEB-05 |
| LEHMAN BROTHERS, INC<br>745 SEVENTH AVENUE<br>NEW YORK, NY 10019 | CONFIDENTIALITY AGREEMENT<br>4-AUG-05 |
| MAKOVSKY & COMPANY, INC.<br>575 LEXINGTON AVE.<br>NEW YORK, NY 10022 | SERVICE AGREEMENT<br>11/4/2005 |

In re: PlusFunds Group, Inc., a Delaware corporation    Case No.    06-10402 (JMP)

## SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### (Continuation Sheet)

| NAME AND MAILING ADDRESS, INCLUDING ZIP CODE, OF OTHER PARTIES TO LEASE OR CONTRACT | DESCRIPTION OF CONTRACT OR LEASE AND NATURE OF DEBTOR'S INTEREST, STATE WHETHER LEASE IS FOR NONRESIDENTIAL REAL PROPERTY, STATE CONTRACT NUMBER OR ANY GOVERNMENT CONTRACT |
|---|---|
| MARK MOORBERG<br>C/O E-HARMON CAPITAL MANAGEMENT LLC<br>400 MONTGOMERY STREET<br>3RD FLOOR<br>SAN FRANCISCO, CA 94101 | CONFIDENTIALITY AGREEMENT<br>5/20/2003 |
| MBI CORREDORES DE BOLSA S.A.<br>GERMAN GUERRERO FALCON<br>PRESIDENTE RIESCO NO. 5711, OF. 602<br>SANTIAGO, CHILE | CONFIDENTIALITY AGREEMENT<br>3-MAR-04 |
| MC TRUST CO.<br>7 RUE DES ALPES<br>1201 GENEVA, SWITZERLAND | CONFIDENTIALITY AGREEMENT<br>9/23/2003 |
| MC TRUSTCO<br>7 RUE DES ALPES<br>1201 GENEVA<br>, SWITZERLAND | SERVICE PROVIDER AGREEMENT<br>4-NOV-05 |
| MERRILL LYNCH ALTERNATIVE INVESTMENTS LLC<br>800 SCUDDERS MILL ROAD<br>PLAINSBORO, NJ 08536 | CONFIDENTIALITY AGREEMENT<br>10-JUN-03 |
| MERRILL LYNCH ALTERNATIVE INVESTMENTS LLC<br>800 SCUDDERS MILL ROAD<br>PLAINSBORO, NJ 08536 | CONFIDENTIALITY AGREEMENT<br>10-JUN-03 |
| MERRILL LYNCH INTERNATIONAL<br>800 SCUDDERS MILL ROAD<br>PLAINSBORO, NJ 08536 | CONFIDENTIALITY AGREEMENT<br>20-JUN-03 |
| MICHAEL ELLOH<br>OTC CONSULTANT<br>PO BOX 1824<br>NEW YORK, NY 10013 | LICENSE AGREEMENT<br>SETTLEMENT AGREEMENT<br>9/2/2005 |
| MITSUBISHI SECURITIES USA, INC..<br>1251 AVENUE OF THE AMERICAS<br>11TH FLOOR<br>NEW YORK, NY 10020 | CONFIDENTIALITY AGREEMENT<br>11-MAR-05 |
| MLIM ALTERNATIVE STRATEGIES LLC<br>800 SCUDDERS MILL ROAD<br>PLAINSBORO, NJ 08536 | CONFIDENTIALITY AGREEMENT<br>3-JAN-03 |

In re:    PlusFunds Group, Inc., a Delaware corporation    Case No.    06-10402 (JMP)

## SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### (Continuation Sheet)

| NAME AND MAILING ADDRESS, INCLUDING ZIP CODE, OF OTHER PARTIES TO LEASE OR CONTRACT | DESCRIPTION OF CONTRACT OR LEASE AND NATURE OF DEBTOR'S INTEREST, STATE WHETHER LEASE IS FOR NONRESIDENTIAL REAL PROPERTY, STATE CONTRACT NUMBER OR ANY GOVERNMENT CONTRACT |
|---|---|
| MORGAN STANLEY<br>25 CABOGT SQUARE, CANARY WHARF<br>LONDON, ENGLAND  E144QA | CONFIDENTIALITY AGREEMENT<br>7-NOV-05 |
| MORGAN STANLEY<br>25 CABOGT SQUARE, CANARY WHARF<br>LONDON, ENGLAND  E144QA | CONFIDENTIALITY AGREEMENT<br>6-MAY-04 |
| MSS FUND MANAGEMENT LIMITED<br>5 OLD BAILEY<br>LONDON, EC4M 7JX, DX 123<br>LONDON/CHANCERY LANE, | CONFIDENTIALITY AGREEMENT<br>2-SEP-05 |
| NEW YORK LIFE INVESTMENT MANAGEMENT LLC<br>51 MADISON AVENUE<br>NEW YORK, NY  10010 | CONFIDENTIALITY AGREEMENT<br>9/11/2003 |
| NOMURA<br>NOMURA HOUSE, 1 ST. MARTIN'S<br>LONDON, ENGLAND  EC1A4NP | CONFIDENTIALITY AGREEMENT<br>23-APR-04 |
| NOMURA<br>NOMURA HOUSE, 1 ST. MARTIN'S<br>LONDON, ENGLAND  EC1A4NP | CONFIDENTIALITY AGREEMENT<br>23-APR-04 |
| OTC, INC.<br>PO BOX 1824<br>NEW YORK, NY  10013 | LICENSE AGREEMENT<br>SETTLEMENT AGREEMENT<br>2-SEP-05 |
| PATICA SECURITIES LIMITED<br>105 ADELAIDE STREET WEST, SUITE 904<br>TORONTO, ON  MSH1P9 | CONFIDENTIALITY AGREEMENT<br>1-DEC-03 |
| PRESCIENT CAPITAL<br>535 PACIFIC AVENUE<br>SAN FRANCISCO, CA  94113 | CONFIDENTIALITY AGREEMENT<br>20-JUN-03 |
| PRESCIENT CAPITAL<br>535 PACIFIC AVENUE<br>SAN FRANCISCO, CA  94113 | CONFIDENTIALITY AGREEMENT<br>20-JUN-03 |
| PRINCIPAL GLOBAL INVESTORS, LLC<br>801 GRAND AVENUE<br>DES MOINES, IA  50392 | CONFIDENTIALITY AGREEMENT<br>28-FEB-05 |

In re:  PlusFunds Group, Inc., a Delaware corporation                    Case No.  06-10402 (JMP)

## SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES

(Continuation Sheet)

| NAME AND MAILING ADDRESS, INCLUDING ZIP CODE, OF OTHER PARTIES TO LEASE OR CONTRACT | DESCRIPTION OF CONTRACT OR LEASE AND NATURE OF DEBTOR'S INTEREST, STATE WHETHER LEASE IS FOR NONRESIDENTIAL REAL PROPERTY, STATE CONTRACT NUMBER OR ANY GOVERNMENT CONTRACT |
|---|---|
| PRIVATE WEALTH MANAGERS LIMITED<br>PHILIP MCENROE<br>72 MERRION SQUARE<br>DUBLIN 2, IRELAND | CONFIDENTIALITY AGREEMENT<br>12-JAN-05 |
| QUEST COMMUNICATIONS CORPORATION<br>1801 CALIFORNIA STREET<br>SUITE 900<br>DENVER, CO  80202 | SERVICE PROVIDER AGREEMENT<br>3-MAY-05 |
| RABO SECURITIES NV<br>P.O. BOX 94640<br>109 GP AMSTERDAM, THE NETHERLANDS | CONFIDENTIALITY AGREEMENT<br>1/15/2004 |
| REDWOOD ASSET MANAGEMENT<br>35 E. 85TH STREET, SUITE 6B<br>NEW YORK, NY  10028 | CONFIDENTIALITY AGREEMENT<br>20-JUN-03 |
| REFCO CAPITAL LLC<br>ATTN: GREG MILMOE, ESQ.<br>SKADDEN, ARPS ET AL.<br>FOUR TIMES SQUARE<br>NEW YORK, NY  10036 | PLEDGE AGREEMENT<br>7-JUN-05 |
| REFCO CAPITAL LLC<br>ATTN: GREG MILMOE, ESQ.<br>SKADDEN, ARPS ET AL.<br>FOUR TIMES SQUARE<br>NEW YORK, NY  10036 | STANDBY CREDIT FACILITY<br>AMENDMENT 1<br>7-JUN-05 |
| REFCO CAPITAL LLC<br>ATTN: GREG MILMOE, ESQ.<br>SKADDEN, ARPS ET AL.<br>FOUR TIMES SQUARE<br>NEW YORK, NY  10036 | STANDBY CREDIT FACILITY<br>13-APR-05 |
| REFCO GROUP, LTD.<br>RICHARD C. BUTT<br>ONE WORLD FINANCIAL CENTER<br>200 LIBERY STREET - TOWER A<br>NEW YORK, NY  10281 | CONFIDENTIALITY AGREEMENT<br>4-NOV-02 |
| RICHARD BUTT<br>200 LIBERTY STREET<br>NEW YORK, NY  10281 | CONFIDENTIALITY AGREEMENT<br>6-FEB-03 |
| RISKDATA<br>65 RUE RAMBUTEAU<br>75004 PARIS<br>FRANCE, | CONFIDENTIALITY AGREEMENT<br>11-JUL-05 |

In re:    PlusFunds Group, Inc., a Delaware corporation                          Case No.    06-10402 (JMP)

## SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### (Continuation Sheet)

| NAME AND MAILING ADDRESS, INCLUDING ZIP CODE, OF OTHER PARTIES TO LEASE OR CONTRACT | DESCRIPTION OF CONTRACT OR LEASE AND NATURE OF DEBTOR'S INTEREST, STATE WHETHER LEASE IS FOR NONRESIDENTIAL REAL PROPERTY, STATE CONTRACT NUMBER OR ANY GOVERNMENT CONTRACT |
|---|---|
| RISKDATA<br>65 RUE RAMBUTEAU<br>75004 PARIS<br>FRANCE, | CONFIDENTIALITY AGREEMENT<br>7-APR-05 |
| RISKMETRICS GROUP, INC.<br>485 ROUTE 1 SOUTH BUILDING E, SUITE 260<br>ISELIN,  NJ  8830 | CONFIDENTIALITY AGREEMENT<br>18-SEP-05 |
| ROTHSTEIN, KASS & COMPANY, P.C.<br>3 BECKER FARM ROAD<br>ROSELAND, NJ  07068 | CONFIDENTIALITY AGREEMENT<br>20-JAN-04 |
| RYDEX CAPITAL PARTNERS<br>JEFF JOSEPH & JOANNA HAIGNEY<br>9601 BLACKWELL ROAD<br>SUITE 500<br>ROCKVILLE, MD  20850 | LICENSE AGREEMENT<br>TERMINATION LETTER<br>30-JAN-06 |
| RYDEX CAPITAL PARTNERS<br>JEFF JOSEPH & JOANNA HAIGNEY<br>9601 BLACKWELL ROAD<br>SUITE 500<br>ROCKVILLE, MD  20850 | LICENSE AGREEMENT<br>OCT-04 |
| RYDEX CAPITAL PARTNERS<br>JEFF JOSEPH & JOANNA HAIGNEY<br>9601 BLACKWELL ROAD<br>SUITE 500<br>ROCKVILLE, MD  20850 | LICENSE AGREEMENT<br>20-SEP-04 |
| RYDEX CAPITAL PARTNERS<br>JEFF JOSEPH & JOANNA HAIGNEY<br>9601 BLACKWELL ROAD<br>SUITE 500<br>ROCKVILLE, MD  20850 | CONFIDENTIALITY AGREEMENT<br>8-APR-04 |
| RYDEX CAPITAL PARTNERS<br>JEFF JOSEPH & JOANNA HAIGNEY<br>9601 BLACKWELL ROAD<br>SUITE 500<br>ROCKVILLE, MD  20850 | LICENSE AGREEMENT<br>ADDENDUM 2<br>31-DEC-03 |
| RYDEX CAPITAL PARTNERS<br>JEFF JOSEPH & JOANNA HAIGNEY<br>9601 BLACKWELL ROAD<br>SUITE 500<br>ROCKVILLE, MD  20850 | LICENSE AGREEMENT<br>ADDENDUM 1<br>27-FEB-03 |

In re:    PlusFunds Group, Inc., a Delaware corporation                                Case No.    06-10402 (JMP)

## SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### (Continuation Sheet)

| NAME AND MAILING ADDRESS, INCLUDING ZIP CODE, OF OTHER PARTIES TO LEASE OR CONTRACT | DESCRIPTION OF CONTRACT OR LEASE AND NATURE OF DEBTOR'S INTEREST, STATE WHETHER LEASE IS FOR NONRESIDENTIAL REAL PROPERTY, STATE CONTRACT NUMBER OR ANY GOVERNMENT CONTRACT |
|---|---|
| RYDEX CAPITAL PARTNERS<br>JEFF JOSEPH & JOANNA HAIGNEY<br>9601 BLACKWELL ROAD<br>SUITE 500<br>ROCKVILLE, MD  20850 | LICENSE AGREEMENT<br>9-JAN-03 |
| RYDEX CAPITAL PARTNERS<br>JEFF JOSEPH & JOANNA HAIGNEY<br>9601 BLACKWELL ROAD<br>SUITE 500<br>ROCKVILLE, MD  20850 | LICENSE AGREEMENT<br>9-JAN-03 |
| SAPPHIRE OFFICE SOLUTIONS<br>485 UNDERHILL, SUITE 203<br>SYOSSET, NY  11791 | CONFIDENTIALITY AGREEMENT<br>1-AUG-05 |
| SEEDS FINANCE SA<br>6615 AVENUE MACMAHON<br>75017 PARIS, FRANCE | CONFIDENTIALITY AGREEMENT<br>1-JUN-04 |
| SENTINEL<br>ST. ANDREWS COURT<br>FREDERICK STREET STEPS<br>NASSAU, BAHAMAS | INVESTMENT AGREEMENT<br>18-OCT-02 |
| SEQUENT CAPITAL, LLC<br>1270 AVENUE OF THE AMERICAS<br>SUITE 1905<br>NEW YORK, NY  10020 | CONFIDENTIALITY AGREEMENT<br>22-JUL-05 |
| SG AMERICAS SECURITIES, LLC<br>1221 AVENUE OF THE AMERICAS<br>6TH FLOOR<br>NEW YORK, NY  10020 | CONFIDENTIALITY AGREEMENT<br>7/13/2004 |
| SJBERWIN<br>MARLA-THERSALA STRABE 5<br>81675 MUNCHEN, | CONFIDENTIALITY AGREEMENT<br>14-FEB-04 |
| SKYFUND, LLC<br>4 INDEPENDENCE DRIVE<br>EAST BRUNSWICK, NJ  08836 | CONFIDENTIALITY AGREEMENT<br>3-OCT-05 |
| SMITH BARNEY<br>666 THIRD AVENUE<br>NEW YORK, NY  10017 | CONFIDENTIALITY AGREEMENT<br>12-AUG-04 |

In re:    PlusFunds Group, Inc., a Delaware corporation                    Case No.    06-10402 (JMP)

## SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### (Continuation Sheet)

| NAME AND MAILING ADDRESS, INCLUDING ZIP CODE, OF OTHER PARTIES TO LEASE OR CONTRACT | DESCRIPTION OF CONTRACT OR LEASE AND NATURE OF DEBTOR'S INTEREST, STATE WHETHER LEASE IS FOR NONRESIDENTIAL REAL PROPERTY, STATE CONTRACT NUMBER OR ANY GOVERNMENT CONTRACT |
|---|---|
| SMITH BARNEY<br>666 THIRD AVENUE<br>NEW YORK, NY  10017 | CONFIDENTIALITY AGREEMENT<br>6-JAN-03 |
| SPECTRUM VALUE MANAGEMENT LTD.<br>ZURCHERSTRASSE 156<br>CH-8645, JONA  SWITZERLAND | CONFIDENTIALITY AGREEMENT<br>2-MAR-04 |
| SPHINX LONG/SHORT EQUITY FUND SPC<br>C/O WALKERS SPV LIMITED ATTN: LANA LEWIS<br>P.O. BOX 908GT<br>WALKER HOUSE, MARY STREET<br>GEORGE TOWN, GRAND CAYMAN, CAYMAN ISLANDS | SIDE LETTER<br>1-MAR-04 |
| SPHINX STRATEGY FUND, LTD<br>C/O WALKERS SPV LIMITED ATTN: LANA LEWIS<br>P.O. BOX 908GT<br>WALKER HOUSE, MARY STREET<br>GEORGE TOWN, GRAND CAYMAN, CAYMAN ISLANDS | INVESTMENT AGREEMENT<br>18-OCT-02 |
| STANDARD & POOR'S<br>JOHN DESMOND<br>55 WATER STREET<br>42ND FLOOR<br>NEW YORK, NY  10041 | CONFIDENTIALITY AGREEMENT<br>7-DEC-04 |
| STANDARD & POOR'S<br>JOHN DESMOND<br>55 WATER STREET<br>42ND FLOOR<br>NEW YORK, NY  10041 | LICENSE AGREEMENT<br>SIDE LETTER AGREEMENT TO PAUL AARONSON<br>20-SEP-04 |
| STANDARD & POOR'S<br>JOHN DESMOND<br>55 WATER STREET<br>42ND FLOOR<br>NEW YORK, NY  10041 | LICENSE AGREEMENT<br>SIDE LETTER AGREEMENT TO PAUL AARONSON<br>16-SEP-04 |
| STANDARD & POOR'S<br>JOHN DESMOND<br>55 WATER STREET<br>42ND FLOOR<br>NEW YORK, NY  10041 | LICENSE AGREEMENT<br>AMENDMENT 3<br>20-FEB-04 |
| STANDARD & POOR'S<br>JOHN DESMOND<br>55 WATER STREET<br>42ND FLOOR<br>NEW YORK, NY  10041 | LICENSE AGREEMENT<br>9-JAN-03 |

In re:    PlusFunds Group, Inc., a Delaware corporation          Case No.    06-10402 (JMP)

## SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES

(Continuation Sheet)

| NAME AND MAILING ADDRESS, INCLUDING ZIP CODE, OF OTHER PARTIES TO LEASE OR CONTRACT | DESCRIPTION OF CONTRACT OR LEASE AND NATURE OF DEBTOR'S INTEREST, STATE WHETHER LEASE IS FOR NONRESIDENTIAL REAL PROPERTY, STATE CONTRACT NUMBER OR ANY GOVERNMENT CONTRACT |
|---|---|
| STANDARD & POOR'S<br>JOHN DESMOND<br>55 WATER STREET<br>42ND FLOOR<br>NEW YORK, NY  10041 | LICENSE AGREEMENT<br>AMENDMENT 2<br>1-DEC-02 |
| STANDARD & POOR'S<br>JOHN DESMOND<br>55 WATER STREET<br>42ND FLOOR<br>NEW YORK, NY  10041 | CONFIDENTIALITY AGREEMENT<br>3-OCT-02 |
| STANDARD & POOR'S<br>JOHN DESMOND<br>55 WATER STREET<br>42ND FLOOR<br>NEW YORK, NY  10041 | LICENSE AGREEMENT<br>AMENDMENT 1<br>17-MAY-02 |
| STANDARD & POOR'S<br>JOHN DESMOND<br>55 WATER STREET<br>42ND FLOOR<br>NEW YORK, NY  10041 | LETTER AGREEMENT<br>LETTER AGREEMENT<br>11-MAR-02 |
| STANDARD & POOR'S<br>JOHN DESMOND<br>55 WATER STREET<br>42ND FLOOR<br>NEW YORK, NY  10041 | LICENSE AGREEMENT<br>20-DEC-01 |
| STANDARD & POOR'S<br>JOHN DESMOND<br>55 WATER STREET<br>42ND FLOOR<br>NEW YORK, NY  10041 | MEMORANDUM OF AGREEMENT<br>1/9/2003 |
| STONEBROOK ADVISORS LLC<br>230 PARK AVENUE, SUITE 1000<br>NEW YORK, NY  10169 | CONFIDENTIALITY AGREEMENT<br>5-DEC-05 |
| SUVA, SWISS NATIONAL ACCIDENT INSURANCE INSTITUTION<br>ROESSLIMATTSTRASSE 39<br>CH-6002<br>LUCERNE, SWITZERLAND | CONFIDENTIALITY AGREEMENT<br>1-JUL-04 |
| SUVA, SWISS NATIONAL ACCIDENT INSURANCE INSTITUTION<br>ROESSLIMATTSTRASSE 39<br>CH-6002<br>LUCERNE, SWITZERLAND | CONFIDENTIALITY / NON-DISCLOSURE AGREEMENT<br>03-OCT-02 |

In re:  PlusFunds Group, Inc., a Delaware corporation                    Case No.   06-10402 (JMP)

## SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES
### (Continuation Sheet)

| NAME AND MAILING ADDRESS, INCLUDING ZIP CODE, OF OTHER PARTIES TO LEASE OR CONTRACT | DESCRIPTION OF CONTRACT OR LEASE AND NATURE OF DEBTOR'S INTEREST, STATE WHETHER LEASE IS FOR NONRESIDENTIAL REAL PROPERTY, STATE CONTRACT NUMBER OR ANY GOVERNMENT CONTRACT |
|---|---|
| TANAKA VALUE INVESTMENTS KK<br>SUITE 3210 LA TOUR CHIYODA<br>3-5-3 NISHI-KAUDA<br>CHIYODA-KU, TOKYO 101-0065 | CONFIDENTIALITY AGREEMENT<br>30-AUG-05 |
| TELCOVE INVESTMENT, LLC<br>GENERAL COUNSEL<br>121 CHAMPION WAY<br>CANONSBURG, PA  15317 | SERVICE PROVIDER AGREEMENT<br>19-OCT-05 |
| TIME WARNER CABLE OF NYC<br>TED GRIFFIN<br>120 EAST 23RD STREET<br>NEW YORK, NY  10010 | SERVICE PROVIDER AGREEMENT<br>26-JAN-05 |
| TOPANGA XX, INC.<br>GEORGETOWN<br>GRAND CAYMAN, CAYMAN ISLANDS | CONFIDENTIALITY AGREEMENT<br>8/6/2003 |
| TREMONT CAPITAL MANAGEMENT LIMITED<br>16 BERKELY STREET<br>WIJ 8DZ<br>LONDON, ENGLAND | CONFIDENTIALITY AGREEMENT<br>2-NOV-04 |
| UBS AG<br>677 WASHINGTON BLVD.<br>STAMFORD, CT  06901 | LETTER AGREEMENT<br>26-FEB-04 |
| UBS AG<br>677 WASHINGTON BLVD.<br>STAMFORD, CT  06901 | LETTER AGREEMENT<br>7-APR-03 |
| UBS AG<br>677 WASHINGTON BLVD.<br>STAMFORD, CT  06901 | CONFIDENTIALITY AGREEMENT<br>25-JUN-02 |
| UNIGESTION<br>8C AVENUE DE CHAMPEL<br>206 GENEVA<br>SWITZERLAND, | CONFIDENTIALITY AGREEMENT<br>1-JUN-05 |
| VEGA ASSET MANAGEMENT I LIMITED<br>28 ELGIN AVENUE<br>GEORGE TOWN, GRAND CAYMAN  CAYMAN ISLA | CONFIDENTIALITY AGREEMENT<br>1-OCT-02 |
| WACHOVIA BANK, NATIONAL ASSOCIATION<br>12 E. 49TH STREET, 45TH FLOOR<br>NEW YORK, NY  10017 | CONFIDENTIALITY AGREEMENT<br>10-FEB-03 |

In re:  PlusFunds Group, Inc., a Delaware corporation                    Case No.    06-10402 (JMP)

## SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES

(Continuation Sheet)

| NAME AND MAILING ADDRESS, INCLUDING ZIP CODE, OF OTHER PARTIES TO LEASE OR CONTRACT | DESCRIPTION OF CONTRACT OR LEASE AND NATURE OF DEBTOR'S INTEREST, STATE WHETHER LEASE IS FOR NONRESIDENTIAL REAL PROPERTY, STATE CONTRACT NUMBER OR ANY GOVERNMENT CONTRACT |
|---|---|
| YURIY VERNIK<br>OTC CONSULTANT<br>PO BOX 1824<br>NEW YORK, NY  10013 | LICENSE AGREEMENT<br>SETTLEMENT AGREEMENT<br>9/2/2005 |
| YURIY VERNIK<br>OTC CONSULTANT<br>PO BOX 1824<br>NEW YORK, NY  10013 | LICENSE AGREEMENT<br>SETTLEMENT AGREEMENT<br>9/2/2005 |
| ZAPCO 1500 INVESTMENT L.P.<br>NW 5583 P.O. BOX 1450<br>MINNEAPOLIS, MN  55485-5583 | FACILITY LEASE<br>AMENDMENT 1<br>30-JUN-05 |
| ZAPCO 1500 INVESTMENT L.P.<br>NW 5583 P.O. BOX 1450<br>MINNEAPOLIS, MN  55485-5583 | FACILITY LEASE<br>20-APR-04 |

In re:    PlusFunds Group, Inc., a Delaware corporation                    Case No.    06-10402 (JMP)
                    **Debtor**

# SCHEDULE H - CODEBTORS

Provide the information requested concerning any person or entity, other than a spouse in a joint case, that is also liable on any debts listed by debtor in the schedules of creditors. Include all guarantors and co-signers. If the debtor resides or resided in a community property state, commonwealth, or territory (including Alaska, Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington, or Wisconsin) within the eight year period immediately preceding the commencement of the case, identify the name of the debtor's spouse and of any former spouse who resides or resided with the debtor in the community property state, commonwealth, or territory. Include all names used by the nondebtor spouse during the eight years immediately preceding the commencement of this case. If a minor child is a codebtor or a creditor, indicate that by stating "a minor child" and do not disclose the child's name. See 11 U.S.C. § 112; Fed. Bankr. P. 1007(m).

**X**    Check this box if debtor has no codebtors.

| NAME AND ADDRESS OF CODEBTOR | NAME AND ADDRESS OF CREDITOR |
|---|---|
|  |  |

**PlusFunds Group, Inc., a Delaware corporation**

**06-10402 (JMP)**

### DECLARATION CONCERNING DEBTOR'S SCHEDULES

### DECLARATION UNDER PENALTY OF PERJURY ON BEHALF OF A CORPORATION

I, S. David Peress, Chief Restructuring Officer of the corporation named as the debtor in this case, declare under penalty of perjury that I have read the foregoing  summary and schedules, consisting of 39 sheets, and that, subject to the General Note and footnotes included therein, they are true and correct to the best of my knowledge, information, and belief.

Date: March 22, 2006                   Signature _____ / s /  S. DAVID PERESS _____

                                                                            S. David Peress
                                                                    Chief Restructuring Officer

(An individual signing on behalf of a partnership or corporation must indicate position or relationship to debtor.)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x
                              :

In re                            :        Chapter 11 Case
                              :        No. 05-60006 (RDD)

REFCO INC., <u>et al.</u>,           :        (Jointly Administered)
                              :

       Debtors.                :
                              :

------------------------------------------------------------ x

**ORDER GRANTING THE PLAN ADMINISTRATORS' MOTIONS FOR
SUMMARY JUDGMENT ON PROOFS OF CLAIM OF PLUSFUNDS GROUP, INC.**

        Before the Court are the motions for summary judgment (the "<u>Motions</u>") of RJM, LLC as

plan administrator (the "<u>Refco Plan Administrator</u>") of Refco Inc. and certain of its subsidiaries

(collectively, the "<u>Reorganized Debtors</u>") and Marc S. Kirschner, as plan administrator and

chapter 11 trustee (the "<u>RCM Plan Administrator</u>" and together with the Refco Plan

Administrator, the "<u>Plan Administrators</u>") of Refco Capital Markets, Ltd. ("<u>RCM</u>" and, together

with the Reorganized Debtors, the "<u>Debtors</u>"), to disallow and expunge the proofs of claim

[Claim Nos. 11288 through 11311] of PlusFunds Group, Inc. ("<u>PlusFunds</u>"), as amended by its

Second Amended Proof of Claim (as so amended, the "<u>Second Amended Claim</u>").[1]

        Upon consideration of the Second Amended Claim, the Motions and responses thereto,

the declarations and exhibits filed in support thereof and in opposition thereto; and the parties

having been given due notice and opportunity to be heard; and after due deliberation, and upon

the record of the two hearings on the Motions on April 12, 2007 and June 28, 2007; and the

Court having determined for the reasons stated in its ruling, attached as Exhibit <u>A</u> hereto, which

modifies and supersedes the Court's bench ruling as the conclusion of the June 28, 2007 hearing

on the Motions, that the Plan Administrators have met their burden under Bankruptcy Rule 7056,

incorporating Fed. R. Civ. P. 76, to obtain summary judgment in that there are no genuine issues

---

[1]     Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the RCM Plan
Administrator's Amended Memorandum of Law in Support of Motion for Summary Judgment on Proof of Claim of
PlusFunds Group, Inc. [Docket No. 5256].

of material fact and they are entitled to judgment as a matter of law disallowing and expunging the Second Amended Claim pursuant to 11 U.S.C. § 502,

The Court hereby makes the following additional findings and conclusions:

A.     This Court has jurisdiction over the Motions pursuant to 28 U.S.C. §§ 157 and 1334.

B.     PlusFunds asserts in its Second Amended Claim claims for breach of contract, having abandoned its other claims.  On such claims, PlusFunds bears the burden of proof.

C.     There is no genuine dispute of material fact that PlusFunds had not made a prima facie showing of the formation of a contract to segregate the other assets of RCM cash or other consideration paid by SPhinX or the SPhinX Funds to Refco, LLC and held there or otherwise transferred to RCM, or to hold such cash in trust.

D.     There is no genuine dispute of material fact, that PlusFunds has not made a prima facie showing of breach of the contract that was formed, i.e., a contract not to satisfy from the assets of one SPhinX Fund or from PlusFunds the liabilities or obligations of another.

Accordingly, it is hereby **ORDERED, ADJUDGED AND DECREED** that:

1.     The Plan Administrators' Motions are **GRANTED**.

2.     PlusFunds' Second Amended Claim is disallowed and expunged in its entirety as against all Debtors, including RCM.

3.     The pre-motion conference requirement of Local Bankruptcy Rule 7056-1(a) is waived with respect to the Motions.

4.    The Court shall retain jurisdiction over any and all matters arising from or related to the interpretation or implementation of this Order.


Dated:        July 20, 2007
              New York, New York

                              ___/s/ Robert D. Drain_____
                              Honorable Robert D. Drain
                              United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                      :

In re:                     :      Chapter 11

Refco Inc., *et al.*,         :      Case No. 05-60006 (RDD)

              Debtors.  :      (Jointly Administered)
                      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## MODIFIED JOINT CHAPTER 11 PLAN OF REFCO INC. AND
## CERTAIN OF ITS DIRECT AND INDIRECT SUBSIDIARIES

J. Gregory Milmoe
Sally McDonald Henry
J. Gregory St. Clair
SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
Four Times Square
New York, New York 10036-6522
(212) 735-3000

Attorneys for Refco Inc., *et al.*

Tina L. Brozman
Timothy B. DeSieno
Mark W. Deveno
BINGHAM McCUTCHEN LLP
399 Park Avenue
New York, NY 10022
(212) 705-7000

Attorneys for Marc S. Kirschner, the Chapter 11 Trustee
for Refco Capital Markets, Ltd.

Luc A. Despins
Susheel Kirpalani
Dennis C. O'Donnell
MILBANK, TWEED, HADLEY & McCLOY LLP
One Chase Manhattan Plaza
New York, New York 10005
(212) 530-5000

Attorneys for the Official Committee of Unsecured
Creditors of Refco Inc., *et al.*

David S. Rosner
Andrew K. Glenn
Jeffrey R. Gleit
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
(212) 506-1700

Attorneys for the Additional Committee of Unsecured
Creditors of Refco Inc., *et al.*

Dated:  New York, New York
        December 14, 2006

## TABLE OF CONTENTS

Page

ARTICLE I DEFINED TERMS AND RULES OF INTERPRETATION ............................................... 1
1.1    *Additional Committee* .......................................................................................................... 1
1.2    *Additional RCM Claim* ......................................................................................................... 1
1.3    *Ad Hoc Committee of Senior Subordinated Note Holders* ................................................. 1
1.4    *Ad Hoc Committee of Senior Subordinated Note Holders Fees and Expenses* ................. 1
1.5    *Ad Hoc Equity Committee* .................................................................................................... 2
1.6    *Ad Hoc Equity Committee Fees and Expenses* ................................................................... 2
1.7    *Adjusted Contributing Debtors Distributive Assets* ........................................................... 2
1.8    *Administrative Claim* ........................................................................................................... 2
1.9    *Administrative/Priority Claims Reserve* ............................................................................. 2
1.10   *Administrative Claims Adjustment* ...................................................................................... 2
1.11   *Administrative Claims Objection Deadline* ......................................................................... 2
1.12   *Administrative Professionals* .............................................................................................. 2
1.13   *Affiliate Debtor(s)* ............................................................................................................... 2
1.14   *AlixPartners* ......................................................................................................................... 3
1.15   *Allotted Administrative Claims* ........................................................................................... 3
1.16   *Allowed* ................................................................................................................................ 3
1.17   *"Allowed ... Claim"* ............................................................................................................ 3
1.18   *Asset Schedule* ..................................................................................................................... 3
1.19   *Ballot* ................................................................................................................................... 3
1.20   *Bankruptcy Code* ................................................................................................................. 3
1.21   *Bankruptcy Court* ................................................................................................................ 3
1.22   *Bankruptcy Rules* ................................................................................................................ 3
1.23   *Bar Date* .............................................................................................................................. 3
1.24   *BAWAG* ................................................................................................................................ 3
1.25   *BAWAG Allocation Order* .................................................................................................... 3
1.26   *BAWAG Contingent Proceeds* ............................................................................................. 4
1.27   *BAWAG Guaranteed Proceeds* ........................................................................................... 4
1.28   *BAWAG Proceeds* ................................................................................................................ 4
1.29   *BAWAG Settlement* .............................................................................................................. 4
1.30   *Business Day* ........................................................................................................................ 4
1.31   *Capstone* .............................................................................................................................. 4
1.32   *Cargill* .................................................................................................................................. 4
1.33   *Cargill Administrative Claim* .............................................................................................. 4
1.34   *Cash* ..................................................................................................................................... 4
1.35   *Cash-Out Option Agreement* ............................................................................................... 4
1.36   *Chapter 11 Case(s)* ............................................................................................................. 4
1.37   *Claim* .................................................................................................................................... 4
1.38   *Claims Distribution Account* ............................................................................................... 4
1.39   *Claims Objection Deadline* ................................................................................................. 4
1.40   *Class* .................................................................................................................................... 5
1.41   *Class Actions Claims* ........................................................................................................... 5
1.42   *Combined Recoveries* .......................................................................................................... 5
1.43   *Committees* ........................................................................................................................... 5
1.44   *Confirmation* ........................................................................................................................ 5
1.45   *Confirmation Date* ............................................................................................................... 5
1.46   *Confirmation Hearing* ......................................................................................................... 5
1.47   *Confirmation Order* ............................................................................................................. 5
1.48   *Contributed Claims* ............................................................................................................. 5
1.49   *Contributed Claims Recoveries* ........................................................................................... 5

i

| | | |
|---|---|---|
| 1.50 | *Contributing Debtors* | 5 |
| 1.51 | *Contributing Debtors BAWAG Proceeds* | 5 |
| 1.52 | *Contributing Debtors Cash Distribution* | 5 |
| 1.53 | *Contributing Debtors Distributive Assets* | 5 |
| 1.54 | *Contributing Debtors Effective Date Claims* | 6 |
| 1.55 | *Contributing Debtors General Unsecured BAWAG Proceeds* | 6 |
| 1.56 | *Contributing Debtors General Unsecured Claim* | 6 |
| 1.57 | *Contributing Debtors General Unsecured Distribution* | 6 |
| 1.58 | *Contributing Debtors Post-Effective Date Claims* | 6 |
| 1.59 | *Contributing Debtors Projection* | 6 |
| 1.60 | *Contributing Non-Debtor Affiliate* | 6 |
| 1.61 | *Contributing Non-Debtor Affiliate Management* | 6 |
| 1.62 | *Contributing Non-Debtor Affiliate Trigger Date* | 6 |
| 1.63 | *Convenience Claims* | 7 |
| 1.64 | *Credit Agreement* | 7 |
| 1.65 | *Creditors' Committee* | 7 |
| 1.66 | *Debtor* | 7 |
| 1.67 | *Debtors* | 7 |
| 1.68 | *Disbursing Agent* | 7 |
| 1.69 | *Disclosure Statement* | 7 |
| 1.70 | *Disputed Claim* | 7 |
| 1.71 | *"Disputed ... Claim"* | 7 |
| 1.72 | *Disputed Claim Amount* | 7 |
| 1.73 | *Disputed Claims Reserve* | 7 |
| 1.74 | *Distribution* | 7 |
| 1.75 | *Distribution Date* | 7 |
| 1.76 | *Distribution Record Date* | 8 |
| 1.77 | *Early Payment Order* | 8 |
| 1.78 | *Effective Date* | 8 |
| 1.79 | *Effective Beneficiaries* | 8 |
| 1.80 | *Employee Benefit Plans* | 8 |
| 1.81 | *ERISA* | 8 |
| 1.82 | *Estate(s)* | 8 |
| 1.83 | *Estimated Unsatisfied Credit Agreement Claims* | 8 |
| 1.84 | *Examiner* | 8 |
| 1.85 | *Examiner Order* | 8 |
| 1.86 | *Excess Priority Claims* | 8 |
| 1.87 | *Exhibit* | 8 |
| 1.88 | *Exhibit Filing Date* | 8 |
| 1.89 | *Fee Committee* | 8 |
| 1.90 | *Final Order* | 8 |
| 1.91 | *FXA* | 9 |
| 1.92 | *FXA Cash Accounts* | 9 |
| 1.93 | *FXA Convenience Claims* | 9 |
| 1.94 | *FXA Distributive Assets* | 9 |
| 1.95 | *FXA General Unsecured Claim* | 9 |
| 1.96 | *FXA General Unsecured Claim Distribution* | 9 |
| 1.97 | *FXCM* | 9 |
| 1.98 | *FXCM Committee* | 9 |
| 1.99 | *General Unsecured Claim* | 9 |
| 1.100 | *Holder* | 9 |
| 1.101 | *Houlihan* | 9 |
| 1.102 | *Impaired* | 9 |
| 1.103 | *Intercompany Claim* | 10 |
| 1.104 | *Interest* | 10 |

ii

1.105   *IPO Underwriter Claims Recovery* ........................................................................ 10
1.106   *JPMC Fees and Expenses* ...................................................................................... 10
1.107   *Joinder Parties* ...................................................................................................... 10
1.108   *Joint Sub-Committee* ............................................................................................. 10
1.109   *KK Japan* ............................................................................................................... 10
1.110   *Leuthold* ................................................................................................................ 10
1.111   *Lien* ....................................................................................................................... 10
1.112   *Litigation Claims* .................................................................................................. 10
1.113   *Litigation Trust* ..................................................................................................... 10
1.114   *Litigation Trust Agreement* ................................................................................... 10
1.115   *Litigation Trust Beneficiaries* ............................................................................... 10
1.116   *Litigation Trust Committee* ................................................................................... 11
1.117   *Litigation Trustee* .................................................................................................. 11
1.118   *Litigation Trust Interests* ...................................................................................... 11
1.119   *Loan Documents* .................................................................................................... 11
1.120   *Loans* ..................................................................................................................... 11
1.121   *MAC Contributing Debtors Assets* ........................................................................ 11
1.122   *MAC RCM Assets* ................................................................................................... 11
1.123   *MCG Members* ....................................................................................................... 11
1.124   *Master Ballot* ........................................................................................................ 11
1.125   *Non-Debtor Affiliates* ............................................................................................ 11
1.126   *Non-Estate Refco Claims* ....................................................................................... 12
1.127   *Non-Tax Priority Claim* ......................................................................................... 12
1.128   *Old Equity Interests* .............................................................................................. 12
1.129   *Other Related Claim* .............................................................................................. 12
1.130   *Other Secured Claim* ............................................................................................. 12
1.131   *Person* ................................................................................................................... 12
1.132   *Petition Date* ......................................................................................................... 12
1.133   *Plan* ....................................................................................................................... 12
1.134   *Plan Administrator* ................................................................................................ 12
1.135   *Plan Administrator Agreement* .............................................................................. 13
1.136   *Plan Committee* ..................................................................................................... 13
1.137   *Plan Document* ...................................................................................................... 13
1.138   *Plan Filing Date* .................................................................................................... 13
1.139   *Plan Proponents* .................................................................................................... 13
1.140   *Plan Support Agreement* ....................................................................................... 13
1.141   *Post-Confirmation RCM* ........................................................................................ 13
1.142   *Post-Petition Management* ..................................................................................... 13
1.143   *Pre-Conversion Administrative Claim Amount* ..................................................... 13
1.144   *Priority Claims* ...................................................................................................... 13
1.145   *Priority Tax Claim* ................................................................................................. 13
1.146   *Private Actions Trust* ............................................................................................. 13
1.147   *Private Actions Trust Agreement* ........................................................................... 13
1.148   *Private Actions Trust Election* ............................................................................... 13
1.149   *Private Actions Trustee* .......................................................................................... 13
1.150   *Professional* ........................................................................................................... 14
1.151   *Professional Fee Claim* .......................................................................................... 14
1.152   *Pro Rata* ................................................................................................................ 14
1.153   *Qualifying Plan* ..................................................................................................... 14
1.154   *Quarterly Distribution Date* .................................................................................. 14
1.155   *RCM* ...................................................................................................................... 14
1.156   *RCM Administrative/Priority Claims Reserve* ....................................................... 14
1.157   *RCM Administrative Professional* ......................................................................... 14
1.158   *RCM Advance* ........................................................................................................ 14
1.159   *RCM BAWAG Proceeds* .......................................................................................... 14

1.160   *RCM Cash Distribution* ............................................................................ 14
1.161   *RCM Difference* ....................................................................................... 14
1.162   *RCM Claims Distribution Account* ......................................................... 15
1.163   *RCM Distribution Reserve* ...................................................................... 15
1.164   *RCM Excess Priority Claims* ................................................................... 15
1.165   *RCM FX/Unsecured Claims* ..................................................................... 15
1.166   *RCM FX/Unsecured Claims Distribution* ................................................ 15
1.167   *RCM FX/Unsecured Convenience Claims* ................................................ 15
1.168   *RCM Implied Deficiency Claim* ............................................................... 15
1.169   *RCM Intercompany Claims* ...................................................................... 15
1.170   *RCM Intercompany Claim Distribution* ................................................... 15
1.171   *RCM Leuthold Metals Claim* .................................................................... 15
1.172   *RCM Leuthold Metals Claim Distribution* ............................................... 15
1.173   *RCM Projection* ........................................................................................ 15
1.174   *RCM Related Claims* ................................................................................ 15
1.175   *RCM Related Claim Subordination Form* ................................................ 16
1.176   *RCM Reserves* .......................................................................................... 16
1.177   *RCM Rights Distribution* ......................................................................... 16
1.178   *RCM Securities Customer Claims* ........................................................... 16
1.179   *RCM Securities Customer Convenience Claims* ...................................... 16
1.180   *RCM Securities Customer Claims Distribution* ....................................... 16
1.181   *RCM Settlement Agreement* ..................................................................... 16
1.182   *RCM Substantial Contribution Fees* ........................................................ 16
1.183   *RCM Trustee* ............................................................................................ 17
1.184   *RCM Unclaimed Distribution Reserve* ..................................................... 17
1.185   *RCM Wind-Down Reserve* ....................................................................... 17
1.186   *Reinstated* ................................................................................................ 17
1.187   *Refco Entities* .......................................................................................... 17
1.188   *Related Claims* ......................................................................................... 17
1.189   *Released/Subordinated Claims* ................................................................ 17
1.190   *Released Parties* ....................................................................................... 17
1.191   *Reorganized Debtors* ............................................................................... 17
1.192   *Reorganized FXA* ..................................................................................... 17
1.193   *Reorganized Refco* ................................................................................... 17
1.194   *Reserves* ................................................................................................... 17
1.195   *Restated Corporate Governance Documents* ........................................... 17
1.196   *Retained Causes of Action* ...................................................................... 17
1.197   *RGL* .......................................................................................................... 18
1.198   *RGL FXCM Distribution* .......................................................................... 18
1.199   *Rogers Funds* ........................................................................................... 18
1.200   *Scheduled* ................................................................................................. 18
1.201   *Schedules* ................................................................................................. 18
1.202   *Secured Lender(s)* .................................................................................... 18
1.203   *Secured Lender Agent* .............................................................................. 18
1.204   *Secured Lender BAWAG Proceeds* ........................................................... 18
1.205   *Secured Lender Claims* ............................................................................. 18
1.206   *Secured Lender Indemnification Claims* .................................................. 18
1.207   *Secured Lender Payment Date* ................................................................. 18
1.208   *Secured Lender Released Claims* .............................................................. 18
1.209   *Secured Lender Releasee* .......................................................................... 19
1.210   *Secured Lender's Collateral* ..................................................................... 19
1.211   *Securities Class Action Stipulation* ......................................................... 19
1.212   *Senior Subordinated Note Allocation* ...................................................... 19
1.213   *Senior Subordinated Note Claims* ............................................................ 19
1.214   *Senior Subordinated Note Holder BAWAG Proceeds* .............................. 19

| | | |
|---|---|---|
| 1.215 | *Senior Subordinated Note Holder Distribution* | 19 |
| 1.216 | *Senior Subordinated Note Holder Fee Distribution* | 19 |
| 1.217 | *Senior Subordinated Note Indenture* | 19 |
| 1.218 | *Senior Subordinated Note Indenture Trustee* | 20 |
| 1.219 | *Senior Subordinated Note Indenture Trustee Charging Lien* | 20 |
| 1.220 | *Senior Subordinated Note Indenture Trustee Fees.* | 20 |
| 1.221 | *Senior Subordinated Notes* | 20 |
| 1.222 | *Specified Difference* | 20 |
| 1.223 | *Subordinated Claim* | 20 |
| 1.224 | *Subsidiary Claims and Interests* | 20 |
| 1.225 | *Tranche A Litigation Trust Interests* | 20 |
| 1.226 | *Tranche B Litigation Trust Interests* | 20 |
| 1.227 | *Unclaimed Distribution Reserve* | 20 |
| 1.228 | *Unclassified Claims* | 20 |
| 1.229 | *Unimpaired* | 20 |
| 1.230 | *Voting Deadline* | 21 |
| 1.231 | *Voting Record Date* | 21 |
| 1.232 | *VR* | 21 |
| 1.233 | *VR/Leuthold Guarantee Claims* | 21 |
| 1.234 | *Wind-Down Reserves* | 21 |

ARTICLE II CLASSIFICATION OF CLAIMS AND INTERESTS ............ 21
| | | |
|---|---|---|
| 2.1 | *Introduction* | 21 |
| 2.2 | *Classification of Claims and Interests of the Contributing Debtors* | 22 |
| 2.3 | *Classification of Claims of FXA* | 23 |
| 2.4 | *Classification of Claims of RCM* | 23 |

ARTICLE III TREATMENT OF CLAIMS AND INTERESTS ............ 24
| | | |
|---|---|---|
| 3.1 | *Treatment of Claims and Interests of the Contributing Debtors* | 24 |
| 3.2 | *Treatment of Claims of FXA* | 26 |
| 3.3 | *Treatment of Claims of RCM* | 28 |
| 3.4 | *Allowed Claims and Interests* | 30 |
| 3.5 | *Alternative Treatment* | 30 |
| 3.6 | *Limitation on Recoveries* | 30 |
| 3.7 | *Special Provision Regarding Unimpaired Claims* | 30 |
| 3.8 | *Claims and Interests of Non-Debtor Affiliates* | 30 |
| 3.9 | *Classification and Treatment of Intercompany Claims* | 31 |
| 3.10 | *Claims of Debtors against RCM* | 31 |

ARTICLE IV ACCEPTANCE OR REJECTION OF THE PLAN ............ 31
| | | |
|---|---|---|
| 4.1 | *Classes Entitled To Vote* | 31 |
| 4.2 | *Acceptance By Impaired Classes* | 31 |
| 4.3 | *Presumed Acceptance by Unimpaired Classes* | 31 |
| 4.4 | *Classes Deemed to Reject the Plan* | 31 |
| 4.5 | *Summary of Classes Voting on the Plan* | 31 |
| 4.6 | *Elimination Of Classes* | 31 |
| 4.7 | *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code* | 31 |

ARTICLE V MEANS FOR IMPLEMENTATION OF THE PLAN ............ 32
| | | |
|---|---|---|
| 5.1 | *Merger Of Subsidiaries Into Refco Inc.* | 32 |
| 5.2 | *Continued Corporate Existence And Dissolution Of Reorganized Debtors* | 32 |
| 5.3 | *Corporate Governance Documentation* | 32 |
| 5.4 | *Directors, Managers And Officers; Effectuating Documents; Further Transactions* | 33 |
| 5.5 | *The Plan Administrator* | 33 |
| 5.6 | *Administration of Post-Confirmation RCM* | 35 |

| 5.7 | *Litigation Trust* | 36 |
|---|---|---|
| 5.8 | *Private Actions Trust* | 38 |
| 5.9 | *No Revesting of Assets* | 39 |
| 5.10 | *Preservation of Rights of Action; Settlement of Litigation* | 39 |
| 5.11 | *The Committees and the Plan Committee* | 40 |
| 5.12 | *Fee Committee* | 41 |
| 5.13 | *Cancellation of Securities, Instruments, and Agreements Evidencing Claims and Interests* | 41 |
| 5.14 | *Sources of Cash for Plan Distributions* | 42 |
| 5.15 | *Risk Sharing in Respect of Cargill Administrative Claim* | 42 |
| 5.16 | *Allocation of Administrative Claims, Priority Tax Claims and Non-Tax Priority Claims* | 42 |
| 5.17 | *Additional RCM Claim* | 43 |
| 5.18 | *Contributing Debtors BAWAG Proceeds* | 43 |
| 5.19 | *Exemption from Transfer Taxes* | 43 |
| 5.20 | *RCM Settlement Agreement and Conversion* | 44 |
| 5.21 | *Allowance of VR/Leuthold Guarantee Claims* | 44 |
| 5.22 | *Wind-Up of Non-Debtor Affiliates* | 44 |
| 5.23 | *FXCM* | 44 |
| 5.24 | *Examiner* | 45 |
| 5.25 | *Transfer of Tranche B Litigation Trust Interests* | 45 |

| ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS | | 45 |
|---|---|---|
| 6.1 | *RCM Rights Distribution* | 45 |
| 6.2 | *Distributions for Claims Allowed as of the Effective Date* | 45 |
| 6.3 | *Distributions of Proceeds of the Litigation Trust* | 45 |
| 6.4 | *Single Distribution* | 45 |
| 6.5 | *Accounts; Escrows; Reserves for the Reorganized Debtors* | 46 |
| 6.6 | *Accounts; Escrows; Reserves for the Post-Confirmation RCM* | 47 |
| 6.7 | *Interest and Penalties on Claims* | 49 |
| 6.8 | *Distributions by Disbursing Agent and RCM Trustee* | 49 |
| 6.9 | *Delivery of Distributions and Undeliverable or Unclaimed Distributions* | 49 |
| 6.10 | *Record Date for Distributions* | 50 |
| 6.11 | *Distributions to Holders of Senior Subordinated Note Claims* | 50 |
| 6.12 | *Senior Subordinated Notes Indenture Trustee as Claim Holder* | 51 |
| 6.13 | *Allocation of Plan Distributions Between Principal and Interest* | 51 |
| 6.14 | *Means of Cash Payment* | 51 |
| 6.15 | *Withholding and Reporting Requirements* | 51 |
| 6.16 | *Setoffs* | 51 |
| 6.17 | *Fractional Dollars* | 51 |
| 6.18 | *Release of Liens* | 51 |

| ARTICLE VII TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES | | 52 |
|---|---|---|
| 7.1 | *Rejected Contracts and Leases* | 52 |
| 7.2 | *Bar to Rejection Damages* | 52 |
| 7.3 | *Assumed and Assigned Contracts and Leases* | 52 |
| 7.4 | *Compensation and Benefit Programs* | 52 |
| 7.5 | *Treatment of RCM Executory Contracts and Unexpired Leases* | 52 |

| ARTICLE VIII PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS AND INTERESTS | | 52 |
|---|---|---|
| 8.1 | *Objection Deadline; Prosecution of Objections* | 52 |
| 8.2 | *No Distributions Pending Allowance* | 53 |
| 8.3 | *Distributions After Allowance* | 53 |

ARTICLE IX CONFIRMATION AND CONSUMMATION OF THE PLAN ...................................... 53
    9.1    *Conditions to Confirmation* ................................................................ 53
    9.2    *Conditions to Effective Date* ............................................................. 54
    9.3    *Waiver of Conditions* ....................................................................... 54
    9.4    *Consequences of Non-Occurrence of Effective Date* ...................... 54

ARTICLE X EFFECT OF PLAN CONFIRMATION ............................................................ 55
    10.1   *Binding Effect* ................................................................................. 55
    10.2   *Releases* .......................................................................................... 55
    10.3   *Exculpation and Limitation of Liability* .......................................... 57
    10.4   *No Discharge of Claims; Injunction* ............................................... 57
    10.5   *Term of Bankruptcy Injunction or Stays* ........................................ 58
    10.6   *Continuation of Forex Adversary* ................................................... 58

ARTICLE XI RETENTION OF JURISDICTION ................................................................. 58
    11.1   *Exclusive Jurisdiction of the Bankruptcy Court* ............................. 58

ARTICLE XII MISCELLANEOUS PROVISIONS ............................................................... 60
    12.1   *Effectuating Documents and Further Transactions* ........................ 60
    12.2   *Corporate Action* ............................................................................ 60
    12.3   *Bar Dates for Certain Claims* ......................................................... 60
    12.4   *Payment of Statutory Fees* ............................................................. 61
    12.5   *Amendment or Modification of the Plan* ......................................... 61
    12.6   *Severability of Plan Provisions* ....................................................... 61
    12.7   *Successors and Assigns* .................................................................. 62
    12.8   *Revocation, Withdrawal, or Non-Consummation* ........................... 62
    12.9   *Notice* .............................................................................................. 62
    12.10  *Governing Law* ............................................................................... 63
    12.11  *Tax Reporting and Compliance* ...................................................... 63
    12.12  *Filing of Additional Documents* ...................................................... 63
    12.13  *Limit on Precedential Effect* ........................................................... 63
    12.14  *Claims Preserved Pending Consummation* ..................................... 63
    12.15  *Continuation of RCM Settlement Agreement* ................................. 63
    12.16  *Continuation of Early Payment Order* ........................................... 64

<u>EXHIBITS</u>

EXHIBIT A          LISTING OF AFFILIATE DEBTORS

EXHIBIT B          RCM SETTLEMENT AGREEMENT

EXHIBIT C          RESTATED CORPORATE GOVERNANCE DOCUMENTS

EXHIBIT D          EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO BE ASSUMED

EXHIBIT E          PLAN ADMINISTRATOR AGREEMENT

EXHIBIT F          LITIGATION TRUST AGREEMENT

EXHIBIT G          PRIVATE ACTIONS TRUST AGREEMENT

EXHIBIT H          ASSET SCHEDULE

EXHIBIT I          EARLY PAYMENT ORDER

EXHIBIT J          BYLAWS OF FXCM COMMITTEE

EXHIBIT K          NON-EXCLUSIVE LIST OF RETAINED CAUSES OF ACTION

EXHIBIT L          LISTING OF CONTRIBUTING NON-DEBTOR AFFILIATES

EXHIBIT M          PRIVATE ACTIONS TRUST ELECTION

<u>SCHEDULES</u>

| | |
|---|---|
| SCHEDULE 1.56 | LIST OF CONTRIBUTING NON-DEBTOR AFFILIATE MANAGEMENT |
| SCHEDULE 2.2(c) | SUB-CLASSES OF CLAIMS AGAINST THE CONTRIBUTING DEBTORS |

## INTRODUCTION

Refco Inc. and certain of its direct and indirect subsidiaries identified on the annexed Exhibit A along with co-Plan Proponents Marc S. Kirschner, the chapter 11 trustee of the Estate of Refco Capital Markets, Ltd., the Official Committee of Unsecured Creditors of Refco Inc., *et al.*, and the Additional Committee of Unsecured Creditors of Refco Inc., *et al.* propose the following joint chapter 11 plan that contemplates the disposition of the Debtors' assets and the resolution of the outstanding Claims against and Interests in the Debtors and RCM. This Plan does not contemplate the disposition of assets or the resolution of Claims against and Interests in Refco, LLC as such Claims and Interests are being addressed separately in conjunction with the administration of the Refco, LLC chapter 7 case. In addition, although the Plan outlines certain aspects of the disposition of the assets of RCM and the votes by certain creditors of RCM will be solicited, the Plan contemplates that on or prior to the Effective Date, the RCM Chapter 11 Case shall, upon notice and a hearing, be converted to a case under subchapter III of chapter 7 of the Bankruptcy Code unless the Debtors and the RCM Trustee agree that the RCM Estate should be administered under chapter 11 of the Bankruptcy Code. Any conversion of the RCM chapter 11 case to a case under subchapter III of chapter 7 or any dispute between the RCM Trustee and the Debtors regarding RCM remaining in chapter 11 will be determined or resolved upon motion of the RCM Trustee with notice to the parties listed on the service list maintained in these Chapter 11 Cases. In the event of such a conversion to a chapter 7, this Plan shall constitute a settlement and compromise between the RCM Estate and the Debtors' Estates and among the Estates of the various Debtors and certain creditors, for which approval is sought simultaneously with the confirmation of this Plan. Furthermore, the Plan incorporates the terms of the Early Payment Order, a copy of which is attached hereto as Exhibit I. To the extent that the provisions herein, or in the Confirmation Order, differ from the terms of the Early Payment Order with respect to the treatment of the Secured Lenders, the terms of the Early Payment Order shall govern. Reference is made to the Disclosure Statement, distributed contemporaneously herewith, for a discussion of (i) the Debtors' history, business, properties, and operations, (ii) a summary and analysis of this Plan, and (iii) certain related matters, including risk factors relating to the consummation of this Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Plan Proponents reserve the right to alter, amend, modify, revoke, or withdraw this Plan prior to its substantial consummation.

## ARTICLE I

### DEFINED TERMS AND RULES OF INTERPRETATION

*Defined Terms.* As used herein, capitalized terms shall have the meanings set forth below. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

**1.1** *Additional Committee* means the Additional Committee of Unsecured Creditors of Refco Inc., *et al.* appointed by the United States Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by notice on August 3, 2006 (and as amended from time to time).

**1.2** *Additional RCM Claim* means the additional Claim of RCM, if any, as more fully set forth in section 5.17 hereof.

**1.3** *Ad Hoc Committee of Senior Subordinated Note Holders* means that certain *ad hoc* committee of Holders of Senior Subordinated Notes.

**1.4** *Ad Hoc Committee of Senior Subordinated Note Holders Fees and Expenses* means fees and expenses of counsel to the ad hoc committee of Holders of Senior Subordinated Notes subject to application pursuant to section 503(b) of the Bankruptcy Code, to which the parties to the Plan Support Agreement, other than the Debtors, may not object and (ii) the Debtors, in the event that they do object to such application, may object solely with respect to the reasonableness, compensability and allocation of the fees and expenses incurred.

**1.5** *Ad Hoc Equity Committee* means that certain *ad hoc* committee of equity interest holders of Refco Inc.

**1.6** *Ad Hoc Equity Committee Fees and Expenses* means up to $1.5 million in professional fees and expenses incurred by the Ad Hoc Equity Committee during the pendency of the Chapter 11 Cases.

**1.7** *Adjusted Contributing Debtors Distributive Assets* means the Contributing Debtors Distributive Assets after reduction for the payment of the RCM Excess Priority Claim.

**1.8** *Administrative Claim* means a Claim for costs and expenses of administration of the Chapter 11 Cases under sections 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code and entitled to priority under section 507(a)(1) of the Bankruptcy Code, including, without duplication: (a) any actual and necessary costs and expenses, incurred after the Petition Date, of preserving the Estates and operating the businesses of the Debtors and RCM (such as wages, salaries, and commissions for services and payments for inventory, leased equipment, and premises) and Claims of governmental units for taxes (including tax audit Claims related to tax years commencing after the Petition Date, but excluding Claims relating to tax periods, or portions thereof, ending on or before the Petition Date); (b) compensation for legal, financial, advisory, accounting, and other services and reimbursement of expenses under sections 328, 330, 331, or 503(b) of the Bankruptcy Code to the extent incurred after the Petition Date and prior to the Effective Date; (c) the amounts contributed to the Wind-Down Reserve; (d) all fees and charges assessed against the Estates under 28 U.S.C. § 1930; (e) the Senior Subordinated Note Indenture Trustee Fees, (f) the JPMC Fees and Expenses, (g) the substantial contribution claims represented by the RCM Substantial Contribution Fees, the Ad Hoc Committee of Senior Subordinated Note Holders Fees and Expenses and the Ad Hoc Equity Committee Fees and Expenses, to the extent allowed by the Bankruptcy Court; (h) any amounts due to RCM for the RCM Advance and (i) all other claims entitled to administrative expense status pursuant to a Final Order of the Bankruptcy Court. In the event that the Chapter 11 Case of RCM is converted to a case administered under chapter 7, an Allowed Claim against RCM or its Estate of the type described above in respect of administering the RCM case in chapter 7 shall be included in the definition of Administrative Claim.

**1.9** *Administrative/Priority Claims Reserve* means the Reserve account(s) to be established and maintained by the Plan Administrator, on behalf of the Reorganized Debtors, to fund the Distribution to Holders of Administrative and Allowed Priority Claims against FXA and the Contributing Debtors.

**1.10** *Administrative Claims Adjustment* means an adjustment whereby the amount of the RCM Cash Distribution shall be reduced by the Pre-Conversion Administrative Claim Amount, if any. For the avoidance of doubt, while the Administrative Claims Adjustment, if any, shall affect the timing and accounts from which Distributions in respect of Allowed Administrative Claims are made, such adjustment shall not affect the ultimate allocation of Administrative Claims as set forth in section 5.16 of this Plan.

**1.11** *Administrative Claims Objection Deadline* means the last day for filing an objection to any request for the payment of an Allowed Administrative Claim, which shall be (a) the later of (i) 60 days after the Effective Date or (ii) 30 days after the filing of such Administrative Claim or (b) such other date specified in this Plan or ordered by the Bankruptcy Court. The filing of a motion to extend the Administrative Claims Objection Deadline shall automatically extend the Administrative Claims Objection Deadline until a Final Order is entered on such motion. In the event that such motion to extend the Administrative Claims Objection Deadline is denied by the Bankruptcy Court, or if approved by the Bankruptcy Court and reversed on appeal, the Administrative Claims Objection Deadline shall be the later of the current Administrative Claims Objection Deadline (as previously extended, if applicable) or 30 days after entry of a Final Order denying the motion to extend the Administrative Claims Objection Deadline.

**1.12** *Administrative Professionals* means the agents, financial advisors, attorneys, consultants, independent contractors, representatives, and other professionals of the Plan Administrator (in their capacities as such).

**1.13** *Affiliate Debtor(s)* means, individually or collectively, the debtors and debtors-in-possession identified on Exhibit A annexed hereto.

**1.14**    *AlixPartners* means collectively, AlixPartners LLC and its affiliate, AP Services, LLC.

**1.15**    *Allotted Administrative Claims* means Allowed Administrative Claims accrued against RCM or the Contributing Debtors from the Petition Date through the Effective Date, but excluding (A) Allowed Administrative Claims paid prior to August 31, 2006, (B) rent and other ordinary operating expenses of the Debtors or RCM, (C) fees and commissions of the RCM Trustee,  (D) repayment of the RCM Advance, and (E) the JPMC Fees and Expenses.

**1.16**    *Allowed* means (a) when used with respect to an Administrative Claim, all or any portion of an Administrative Claim (i) that has been allowed, or adjudicated in favor of the holder by estimation or liquidation, by a Final Order, or (ii) that was incurred by the Debtors or RCM in the ordinary course of business during  the Chapter 11 Cases; *provided, however,* that in no event shall a post-petition obligation that is contingent or disputed and subject to liquidation through pending or prospective litigation, including, but not limited to, alleged obligations arising from personal injury, property damage, products liability, consumer complaints, employment law (excluding claims arising under workers' compensation law), secondary payor liability, or any other disputed legal or equitable claim based on tort, statute, contract, equity, or common law, be considered to be an obligation which is payable in the ordinary course of business; or (b) when used with respect to a Claim other than an Administrative Claim, such Claim against a Debtor or RCM or any portion thereof (i) that has been allowed by a Final Order of the Bankruptcy Court, (ii) as to which, on or by the Effective Date, (w) no proof of claim has been filed with the Bankruptcy Court and (x) the liquidated and noncontingent amount of which is Scheduled, other than a Claim that is Scheduled at zero, in an unknown amount, or as disputed, (iii) for which a proof of claim in a liquidated amount has been timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, any Final Order of the Bankruptcy Court, or other applicable bankruptcy law, and as to which either (y) no objection to its allowance has been filed by the Claims Objection Deadline or the Administrative Claims Objection Deadline (as applicable), or within any period specified by the Bankruptcy Code or an order of the Bankruptcy Court, or (x) any objection to its allowance has been settled or withdrawn, or has been denied by a Final Order, or (iv) that is expressly allowed in a liquidated amount in the Plan.

**1.17**    *"Allowed ... Claim"* means an Allowed Claim of the particular type or Class described.

**1.18**    *Asset Schedule* means the schedule prepared by Houlihan to describe the estimated value of assets of the Debtors as of August 31, 2006, attached hereto as <u>Exhibit H</u>.

**1.19**    *Ballot* means each of the ballot forms distributed to each Holder of a Claim entitled to vote to accept or reject this Plan.

**1.20**    *Bankruptcy Code* means title 11 of the United States Code, as now in effect or hereafter amended (if such amendment applies to the Debtors and RCM).

**1.21**    *Bankruptcy Court* means the United States Bankruptcy Court for the Southern District of New York, or any other court with jurisdiction over the Chapter 11 Cases.

**1.22**    *Bankruptcy Rules* means the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as now in effect or hereafter amended.

**1.23**    *Bar Date* means the deadline established by the Bankruptcy Court by order dated March 27, 2006, for filing proofs of Claim in the Chapter 11 Cases.

**1.24**    *BAWAG* means the BAWAG Parties as such term is defined in paragraph 4(a) of the Stipulation and Order of Settlement entered by the Bankruptcy Court on July 6, 2006 (Docket No. 2348).

**1.25**    *BAWAG Allocation Order* means one or more orders of the Bankruptcy Court approving the allocation of the BAWAG Proceeds, which may include the Confirmation Order.

**1.26** **_BAWAG Contingent Proceeds_** means an amount, if any, whether or not monetized prior to the Effective Date, of the BAWAG Proceeds up to $150,000,000 to be paid pursuant to the BAWAG Settlement upon a sale or recapitalization as set forth in the BAWAG Settlement within two (2) years of the date of approval of the BAWAG Settlement.

**1.27** **_BAWAG Guaranteed Proceeds_** means that portion of the BAWAG Proceeds equal to a guaranteed amount of $506,250,000 in Cash paid pursuant to the BAWAG Settlement.

**1.28** **_BAWAG Proceeds_** means the sum of (a) the BAWAG Guaranteed Proceeds plus (b) the BAWAG Contingent Proceeds, even if returned to BAWAG pursuant to the terms of this Plan and the BAWAG Settlement.

**1.29** **_BAWAG Settlement_** means the settlement stipulation among the Creditors Committee, BAWAG, and the Refco Entities as approved by the Bankruptcy Court by an order entered on July 6, 2006. A copy of the BAWAG Settlement is annexed as an Exhibit to the Disclosure Statement.

**1.30** **_Business Day_** means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

**1.31** **_Capstone_** means Capstone Advisory Group, LLC.

**1.32** **_Cargill_** means Cargill, Incorporated and any of Cargill, Incorporated's affiliates who filed proofs of claim in any of the Chapter 11 Cases.

**1.33** **_Cargill Administrative Claim_** means an Administrative Claim of Cargill, if any, against the Contributing Debtors.

**1.34** **_Cash_** means legal tender of the United States of America and equivalents thereof.

**1.35** **_Cash-Out Option Agreement_** means the agreement, if any, between one or more third parties and the Holders of Litigation Trust Interests to be executed as of the Effective Date establishing the terms and conditions by which third parties may purchase Litigation Trust Interests from such Holders, the form of which Cash-Out Option Agreement will be attached as an exhibit to the Litigation Trust Agreement.

**1.36** **_Chapter 11 Case(s)_** means (a) when used with reference to a particular Debtor or RCM, the case under chapter 11 of the Bankruptcy Code commenced by such Debtor in the Bankruptcy Court and (b) when used with reference to the Debtors and RCM, the cases under chapter 11 of the Bankruptcy Code commenced by the Debtors and RCM in the Bankruptcy Court.

**1.37** **_Claim_** means a "claim" as defined in section 101(5) of the Bankruptcy Code.

**1.38** **_Claims Distribution Account_** means the account established and maintained by the Reorganized Debtors from which Distributions to Holders of Allowed Claims against the Contributing Debtors or FXA shall be made and from which reserves on behalf of the Reorganized Debtors will be funded for the benefit of Holders of Disputed Claims.

**1.39** **_Claims Objection Deadline_** means the last day for filing objections to Claims against the Debtors and RCM, which day shall be (a) the later of (i) 90 days after the Effective Date or (ii) 60 days after the filing of a proof of claim for, or request for payment of, such Claim or (b) such other date as the Bankruptcy Court may order. The filing of a motion to extend the Claims Objection Deadline shall automatically extend the Claims Objection Deadline until a Final Order is entered on such motion. In the event that such motion to extend the Claims Objection Deadline is denied by the Bankruptcy Court, or approved by the Bankruptcy Court and reversed on appeal, the Claims Objection Deadline shall be the later of the current Claims Objection Deadline (as previously extended, if applicable) or 30 days after entry of a Final Order denying the motion to extend the Claims Objection Deadline.

**1.40**     *Class* means a category of Holders of Claims or Interests, as described in Article II hereof.

**1.41**     *Class Actions Claims* means (i) claims for violation of securities laws arising under and pursuant to Section 10(b) and 20(a) of the Securities Exchange Act of 1934 that currently are being asserted in the class action styled In re Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation, 06-CIV 643 (GEL) (S.D.N.Y.) (the "Brokerage Customer Securities Litigation"), (ii) claims asserted in the securities class action entitled *In re Refco Inc. Securities Litigation*, Case No. 05 Civ. 8626 (GEL), filed in the United States District Court for the Southern District of New York, and (iii) other claims currently being asserted in class actions relating to the Debtors and RCM, if any.

**1.42**     *Combined Recoveries* means the aggregate of Contributed Claims Recoveries and recoveries obtained by the Private Actions Trust, net of the costs of administration of the Private Actions Trust, including, but not limited to, fees associated with the litigation of the Non-Estate Refco Claims.

**1.43**     *Committees* means, collectively, the Creditors' Committee and the Additional Committee.

**1.44**     *Confirmation* means the confirmation of the Plan by the Bankruptcy Court under section 1129 of the Bankruptcy Code.

**1.45**     *Confirmation Date* means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

**1.46**     *Confirmation Hearing* means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

**1.47**     *Confirmation Order* means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

**1.48**     *Contributed Claims* means any and all Litigation Claims of the Debtors, RCM or their Estates (including claims being pursued by the Committees on behalf of the Debtors), which shall be contributed by the Debtors, RCM and their Estates to the Litigation Trust and, to the extent of any election, or deemed election, by Holders of RCM Related Claims to exchange and subordinate such Claims in accordance with section 6.6(c) of this Plan, such RCM Related Claims shall be deemed to remain unpaid liabilities of the Debtors and their Estates immediately prior to the contribution of Litigation Claims to the Litigation Trust. The term Contributed Claims shall specifically exclude the Released/Subordinated Claims.

**1.49**     *Contributed Claims Recoveries* means any recoveries obtained on account of the Contributed Claims net of the costs of administration of the Litigation Trust, including, but not limited to, fees associated with the litigation of the Contributed Claims.

**1.50**     *Contributing Debtors* means the Debtors excluding FXA.

**1.51**     *Contributing Debtors BAWAG Proceeds* means that portion of the BAWAG Proceeds that compose the Secured Lender BAWAG Proceeds, the Senior Subordinated Note Holder BAWAG Proceeds and the Contributing Debtors General Unsecured BAWAG Proceeds.

**1.52**     *Contributing Debtors Cash Distribution* means $94 million of Cash, which amount shall be adjusted, upwards or downwards, by an amount equal to the Specified Difference.

**1.53**     *Contributing Debtors Distributive Assets* means the assets of the Contributing Debtors after the payment of the Contributing Debtors Effective Date Claims, Allowed Other Secured Claims against the Contributing Debtors, Allowed Secured Lender Claims against the Contributing Debtors, the Senior Subordinated Note Holder Distribution, the Senior Subordinated Note Holder Fee Distribution (each to the extent payable under the Plan) and the funding of any required reserves (provided that upon the release of any funds from reserves for

payment of the Contributing Debtors General Unsecured Distribution or RCM Intercompany Claim Distribution, such released funds shall be counted as Contributing Debtors Distributive Assets). The term Contributing Debtors Distributive Assets shall include the assets of the Contributing Debtors reflected on the Asset Schedule and, without duplication, to the extent not inconsistent with the Asset Schedule, (i) any amounts paid to the Contributing Debtors or RCM on or after September 1, 2006, (ii) the BAWAG Proceeds, and (iii) any amounts paid to the Contributing Debtors or RCM from Non-Debtor Affiliates on or after September 1, 2006 (except to the extent any such amounts have been deemed "Assets in Place" or "Additional Property," as defined in the RCM Settlement Agreement, by applicable Court Orders); *provided, however,* that any amounts paid by direct or indirect subsidiaries of RCM on or after September 1, 2006 shall not constitute Contributing Debtors Distributive Assets. The term Contributing Debtors Distributive Assets shall not include any value in respect of the RGL FXCM Distribution nor any interest in Contributed Claims.

       **1.54**    *Contributing Debtors Effective Date Claims* means Allowed Priority Tax Claims and Allowed Non-Tax Priority Claims and Allowed Administrative Claims accrued through and including the Effective Date, each to the extent required to be borne by the Contributing Debtors pursuant to section 5.16 of this Plan.

       **1.55**    *Contributing Debtors General Unsecured BAWAG Proceeds* means (i) $56,250,000 of the BAWAG Guaranteed Proceeds and (ii) a portion of the BAWAG Contingent Proceeds allocable to the Contributing Debtors Cash Distribution from the Contributing Debtors Distributive Assets, which proceeds, pursuant to section 5.18 hereof, shall be deemed to be exclusively offered to pay, in exchange for the releases offered by the BAWAG Settlement, Holders of Allowed Contributing Debtors General Unsecured Claims.

       **1.56**    *Contributing Debtors General Unsecured Claim* means a General Unsecured Claim against a Contributing Debtor.

       **1.57**    *Contributing Debtors General Unsecured Distribution* means a Distribution from the Contributing Debtors Distributive Assets equal to (A) the Contributing Debtors Cash Distribution after reduction for the payment of the Allowed Contributing Debtors Post-Effective Date Claims plus (B) 50% of the RGL FXCM Distribution; *provided, however,* the amount of such Distribution under (A) and (B) shall not exceed 40% of the Allowed Contributing Debtors General Unsecured Claims. The Contributing Debtors General Unsecured Distribution shall also include the Tranche A Litigation Trust Interests set forth in section 5.7 of this Plan.

       **1.58**    *Contributing Debtors Post-Effective Date Claims* means Administrative Claims accrued after the Effective Date by the Contributing Debtors, which are required to be borne by the Contributing Debtors pursuant to section 5.16 of this Plan (including amounts, if any, in respect of repaying the RCM Advance).

       **1.59**    *Contributing Debtors Projection* means a projection of the Cash or value to be available from the MAC Contributing Debtors Assets for Distribution in respect of the Contributing Debtors Cash Distribution.

       **1.60**    *Contributing Non-Debtor Affiliate* means the Non-Debtor Affiliates listed on <u>Exhibit L</u> hereto who are reasonably expected to contribute assets to or release Claims against the Debtors or RCM pursuant to the provisions of this Plan, including, but not limited to, section 5.22.

       **1.61**    *Contributing Non-Debtor Affiliate Management* means the directors and officers of certain foreign Contributing Non-Debtor Affiliates, a list of which officers and directors is set forth on Schedule 1.56 hereto.

       **1.62**    *Contributing Non-Debtor Affiliate Trigger Date* means, with respect to any Contributing Non-Debtor Affiliate, the earlier of (i) the date at which such Contributing Non-Debtor Affiliate winds up its affairs and distributes on a net basis (whether on account of equity or intercompany balances) positive Cash (consistent with its books and records and claims pending against it) to the Contributing Debtors and RCM or, if insufficient Cash will be available (consistent with the Contributing Non-Debtor Affiliate's books and records and claims pending against it) for Distribution to the Contributing Debtors and RCM, otherwise releases all Intercompany Claims of the Contributing Non-Debtor Affiliate against RCM and the Contributing Debtors, or, if such events occur

prior to the Effective Date, the Effective Date or (ii) a date determined by the RCM Trustee, with the consent of the Plan Committee, on notice to the Bankruptcy Court, as necessary to accomplish the purposes of clause (i) of this definition.

   **1.63**  ***Convenience Claims*** means collectively FXA Convenience Claims, RCM Securities Customer Convenience Claims and RCM FX/General Unsecured Convenience Claims.

   **1.64**  ***Credit Agreement*** means the credit agreement, dated August 5, 2004 (as amended), among RGL as successor by merger to Refco Finance Holdings LLC, New Refco Group Ltd, LLC, the Secured Lender Agent and the Secured Lenders party thereto.

   **1.65**  ***Creditors' Committee*** means the Official Committee of Unsecured Creditors of Refco Inc., *et al.* appointed by the United States Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code on October 28, 2006, as reconstituted on March 29, 2006, July 21, 2006 and August 3, 2006 (and as amended from time to time).

   **1.66**  ***Debtor*** means any of Refco Inc. or the Affiliate Debtors in its individual capacity.

   **1.67**  ***Debtors*** means, collectively, Refco Inc. and all of the Affiliate Debtors.

   **1.68**  ***Disbursing Agent*** means, solely in its capacity as agent to effectuate Distributions on behalf of FXA and the Contributing Debtors pursuant to the Plan, the Plan Administrator or such other entity as may be designated by the Plan Proponents and appointed by the Bankruptcy Court as set forth in the Confirmation Order. For the avoidance of doubt, the RCM Trustee shall act as the Disbursing Agent for Post-Confirmation RCM.

   **1.69**  ***Disclosure Statement*** means the disclosure statement (including all exhibits and schedules thereto) relating to this Plan, distributed contemporaneously herewith in accordance with sections 1125 and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018, as it may be amended or supplemented from time to time.

   **1.70**  ***Disputed Claim*** means any Claim other than an Allowed Claim.

   **1.71**  ***"Disputed ... Claim"*** means a Disputed Claim of the type described.

   **1.72**  ***Disputed Claim Amount*** means (a) with respect to a contingent or unliquidated Claim, zero or the amount estimated by the Bankruptcy Court prior to the initial Distribution Date, for purposes of allowance, reserves or Distributions in respect of such Claim in accordance with section 502(c) of the Bankruptcy Code or (b) with respect to any Disputed Claim that is not contingent or unliquidated, the amount set forth in a timely filed proof of claim; *provided, however,* that for purposes of establishing the Disputed Claims Reserve, the Disputed Claim Amount shall not exceed an amount equal to the applicable deductible or self-retention portion plus any uninsured amount in respect of Disputed Claims that are covered by insurance.

   **1.73**  ***Disputed Claims Reserve*** means the reserve of Contributing Debtors Distributive Assets and FXA Distributive Assets established and maintained by the Reorganized Debtors for Holders of Disputed Claims; *provided, however,* that any reserve from Contributing Debtors Distributive Assets shall be a reserve from amounts to be paid on the Contributing Debtors Unsecured Claim Distribution and shall not result in a reserve against amounts to be paid on the RCM Cash Distribution in accordance with section 6.6(b) of this Plan.

   **1.74**  ***Distribution*** means any distribution pursuant to the Plan to the Holders of Allowed Claims.

   **1.75**  ***Distribution Date*** means the Effective Date (subject to section 6.2 hereof) or any Quarterly Distribution Date.

**1.76**     ***Distribution Record Date*** means, with respect to all Claims other than Senior Subordinated Note Claims, initially the Voting Deadline (unless a different date is agreed to by the Plan Proponents and filed with the Bankruptcy Court) and thereafter, 45 days prior to each scheduled Distribution Date.

**1.77**     ***Early Payment Order*** means the Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019 Approving Settlement of Controversies and Disputes Among the Debtors, the RCM Trustee, the Secured Lenders, and Certain Other Parties dated September 27, 2006 (Docket No. 2958) attached hereto as Exhibit I.

**1.78**     ***Effective Date*** means the Business Day this Plan becomes effective as provided in Article IX hereof.

**1.79**     ***Effective Beneficiaries*** means (i) the Litigation Trust Beneficiaries (other than RCM) and (ii) the Holders of Allowed RCM Securities Customer Claims and Allowed RCM FX/Unsecured Claims that benefit from RCM's beneficial interest in the Litigation Trust.

**1.80**     ***Employee Benefit Plans*** means those "employee benefit plans" (as defined in Section 3(3) of ERISA (whether or not such plan is subject to ERISA)), other material plans, policies, programs, practice, agreements, and understandings or arrangements maintained, sponsored, or contributed to for the benefit of current or former employees of the Debtors.

**1.81**     ***ERISA*** shall mean the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

**1.82**     ***Estate(s)*** means, individually, the estate of any of the Debtors or RCM and, collectively, the estates of all of the Debtors and RCM created under section 541 of the Bankruptcy Code.

**1.83**     ***Estimated Unsatisfied Credit Agreement Claims*** has the meaning ascribed to such term in the Early Payment Order.

**1.84**     ***Examiner*** means Joshua R. Hochberg, the examiner appointed by United States Trustee pursuant to 11 U.S.C. § 1104(c)(2) and approved by the Bankruptcy Court in accordance with the Examiner Order.

**1.85**     ***Examiner Order*** means the Order Granting the Motion of the United States Trustee for the Appointment of an Examiner entered on March 16, 2006 (Docket No. 1487).

**1.86**     ***Excess Priority Claims*** means that portion of Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Non-Tax Priority Claims against the Contributing Debtors and RCM, or their respective Estates, accrued through the Effective Date that exceed $180 million in the aggregate, excluding any amounts paid as of August 31, 2006, as more particularly set forth in section 5.16 of this Plan.

**1.87**     ***Exhibit*** means an exhibit annexed to either this Plan or as an appendix to the Disclosure Statement.

**1.88**     ***Exhibit Filing Date*** means the date on which Exhibits to the Plan shall be filed with the Bankruptcy Court and posted on the refcodocket.com website, which date shall be at least ten (10) days prior to the Voting Deadline or such later date as may be approved by the Bankruptcy Court without further notice to parties-in-interest.

**1.89**     ***Fee Committee*** means the committee established by the Bankruptcy Court pursuant to the order entered on July 24, 2006 (Docket No. 2482).

**1.90**     ***Final Order*** means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in any Chapter 11 Case, the operation or effect of which has not been stayed, reversed, or amended and as to which order or judgment (or any revision, modification, or amendment

thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending; *provided, however*, that the possibility that a motion under section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Bankruptcy Rules or any analogous rule may be, but has not been filed shall not cause an order not to be a Final Order.

1.91     *FXA* means Refco F/X Associates, LLC.

1.92     *FXA Cash Accounts* means the Cash accounts of FXA listed in the Schedules of FXA, which consist of the following accounts at the bank and with the account numbers designated herein: (i) Fleet Bank of New York, acct: 9421286511; (ii) Fleet Bank of New York, acct: 9421286589; (iii) Fleet Bank of New York, acct: 9421286693; (iv) Fleet Bank of New York, acct: 9421286896; (v) Fleet Bank of New York, acct: 9489924815; (vi) HK and Shanghai Banking Corp., acct: 009-030925-001; and (vii) Wachovia Bank, N.A., acct: 200017918646.

1.93     *FXA Convenience Claims* means any FXA General Unsecured Claim equal to or less than $10,000 or greater than $10,000 but, with respect to which, the Holder thereof voluntarily reduces the FXA General Unsecured Claim to $10,000 on the applicable Ballot; *provided, however*, that for purposes of the Plan and the Distributions to be made hereunder, the aggregate amount of Distributions to FXA Convenience Claims shall be limited to $5 million. To the extent that the amount of FXA General Unsecured Claims electing to receive a FXA Convenience Claim exceeds $5 million, the Claims permitted to elect such treatment shall be determined by reference to the amount of the Claim, with the Claim in the lowest amount being selected first and the next largest Claims being selected thereafter until the $5 million cap is reached.

1.94     *FXA Distributive Assets* means (i) the FXA Cash Accounts, allocated as agreed or otherwise resolved between FXA and KK Japan, plus (ii) proceeds, if any, of the sale of the customer list of FXA.

1.95     *FXA General Unsecured Claim* means a General Unsecured Claim against FXA.

1.96     *FXA General Unsecured Claim Distribution* means a Distribution from the FXA Distributive Assets after the payment of Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Non-Priority Tax Claims, Allowed Other Secured Claims and Allowed Secured Lender Claims against FXA, and less any amounts paid to the Holders of Allowed FXA Convenience Claims. The FXA General Unsecured Claim Distribution shall also include the Tranche A Litigation Trust Interests set forth in section 5.7 of this Plan.

1.97     *FXCM* means Forex Capital Markets, LLC.

1.98     *FXCM Committee* means a five person committee composed of the RCM Trustee and four creditors of either RCM or the Contributing Debtors (and chaired by the RCM Trustee) formed to coordinate on all matters relating to the disposition or distribution of RGL's 35% interest in FXCM.

1.99     *General Unsecured Claim* means a Claim that is not an Administrative Claim, Priority Tax Claim, Non-Tax Priority Claim, Other Secured Claim, Secured Lender Claim, Senior Subordinated Note Claim, RCM Intercompany Claim, FXA Convenience Claim, RCM Securities Customer Claim, RCM Leuthold Metals Claim, RCM Securities Customer Convenience Claim, RCM FX/Unsecured Convenience Claim, Subordinated Claim or Old Equity Interest.

1.100     *Holder* means an entity holding a Claim or Interest and, with respect to Senior Subordinated Note Claims, the beneficial holder of the Senior Subordinated Notes.

1.101     *Houlihan* means Houlihan Lokey Howard & Zukin Capital Advisors, Inc.

1.102     *Impaired* means, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

**1.103**     *Intercompany Claim* means any Claim held by a Refco Entity against any other Refco Entity, including any intercompany book entries reflecting obligations owed by one Refco Entity with respect to any other Refco Entity.

**1.104**     *Interest* means the legal, equitable, contractual, and other rights of any Person with respect to any capital stock or other ownership interest in any Debtor or RCM, whether or not transferable, and any option, warrant, or right to purchase, sell, or subscribe for an ownership interest or other equity security in any Debtor.

**1.105**     *IPO Underwriter Claims Recovery* means any recovery from a claim brought by the Litigation Trust against an underwriter in connection with the initial public offering of Refco Inc., net of the fees and expenses incurred in pursuing such recovery.

**1.106**     *JPMC Fees and Expenses* means the reasonable fees and expenses of JPMorgan Chase Bank, N.A., agreed to by RCM as part of that certain settlement between RCM and JPMorgan Chase Bank, N.A., approved by the Bankruptcy Court on [December 12, 2006 (docket no. _____)].

**1.107**     *Joinder Parties* has the meaning set forth in the RCM Settlement Agreement.

**1.108**     *Joint Sub-Committee* means the joint sub-committee comprised of the Committee and the Additional Committee pursuant to a stipulation and protocol approved by order of the Bankruptcy Court, dated August 17, 2006 (Docket No. 2711).

**1.109**     *KK Japan* means RefcoFX Japan KK.

**1.110**     *Leuthold* means, collectively, Leuthold Funds, Inc. and Leuthold Industrial Metals Fund, L.P.

**1.111**     *Lien* shall mean any lien, security interest, pledge, title retention agreement, encumbrance, charge, mortgage or hypothecation, other than, in the case of securities and any other equity ownership interests, any restrictions imposed by applicable United States or foreign securities laws.

**1.112**     *Litigation Claims* means the claims, rights of action, suits, or proceedings, whether in law or in equity, whether known or unknown, that any Debtor or RCM may hold against any Person (after netting cross margin obligations, if applicable, to the extent required under the cross margining arrangement or to the extent determined necessary by the applicable Debtor or RCM) excluding the Released/Subordinated Claims and also excluding, with respect to RCM, any claims, rights of action, suits, or proceedings (A) pursuant to sections 547, 749 and to the extent a recovery is predicated on such sections, section 550 of the Bankruptcy Code, (B) to recover Assets in Place as defined in the RCM Settlement Agreement or (C) against RCM customers and creditors arising from trading or other ordinary course business transactions or contracts with RCM, including loan and deposit transactions; *provided, however,* that the claims commenced and settled by the Creditors' Committee against SPhinX Managed Futures Fund, LLC, and BAWAG shall not constitute Litigation Claims.

**1.113**     *Litigation Trust* means the trust established on the Effective Date to hold the Litigation Claims.

**1.114**     *Litigation Trust Agreement* means the agreement to be executed as of the Effective Date establishing the Litigation Trust pursuant to the Plan attached as <u>Exhibit F</u> hereto.

**1.115**     *Litigation Trust Beneficiaries* means the Estate of RCM, Holders of Allowed Contributing Debtors General Unsecured Claims, Holders of Allowed FXA General Unsecured Claims, Holders of Allowed Contributing Debtors Subordinated Claims, Holders of Allowed Old Equity Interests and the Disputed Claims Reserve.

**1.116**     *Litigation Trust Committee* means the Committee established pursuant to section 5.7(d) of this Plan to participate in management of the Litigation Trust.

**1.117**     *Litigation Trustee* means the Person appointed pursuant to section 5.7(a) of the Plan to act as trustee of and administer the Litigation Trust and identified on or before the date of the hearing before the Bankruptcy Court seeking confirmation of the Plan, who may be the Plan Administrator and/or the Private Actions Trustee.

**1.118**     *Litigation Trust Interests* means the beneficial interests in the Litigation Trust.

**1.119**     *Loan Documents* has the meaning ascribed to such term in the Early Payment Order.

**1.120**     *Loans* has the meaning ascribed to such term in the Early Payment Order.

**1.121**     *MAC Contributing Debtors Assets* means (x) the estimated value of the sum of the Contributing Debtors Distributive Assets (including the RCM BAWAG Proceeds), less (y) the estimated sum of, without duplication, (A) payments to be made in respect of the RCM Excess Priority Claims (whether funded from the RCM Cash Distribution or as part of the Pre-Conversion Administrative Claim Amount), (B) payments to be made in respect of the RCM Cash Distribution (without reduction for the Administrative Claims Adjustment), and (C) payments to be made by RCM pursuant to clause (iii) of section 5.15 of this Plan, provided that for purposes of making the estimate in this sub-section (C), total Allowed Contributing Debtors General Unsecured Claims will be assumed to be $502 million (unless the actual total amount of Allowed Contributing Debtors General Unsecured Claims are known at the time).

**1.122**     *MAC RCM Assets* means (x) the estimated value of the sum of (A) the Contributing Debtors Distributive Assets (including the RCM BAWAG Proceeds) less (y) the estimated sum of, without duplication, (A) payments to be made in respect of the RCM Excess Priority Claims (whether funded from the RCM Cash Distribution or as part of the Pre-Conversion Administrative Claim Amount), (B) payments to be made in respect of the Contributing Debtors Cash Distribution (without adjustment for the Contributing Debtors Post-Effective Date Claims), and (C) payments to be made by RCM pursuant to clause (iii) of section 5.15 of this Plan; *provided, however,* that for purposes of making the estimate in this sub-section (C), total Allowed Contributing Debtors General Unsecured Claims will be assumed to be $502 million (unless the actual total amount of Allowed Contributing Debtors General Unsecured Claims are known at the time).

**1.123**     *MCG Members* has the meaning set forth in the RCM Settlement Agreement.

**1.124**     *Master Ballot* means the ballot distributed to brokers, nominees or other agents for Holders of the Senior Subordinated Notes to record the votes of the beneficial Holders of Senior Subordinated Notes.

**1.125**     *Non-Debtor Affiliates* means Refco LLC, Refco Canada Finance Inc., Refco Commodity Management Inc., Refco Administrative Services Inc., Refco Securities LLC, Refco Clearing LLC, Refco EasySolutions LLC, RefcoFund Management LLC, Haut Commodities LLC, Refco Local Divisions LLC, RefcoFund Holdings LLC, Refco Alternative Investments LLC, Refco Trading Services LLC, Refco Securities Ltd. (in liquidation), Refco Energy (UK) Ltd., Refco Ltd., Westminster Clearing Ltd., Refco Trading Services Ltd., Refco Trading Services (UK) Ltd., Refco Equity Derivatives Ltd., Refco Europe Ltd., Refco Overseas Ltd., Refco East Services Ltd. (in liquidation), Just Commodity Inc., Just (Dalian) Trading Co Ltd., Refco Capital Singapore Pte Ltd, Refco India Pvt Ltd, Refco Singapore Pte Ltd, Refco Investment Services Pte Ltd, Refco Forex Ltd (in liquidation), Refco Securities SA, Refco Trading Services (Gibraltar) Ltd., Refco Capital Markets International Ltd, Refco Capital Markets International Services Ltd, ACM Advanced Currency Markets SA, C.I. Investor Services, Limited. East Client Svc. Ltd., Eastern Refco (L) Labaun, Easylink Limited, Easyscreen Employee Services Limited, Easyscreen Trustees Limited, Forex Capital Markets, L.L.C., Forex Trading, L.L.C., Greenwich Europe Limited, Greenwich SA (Pty) Limited, Hanmag Refco Futures Corp, Just Commodity Pte. Ltd., Just Commodity Software Solutions Pte. Ltd., Kaf-Refco Futures (Malaysia), Lind-Waldock Financial Partners LLC, MacFutures, Mactechonologies Ltd, Market Educational Institute, LLC, MCC Futures Management L.P., Partners Capital Investment Group, LLC, Polaris-Refco Futures Co Ltd, Refco Canada Co., Refco Capital India Private Ltd.,

Refco Carlton Ltd, Refco Commodity India PVT Ltd., Refco Futures, AG (Zurich), Refco Futures GMbH (Hamburg), Refco Hong Kong Ltd., Refco International Investment Svc. Ltd., Refco Japan, Ltd., Refco Overseas Suisse SA, Refco Resources Ltd., Refco Sify Securities (India) Ltd, Refco Trading Services (Australia) PTY Ltd, S&P Managed Futures Index Fund, L.P., Sino Refco Investments Limited Partnership, Sino Refco Investments LLC, SN Bank Ltd, Sphinx Managed Futures Index Fund, L.P., Trafalgar Commodities Ltd, Wells Limited and Westminster-Refco Holding Company, LLC.

**1.126** *Non-Estate Refco Claims* means non-estate causes of action arising from any matter involving any Refco Entity including, without limitation, causes of action against: (i) all current and former officers, directors or employees of the Refco Entities; (ii) all persons or entities that conducted transactions with the Refco Entities; and (iii) all persons or entities that provided services to the Refco Entities, including, without limitation, all attorneys, accountants, financial advisors and parties providing services to the Refco Entities in connection with the public issuance of debt or equity, including, without limitation, all underwriters; *provided, however,* Non-Estate Refco Claims shall exclude (i) contract claims against third parties and (ii) Class Action Claims.

**1.127** *Non-Tax Priority Claim* means a Claim, other than an Administrative Claim or Priority Tax Claim, which is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code.

**1.128** *Old Equity Interests* means the common stock of Refco Inc. outstanding immediately prior to the Petition Date, including treasury stock and all options, warrants, calls, rights, participation rights, puts, awards, commitments, or any other agreements of any character to acquire such common stock, and shall also include any Claim subordinated pursuant to section 510(b) arising from the rescission of a purchase or sale of any such common stock or rights relating to such common stock, or any Claim for damages arising from the purchase or sale of common stock of Refco Inc. or any Claim for reimbursement, contribution, or indemnification arising from or relating to any such claims.

**1.129** *Other Related Claim* means, other than an RCM Related Claim, any Claim or cause of action of any Holder of an Impaired Claim against RCM or any Debtor arising from the same facts, transactions or occurrences giving rise to such Holder's Impaired Claim against its primary Debtor obligor or RCM; *provided, however,* that the term Other Related Claim shall not include any Claim, based on a contractual guarantee or other direct contractual undertaking, against RCM or any Debtor that is not such Holder's primary Debtor obligor.

**1.130** *Other Secured Claim* means a Claim (other than an Administrative Claim or Secured Lender Claim) that is secured by a lien on property in which a Debtor's Estate or RCM's Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code.

**1.131** *Person* means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, or other entity.

**1.132** *Petition Date* means, with respect to a Debtor or RCM, the date on which such Debtor filed its petition for relief commencing its Chapter 11 Case.

**1.133** *Plan* means this chapter 11 plan, including the Exhibits and all supplements, appendices, and schedules hereto, either in its current form or as the same may be altered, amended, or modified from time to time in accordance with the Bankruptcy Code and the Bankruptcy Rules.

**1.134** *Plan Administrator* means the person designated pursuant to section 5.5 hereof prior to the Confirmation Date and approved by the Bankruptcy Court pursuant to the Confirmation Order to administer the Plan on behalf of the Contributing Debtors and FXA in accordance with the terms of the Plan and the Plan Administrator Agreement and to take such other actions as may be authorized under the Plan Administrator Agreement, and any successor thereto.

**1.135**    *Plan Administrator Agreement* means the agreement between and among the Contributing Debtors and the Plan Administrator specifying the rights, duties, and responsibilities of and to be performed by the Plan Administrator under the Plan, in substantially the same form as the agreement attached to the Plan as <u>Exhibit E</u>.

**1.136**    *Plan Committee* means the committee as appointed pursuant to section 5.11(b) hereof as of the Effective Date, which will supervise and direct the Plan Administrator, to monitor implementation of the Plan, and to take such other actions and have such other rights as are set forth in the Plan, all as described in Article V of this Plan.

**1.137**    *Plan Document* means the Plan, together with any contract, instrument, release, or other agreement or document entered into in connection with Plan.

**1.138**    *Plan Filing Date* means September 14, 2006.

**1.139**    *Plan Proponents* means the Debtors, the RCM Trustee and the Committees.

**1.140**    *Plan Support Agreement* means that certain agreement among the RCM Trustee, certain Non-Debtor Affiliates, the Committees, certain individual customers and creditors of RCM and the Debtors, and the chapter 7 trustee for Refco, LLC, in his capacity as chapter 7 trustee for Refco, LLC, filed with the Bankruptcy Court on September 15, 2006 (Docket No. 2861).

**1.141**    *Post-Confirmation RCM* means the estate of RCM on and after the entry of the Confirmation Order as administered by the RCM Trustee.

**1.142**    *Post-Petition Management* means AlixPartners and Harrison J. Goldin, Goldin Associates, LLC, and any directors appointed to the board of directors of Refco Inc. subsequent to Mr. Goldin's appointment as Chief Executive Officer of Refco Inc. on January 25, 2006.

**1.143**    *Pre-Conversion Administrative Claim Amount* means, if determined necessary by the RCM Trustee, any amount deposited by the Contributing Debtors into a reserve for the benefit of Holders of Administrative Claims against RCM arising or accruing prior to the date of conversion, if any, of RCM's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code (including RCM Substantial Contribution Fees). The Pre-Conversion Administrative Claim Amount shall in no case exceed an amount equal to (i) $60 million plus (ii) the RCM Excess Priority Claims that RCM is responsible for bearing pursuant to section 5.16 of this Plan.

**1.144**    *Priority Claims* means, collectively, all Priority Tax Claims and Non-Tax Priority Claims.

**1.145**    *Priority Tax Claim* means a Claim of a governmental unit of the kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**1.146**    *Private Actions Trust* means the trust established on the Effective Date pursuant to section 5.8 of the Plan to hold certain claims and causes of action against third-parties owned by Holders of Claims or Interests against RCM or the Debtors and which claims, even after contribution, are not assets of the Estates.

**1.147**    *Private Actions Trust Agreement* means the agreement to be executed as of the Effective Date establishing the Private Actions Trust pursuant to the Plan attached as <u>Exhibit G</u> hereto.

**1.148**    *Private Actions Trust Election* means, in respect of a Holder of an Allowed Old Equity Interest, the agreement of such Holder to assign and contribute such Holder's Non-Estate Refco Claims, and the proceeds of Class Action Claims to the Private Actions Trust, which election shall be evidenced by the submission of the election form attached hereto as <u>Exhibit M</u>.

**1.149**    *Private Actions Trustee* means the Person appointed pursuant to the Private Actions Trust Agreement of the Plan to act as trustee of and administer the Private Actions Trust and identified on or before

the date of the hearing before the Bankruptcy Court seeking confirmation of the Plan, who may be the Plan Administrator and/or the Litigation Trustee.

      **1.150**   *Professional* means (a) any professional employed in these Chapter 11 Cases pursuant to sections 327, 328, or 1103 of the Bankruptcy Code or otherwise and (b) any professional or other entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

      **1.151**   *Professional Fee Claim* means an Administrative Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses, or other charges incurred after the Petition Date and prior to and including the Effective Date.

      **1.152**   *Pro Rata* means, with respect to Claims or Interests (i) within the same Class or sub-Class, the proportion that a Claim or Interest bears to the sum of all Claims or Interests, as the case may be, within such Class or sub-Class, and (ii) among all Classes, the proportion that a Class of Claims or Interests bears to the sum of all Claims or Interests, as the case may be; *provided, however*, that for purposes of distributing Litigation Trust Interests, Pro Rata share shall exclude Convenience Claims.

      **1.153**   *Qualifying Plan* has the meaning ascribed to such term in the Early Payment Order.

      **1.154**   *Quarterly Distribution Date* means the last Business Day of the month following the end of each calendar quarter after the Effective Date; *provided, however*, that if the Effective Date is within 30 days of the end of a calendar quarter, the first Quarterly Distribution Date shall be the last Business Day of the month following the end of the first calendar quarter after the calendar quarter in which the Effective Date falls.

      **1.155**   *RCM* means Refco Capital Markets, Ltd.

      **1.156**   *RCM Administrative/Priority Claims Reserve* means the Reserve account(s) to be established and maintained by the RCM Trustee, on behalf of Post-Confirmation RCM, to fund the Distribution to Holders of Administrative and Priority Claims against RCM.

      **1.157**   *RCM Administrative Professional* means any professional employed in the RCM Chapter 11 Case pursuant to sections 327, 328, or 1103 of the Bankruptcy Code or otherwise.

      **1.158**   *RCM Advance* means a post-petition advance, if any, by RCM to or for the benefit of one or more of the Contributing Debtors in the amount of up to $115 million.

      **1.159**   *RCM BAWAG Proceeds* means (i) $200,000,000.00 of the BAWAG Guaranteed Proceeds (whether directly allocated to RCM or recovered by RCM on account of its RCM Intercompany Claim), and (ii) a portion of the BAWAG Contingent Proceeds allocable to payment of the RCM Cash Distribution from the Contributing Debtors Distributive Assets, which proceeds, pursuant to section 5.18 hereof, shall be deemed to be exclusively offered to pay, in exchange for the releases required by the BAWAG Settlement, Holders of Allowed RCM Securities Customer Claims and Allowed RCM FX/Unsecured Claims.

      **1.160**   *RCM Cash Distribution* means the sum of (i) $460 million of Cash (inclusive of RCM BAWAG Proceeds) payable from Contributing Debtor Distributive Assets, which amount shall be adjusted upwards or downwards, by an amount equal to the Specified Difference plus (ii) payment to RCM of any amounts available from the Contributing Debtors General Unsecured Distribution, to the extent that such amounts are not paid to Holders of Allowed Contributing Debtors General Unsecured Claims as a result of recoveries for Holders of Allowed Contributing Debtors General Unsecured Claims (from Contributing Debtors Distributive Assets and the RGL FXCM Distribution) having reached 40%; *provided, however*, such Distribution shall be subject to the Administrative Claims Adjustment.

      **1.161**   *RCM Difference* means the amount by which the Allowed amount of any RCM FX/Unsecured Claim filed by Cargill is reduced by allowance of the Cargill Administrative Claim.

**1.162**    ***RCM Claims Distribution Account*** means the account established and maintained by the Post-Confirmation RCM from which Distributions to Holders of Allowed Claims against RCM shall be made and from which reserves on behalf of RCM will be funded.

**1.163**    ***RCM Distribution Reserve*** means the reserve established by the Plan Administrator or RCM, as the case may be, to hold that portion of the RCM Cash Distribution and that portion of the RGL FXCM Distribution applicable to Holders of a right to demand an applicable share of the RCM Cash Distribution and 50% of the RGL FXCM Distribution, but who have not tendered an RCM Related Claim Subordination Form.

**1.164**    ***RCM Excess Priority Claims*** means that portion of Excess Priority Claims that are to be borne by RCM pursuant to section 5.16 of this Plan.

**1.165**    ***RCM FX/Unsecured Claims*** has the meaning given to the term "FX/Unsecured Claim" in the RCM Settlement Agreement.

**1.166**    ***RCM FX/Unsecured Claims Distribution*** means the Distribution for Holders of RCM FX/Unsecured Claims set forth in the RCM Settlement Agreement less any amounts paid to the Holders of Allowed RCM FX/ Unsecured Convenience Claims.

**1.167**    ***RCM FX/Unsecured Convenience Claims*** means any RCM FX/Unsecured Claim equal to or less than $10,000 or greater than $10,000 but, with respect to which, the Holder thereof voluntarily reduces the RCM FX/Unsecured Claim to $10,000 on the applicable Ballot; *provided, however,* that for purposes of the Plan and the Distributions to be made hereunder, the aggregate amount of Distributions to RCM FX/ Unsecured Convenience Claims shall be limited to $1.458 million. To the extent that the amount of RCM FX/Unsecured Claims reducing and electing treatment of such Claims as RCM FX/Unsecured Convenience Claims exceeds $1.458 million, the Claims permitted to elect such treatment shall be determined by reference to the amount of the Claim, with the Claim in the lowest amount being selected first and the next largest Claims being selected thereafter until the $1.458 million cap is reached.

**1.168**    ***RCM Implied Deficiency Claim*** has the meaning given to the term "Implied Deficiency Claim" in §8(b) of the RCM Settlement Agreement.

**1.169**    ***RCM Intercompany Claims*** means Claims of RCM against one or more of the Debtors. Unless and until Allowed in a definitive amount, for purposes of calculations herein, the RCM Intercompany Claims shall be deemed to be in an amount that is no less than the amount necessary to cause all Holders of Allowed RCM Securities Customer Claims and Allowed RCM FX/Unsecured Claims to receive payment in full.

**1.170**    ***RCM Intercompany Claim Distribution*** means the sum of (i) the RCM Rights Distribution, (ii) the Additional RCM Claim, (iii) 50% of the RGL FXCM Distribution, (iv) the RCM BAWAG Proceeds and (v) the allocable share of the Tranche A Litigation Trust Interests set forth in section 5.7 of this Plan.

**1.171**    ***RCM Leuthold Metals Claim*** has the meaning given to the term "Leuthold Metals Claim" in the RCM Settlement Agreement.

**1.172**    ***RCM Leuthold Metals Claim Distribution*** means the Distribution for Holders of RCM Leuthold Metals Claims set forth in the RCM Settlement Agreement.

**1.173**    ***RCM Projection*** means a projection of the Cash or value to be available from the MAC RCM Assets for Distribution in respect of the RCM Cash Distribution and the Additional RCM Claim.

**1.174**    ***RCM Related Claims*** means any Claim or cause of action of any Holder of an Impaired Claim against the Debtors and Non-Debtor Affiliates arising from the same facts, transactions or occurrences giving rise to such Holder's Impaired Claim against RCM; *provided, however*, that the term RCM Related Claim shall not include any Claim of a Holder of an RCM Securities Customer Claim or an RCM FX/Unsecured Claim against any Contributing Debtor or FXA based on contractual guarantees or other direct contractual undertakings.

**1.175**    *RCM Related Claim Subordination Form* means, in respect of a Holder of an Allowed RCM Securities Customer Claim or Allowed RCM FX/Unsecured Claim, either (i) a ballot cast by such Holder in respect of the Plan whereby the Holder has elected (by means of not affirmatively opting out of such election) to (A) assign such Holder's RCM Related Claims against the Debtors, if any, to the Litigation Trust; (B) affirming its understanding that its RCM Related Claim against any Contributing Non-Debtor Affiliate will be subordinated pursuant to the Plan, as of each applicable Contributing Non-Debtor Affiliate Trigger Date, to all other existing claims against and equity interests in the applicable Contributing Non-Debtor Affiliate (and that such RCM Related Claim may be deemed released upon the determination of the RCM Trustee, with the consent of the Plan Committee, in accordance with section 10.2(c) of the Plan); (C) release the Secured Lenders (in such capacities) from the Secured Lender Released Claims held by such Holder, if any; and (D) receive such Holder's applicable share of the RCM Cash Distribution and 50% of the RGL FXCM Distribution, which, unless such Holder elects not to receive RCM BAWAG Proceeds, shall include such Holders' applicable share of the RCM BAWAG Proceeds portion of the RCM Cash Distribution or (ii) any agreement, in a form satisfactory to the Plan Administrator, by which such Holder agrees to do the forgoing. For the avoidance of doubt, any ballot properly cast by the Voting Deadline and satisfying the conditions above shall be deemed to have been "provided" to the RCM Trustee and the Plan Administrator for purposes of section 6.6(c) of this Plan.

**1.176**    *RCM Reserves* means (A) the RCM Disputed Claims Reserve, (B) the RCM Administrative/Priority Reserve, (C) the RCM Wind-Down Reserve, (D) the RCM Unclaimed Distribution Reserve, and (E) any other reserves required to be established by the RCM Trustee under the RCM Settlement Agreement.

**1.177**    *RCM Rights Distribution* means the transfer to the RCM Trustee, as part of the RCM Intercompany Claims Distribution, of rights which will allow each Holder of an Allowed RCM Securities Customers Claim on account of its RCM Implied Deficiency Claim and each Holder of an Allowed RCM FX/Unsecured Claim to make a demand for payment from the Plan Administrator or RCM, as the case may be, for such Holder's Pro-Rata share of the RCM Distribution Reserve to the extent that such Holder satisfies the conditions set forth in section 6.6(c) of this Plan.

**1.178**    *RCM Securities Customer Claims* has the meaning given to the term "Securities Customer Claims" in the RCM Settlement Agreement.

**1.179**    *RCM Securities Customer Convenience Claims* means any RCM Securities Customer Claim equal to or less than $10,000 or greater than $10,000 but, with respect to which, the Holder thereof voluntarily reduces the RCM Securities Customer Claim to $10,000 on the applicable Ballot; *provided, however*, that for purposes of the Plan and the Distributions to be made hereunder, the aggregate amount of Distributions to RCM Securities Customer Convenience Claims shall be limited to $0.333 million. To the extent that the amount of RCM Securities Customer Convenience Claims reducing and electing treatment of such Claims as RCM Securities Customer Convenience Claims exceeds $0.333 million, the Claims permitted to elect such treatment shall be determined by reference to the amount of the Claim, with the Claim in the lowest amount being selected first and the next largest Claims being selected thereafter until the $0.333 million cap is reached.

**1.180**    *RCM Securities Customer Claims Distribution* means the Distribution for Holders of RCM Securities Customer Claims set forth in the RCM Settlement Agreement less any amounts paid to the Holders of Allowed RCM Securities Customer Convenience Claims.

**1.181**    *RCM Settlement Agreement* means, collectively, (i) the settlement agreement dated as of June 29, 2006 by and among the RCM Trustee and certain creditors of RCM and (ii) the Joinder Agreement dated as of July 20, 2006 between the RCM Trustee and the Rogers Funds, in each case as amended (copies of which are attached hereto as Exhibit B).

**1.182**    *RCM Substantial Contribution Fees* means the approximate amount of $4.3 million constituting the substantial contribution Claim of the MCG Members and the Joinder Parties under sections 503(b)(3)(d), 507(a)(2) and 752(a) of the Bankruptcy Code as set forth in the RCM Settlement Agreement.

**1.183**    *RCM Trustee* means Marc S. Kirschner, the chapter 11 trustee appointed in the RCM Chapter 11 Case in connection with the March 22, 2006 order issued by the Bankruptcy Court authorizing appointment of one disinterested person as Chapter 11 trustee for the Estate of RCM. The term includes any successor chapter 11 trustee or, if the RCM Chapter 11 Case is converted to a chapter 7 case to be administered under subchapter III of chapter 7 of the Bankruptcy Code, the chapter 7 trustee.

**1.184**    *RCM Unclaimed Distribution Reserve* means the reserve or reserves established in respect of unclaimed Distributions for RCM pursuant to Article VI of the Plan.

**1.185**    *RCM Wind-Down Reserve* means a reserve, if determined necessary by the RCM Trustee, of up to $15 million from the Cash or value available for the RCM Cash Distribution, with the amount of such RCM Wind-Down Reserve to be subject to downward adjustment from time to time by the RCM Trustee, to the extent the RCM Trustee determines that RCM's wind-down expenses after the Effective Date will be less than $15 million.

**1.186**    *Reinstated* means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim so as to leave such Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code, (ii) reinstating the maturity of such Claim as such maturity existed before such default, and (iii) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim.

**1.187**    *Refco Entities* means the Debtors, RCM and the Non-Debtor Affiliates.

**1.188**    *Related Claims* means any RCM Related Claim or Other Related Claim.

**1.189**    *Released/Subordinated Claims* means the claims or causes of actions described in sections 10.2(a), (b), (c) and (d) of the Plan or claims or causes of action that have been otherwise released or waived pursuant to an order of the Bankruptcy Court (including, without limitation, the Early Payment Order).

**1.190**    *Released Parties* means, acting in such capacity, (i) the Post-Petition Management, (ii) the Secured Lender Releasees, (iii) the Senior Subordinated Note Indenture Trustee, its directors, officers, and employees (all in such capacity) and (iv) present and former holders of the Senior Subordinated Notes in their capacity as Holders of the Senior Subordinated Notes.

**1.191**    *Reorganized Affiliate Debtor* means any Affiliate Debtor on and after the Effective Date.

**1.192**    *Reorganized Debtors* means Reorganized Refco, Reorganized FXA and any Reorganized Affiliate Debtor.

**1.193**    *Reorganized FXA* means FXA on and after the Effective Date.

**1.194**    *Reorganized Refco* means Refco Inc. on and after the Effective Date.

**1.195**    *Reserves* means, collectively, the Disputed Claims Reserve, Unclaimed Distribution Reserve, Administrative/Priority Claims Reserve and the RCM Reserves (if held by the Plan Administrator, rather than the RCM Trustee) and the Wind-Down Reserve.

**1.196**    *Restated Corporate Governance Documents* means the restated corporate governance documents of the Reorganized Debtors in substantially the form attached to this Plan as <u>Exhibit C</u>.

**1.197**    *Retained Causes of Action* means all of the Debtors' and RCM's claims, rights, actions, causes of action, liabilities, obligations, suits, debts, remedies, dues, sums of money, accounts, reckonings, bonds,

bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages or judgments against any party, whether known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, foreseen or unforeseen, asserted or unasserted, and regardless of whether arising in law, equity or under or pursuant to Chapter 5 of the Bankruptcy Code, including, but not limited to, the Litigation Claims. A non-exclusive list of the Retained Causes of Action is set forth on Exhibit K attached hereto.

       **1.198**    *RGL* means Refco Group Limited LLC.

       **1.199**    *RGL FXCM Distribution* means RGL's 35% interest in FXCM, which for purposes of the cap on Distributions to Holders of Contributing Debtors General Unsecured Claims from Contributing Debtors Distributive Assets and the RGL FXCM Distribution shall have a value equal to (i) if liquidated prior to the Effective Date, the value obtained through liquidation and (ii) if not liquidated prior to the Effective Date, a deemed value of $90 million.

       **1.200**    *Rogers Funds* means Rogers Raw Materials Fund, L.P. and Rogers International Raw Materials Fund, L.P.

       **1.201**    *Scheduled* means, with respect to any Claim, the status, priority, and amount, if any, of such Claim as set forth in the Schedules.

       **1.202**    *Schedules* means the schedules of assets and liabilities, the list of Holders of Interests, and the statements of financial affairs filed by the Debtors or RCM pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rules, as such schedules have been or may be further modified, amended, or supplemented in accordance with Bankruptcy Rule 1009 or orders of the Bankruptcy Court.

       **1.203**    *Secured Lender(s)* has the meaning assigned to the term "Lender(s)" in the Early Payment Order.

       **1.204**    *Secured Lender Agent* has the meaning assigned to the term "Agent" in the Early Payment Order.

       **1.205**    *Secured Lender BAWAG Proceeds* means $100 million of the BAWAG Guaranteed Proceeds, which proceeds, pursuant to section 5.18 hereof, shall be deemed exclusively offered to pay and accepted by the Holders of Allowed Secured Lender Claims.

       **1.206**    *Secured Lender Claims* has the meaning assigned to the term "Secured Claim" in the Early Payment Order.

       **1.207**    *Secured Lender Indemnification Claims* means any and all Estimated Unsatisfied Credit Agreement Claims and all other claims of the Secured Lender Agent and/or the Secured Lenders of the type specified in paragraph 9(b) of the Early Payment Order.

       **1.208**    *Secured Lender Payment Date* has the meaning assigned to the term "Payment Date" in the Early Payment Order.

       **1.209**    *Secured Lender Released Claims* means any and all actual or potential demands, claims, causes of action (including, without limitation, derivative causes of action), suits, assessments, liabilities, losses, costs, damages, penalties, fees, charges, expenses and all other forms of liability whatsoever, in law or equity (including, without limitation, actions seeking to recharacterize, avoid, subordinate, set aside or disallow the liens or claims of any Secured Lender Releasee, or seeking turnover of property, damages or any other affirmative recovery from any Secured Lender Releasee, including, without limitation, any claim for contribution), whether asserted or unasserted, known or unknown, foreseen or unforeseen, pending or anticipated, arising under the Bankruptcy Code or under otherwise applicable law, that any Person ever had, now has or hereafter may have (whether by assignment or otherwise) based in whole or in part upon any act or failure to act by any of the Secured Lender Releasees, on or prior to the Secured Lender Payment Date, in contemplation of the execution of the Loan Documents, in connection

with the execution of the Loan Documents or the making or repayment of the Loans, or in connection with any transactions directly or indirectly related or connected in any way to the Loan Documents, the Secured Lender's Collateral, the use of proceeds of Loans made under the Loan Documents, or any other transactions related to or in connection with any of the foregoing.

   **1.210** *Secured Lender Releasee* has the meaning assigned to the term "Lender Releasee" in the Early Payment Order.

   **1.211** *Secured Lender's Collateral* has the meaning assigned to the term "Collateral" in the Early Payment Order.

   **1.212** *Securities Class Action Stipulation* means that certain Stipulation and Agreement of Settlement entered into on September 7, 2006 between BAWAG and the lead plaintiffs in the securities class action entitled *In re Refco Inc. Securities Litigation*, Case No. 05 Civ. 8626 (GEL), filed in the United States District Court for the Southern District of New York, or any future settlement between the parties as contemplated therein.

   **1.213** *Senior Subordinated Note Allocation* means an allocation of the Senior Subordinated Note Holder Fee Distribution on account of the Senior Subordinated Note Indenture Trustee Fees and Ad Hoc Committee of Senior Subordinated Note Holders Fees and Expenses, which allocation shall be agreed upon between the Senior Subordinated Note Indenture Trustee and the Ad Hoc Committee of Senior Subordinated Note Holders. Any amount of Senior Subordinated Note Indenture Trustee Fees not paid on account of such allocation may be satisfied pursuant to the Senior Subordinated Note Indenture Trustee Charging Lien.

   **1.214** *Senior Subordinated Note Claims* means all Claims of any kind arising from or related to the Senior Subordinated Notes, and including, without limitation, any Claims arising from any guarantees under the Senior Subordinated Note Indenture, which Claims shall be Allowed Claims in the amount of $397,413,324.50.

   **1.215** *Senior Subordinated Note Holder BAWAG Proceeds* means $150,000,000 of the BAWAG Guaranteed Proceeds, which proceeds, pursuant to section 5.18 hereof, shall be deemed to be exclusively offered to pay, in exchange for releases required in the BAWAG Settlement, Holders of Allowed Senior Subordinated Note Claims.

   **1.216** *Senior Subordinated Note Holder Distribution* means $331,522,195.30, which, pursuant to the compromises and settlements contained in this Plan document, constitutes 83.42% of the outstanding balance of principal and prepetition interest of the Senior Subordinated Note Claims. Such Distribution shall be paid to the Senior Subordinated Note Indenture Trustee on the Effective Date to the extent of available Cash after taking into account the funding of the Administrative/Priority Claims Reserve, with any balance paid from time to time to the Senior Subordinated Note Indenture Trustee from available Cash with interest accruing, beginning January 1, 2007, on the unpaid balance at the same rate of interest that Refco LLC earns on its invested Cash and cash equivalents, payable from the Senior Subordinated Note Holder BAWAG Proceeds and, to the extent of any deficiencies, the Contributing Debtors Distributive Assets.

   **1.217** *Senior Subordinated Note Holder Fee Distribution* means an amount up to $6.0 million of the (i) Senior Subordinated Note Indenture Trustee Fees, and (ii) the Allowed Ad Hoc Committee of Senior Subordinated Note Holders Fees and Expenses. Such Distribution shall be paid on the Effective Date from the Contributing Debtors Distributive Assets to the Senior Subordinated Note Indenture Trustee and counsel to the Ad Hoc Committee of Senior Subordinated Note Holders , subject to the Senior Subordinated Note Allocation. For the avoidance of doubt, any portion of the Senior Subordinated Note Indenture Trustee Fees not paid by the Senior Subordinated Note Holder Fee Distribution may be satisfied pursuant to the Senior Subordinated Note Indenture Trustee Charging Lien.

   **1.218** *Senior Subordinated Note Indenture* means the indenture dated as of August 5, 2004, among Refco Finance Holdings LLC (now known as Refco Group Ltd., LLC) and Refco Finance Inc., as issuers, and Wells Fargo Bank, National Association, as indenture trustee, relating to the Senior Subordinated Notes, as it may be amended, supplemented, or modified from time to time.

**1.219**    *Senior Subordinated Note Indenture Trustee* means Wells Fargo Bank, National Association, the indenture trustee under the Senior Subordinated Note Indenture, or any successor thereto.

**1.220**    *Senior Subordinated Note Indenture Trustee Charging Lien* means any Lien or other priority in payment or right available to the Senior Subordinated Note Indenture Trustee pursuant to the Senior Subordinated Note Indenture or otherwise available to the Senior Subordinate Note Indenture Trustee under applicable law, for the payment of Senior Subordinated Note Indenture Trustee Fees.

**1.221**    *Senior Subordinated Note Indenture Trustee Fees* means the fees, costs, expenses and indemnity claims of the Senior Subordinated Note Indenture Trustee and the fees and expenses of its counsel and financial advisor.

**1.222**    *Senior Subordinated Notes* means the 9% Senior Subordinated Notes due 2012 issued by RGL and Refco Finance Inc. under the Senior Subordinated Note Indenture and guaranteed by certain of the Debtors.

**1.223**    *Specified Difference* means 50% of the difference (positive or negative) between the value of the Adjusted Contributing Debtors Distributive Assets and $554 million (in making such calculation the Adjusted Contributing Debtors Distributive Assets shall not be subject to the Administrative Claims Adjustment); *provided, however*, that once the portion of the Contributing Debtors General Unsecured Distribution has reached 40% exclusive of the value of the Tranche A Litigation Trust Interests, 100% of the remainder of the positive difference shall be added to the RCM Cash Distribution. For the avoidance of doubt, any BAWAG Proceeds received pursuant to the BAWAG Settlement, even if returned to BAWAG pursuant to the terms of this Plan and the BAWAG Settlement, shall be included in the calculation of Adjusted Contributing Debtors Distributive Assets.

**1.224**    *Subordinated Claim* means any Claim which (i) is subordinated pursuant to section 510(c) of the Bankruptcy Code, (ii) arising from recision of a purchase or sale of a debt security of the Debtors, for damages arising from the purchase or sale of such debt security, or any Claim for reimbursement, contribution, or indemnification arising from or relating to any such Claims, or  (iii) is a Claim for a fine, penalty, forfeiture, multiple, exemplary or punitive damages, or otherwise not predicated upon compensatory damages, and that would be subordinated in a chapter 7 case pursuant to section 726(a)(4) of the Bankruptcy Code or otherwise.

**1.225**    *Subsidiary Claims and Interests* means Claim against or an Interest in any of the Refco Entities held by any other Refco Entity other than the RCM Intercompany Claims.

**1.226**    *Tranche A Litigation Trust Interests* means the Litigation Trust Interests distributed to (i) the RCM Estate, (ii) Holders of Contributing Debtors General Unsecured Claims (which for the sake of clarity, shall not include the Secured Lender Claims or, the Senior Subordinated Note Claims) and (iii) the Holders of FXA General Unsecured Claims (which for the sake of clarity, shall not include FXA Convenience Class Claims, RCM Securities Customer Convenience Claims and RCM FX/General Unsecured Convenience Claims) in accordance with section 5.7(c) hereof.

**1.227**    *Tranche B Litigation Trust Interests* means interests in the Litigation Trust given by the beneficiaries of the Tranche A Litigation Trust Interests to Holders of Allowed Old Equity Interests that have made the Private Actions Trust Election and consisting of 3% of the first $500 million of Combined Recoveries, 7.5% of the Combined Recoveries greater than $500 million and 15% of the Combined Recoveries greater than $1 billion, as set forth in section 5.7(c) hereof.

**1.228**    *Unclaimed Distribution Reserve* means the reserve or reserves established in respect of unclaimed Distributions for FXA and the Contributing Debtors pursuant to Article VI of the Plan.

**1.229**    *Unclassified Claims* means Administrative Claims and Priority Tax Claims

**1.230**    *Unimpaired* means a Claim or Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

**1.231** *Voting Deadline* means [●], 2006 at [●] p.m. (prevailing Eastern Time).

**1.232** *Voting Record Date* means [●].

**1.233** *VR* means, collectively, VR Global Partners, L.P. and its affiliates.

**1.234** *VR/Leuthold Guarantee Claims* means the Claims against RGL arising from (i) that certain guarantee agreement, dated July 11, 2003 between Refco Group Ltd., LLC and VR Capital Group Ltd., (ii) that certain guarantee agreement, dated July 11, 2003 between Refco Group Ltd., LLC and VR Argentina Recovery Fund, Ltd., (iii) that certain guarantee agreement, dated July 11, 2003 between Refco Group Ltd., LLC and VR Global Partners, L.P., and (iv) that certain guarantee agreement, dated September 1, 2005 between Refco Group Ltd., LLC and Leuthold Funds, Inc. and (v) any other documents, agreements or transactions in any way related to (i) through (iv) above.

**1.235** *Wind-Down Reserves* means the reserve accounts to be established and maintained by the Plan Administrator, on behalf of the Reorganized Debtors, to fund the administration of this Plan, including, but not limited to, compensation of the Plan Administrator and Administrative Professionals.

*Rules Of Interpretation And Computation Of Time.* For purposes of this Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) unless otherwise provided in this Plan, any reference in this Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference in this Plan to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified, or supplemented pursuant to this Plan; (d) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors and assigns; (e) all references in this Plan to sections and articles are references to sections and articles of or to this Plan; (f) the words "herein," "hereunder," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) captions and headings to articles and sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (h) subject to the provisions of any contract, certificates of incorporation, by-laws, instrument, release, or other agreement or document entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules; (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (j) in computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply; (k) "including" means "including without limitation;" and (l) with reference to any Distribution under this Plan, "on" a date means on or as soon as reasonably practicable after that date.

*Exhibits.* All Exhibits to the Plan are incorporated into and are a part of this Plan as if set forth in full herein, and, to the extent not annexed hereto, such Exhibits shall be filed with the Bankruptcy Court on or before the Exhibit Filing Date. After the Exhibit Filing Date, copies of Exhibits can be obtained upon written request to Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York, 10036-6522 (Attn. David R. Hurst, Esq.), counsel to the Debtors or by downloading such Exhibits from the Bankruptcy Court's website at http://www.nysb.uscourts.gov (registration required), the Refco website at http://www.refcoinc.com or http://www.refcodocket.com. To the extent any Exhibit is inconsistent with the terms of this Plan, unless otherwise ordered by the Bankruptcy Court, the non-Exhibit portion of this Plan shall control; *provided, however,* in all relevant cases, to the extent this Plan is inconsistent with the RCM Settlement Agreement, the RCM Settlement Agreement shall control.

## ARTICLE II

## CLASSIFICATION OF CLAIMS AND INTERESTS

**2.1** *Introduction.*

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtors and RCM. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims, as described below, have not been classified and are not entitled to vote on the Plan. A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest is also placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.

This Plan is premised on a consensual pooling of assets and liabilities by the Contributing Debtors solely to implement the settlements and compromises reached by the primary constituencies in the Chapter 11 Cases, including the Debtors, the RCM Trustee, the Committees, the Secured Lenders and certain of the Holders of Senior Subordinated Notes. If for any reason the Bankruptcy Court determines that such compromises and settlements, as embodied herein, should not be implemented as set forth herein, the Plan Proponents may elect to seek confirmation of the Plan on the basis of complete or partial substantive consolidation or on a Debtor by Debtor basis identifying sub-Classes of each of the listed Classes of Claims of the Contributing Debtors for each Contributing Debtor.

**The provisions set forth below also describe the classification of RCM Claims and Interests, but the provisions applicable to the RCM Claims and Interests are qualified in their entirety by reference to the RCM Settlement Agreement with respect to the Claims against RCM. To the extent that the summary below conflicts with the provisions of the RCM Settlement Agreement, the terms and conditions set forth in the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code shall govern. This Plan contemplates that on or prior to the Effective Date, the RCM Chapter 11 Case shall, upon notice and a hearing, be converted to a case under subchapter III of chapter 7 of the Bankruptcy Code unless the Debtors and the RCM Trustee agree that the RCM Estate should be administered under chapter 11 of the Bankruptcy Code. Any conversion of the RCM chapter 11 case to a case under subchapter III of chapter 7 or any dispute between the RCM Trustee and the Debtors regarding RCM remaining in chapter 11 will be determined or resolved upon motion of the RCM Trustee with notice to the parties listed on the service list maintained in these Chapter 11 Cases. Upon conversion of RCM's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, this Plan shall proceed as a chapter 11 plan for the Debtors and shall constitute a settlement and compromise of Claims between the Estate of RCM and the Debtors, for which RCM and the Debtors seek approval simultaneously with the confirmation of this Plan.**

The provisions set forth below also describe the classification of Secured Lender Claims, but the provisions applicable to the Secured Lender Claims are qualified in their entirety by reference to the Early Payment Order.

2.2    *Classification of Claims and Interests of the Contributing Debtors.*

(a)    *Unclassified Claims – Contributing Debtors* (not entitled to vote on the Plan).

Administrative Claims.

Priority Tax Claims.

(b)    *Unimpaired Classes of Claims – Contributing Debtors* (deemed to have accepted the Plan and, therefore, not entitled to vote on the Plan).

Class 1 - Non-Tax Priority Claims.

Class 2 - Other Secured Claims.

Class 3 - Secured Lender Claims.

(c)    *Impaired Classes of Claims – Contributing Debtors* (Classes 4, 5 and 6 are entitled to vote on the Plan; Class 7 shall be deemed to have rejected the Plan and, therefore, is not entitled to vote on the Plan).

Class 4 - Senior Subordinated Note Claims.

Class 5(a) - General Unsecured Claims.

Class 5(b) - Related Claims

Class 6 - RCM Intercompany Claims.

Class 7 - Subordinated Claims.

Each of Classes 4 and 5 shall contain sub-Classes corresponding to each of the Contributing Debtors.  A schedule of such sub-Classes is attached hereto as Schedule 2.2(c).

(d)    *Impaired Classes of Interests – Contributing Debtors*  (deemed to have rejected the Plan and, therefore, not entitled to vote on the Plan).

Class 8 - Old Equity Interests.

**2.3    *Classification of Claims of FXA*.**

(a)    *Unclassified Claims – FXA* (not entitled to vote on the Plan).

Administrative Claims.

Priority Tax Claims.

(b)    *Unimpaired Classes of Claims – FXA* (deemed to have accepted the Plan and, therefore, not entitled to vote on the Plan).

Class 1 - FXA Non-Tax Priority Claims.

Class 2 - FXA Other Secured Claims.

Class 3 - Secured Lender Claims.

(c)    *Impaired Classes of Claims – FXA* (Classes 4, 5 and 6 are entitled to vote on the Plan; Class 7 shall be deemed to have rejected the Plan and, therefore, not entitled to vote on the Plan).

Class 4 - Senior Subordinated Note Claims.

Class 5(a) - FXA General Unsecured Claims.

Class 5(b) - Related Claims.

Class 6 - FXA Convenience Claims.

Class 7 - FXA Subordinated Claims.

**2.4    *Classification of Claims of RCM*.**

(a)    *Unclassified Claims – RCM* (not entitled to vote on the Plan).

      Administrative Claims.

      Priority Tax Claims.

(b)    *Unimpaired Classes of Claims – RCM* (deemed to have accepted the Plan and, therefore, not entitled to vote on the Plan).

      Class 1 - Non-Tax Priority Claims.

      Class 2 - Other Secured Claims.

(c)    *Impaired Classes of Claims – RCM* (Classes 3, 4, 5, 6, 7 and 8 are entitled to vote on the Plan; Class 9 shall be deemed to have rejected the Plan and, therefore, not entitled to vote on the Plan).

      Class 3 - RCM FX/Unsecured Claims.

      Class 4 - RCM Securities Customer Claims.

      Class 5 - RCM Leuthold Metals Claims.

      Class 6 - RCM FX/Unsecured Convenience Claims.

      Class 7 - RCM Securities Customer Convenience Claims.

      Class 8 - Related Claims.

      Class 9 - RCM Subordinated Claims.

## ARTICLE III

### TREATMENT OF CLAIMS AND INTERESTS

**3.1    *Treatment of Claims and Interests of the Contributing Debtors*.**

(a)    *Unclassified Claims – Contributing Debtors*

(i)    *Administrative Claims.*  On the later of (a) the Effective Date, (b) the date on which its Administrative Claim becomes Allowed, or (c) the date on which its Administrative Claim becomes payable under any agreement relating thereto, each Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Administrative Claim against the Contributing Debtors, Cash equal to the unpaid portion of such Administrative Claim in accordance with the allocation set forth in section 5.16 of the Plan. Notwithstanding the foregoing, (a) any Administrative Claim based on a liability incurred by a Contributing Debtor in the ordinary course of business during the Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto and (b) any Administrative Claim may be paid on such other terms as may be agreed on between the Holder of such Claim and the Contributing Debtors or the Plan Administrator.  Subsection (b) of the second sentence in this section 3.1(a)(i) of the Plan shall not be construed to avoid the need for Court approval of an Administrative Claim when such Court approval is otherwise required by the Bankruptcy Code.

(ii)  *Priority Tax Claims*. On the later of (a) the Effective Date or (b) the date on which its Priority Tax Claim becomes an Allowed Priority Tax Claim, in the sole discretion of the Contributing Debtors, each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim against the Contributing Debtors, (i) Cash equal to the unpaid portion of such Allowed Priority Tax Claim in accordance with the allocation set forth in section 5.16 of the Plan, (ii) treatment in any other manner such that its Allowed Priority Tax Claims shall not be impaired pursuant to section 1124 of the Bankruptcy Code, including payment in accordance with the provisions of section 1129(a)(9)(C) of the Bankruptcy Code, or (iii) such other treatment as to which the Contributing Debtors or the Plan Administrator and such Holder shall have agreed upon in writing. Clause (iii) of the preceding sentence shall not be construed to avoid the need for Bankruptcy Court approval of a Priority Tax Claim when such Bankruptcy Court approval is otherwise required by the Bankruptcy Code.

(b)  *Unimpaired Classes of Claims – Contributing Debtors.*

(i)  *Class 1 - Non-Tax Priority Claims.*  On (a) the Effective Date if such Non-Tax Priority Claim is an Allowed Non-Tax Priority Claim on the Effective Date or (b) the Quarterly Distribution Date following the date on which such Non-Tax Priority Claim becomes an Allowed Non-Tax Priority Claim against the Contributing Debtors, each Holder of an Allowed Class 1 Non-Tax Priority Claim shall receive, in full and final satisfaction, release, and discharge of, and in exchange for, such Allowed Non-Tax Priority Claim, Cash equal to the unpaid portion of such Allowed Non-Tax Priority Claim in accordance with the allocation set forth in section 5.16 of the Plan.

(ii)  *Class 2 - Other Secured Claims.*  On the Effective Date, each Holder of an Allowed Class 2 Other Secured Claim against the Contributing Debtors shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Other Secured Claim, one of the following Distributions: (i) the payment of such Holder's Allowed Other Secured Claim in full, in Cash; (ii) the sale or disposition proceeds of the property securing such Allowed Other Secured Claim to the extent of the lesser of the amount of such Allowed Other Secured Claim and the value of the interests in such property; (iii) the surrender to the Holder or Holders of such Allowed Other Secured Claim of the property securing such Claim; or (iv) such other Distributions as shall be necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.

(iii)  *Class 3 - Secured Lender Claims.*  The Secured Lender Claims against the Contributing Debtors shall be allowed to the extent provided in the Early Payment Order, the terms and conditions of which are incorporated by reference herein, and such Allowed Secured Lender Claims, to the extent not paid in Cash prior to the Effective Date, shall be paid in full in Cash. In addition, the Secured Lenders shall have the benefit of the releases to the full extent contemplated by paragraph 8 of the Early Payment Order and section 10.2 of the Plan.

(c)  *Impaired Classes of Claims – Contributing Debtors.*

(i)  *Class 4 - Senior Subordinated Note Claims.*  On the Effective Date, each Holder of an Allowed Class 4 Senior Subordinated Note Claim against the Contributing Debtors shall receive, to the extent not previously paid, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Senior Subordinated Note Claim and any and all Claims against the Refco Entities, its Pro Rata share of the Senior Subordinated Note Holder Distribution (subject to the Senior Subordinated Note Indenture Trustee Charging Lien); and the Debtors shall pay the Senior Subordinated Note Holder Fee Distribution; *provided, however*, to the extent that a Holder of an Allowed Class 4 Senior Subordinated Note Claim against the Contributing Debtors elects to not receive the Senior Subordinated Note Holder BAWAG Proceeds, such Holder's Distribution shall consist of its Pro Rata share of the Senior Subordinated Note Holder Distribution less such Holder's portion of the Senior Subordinated Note Holder BAWAG Proceeds.

(ii)    *Class 5(a) - Contributing Debtors General Unsecured Claims.*  Subject to section 6.4 of this Plan, on the Effective Date (but in no case prior to payment in full of the Senior Subordinated Note Holder Distribution and the Senior Subordinated Note Holder Fee Distribution), each Holder of an Allowed Class 5(a) Contributing Debtors General Unsecured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Contributing Debtors General Unsecured Claim and any and all Other Related Claims, its Pro Rata share of the Contributing Debtors General Unsecured Distribution; *provided, however,* to the extent that a Holder of an Allowed Class 5(a) General Unsecured Claim against the Contributing Debtors elects to not receive the Contributing Debtors General Unsecured BAWAG Proceeds, if any, such Holder's Distribution shall consist of its Pro Rata share of the Contributing Debtors General Unsecured Distribution less such Holder's portion of the Contributing Debtors General Unsecured BAWAG Proceeds.

(iii)    *Class 5(b) - Related Claims.*  On the Effective Date, pursuant to section 6.4 hereof, each Allowed Class 5(b) Related Claim against any Contributing Debtor shall be subordinated and shall receive no Distribution from the Contributing Debtors Distributive Assets unless and until such time as all Holders of Allowed Contributing Debtors General Unsecured Claims and Allowed RCM Intercompany Claims have been paid in full; *provided, however,* that any Holder of an RCM Related Claim that provides an RCM Related Claim Subordination Form in accordance with section 6.6(c) of this Plan shall, on account of its RCM Securities Customer Claim or RCM FX/Unsecured Claim (if Allowed), receive its applicable share of the RCM Distribution Reserve as more fully set forth in section 6.6(c) hereof.

(iv)    *Class 6 - RCM Intercompany Claims.*  On the Effective Date (but in no case prior to payment in full of the Senior Subordinated Note Holder Distribution and the Senior Subordinated Note Holder Fee Distribution), the RCM Trustee, on behalf of RCM, shall receive the RCM Intercompany Claim Distribution.

(v)    *Class 7 - Subordinated Claims.*  No Holder of a Class 7 Subordinated Claim against the Contributing Debtors shall be entitled to, nor shall it receive or retain, any property or interest in property on account of such Class 7 Subordinated Claim.

(d)    *Impaired Classes of Interests – Contributing Debtors.*

(i)    *Class 8 - Old Equity Interests.*  No Holder of a Class 8 Old Equity Interest shall be entitled to, nor shall it receive or retain, any property or interest in property on account of such Class 8 Old Equity Interest; *provide, however,* that Holders of Class 8 Old Equity Interests have been given certain rights to participate in the Litigation Trust and the Private Actions Trust as set forth in section 5.25 hereof.

3.2    *Treatment of Claims of FXA.*

(a)    *Unclassified Claims – FXA.*

(i)    *Administrative Claims.*  On the later of (a) the Effective Date, (b) the date on which its Administrative Claim becomes Allowed, or (c) the date on which its Allowed Administrative Claim becomes payable under any agreement relating thereto, each Holder of an Administrative Claim against FXA shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Administrative Claim, Cash equal to the unpaid portion of such Administrative Claim in accordance with the allocation set forth in section 5.16 of the Plan.  Notwithstanding the foregoing, (a) any Administrative Claim based on a liability incurred by FXA in the ordinary course of business during the Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto and (b) any Administrative Claim may be paid on such other terms as may be agreed on between the Holder of such Claim and FXA or the Plan Administrator. Subsection (b) of the second sentence in this section 3.2(a)(i) of the Plan shall not be construed to avoid the need for Court approval of an Administrative Claim when such Court approval is otherwise required by the Bankruptcy Code.

(ii) *Priority Tax Claims.* On the later of (a) the Effective Date or (b) the date on which its Priority Tax Claim becomes an Allowed Priority Tax Claim, in the sole discretion of FXA, each Holder of an Allowed Priority Tax Claim against FXA shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, (i) Cash equal to the unpaid portion of such Allowed Priority Tax Claim in accordance with the allocation set forth in section 5.16 of the Plan, (ii) treatment in any other manner such that its Allowed Priority Tax Claims shall not be impaired pursuant to section 1124 of the Bankruptcy Code, including payment in accordance with the provisions of section 1129(a)(9)(C) of the Bankruptcy Code, or (iii) such other treatment as to which FXA or the Plan Administrator and such Holder shall have agreed upon in writing. Clause (iii) of the preceding sentence shall not be construed to avoid the need for Bankruptcy Court approval of a Priority Tax Claim when such Bankruptcy Court approval is otherwise required by the Bankruptcy Code.

(b) *Unimpaired Classes of Claims – FXA.*

(i) *Class 1 - FXA Non-Tax Priority Claims.* On (a) the Effective Date if such Non-Tax Priority Claim against FXA is an Allowed Non-Tax Priority Claim on the Effective Date or (b) the Quarterly Distribution Date following the date on which such Non-Tax Priority Claim becomes an Allowed Non-Tax Priority Claim, each Holder of an Allowed Class 1 Non-Tax Priority Claim against FXA shall receive, in full and final satisfaction, release, and discharge of, and in exchange for, such Allowed Class 1 FXA Non-Tax Priority Claim, Cash equal to the unpaid portion of such Allowed Class 1 FXA Non-Tax Priority Claim in accordance with the allocation set forth in section 5.16 of the Plan.

(ii) *Class 2 - FXA Other Secured Claims.* On the Effective Date, each Holder of an Allowed Class 2 Other Secured Claim against FXA shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Class 2 Other Secured Claim, one of the following Distributions: (i) the payment of such Holder's Allowed Class 2 Other Secured Claim in full, in Cash; (ii) the sale or disposition proceeds of the property securing such Allowed Class 2 Other Secured Claim to the extent of the amount of such Allowed Other Secured Claim and the value of the interests in such property; (iii) the surrender to the Holder or Holders of such Allowed Class 2 Other Secured Claim of the property securing such Claim; or (iv) such other Distributions as shall be necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.

(iii) *Class 3 - FXA Secured Lender Claims.* The Secured Lender Claims against FXA shall be allowed to the extent provided in the Early Payment Order, the terms and conditions of which are incorporated by reference herein, and such Allowed Secured Lender Claims against FXA, to the extent not paid in Cash prior to the Effective Date, shall be paid in full in Cash. In addition, the Secured Lenders shall have the benefit of the releases to the full extent contemplated by paragraph 8 of the Early Payment Order and section 10.2 of the Plan.

(c) *Impaired Classes of Claims – FXA.*

(i) *Class 4 - FXA Senior Subordinated Note Claims.* On the Effective Date, based on the agreements and settlement set forth in this Plan, each Holder of an Allowed Class 4 FXA Senior Subordinated Note Claim shall waive its share of the FXA General Unsecured Claims Distribution in return for the releases set forth in sections 10.2(a) and (b) of the Plan.

(ii) *Class 5(a) - FXA General Unsecured Claims.* On the Effective Date, each Holder of an Allowed Class 5(a) FXA General Unsecured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Class 5(a) FXA General Unsecured Claim and any and all Other Related Claims, its Pro Rata share of the FXA General Unsecured Claim Distribution.

(iii) *Class 5(b) –Related Claims.* On the Effective Date, pursuant to section 6.4 hereof, each Allowed Class 5(b) Related Claim against FXA shall be subordinated and shall receive no Distribution from the FXA Distributive Assets unless and until such time as all Holders of Allowed FXA

General Unsecured Claims have been paid in full; *provided, however*, that any holder of an RCM Related Claim that provides an RCM Related Claim Subordination Form in accordance with section 6.6(c) of this Plan shall, on account of its RCM Securities Customer Claim or RCM FX/Unsecured Claim (if Allowed), receive its applicable share of the RCM Distribution Reserve as more fully set forth in section 6.6(c) hereof.

(iv)    *Class 6 - FXA Convenience Claims.*  On the Effective Date, each Holder of an Allowed Class 6 FXA Convenience Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Class 6 FXA Convenience Claim, Cash equal to 40% of its Allowed Class 6 FXA Convenience Claim.  Holders of Allowed Class 6 FXA Convenience Claims shall <u>not</u> receive any interest in the Litigation Trust described in section 5.7 of this Plan.

(v)    *Class 7 - FXA Subordinated Claims.*  No Holder of a Class 7 Subordinated Claim against FXA shall be entitled to, nor shall it receive or retain, any property or interest in property on account of such Class 7 Subordinated Claim.

### 3.3    *Treatment of Claims of RCM.*

**The following section is a summary of the treatment of RCM Claims set forth in the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code.  This Plan summary of the treatment of RCM Claims is qualified in its entirety by reference to the RCM Settlement Agreement.  To the extent that the summary treatment below conflicts with the treatment afforded in the RCM Settlement Agreement, the terms and conditions set forth in the RCM Settlement Agreement shall govern the treatment of RCM Claims.**

(a)    *Unclassified Claims – RCM.*

(i)    *Administrative Claim.*  As is more fully set forth in and governed by the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code, on the later of (a) the Effective Date, (b) the date on which its Administrative Claim becomes Allowed, or (c) the date on which its Administrative Claim becomes payable under any agreement relating thereto, each Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim in accordance with the allocation set forth in section 5.16 of the Plan.  Notwithstanding the foregoing, (a) any Administrative Claim based on a liability incurred by RCM in the ordinary course of business during the Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto and (b) any Administrative Claim may be paid on such other terms as may be agreed on between the Holder of such Claim and the RCM Trustee.  Subsection (b) of the second sentence in this section 3.3(a)(i) of the Plan shall not be construed to avoid relieving the need for Court approval of an Administrative Claim when such Court approval is otherwise required by the Bankruptcy Code.

(ii)    *Priority Tax Claims.*  As is more fully set forth in and governed by the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code, on the later of (a) the Effective Date or (b) the date on which its Priority Tax Claim becomes an Allowed Priority Tax Claim, in the sole discretion of the RCM Trustee, each Holder of an Allowed Priority Tax Claim against RCM shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, (i) Cash equal to the unpaid portion of such Allowed Priority Tax Claim in accordance with the allocation set forth in section 5.16 of the Plan, (ii) treatment in any other manner such that its Allowed Priority Tax Claims shall not be impaired pursuant to section 1124 of the Bankruptcy Code, including payment in accordance with the provisions of section 1129(a)(9)(C) of the Bankruptcy Code, or (iii) such other treatment as to which the RCM Trustee and such Holder shall have agreed upon in writing.  Clause (iii) of the preceding sentence shall not be construed to avoid the need for Bankruptcy Court approval of a Priority Tax Claim when such Bankruptcy Court approval is otherwise required by the Bankruptcy Code.

(b)  *Unimpaired Classes of Claims – RCM.*

(i)  *Class 1 - RCM Non-Tax Priority Claims.*  As is more fully set forth in and governed by the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code, on (a) the Effective Date if such Non-Tax Priority Claim is an Allowed Non-Tax Priority Claim against RCM on the Effective Date or (b) the Quarterly Distribution Date following the date on which such Non-Tax Priority Claim becomes an Allowed Non-Tax Priority Claim, each Holder of an Allowed Class 1 Non-Tax Priority Claim against RCM shall receive, in full and final satisfaction, release, and discharge of, and in exchange for, such Allowed Non-Tax Priority Claim, Cash equal to the unpaid portion of such Allowed Non-Tax Priority Claim in accordance with the allocation set forth in section 5.16 of the Plan.

(ii)  *Class 2 - RCM Other Secured Claims.*  As is more fully set forth in and governed by the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code, on the Effective Date, each Holder of an Allowed Class 2 Other Secured Claim against RCM shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Other Secured Claim, one of the following Distributions: (i) the payment of such Holder's Allowed Other Secured Claim in full, in Cash; (ii) the sale or disposition proceeds of the property securing such Allowed Other Secured Claim to the extent of the value of the interests in such property; (iii) the surrender to the Holder or Holders of such Allowed Other Secured Claim of the property securing such Claim; or (iv) such other Distributions as shall be necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.

(c)  *Impaired Classes of Claims – RCM.*

(i)  *Class 3 - RCM FX/Unsecured Claims.*  Subject to section 6.4 of this Plan, as is more fully set forth in and governed by the RCM Settlement Agreement, on the Effective Date, each Holder of an Allowed Class 3 RCM FX/Unsecured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed RCM FX/Unsecured Claim, its applicable share (as more fully set forth in the RCM Settlement Agreement) of (A) the RCM FX/Unsecured Claims Distribution and (B) unless a Holder elects not to provide a RCM Related Claim Subordination Form in respect of its RCM Related Claims, the RCM Cash Distribution and 50% of the RGL FXCM Distribution, which shall include, unless such Holder affirmatively elects otherwise prior to the Voting Deadline, the RCM BAWAG Proceeds portion of the RCM Cash Distribution.

(ii)  *Class 4 - RCM Securities Customer Claims.*  Subject to section 6.4 of this Plan, as is more fully set forth in and governed by the RCM Settlement Agreement, on the Effective Date, each Holder of an Allowed Class 4 RCM Securities Customer Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed RCM Securities Customer Claim, its applicable share (as more fully set forth in the RCM Settlement Agreement) of (A) the RCM Securities Customer Claims Distribution and (B) unless a Holder elects not to provide a RCM Related Claim Subordination Form in respect of its RCM Related Claims, the RCM Cash Distribution and 50% of the RGL FXCM Distribution, which shall include, unless such Holder affirmatively elects otherwise prior to the Voting Deadline, the RCM BAWAG Proceeds portion of the RCM Cash Distribution.

(iii)  *Class 5 - RCM Leuthold Metals Claims.*  Subject to section 6.4 of this Plan, as is more fully set forth in and governed by the RCM Settlement Agreement, on the Effective Date, each Holder of an Allowed Class 5 RCM Leuthold Metals Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed RCM Leuthold Metals Claim, its Pro Rata share of the RCM Leuthold Metals Claim Distribution.

(iv)  *Class 6 – RCM FX/Unsecured Convenience Claims.*  On the Effective Date, each Holder of an Allowed Class 6 RCM FX/Unsecured Convenience Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Class 6 RCM FX/Unsecured Convenience Claim, Cash equal to 60% of its Allowed Class 6 RCM FX/Unsecured Convenience Claim. Holders of Allowed Class 6 RCM FX/Unsecured Convenience Claims shall <u>not</u> receive any interest in the Litigation Trust described in section 5.7 of this Plan.

(v)    *Class 7 – RCM Securities Customer Convenience Claims.*  On the Effective Date, each Holder of an Allowed Class 7 RCM Securities Customer Convenience Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Class 7 RCM Securities Customer Convenience Claim, Cash equal to 100% of its Allowed Class 7 RCM Securities Customer Convenience Claim.  Holders of Allowed Class 7 RCM Securities Customer Convenience Claims shall <u>not</u> receive any interest in the Litigation Trust described in section 5.7 of this Plan.

(vi)    *Class 8 - Related Claims.*  On the Effective Date, pursuant to section 6.4 hereof, each Allowed Class 8 Other Related Claim against RCM shall be subordinated and shall receive no Distribution from RCM unless and until such time as all Holders of Allowed RCM FX/Unsecured Claims, Allowed RCM Securities Customer Claims and Allowed RCM Leuthold Metals Claims have been paid in full.

(vii)    *Class 9 - RCM Subordinated Claims.*  No Holder of a Class 6 Subordinated Claim against RCM  shall be entitled to, nor shall it receive or retain, any property or interest in property on account of such Class 9 RCM Subordinated Claim.  On the Effective Date, all Class 9 RCM Subordinated Claims shall be cancelled and extinguished.

**3.4    *Allowed Claims and Interests*.**  Except as provided in the Early Payment Order, notwithstanding any provision herein to the contrary, the Disbursing Agent, on behalf of the Reorganized Debtors, and the RCM Trustee, on behalf of RCM, shall make Distributions only to Holders of Allowed Claims and Interests.  A Holder of a Disputed Claim or Disputed Interest shall receive only a Distribution on account thereof when and to the extent that its Disputed Claim or Disputed Interest becomes an Allowed Claim or an Allowed Interest, as applicable.

**3.5    *Alternative Treatment*.**  Notwithstanding any provision herein to the contrary, any Holder of an Allowed Claim or Interest may receive, instead of the Distribution or treatment to which it is entitled hereunder, any other less favorable Distribution or treatment to which it, the Plan Proponents and FXA (in respect of FXA), the Plan Administrator (in respect of the Contributing Debtors) or the RCM Trustee (in respect of RCM) may agree in writing.

**3.6    *Limitation on Recoveries*.**  Notwithstanding anything contained herein to the contrary but subject to interest on Claims set forth in section 5.7 of the Plan, in the event that each Holder of an Allowed Claim in any Class of Claims is to receive Distributions in excess of one hundred percent (100%) of each Holder's Allowed Claim in such Class, then, any amounts remaining to be distributed to such Holders in excess of one hundred percent (100%) shall be redistributed to Holders of Allowed Claims or Interests immediately junior to such class as set forth in Article III of this Plan and shall be distributed in accordance with the provisions of the documents, instruments and agreements governing such Claims or Interests, including, without limitation, the RCM Settlement Agreement and the Bankruptcy Code.

**3.7    *Special Provision Regarding Unimpaired Claims*.**  Except as otherwise provided in this Plan, the RCM Settlement Agreement or a Final Order of the Bankruptcy Court (including, without limitation, the Early Payment Order), nothing shall affect the Debtors', RCM's, the Reorganized Debtors' or Post-Confirmation RCM's rights and defenses, both legal and equitable, with respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to, setoffs against, or recoupments of Unimpaired Claims.

**3.8    *Claims and Interests of Non-Debtor Affiliates*.**  Claims of Non-Debtor Affiliates (other than those of Refco LLC) against the Debtors or RCM , unless otherwise resolved prior to the Effective Date, shall be released and receive no Distribution under the Plan; *provided, however,* that, notwithstanding such release of Claims, the Contributing Debtors, RCM and the Non-Debtor Affiliates may, but are not obligated to, treat such Claims as though they survive solely for purposes of entering into netting or similar arrangements between the Contributing Debtors, RCM and one or more Non-Debtor Affiliates.  Interests of Non-Debtor Affiliates shall be treated in accordance with the provisions of this Plan, including, but not limited to, sections 5.1 and 5.22 below.

**3.9** *Classification and Treatment of Intercompany Claims.* Except as provided herein, Intercompany Claims among the Debtors or RCM are deemed to be resolved and satisfied by the provisions of and in accordance with this Plan. Notwithstanding the compromises and settlements set forth herein, each such Intercompany Claim shall be deemed to be an unsatisfied liability of each of the Debtors and RCM immediately prior to their contribution of Contributed Claims to the Litigation Trust.

**3.10** *Claims of Debtors against RCM.* Notwithstanding anything in this Plan to the contrary, Claims against RCM held by any other Debtor will receive no Distribution consistent with the settlement among RCM and the Debtors contained in and implemented by this Plan.

## ARTICLE IV

## ACCEPTANCE OR REJECTION OF THE PLAN

**4.1** *Classes Entitled To Vote.* Each Impaired Class of Claims of the Contributing Debtors, FXA or RCM that is entitled to receive or retain property or any interest in property under the Plan is entitled to vote to accept or reject this Plan. By operation of law, each Unimpaired Class of Claims is deemed to have accepted the Plan and, therefore, is not entitled to vote. Holders of Claims and Interests in Classes that are not entitled to receive or retain any property under the Plan are presumed to have rejected the Plan and such Holders are also not entitled to vote.

**4.2** *Acceptance By Impaired Classes.* An Impaired Class of Claims shall have accepted the Plan if (i) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept the Plan and (ii) the Holders of more than one-half in number of the Allowed Claims actually voting in the Class have voted to accept the Plan, not counting the vote of any Holder designated under section 1126(e) of the Bankruptcy Code or any insider.

**4.3** *Presumed Acceptance by Unimpaired Classes.* Classes 1, 2 and 3 of each of the Contributing Debtors and FXA and RCM Classes 1 and 2 are Unimpaired by this Plan. Under section 1126(f) of the Bankruptcy Code, Holders of such Claims or Interests are conclusively presumed to accept this Plan, and the votes of the Holders of such Claims or Interests will not be solicited.

**4.4** *Classes Deemed to Reject the Plan.* Classes 7 and 8 of the Contributing Debtors, FXA Class 7 and RCM Class 9 are deemed to reject the Plan and, therefore, votes to accept or reject the Plan will not be solicited from Holders of Claims or Interests in such Classes.

**4.5** *Summary of Classes Voting on the Plan.* As a result of the provision of sections 4.3 and 4.4 of this Plan, only the votes of Holders of Claims of the Contributing Debtors in Classes 4, 5 and 6, Holders of FXA Claims in Classes 4, 5 and 6 and Holders of RCM Claims in Classes 3, 4, 5,6 ,7 and 8 will be solicited with respect to this Plan.

**4.6** *Elimination Of Classes.* Any Class that does not contain any Allowed Claims or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018, as of the date of the commencement of the Confirmation Hearing, shall be deemed to have been deleted from the Plan for purposes of (a) voting to accept or reject the Plan and (b) determining whether it has accepted or rejected the Plan under section 1129(a)(8) of the Bankruptcy Code.

**4.7** *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.* To the extent that any Impaired Class votes to reject the Plan or is deemed to have rejected it, the Plan Proponents shall request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code.

# ARTICLE V

## MEANS FOR IMPLEMENTATION OF THE PLAN

**5.1** *Merger Of Subsidiaries Into Refco Inc.* As soon after the Effective Date that the Plan Administrator determines, in consultation with the Litigation Trustee, that it is appropriate, each of the Affiliate Debtors may be merged with and into Refco Inc., with Refco Inc. as the surviving entity. Notwithstanding anything to the contrary in this section of the Plan, mergers in fact of each of the Affiliate Debtors, other than FXA, with and into Refco Inc. referenced in such section shall occur no earlier than the Effective Date. Upon the occurrence of such a merger, the Plan Administrator, on behalf of the Reorganized Debtors, shall file all appropriate and required documentation with applicable state governmental agencies to reflect the occurrence of such mergers.

**5.2** *Continued Corporate Existence And Dissolution Of Reorganized Debtors.*

(a)    Refco Inc., FXA and, until they are wound up and dissolved, the Affiliate Debtors shall continue to exist as Reorganized Refco, Reorganized FXA and/or the applicable Reorganized Affiliate Debtor, respectively, after the Effective Date pursuant to the certificate of incorporation, certificate of formation or other corporate governance document, as applicable, and by-laws, operating agreement or other corporate governance document in effect prior to the Effective Date, except to the extent that such corporate governance documents are amended under the Plan, for the limited purposes of liquidating all of the assets of the Estates, and making Distributions in accordance with the Plan.

(b)    As soon as practicable after the Plan Administrator, liquidates or otherwise disposes of assets of the Estates of the Reorganized Debtors and makes the final Distribution under the Plan, the Plan Administrator shall, at the expense of the Estates of the Reorganized Debtors and in consultation with the Plan Committee, (i) provide for the retention and storage of the books, records, and files that shall have been delivered to or created by the Plan Administrator until such time as all such books, records, and files are no longer required to be retained under applicable law, and file a certificate informing the Bankruptcy Court of the location at which such books, records, and files are being stored, (ii) file a certification stating that the Plan Administrator has liquidated or otherwise disposed of the assets of the Estates of the Reorganized Debtors and made a final Distribution under the Plan, (iii) file the necessary paperwork with the Office of the Secretary of State for the State of Delaware to effectuate the dissolution of the Reorganized Debtors in accordance with the laws of the State of Delaware, and (iv) resign as the sole officer, manager or director, as applicable, of the Reorganized Debtors. Upon the filing of the certificates described in sub-section (ii) of the preceding sentence, the Reorganized Debtors shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Reorganized Debtors or payments to be made in connection therewith.

(c)    The RCM Trustee shall have sole discretion with respect to determining the timing and manner of dissolution of Post-Confirmation RCM in accordance with the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code.

**5.3** *Corporate Governance Documentation.* The certificate of incorporation of Reorganized Refco shall be restated to, among other things: (a) authorize issuance of one share of new common stock, $0.01 par value per share that will be held by the Plan Administrator; (b) provide, pursuant to section 1123(a)(6) of the Bankruptcy Code, for a provision prohibiting the issuance of non-voting equity securities; and (c) limit the activities of the Reorganized Refco to matters related to the implementation of the Plan and to matters reasonably incidental thereto. The corporate governance documents of Reorganized FXA shall be restated to, among other things: (a) provide, pursuant to section 1123(a)(6) of the Bankruptcy Code, for a provision prohibiting the issuance of non-voting equity securities; and (b) limit the activities of the Reorganized FXA to matters related to the implementation of the Plan and to matters reasonably incidental thereto. To the extent that the Plan Administrator decides it necessary, the corporate governance documents of the Affiliate Debtors that will continue in existence following the Effective Date pending the wind up of their businesses shall be restated to, among other things: (a) provide, pursuant to section 1123(a)(6) of the Bankruptcy Code, for a provision prohibiting the issuance of non-voting equity securities; and (b) limit the activities of such Reorganized Affiliate Debtor to matters related to the implementation

of the Plan and to matters reasonably incidental thereto. The form of the restated corporate governance documents are attached hereto as Exhibit C.

**5.4    Directors, Managers And Officers; Effectuating Documents; Further Transactions.** From and after the Effective Date, the Plan Administrator shall serve as the sole officer and director or manager, as applicable, of the Reorganized Debtors and the RCM Trustee shall serve as the sole representative of RCM. The Plan Administrator on behalf of the Reorganized Debtors, and the RCM Trustee, on behalf of RCM, shall be authorized to execute, deliver, file, or record such documents, instruments, releases, and other agreements and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**5.5    The Plan Administrator.**

(a)    *Appointment.* From and after the Effective Date, a person or entity designated by the Joint Sub- Committee (inclusive of its ex-officio members, but exclusive of Holders of Senior Subordinated Note Claims and the Senior Subordinated Note Indenture Trustee) prior to the Confirmation Date, shall serve as the Plan Administrator pursuant to the Plan Administrator Agreement and the Plan, until the resignation or discharge and the appointment of a successor Plan Administrator in accordance with the Plan Administrator Agreement and the Plan.

(b)    *Plan Administrator Agreement.* Prior to or on the Effective Date, the Contributing Debtors and FXA shall execute a Plan Administrator Agreement in substantially the same form as Exhibit E hereto with the Plan Administrator. The form of Plan Administrator Agreement is hereby approved. Any nonmaterial modifications to the Plan Administrator Agreement by the Debtors prior to the Effective Date are hereby ratified. The Plan Administrator Agreement will contain provisions permitting the amendment or modification of the Plan Administrator Agreement necessary to implement the provisions of this Plan.

(c)    *Separate Administration of the RCM Estates.* Notwithstanding anything herein to the contrary, all references in the Plan to the Plan Administrator shall refer exclusively to the administration of the Estates of the Contributing Debtors and FXA. The RCM Estate shall be administered separately by the RCM Trustee and the RCM Trustee shall wind down the RCM Estate in accordance with the terms and conditions set forth in the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code.

(d)    *Rights, Powers, And Duties Of The Reorganized Debtors And The Plan Administrator.* The Reorganized Debtors shall retain and have all the rights, powers, and duties necessary to carry out their responsibilities under the Plan. Such rights, powers, and duties, which shall be exercisable by the Plan Administrator on behalf of the Reorganized Debtors and the Estates pursuant to the Plan and the Plan Administrator Agreement, shall include, among others:

(i)    liquidating the Reorganized Debtors' assets;

(ii)    investing the Cash of the Estates of the Reorganized Debtors, including, but not limited to, the Cash held in the Reserves, in (A) direct obligations of the United States of America or obligations of any agency or instrumentality thereof that are backed by the full faith and credit of the United States of America, including funds consisting solely or predominantly of such securities, (B) money market deposit accounts, checking accounts, savings accounts or certificates of deposit, or other time deposit accounts that are issued by a commercial bank or savings institution organized under the laws of the United States of America or any state thereof, or (C) any other investments that may be permissible under section 345 of the Bankruptcy Code or as otherwise ordered by the Bankruptcy Court;

(iii)    calculating and paying all Distributions in accordance with the terms of the Plan, the Plan Administrator Agreement, and other orders of the Bankruptcy Court by the Plan Administrator to Holders of Allowed Claims;

(iv)   employing, supervising, and compensating professionals retained to represent the interests of and serve on behalf of the Reorganized Debtors and their Estates;

(v)   making and filing tax returns for any of the Contributing Debtors, FXA or the Reorganized Debtors;

(vi)   as provided in Article V, objecting to Claims or Interests filed against the Estates of any of the Contributing Debtors, FXA or the Reorganized Debtors on any basis except to the extent such Claims or Interests have previously been allowed by a Final Order;

(vii)   seeking estimation of contingent or unliquidated Claims against the Contributing Debtors, FXA or the Reorganized Debtors under section 502(c) of the Bankruptcy Code;

(viii)   seeking determination of tax liability for the Contributing Debtors, FXA and the Reorganized Debtors under section 505 of the Bankruptcy Code;

(ix)   closing the Chapter 11 Cases of the Reorganized Debtors;

(x)   dissolving and winding up the Reorganized Debtors;

(xi)   exercising all powers and rights, and taking all actions, contemplated by or provided for in the Plan Administrator Agreement; and

(xii)   taking any and all other actions necessary or appropriate to implement or consummate the Plan and the provisions of the Plan Administrator Agreement.

(e)   *Compensation Of The Plan Administrator.*  The Plan Administrator shall be compensated from the Wind-Down Reserve pursuant to the terms and conditions of the Plan Administrator Agreement.  Any professionals retained by the Plan Administrator shall be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred from the Wind-Down Reserve.  The payment of the reasonable fees and expenses of the Plan Administrator and its retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court; *provided, however,* that any disputes related to such fees and expenses shall be brought before the Bankruptcy Court.

(f)   *Indemnification.*  The Reorganized Debtors shall indemnify and hold harmless (i) the Plan Administrator (in its capacity as such and as officer, director or manager, as applicable of the Reorganized Debtors), (ii) such individuals as may serve as officers, directors or managers, as applicable of the Reorganized Debtors, if any, and (iii) the Administrative Professionals (collectively, the "Indemnified Parties"), from and against, and with respect to any and all liabilities, losses, damages, claims, costs, and expenses, including, but not limited to, attorneys' fees, arising out of or due to their actions or omissions, or consequences of such actions or omissions, other than acts or omissions resulting from such Indemnified Party's willful misconduct or gross negligence, with respect to the Reorganized Debtors or the implementation or administration of the Plan or Plan Administration Agreement.  To the extent an Indemnified Party asserts a claim for indemnification as provided above, the legal fees and related costs incurred by counsel to the Indemnified Party in the defense of such claims giving rise to the asserted right of indemnification shall be advanced to such Indemnified Party (and such Indemnified Party undertakes to repay such amounts if it ultimately shall be determined that such Indemnified Party is not entitled to be indemnified therefor) out of the Wind-Down Reserve or any insurance purchased using the Wind-Down Reserve. The indemnification provisions of the Plan Administrator Agreement shall remain available to and be binding upon any former Plan Administrator or the estate of any decedent Plan Administrator and shall survive the termination of the Plan Administrator Agreement.

(g)   *Insurance.*  The Plan Administrator shall be authorized to obtain and pay for out of the Wind-Down Reserve all reasonably necessary insurance coverage for itself, its agents, representatives, employees, or independent contractors, and the Reorganized Debtors, including, but not limited to, coverage with respect to (i) any property that is or may in the future become the property of the Reorganized Debtors or their

Estates and (ii) the liabilities, duties, and obligations of the Plan Administrator and its agents, representatives, employees, or independent contractors under the Plan Administrator Agreement (in the form of an errors and omissions policy or otherwise), the latter of which insurance coverage may, at the sole option of the Plan Administrator, remain in effect for a reasonable period (not to exceed seven years) after the termination of the Plan Administrator Agreement.

(h)     *Authority To Object To Claims And Interests And To Settle Disputed Claims.* From and after the Effective Date, the Plan Administrator, on behalf of the Reorganized Debtors, shall be authorized, with respect to those Claims or Interests which are not Allowed hereunder or by Court order, after consultation with the Plan Committee, (i) to object to any Claims or Interests filed against any of the Contributing Debtors' or FXA's Estates and (ii) pursuant to Bankruptcy Rule 9019(b) and section 105(a) of the Bankruptcy Code, to compromise and settle Disputed Claims against any of the Contributing Debtors' or FXA's Estates, in accordance with the following procedures, which shall constitute sufficient notice in accordance with the Bankruptcy Code and the Bankruptcy Rules for compromises and settlements of claims:

(i)     If the proposed face amount at which the Disputed Claim is to be allowed is less than or equal to $500,000, the Plan Administrator shall be authorized and empowered to settle the Disputed Claim and execute necessary documents, including a stipulation of settlement or release, in its sole discretion and without notice to any party or Bankruptcy Court approval and the Plan Administrator shall have no liability to any party for the reasonableness of such settlement, except to the extent such settlement is determined by a Final Order to have been the product of the Plan Administrator's gross negligence or willful misconduct.

(ii)     If the proposed face amount at which the Disputed Claim is to be allowed is greater than $500,000, but less than or equal to $10 million, the Plan Administrator, on behalf of the Reorganized Debtors, shall be authorized and empowered to settle such Disputed Claim and execute necessary documents, including a stipulation of settlement or release, only upon receipt of Plan Committee approval or, if such approval of the Plan Committee is not forthcoming, upon Bankruptcy Court approval of such settlement.

(iii)     If the proposed face amount at which the Disputed Claim is to be allowed is greater than $10 million, the Plan Administrator shall be authorized and empowered to settle the Disputed Claim and execute necessary documents, including a stipulation of settlement or release, only upon receipt of Plan Committee and Bankruptcy Court approval of such settlement.

Other than as set forth in section 5.21 herein, parties in interest (other than the Reorganized Debtors and Plan Administrator, whose objection deadlines are set forth in section 8.1 of the Plan) shall have 90 days following the Effective Date to object to any Claims or Interests filed against any of the Contributing Debtors' or FXA's Estates to the extent that under the Bankruptcy Code such parties are permitted (to the extent not previously allowed pursuant to the Plan or by order of the Bankruptcy Court), and have standing, to assert such objections. Notwithstanding anything to the contrary in this section of the Plan, Disputed Claims may not be resolved absent Bankruptcy Court approval under the procedures set forth in this section of the Plan until the date that is on or after 90 days following the Effective Date.

5.6     *Administration of Post-Confirmation RCM.*

(a)     *Rights, Powers, And Duties Of The RCM Trustee.* The RCM Trustee shall retain and have all the rights, powers, and duties necessary to carry out his responsibilities under the Plan, the RCM Settlement Agreement or applicable law. Such rights, powers, and duties, which shall be exercisable by the RCM Trustee on behalf of Post-Confirmation RCM and the RCM Estate pursuant to the Plan and the RCM Settlement Agreement, shall include, among others:

(i)     liquidating Post-Confirmation RCM's assets;

(ii)    investing Post-Confirmation RCM's Cash, including, but not limited to, the Cash held in any reserves, in (A) direct obligations of the United States of America or obligations of any agency or instrumentality thereof that are backed by the full faith and credit of the United States of America, including funds consisting solely or predominantly of such securities, (B) money market deposit accounts, checking accounts, savings accounts or certificates of deposit, or other time deposit accounts that are issued by a commercial bank or savings institution organized under the laws of the United States of America or any state thereof, or (C) any other investments that may be permissible under section 345 of the Bankruptcy Code or as otherwise order by the Bankruptcy Court;

(iii)    calculating and paying all Distributions to be made under the Plan, the RCM Settlement Agreement, and other orders of the Bankruptcy Court to Holders of Allowed Claims against RCM;

(iv)    employing, supervising, and compensating professionals retained to represent the interests of and serve on behalf of the Post-Confirmation RCM including professionals engaged for the valuation, sale or other disposition of Post-Confirmation RCM's assets or proceeds thereof;

(v)    making and filing tax returns, if any are required, for Post-Confirmation RCM;

(vi)    as provided in Article V, objecting to Claims or Interests filed against RCM or Post-Confirmation RCM on any basis except to the extent such Claims or Interests have previously been Allowed;

(vii)    seeking estimation of contingent or unliquidated Claims against RCM or Post-Confirmation RCM under section 502(c) of the Bankruptcy Code;

(viii)    seeking determination of tax liability, if any, for RCM and Post-Confirmation RCM under section 505 of the Bankruptcy Code;

(ix)    closing the RCM Chapter 11 Case or chapter 7 case;

(x)    dissolving and winding up Post-Confirmation RCM;

(xi)    exercising all powers and rights, and taking all actions, contemplated by or provided for in the RCM Settlement Agreement or applicable law; and

(xii)    taking any and all other actions necessary or appropriate to implement or consummate the Plan and the provisions of the RCM Settlement Agreement or to administer the RCM Estate.

(b)    *Authority To Object To Claims And Interests And To Settle Disputed Claims.* From and after the Effective Date, the RCM Trustee, on behalf of Post-Confirmation RCM, shall be authorized, with respect to those Claims or Interests which are not Allowed hereunder, under the RCM Settlement Agreement or by Court order (i) to object to any Claims or Interests filed against the RCM Estate and (ii) pursuant to Bankruptcy Rule 9019(b) and section 105(a) of the Bankruptcy Code, to compromise and settle any such Disputed Claims asserted against RCM.

**5.7    *Litigation Trust.***

(a)    *Establishment of the Litigation Trust.* The Litigation Trust shall be established for pursuit of the Contributed Claims and shall become effective on the Effective Date as summarized below and in accordance with the terms and conditions set forth in more detail in the Litigation Trust Agreement attached hereto as Exhibit F. The Litigation Trustee will be selected by the Joint Sub-Committee (inclusive of its ex-officio members, but exclusive of Holders of Senior Subordinated Note Claims and the Senior Subordinated Note Indenture

Trustee), and shall be identified in advance of the Confirmation Hearing and approved by the Bankruptcy Court at the Confirmation Hearing.

(b)     *Transfer of Assets.* The transfer of the Contributed Claims to the Litigation Trust shall be made, as provided herein, for the ratable benefit of the Litigation Trust Beneficiaries as set forth herein. On the Effective Date, the Contributed Claims, held by the Debtors and RCM on behalf of the Litigation Trust Beneficiaries shall be transferred to the Litigation Trust in exchange for Litigation Trust Interests for the ratable benefit of the Litigation Trust Beneficiaries. Upon transfer of the Contributed Claims to the Litigation Trust, the Debtors, RCM and the Plan Administrator shall have no interest in or with respect to the Contributed Claims or the Litigation Trust and the Litigation Trustee shall be a representative of the Estates pursuant to sections 1123(a)(5), (a)(7) and (b)(3)(B) of the Bankruptcy Code with respect to the Contributed Claims. To the extent that any Contributed Claims cannot be transferred to the Litigation Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by section 1123 of the Bankruptcy Code or any other provision of the Bankruptcy Code, such Contributed Claims shall be deemed to have been retained by the Reorganized Debtors and RCM, as applicable, and the Litigation Trustee shall be deemed to have been designated as a representative of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to enforce and pursue such Contributed Claims on behalf of the Estates. Notwithstanding the foregoing, all net proceeds of the Contributed Claims shall be transferred to the Effective Beneficiaries consistent with the remaining provisions of this Plan and the Litigation Trust Agreement.

(c)     *Structure of the Litigation Trust and Trust Distributions.* The Litigation Trust shall be structured in a manner that provides for a Tranche A and a Tranche B. All Contributed Claims Recoveries, whether applicable to Tranche A or Tranche B, will be distributed Pro Rata according to the beneficial interests in Tranche A and Tranche B. The Litigation Trustee (in consultation with the Litigation Trust Committee) may establish further separate sub-Tranches, as necessary, in respect of the beneficial interests of the Litigation Trust Beneficiaries in Tranche A and Tranche B. To the extent deemed "securities," the Litigation Trust Interests (or any redistribution of such interests or related interests by the RCM Trustee to the Holders of Allowed RCM Securities Customer Claims and Allowed RCM FX/Unsecured Claims) will be exempt from registration to the extent provided in section 1145 of the Bankruptcy Code.

(i)     *Tranche A Litigation Trust Interests.* Beneficiaries of Tranche A Litigation Trust Interests will be the RCM Estate (for Distribution in accordance with the RCM Settlement Agreements), Holders of Allowed Contributing Debtors General Unsecured Claims (which for the sake of clarity, shall not include the Secured Lenders, the Senior Subordinated Note Indenture Trustee or the Holders of Senior Subordinated Notes) and Holders of Allowed FXA General Unsecured Claims (which for the sake of clarity, shall not include Holders of FXA Convenience Class Claims, RCM Securities Customer Convenience Claims or RCM FX/General Unsecured Convenience Claims) and such Beneficiaries shall share the Tranche A Litigation Trust Interests Pro Rata based on (x) in the case of the RCM Estate, the aggregate amount of Allowed RCM Implied Deficiency Claims and the Allowed RCM FX/Unsecured Claims and (y) in the case of Holders of Contributing Debtors General Unsecured Claims and the Holders of FXA General Unsecured Claims, the amount of each such Holder's Allowed Claim.

(ii)     *Tranche B Litigation Trust Interests.* Beneficiaries of Tranche B Litigation Trust Interests will be the Holders of Old Equity Interests who have made a Private Actions Trust Election and such Beneficiaries shall share the Tranche B Litigation Trust Interests Pro Rata based on the number of shares held by the Holders of such Interests or the number of shares previously held to the extent that the Holder has asserted a Claim related to such shares.

(d)     *Management of the Litigation Trust.* The Litigation Trust shall be managed and operated by the Litigation Trustee. A committee composed of VR and four Holders of Claims against RCM that do not assert Claims against any Contributing Debtor based on guarantees or other direct contractual undertakings shall have certain approval rights on key issues relating to the operation and management of the Litigation Trust. The Four members (other than VR) shall be selected by the Joint Sub-Committee (inclusive of its ex-officio members, but exclusive of Holders of Senior Subordinated Note Claims and the Senior Subordinated Note Indenture Trustee). No Holder of Tranche A Litigation Trust Interests (except to the extent such Holder is a member of the Litigation

Trust Committee) and no Holder of Tranche B Litigation Trust Interests shall have any consultation or approval rights whatsoever in respect of management and operation of the Litigation Trust

      (e)    *Funding the Litigation Trust.* The Litigation Trust may be funded (i) from a loan that is non-recourse to RCM, the Debtors or the Estates, secured only by the proceeds of the Contributed Claims from one or more lenders who agree to make such loan on terms acceptable to the RCM Trustee, the Committees and the Super Majority (as defined in the RCM Settlement Agreement) or (ii) with up to $25 million drawn from the Contributing Debtors Distributive Assets, deducted on a Pro Rata basis from the Distributions that otherwise would be made to (x) Holders of Contributing Debtors General Unsecured Claims in accordance with the calculation of the Contributing Debtors General Unsecured Distribution and (y) to the RCM Estate in accordance with the calculation of the RCM Intercompany Claims Distribution in section 3.1 of this Plan. Any failure or inability of the Litigation Trust to obtain funding will not affect the consummation of this Plan.

      (f)    *Distributions by the Litigation Trust.* Any Contributed Claims Recoveries will first be used to repay the funding described in section 5.7(e) above and then will be transferred to the Disbursing Agent or the RCM Trustee, as applicable, for distribution to the Litigation Trust Beneficiaries as set forth herein. In addition, to the extent that the Reorganized Debtors or Post-Confirmation RCM become liable for the payment of any Claims arising under section 502(h) of the Bankruptcy Code by reason of the Litigation Trustee's prosecution of the Litigation Claims, the Litigation Trustee will be responsible for making Distributions on account of such Claims from the assets of the Litigation Trust.

      (g)    *Cash-Out Option.* As set forth more fully in the Cash-Out Option Agreement, if any, the form of which would be attached as an exhibit to the Litigation Trust Agreement, one or more third parties may offer, to Purchase Litigation Trust Interests from the Litigation Trust Beneficiaries.

      (h)    *Duration of Trust.* The Litigation Trust shall have an initial term of five (5) years, provided that if reasonably necessary to realize maximum value with respect to the assets in the Litigation Trust and following Bankruptcy Court approval, the term of the Litigation Trust may be extended for one or more one (1) year terms. The Litigation Trust may be terminated earlier than its scheduled termination if (i) the Bankruptcy Court has entered a Final Order closing all of or the last of the Chapter 11 Cases pursuant to section 350(a) of the Bankruptcy Code and the RCM Case to the extent the RCM Case was converted to chapter 7; and (ii) the Litigation Trustee has administered all assets of the Litigation Trust and performed all other duties required by the Plan and the Litigation Trust Agreement.

      (i)    *Certain Federal Income Tax Matters.*

      (j)    For federal income tax purposes, the Debtors, RCM, the Litigation Trustee and the Effective Beneficiaries will treat the transfer of assets to the Litigation Trust and issuance of Litigation Trust Interests as a transfer by the Debtors and RCM of the assets to the Effective Beneficiaries, followed by a transfer of such assets by the Effective Beneficiaries to the Litigation Trust in exchange for direct or indirect beneficial interests in the Litigation Trust. For federal income tax purposes, the Effective Beneficiaries will be treated as the grantors, deemed owners and beneficiaries of the Litigation Trust.

      (k)    The Litigation Trustee, the Debtors and RCM will determine the fair market value as of the Effective Date of all assets transferred to the Litigation Trust, and such determined fair market value shall be used by the Debtors, RCM, the Litigation Trust, the Litigation Trustee and the Effective Beneficiaries for all federal income tax purposes.

      **5.8**    *Private Actions Trust.*

      (a)    On the Effective Date the Private Actions Trust will be established on the terms set forth in the Private Actions Trust Agreement attached hereto as Exhibit G. The Private Actions Trust shall hold certain claims and causes of action against third-parties owned by Holders of Claims or Interests against RCM or the Debtors and which claims, even after contribution, are not assets of the Estates. Beneficiaries of the Private Actions

Trust will be Holders of Contributing Debtors General Unsecured Claims, FXA General Unsecured Claims, RCM Securities Customer Claims, RCM FX/Unsecured Claims and those Old Equity Interests that make the Private Actions Trust Election, who shall be given interests in the Private Actions Trust to the same extent as in the Litigation Trust; *provided, however*, that a secondary purchaser of a Contributing Debtors General Unsecured Claim, FXA General Unsecured Claim, RCM Securities Customer Claim or RCM FX/Unsecured Claim may participate in the Private Actions Trust only if such purchaser has received an assignment of Non-Estate Refco Claims from the original holder of such claims and has elected to (i) assign such Non-Estate Refco Claims to the Private Actions Trust and (ii) assign (or cause to be assigned) its allocable share of any proceeds of Class Action Claims to the Private Actions Trust. The Private Actions Trust shall be managed and operated by the Private Actions Trustee. The Private Actions Trustee will be selected by the members of the Joint Sub-Committee (inclusive of its ex-officio members, but exclusive of Holders of Senior Subordinated Note Claims and the Senior Subordinated Note Indenture Trustee) that have signed the Plan Support Agreement and thereby agreed to assign their Non-Estate Refco Claims to the Private Actions Trust, and shall be identified in advance of the Confirmation Hearing and approved by the Bankruptcy Court at the Confirmation Hearing. A committee composed of VR and four Holders of Claims against RCM that do not assert Claims against any Contributing Debtor based on guarantees or other direct contractual undertakings (in each case, only to the extent such parties have assigned their Non-Estate Refco Claims to the Private Actions Trust) shall have certain approval rights on key issues relating to the operation and management of the Private Actions Trust. The Four members (other than VR) shall be selected by the members of the Joint Sub-Committee (inclusive of its ex-officio members, but exclusive of Holders of Senior Subordinated Note Claims and the Senior Subordinated Note Indenture Trustee) that have signed the Plan Support Agreement and thereby agreed to assign their Non-Estate Refco Claims to the Private Actions Trust.

(b)     To the extent that any Non-Estate Refco Claims cannot be transferred to the Private Actions Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by section 1123 of the Bankruptcy Code or any other provision of the Bankruptcy Code, such Non-Estate Refco Claims shall be deemed to have been retained by the grantor, as applicable, and the Private Actions Trustee shall be deemed to have been designated as a representative of such grantor to enforce and pursue such Non-Estate Refco Claims on behalf of such grantor. Notwithstanding the foregoing, all net proceeds of such Non-Estate Refco Claims shall be transferred to the Private Actions Trust Beneficiaries consistent with the other provisions of this Plan and the Private Actions Trust Agreement.

**5.9     *No Revesting of Assets*.** Other than as set forth herein, the remaining property of the respective Estates, other than the Contributed Claims, which shall be transferred to and vest in the Litigation Trust, shall not revest in the Debtors or RCM on or following the Confirmation Date or Effective Date, but shall remain property of the respective Estates and continue to be subject to the jurisdiction of the Bankruptcy Court until distributed to Holders of Allowed Claims in accordance with the provisions of the Plan, the Confirmation Order and the RCM Settlement Agreement. From and after the Effective Date, all such property shall be distributed in accordance with the provisions of the Plan, the Confirmation Order and the RCM Settlement Agreement, without further order of the Court (except as specifically required). For the avoidance of doubt, the Debtors' or RCM's insurance policies shall remain property of their respective Estates in accordance with this section of the Plan, and shall not be subject to the rejection provisions of section 7.1 of the Plan.

**5.10     *Preservation of Rights of Action; Settlement of Litigation***

(a)     *Preservation Of Rights Of Action.* Except as otherwise provided herein, the Confirmation Order, the RCM Settlement Agreement, or in any other Plan Document, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors and RCM shall retain all Retained Causes of Action notwithstanding the Confirmation of the Plan and the occurrence of the Effective Date, to be administered and prosecuted after the Effective Date pursuant to the terms of the Plan.

(b)     *Settlement Of Litigation Claims Prior to the Effective Date.* At any time prior to the Effective Date, notwithstanding anything in the Plan to the contrary, the Debtors (and the RCM Trustee on behalf of RCM with respect to Litigation Claims of RCM) may settle any or all of the Litigation Claims with Bankruptcy Court approval pursuant to Bankruptcy Rule 9019, following notice to parties-in-interest and a hearing.

Any net proceeds obtained in respect of Litigation Claims prior to the Effective Date shall be contributed to the Litigation Trust.

### 5.11    *The Committees and the Plan Committee.*

(a)    *Dissolution of the Committees.*  The Committees shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code and such other duties as they may have been assigned by the Bankruptcy Court prior to the Effective Date.  On the Effective Date, the Committees shall be dissolved and their members shall be deemed released of all their duties, responsibilities and obligations in connection with the Chapter 11 Cases or the Plan and its implementation, and the retention or employment of the Committees' attorneys, accountants, professionals and other agents shall terminate, except with respect to (i) all Professional Fees and matters relating to the Fee Committee, (ii) any appeals of the Confirmation Order and (iii) the continuation and completion of any litigation to which the Creditors' Committee or the Additional Committee, as applicable, is a party as of the Effective Date.  All expenses of members of the Committees and the fees and expenses of the Committees' professionals through the Effective Date shall be paid in accordance with any applicable orders of the Bankruptcy Court.  Counsel to the Committees shall be entitled to reasonable compensation and reimbursement of actual, necessary expenses for post-Effective Date activities authorized hereunder without further court approval upon the submission of invoices to the Reorganized Debtors.  Following the Effective Date, subject to actual conflicts of interest, none of the Committees' professionals shall be precluded from representing any entity acting for any successor fiduciaries or other entities created by this Plan, including the Plan Administrator, Plan Committee, Litigation Trustee or any of the Reorganized Debtors.

(b)    *Creation of Plan Committee; Procedures.*

(i)    Unless there are no parties in interest willing to serve, on the Effective Date, the Plan Committee shall be formed and constituted.  The Plan Committee shall be of a size determined by and composed of members chosen by the Joint Sub-Committee (exclusive of the Senior Subordinated Note Indenture Trustee and any Holder of a Senior Subordinated Note Claim); *provided, however*, that the Plan Committee shall include VR, Leuthold and Cargill and shall include the Senior Subordinated Note Indenture Trustee until such time as all payments in respect of the Senior Subordinated Note Holder Distribution have been made.  All proposed members of the Plan Committee shall be disclosed to the Bankruptcy Court on or before the Confirmation Hearing.  Membership on the Plan Committee shall be on an institutional and not on an individual basis.  In the event that a member of the Plan Committee resigns from its position on the Plan Committee, the remaining members shall have the right to designate its successor on the Plan Committee as set forth in the Plan Administrator Agreement.  The Plan Committee shall, absent further order of the Bankruptcy Court, have not fewer than three members.

(ii)    In the event that there are fewer than three members of the Plan Committee for a period of sixty (60) consecutive days, then the Plan Administrator may, during such vacancy and thereafter, in its sole discretion, ignore any reference in the Plan, the Plan Administrator Agreement or the Confirmation Order to the Plan Committee, and all references to the Plan Committee's ongoing duties and rights in the Plan, the Plan Administrator Agreement and the Confirmation Order shall be null and void.

(c)    *Standing of Plan Committee.*  The Plan Committee shall have independent standing to appear and be heard in the Bankruptcy Court as to any matter relating to the Plan, the Plan Administrator, the Estates or the Reorganized Debtors, including any matter as to which the Bankruptcy Court has retained jurisdiction pursuant to Article XI of the Plan.

(d)    *Function and Duration; Compensation and Expenses.*  The Plan Committee shall have ultimate supervisory authority over the Plan Administrator (but shall have no authority over the RCM Trustee, the RCM Estate or the Litigation Trustee, in such capacity).  The Plan Administrator shall report to the Plan Committee and the Plan Committee shall have the power to remove the Plan Administrator with or without cause. The Plan Committee (i) shall be responsible for (A) instructing and supervising the Reorganized Debtors and the Plan Administrator with respect to their responsibilities under the Plan and the Plan Administrator Agreement, (B)

reviewing and approving the prosecution of adversary and other proceedings, if any, including approving proposed settlements thereof, (C) reviewing and approving objections to and proposed settlements of Disputed Claims against the Contributing Debtors, FXA or the Reorganized Debtors, (D) performing such other duties that may be necessary and proper to assist the Plan Administrator and its retained professionals, and (ii) shall remain in existence until such time as the final Distributions under the Plan have been made by the Disbursing Agent, on behalf of the Reorganized Debtors. The members of the Plan Committee shall serve without compensation for their performance of services as members of the Plan Committee, except that they shall be entitled to reimbursement of reasonable expenses by the Reorganized Debtors to be paid from the Wind-Down Reserve. The Plan Committee may retain counsel or other professionals who shall be entitled to reasonable compensation and reimbursement of actual, necessary expenses to be paid from the Wind-Down Reserve upon the submission of invoices to the Reorganized Debtors; provided, however, that any disputes related to such fees and expenses may be brought before the Bankruptcy Court.

(e)    *Liability; Indemnification.* Neither the Plan Committee, nor any of its members or designees, nor any duly designated agent or representative of the Plan Committee, or their respective employees, shall be liable for the act or omission of any other member, designee, agent or representative of the Plan Committee, nor shall any member be liable for any act or omission taken or omitted to be taken in its capacity as a member of the Plan Committee, other than acts or omissions resulting from such member's willful misconduct or gross negligence. The Reorganized Debtors shall indemnify and hold harmless the Plan Committee and its members and designees, and any duly designated agent or representative thereof (in their capacity as such), from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including, but not limited to, attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, other than as a result of their willful misconduct or gross negligence, with respect to the Reorganized Debtors or the implementation or administration of the Plan. To the extent the Reorganized Debtors indemnify and hold harmless the Plan Committee and its members and designees, or any duly designated agent or representative thereof (in their capacity as such), as provided above, the legal fees and related costs incurred by counsel to the Plan Committee in monitoring and participating in the defense of such claims giving rise to the right of indemnification shall be advanced to the Plan Committee (and the Plan Committee undertakes to repay such amounts if it ultimately shall be determined that the Plan Committee is not entitled to be indemnified therefor) out of the Wind-Down Reserve or any applicable insurance.

5.12    *Fee Committee.* From and after the Confirmation Date, the members of the Fee Committee (including the RCM Trustee) and the Fee Committee's professionals shall continue to serve and be authorized to continue, in a manner consistent with practice before the Confirmation Date, to review, analyze, and prepare advisory reports with respect to applications for the payment of fees and the reimbursement of expenses of professionals retained in the Chapter 11 Cases pursuant to an order of the Bankruptcy Court during the period up to and including the Confirmation Date, including, without limitation, final fee applications in accordance with sections 328, 330, 331, and 503 of the Bankruptcy Code. From and after the Confirmation Date, the Reorganized Debtors shall pay the reasonable fees and expenses of the members of the Fee Committee to satisfy their duties and responsibilities. Notwithstanding the foregoing, unless otherwise provided by the Bankruptcy Court, the Fee Committee shall be dissolved and the members thereof and the professionals retained by the Fee Committee shall be released and discharged from their respective obligations upon the earlier to occur of (i) the date which is six (6) months after the Confirmation Date and (ii) resolution of all duties of the Fee Committee set forth in this section of the Plan.

5.13    *Cancellation of Securities, Instruments, and Agreements Evidencing Claims and Interests.* With the exception of the equity interests of any Refco Entity held by any other Refco Entity pending wind-up and dissolution of such entities pursuant to this Plan, and except as otherwise provided in the Plan and in any other Plan Document, on the Effective Date and concurrently with the applicable Distributions made pursuant to this Article V, the promissory notes, share certificates (including treasury stock), other instruments evidencing any Claims or Interests, and all options, warrants, calls, rights, puts, awards, commitments, or any other agreements of any character to acquire such Interests shall be deemed canceled and of no further force and effect, without any further act or action under any applicable agreement, law, regulation, order, or rule, and the obligations of the Debtors or RCM under the notes, share certificates, and other agreements and instruments governing such Claims and Interests shall be discharged; *provided, however,* that the Senior Subordinated Notes Indenture shall continue in effect solely for the purposes of allowing the Senior Note Indenture Trustee to enforce the indemnity provisions of

the Senior Subordinated Note Indenture on account of the Senior Subordinated Note Indenture Trustee's service on the Plan Committee, to make the Distributions to be made on account of Senior Subordinated Note Claims under the Plan and, to the extent necessary, enforce the Senior Subordinated Note Indenture Trustee Charging Lien, after which point the Senior Subordinated Note Indenture shall be cancelled and discharged. The Holders of or parties to such canceled notes, share certificates, and other agreements and instruments shall have no rights arising from or relating to such notes, share certificates, and other agreements and instruments, or the cancellation thereof, except the rights provided pursuant to the Plan.

5.14    *Sources of Cash for Plan Distributions.* Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtors and the Plan Administrator to make payments pursuant to the Plan shall be obtained from the Reorganized Debtors' Cash balances and the liquidation of the Reorganized Debtors' and the Reorganized Debtors' remaining non-Cash assets, if any, including the Contributing Debtors BAWAG Proceeds. Cash payments to be made pursuant to the Plan to Holders of Allowed Claims and to the Senior Subordinated Note Indenture Trustee for the benefit of the Holders of Senior Subordinated Note Claims shall be made by the Reorganized Debtors (or any successor thereto) or, if the Disbursing Agent is an entity other than the Reorganized Debtors, the Disbursing Agent, which may be the Senior Subordinated Note Indenture Trustee. Distributions to be made on behalf of the RCM Estate pursuant to the Plan or the RCM Settlement Agreement shall be made by the RCM Trustee in accordance with the Plan, the RCM Settlement Agreement and applicable law.

5.15    *Risk Sharing in Respect of Cargill Administrative Claim.* In the event that Cargill receives a Cargill Administrative Claim, the amount of such Claim shall be borne by RCM and the Contributing Debtors as follows: (i) to the extent the allowance of the Cargill Administrative Claim reduces the Allowed amount of any RCM FX/Unsecured Claim held by Cargill, RCM shall bear for the benefit of the Contributing Debtors a portion of the Cargill Administrative Claim equal to forty percent (40%) of the amount of the RCM Difference; (ii) the Contributing Debtors shall next pay an amount up to the remainder of the Cargill Administrative Claim Amount; *provided, however,* that such payment pursuant to this subsection (ii) shall be capped at the amount that would cause recoveries of Holders of Allowed Contributing Debtors General Unsecured Claims from Contributing Debtors Distributive Assets plus the Contributing Debtors portion of the RGL FXCM Distribution to fall below 30% of the face amount of such Allowed Contributing Debtors General Unsecured Claims; and (iii) if not yet paid in full, the remainder of the Cargill Administrative Claim will be borne by the Contributing Debtors and RCM equally. For the avoidance of doubt, amounts to be borne by the Contributing Debtors shall be deducted from the amounts available for the Contributing Debtors General Unsecured Distribution and amounts to be borne by RCM shall be deducted from the amounts available for the RCM Cash Distribution.

5.16    *Allocation of Administrative Claims, Priority Tax Claims and Non-Tax Priority Claims.* Payment of Allowed Priority Tax Claims and Allowed Non-Tax Priority Claims of the Contributing Debtors and of the RCM Estate and Allowed Administrative Claims of the Contributing Debtors and of the RCM Estate, other than amounts in respect of the RCM Advance, accrued through the Effective Date (excluding any amounts paid as of August 31, 2006) will be allocated such that RCM will first provide up to $60 million, the Contributing Debtors will next provide up to $120 million and to the extent that such Claims exceed $180 million in the aggregate, RCM and the Contributing Debtors will bear the cost of such excess (the "Excess Priority Claims") equally. Notwithstanding the preceding sentence, the Contributing Debtors may fund the payment of any Pre-Conversion Administrative Claim Amounts if and to the extent that the RCM Trustee and the Contributing Debtors determine such funding necessary to facilitate Distributions in respect of such amounts on the Effective Date; *provided, however,* that any amounts so paid by the Contributing Debtors shall be deducted from the RCM Cash Distribution in a manner that causes RCM to ultimately bear the cost of the Pre-Conversion Administrative Claim Amounts. FXA shall be responsible for all of its Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Non-Tax Priority Claims, *provided, however,* that professional services (other than those related to FXA's claims resolution process and issues unique to FXA after the initial date of the filing of this Plan) and overhead allocable to FXA in the period between the Plan Filing Date and the Plan Effective Date shall be borne by RCM and the Contributing Debtors as set forth in the preceding sentence. Only Allowed Administrative Claims accrued from the Petition Date through the Plan Effective Date that were or are paid after August 31, 2006 shall be counted toward the sharing allocation of the preceding three sentences; provided that the Contributing Debtors shall alone bear the cost of repaying the RCM Advance. To the extent RCM is responsible for bearing amounts in respect of Excess Priority Claims, payment of such amounts shall be made from Cash otherwise available for the RCM Cash Distribution. Allowed Administrative

Claims incurred by the Contributing Debtors after the Effective Date shall be borne by the Contributing Debtors out of the Cash or value that would otherwise be paid to Holders of Allowed Contributing Debtors General Unsecured Claims. Allowed Administrative Claims incurred by RCM after the Effective Date shall be borne by RCM from the RCM Wind-Down Reserve, and, to the extent the RCM Wind-Down Reserve is not sufficient to pay such Allowed Administrative Claims, such Claims shall be paid directly by RCM out of the Cash or value that would otherwise be paid to Holders of Allowed Securities Customer Claims and RCM FX/Unsecured Claims as more particularly set forth in the RCM Settlement Agreement. Allowed Administrative Claims incurred by FXA after the Effective Date shall be borne by the FXA out of the Cash or value that would otherwise be paid to Holders of Allowed FXA General Unsecured Claims. All costs and expenses of administering the Litigation Trust described in section 5.7 shall be separately funded by the Litigation Trust and shall not be included in the calculation of the allocations of Administrative Claims, Priority Tax Claims and Non-Tax Priority Claims above.

　　　5.17　　**Additional RCM Claim.** If, at the conclusion of the claims reconciliation process, (x) the total Allowed Contributing Debtors General Unsecured Claims are less than $394 million, and (y) the Distributions to be made to Holders of Allowed Contributing Debtors General Unsecured Claims would result in a recovery for such Holders in excess of 35% from the sum of the Contributing Debtors Distributive Assets and the Contributing Debtors' portion of the RGL FXCM Distribution, RCM shall be entitled to an additional Claim. Specifically, RCM shall be entitled to an additional Claim equal to the positive difference between $394 million minus the amount of the Allowed Contributing Debtors General Unsecured Claims. This "Additional RCM Claim" shall participate Pro Rata in all Distributions from Contributing Debtors Distributive Assets and the Contributing Debtors' portion of the RGL FXCM Distribution to Holders of Allowed Contributing Debtors General Unsecured Claims that exceed the 35% recovery threshold set forth in clause (y) above; *provided, however,* that such Additional RCM Claim shall not be subject to the 40% limit on Distributions set forth in the Contributing Debtors General Unsecured Distribution.

　　　5.18　　**Contributing Debtors BAWAG Proceeds.** Notwithstanding the actual timing and source of any payments hereunder, so long as not inconsistent with the BAWAG Allocation Order, (i) a portion of BAWAG Guaranteed Proceeds equal to $100 million will be deemed to have been received by the Contributing Debtors and paid to the Secured Lenders under the Early Payment Order, (ii) a portion of BAWAG Guaranteed Proceeds equal to $150 million will be deemed to have been received by the Contributing Debtors and made available for Distribution to Holders of Allowed Senior Subordinated Note Claims, (iii) a portion of BAWAG Guaranteed Proceeds equal to $56.25 million plus an applicable share of BAWAG Contingent Proceeds (if any) will be deemed to have been received by the Contributing Debtors and made available for Distribution to Holders of Allowed Contributing Debtors General Unsecured Claims, and (iv) a portion of BAWAG Guaranteed Proceeds equal to $200 million plus an applicable share of BAWAG Contingent Proceeds (if any) will be deemed to have been received by RCM or the Contributing Debtors and made available for Distribution to Holders of RCM Securities Customer Claims and RCM FX/Unsecured Claims. For the avoidance of doubt, all BAWAG Contingent Proceeds (if any) shall be treated as part of the Contributing Debtors Distributive Assets and shall be shared between RCM (for distribution to Holders of Allowed Claims against RCM) and Holders of Contributing Debtors General Unsecured Claims pursuant to the sharing formulas set forth in this Plan. To the extent that a Holder of an Allowed Senior Subordinated Note Claim against the Contributing Debtors, a Holder of an Allowed Contributing Debtors General Unsecured Claim, a Holder of an Allowed RCM Securities Customer Claim or a Holder of an Allowed RCM FX/Unsecured Claim elects not to receive its allocable share of the Senior Subordinated Note Holder BAWAG Proceeds, the Contributing Debtors General Unsecured BAWAG Proceeds or the RCM BAWAG Proceeds, as applicable, such portion of BAWAG Proceeds shall be returned to BAWAG in accordance with the BAWAG Settlement. For the avoidance of doubt, all BAWAG Contingent Proceeds (if any) shall be treated as part of the Contributing Debtors Distributive Assets and shall be shared between RCM (for distribution to Holders of Allowed Claims against RCM) and Holders of Contributing Debtors General Unsecured Claims pursuant to the sharing formulas set forth in this Plan.

　　　5.19　　**Exemption from Transfer Taxes.** Pursuant to section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of notes or equity securities under the Plan, (b) the creation of any mortgage, deed of trust, lien, pledge, or other security interest, (c) the making or assignment of any contract, lease, or sublease; or (d) the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, any merger agreements; agreements of consolidation, restructuring, disposition, liquidation or dissolution; deeds; bills of sale; and transfers of tangible property, shall not be subject to any stamp tax, recording tax, transfer

tax, or other similar tax. Unless the Bankruptcy Court orders otherwise, all sales, transfers, and assignments of owned and leased property, approved by the Bankruptcy Court on or prior to the Effective Date, shall be deemed to have been in furtherance of, or in connection with, the Plan. Notwithstanding anything in this section of the Plan to the contrary, the exemption from taxes referenced in this section of the Plan shall only be to the extent permitted for under section 1146 of the Bankruptcy Code.

5.20    *RCM Settlement Agreement and Conversion.* This Plan incorporates the RCM Settlement Agreement in its entirety. On or prior to the Effective Date, the RCM Chapter 11 Case will, upon notice and a hearing, be converted to a case under subchapter III of chapter 7 of the Bankruptcy Code unless the Debtors and the RCM Trustee agree that the RCM Estate should be administered under chapter 11 of the Bankruptcy Code. Any conversion of the RCM Chapter 11 Case to a case under subchapter III of chapter 7 or any dispute between the RCM Trustee and the Debtors regarding RCM remaining in chapter 11 will be determined or resolved upon motion of the RCM Trustee with notice to the parties listed on the service list maintained in these Chapter 11 Cases. Upon conversion of RCM's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, this Plan shall proceed as a chapter 11 plan for the Debtors and shall constitute a settlement and compromise of claims between the chapter 7 Estate of RCM and the Debtors, for which RCM and the Debtors seek approval simultaneously with the confirmation of this Plan. In the event that the RCM Estate does not convert to chapter 7, the Distributions to RCM's creditors shall be governed by the terms of the RCM Settlement Agreement and this Plan.

5.21    *Allowance of VR/Leuthold Guarantee Claims.* The VR/Leuthold Guarantee Claims shall be Allowed Contributing Debtors General Unsecured Claims (subject, however, to allowance of the underlying Claims against RCM) unless objected to by the Contributing Debtors prior to entry of the Confirmation Order. No party other than the Contributing Debtors shall be authorized to object to or otherwise challenge the VR/Leuthold Guarantee Claims. The Contributing Debtors will not object to or otherwise challenge the VR/Leuthold Guarantee Claims based on or related to any of the following theories or issues: the corporate structure or business practices of any of the Contributing Debtors; alter ego; substantive consolidation; fraud; or any other theories or causes of action similar to the foregoing. The Contributing Debtors, however, may object to the VR/Leuthold Guarantee Claims based on facts specific to a particular VR/Leuthold Guarantee Claim, including, but not limited to, objections based on Bankruptcy Code avoidance theories or challenges to the purported dollar amount of the asserted claims.

5.22    *Wind-Up of Non-Debtor Affiliates.* All Non-Debtor Affiliates, other than the direct or indirect subsidiaries of RCM and Refco LLC, shall be wound up and dissolved as soon as practicable and all available Cash, after appropriate wind-up activities, shall be distributed to the Contributing Debtors and Refco LLC on account of intercompany balances (or equity dividends where applicable). All Non-Debtor Affiliates that are direct or indirect subsidiaries of RCM shall be wound up as soon as practicable and all available Cash, after appropriate wind-up activities, shall be distributed to RCM on account of intercompany balances (or equity dividends where appropriate). The direct and indirect subsidiaries of RCM shall be wound up and dissolved by the RCM Trustee and the remainder of the Non-Debtor Affiliates shall be wound up and dissolved by the Plan Administrator.

5.23    *FXCM.* If not liquidated in advance of the Effective Date, RGL's 35% interest in FXCM shall become an interest of and be held by Reorganized Refco upon the merger of RGL into Reorganized Refco pursuant to section 5.1 of this Plan. The Plan Administrator shall exercise all rights of Reorganized Refco in respect of the 35% interest in FXCM. Notwithstanding the above, the FXCM Committee shall be formed to coordinate on all matters relating to the disposition or distribution of the 35% interest in FXCM. If not formed as of the Effective Date pursuant to the Plan Support Agreement, the members of the FXCM Committee, other than the RCM Trustee, shall be selected by the Joint Sub-Committee (inclusive of its ex-officio members, but exclusive of Holders of Senior Subordinated Note Claims and the Senior Subordinated Note Indenture Trustee). All decisions in respect of the disposition or distribution of the 35% interest in FXCM shall be made by Reorganized Refco; *provided, however,* that no such decision shall be made by Reorganized Refco without first consulting with the FXCM Committee and, to the extent permitted by applicable law, obtaining the consent of the FXCM Committee. Bylaws of the FXCM Committee shall be established by the FXCM Committee after its formation and shall be substantially in the form attached hereto as <u>Exhibit J</u>.

**5.24** *Examiner.* No provision of the Plan shall be construed as impairing the Examiner's investigation, and his authority to file his report in accordance with the provisions of the Examiner Order and the additional directions given by the Bankruptcy Court at the Hearing held on June 21, 2006, even if such investigation concludes, and such filing occurs, after the occurrence of the Effective Date. Unless otherwise ordered by the Bankruptcy Court prior to the Effective Date, the procedures with respect to the filing and consideration of the Examiner's Fee Applications and Requests for Reimbursements of Expenses shall continue after the Effective Date in the same manner as prior to the Effective Date as provided in the Examiner Order.

**5.25** *Transfer of Tranche B Litigation Trust Interests.* In consideration of the litigation expenses and potential delay avoided by the withdrawal of the objections to this Plan asserted by the Ad Hoc Equity Committee, the Beneficiaries of Tranche A Litigation Trust Interests (the RCM Estate, Holders of Allowed Contributing Debtors General Unsecured Claims and Holders of Allowed FXA General Unsecured Claims) shall be deemed to have transferred to each Holder of an Allowed Class 8 Old Equity Interest who has made a Private Actions Trust Election a Pro Rata share of the Tranche B Litigation Trust Interests.

## ARTICLE VI

### PROVISIONS GOVERNING DISTRIBUTIONS

**6.1** *RCM Rights Distribution.* On the Effective Date the Plan Administrator shall be deemed to have made the RCM Rights Distribution to the RCM Trustee and the Plan Administrator or the RCM Trustee, as the case may be, shall establish the RCM Distribution Reserve. Unless a Holder of an RCM FX/Unsecured Claim or RCM Securities Customer Claim has decided to not participate in the RCM Cash Distribution by electing not to (i) assign such Holder's RCM Related Claims, if any, to the Litigation Trust; (ii) affirm its understanding that its RCM Related Claim against any Contributing Non-Debtor Affiliate shall be subordinated pursuant to the Plan, as of each applicable Contributing Non-Debtor Affiliate Trigger Date, to all other existing Claims against and equity Interests in the applicable Contributing Non-Debtor Affiliate, and (iii) release the Secured Lenders (in such capacities) from the Secured Lender Released Claims held by such Holder, if any, such Holder will receive its applicable share of the RCM Cash Distribution and 50% of the RGL FXCM Distribution, which, unless such Holder elects not to receive RCM BAWAG Proceeds, shall include such Holders' applicable share of the RCM BAWAG Proceeds portion of the RCM Cash Distribution. Upon contribution of the RCM Related Claims against any Debtor to the Litigation Trust, such Claims will be deemed Allowed.

**6.2** *Distributions for Claims Allowed as of the Effective Date.* Except as otherwise provided herein or as ordered by the Bankruptcy Court, Distributions to be made on account of Claims against FXA, the Contributing Debtors or RCM that are Allowed Claims as of the Effective Date shall be made on the Effective Date or as soon thereafter as is practicable; *provided, however,* that the Disbursing Agent, on behalf of the Reorganized Debtors, shall not make Distributions to Holders of Allowed Claims (other than Allowed Secured Lender Claims) that are not Senior Subordinated Note Claims until all Reserves have been established and adequately funded in accordance with the terms of this Plan and the Senior Subordinated Note Holder Distribution and the Senior Subordinated Note Holder Fee Distribution have been paid in full; *provided further, however,* that the RCM Trustee shall not be required to make Distributions until all RCM Reserves have been established and adequately funded in accordance with the terms of this Plan and the RCM Settlement Agreement. Any payment or Distribution required to be made under this Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

**6.3** *Distributions of Proceeds of the Litigation Trust.* Pursuant to the terms and conditions set forth in the Litigation Trust Agreement, the Litigation Trustee shall transfer all the Contributed Claims Recoveries to the Disbursing Agent or the RCM Trustee for Distribution in accordance with the provisions of this Plan and the RCM Settlement Agreement.

**6.4** *Single Distribution.* Except with respect to Allowed Secured Lender Claims and Senior Subordinated Note Claims, any Holder of a Claim asserted against more than one Debtor (or a Debtor and RCM), shall be entitled to a Distribution from only the Refco Entity with which such Holder was in privity or had another direct right to payment not predicated upon theories of fraud, piercing the corporate veil, alter ego, domination,

constructive trust or other equitable principles arising from a lack of knowledge of the true prepetition financial condition of the Refco Entities (whether that results in Distribution from RCM, FXA, or the Contributing Debtors), and all RCM Related Claims and Other Related Claims shall be subordinated and shall receive no Distribution from the assets of the applicable Debtor or RCM, as the case may be, unless and until such time as all Allowed General Unsecured Claims (or in the case of RCM, all Allowed RCM Securities Customer Claims, Allowed RCM FX/Unsecured Claims and Allowed Leuthold Metals Claims) against the applicable Debtor or RCM, as the case may be, have been paid in full; *provided, however*, that (A) any Holder of an RCM Securities Customer Claim or an RCM FX/Unsecured Claim with an independent Claim against any Contributing Debtor based on a contractual guarantee or other direct contractual undertaking may also recover once from the Contributing Debtors on such Claim based on the full underlying Claim amount owed by RCM, as of the Petition Date, for which such guarantee or other direct contractual undertaking was provided (and such Claim against the Contributing Debtors shall not be limited to the amount remaining after recovery from RCM under this Plan), (B) any Holder of a Contributing Debtors General Unsecured Claim with an independent Claim against any Contributing Debtor based on a contractual guarantee or other direct contractual undertaking may also recover once from the Contributing Debtors on such Claim based on the full underlying Claim amount owed by such Contributing Debtor, as of the Petition Date, for which such guarantee or other direct contractual undertaking was provided (and such Claim against the guaranteeing Contributing Debtor shall not be limited to the amount remaining after recovery from non-guaranteeing Contributing Debtor under this Plan) and (C) any Holder of a Claim against FXA with an independent Claim against the Contributing Debtors or RCM based on a contractual guarantee or other direct contractual undertaking may also recover once from the Contributing Debtors on such Claim based on the full underlying Claim amount owed by FXA, as of the Petition Date, for which such guarantee or other direct contractual undertaking was provided (and such Claim against the Contributing Debtors shall not be limited to the amount remaining after recovery from FXA under this Plan). In addition, subject to the earning of interest in respect of the Litigation Trust as set forth in section 5.7 of this Plan no Holder of a Claim against one or more Debtors (or a Debtor and RCM) shall receive a Distribution under the Plan that results in greater than a 100% recovery on such Holder's Claim (which, in the case of a Holder of both a primary Claim against a Debtor and a contractual guarantee from another Debtor or RCM, shall mean no more than a cumulative 100% recovery on the underlying Claim amount owed by the primary obligor).

**6.5     *Accounts; Escrows; Reserves for the Reorganized Debtors*.**  The Plan Administrator, on behalf of the Reorganized Debtors, in accordance with the provisions of the Plan Administrator Agreement, shall (a) establish one or more general accounts into which shall be deposited all funds not required to be deposited into any other account, Reserve, or escrow and (b) create, fund, and withdraw funds from, as appropriate, such general accounts in order to comply with and implement the provisions of this Plan.  The Plan Administrator shall dispose of non-Cash assets of the Estates of the Reorganized Debtors, if any, in accordance with the provisions of the Plan and the Plan Administrator Agreement.

(a)     *Administrative/Priority Claims Reserve*.  On the Effective Date (or as soon thereafter as is practicable), the Plan Administrator shall, subject to the provisions of section 5.16 hereof, create and fund the Administrative/Priority Claims Reserve with Cash equal to one hundred percent (100%) of the Distributions to which Holders of Administrative and Allowed Priority Claims of the Contributing Debtors and FXA, not otherwise paid in full on the Effective Date, would be entitled under the Plan if such Claims were Allowed in full.  The Plan Administrator may increase the amount of the Administrative/Priority Claims Reserve to satisfy disputed, contingent or unliquidated Administrative and Priority Claims (not previously estimated or allowed as of the Effective Date) with funds held in the Claims Distribution Account.

(b)     *Disputed Claims Reserve*.

(i)     The Plan Administrator shall create and fund the Disputed Claims Reserve with Cash and Litigation Trust Interests equal to the aggregate Pro Rata share of the Contributing Debtors General Unsecured Distribution or the FXA General Unsecured Distribution, as applicable, that would have been made to each Holder of a Disputed Claim against the Contributing Debtors or FXA if such Claim were an Allowed Contributing Debtors General Unsecured Claim or an Allowed FXA General Unsecured Claim for the Disputed Claim Amount or such other amount established by the Bankruptcy Court prior to the Effective Date; *provided, however*, that the Debtors, the Plan Administrator or the

Reorganized Debtors may within 90 days after the Effective Date (or such other date as the Bankruptcy Court may order) file a motion(s) seeking to estimate any contingent or unliquidated Claims asserted on or before the Effective Date, with notice and an opportunity to be heard to be given to the affected Holders of such Disputed Claims.

(ii)    The Disputed Claims Reserve shall be funded with Cash and Litigation Trust Interests equal to such percentage amounts approved by the Bankruptcy Court at the Confirmation Hearing and shall be reduced following each Quarterly Distribution Date by any amounts in the Disputed Claims Reserve that exceed the amounts required to be reserved by section (i) above, with such amounts being distributed to the Holders of Disputed Claims against the Contributing Debtors or FXA whose Claims have become Allowed Claims.

(iii)    If any Cash or Litigation Trust Interests remains in the Disputed Claims Reserve after all Disputed Claims against the Contributing Debtors and FXA have been resolved, such remaining assets shall be transferred to Reorganized Refco or Reorganized FXA, as applicable, for Distribution in accordance with the terms hereof. Unless otherwise provided in an order of the Bankruptcy Court, in the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court; *provided*, *however*, that, if the estimate constitutes the maximum limitation on such Claim, the Plan Administrator may elect to pursue supplemental proceedings to object to any ultimate allowance of such Claim.

(iv)    The Plan Administrator shall maintain two sub-accounts within the Disputed Claims Reserve for (i) the Contributing Debtors and (ii) FXA.

(c)    *Wind-Down Reserves.*  On the Effective Date (or as soon thereafter as is practicable), the Plan Administrator, on behalf of the Reorganized Debtors, shall create and fund the Wind-Down Reserve with sufficient Cash to administer the Plan, including, but not limited to, compensation of the Plan Administrator and Administrative Professionals. The Plan Administrator may make reasonable adjustments to the Wind-Down Reserve as necessary. Any Cash in the Wind-Down Reserve which is unnecessary for the administration of the Plan shall be transferred to Reorganized Refco or Reorganized FXA, as applicable, for Distribution to Holders of Allowed Claims against the Contributing Debtors or FXA, as applicable, in accordance with the terms hereof.

**6.6**    *Accounts; Escrows; Reserves for the Post-Confirmation RCM.*  The RCM Trustee, on behalf of Post-Confirmation RCM, in accordance with the provisions of the RCM Settlement Agreement, shall (a) establish one or more general accounts into which shall be deposited all funds not required to be deposited into any other account, RCM Reserve, or escrow and (b) create, fund, and withdraw funds from, as appropriate, such general accounts in order to comply with and implement the provisions of this Plan. The RCM Trustee shall dispose of non-Cash assets of the RCM Estate, if any, in accordance with the provisions of the Plan and the RCM Settlement Agreement and applicable law.

(a)    *RCM Administrative/Priority Claims Reserve.*  On the Effective Date (or as soon thereafter as is practicable), the RCM Trustee shall, subject to the provisions of section 5.16 hereof, create and fund the RCM Administrative/Priority Claims Reserve with Cash equal to one hundred percent (100%) of the Distributions to which Holders of Administrative and Allowed Priority Claims of RCM, not otherwise paid in full on the Effective Date, would be entitled under the Plan if such Claims were Allowed in full. The RCM Trustee may increase the amount of the RCM Administrative/Priority Claims Reserve to satisfy disputed, contingent or unliquidated Administrative and Priority Claims (not previously estimated or allowed as of the Effective Date) with funds held in the RCM Claims Distribution Account. If the Chapter 11 Case of RCM is converted to a case in chapter 7, prior to any conversion the RCM Trustee shall be entitled to set aside appropriate reserves for Administrative Claims incurred or to be incurred prior to conversion, with the amounts of such Administrative Claims to be payable from the reserves upon allowance of the Claims therefor so long as the RCM Trustee has determined that there are or will be sufficient funds available to pay all Administrative Claims of the chapter 7 case.

(b)    *RCM Disputed Claims Reserve.*

(i)    The RCM Trustee shall create and fund the RCM Disputed Claims Reserve with Cash and Litigation Trust Interests equal to the aggregate Pro Rata share of the Distribution that would have been made to each holder of a Disputed Claim against RCM if such Claim were an Allowed RCM Securities Customer Claim or RCM FX/Unsecured Claim for the Disputed Claim Amount or such other amount established by the Bankruptcy Court prior to the Effective Date; *provided, however,* that the RCM, Post-Confirmation RCM or the RCM Trustee may within 90 days after the Effective Date (or such other date as the Bankruptcy Court may order) file a motion(s) seeking to estimate any contingent or unliquidated Claims asserted on or before the Effective Date, with notice and an opportunity to be heard to be given to the affected Holders of such Disputed Claims.

(ii)    The RCM Disputed Claims Reserve shall be funded with Cash and Litigation Trust Interests equal to such percentage amounts approved by the Bankruptcy Court at the Confirmation Hearing and shall be reduced following each Quarterly Distribution Date by any amounts in the RCM Disputed Claims Reserve that exceed the amounts required to be reserved by section (i) above, with such amounts being distributed to the Holders of Disputed Claims whose Claims against RCM have become Allowed Claims.

(iii)    If any Cash or Litigation Trust Interests remain in the RCM Disputed Claims Reserve after all Disputed Claims against RCM have been resolved, such remaining amounts shall be transferred to Post-Confirmation RCM for Distribution in accordance with the terms of the Plan and the RCM Settlement Agreement. Unless otherwise provided in an order of the Bankruptcy Court, in the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim against RCM, the estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court; *provided, however,* that, if the estimate constitutes the maximum limitation on such Claim, the RCM Trustee may elect to pursue supplemental proceedings to object to any ultimate allowance of such Claim.

(iv)    The RCM Trustee shall maintain sub-accounts within the RCM Disputed Claims Reserve for RCM Securities Customer Claims and RCM FX/Unsecured Claims. Each sub-account shall be further subdivided for Assets in Place and Additional Property (each as defined in the RCM Settlement Agreement). The RCM Trustee may maintain such other reserves as are permitted by the RCM Settlement Agreement.

(v)    Distributions of Additional Property under the RCM Settlement Agreement on behalf of RCM Securities Customer Claims and RCM FX/Unsecured Claims shall be made Pro Rata (as such term is defined in the RCM Settlement Agreement). True up Distributions (as defined in the RCM Settlement Agreement) shall be made from time to time from Additional Property as determined by the RCM Trustee. The RCM Reserves shall take into account the requirement to true up with respect to Pro Rata (as defined in the RCM Settlement Agreement) shares of Additional Property.

(c)    *RCM Distribution Reserve.* On the Effective Date, the Plan Administrator shall create and fund the RCM Distribution Reserve. Each Holder of an Allowed RCM Securities Customer Claim or Allowed RCM FX/Unsecured Claim that has provided the Plan Administrator with an RCM Related Claim Subordination Form shall receive from the Plan Administrator on the next available Distribution Date its allocable share (as determined by the RCM Trustee consistent with their elections) of the RCM Distribution Reserve (net of costs, if any, with respect to obtaining such RCM Related Claim Subordination Form if such form has been provided after the Voting Deadline and the election was not made in a ballot); *provided, however,* if the RCM Settlement Agreement is amended prior to the Confirmation Hearing so as to permit the RCM Trustee to receive conditional Distributions of Additional Property (as defined in the RCM Settlement Agreement) and to not require an immediate distribution of all assets received by the RCM Trustee to Holders of Allowed Claims against RCM, any amounts that would have been held in the RCM Distribution Reserve shall be transferred to the RCM Trustee who shall then distribute such funds on the next available Distribution Date to each Holder of an Allowed RCM Securities Customer Claim or Allowed RCM FX/Unsecured Claim that has provided the RCM Trustee with an RCM Related

Claim Subordination Form (net of costs, if any, with respect to obtaining such RCM Related Claim Subordination Form if such form has been provided after the Voting Deadline and the election was not made in a ballot). In the event that any Holder of an RCM Related Claim has not provided an RCM Related Claim Subordination Form, but the RCM Related Claim of such Holder is subsequently expunged by objection of the Plan Administrator, the reserve in respect of such Claim shall be distributed (net of costs of expunging the RCM Related Claim) by the RCM Trustee or the Plan Administrator, as applicable, Pro Rata (as defined in the RCM Settlement Agreement) to such Holder and to those Holders of Allowed RCM Securities Customer Claims and Allowed RCM FX/Unsecured Claims that provided the Plan Administrator or the RCM Trustee, as applicable, with an RCM Related Claim Subordination Form. In the event that any RCM Related Claim becomes an Allowed Claim, the reserve in respect of such Claim shall be deposited in the Claims Distribution Account for Distribution in accordance with the terms of this Plan.

(d)    *RCM Wind-Down Reserve.* On the Effective Date (or as soon thereafter as is practicable), the RCM Trustee or the Plan Administrator, as the case may be, on behalf of Post-Confirmation RCM, shall create and fund the RCM Wind-Down Reserve with sufficient Cash from the RCM Cash Distribution to administer the Plan and the RCM Settlement Agreement, including, but not limited to, compensation of the RCM Trustee and RCM Administrative Professionals. The RCM Trustee may make reasonable adjustments to the RCM Wind-Down Reserve as necessary. Any Cash in the RCM Wind-Down Reserve which is unnecessary for the administration of the Plan and the RCM Settlement Agreement shall be transferred to Post-Confirmation RCM for Distribution to Holders of Allowed Claims against RCM in accordance with the terms hereof.

6.7    *Interest and Penalties on Claims.* Unless otherwise specifically provided for in this Plan, the Confirmation Order or another order of the Court (including, without limitation, the Early Payment Order), or if required by applicable bankruptcy law, postpetition interest and penalties shall not accrue or be paid on any Claims and no Holder of a Claim shall be entitled to interest and penalties accruing on or after the Petition Date through the date such Claim is satisfied in accordance with the terms of this Plan.

6.8    *Distributions by Disbursing Agent and RCM Trustee.* All Distributions under the Plan on behalf of the Reorganized Debtors shall be made by the Disbursing Agent at the direction of the Plan Administrator and all Distributions under the Plan and the RCM Settlement Agreement on behalf of RCM shall be made by the RCM Trustee. The Disbursing Agent and the RCM Trustee shall be deemed to hold all property to be distributed by each hereunder in trust for Persons entitled to receive the same. The Disbursing Agent and the RCM Trustee shall not hold an economic or beneficial interest in such property.

6.9    *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

(a)    *Delivery Of Distributions In General.* Distributions to Holders of Allowed Claims shall be made at the addresses set forth in the Debtors' or RCM's records unless such addresses are superseded by proofs of claim or transfers of claim filed pursuant to Bankruptcy Rule 3001; *provided, however,* Distributions on account of Senior Subordinated Note Claims shall be made to the Senior Subordinated Note Indenture Trustee who shall, in turn, administer such Distributions to the Holders of Senior Subordinated Note Claims in accordance with the terms of the Senior Subordinated Note Indenture. The Senior Subordinated Note Indenture Trustee shall be authorized but not required to effect any Distribution under the Plan through the book entry transfer facilities of The Depositary Trust Company pursuant to the procedures used for effecting distributions thereunder on the date of any such distribution. Distributions on account of Secured Lender Claims shall be made to the Secured Lender Agent, who shall in turn administer such Distributions in accordance with the terms of the Credit Agreement.

(b)    *Undeliverable and Unclaimed Distributions.*

(i)    *Holding and Investment of Undeliverable and Unclaimed Distributions.* If the Distribution to any Holder of an Allowed Claim is returned to the Disbursing Agent or the RCM Trustee, as applicable, as undeliverable or is otherwise unclaimed, no further Distributions shall be made to such Holder unless and until the Disbursing Agent or the RCM Trustee, as applicable, is notified in writing of such Holder's then current address. Undeliverable and unclaimed Distributions shall be deposited in the Unclaimed Distribution Reserve or the RCM Unclaimed Distribution Reserve, as the case may be, until

such time as a Distribution becomes deliverable or is unclaimed in accordance with this section of the Plan. The accounts for the Unclaimed Distribution Reserve and RCM Unclaimed Distribution Reserve may be interest-bearing accounts, provided that any interest accruing on funds in the Unclaimed Distribution Reserve shall be transferred to the Reorganized Refco or Reorganized FXA, as applicable, for Distribution in accordance with the terms hereof and any interest accruing on funds in the RCM Unclaimed Distribution Reserve shall be transferred to the RCM Trustee for Distribution in accordance with the terms of this Plan and the RCM Settlement Agreement.

                (ii)   *After Distributions Become Deliverable.*  The Disbursing Agent or RCM Trustee, as applicable, shall make all Distributions that have become deliverable or have been claimed since the Effective Date or the next Quarterly Distribution Date as soon as practicable after such Distribution has become deliverable.

                (iii)   *Failure to Claim Undeliverable Distributions.*  Any Holder of an Allowed Claim that does not assert a claim pursuant to this Plan for an undeliverable or unclaimed Distribution within one year after the applicable date of Distribution shall be deemed to have forfeited its claim for such undeliverable or unclaimed Distribution and shall be forever barred and enjoined from asserting any such claim for an undeliverable or unclaimed Distribution against the Debtors, RCM or their Estates, the Reorganized Debtors, the Plan Administrator, Post-Confirmation RCM, the RCM Trustee or their property. In such cases, any Cash in the Unclaimed Distribution Reserve or the RCM Unclaimed Distribution Reserve, as applicable, for Distribution on account of such Claims for undeliverable or unclaimed Distributions shall become the property of the applicable Estate free of any restrictions thereon. Such unclaimed or undeliverable funds shall be transferred to the Reorganized Debtors or Post-Confirmation RCM, as applicable, to be distributed in accordance with the terms of the Plan or the RCM Settlement Agreement. Nothing contained in this Plan, the Plan Administrator Agreement or the RCM Settlement Agreement shall require the Disbursing Agent or the RCM Trustee to attempt to locate any Holder of an Allowed Claim.

            (c)   *Time Bar to Cash Payments.*  Checks issued by the Disbursing Agent or the RCM Trustee, as applicable, on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days from and after the date of issuance thereof. Requests for reissuance of any check shall be made directly to the Disbursing Agent or the RCM Trustee, as applicable, by the Holder of the Allowed Claim with respect to which such check originally was issued. Any claim in respect of such a voided check shall be made on or before the later of (a) the second (2nd) anniversary of the Effective Date or (b) ninety (90) days after the date of issuance of such check, if such check represents a final Distribution hereunder on account of such Claim. After such date, all Claims in respect of voided checks shall be discharged and forever barred and the Reorganized Debtors or RCM, as the case may be, shall retain all monies related thereto for the sole purpose of redistribution to Holders of Allowed Claims or Interests in accordance with the terms of this Plan and the RCM Settlement Agreement, as applicable.

        **6.10**    *Record Date for Distributions.*  With respect to all Claims except Senior Subordinated Note Claims, the Disbursing Agent or the Plan Administrator or the RCM Trustee, as applicable, shall have no obligation to recognize the transfer of, or the sale of any participation in, any Claim that occurs after the close of business on the Distribution Record Date, and shall be entitled for all purposes herein to recognize and distribute only to those Holders of Claims who are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date. The Disbursing Agent, the Plan Administrator or the RCM Trustee, as applicable, shall instead be entitled to recognize and deal for all purposes under this Plan with only those record holders stated on the official claims register as of the close of business on the Distribution Record Date. No Distribution Record Date shall be established for Distributions on account of Senior Subordinated Note Claims.

        **6.11**    *Distributions to Holders of Senior Subordinated Note Claims.*  As a condition precedent to receiving any Distribution under this Plan on account of an Allowed Senior Subordinated Note Claim, the registered Holders (as defined in the Senior Subordinated Note Indenture) of such Senior Subordinated Note Claim shall surrender any certificate(s) evidencing such Senior Subordinated Note Claim in accordance with written instructions to be provided to such registered Holders (as defined in the Senior Subordinated Note Indenture) and the Senior Subordinated Note Indenture Trustee by the Plan Administrator (in consultation with the Senior Subordinated

Note Indenture Trustee, and consistent with customary market practice), unless waived in writing by the Debtors or the Plan Administrator.

**6.12    *Senior Subordinated Notes Indenture Trustee as Claim Holder.*** Consistent with Bankruptcy Rule 3003(c), the Debtors or the Plan Administrator, as the case may be, shall recognize a proof of claim filed by the Senior Subordinated Notes Indenture Trustee in respect of the Senior Subordinated Notes Claims. Accordingly, any Senior Subordinated Note Claim, proof of which is filed by the registered or beneficial Holder of a Senior Subordinated Note Claim, may be disallowed as duplicative of any Senior Subordinated Notes Claims of the Senior Subordinated Notes Indenture Trustee, without need for any further action or Bankruptcy Court order. For the avoidance of doubt, the Senior Subordinated Notes Indenture Trustee shall be authorized to distribute amounts received in respect of Senior Subordinated Note Holder Distributions.

**6.13    *Allocation of Plan Distributions Between Principal and Interest.*** Except for Distributions made in respect of Allowed Secured Lender Claims, which shall be made in accordance with the Credit Agreement, to the extent that any Allowed Claim entitled to a Distribution under this Plan is composed of indebtedness and accrued but unpaid interest thereon, such Distribution shall, for all income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent that the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

**6.14    *Means of Cash Payment.*** Payments of Cash made pursuant to this Plan shall be in U.S. dollars and shall be made, at the option and in the sole discretion of the Plan Administrator or the RCM Trustee, as applicable, by (a) checks drawn on or (b) wire transfer from a domestic bank selected by the Plan Administrator or the RCM Trustee, as applicable. Cash payments to foreign creditors may be made, at the option of the Plan Administrator or the RCM Trustee, as applicable, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

**6.15    *Withholding and Reporting Requirements.*** In connection with this Plan and all Distributions thereunder, the Disbursing Agent, the Plan Administrator or the RCM Trustee, as applicable, on behalf of the Reorganized Debtors, shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions hereunder shall be subject to any such withholding and reporting requirements. The Disbursing Agent, the Plan Administrator and the RCM Trustee, on behalf of the Reorganized Debtors and RCM, as applicable, shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

**6.16    *Setoffs.*** Unless prohibited by the terms of this Plan or any other Plan Document, the Plan Administrator on behalf of the Reorganized Debtors or the RCM Trustee on behalf of Post-Confirmation RCM, may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy laws, but shall not be required to, set off against any Claim, the payments or other Distributions to be made pursuant to this Plan in respect of such Claim, or claims of any nature whatsoever (other than the Released/Subordinated Claims) that the Debtors, RCM, the Reorganized Debtors or Post-Confirmation RCM may have against the Holder of such Claim; *provided, however,* that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors or Post-Confirmation RCM of any such claim that the Debtors, RCM, Post-Confirmation RCM or the Reorganized Debtors may have against such Holder.

**6.17    *Fractional Dollars.*** Notwithstanding any other provision of the Plan, the Plan Administrator Agreement or the RCM Settlement Agreement, none of the Plan Administrator, the Reorganized Debtors, the RCM Trustee or RCM, as applicable, shall be required to make Distributions or payments of fractions of dollars, and whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment made shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.

**6.18    *Release of Liens.*** Except as otherwise provided in this Plan or in any other Plan Document, on the Effective Date and concurrently with the applicable Distributions made pursuant to this Plan, all mortgages, deeds of trust, liens, pledges, or other security interests (collectively, the "Mortgages") in and against the property of any Estate automatically shall be fully released and discharged, and all such property shall be free and

clear of all such Mortgages. Nothing in the Plan shall be deemed, asserted or construed to affect the Senior Subordinated Notes Indenture Trustee Charging Lien.

## ARTICLE VII

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**7.1** *Rejected Contracts and Leases.* Except as otherwise provided in the Confirmation Order, the Plan, or in any other Plan Document, the Confirmation Order shall constitute an order under section 365 of the Bankruptcy Code rejecting all prepetition executory contracts and unexpired leases to which any Debtor is a party, to the extent such contracts or leases are executory contracts or unexpired leases, on and subject to the occurrence of the Effective Date, unless such contract or lease (a) previously shall have been assumed, assumed and assigned, or rejected by the Debtors, (b) previously shall have expired or terminated pursuant to its own terms before the Effective Date, (c) is the subject of a pending motion to assume or reject on the Confirmation Date, or (d) is identified in Exhibit D to this Plan as a contract or lease to be assumed; *provided, however,* that the Debtors may amend such exhibit of assumed and assigned executory contracts and unexpired leases at any time prior to the Confirmation Date.

**7.2** *Bar to Rejection Damages.* If the rejection of an executory contract or unexpired lease pursuant to section 7.1 above gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the applicable Debtor or its Estate, the Reorganized Debtors, the Plan Administrator, or their respective successors or properties unless a proof of Claim is filed and served on the Reorganized Debtors and counsel for the Reorganized Debtors within thirty (30) days after service of a notice of the Effective Date or such other date as is prescribed by the Bankruptcy Court.

**7.3** *Assumed and Assigned Contracts and Leases.* Except as otherwise provided in the Confirmation Order, the Plan, or any other Plan Document entered into after the Petition Date or in connection with the Plan, the Confirmation Order shall constitute an order under section 365 of the Bankruptcy Code assuming, as of the Effective Date, those executory contracts and unexpired leases listed on <u>Exhibit D</u> to this Plan; *provided, however,* that the Debtors may amend such Exhibit of assumed and assigned executory contracts and unexpired leases at any time prior to the Confirmation Date.

**7.4** *Compensation and Benefit Programs.* All Employee Benefit Plans, including programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Petition Date shall be deemed to be, and shall be treated as if they were, executory contracts that are subject to rejection in accordance with section 7.1 of the Plan (to the extent such rejection does not violate sections 1114 and 1129(a)(13) of the Bankruptcy Code).

**7.5** *Treatment of RCM Executory Contracts and Unexpired Leases.* Notwithstanding the preceding sections of this Article VII, the RCM Trustee shall determine the appropriate treatment for the executory contracts and unexpired leases of RCM in accordance with applicable law and the RCM Settlement Agreement.

## ARTICLE VIII

## PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS AND INTERESTS

**8.1** *Objection Deadline; Prosecution of Objections.* Subject to section 5.21 of this Plan, no later than the Claims Objection Deadline or the Administrative Claims Objection Deadline, as applicable, the Plan Administrator on behalf of the Reorganized Debtors, after consultation with the Plan Committee, may file objections to Claims or Interests against FXA and the Contributing Debtors that are not yet Allowed with the Bankruptcy Court and serve such objections upon the Holders of each of the Claims or Interests to which objections are made. No later than the Claims Objection Deadline or the Administrative Claims Objection Deadline, as applicable, the RCM

Trustee on behalf of Post-Confirmation RCM may file objections to Claims or Interests against RCM that are not yet Allowed with the Bankruptcy Court and serve such objections upon the Holders of each of the Claims or Interests to which objections are made. Nothing contained herein, however, shall limit the ability of the Plan Administrator or the RCM Trustee, as applicable, to object to Claims or Interests, if any, filed or amended after the Claims Objection Deadline or the Administrative Claims Objection Deadline, as applicable. Subject to limitations set forth in the Plan Administrator Agreement and the Plan, as applicable, the Plan Administrator shall be authorized to, and shall, dispose of all Disputed Claims or Interests by withdrawing or settling such objections thereto, or by litigating to judgment in the Bankruptcy Court or such other court as may have jurisdiction the validity, nature, and/or amount thereof. The RCM Trustee shall have sole discretion and authority to object to any RCM Claims or Interests in accordance with the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code.

        **8.2**    *No Distributions Pending Allowance*. Notwithstanding any other provision of this Plan, no payments or Distributions shall be made with respect to any disputed portion of a Disputed Claim or Interest unless and until all objections to such Disputed Claim or Interest have been settled or withdrawn or have been determined by Final Order and the Disputed Claim or Interest, or some portion thereof, has become an Allowed Claim or Interest.

        **8.3**    *Distributions After Allowance*. The Disbursing Agent on behalf of the Reorganized Debtors and the RCM Trustee on behalf of RCM shall make payments and Distributions from the Disputed Claims Reserve and the RCM Disputed Claims Reserve, as applicable, to the Holder of any Disputed Claim or Interest that has become an Allowed Claim or Interest, or any portion of which has become Allowed, on the first Quarterly Distribution Date following the date that such Disputed Claim or Interest becomes an Allowed Claim. Such Distributions shall be made in accordance with the Plan, the Plan Administrator Agreement and the RCM Settlement Agreement, as applicable.

## ARTICLE IX

## CONFIRMATION AND CONSUMMATION OF THE PLAN

        **9.1**    *Conditions to Confirmation.*

        (a)    The Confirmation Order shall be reasonably acceptable in form and substance to the Plan Proponents (and with respect to any matter affecting the Secured Lender Agent and/or the Secured Lenders, the Secured Lender Agent);

        (b)    The Confirmation Date of this Plan shall have occurred on or before December 15, 2006; and

        (c)    The Plan Proponents shall have determined and shall have filed with the Bankruptcy Court a notice confirming that the Allotted Administrative Claims are not reasonably expected to exceed, in the aggregate, $180 million;

        (d)    Houlihan and Capstone shall have each filed with the Bankruptcy Court in advance of the Voting Deadline, its respective RCM Projection and Contributing Debtors Projection.

        (e)    Either (i) both of the Houlihan and Capstone RCM Projections shall be equal to or exceed $430 million, or (ii) in the event that one such RCM Projection is less than $430 million and the other is equal to or exceeds $430 million, the Bankruptcy Court (after reviewing both RCM Projections and the assumptions therein) shall have determined that the appropriate RCM Projection is equal to or exceeds $430 million; and

        (f)    Either (i) both of the Houlihan and Capstone Contributing Debtors Projections shall be equal to or exceed $64 million, or (ii) in the event that one such Contributing Debtors Projection is less than $64 million and the other is equal to or exceeds $64 million, the Bankruptcy Court (after reviewing both RCM

Projections and the assumptions therein) shall have determined that the appropriate Contributing Debtors Projection is equal to or exceeds $64 million.

**9.2    *Conditions to Effective Date*.**  The Plan Proponents shall request that the Confirmation Order include a finding by the Bankruptcy Court that, notwithstanding Bankruptcy Rule 3020(e), the Confirmation Order shall take effect immediately upon its entry. The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived by the Plan Proponents in accordance with the terms hereof prior to December 31, 2006:

(a)    The Confirmation Order, in form and substance reasonably satisfactory to the Plan Proponents, shall have been entered and not thereafter stayed, reversed or vacated and shall, among other things, provide that:

(i)    the Debtors, the Plan Administrator, on behalf of the Reorganized Debtors, and the RCM Trustee on behalf of Post-Confirmation RCM are authorized to take all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan; and

(ii)    the provisions of the Confirmation Order are non severable and mutually dependent.

(b)    Unless the condition set forth in paragraph 15(a) of the Early Payment Order that the Early Payment Order shall have become a Final Order in full force and effect shall have been waived in accordance therewith, the Early Payment Order shall have become a Final Order and shall be in full force and effect;

(c)    The RCM Settlement Agreement shall have been approved by the Bankruptcy Court and shall have become effective by satisfaction of all conditions to effectiveness therein.

(d)    All other actions, documents, and agreements necessary to implement the Plan shall have been effected or executed;

(e)    The Secured Lender Payment Date shall have occurred; and

(f)    The Debtors shall have sufficient Cash to make all required payments to be made on the Effective Date.

(g)    All amounts owed, as of the Effective Date, to the Secured Lender Agent and/or any Secured Lender pursuant to paragraph 12 of the Early Payment Order shall have been paid in full.

**9.3    *Waiver of Conditions*.**  Each of the conditions to the Effective Date set forth herein may be waived in whole or in part by the Plan Proponents by agreement, without any notice to parties in interest or the Bankruptcy Court and without a hearing; *provided, however,* in the event that such waiver is not unanimous, the waiving Plan Proponents shall be required to obtain approval of the Bankruptcy Court to effect such waiver, following notice and a hearing; and *provided further,* the conditions set forth in the parenthetical of section 9.1(a) and sections 9.2(b), (e) and (g) hereof shall not be waived without the consent of the Secured Lender Agent and Secured Lenders that hold the number and amount of Secured Lender Claims required to accept a plan pursuant to section 1126(c) of the Bankruptcy Code (as if, for purposes of this paragraph, such Secured Lender Claims were impaired). The failure to satisfy or waive any condition to the Effective Date may be asserted by the Plan Proponents regardless of the circumstances giving rise to the failure of such condition to be satisfied, including any action or inaction by the Plan Proponents. The failure of the Plan Proponents to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.

**9.4    *Consequences of Non-Occurrence of Effective Date*.**  In the event that the Effective Date does not timely occur, the Plan Proponents reserve all rights to seek an order from the Bankruptcy Court

directing that the Confirmation Order be vacated, that the Plan be null and void in all respects, and/or that any settlement of Claims provided for in the Plan, other than those contained in the RCM Settlement Agreement, be null and void. In the event that the Bankruptcy Court shall enter an order vacating the Confirmation Order, the time within which the Debtors may assume and assign, or reject all executory contracts and unexpired leases not previously assumed, assumed and assigned, or rejected, shall be extended for a period of 60 days after the date the Confirmation Order is vacated, without prejudice to further extensions.

## ARTICLE X

## EFFECT OF PLAN CONFIRMATION

    **10.1**    *Binding Effect.* This Plan, and all compromises and settlements contemplated hereby or incorporated by reference herein, shall be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims and Interests, and their respective successors and assigns, including, but not limited to, the Reorganized Debtors and any Chapter 7 trustee appointed to administer any of the Estates.

    **10.2**    *Releases.*

        (a)    **Releases by the Debtors and RCM.** As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors and RCM (in their individual capacities and as debtors and debtors in possession) will be deemed to release forever, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities (other than the rights of the Debtors, RCM, the Reorganized Debtors or Post-Confirmation RCM to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered hereunder, and liabilities arising after the Effective Date in the ordinary course of business) whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or part on any act omission, transaction, event, or other occurrences taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, RCM, Post-Confirmation RCM, the Chapter 11 Cases, this Plan, the Disclosure Statement or the RCM Settlement Agreement and that could have been asserted by or on behalf of the Debtors, RCM, their Estates, the Reorganized Debtors or Post-Confirmation RCM, including pursuant to principles of substantive consolidation, piercing the corporate veil, alter ego, domination, constructive trust and similar principles of state or federal creditors' rights laws, in any such case, against the Released Parties. For the avoidance of doubt, Released/Subordinated Claims shall include any and all claims and causes of action against the Released Parties, acting in such capacity, arising from or relating to (w) the Debtors' and RCM's centralized cash management system and intercompany transfers other than the RCM Intercompany Claims and Intercompany Claims with respect to Non-Debtor Affiliates, (x) the leveraged recapitalization in August 2004, (y) the initial public offering, and any related transactions effectuated in August 2005/September 2005, and (z) any transfer or payment made in respect of the Credit Agreement or the Senior Subordinated Note Indenture, including any redemption of Senior Subordinated Notes, which shall include any Claim or cause of action arising therefrom pursuant to sections 541, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code.

        (b)    **Releases by Holders of Claims and Interests in Respect of Released Parties.** On the Effective Date, each Holder of an Impaired Claim, including, but not limited to any Holder of an Impaired Claim against RCM that receives a Distribution in consideration for the obligations of the Debtors, RCM, the Reorganized Debtors and Post-Confirmation RCM under the Plan and the Cash and other contracts, instruments, releases, agreements, or documents to be delivered in connection with the Plan, shall be deemed to forever release, waive, and discharge all claims, demands, debts, rights, causes of action, or liabilities (other than the right to enforce Released Parties' obligations under the Plan, the Confirmation Order, and the contracts, instruments, releases, agreements, and documents delivered under the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or in part on any act or omission, transaction, event, or other occurrence taking place on or prior to the

Effective Date in any way relating to the Debtors, RCM the Chapter 11 Cases, the Plan, or the Disclosure Statement, in any such case, against the Released Parties.

(c)    *Releases and Subordination by Holders of Claims and Interests in Respect of Contributing Non-Debtor Affiliates and Contributing Non-Debtor Affiliate Management.* On each Contributing Non-Debtor Affiliate Trigger Date, each Holder of an Impaired Claim, including, but not limited to any Holder of an Impaired Claim against RCM that receives a Distribution under the Plan in consideration for the obligations of the Debtors, RCM, the Reorganized Debtors and Post-Confirmation RCM under the Plan and the Cash and other contracts, instruments, releases, agreements, or documents to be delivered in connection with the Plan, shall be deemed to (a) subordinate all claims of the type described in section 10.2(b) against the applicable Contributing Non-Debtor Affiliate to all other existing claims against and equity interests in such Contributing Non-Debtor Affiliate, and (b) release all claims of the type described in section 10.2(b) against parties who are Contributing Non-Debtor Affiliate Management of such Contributing Non-Debtor Affiliate; *provided, however,* that the RCM Trustee, with the consent of the Plan Committee, may deem any subordination referenced in this section 10.2(c) to be a "release" of claims (and may request the Bankruptcy Court to enter an Order confirming the same) to the extent the RCM Trustee determines such a release necessary to ensuring that the applicable Contributing Non-Debtor Affiliate winds up its affairs and distributes on a net basis (whether on account of equity or intercompany balances) positive Cash to the Contributing Debtors and RCM or, if insufficient Cash will be available for Distribution to RCM and the Contributing Debtors, otherwise releases all Intercompany Claims of the Contributing Non-Debtor Affiliate against RCM and the Contributing Debtors.

(d)    *Qualifying Plan Releases.* In order to obtain for the estates of the Debtors the full benefits of the Early Payment Order, including the final allowance of Secured Lender Indemnification Claims at zero for purposes of the Chapter 11 Cases pursuant to paragraph 9(a) and (b) of the Early Payment Order, any Secured Lender Released Claims not previously released under the Early Payment Order are hereby fully, finally and forever released as of the Effective Date. For the avoidance of doubt, the releases provided under this section 10.2(d) of the Plan shall be interpreted such that their scope will satisfy the requirements under the Early Payment Order for the Plan to be a Qualifying Plan thereunder.

(e)    *Releases by Recipients of BAWAG Proceeds.* On the Effective Date, or in the case of Holders of RCM Securities Customer Claims and RCM FX/Unsecured Claims, the later of the Effective Date and the date at which an RCM Related Claim Subordination Form is provided (i) each Holder of a Secured Lender Claim, (ii) each Holder, that has not affirmatively exercised its option to be excluded from any Distribution of BAWAG Proceeds prior to the Voting Deadline, of (A) a Senior Subordinated Note Claim, or (B) a Contributing Debtors General Unsecured Claim, or (iii) each Holder, that has provided an RCM Related Claim Subordination form electing to receive RCM BAWAG Proceeds, of (A) an RCM Securities Customer Claim or (B) an RCM FX/Unsecured Claim, shall be deemed to forever release, waive, and discharge all claims, demands, debts, rights, causes of action, or liabilities against BAWAG, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or in part on any act or omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way arising from or relating to Refco or the RGHI Entities (each as defined in the BAWAG Settlement), and any transactions involving such parties, including, but not limited to, claims or actions arising from or related to (a) the allegations set forth in the Complaint and the Counterclaim (each as defined in the BAWAG Settlement), (b) the allegations set forth in the Adversary Proceeding (as defined in the BAWAG Settlement), or (c) any allegations that could have been made by any of the Refco Parties (as defined in the BAWAG Settlement); *provided however,* that pursuant to the Securities Class Action Stipulation, any Holder of a Claim or Interest against the Debtors, that is also a member of the securities class action class described in the Securities Class Action Stipulation may, assuming approval of the Securities Class Action Stipulation (and the settlement contained therein), elect to receive BAWAG Proceeds without releasing BAWAG of its Securities Class Action claims as set forth in this subparagraph.

(f)    *Injunction Related to Releases.* The Confirmation Order shall permanently enjoin the commencement or prosecution by any entity, whether directly, derivatively, or otherwise, of any

claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities released pursuant to this Plan or the Early Payment Order, including, but not limited to, the claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities released in this section of the Plan. For the avoidance of doubt, neither the Litigation Trust nor the Private Actions Trust shall bring any action to recover on any Released/Subordinated Claims. Notwithstanding any provision contained herein or any provision in any documents incorporating or implementing in any manner the Plan to the contrary, nothing in this Plan or the transactions approved hereby is intended to or shall release any non debtor of any liabilities or obligations to the United States of America or its agencies or subdivisions (the "United States"), nor shall it enjoin or bar any claim by the United States against any Non-Debtor Affiliate.

       **10.3**    *Exculpation and Limitation of Liability.* To the maximum extent permitted by the Bankruptcy Code and applicable law, none of the (a) Debtors, (b) RCM, (c) the Reorganized Debtors, (d) the Plan Administrator, (e) any professionals retained by the Debtors or the RCM Trustee pursuant to an order of the Bankruptcy Court, (f) the Committees (including any present and former members thereof), (g) the RCM Trustee, (h) the parties to the RCM Settlement Agreement and the Plan Support Agreement (in such capacities), (i) the Post-Petition Management, (j) Post-Confirmation RCM, (k) the chapter 7 trustee appointed in Refco LLC's chapter 7 case, (l) AlixPartners, (m) the members of the Portfolio Management Advisory Committee and the Plan, Negotiation, and Litigation Advisory Committee, in each case, established under the RCM Settlement Agreement and in each case acting in such capacities, (n) the Ad Hoc Equity Committee, (o) the Ad Hoc Committee of Senior Subordinated Note Holders. (p) the Senior Subordinated Note Indenture Trustee in its role of effectuating Distributions to Holders of Senior Subordinated Notes nor (q) any of their respective representatives, agents, officers, directors, employees, advisors, or attorneys shall have or incur any liability to, or be subject to any right of action by, any Holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or agents acting in such capacity, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the RCM Settlement Agreement or, if on or prior to the Effective Date, RCM's Chapter 11 Case is converted to a chapter 7 case to be administered under subchapter III of chapter 7, related to, or arising out of, the chapter 7 case, formulating, negotiating, or implementing this Plan, the solicitation of acceptances of this Plan, the pursuit of confirmation of this Plan, the confirmation of this Plan, the consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan, except for gross negligence or willful misconduct, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under this Plan.

       **10.4**    *No Discharge of Claims; Injunction.*

       (a)    Pursuant to section 1141(d)(3) of the Bankruptcy Code, confirmation will not discharge Claims against the Contributing Debtors, FXA and RCM; provided, however, that no holder of a Claim against or Interest in any Contributing Debtor, FXA and RCM may, on account of such Claim or Interest, seek or receive any payment or other Distribution from, or seek recourse against the Estates of any Contributing Debtor, FXA or RCM, the Reorganized Debtors, Post-Confirmation RCM or their respective successors or their respective properties, except as expressly provided herein. Accordingly, except as otherwise provided in the Plan, the Confirmation Order shall provide, among other things, that from and after the Confirmation Date all Persons who have held, hold, or may hold Claims against or Interests in the Debtors or RCM are (i) permanently enjoined from taking any of the following actions against the Estate(s) of the Contributing Debtors, FXA, RCM, the Plan Administrator, the RCM Trustee, the Reorganized Debtors, Post-Confirmation RCM or any of their property on account of any such Claims or Interests and (ii) preliminarily enjoined from taking any of the following actions against any of the Contributing Debtors, FXA, RCM, the Reorganized Debtors, Post-Confirmation RCM or their property on account of such Claims or Interests: (A) commencing or continuing, in any manner or in any place, any action or other proceeding; (B) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (C) creating, perfecting, or enforcing any lien or encumbrance; and (D) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that (x) nothing contained herein shall preclude such Persons from exercising their rights pursuant to and consistent with the terms of this Plan and (y) the preliminary injunction of actions against the Contributing Debtors, FXA and RCM, the Reorganized Debtors, Post-Confirmation RCM, and their property (if any) shall be dissolved and terminate one (1) day following the dissolution of the Reorganized Debtors and Post-Confirmation RCM and completion of the winding up of their affairs. Notwithstanding anything to the contrary set

forth in this Plan, creditors' rights of setoff and recoupment are preserved, and the injunctions referenced in this section or section 10.5 of the Plan shall not enjoin the valid exercise of such rights of setoff and recoupment.

(b)    By accepting Distributions pursuant to this Plan, each Holder of an Allowed Claim or Allowed Interest shall be deemed to have specifically consented to the injunctions set forth in this Article X.

**10.5    *Term of Bankruptcy Injunction or Stays*.**  All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until all of the property of the Estates of the Contributing Debtors, FXA, the Reorganized Debtors and Post-Confirmation RCM have been distributed and the Contributing Debtors and the Reorganized Debtors have been merged into the Reorganized Debtors, dissolved or otherwise liquidated, as the case may be, in accordance with the terms of the Plan or any Plan Document, and the Estate of Post-Confirmation RCM shall have been fully administered and the RCM Trustee discharged from his duties; *provided, however*, that any injunction that by its terms is permanent or otherwise is intended to survive the Effective Date and Distributions hereunder (whether by law or pursuant to order of the Court), shall be continued without modification, notwithstanding anything to the contrary contained in this Plan.

**10.6    *Continuation of Forex Adversary*.**  Notwithstanding any provision herein to the contrary, neither this Plan nor any contract, instrument, release, agreement or document executed or delivered in connection therewith, nor the occurrence of the Effective Date (i) shall release, waive or discharge any of the claims or causes of action asserted in that certain adversary proceeding styled Forex Trading, LLC and The Ad Hoc Refco F/X Customer Committee v. Refco F/X Associates, LLC and Refco Capital Markets, Ltd., Adv. Proc. No. 06-01748 (RDD) (the "Forex Adversary") against FXA and RCM, their successors and assigns, including Reorganized FXA and Post-Confirmation RCM, and/or any of their property, and/or (ii) shall permanently or preliminarily enjoin, prohibit or prevent in any way the continuation and/or prosecution of the Forex Adversary and the claims and causes of action asserted therein against FXA and RCM, their successors and assigns, including Reorganized FXA and Post-Confirmation RCM, and/or any of their property; and all such claims and causes of action, as well as any and all defenses and counterclaims of FXA and RCM (including, without limitation, FXA's right to argue that the constructive trust claim asserted against RCM in the Forex Adversary belongs to FXA and not Forex Trading LLC or the Ad Hoc Refco F/X Customer Committee, as defined in the Forex Adversary), are hereby expressly preserved.

## ARTICLE XI

## RETENTION OF JURISDICTION

**11.1    *Exclusive Jurisdiction of the Bankruptcy Court*.**

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction (unless otherwise indicated) over all matters arising out of, and related to, the Chapter 11 Cases, this Plan and the RCM Settlement Agreement to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)    Allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Allowed Administrative Claim and the resolution of any objections to the allowance or priority of Claims or Interests;

(b)    Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan for periods ending on or before the Effective Date;

(c)     Resolve any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which any Debtor or RCM is a party or with respect to which any Debtor or RCM may be liable and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

(d)     Ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan and the RCM Settlement Agreement, as applicable;

(e)     Decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the Debtors or RCM that may be pending on the Effective Date (which jurisdiction shall be non-exclusive as to any such non-core matters);

(f)     Enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan, the RCM Settlement Agreement and all contracts, instruments, releases, and other agreements or documents created in connection with this Plan, the RCM Settlement Agreement, the Disclosure Statement or the Confirmation Order;

(g)     Resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of this Plan or the RCM Settlement Agreement or any contract, instrument, release, or other agreement or document that is executed or created pursuant to this Plan the RCM Settlement Agreement or any entity's rights arising from or obligations incurred in connection with this Plan the RCM Settlement Agreement;

(h)     Modify this Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or modify the Disclosure Statement, the Confirmation Order, or any other Plan Document, the Disclosure Statement, or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, this Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with this Plan, the Disclosure Statement, or the Confirmation Order, in such manner as may be necessary or appropriate to consummate this Plan;

(i)     Hear and determine all applications for compensation and reimbursement of expenses of Professionals under this Plan or under sections 330, 331, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code; *provided, however*, that from and after the Confirmation Date the payment of fees and expenses of the Reorganized Debtors and the Plan Administrator, including professional fees, shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(j)     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation, or enforcement of this Plan or the Confirmation Order;

(k)     Hear and determine causes of action by or on behalf of the Contributing Debtor, FXA, RCM, the Reorganized Debtors, the Litigation Trustee, the Private Actions Trustee or Post-Confirmation RCM;

(l)     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(m)     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked, or vacated, or Distributions pursuant to this Plan are enjoined or stayed;

(n)     Determine any other matters that may arise in connection with or relate to this Plan, the RCM Settlement Agreement, the Disclosure Statement, the Confirmation Order or any other Plan Document;

(o)    Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases or any subsequent chapter 7 case, as applicable (which jurisdiction shall be non-exclusive except as otherwise provided by Titles 11 and 28 of the United States Code);

(p)    Hear and determine all matters related to (i) the property of the Estates of the Reorganized Debtors and Post-Confirmation RCM from and after the Confirmation Date, (ii) the winding up of the Debtors' and RCM's affairs, and (iii) the activities of the Plan Administrator and the RCM Trustee, including (A) challenges to or approvals of the Reorganized Debtors', the Plan Administrator's, the RCM Trustee's or Post-Confirmation RCM's activities, (B) resignation, incapacity, or removal of the Plan Administrator or the RCM Trustee and selection of a successor, (C) reporting by, termination of, and accounting by the Reorganized Debtors, the Plan Administrator, the RCM Trustee and Post-Confirmation RCM, and (D) release of the Plan Administrator or the RCM Trustee from their duties;

(q)    Hear and determine disputes with respect to compensation of (i) the Reorganized Debtors' and Post-Confirmation RCM's professional advisors and (ii) the Plan Administrator, the RCM Trustee, the Litigation Trustee, the Private Actions Trustee and their professional advisors;

(r)    Hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under the Bankruptcy Code; and

(s)    Enter an order closing the Chapter 11 Cases or chapter 7 case of RCM, if any, as applicable.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

**12.1    *Effectuating Documents and Further Transactions*.** Each of the Debtors, RCM, the Plan Administrator on behalf of the Reorganized Debtors and the RCM Trustee on behalf of Post-Confirmation RCM shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of this Plan and any notes or securities issued pursuant to this Plan.

**12.2    *Corporate Action*.** Prior to, on, or after the Effective Date (as appropriate), all matters expressly provided for under this Plan that would otherwise require approval of the stockholders, members, directors or managers of one or more of the Debtors, RCM, the Reorganized Debtors or Post-Confirmation RCM shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date (as appropriate) pursuant to the applicable law of the states in which the Debtors, RCM, the Reorganized Debtors or Post-Confirmation RCM are incorporated or formed without any requirement of further action by the stockholders, members, directors or managers, as applicable, of the Debtors, RCM, the Reorganized Debtors or Post-Confirmation RCM.

**12.3    *Bar Dates for Certain Claims*.**

(a)    *Administrative Claims*.  The Confirmation Order shall establish an Administrative Claims Bar Date for filing Administrative Claims against all Debtors and RCM which date shall be thirty (30) days after the Effective Date.  Holders of asserted Administrative Claims not paid prior to the Confirmation Date shall submit requests for the payment of administrative expenses on or before such Administrative Claims Bar Date or forever be barred from doing so.  The notice of Confirmation to be delivered pursuant to Bankruptcy Rules 3020(c) and 2002(f) shall set forth such date and constitute notice of this Administrative Claims Bar Date.  The Reorganized Debtors and the RCM Trustee shall have until the Administrative Claims Objection Deadline to object to such claims.

(b)    *Professional Fee Claims.*  All Professionals and other entities requesting compensation or reimbursement of Professional Fee Claims pursuant to sections 327, 328, 330, 331, or 503(b) of the Bankruptcy Code for services rendered prior to the Confirmation Date shall file and serve on the Reorganized Debtors and counsel for the Reorganized Debtors and on the RCM Trustee and his counsel an application for final allowance of compensation and reimbursement of expenses no later than sixty (60) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.  Objections to applications of such Professionals or other entities for compensation or reimbursement of expenses must be filed and served on the Reorganized Debtors, counsel for the Reorganized Debtors, the RCM Trustee and his counsel, and the requesting Professional or other entity no later than thirty (30) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable request for compensation or reimbursement was served.  Upon the Confirmation Date, any requirement that Professionals comply with sections 328, 330, or 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate.  Professional Fee Claims relating to fees and expenses incurred after the Effective Date shall be paid in the ordinary course of business.

(c)    *Professional Fee Holdback.*  Within 10 calendar days prior to the Confirmation Hearing, each Professional shall provide to the Plan Proponents (with a copy to the Fee Committee) a notice of Professional Fee Claim containing (i) a disclosure of fees and expenses incurred, unbilled and unpaid in the Chapter 11 Cases, including any amounts that may be sought by any Professional as an enhancement of the fees billed by it in the Chapter 11 Cases based on the results achieved in the Chapter 11 Cases  and (ii) an estimate of additional fees and expenses expected to be incurred by each such Professional through the Effective Date (in the aggregate, the "Professional Fee Claims").  On the Effective Date, the Reorganized Debtors and Post-Confirmation RCM shall fund an escrow account consisting of 110% of (x) the amount of any holdbacks on previously billed and paid amounts and (y) the amount of the Professional Fee Claims estimated in (ii) of the first sentence of this subparagraph 12.3(c).  Amounts held in such escrow account shall be used to pay amounts not previously paid and subsequently allowed by the Bankruptcy Court following compliance with the interim compensation procedures established by the Bankruptcy Court in these Chapter 11 Cases and/or a hearing on the Professionals' final fee applications.  When all Professional Fee Claims have been paid in full, amounts remaining in such escrow account, if any, shall be returned to the Reorganized Debtors and Post-Confirmation RCM.

**12.4    *Payment of Statutory Fees.*** All fees payable pursuant to section 1930 of title 28, United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.  The Debtors, RCM, the Reorganized Debtors and Post-Confirmation RCM shall remain liable for any quarterly fees validly due and owing to the United States Trustee under 28 U.S.C. § 1930 through and including such dates that their respective Chapter 11 Cases are converted to cases under chapter 7, dismissed, or closed.

**12.5    *Amendment or Modification of the Plan.*** Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, the Plan Proponents reserve the right to alter, amend, or modify this Plan at any time prior to or after the Confirmation Date but prior to the substantial consummation of this Plan; *provided, however,* that no such alteration, amendment or modification shall conflict with any Final Order (including, without limitation, the Early Payment Order).  A Holder of a Claim that has accepted this Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

**12.6    *Severability of Plan Provisions.*** If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**12.7** *Successors and Assigns.* This Plan shall be binding upon and inure to the benefit of the Debtors, RCM, and their respective successors and assigns, including, without limitation, any chapter 7 trustee subsequently appointed. The rights, benefits, and obligations of any entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such entity.

**12.8** *Revocation, Withdrawal, or Non-Consummation.* The Plan Proponents reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date and to file other plans of reorganization. If the Plan Proponents revoke or withdraw the Plan, or if Confirmation or consummation of the Plan does not occur, then (i) the Plan shall be null and void in all respects, (ii) except as provided in sections 12.15 and 12.16 of the Plan, any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Class of Claims), assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (iii) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (A) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the Plan Proponents or any other Person, (B) prejudice in any manner the rights of the Plan Proponents or any Person in any further proceedings involving the Plan Proponents, or (C) constitute an admission of any sort by the Plan Proponents or any other Person.

**12.9** *Notice.* All notices, requests, and demands to or upon the Reorganized Debtors and Post-Confirmation RCM to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> SKADDEN, ARPS, SLATE, MEAGHER
>     & FLOM LLP
> Four Times Square
> New York, New York 10036-6522
> Telephone: (212) 735-3000
> Facsimile: (212) 735-2000
> Att'n:    J. Gregory Milmoe, Esq.
>           Sally McDonald Henry, Esq.
>           J. Gregory St. Clair, Esq.

> Attorneys for Debtors and Debtors-in-Possession

> MILBANK, TWEED, HADLEY & McCLOY LLP
> 1 Chase Manhattan Plaza
> New York, NY 10005
> Telephone: (212) 530-5000
> Facsimile: (212) 530-5219
> Att'n:    Luc A. Despins
>           Susheel Kirpalani
>           Dennis C. O'Donnell

> Counsel for the Official Committee of Unsecured Creditors of Refco Inc., *et al.*

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, NY 10019
Telephone: (212) 506-1700
Facsimile:
Att'n:    David S. Rosner
          Andrew K. Glenn
          Jeffrey R. Gleit

Counsel for Additional Committee of Unsecured Creditors of Refco Inc., et al.


BINGHAM McCUTCHEN LLP
399 Park Avenue
New York, NY 10022
Telephone: (212) 705-7000
Facsimile: (212) 752-5378
Att'n:    Tina L. Brozman
          Timothy B. DeSieno
          Mark W. Deveno

Counsel for the Chapter 11 Trustee for Refco Capital Markets, Ltd.

**12.10    Governing Law.** Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Delaware without giving effect to the principles of conflicts of law of such jurisdiction.

**12.11    Tax Reporting and Compliance.** The Reorganized Debtors are hereby authorized, on behalf of each of the Debtors, to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtors for all taxable periods ending after the Petition Date through, and including, the Effective Date.

**12.12    Filing of Additional Documents.** On or before substantial consummation of this Plan, the Plan Proponents shall file such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

**12.13    Limit on Precedential Effect.** The structure of this Plan and the classification of creditors or groups of creditors within one Class contained herein shall have no evidentiary or precedential effect if the such Plan is not confirmed and consummated.

**12.14    Claims Preserved Pending Consummation.** Except as provided in the Early Payment Order and the RCM Settlement Agreement, in the event this Plan is not consummated, all parties-in-interest expressly reserve their claims and rights, as well as all defenses to such claims and rights and causes of action against such other parties, including, without limitation, (i) the subrogation claim of any Debtor that is a Guarantor under the Credit Agreement against any other Debtor that is a Loan Party under the Credit Agreement, arising out of the payment to the Secured Lenders, (ii) all claims of RCM and Holders of RCM Customer Claims and RCM FX/Unsecured Claims against the Contributing Debtors, Refco LLC and other third parties, (iii) all claims of the Contributing Debtors and Refco LLC, and their respective creditors, against RCM and other third parties and (iv) avoidance actions and other causes of action against creditors of RCM and the Contributing Debtors.

**12.15    Continuation of RCM Settlement Agreement.** Neither any term or provision of this Plan, nor any failure of such Plan to proceed or be confirmed or consummated nor any conversion of the RCM Chapter 11

Plan - 63

Case to a case under chapter 7 of the Bankruptcy Code, will in any way affect the terms or effectiveness of the RCM Settlement Agreement, which will at all times operate and be binding in accordance with its terms.

        **12.16**   *Continuation of Early Payment Order.*  Neither any term or provision of this Plan or the Confirmation Order, nor any failure of such Plan to proceed or be confirmed or consummated nor any conversion of the RCM Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, will in any way affect the terms or effectiveness of the Early Payment Order, which will at all times operate and be binding in accordance with its terms.

Dated:   New York, New York
         December 14, 2006

            REFCO INC.
              (for itself and on behalf of the Affiliate Debtors other than Refco Finance Inc. and Refco Global Finance Ltd.)

By:       /s/ Harrison J. Goldin
      Name:     Harrison J. Goldin
      Title:      Chief Executive Officer

REFCO FINANCE INC.

By:       /s/ Harrison J. Goldin
      Name:     Harrison J. Goldin
      Title:      President

REFCO GLOBAL FINANCE LTD.

By:       /s/ Harrison J. Goldin
      Name:     Harrison J. Goldin
      Title:      Executive Vice President

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
       Attorneys for Refco Inc. and the Affiliate Debtors

By:       /s/ J. Gregory Milmoe
      J. Gregory Milmoe (JGM 0919)
      Sally McDonald Henry (SMH 0839)
      J. Gregory St. Clair (GS 8344)
      Four Times Square
      New York, New York 10036-6522
      (212) 735-3000

REFCO CAPITAL MARKETS, LTD.


By: _____ /s/ Marc S. Kirschner _____
    Name:    Marc S. Kirschner
    Title:    Chapter 11 Trustee for Refco Capital Markets, Ltd.


RCM Trustee


By: _____ /s/ Marc S. Kirschner _____
    Name:    Marc S. Kirschner
    Title:    Chapter 11 Trustee for Refco Capital Markets, Ltd.


BINGHAM McCUTCHEN LLP
    Attorneys for Marc S. Kirschner, the Chapter 11 Trustee for
    Refco Capital Markets, Ltd.


By: _____ /s/ Tina L. Brozman _____
    Tina L. Brozman
    Timothy B. DeSieno
    Mark W. Deveno
    399 Park Avenue
    New York, NY 10022
    (212) 705-7000


MILBANK, TWEED, HADLEY & McCLOY LLP
    Attorneys for the Official Committee of
    Unsecured Creditors of Refco Inc., *et al.*


By: _/s/ Susheel Kirpalani _____
    Luc A. Despins
    Susheel Kirpalani
    Dennis C. O'Donnell
    One Chase Manhattan Plaza
    New York, New York 10005
    (212) 530-5000

KASOWITZ, BENSON, TORRES & FRIEDMAN
LLP
    Attorneys for the Additional Committee of
    Unsecured Creditors of Refco Inc., *et al.*

By:  /s/ David S. Rosner
    David S. Rosner
    Andrew K. Glenn
    Jeffrey R. Gleit
    1633 Broadway
    New York, New York 10019
    (212) 506-1700

| UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK (Manhattan Division) | PROOF OF CLAIM |
|---|---|
| | THIS SPACE IS FOR COURT USE ONLY |

Specific Debtor against which this claim is asserted:

**Refco Inc.    Case No. 05-60006**

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Name of Creditor (The person or other entity to whom the debtor owes money or property):
**GRANT THORNTON LLP**

Name and address where notices should be sent:

GRANT THORNTON LLP
C/O WINSTON & STRAWN LLP (NY)
ATTN: DAVID MOLLON
200 PARK AVENUE
NEW YORK, NEW YORK 10166
Email: dmollon@winston.com

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☑ Check box if you have never received any notices from the bankruptcy court in this case.

Tax Payer Identification #: 3 6 - 6 0 5 5 5 5 8

OR

Last 4 Digits of Your Social Security #:

TEL: ( 2 1 2 ) 2 9 4 - 4 7 4 8

Carefully read instructions included with this Proof of Claim before completing. In order to have your claim considered for payment and/or voting purposes, complete ALL applicable questions. The original of this Proof of Claim must be mailed to: United States Bankruptcy Court, Southern District of New York, Attn: Refco Inc. Claims Docketing Center, Bowling Green Station, P.O. Box 5173, New York, New York 10274-5173 or hand delivered to: United States Bankruptcy Court, Southern District of New York, Attn: Refco Inc. Claims Docketing Center, One Bowling Green, Room 534, New York, New York 10004-1408. This Proof of Claim must be received no later than July 17, 2006, at 5:00 p.m. prevailing Eastern Time. No facsimiles will be accepted.

| Last four digits of account or other number by which creditor identifies debtor: 0 0 2 6 | Check here if this claim | ☐ Replaces ☐ Amends | A previously filed claim, dated: __/__/____ Number: |
|---|---|---|---|

**1. Basis for Claim**
☐ Goods sold.
☑ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Other: _____

☐ Taxes
☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensation (fill out below)
Unpaid compensation for services performed
from (mm/dd/yyyy):
to (mm/dd/yyyy):

**2. Date debt was incurred:** mm dd yyyy

**3. If court judgment, date obtained:** mm dd yyyy

**4. Classification of Claim.** Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the time case filed. See reverse side for important explanations.

Unsecured Nonpriority Claim
$ see attached

☐ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or c) none or only part of your claim is entitled to priority.

Unsecured Priority Claim
☑ Check this box if you have an unsecured priority claim, all or part of which is entitled to priority.

Amount entitled to priority:
$ see attached

Specify the priority of the claim:
☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
☐ Wages, salaries, or commissions (up to $10,000),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

**Secured Claim**
☑ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate   ☐ Motor Vehicle
☑ Other: see attached

Value of Collateral: $ see attached

Amount of arrearage and other charges at time case filed included in secured claim, if any:
$ see attached

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☑ Other - Specify applicable paragraph of 11 U.S.C. § 507(a): (_____)
*Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**5. Total Amount of Claim at Time Case Filed:** see attached
(unsecured)    (secured)    (priority)    (total)

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**6. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**7. Supporting Documents:** Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary. Failure to provide appropriate documentation may result in your claim being subject to objection.

**8. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

SIGN and print the name and title, if any, of the creditor or other person authorized to file this claim (attach power of attorney, if any).

Signature: *Gary Goodman*
Date: 07/17/2006

Printed Name: GARY GOODMAN
Title: PARTNER

THIS SPACE IS FOR COURT USE ONLY
RECEIVED
JUL 17 2006
U.S. BANKRUPTCY COURT
SO. DIST OF NEW YORK

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

POC0001

## ATTACHMENT TO PROOF OF CLAIM OF
## GRANT THORNTON LLP

The claims of Grant Thornton LLP ("Grant Thornton") arise from and relate to amounts owing to Grant Thornton for services rendered as the independent auditor of Refco, Inc. and several of its subsidiaries (collectively, "Refco").

Grant Thornton reserves its right to assert any of these amounts as post-petition administrative expenses pursuant to 11 U.S.C. §§503, 507.

Grant Thornton further claims costs of collection and enforcement, and prepetition and post-petition interest to the extent provided for at law or in equity.

Grant Thornton further reserves the right to amend, supplement or modify this Proof of Claim at any time.

Supporting documentation with respect to Grant Thornton's claim is (i) in the possession of the Debtors, (ii) too voluminous to attach hereto and/or (iii) is designated "Confidential", and may be obtained by contacting:

David E. Mollón, Esq.
200 Park Avenue
Winston & Strawn LLP
New York, New York
(212) 294-4748
(212) 294-4700 (fax)
dmollon@winston.com

-and-

Margaret Maxwell Zagel
Grant Thornton LLP
175 West Jackson, 20th Floor
Chicago, Illinois 60604
(312) 856-0001
(312) 565-3473 (fax)
Peggy.Zagel@GT.com

Such additional supporting documentation includes, but is not limited to, statements and accounting records maintained by the Debtors and Grant Thornton that detail some or all of the amounts due to Grant Thornton pursuant to, *inter alia*, certain engagement and other agreements between Refco and Grant Thornton (collectively, the "Engagement Agreements"), including, without limitation, those Engagement Agreements listed on Schedule 1 annexed hereto.

Damages asserted pursuant to this Proof of Claim are presently only partially liquidated in the amount of approximately $3,042,804.23. Grant Thornton reserves the right to amend, supplement or modify the amount of its damages at any time.

## Claim

1.     Grant Thornton was the independent auditor of Refco, Inc. and several of its subsidiaries, performing audits of Refco's financial statements for the fiscal years ending February 28, 2003 and 2005, and February 29, 2004. Grant Thornton subsequently reaudited Refco's 2002 fiscal year-end financial statements.

2.     Grant Thornton is owed $242,804.23 in fees and costs for services rendered to Refco prior to the petition date.

3.     Although Grant Thornton was a victim of the alleged fraud perpetrated by Refco and certain of its officers and directors of Refco, certain actions (a list of which is attached hereto as Schedule 2) have been commenced and may in the future be commenced against Grant Thornton, and, in certain cases, against the Debtors and certain of their officers and directors, alleging, among other things, that Refco's financial statements contained fraudulent, false and/or misleading material statements or omissions of fact regarding Refco's financial condition and accounting practices. (Collectively, the "Actions").

4.     In addition, Grant Thornton has been required to respond to the inquiries of certain regulatory agencies regarding Refco's financial statements as a result of allegations of fraud perpetrated by certain officers and/or directors of Refco.

5.     Grant Thornton and Refco entered into Engagement Agreements regarding the scope and terms of the services Grant Thornton provided to Refco. To the extent Grant Thornton is a party to the Actions as a result of the services it provided to Refco, pursuant to, among other things, the Engagement Letters, Grant Thornton is entitled to recover, including without limitation, all costs and expenses (including reasonable attorneys' fees), damages, losses, liabilities, that may be incurred, asserted or awarded in connection with or by reason of the services provided under the Engagement Letters, including, without limitation, any claims, damages, losses, liabilities, costs and expenses that may be incurred, asserted or awarded in connection with the Actions (or actions that may be commenced in the future) as well as complying with regulatory inquiries. Such obligations constitute unsecured obligations. In addition to future claims, damages, losses, liabilities, costs and expenses that may be incurred by or asserted or awarded against Grant Thornton, as of July 17, 2006, Grant Thornton has accrued no less than approximately $2.8 million in legal fees and costs in connection with the Actions and regulatory inquiries. Such amounts accrued to date are neither contingent nor unliquidated.

6.     In addition, Grant Thornton has rights to contribution against the Debtor for damages and costs incurred as a result of the Actions and any other actions that have been commenced (or that may be commenced in the future) against it arising out of or related to the services provided, among other things, under the Engagement Letters and hereby asserts such claims against the Debtor for contribution. Grant Thornton further reserves all rights to assert all

claims under federal and state securities and other laws, including, but not limited to, indemnification, contribution and subrogation against the Debtor with respect to all actions brought against them in connection with the Debtor, whether the actions currently are pending or are filed at a future date.

7.    Grant Thornton reserves the right to amend or supplement this Proof of Claim as necessary with respect to relief requested by plaintiffs in the Actions, including but not limited to, the filing of amended pleadings in such Actions.  Grant Thornton further reserves its right to amend or supplement this Proof of Claim or to file additional proofs of claim for any and all damages and expenses, including but not limited to legal fees, with respect to any other actions or proceedings commenced against it, including but not limited to those actions or proceedings commenced against it in connection with these Chapter 11 cases, or services provided by it pursuant to the Engagement Letters, whether the actions are currently pending or are filed at a future date.

8.    To the extent the Debtor asserts claims against Grant Thornton of any kind, Grant Thornton reserves the right to assert that such claims are subject to rights of setoff and/or recoupment, which rights are treated as secured claims under the Bankruptcy Code and similar state and federal laws as well as in equity.  To the extent that the Debtor or any other party take any action that would give rise to a counterclaim or other rights or claims Grant Thornton may have against the Debtor, Grant Thornton reserves all of its respective rights.

9.    To the extent that Grant Thornton has rights to set-off or recoupment under 11 U.S.C. § 553 against any claims, defenses, or set-offs the Debtors may have or might assert against Grant Thornton, Grant Thornton asserts a secured claim.  In addition, with the filing of this Proof of Claim, Grant Thornton does not waive any of its rights to claim specific assets or any other rights or rights of action that Grant Thornton has or may have against the Debtor, and Grant Thornton expressly reserves such rights.

10.    By filing this Proof of Claim, Grant Thornton does not waive, and specifically preserves, its respective procedural and substantive defenses to any claim that may be asserted against it by the Debtors, by any trustee of its estates, by any Official Committee appointed in this case, or by any other party.

11.    Grant Thornton also reserves all rights accruing to it against the Debtor, and the filing of this Proof of Claim is not intended to be and shall not be construed as an election of remedy or a waiver or limitation of any rights of Grant Thornton.  In addition, Grant Thornton reserves the right to withdraw this Proof of Claim for any reason whatsoever.

12.    This Proof of Claim shall not be deemed to be a waiver of Grant Thornton's right (i) to have final orders in noncore matters entered only after *de novo* review by a District Court Judge; (ii) to trial by jury in any proceeding so triable in these cases or any case, controversy, or proceeding related to these cases; (iii) to have the District Court withdraw the reference in any matter subject to mandatory or discretionary withdrawal; or (iv) to any other rights, claims, actions, setoffs, or recoupments to which Grant Thornton is or may be entitled, in law or in

equity, all of which rights, claims, actions, defenses, set-offs, and recoupments Grant Thornton expressly reserves.

13.     All notices, objections or other communications relating to this Proof of Claim should be addressed and sent to:

David E. Mollón, Esq.
Winston & Strawn LLP
200 Park Avenue
New York, New York 10166
(212) 294-4748
(212) 294-4700 (fax)
dmollon@winston.com

-and-

Margaret Maxwell Zagel
Grant Thornton LLP
175 West Jackson, 20th Floor
Chicago, Illinois 60604
(312) 856-0001
(312) 565-3473 (fax)
Peggy.Zagel@GT.com

## Schedule 1  (Engagement Agreements)

| Date of Letter | Executed By | Engagement |
|---|---|---|
| March 14, 2003 | Robert Trosten on March 28, 2003 | Audit the consolidated statement of financial condition of Refco Group Ltd., LLC and Subsidiaries as of February 28, 2003 and the related consolidated statements of operations, changes in members' equity, and cash flows for the year then ended |
| March 9, 2004 | Robert Trosten on March 9, 2004 | Audit the consolidated statement of financial condition of Refco Group Ltd., LLC and Subsidiaries, as of February 29, 2004 and the related consolidated statements of operations, changes in members' equity, and cash flows for the year then ended |
| June, 8, 2004 | Phil Bennett and Robert Trosten on June 21, 2004 | Reaudit the consolidated statement of financial condition of Refco Group Ltd., LLC as of February 28, 2002 and the related consolidated statements of operations, changes in members' equity, and cash flows for the year then ended |
| November 9, 2004 | Phillip Bennett on December 10, 2004 | Review of Refco Group Ltd., LLC and subsidiaries interim financial information from June 1, 2004 to August 5, 2004, August 6, 2004 to August 31, 2004 and the quarter ended August 31, 2003 on Forms  S-4 and S-1 to be filed with the SEC for such periods |
| January 6, 2005 | Phillip Bennett on January 14, 2005 | Review of Refco Group Ltd., LLC and subsidiaries interim financial information for the quarters ended November 30, 2004 and 2003 on Forms S-4 and S-1 to be filed with the SEC for such periods |
| March 21, 2005 | Ronald L. O'Kelley on April 26, 2005 and Gerald Sherer on April 27, 2005 | Audit the consolidated balance sheet of Refco Group Ltd., LLC and subsidiaries as of February 28, 2005 and the related consolidated statements of income, changes in members' capital, and cash flows for the period from August 6, 2004 to February 28, 2005 and for the period from March 1, 2004 to August 5, 2004. |

Something

### Schedule 2 – Civil Litigation

1. <u>In re Refco, Inc. Securities Litigation</u>, No. 05 Civ. 8626 (GEL) (S.D.N.Y.) Relating to 05-CV-08663, 05-CV-08667, 05-CV-08691, 05-CV-08692, 05-CV-08697, 05-CV-08716, 05-CV-07837, 05-CV-08742, 05-CV-08886, 05-CV-08923, 05-CV-08926, 05-CV-08929, 05-CV-09048, 05-CV-09126, 05-CV-09611, 05-CV-09654, 05-CV-09941, 05-CV-10318, and 05-CV-10403

2. <u>In re Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation</u>, No. 06-CV-643 (GEL) (S.D.N.Y.) Relating to No. 06-CV-3347

3. <u>Bankruptcy Trust of Gerard Sillam v. Refco Group, LLC et al.</u>, No. 05-CV-10072 (GEL) (S.D.N.Y.)

-6-

FORM B10 (Official Form 10) (10/05)

| United States Bankruptcy Court  Southern  District of  New York | PROOF OF CLAIM |
|---|---|

| Name of Debtor  Refco Inc. | Case Number  05-60006 |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Name of Creditor (The person or other entity to whom the debtor owes money or property):

Grant Thornton LLP

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

Name and address where notices should be sent:
Grant Thornton LLP c/o Winston & Strawn LLP
200 Park Avenue, New York, NY 10166
Attn: David Mollon
Telephone number: 212-294-4748

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

THIS SPACE IS FOR COURT USE ONLY

Last four digits of account or other number by which creditor identifies debtor:  0026

Check here ☐ replaces  ☒ amends  Claim No. 11527  a previously filed claim, dated: 07/17/06

**1. Basis for Claim**
- ☐ Goods sold
- ☒ Services performed
- ☐ Money loaned
- ☐ Personal injury/wrongful death
- ☐ Taxes
- ☐ Other ——————————

- ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
- ☐ Wages, salaries, and compensation (fill out below)
  Last four digits of your SS #: _____
  Unpaid compensation for services performed
  from _____ to _____
  (date)                  (date)

**2. Date debt was incurred:**  various--see attached

**3. If court judgment, date obtained:**

**4. Classification of Claim.** Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the time case filed. See reverse side for important explanations.

**Unsecured Nonpriority Claim** $ See attached

☐ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**Secured Claim**

☒ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:  See attached
- ☐ Real Estate  ☐ Motor Vehicle  ☐ Other
Value of Collateral: $ See attached

**Unsecured Priority Claim**

☒ Check this box if you have an unsecured claim, all or part of which is entitled to priority.

Amount entitled to priority $ See attached

Amount of arrearage and other charges at time case filed included in secured claim, if any: $ See attached

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B)

☐ Wages, salaries, or commissions (up to $10,000),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☒ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

*Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**5. Total Amount of Claim at Time Case Filed:**  See attached
  (unsecured)   (secured)   (priority)   (Total)

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**6. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

**7. Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**8. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

| Date  3/13/07 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):  Gary Goldman, Partner |
|---|---|

2007 MAR 16 P 2: 24  S.D.N.Y.  U.S. BANKRUPTCY COU... FILED

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

FORM B10 (Official Form 10) (10/05)

# INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In particular types of cases or circumstances, such as bankruptcy cases that are not filed voluntarily by a debtor, there may be exceptions to these general rules.*

## —— DEFINITIONS ——

**Debtor**

The person, corporation, or other entity that has filed a bankruptcy case is called the debtor.

**Creditor**

A creditor is any person, corporation, or other entity to whom the debtor owed a debt on the date that the bankruptcy case was filed.

**Proof of Claim**

A form telling the bankruptcy court how much the debtor owed a creditor at the time the bankruptcy case was filed (the amount of the creditor's claim). This form must be filed with the clerk of the bankruptcy court where the bankruptcy case was filed.

**Secured Claim**

A claim is a secured claim to the extent that the creditor has a lien on property of the debtor (collateral) that gives the creditor the right to be paid from that property before creditors who do not have liens on the property.

Examples of liens are a mortgage on real estate and a security interest in a car, truck, boat, television set, or other item of property. A lien may have been obtained through a court proceeding before the bankruptcy case began; in some states a court judgment is a lien. In addition, to the extent a creditor also owes money to the debtor (has a right of setoff), the creditor's claim may be a secured claim. (See also *Unsecured Claim.*)

**Unsecured Claim**

If a claim is not a secured claim it is an unsecured claim. A claim may be partly secured and partly unsecured if the property on which a creditor has a lien is not worth enough to pay the creditor in full.

**Unsecured Priority Claim**

Certain types of unsecured claims are given priority, so they are to be paid in bankruptcy cases before most other unsecured claims (if there is sufficient money or property available to pay these claims). The most common types of priority claims are listed on the proof of claim form. Unsecured claims that are not specifically given priority status by the bankruptcy laws are classified as *Unsecured Nonpriority Claims.*

---

# Items to be completed in Proof of Claim form (if not already filled in)

**Court, Name of Debtor, and Case Number:**
Fill in the name of the federal judicial district where the bankruptcy case was filed (for example, Central District of California), the name of the debtor in the bankruptcy case, and the bankruptcy case number. If you received a notice of the case from the court, all of this information is near the top of the notice.

**Information about Creditor:**
Complete the section giving the name, address, and telephone number of the creditor to whom the debtor owes money or property, and the debtor's account number, if any. If anyone else has already filed a proof of claim relating to this debt, if you never received notices from the bankruptcy court about this case, if your address differs from that to which the court sent notice, or if this proof of claim replaces or changes a proof of claim that was already filed, check the appropriate box on the form.

**1. Basis for Claim:**
Check the type of debt for which the proof of claim is being filed. If the type of debt is not listed, check "Other" and briefly describe the type of debt. If you were an employee of the debtor, fill in your social security number and the dates of work for which you were not paid.

**2. Date Debt Incurred:**
Fill in the date when the debt first was owed by the debtor.

**3. Court Judgments:**
If you have a court judgment for this debt, state the date the court entered the judgment.

**4. Classification of Claim**
**Secured Claim:**
Check the appropriate place if the claim is a secured claim. You must state the type and value of property that is collateral for the claim, attach copies of the documentation of your lien, and state the

amount past due on the claim as of the date the bankruptcy case was filed. A claim may be partly secured and partly unsecured. (See DEFINITIONS, above).

**Unsecured Priority Claim:**
Check the appropriate place if you have an unsecured priority claim, and state the amount entitled to priority. (See DEFINITIONS, above). A claim may be partly priority and partly nonpriority if, for example, the claim is for more than the amount given priority by the law. Check the appropriate place to specify the type of priority claim.

**Unsecured Nonpriority Claim:**
Check the appropriate place if you have an unsecured nonpriority claim, sometimes referred to as a "general unsecured claim". (See DEFINITIONS, above.) If your claim is partly secured and partly unsecured, state here the amount that is unsecured. If part of your claim is entitled to priority, state here the amount not entitled to priority.

**5. Total Amount of Claim at Time Case Filed:**
Fill in the total amount of the entire claim. If interest or other charges in addition to the principal amount of the claim are included, check the appropriate place on the form and attach an itemization of the interest and charges.

**6. Credits:**
By signing this proof of claim, you are stating under oath that in calculating the amount of your claim you have given the debtor credit for all payments received from the debtor.

**7. Supporting Documents:**
You must attach to this proof of claim form copies of documents that show the debtor owes the debt claimed or, if the documents are too lengthy, a summary of those documents. If documents are not available, you must attach an explanation of why they are not available.

## ATTACHMENT TO AMENDED PROOF OF CLAIM
## OF GRANT THORNTON LLP

Grant Thornton LLP ("Grant Thornton") asserts its right, as reserved in its proof of claim, dated July 17, 2006, Claim No. 11527 ("Proof of Claim"), to amend its Proof of Claim to include additional fees and costs incurred since the Proof of Claim was filed. THIS CLAIM IS AN AMENDMENT AND DOES NOT SUPESEDE ANY OTHER CLAIMS FILED BY CLAIMANT. As described more fully in its Proof of Claim, Grant Thornton's claims arise from and relate to amounts owing to Grant Thornton for services it rendered as the independent auditor of Refco, Inc. and several of its subsidiaries (collectively, "Refco"). Each of the claims set forth in the Proof of Claim are incorporated herein.

Grant Thornton reserves its right to assert any of these amounts as post-petition administrative expenses pursuant to 11 U.S.C. §§ 503, 507.

Grant Thornton further claims costs of collection and enforcement, and pre-petition and post-petition interest, to the extent provided for at law or in equity.

Grant Thornton further reserves the right to amend, supplement or modify this Amended Proof of Claim at any time.

Supporting documentation with respect to Grant Thornton's claim is (i) in the possession of the Debtors, (ii) too voluminous to attach hereto and/or (iii) is designated "Confidential," and may be obtained by contacting:

David E. Mollón, Esq.
200 Park Avenue
Winston & Strawn LLP
New York, New York
(212) 294-4748
(212) 294-4700 (fax)
dmollon@winston.com

-and-

Margaret Maxwell Zagel
Grant Thornton LLP
175 West Jackson, 20th Floor
Chicago, Illinois 60604
(312) 856-0001
(312) 565-3473 (fax)
Peggy.Zagel@GT.com

Such additional supporting documentation includes, but is not limited to, statements and accounting records maintained by the Debtors and Grant Thornton that detail some or all of the amounts due to Grant Thornton pursuant to, *inter alia*, certain engagement and other agreements between Refco and Grant Thornton (collectively, the "Engagement Agreements"), including,

without limitation, those Engagement Agreements listed on Schedule 1, attached to Proof of Claim No. 11527, filed July 17, 2006.

Damages asserted pursuant to its Amended Proof of Claim are presently only partially liquidated in the amount of approximately $4,356,371.30. Grant Thornton reserves the right to amend, supplement or modify the amount of its damages at any time.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- x
                              :

In re                          :      Chapter 11 Case

Refco Inc., et al.,          :      No. 05-60006 (RDD)
                              :      (Jointly Administered)

Debtors.                :

                              :

---------------------------------------------------------- x

### STIPULATION AND ORDER: (A) WITHDRAWING PLAN ADMINISTRATORS' TENTH OMNIBUS MOTION FOR ORDER UNDER 11 U.S.C. § 502 AND FED. R. BANKR. P. 3007 AND 9014 DISALLOWING AND EXPUNGING CLAIMS OF TONE N. GRANT; AND (B) PURSUANT TO 11 U.S.C. § 502(c)(1), ESTIMATING SUCH CLAIMS AT $0

This Stipulation and Order (the "Stipulation and Order") is entered into by and between: (a) RJM, LLC, as Plan Administrator for Refco Inc. and its affiliated debtors (other than Refco Capital Markets, Ltd.) under the Modified Joint Chapter 11 Plan of Refco Inc. and Certain of Its Direct and Indirect Subsidiaries dated December 14, 2006 (the "Plan"); and (b) Tone N. Grant (the "Claimant").

### R E C I T A L S

WHEREAS, on October 17, 2005 (the "Petition Date"), Refco Inc. and the other debtors in the above captioned cases (the "Debtors"),[1] filed voluntary petitions in this Court for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"); and

WHEREAS, by order entered March 27, 2006 (the "Bar Date Order"), this Court: (a) established July 17, 2006 as the last date on which any person might file a proof a claim with

---

[1] Debtors Lind-Waldock Securities LLC, Refco Managed Futures, LLC and Westminster-Refco Management LLC filed chapter 11 petitions on June 5, 2006. Furthermore, related entity Refco Commodity Management, Inc. filed a chapter 11 petition on October 16, 2006.

ACTIVE/72033270.2

respect to any prepetition claim asserted against any of the Debtors (the "Bar Date"); and

(b) approved procedures by which the Debtors should provide notice of such deadline; and

WHEREAS, on or before the Bar Date, the Claimant filed numerous proofs of claim against the Debtors, including those designated as Claims numbered 10480, 10481, 10482, 10483, 10484, 10485, 10486, 10488, 10489, and 10490 (collectively, the "Claims"); and

WHEREAS, on or around February 1, 2007, the Plan Administrator filed that certain "Tenth Omnibus Motion for Order Under 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 and 9014 Disallowing and Expunging Claims of Tone N. Grant" (the "Omnibus Objection") which sought to have the Claims disallowed and expunged; and

WHEREAS, on or around March 30, 2007, the Claimant filed his reply to the Omnibus Objection, which incorporated a motion for a stay of this Court's consideration of the Omnibus Objection (the "Stay Motion"); and

WHEREAS, by Order, dated May 8, 2007, this Court, *inter alia,* denied the Stay Motion, and scheduled a hearing for consideration of the Omnibus Objection for June 6, 2007; and

WHEREAS, after discussion between the parties, the parties wish to resolve the Omnibus Objection.

NOW, THEREFORE, in order to resolve the Omnibus Objection, and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, the parties agree and stipulate as follows:

1.    The Omnibus Objection shall be deemed withdrawn, without prejudice to the Plan Administrator's right to file a renewed objection to the Claims at a later date, notwithstanding any otherwise applicable deadline for the filing of objections to claims in the

Debtors' cases; *provided, however,* that the Plan Administrator shall not object to the Claims prior to March 1, 2008.

2.    Pursuant to section 502(c)(1) of the Bankruptcy Code, the Claims shall each be estimated at zero dollars ($0) for distribution, reserve, and all other purposes under the Plan, without prejudice to any right that the Claimant may have to amend the Claims or to move for relief relating to allowance, payment or reservation of funds.

3.    Notwithstanding paragraph (1) above, if at any time the Claimant moves to have one or more of his Claims allowed by the Court, or otherwise moves the Court or makes demand upon the Plan Administrator to have the Plan Administrator make payment or reserve funds on account of the Claims under the Plan, the Plan Administrator shall be immediately entitled to object to the Claims and take any other action it deems necessary or appropriate to have the Claims disallowed and expunged by the Court.

4.    This Stipulation shall be binding upon the parties hereto and their respective successors and assigns from the date of its execution, but is expressly subject to and contingent upon entry of an order approving this Stipulation by the Court.

ACTIVE/72033270.2

3

5.     The Court shall retain jurisdiction with respect to matters arising from or related to the Claims, including, but not limited to, the interpretation and enforcement of this Stipulation.

Dated: New York, New York
        June 1, 2007


ZUCKERMAN SPAEDER LLP                    BINGHAM McCUTCHEN LLP


By: s/ Thomas G. Macauley               By: s/ Steven Wilamowsky
Thomas G. Macauley                       Tina L. Brozman (TB-0854)
919 Market Street                        Steven Wilamowsky (SW-9266)
Suite 990                                399 Park Avenue
Wilmington, Delaware 19801               New York, New York 10022-4873
(302) 427-0400                           (212) 705-7000

Attorneys for Tone N. Grant              Attorneys for the Plan Administrator


SO ORDERED:

Dated:  June 6th, 2007
        New York, New York

                                        /s/Robert D. Drain
                                        UNITED STATES BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

In re                                          :

                                       :    Chapter 11

REFCO, INC., et al.,                            :

                                       :    Case No. 05-60006 (RDD)

                                       :

            Debtors.                              :    (Jointly Administered)

------------------------------------------------------------x

AXIS REINSURANCE COMPANY,                       :

                                       :

            Plaintiff,                             :

                                       :

            v.                                   :    Adv. Proc. No. 07-01712 (RDD)

                                       :

PHILLIP R. BENNETT, et al.,                     :

                                       :    [caption continued on next page]

           Defendants.                            :

------------------------------------------------------------x

## ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT

```
-----------------------------------------------------------x
TONE N. GRANT, et al.,                                     :
              Plaintiffs,                                  :
                                                           :
       v.                                                  :     Adv. Proc. No.  07-2005 (RDD)
                                                           :
AXIS REINSURANCE COMPANY,                                  :
              Defendant.                                   :
-----------------------------------------------------------x
LEO R. BREITMAN, et al.,                                   :
              Plaintiffs,                                  :
                                                           :
       v.                                                  :     Adv. Proc. No.  07-2032 (RDD)
                                                           :
AXIS REINSURANCE COMPANY,                                  :
              Defendant.                                   :
-----------------------------------------------------------x
```

Upon the motions (the "Motions"), dated September 25, 2007, of Tone N. Grant, Robert C. Trosten, Phillip R. Bennett, Dennis Klejna, William M. Sexton, Gerald Sherer, Philip Silverman, Joseph Murphy, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, and Scott A. Schoen (the "Moving Insureds"), for entry of an order, pursuant to Fed. R. Civ. P. 56, applicable to this proceeding pursuant to Fed. R. Bankr. P. 7056, granting summary judgment against Axis Reinsurance Company ("Axis"), all as more fully set forth in the Motions; and the Court having jurisdiction to consider the Motions and the relief requested therein pursuant to 28 U.S.C. §§ 157, 1334, and 2201; and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motions having been provided; and the Court having reviewed the Motions and the objections and other pleadings related thereto; and upon the record of the October 12, 2007

hearing thereon; and after due deliberation and sufficient cause appearing therefor, the Court having found for the reasons stated in Exhibit A hereto, which amends and supersedes the Court's bench ruling appearing in the October 12, 2007 hearing transcript, that no genuine issue of material fact exists and that the Moving Insureds are entitled to judgment as a matter of law, it is hereby

ORDERED that the Motions are granted in all respects; and it is further

ORDERED that under the terms of the Axis Policy Axis shall advance, subject to a complete reservation of rights, privileges, and defenses of the parties under the Axis Policy,[1] Defense Costs incurred by the Moving Insureds in defense of the various matters asserted against them related to the demise of Refco, Inc. (the "Claim"), unless and until: (1) there is a final determination that (a) the Claim is not covered by the Axis Policy, or (b) such Defense Costs are not covered under the Axis Policy; or (2) the Limit of Liability of the Axis Policy has been exhausted; and it is further

ORDERED that Axis shall notify counsel to the Plan Administrators of the Modified Joint Chapter 11 Plan (the "Refco Plan") of Refco Inc. and Certain of Its Direct and Indirect Subsidiaries (the "Plan Administrators") when the advancement of Defense Costs hereunder exceeds $2 million in the aggregate, and in increments of $100,000 thereafter; provided, that if individual statements for Defense Costs exceed $100,000, Axis need only notify the Plan Administrators of payment of such bills, without breaking such advances into $100,000 increments; and it is further

ORDERED that entry of this Order shall be without prejudice to the right of the Plan Administrators or any party in interest to seek the re-imposition of the injunction provided

---

[1] Capitalized terms used but not defined herein having the meanings ascribed to such terms in the Motions and the insurance policies referred to therein.

for in the Refco Plan, on a prospective basis with respect to any advances of Defense Costs not yet made, for cause shown on appropriate notice to the Insureds and Axis; and it is further

ORDERED that nothing in this Order shall modify this Court's Order confirming the Refco Plan, including paragraph 34(b) thereof, or constitute a determination that the automatic stay under 11 U.S.C. § 362(a) applies to the actions described in the third decretal paragraph hereof; and it is further

ORDERED that Axis' (a) motion seeking a declaratory judgment with regard to the Moving Insureds' obligations under the Axis policy to refund advanced Defense Costs and (b) request for a determination of the priority and proper allocation of Defense Costs or other Losses under the Axis Policy and denied without prejudice to the rights of all parties to and beneficiaries of the Axis Policy regarding such issue; and it is further

ORDERED that the requirement pursuant to Local Rule 9013-1(b) that the Moving Insureds file a memorandum of law in support of the Motion is hereby waived, and it is further

ORDERED that this Order shall be deemed to constitute a separate order on each of the Motions.


Dated: October 19, 2007
       New York, New York


                              /s/Robert D. Drain
                              UNITED STATES BANKRUPTCY JUDGE

4

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
In re                                                           :
                                                                :    Chapter 11
REFCO, INC., et al.,                                            :
                                                                :    Case No. 05-60006 (RDD)
                                                                :
              Debtors.                                          :    (Jointly Administered)
----------------------------------------------------------------x
                                                                :
AXIS REINSURANCE COMPANY,                                       :
                                                                :
              Plaintiff,                                        :
                                                                :
              v.                                                :    Adv. Proc. No. 07-01712 (RDD)
                                                                :
                                                                :
PHILLIP R. BENNETT, et al.,                                     :
                                                                :    [caption continued on next page]
              Defendants.                                       :
----------------------------------------------------------------x

## ERRATA ORDER

```
----------------------------------------------------------x
                                                          :
TONE N. GRANT, et al.,                                    :
                                                          :
              Plaintiffs,                                 :
                                                          :
       v.                                                 :    Adv. Proc. No.  07-2005 (RDD)
                                                          :
AXIS REINSURANCE COMPANY,                                 :
                                                          :
              Defendant.                                  :
----------------------------------------------------------x
                                                          :
LEO R. BREITMAN, et al.,                                  :
                                                          :
              Plaintiffs,                                 :
                                                          :
       v.                                                 :    Adv. Proc. No.  07-2032 (RDD)
                                                          :
AXIS REINSURANCE COMPANY,                                 :
                                                          :
              Defendant.                                  :
----------------------------------------------------------x
```

**ORDERED**, that the Order Granting Motions for Summary Judgment, dated October 19, 2007,

Docket Number 125, be amended as follows:

1. Page 4, second full paragraph, second line from the bottom, reading, "…Losses under

   the Axis Policy and denied without prejudice…" should be corrected to read as follows:

   "…Losses under the Axis Policy are denied without prejudice…"


Dated: New York, New York
       October 22, 2007

                                    /s/Robert D. Drain_____
                                    HON. ROBERT D. DRAIN
                                    UNITED STATES BANKRUPTCY JUDGE

1              UNITED STATES BANKRUPTCY COURT
2              SOUTHERN DISTRICT OF NEW YORK

3    ---------------------------------------X
                                           :
4    In Re:                                :    05-60006
                                           :
5            REFCO, INC.,                   :    One Bowling Green
                                           :    New York, New York
6            Debtors.                       :    September 11, 2007
     ---------------------------------------X
7    TONE N. GRANT, et al,                  :    07-2005
                                           :
8              Plaintiffs,                  :
                                           :
9              v.                           :
                                           :
10   AXIS REINSURANCE COMPANY,              :
                                           :
11             Defendant.                   :
     ---------------------------------------X
12              TRANSCRIPT OF HEARING
13      BEFORE THE HONORABLE ROBERT D. DRAIN
            UNITED STATES BANKRUPTCY JUDGE
14
15   APPEARANCES:

16   For Plaintiffs:        NORMAN L. EISEN, ESQ.
                            Zuckerman, Spaeder, LLP
17                          1800 M Street, N.W.
                            Washington, D.C.  20036
18
     For Messrs Grant:      HELEN B. KIM, ESQ.
19    and Klejna            Baker & Hostetler, LLP
                            333 South Grand Avenue
20                          Los Angeles, California  90071

21   For Mr. Trosten:       BARBARA MOSES, ESQ.
                            Morvillo, Abramowitz, Grand, Jason,
22                           Anello & Bohrer, P.C.
                            565 Fifth Avenue
23                          New York, New York  10017

24   For Axis:              JOAN M. GILBRIDE, ESQ.
                            Kaufman, Borgeest & Ryan, LLP
25                          99 Park Avenue
                            New York, New York  10016

                  (Appearances continued on next page)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

APPEARANCES CONTINUED:

For Mr. Silverman:          RICHARD CASHMAN, ESQ.
                            Heller, Ehrman, LLP
                            Seven Times Square
                            New York, New York  10036

For Messrs. Sexton and:     IVAN O. KLINE, ESQ.
  Shearer                   Friedman, Wittenstein & Hochman
                            600 Lexington Avenue
                            New York, New York  10022

For RJM, LLC:               STEVEN WILOMOWSKY, ESQ.
                            Bingham, McCutchen, LLP
                            399 Park Avenue
                            New York, New York  10022

For Mr. Murphy:             JOHN J. JEROME, ESQ.
                            Saul Ewing, LLP
                            1500 Market Street
                            Philadelphia, Pennsylvania  19102

Court Transcriber:          SHARI RIEMER
                            TypeWrite Word Processing Service
                            356 Eltingville Boulevard
                            Staten Island, New York 10312

Proceedings recorded by electronic sound recording,
transcript produced by transcription service

3

1            THE COURT:   <u>Grant v Axis Reinsurance</u> in the <u>Refco</u>

2     case.

3            MR. EISEN:   Good morning, Your Honor.

4            Norman Eisen representing Mr. Grant and I will be

5     arguing on the motion for advancement on behalf of Mr. Grant,

6     Mr. Trosten and Mr. Bennett, although Mr. Trosten and Mr.

7     Bennett's counsel are here as well and they may wish to join in

8     at certain points.

9            THE COURT:   Okay.

10           MR. EISEN:   On behalf of everyone we want to thank

11    the Court for taking the motion on an expedited basis.  We

12    believe that the fundamental issues that are raised by our

13    advancement motion were raised and decided by the Court on the

14    other insurance motion that we were before the Court on less

15    than two weeks ago.  As the Court knows, the criminal

16    defendants -- we refer to them as the presumed innocent

17    defendants in distinction to Axis' designation -- joined in the

18    motion for advancement we argued, and the Court actually

19    addressed in the course of its holdings -- actually addressed

20    the prejudice to the criminal defendants with respect to the --

21    on the balancing of harms.

22           I will just quickly go through the issues and I

23    think reference to Axis' brief makes clear that fundamentally

24    Axis is rearguing the issues that were before the Court the

25    last time we were here on the question of what the standard is,

4

1   whether this is a prohibitory or mandatory injunction.  The

2   Court has already invoked the reasoning of <u>WorldCom</u> and ruled.

3   The Court has applied the test of a likelihood of success on

4   the merits or a sufficiently serious question and balance of

5   harms.  There is no new issue in the brief about, and we

6   recognize the Court likely went to, the sufficiently serious

7   question and balancing the harms prong of that test.  The Court

8   noted as much when it was ruling previously.  There is no new

9   issue in the papers about the likelihood of success on the

10  merits or the sufficiently serious question going to the

11  merits.  It is a reargument of the clause relating -- the

12  disputed clause and the Court has already ruled on that.

13         On the balance of the harms, we would submit that,

14  again, as noted by the Court the harms are even more severe

15  because the criminal defendants are facing trial; it's not

16  merely a question of a risk of financial loss, it is a liberty

17  interest and the most serious liberty interest, and any

18  disruption in the preparation for trial as the Court noted is a

19  very, very serious harm indeed.

20         One of the only -- I will not rehash absolutely

21  every argument that the Court has heard ad infinitum in the

22  many, many papers that have been filed.  I'll attempt to focus

23  on what's new in Axis' submission and the response.  They do

24  rely on a new case in addressing the balancing of the harms,

25  that is the <u>Gaon v. Twin Cities</u> case.  We obtained from Axis --

5

1        THE COURT:  No one gave me a copy of that case.

2        MR. EISEN:  Your Honor, we had the same problem --

3        THE COURT:  And consequently I'm not going to

4  consider it.

5        MR. EISEN:  Okay.  Then, Your Honor, really the

6  only other significant --

7        THE COURT:  Let me -- it's an unpublished

8  decision.

9        MR. EISEN:  Yes, it is, Your Honor.

10        THE COURT:  You're all familiar with the Second

11  Circuit rule on citing unpublished decisions.  If I were to

12  consider it as persuasive authority, simply like a law review

13  article or the like, I would have expected the parties to have

14  provided it to me since I prepare in advance for these things

15  and this is a preliminary injunction hearing and that's not

16  been done and so I'm not going to consider it.

17        MR. EISEN:  Understood, Your Honor, and we

18  certainly are not relying on it and you won't hear anymore

19  about it from us.

20        The only other issue of significance that is new

21  in the papers is the priority of payments issue and that popped

22  up, really, yesterday with the filing of Axis' opposition and

23  then of the motion to intervene.  With respect to proposed

24  intervenors' issues, we conferred with them before court this

25  morning and we've also informed Axis of this, the movants today

6

1    are satisfied to have the identical form of order that the
2    Court entered last time with the addition of the proposed
3    language that Mr. Klejna's counsel has requested, which is to
4    the effect that nothing in this order shall affect the priority
5    of payments issue.  We really do not view the priority of
6    payments issue as procedurally appropriate for a decision
7    before the Court.  It has not been teed up.  It is not ripe.
8    We don't know if there is a disagreement yet.  We haven't had a
9    chance to evaluate it.  Obviously, there's been no factual
10   development, there's been no briefing.  It really is a last
11   ditch attempt to interpose an obstacle to the payment of the
12   fees that the movants today so desperately need in order to
13   avoid disruption of the criminal case.
14          So, the issues really being the same, we would
15   submit to the Court that it is a straightforward application of
16   the decision that the Court has already rendered and, indeed,
17   was prepared to render but for the Court's request that we file
18   an adversary proceeding of our own and a motion for preliminary
19   injunction which we've done.
20          THE COURT:  What is the -- and there was some
21   confusion about this last time -- billed amount of the defense
22   costs for the three defendants?
23          MR. EISEN:  Your Honor, Axis has provided that
24   information on Page 30 of their opposition and I'll go over
25   that and then I will relate an issue -- conversation that we

7

1    all had amongst ourselves in the hallway just updating that and

2    I know Axis' counsel will correct me if I err.

3              When we were before the Court the last time the

4    total amount was in the neighborhood of $2 million for Axis.

5    As of Friday, the total amount at issue was in excess of $2.9

6    million.  We certainly do not -- I think it's our position and

7    the other insureds' position that none of us begrudge the

8    payment of those sums to the others.  Indeed, for the criminal

9    defendants it is crucial because the pipeline is building up

10   and we have so much work to do and the consequences are so

11   great.  We would ask the Court to order payment of that amount.

12   Approximately $300,000.00 of that $2.9 million has already been

13   paid down or is in the process of being paid down.

14             THE COURT:  Well, let me make sure of that.  The

15   aggregate number you gave me, the $2 million as of last Friday

16   --

17             MR. EISEN:  It's $2.9 million, Your Honor, as of

18   Friday.

19             THE COURT:  I'm sorry.  Then there was $2 million

20   as of the hearing that we had.

21             MR. EISEN:  Yes, Your Honor.

22             THE COURT:  That includes the defense costs of

23   which defendants?

24             MR. EISEN:  I believe that includes the defense

25   costs of all of the parties who were before the Court on the

8

1   previous motions and --

2            THE COURT:  Well, let me make sure.  It does not

3   include Mr. Lee; right?

4            MR. EISEN:  I do not know if it includes or not.

5   I can speak for the five insured individuals represented by

6   Baker, Hostetler and the other firms and I can speak for the

7   three criminal defendants.  I cannot at all speak for Weil,

8   Gotshal's clients, for Mr. Lee.  I'm sure Ms. Gilbride knows

9   the answer to that question.  I do not.

10           THE COURT:  All right.

11           MR. EISEN:  And just to update the Court there

12  have been approximately $1 million in additional invoices that

13  have come in over the weekend and yesterday.

14           MS. GILBRIDE:  I believe that is correct.  I

15  actually anticipated -- to correct you since we're on this

16  topic, I think the $2.9 million as of Friday does include the

17  Thomas H. Lee fees.

18           THE COURT:  It does.  Well, as far as the

19  defendants represented by Ms. Kim and Mr. Goodman, the ones

20  represented by Baker & Hostetler, I gather that that was about

21  $300,000.00/$307,000.00; is that right?

22           MS. GILBRIDE:  That's correct, Your Honor.

23           THE COURT:  And I'm taking that away for the

24  record in the district court?

25                    [Pause in proceedings.]

9

1          MS. GILBRIDE:  Oh, as of the earlier hearing, Your

2   Honor.

3          THE COURT:  Right.

4          MS. GILBRIDE:  Not as of today.

5          THE COURT:  Right.  No, I understand.

6          MS. KIM:  Your Honor, the $307,000.00 was as of

7   August 30th for the five officer defendants that moved as of

8   that day.

9          THE COURT:  All right.  All five of them?

10          MS. KIM:  All five, not just the Baker, Hostetler

11   --

12          THE COURT:  So that's not just Baker & Hostetler

13   but all five.

14          MS. GILBRIDE:  All five of the moving parties;

15   right.

16          THE COURT:  All right.  Do we know how much is for

17   the movants today in the aggregate?  The three?

18          MR. EISEN:  Your Honor, I --

19          THE COURT:  Well, no, no, no, let me hear the

20   answer.

21          MS. GILBRIDE:  Your Honor, my understanding is as

22   of yesterday for just these moving parties it's $2.9 million.

23          THE COURT:  Just them?

24          MS. GILBRIDE:  Just them.

25          THE COURT:  Just these three?

10

1           MS. GILBRIDE:  Yes, Your Honor.

2           MS. MOSES:  Your Honor, Barbara Moses, Your Honor,

3    for Robert Trosten.

4           THE COURT:  Well, let me make sure -- there's some

5    conferring going on over here.

6                      [Pause in proceedings.]

7           THE COURT:  Just these three?

8           MS. GILBRIDE:  Yes, Your Honor.

9           THE COURT:  And how much as of the date that I

10   ordered the -- would you have this number as of the date that I

11   ordered the payment for the five represented --

12          MS. GILBRIDE:  Yes.  Yes, that would be $1.6.

13          THE COURT:  $1.6.

14          MS. MOSES:  These are the three numbers for us.

15          THE COURT:  Okay.  But that would be just for

16   these three --

17          MS. GILBRIDE:  Yes, Your Honor.

18          THE COURT:  -- as of the date of the earlier order

19   that I entered?

20          MS. GILBRIDE:  Correct.  As of August 31st, right.

21          THE COURT:  Okay.  Go ahead.

22          MS. MOSES:  I apologize, Your Honor.  I was

23   conferring with Mr. Eisen and I missed your last exchange with

24   Ms. Gilbride.  This is Barbara Moses speaking on behalf of

25   Robert Trosten.  But we, the three movants before the Court

11

1   this morning, have added up our numbers among ourselves and

2   they don't add up to $2 million.

3          THE COURT:  Well, okay.  I asked Ms. Gilbride two

4   questions; one was as of the most recent date and that was $2.9

5   and I understood, and then I asked as of August 31st which was

6   the date of my earlier order, and that was $1.6 million.  Have

7   you broken it out that way too?

8          MS. MOSES:  Well, my understanding, Your Honor --

9   and co-counsel for today's moving parties will correct me if I

10  am wrong -- but my understanding is that as of August 30th the

11  three plaintiffs who are before you today had submitted bills

12  totaling -- I'm doing this in my head so bear with me while I

13  round -- approximately $940,000.00 or maybe $950,000.00.

14         THE COURT:  Okay.

15         MS. GILBRIDE:  We received substantial bills just

16  yesterday from --

17         THE COURT:  No, we're just focusing right now --

18         MS. MOSES:  Right.  That was the August 30th

19  figure.

20         MS. GILBRIDE:  Okay.  From Kramer, Levin.

21         THE COURT:  -- as of August 31st.

22         MR. EISEN:  Yes, that was included.

23         MS. GILBRIDE:  Okay.

24                [Pause in proceedings.]

25         THE COURT:  So you include bills that cover the

12

1  period through August 30th in that $950,000.00 number?

2              MS. MOSES:  Your Honor, I'm going to apologize and

3  correct myself on the record.  Mr. Eisen tells me that my

4  figure was incorrect.

5              THE COURT:  Okay.  So is it as of August 31st it's

6  really $1.6 million?

7              MR. EISEN:  It's $1.6 million to $1.7 million,

8  Your Honor.

9              THE COURT:  Okay.

10             MS. GILBRIDE:  That's the same number we have.

11             THE COURT:  Okay.

12             MR. EISEN:  Then, just so I'm clear if I may ask

13 Axis through the Court it then goes up to $2.6 as of Friday

14 when the papers were filed according to Axis' motion at Page

15 30, Paragraph 65, as of Friday, September 7th, Axis had defense

16 bills with a value of over $2.9, of this amount $307 was

17 subject to the Court's August 31st order so $2.9 minus $300 is

18 $2.6 and then as of the weekend and yesterday it is up to $2.9.

19             THE COURT:  Okay.

20             MS. GILBRIDE:  Yes,

21             THE COURT:  And what is that for?  September?

22             MR. EISEN:  No, Your Honor.

23             THE COURT:  Is that the difference is September?

24             MR. EISEN:  No.  With the Court's leave I will

25 explain the pipeline issue.

13

1     The firms have time going back to June that is in

2     these bills because of the way they're billed at the end of the

3     month.

4         THE COURT:  Okay.

5         MR. EISEN:  So you have June time, you have July

6     time and how you have August time coming in because August has

7     closed and the bills for August issue at the beginning of

8     September.  From the perspective of the criminal defendants --

9     and I don't believe that the other moving insureds who sought

10    advancement and whose motion we previously joined disagree --

11    what we would like to request the Court to do is to enter an

12    order that would be -- really, the words of which would be

13    identical to the order that was entered last time other than

14    the caption and the introductory paragraph, which would provide

15    that the bills should be paid through the date of the order

16    subject to the proviso that nothing in the order affects the

17    priority of payments because, you know, none of us wants -- we

18    recognize as the Court noted previously that it is a narrow

19    ruling confined to the obligation to advance that does not get

20    into other issues.  I would only add that in terms of the

21    equities or the harms to have -- we are already going to be

22    carrying September time while we wait for the issue to be

23    resolved.  We are at the point of having to undertake, as is

24    obvious from the bills, very substantial work to get ready for

25    trial which is in March, and I really think it goes to the

14

1   spirit and the letter of the cases to -- obviously, I'm not

2   asking the Court to issue an injunction that carries forward.

3   I recognize that there's going to be a motion for summary

4   judgment heard in October but in order to avoid disruption it's

5   important to have some lessening of the liabilities hanging

6   over the clients in the pipeline, and the other movants agree

7   with that provided the language is inserted about the priority

8   of payments.

9             THE COURT:  Well, let me make sure I understand

10  that.  I mean I can certainly see them making the argument that

11  they moved first for an injunction and I approved -- ordered

12  the payment of their defense costs through the date of the

13  earlier order so they're in essence now a week or so behind and

14  that may be a meaningful week because of month-end billing, and

15  so you're saying they don't oppose your sort of jumping ahead

16  by that extra billing?

17            MR. EISEN:  Your Honor, I think they would ask

18  that that be reciprocal that it also apply to them so the --

19  and I think that that is --

20            THE COURT:  Well, let me hear from them.  They're

21  standing up behind you so --

22            MR. KLINE:  Your Honor, Ivan Kline from Friedman,

23  Wittenstein for two of the other movants, Mr. Sexton and

24  Mr. Shearer.  I know I'm speaking also for Mr. Silverman.  I

25  believe -- because we joined in the same comment with Baker &

15

1  Hostetler -- our position is that it should be limited to the

2  same date, August 31st or August 30th, whichever it was --

3           THE COURT:  The date of that order.

4           MR. KLINE:  And they should not be jumping ahead.

5  And let's be realistic, a bill sent for August time on

6  September 8th is really not due now in any event and lawyers

7  all the time carry their bills for thirty days.  We didn't get

8  payment from U.S. Specialty or Lexington in, you know, a week

9  after the bills were submitted and in all fairness,

10 understanding the situation they're in is really -- we could

11 all wait until October 12th for the bills that are being sent

12 out in September.  That is our position and that this order

13 should not go beyond the same August 31st cutoff under any

14 circumstances.

15           THE COURT:  All right.  Ms. Kim, is that the view

16 for your clients as well?

17           MS. KIM:  Yes, Your Honor.  However, if you are

18 inclined to grant that as of this date --

19           THE COURT:  No, I understand.

20           MS. KIM:  Then, of course, we'd want to be brought

21 to the same and not falling behind, Your Honor.  That's all.

22           THE COURT:  Right.  Okay.  All right.

23           MR. EISEN:  Your Honor, our view is -- and I

24 apologize, I had understood from my conversation from Ms. Kim

25 that she was comfortable, in fact I circulated a form of order

16

1    that provided today and I had understood that others were

2    comfortable with that form of order and --

3            THE COURT:  Well, as long as they were going to

4    get pushed up, but I phrased my question with the assumption

5    that they weren't --

6            MR. EISEN:  I apologize if I did not understand

7    the admittedly rushed conversation in the hallway.

8            Your Honor, the criminal defendants, though, would

9    submit to the Court that there are different exigencies that

10   apply to our need and if I may the clients will be facing the

11   prospect of uncertainty as you've heard from Axis very

12   substantial August bills on top of very substantial September

13   bills.  It's not just the question of Axis having agreed to pay

14   and waiting a reasonable amount of time for the invoice to be

15   honored, it is the uncertainty and the precise chilling effect

16   on the ability to defend the case that the WorldCom court was

17   concerned with when it balanced the harms.  I do think in

18   fairness that if the Court were to order this relief that it

19   ought to apply to the intervening parties as well, but the

20   criminal defendants are really in a unique situation because of

21   the pendency of the criminal case and it will have a disruptive

22   effect on the ability to defend that case.  They will be

23   incurring enormous costs, and so I would ask the Court in a

24   balanced way that also recognized the needs of the intervenors

25   and for that matter of Axis with respect to priority of

1   payments to enter the order that allows us to limit some of the

2   backlog.  We're not insisting that those bills be paid

3   tomorrow.  Axis can take a reasonable amount of time to

4   evaluate them.  I understand that there were some deductions

5   that they applied to the bills that the others who were before

6   the Court a little less than two weeks ago submitted and we

7   don't have any objection to the normal course.  What is

8   difficult for us is to arrive at mid-October carrying millions

9   of dollars in fees for August and for September not knowing

10  whether our clients are going to be able to defend the criminal

11  case.  We think that the case law provides guidance to the

12  Court that in those circumstances it is appropriate to award

13  those fees and, frankly, the context is not irrelevant.  We

14  believe that Axis -- well, I certainly won't rehash the

15  argument -- we think that Axis should have advanced these fees.

16  The first two layers of insurance did advance the fees, we've

17  been in this position of jeopardy for some time and, you know,

18  Axis could have avoided today by, once the Court made its view

19  of the law and the facts clear, agreeing to advance fees we

20  would not be here.  So to some extent Axis has proceeded at its

21  peril.  We think that that raises issues about the good faith

22  of the insurer but that at any rate it is fair and right and

23  equitable for the criminal defendants to have the pipeline

24  lessened somewhat.

25              THE COURT:  Do you or the other two movants have

18

1   any factual showing that you want to make in respect of the

2   issue of whether, in no particular order, if I ruled -- or

3   whatever court had jurisdiction over this matter ruled --

4   against them ultimately that they could reimburse the money

5   advanced?  That would be one issue.  The other issue is their

6   ability to pay currently, themselves, and, I guess, the third

7   issue is as to the defense counsel's willingness to proceed

8   with this issue hanging over them. Or do you intend to rely on

9   the logic that Judge Cote set forth in WorldCom?

10              MR. EISEN:  Your Honor, I'll take those --

11              THE COURT:  In no particular order.

12              MR. EISEN:  -- in no particular order.  I think

13  there are two guiding precedents; one is the WorldCom case on

14  your first question and the other is this Court's decision two

15  weeks ago and this is the exact argument that the insurers made

16  in WorldCom.  I'll just read from the opinion at 469 to 470,

17  "Continental and Twin City argue that Roberts has failed to

18  show irreparable injury because he has not shown that he is

19  unable to retain counsel from his own funds." And then later on

20  the WorldCom Court also addresses the argument about

21  reimbursement and the Court says, "the issues here surmount

22  whether an individual director has or does not have sufficient

23  funds to pay counsel when confronted with litigation stemming

24  from services of a corporate director.  In some cases it will

25  be minor [here it is massive], in some cases a director will

1   have great personal wealth, in other cases she will not.  The

2   issue here is whether every director is protected by a policy

3   to have the ongoing payment of defense costs."  So we think

4   that <u>WorldCom</u> -- that that's the wrong question under <u>WorldCom</u>.

5   This is a -- as the Court noted at 87 to 88 of the transcript,

6   this is a massive litigation.  As demonstrated, the Court has

7   the evidence about the size of the bills, it has the evidence

8   about the pending civil cases that it relied on when we were

9   last before the Court.  It certainly is aware of the pending

10  criminal cases, and, respectfully, Your Honor, we think that

11  the case law does not require that question to be answered and

12  for the same reason that the Court advanced previously it's

13  appropriate to do so as of today or if the Court -- really, as

14  of today as to all the insureds.  We're not asking for special

15  treatment.  It really is as to all the insureds and we wouldn't

16  be here but for Axis' refusal to do that.  Indeed, for their

17  refusal to do something less.

18           THE COURT:  Okay.  What about the other two

19  defendants on that particular question?

20           MS. MOSES:  Thank you, Your Honor.  Barbara Moses

21  for Mr. Trosten.

22           I concur in Mr. Eisen's remarks.  I would also

23  point out that by asking the question together, by coupling the

24  two questions of ability to pay defense costs currently and

25  ability to repay in the event the case ultimately is determined

20

1    differently, I think Your Honor may have fallen into, perhaps

2    just on a testing the waters basis, what's really a Catch-22

3    that the carrier would like to set up.  On the one hand, they

4    have urged Your Honor -- and Your Honor rejected this on August

5    30th, correctly we believe -- on the one hand they urged Your

6    Honor to require the insureds to prove that they are broke in

7    order to get the advancement to which they are contractually

8    entitled but then in the next breath they have urged Your Honor

9    to rule that if the insureds are broke relief should be denied

10   because they will be at risk of non-repayment should the case

11   turn out adversely later in the day.  It seems to me, Your

12   Honor, that common sense and ordinary principles of equity tell

13   you that they can't have it both ways.  With respect to the

14   ability to repay, let me make the following, I think, also

15   common sense comment which is that the ability of an insured

16   who is facing criminal charges and is subject to a pre-trial

17   asset freeze order to repay at the conclusion of the criminal

18   trial depends in large part on how that trial comes out.  Now,

19   Axis, I think, would like for my client and the other criminal

20   defendants to lose their criminal trial because they will then

21   use that in the coverage dispute, but with respect to the

22   ability to repay I say to you that we need the defense costs

23   now in order to insure that the criminal trial comes out in

24   favor of our clients, which in turn has a bearing on the

25   ability to repay at the end of the day.

21

1          THE COURT:  Okay.

2          MR. GOLENBOCK:  Your Honor, Jeffrey Golenbock for

3   Mr. Bennett.

4          I would like to rely on the arguments that have

5   been made by my colleagues.  I don't think I need to add

6   anything further.  I'll, of course, answer any questions Your

7   Honor may have.

8          THE COURT:  Okay.  Thank you.

9          Ms. Gilbride.

10          MS. GILBRIDE:  Your Honor, the first thing I'd

11   just like to note for the record is that we have gone ahead as

12   suggested by Your Honor during the August 30th hearing and made

13   a motion to withdraw the reference.  I think it is important

14   for the Court to be aware of that.  Perhaps you are already

15   aware of that.

16          THE COURT:  I was.  Yes.

17          MS. GILBRIDE:  Okay.  That motion is before the

18   district court.  We're not quite sure where we are procedurally

19   with that so I can't report back where we are and when there's

20   going to be a hearing.  We have certainly asked that there be a

21   hearing expeditiously.  I believe that there will be, but we

22   face substantial opposition from the insureds with respect to

23   going that route as suggested by Your Honor on August 30th.

24          In any event, I don't believe we're here today in

25   the same posture that we were here on August 30th.  First of

22

1   all, the three moving parties here today initially moved to

2   dismiss Axis' complaint.  They joined in that motion.  That

3   motion was granted by Your Honor.  They have now turned around

4   and instituted an adversary proceeding seeking the same relief

5   sought by other moving parties and, Your Honor, I would suggest

6   that that is just fundamentally unfair and an abuse of the

7   legal system by these moving parties.

8            Additionally, Your Honor, these three defendants

9   are not in the same posture, on any test, particularly, one of

10  the three moving parties, as the moving parties on August 30th

11  who requested the preliminary injunction.  One of these parties

12  is the individual who signed the warranty letter that Axis

13  relied upon.  He's the individual who signed the application,

14  he's the individual whom the company disclosed in an SEC filing

15  three days after -- excuse me, shortly after the company went

16  public that he had hidden $430 million worth of receivables.

17  Well, that was information that Axis relied upon as well.  So,

18  Your Honor, I submit we are not in the same position that we

19  were in on August 30th.

20           With respect to the preliminary injunction, Your

21  Honor, I apologize first of all that we did not attach the Gaon

22  transcript.  It's not a published decision.  It's a transcript.

23  It was before Your Honor on August 30th.  It was submitted by

24  Arch, who sought to intervene on that day.  In any event, we'd

25  be happy to hand up a copy to Your Honor but you've already

23

1   made it clear that you're not going to rule upon it.  This

2   preliminary injunction was brought on very quickly as Your

3   Honor is aware and we apologize, again, for not submitting that

4   but I would strongly urge that the Court consider the

5   propositions that were articulated in that ruling, which

6   essentially our position is that what Judge Wood did was simply

7   apply Second Circuit case law which is clear that if you're

8   going to apply the lower standard for injunctions there has to

9   be a balancing of harms.  There's been no factual record made

10  before this Court; not one affidavit, not one individual has

11  come here to testify before Your Honor with respect to the

12  irreparable harm that they have allegedly suffered.  There is

13  no factual record before Your Honor, and I submit under Second

14  Circuit law that is simply fatal to an application for a

15  preliminary injunction.

16            Going to the balancing of harms, Your Honor, you

17  know, on the one hand you have individuals who have made no

18  factual showing whatsoever but who have come before Your Honor

19  and said that their defense is going to be devastated because

20  their defense counsel is not paid.  Well, I submit that that

21  should have been submitted to Your Honor in factual form.

22  There should have been evidence submitted to your Court of

23  that, not counsels' statements.  But in any event, so there's

24  no factual showing.

25            On the other side of the coin you have an

24

1     insurance company who has a policy provision that says if we

2     are ultimately successful we are entitled to repayment.  The

3     movants are here on a preliminary injunction.  Rule 65 provides

4     the answer to all of these questions.  If the Court is inclined

5     to grant the preliminary injunction, Your Honor, we would

6     suggest that the Court require the moving parties to post a

7     bond or some form of security so that in the event some court

8     agrees with Axis' position and finds that we have been

9     wrongfully enjoined that there is then some security for Axis

10    with respect to repayment.  Otherwise, Your Honor is advancing

11    something -- advancing relief to these parties on a very

12    preliminary basis without a full-blown hearing, with Axis'

13    complaint having been dismissed.  So with Axis not having the

14    ability to present its arguments in any shape or form and not

15    even requiring a factual showing by the parties and, you know,

16    Your Honor, we would submit under those circumstances at the

17    very least that the Court order these moving parties to post

18    some form of security in the event that Axis is successful.

19                You know, under the circumstances it's clear that

20    Axis has zero prospect of being repaid if at the end of the day

21    Axis is actually successful in whatever form we are able to

22    actually litigate our dispute.

23                With respect -- I don't know if you want to get

24    into the priority of payments issue, Your Honor -- the issue we

25    have there is that separate and apart from defense costs there

25

1    has been an executed MOU submitted to Axis, and as of today if

2    some court ultimately finds that there is actually coverage

3    under the policy and we are required to fund that settlement --

4    if the court says we should have considered that settlement as

5    of the date the settlement was executed, Your Honor will be

6    ordering us to advance defense costs in excess of our policy

7    limits.  Now, we are not at liberty to share that MOU with you

8    but --

9            THE COURT:  But you aren't paying under the MOU;

10   right?  Your clients aren't making a payment.  It's disputing

11   the coverage, I think.

12           MS. GILBRIDE:  Well, we've been asked to fund the

13   settlement.

14           THE COURT:  I know but you're not paying it.

15           MS. GILBRIDE:  I don't know that any determination

16   has been made.  Whether we are going to fund it or not has not

17   come to fruition.

18           THE COURT:  But I thought that Axis disclaimed

19   coverage?

20           MS. GILBRIDE:  Well, we did, Your Honor, but you

21   know, there's a moving target in terms of what the Court is

22   ordering us to do here.

23           THE COURT:  Well, but all I'm saying is the

24   individual -- I'm assuming it's an individual -- who submitted

25   the proposed settlement hasn't sought relief to compel payment;

26

1   right?

2                MS. GILBRIDE:  Not yet.

3                THE COURT:  Okay.  So how does requiring payment

4   of the defense costs, to somebody who hasn't sought that relief

5   -- and I'm assuming that anyone whose the beneficiary of the

6   policy knows that if this litigation is going on and would make

7   the same application that if they really wanted to enforce it,

8   but hasn't -- how does my ordering the -- if I were to do it --

9   the advancement of the defense costs put the insurer at a

10  disadvantage?

11               MS. GILBRIDE:  Your Honor, historically, the

12  defense costs have been reimbursed by the two underlying

13  carriers on a first in/first out basis.  So if one was to

14  consider the settlement as of the date it was executed in that

15  line of payments and we do ultimately -- we are required to

16  fund the settlement -- by advancing these defense costs now, we

17  could theoretically or we would be asked -- we are being put in

18  a position where we potentially are paying fees --

19               THE COURT:  Well, when was the MOU submitted?

20               MS. GILBRIDE:  When was it executed?  August 30th.

21               THE COURT:  Well, what --

22               MS. GILBRIDE:  Well, it was signed on August 30th.

23               THE COURT:  But when was it submitted to the

24  insurer?

25               MS. GILBRIDE:  July 30th.

27

1           MR. EISEN:  No.

2           MS. KIM:  Yes, July 30th.

3           MR. EISEN:  The MOU submitted --

4           THE COURT:  But it was signed after it was

5  submitted?

6           MS. KIM:  Your Honor, may I address that issue?

7           THE COURT:  Okay.

8           MS. KIM:  Helen Kim on behalf of Mr. Klejna, Your

9  Honor.  The MOU which was a settlement demand from the lead

10  plaintiffs in the underlying securities litigation in In Re:

11  Refco securities litigation was submitted to Axis on July 30th

12  on the date it was received by Mr. Klejna.

13          THE COURT:  Okay.

14          MS. KIM:  With a request to Axis to assist in the

15  settlement and to --

16          THE COURT:  To assist, but as far as a settlement

17  itself, when was that submitted as a settlement?

18          MS. KIM:  Well, we requested Axis to join the

19  negotiations because they have an obligation under the policy

20  to consent to settlement.

21          THE COURT:  All right.  But as far as an

22  obligation to pay money in respect of a settlement --

23          MS. KIM:  Well, Your Honor, it is our position

24  that Axis has an obligation, once it's presented with a signed

25  settlement agreement, to either consent or not consent and so

28

1    it has to set aside money for a settlement if it consents.

2            THE COURT:  I'm sorry, it wasn't signed when it

3    was submitted to them in July; right?

4            MS. KIM:  Not on July 30th but after --

5            THE COURT:  It was signed at the end of August;

6    right?

7            MS. KIM:  It was signed on August 30th after Axis

8    gave us -- told us to proceed as a prudent uninsured and to

9    proceed accordingly.

10           THE COURT:  Okay.  So wouldn't that be the

11   relevant date then?

12           MS. KIM:  August 30th; correct, Your Honor.

13           THE COURT:  Okay.

14           MS. KIM:  So what we're saying is -- and this goes

15   to the issue of priority of payments -- as long as any order on

16   the preliminary injunction does not interfere with the priority

17   of payments under the terms of the Axis policy we don't believe

18   that there's a problem.

19           THE COURT:  Okay.  How would it interfere?  Say I

20   were to require payment of these three individuals' defense

21   costs as of the date of my order which, I forget, was that

22   either August 30th or 31st?

23           MS. GILBRIDE:  The 31st.

24           THE COURT:  How would it interfere with this

25   separate potential obligation?

29

| | |
|---|---|
| 1 | MS. KIM: It would not, Your Honor. |
| 2 | THE COURT: Well, no, I was asking Ms. Gilbride. |
| 3 | MS. KIM: Oh, I'm sorry. |
| 4 | MS. GILBRIDE: If you were to order today as of |
| 5 | August 31st? |
| 6 | THE COURT: Yes. |
| 7 | MS. GILBRIDE: We're just trying to look at the |
| 8 | numbers and figure this out. We were anticipating that Your |
| 9 | Honor might be inclined to award advancement of defense costs |
| 10 | as of today. |
| 11 | THE COURT: No, well, that wasn't my question. |
| 12 | MS. GILBRIDE: Okay. I know. So I don't have the |
| 13 | answer readily available. I apologize. |
| 14 | MS. KIM: If it's $2.1 million as of August 31st |
| 15 | which were the numbers that we discussed earlier, there would |
| 16 | be nothing, Your Honor. No interference whatsoever. |
| 17 | THE COURT: All right. |
| 18 | MS. GILBRIDE: Your Honor, I think that if it was |
| 19 | as of August 31st I agree that we would still be within the |
| 20 | policy limits. |
| 21 | THE COURT: All right. I'm not saying that that's |
| 22 | where I'm going on this. I'm not saying that's -- no one |
| 23 | should read this as a determination of any allocation or |
| 24 | priority issues. |
| 25 | MS. KIM: We understand, Your Honor. |

30

1          THE COURT:  It's just that we're trying to figure

2     out the facts.

3          MS. KIM:  That's right, Your Honor, and we agree

4     with Your Honor.

5          MR. EISEN:  Your Honor, were the Court to decide

6     to enter the identical order as last time effective as of

7     today, the date of the order, it could also address this issue

8     by simply including the sentence that Ms. Kim requested.  We

9     and Ms. Kim's clients agree on that, that this order does not

10    affect the priority of payments in any way.

11         THE COURT:  Well, I know that an order can say

12    that, but as a practical matter it might wouldn't it?

13         MR. EISEN:  No, Your Honor, we think it would not

14    because the insurer is perfectly capable, as they've

15    demonstrated, of taking positions on the legal issues.  The

16    priority of payment issue is, we think, a make-weight issue.

17    The settlement has not been presented, much less approved.

18    They could certainly pay up to the limits without any risk.

19         THE COURT:  Well, no, let me -- as I understand

20    Axis' point, it's this, that although they have disclaimed

21    coverage, ultimately they might have to pay on the settlement,

22    and since the settlement came in as of a date that preceded

23    some of these bills, you know, the ones in September, they

24    would be paying these bills -- the post-September bills --

25    potentially out of sequence, first come/first serve.  Now,

1   maybe that's not right, maybe that priority doesn't depend on

2   first come/first serve necessarily, but that's their point.

3            MR. EISEN:  Your Honor --

4            THE COURT:  And they wouldn't have any ability

5   necessarily to get it back or reallocate it, necessarily.

6            MR. EISEN:  Your Honor, the issue is clouded

7   because the amount of the settlement is unknown.  However, I

8   can represent to the Court based on conversations with various

9   persons attempting to determine, you know, would you pay the

10   bills as of the beginning of September, mid-September, so on

11   and so forth, that the -- we believe it would be possible to,

12   without implicating the priority of payments issue at all, to

13   pay the bills through Friday. But, again, there is a safe

14   harbor for this, which is simply to provide in the order to

15   have us agree that pending the resolution in October the

16   insurer only needs to pay up to the amount of the settlement.

17   If, for example, the settlement is $6.5 million --

18            THE COURT:  No, I understand your point.  All

19   right.  So that would be a cap --

20            MR. EISEN:  That is a way to accommodate the harms

21   that the criminal defendants are facing and at the same time

22   give Axis a safe harbor.

23            THE COURT:  Okay.

24            MS. MOSES:  May I add a word, Your Honor, on the

25   priority of payment issue?  A word which is, I think,

32

1   particularly appropriate given Ms. Gilbride's comments

2   concerning consistency in litigation position.

3          We were required to initiate a new adversary

4   proceeding and to submit a pleading -- an adversary complaint -

5   - demanding payment of our defense costs in an ongoing schedule

6   in order to properly put this issue before Your Honor and be in

7   a position to ask Your Honor for a preliminary injunction for

8   that relief.  The settlement issue has never been teed up in

9   any pleading.  So, clearly, whether the Court has if you will

10  jurisdiction to rule on it at this point --

11         THE COURT:  Well, I don't think they're asking me

12  to rule on it, I think they're saying that as far as the

13  balance of the harms goes, I should take it into account.

14         MS. MOSES:  Well, second, Your Honor, Ms. Gilbride

15  has also asked Your Honor where's the evidence and has in

16  effect asked Your Honor to ask us for evidence of financial

17  condition, but, again, there has been no evidence presented to

18  Your Honor of the settlement or its amount or any of its

19  particulars, and, third, Your Honor, as we all know we have not

20  had an opportunity to brief this point but as we all know from

21  having practiced in federal court and under Rule 23 any

22  settlement in In Re:  Refco would have to be approved both

23  preliminarily and finally after a notice and comment period by

24  Judge Lynch before it would be binding on anyone.

25         THE COURT:  Okay.

33

1          MR. EISEN:  Your Honor, in addition to the very

2     last point that Ms. Gilbride made, I do think that we and

3     Ms. Kim's client and the other insureds agree that that

4     language that she suggested to the order that this does not

5     affect the priority of payments would allow the insurer to pay

6     up to what's available and then provide a safe harbor for the

7     rest.

8          May I very quickly be heard on Ms. Gilbride's

9     other points?

10         THE COURT:  Well, I hadn't finished asking her

11    questions.

12         MR. EISEN:  Okay.  I'll sit down.

13         THE COURT:  You can be, briefly, but after I -- I

14    want to go back over something that we spent a lot of time on

15    the last hearing, the interpretation of the provision of the

16    U.S. Specialty policy that says the insurer will pay covered

17    defense costs on an as incurred basis, and as I understand it

18    Axis' argument is that these defense costs aren't "covered"

19    under the policy?

20         MS. GILBRIDE:  Yes, Your Honor.

21         THE COURT:  But is that based simply on the

22    exclusions?

23         MS. GILBRIDE:  Yes.  It's based upon the warranty

24    and --

25         THE COURT:  Well, the warranty is not part of the

34

1    policy is it?

2           MS. GILBRIDE:  Well, it becomes part of the policy

3    and it provides for its own remedy, Your Honor.  It becomes an

4    exclusion by its own terms.  At the bottom of the warranty it

5    provides that it becomes part of the policy and becomes an

6    exclusion and it does not require any filing or adjudication of

7    facts, it simply requires that Axis in good faith make a

8    determination whether it applies to the facts before it and

9    determine whether or not there's coverage.

10          THE COURT:  Well, now you're moving away from the

11   warranty to the overall argument?

12          MS. GILBRIDE:  No, I was just saying what the

13   remedy is that the warranty provides.

14          THE COURT:  Okay.  All right.

15          Then I guess my other question on this same

16   contract issue is, you point to the following paragraph,

17   Paragraph 3, which is dealing with the allocation of losses

18   "covered" and losses "not covered" and say that that's further

19   indication that the insurance carrier was given the authority

20   under this contract to act unilaterally if it wasn't able to

21   agree; and my question is, I guess, why go through that

22   distinction at all in 3 if "coverage" pertains already?  Why

23   isn't that just a separate provision dealing with allocation?

24   I mean if -- as I take it your first argument is you can act

25   unilaterally as to whether something is "covered" or not.  Why

35

1   would the parties then have a whole separate provision that

2   would say the same thing?

3           MS. GILBRIDE:  Your Honor, we pointed to condition

4   (d)(3) simply as evidence that the entire policy should be

5   construed in context.  So our position is not that you should

6   go to (d)(3) with respect to this dispute, we rely solely with

7   respect to this dispute on (d)(1), but we rely upon (d)(3) as

8   evidence to be in support of our position under (d)(2); (d)(3)

9   is a provision that you actually utilize when there's covered

10  and uncovered claims.  So Your Honor is absolutely right that

11  you would not utilize (d)(3) in this dispute.  We were simply

12  pointing it out to show that it is consistent with Axis'

13  interpretation of (d)(2).  Our position is that (d)(2) says in

14  the first instance if defense costs are not covered, if the

15  policy is not triggered, then Axis, acting in good faith, of

16  course, would not have to advance defense costs.

17          THE COURT:  Okay.  Thanks.

18          MR. EISEN:  Your Honor, I'll take them in order

19  and I will attempt to be brief.

20          Ms. Gilbride's first point was that, after joining

21  in the motion to dismiss, for us now to seek advancement is an

22  abuse.  As the Court well remembers, we did not just join in

23  the motion to dismiss; in the alternative we also joined in the

24  motion to advance, and in response the Court asked us to take

25  procedural steps.  We've done that.  We've been crystal clear

36

1    throughout that we believe there's a legal obligation to

2    advance, so I think there's no inconsistency there.

3              In terms of the factual record issue, I really

4    would point the -- she first makes the point about irreparable

5    harm and then about the balance of the harms.  Our factual

6    showing is exactly the same factual showing that the other

7    moving insureds made.  It's exactly the same factual showing on

8    both of those points as was approved in WorldCom, so I think

9    that this is an argument that was made and that was rejected

10   and that does not --

11             THE COURT:  Well, I guess the only distinction

12   there is -- there seemed to be agreement between the parties

13   last week that the five D's and O's that were covered by the

14   injunction last week were fairly well-healed, and I mean that

15   was a point that Axis made and no one really disputed it -- and

16   that doesn't go to the point of irreparable harm but it does go

17   to their other point about ability to reimburse and I

18   understand your colleague's point about the Catch-22 or a

19   Hobson's Choice, but I think that may be a distinction between

20   last week's record and today's.

21             MR. EISEN:  Your Honor, I do think it is clear in

22   the WorldCom case that given the volume of the defense costs

23   here -- for example, as the Court knows in the KPMG criminal

24   litigation there was recently fact-finding by the district

25   court about what it costs to defend these cases.  Given the

37

1  volume, the precise -- you know, it is a harm on anyone and

2  that that factual showing is not required, we think, under the

3  case law.

4          I would also -- it goes to, I guess,

5  Ms. Gilbride's repeated statements both here today and in the

6  brief that there's zero prospect of repayment.  That really

7  turns the presumption of innocence on its head.  We believe the

8  clients will be acquitted.  We're looking to the Court for the

9  interim time so that we can keep working in September and at

10 the beginning of October towards that goal and to presume that

11 -- and Ms. Gilbride's conclusion really turns the legal

12 presumption on its head -- we think that she's made the wrong

13 analysis and she has not shown that there is zero prospect of

14 repayment, and, of course, I think zero prospect is an

15 overstatement.

16          On the priority of payments issue, we've already

17 made the point that there is a solution, which is to include

18 the language.  And then the interpretation issues, we think,

19 have already been decided by the Court and those are queued up

20 for summary judgment, so I won't speak to those now unless the

21 Court wishes me to.

22          THE COURT:  Okay.  Anyone else?

23          MR. CASHMAN:  Your Honor, may I be heard for one

24 moment?

25          THE COURT:  Yes.  Sure.  I'm sorry, which one of

38

1    these movants do you represent?

2            MR. CASHMAN:  I represent defendant Philip

3    Silverman.  He was among those who received the benefit of Your

4    Honor's preliminary injunction last week.

5            THE COURT:  Okay.

6            MR. CASHMAN:  I just wanted to underscore, Your

7    Honor, that I do not believe the issue of priority of payments

8    is appropriately before Your Honor this morning.  I think I

9    would be remiss being here today, having listened to all these

10   arguments, if I did not simply point out to Your Honor that

11   there are various conflicting interests among the insureds that

12   would have to be assessed in connection with any priority of

13   payment argument that were made, and so I think the only issue

14   that ought to be addressed here today is simply whether or not

15   defense costs should continue to be advanced at the request of

16   the moving defendants here and through what date, I think.

17   Those are the only issues that need to be addressed and ought

18   to be addressed, because all the other issues are complicated

19   and raise varying issues that are not before you today and the

20   policy itself does not offer a simple solution to those issues.

21           THE COURT:  Okay.  Well, let me hear somebody who

22   hasn't spoken yet.

23           MR. WILOMOWSKY:  Good morning, Your Honor.  Steven

24   Wilomowsky of Bingham, McCutchen, LLP on behalf of RJM, LLC,

25   the plan administrator.

39

1        Your Honor, I just want to make a point on the

2    record with regard to this motion, because the tie-in that

3    brings these parties to this Court is the lift-stay aspect, is

4    obviously the Refco aspect, but it does not follow necessarily

5    that if the Court's analysis that led to the lifting of the

6    automatic stay to the extent applicable for the other

7    defendants necessarily applies to the movants that are here

8    today. And the reason is, Your Honor, the movants today,

9    particularly Mr. Bennett and Mr. Trosten, have not filed proofs

10    of claim against the estates.  Mr. Grant, also, though he did

11    file a proof of claim, his claim has been estimated at zero

12    dollars for all purposes including distribution.

13        To the extent that in considering today's motion

14    Your Honor, taking into account impact on the estate, I think

15    that there is a difference between just, for example,

16    Mr. Klejna, who does have a claim filed against the estate and

17    then, presumably, even though that hasn't been litigated or

18    allowed or disallowed yet, but at least it's a claim that's

19    there that potentially that any recoveries that they are able

20    to get out of Axis or any other insurer is going to serve to

21    reduce the claim against the Debtors' estates, whereas, with

22    respect to the recoveries, for example, that may be achieved by

23    Mr. Bennett, the only thing that's doing is really reducing

24    availability of insurance proceeds for other people who do have

25    claims and whose claims would be reduced if they were able to

40

1    receive insurance proceeds.

2            So we haven't taken a position in this litigation,

3    it's been until now, certainly, it hasn't been -- early on in

4    the cases there had been some involvement, we had been involved

5    with Lexington, and it's been a close call among the plan

6    administrators whether to -- this whole process is an expensive

7    one and it's been a very time-consuming litigation for the

8    parties here and so we've been reluctant to get involved,

9    since, ultimately, there are no dollars -- there are no

10   actually dollars that can come out of this policy that can come

11   back into the estates, but we did want to say that to the

12   extent that Your Honor is reviewing today's motion both in

13   terms of its own jurisdiction and in terms of the lift-stay

14   standards and elements, we would note that the estate is not

15   going to be benefitted to the extent that, for example,

16   Mr. Bennett were to recover from these proceeds.

17            THE COURT:  Whether you take Judge Baer's version

18   of it or Judge Gerber's version of it, doesn't _Adelphia_ control

19   here?  I mean there's been -- at this point they're simply

20   indicted, they're not convicted, and under the _Adelphia_ case

21   law, which I think is the most thorough discussion of this

22   issue, wouldn't they be entitled to the money?  Leaving aside

23   issues of allocation which, again, I don't think I'm going to

24   get into, but assuming that there are no allegation issues,

25   don't they come first?

41

1          MR. WILOMOWSKY:  Well, two responses to that.

2     First, to the extent -- if one supposes that the automatic stay

3     is applicable here and I understand that that could be an open

4     question --

5          THE COURT:  Well, I don't think there's -- people

6     should stop talking about the automatic stay.

7          MR. WILOMOWSKY:  Okay.

8          THE COURT:  It's a plan injunction.

9          MR. WILOMOWSKY:  Okay.

10          THE COURT:  The confirmation order is really clear

11     on this in Paragraph 34.

12          MR. WILOMOWSKY:  Okay.  That's correct, Your

13     Honor.

14          THE COURT:  So when people are saying "automatic

15     stay" I'm translating it in my head --

16          MR. WILOMOWSKY:  They mean --

17          THE COURT:  -- the plan injunction.

18          MR. WILOMOWSKY:  Okay.  You got it, Your Honor.

19          THE COURT:  So that's what we're talking about.

20          MR. WILOMOWSKY:  All right.  In response to your

21     question I think that the differences here is that at least

22     what Adelphia speaks to is the access that the parties can have

23     to the policy notwithstanding the fact that they may be under

24     criminal indictment or whatever their situation might be.  I

25     think it's a separate question as to -- and I may be

42

1    misremembering <u>Adelphia</u> but I don't think that there was a

2    question in terms of the claims or at least the jurisdictional

3    question, I guess, which is if there is no possible benefit to

4    the estate then should this be something -- should this Court

5    be enjoining -- should be requiring this particular result from

6    Axis when either way there isn't going to be any possibility of

7    a benefit to the estate even in the form of a reduced claim.

8    That's the question, I guess.

9           THE COURT:  Well, but it, I guess -- okay.  Now I

10   understand your point now.  It's a jurisdictional point you're

11   raising as opposed to a lifting of an injunction point.

12          MR. WILOMOWSKY:  I think so, Your Honor.

13          THE COURT:  But as far as jurisdiction goes, in

14   addition to the narrow "benefit" issue, isn't there

15   jurisdiction premised on the fact that the policy itself is

16   property of the estate and I'm being asked to interpret it,

17   and, secondly, the fact that it's one in a layering of excess

18   coverage and at some point if the policy is interpreted

19   properly and the facts play out properly in that layering -- in

20   that sequence of layers the estate will benefit because there

21   will be insurance that will pay claims either of D's and O's or

22   of other claimants -- third parties -- who were, under the

23   Plan, made the appropriate election to look to the litigation

24   and, obviously, the insurance that is behind the litigation.

25          MR. WILOMOWSKY:  I think that's right, Your Honor.

43

1    I think though that ironically though the granting of this

2    motion is more likely -- if you assume -- if we don't present -

3    -

4                    THE COURT:  No, but you see that goes to the

5    merits as opposed to jurisdiction.  I understand, but sometimes

6    you have --

7                    MR. WILOMOWSKY:  I understand, Your Honor.  That

8    was it.  I think I've said enough.

9                    THE COURT:  Okay.

10                   MR. JEROME:  Your Honor, may I be heard?

11                   THE COURT:  Yes.

12                   MR. JEROME:  Your Honor, I represent Joseph P.

13   Murphy along with Baker, Hostetler.  Mr. Murphy was an officer

14   of Refco in charge of marketing and ran the regulated company,

15   which as Your Honor may recall was sold in these bankruptcy

16   proceedings.  Now, Mr. Murphy, as an officer of Refco is

17   unfortunately embroiled in the various class actions.  He was

18   also a beneficiary of the various insurance policies which are

19   contested.

20                   I think the dark and somewhat unstated fact here

21   is that as the assets -- and I'm not saying that it shouldn't

22   be done and that's not appropriate -- but equitably and fairly,

23   the unhappy fact is that as assets are burned for criminal

24   defense I have no doubt that the consequence of that will be

25   that Mr. Murphy will not in fact have enough funds from

44

1    insurance proceeds to answer to any judgment that might be

2    levied against him, and I also think he probably will not have

3    sufficient funds to defend himself in the class actions given

4    what I know and maybe my knowledge is deficient and Your Honor

5    knows, sometimes that happens with me, but it may be I'm right

6    and I think that I am.

7             So in terms of weighing the harm and the equities

8    here, while I'm not suggesting that the criminal defendants are

9    entitled to the relief that they seek here, I would like to

10   suggest that there is an opportunity that we have, an

11   opportunity of constricted time which we have between now and

12   October 12th when Your Honor will be called upon to make a

13   decision in respect of the permanent injunction.  I would hope

14   that in that constrained time frame we would, perhaps, resort

15   to some form of mediation. And I know, Your Honor, the other

16   insurance companies are not before you and I'm certainly not

17   asking that this Court, although it has the power, to compel

18   mediation.  I'm suggesting that the parties in the interests of

19   trying to iron out these various issues which will continue,

20   Your Honor, to come before this Court, because each and every

21   insurance company is going to deny coverage and is going to be

22   before this Court or some other court arguing this for months

23   on end, I think that if Your Honor would at least on the

24   record, while not compelling arbitration, suggest that it might

25   be a good idea for the parties to engage in between now and

45

1   October 12th and in addition to the parties, those other

2   insurers who are not before Your Honor may at least get a

3   friendly message which would encourage them to sit down and try

4   to at least get the process started.  I think that the result

5   of an appropriately negotiated, successful mediation could

6   result in evening out, I think, some of the tawdry races that

7   we're witnessing in terms of first come/first serve, have you

8   gotten your bills in or haven't you, and in point of fact,

9   Mr. Murphy's $13,000.00 bill for July wasn't filed on time.  We

10  were seven days late.

11          I know we'd like to avoid this and I think

12  mediation, hopefully, if it could resolve these matters could

13  resolve this, I think, unseemly race to the insurance

14  courthouse.  So, Your Honor, I would respectfully request that

15  this Court at least on the record encourage the parties to come

16  to some form of mediation.  I might add that there has been

17  some discussion between the parties on the subject and I think

18  that some of them might be favorably disposed to doing so.  If

19  some of the parties fall out and don't want to do it, that

20  doesn't mean that other parties involved, particularly my

21  client, my shared client, couldn't benefit from the mediation,

22  and in no way, shape or form, Your Honor, am I suggesting that

23  the mediation would prejudice these proceedings or interfere

24  with what's going to happen on October 12th.  I am suggesting

25  that we have a window of time, and I would hope that the Court

46

1    would encourage us and urge us to resort to mediation.

2              With that, Your Honor, I thank you very much for

3    your indulgence.

4              THE COURT:   Okay.

5              MR. EISEN:   Your Honor, I have a couple of very

6    brief points and then Ms. Moses will conclude on behalf of the

7    insureds.

8              With respect to counsel for Mr. Murphy's

9    statement, we wholeheartedly agree.  I don't know that it is

10   necessary or appropriate to be part of an order.  I take it

11   there's no disagreement as with the Debtor's position, they

12   haven't objected to the relief we seek and we think that the

13   idea of all sitting down and talking, bringing the other

14   insurers to the table is a good idea.  So, certainly, the

15   movants today do not need to be ordered to do that.  I do think

16   that the counsel's statement does emphasize the value of

17   issuing an order as of today that will apply to the payments of

18   these fees so that this race is not to the disadvantage of

19   some.  Obviously, we think the disadvantage is greater as to

20   the criminal defendants.

21             On the jurisdictional point that the Debtor

22   raised, the Court responded more eloquently and knowledgeably

23   than I can and I would only echo those points by saying, you

24   know, it really is one dispute that all of the movants are

25   queuing up for the Court.  The Court has already found that it

47

1    has jurisdiction, and as the Debtor noted, Mr. Grant had filed

2    the claims, they were disputed.

3            Then, finally, I looked back at whether it was

4    agreed or not as to the means of the previous movants and in

5    fact it was hotly contested.  Axis made the point very

6    forcefully that the previous insureds had not made a showing

7    either that they can't pay or that they can repay, and the

8    previous insureds replied with equal force that that is not the

9    test and I think the Court will find that the record is

10    completely devoid of that evidence because under WorldCom and

11    under Your Honor's holding that showing is not required in a

12    mega case of this kind and with that I will yield to my

13    colleague.

14            MS. MOSES:  Very briefly, Your Honor, and we do

15    appreciate the time you've devoted to this matter this morning.

16            Mr. Jerome used the term "unseemly" with respect

17    to the various insureds' request for defense payments.  I think

18    the only thing that can be said about that is that my client,

19    Mr. Trosten, and the other indicted plaintiffs, Mr. Bennett and

20    Mr. Grant, did not indict themselves.  They did not choose to

21    be criminal defendants, they are not --

22            THE COURT:  Well, I think he was just talking

23    about a rush to get bills in.  I think that's all he meant by

24    that.

25            MS. MOSES:  Right.

48

1              MR. JEROME: That's correct, Your Honor. Thank

2    you.

3              MS. MOSES: With respect to the mediation point,

4    no lawyer wants to be in the position of resisting a suggestion

5    of mediation and I certainly am not going to put myself in that

6       position but I do think it is fair to point out that while

7    the parties can and I hope they will voluntarily discuss a

8    potential non-litigation solution to this issue between now and

9    October 12th, nothing that we do between now and October 12th

10   can stop the clock with respect to the underlying actions,

11   either civil or criminal, and particularly given Axis' history

12   of resisting to the very last moment and sometimes beyond and

13   its demonstrated reluctance to write a check until and unless

14   it is specifically ordered to do so by this Court, my own view,

15   Your Honor, is that settlement discussions with an eye towards

16   possibly a global settlement involving the higher tier carriers

17   as well will be far more effective and far more likely to

18   succeed after October 12th if, indeed, that is the date for

19   summary judgment. Thank you.

20             THE COURT: Okay. Do you have anything to say,

21   Ms. Gilbride?

22             MS. GILBRIDE: Yes, just very, very briefly, Your

23   Honor.

24             With respect to the arguments advanced by both

25   counsel that the WorldCom decision controls somehow, whether or

49

1   not Your Honor has to consider balancing of harms, I would just

2   simply submit that the <u>WorldCom</u> court did not consider

3   balancing of harms in any way, shape or form. It didn't say

4   that you don't consider it, it simply wasn't considered. There

5   is Second Circuit authority precisely on point which says that

6   the balancing of harms must be considered when the Court orders

7   a preliminary injunction.

8           With respect to the Catch-22 that counsel and Your

9   Honor are concerned about, respectfully, there is a provision

10  in the Federal Rules that deal with that precise issue, it's

11  Rule 65(c), which states that when ordering a preliminary

12  injunction a court can and should but has discretion, of

13  course, order that the party who is being awarded the

14  preliminary injunction either post a bond or securitize the

15  amounts being awarded, and, respectfully, I think that that

16  deals with the Catch-22 situation that counsel is referring to

17  and, perhaps, was meant for just that situation.

18          With respect to the priority of payments issue,

19  Your Honor, I haven't had a chance to confer with Baker &

20  Hostetler but if Your Honor so desires a copy of the MOU in

21  camera with consent of counsel, we'd be happy to submit that to

22  you if you so desire.

23          I have nothing further. Thank you.

24          THE COURT: Okay.

25          MR. EISEN: Your Honor, could I just respond to

50

 1   the WorldCom point, because it is in the case.

 2               THE COURT:  No, I read -- I know.

 3        I'm going to take a look at Judge Woods' decision,

 4   so you can hand that up to me and I'm going to take a break,

 5   but before I do that I'm going to deal with the two pre-trials

 6   that I put at the end of the calendar and then I'll come back

 7   to you all probably by -- hopefully, by 12:00 or 12:15, so you

 8   can check your Blackberrys and make some phone calls and I'll

 9   be back around 12:15 or so, is my guess, with a ruling.

10               ALL ATTORNEYS:  Thank you, Your Honor.

11               THE COURT:  So if you could hand that up and then

12   I'll take the American Express v. Rodriguez or Gloria Ramirez.

13                    [Off the record.]

14               THE CLERK:  Please be seated.

15               THE COURT: Before the Court is a motion for a

16   preliminary injunction brought by Messrs. Grant, Trosten and

17   Bennett in this adversary proceeding in which they are

18   ultimately seeking a declaratory judgment and permanent

19   injunction against Axis Reinsurance Company, an excess insurer

20   that is currently in line in the tiers of insurance coverage

21   obtained by the debtor, Refco, Inc., for its officers and

22   directors and itself.

23        Procedurally, I should go through the history of

24   this matter briefly.  The first step in respect of this

25   insurance company or insurance coverage dispute was taken by

51

1    Axis in initiating an adversary proceeding against not only

2    Grant, Trosten and Bennett but the other officers and directors

3    of Refco, Inc. who have made claims in respect of the policy,

4    as well as Refco, for a declaratory judgment that Axis was not

5    obligated to pay under the policy.

6            That was followed by different responses by

7    various groups of defendants.  First, one group of defendants

8    represented by Weil, Gotshal moved to dismiss Axis' adversary

9    complaint. Second, another group of officers and directors made

10   a counterclaim for the advancement of defense costs, and third,

11   the present group, Grant, Trosten and Bennett, joined in or

12   purported to join in both of those requests for relief.  I

13   granted the motion to dismiss Axis' request for a declaratory

14   judgment as to its obligations generally under the policy to

15   provide coverage on the basis of the so-called "substantial

16   overlap" doctrine as set forth in numerous cases, including by

17   Judge Cote in In re: WorldCom, Inc. Securities Litigation, 2002

18   W.L. 31729501 (S.D.N.Y., December 5, 2002), as well as in

19   Adelphia and Enron.

20           The basis set forth in my bench ruling was that

21   ultimately the facts that Axis would need to establish to

22   prevail on its claim and, to the contrary, the facts that the

23   defendants would need to refute to defeat Axis' claim

24   substantially overlap with facts that would also in all

25   likelihood arise in the pending securities litigation before

52

1  District Judge Lynch, as well as, potentially, in the District

2  Court criminal litigation against Grant, Trosten and Bennett.

3          Turning then to the counterclaim and related

4  request  for a preliminary injunction, I determined that there

5  was a likelihood of success on the merits and irreparable harm

6  and, absent such, sufficient questions going to the merits and

7  the balance of harms in favor of the counter-claimants to

8  support an injunction requiring the advancement of their

9  defense costs billed through the date of my order.

10         However, I also concluded that procedurally the

11 request for the same relief by Messrs. Grant, Trosten and

12 Bennett was not properly before me, as they themselves had not

13 made a counterclaim and there was no adversary proceeding

14 asserting their claims against Axis and, consequently, no basis

15 for granting them a preliminary injunction.  They subsequently

16 remedied that procedural defect by commencing an adversary

17 proceeding and seeking and obtaining an expedited hearing on

18 their motion for a preliminary injunction for the advancement

19 of defense costs.

20         I should note as an aside that the parties should,

21 unless I'm missing something, promptly consolidate this

22 adversary proceeding with the counterclaim, which is now its

23 own adversary proceeding brought by the defendants represented

24 in part by Baker & Hostetler.

25         I won't go over at length the findings that I made

53

1  and the rulings that I made at the prior hearing.  They're set

2  forth in the transcript -- which I've reviewed as far as typos

3  and misheard words are concerned and corrected, and I hope

4  that's what the parties have.  I think it is.

5          I'll note that there was a procedural matter that

6  -- consistent with some of my remarks on the record, Axis has

7  subsequently moved in the District Court for withdrawal of the

8  reference of the adversary proceeding, and that well may be

9  heard before the hearing that I've scheduled for mid-October on

10 the ultimate relief requested by the counterclaim plaintiffs

11 and by Grant, Trosten and Bennett against Axis.

12          However, pending a determination of that motion

13 for withdrawal of the reference, I continue to have

14 jurisdiction and, as noted at the prior hearing and I think as

15 reiterated today in the colloquy with counsel for the Refco

16 plan administrators, I believe I have jurisdiction over this

17 matter and this adversary proceeding because it is one in which

18 I am asked to interpret the provisions of the Axis policy,

19 which is property of the debtor's estate, and, secondly,

20 because the payments under the policy affect distributions to

21 creditors of this estate, either creditors with indemnification

22 claims such as the directors and officers or, perhaps,

23 ultimately, securities law creditors and others who have made

24 claims not only against Refco but also against officers and

25 directors and under the plan agreed to a mechanism for pursuing

54

1    those claims jointly with the Refco estate.

2         This motion before me also seeks relief from --

3    what it says is the automatic stay -- to permit payment of the

4    insurance proceeds in respect of the advancement of defense

5    costs, which is also a "core" matter.  However, as I noted at

6    the last hearing, Paragraph 34 of the confirmation order

7    provides that the automatic stay itself is no longer in place.

8    However, it also notes that it does not otherwise amend the

9    Plan and the other provisions of the confirmation order, which

10   does contain its own plan injunction which may be implicated by

11   the payment of the defense costs.

12        In any event, because of that request, which I am

13   taking as a request for relief from the Plan injunction as

14   opposed to from the automatic stay, I also, as a third basis,

15   have jurisdiction here because ultimately I'm being asked to

16   interpret the Plan and enforce the Plan by considering relief

17   from the injunction in the Plan.

18        In short, the basis for the request for a

19   preliminary injunction is the movants' contention that under

20   the applicable insurance policies, which include the primary

21   policies as incorporated in the Axis policy, Axis is obligated

22   to advance, that is pay, defense costs, subject to

23   reimbursement if it's ultimately concluded that such defense

24   costs were not covered under the policy.

25        The movants contend that that contractual language

55

1   when coupled with the various presumptions regarding

2   interpretation of insurance policies under New York law

3   particularly provisions of insurance policies dealing with

4   exclusions and dealing with defense costs -- is clear and that

5   there's a substantial likelihood that they would prevail on the

6   merits.

7          They also contend that given the amount of defense

8   costs that have been incurred to date and the fact that they

9   are criminal defendants subject to freeze orders, the failure

10  to advance the defense costs irreparably harms them in that it

11  impairs their ability to mount an effective defense, in this

12  case of a criminal indictment.

13         They also contend that even if they were not a

14  substantial likelihood of success the balance of harms tips in

15  their favor given the foregoing contentions and the opposite

16  consideration that Axis is a very substantial corporation and

17  that it agreed to make these payments and take the risk of non-

18  payment in the policy.

19         Finally, they state, as a matter of public policy,

20  they should not be saddled with the payment of the defense

21  costs since that would vitiate the purpose of a D&O policy and

22  ultimately discourage parties from serving as officers and

23  directors of a corporation.

24         They have not presented any other evidence than

25  the amount of the defense costs and the fact that they are

56

1    facing a criminal trial in March of 2008 and the request for me

2    to take judicial notice of freeze orders.  That is, they've not

3    offered evidence as to their financial condition or their law

4    firms' willingness to work with the overhanging uncertainty as

5    to whether they would ultimately be paid for conducting the

6    movants' defense.

7              Axis has responded by, first, disputing that there

8    is a substantial likelihood that the movants would ultimately

9    prevail on the merits.  It is also contended that as a factual

10   matter irreparable harm has not been shown and that neither has

11   a balance of the equities tipping in favor of or a  balance of

12   the harms tipping in favor of the movants.  They also contend

13   that the public policy cited by some of the courts that have

14   previously considered this issue is less significant where an

15   officer and director is the subject of a criminal indictment

16   and is being defended in a criminal proceeding.  It has sought

17   a bond under Rule 65(c), as well.

18             Finally, it has contended that the relief that is

19   sought here is fundamentally inequitable because the movants

20   had previously joined in the motion, which was successful, to

21   dismiss Axis' declaratory judgment complaint.

22             As far as the amount of the defense costs is

23   concerned, I believe the record is now clear that through the

24   date of my prior injunction order, August 31st, the cost billed

25   was approximately $1.6 million for these three movants and that

57

1    it is approximately $2.9 million as of today.  The policy

2    itself has a $10 million limit.

3            Clearly, as far as these defendants are concerned,

4    they have been in serious litigation mode with very large

5    defense costs being incurred since July of this year, and it is

6    likely that that will continue over the next several months as

7    they prepare for trial in what appears to be a complex, at

8    least as a factual matter, case.  And I'll note in that regard

9    that I take judicial notice of the cost incurred by the Refco

10   estate of examining the facts and circumstances surrounding the

11   claims that at least overlap with the claims against

12   Mr. Bennett and the other two criminal defendants, costs which

13   I had to approve before they were paid.

14           Let me turn to the last point raised by Axis

15   first.  I concluded last week that it is not inequitable to

16   proceed with this type of claim and to grant preliminary

17   injunctive relief notwithstanding the movants' prior request to

18   dismiss Axis' complaint, although they along with Weil, Gotshal

19   were successful in that request or the Weil, Gotshal defendants

20   were successful in that request.  I do not believe there is a

21   basis for judicial estoppel here because I believe that the

22   issues pertaining to the motion to dismiss are fundamentally

23   different than the issues presented by the claim asserted in

24   the present adversary proceeding as well as the counterclaim

25   asserted by the other defendants.

58

1         As I noted previously, the basis for this request

2   is one in which I need not consider the factual issues that

3   overlap with the District Court securities litigation and the

4   criminal litigation but rather need only consider the language

5   of the contract, that is the insurance policies and the related

6   warranty, and applicable case law.  If, in fact, I were to

7   conclude ultimately that Axis was not obligated to advance

8   defense costs but could withhold those costs pending a

9   determination as to whether they were -- whether Axis would be

10  successful in concluding that this denial of coverage was

11  appropriate and correct, then there would be an overlap and at

12  that point this adversary proceeding and the adversary

13  proceeding brought by the counterclaim parties would be either

14  stayed or dismissed without prejudice pending the development

15  of those facts in the multi-district securities litigation

16  and/or the criminal case.  But I believe I can -- and unless

17  the reference is withdrawn, I must -- consider whether as a

18  matter of reading the insurance policies and the case law and

19  the related warranty whether there is a separate obligation to

20  advance defense costs prior to determination of the underlying

21  coverage dispute based on whether there was a misrepresent -- a

22  breach of the representation -- a breach of the so-called

23  warranty and/or the exclusions in the policy relied upon by

24  Axis for disclaimer of coverage apply.

25         Turning then to the other defenses raised by Axis,

59

1   let me address first the appropriate standard by which I should

2   consider the motion here for a preliminary injunction.  Axis

3   contends that because the relief sought here is one in which

4   Axis would be compelled to advance defense costs, this is a

5   request for mandatory injunctive relief rather than for a

6   prohibitory injunction.  Consequently, Axis argues, I need to

7   consider the request pursuant to a heightened standard that

8   applies to mandatory injunctions -- where I would have to find

9   on the merits a substantial likelihood that the plaintiffs

10  would ultimately prevail.  See, for example, Tom Doherty

11  Associates, Inc. v. Saban Entertainment, Inc., 60 F.3d 27, 35

12  (2d Cir. 1995).  In that case, the Second Circuit noted that

13  the distinction between a mandatory and a prohibitory

14  injunction has been the subject of criticism and particularly

15  noted the criticism of that standard in respect of breach of

16  contract cases where one party's assertion that the status quo

17  is merely being maintained is another party's assertion that

18  that party is actually breaching the status quo by breaching

19  the underlying agreement.

20          This very issue was addressed by what I believe to

21  be the leading case, or the most relevant case to the issues

22  before me, that is Judge Cote's opinion in In re: WorldCom,

23  Inc. Securities Litigation, 354 F. Supp. 2d. 455 (S.D.N.Y.

24  2005) in which she concluded ultimately that the heightened

25  standard for a preliminary mandatory injunction does not apply

60

1    to a motion for a preliminary injunction for the advancement of

2    defense costs, for the reason that -- for the reasons that she

3    lays out at Page 463 of that opinion.  She notes first that in

4    that matter, as well as here, given that the amount at issue is

5    well under the policy limit that a preliminary injunction would

6    not make it difficult or impossible to render a meaningful

7    remedy to a defendant who prevails on the merits at trial, and

8    that only part of the benefits to which the directors, in this

9    case the directors and officers, are seeking ultimately would

10   be covered here in the injunction.  And, secondly, that the

11   policy itself contemplated reimbursement.

12            That view was also recently followed in Great

13   American Insurance Company v. Gross, 2005 U.S. District Lexis

14   8003 (E.D. Va., May 3, 2005), which was vacated on other

15   grounds, 468 F. 3d 199 (4th Cir. 2006).

16            So I don't believe that I must follow the

17   heightened standard requiring the finding of clear likelihood

18   or a substantial likelihood of success on the merits.

19   Nevertheless, I have considered obviously whether there would

20   be a likelihood of success on the merits, as did Judge Cote in

21   the WorldCom case, but did not limit my inquiry to that

22   analysis but considered also the regular standard.

23            I conclude that, as did Judge Cote, in her words,

24   nevertheless even if the heightened standard applies I believe

25   that the movants here have established a clear likelihood of

61

1    success on the merits.

2         Let me turn to the merits now.  As Judge Cote

3    recognized, under New York law (and as an aside I previously

4    concluded that New York law should apply to disputes in respect

5    of this insurance coverage for the reasons set forth in my

6    earlier bench ruling), while the plain language of an insurance

7    agreement, as with any contract covered by New York law, is the

8    best evidence, and, if unambiguous, the only evidence, of the

9    parties' intentions, as a matter of law for the Court to

10   decide, in respect of insurance contracts, to the extent an

11   ambiguity exists and is unresolved by extrinsic evidence, such

12   ambiguity is read against the insurer.  The rule that insurance

13   policies are to be construed in favor of the insured is most

14   rigorously applied in construing the meaning of exclusions

15   incorporated into a policy of insurance or provisions seeking

16   to narrow the insurer's liability. And, finally, that where a

17   contract of insurance includes the duty to defend or to pay for

18   the defense of its insured that duty is a "heavy" one.

19         As set forth by Judge Cote, in addition under New

20   York law, including as interpreted by the Appellate Division in

21   the Kozlowski/Tyco case, as well as by numerous Southern

22   District courts, the duty of an insurer to pay an insured's

23   defense costs is distinct from and broader than its duty

24   ultimately to indemnify. Even where the policy does not provide

25   specifically for when defense costs are to be advanced, it has

62

1   been held that they need to be advanced as incurred under a

2   liability policy as set forth in Judge Baer's <u>Nu-Way</u> decision.

3         Moreover, it appears clear to me under New York

4   law that the duty to pay defense costs exists whenever a

5   complaint against the insured alleges claims that <u>may</u> be

6   covered under the insurer's policy.  That is, if it appears

7   from the face of the underlying complaint against the insured

8   that there is an issue as to whether that complaint sets forth

9   a claim that <u>may</u> be covered the costs would need to be

10  advanced.  See, for example, the <u>Kozlowski/Tyco</u> case as well as

11  the <u>Nu-Way</u> decision, which appears at 1997 U.S. District Lexis

12  11884 (S.D.N.Y. August 12, 1997).

13        The opposition to the motion by Axis attempts to

14  make a distinction between situations where the courts have

15  considered a refusal to pay defense costs because the insurer

16  has sought or has taken the position that the policy was

17  rescinded.  It has also taken the position that there should be

18  a distinction between the present matter and decisions which

19  have dealt with the duty to defend as opposed to a duty to

20  advance defense costs.  But I conclude based on my review of

21  the case law that where an insurer takes the position that a

22  claim is not covered and therefore it is not obligated to

23  advance defense costs those distinctions are not meaningful, in

24  that they apply in cases of rescission, cases where there's an

25  alleged obligation to advance and cases where there's an

63

1    alleged obligation to defend.

2                For example, in the Tyco/Kozlowski matter the

3    insurer alleged that the underlying claims were not covered and

4    therefore the defense costs would not be covered either.  The

5    Court held, however, that unless the insurer has no duty as a

6    matter of law it would have an obligation to advance the

7    defense costs, stating that the duty to defend or pay defense

8    costs is construed liberally and any doubts about coverage are

9    resolved in the insured's favor.  Furthermore, an insurer can

10   only invoke a policy exclusion to avoid coverage if it can show

11   that the allegations in the complaint casts that pleading

12   solely and entirely within the policy exclusions.  The duty to

13   defend arises when the action is brought and is unaffected by

14   the outcome of the action.  See, also, Pepsico, Inc. v.

15   Continental Casualty Company (S.D.N.Y. 1986), McGinnis v.

16   Employer's Reinsurance Corporation, 648 F. Supp. 1263 (S.D.N.Y.

17   1986); The Great American Insurance Company v. Gross case that

18   I referred to earlier and G1 Holdings, Inc. v. Heyman -- I'm

19   sorry, G1 Holdings, Inc. v. Reliance Insurance Company, 2006

20   U.S. District Lexis 17597 (D. New Jersey, March 22, 2006).

21               Axis' response, in addition to saying that it need

22   not advance the costs pending resolution of the dispute, is

23   that it is clear from the language of the insurance policy

24   itself that there is no way that it would be obligated to

25   provide coverage here.

64

1      As I noted in my prior ruling on the earlier

2  request for an injunction, this is ultimately premised upon

3  Axis' reading of Paragraph D2 of the underlying policy which

4  states that "the insurer will pay covered defense costs on an

5  as incurred basis.  If it is finally determined that any

6  defense costs paid by the insurer are not covered under this

7  policy the insured's agree to repay such non covered defense

8  costs to the insurer."  Axis contends that because of the word

9  "covered" in the first sentence, it need not pay costs that are

10 not covered under the policy.

11      I conclude that it is likely that that

12 interpretation will not prevail, given the foregoing case law

13 as well as the provision when read as a whole, which, first,

14 requires the insurer to pay covered defense costs "on an as

15 incurred basis," i.e. not waiting until an ultimate

16 determination, but as incurred with out of pocket payment, and,

17 secondly, the second sentence, which provides for reimbursement

18 if it is finally determined that any defense costs paid by the

19 insurer were not covered.

20      Axis contends that the word covered in the first sentence

21 has to mean "covered" by the policy but I have two responses to

22 that.  The first is that I see little difference between that

23 argument and an argument that says that, as in the cases that I

24 previously cited, a defense cost falls into an exclusion

25 because it's not for costs determined to have arisen from

65

1    defense of a claim covered by a policy -- i.e. the policy, it

2    was argued in those other cases, doesn't cover certain types of

3    claims and, therefore, the defense costs also would not fall

4    into the coverage of the policy.  Notwithstanding those

5    arguments, courts like the <u>Kozlowski</u> court determined that the

6    costs should be advanced pending ultimate determination of that

7    issue.

8            Secondly, "covered" -- when one looks at the

9    definition of defense costs and loss in the first sentence --

10   "covered," as used in the first sentence after looking at those

11   definitions, could mean whether it pertained to "insured

12   persons," or not, or whether those persons had become "legally

13   obligated," or not, to make the payments of their defense

14   costs.

15           So, in any event, I believe that ultimately it is

16   likely that the movants here would prevail on the merits. I

17   conclude that the following paragraph of the policy, which

18   deals with the allocation of losses covered and losses not

19   covered by the policy, does little to advance Axis'

20   interpretation and may slightly advance the movants' in that it

21   would seem to be superfluous if Axis' interpretation were the

22   correct one.  That is, you would not need to provide for a

23   distinction between losses covered and losses not covered if

24   the insurer could withhold under Paragraph D2, defense costs

25   that it believed were not covered.

66

1          I do not believe the language, which, again,

2   requires payment on an "as incurred," basis is materially

3   different from the language quoted by Judge Cote in the

4   WorldCom case and would need to be far clearer to create an

5   exclusion here.

6          Turning to the issue of irreparable harm, Judge

7   Cote found in WorldCom that wherever individual officers and

8   directors were faced with substantial defense costs that were

9   not being paid, they would -- they were subject to irreparable

10  harm.  As she says, "it is impossible to quantify the impact on

11  a litigant of a failure to have adequate representation at this

12  critical stage of litigation.  The ability to mount a

13  successful defense requires competent and diligent

14  representation.  The impact of an adverse judgment will have

15  ramifications beyond the money that will necessarily be

16  involved."  That's especially true, as noted by Judge Gerber in

17  the Adelphia/Regis case where the insured or the beneficiary of

18  the policy is the subject of a criminal proceeding.

19          Judge Cote is not alone in finding irreparable

20  harm in these circumstances.  It was also found in the G1 and

21  Gross cases that I cited earlier, as well as in McPeek v.

22  Travelers Casualty & Surety Company of America, 2006 U.S.

23  District

24  Lexis -- I'm sorry, excuse me.  Let me back up.

25          It was recognized in the Bondex International,

67

1    Inc. v. Hartford Accident & Indemnity Company case, 2006 U.S.

2    District Lexus 50083 (N.D. Ohio, July 21, 2006), to apply in a

3    case of an individual beneficiary or insured under a director's

4    and officer's policy but would not apply to a corporation, at

5    least absent evidence of insolvency, which again I believe

6    heightens or puts a fine point upon the burden faced by an

7    individual here.

8             There is one case that takes a contrary view, and

9    that is the McPeek case that I started to cite earlier.  McPeek

10   v. Travelers Casualty & Surety Company of America, 2006 U.S.

11   District Lexis 28619 (W.D. Penn., May 10, 2006), in which the

12   court found there was not irreparable harm because there had

13   not been a showing, a factual showing, that the beneficiaries

14   there would be unable to mount a defense.

15            There may conceivably be circumstances where an

16   additional factual showing would need to be made to establish

17   irreparable harm in this context, but I believe that there's a

18   sufficient record before me to show irreparable harm given the

19   substantial amount of the defense costs, the freezing of the

20   defendants' assets and the fact that they're subject to

21   criminal exposure.  So to the extent that I find McPeek at all

22   persuasive, I believe it's distinguished under the present

23   circumstances.

24         As did Judge Cote, therefore, I've concluded, although I

25   do not believe the heightened standard needs to apply, that the

68

1    movants meet it here.

2         Turning, however, to the ordinary standard for a

3    preliminary injunction, I've already discussed the merits, and

4    even if one were not to take the view that there was a clear or

5    substantial likelihood of success, for the reasons I've stated

6    I believe there is definitely sufficient a issue going to the

7    merits that I would turn then to the balance of harms, as the

8    merits are fair ground for litigation.

9         I conclude that the balance of harms tips

10   decidedly in favor of the movants here.  I believe that

11   although she did not have a heading in her opinion in which she

12   balanced the harms, Judge Cote did consider the harm not only

13   to the movant in not granting injunctive relief but also the

14   potential harm to the insurer were she to grant the relief, and

15   concluded, as I conclude here, that the balance of harms tips

16   decidedly in favor of the movant and that, as she discussed,

17   the fact that the -- in her belief there was no undue hardship

18   on the insurer as its liability is ultimately capped and,

19   secondly, that the policy set out a mechanism that the insurer

20   bargained for for reimbursement ultimately and that

21   particularly in light of the potential harm to the movant and

22   the public interest in favor of advancing the defense costs,

23   the insurer should not be entitled to more.

24        In a more explicit analysis both the <u>McPeek</u> and

25   <u>Great American v. Gross</u> cases similarly found a balance of

69

1  harms tipping in favor of the movant as well as the public

2  interest being in favor of the movant.

3         As noted at oral argument, Axis had cited to me an

4  unpublished -- including not appearing on either Lexis or

5  Westlaw -- ruling by Judge Wood in a civil matter, <u>Gaon v. Twin</u>

6  <u>City Fire Insurance Company</u>.  I've reviewed that,

7  notwithstanding the Second Circuit's rule on citation to

8  unpublished opinions and the fact that a copy of the ruling was

9  not obtainable by the Court or provided to the Court prior to

10 oral argument, and I conclude, first, that the decision by

11 Judge Wood is distinguishable in that she had, to my mind, a

12 far different view of the underlying merits of the case, which

13 was a very different case than the case before me. I note

14 further that while she mused that cases such as <u>WorldCom</u> may

15 not have considered sufficiently the balance of harms or the

16 balance of the equities, I do not view her as ultimately ruling

17 on that basis.

18        In any event, again, as I distinguished the <u>McPeek</u>

19 case, I believe that the amount at issue here and the fact that

20 this is a criminal matter distinguish the present matter from

21 <u>Gaon</u>.

22        As far as Axis' request that the movants post a

23 bond under Rule 65(c) incorporated by Rule 7065, I again follow

24 the logic set forth by Judge Cote in <u>WorldCom</u>, which was also

25 adopted by the <u>Great American v. Gross</u> and <u>G1</u> cases that I

70

1    cited earlier: effectively, to require a bond here in my view

2    would vitiate the entire ruling, particularly since these are

3    individual defendants. In essence, it would under the guise of

4    obtaining a bond require the movants to pay for insurance all

5    over again, notwithstanding the language of the policy.

6         So I exercise my discretion not to require a bond

7    in these circumstances. I do so also mindful that the amount

8    that I'm going to require to be advanced is well within the

9    capped amount of the policy and that, as I noted earlier, the

10   ultimate issues here are teed up for a final determination in

11   31 days, and that leads into the last part of my ruling.

12        It was requested by Axis that I rule as to the

13   proper allocation or priority of payment of funds directed to

14   be paid, if any, by me. I do not believe that request is

15   appropriately before me, given the seriousness of it, the

16   parties who would be affected by it, and the limited amount of

17   notice. As importantly, I don't believe it's a ripe question,

18   because I don't believe any other priority or any priority

19   issues are necessarily determined by my ruling today, and,

20   further, although this is not critical to my ruling, I don't

21   believe that my ruling today would put Axis in a position of

22   acting at its peril and paying out one way or another under the

23   policy, which it has generally disclaimed and refused to pay

24   out under, absent a judicial ruling requiring it to do so.

25        It appears to me that, therefore, an order

71

1    requiring payment with a full reservation of rights as to the

2    allocation, or priority, of payment generally under the policy

3    is appropriate.  I've determined, given the record as to the

4    billing of costs and the incurrence of costs, that it would be

5    appropriate to require Axis to advance the defense costs to

6    these three movants billed through the date of my prior order

7    so that there's no, if you will, acceleration of billing, and

8    that in my view the costs through the date of the prior order

9    were in large measure billed in the ordinary course and I think

10   appropriately paid.

11            I also believe that requiring the payment through

12   that date puts these three movants on an even footing with the

13   other movants who previously obtained the preliminary

14   injunction.  Given that I will be ruling, unless the reference

15   is withdrawn, at or around October 12th, I believe that my

16   present ruling would provide sufficient comfort to the law

17   firms defending these three individuals that they will continue

18   to provide the same level of service going forward without the

19   necessity of paying them the additional amounts that have been

20   billed starting in September and through today and that such

21   payments would not be necessary to avoid irreparable harm in

22   light of this ruling.

23            So it has been represented by counsel for the

24   movants that they would propose an order that's substantially

25   similar if not precisely similar to the prior injunction that I

72

1   had entered. I believe it would contain the language about,

2   though, the reservation and preservation of all issues as to

3   priority of payment.  Have you -- do you have such an order?

4           MR. EISEN: Your Honor, I have the following order.

5   I also have a disk.  This order is identical other than

6   changing the identities of the parties.  I provided a copy to

7   Ms. Gilbride and I provided a copy to Ms. Kim before the

8   hearing today.  If the Court likes as last time I can hand this

9   draft up and the Court can --

10          THE COURT: Does it have the language about the

11  reservation of rights as to priority?

12          MR. EISEN: It does not have the language about

13  reservations of rights.

14          THE COURT: All right.  Well, you should consider

15  the injunction effective as of today but I think you should

16  circulate that language because I think it's meaningful to the

17  parties and you can submit an order tomorrow.  It's 1:20 now.

18  You may get it in today, but submit it with that language.  You

19  don't have to settle it on the parties but they'll have some

20  time.  You should email it to them at the same time you submit

21  it to Chambers.  They can tell me if it doesn't agree with my

22  ruling.

23          MR. EISEN: I will, Your Honor.

24          MS. GILBRIDE: Your Honor, given the amount of

25  money involved and the fact that we've only recently received

73

1    most of these bills, Axis would respectfully request a

2    reasonable amount of time to review the bills and --

3              THE COURT: It's the same as the last ruling.  I

4    think it's -- it doesn't change anything as far as the policy,

5    as far as your other rights under the policy including

6    reviewing the bills, et cetera.

7              MS. GILBRIDE: It's just the turnaround time.

8    Since we've just gotten the bills it does take a little bit of

9    time to review the bills.

10             THE COURT: Again, this doesn't change that.  I'm

11   not saying you pay them tomorrow.

12             MS. GILBRIDE: I think the order says that we pay

13   them within ten days of the order.

14             MR. EISEN: Your Honor, if I understand the Court

15   correctly, it's only the bills that were presented to Axis as

16   of the Court's previous --

17             THE COURT: The date was August 31st.

18             MR. EISEN: August 31st.

19             MS. GILBRIDE: Presented to us or through that day?

20             THE COURT: Yes, billed.  Billed.

21             MR. EISEN: It's that the -- what I understood the

22   Court to be saying was the insurers had -- if the insurer had

23   the bills in hand as of August 31.

24             THE COURT: Okay.

25             MS. GILBRIDE: Thank you.

74

1       THE COURT: Now, as far as -- I know we're having -
2  - I had previously scheduled a telephonic conference on the
3  14th.  I saw the result in front of Judge Koetl. I don't know
4  whether there will be a motion for a stay or not.  I don't know
5  where you're going with withdrawal of the reference but I would
6  like to keep this on track for the 12th.  So --
7       MS. KIM:  Yes, Your Honor, that is our intention
8  to keep the motion for summary --
9       THE COURT: So I think we should still have that
10 conference on the 14th.
11      MS. KIM: That's fine, Your Honor. With respect to
12 Judge Koeltl, Judge -- we had an oral argument last Wednesday.
13      THE COURT: I read the -- someone attached the
14 transcript and the ruling.  So I'm up to date on that I think
15 unless there -- I read what was attached to the exhibit as an
16 exhibit.
17      MS. KIM: Well, actually that transcript, Axis
18 submitted a letter --
19      THE COURT: I saw that.  I saw that.  Very well.
20 Mr. Jerome raised the issue of mediation.  This is perhaps an
21 appropriate thing for the parties to do it.  I did not hear
22 Axis say whether it would be amenable to mediation or not.  I
23 think it would need to include the other insurers.  It seems to
24 me that the parties should consider mediation, but I don't
25 believe that these issues should be put on hold unless there is

75

1   substantial progress in such a mediation.  It seems to me that,

2   as I noted at the last hearing --

3           MS. GILBRIDE: Just so Your Honor is clear, it was

4   actually Axis' suggestion initially.

5           THE COURT: That's fine.  I'm happy if Axis wants

6   to mediate, but I think there are other insurers involved and

7   that would be fine to have happen but there's a -- I believe

8   there's a legal regime that governs in this area where insurers

9   refuse to pay under policies and the parties are free to

10  mediate but that legal regime governs and I think it needs to

11  be followed because there are consequences beyond just a ruling

12  by the Court as to whether the insured failed to pay or not.

13  So I'm not going to hold off in the litigation unless there's

14  substantial progress on a mediation, and I encourage the

15  parties to try to make substantial progress on it.  But I'm

16  afraid "the parties" means not just Axis but other parties.

17  This is not a litigation matter.  This is a mediation matter

18  and I think, as a practical matter, to mediate it you're going

19  to need other parties, the other insurers.

20          Ms. Kim.

21          MS. KIM: Your Honor, just one last housekeeping

22  matter.  Our intervention motion, I don't think anyone -- no

23  one opposed it.  So if you could just --

24          THE COURT: That's fine.  I obviously heard you

25  all. Again, the two proceedings should be consolidated, I

76

1    believe.   They raise the same issues in terms of interpreting

2    the contract at least.

3              MR. EISEN: Your Honor, we would move for

4    consolidation.  If the Court wants to order that now then we'll

5    take the appropriate steps with the clerk.

6              THE COURT: Do you want to think about that?

7              MS. GILBRIDE: Your Honor, we would appreciate an

8    opportunity to consider that.

9              THE COURT: That's fine.  That's fine.  It seems to

10   me it's sort of --

11             MR. EISEN: Thank you, Your Honor.

12                           * * * * *

13

14

15

16

17

18

19

20

21

22

23

24

25

77

1        I certify that the foregoing is a court transcript from

2    an electronic sound recording of the proceedings in the above-

3    entitled matter, except where, as indicated, the Court has

4    modified the transcript.

5

6                            _____

7                                      Shari Riemer

8    Dated:   September 12, 2007

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25