UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                       :

In re REFCO INC. SECURITIES LITIGATION    :     Case No. 07-md-1902 (JSR)
                       :

------------------------------------------------------------X
This Document Relates to:
------------------------------------------------------------X
KENNETH M. KRYS, *et al.*,            :
                       :

         Plaintiffs,       :
                       :     Case No. 08-cv-3065 (JSR)
    -against-             :     Case No. 08-cv-3086 (JSR)
                       :
CHRISTOPHER SUGRUE, *et al.*,      :
                       :

         Defendants.     :
------------------------------------------------------------X
------------------------------------------------------------X
KENNETH M. KRYS, *et al.*,            :
                       :

         Plaintiffs,       :
                       :     Case No. 10-cv-3594 (JSR)
    -against-             :
                       :
DEUTSCHE BANK SECURITIES INC., *et al.*,  :
                       :

         Defendants.     :
------------------------------------------------------------X

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION FOR CERTIFICATION OF THE COURT'S ORDER DENYING
DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' REFCO FRAUD CLAIMS ON
GROUNDS OF *IN PARI DELICTO***

## <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

Table of Authorities .................................................................................................. ii

PRELIMINARY STATEMENT ................................................................................ 1

1.  The lengthy pre-trial proceedings in this litigation have prevented SPhinX's
    investors from recovering the $263 million lost in the Refco fraud .................................... 4

2.  The extended pre-trial proceedings in this litigation have prevented SPhinX's
    investors from recovering an additional $511 million of their own money,
    which is sitting in secure bank accounts ........................................................ 6

ARGUMENT ......................................................................................................... 8

1.  An interlocutory appeal would be improper because it would delay the ultimate
    termination of this litigation ........................................................................ 10

2.  An interlocutory appeal would be improper because Defendants have not shown
    a question of law. .................................................................................... 13

3.  An interlocutory appeal would be improper because Defendants have not shown
    that any question of law is controlling ........................................................... 15

4.  An interlocutory appeal would be improper because Defendants have not shown
    substantial ground for difference of opinion .................................................... 16

CONCLUSION ...................................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ahrenholz v. Bd. of Trs. of Univ. of Ill.*,
 219 F.3d 674 (7th Cir. 2000) ...................................................................... 9, 13, 18

*Bankr. Servs., Inc. v. Ernst & Young (In re CBI Holding Co.)*,,
 529 F.3d 432 (2d Cir. 2008)................................................................................ 14

*Breeden v. Kirkpatrick & Lockhart LLP (In re Bennett Funding Grp., Inc.)*,
 336 F.3d 94 (2d Cir. 2003)................................................................................... 14

*Caraballo-Seda v. Municipality of Hormigueros*,
 395 F.3d 7 (1st Cir. 2005).................................................................................... 16

*Casey v. Long Island R.R.*,
 406 F.3d 142 (2d Cir. 2005)........................................................................... 13, 15

*Consol. Edison, Inc. v. Ne. Utils.*,
 318 F. Supp. 2d 181 (S.D.N.Y. 2004),
 *rev'd in part on other grounds*, 426 F.3d 524 (2d Cir. 2005) .................... 11

*Coopers & Lybrand v. Livesay*,
 437 U.S. 463 (1978)............................................................................................... 9

*Flor v. BOT Fin. Corp. (In re Flor)*,
 79 F.3d 281 (2d Cir. 1996).................................................................................... 16

*German ex. rel. German  v. Fed. Home Loan Mortg. Corp.*,
 896 F. Supp. 1385 (S.D.N.Y. 1995)............................................................. *passim*

*Gibbs v. Hawaiian Eugenia Corp.*,
 966 F.2d 101 (2d Cir. 1992)................................................................................. 14

*Hirsch v. Arthur Andersen & Co.*,
 72 F.3d 1085 (2d Cir. 1995).................................................................................. 14

*Kirschner v. Grant Thornton LLP*,
 No. 07 Civ. 11604(GEL), 2009 WL 1286326 (S.D.N.Y. Apr. 14, 2009),
 *aff'd sub. nom, Kirschner v. KPMG LLP* ["*Kirschner IV*"],
 626 F.3d 673 (2d Cir. 2010).................................................................................. 14

*Kirschner v. KPMG LLP*,
 No. 08 Civ. 8784, 2009 WL 1010060 (S.D.N.Y. Apr. 14, 2009)............................. 14

ii

*Kirschner v. KPMG LLP,* [*"Kirschner II"*],
    590 F.3d 186 (2d Cir. 2009)..................................................................... 10, 17

*Kirschner v. KPMG LLP* [*"Kirschner IV"*],
    626 F.3d 673 (2d Cir. 2010)..................................................................... 10, 17

*Klinghoffer v. S.N.C. Achille Lauro,*
    921 F.2d 21 (2d Cir. 1990)............................................................................ 11

*Koehler v. Bank of Bermuda Ltd.,*
    101 F.3d 863 (2d Cir. 1996)....................................................................... 9, 12

*Maryland Cas. Co. v. W.R. Grace & Co.,*
    128 F.3d 794 (2d Cir. 1997)............................................................................ 16

*McFarlin v. Conseco Servs., LLC,*
    381 F.3d 1251 (11th Cir. 2004) ............................................................. 13, 14, 15

*Mediators, Inc. v. Manney (In re The Mediators, Inc.),,*
    105 F.3d 822 (2d Cir. 1997)............................................................................ 14

*Oneida Indian Nation of N.Y. State v. County of Oneida,*
    622 F.2d 624 (2d Cir. 1980)............................................................................ 16

*Primavera Familienstifung v. Askin,*
    139 F. Supp. 2d 567 (S.D.N.Y. 2001)............................................................ 17

*Rosa v. Senkowski,*
    97 Civ. 2468, 1997 U.S. Dist. LEXIS 18310 (S.D.N.Y. Nov. 17, 1997) ................. 12

*SEC v. Credit Bancorp, Ltd.,*
    103 F. Supp. 2d 223 (S.D.N.Y. 2000)............................................................ 17

*Shearson Lehman Hutton, Inc. v. Wagoner,*
    944 F.2d 114 (2d Cir. 1991)............................................................................ 14

*United States ex rel. Assocs. Against Outlier Fraud v. Huron Consulting Grp., Inc.,*
    09 Civ. 1800, 2011 U.S. Dist. Lexis 54938 (S.D.N.Y. May 16, 2011) ................. 9, 10

*United States v. Culbertson,*
    598 F.3d 40 (2d Cir. 2010)............................................................................ 11

*Wight v. BankAmerica Corp.,*
    219 F.3d 79 (2d Cir. 2000)............................................................................ 14

## **Statutes**

28 U.S.C. § 1292(b) .......................................................................... *passim*

## __Other Authorities__

Statistical Division of the Admin. Office of the U.S. Cts.,
   6 Statistics Court of Appeals (2009) (www.ca2.uscourts.gov/Reports/09/Statistics.pdf) ......... 10

## PRELIMINARY STATEMENT

Over $511 million, held in the name of the SPhinX Funds, sits in secure bank accounts earning very little interest. This money belongs to investors[1] in the SPhinX Funds – all of the SPhinX Funds, not just SMFF.  The case *sub judice* seeks not only recovery for SMFF's loss of $263 million plus interest and the loss of the value of PlusFunds, as outlined in the Amended Complaint; it will also determine and give guidance regarding issues that need to be resolved for the Grand Court of the Cayman Islands to allow distribution of the $511 million that the SPhinX Funds are already holding for investors. This money has been tied up for over five years and cannot be distributed to the investors until key aspects of this litigation are resolved.

Without describing all of the issues Chief Justice Smellie of the Cayman court has to deal with, several things must happen in this Court before the Cayman court can authorize distribution of this half billion dollars. One is an adjudication from this Court relating to purported claims by, among others, PricewaterhouseCoopers LLP, Mark Kavanagh, Brian Owens, the DPM entities and Robert Aaron against the SPhinX Funds for direct indemnification, indemnification for possible contribution claims by other Defendants in this litigation and indemnification for attorneys' fees and legal expenses.

The parties have not attempted to adjudicate these indemnity claims in the Cayman court for several reasons, including New York law choice-of-law provisions in several of the relevant contracts. *See, e.g.*, Service Agreement § 20, at RA 0014834, June 30, 2004, submitted herewith as Exhibit A to the Declaration of Mason Simpson, Oct. 19, 2011.  In addition, each of the relevant contracts relieves the SPhinX Funds from any duty to indemnify the other party for

---

[1]SPhinX's investors include retirement funds, pension funds, institutional investors and charitable foundations such as the Miami Children's Hospital Foundation.

claims relating to that party's "willful misconduct," or similar language. For example, the Service Agreement with DPM provides:

> Nothing contained herein shall require either party to indemnify the other for acts of the others, which constitute gross negligence, malfeasance or willful misconduct.

*Id.* § 18.

Questions of the willfulness of Defendants' misconduct and of the validity of the indemnity provisions under New York law will be adjudicated, either on motions or at trial, in Your Honor's Court. And absent a settlement with all or nearly all of the Defendants purporting to hold indemnity rights, the Defendants argue in the Cayman court that there can be no distribution of any amount because potential contribution claims are virtually unlimited, and SPhinX's assets must be reserved to indemnify for such contingent claims in the event the Defendants' misconduct is found not to be willful.

Since they were appointed, the Joint Official Liquidators ("JOLs") of the SPhinX Funds have endeavored to facilitate a voluntary agreement among SPhinX's disparate groups of investors and other creditors for the distribution of at least some of their $511 million. In 2007, investors and the JOLs began negotiating a scheme of arrangement[2] to provide for at least a partial distribution. After extensive hearings and millions of dollars of fees spent by the JOLs and investors alike, the negotiations ended in February 2010 when the Cayman court issued an order, described in greater detail below, requiring a preliminary reserve of $117 million for only a certain subset of indemnity claims for attorneys' fees and expenses. It was clear that the reserve would become *much* bigger once the potential contribution claims and claims for

---

[2] A "scheme of arrangement" is, in essence, the Cayman Islands analog to a plan of liquidation under United States bankruptcy law.

additional attorneys' fees and expenses were included. In other words, the Cayman court cannot set an indemnity reserve until this case is resolved.

In May of this year, after this Court entered key rulings, the negotiations for a scheme of arrangement were rekindled and a tentative deal struck.  Certain Defendants – Deutsche Bank and BAWAG, who are claimants in the SPhinX liquidation and have the ability to block any scheme – demanded releases in this litigation as a condition to the proposed scheme of arrangement. Because of the impact of the proposed releases on this litigation, among other reasons, the JOLs do not support this new scheme.[3]

Uncertainties and delays hinder meaningful discussions between Plaintiffs and Defendants to settle pieces of this litigation.  The Defendants have been unwilling to come to the bargaining table while motions to dismiss remain pending.  It has been difficult to explain to investors how this suit was filed in March 2008, motions to dismiss were fully briefed by May 2009, and yet those motions still are not fully resolved.  Investors are so frustrated with the delay in this litigation that they are (unwisely, in the JOLs' opinion) considering giving up their day in court against Deutsche Bank and BAWAG just to get closer to partially resolving the indemnity issues and receiving a distribution.  The interlocutory appeal sought by the Defendants would put the investors at least a year and a half further from any resolution.

Even though Defendants are not asking for a stay, delay is inherent in all interlocutory appeals.  The delay in this case, however, places a unique hardship on innocent victims who have had their money tied up for over five years. The Defendants are using delay, deliberately or not,

---

[3] The JOLs are putting forth the proposed scheme to investors despite the JOLs' reservations regarding certain provisions of the scheme. The JOLs have provided the investors a confidential memorandum that the JOLs believe provides the information reasonably necessary to make an informed decision about the merits of the scheme.

to protect themselves from the consequences of their wrongdoing.  In this context the oft-repeated maxim is literally true: justice delayed is justice denied.

1.    **The lengthy pre-trial proceedings in this litigation have prevented SPhinX's investors from recovering the $263 million lost in the Refco fraud.**

On October 10, 2005, Refco revealed that its management had fraudulently inflated Refco's financial statements by some $430 million.  *See* Amended Complaint ("FAC") ¶ 11. SPhinX Managed Futures Fund SPC ("SMFF") had relied on Refco's reported financial strength in depositing and maintaining hundreds of millions of dollars of cash in unprotected accounts at Refco Capital Markets Ltd. ("RCM").  *See id.* ¶ 722-23; Primary Violations R&R at 25-26.  In fact, Refco was insolvent.  *See* FAC ¶ 26.

SMFF had approximately $312 million cash in RCM accounts as of October 10, 2005. *See* FAC ¶ 11.  On October 12, 2005, SMFF's cash was transferred out of the RCM accounts. *See id.* ¶¶ 12, 334.  RCM and other Refco entities entered bankruptcy on October 17, 2005.  *See id.* ¶¶ 11, 338.

On December 16, 2005, RCM's Official Committee of Unsecured Creditors commenced an adversary proceeding to recover the $312 million from SMFF.  *See id.* ¶¶ 12, 341.  The Bankruptcy Court entered a temporary restraining order freezing the cash the same day.  *See id.* As of that date, the SPhinX Funds no longer paid redemptions for investments exposed to SMFF and instead issued in-kind shares, denominated Special Situation Shares, to the extent of a redeeming investor's exposure to SMFF.  *See* Declaration of Margot MacInnis ("MacInnis Decl.") ¶ 7, Oct. 19, 2011.  SMFF settled RCM's preference claim for $263 million on April 26, 2006.  *See* FAC ¶¶ 14, 342.

On June 14, 2006, the SPhinX Funds halted redemptions entirely.  *See* MacInnis Decl. ¶ 8.  The companies began liquidation proceedings in the Cayman Islands on June 30, 2006.  *See*

FAC ¶¶ 15, 35.  The JOLs were appointed soon thereafter to manage the liquidation of the SPhinX Funds.  *See id.* ¶ 35; MacInnis Decl. ¶¶ 3-4.

On March 5, 2008, the JOLs filed suit against those who aided and abetted Refco's wrongful conduct.  Defendants removed these claims to federal court, where they were assigned to Judge Lynch and the Refco MDL.  The JOLs moved to remand, and Judge Lynch denied the motion on October 23, 2008.  Nearly all of the Defendants filed motions to dismiss in November 2008.  The motions were fully briefed by May 2009.[4]

President Obama appointed Judge Lynch to the Second Circuit on April 2, 2009, and on September 17, 2009 the Senate confirmed him.  Judge Lynch did not rule on the pending motions to dismiss before joining the Second Circuit.  The JOLs' actions (the *Krys* actions), together with the other Refco MDL actions, were transferred to this Court, which appointed Special Master Capra in October 2009 to issue reports and recommendations on motions to dismiss.  The Special Master has allowed virtually unlimited briefing and oral argument and has filed his reports and recommendations *seriatim* – issue by issue and defendant by defendant.  This process has been long and laborious, but it is now nearing completion.

In total, it has been over six years since the Refco fraud was revealed and over five years since the Funds made any distributions to investors.  The JOLs' claims against Refco's aiders and abettors have been pending for over three and a half years.  Meanwhile, the SPhinX investors have not received a penny of their money.  *See* MacInnis Decl. ¶ 8.  With this litigation continuing, the JOLs have not yet recovered the $263 million and other damages for the Refco

---

[4] With respect to the Defendants joining in the present motion for certification, only the Deutsche Bank entities' motions were not briefed by May 2009. The JOLs did not sue the Deutsche Bank entities until March 31, 2010.

fraud.  Worse, another $511 million, most of which was not exposed at all to SMFF or Refco, has been tied up since June 14, 2006 – more than five years ago.

2.    **The extended pre-trial proceedings in this litigation have prevented SPhinX's investors from recovering an additional $511 million of their own money, which is sitting in secure bank accounts.**

The JOLs currently hold approximately $511 million in cash in segregated, secure accounts earning very little interest.  *See* MacInnis Decl. ¶ 9.  One might ask why JOLs cannot distribute the portion of the $511 million to investors.  It is because PwC, Mark Kavanagh, Brian Owens, the DPM entities and Robert Aaron have asserted (either formally or informally) indemnity claims based on various contracts with the SPhinX Funds.  They have argued that the SPhinX Funds must indemnify them not only for the amount of their attorneys' fees and costs in this litigation, but also for the amount of any possible contribution claims by non-indemnified defendants.

The JOLs rejected the indemnity claims because the indemnity agreements are inapplicable to litigation between the parties to the agreements, as well as being inapplicable to claims arising from the indemnity claimants' intentional misconduct.  The Cayman court, at the JOLs' request, has said that it will look to this Court to determine what indemnity claims, if any, are valid.  *See* MacInnis Decl. ¶ 14.

The indemnity claimants asked the Cayman court to order the JOLs to set aside a reserve, pending the outcome of this litigation, to pay any indemnity claims that might someday be allowed.   In November 2009, the Cayman court held extensive hearings, which included testimony from expert witnesses, to determine the reserve amount *just for the litigation expenses of the indemnity claimants*.  *See id*. ¶ 15.  PwC, Kavanagh, Owens, DPM and Aaron argued in that hearing that the reserve should be set at an amount representing the maximum possible

expenses that might be incurred in this litigation.  The court issued an order dated February 4, 2010, setting an *initial* reserve for potential litigation costs at $117 million.  *See id.*

As noted, $117 million is only a preliminary number.  The Cayman court has not yet determined the additional amount that must be reserved to cover possible liability for contribution or other potential claims that could hypothetically be asserted against PwC, Kavanagh, Owens, Aaron, Deutsche Bank and other parties such as former officers and directors who have indemnity agreements with the SPhinX Funds.  *See id.*  Based on the outcome of the November 2009 hearing, the JOLs expect that the court will set a reserve equal to the maximum possible liability.  *See id.* ¶¶ 19-20.  Through their purported indemnity claims, PwC, Kavanagh, Owens, DPM and Aaron have effectively hijacked the entire SPhinX Funds liquidation and are holding the investors hostage.

The effectiveness of the indemnity claimants' tactics is apparent.  From 2007 through 2010, the JOLs worked with investors to negotiate a scheme of arrangement that would compromise disputes among the investors and allow for a substantial distribution of assets.  *See id.* ¶ 11.  When the Cayman court set an initial indemnity reserve at $117 million, the proposed scheme collapsed.  *See id.* ¶ 15.

Certain investors have now proposed a new scheme, which would require the JOLs to release defendants Deutsche Bank and BAWAG as part of its terms.  *See id.* ¶ 17.  The JOLs oppose the releases and believe the proposed scheme would be harmful to this litigation if adopted.  *See id.*  But the investors' willingness to release claims to get them closer to a distribution demonstrates their frustration with the delay caused by the litigation.  The new scheme would not even result in an immediate distribution because it does not resolve the indemnity reserve issue, but investors are considering it, along with the releases, in the hope that

it will bring them closer to a distribution.  In other words, SPhinX's investors may give up their day in court just to get closer to a distribution.

The bottom line is that PwC, Kavanagh, Owens, DPM, Aaron and Deutsche Bank have leveraged this litigation by asserting their purported indemnity claims against the SPhinX estate. And it is not only these Defendants that reap the inappropriate benefit; *all* of the Defendants gain.  The Defendants' leverage only increases as this litigation drags on and investors become more anxious to obtain a distribution.  This Court should not countenance any further delay. Interlocutory appeal would postpone the resolution of this litigation by a year and a half or more, and distribution to investors would be postponed in lockstep.  For this reason, and because the Defendants cannot meet the exacting standards of 28 U.S.C. 1292(b), this Court should deny certification of the September 12, 2011 Order for interlocutory appeal.

## <u>ARGUMENT</u>

The requirements for certification of an order for interlocutory review are established by 28 U.S.C. § 1292(b):

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.

The Second Circuit has recognized that interlocutory review under this statute is a rare exception to the final judgment rule:

> It is a basic tenet of federal law to delay appellate review until a final judgment has been entered. Section 1292(b)'s legislative history reveals that although that law was designed as a means to make an interlocutory appeal available, it is a rare exception to the final judgment rule that generally prohibits piecemeal appeals.

*Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863, 865 (2d Cir. 1996) (citing *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 475 (1978)).

Interlocutory appeal is a "drastic delaying remedy" and "federal practice is strongly biased against" it. *United States ex rel. Assocs. Against Outlier Fraud v. Huron Consulting Grp., Inc.*, 09 Civ. 1800, 2011 U.S. Dist. Lexis 54938, at *4 (S.D.N.Y. May 16, 2011) (Rakoff, J.). "Appeals from interlocutory orders prolong judicial proceedings, add delay and expense to litigants, burden appellate courts, and present issues for decisions on uncertain and incomplete records, tending to weaken the precedential value of judicial opinions." *Id.* at *4-5. Indeed, one very seasoned appellate judge observed that "merely the filing of a section 1292(b) petition tends to delay the litigation in the district court even though the filing does not cause the litigation to be stayed." *Ahrenholz v. Bd. of Trs. of Univ. of Ill.*, 219 F.3d 674, 675 (7th Cir. 2000) (Posner, J.).

As this Court made clear in *Huron Consulting*, interlocutory review is disfavored even if the requirements of 28 U.S.C. § 1292(b) are met:

> The Second Circuit has therefore held that only exceptional circumstances will justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment. Indeed, a district judge has unfettered discretion to deny certification of an order for interlocutory appeal even when a party has demonstrated that the criteria of 28 U.S.C. § 1292(b) are met.

2011 U.S. Dist. Lexis 54938, at *5 (citations and internal quotation marks omitted).[5]

---

[5] *See also Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863, 866 (2d Cir. 1996) ("The public record of the Second Circuit for the years 1994 and 1995 reveals a total for the two years of 35 motions for leave to appeal under § 1292(b), of which only eight were granted.").

1.    **An interlocutory appeal would be improper because it would delay the ultimate termination of this litigation.**

Certification of the Court's September 12, 2011 Order would not "materially advance the ultimate termination" of this litigation as required by 28 U.S.C. § 1292(b).  Instead, it would impose delay.

As described above, the Defendants have a strong incentive to delay these proceedings. The interlocutory review sought by Defendants would hold SPhinX's investors hostage for an extra year and a half, *at a minimum*.  According to the most recent available statistics, the median time for deciding an appeal in the Second Circuit, from the filing of the notice of appeal to the issuance of the opinion, is 17.6 months.  *See* Statistical Division of the Admin. Office of the U.S. Cts., 6 Statistics Court of Appeals (2009) (www.ca2.uscourts.gov/Reports/09/Statistics.pdf).

Furthermore, any review of this Court's September 12, 2011 Order would necessarily involve state law principles of agency, the nature of claims (*i.e.*, direct versus derivative), and injury to the corporate body.  Thus, resolution of the Defendants' appeal could well require certification to the New York Court of Appeals, adding yet *another* year to the appeal.[6]  This additional delay, in light of the already protracted process for deciding motions to dismiss, is reason enough to deny certification.  *See Huron Consulting*, 2011 U.S. Dist. LEXIS 54938, at *4-5.

Defendants argue that if the Second Circuit were to reverse this Court's Order, "costly discovery and motion practice" would be eliminated.  Def. Mem. at 13.  But this is true every time a trial court denies a motion to dismiss.  The cases cited by Defendants do nothing to

---

[6] In the *Kirschner* appeal, certification of state law questions to the New York Court of Appeals added approximately 11 months to the appeal. *See Kirschner v. KPMG LLP* ["*Kirschner II*"], 590 F.3d 186 (2d Cir. 2009); *Kirschner v. KPMG LLP* ["*Kirschner IV*"], 626 F.3d 673 (2d Cir. 2010).

weaken the strong policy against interlocutory appeal and "piecemeal" appellate practice. *United States v. Culbertson*, 598 F.3d 40, 46 (2d Cir. 2010) (rule of finality "is inimical to piecemeal appellate review of trial court decisions which do not terminate the litigation") (citation and internal quotation marks omitted).[7]

Defendants fail to acknowledge that much of the discovery regarding the Refco fraud has already occurred.  Document production appears to be complete, and the parties in the MDL have conducted over 100 depositions, including representatives of the moving Defendants, regarding the fraud at Refco.  Although depositions regarding the so-called SPhinX fraud must be taken, these depositions will happen regardless of the outcome of an interlocutory appeal on the Refco fraud claims.  And, while some additional discovery regarding the Refco fraud may be necessary, this is not a case where a ruling from the Second Circuit could obviate a significant amount of discovery.

The Defendants argue that if the Second Circuit were to reverse the Court, a number of Refco fraud defendants would be dismissed, and the case would be narrowed.  *See* Def. Mem. at 15.  Again, this is true every time a motion to dismiss is denied.  As Defendants concede, only some of the claims against some of the Defendants are affected by the Court's September 12, 2011 Order.  *See* Def. Mem. at 13.  There would still be discovery, the case would still go to trial (assuming the case is not dismissed on separate grounds), and issues related to the Refco fraud would still need to be developed and proved, even if the Court's ruling were reversed.

---

[7] *See also, e.g., Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 25 (2d Cir. 1990) ("only exceptional circumstances will justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment" (citation and internal quotation marks omitted)); *Consol. Edison, Inc. v. Ne. Utils.*, 318 F. Supp. 2d 181, 196 (S.D.N.Y. 2004) ("Section 1292(b) was not intended to open the floodgates to a vast number of appeals from interlocutory orders" (citations and internal quotation marks omitted)), *rev'd in part on other grounds*, 426 F.3d 524 (2d Cir. 2005).

Defendants therefore cannot show that an immediate appeal will materially advance the ultimate termination of the litigation.  *See German ex. rel. German  v. Fed. Home Loan Mortg. Corp.*, 896 F. Supp. 1385, 1398 (S.D.N.Y. 1995) (denying motion for certification where "there are numerous claims and other defendants who would be unaffected by a favorable ruling" on an interlocutory appeal).

Narrowing the issues or parties simply is not one of the goals of Section 1292(b), nor is the statute a "vehicle to provide early review of difficult rulings in hard cases."  *Rosa v. Senkowski*, 97 Civ. 2468, 1997 U.S. Dist. LEXIS 18310, at *8 (S.D.N.Y. Nov. 17, 1997).  The standard is not whether immediate review might somehow be productive, but whether it will "materially advance the *ultimate* termination of the litigation."  28 U.S.C. § 1292(b) (emphasis added); *see also Rosa*, 1997 U.S. Dist. LEXIS 18310, at *7 ("Certification is only warranted in 'exceptional cases', where early appellate review 'might avoid protracted and expensive litigation'") (citation omitted).

Here, the appellate review sought by the Defendants is not early.  We are three and half years in, and the litigation has already been protracted.  Appellate review would only affect a portion of the claims and parties – parties for whom most of the discovery has been completed – so a ruling from the Second Circuit would not accelerate the "ultimate termination" of the litigation.  *See Koehler*, 101 F.3d at 865-66 (interlocutory appeal is a "rare exception" to the rule against piecemeal appeals "reserved for those cases where an intermediate appeal may avoid protracted litigation").

Most importantly, the Defendants ignore the fact that if the Second Circuit were to agree with the conclusions of this Court, which we submit is entirely likely, certification would result

in a needless delay of a year and a half or more.  Defendants' motion for certification should be denied to avoid further delay.

## 2.   An interlocutory appeal would be improper because Defendants have not shown a question of law.

Certification of this Court's September 12, 2011 Order for interlocutory review would be improper for the additional reason that there is no "question of law" as required by 28 U.S.C. § 1292(b).  The Court and the Special Master correctly concluded that the SPhinX Plaintiffs do not seek to step into Refco's shoes to assert claims on behalf of the Refco estate.  *See* July 5, 2011 Report & Recommendation of the Special Master on the Omnibus Issue of In Pari Delicto & Refco Fraud Claims ["R&R"] at 16, *aff'd*, Order, Sept. 12, 2011 (Rakoff, J.).  As such, Refco management's bad acts cannot be imputed to SPhinX or PlusFunds. Defendants seek certification because they lost on this issue.

Interlocutory review is not available, however, merely because Defendants disagree with the Court's ruling.  Rather, interlocutory review is reserved for extraordinary situations where a case turns at least in large part on a "pure" question of law that can be readily resolved by an appellate court "without having to delve beyond the surface of the record."  *McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251, 1259 (11th Cir. 2004).[8]  Thus, interlocutory review is routinely declined where the disputed issue is the application of law to the facts of the case.  *See, e.g., Casey v. Long Island R.R.*, 406 F.3d 142, 147 (2d Cir. 2005) (holding no question of law existed where there was no "dispute as to the proper legal standard" and the question turned on the

---

[8] *See also Ahrenholz v. Bd. of Trs. of Univ. of Ill.*, 219 F.3d 674, 676-77 (7th Cir. 2000) (noting that the drafters of 28 U.S.C. § 1292(b) "used 'question of law' in much the same way a lay person might, as referring to a 'pure' question of law rather than merely to an issue that might be free from a factual contest").

application of this standard to the evidence); *McFarlin*, 381 F.3d at 1258 ("The term 'question of law' does not mean the application of settled law to fact.").

Here, the relevant principles of law are settled: When an interested party (such as a creditor, shareholder, or insurer-subrogee) steps into the shoes of a corporation to bring claims on behalf of the company against third parties, those claims are subject to the any defenses that could be raised if the company itself were bringing the claims.  *See, e.g., Gibbs v. Hawaiian Eugenia Corp.*, 966 F.2d 101, 104 (2d Cir. 1992).  Where third parties have cooperated with the company's management to commit a fraud on the company's creditors, claims on behalf of the company are barred, and creditors may bring claims in their own right against the third parties. *See Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118-19 (2d Cir. 1991); *Mediators, Inc. v. Manney (In re The Mediators, Inc.)*, 105 F.3d 822, 825 (2d Cir. 1997) ("Where third parties aid and abet a fiduciary's breach of duty to creditors – as is claimed here – the creditors may bring an action in their own right against such parties.").[9]

Defendants quarrel with this Court's determination that the SPhinX Plaintiffs bring these claims in their own right, rather than as representatives of Refco.  *See* July 5, 2011 R&R at 16. This is a classic question of the application of settled law to the facts of the case, which is no basis for interlocutory review.  *See German*, 896 F. Supp. at 1399 (denying motion to certify interlocutory order where prior case law "described the standard and this Court applied it," notwithstanding no other court had addressed "this exact question").

---

[9] *See also, e.g., Kirschner v. Grant Thornton LLP*, No. 07 Civ. 11604(GEL), 2009 WL 1286326, at *5, 10 (S.D.N.Y. Apr. 14, 2009), *aff'd sub. nom., Kirschner v. KPMG LLP ["Kirschner IV"]*, 626 F.3d 673, 676-77 (2d Cir. 2010); *Bankr. Servs., Inc. v. Ernst & Young (In re CBI Holding Co.)*, 529 F.3d 432, 438 (2d Cir. 2008); *Breeden v. Kirkpatrick & Lockhart LLP (In re Bennett Funding Grp., Inc.)*, 336 F.3d 94, 102 (2d Cir. 2003); *Wight v. BankAmerica Corp.*, 219 F.3d 79, 86 (2d Cir. 2000); *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1094 (2d Cir. 1995); *Kirschner v. KPMG LLP*, No. 08 Civ. 8784, 2009 WL 1010060, at *1 (S.D.N.Y. Apr. 14, 2009).

Furthermore, an interlocutory appeal could open up numerous other questions that have been decided by this Court. The September 12, 2011 Order incorporates prior rulings on questions of standing, primary violations (*e.g.*, whether Refco fraudulently induced SMFF to deposit cash, whether Refco owed fiduciary duties to SMFF), and the effect of certain Defendants' settlement with the Refco trustee. Accordingly, the Second Circuit on the proposed interlocutory appeal would necessarily have to consider a number of this Court's orders and Reports and Recommendations of Special Master Capra, including the Standing R&R, the Primary Violations R&R, the BAWAG/EMF R&R and the R&R on *In Pari Delicto* and *Wagoner*, in addition to the September 12, 2011 Order. None of these questions is a "pure" question of law, and it would be difficult for the Second Circuit to sort through these myriad questions "without having to delve beyond the surface of the record." *McFarlin*, 381 F.3d at 1259. The Court should therefore reject Defendants' invitation to certify the Court's Order for interlocutory appeal.

**3.     An interlocutory appeal would be improper because Defendants have not shown that any question of law is controlling.**

For this Court to consider certifying its order for interlocutory review, the Defendants must also show that the question of law is "controlling." 28 U.S.C. § 1292(b). The question of application of the *in pari delicto* defense to the SPhinX Plaintiffs is not controlling because it is only one of numerous questions Defendants have raised in arguing their motions to dismiss. Where, as here, there exist multiple grounds on which the Court can decide a motion, none of these questions is "controlling." *See Casey*, 406 F.3d at 147 (holding question of law was not controlling where the court saw "more than one basis on which that motion can be ruled").

Moreover, the Court has ruled only on some of these questions and still has not fully adjudicated the motions to dismiss. It is conceivable that some or all of the moving Defendants

may be dismissed on different grounds, rendering the *in pari delicto* question moot.  Where a question may be mooted by future developments in the litigation, the question is not ripe and courts properly refuse certification, as this Court should do here.  *See Maryland Cas. Co. v. W.R. Grace & Co.*, 128 F.3d 794, 797 (2d Cir. 1997) (holding district court's partial summary judgment "ruling . . . is not appropriate for section 1292(b) certification" because "the ruling is extremely preliminary and unfocused, and leaves for later determination many of the matters about which the parties are currently in dispute").[10]

**4.     An interlocutory appeal would be improper because Defendants have not shown substantial ground for difference of opinion.**

Defendants devote most of their brief to arguing that there is an absence of authority on the purported question of law, that the Court's order is wrong and that obtaining clarity on the question is of critical importance to other litigants.  "Simply because a question of law has not been authoritatively addressed, however, does not make the question grounds for a substantial difference of opinion." *German*, 896 F. Supp. at 1398.[11]  "Nor, for that matter, does the fact that the parties themselves disagree as to the interpretation of persuasive authority constitute a 'difference of opinion' sufficient to warrant certification." *Id.*  Nor does the Court's description of "the question as 'a difficult and close one.'" *Id.* at 1399.  Nor does the purported relevance of

---

[10] *See also, e.g.*, *Oneida Indian Nation of N.Y. State v. County of Oneida*, 622 F.2d 624, 629 (2d Cir. 1980) (dismissing interlocutory appeal and holding district court's "section 1292(b) certification was improvidently granted" where appeal presented a "question that may well be mooted" by later proceedings); *Caraballo-Seda v. Municipality of Hormigueros*, 395 F.3d 7, 9 (1st Cir. 2005) ("As a general rule, we do not grant interlocutory appeals from a denial of a motion to dismiss . . . This reflects our policy preference against piecemeal litigation, as well as prudential concerns about mootness, ripeness, and lengthy appellate proceedings." (internal citations omitted)).

[11] *See also, e.g.*, *Flor v. BOT Fin. Corp. (In re Flor)*, 79 F.3d 281, 284 (2d Cir. 1996) ("[T]he mere presence of a disputed issue that is a question of first impression, standing alone, is insufficient to demonstrate a substantial ground for difference of opinion.").

the question to other litigants.  *See SEC v. Credit Bancorp, Ltd.*, 103 F. Supp. 2d 223, 227 (S.D.N.Y. 2000) ("Precedential value, while certainly something that should be considered, is not in this Court's view per se sufficient to meet the 'controlling issue of law' standard.").[12]

If Defendants are sincere in wanting to obtain clarity in the law, they cannot obtain it from the Second Circuit, because the ownership of claims and the *in pari delicto* defense are matters of New York law.  *See Kirschner v. KPMG LLP*, 626 F.3d 673, 676-77 (2d Cir. 2010) (applying New York law to allegations of harm to Refco and insiders' intent to benefit themselves).  The Second Circuit is not an arbiter of New York law.  Thus, to achieve the desired clarity on issues of state law, not only would Defendants have to obtain review in the Second Circuit; they would also have to obtain certification of the issue from the Second Circuit to the New York Court of Appeals.  *See Kirschner v. KPMG LLP*, 590 F.3d 186, 194-95 (2d Cir. 2009) (certifying questions of New York law to New York Court of Appeals); *Primavera Familienstifung v. Askin*, 139 F. Supp. 2d 567, 571 (S.D.N.Y. 2001) ("If a district court certifies an order for interlocutory appeal, and if the circuit court accepts certification, … then the circuit court may certify questions of state law to the New York Court of Appeals.") (internal citations omitted).  As discussed above, certification of state law questions to the New York Court of Appeals potentially adds another year or more to the appeal process, further adding to the delay described above.

At bottom, Defendants' motion to certify is nothing more than a reargument of their motions to dismiss.  They have "presented no basis for substantial grounds for differences of opinion, except by reciting the same cases [they] argued . . . in the first instance."  *German*, 896

---

[12] It is paradoxical, to say the least, for Defendants to suggest that this issue is likely to be encountered by large numbers of future litigants while at the same time arguing that there is no case that has squarely addressed the issue.

F. Supp. at 1400.[13]  "Those cases were considered fully" by both the Special Master and this Court "and did not mandate a different outcome then."  *Id.*  They do not mandate a different outcome now.

## CONCLUSION

For the reasons outlined above, this Court should deny Defendants' request for certification for interlocutory review of the Court's September 12, 2011 Order.

Dated: New York, New York
        October 19, 2011

By:    s/  David J. Molton
David J. Molton (DM-1106)
Andrew Dash (AD-7913)
Mason Simpson (MS-4904)
**BROWN RUDNICK LLP**
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
dmolton@brownrudnick.com
adash@brownrudnick.com
msimpson@brownrudnick.com

-and-

Leo R. Beus, *pro hac vice*
Dennis K. Blackhurst, *pro hac vice*
**BEUS GILBERT PLLC**
4800 North Scottsdale Road,
Suite 6000
Scottsdale, Arizona 85251
Telephone: (480) 429-3000
Facsimile: (480) 429-3100
lbeus@beusgilbert.com
dblackhurst@beusgilbert.com

---

[13] *See also, e.g.*, *Ahrenholz*, 219 F.3d at 676 (denying interlocutory review where defendants' petition "merely reargues the case for summary judgment").