UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
In re REFCO INC. SECURITIES LITIGATION    :   Case No. 07-md-1902 (JSR)
                                                            :
------------------------------------------------------------X
             This Document Relates to:
------------------------------------------------------------X
KENNETH M. KRYS, *et al.*,                          :
                                                            :
              Plaintiffs,                                :
                                                            :   Case No. 08-cv-3065 (JSR)
         -against-                                      :   Case No. 08-cv-3086 (JSR)
                                                            :
CHRISTOPHER SUGRUE, *et al.*,              :
                                                            :
              Defendants.                             :
------------------------------------------------------------X
------------------------------------------------------------X
KENNETH M. KRYS, *et al.*,                          :
                                                            :
              Plaintiffs,                                :
                                                            :   Case No. 10-cv-3594 (JSR)
         -against-                                      :
                                                            :
DEUTSCHE BANK SECURITIES INC., *et al.*, :
                                                            :
              Defendants.                             :
------------------------------------------------------------X

### **DECLARATION OF MARGOT MACINNIS**

I, Margot MacInnis, solemnly state:

1. I make this Declaration on personal knowledge and information.

2. I am one of the Joint Official Liquidators ("JOLs") of the SPhinX Companies and one of the plaintiffs in the above-captioned litigation.

3. On 30 June 2006, by special resolution the SPhinX Companies were put into voluntary liquidation and Kenneth Krys and Christopher Stride were appointed as Joint Voluntary Liquidators of the Companies.

4. On 28 July 2006, the Grand Court of the Cayman Islands granted orders appointing the Joint Voluntary Liquidators to Joint Official Liquidators of all the Companies except SPhinX Managed Futures Fund SPC ("SMFF"). Messrs. Krys and Stride were appointed Joint Official Liquidators of SMFF on 8 August 2006 by order of the Grand Court.

5. On 10 November 2009, I was appointed as a Joint Official Liquidator in place of Mr. Stride. Mr. Krys and I are now Joint Official Liquidators of all of the SPhinX companies.

6. Until December 2005, the SPhinX Funds paid redemptions to investors. On or about 16 December 2005, the unsecured creditors committee of Refco Capital Markets Ltd. ("RCM") instituted an adversary proceeding in Bankruptcy Court against SMFF, seeking to recover approximately $312 million removed from RCM's custody in the days after the disclosure of Refco's fraud, but before Refco's bankruptcy petition. The court issued a temporary restraining order freezing all of SMFF's assets in connection with the preference litigation.

7. After the issuance of the TRO on or about 16 December 2005, the Funds continued to make payments in connection with redemption requests of investors whose investments were not exposed to SMFF. Requests to redeem shares that were exposed to SMFF were generally, to the extent of their exposure to SMFF, discharged not in cash but by the issue or purported issue of Special Situation Shares or S-shares.

8. On 14 June 2006, the directors of the SPhinX Funds sent a letter to investors indicating that the Board had decided to suspend all redemptions of shares in the SPhinX Funds. Accordingly, although redemption requests were submitted by investors, there have been no redemptions honored from any of the SPhinX Funds since 14 June 2006.

9. The JOLs currently hold property of the SPhinX Funds totaling approximately $511 million. The property is held in cash or equivalent cash securities in such corporate, financial or government instruments with A rated institutions. The cash and equivalent cash securities has earned and is now earning low rates of interest.

10. There are approximately 106 SPhinX investors who have asserted claims against SPhinX's estate, with aggregate claims of at least $725 million.

11. From July 2007 to March 2010, the JOLs worked with SPhinX's Liquidation Committee to put forward a proposal whereby certain companies in the SPhinX Group would enter into a scheme of arrangement for the compromise of investors' claims as shareholders, or in respect of redemption requests that went unsatisfied or were purportedly satisfied with S-shares.

12. Several defendants in the litigation pending in the United States District Court for the Southern District of New York have asserted (or may assert) indemnity claims against some or all of the SPhinX Companies. These defendants include Mark Kavanagh, Brian Owens, the DPM entities, Robert Aaron, PricewaterhouseCoopers LLP and the Deutsche Bank entities.

13. In addition, there is the potential for indemnity claims against some or all of the SPhinX Companies by former SPhinX and PlusFunds agents for costs incurred in connection with their roles at SPhinX and/or PlusFunds, or in the event certain defendants assert contribution or other claims against them.

14. The Grand Court has indicated that it will not address the merits of these indemnity claims, but will leave the indemnity claims to be determined by the U.S. courts in the litigation brought by the JOLs. Under the Cayman winding up rules, the JOLs cannot make any

distribution, whether by scheme or otherwise, until they have reserved funds from SPhinX's assets to cover the contingent liability in respect of potential indemnity claims.

15. After conducting hearings in November 2009 and receiving expert testimony regarding potential indemnity claims, the Grand Court issued an order on 4 February 2010, directing the JOLs to establish an initial reserve of approximately $117 million to cover certain potential litigation expenses of the indemnity claimants in connection with these litigation proceedings. The $117 million figure was not considered a final reserve, and the Grand Court contemplated further proceedings to determine whether additional reserves should be established for other expenses and for indemnity claimants' liability for possible contribution claims by defendants in the U.S. litigation. The initial figure for the indemnity reserve, which was much higher than had been anticipated, was to be a primary factor in the failure of the scheme then being prepared for submission to investors for their approval, because the members of the liquidation committee were unable to agree amongst themselves how the indemnity reserve should be allocated.

16. In May 2011, two entities who appeared to have the largest economic interest as investors, or in investors' claims, in the SPhinX Companies, Deutsche Bank AG ("DB") and hfc Limited ("hfc"), negotiated the terms for a new scheme of arrangement to compromise investors' claims as shareholders, or in respect of redemption requests that went unsatisfied or were purportedly satisfied with S-shares. This proposed scheme is currently being prepared for presentation to SPhinX's investors.

17. The new scheme would require the JOLs to release claims against certain defendants, including Deutsche Bank and BAWAG. The JOLs do not recommend the proposed scheme because of the Deutsche Bank release, which they believe will harm the U.S. litigation.

18. The new scheme would compromise a number of issues such that the assets of the SPhinX Companies could be distributed to investors, but only after a reserve can be established to meet the contingent liabilities of the SPhinX Companies to indemnity claimants. The amount of the indemnity reserve, if not agreed with the indemnity claimants, must be determined by the Grand Court once it has resolved the outstanding issues affecting the amount of the indemnity reserve.

19. Establishing the indemnity reserve will depend upon resolving the outstanding issues that affect the amount of the indemnity reserve by means of satisfactory mechanisms. At present, it is not clear how these issues can be resolved. However, it does seem to the JOLs that the faster the progress that can be made in the U.S. litigation, the quicker and easier it will be to resolve the outstanding indemnity reserve issues, because there will be fewer unknowns to envisage and provide for. Continuing uncertainties and delays in the U.S. litigation make it harder to establish the factors that which need to be taken into account to resolve the outstanding issues in relation to the indemnity reserve. Whilst it is implicit that the reserve will need to be increased beyond the initial sum of $117 million merely to take into account additional expenses in respect of the U.S. litigation, the continuing uncertainties in relation to the U.S. litigation make it difficult even to estimate such additional expenses.

20. The $117 million calculation did not include a reserve for potential claims that might be asserted against indemnity claimants, including contribution claims from defendants in the U.S. litigation, direct claims that might be asserted by investors or other claims that might arise in connection with the SPhinX Funds. In light of the cautious approach employed by the Grand Court to date, the JOLs anticipate that the indemnity reserve will be increased significantly to take into account these matters.

21.     The indemnity claimants have argued in the Grand Court that *all* of the SPhinX Funds' assets should be withheld by the JOLs until any potential contribution claims arising from the litigation have expired, because the amount of contribution claims cannot be determined with any certainty and could exceed the total amount of the SPhinX Funds' total assets. The indemnity claimants have argued that the indemnity reserve must be withheld until all potential indemnity claims expire – potentially six years after the U.S. litigation is complete.

22.     The JOLs' view is that the sooner the U.S. litigation is resolved, the more likely it is that the resolution of the indemnity reserve can happen sooner and more easily than would otherwise be the case. The JOLs will then be in a position to make a distribution of the SPhinX Funds' assets to their investors, who already have been waiting more than five years for a distribution.

23.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 19, 2011

                                                        MARGOT MACINNIS