UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
                                                                :
In re REFCO INC. SECURITIES LITIGATION   :   Case No. 07-md-1902 (JSR)
                                                                :
---------------------------------------------------------------X

This Document Relates to:


---------------------------------------------------------------X
KENNETH M. KRYS, et al.,                        :   Case No. 08-cv-3065 (JSR)
                                                                :   Case No. 08-cv-3086 (JSR)
Plaintiffs,              :
                                                                :      REPORT AND
        -against-                                       :      RECOMMENDATION
                                                                :      OF THE SPECIAL MASTER
CHRISTOPHER SUGRUE, et al.,           :      ON MOTIONS TO DISMISS
                                                                :      BROUGHT BY
                        Defendants.               :      GRANT THORNTON LLP
                                                                :      AND MARK RAMLER
---------------------------------------------------------------X

Daniel J. Capra, Special Master

      Defendants Grant Thornton LLP ("GT") and Mark Ramler move to dismiss three counts of the Plaintiffs' First Amended Complaint ("FAC")— the only counts directed against them. The Counts allege aiding and abetting fraud (Count XVII); aiding and abetting breach of fiduciary duty (Count XVIII); and aiding and abetting conversion (Count (XIX).

      The Special Master has previously issued more than a dozen R and R's in the Refco matter. Some of these R and R's will be referred to herein. Abbreviations used in the prior R and R's will be used herein. Familiarity with all of the R and R's — and with Judge Rakoff's orders reviewing them — is presumed.

      The Plaintiffs' claims arise from losses allegedly suffered when assets were transferred from segregated accounts at Refco LLC to unprotected accounts at Refco Capital Markets, Ltd. ("RCM"), where they were then upstreamed to fund Refco operations and then ultimately lost when Refco's true financial picture was made public.[1] According to the FAC, this action is brought to recover (i)

---

[1] The facts pertinent to these motions have been recounted in a number of opinions by Judge Lynch (*see, e.g.*, *Kirschner v. Grant Thornton,* 2009 WL 996417 (S.D.N.Y. 2009)) and in

1

$263 million plus interest in damages suffered by the SPhinX family of hedge funds ("SPhinX"); (ii) the lost business enterprise value and deepening insolvency damages suffered by SPhinX's investment manager, PlusFunds Group, Inc., ("PlusFunds") and (iii) damages suffered by the Assignors, a group comprised of SPhinX investors. FAC ¶1. [2]

For the reasons stated below, the Special Master recommends that a) the GT and Ramler motion to dismiss Count XVII should be granted in part and denied in part; b) the claims against GT and Ramler in Counts XVIII and XIX should be dismissed with prejudice.

The above recommendations are essentially determined by the findings and recommendations made in the following R and R's:

● The Primary Wrongs R and R, dated March 1, 2010 and affirmed and adopted by Judge Rakoff on May 3, 2011.

● The Private Actions Trust R and R, dated June 3, 2010, affirmed and adopted by Judge Rakoff by order dated June 3, 2010.

● The R and R on Grant Thornton's motion for summary judgment in *THL v. Grant Thornton,* dated March 28, 2011, and affirmed and adopted by Judge Rakoff by order dated May 27, 2011.

● The PwC R and R dated August 9, 2011 and affirmed and adopted by Judge Rakoff by order dated October 24, 2011.

● The Deutsche Bank R and R, dated November 1, 2011, and *sub judice* with Judge Rakoff.

● The Bank Defendants R and R, dated December 8, 2011, and *sub judice* with Judge Rakoff.

---

a number of R and R's by the Special Master. To the extent necessary for background on the instant motion, familiarity with the financial schemes of Refco is assumed.

[2] As recounted in a number of prior opinions, the named Plaintiffs have been appointed by the Cayman Court to bring claims on behalf of SPhinX and PlusFunds. Prior rulings by Judge Rakoff have narrowed the claims for damages to those incurred by SMFF and PlusFunds. *See generally* the Standing R and R dated  dated February 3, 2010 and affirmed by Judge Rakoff in Orders dated March 31, 2010 and May 3, 2011.

*To summarize, these R and R's have established the following principles that govern the disposition of the instant motion to dismiss:*

1. The Plaintiffs have adequately pled the primary wrongs of fraud, breach of fiduciary duty (based on a relationship of trust and confidence), and conversion.

2. A financial adviser or accountant servicing Refco would not by that fact have known that Refco was breaching a fiduciary duty owed to SphinX/PlusFunds, as it would have no reason to know of the relationship of trust and confidence.

3. A financial adviser or accountant servicing Refco would not by that fact have known that Refco was converting SMFF excess cash, as knowledge of conversion was dependent on murky questions involving SMFF's right to segregation and the terms of the Margin Annex.

4. A question of fact exists as to whether a financial adviser or accountant servicing Refco would have known about some aspect of the Refco Fraud.

5. A question of fact exists as to whether a financial adviser or accountant with responsibility for preparing public statements of Refco's financial condition would have substantially assisted the Refco Fraud.

6. The Plaintiffs have alleged sufficient facts to indicate that SphinX/PlusFunds reasonably relied on the misleading public statements about Refco's financial condition.

7. The Plaintiffs cannot adequately allege that parties who aided and abetted the Refco Fraud proximately caused SphinX/PlusFunds to *retain* assets at Refco, because if Refco's true financial picture had been known, the SMFF excess cash would still have been lost in a run on the bank and RCM's consequent inability to pay its customers back.

8. The Plaintiffs have adequately alleged proximate cause for any substantial assistance of the Refco Fraud as to assets *placed* with Refco after the date of the defendant's wrongful act. That is, the Plaintiffs have adequately alleged that if SphinX/PlusFunds knew of Refco's true financial condition, they would not have *continued* to place excess cash with Refco.

## I. Allegations Forming the Basis of the Complaint Against These Defendants

GT served as auditor of Refco's financial statements from 2003 through 2005, and also re-audited Refco's 2002 financial statements, which had originally been audited by Arthur Andersen. FAC ¶ 46. GT also served as "the purportedly independent auditor for RCM." Id. Ramler was the engagement partner on the Refco account, first at Arthur Andersen and then with GT after Andersen's demise. FAC ¶ 47.

The complaint against these Defendants is grounded solely in the Refco Fraud. The Plaintiffs

3

do not claim that GT or Ramler had anything to do with the unauthorized transfers of SMFF cash from protected accounts at Refco LLC to RCM. Rather, the Plaintiffs' claim is basically that GT/Ramler aided and abetted the Refco Fraud by issuing "unqualified, clean audit opinions on Refco's fraudulent financial statements with knowledge of the Refco fraud." FAC ¶ 211. The Plaintiffs allege that SphinX and PlusFunds "reasonably relied on the misstatements of Refco's financial condition" — meaning that if SphinX/PlusFunds had been informed by GT's audits of Refco's true financial condition, they would have 1) withdrawn the excess cash at RCM, and 2) ceased placing any more assets with Refco.

## II. Standards for Reviewing the Plaintiff's Allegations on a Motion to Dismiss

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, (2007) (quoting Fed.R.Civ.P. 8(a)(2)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (quoting *Twombly,* 550 U.S. at 570). The requirement of "factual matter" means that "recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 1949. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" Id. (quoting *Twombly*, 550 U.S. at 557). If the factual allegations rise only to the level of the "mere possibility of misconduct," the complaint should be dismissed. *Starr v. Sony BMG Music Entn't,* 592 F.3d 314, 321 (2d Cir.2010).

For all counts sounding in fraud — in this case, Counts XVII and XVIII — the allegations must be evaluated more closely because Federal Rule of Civil Procedure 9(b) requires a plaintiff to plead fraud with particularity. Fed.R.Civ.P. 9(b). The heightened pleading standard contained in Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Rule 9(b) permits "[m]alice, intent, [and] knowledge," to be averred generally. Fed.R.Civ.P. 9(b). However, because courts "must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a license to base claims of fraud on speculation and conclusory allegations [,] ... plaintiffs must allege facts that give rise to a strong inference of fraudulent intent." *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995) (internal quotation marks and citation omitted). "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994). The Plaintiffs must specifically describe the acts or statements alleged to be fraudulent and provide some factual basis that creates a plausible inference of fraudulent intent. Id. The particularity requirement applies not only to fraud claims but also to all claims sounding in fraud, including the claims for aiding and abetting fraud and aiding and abetting breach of fiduciary

duty in this case. *See, e.g., Henneberry v. Sumitomo Corp. of America,* 415 F.Supp.2d 423, 464 (S.D.N.Y. 2006) ("Rule 9(b)'s heightened pleading standards apply to breach of fiduciary claims where the breach is premised on the [underlying wrongdoer's] fraudulent conduct."). Claims sounding in conversion — in this case, Count XIX — are evaluated under Rule 8, not Rule 9. *Kirchner v. Bennett*, 648 F. Supp.2d 525, 542, n.3 (S.D.N.Y. 2009).

### III. Review of Counts in the Complaint

#### A. Count XVII: Aiding and Abetting Fraud (Against Both Defendants)

In New York, to establish a claim of aiding and abetting fraud, a plaintiff must allege (i) the existence of a violation by the primary wrongdoer; (ii) knowledge of this violation by the aider and abettor; and (iii) proof that the aider and abettor substantially assisted in the primary wrong. *Armstrong v. McAlpin,* 699 F.2d 79, 91 (2d Cir.1983). Part of the substantial assistance/proximate cause requirement is that the plaintiff reasonably relied on the fraudulent statements. *Thomas H. Lee Equity Fund V, L.P. v. GT, LLP,* 586 F.Supp.2d 119, 133 (S.D.N.Y.2008). Each of these elements will be discussed below.

##### 1. Primary Wrong:

In the Primary Wrongs R and R at 42, the Special Master, in evaluating the Plaintiffs' allegations in the FAC, concluded that the Plaintiffs "have sufficiently alleged that Refco committed the primary wrong of fraud with regard to the Refco Fraud." So the Plaintiffs have satisfied the first element of the claim for aiding and abetting the Refco Fraud.

##### 2. Knowledge:

To be liable on an aiding and abetting claim, the defendant must have had knowledge of the underlying wrongful conduct — a standard that is not satisfied by a mere allegation of constructive knowledge. *See Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 246 (S.D.N.Y. 1996) ("New York common law . . . has not adopted a constructive knowledge standard for imposing aiding and abetting liability").

As stated in previous Reports and Recommendations, there is dispute in the case law on whether "conscious avoidance" is sufficient for the knowledge prong of an aiding and abetting claim. *Compare Fraternity Fund Ltd.*, 479 F. Supp. 2d at 368 (finding it sufficient to plead with particularity conscious avoidance — meaning that it can almost be said that, given the underlying circumstances, the defendant actually knew of the breach), *with Pension Committee of University of Montreal Pension Plan v. Banc of America Securities, LLC,* 446 F.Supp.2d 163, 202, n. 273 (S.D.N.Y.) (noting that the weight of authority under New York law requires actual knowledge, as distinct from "willful blindness"). The difference, however, between actual knowledge and "it can almost be said that the defendant actually knew" is, to say the least, a narrow one. And any

difference is not material in this case.

The Special Master finds that the Plaintiffs have adequately alleged that GT and Ramler had knowledge of the Refco Fraud — specifically that Refco's financial condition was materially misstated to the public. The issue of GT's (and implicitly Ramler's) knowledge of the Refco Fraud has been previously explored by Judge Lynch, as well as by the Special Master in two R and R's affirmed and adopted by Judge Rakoff. The following passages from the Private Actions Trust R and R and from the Grant Thornton Motion for Summary Judgment R and R — both adopted by Judge Rakoff — are determinative here:

*From the Private Actions Trust R and R:*

> The Amended Complaint [of the Refco Trustee] adequately alleges Grant Thornton's knowledge of the customer scheme. The Trustee alleges that Grant Thornton audited RCM on a stand-alone basis for the years 2003-2005. ¶278. And Grant Thornton audited Refco's financial statements on a consolidated basis. Thus, Grant Thornton "had a complete picture of the finances, operations and business of both RCM and the other Refco entities and had access to all material information concerning the transfers of FX Customer assets." ¶203. The Amended Complaint alleges that Grant Thornton knew that RCM was an unregulated entity --- an allegation that is more than plausible given Grant Thornton's role. ¶¶263-64. And Grant Thornton's own reports indicate that it knew that RCM was making substantial transfers to affiliates, which were greater than RCM's profits. ¶¶265-68.
>
> Grant Thornton argues that the Refco Insiders' guilty pleas are evidence of a lack of knowledge on Grant Thornton's part --- because the Insiders admitted to lying to Grant Thornton. But at best this is evidence that a jury could consider. It does not render the Trustee's specific averments as to knowledge implausible . . . .

Private Actions Trust R and R at 31-32.

*From the R and R on Grant Thornton's Motion for Summary Judgment in THL v. Grant Thornton:*

> When the fraudulent misrepresentation and aiding and abetting claims in this case were before Judge Lynch on a motion to dismiss, Judge Lynch denied the motion, finding that THL had "adequately alleged facts giving rise to a strong inference of actual knowledge." 586 F.Supp.2d at 132, n.9. Judge Lynch analyzed THL's allegations and the question of scienter in the following passage:
>
> > GT contends that its awareness of certain specific "reverse repo" transactions is insufficient to show actual knowledge of the Refco fraud because "there is nothing fraudulent about these transactions in and of themselves." (P. Mem.12.) In particular, GT claims that it was never provided with documentation sufficient to discover the fraud because Refco's books at the close of each reporting period showed only a loan to a third-party and did not disclose that the transactions were being routed back to

> Refco-related entities. This contention, however, is belied by the complaint's allegation that during an interim review of Refco's November 2004 financial statements, GT discovered a $545 million "reverse repo" transaction between Refco and a third party that coincided precisely with an RGHI "reverse repo" transaction "on the same day in the same amount." ( Id. ¶ 57.) The only difference between the two transactions was the interest rate — the third party was charged 2.00%, while RGHI was charged 2.75%. ( Id.) Particularly in the context of long-held suspicions by GT's engagement partner (Ramler) that "related-party transactions between [Refco and RGHI] created a high risk of material misstatement" ( id. ¶ 50), GT's discovery of these identical "reverse repo" transactions was surely a significant red flag strongly suggesting a link between Refco's transactions with the third party and RGHI.
>
> Reading the complaint as a whole, plaintiffs allege that GT knew, inter alia, of (1) the existence of a significant unsecured receivable owed to Refco by RGHI, (2) the repeated appearance and disappearance of large receivables through unsecured transactions with third parties straddling the end of Refco's financial reporting periods, and (3) at least one instance in which a "reverse repo" transaction between Refco and a third party coincided exactly with an identical RGHI "reverse repo" transaction on the same day in the same amount. These allegations, coupled with Ramler's longstanding concerns regarding the "high risk of material misstatement" posed by related-party transactions between Refco and RGHI (id.), are together more than sufficient to support a strong inference of GT's actual knowledge of the underlying fraud.

Id. at 132 (footnote omitted).

GT argues that discovery has shown that none of the red flags alleged and relied upon by Judge Lynch have turned out to be red. For example, according to GT, the correlation of the transaction between Refco and a third party and an identical RGHI reverse repo transaction on the same day in the same amount turns out to be nothing more than (as explained to GT by the RCM CFO) a clerical error. See GT Memorandum in Support at 15. THL draws a different inference — that any such explanation was implausible on its face — so the flag was still red. Motion in Opposition to Summary Judgment at 17, n. 15. Both explanations are within the realm of plausibility but it is fundamental on a motion for summary judgment that inferences are to be derived in favor of the non-moving party. Therefore the red flag listed as (3) in Judge Lynch's list is as strong a reason for denying summary judgment as it was for denying the motion to dismiss.

Similarly, the remaining two factors numbered by Judge Lynch are still, at a minimum, subjects of reasonable dispute. GT does not of course dispute the existence of a significant unsecured receivable owed to Refco by RGHI, nor "the repeated appearance and disappearance of large receivables through unsecured transactions with third parties straddling the end of Refco's financial reporting periods." As before, GT argues that 1) it was

7

told that the receivable was being paid down; and 2) there was no reason to think that the simultaneous transactions with Refco and third parties and with those third parties and RGHI were anything but legitimate. But Judge Lynch's responses to this argument — that the pattern of transactions straddling reporting periods was suspicious — is equally applicable and persuasive at the summary judgment stage. Put another way, GT provided the same explanation to Judge Lynch and he was unpersuaded, and nothing in the interim has changed that determination.

Finally, GT does not seriously contest the final (unnumbered) factor relied upon by Judge Lynch — that all the information about the repo transactions and the RGHI receivable was colored by Ramler's longstanding concerns regarding related party transactions between Refco and RGHI. Again, nothing has arisen in discovery to affect Judge Lynch's ruling that Ramler's concerns are relevant to raising a question of fact as to scienter.

If anything discovery has raised more inferences of scienter than were relied upon by Judge Lynch. For example:

● RGHI represented in the Equity Purchase and Merger Agreement (attendant to the LBO) that it did not have any brokerage accounts at Refco or its subsidiaries. The EPMA was in GT's workpapers. A reasonable inference could be drawn that GT knew or recklessly disregarded the falsity of RGHI's assertion, given its audits of Refco and RCM. As the Round Trip Loans were effectuated through RGHI's accounts, the inference of knowledge of a material misstatement adds to the showing of scienter at the summary judgment stage.

● An inference can be drawn that Mark Ramler was aware of substantial fluctuations in the RGHI receivable, occurring right around reporting dates, and that these fluctuations were suspicious because RGHI had no business, pledged no stock, and had no perceivable means to repay any debt. See Transcript of Oral Argument at 131-35. Of course GT has a different take on these transactions and on whether a red flag was raised, but if inferences can be drawn one way or the other, that is precisely what a factfinder is supposed to do.

● Trosten, the Chief Financial Officer of Refco, testified that in light of the fluctuations in the RGHI receivable and the suspiciously timed transactions, the fraud was right in front of the auditors. Id.

● Trosten testified that he was worried about the fraud being discovered and so asked Mark Ramler to stop requesting documentation of the RGHI transactions. A reasonable inference can be drawn that this request raised a red flag. Ramler testified that he accepted Trosten's stated explanation that the documentation was unnecessary and duplicative. Whether it was appropriate to accept that explanation presents a question of fact — especially in light of the fact that Ramler still asked for

confirmations from other related Refco entities, so why not RGHI? Id.[3]

● GT was aware that the first leg of the round trip loans — from Refco to the third party — were uncollateralized loans from RCM to the third party. These loans were for millions of dollars — including the $720 million loan from RCM to Liberty Corner in February 2004, which was more than the net worth of RCM. Transcript of Oral Argument at 146. GT argues that there was no reason for GT to worry about collateral because by the time GT found out about any of these transactions, the deals were done. But certainly the existence of such large uncollateralized loans creates a jury question as to whether there was a red flag which, when added to the other red flags, supports a finding of scienter.

These factors, when added to those relied on by Judge Lynch, at the very least indicate a triable issue of fact on GT's scienter.

In the dispute on scienter, much is made by the parties about whether GT conducted its audits in accordance with Generally Accepted Accounting Principles. . . . GT correctly notes that scienter cannot be found simply because an accountant failed to comply with GAAP. *In re Scottish Re Group Sec. Lit.*, 524 F.Supp.2d 370, 385 (S.D.N.Y.2007). But THL is not relying solely on failure to comply with GAAP for its showing on scienter. It is relying also on the red flags that Judge Lynch noted in ruling on the motion to dismiss, and on other red flags discussed above. See Id. ("Allegations of 'red flags,' when coupled with allegations of GAAP and GAAS violations, are sufficient to support a strong inference of scienter."). (Quoting *In re AOL Time Warner, Inc. Sec. and "ERISA" Litig.,* 381 F.Supp.2d 192, 240 (S.D.N.Y.2004)).

\* \* \*

Finally, GT argues that there is an intervening circumstance that should alter Judge Lynch's assessment of scienter. At the motion to dismiss stage, GT noted that indictments had been issued against the Refco fraudsters, and these indictments alleged that the scheme was designed to hide Refco's true condition from its auditors. Judge Lynch rejected the indictments as being important to the scienter enquiry, stating that they represented only the "government's theory" of liability that should not be binding on civil plaintiffs.586 F.Supp.2d at 132, n. 10. Since that decision, of course, the fraudsters have either pled guilty or have been convicted and it has been determined that part of the Refco fraud was to hide

---

[3] [Footnote from the R and R on GT's Motion for Summary Judgment] The confirmations that Trosten was concerned about arose in 1999 and 2000, before GT was retained. But the lead auditor was Mark Ramler, who carried the Refco account from Arthur Anderson to GT. And the confirmations are in GT's files. Transcript of Oral Argument at 140. Under these circumstances there is at a minimum a question of fact as to whether GT was put on notice of the documents that Trosten testified indicated the fraud.

the true state of affairs from GT. This new fact surely cuts against GT's scienter. But as stated in the [Private Actions Trust] R and R at 33, the convictions are "evidence that a jury could consider on the question of knowledge." The convictions are not dispositive when 1) all the red flags relied upon by Judge Lynch are equally significant today; 2) additional information obtained in discovery, discussed above, raise further questions of fact as to scienter; and 3) all reasonable inferences are to be drawn in favor of THL on this motion.

In any case, the guilty pleas and verdicts show only that the fraudsters *tried* to hide the truth from GT. The red flags relied on by Judge Lynch are of weight precisely because GT *was* aware of the existence of a substantial receivable, the reverse repo, transactions, etc. — despite the fraudsters' efforts to hide the fraud. See *In re WorldCom, Inc. Sec. Litig.*, 352 F.Supp.2d 472, at 499-500 (S.D.N.Y.2005) (finding question of fact as to scienter even though management "actively concealed" the fraud from the auditor).[4]

R and R on Grant Thornton's Motion for Summary Judgment at 12-17.

Thus, the Special Master and Judge Rakoff have already, after extensive review, found that the allegations of Grant Thornton's knowledge of the Refco Fraud are sufficient to withstand *summary judgment.* It is true, of course, that the allegations previously reviewed were made in different actions in this MDL. But it would be strange indeed if the Plaintiffs' copious and detailed allegations of GT's scienter in this case should be found wanting when those of other plaintiffs have been found sufficient. The Plaintiffs' allegations in this case are for the most part the same allegations as those made by the Refco Trustee and THL, and in some respects the allegations of scienter are more detailed in this action than in those others. The most important factual allegations in the FAC, which cumulatively provide a strong indication that GT knew about the Refco Fraud, are as follows:

● Ramler was the engagement partner for Arthur Andersen's Refco engagement at a time when the RGHI receivable was created. Ramler never reviewed any documentation for the purported loan. FAC ¶¶ 218, 225, 231-39, 742-47.

● Around 2001, Ramler put pressure on Refco management to reduce the size of the reported RGHI receivable. And coincidentally at that time, Refco management began to perform the Round Trip Loans at the end of each reporting period to give the appearance that the RGHI Receivable was diminishing. FAC ¶¶ 231-34, 239

● In 2002, Ramler left Arthur Andersen, taking the Refco account and his knowledge of Refco operations to GT. Id. at ¶¶ 727, 736, 738. On Refco's financial statements for the

---

[4] [Footnote from the R and R on GT's Motion for Summary Judgment] Even GT does not argue that the intervening pleas and verdicts are dispositive of the scienter question. See Transcript of Oral Argument at 232:6-8.

period ending February 28, 2003, the RTLs caused the RGHI Receivable to be underreported by at least $900 million; for February 29, 2004, at least $970 million; and for February 28, 2005, at least $695 million.  Id. at ¶¶ 968, 1016.

● Ramler was told that Bennett's endgame was to cash-out, and was aware of Refco's history in misstating related-party transactions. Id. at ¶ 738.

●GT internally classified Refco as a "high-risk" client. Id. at ¶ 739.  Ramler stated in a GT client evaluation form: "I have no indication to believe [the RGHI Receivable balances] are the result of losses which should have been recognized by the Group, but are actual borrowings of funds.  At Andersen we viewed them as obligations of the shareholders…." Id. at. ¶ 741.  Yet neither Ramler nor anyone else at GT ever reviewed – or even asked to review – any promissory notes or other documentation of loans to shareholders.  Id.at ¶¶ 742-47.

●The amount of interest accrued on the RGHI Receivable made it obvious to an accountant that the amount of the receivable was much larger than reported.  Id. at ¶ 203, 227-28, 744.  Yet GT ceased to request a document called "Schedule of Loans to Stockholders and Unconsolidated Affiliates" after the 2003 audit — a document that would have provided information on the amount of the receivable. Id. at ¶ 745.

●Each of the RTLs was recorded as either a "reverse repo" or a "time deposit." Id. at ¶ 749. GT's workpapers demonstrate its awareness that such transactions require collateral. Id. at ¶ 750.  However, the account statements reviewed by GT in auditing the RTL transactions demonstrate the absence of any collateral. Id.at ¶¶ 749-50.  These account statements were further suspicious in that they demonstrated no trading activity and revealed large, round-dollar transactions with affiliated entities at the end of each reporting period. Id. at  ¶¶ 752-55.

● GT, in violation of GAAS,  failed to review interim financial statements as of the date of its audit opinions.  Because the RTLs had been unwound by those dates, interim financial statements would have revealed the full amount of the RGHI Receivable.  GT's workpapers state, however, that Refco management refused to provide interim statements.  Id. at ¶ 758.

● GT, in violation of GAAS, failed  to obtain a letter from Refco management "as to whether any events have occurred subsequent to the date of the financial statements being reported on by the independent auditor that in [management's] opinion would require adjustment or disclosure in the statements." Id. at ¶ 360.  The management representation letters drafted by GT do not include such a representation, even though unwindings of the RTLs occurred in the interim.  Id. at ¶ 760.

● Kurt Niedhardt, the managing partner for Ernst & Young's tax preparation engagement with Refco, admitted that he had been told by Bennett about the RGHI Receivable and the

RTL scheme. Id. at ¶ 763. Niedhardt disclosed in his deposition that the RTLs were created under pressure from Arthur Andersen (*i.e.*, Ramler) to reduce the size of the RGHI Receivable for "optimal balance sheet presentation" and that it was his belief that the RTLs were common knowledge among Refco management and its auditors. Id. A handwritten note by Mark Ramler indicates that he actually knew the transactions with Liberty Corner were for the purpose of "clean-up of interco accounts." Id. at. ¶ 762.

● The stand-alone financial statements of RCM, audited by GT, indicate that the net increase in intercompany payables to RCM was $141 million, $58 million, and $2.5 billion during the years 2003, 2004 and 2005; but reported, internally generated cash flow from operations for each period combined with cash held over from previous periods, was $6 million, $30 million and $56 million for 2003, 2004 and 2005, respectively. Id. at ¶¶ 732, 767-79. GT as auditor would thereby know that RCM's internal cash generation was insufficient to provide for these intercompany loans, and an inference could be derived and that the loans necessarily included customer cash. Moreover, RCM's stand-alone financial statements showed that it held only about $50 million in cash at any given time between 2002 and 2005, while purporting to hold billions of dollars in outstanding customer balances, meaning nearly all customer cash in RCM accounts was loaned out to other Refco entities at any given time. Id. at ¶ 243. As an auditor would be aware, the related Refco entities could not repay these unsecured loans to RCM because if it had done so, its regulated brokerage entities would have fallen below regulatory capital requirements. Id. at ¶¶ 773, 820, 823-25.

● In connection with its audit of Refco for the period ending February 29, 2004, GT generated a management letter identifying "material weaknesses" in Refco's internal controls. Id. at ¶ 791. When asked by THL whether such a letter existed, GT denied its existence. Id. at ¶ 794-98.

It is plain from the above that the Plaintiffs have made copious and particularized assertions that GT, in its service as auditor and its close relationship with Refco, came to know *at least* that the financial picture it reported at Refco was materially overstated, particularly with respect to the RGHI receivable, but also with respect to the upstreaming of assets from RCM that could never be paid back.. The Plaintiffs' allegations in the FAC meet and go beyond the assertions made by the Plaintiffs in the two actions in which the Special Master and Judge Rakoff have already found sufficient allegations of GT's knowledge of the Refco Fraud.

What is missing from the FAC, though, is an allegation about the spreadsheet in GT's workpapers that showed an open $545 million with Liberty Corner and, on the same page, a $545 million mirror-image transaction with RGHI.[5] In the *THL v. GT* action, Judge Lynch, the Special

---

[5] Some other allegations reviewed by the Special Master at the summary judgment stage in *THL v. Grant Thornton* are also missing from the FAC — understandably so as they were uncovered in discovery during that action, well after the FAC was filed. These are bullet-pointed at pages 8-9, *supra.* These assertions add to the case on GT's scienter, but they are not necessary

Master, and Judge Rakoff each relied on this factual assertion in concluding that THL had adequately alleged GT's scienter. The Plaintiffs *do* include that allegation in a proposed Second Amended Complaint. See Proposed Second Amended Complaint ¶ 828.[6] The question is whether the lack of such an allegation in the First Amended Complaint is material and if so whether the Plaintiffs should be given leave to amend to include this (and other) assertions regarding scienter. See note 6.

The Special Master finds that the Plaintiffs have more than sufficiently alleged scienter even in the absence of an allegation about the spreadsheet regarding the $545 million Liberty Corner transaction, or any other assertion in the Proposed Amended Complaint. It is notable that sufficient allegations of scienter were found in the Private Actions Trust case without specific reliance on the spreadsheet recording of the transaction. Moreover, the Plaintiffs have, as set out above, presented extensive direct and circumstantial evidence indicating that GT knew about the RGHI receivable, that it was underreported, and also that RCM could not be repaid. The bulleted points above meet or exceed the allegations previously found sufficient to establish scienter with respect to PwC and DBSI.

---

to create a question of fact on scienter, as the Special Master so recognized in the R and R on GT's motion for summary judgment.

[6] The Second Amended Complaint also contains at least the following further allegations regarding GT's scienter:

● Though Ramler admitted that GT tested the accrued interest on the RGHI receivable, GT's workpapers lack any documentation of these tests. Second Am. Compl. ¶ 802. While at Arthur Andersen, in connection with each annual audit at least through 2001, Ramler requested and received an account statement for RGHI, which showed the receivable balance being largely paid down shortly prior to the end of each reporting period. Id. at ¶¶ 803. In his audits at GT for 2003 through 2005, Ramler ceased to even request this document and relied on bare representations from management as to the size and collectability of the receivable. Id.

● Richard Flowers, GT's concurring partner for the Refco engagement, noticed the RTL transactions in his July 2004 review of the financial statements submitted with the 144A and in an e-mail questioned Ramler about the increase in repo activity, the source of funds for the purported transactions, and the presence of unsecured repo transactions: "need somewhere an explanation of the substantial increase in repo and reverse repo activity; also, where did the funds come from to finance the 500 million deposit held at BAWAG? A noncollateralized repo transaction??" Id. at ¶ 817.

● Ramler has admitted that a significant portion of GT's 2003 workpapers for Refco were unaccountably missing as of October 2005. Id. at ¶ 875. Time stamps on certain documents show that GT recreated those workpapers after the fact on October 10, 2005, precisely the date that the Refco fraud was publicly revealed and GT withdrew its prior audit opinions. Id.

But assuming arguendo that the assertion about the entries on the spreadsheet is material to the Court's finding sufficient allegations of scienter, then the Special Master recommends that the Plaintiffs be given leave to amend the Complaint to include that allegation as well as the other allegations on GT/Ramler's scienter in the Proposed Amended Complaint. By definition, such an amendment would not be futile. *See Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 55 (2d Cir. 1995) (leave to amend should be denied where the exercise is futile). Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to replead should be "freely given when justice so requires." Fed.R.Civ.P. 15(a). While the Special Master of course recognizes that the Plaintiffs have already had leave to amend the Complaint, it would nonetheless be unjust to dismiss the Plaintiffs' claims on scienter grounds where similarly situated plaintiffs have survived motions to dismiss on this identical issue. *See also Kirschner v. Bennett*, 2009 WL 2601375 at *15 (S.D.N.Y., August 25, 2009) (granting leave to replead in part due to "a number of other developments in related cases that may allow all parties to benefit from repleading").[7]

Accordingly, the Special Master concludes that the Plaintiffs have adequately alleged GT's knowledge of the Refco Fraud. Alternatively the Plaintiffs should be granted leave to amend their allegations regarding GT's scienter in accordance with their Proposed Second Amended Complaint, in which event the Plaintiffs will have adequately alleged GT's knowledge of the Refco Fraud.[8]

The final question on scienter is whether the Plaintiffs have adequately alleged *Ramler's* knowledge of the Refco Fraud. That question was not explicitly answered in the previous R and R's involving GT. But it is not a difficult question to answer in light of the findings of the Special Master in this and those previous R and R's. Ramler was GT's point man for Refco; he brought the Refco account to GT. The allegations set forth in the bullet points above put Ramler at the heart of all the evidence indicating scienter — including his concerns about the RGHI receivable, his failure to obtain reliable assurances that the receivable was being paid down, and his long-held suspicions that the related-party transactions between Refco and RGHI created a high risk of material misstatement.  See the excerpt from Judge Lynch's opinion set forth above. Under the circumstances, it is impossible to conclude that the allegations against GT are sufficient to show scienter but the allegations against Ramler are not.

Accordingly, the conclusions on scienter regarding GT are fully applicable to Ramler: 1. The

---

[7] To be clear, if leave to amend is necessary to avoid dismissal on scienter grounds, it should be limited to the new assertions regarding GT/Ramler's scienter in the Proposed Amended Complaint. It should not be a dispensation to amend the Complaint as to other issues or other parties.

[8] Among other arguments, GT contends that scienter cannot be found because 1) the fraudsters have been convicted or pled guilty, in part of lying to GT; and 2) the Plaintiff's allegations regarding violations of GAAS cannot on their own establish scienter. These arguments have already been discussed and rejected in the *THL v. GT* R and R, and the excerpts from that R and R are reproduced above.

14

Plaintiffs have sufficiently alleged that Ramler knew about the Refco Fraud; and 2) In the alternative, the Plaintiffs should be granted leave to amend their allegations regarding scienter in accordance with their Proposed Second Amended Complaint, in which event the Plaintiffs will have adequately alleged Ramler's knowledge of the Refco Fraud.

### 3. Substantial Assistance:

"In the aiding and abetting context, a plaintiff must allege that the defendant's substantial assistance in the primary violation proximately caused the harm on which the primary liability is predicated. The Plaintiffs must allege more than but-for causation. They must allege also that their injury was a direct or reasonably foreseeable result of the conduct." *Fraternity Fund Ltd. v. Beacon Hill Asset Management, LLC*, 479 F.Supp.2d 349, 370-71 (S.D.N.Y. 2007).[9]

The case for substantial assistance as to GT and Ramler is as strong or stronger than that found sufficient as to PwC, DB, and Credit Suisse and BAS in previous R and R's. Clean audit opinions are public statements that are intended to provide assurance to the public of the financial health of a company. *See Mishkin v. Peat, Marwick, Mitchell & Co.,* 658 F.Supp. 271, 274 (S.D.N.Y. 1987) (accountant's certification of materially false financial statements substantially assisted the fraud). *See also Nathel v. Siegel,* 592 F.Supp.2d 452, 470 (S.D.N.Y. 2008) (where primary wrong involves false documentation, "substantial assistance usually involves assistance in the preparation or dissemination of the documents."). As discussed in previous R and R's the Plaintiffs have adequately alleged that SphinX/PlusFunds reasonably relied on public statements regarding Refco's financial condition.        For example, the Plaintiffs allege that PlusFunds' risk committee kept a "shadow rating" for Refco, reviewed public statements, and calculated guidelines to limit exposure on transactions with Refco. FAC ¶ 189. *See also* Id. at ¶723 ("SphinX and PlusFunds' innocent decision-makers received and relied on [Refco's] financial statements and Grant Thornton's unqualified audit opinions thereupon in determining whether to allow and continue to allow SphinX assets to be deposited at Refco and, specifically, RCM.").

GT argues that it cannot be liable because it had nothing to do with the upstreaming of assets from RCM, it did nothing to effectuate the Round Trip Loans, etc. But similar arguments made by DBSI were rejected as missing the point of substantial assistance. *See* DB R and R at 40. In a multi-faceted fraud, there cannot be a requirement that an aider and abetter substantially assist every aspect of the fraud to be held liable. The "critical test" for substantial assistance is whether the third party's conduct "made a substantial contribution to the perpetration of the fraud." *Pension Comm. of Montreal Pension Plan v. Banc of Am. Secs., LLC,* 652 F.Supp.2d 495, 511 (S.D.N.Y. 2009).

---

[9] As Judge Kaplan recognized in *Fraternity Fund,* "there is some debate about whether proximate cause and substantial assistance ought to be equated in the aiding and abetting context." But most case law in the Second Circuit requires a showing of proximate cause for an aiding and abetting claim. *See, e.g., Pension Committee of University of Montreal Pension Plan v. Banc of America Securities*, *LLC*, 446 F.Supp.2d 163, 201 (S.D.N.Y. 2006).

Certainly giving a public imprimatur to materially misleading financial statements constitutes a "substantial contribution to the perpetration" of the Refco Fraud because it allowed Refco to continue to do business and deceive the public until the insiders could cash out. Moreover the Plaintiffs allege that GT and Ramler — like DBSI, Credit Suisse and BAS — helped to prepare and approve statements used to effectuate the LBO and IPO,[10] and such conduct has itself been held to be substantial assistance of the Refco Fraud. See DB R and R at 38-39; Bank Defendants R and R at 20-22. As the courts have noted, substantial assistance "can take many forms."*Primavera Familienstifung v. Askin*, 130 F.Supp.2d 450, 511 (S.D.N.Y.2001).

Yet, as discussed in previous R and R's, all this does not mean that GT/Ramler proximately caused all of the damages claimed by the Plaintiffs on behalf of SPhinX/PlusFunds. In four previous R and R's (one of which, the Private Actions Trust R and R, involved GT), the Special Master — affirmed by Judge Rakoff — analyzed the damages that can properly be claimed for various actions aiding and abetting the Refco Fraud.[11] What follows is the analysis of those R and Rs as applied to the aiding and abetting allegation against GT/Ramler in this case:

> The Plaintiffs claim that GT/Ramler substantially assisted the Refco Fraud by issuing clean audit opinions and if the true facts about Refco's financial condition had been disclosed, then SPhinX and PlusFunds would have taken the cash out of RCM and ceased doing business with Refco. But the problem with the argument that these Defendants caused SPhinX and PlusFunds to *keep* the cash at Refco is that the information that the Plaintiffs insist should have been disclosed (and that GT/Ramler helped to conceal) was in the context of public statements, that would have come to SPhinX and PlusFunds together with the public at large. *See, e.g.,* FAC ¶826 (had GT disclosed Refco's true financial condition, "Refco's existence would have been put to a more timely end, thus preventing much of the harm suffered by Refco's victims, including SphinX").

> But assuming that GT did issue an audit opinion truly stating the financial situation at Refco — meaning an opinion that Refco was hiding a giant related-party receivable and was insolvent and using customer funds to operate — there is nothing that those customers could have done at that point to get their money back. The announcement of Refco's true financial picture would have triggered a run on RCM, in which all the company's customers would have sought to recover their funds prior to the inevitable bankruptcy filing. Because RCM, by the terms of the Plaintiffs' Complaint, had no ability to pay back the money that was upstreamed at the time of the audit opinions, SphinX would have been unable to recover its funds deposited there at that time. SphinX/PlusFunds might well have tried to get the money back — as they did when the truth was in fact disclosed — but so would (and did) everyone else. And if they got the money out in front of everyone else after GT revealed the

---

[10] *See, e.g.,* FAC ¶722.

[11]*See* Private Actions Trust R and R at 17; PWC R and R at 23; DB R and R at 40-41; Bank Defendants R and R at 23-24.

16

fraud, they would have been (and of course were in fact) subject to clawback by a preference action.

---

Thus, the Special Master's analysis finding a lack of proximate cause regarding claims of fraudulent *retention* of assets at Refco — in four separate R and R's (two affirmed and adopted by Judge Rakoff) — bars the Plaintiffs from suing GT and Ramler for such damages here.

Accordingly, the claims against GT and Ramler for aiding and abetting the Refco Fraud should be dismissed insofar as they encompass damages for SPhinX assets held at RCM before the date of GT's issuance of its first clean auditing opinion, which is the first act properly alleged as GT's and Ramler's substantial assistance.

In contrast are the claims regarding assets placed with RCM *after* the wrongdoing attributed to GT and Ramler allegedly occurred. As to those assets, the Plaintiffs have plausibly alleged that if the true conditions at Refco had been known, PlusFunds would never have placed the assets with Refco, and then of course that money would never have been swept up in the Refco Fraud in the first place.[12] As stated above, the Plaintiffs provide specific allegations pertinent to SPhinX and PlusFunds reasonably relying on the misinformation coming from public statements of Refco's financial condition in deciding to continue to place assets at Refco. FAC ¶¶ 189, 723.

*Recommendation on Count XVII:*

***The Plaintiffs' claims against GT and Ramler in Count XVII should be dismissed with prejudice to the extent they seek recovery of assets placed at RCM before the date of GT's first clean audit opinion. In all other respects, the Defendants' motion to dismiss should be denied.***

**B. Count XVIII: Aiding and Abetting Breach of Fiduciary Duty (Against Both Defendants)**

The Plaintiffs allege that Refco owed and breached fiduciary duties to SphinX and that GT/Ramler substantially assisted the breach by issuing clean audit opinions and helping to conceal the Refco Fraud. FAC ¶ 1274. Like the claims against PwC in this Count (and the similar claims against DBSI and the Bank Defendants), the Plaintiffs' claims for aiding and abetting breach of fiduciary duty should be dismissed because the Plaintiffs have not sufficiently alleged scienter. *See* PwC R and R at 25; DB R and R at 38; Bank Defendants R and R at 9. To sum up from those R and R's:

---

[12]*See* Private Actions Trust R and R at 17; PWC R and R at 23; DB R and R at 40-41; Bank Defendants R and R at 23-24.

***1. Primary Wrong***: The Primary Wrongs R and R establishes that the Plaintiffs have sufficiently alleged that Refco had a fiduciary duty, based on a relationship of trust and confidence, to refrain from "self-dealing — use of the SMFF excess cash at RCM to fund Refco's various operations." Primary Wrongs R and R at 37. Thus, the Plaintiffs have adequately alleged a breach of fiduciary duty by upstreaming SPhinX assets at RCM and using them to fund Refco operations.

***2. Knowledge:*** The Plaintiffs must show not only knowledge of wrongdoing but also that the wrongdoing was a breach of fiduciary duty owed to SphinX/PlusFunds. The Plaintiffs have not and cannot allege that GT/Ramler knew that Refco had a relationship of trust and confidence with SphinX/PlusFunds that was being breached by upstreaming the assets from RCM. There are some sparse allegations that GT, in its work for RCM, came to know that SphinX accounts were not "equity" accounts at RCM and that Refco was using the accounts as a "slush fund." FAC ¶ 784. But while this information may have given some notice about some wrongdoing, it adds nothing to a showing of knowledge of a relationship of trust and confidence between Refco and SphinX/PlusFunds. Even the Plaintiffs do not allege that GT's knowledge of SphinX accounts at RCM had any bearing on knowledge of a breach of fiduciary duty. See Id. ("These 'equity' accounts thus were, at a minimum, red flags that should have alerted Grant Thornton to existence of *fraud*.") (emphasis added). It is elementary that not every fraud is a violation of a fiduciary duty. And it is also elementary that in ordinary circumstances, the only fiduciary duty of a non-discretionary broker is to effectuate the trades ordered by the customer. *United States v. Wolfson,* 642 F.3d 293, 295 (2nd Cir. 2011). Accordingly the Plaintiffs have not and cannot show GT/Ramler's knowledge of Refco's breach of fiduciary duty based on relationship of trust and confidence.[13]

***3. Substantial Assistance:*** The Plaintiffs adequately allege substantial assistance. The discussion of substantial assistance under Count XVII, for aiding and abetting fraud, would be fully applicable to a claim for aiding and abetting fiduciary duty. The allegation that GT/Ramler propped up Refco by portraying a false financial picture, and thereby allowed Refco to continue its wrongdoing, is not dependent on the underlying wrong. *See* PWC R and R at 27; DB R and R at 39; Bank Defendants R and R at 19. But as with the claim for aiding and abetting fraud, the Plaintiffs' damages would be limited to the loss of assets placed with RCM *after* the date of the issuance of the first clean audit opinion.

*Recommendation on Count XVIII:*

**The claims against GT and Ramler in Count XVIII should be dismissed with prejudice because the Plaintiffs have not adequately alleged scienter.**

---

[13] It should be noted that none of the additional allegations in the Proposed Second Amended Complaint has any bearing on GT/Ramler's knowledge of any fiduciary duty that Refco owed to SphinX/PlusFunds.

18

**C. Count XIX: Aiding and Abetting Conversion (Against both Defendants)**

The Plaintiffs allege that Refco converted customer assets held at RCM, and that GT/Ramler substantially assisted the conversion by issuing clean audit opinions and helping to conceal the Refco Fraud. FAC ¶ 1285. Like the claims against PwC in this Count (and the similar claims against DBSI and the Bank Defendants), the Plaintiffs' claims for aiding and abetting conversion should be dismissed because the Plaintiffs have not sufficiently alleged scienter. *See* PwC R and R at 28-29; DB R and R at 46-48; Bank Defendants R and R at 16-18. To sum up from those R and R's:

***1. Primary Wrong:*** The Primary Wrongs R and R, at 41, establishes that the Plaintiffs have adequately alleged the primary wrong of conversion.

***2. Knowledge:*** The Plaintiffs have not, and cannot, allege that GT/Ramler knew that the upstreaming of assets from RCM was conversion. Simply knowing that customer assets were being upstreamed is not enough to establish knowledge that the upstreaming was a conversion, "as the question of authorization is a murky one based on the Margin Annex, segregation requirements, and other factors well beyond the knowledge" of GT/Ramler. DB R and R at 48; Bank Defendants R and R at 17; PwC R and R at 28. Knowledge that the transfers from RCM were unauthorized would have required GT/Ramler to know that the terms of the Margin Annex (to which they were not privy) did not apply in the same way to the SMFF assets as it would to the FX deposits. There is nothing in the Complaint, and nothing about GT/Ramler's role at Refco, that could have caused these Defendants to know the intricacies required for a finding of conversion.[14]

***3. Substantial Assistance:***

The analysis of the substantial assistance factor under prior Counts is fully applicable here. The Plaintiffs have adequately alleged that GT/Ramler substantially assisted the Refco Fraud by providing a false financial picture, and thus allowing the fraud to continue. And part of that fraud was converting customer assets to continue to function until the fraudsters could cash out. And the Plaintiffs have adequately alleged that they reasonably relied on GT's public statements of Refco's financial condition. But as with the other claims, principles of proximate cause would limit damages to losses of those assets placed with RCM after the date of GT's issuance of the first clean audit opinion.

*Recommendation on Count XIX:*

***The claims against GT and Ramler in Count XIX should be dismissed with prejudice because the Plaintiffs have not adequately alleged scienter.***

---

[14] See Primary Wrongs R and R at 40-41 (distinguishing between FX customer's cash which had not been converted due the provisions of the Margin Annex, and SPhinX cash which had been converted, due to the violation of the right of segregation that occurred because the transfers were unauthorized).

**IV. Recommendations**

1. The claims against GT and Ramler in Count XVII should be dismissed with prejudice to the extent they seek recovery of assets placed at RCM before the date of GT's first clean audit opinion. In all other respects, the Defendants' motion to dismiss should be denied.

2. The claims against GT and Ramler in Count XVIII should be dismissed with prejudice because the Plaintiffs have not adequately alleged scienter.

3. The claims against GT and Ramler in Count XIX should be dismissed with prejudice because the Plaintiffs have not adequately alleged scienter.

Daniel J. Capra
Special Master

Dated: December 16, 2011
New York, New York