UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------- x
                                       :
In re REFCO, INC. SECURITIES LITIGATION :     07 MDL No. 1902 (JSR)
                                       :
-------------------------------------- x
-------------------------------------- x
                                       :
KENNETH M. KRYS, et al.,               :
                                       :     08 Civ. 3086 (JSR)
                                       :
                    Plaintiffs,        :
                                       :
            v.                         :
                                       :
CHRISTOPHER SUGRUE, et al.,            :
                                       :
                    Defendants.        :
                                       :
-------------------------------------- x

---

**INGRAM DEFENDANTS' RESPONSE TO PLAINTIFFS' OBJECTION
TO REPORT AND RECOMMENDATION OF THE SPECIAL MASTER
ON INGRAM DEFENDANTS' MOTION TO DISMISS**

---

## TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT ..............................................................................................................2

   I.   The "facts" recited in plaintiffs' objections are insufficient to show knowledge of
      the alleged fraud ........................................................................................2

   II.  Santo Maggio's testimony does not support plaintiffs' assertion that INGRAM had
      actual knowledge of the Refco Fraud and does not justify leave to amend. ....................7

   III.  Plaintiffs' objection to the special master's conclusion that plaintiffs have not
      adequately alleged substantial assistance is unavailing.........................................10

   IV.  Plaintiffs' allegations do not establish proximate cause........................................12

   V.  Plaintiffs fail adequately to plead claims against ingram for aiding and abetting
      breach of fiduciary duty................................................................................14

CONCLUSION..........................................................................................................15

# TABLE OF AUTHORITIES

PAGE

## Cases

*Aetna Cas. & Sur. Co.*, 219 F.3d 519 (6th Cir. 2000) ............................................ 10

*Chemtex, LLC v. St. Anthony Enters. Inc.*, 490 F. Supp. 2d 536 (S.D.N.Y. 2007).................... 7

*Chill v Gen. Elec. Co.*, 101 F.3d 263 (2d Cir. 1996) ................................................ 4

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349 (S.D.N.Y.) ... 10, 11, 12

*In re Duke Energy Corp. Secs. Litig.*, 282 F. Supp. 2d 393 (S.D.N.Y. 2003).................... 3

*In re Flag Telecom Holdings, Ltd. Secs. Litig.*, 308 F. Supp. 2d 249 (S.D.N.Y. 2004) ................ 3

*Kaufman v. Cohen*, 760 N.Y.S.2d 157 (N.Y. App. Div. 2003) .................................... 4

*Kolbeck v. LIT America, Inc.*, 939 F. Supp. 240 (S.D.N.Y. 1996) ............................. 13

*Lerner v. Fleet Bank, N.A.*, 459 F.3d 273 (2d Cir. 2006) ...................................... 4

*Ryan v. Hunton & Williams*, No. 99-cv-5938 (JG), 2000 WL 1375265 (E.D.N.Y. Sept. 20, 2000) ................................................................................................ 6, 7

*UniCredito Italiano SPA v. JPMorgan Chase Bank*, 288 F. Supp. 485 (S.D.N.Y. 2003)............ 10

## Statutes and Rules

Fed. R. Civ. P. 9(b) ................................................................................... 4

Fed. R. Evid. 602 ..................................................................................... 9

Ingram Micro, Inc. and its subsidiary CIM Ventures, Inc. (collectively, "Ingram") respectfully submit this response to the SPhinX Plaintiffs' Objection to the Report and Recommendation of the Special Master on Ingram's Motions to Dismiss.

## PRELIMINARY STATEMENT

The Special Master recommends dismissal of the only two claims against Ingram, aiding and abetting fraud (Count XXIII) and aiding and abetting breach of fiduciary duty (Count XXIV). His Report and Recommendation correctly observes that Plaintiffs fail to allege either knowledge or substantial assistance, essential elements of both aiding and abetting claims, against Ingram. With respect to aiding and abetting fraud, the Special Master found that "the allegations of scienter . . . are especially infirm" against Ingram and that "[t]he lack of sufficient causal connection [to show substantial assistance] to Refco's financial statement fraud is particularly evident." R&R at 12, 14. With respect to aiding and abetting breach of fiduciary duty, the Special Master correctly noted that "[t]he case against [the Ingram Defendants] . . . is in fact far weaker than the similar claims found wanting as to the other defendants." *Id.* at 17. Plaintiffs object to these conclusions, but they do not provide any cogent reason for the Court to reject them or to depart from the rulings it has made in adopting previous Reports.

*First*, as to aiding and abetting fraud, the Report correctly concludes that Plaintiffs' conclusory allegations about Ingram's participation in certain back-to-back loan transactions, which the Plaintiffs refer to as "round-trip loans" ("RTLs"), with Refco are insufficient as a matter of law to allege the required knowledge or substantial assistance. The litany of repetitious, irrelevant, conclusory, and—in some cases—indisputably incorrect "facts" recited in Plaintiffs' Objections adds nothing to their claims, which the Special Master correctly deemed insufficient to show that Ingram had knowledge of any fraud by Refco or offered substantial assistance to Refco in perpetrating its financial statement fraud.

1

*Second*, as to aiding and abetting breach of fiduciary duty, Plaintiffs' arguments are foreclosed both by previous Reports adopted by the Court and by Plaintiffs' own prior admission that they have no evidence that Ingram had knowledge of any breach of fiduciary duty owed to Plaintiffs, which, it is undisputed, did not occur, if at all, until years after the last transaction in which Ingram participated.

## ARGUMENT

## I.   THE "FACTS" RECITED IN PLAINTIFFS' OBJECTIONS ARE INSUFFICIENT TO SHOW KNOWLEDGE OF THE ALLEGED FRAUD

Plaintiffs do not contest that to allege a claim for aiding and abetting fraud, they must allege actual knowledge by Ingram of the alleged fraud by Refco. Plaintiffs contend that Ingram engaged in so-called "round-trip loans" with Refco, which Refco used to conceal the weakness of its financial position and to give a false illusion of solvency to what they claim was, essentially, a failing financial enterprise. Plaintiffs have argued that the loans were transparently fraudulent on their face and that mere participation in them supports an inference of actual knowledge that Refco was using the loans to cook its books and perpetrate a fraud on others. Plaintiffs offer nothing beyond the loans themselves to support their knowledge allegations, asserting that the loans were *per se* fraudulent.

The Special Master's Report correctly rejects this interpretation of the loans, noting that "there is significant case law . . . establishing that the kind of back-to-back loans at issue in this case are not *per se* fraudulent." R&R at 10. Plaintiffs object to this conclusion; however, their objections amount to little more than a repetition of previously asserted "facts"—many of them redundant or irrelevant and others of them demonstrably false—describing the transactions at issue followed by the unsupported, bald assertion that the loans are therefore "obviously fraudulent." Pl. Obj. at 5. As the Special Master noted, such allegations are insufficient.

It is undisputed that Ingram, which had been a Refco customer, agreed at Refco's request to participate in two "back-to-back" loan transactions with Refco entities, one in early 2000 in the amount of $150 million and a second a year later in early 2001 in the amount of $250 million. Ingram earned a small interest differential on the transactions, totaling $19,583.33. The loans were secured and were fully documented by Refco's nationally well-known and respected outside counsel, Mayer Brown. Each loan transaction was fully unwound within a matter of a few weeks, leaving no long-term obligations between the parties. After the 2001 loan, Ingram declined to participate in any further transactions and is not alleged to have had any involvement with Refco or its alleged misdeeds thereafter. As the Special Master noted, such allegations are simply insufficient.

Plaintiffs' Objection opens with a list of fifteen bullet points that Plaintiffs contend support the inference that the loan transactions were "obviously fraudulent." *See* Pl. Obj. at 1-2. The first six points merely describe the loans, as above. The seventh point on Plaintiffs' list merely reiterates that these were risk-free transactions taking place near the end of Refco's reporting period, and point eight notes that Ingram ultimately transacted a total of $400 million dollars. There is nothing illegal, deceptive, or fraudulent about any of the terms of the loans. *See In re Duke Energy Corp. Secs. Litig.*, 282 F. Supp. 2d 393, 409 (S.D.N.Y. 2003) (Rakoff, J.) ("'wash sales' and 'round-trip trading' are not necessarily illegal *per se*."); *In re Flag Telecom Holdings, Ltd. Secs. Litig.*, 308 F. Supp. 2d 249, 261 (S.D.N.Y. 2004) ("[T]here is nothing inherently wrong with reciprocal transactions.").

Plaintiffs then in point ten[1] make conclusory allegations, without pleading any factual basis for their assertions, that Ingram "knew that: (i) Refco's year-ending reporting period ended

---

[1] Point nine relates solely to Defendant Liberty Corner and has, thus, been omitted from this discussion.

February 28; (ii) no cash moved as a result of these transactions; and (iii) Refco was using these transactions to manipulate its financial statements and misreport its financial condition." Plaintiffs fail to point to any facts that could tend to establish these allegations other than the uncontroverted description of the loans. The bald conclusion that Ingram "knew" that the transactions were part of a fraud is, and always has been, insufficient as a matter of law. In accordance with the heightened pleading obligations imposed by Federal Rule of Civil Procedure 9(b), Plaintiffs cannot rely on conclusory allegations such as these to establish actual knowledge. *See, e.g., Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 293 (2d Cir. 2006); *see also Kaufman v. Cohen*, 760 N.Y.S.2d 157, 169-70 (N.Y. App. Div. 2003). Boilerplate allegations, such as the ones made in the Amended Complaint and repeated here, are patently insufficient to establish actual knowledge of the broader fraudulent scheme. *See, e.g., Chill v Gen. Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996) ("Plaintiffs still have the burden of pleading circumstances the provide at least a minimal factual basis for their conclusory allegations of scienter.")[2]

Point eleven makes much of an email sent by Ingram to Refco employee Santo Maggio in February of 2002 in which Ingram declined to participate in an additional loan transaction, noting that "the Enron debacle is putting pressure on the SEC to increase the level of financial disclosure by large companies like [Ingram Micro]." *Id.* Plaintiffs assert that this email shows awareness of the impropriety of Refco's activities, but they ignore that Refco was not a public company and therefore not subject to SEC regulations. Thus, the references to SEC reporting requirements necessarily related to Ingram's *own position* and not to concerns about accounting

---

[2]  Plaintiffs attempt to bolster their allegation of "knowledge" with the assertion that the "Ingram [] Defendants were sophisticated fund managers." Pl. Opp. at 2. Not only is Ingram not a sophisticated fund manager, it is in fact not a financial firm at all. It is undisputed, and Plaintiffs are fully aware, that Ingram Micro is public company that is a wholesale provider of technology products and supply chain services. Plaintiffs' characterization of Ingram as a "sophisticated" investor is totally unsupported.

at Refco.  There is simply no reading of the email that supports an allegation that Ingram was aware that corrupt insiders at Refco were using the loans as part of a broader scheme to manipulate Refco's financial condition and strip the company of its assets.

The twelfth bullet point makes the unremarkable observation that Ingram "had existing business with Refco and/or a personal relationship with Bennett and [] had an incentive to further their relationship with Bennett and Refco by agreeing to serve as conduits in the RTLs." *Id.* This does not suggest knowledge of fraud.  Point thirteen merely repeats the wholly conclusory allegation that Ingram "knew the RTLs did not serve any legitimate business purpose," an allegation that remains insufficient for the reasons set forth above.  *Id.*  Point fourteen repeats the descriptive feature of the loans that they did not require cash to change hands.

Point fifteen again repeats, without support, conclusory allegations about what Ingram "knew."  Included among these allegations are statements that Ingram "knew . . . Refco's annual reporting year closed at the end of February and that the RTLs occurred at the end of the fiscal year and were unwound shortly after the new reporting period began." *Id.*  As argued above, Plaintiffs offer no support for the allegation that Ingram knew anything about Refco's accounting process or the accounting treatment being given to the loans.  Point fifteen further asserts that Ingram "knew . . . [t]he RTLs were not isolated transactions; they were systematic elements of a large-scale fraud."  This allegation is, as the Special Master correctly noted, unsupportable as to Ingram:

> Ingram engaged in two loan transactions, in 2001 and 2002.  Many of the Plaintiffs allegations pertinent to scienter are simply not applicable to Ingram. For example, Plaintiffs allege as red flags that the loans were systematically conducted, increasing in frequency as Refco's LBO and IPO approached.  But surely these allegations say nothing about Ingram's knowledge.  Nor is it relevant to the case against Ingram that the transactions were suspicious because the amounts increased over time.

R&R at 12.  Ingram was cannot possibly be said to have seen or consciously avoided seeing a "pattern" to these two isolated transactions.

Lastly, point fifteen asserts that "[t]he size of the RTLs was suspicious."  Pl. Opp. at 2.  Again, this point is simply not applicable to Ingram.  Ingram engaged in two relatively small transactions several years before ultimate disclosure of the Refco fraud.  For its participation in these loans, Ingram received less than $20,000, an amount that hardly registers as a blip on the balance sheets of a large, multi-national public corporation such as Ingram and an amount that the Special Master correctly notes "is hardly indicative of motive to aid and abet a major fraud."  R&R at 12.  Moreover, even assuming *arguendo* that Plaintiffs were correct that the size of the loans was "suspicious," it is well-established that "suspicion" does not properly give rise to an inference of actual knowledge.  *See, e.g., Ryan v. Hunton & Williams*, No. 99-cv-5938 (JG), 2000 WL 1375265 at *9 (E.D.N.Y. Sept. 20, 2000) ("Allegations that [a defendant] suspected fraudulent activity . . . do not raise an inference of actual knowledge of [the] fraud.").

Plaintiffs litany of "facts" in support of their allegations that Ingram knew of the financial statement fraud taking place at Refco is nothing more than a list of generally unremarkable observations related to two loan transactions engaged in by Ingram several years prior to any conceivable harm suffered by Plaintiffs combined with a list of unsupported allegations that Ingram's participation in these transactions must necessarily have been done with knowledge of their fraudulent purpose.  Plaintiffs do not and cannot make allegations sufficient to support an inference of actual knowledge by Ingram of the financial statement fraud being perpetrated by Refco.  Instead, Plaintiffs attempt to lower the standard for "knowledge" that has been carefully set forth by the Special Master in multiple R&Rs approved by this court throughout the course of this litigation in order to assert that something like "suspicion" or the presence of "red flags" is

sufficient to plead knowledge of fraud.  This is simply not the law of New York nor the standard

that has been used by the Special Master and approved by the Court throughout the course of this

litigation.  *Id.*; *Chemtex, LLC v. St. Anthony Enters. Inc.*, 490 F. Supp. 2d 536, 547 (S.D.N.Y.

2007) ("New York courts have routinely held that when a defendant is under no independent

duty, even alleged ignorance of obvious warning signs will not suffice to adequately allege

'actual knowledge.'").

## II.  SANTO MAGGIO'S TESTIMONY DOES NOT SUPPORT PLAINTIFFS' ASSERTION THAT INGRAM HAD ACTUAL KNOWLEDGE OF THE REFCO FRAUD AND DOES NOT JUSTIFY LEAVE TO AMEND.

The Special Master correctly concluded that Santo Maggio's deposition testimony, even

if considered in opposition to the motion to dismiss, would provide insufficient support to

Plaintiffs' claims to sustain their allegations of scienter with respect to Ingram.  R&R at 11-12.

Plaintiffs object to this finding, citing out-of-context only those portions of the Maggio

deposition transcript that they believe bolster their case and ignoring those portions of the

transcript that the Special Master pointed out in fact undermined their claims such that the

Special Master ultimately deemed the deposition testimony to be "a wash." *Id.* at 12.  For

example, plaintiffs cite to Maggio's inadmissible opinion testimony that he believed that

"anybody who was experienced" would have realized the loans were fraudulent.  (Wise Decl.,

Ex. A, 12/14/2009 Maggio Dep. Tr. at 175:10-11.)  However, Plaintiffs fail to mention that

notwithstanding Mr. Maggio's non-expert opinion regarding what "anybody" would have

known, he testified that he specifically and intentionally concealed the fraudulent portion of the

transaction, i.e., the temporary repayment by RGHI of its liability to Refco, from the loan

participants.  (*Id.*, 12/15/2009 Maggio Dep. Tr. at 642:10-643:18; 646:17-647:23.)  He further

testified that he lied to the loan participants, who were themselves customers of Refco, because if

7

they knew the truth about Refco's financial condition, they would no longer do business with

Refco:

> Q.     Now, during that course of time, you were asked by [loan participant] customers about the purpose of those transactions, right?
>
> A.     I was asked by certain customers about the purpose of the transactions, yes.
>
> Q.     And you lied to them?
>
> A.     Yes.
>
> Q.     And you lied to them for a very specific reason; right?
>
> A.     Yes.
>
> Q.     And that very specific reason was related to the fact that they were Refco's customers; right?
>
> A.     Yes.
>
> Q.     You didn't want a Refco customer to know about Refco's financial problems; right?
>
> A.     Yes.
>
> Q.     Because if a Refco customer found out about Refco's problems, you were concerned, am I right, that they might not be Refco customers anymore; right?
>
> A.     Yes.
>
> Q.     And with no Refco customers, no Refco; right?
>
> A.     Yes.
>
> . . .
>
> Q.     Because if you didn't have the customers, Refco would cease to be a going concern; right?
>
> A.     Yes.
>
> Q.     So you had to be certain that you concealed from the customers the existence of what I'm going to call, if you understand it, the RGHI receivable; is that right?
>
> A.     Yes.

(*Id.*, 12/16/2009 Maggio Dep. Tr. at 928:6 – 930:14; *see also id.* 12/15/2009 Maggio Dep. Tr. at

611:21-612:25 (agreeing "Refco wanted to mask the existence of the RGHI receivable from the

customers who were engaging in these transactions."). That is to say, Maggio specifically

testified that loan defendants did not have and were not provided with actual knowledge of the fraudulent purpose of the loans. His testimony supports, at most, an inference of constructive knowledge or of loan participants' having ignored "red flags," which, as set forth above, is legally insufficient to support an allegation of actual knowledge.

Maggio's testimony is especially deficient with respect to its ability to bolster any claim against Ingram. Maggio testified that he never personally spoke with anyone at Ingram about the loan transactions. (*Id.* 12/14/2009 Maggio Dep. Tr. at 131:16-132:17.) Nor did Maggio testify that he was ever told by others what had been said to Ingram, one way or the other, about RGHI or whether its financials were consolidated with Refco's. Absent some indicia of personal knowledge, Maggio is not competent to testify or offer an opinion about what Ingram may or may not have known about the loans. *See* Fed. R. Evid. 602 (providing a "witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

Plaintiffs cite to a portion of Maggio's testimony in which he appears to say that he told Ingram that RGHI was not part of Refco's consolidated reporting group as evidence that Ingram has actual knowledge of Refco's fraud. Pl. Obj. at 13. However, Plaintiffs fail to mention that immediately prior to making this assertion, Maggio testified that he did not recall what Ingram had been told about RGHI. (Wise decl., Ex. A., 12/14/2009 Maggio Dep. Tr. at 252:18-23.) Whatever Maggio was trying to say in the passage Plaintiffs cite, insofar as it purports to describe any communication he had with Ingram, it is inconsistent with his testimony, cited above, that he never spoke with anyone at Ingram about the loans. Furthermore, even if the part of Maggio's testimony cited by Plaintiffs regarding Ingram's knowledge about RGHI were credited, it would be significant only if Ingram also knew about the undisclosed third leg of the

9

loan transactions—a fact that Maggio's testimony confirms was concealed from Ingram. Supra at 8. Plaintiffs also ignore that Maggio testified that he did not recall whether anyone at Ingram had ever asked about the purpose of the loans and did not know whether anyone at Ingram understood their "true purpose." (*Id.* at 135:9-22.)

## III.   PLAINTIFFS' OBJECTION TO THE SPECIAL MASTER'S CONCLUSION THAT PLAINTIFFS HAVE NOT ADEQUATELY ALLEGED SUBSTANTIAL ASSISTANCE IS UNAVAILING.

The Special Master correctly finds that under the general rule of New York law that "substantial assistance of a financial statement fraud will . . . only be found if the defendant has actually participated in preparing or disseminating the financial statements." There is no reasonable interpretation of the allegations under which Ingram can be said to have substantially assisted in the perpetration of Refco's fraud. R&R at 13. Plaintiffs object that this interpretation is "unsupportable," yet they cite only two cases, *Aetna Cas. & Sur. Co.*, 219 F.3d 519, 537 (6th Cir. 2000) and *UniCredito Italiano SPA v. JPMorgan Chase Bank*, 288 F. Supp. 485, 502 (S.D.N.Y. 2003) in support of any other interpretation. Pl. Opp. at 14. Both these cases are easily distinguishable from the matter at hand. *Aetna Cas & Sur. Co.* is a Sixth Circuit case applying Ohio law and is therefore inapplicable. *UniCredito Italiano SPA v. JPMorgan Chase Bank* devotes only a few sentences to substantial assistance, does not refer to or cite the general New York rule regarding substantial assistance in financial statement fraud cases and does not apply that rule, or any other, to the conduct of the defendants in that case.

Plaintiffs urge that the Special Master has misread *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349 (S.D.N.Y.), which the Special Master read as applying the general New York rule that a defendant must have assisted in preparing or disseminating financial statements in order to be liable for aiding and abetting a financial statement fraud.

Specifically, Plaintiffs assert that because in *Fraternity Fund* Judge Kaplan held certain plaintiffs had adequately alleged substantial assistance against Banc of America Securities LLC ("BAS"), who had allegedly confirmed phony net asset values of a fund that were subsequently incorporated into the fund's audited financial statements, that *Fraternity Fund* actually *supports* Plaintiffs' claims.  Pl. Opp. at 15.  However, in *Fraternity Fund*, BAS was in fact alleged to have participated in creation of the financial statements at issue.  *Fraternity Fund*, 479 F. Supp. 2d at 372-73.  Specifically, "BAS [was] alleged to have known about and participated actively in Beacon Hill's scheme by sending fake corroboration to auditors" and to have "[taken] a list of CMO values provided to it by a hedge fund manager, put the list on its own letterhead at the request of the manager, and then sent the list directly to the hedge fund's auditor."  *Id*.  There is no analogy to the present case.  Ingram is not alleged ever to have had any contact with Refco's auditors.  It is not alleged to have reviewed, provided information for, or signed off on any of Refco's financial statements, or to have had any involvement with or knowledge of the accounting treatment given to the loans.  The allegations against BAS in *Fraternity Fund* highlight the distinction from the allegations here and show that Plaintiffs fall far short of what is required.

Plaintiffs' objection to the Special Master's finding regarding substantial assistance with respect to the financial statement fraud provides merely another example of Plaintiffs' oft-used tactic in this case of making sweeping, generalized allegations divorced from any particularized consideration of the facts relevant to any particular defendant.  The objection with respect to substantial assistance makes no reference to Ingram apart from its general role as an "RTL Participant" even though, as the Special Master notes:

> The lack of sufficient casual connection to Refco's financial statement fraud is
> particularly evident with respect to the Ingram Defendants, who engaged in only

> two transactions well before SPhinX and PlusFunds even existed. The contention
> that they should be held to have aided and abetted a financial statement fraud,
> where the financial statement was issued in 2001 and not relied upon until years
> later—and where the Ingram Defendants had nothing to do with the preparation
> and dissemination of that financial statement—stretches the concept of substantial
> assistance beyond the breaking point.

R&R at 14-15.

It is well-established in the context of aiding and abetting that a plaintiff must allege that

the defendant's substantial assistance of the primary violation proximately caused the harm on

which the primary liability is predicated and must further allege that their injury was a direct or

reasonably foreseeable result of the conduct. *Fraternity Fund Ltd.*, 479 F. Supp. 2d. at 370-71.

Plaintiffs make no attempt to explain how Ingram, a company whose involvement in the loan

transactions at issue undisputedly ended years before Plaintiffs even came into existence, can be

said to have provided substantial assistance to a fraud allegedly perpetrated against those

Plaintiffs. It is clear that Ingram cannot have owed a duty to Plaintiffs at the time the loan

transactions took place because Plaintiffs did not exist. Plaintiffs offer no explanation for when,

precisely, subsequent to Ingram's ceasing to participate in the loans, Plaintiffs believe that

Ingram's duty to them arose. They offer no explanation of the scope and contours of such a

duty, and they offer no legal basis for asserting any such duty. In fact, never at any point in this

litigation have Plaintiffs addressed the temporal disconnect between Ingram's participation in the

loans at issue and the harm they allege they suffer. Absent a connection, Plaintiffs cannot allege

substantial assistance.

## IV.    PLAINTIFFS' ALLEGATIONS DO NOT ESTABLISH PROXIMATE
## CAUSE.

Plaintiffs incorrectly suggest that proximate cause should not be resolved on a motion to

dismiss, a suggestion that is undercut by their own admission that proximate cause can "be

determined on the pleadings as a matter of law" where "no reasonable person could find causation based on the facts alleged in the complaint." Pl. Opp. at 17. Plaintiffs have failed to allege any facts that would support a finding of proximate causation, and as such, the issue may properly be resolved on the Motion to Dismiss.

Just as Plaintiffs provide no explanation for how Ingram can be said to have substantially assisted in a fraud perpetrated against Plaintiffs who did not exist at the time of Ingram's participation in the allegedly fraudulent scheme, Plaintiffs similarly provide no explanation for how injuries to those as-yet-nonexistent Plaintiffs could have been a reasonably foreseeable consequence of Ingram's participation in the scheme. "Aiding and abetting liability arises only when plaintiffs' injury was a direct or reasonably foreseeable result of the complained of conduct." *Kolbeck v. LIT America, Inc.*, 939 F. Supp. 240, 249 (S.D.N.Y. 1996). Plaintiffs provide no explanation, nor have they ever provided any explanation, for how their injuries were a direct or reasonably foreseeable result of Ingram's participation in the loans.

To establish that the 2000 and 2001 loans were a proximate cause of the injuries to SPhinX and PlusFunds, Plaintiffs would have to allege with particularity that Ingram knew or could reasonably have foreseen that: (i) Refco had material trading losses that predated the Ingram transactions and that these losses were being "hidden" by a receivable on the books of RGHI; (ii) Refco was going to use the funds from the Ingram transactions to disguise the size of the RGHI receivable by having RGHI use the proceeds to pay it down temporarily; (iii) Refco would not account for the Ingram transactions properly and would deceive its auditors about them; (iv) Refco's 2000 and 2001 financial statements would be rendered materially misleading because of the Ingram transactions; (v) years after Ingram's participation in the loans ceased, SPhinX and PlusFunds would be incorporated and choose to do business with Refco in alleged

13

reliance on Refco's 2000 and 2001 financial statements; (vi) Refco and PlusFunds, in contravention of various statutory and contractual obligations, would subsequently commingle SMFF cash with other non-segregated assets; (v) yet more years later, corrupt Refco insiders would cause the company to enter into an LBO and IPO; and (vi) corrupt Refco insiders would subsequently engage in the alleged stripping of the company's assets, thereby leaving SMFF's commingled cash exposed to the claims of other Refco creditors upon the company's bankruptcy.  The train of events leading to Plaintiffs' alleged losses is both indirect and lengthy. It goes far beyond anything that could be sustained as reasonably foreseeable by Ingram under the proximate causation law.

## V.   PLAINTIFFS FAIL ADEQUATELY TO PLEAD CLAIMS AGAINST INGRAM FOR AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

Plaintiffs' objections concede that in order to state a claim against Ingram for aiding and abetting breach of fiduciary duty, Plaintiffs need to allege that Ingram knew of Refco's violation of its duty to maintain segregated client funds and substantially assisted in that breach.  Pl. Opp. at 18.  In support of the allegation that Ingram knew of the commingling of funds at Refco, Plaintiffs offer nothing more than a repetition of the unsupported assertion in their complaint that all of the round-trip loan defendants knew of these breaches.

Plaintiffs' assertion that they have adequately pleaded knowledge with respect to Ingram is puzzling given that counsel for Plaintiffs previously conceded that they have no evidence and cannot plead that Ingram knew of Refco's violation of its duty to safeguard assets in segregated funds for the benefit of its creditors.  *See* Oral Arg. Tr. vol. 2, 702:10-14, Dec. 3, 2009 ("We can't tell you the three round-trippers, non-BAWAG, knew about this segregation.  We don't have evidence of that.  Couldn't sign a pleading to that effect.").  At any rate, as the Special

14

Master correctly notes, "[t]he case against [Ingram] for aiding and abetting breach of fiduciary duty is in fact far weaker than the similar claims found wanting as to the other defendants." R&R at 17.  Ingram could not have known about any fiduciary duties Refco owed to SPhinX/PlusFunds because it is undisputed that they *did not exist* in 2000 or 2001 when the Ingram transactions took place.  They obviously had not opened any accounts at Refco, segregated or otherwise.  Ingram cannot, therefore, conceivably be said to know that Refco had a relationship of trust and confidence with the Plaintiffs.  Furthermore, Ingram's last loan transaction with Refco occurred years before any alleged upstreaming of *any* assets took place. Ingram could not possibly have been aware of a situation that did not even exist at the time of its involvement.  The claim against Ingram for aiding and abetting breach of fiduciary duty is insufficient as a matter of law.

## CONCLUSION

For the foregoing reasons, the Report and Recommendation of the Special Master on the Motions to Dismiss Brought by the Ingram Defendants and the Liberty Corner Defendants should be approved and all claims against Ingram dismissed with prejudice.

Respectfully submitted,

DAVIS POLK & WARDWELL LLP

Dated: New York, NY
      March 2, 2012

BY:    s/ Robert F. Wise, Jr.
           Robert F. Wise, Jr. (RW-1508)
           Paul Spagnoletti (PS-5298)

           450 Lexington Avenue
           New York, NY 10017
           (212) 450-4000
           robert.wise@dpw.com

           *Attorneys for Defendants Ingram*
           *Micro, Inc. and CIM Ventures, Inc.*